## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION )<br><br>Plaintiff, )<br><br>v. )<br><br>WHOLE FOODS MARKET, INC. )<br><br>and )<br><br>WILD OATS MARKETS, INC. )<br><br>Defendants. ) | Civil Action No. 1:07-CV-01021-PLF |

## MOTION OF DEFENDANT WHOLE FOODS MARKET, INC.
## FOR ENTRY OF A FINAL PROTECTIVE ORDER

Defendant Whole Foods Market, Inc. ("Whole Foods"), through counsel, hereby moves the Court pursuant to Rule 26(c) for the entry of a final protective order governing the use and disclosure of confidential information. This proposed final protective order would replace the Interim Protective Order entered by the Court on June 8, 2007. A Memorandum of Points and Authorities in support of the motion, as well as the Declaration of Roberta Lang and the proposed Final Protective Order, is being submitted herewith.

Defendant Whole Foods requests oral argument in connection with this motion.

Respectfully submitted,


/s/ Alden L. Atkins_____
Alden L. Atkins (DC Bar No. 393922)
Neil W. Imus (DC Bar No. 394544)
David E. Hawkins (DC Bar No. 482016)
VINSON & ELKINS L.L.P.
The Willard Office Building
1455 Pennsylvania Avenue, N.W., Suite 600
Washington, DC  20004-1008
Telephone (202) 639-6500
Facsimile (202) 639-6604
Email  aatkins@velaw.com
        nimus@velaw.com
        dhawkins@velaw.com

Attorneys for Whole Foods Market, Inc.

June 11, 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:07-CV-01021-PLF |
| WHOLE FOODS MARKET, INC. | ) | |
| and | ) | |
| WILD OATS MARKETS, INC. | ) | |
| Defendants. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE MOTION OF DEFENDANT WHOLE FOODS MARKET, INC.
FOR ENTRY OF A FINAL PROTECTIVE ORDER**

Before this case was filed by the Federal Trade Commission (the "Commission"), the parties tried to negotiate a protective order that would facilitate the efficient litigation of this matter, allow parties and third parties with confidential information to protect that information in discovery, and to ensure that commercially sensitive information filed with the Court would be protected. The parties were able to reach agreement on most issues, but one significant issue remains and requires the Court's intervention: the Commission refuses to allow Roberta L. Lang, the General Counsel of Defendant Whole Foods Market, Inc. ("Whole Foods"), to have access to confidential information.

In order to allow the prompt exchange of pleadings and other confidential information in the early days of this litigation, the defendants provisionally accepted an Interim Protective Order prepared by the Commission, which was entered by the Court on June 8, 2007. The

– 1 –

Interim Protective Order specifically provides that its entry is without prejudice to the right of either party to ask the Court to amend the protective order.  Importantly, the Interim Protective Order prohibits Ms. Lang from seeing any confidential information.  Because the Interim Protective Order designates as Confidential all information received by the Commission during its investigation, and because it provisionally designates all materials as Restricted Confidential (a higher level of confidentiality) for a period of ten days, the effect of the Interim Protective Order is to prevent Ms. Lang from seeing even unredacted copies of the pleadings filed with the Court.

As demonstrated below, Ms. Lang's unrestricted involvement in this important matter, both as a participant in the company's defense and as the legal advisor to her senior management and board of directors, is critical to Whole Foods.  The Commission's proposal would prohibit the complete participation of Whole Foods' General Counsel in the defense of serious antitrust claims arising from the proposed acquisition of Wild Oats Markets, Inc. ("Wild Oats") by Whole Foods.  In this type of case, it is critical that the defense have the complete participation of the defendant's chief legal officer, who has unique and comprehensive knowledge of the relevant legal issues both in the company and in the industry.  Without the full assistance of Ms. Lang, Whole Foods will be hobbled in preparing its defense, and the Commission would have an unfair advantage.

The compelling interests of Whole Foods in defending itself far outweigh the Commission's confidentiality concerns.  The Commission is concerned that Ms. Lang is employed by Whole Foods and therefore could unintentionally misuse the confidential information of competitors.  Those concerns are ironic in light of the Commission's central contention here that those third parties are not in the same product market as Whole Foods and

therefore are not significant competitors.  In any event, the Commission's concerns are mitigated because (1) Ms. Lang is not involved in competitive decisionmaking and therefore is not in a position inadvertently to disclose confidential information, and (2) Ms. Lang is an attorney bound by ethics rules and has agreed to subject herself to the disciplinary jurisdiction of this Court to ensure compliance with the proposed protective order.

The Commission has recently litigated this very same issue in <u>FTC v. Foster</u>, No. CIV 07-532 JB/ACT (D.N.M. Apr. 26, 2007), and, as discussed in greater detail below, the court in that case rejected the Commission's position and permitted the defendants' general counsel to have access to confidential information.  The defendants' interests here are just as compelling.  Accordingly, the Court should modify the interim protective order to grant Ms. Lang full access to discovery material and pleadings filed with the Court.  <u>See</u> Whole Foods' proposed "Protective Order Regarding Discovery Material" (copies attached and incorporated herein as Exhibits "A" and "B", reflecting native and redline versions of the proposed order, respectively).

**Background**

Whole Foods' General Counsel, Roberta L. Lang, has been an integral part of the legal team involved in the FTC proceedings leading up to this lawsuit.  She advised the Company with respect to the negotiation of the underlying transaction, and she has supervised the legal strategy for the administrative process while the Commission was reviewing the proposed transaction. <u>See</u> <u>Declaration of Roberta Lang</u> ("<u>Lang Decl.</u>") (attached as Exhibit "C" and incorporated herein by reference) ¶ 8.  She also is responsible for advising her senior management and board of directors on litigation strategy, and she cannot provide informed legal advice without full access to relevant information.  <u>See</u> <u>id.</u> ¶ 10.

– 3 –

The Commission alleges that Whole Foods' proposed acquisition of Wild Oats will increase prices and reduce quality and services among premium natural and organic supermarkets by reducing competition in the industry. During its inquiry, the Commission collected confidential information from Whole Foods, Wild Oats, and their competitors. Although defendants have not yet received the information collected by the Commission, they expect that the Commission has collected information about prices, margins, competitive strategy, and other matters. They also anticipate that they may seek additional discovery from competitors in discovery.

The Commission alleges that the relevant product market in this case is "premium natural and organic supermarkets." Complaint ¶ 20. It has defined the product market so narrowly that the only participants in the relevant market are Whole Foods, Wild Oats, and perhaps one or two others that are not located in any of the geographic markets at issue. In short, the third party competitors whose information is at issue are ones that the Commission alleges are outside the relevant product market and are, in the Commission's view, distant competitors of Whole Foods. We expect to show that there is robust competition, but the Commission's position on this protective order is at odds with its central position on the merits.

The Interim Protective Order provides that "Restricted Confidential Discovery Material," a highly sensitive subset of Confidential Information, is eligible for additional protection. This category is defined to include critical information such as "marketing plans, pricing plans, financial information, trade secrets, or Documents of a like nature." Paragraph 8 of the FTC's Interim Protective Order lists certain classes of persons who are entitled to access Restricted Confidential Discovery Material, and it does not include inside counsel. Theoretically an inside

– 4 –

counsel could see Confidential Information, but as the blank in Paragraph 9 illustrates, the Commission will not let Ms. Lang see even Confidential Information.

Importantly, Ms. Lang has no involvement in the competitive decisionmaking of Whole Foods.  See Lang Decl. ¶ 4.  Most competitive decisions at Whole Foods are handled at the regional level by each of the eleven Regional Presidents and their teams.  See id. ¶ 5.  Ms. Lang is also not a member of Whole Foods' six-member "E Team," its group of senior executives with ultimate responsibility for those competitive decisions that are made at the national level. See id. ¶ 6.  Ms. Lang does not participate in decisions on pricing, how much inventory to purchase, the mix of products to carry, or where and how to sell these products.  See id. ¶ 4. Also, Wild Oats has voluntarily agreed that Ms. Lang should have access to all of its confidential information pursuant to the terms of the proposed protective order.  See id. ¶ 13.

While other personnel at Whole Foods make competitive business decisions, Ms. Lang is deeply involved in the legal affairs of Whole Foods and is uniquely positioned to advise her management on important legal issues, including the pending litigation that will decide the fate of her company.  See id. ¶¶ 8-11.  Ms. Lang has worked at Whole Foods since 1998, serving as General Counsel since 2000, and has unique and in-depth knowledge of the company and its business.  See id. ¶ 11.  Ms. Lang is uniquely positioned to understand the evidence in this case, to appreciate its legal significance, and to identify sources of information within the company to develop responses as appropriate.  See id. ¶¶ 8-11.  Further, as General Counsel, she must provide fully informed legal advice to the executives of the company and its board of directors about this litigation and the transaction.  See id. ¶ 10.

**Argument**

A.    **Rule 26(c)(7) Gives Courts Discretion to Fashion Appropriate Protective Orders.**

Rule 26(c)(7) of the Federal Rules of Civil Procedure permits a court to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way . . . ."  Fed. R. Civ. P. 26(c)(7).  Thus, "the district court has discretion in managing discovery" and may "undertake 'an individualized balancing of the many interests that may be presented in a particular case.'"  Diamond Ventures, LLC v. Barreto, 452 F.3d 892, 898 (D.C. Cir. 2006).

B.    **Inside Counsel Not Involved in Competitive Decisionmaking Should Have Access to Confidential Information**

With respect to distinctions between outside and inside counsel in protective orders, the most important factor is whether the inside counsel is involved in "competitive decisionmaking." U.S. Steel Corp. v. United States, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984) (granting access to inside counsel).  Competitive decisionmaking includes "advising on decisions about pricing or design 'made in light of similar or corresponding information about a competitor.'"  Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1470 (9th Cir. 1992) (quoting U.S. Steel "as the leading authority" on the matter).  Courts should not adopt a per se rule categorically restricting inside counsel access to confidential information, but instead must examine the role that the inside counsel plays in the company.  See Matsushita Elec. Indus. Co. v. United States, 929 F.2d 1577, 1580 (Fed. Cir. 1991) ("denial of access sought by in-house counsel on the sole ground of status as a corporate officer is error").

Accordingly, courts have frequently held that inside counsel who demonstrate the requisite detachment from competitive decisionmaking are entitled access to confidential information. See Intervet, Inc. v. Merial Ltd., 241 F.R.D. 55 (D.D.C. 2007) (Facciola, J.) (permitting inside counsel not involved in competitive decisions to "access[] all materials in discovery."); United States v. Sungard Data Systems, Inc., 173 F. Supp. 2d 20, 24 (D.D.C. 2001) (Facciola, J.) (granting four inside counsel access to all confidential information); Volvo Penta, Inc. v. Brunswick Corp., 187 F.R.D. 240, 242-45 (E.D. Va. 1999) (granting inside counsel complete access to confidential information); Glaxo Inc. v. Genpharm Pharm, Inc., 796 F. Supp. 872, 874 (E.D.N.C. 1992) (granting access to inside counsel whose affidavits suggest no role in competitive decisionmaking); Carpenter Tech. Corp. v. Armco, Inc., 132 F.R.D. 24, 27-29 (E.D. Penn. 1990) (granting access to one inside counsel who demonstrated detachment from competitive decisions and denying it to another whose affidavit suggested possible involvement in such decisions). Conversely, the D.C. Circuit has recognized that, in those instances where inside counsel are shown to be inextricably involved in competitive decisionmaking, it is appropriate to limit their access to confidential information. See FTC v. Exxon Corp., 636 F.2d 1336, 1350 (D.C. Cir. 1980). Importantly, this Court has also considered the accelerated pace of a merger challenge to be a factor weighing in favor of granting complete access to in-house counsel who are most intimately familiar with their businesses. See Sungard, 173 F. Supp. 2d. at 24.

In a similar dispute between the Commission and the defendants in an antitrust merger challenge less than two months ago, the United States District Court for the District of New Mexico rejected the Commission's argument that general counsel of the defendants should not have access to confidential information. See FTC v. Foster, No. 07-cv-532 JB/ACT,

Mem. Op. & Order (D.N.M. Apr. 26, 2007) (attached as Exhibit "D").  The court instead fashioned a protective order granting defendants' general counsel access to confidential information with limited restrictions that had been suggested by the defendants.  See id. at 11.[1]

### C.    The Commission's Proposed Restrictions are Overbroad.

Paragraphs 8 and 9 of the Commission's Interim Protective Order are overbroad in that they would entirely prohibit Whole Foods' General Counsel from having access to the most sensitive and important information on the competitive issues central to this case.  The Interim Protective Order also creates cumbersome distinctions between "Confidential Discovery Material" and "Restricted Confidential Discovery Material" that are wholly unnecessary in a case where, as here, the inside counsel to be given selective access has no role in making competitive decisions and has freely submitted herself to the jurisdiction of the Court.

The Commission's protective order prohibits Ms. Lang from seeing any confidential information, regardless of whether designated Confidential or Restricted.  See Interim Protective Order ¶ 9 (leaving blank the identity of an inside lawyer who could see Confidential Information).  It thus would prevent her from seeing, evaluating, and helping outside counsel respond to the vast majority of the factual arguments that the Commission will be raising.  In short, she would be denied access to the most important factual information in the case.  She would be unable to render legal advice to the company, and Whole Foods' arms would be tied behind its back as it prepares its defense. As in Carpenter, "the advice of in-house counsel with specialized knowledge of [this] industry could be essential to the proper handling of this litigation by outside counsel."  132 F.R.D. at 27.  See also Lang Decl. ¶¶ 8-9.

---

[1]    The extensively redacted public versions of the pleadings in Foster underscore the importance of granting in-house counsel access to confidential material.  See Foster, Plaintiff's Pre-Hearing Brief on Plaintiff's Motion for Preliminary Injunction (Public Version), Docket No. 212 (attached as Exhibit "E").  Left to rely on such incomplete documents, Ms. Lang would be severely hampered in her ability to advise Whole Foods on this critical litigation.

Although the Interim Protective Order would theoretically permit another inside lawyer to see the information (if the Commission agreed), there are no other inside lawyers at Whole Foods who could fill Ms. Lang's shoes in this matter. She is the company's first general counsel, she has in-depth knowledge of the company and its business, and she is the only "generalist" lawyer on its staff. She is the lead inside lawyer on this transaction and the prior agency proceedings. She is thus the inside lawyer most knowledgeable about the transaction, the issues, the sources of information in the company, and the company's likely responses to arguments made by the Commission. The more junior lawyers in the company are specialized in areas such as contracts, labor, and SEC disclosure and are not able to fulfill the role of coordinating the defense and advising senior management about the litigation. Lang Decl. ¶ 11. Because there are no other inside attorneys at Whole Foods with the depth of knowledge about the company and this transaction as Ms. Lang, no other inside attorney could adequately assist in the defense of this action or provide informed legal advice to senior management or the board of directors.

## Conclusion

For the foregoing reasons, defendant Whole Foods Market, Inc. respectfully requests that the Court vacate the existing Interim Protective Order with a Final Protective Order that properly balances the need to protect confidential information with the needs of Whole Foods to defend itself with the unrestricted assistance of its General Counsel and without artificial burdens that would complicate discovery in this fast-paced case.

– 9 –

Defendant Whole Foods renews its request for oral argument in connection with its Motion for Entry of a Final Protective Order.

Respectfully submitted,

/s/ Alden L. Atkins
Alden L. Atkins (DC Bar No. 393922)
Neil W. Imus (DC Bar No. 394544)
David E. Hawkins (DC Bar No. 482016)
VINSON & ELKINS L.L.P.
The Willard Office Building
1455 Pennsylvania Avenue, N.W., Suite 600
Washington, DC 20004-1008
Telephone (202) 639-6500
Facsimile (202) 639-6604
Email  aatkins@velaw.com
        nimus@velaw.com
        dhawkins@velaw.com

Attorneys for Whole Foods Market, Inc.

June 11, 2007

## <u>CERTIFICATE OF CONFERENCE</u>

     Pursuant to L. Civ. R. 7(m) and Fed. R. Civ. P. 26(c), I hereby certify that I conferred in good faith with counsel for plaintiff on June 1, 2, and 9, 2007, in an attempt to reach agreement on the foregoing MOTION OF DEFENDANT WHOLE FOODS MARKET, INC. FOR ENTRY OF A FINAL PROTECTIVE ORDER without court action.  The parties have been unable to reach agreement on this matter.


                                  /s/ Alden L. Atkins

                                  Attorney for Whole Foods Market, Inc.

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this 11th day of June, 2007, I caused the foregoing MOTION OF DEFENDANT WHOLE FOODS MARKET, INC. FOR ENTRY OF A FINAL PROTECTIVE ORDER, together with the Memorandum of Points and Authorities, Declaration of Roberta L. Lang, and proposed order in support thereof, to be filed and served using the Court's ECF system and also caused these same papers to be served on the persons listed below by electronic mail:

**Attorneys for Plaintiff**

Michael J. Bloom
Thomas H. Brock
FEDERAL TRADE COMMISSION
601 New Jersey Ave., NW
Washington, D.C. 20001
mjbloom@ftc.gov

**Attorney for Defendant Wild Oats Markets, Inc.**

Clifford H. Aronson
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
caronson@skadden.com

/s/ Alden L. Atkins_____
Attorney for Whole Foods Market, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br><br>FEDERAL TRADE COMMISSION )<br> )<br> Plaintiff, )<br> )<br> )<br> v. )<br> )<br> )<br>WHOLE FOODS MARKET, INC. )<br> )<br>and )<br> )<br>WILD OATS MARKETS, INC. )<br> )<br> Defendants. )<br>_____) | Civil Action No. 1:07-CV-01021-PLF |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE MOTION OF DEFENDANT WHOLE FOODS MARKET, INC.
FOR ENTRY OF A FINAL PROTECTIVE ORDER**

**Exhibit "A"**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | )    Civil Action No. 1:07-CV-01021-PLF |
| | ) |
| | ) |
| WHOLE FOODS MARKET, INC. | ) |
| | ) |
| and | ) |
| | ) |
| WILD OATS MARKETS, INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PROTECTIVE ORDER GOVERNING DISCOVERY MATERIAL**

For the purpose of protecting the interests of the Parties and Third Parties against the improper use and disclosure of confidential information submitted or produced in connection with this Matter:

IT IS HEREBY ORDERED THAT this Protective Order Governing Discovery Material (the "Protective Order") shall govern the handling of all Discovery Material in the above captioned Matter.

<u>DEFINITIONS</u>

For purposes of this Protective Order, the following definitions shall apply:

1.    "Whole Foods" means defendant Whole Foods Market, Inc., a corporation organized, existing, and doing business under and by virtue of the laws of the State of Texas, with its office and principal place of business at 550 Bowie Street, Austin, Texas 78703, and its predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures.

2.     "Wild Oats" means defendant Wild Oats Markets, Inc., a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 3375 Mitchell Lane, Boulder, Colorado 80301, and its predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures.

3.     "Commission" or "FTC" means the Federal Trade Commission, or any of its employees, agents, attorneys, and all other persons acting on its behalf, excluding persons retained as consultants or experts for the purposes of this Matter.

4.     "Confidential Discovery Material" means all Discovery Material that is confidential or proprietary information produced in discovery.  Such material is referred to in, and protected by, Rule 26(c)(7) of the Federal Rules of Civil Procedure.  Confidential Discovery Material shall include non-public trade secret or other research, development, or commercial information, the disclosure of which would likely cause commercial harm to the Producing Party or to Defendants, in instances where the Producing Party produces information generated by the Defendants.  The following is a non-exhaustive list of examples of information that likely will qualify for treatment as Confidential Discovery Material: strategic plans (involving pricing, marketing, research and development, product road maps, corporate alliances, or mergers and acquisitions) that have not been fully implemented or revealed to the public; trade secrets; customer-specific evaluations or data (e.g., prices, volumes, or revenues); sales contracts; system maps; personnel files and evaluations; information subject to confidentiality or non-disclosure agreements; proprietary technical or engineering information; proprietary financial data or projections; and proprietary consumer, customer, or market research or analyses applicable to current or future market conditions, the disclosure of which could reveal Confidential Discovery Material.  Discovery Material will not be considered confidential if it is in the public domain.

5.     "Counsel of Record" means counsel who file a notice of appearance in this Matter.

6.     "Disclosing Party" means a party that is disclosing or contemplating disclosing Discovery Material pursuant to this Protective Order.

7.     "Discovery Material" includes without limitation deposition testimony, deposition exhibits, interrogatory responses, admissions, affidavits, declarations, Documents produced pursuant to compulsory process or voluntarily in lieu thereof, and any other Documents or information produced or given to one Party by another Party or by a Third Party in connection with discovery in this Matter.   Information taken from Discovery Material that reveals its substance shall also be considered Discovery Material.

8.     "Document" means the complete original or a true, correct, and complete copy and any non-identical copies of any written or graphic matter, no matter how produced, recorded, stored, or reproduced.  "Document" includes, but is not limited to, any writing, letter, envelope, telegraph, e-mail, meeting minute, memorandum, statement, affidavit, declaration, book, record, survey, map, study, handwritten note, working paper, chart, index, tabulation, graph, drawing, chart, photograph, tape, phono record, compact disc, video tape, data sheet, data processing card, printout, microfilm, index, computer readable media or other electronically stored data, appointment book, diary, diary entry, calendar, organizer, desk pad, telephone message slip, note of interview or communication, and any other data compilation from which information can be obtained, and includes all drafts and all copies of such Documents and every writing or record that contains any commentary, notes, or marking whatsoever not appearing on the original.

9.    "Expert/Consultant" means testifying or consulting experts or other persons who are retained to assist Plaintiff's Counsel or Defendants' Counsel in preparation for the hearing or to give testimony at the hearing.

10.    "Matter" means the above captioned matter pending in the United States District Court for the District of Columbia, and all subsequent administrative, appellate or other review proceedings related thereto.

11.    "Outside Counsel" means the law firms that are Counsel of Record for Defendants in this Matter, their partners and associated attorneys, or other persons regularly employed by such law firm(s) including legal assistants, clerical staff, vendors assisting with electronic discovery and information management personnel and temporary personnel retained by such law firm(s) to perform legal or clerical duties, or to provide logistical litigation support with regard to this Matter; provided that any attorney associated with Outside Counsel shall not be a director, officer, or employee of Defendants.  The term Outside Counsel does not include persons retained as consultants or experts for the purposes of this Matter.

12.    "Party" means either the FTC, Whole Foods, or Wild Oats.

13.    "Person" means any natural person, business entity, corporate entity, sole proprietorship, partnership, association, governmental entity, or trust.

14.    "Producing Party" means a Party or Third Party that produced or intends to produce Confidential Discovery Material to any of the Parties.  With respect to Confidential Discovery Material of a Third Party that is in the possession, custody, or control of the FTC, or has been produced by the FTC in this Matter, the Producing Party shall mean the Third Party that originally provided such material to the FTC. The Producing Party shall mean the FTC for purposes of any Document or Discovery Materials prepared by, or on behalf of, the FTC.

15.    "Defendants" means Whole Foods and Wild Oats.

16.     "Third Party" means any natural person, partnership, corporation, association, or other legal entity not named as a Party to this Matter and its employees, directors, officers, attorneys, and agents.

<u>TERMS AND CONDITIONS OF PROTECTIVE ORDER</u>

1.    Discovery Material, or information derived therefrom, shall be used solely by the Parties for purposes of this Matter, and shall not be used for any other purpose, including without limitation any business or commercial purpose.    Notwithstanding the foregoing, nothing contained in this Protective Order shall prevent the Commission from using any material produced as part of the investigation in this Matter, including any Discovery Material, for any authorized law enforcement purpose, provided that the Commission may only use or disclose Discovery Material as provided by (a) its Rules of Practice, and any cases so construing them, (b) Sections 6(f) and 21 of the Federal Trade Commission Act, and any cases so construing them, and (c) any other legal obligation imposed upon the Commission.    The Parties, in conducting discovery from Third Parties, shall attach to all discovery requests a copy of this Protective Order and a cover letter that will apprise such Third Parties of their rights hereunder.

2.    Confidential Discovery Material may be designated as such by (a) placing or affixing on each page of a Document containing such material, in a manner that will not interfere with its legibility, the notation "CONFIDENTIAL - FTC v. Whole Foods," or (b) any Party or Third Party instructing the court reporter, with notice to all Parties, within five (5) business days of the receipt of the transcript, to designate as "Confidential" each page of the deposition transcript containing the Confidential Discovery Material.    Such designations constitute a good-faith representation by counsel for the Party or Third Party making the designation that the

Document or transcript constitutes or contains Confidential Discovery Material. All deposition transcripts shall be treated as Confidential Discovery Material until the expiration of five (5) business days after the receipt of the transcript. A Producing Party will use reasonable care to avoid designating any Discovery Material as Confidential Discovery Material that is not entitled to such designation.

3.    Confidential Discovery Material shall not be copied or reproduced for use in this Matter except to the extent such copying or reproduction is reasonably necessary to the conduct of this Matter. All such copies or reproductions of the Discovery Material and any documents generated by the Parties containing information drawn from such Discovery Material shall be subject to the terms of this Protective Order. If the duplication process by which copies or reproductions of Confidential Discovery Material are made does not preserve the confidentiality designations that appear on the original Documents, all such copies or reproductions shall be stamped with the same confidentiality designation as the original.

4.    All Documents obtained by compulsory process or voluntarily in lieu of process from any Party or Third Party, regardless of whether designated or marked confidential by the Party or Third Party, and transcripts of any investigational hearings, interviews, or depositions that were obtained before this Protective Order was adopted, shall be treated as Confidential Discovery Material for a period of ten (10) days from the time notice of the intent to produce is given to the Producing Party. At the expiration of that time, this material shall be treated as non-confidential unless documents or transcripts pages are otherwise designated with specificity by the Producing Party as Confidential Discovery Material.

5.    If any Party seeks to challenge a Producing Party's designation of material as Confidential Discovery Material, the challenging Party shall notify the Producing Party and all

other Parties of the challenge. Such notice shall identify with specificity (*i.e.*, by document control numbers, deposition transcript page and line reference, or other means sufficient to locate easily such materials) the designation being challenged. The Producing Party may preserve its designation by providing the challenging Party and all other Parties a written statement of the reasons for the designation within three (3) business days of receiving notice of the confidentiality challenge. If the Producing Party timely preserves its rights, the Parties shall continue to treat the challenged material as Confidential Discovery Material, absent a written agreement with the Producing Party or order of the Court providing otherwise.

6. If any conflict regarding a confidentiality designation arises and the Parties involved have failed to resolve the conflict via good-faith negotiations, a Party seeking to disclose Confidential Discovery Material or challenging a confidentiality designation may make written application to the Court for relief. The application shall be served on the Producing Party and the other Parties to this Matter, and shall be accompanied by a certification that good-faith negotiations have failed to resolve the outstanding issues. The Producing Party and any other Party shall have three (3) business days after receiving a copy of the motion to respond to the application. While an application is pending, the Parties shall maintain the pre-application status of the Confidential Discovery Material. Nothing in this Protective Order shall create a presumption or alter the burden of persuading the Court of the propriety of a requested disclosure or change in designation.

7. The Parties shall not be obligated to challenge the propriety of any designation or treatment of information as Confidential Discovery Material and the failure to do so promptly shall not preclude any subsequent objection to such designation or treatment, or any motion seeking permission to disclose such material to Persons not otherwise entitled to access under the

terms of this Protective Order.  If Confidential Discovery Material is produced without the designation attached, the material shall be treated as Confidential from the time the Producing Party advises Plaintiff's Counsel and Defendants' Counsel in writing that such material should be so designated and provides all the Parties with an appropriately labeled replacement.  The Parties shall return promptly or destroy the unmarked materials.

8.      Confidential Discovery Material shall not, directly or indirectly, be disclosed or otherwise provided to anyone except:

(a)      Plaintiff's counsel and the Commission, as permitted by the Commission's Rules of Practice;

(b)      Outside Counsel;

(c)      Roberta L. Lang, General Counsel of Whole Foods Market, Inc.;

(d)      Experts/Consultants;

(e)      court reporters and deposition transcript reporters;

(f)      judges and other court personnel of any court having jurisdiction over any proceedings involving this Matter;

(g)      any author or recipient of the Discovery Material; any individual who was in the direct chain of supervision of the author at the time the Discovery Material was created or received; any employee or agent of the entity that created or received the Discovery Material; or anyone representing the author or recipient of the Discovery Material in this Matter; and

(h)      any other Person(s) authorized in writing by the Producing Party.

9.      Confidential Discovery Material shall not, directly or indirectly, be disclosed or otherwise provided to an Expert/Consultant until such person has executed and transmitted to counsel for the party retaining such person a declaration in the form attached as Exhibit "A." Each Party's counsel shall maintain a file of all such declarations for the duration of the litigation.

10.     If any Party desires to disclose Confidential Discovery Material to (a) either any Expert/Consultant, any deponent, or any witness that is or was an officer, director or employee of Whole Foods or Wild Oats, or (b) any Person other than those referred to in paragraph 8 of this Protective Order, the Disclosing Party shall notify the Producing Party any other Party of its desire to disclose such material.  The notice shall identify those materials sought to be disclosed with specificity (*i.e.*, by document control numbers, deposition transcript page and line reference, or other means sufficient to locate easily such materials) and the specific Person to whom the Confidential Discovery Material is to be disclosed.  For disclosure to any Expert/Consultant, deponent, or witness that is or was an officer, director, or employee of Whole Foods or Wild Oats, the identification of the Person shall include, but not be limited to, the full name, professional address and/or affiliation, and current curriculum vitae of the identified Person.  The Producing Party may object to the disclosure of the Confidential Discovery Material within five (5) business days of receiving notice of an intent to disclose such material to the Person by providing the Disclosing Party with a written statement of the reasons for objection.  If the Producing Party timely objects, the Disclosing Party shall not disclose the Confidential Discovery Material to the identified Person, absent a written agreement with the Producing Party or order of the Court permitting the disclosure.  If the Producing Party does not object to the disclosure of Confidential Discovery Material to the identified Person within five (5) business days, the Disclosing Party may disclose the Confidential Discovery Material to the identified Person.

11.     If the FTC (a) receives a discovery request that may require the disclosure by it of a Third Party's Confidential Discovery Material, or (b) intends to or is required to disclose, voluntarily or involuntarily, a Third Party's Confidential Discovery Material (whether or not

such disclosure is in response to a discovery request), the FTC promptly shall notify the Third Party of the receipt of such request or its intention to disclose such material. Such notification shall be in writing and, if not otherwise done, sent for receipt by the Third Party at least five (5) business days before disclosure, and shall include a copy of this Protective Order and a cover letter that will apprise the Third Party of its rights hereunder.

12.    If any Person receives a discovery request in another proceeding that may require the disclosure of a Producing Party's Confidential Discovery Material, the recipient of the discovery request shall promptly notify the Producing Party of receipt of the request. The notification shall be in writing and be received by the Producing Party at least five (5) business days before production in the other proceeding, and shall include a copy of this Protective Order and a cover letter apprising the Producing Party of its rights. Nothing herein shall be construed as requiring the recipient of the discovery request or anyone else covered by this Protective Order to challenge or appeal an order requiring production of Confidential Discovery Material, to subject itself to any penalties for noncompliance with such an order, or to seek any relief from the Court. The recipient shall not oppose the Producing Party's efforts to challenge the discovery request calling for the production by the recipient of the Producing Party's Confidential Discovery Material. In addition, nothing herein shall limit the applicability of Section 4.11(e) of the FTC Rules of Practice, 16 C.F.R. § 4.11(e), to discovery requests in another proceeding that are directed to the Commission.

13.    Counsel for the Parties or any Producing Party shall have the right to exclude from oral depositions any person not authorized to receive Confidential Discovery Material, during periods of examination or testimony relating to such material.

14.     In the event that any Confidential Discovery Material is contained in any pleading, motion, exhibit, brief, or other paper filed or to be filed with the Court, the Party filing the papers shall inform the Clerk of Court, and the papers shall be filed under seal pursuant to the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Columbia.   Confidential Discovery Material contained in papers (including Confidential Discovery Material from the Parties and Third Parties) shall remain under seal until further order of the Court; provided, however, that the papers may be furnished to persons or entities who may receive Confidential Discovery Material pursuant to this Protective Order. After filing any paper containing Confidential Discovery Material, the filing Party must file on the public record a duplicate copy of the paper with the Confidential Discovery Material deleted, within five (5) business days of the original filing.   Further, if the protection for any such material ceases, any Party may file on the public record a copy that also contains the formerly protected material.

15.     If counsel for a Party plans to introduce into evidence at trial any Document or transcript containing Confidential Discovery Material produced by a Third Party or any other Party, the counsel shall provide forty-eight (48) hours advance notice before such introduction to the Producing Party and any other Party, or as much notice before the introduction as practicable under the circumstances, for purposes of allowing that Party to seek an order that the Document or transcript be granted *in camera* treatment.   Except where an order seeking *in camera* treatment is granted, all Documents and transcripts shall be part of the public record.   If *in camera* treatment is granted, a copy of the Document or transcript with the Confidential Discovery Material deleted must be placed on the public record.

16.    The inadvertent production or disclosure of (i) material provided to the FTC during its investigation under the Hart-Scott-Rodino Antitrust Improvement Act, 15 U.S.C. § 18a, or (ii) any Discovery Material, which a Producing Party claims should not have been produced or disclosed because of a privilege, will not be deemed to be a waiver of any privilege to which the Producing Party would have been entitled had the privileged Discovery Material not inadvertently been produced or disclosed.  In the event of such claimed inadvertent production or disclosure, the procedures of Federal Rules of Civil Procedure 26(b)(5)(B) shall apply. The inadvertent production of a privileged document shall not be deemed a waiver of any privilege applicable to any other documents relating to that subject matter.

17.    Nothing in this Protective Order shall be construed to conflict with the provisions of Sections 6, 10, and 21 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 50, 57b-2, or with Rules 3.22, 3.45, or 4.11 (b)-(e), 16 C.F.R. §§ 3.22, 3.45, and 4.11 (b)-(e).  Any Party or Producing Party may move at any time for *in camera* treatment of any Confidential Discovery Material or any portion of the proceedings in this Matter to the extent necessary for proper disposition of this Matter.

18.    At the conclusion of this Matter, the Defendants shall (a) return or destroy all Documents obtained in this Matter that contain or refer to Confidential Discovery Material, other than materials that have been made part of the public record in this Matter, and (b) provide the Producing Party with an affidavit of destruction, provided that the provisions of 15 U.S.C. § 18a and § 4.12 of the FTC Rules of Practice, 16 C.F.R. § 4.12, shall govern the retention, return, or destruction of any documents obtained by the FTC prior to the filing of the Complaint to the extent the provisions of that statute or regulation is inconsistent with the provisions of this Protective Order.  At the time that any Expert/Consultant or other person retained to assist

counsel in the preparation of this Matter concludes participation in this Matter, that person shall return to counsel all copies of Documents or portions thereof designated Confidential Discovery Material that are in the possession of that person, together with all notes, memoranda, or other papers containing Confidential Discovery Material.

19.     The provisions of this Protective Order, insofar as they restrict the communication and use of Confidential Discovery Material shall, without written permission of the Producing Party or further order of the Court, continue to be binding after the conclusion of this Matter.

20.     This Protective Order shall not apply to the disclosure by a Producing Party or its Counsel of the Producing Party's Confidential Discovery Material to the Producing Party's current or former employees, agents, board members, directors, and officers.

21.     Entry of the foregoing Protective Order is without prejudice to the right of the Parties or Third Parties to apply for further protective orders or for modification of any provision of this Protective Order by application to the Court for good cause shown,

ORDERED:

                            _____

                            Paul L. Friedman
                            United States District Judge

Dated:

WE ASK FOR THIS:

Alden L. Atkins
Vinson & Elkins L.L.P.
1455 Pennsylvania Ave., N.W., Suite 600
Washington, D.C. 20004-1008
(202) 639-6613
aatkins@velaw.com

Counsel for Whole Foods Market, Inc.


WITH ADDITIONAL COPIES TO:

Thomas H. Brock
Bureau of Competition
Federal Trade Commission
600 New Jersey Ave., N.W.
Washington, D.C. 20580
(202) 326-2813
TBrock@FTC.gov

Counsel for the Federal Trade Commission

Clifford H. Aronson
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
(212) 735-3000
caronson@skadden.com

Counsel for Wild Oats Markets, Inc.

**EXHIBIT A**
**TO THE PROTECTIVE ORDER GOVERNING DISCOVERY MATERIAL**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION,      )
                               )
             Plaintiff,        )
                               )
      v.                       )      Civil Action No. 1:07-CV-01021-PLF
                               )
WHOLE FOODS MARKET, INC.,      )
                               )
      - and -                  )
                               )
WILD OATS MARKETS, INC.,       )
                               )
             Defendants.       )

**DECLARATION CONCERNING PROTECTIVE**
**ORDER GOVERNING DISCOVERY MATERIAL**

I, [NAME], hereby declare and certify the following to be true:

1.      [Statement of employment]

2.      I have read the "Protective Order Governing Discovery Material" ("Protective Order") issued by the Court on [Date], in connection with the above captioned Matter.  I understand the restrictions on my access to and use of any Confidential Discovery Material (as that term is used in the Protective Order) in this Matter, and I agree to abide by the Protective Order.

3.      I understand that the restrictions on my use of such Confidential Discovery Material include:

        a.      that I will use such Confidential Discovery Material only for the purpose of preparing for this proceeding, and hearing(s) and any appeal of this proceeding and for no other purpose;

        b.      that I will not disclose such Confidential Discovery Material to anyone, except as permitted by the Protective Order;

        c.      that I will use, store and maintain the Confidential Discovery Material in such a way as to ensure its continued protected status; and

– 15 –

      d.     that, upon the termination of my participation in this proceeding, I will promptly return all Confidential Discovery Material and all notes, memoranda, or other papers containing Confidential Discovery Material, to Plaintiff's Counsel or Defendants' Outside Counsel, as appropriate.

4.     I understand that if I am receiving Confidential Discovery Material as an Expert/Consultant, as that term is defined in this Protective Order, the restrictions on my use of Confidential Discovery Material also include the duty and obligation to:

      a.     maintain such Confidential Discovery Material in separate locked room(s) or locked cabinet(s) when such Confidential Discovery Material is not being reviewed;

      b.     return such Confidential Discovery Material to Plaintiff's Counsel or Defendants' Outside Counsel, as appropriate, upon the conclusion of my assignment or retention, or upon conclusion of this Matter; and

      c.     use such Confidential Discovery Material and the information contained therein solely for the purpose of rendering consulting services to a Party to this Matter, including providing testimony in judicial or administrative proceedings arising out of this Matter.

5.     I am fully aware that, pursuant to Rule 26, Federal Rules of Civil Procedure, Rule 37, Federal Rules of Civil Procedure, and Section 3.42(h) of the FTC Rules of Practice, 16 C.F.R. § 3.42(h), my failure to comply with the terms of the Protective Order may constitute contempt of the Commission and may subject me to sanctions imposed by the Court or the Commission.


_____      Date:  _____

Full Name [Typed or Printed]



_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-CV-01021-PLF |
| | ) | |
| | ) | |
| WHOLE FOODS MARKET, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILD OATS MARKETS, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE MOTION OF DEFENDANT WHOLE FOODS MARKET, INC.
FOR ENTRY OF A FINAL PROTECTIVE ORDER**

**Exhibit "B"**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
_____ **)**

FEDERAL TRADE COMMISSION~~,~~        )
~~600 Pennsylvania Avenue, N.W.~~        )
~~Washington, DC  20580,~~        )

                                                      **)**
                                            **Plaintiff,**    **)**
                                                          )
            ~~Plaintiff,~~        )
                                            )
      ~~v.~~                     )        ~~No.~~
                                                      **)**
            **v.**                    **)**        **Civil    Action    No.**
**1:07-CV-01021-PLF**
                                                      **)**
                                                          )
WHOLE FOODS MARKET, INC.~~,~~        )
~~550 Bowie Street,~~        )
~~Austin, Texas 78703,~~        )
                                            )
                                                      **)**
      ~~—~~and~~—~~                              )
                                                          )
WILD OATS MARKETS, INC.~~,~~        )
~~3375 Mitchell Lane,~~        )
~~Boulder, Colorado 80301~~        )
                                            )
                                                      **)**
            Defendants.        )
                                                      **)**

~~INTERIM~~ PROTECTIVE ORDER GOVERNING DISCOVERY MATERIAL

For the purpose of protecting the interests of the Parties and Third Parties against the improper use and disclosure of confidential information submitted or produced in connection with this Matter:

IT IS HEREBY ORDERED THAT this ~~Interim~~ Protective Order Governing Discovery Material (**the** "~~Interim~~ Protective Order") shall govern the handling of all Discovery Material ~~during the proceedings~~ in the above captioned Matter~~, until such time as a final protective order shall be entered~~.

<u>DEFINITIONS</u>

For purposes of this Protective Order, the following definitions shall apply:

1. "Whole Foods" means defendant Whole Foods Market, Inc., a corporation organized, existing, and doing business under and by virtue of the laws of the State of Texas, with its office and principal place of business at 550 Bowie Street, Austin, Texas 78703, and its predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures.

2. "Wild Oats" means defendant Wild Oats Markets, Inc., a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 3375 Mitchell Lane, Boulder, Colorado 80301, and its predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures.

3. "Commission" or "FTC" means the Federal Trade Commission, or any of its employees, agents, attorneys, and all other persons acting on its behalf, excluding persons retained as consultants or experts for the purposes of this Matter.

4. "Confidential Discovery Material" means all Discovery Material that is confidential or proprietary information produced in discovery. Such material is referred to in, and protected by, Rule 26(c)(7) of the Federal Rules of Civil Procedure. Confidential Discovery Material shall include non-public trade secret or other research, development**,** or commercial information, the disclosure of which would likely cause commercial harm to the Producing Party or to Defendants, in instances where the Producing Party produces information generated by the

Defendants.  The following is a non-exhaustive list of examples of information that likely will qualify for treatment as Confidential Discovery Material: strategic plans (involving pricing, marketing, research and development, product road maps, corporate alliances, or mergers and acquisitions) that have not been fully implemented or revealed to the public; trade secrets; customer-specific evaluations or data (e.g., prices, volumes, or revenues); sales contracts; system maps; personnel files and evaluations; information subject to confidentiality or non-disclosure agreements; proprietary technical or engineering information; proprietary financial data or projections; and proprietary consumer, customer, or market research or analyses applicable to current or future market conditions, the disclosure of which could reveal Confidential Discovery Material.  Discovery Material will not be considered confidential if it is in the public domain.

5.      "Counsel of Record" means counsel who file a notice of appearance in this Matter.

6.      "Disclosing Party" means a party that is disclosing or contemplating disclosing Discovery Material pursuant to this Protective Order.

7.      "Discovery Material" includes without limitation deposition testimony, deposition exhibits, interrogatory responses, admissions, affidavits, declarations, Documents produced pursuant to compulsory process or voluntarily in lieu thereof, and any other Documents or information produced or given to one Party by another Party or by a Third Party in connection with discovery in this Matter.  Information taken from Discovery Material that reveals its substance shall also be considered Discovery Material.

8.      "Document" means the complete original or a true, correct, and complete copy and any non-identical copies of any written or graphic matter, no matter how produced, recorded, stored, or reproduced.  "Document" includes, but is not limited to, any writing, letter,

envelope, telegraph, e-mail, meeting minute, memorandum, statement, affidavit, declaration, book, record, survey, map, study, handwritten note, working paper, chart, index, tabulation, graph, drawing, chart, photograph, tape, phono record, compact disc, video tape, data sheet, data processing card, printout, microfilm, index, computer readable media or other electronically stored data, appointment book, diary, diary entry, calendar, organizer, desk pad, telephone message slip, note of interview or communication, and any other data compilation from which information can be obtained, and includes all drafts and all copies of such Documents and every writing or record that contains any commentary, notes, or marking whatsoever not appearing on the original.

9.     "Expert/Consultant" means testifying or consulting experts or other persons who are retained to assist Plaintiff's Counsel or Defendants' Counsel in preparation for the hearing or to give testimony at the hearing.

10.     "Matter" means the above captioned matter pending in the United States District Court for the District of Columbia, and all subsequent administrative, appellate or other review proceedings related thereto.

11.     "Outside Counsel" means the law firms that are Counsel of Record for Defendants in this Matter, their partners and associated attorneys, or other persons regularly employed by such law firm(s) including legal assistants, clerical staff, vendors assisting with electronic discovery and information management personnel and temporary personnel retained by such law firm(s) to perform legal or clerical duties, or to provide logistical litigation support with regard to this Matter; provided that any attorney associated with Outside Counsel shall not be a director, officer, or employee of Defendants.  The term Outside Counsel does not include persons retained as consultants or experts for the purposes of this Matter.

12.    "Party" means either the FTC, Whole Foods, or Wild Oats.

13.    "Person" means any natural person, business entity, corporate entity, sole proprietorship, partnership, association, governmental entity, or trust.

14.    "Producing Party" means a Party or Third Party that produced or intends to produce ~~Restricted Confidential or~~ Confidential Discovery Material to any of the Parties. With respect to ~~Restricted Confidential or~~ Confidential Discovery Material of a Third Party that is in the possession, custody, or control of the FTC, or has been produced by the FTC in this Matter, the Producing Party shall mean the Third Party that originally provided such material to the FTC. The Producing Party shall mean the FTC for purposes of any Document or Discovery Materials prepared by, or on behalf of, the FTC.

15.    "Defendants" means Whole Foods and Wild Oats.

~~16.    "Restricted Confidential Discovery Material" means Confidential Discovery Material designated as "Restricted Confidential Discovery Material" that contains non-public, current information that is highly sensitive (e.g., marketing plans, pricing plans, financial information, trade secrets, or Documents of a like nature) and the disclosure of which would likely cause substantial commercial harm to the Producing Party or to Defendants. It is the intention of the Parties that this particularly restrictive designation should be utilized for only a select number of Documents. Such a designation shall constitute a representation by counsel for the Producing Party or Defendants, in instances where the Producing Party produces information generated by the Defendants, that the material is properly subject to Restricted Confidential treatment under this Order.~~

**16.** ~~17.~~ "Third Party" means any natural person, partnership, corporation, association, or other legal entity not named as a Party to this Matter and its employees, directors, officers, attorneys, and agents.

TERMS AND CONDITIONS OF PROTECTIVE ORDER

1.      Discovery Material, or information derived therefrom, shall be used solely by the Parties for purposes of this Matter, and shall not be used for any other purpose, including without limitation any business or commercial purpose.  Notwithstanding the foregoing, nothing contained in this Protective Order shall prevent the Commission from using any material produced as part of the investigation in this Matter, including any Discovery Material, for any authorized law enforcement purpose, provided that the Commission may only use or disclose Discovery Material as provided by (a) its Rules of Practice, and any cases so construing them, (b) Sections 6(f) and 21 of the Federal Trade Commission Act, and any cases so construing them, and (c) any other legal obligation imposed upon the Commission.  The Parties, in conducting discovery from Third Parties, shall attach to all discovery requests a copy of this Protective Order and a cover letter that will apprise such Third Parties of their rights hereunder.

2.      Confidential ~~or Restricted Confidential~~ Discovery Material may be designated as such by (a) placing or affixing on each page of a Document containing such material, in a manner that will not interfere with its legibility, the notation "CONFIDENTIAL - FTC v. Whole Foods," or ~~"RESTRICTED CONFIDENTIAL, OUTSIDE COUNSEL ONLY - FTC v. Whole Foods," or~~ (b) any Party or Third Party instructing the court reporter, with notice to all Parties, within five (5) business days of the receipt of the transcript, to designate as "Confidential" ~~or "Restricted Confidential"~~ each page of the deposition transcript containing the ~~Confidential or Restricted~~ Confidential Discovery Material.  Such designations constitute a good-faith

representation by counsel for the Party or Third Party making the designation that the Document or transcript constitutes or contains Confidential Discovery Material ~~or Restricted Confidential Discovery Material~~. All deposition transcripts shall be treated as ~~Restricted~~ Confidential Discovery Material until the expiration of five (5) business days after the receipt of the transcript. A Producing Party will use reasonable care to avoid designating any Discovery Material as Confidential ~~or Restricted Confidential~~**Discovery Material** that is not entitled to such designation.

      3.    ~~Restricted Confidential or~~ Confidential Discovery Material shall not be copied or reproduced for use in this Matter except to the extent ~~:~~such copying or reproduction is reasonably necessary to the conduct of this Matter. All such copies or reproductions of the **Discovery** Material and any documents generated by the Parties containing information drawn from such **Discovery** Material~~,~~ shall be subject to the terms of this Protective Order. If the duplication process by which copies or reproductions of ~~Restricted Confidential or~~ Confidential Discovery Material are made does not preserve the confidentiality designations that appear on the original Documents, all such copies or reproductions shall be stamped with the same confidentiality designation as the original.

      4.    All Documents obtained by compulsory process or voluntarily in lieu of process from any Party or Third Party, regardless of whether designated or marked confidential by the Party or Third Party, and transcripts of any investigational hearings, interviews, or depositions that were obtained before this Protective Order was adopted, shall be treated as ~~Restricted~~ Confidential Discovery Material for a period of ten (10) days from the time notice of the intent to produce is given to the Producing Party. At the expiration of that time, this material shall be treated as ~~Confidential Discovery Material~~**non-confidential** unless documents or transcripts

– 7 –

pages are otherwise designated with specificity by the Producing Party as ~~either Restricted~~ Confidential Discovery Material ~~or non-confidential~~.

5.     If any Party seeks to challenge a Producing Party's designation of material as ~~Restricted Confidential or~~ Confidential Discovery Material, the challenging Party shall notify the Producing Party and all other Parties of the challenge.  Such notice shall identify with specificity (*i.e.*, by document control numbers, deposition transcript page and line reference, or other means sufficient to locate easily such materials) the designation being challenged.  The Producing Party may preserve its designation by providing the challenging Party and all other Parties a written statement of the reasons for the designation within three (3) business days of receiving notice of the confidentiality challenge.  If the Producing Party timely preserves its rights, the Parties shall continue to treat the challenged material as ~~Restricted Confidential or~~ Confidential Discovery Material, absent a written agreement with the Producing Party or order of the Court providing otherwise.

6.     If any conflict regarding a confidentiality designation arises and the Parties involved have failed to resolve the conflict via good-faith negotiations, a Party seeking to disclose ~~the Restricted Confidential or~~ Confidential Discovery Material or challenging a confidentiality designation may make written application to the Court for relief.  The application shall be served on the Producing Party and the other Parties to this Matter, and shall be accompanied by a certification that good-faith negotiations have failed to resolve the outstanding issues.  The Producing Party and any other Party shall have three (3) business days after receiving a copy of the motion to respond to the application.  While an application is pending, the Parties shall maintain the pre-application status of the ~~Restricted Confidential or~~ Confidential Discovery Material.  Nothing in this Protective Order shall create a presumption or alter the

– 8 –

burden of persuading the Court of the propriety of a requested disclosure or change in designation.

7.    The Parties shall not be obligated to challenge the propriety of any designation or treatment of information as ~~Restricted Confidential or~~ Confidential Discovery Material and the failure to do so promptly shall not preclude any subsequent objection to such designation or treatment, or any motion seeking permission to disclose such material to Persons not otherwise entitled to access under the terms of this Protective Order.   If ~~Restricted Confidential or~~ Confidential Discovery Material is produced without the designation attached, the material shall be treated as ~~Restricted Confidential or~~ Confidential from the time the Producing Party advises ~~Plaintiffs~~**Plaintiff's** Counsel and Defendants' Counsel in writing that such material should be so designated and provides all the Parties with an appropriately labeled replacement.  The Parties shall return promptly or destroy the unmarked materials.

8.    ~~Restricted~~ Confidential Discovery Material shall not, directly or indirectly, be disclosed or otherwise provided to anyone except:

(a)    ~~Plaintiffs~~**Plaintiff's** counsel and the Commission, as permitted by the Commission's Rules of Practice;

(b)    Outside Counsel;

**(c)    Roberta L. Lang, General Counsel of Whole Foods Market, Inc.;**

**(d)**    ~~(c)~~ Experts/Consultants;

**(e)**    ~~(d)~~ court reporters and deposition transcript reporters;

**(f)**    ~~(e)~~ judges and other court personnel of any court having jurisdiction over any ~~appeal~~ proceedings involving this Matter;

**(g)**    ~~(f)~~ any author or recipient of the Discovery Material; any individual who was in the direct chain of supervision of the author at the time the Discovery Material was created or received; any employee or agent of the entity that created or received the Discovery Material; or anyone

representing the author or recipient of the Discovery Material in this Matter; and

**(h)**    ~~(g)~~ any other Person(s) authorized in writing by the Producing Party **.**

~~9.    Confidential Discovery Material shall not, directly or indirectly, be disclosed or otherwise provided to anyone other than those persons listed in paragraph 8 of this Protective Order and to the following representative of Whole Foods: _____; provided that each such representative executes a declaration in the form attached as Exhibit A. Defendants' Counsel shall maintain a file of all such declarations for the duration of the litigation.~~

**9.**    ~~10.~~ Restricted Confidential or Confidential Discovery Material shall not, directly or indirectly, be disclosed or otherwise provided to an Expert/Consultant until such person has executed and transmitted to counsel for the party retaining such person a declaration in the form attached as Exhibit **"**A**."** Each Party's counsel shall maintain a file of all such declarations for the duration of the litigation.

**10.**    ~~11.~~ If any Party desires to disclose ~~Restricted Confidential or~~ Confidential Discovery Material to (a) either any Expert/Consultant, any deponent, or any witness that is or was an officer, director or employee of Whole Foods or Wild Oats, or (b) any Person other than those referred to in ~~paragraphs~~**paragraph** 8 ~~and 9~~ of this Protective Order, the Disclosing Party shall notify the Producing Party any other Party of its desire to disclose such material. The notice shall identify those materials sought to be disclosed with specificity (*i.e.*, by document control numbers, deposition transcript page and line reference, or other means sufficient to locate easily such materials) and the specific Person to whom the Confidential ~~or Restricted Confidential~~**Discovery** Material is to be disclosed. For disclosure to any Expert/Consultant, deponent**,** or witness that is or was an officer, director**,** or employee of Whole Foods or Wild Oats, the identification of the Person shall include, but not be limited to, the full name,

– 10 –

professional address and/or affiliation, and current curriculum vitae of the identified Person.  The Producing Party may object to the disclosure of the ~~Restricted Confidential or~~ Confidential Discovery Material within five (5) business days of receiving notice of an intent to disclose such material to the Person by providing the Disclosing Party with a written statement of the reasons for objection.  If the Producing Party timely objects, the Disclosing Party shall not disclose the ~~Restricted Confidential or~~ Confidential Discovery Material to the identified Person, absent a written agreement with the Producing Party or order of the Court permitting the disclosure.  If the Producing Party does not object to the disclosure of ~~Restricted Confidential or~~ Confidential Discovery Material to the identified Person within five (5) business days, the Disclosing Party may disclose the ~~Restricted~~ Confidential Discovery Material to the identified Person.

**11.**    ~~12.~~ If the FTC (a) receives a discovery request that may require the disclosure by it of a Third Party's ~~Restricted Confidential or~~ Confidential Discovery Material, or (b) intends to or is required to disclose, voluntarily or involuntarily, a Third Party's ~~Restricted Confidential or~~ Confidential Discovery Material (whether or not such disclosure is in response to a discovery request), the FTC promptly shall notify the Third Party of the receipt of such request or its intention to disclose such material.  Such notification shall be in writing and, if not otherwise done, sent for receipt by the Third Party at least five (5) business days before disclosure, and shall include a copy of this Protective Order and a cover letter that will apprise the Third Party of its rights hereunder.

**12.**    ~~13.~~ If any Person receives a discovery request in another proceeding that may require the disclosure of a Producing Party's ~~Restricted Confidential or~~ Confidential Discovery Material, the recipient of the discovery request shall promptly notify the Producing Party of receipt of the request.  The notification shall be in writing and be received by the Producing

Party at least five (5) business days before production in the other proceeding, and shall include a copy of this Protective Order and a cover letter apprising the Producing Party of its rights. Nothing herein shall be construed as requiring the recipient of the discovery request or anyone else covered by this Protective Order to challenge or appeal an order requiring production of ~~Restricted Confidential or~~ Confidential Discovery Material, to subject itself to any penalties for noncompliance with such an order, or to seek any relief from the Court.  The recipient shall not oppose the Producing Party's efforts to challenge the discovery request calling for the production by the recipient of the Producing Party's ~~Restricted Confidential or~~ Confidential Discovery Material.  In addition, nothing herein shall limit the applicability of Section 4.11(e) of the FTC Rules of Practice, 16 C.F.R. § 4.11(e), to discovery requests in another proceeding that are directed to the Commission.

**13.**    ~~14.~~ Counsel for the Parties or any Producing Party shall have the right to exclude from oral depositions any person not authorized to receive ~~Restricted Confidential or~~ Confidential Discovery Material, during periods of examination or testimony relating to such material.

**14.**    ~~15.~~ In the event that any ~~Restricted Confidential or~~ Confidential Discovery Material is contained in any pleading, motion, exhibit, brief, or other paper filed or to be filed with the Court, the Party filing the papers shall inform the Clerk of Court, and the papers shall be filed under seal pursuant to the Federal Rules of Civil Procedure and the **Local** Rules of the United States District Court for the District of Columbia. ~~Restricted Confidential or~~ Confidential Discovery Material contained in papers (including ~~Restricted Confidential or~~ Confidential Discovery Material from the Parties and Third Parties) shall remain under seal until further order of the Court; provided, however, that the papers may be furnished to persons or entities who may

receive ~~Restricted Confidential or~~ Confidential Discovery Material pursuant to this Protective Order. After filing any paper containing ~~Restricted Confidential or~~ Confidential Discovery Material, the filing Party must file on the public record a duplicate copy of the paper with the ~~Restricted Confidential or~~ Confidential Discovery Material deleted, within five (5) business days of the original filing. Further, if the protection for any such material ceases, any Party may file on the public record a copy that also contains the formerly protected material.

**15.** ~~16.~~ If counsel for a Party plans to introduce into evidence at trial any Document or transcript containing ~~Restricted Confidential or~~ Confidential Discovery Material produced by a Third Party or any other Party, the counsel shall provide forty-eight (48) hours advance notice before such introduction to the Producing Party and any other Party, or as much notice before the introduction as practicable under the circumstances, for purposes of allowing that Party to seek an order that the Document or transcript be granted *in camera* treatment. Except where an order seeking *in camera* treatment is granted, all Documents and transcripts shall be part of the public record. If *in camera* treatment is granted, a copy of the Document or transcript with the ~~Restricted Confidential or~~ Confidential Discovery Material deleted must be placed on the public record.

**16.** ~~17.~~ The inadvertent production or disclosure of (i) material provided to the FTC during its investigation under the Hart-Scott-Rodino Antitrust Improvement Act, 15 U.S.C. § 18a, or (ii) any Discovery Material, which a Producing Party claims should not have been produced or disclosed because of a privilege, will not be deemed to be a waiver of any privilege to which the Producing Party would have been entitled had the privileged Discovery Material not inadvertently been produced or disclosed. In the event of such claimed inadvertent production or disclosure, the procedures of Federal Rules of Civil Procedure 26(b)(5)(B) shall apply. The

inadvertent production of a privileged document shall not be deemed a waiver of ~~the~~**any** privilege ~~for all~~**applicable to any other** documents relating to that subject matter.

**17.**     ~~18.~~Nothing in this Protective Order shall be construed to conflict with the provisions of Sections 6, 10, and 21 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 50, 57b-2, or with Rules 3.22, ~~3.45~~**3.45,** or 4.11 (b)-(e), 16 C.F.R. §§ 3.22, ~~3.45~~**3.45,** and 4.11 (b)-(e).   Any Party or Producing Party may move at any time for *in camera* treatment of any Confidential Discovery Material or any portion of the proceedings in this Matter to the extent necessary for proper disposition of this Matter.

**18.**     ~~19.~~At the conclusion of this Matter, the Defendants shall (a) return or destroy all Documents obtained in this Matter that contain or refer to ~~Restricted Confidential or~~ Confidential Discovery Material, other than materials that have been made part of the public record in this Matter, and (b) provide the Producing Party with an affidavit of destruction, provided that the provisions of 15 U.S.C. § 18a and § 4.12 of the FTC Rules of Practice, 16 C.F.R. § 4.12, shall govern the retention, return, or destruction of any documents obtained by the FTC prior to the filing of the Complaint to the extent the provisions of that statute or regulation is inconsistent with the provisions of this Protective Order.   At the time that any Expert/Consultant or other person retained to assist counsel in the preparation of this Matter concludes participation in this Matter, that person shall return to counsel all copies of Documents or portions thereof designated ~~Restricted Confidential or~~ Confidential Discovery Material that are in the possession of that person, together with all notes, memoranda, or other papers containing ~~Restricted Confidential or~~ Confidential Discovery Material.

**19.**     ~~20.~~The provisions of this Protective Order, insofar as they restrict the communication and use of ~~Restricted Confidential and~~ Confidential Discovery Material shall,

without written permission of the Producing Party or further order of the Court, continue to be binding after the conclusion of this Matter.

**20.** ~~21.~~ This Protective Order shall not apply to the disclosure by a Producing Party or its Counsel of the Producing Party's ~~Restricted Confidential or~~ Confidential Discovery Material to the Producing Party's current or former employees, agents, board members, directors, and officers.

**21.** ~~22.~~ Entry of the foregoing Protective Order is without prejudice to the right of the Parties or Third Parties to apply for further protective orders or for modification of any provision of this Protective Order by application to the Court for good cause shown,

~~23.     The parties stipulate to the foregoing interim protective order in order to facilitate the prompt exchange of pleadings, documents, and information, but without prejudice to their right to move for the entry of a final protective order with differing provisions.~~

~~Respectfully submitted,~~

**ORDERED:**

**_____**
**Paul L. Friedman**
**United States District Judge**

Dated: ~~June 6,2007~~     _____

**WE ASK FOR THIS:**

**Alden L. Atkins**
**Vinson & Elkins L.L.P.**
**1455 Pennsylvania Ave., N.W., Suite 600**
**Washington, D.C. 20004-1008**
**(202) 639-6613**
**aatkins@velaw.com**

**Counsel for Whole Foods Market, Inc.**

**WITH ADDITIONAL COPIES TO:**

Thomas H. Brock~~, Esq.~~

~~D.C. Bar No. 939207~~

Bureau of Competition
Federal Trade Commission
600 New Jersey Ave., N.W.
Washington, D.C. 20580
(202) 326-2813
TBrock@FTC.gov

Counsel for the Federal Trade Commission

~~Dated: June 6, 2007~~      _____

~~Alden L. Atkins~~
~~D.C. Bar No. 393922~~
~~Vinson & Elkins~~
~~The Willard Office Building~~
~~1455 Pennsylvania Ave., N.W.~~
~~Suite 600~~
~~Washington, D.C. 20004-1008~~
~~(202) 639-6613~~
~~Aatkins@VELaw.com~~

~~Counsel for Whole Foods Market, Inc.~~

~~Dated: June 6, 2007~~      _____
Clifford H. Aronson~~, Esq.~~

~~D.C. Bar. No. 3351-82~~

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square

New York, New York 10036
(212) 735-3000

~~Caronson@Skadden.com~~

**caronson@skadden.com**

Counsel for Wild Oats Markets, Inc.

~~ORDERED:~~

_____
~~United States District Judge~~
~~District of Columbia~~

~~Dated~~

**EXHIBIT A**
**TO THE PROTECTIVE ORDER GOVERNING DISCOVERY MATERIAL**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. **Civil Action No. 1:07-CV-01021-PLF** |
| | ) | |
| WHOLE FOODS MARKET, INC., | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| WILD OATS MARKETS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION CONCERNING PROTECTIVE**
**ORDER GOVERNING DISCOVERY MATERIAL**

I, [NAME], hereby declare and certify the following to be true:

1. [Statement of employment]

2. I have read the "Protective Order Governing Discovery Material" ("Protective Order") issued by the Court on **[Date]**, in connection with the above captioned Matter. I understand the restrictions on my access to and use of any Restricted Confidential or Confidential Discovery Material (as these terms are**that term is** used in the Protective Order) in this Matter**,** and I agree to abide by the Protective Order.

3. I understand that the restrictions on my use of such Restricted Confidential or Confidential Discovery Material include:

   a. that I will use such Restricted Confidential or Confidential Discovery Material only for the purpose of preparing for this proceeding, and hearing(s) and any appeal of this proceeding and for no other purpose;

   b. that I will not disclose such Restricted Confidential or Confidential Discovery Material to anyone, except as permitted by the Protective Order;

    c.      that I will use, store and maintain the ~~Restricted Confidential and~~ Confidential Discovery Material in such a way as to ensure its continued protected status; and

    d.      that**,** upon the termination of my participation in this proceeding**,** I will promptly return all ~~Restricted Confidential or~~ Confidential Discovery Material~~.~~ and all notes, memoranda, or other papers containing ~~Restricted Confidential or~~ Confidential Discovery Material, to ~~Plaintiffs'~~ **Plaintiff's** Counsel or Defendants' Outside Counsel, as appropriate.

    4.    I understand that if I am receiving Confidential Discovery Material as an Expert/Consultant, as that term is defined in this Protective Order, the restrictions on my use of Confidential Discovery Material also include the duty and obligation to:

    a.      maintain such ~~Restricted Confidential or~~ Confidential Discovery Material in separate locked room(s) or locked cabinet(s) when such ~~Restricted Confidential or~~ Confidential Discovery Material is not being reviewed;

    b.      return such ~~Restricted Confidential or~~ Confidential Discovery Material to ~~Plaintiffs~~**Plaintiff's** Counsel or Defendants' Outside Counsel, as appropriate, upon the conclusion of my assignment or retention, or upon conclusion of this Matter; and

    c.      use such ~~Restricted Confidential or~~ Confidential Discovery Material and the information contained therein solely for the purpose of rendering consulting services to a Party to this Matter, including providing testimony in judicial or administrative proceedings arising out of this Matter.

    5.    I am fully aware that, pursuant to Rule 26, Federal Rules of Civil Procedure, Rule 37, Federal Rules of Civil Procedure, and Section 3.42(h) of the FTC Rules of Practice, 16 C.F.R. § 3.42(h), my failure to comply with the terms of the Protective Order may constitute contempt of the Commission and may subject me to sanctions imposed by the Court or the Commission.


_____    Date:  _____

Full Name [Typed or Printed]


_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:07-CV-01021-PLF |
| ) | |
| WHOLE FOODS MARKET, INC. ) | |
| ) | |
| and ) | |
| ) | |
| WILD OATS MARKETS, INC. ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE MOTION OF DEFENDANT WHOLE FOODS MARKET, INC.
FOR ENTRY OF A FINAL PROTECTIVE ORDER**

**Exhibit "C"**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION <br><br> Plaintiff, <br><br> v. <br><br> WHOLE FOODS MARKET, INC. <br><br> and <br><br> WILD OATS MARKETS, INC. <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> Civil Action No. 1:07-CV-01021-PLF |

**DECLARATION OF ROBERTA L. LANG IN SUPPORT OF THE**
**MOTION OF DEFENDANT WHOLE FOODS MARKET, INC.**
**FOR ENTRY OF A FINAL PROTECTIVE ORDER**

1.      My name is Roberta L. Lang.  I am over 21 years of age, and I am competent to make this affidavit.  The statements herein are true and are within my personal knowledge unless stated otherwise.

2.      I make this declaration in support of the Motion of Whole Foods Market, Inc. for entry of a final protective order.  Specifically, I make this affidavit to demonstrate why I should be permitted to receive and review all Discovery Material described in the proposed Protective Order.  It is essential that I be provided access to the information in order to use my knowledge of the company and the grocery industry to assist outside counsel in formulating a defense to this action.  It is also essential for me to provide fully informed legal advice to the company, and to do so it is essential that I be given access to all confidential information.

– 1 –

3.    I am the General Counsel of defendant Whole Foods Markets, Inc. ("Whole Foods"). As General Counsel, I give legal advice to the senior management of Whole Foods and its board of directors.  I am an attorney licensed to practice law in the states of Illinois and Indiana.

4.    I do not participate in competitive decisionmaking at Whole Foods.  I do not participate in any decisions about formulating or implementing strategies to compete with our competitors or any decisions about formulating or implementing pricing strategies.  I am not involved in pricing decisions, selection of vendors, purchasing decisions, marketing, or other competition-related issues that are the subjects of confidential information in this case.  I am also not involved in decisions about how much product to purchase at wholesale, the mix of products to carry, where to sell those products, or how to transport those products.

5.    Whole Foods is divided into eleven geographic regions, and the Regional President of each region is responsible for making competitive decisions and implementing competitive strategies in his or her region.  Most competitive decisions at Whole Foods, particularly with respect to product pricing, product mix, and competitive strategy, are made at the regional level by Regional Presidents and those working under them.

6.    Competitive decisions at Whole Foods are made at the national level by a group of the most senior executives of the company known as the "Executive Team" or "Eteam."  The members of the Eteam are the Chief Executive Officer, the Chief Financial Officer, the Co-Presidents, and two Executive Vice Presidents.  The Eteam makes decisions about Whole Foods business and policy at a national level.  Most decisions about pricing and competitive strategy are made at the regional level rather than at the national level by the Eteam.  I am not a member of the Eteam, although as General Counsel I have occasion to give legal advice to the Eteam.

7.     As the General Counsel, I am one of approximately 27 voting members of the Whole Foods Leadership Network ("WFLN"), a group of Vice Presidents and Regional Presidents that meets periodically to make decisions about policy matters unrelated to competition.  For example, we make decisions about the company's benefit programs, the company's compensation and bonus programs, and whether products meet our quality standards. In addition, we have established charitable programs to further the mission of our company, such as the Animal Compassion Foundation, a nonprofit dedicated to achieving more compassionate treatment of farm animals, and the Whole Planet Foundation, a nonprofit providing assistance to micro-entrepreneurs in developing countries.  While WFLN may discuss the competitive landscape generally, this body does not make decisions about competitive strategies, responding to the strategies of our competitors, pricing, product mix, or other matters relating to competition.  Competitive strategies are made at the regional level by the Regional Presidents and their teams.

8.     This case arises out of the proposed acquisition of Wild Oats Markets, Inc. ("Wild Oats") by Whole Foods.  I am the inside lawyer who worked on the negotiation of the transaction.  After the parties signed the merger agreement, they submitted a notification of the transaction to the Federal Trade Commission (the "Commission").  Thereafter, the Commission issued a second request for documents and information.  I am the inside lawyer who supervised the collection of information in response to the Commission's request and who advised the company during the agency's investigation.  Therefore, I am the only inside lawyer for the company with comprehensive knowledge of the transaction and the proceedings which have transpired to date with the Commission.

9.     The Commission alleges that Whole Foods and Wild Oats are in a unique product market that does not include other grocery or supermarket retailers.  In order to respond, Whole Foods must collect and analyze information from all levels of the company concerning its operations, its pricing strategies, its product strategies, its responses to competitors, the entities it considers its competitors and why, and the witnesses, data, and documents it has available. Although I do not participate in decisions concerning competition, I am the inside attorney most familiar with the company and I know where that information can be found.  Further, if I am informed about factual assertions made by the Commission, I can use my detailed knowledge of the company and my experience in the grocery industry to help our outside counsel develop a response and collect the information needed for that response.  Although our outside counsel know a great deal about Whole Foods, they do not have the in-depth knowledge that I do of the company and the industry, and my knowledge and assistance is essential to help counsel defend this case.  Unless I am able to review all Discovery Material in this matter, Whole Foods will be severely limited in its ability to defend itself fully in this action.

10.    In addition, it is essential that I be allowed to have access to all Discovery Material in order to be an active member of the trial team and in order to provide informed legal advice to the Eteam and the board of directors.  This transaction is the largest acquisition ever undertaken by Whole Foods, and it is of great importance to the company.  In addition, the Commission's decision to challenge the proposed transaction and to file this lawsuit is a matter of extreme importance to the company.  I am called upon daily to provide legal advice to the Eteam, the board of directors, and our senior leadership concerning this transaction.  I cannot provide informed legal advice to the company unless I have access to all information – including confidential information – at issue in this matter.  Because I understand the company, the grocery

industry, and the questions and concerns of our management, I am more able than outside counsel to advise the company about the arguments being raised, the strength of the arguments, and the strength of the evidence in terms that the business executives can understand. Of course, in providing that advice, I would not disclose the confidential information itself.

11.     Although there are other attorneys in the Whole Foods legal department, none shares my comprehensive knowledge of the company and the legal issues it presently faces. I joined Whole Foods in 1998 as the first attorney ever to be employed by the company, and I was promoted to General Counsel in 2000. I am uniquely qualified to represent the company due to my many years in the food industry. Other attorneys now work in the legal department in specialty areas such as contracts, labor law, and securities disclosure, but I am the only "generalist" attorney in the legal department. Importantly, I am the only attorney to have been involved in all aspects of the proposed merger and the Commission's review of the transaction. As its long-serving General Counsel and the attorney responsible for handling the proposed merger, I am uniquely positioned to assist our outside counsel and to advise Whole Foods management on this important litigation.

12.     My office is located at Whole Foods' headquarters in Austin, Texas. Because both the court handling this litigation and the offices of Whole Foods' lead outside counsel are located in the District of Columbia, my ability to participate in the defense of this case would be severely restricted if I were required to review certain confidential information only in the offices of our outside counsel.

13.     With the understanding that I would not use its confidential information for any improper purpose, Wild Oats has consented to my having access to such information pursuant to the terms of the proposed protective order.

14.    As an attorney, I acknowledge and agree that I am subject to the jurisdiction of this Court and to its contempt powers.  I agree to remain subject to the Court's jurisdiction at all times, including after this litigation is concluded.

15.    I further represent that I will not make use of any confidential discovery material, directly or indirectly, for any purpose other than the defense of this action.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 11, 2007.

Roberta L. Lang

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | )     Civil Action No. 1:07-CV-01021-PLF |
| | ) |
| | ) |
| WHOLE FOODS MARKET, INC. | ) |
| | ) |
| and | ) |
| | ) |
| WILD OATS MARKETS, INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE MOTION OF DEFENDANT WHOLE FOODS MARKET, INC.
FOR ENTRY OF A FINAL PROTECTIVE ORDER**

**Exhibit "D"**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

FEDERAL TRADE COMMISSION,

     Plaintiff,

vs.                                                                No. CIV 07-532 JB/ACT

PAUL L. FOSTER and
WESTERN REFINING,

     and

GIANT INDUSTRIES, INC.

     Defendants.

**MEMORANDUM OPINION AND ORDER**[1]

**THIS MATTER** comes before the Court on: (i) the Plaintiff's Motion for Protective Order,

filed April 12, 2007 (Doc. 8); and (ii) the Plaintiff's Corrected Motion for Protective Order, filed

April 19, 2007 (Doc. 67).  The Court held hearings on the motions on April 13, 2007 and April 23,

2007.  The primary issue is whether the Court should prohibit, via protective order, the General

Counsels of Defendants Western Refining, Inc. ("Western") and Giant Industries, Inc. ("Giant")

from accessing confidential discovery material that Plaintiff Federal Trade Commission ("FTC")

possesses.  Because the Court believes that a protective order is warranted, and that one balancing

the needs of Western and of Giant for information against the injury that may result from disclosure

can be fashioned, the Court will adopt the Proposed Protective Order under which the parties have

been laboring except insofar as its language enjoins Western's and Giant's General Counsels from

---

[1] The Court does not believe that this Memorandum Opinion and Order contains any sensitive information requiring filing under seal.  If the parties would prefer that the filing be sealed, they may contact the Court and make that request.

viewing confidential discovery materials the FTC holds

## FACTUAL BACKGROUND

Capable outside counsel represents the Defendants.  See Clerk's Minutes, filed April 13, 2007 (Doc. 36).  The Defendants' General Counsels are officers of their respective corporations. See Plaintiff's Corrected Response in Support of Plaintiff's Motion for a Protective Order at 6, filed April 22, 2007 (Doc. 99)("Plaintiff's Response").  Western's General Counsel, Lowry Barfield, is a Vice President and Secretary of Western.  See id.  Kim Bullerdick, Giant's General Counsel, is a Senior Vice President and Secretary of Giant.  See id.  Western's legal department consists of Mr. Barfield and one relatively young attorney.  See Hearing Transcript at 4:7-9 (Smith)(taken April 23, 2007)("April 23 Transcript").[2]  Giant's legal department consists of Mr. Bullerdick and three other attorneys.  See id. at 4:10-14 (Smith).  Because both Mr. Barfield and Mr. Bullerdick are corporate officers, each presumably owes a fiduciary duty to his company that goes beyond the law to other aspects of their businesses.

Certain documents have suggested to the FTC that Mr. Barfield engages in "competitive decision making."  Submissions PX00017, PX00018, and PX00019 are e-mails from Mr. Barfield's file.  See Appendix to Plaintiff's Corrected Response in Support of Plaintiff's Motion for Protective Order to Cure Deficiency in Document 54 Noticed to Plaintiff in Document 57, filed April 21, 2007 (Doc. 98)("Plaintiff's Appendix"), PX00017, E-mail from Mike Whentley to Lowry Barfield, Paul Foster, Jeff Stevens, Scott Weaver, and Ralph Schmidt (dated November 4, 2005)("PX00017"); id. PX00018, E-mail from Gary Dalke to Lowry Barfield (dated August 19, 2006)("PX00018"); id. PX00019, E-mail from Leroy Crow to Lowry Barfield (dated October 6, 2006)("PX00019").

---

[2] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

PX00017 is an e-mail addressed to Mr. Barfield and others, discussing a possible pipeline venture and soliciting "any other finished product ideas." PX00017. PX00018 is an e-mail addressed to Mr. Barfield discussing capital expenditures. <u>See</u> PX00018. PX00019 is an e-mail addressed to Mr. Barfield, describing facilities inspection and construction progress. <u>See</u> PX00019.

The FTC's investigation has resulted in the production of sensitive and confidential information. <u>See</u> Plaintiff's Corrected Memorandum in Support of Motion for Protective Order at 1, filed April 19, 2007 (Doc. 68)("Plaintiff's Memo"). The Defendants have submitted documents and information pursuant to requests under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a. <u>See id.</u> at 3. Both Western and Giant have indicated that most of the documents submitted contain confidential material unknown to their competitors and the public in general. <u>See id.</u> Similarly, third parties have submitted and may be asked to submit additional information to the FTC that is relevant to this case and that contains non-public, competitively sensitive material. <u>See id.</u>

## PROCEDURAL BACKGROUND

On April 12, 2007, the FTC filed a Complaint seeking a temporary restraining order and a preliminary injunction halting Western's acquisition of Giant to preserve the competitive status quo while the FTC conducts an administrative proceeding to determine whether the transaction would violate antitrust laws. <u>See</u> Complaint for Temporary Restraining Order and Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act ("FTCA") at 1-2, filed April 12, 2007 (Doc. 1)("Complaint"). The FTC represents that it has reason to believe that such acquisition would violate Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, and Section 7 of the Clayton Act, 15 U.S.C. § 18. <u>See</u> Complaint at 4, 11.

The FTC's Complaint was filed pursuant to a Stipulated Interim Protective Order designed

to protect competitively sensitive commercial information, especially that of third parties.  See Plaintiff's Motion for Protective Order, filed April 12, 2007 (Doc. 8)("Motion for Protective Order"), Stipulated Interim Protective Order (dated April 12, 2007)("Stipulated Order").   In accordance with D.N.M. LR-Civ. 7.1(a), the FTC represents that it discussed its Motion for a Protective Order with opposing counsel, and that the Defendants advised they would not oppose the motion.  See Motion for Protective Order at 1-2.  The FTC moves the Court, pursuant to rule 26(c) of the Federal Rules of Civil Procedure, for a protective order preserving the confidentiality of information that the Defendants or third parties have provided, or will be providing, to the FTC, and that the FTC has provided, or will be providing, to the Defendants.  See Motion for Protective Order at 1.  The FTC submitted a proposed order with its request for a protective order.  See Stipulated Order.

        In the Stipulated Interim Protective Order, counsel for the parties agree that they will abide by the terms of the Proposed Protective Order appended to the Stipulation, unless and until such time as the Court enters a protective order.  See id. at 1.  The Stipulation also states that it shall not prejudice the Defendants from opposing or seeking modification of any of the provisions of the protective order, and that it is intended only to secure confidentiality for documents related to this litigation pending the Court's acting on the Motion for Protective Order.  See id.  Thomas J. Lang, counsel for the FTC, Marc D. Schildkraut, counsel for Defendants Paul L. Foster and Western, and Tom D. Smith, counsel for Defendant Giant signed the Stipulated Interim Protective Order adopting the Proposed Protective Order on April 12, 2007, the day that it was submitted to the Court.  See id. at 1-3.

        Under the Proposed Protective Order, "Confidential Discovery Material" is "non-public trade secret or other research, development or commercial information, the disclosure of which would

likely cause commercial harm to the Producing Party." Stipulated Order, Proposed Protective Order ¶ 4, at 2. The Proposed Protective Order includes the following examples of Confidential Discovery Material:

> strategic plans (involving pricing, marketing, research and development, corporate alliances, or mergers and acquisitions) that have not been fully implemented or revealed to the public; trade secrets; customer-specific evaluations or data (e.g., prices, volumes, or revenues); sales contracts; system maps; personnel files and evaluations; information subject to confidentiality or non-disclosure files and evaluations; information subject to confidentiality or non-disclosure agreements; proprietary technical or engineering information; proprietary financial data or projections; and proprietary consumer, customer, or market research or analyses applicable to current or future market conditions, the disclosure of which could reveal Confidential Discovery Material.

Id. ¶ 4 at 2-3. Pursuant to the Proposed Protective Order, each corporate defendant may give Confidential Discovery Material to one in-house counsel who "does not have any influence over the direction of [that company's] business or its operations (in addition to outside counsel and experts or consultants retained to assist in this action)." Stipulated Order, Proposed Protective Order ¶ 8, at 9.

Specifically with regard to in-house counsel, paragraph 8 of the Proposed Protective Order provides that Confidential Discovery Material is not to be provided to any person except "one in-house counsel designated by Western who does not have any influence over the direction of Western's business or its operations," and "one in-house counsel designated by Giant who does not have any influence over the direction of Giant's business or its operations . . ." Id. ¶ 8, at 8. Paragraph 9 of the Proposed Protective Order states that, if any party desires to disclose Confidential Discovery Material to in-house counsel for Western or for Giant not designated in paragraph 8 of the protective order, the disclosing party shall notify the producing party of its desire to disclose such Confidential Discovery Material. See id. ¶ 9, at 9. Paragraph 9 allows the producing party to

object to the disclosure of the Confidential Discovery Material within five days of receiving notice of an intent to disclose such material. <u>See</u> <u>id.</u> ¶ 9, at 10. If the producing party timely objects, the disclosing party shall not disclose the Confidential Discovery Material to the identified person, absent a written agreement with the producing party or Court order permitting disclosure. <u>See</u> <u>id.</u> The Proposed Protective Order also permits any party to ask the Court to enter a protective order with different terms. <u>See</u> <u>id.</u> ¶ 18, at 14.

The FTC requests that the Court issue an advance ruling in the form of the Proposed Protective Order. <u>See</u> Motion for Protective Order, Plaintiff's Memorandum in Support of Motion for Protective Order at 2 ("Plaintiff's Protective Order Memo"). The FTC requests that the Court enter the Proposed Protective Order to expedite the litigation of the case, to protect the parties' ability to secure and use confidential information in an appropriate matter, and to protect the interest of the Defendants and third parties against inappropriate disclosure of confidential material. <u>See</u> <u>id.</u> at 3-4.

On April 13, 2007, the Court granted the FTC's request for a Temporary Restraining Order. <u>See</u> Memorandum Opinion and Order at 1, 8, filed April 13, 2007 (Doc. 37). On April 16, 2007, the Court set the hearing on the FTC's request for Preliminary Injunction for May 7, 2007. <u>See</u> Hearing Transcript at 10:10 (Court)(taken April 16, 2007)("April 16 Transcript").

On April 16, 2007, the Defendants also orally moved to amend the Proposed Protective Order so that their General Counsels could access confidential information. <u>See</u> <u>id.</u> at 14:17-16:4 (Smith). At that time, the Court indicated that it was inclined to grant the Defendants' request, <u>see</u> <u>id.</u> at 17:20-21 (Court), but the parties requested to serve simultaneous briefing within forty-eight hours, <u>see</u> <u>id.</u> at 18:4-12 (Lang), <u>id.</u> at 18:15-19 (Smith). Both parties filed their briefs on the issue on April 18, 2007. <u>See</u> Plaintiff's Response in Opposition to Defendants' Motion to Amend the

-6-

Protective Order, filed April 18, 2007 (Doc. 53); Defendants' Memorandum in Opposition to Plaintiff's Motion for Protective Order, filed April 18, 2007 (Doc. 55)("Defendants' Opposition Memo").

The FTC opposes the Defendants' suggested amendments to paragraphs 8(c) and 8(d), which would appear to allow the General Counsels of Western and Giant to access all confidential discovery material produced in this litigation, including sensitive commercial information that the Defendants' competitors have supplied. See Plaintiff's Response at 4. The Defendants assert that the full participation of their General Counsels is essential to their defense. See Defendants' Opposition Memo at 1-2. They also submit that Mr. Bullerdick and Mr. Barfield, in particular, are experienced litigators, who will play a significant role in defending the contested transaction. See April 16 Transcript at 15:2-11 (Smith). Western and Giant also represent that Mr. Barfield and Mr. Bullerdick have no involvement in the competitive decision making of their companies. See Defendants' Opposition Memo at 2-3.

At the April 23, 2007 hearing on the filings relating to the Motion for Protective Order, Western and Giant represented that Mr. Barfield and Mr. Bullerdick would submit affidavits to the Court attesting that they do not take part in competitive decision making. See April 23 Transcript at 5:9-13 (Smith). Further, at the hearing, Western and Giant stated that they seek to allow their General Counsels access to only deposition transcripts, transcripts of the FTC's investigative hearings, and un-redacted pleadings -- not the actual documents produced to the FTC. See id. at 10:22-11:2.

On April 24, 2007, Mr. Barfield and Mr. Bullerdick submitted affidavits stating that they are not involved in the competitive decision making of their companies. See Affidavit of Kim Bullerdick in Support of Defendants' Memorandum in Opposition to Plaintiff's Motion for

Protective Order ¶ 3, at 1-2, filed April 24, 2007 (Doc. 118)("Bullerdick Affidavit"); Affidavit of Lowry Barfield in Support of Defendants' Memorandum in Opposition to Plaintiff's Motion for Protective Order ¶ 3, at 1, filed April 24, 2007 (Doc. 119)("Barfield Affidavit").

## FTCA

Section 21(d)(2) of the FTCA provides:

> Any disclosure of relevant and material information in Commission adjudicative proceedings or in judicial proceedings to which the Commission is a party shall be governed by the rules of the Commission for adjudicative proceedings or by court rules or orders, except that the rules of the Commission shall not be amended in a manner inconsistent with the purposes of this section.

15 U.S.C. § 57b-2-d(2)(2). In furtherance of the requirements of Section 21, the FTC promulgated Rule 4.10(g). See 16 C.F.R. § 4.10(g)(1996). Rule 4.10(g)(3) provides that a person submitting confidential information to the FTC will be "afforded an opportunity to seek an appropriate protective or in camera order" before the disclosure of such documents in court proceedings. See id.

## RULE 26(c)(7)

Rule 26(c)(7) permits a court to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way . . . ." Fed. R. Civ. P. 26(c)(7). Rule 26 creates a presumption of openness in discovery matters, and "it is well established that there is no absolute privilege for trade secrets or similar confidential information." Sears v. Nissan Motor Co., Ltd., No. 90-2169, 1991 WL 80741, at *2 (10th Cir. May 16, 1991).

> To resist discovery under Rule 26(b)(7), a person must first establish that the information sought is a trade secret and then demonstrate that its disclosure might be harmful. If these requirements are met, the burden shifts to the party seeking

discovery to establish that the disclosure of trade secrets is relevant and necessary to the action. The district court must balance the need for the trade secrets against the claim of injury resulting from disclosure.

<u>Centurion Indus., Inc. v. Warren Steurer & Assocs.</u>, 665 F.2d 323, 325 (10th Cir. 1981). Generally, in determining whether to require disclosure, a court should weigh the competing interests involved within the context of the total situation and consider factors such as the dangers of abuse, good faith, adequacy of protective measures, and the availability of other means of proof. <u>See id.</u> at 326 n.6.

It is within the sound discretion of the trial court to decide whether trade secrets are relevant and whether the need outweighs the harm of disclosure. Likewise, if the trade secrets are deemed relevant and necessary, the appropriate safeguards that should attend their disclosure by means of a protective order are also a matter within the trial court's discretion.

<u>Id.</u> at 326.

With respect to distinguishing between outside and in-house counsel in protective orders that seek to guard against the disclosure of competing companies' confidential information, an important factor is whether the in-house counsel is involved in "competitive decision making." <u>Brown Bag Software v. Symantec Corp.</u>, 960 F.2d 1465, 1470 (9th Cir. 1992)(citing <u>U.S. Steel Corp. v. United States</u>, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984))(affirming a district court's upholding of a magistrate's protective order denying in-house counsel access to a competitor's confidential information where the in-house counsel was involved in competitive decision making and outside counsel had over six months to review the sensitive information to which the in-house counsel was not privy). Competitive decision making encompasses "a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." <u>Glaxo Inc. Genpharm Pharm, Inc.</u>, 796 F. Supp. 872, 874 (E.D.N.C. 1992)(quoting <u>U.S. Steel Corp. v. United States</u>, 730 F.2d at 1468)(internal quotations

omitted).   See Akzo v. U.S. Int'l Trade Comm'n, 808 F.2d 1471, 1482-83 (Fed. Cir. 1986)(reviewing administrative law and upholding an administrative law judge's protective order denying in-house counsel access to confidential information about a competitor company where the party to which in-house counsel belonged failed to demonstrate that the information sought was needed).   "[I]n-house counsel stand in a unique relationship to the corporation in which they are employed.  Although in-house counsel serve as legal advocates and advisors for their client, their continuing employment often intimately involves them in the management and operation of the corporation of which they are a part."  Fed. Trade Comm'n v. Exxon Corp., 636 F.2d 1336, 1350 (D.C. Cir. 1980)(finding that the district court did not abuse its discretion when it did not allow in-house counsel access to the competitively sensitive information of a subsidiary subject to divestment).

In Carpenter Tech. Corp. v. Armco, Inc., 132 F.R.D. 24 (E.D. Penn. 1990), the Honorable Daniel H. Huyett III, United States District Court Judge for the Eastern District of Pennsylvania, considered whether in-house counsel could have access to a competitor's confidential information. See id. at 27-29.  Judge Huyett held that a senior staff attorney, who was not an officer or a director, was not related, by blood or marriage, to an officer or employee of the company, and who submitted an affidavit to the court stating that he was not involved in competitive decision making, could have access to the information in question.  See id. at 27-28.  Judge Huyett also ruled, however, that the Director of Law, who was an officer, was not a director, was not related, by blood or marriage, to another officer or company employee, and who filed an affidavit with the court declaring that he had no "direct" involvement in competitive decision making, was barred from accessing the information sought.  Id. at 28.

In Glaxo Inc. v. Genpharm Pharm, Inc., the Honorable Terrence William Boyle, United

States District Judge for the Eastern District of North Carolina, overruled a magistrate's protective order denying one of the party's in-house counsel access to confidential materials obtained from the opposing party through discovery.  See id. at 874.  The magistrate had barred the in-house counsel from accessing the information in question on the grounds that he was a high-level employee and substantial investor in the party-company, his company had retained three outside law firms that could provide adequate representation, and that the opposing party had no in-house counsel.  See id.  Judge Boyle held that the in-house counsel, who was a member of three different bars and attested in two un-controverted affidavits that he had no involvement in competitive decisions involving  pricing, scientific research, sales, or marketing, could access the opposing party's confidential materials.  See id.

## ANALYSIS

The Court believes that the nature of the confidential discovery materials in this case warrants a protective order.  The Court also concludes that it can craft one that balances the need of Western and Giant for information against the injury that may result from disclosure. Accordingly, the Court will modify the Proposed Protective Order to allow Western's and Giant's General Counsel, subject to meeting certain conditions, to access certain categories of the confidential discovery information.

## I.    THE COURT WILL ENTER A PROTECTIVE ORDER IN THIS CASE.

The confidential information at issue here includes competitors' cost data, customer lists, prices, and volumes sold.  See Affidavit of Bradley Barron, General Counsel, NuStar Energy, L.P. ¶ 5, at 1 (executed April 18, 2007); Declaration of Thomas D. Carmel, Senior Counsel, Conoco Phillips ¶ 3, at 1 (executed April 18, 2007); Declaration of Darby L. Reid, Senior Manager, Valero Energy Corporation ¶ 3, at 1 (executed April 18, 2007).  Under rule 26(c)(7), such information fits

within categories of information that may be protected.  See American Standard, Inc.v. Pfizer, Inc., 828 F.2d 734, 740 (Fed. Cir. 1987)(stating that confidential information includes trade secrets and marketing plans); Diamond State Ins. Co. v. Rebel Oil Co., Inc., 157 F.R.D. 691, 697 (D. Nev. 1994)(holding that confidential information includes that which would cause substantial economic harm to the competitive position of the producer); Fed. R. Civ. P. 26(c)(7).  The parties do not dispute the harm that disclosure of competitively sensitive information to competitors can inflict on a business.

Litigation of this case may require that all parties engage in discovery of confidential material in the possession of third parties and may require the disclosure of confidential material to the Court.  The FTC represents that, in litigating similar cases, it has found that courts frequently receive several requests for protective orders pursuant to rule 26(c), 15 U.S.C. § 57b-2(d)(2), and 16 C.F.R. § 4.10(g).  In the interests of efficiency and fairness to the Defendants and to all third parties who have provided or may provide competitively sensitive information, the FTC seeks this relief to establish a uniform procedure to safeguard certain confidential material that the parties to this litigation have discovered or will discover.  There is no doubt that such an order would alleviate the burden on the Court to respond to numerous requests for orders protecting confidential information on a case-by-case basis, and effect a more orderly discovery process.

The proposed order seeks to ensure, to the extent possible, that matters raised in this proceeding will be open to the public, while simultaneously limiting the number of persons who have access to the confidential information generated during the discovery phase of the litigation and providing a mechanism for the proper dissemination of discoverable documents.  Furthermore, such material submitted by the Defendants, as well as material submitted by third parties, may be entitled to confidential treatment under Sections 6(f) and 21 of the FTC Act, 15 U.S.C. §§ 46(f),

57b-2.

      The Court will adopt the Proposed Protective Order subject to the amendments introduced below.

## II.    THE COURT WILL AMEND THE FTC'S PROPOSED PROTECTIVE ORDER TO ALLOW WESTERN'S AND GIANT'S GENERAL COUNSEL LIMITED ACCESS TO SOME CONFIDENTIAL INFORMATION.

      The FTC seeks a protective order that would bar Mr. Barfield and Mr. Bullerdick from viewing confidential discovery materials. <u>See</u> Plaintiff's Response at 2. The FTC asserts that it is crucial that this information remain confidential and unexploited, because, if it is used to gain competitive advantage, companies will be reluctant to provide information to the FTC in the future. <u>See</u> Plaintiff's Response at 9-10.

      Western and Giant assert that it is essential to their defense that their General Counsels have access to the confidential discovery material in this case. <u>See</u> Defendants' Opposition Memo at 1. Western and Giant contend that Mr. Barfield and Mr. Bullerdick are responsible for advising their management on litigation strategy, and that they cannot do so without full access to relevant information. <u>See id.</u> at 2. They also represent that Mr. Barfield is an experienced commercial litigator who desires to take a leading role in this litigation. <u>See</u> April 23 Transcript at 9:14-24. Western and Giant concede that the discovery materials should be subject to protection and that they should remain confidential. <u>See id.</u> at 1. Western and Giant seek only limited access to information for their General Counsels: they seek to allow Mr. Barfield and Mr. Bullerdick access to deposition transcripts, transcripts of FTC investigative hearings, and un-redacted pleadings, <u>see</u> April 23 Transcript at 10:22-11:2, in their outside counsels' office(s) in a manner that would allow them to take notes but not remove the notes from the outside counsels' office(s), <u>see</u> Defendants' Opposition Memo at 1. The Court finds that the limited nature of this request substantially lessens the danger

-13-

that Western and Giant will be able to view, yet alone use, any information that could provide them advantages over their competitors. Moreover, addressing the issue of in-house counsel and competitive decision making, Western and Giant represent that Mr. Barfield and Mr. Bullerdick do not take part in competitive decision making, see Defendants' Opposition Memo at 2-3, and Mr. Barfield and Mr. Bullerdick have submitted affidavits to the Court affirming that representation, see Barfield Affidavit ¶ 3, at 1; Bullerdick Affidavit ¶ 3, at 1-2.

The FTC presents three e-mail communications, PX00017, PX00018, and PX00019, to dispute the assertion that Mr. Barfield is not involved in competitive decision making. The Defendants respond that those three e-mails were the only ones out of approximately 900,000 documents submitted to the FTC that indicate that Mr. Barfield may have a role in competitive decision making at Western. April 23 Transcript at 8:6-11. Further, the Defendants represent that PX00017 was simply a solicitation of interest sent to multiple parties, and that PX00018 and PX00019 related to due diligence concerning the Giant transaction. See id. at 8:11-24. The Court finds that the number and nature of the communications the FTC submits do not override the declarations regarding competitive decision making contained in the affidavits of Mr. Barfield and Mr. Bullerdick.

Acknowledging that it is within the trial Court's discretion to determine which safeguards are appropriate for protecting commercial information, see Centurion Indus., Inc. v. Warren Steurer & Assocs., 665 F.2d at 326, recognizing the FTC's significant interest in safeguarding information cooperating companies give it and the significant interest the Defendants have in putting on the strongest defense they can, because the FTC has not demonstrated that harm will result from allowing the limited access to confidential information that Western and Giant seek, because Western and Giant have shown that their defense would be prejudiced if their General Counsels

-14-

were prohibited from providing them with well-informed strategic legal advice, noting that Western's and Giant's in-house counsel are limited in number, and because Mr. Barfield and Mr. Bullerdick attest that they do not take part, directly or indirectly, in their companies' competitive decision making, the Court will adopt the Proposed Protective Order after amending paragraphs 8(c) and 8(d) to balance Western's and Giant's need for information with the FTC's concern for potential harm from the disclosure of confidential competitive information.

Based on the foregoing, and based upon Mr. Barfield's and Mr. Bullerdick's entering affidavits declaring of which bars they are members and remaining subject to the Court's jurisdiction at all times, including after the case is concluded, the Court will amend paragraphs 8(c) and 8(d) to read:

> (c)     Lowry Barfield, General Counsel of Western Refining, Inc., who may have access to confidential deposition transcripts, transcripts of FTC investigative hearings, and un-redacted pleadings, without exhibits, in the office(s) of Western's outside counsel, and who may take notes regarding such material but may not remove these notes from the office(s) of Western's outside counsel;

> (d)     Kim Bullerdick, General Counsel of Giant Industries, Inc., who may have access to confidential deposition transcripts, transcripts of FTC investigative hearings, and un-redacted pleadings, without exhibits, in the office(s) of Giant's outside counsel, and who may take notes regarding such material but may not remove these notes from the office(s) of Giant's outside counsel;

**IT IS ORDERED** that the Plaintiff's Motion for Protective Order and the Plaintiff's Corrected Motion for Protective Order are granted in part and denied in part. The Court adopts, based on Mr. Barfield's and Mr. Bullerdick's agreeing to meet the terms stated herein, the Proposed Protective Order with the stated amendments to paragraphs 8(c) and 8(d). Mr. Barfield and Mr. Bullerdick must enter affidavits listing the bar(s) of which they are members, acknowledge that the are subject to the Court's contempt powers, and agree to remain subject to the Court's jurisdiction

-15-

at all times, including after the case is concluded.  Mr. Barfield and Mr. Bullerdick are also

instructed not to use the confidential information, directly or indirectly, for any purpose other than

defending against this lawsuit.

_____

UNITED STATES DISTRICT JUDGE

*Counsel*:

Deyonna Young
    Assistant Attorney General
    Special Deputy to the Federal Trade
    Commission
Litigation Division (Antitrust)
Office of the New Mexico Attorney General
Albuquerque, New Mexico

-- and --

Thomas J. Lang
    Senior Litigation Counsel
Bureau of Competition
Federal Trade Commission
Washington, D.C.

    *Attorneys for the Plaintiff*

Henry M. Bohnhoff
Andrew G. Schultz
Thomas A. Outler
Patrick Shay
Rodey, Dickason, Sloan, Akin
    & Robb, P.A.
Albuquerque, New Mexico

    *Attorneys for the Defendants*

-16-

Lowry Barfield
General Counsel
Western Refining, Inc.
El Paso, Texas

-- and --

Marc G. Schildkraut
Michael P.A. Cohen
Heller Ehrman, LLP
Washington, D.C.

*Attorneys for Defendants Paul L. Foster
and Western Refining, Inc.*


Kim H. Bullerdick
General Counsel
Giant Industries, Inc.
Scottsdale, Arizona

-- and --

Hugh R. Whiting
Tom D. Smith
Jones Day
Houston, Texas
Washington, D.C.

*Attorneys for Defendant Giant Industries, Inc.*

-17-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-CV-01021-PLF |
| | ) | |
| | ) | |
| WHOLE FOODS MARKET, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILD OATS MARKETS, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE MOTION OF DEFENDANT WHOLE FOODS MARKET, INC.
FOR ENTRY OF A FINAL PROTECTIVE ORDER**

**Exhibit "E"**

**IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

FEDERAL TRADE COMMISSION,                    )
                                             )
                        Plaintiff,           )
                                             )
            v.                               )        Civil Action No. 07cv352 JB/ACT
                                             )
PAUL L. FOSTER,                              )
                                             )        **PUBLIC VERSION**
WESTERN REFINING, INC.                       )
                                             )
and                                          )
                                             )
GIANT INDUSTRIES, INC.                       )
                                             )
                        Defendants.          )

---

**PLAINTIFF'S PRE-HEARING BRIEF
ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.    THE RELEVANT MARKET IS BULK SUPPLY OF GASOLINE
      INTO NORTHERN NEW MEXICO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.   GIANT AND WESTERN COMPETE IN THE BULK SUPPLY OF
      GASOLINE INTO NORTHERN NEW MEXICO . . . . . . . . . . . . . . . . . . . . . 9

III.  THE ACQUISITION WILL SUBSTANTIALLY REDUCE
      COMPETITION IN NORTHERN NEW MEXICO GASOLINE MARKET . . . 11

      A.    The Proposed Acquisition Is Presumptively Unlawful . . . . . . . . . . . . . 11

      B.    The Acquisition Will Raise Gasoline Prices to Northern New
            Mexico Consumers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      C.    Other Suppliers Will Not Defeat Supracompetitive Gasoline Prices
            Resulting from the Acquisition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      D.    The Relevant Market Is Insulated from New Entry or Expansion
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      E.    The Proposed Transaction Will Not Enhance Competition By
            Producing Cognizable Efficiencies . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## CASES

Brown Shoe Co. v. United States,
370 U.S. 294 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

California v. Am. Stores Co.,
697 F. Supp. 1125 (C.D. Cal. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

FTC v. Aloha Petroleum, LTD.
No. 05-00471 (D. Haw. filed July 27, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

FTC v. Bass Bros. Enters.,
1984-1 Trade Cas. (CCH) ¶ 66,041 (N.D. Ohio 1984) . . . . . . . . . . . . . . . . . . . . . . 13, 17

FTC v. Cardinal Health,
12 F.Supp.2d 34 (D.D.C., 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

FTC v. Elders Grain, Inc.,
868 F.2d 901 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

FTC v. Food Town Stores, Inc.,
539 F.2d 1339 (4th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

FTC v. H.J. Heinz Co.,
246 F.3d 708 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 24, 25

FTC v. PPG Indus., Inc.,
628 F. Supp. 881 (D.D.C.), aff'd 798 F.2d 1500 (D.C. Cir. 1986) . . . . . . . . . . . . . 16, 25

FTC v. Staples, Inc.,
970 F. Supp. 1066 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 16, 24, 25

FTC v. Warner Communications, Inc.,
742 F.2d 1156 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

Hosp. Corp. of Am. v. FTC,
807 F.2d 1381 (7th Cir. 1986), cert. denied, 481 U.S. 1038 (1987) . . . . . . . . . . . . 12, 17

Illinois Brick Co. v. State of Ill.,
431 U.S. 720 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Monfort of Colo., Inc. v. Cargill, Inc.,
761 F.2d 570 (10th Cir. 1985), rev'd on other grounds, 479 U.S. 104 (1986) . . . . . . . . 23

Rebel Oil Co. v. Atl. Richfield Co.,
51 F.3d 1421 (9th Cir. 1995), cert. denied, 516 U.S. 987 (1995) . . . . . . . . . . . . . . . . 5, 20

Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.,
    1995-2 Trade Cas. (CCH) ¶ 71,254(N.D. Cal. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Shell Oil Co.,
    125 F.T.C. 769 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Eastman Kodak Co.,
    853 F. Supp. 1469 (W.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., 8

United States v. Phila. Nat'l Bank,
    374 U.S. 357 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. UPM-Kymmene OYJ,
    2003-2 Trade Cas. (CCH) ¶ 74,101 (N.D. Ill. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## STATUTES

Federal Trade Commission Act, Section 13(b)
    15 U.S.C. § 53(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## OTHER AUTHORITIES

Complaint, Phillips Petroleum Co., (2003) (FTC Docket No. C-4058) . . . . . . . . . . . . . . . . . . . 12

William M. Landes & Richard A. Posner, Market Power in Antitrust Cases,
    94 HARV. L. REV. 937, (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## PRELIMINARY STATEMENT

Western Refining, Inc. ("Western") proposes to acquire Giant Industries, Inc. ("Giant") in a $1.4 billion transaction that would combine two of the leading bulk suppliers of gasoline to the northern New Mexico market.[1] **[Redacted**

**]** With the transaction, the incentives to do so will be significantly diminished, resulting in millions of dollars in harm via higher gasoline prices to New Mexico consumers and businesses.

Today, Giant owns and operates two refineries in the Four Corners region of New Mexico,[2] which have a combined crude oil capacity of 36,800 barrels per day ("bpd"). **[Redacted**

**]** The

---

[1]    The northern New Mexico market includes the counties of Rio Arriba, Taos, Mora, San Miguel, Los Alamos, Valencia, Torrence, Bernalillo, Sandoval, Guadalupe, and Santa Fe. This is an area that can be reached by truck from Giants' refineries and Albuquerque area terminals. **[Redacted**

**]**

[2]    There are six refineries that supply gasoline and other light petroleum products to Albuquerque:  Giant's refineries in Ciniza and Bloomfield; Valero Energy Corporation's ("Valero") refinery in McKee; ConocoPhillips' refinery in Borger; Western's refinery in El Paso; and Holly Corporation's ("Holly") refinery in Artesia. Three pipelines deliver product into Albuquerque:  Plains All American Pipeline, L.P.'s New Mexico Pipeline ("Plains Pipeline"); the Holly Energy Partners, L.P. pipeline ("HEP pipeline"); and NuStar, L.P./ConocoPhillips' Albuquerque-to-Amarillo pipeline ("ATA pipeline"). There are five terminals in Albuquerque, which are owned by Giant, Chevron Corporation ("Chevron"), Holly, NuStar, L.P., and ConocoPhillips. **[Redacted**

**]** Holly Energy Partners ("HEP") also owns a terminal in Moriarty, which is supplied by the HEP pipeline. White p. 5, ¶ 14 (PX04063 at 008).

capacity utilization rates at these two refineries have declined 25% over the past fifteen years due to declining availability of local sources of crude oil.  Ownby p. 26, ¶ 55 (PX04061 at 026); White p. 23, ¶ 70 (PX04063 at 026-027); PX00610 at 027; Giant Industries, Inc. Form 10-K (Dec. 31, 2003) at 17.  To bring Giant's refineries back to full utilization levels, Giant acquired the idle Texas New Mexico pipeline, **[Redacted**

**]**

---

[3]     **[Redacted**

**]**

Western's incentives are quite the opposite.[4]  Western owns and operates a 124,000 bpd refinery and a related terminal in El Paso. **[Redacted**

**]** Western also faces significant losses on its own sales in Albuquerque should gasoline prices fall.  Because of the enormous ramifications to Western of even slight decreases in Albuquerque prices, Western has a strong incentive and ability to keep prices from falling in the northern New Mexico market by diverting Giant's incremental volumes to other areas.  Indeed, Dr. White has concluded that the merged entity would have the incentive and ability to increase prices **[Redacted** **]** above the level that would prevail absent the merger.  White p. 35, ¶ 105 (PX04063 at 038)

No other firm would be able to defeat price increases generated by the combined firm's output reduction scheme.  Existing suppliers are unlikely to respond by delivering more product into the market, **[Redacted**

**]** And additional supply from other markets such as the Gulf Coast has no significant impact on northern New Mexico.

---

[4]      **[Redacted** **]**

[5]      **[Redacted**

**]**

3

The Plains Pipeline, the only conduit to bring product to the market, is fully utilized by current

shippers **[Redacted**

                                                                                                    ]

The Federal Trade Commission seeks to enjoin the proposed merger to prevent the

considerable harm that would be inflicted on northern New Mexico consumers as a result of the

proposed transaction.[6]  Pursuant to Section 13(b) of the Federal Trade Commission Act, 15

U.S.C. § 53(b),[7] the Commission respectfully requests injunctive relief to preserve the status quo

---

[6]        "In order to protect the public interest in competitive markets . . . the
Commission has consistently required merger parties to bear the risk that relief might be
overinclusive, rather than imposing on the public the risk that relief might be underinclusive."
FTC, THE PETROLEUM INDUS.: MERGERS, STRUCTURAL CHANGE, & ANTITRUST ENFORCEMENT
at 14 (Aug. 2004) ("FTC PETROLEUM STUDY").  The Commission has a long history of
preserving competition in the petroleum industry.  It has conducted well over 200 merger
investigations in the industry in the last 10 years.  During the last 25 years, the Commission has
obtained divestitures of refineries and other remedies, and caused the parties to abandon the
transaction in 11 mergers where it feared that competition would suffer in bulk refined products
markets.  Id. at 35-36.

[7]        Section 13(b) "provides for the grant of a preliminary injunction where such
action would be in the public interest—as determined by a weighing of the equities and a
consideration of the Commission's likelihood of success on the merits."  FTC v. H.J. Heinz Co.,
246 F.3d 708, 714 (D.C. Cir. 2001).  The Commission is not required to establish that the
proposed acquisition would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, which prohibits
an acquisition "where in any line of commerce or in any activity affecting commerce in any
section of the country, the effect of such acquisition may be substantially to lessen competition or
to tend to create a monopoly."  Id. at 714 (citing FTC v. Staples, Inc., 970 F. Supp. 1066, 1071
(D.D.C. 1997).  See also FTC v. Food Town Stores, Inc., 539 F.2d 1339, 1342 (4th Cir. 1976)
("The district court is not authorized to determine whether the antitrust laws have been or are
about to be violated.  That adjudicatory function is vested in F.T.C. in the first instance.").

4

pending consideration of the issues in a full administrative trail and to prevent the difficulty of obtaining adequate relief if the parties are now allowed to merge.[8]

## ARGUMENT

### I.    THE RELEVANT MARKET IS BULK SUPPLY OF GASOLINE INTO NORTHERN NEW MEXICO

The relevant product market is the bulk supply of gasoline because, if gasoline prices increase, consumers are unable to substitute gasoline for other refined petroleum products for automobiles and other vehicles designed to use gasoline.  Ownby p. 6, ¶ 12 (PX04061 at 006); White p. 8, ¶ 29 (PX04063 at 011) ("demand for gasoline tends to be highly price inelastic").[9]

---

[8]      [Redacted

] Because wholesalers routinely pass on increased supply costs to their customers, they have no reason to complain about higher gasoline prices post-merger. See Illinois Brick Co. v. State of Ill., 431 U.S. 720 (1977). [Redacted

]

[9]      Plaintiff's First Amended Complaint for Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act narrows the relevant product market definition to gasoline only to streamline the prosecution of this preliminary injunction case. [Redacted

] The Commission nonetheless believes that a broader market covering all light petroleum products, including gasoline, continues to be appropriate [Redacted                                                                                      ] Contrary to Defendant's claims, both demand-side and supply-side substitution are "the relevant (continued...)

Bulk supply involves delivery of large quantities of gasoline produced at local refineries or otherwise shipped by pipeline or ship (for areas near water) to an area. Because Albuquerque is land-locked, bulk supply refers to "pipeline tender" quantities of 5,000 to 25,000 barrels of light petroleum products. Ownby p. 6, ¶ 11 (PX04061 at 006). Bulk deliveries are feasible only at the refinery, via a pipeline, or, in the case of relatively short hauls, via tanker trucks delivering from a refinery or terminal. Customers for bulk deliveries of gasoline include fuel terminals, wholesale resellers, fleet customers with private service stations, and retail service stations. White p. 8, ¶ 31 (PX04063 at 011).

The relevant geographic market is northern New Mexico, which is the "area that would be adversely affected" by the proposed acquisition. <u>United States v. Phila. Nat'l Bank</u>, 374 U.S. 32, 357 (1963). Ownby p. 15, ¶¶ 30, 31 (PX04061 at 015); White p. 8, ¶ 33 (PX04063 at 011); **[Redacted** ] As demonstrated by Dr. White, "demand for bulk deliveries of gasoline to Albuquerque is inelastic at prices prevailing today, and likely would remain inelastic in the face of any insignificant increase in Albuquerque prices for bulk delivery of gasoline." White p. 7, ¶ 25 (PX04063 at 010). **[Redacted**

] Moreover, as Dr. White concludes, because "Giant's capacity expansion likely will lead to significantly reduced prices in Albuquerque . . . the

---

<sup>9</sup> (...continued)
inquiry for product market definition." <u>Id.</u> at 3. <u>See, e.g.</u>, <u>Rebel Oil Co. v. Atl. Richfield Co.</u>, 51 F.3d 1421, 1436 (9th Cir. 1995), <u>cert. denied</u>, 516 U.S. 987 (1995) ("But defining a market on the basis of demand considerations alone is erroneous. A reasonable market definition must also be based on "supply elasticity.") (citations omitted). Regardless, if an acquisition is likely to harm competition in <u>any</u> relevant product market alleged—in this case, either bulk gasoline <u>or</u> bulk light petroleum products—the acquisition would violate Section 7 of the Clayton Act. <u>See Staples</u>, 970 F. Supp. at 1075.

appropriate starting price for the market definition . . . is significantly lower than the prevailing price." White p. 7, ¶ 26 (PX04063 at 010). "At prices below the prevailing price, demand will be even more inelastic than it is at the prevailing price," therefore confirming that northern New Mexico is an appropriate geographic market. White p. 7, ¶ 26 (PX04063 at 010).

     **[Redacted**

     **]** But a relevant geographic market must also "correspond with the commercial realities of the industry . . ." <u>Brown Shoe Co. V. United States</u>, 370 U.S. 294, 336 (1962). **[Redacted**

     **]** The only economic way to deliver Gulf Coast product from El Paso to Albuquerque is via the Plains Pipeline. **[Redacted**

     **]** The Plains Pipeline, however, is fully utilized by current shippers **[Redacted**

     **]**

     Trucking is a physically possible alternative, but is similarly not economically viable over an extended time period. **[Redacted**

---

[10]    **[Redacted**

     **]**

7

] Ownby pp. 23-24, ¶¶ 50, 51

(PX04061 at 023-024); White p. 9, ¶ 36 (PX04063 at 012).  The relevant price differential

between El Paso and Albuquerque would need to be greater than **[Redacted**

] transport cost just to break even.  Ownby pp. 23, ¶ 49 (PX04061 at 023).  The trucking

cost from Amarillo to Albuquerque is even higher **[Redacted**                    ] Ownby pp. 23-24, ¶

50 (PX04061 at 023-024). **[Redacted**

] Thus, trucking does not expand the

relevant geographic market beyond northern New Mexico.

---

[11]    In any event, it is "improper [ ] to include in the market substitutes that may have been attractive . . . only because the market price was far above the competitive level."  United States v. Eastman Kodak Co., 853 F. Supp. 1454, 1469 (W.D.N.Y. 1994) (certain alterations in original) (quoting William M. Landes & Richard A. Posner, Market Power in Antitrust Cases, 94 HARV. L. REV. 937, 970-71 (1981)), aff'd, 63 F.3d 95 (2d Cir. 1995); cf. Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp., 1995-2 Trade Cas. (CCH) ¶ 71,254 at *33 & n.10 (N.D. Cal. 1995) (discussing Cellophane fallacy and geographic market definition).

## II.    GIANT AND WESTERN COMPETE IN THE BULK SUPPLY OF GASOLINE INTO NORTHERN NEW MEXICO

Giant and Western are both bulk gasoline suppliers to the northern New Mexico market.

Ownby pp. 8-9; ¶ 17 **[Redacted**

**]** Giant owns and operates two refineries that supply northern New Mexico by truck.

**[Redacted                              ]** Western supplies the area through the Plains Pipeline,

**[Redacted**

**]**

Defendants would ignore this reality by claiming that Western's product is effectively absent from the market because Western does not own any storage space in Albuquerque terminals.[12] **[Redacted**

---

[12]        **[Redacted**

**]**

9

]

Defendants attempt to rely on a prior Commission investigation where—based on the unique features of the Hawaii market—the Commission argued that bulk suppliers of gasoline "included refiners and owners and operators of terminals." FTC v. Aloha Petroleum, LTD. No. 05-00471 (D. Haw. filed July 27, 2005). However, Aloha Petroleum did not establish a per se rule that bulk suppliers of gasoline may only include refiners and those with control of storage space in local terminals.[13] The Commission's long-standing view has been that "the delineation of relevant antitrust markets requires a careful, realistic assessment of practical demand and supply alternatives."[14] Unlike Defendants' simplistic approach to antitrust analysis where "one-size fits all," the Commission engages in a rigorous, fact-intensive analysis of each proposed merger and seeks the appropriate enforcement action based on the evidence in that particular investigation. In the context of the refined petroleum products markets, the Commission has also repeatedly emphasized that "[a] consuming area's bulk supply comes from either local refineries

---

[13]     Aloha Petroleum LTD, a half-owner of only two marine import terminals on Oahu, proposed to acquire the remaining 50% equity interest in the terminals from Trustreet Properties, Inc. The Commission argued that the only competitive response to the two refiners on Oahu could come from imported cargoes coming through the two marine terminals. Unless imported gasoline could be delivered into the terminals and thus directly into Oahu, it was immaterial how many potential bulk suppliers had the theoretical ability to bring the product to the shores of Oahu. The Commission, therefore, rationally argued that the relevant bulk suppliers were limited to the two Oahu refiners and the owners of the marine terminals. The Aloha Petroleum case is inapposite as firms have terminal access to six terminals serving northern New Mexico and Western does deliver its product into Albuquerque.

[14]     FTC PETROLEUM STUDY at 4.

or <u>more distant refineries that supply the market by pipeline</u>, barge, or tanker," whether or not such outside refineries directly control terminal space in the destination market.[15]

**[Redacted**

] As explained before, all gasoline shipped on the Plains Pipeline is delivered to Albuquerque and therefore is part of that market. The significance of the Plains Pipeline being full is that, should northern New Mexico prices increase, new shippers cannot gain space in any meaningful way, **[Redacted**

] In this context, the question is not whether the pipeline-supplied product is in the market, but whether more product can be delivered on the pipeline in case of the likely price increases that will result from the proposed acquisition.

## III.    THE ACQUISITION WILL SUBSTANTIALLY REDUCE COMPETITION IN NORTHERN NEW MEXICO GASOLINE MARKET

### A.    The Proposed Acquisition Is Presumptively Unlawful

Acquisitions that significantly increase market concentration are presumptively unlawful because the fewer the competitors and the larger the respective market shares, the greater the

---

[15]    <u>Id.</u> (emphasis added) ("Relevant product markets in petroleum mergers . . . include: 1) exploration and production of crude oil; 2) bulk transportation of crude oil; 3) bulk supply (refining and bulk transportation) of refined products; 4) terminaling of refined products; and 5) marketing (wholesale and retailing) of refined products").

[16]    **[Redacted**

]

11

likelihood that the combined firm, or group of firms, could raise prices above competitive levels.[17] The Commission has historically acknowledged that mergers in this industry require particular vigilance on account of the competitive harm resulting from increases in concentration. "The FTC has taken a strict approach in reviewing petroleum-related mergers and has obtained relief in markets at lower concentration levels than it has in other industries." FTC PETROLEUM STUDY AT 13.[18]

Under even the most conservative analysis, the contemplated transaction satisfies the thresholds for presumptive illegality. Viewed conservatively, the transaction would reduce the number of relevant bulk gasoline suppliers to northern New Mexico from six to five, **[Redacted**

---

[17]     MERGER GUIDELINES PX04051 at 015-016; Hosp. Corp. of Am. v. FTC, 807 F.2d 1381, 1389 (7th Cir. 1986), cert. denied, 481 U.S. 1038 (1987). The Herfindahl-Hirschman Index ("HHI") measures market concentration by summing the squares of the individual market shares of all firms in the market. Under Section 1.51 of the MERGER GUIDELINES, an HHI over 1,800 indicates a "highly concentrated" market. If the post-merger HHI exceeds 1,800 and the HHI increase from the merger exceeds 100, a rebuttable presumption is created that the merger would "create or enhance market power or facilitate its exercise." PX04051 at 013-015.

[18]     For example, in the merger of Shell and Texaco Inc., the Commission required the divestiture of Shell's refinery at Anacortes, Washington, when the merger would have increased the HHI for the bulk supply of gasoline in California by as little as 154, to a post-merger level as low as 1,635. Shell Oil Co., 125 F.T.C. 769 (1998). Likewise, in the ConocoPhillips merger, the Commission required the divestiture of Phillips' Salt Lake City refinery and its northern Utah marketing assets when the merger would have increased the HHI in the bulk light petroleum products market to northern Utah by 300, to a post-merger level of 2,100. The Commission also required the divestiture of Conoco's Denver refinery and all of Phillips' eastern Colorado marketing assets when the merger would have increased the HHI by 500, to a post-merger level of 2,600. Complaint, Phillips Petroleum Co., (2003) (FTC Docket No. C-4058), at http://www.ftc.gov/os/2002/08/conocophillipscmp.pdf; Decision and Order (2003) (FTC Docket No. C-4058), at http://www.ftc.gov/os/2003/02/conocophillipsdo.htm.

]

**B.    The Acquisition Will Raise Gasoline Prices to Northern New Mexico Consumers**

[Redacted

---

[19]    Courts have granted preliminary injunctions where mergers resulted in equivalent or lower HHI concentration levels or market shares than those found here. See, e.g., FTC v. Elders Grain, Inc., 868 F.2d 901, 902 (7th Cir. 1989) (acquisition increased market share of largest firm from 23% to 32%); FTC v. Warner Communications, Inc., 742 F.2d 1156,1163 (9th Cir. 1984) (preliminary injunction warranted where merger combined second largest firm with sixth largest firm, resulting in combined 26% market share); FTC v. Bass Bros. Enters., 1984-1 Trade Cas. (CCH) ¶ 66,041 at **18, 20 (N.D. Ohio 1984) (preliminary injunction warranted where mergers increased the HHI by 518 points to 2,320); United States v. UPM-Kymmene OYJ, 2003-2 Trade Cas. (CCH) ¶ 74,101 at **24-25, 36-37 (N.D. Ill. 2003) (injunction warranted where merger resulting in three-firm concentration would account for 80% of production).

[20]    [Redacted

]

13

]

The promise of impending price competition **[Redacted

] was echoed in interviews Giant gave to the media on the topic.  Mr.

---

[21]    Giant's ability and willingness to increase gasoline supply to Albuquerque and Santa Fe makes it a "maverick" in antitrust terms.  A competitor is considered a "maverick" if it can easily expand its sales because of excess capacity:

> [I]n a market where capacity constraints are significant for many competitors, a firm is more likely to be a maverick <u>the greater is its excess or divertable capacity in relation to its sales or its total capacity,</u> and the lower are its direct and opportunity costs of expanding sales in the relevant market.

PX04051 at 018-019 (emphasis added) (footnotes omitted).  Acquisition of a maverick may make coordination among the remaining firms "more likely, more successful, or more complete." <u>Id.</u>

14

Leland Gould, Giant's Executive Vice President for Governmental Affairs **[Redacted        ]** confirmed the direct relationship between Giant's production volumes and gasoline prices in the area in a news story published by The New Mexican on May 7, 2006.[22]  In the article, titled "The Whys Behind Highs," the author writes that "Gould said [gasoline] prices are currently higher in northwest New Mexico because both of Giant's refineries are running at 50 percent capacity." Later in the article the author notes that "Gould said he couldn't estimate how much gasoline prices in New Mexico might drop once the [Giant] refineries are running at full capacity."  Id.

Post-acquisition, the combined Western/Giant would have different economic incentives than Giant alone, and would likely send less total gasoline into the northern New Mexico market than would Giant and Western acting independently. **[Redacted**

**]**

By re-directing or restricting supply away from northern New Mexico, the combined Western/Giant would capture a substantial portion of the resulting price increase due to its large post-merger share of the market.  White p. 10, ¶ 38, Exh. 1 (PX04063 at 012-013); pp. 32, 34, ¶¶ 95, 101, 104 (PX04063 at 035, 037, 038); **[Redacted**

**]**

---

[22]    Wendy Brown, The Whys' Behind the 'Highs', SANTA FE NEW MEXICAN, May 7, 2006, available at http://www.freenewmexican.com/search_archives.php?num=25&st=basic& QryTxt=&sortby=REVERSE_CHRON&datetype=7

There are several ways by which the combined Western/Giant could reduce the overall supply of gasoline to northern New Mexico, thus causing market prices to increase or to fall less than they otherwise would have fallen had Giant remained independent.[23] **[Redacted**

**]**

Eliminating a maverick competitor such as Giant and reducing the overall number of competitors in a market also increases the risk of coordinated interaction among the remaining firms. The ability of firms to coordinate their actions—to pull their competitive punches, with the expectation that their competitors would do the same—depends in substantial part on the number of significant participants in the market. "The relative lack of competitors eases coordination of actions, explicitly or implicitly, among the remaining few to approximate the performance of a monopolist." FTC v. PPG Indus., Inc., 628 F. Supp. 881, 885 n.9 (D.D.C.), aff'd 798 F.2d 1500 (D.C. Cir. 1986). Coordination need not consist of illegal price-fixing, or agreements to allocate customers or restrict output, but may include tacit coordination and interdependent behavior. Elders Grain, 868 F.2d at 905 (". . . if conditions are ripe sellers may

---

[23]     See Staples, 970 F. Supp. at 1092 ("[c]onsumers would still be hurt if prices after the merger did not fall as far as they would have absent the merger.").

[24]     Ownby, p. 28, ¶ 65 (PX04061 at 028).

[25]     Ownby, pp. 28-29, ¶¶ 65, 66 (PX04061 at 028-029).

not have to communicate or otherwise collude overtly in order to coordinate their price and output decisions") (reduction of competitors from 6 to 5); see also PX04051 at 016-017.

By reducing the number of effective bulk suppliers of gasoline from six to five, the acquisition thus also increases the likelihood of coordinated interaction. Together, these five firms would account for essentially all of the bulk supply of gasoline to the market. Courts have blocked mergers where the number of competitors post-acquisition was greater than those here.[26]

### C.    Other Suppliers Will Not Defeat Supracompetitive Gasoline Prices Resulting from the Acquisition

Three firms **[Redacted                        ]** could theoretically respond to a Western-generated output decrease or price increase by shipping additional gasoline to the northern New Mexico market.[27] Ownby, pp. 10-11, ¶¶ 20, 21 (PX04061 at 010-011).[28] Such competitive response appears highly unlikely, however, even if Albuquerque prices rose as much as three cents per gallon. Ownby, p. 15, ¶ 31 (PX04061 at 015).

---

[26]    See Hosp. Corp. of Am., 807 F.2d at 1387 (reduction from 11 to 7 competitors); Bass Bros. Enters., at *23 (reduction from 7 to 5 competitors); Warner Communications, 742 F.2d at 1163 (reduction from 6 to 5 competitors).

[27]    **[Redacted**

**]**

[28]    As indicated, supply from the Gulf Coast is not viable, primarily because of the high trucking costs and the fact that the Plains Pipeline operates at full capacity. Ownby, p. 21, ¶ 42 (PX04061 at 021); **[Redacted ]**

**[Redacted**

**]** Dr. White's econometric analysis confirms that "if the supply of gasoline to Albuquerque were restricted in the post-merger era relative to what it otherwise would be, then [the] third-party supplier responses would do little to mitigate price increase within the range of the observed data." White, p. 20, ¶ 62 (PX04063 at 023).

The reason for the lack of competitive responses are varied. **[Redacted**

**]** Pure economics drives those suppliers' decisions to supply more profitable markets before sending additional gasoline to Albuquerque. Ownby, pp. 16-18, ¶¶ 34,35 (PX040610 at 016-018); **[Redacted**

**]** Existing supply obligations also prevent the firms from shifting significant volumes into the Albuquerque market, or from the Albuquerque market to alternative markets, in response to changes in supply or prices. Ownby, p. 18, ¶ 35 (PX04061 at

18

18); **[Redacted**                                     **]** Finding new customers and building incremental demand is also exceedingly difficult.[29]

Another consideration is the risk of an unexpected oversupply of Albuquerque terminals and the threat of a resulting "fire-sale." Ownby, pp. 18-19, ¶ 36 (PX04061 at 018-019). Should Albuquerque prices fall after a decision were made to send more gasoline to the market, the suppliers would have no ability to then divert product to a higher-priced market, meaning they could potentially incur losses on the added supply. Ownby, pp. 18-19, ¶¶ 35, 36 (PX04061 at 018-019). Last but not least, physical constraints such as refinery interruptions or pipeline problems occasionally prevent these firms from sending additional product to the market to respond to a small price increase. **[Redacted**

                                                                    **]**

---

[29]      One reason it is difficult and time-consuming for these suppliers to build incremental demand in northern New Mexico is because the market is largely a "branded" retail area, with limited demand for unbranded gasoline. Ownby, p. 21, ¶ 43 (PX04061 at 021); **[Redacted**                                      **]**

**D.**     **The Relevant Market Is Insulated from New Entry or Expansion**[30]

Existing pipeline bottlenecks prevent new suppliers from entering the northen New Mexico bulk gasoline supply market. Two pipelines, Longhorn and Magellan, bring product from Gulf Coast refineries to El Paso. **[Redacted**

**]** However, the Plains Pipeline is the only pipeline capable of delivering Gulf Coast product to the northern New Mexico market. Ownby, p. 12, ¶ 24 (PX04061 at 012). The Plains Pipeline has been full for several years and operates under proration, meaning that current shippers receive a pro rata share of the pipeline space. **[Redacted** **]** Ownby, p. 13, ¶ 25 (PX04061 at 013); PX01200 at 037. New shippers can annually reserve 5% of the total Plains pipeline space, but each individual new shipper can use only 1.25% of the total line capacity. Ownby, p. 13, ¶ 25 (PX04061 at 013); **[Redacted**

**]** A new shipper could therefore ship an average of only 350 barrels daily, the equivalent of less than two truckloads of gasoline or diesel fuel. **[Redacted** **]** Ownby, p. 13, ¶ 25 (PX04061 at 013). Moreover, the lilliputian volume would not increase supply to northern New Mexico because it would displace an equivalent volume of shipments on the same pipeline by the other current shippers. **[Redacted**

---

[30]     If entry or expansion is unlikely, the merged entity can raise prices without attracting new competition or offsetting supply. California v. Am. Stores Co., 697 F. Supp. 1125, 1131 (C.D. Cal. 1988). Entry is considered "easy" if it would be "timely, likely and sufficient in its magnitude, character and scope to deter or counteract the [anti]competitive effects" of a proposed transaction. PX04051 at 21, quoted with approval, Rebel Oil, 51 F.3d at 1440. Entry is timely if a new entrant would have a significant market impact within two years. PX04051 at 023. Entry is sufficient if it would be on a large enough scale to counteract the anticompetitive effects of the transaction. Id. at 024.

]

The other pipelines that supply the northern New Mexico market—the ATA pipeline and the Four Corners pipeline—are not available to new suppliers. Both pipelines are owned by current suppliers to the market and, more importantly, the only access to the pipelines is through the refineries owned by the suppliers. As a result, in order to supply the northern New Mexico market, a new supplier would have to bring product by truck from El Paso (266 highway miles) or Amarillo (288 highway miles).[31] **[Redacted**

]

New entry within the next two years by building new refineries or pipelines is also extremely unlikely given the enormous cost, permitting, and construction issues involved. FTC PETROLEUM STUDY AT 238. No publicly announced pipeline projects serving Albuquerque are under way. Building or expanding a new pipeline is expensive and time consuming, would not

---

[31]    The Plains pipeline tariff to transport a barrel of light petroleum products from El Paso to Albuquerque is approximately 2.5 cents per gallon. PX1200 at 050. **[Redacted**

]

be undertaken without firm volume commitments by shippers, and requires surmounting onerous permitting issues.  Id.

   **[Redacted**

]

---

[32]     See, e.g., <u>Monfort of Colo., Inc. v. Cargill, Inc.,</u> 761 F.2d 570, 580-81 (10th Cir. 1985), rev'd on other grounds, 479 U.S. 104 (1986) (entry barriers in meat packing market suggested by facts that new plant would cost $20 to $40 million, that it would take 12 to 18 months to complete, and that profit margins were low); <u>FTC v. Cardinal Health,</u> 12 F.Supp.2d 34,

(continued...)

23

**E.     The Proposed Transaction Will Not Enhance Competition By Producing Cognizable Efficiencies**

**[Redacted**

**]**

For efficiencies to be credited they must be "merger-specific" and "verifiable." PX04051 at 024-026. "Merger-specific" means they must be "likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects." Id. The claimed efficiencies cannot be efficiencies that could "be achieved by either company alone." Heinz, 246 F.3d at 722. Claimed efficiencies must also be verifiable. PX04051 at 024-026; see also Staples, 970 F. Supp. at 1089 (efficiency claims must be backed by "credible evidence").

Defendants' few, half-hearted claims of efficiencies from the transaction are not merger-specific. **[Redacted**

**]** In short, none of the claimed efficiencies are merger specific and thus should not be given any weight by the Court.[33]

---

[32]     (...continued)
58-59 (D.D.C., 1998) (new entry insufficient to defeat anticompetitive effects caused by the merger).

[33]     Even if the claimed efficiencies were assumed to be specific to this acquisition, Western concedes that they are not verifiable. In a recent 10-Q filed with the Securities

(continued...)

24

## CONCLUSION

Where, as here, the Commission has demonstrated a likelihood of success on the merits, Defendants face a difficult task of "justifying anything less than a full stop injunction." PPG Indus., 798 F.2d at 1506; see Heinz, 246 F.3d at 726; Staples, 970 F. Supp. at 1091. To preserve competition pending administrative adjudication the Court should grant the Commission's motion for preliminary injunction.

Respectfully submitted,

Electronically Filed

Dated: May 4, 2007

/s/ Thomas J. Lang (N.M. Bar. No. 0739)
Senior Litigation Counsel
Bureau of Competition
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC  20580
(202) 326-3665

DEYONNA YOUNG (N.M. Bar No. 2980)
Assistant Attorney General, Litigation Division (Antitrust)
Office of the New Mexico Attorney General
Special Deputy to the Federal Trade Commission
111 Lomas Boulevard NW, Suite 300
Albuquerque, NM  87102
(505) 222-9089

---

[33]    (...continued)
Exchange Commission Western admits that "We can give no assurance that our expectations with regards to integration and synergies [from the Giant acquisition] will materialize." PX00021 at 047.

25

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 11th day of May, 2007, I filed the foregoing

electronically through the CM/ECF system.

I FURTHER CERTIFY that on such date I served the foregoing on the following counsel

via electronic mail:

Marc G. Schildkraut, Counsel for Defendants Paul L. Foster and Western Refining, Inc.
Heller Ehrman, LLP
1717 Rhode Island Avenue, N.W.
Washington, DC  20036
marc.schildkraut@hellerehrman.com
(202) 912-2140

Tom D. Smith, Counsel for Defendant Giant Industries, Inc.
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC  20001
tdsmith@jonesday.com
(202) 879-3971

Thomas A. Outler, Counsel for Defendants
Rodey, Dickason, Sloan, Akin & Robb, P.A.
P.O Box 1888
Albuquerque, NM  87103
toutler@rodey.com
(505) 768-7256

_____/s/_____
Thomas J. Lang, Attorney for Plaintiff