# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION )
)
Plaintiff, )
)
v. ) Civil Action No. 1:07-CV-01021-PLF
)
)
WHOLE FOODS MARKET, INC. ) Judge: The Hon. Paul L. Friedman
)
and )
)
WILD OATS MARKETS, INC. )
)
Defendants. )
)
)
THE KROGER CO. )
1014 Vine Street )
Cincinnati, OH 45202 )
(513) 762-4000 )
Proposed Intervenor )
)
)
)

## UNOPPOSED MOTION OF THE KROGER CO. TO INTERVENE FOR THE PURPOSE OF PROTECTING ITS CONFIDENTIAL BUSINESS INFORMATION

The Kroger Co. ("Kroger") hereby moves to intervene in this action pursuant to

Fed. R. Civ. P. 24 for the limited purpose of protecting some of its most highly confidential

business and trade secrets. The parties to this case do not oppose the relief sought in this motion.

Kroger provided these highly confidential documents and information to the Federal

Trade Commission ("FTC") during the course of the FTC's investigation into the proposed

**RECEIVED**

JUN 1 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

acquisition of Wild Oats Markets, Inc. ("Wild Oats") by Whole Foods Market, Inc. ("Whole Foods").

As this Court is aware, Whole Foods has filed a motion for entry of a "final" protective order[1] that would permit sharing of highly confidential business and trade secrets – including documents and information produced by Kroger to the FTC – with an in-house General Counsel at Whole Foods.

For the reasons set forth in the memorandum in support hereof, this Court should grant Kroger's motion to intervene.  First, Kroger unquestionably has a cognizable interest in this issue because it is Kroger's highly confidential business and trade secrets that could be produced to an in-house General Counsel of Whole Foods.  Second, if these trade secrets are produced as requested by Whole Foods, Kroger's interest could be irreparably impaired.  Third, the existing parties do not adequately represent Kroger's interests in this matter as they are concerned with Whole Foods' proposed acquisition of Wild Oats, not with protecting Kroger's business secrets. Finally, Kroger has timely filed this Motion.

---

[1] *See* Docket # 12 (Ex. A to memorandum in support hereof).

2

WHEREFORE, Kroger respectfully requests that this Court grant its unopposed motion to intervene in this action for the purpose of protecting its confidential documents and information.

Respectfully submitted

Justin S. Antonipillai (D.C. Bar # 460046)
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5066
(202) 942-5999 (facsimile)
Justin_Antonipillai@aporter.com
Attorney for The Kroger Co.

June 18, 2007

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION )<br><br>Plaintiff, )<br><br>v. )<br><br>WHOLE FOODS MARKET, INC. )<br><br>and )<br><br>WILD OATS MARKETS, INC. )<br><br>Defendants. )<br>_____ )<br><br>THE KROGER CO. )<br>1014 Vine Street )<br>Cincinnati, OH 45202 )<br>(513) 762-4000 )<br>Proposed Intervenor )<br><br>_____ ) | Civil Action No. 1:07-CV-01021-PLF<br><br>Judge: The Hon. Paul L. Friedman |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNOPPOSED
MOTION OF THE KROGER CO. TO INTERVENE FOR THE PURPOSE OF
PROTECTING ITS CONFIDENTIAL BUSINESS INFORMATION**

The Kroger Co. ("Kroger") respectfully submits this Memorandum of Points and

Authorities in Support of its Motion to Intervene For The Limited Purpose Of Protecting Its

Confidential Business Secrets.  The parties to this action do not oppose the relief sought herein.

Whole Foods Market, Inc. ("Whole Foods") has filed a motion for entry of a "final"

protective order that would permit certain highly confidential information to be shared with an

1

in-house General Counsel at Whole Foods.[1]  Intervention is proper because Kroger has an interest in protecting certain highly confidential documents sought to be shared with an in-house General Counsel at Defendant Whole Foods.  If these documents are so shared, Kroger's ability to protect its business secrets would be seriously impaired.  In addition, Kroger should be permitted to intervene because Kroger's interest in maintaining the confidentiality of this vital information is not adequately represented in this matter.  For these, and the other reasons set forth below, this Court should grant Kroger's motion to intervene.

## BACKGROUND

When the Federal Trade Commission ("FTC") began investigating a proposed acquisition by Whole Foods of Wild Oats Markets, Inc. ("Wild Oats"), Kroger cooperated with this effort by providing certain highly confidential, trade secret information to the FTC.  *See* Declaration of T. Foley ("Foley Decl.") ¶¶9, 11 (Ex. B).  However, because Kroger regularly takes great care in assuring its business and trade secrets are protected and maintained as confidential, it requested that Kroger's confidential business and trade secrets be protected from disclosure to unauthorized third parties, including its competitors.  *See* Foley Decl. ¶ 9.  The FTC made clear that it would treat the documents and information produced by Kroger confidentially consistent with its obligations under law and regulations, including the Hart-Scott-Rodino Act.  Foley Decl. ¶ 10.

Included in Kroger's production to the FTC was certain highly confidential information, including (1) Kroger's "progress reports," which sets forth Kroger's strategic expansion and new store information; (2) Kroger operating statements, including sales and gross profit by store and

---

[1] Pursuant to Rule 24(c), a copy of the Whole Foods motion (Docket Number 12) is attached as Exhibit A.

department; and (3) certain Supermarket Division data, including transaction data by store and department. Foley Decl. ¶ 11. This information is not technical. Foley Decl. ¶ 14. In other words, it can easily be understood by outside counsel without the aid of consultants or experts in the field. *Id.* That is one of the reasons why they are so sensitive to Kroger.

On June 8, 2007, this Court entered an Interim Protective Order Governing Discovery Material that would keep Kroger's highly confidential information protected from review by in-house employees at Whole Foods. *See* Letter from Jennifer K. Schwab, Bureau of Competition, Federal Trade Commission, to Bruce Gack, Assistant General Counsel, The Kroger Co. (June 7, 2007) (Ex. C). Whole Foods has now filed a motion seeking entry of a final protective order that would permit sharing of this highly confidential information with an in-house General Counsel at Whole Foods. *See* Docket No. 12. If the Whole Foods' Motion were granted, someone at Whole Foods who, under established law, would be deemed to be participating in strategic and competitive decisions would immediately learn Kroger's business plans and strategies, gain access and insight as to Kroger's customers' preferences and demands, and learn how Kroger's individual stores and departments in those store operate, including sales and gross profit. *See* Foley Decl. ¶ 19. In sum, the very essence of Kroger's business would be open to Whole Foods' scrutiny. As a result, Kroger will suffer substantial harm.

In this context, Kroger now seeks to intervene to protect its highly confidential business information.

## **ARGUMENT**

"Federal appellate courts considering the issue have interpreted the requirements of Rule 24 flexibly and have uniformly concluded that third parties may permissively intervene for the purpose of contesting protective orders." *In re Vitamins Antitrust Litig.*, No. MISC. 99-197, 2001 WL 34088808 at *5 (D.D.C. Mar. 19, 2001) (Ex. D); *see EEOC v. Nat'l Children's Center,*

3

*Inc.,* 146 F.3d 1042, 1045 (D.C. Cir. 1998) (surveying decisions from the First, Second, Third,

Fifth, Sixth, Seventh, Ninth, and Tenth Circuits that have granted permissive intervention for the

purpose of challenging a protective order). Moreover, courts considering the issue are nearly

uniform in holding that intervention is the proper means for challenging or modifying a

protective order. *See, e.g., Nat'l Children's Center,* 146 F.3d 1042; *Autry v. K Mart Corp., Inc.,*

No. 92-105-Civ-3-BR, 1995 U.S. Dist. LEXIS 18253, at *2-3 (E.D.N.C. Nov. 22, 1995)

(Ex. E)(citing cases from First, Second, Sixth, Ninth, and Tenth Circuits); *Beckman Indus. Inc. v.*

*Int'l Ins. Co.,* 966 F.2d 470, 472 (9 Cir. 1992) (citing cases from First, Second, Fifth, Sixth, and

Tenth Circuits).

Kroger is clearly entitled to intervene under these circumstances. A party may intervene

as a matter of right pursuant to Rule 24 if it meets four requirements:

(1) the motion must be timely;

(2) the applicant must have a significantly protectable interest relating to the property or transaction which is the subject of the action;

(3) the applicant must be so situated that the disposition of the action may, as a practical matters, impair or impede its ability to protect its interest; and

(4) the applicant's interest must be inadequately represented by the parties to the action.

*See* Fed. R. Civ. P. 24(a)(2); *Williams & Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.,*

840 F.2d 72, 74 (D.D.C. 1988). A nonparty, such as Kroger, who seeks to intervene need not

intervene as a full party to the litigation, but may intervene for a limited purpose, such as relating

to a protective order. *EEOC v. National Children's Ctr.,* 146 F.3d 1042, 1047 (D.C. Cir. 1998).

Kroger seeks to intervene in this litigation for the limited purpose of opposing the entry

of a protective order that would allow the disclosure of Kroger's most highly confidential

business and trade secret documents to an in-house General Counsel at Whole Foods. As a

result, and as fully demonstrated below, Kroger meets the requirements of Fed. R. Civ. P. 24, and it is entitled to intervene.[2]

### 1.    Kroger's Motion is Timely.

First, Kroger's Motion is timely. Kroger filed its motion within days of learning that its interests were at stake in the litigation. *See* Foley Decl. ¶ 18. Thus, the timeliness of Kroger's motion is not open to serious debate.

### 2.    Kroger has an Interest That May be Impaired.

Here, if the Court enters any form of protective order that fails to protect the confidential documents that Kroger submitted to the FTC, Kroger will suffer irreparable and substantial economic harm. The FTC has obtained sensitive business information from Kroger that Kroger would never otherwise disclose to unauthorized persons outside the company, much less companies like Whole Foods and Wild Oats that generally compete with Kroger. *See* Foley Decl. ¶¶11, 13, 19. Maintaining Kroger's confidential business and secrets by preventing their disclosure represents a significant interest in this action, and this Court has the ability to prevent injury to Kroger by entering a protective order sufficient to protect Kroger's most sensitive information. Accordingly, intervention is proper.

### 3.    The Disposition of the Action May, As a Practical Matter, Impair or Impede Kroger's Ability to Protect Its Interest.

Kroger's interest will unquestionably be impaired if Whole Foods prevails in having its version of the protective order entered. Whole Foods' proposed protective order allows

---

[2] Permissive intervention also is appropriate under these circumstances. *In re Vitamins Antitrust Litig.*, No. MISC. 99-197, 2001 WL 34088808 at *5 (D.D.C. March 19, 2001) (Ex.D) (see quotations in text); *see EEOC v. Nat'l Children's Center, Inc.*, 146 F.3d 1042, 1045 (D.C. Cir. 1998) (same). Because it is the sharing of Kroger's trade secrets that would be affected by Whole Foods' Motion, Kroger should be permitted to intervene as a matter of right. However, if this Court determines that only permissive intervention is available, Kroger should be permitted to intervene permissively for the same reasons set forth in this brief. Because many of the same arguments would apply, Kroger does not repeat those arguments.

disclosure of even Kroger's most sensitive business information and trade secrets to an in-house General Counsel at Whole Foods who – under the legal tests at issue – would be deemed to participate in strategic and competitive decisions. While Kroger does not oppose the production of the majority of the confidential documents it provided to the FTC to be shared with Whole Foods' in-house counsel, *see* Foley Decl. ¶¶12-13, it does oppose sharing Kroger's most sensitive business information. *Id.* ¶ 13. Moreover, while Kroger does not question the ethics of the individual attorney designated by Whole Foods to review its competitors' confidential business documents, the fact that she is in-house General Counsel and employed by Whole Foods is Kroger's chief concern. Among other things, the designated in-house counsel can be indirectly charged with participating in discussions or decisions that would be affected by these highly sensitive Kroger documents, and it would be unfair for Whole Foods to obtain this kind of a business advantage through this lawsuit. In addition, mistakes can be made, inadvertent disclosures do happen, and unauthorized personnel can either accidentally or intentionally gain access to Kroger's documents so long as they are in the possession of Whole Foods' employees.

### 4.    Kroger is Not Adequately Represented by Existing Parties.

An intervenor must make only a minimal showing that the existing parties may not adequately represent its interests. *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n.10 (1972). Here, the existing parties to the lawsuit have their own objectives, none of which are focused on protecting the confidentiality of Kroger's production of documents. While the FTC is interested in preventing a merger between the Defendants, and Defendants are interested in seeing the merger through, Kroger seeks intervention not to voice a position on the merger, but rather only to protect its confidential business information and trade secrets. Any company has a vital interest in assuring that its most sensitive business and trade secrets are protected against disclosure outside the company. Kroger's interests are no different here.

Thus, while the FTC and Defendants are ultimately concerned with the outcome of the underlying case, Kroger's **sole focus** for seeking intervention in this matter is the protection of its

6

business and trade secrets, regardless of the ultimate decision in this case concerning Whole

Foods' proposed acquisition of Wild Oats.

WHEREFORE, Kroger respectfully requests that the Court grant its Motion to Intervene

in this action for the purpose of protecting its confidential documents and information.

Respectfully submitted,

Justin S. Antonipillai (D.C. Bar #  460046)
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
(202) 942-5066
(202) 942-5999 (facsimile)
Justin_Antonipillai@aporter.com
Attorney for The Kroger Co.

June 18, 2007

7

## CERTIFICATE OF CONFERENCE

Pursuant to L. Civ. R. 7(m) and Fed. R. Civ. P. 26(c), I hereby certify that I conferred in good faith with counsel for Plaintiff and Defendants on June 18, 2007, in an attempt to obtain consent on the foregoing UNOPPOSED MOTION OF THE KROGER CO. TO INTERVENE FOR THE PURPOSE OF PROTECTING ITS CONFIDENTIAL BUSINESS INFORMATION.

On June 18, 2007, counsel for the Federal Trade Commission, Wild Oats Markets, Inc., and Whole Foods Market, Inc., indicated that those parties do not oppose the relief sought in this motion.

Justin S. Antonipillai
Attorney for The Kroger Co.

## CERTIFICATE OF SERVICE

I hereby certify that, on this 18th day of June, 2007, I caused the foregoing UNOPPOSED MOTION OF THE KROGER CO. TO INTERVENE FOR THE PURPOSE OF PROTECTING ITS CONFIDENTIAL BUSINESS INFORMATION, together with the Memorandum of Points and Authorities, Declaration of Todd Foley, and proposed order in support thereof, to be served on the persons listed below by first-class mail and electronic mail:

**Attorneys for Plaintiff**
Thomas H. Brock
FEDERAL TRADE COMMISSION
601 New Jersey Ave., NW
Washington, D.C. 20001
tbrock@ftc.gov

**Attorneys for Defendant Whole Foods Market, Inc.**
Alden L. Atkins
VINSON & ELKINS L.L.P.
The Willard Office Building
1455 Pennsylvania Avenue, N.W., Suite 600
Washington, DC 20004-1008
aatkins@velaw.com

**Attorney for Defendant Wild Oats Markets, Inc.**
Clifford H. Aronson
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
caronson@skadden.com

Jordan Esbrook[*]

---

[*] Admitted only in Minnesota; practicing in the District of Columbia pending approval of application for admission to the D.C. Bar and under the supervision of principals of the firm who are members in good standing of the D.C. Bar.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-CV-01021-PLF |
| | ) | |
| | ) | Judge: Paul L. Friedman |
| WHOLE FOODS MARKET | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILD OATS MARKETS, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## MOTION OF THE KROGER CO. TO INTERVENE

**Exhibit A**

# RECEIVED

JUN **1 8** 2007



NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION )
)
Plaintiff, )
)
)
v. ) Civil Action No. 1:07-CV-01021-PLF
)
)
WHOLE FOODS MARKET, INC. )
)
and )
)
WILD OATS MARKETS, INC. )
)
Defendants. )

## MOTION OF DEFENDANT WHOLE FOODS MARKET, INC.
## FOR ENTRY OF A FINAL PROTECTIVE ORDER

Defendant Whole Foods Market, Inc. ("Whole Foods"), through counsel, hereby moves

the Court pursuant to Rule 26(c) for the entry of a final protective order governing the use and

disclosure of confidential information. This proposed final protective order would replace the

Interim Protective Order entered by the Court on June 8, 2007. A Memorandum of Points and

Authorities in support of the motion, as well as the Declaration of Roberta Lang and the

proposed Final Protective Order, is being submitted herewith.

Defendant Whole Foods requests oral argument in connection with this motion.

Respectfully submitted,


/s/ Alden L. Atkins
Alden L. Atkins (DC Bar No. 393922)
Neil W. Imus (DC Bar No. 394544)
David E. Hawkins (DC Bar No. 482016)
VINSON & ELKINS L.L.P.
The Willard Office Building
1455 Pennsylvania Avenue, N.W., Suite 600
Washington, DC 20004-1008
Telephone (202) 639-6500
Facsimile (202) 639-6604
Email aatkins@velaw.com
         nimus@velaw.com
         dhawkins@velaw.com

Attorneys for Whole Foods Market, Inc.

June 11, 2007

## CERTIFICATE OF SERVICE

I hereby certify that, on this 11th day of June, 2007, I caused the foregoing MOTION OF DEFENDANT WHOLE FOODS MARKET, INC. FOR ENTRY OF A FINAL PROTECTIVE ORDER, together with the Memorandum of Points and Authorities, Declaration of Roberta L. Lang, and proposed order in support thereof, to be filed and served using the Court's ECF system and also caused these same papers to be served on the persons listed below by electronic mail:

**Attorneys for Plaintiff**

Michael J. Bloom
Thomas H. Brock
FEDERAL TRADE COMMISSION
601 New Jersey Ave., NW
Washington, D.C. 20001
mjbloom@ftc.gov

**Attorney for Defendant Wild Oats Markets, Inc.**

Clifford H. Aronson
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
caronson@skadden.com


/s/ Alden L. Atkins
Attorney for Whole Foods Market, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:07-CV-01021-PLF |
| WHOLE FOODS MARKET, INC. | ) | |
| and | ) | |
| WILD OATS MARKETS, INC. | ) | |
| Defendants. | ) | |

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
### THE MOTION OF DEFENDANT WHOLE FOODS MARKET, INC.
### FOR ENTRY OF A FINAL PROTECTIVE ORDER

Before this case was filed by the Federal Trade Commission (the "Commission"), the parties tried to negotiate a protective order that would facilitate the efficient litigation of this matter, allow parties and third parties with confidential information to protect that information in discovery, and to ensure that commercially sensitive information filed with the Court would be protected. The parties were able to reach agreement on most issues, but one significant issue remains and requires the Court's intervention: the Commission refuses to allow Roberta L. Lang, the General Counsel of Defendant Whole Foods Market, Inc. ("Whole Foods"), to have access to confidential information.

In order to allow the prompt exchange of pleadings and other confidential information in the early days of this litigation, the defendants provisionally accepted an Interim Protective Order prepared by the Commission, which was entered by the Court on June 8, 2007. The

– 1 –

Interim Protective Order specifically provides that its entry is without prejudice to the right of either party to ask the Court to amend the protective order. Importantly, the Interim Protective Order prohibits Ms. Lang from seeing any confidential information. Because the Interim Protective Order designates as Confidential all information received by the Commission during its investigation, and because it provisionally designates all materials as Restricted Confidential (a higher level of confidentiality) for a period of ten days, the effect of the Interim Protective Order is to prevent Ms. Lang from seeing even unredacted copies of the pleadings filed with the Court.

As demonstrated below, Ms. Lang's unrestricted involvement in this important matter, both as a participant in the company's defense and as the legal advisor to her senior management and board of directors, is critical to Whole Foods. The Commission's proposal would prohibit the complete participation of Whole Foods' General Counsel in the defense of serious antitrust claims arising from the proposed acquisition of Wild Oats Markets, Inc. ("Wild Oats") by Whole Foods. In this type of case, it is critical that the defense have the complete participation of the defendant's chief legal officer, who has unique and comprehensive knowledge of the relevant legal issues both in the company and in the industry. Without the full assistance of Ms. Lang, Whole Foods will be hobbled in preparing its defense, and the Commission would have an unfair advantage.

The compelling interests of Whole Foods in defending itself far outweigh the Commission's confidentiality concerns. The Commission is concerned that Ms. Lang is employed by Whole Foods and therefore could unintentionally misuse the confidential information of competitors. Those concerns are ironic in light of the Commission's central contention here that those third parties are not in the same product market as Whole Foods and

-2-

therefore are not significant competitors. In any event, the Commission's concerns are mitigated because (1) Ms. Lang is not involved in competitive decisionmaking and therefore is not in a position inadvertently to disclose confidential information, and (2) Ms. Lang is an attorney bound by ethics rules and has agreed to subject herself to the disciplinary jurisdiction of this Court to ensure compliance with the proposed protective order.

The Commission has recently litigated this very same issue in FTC v. Foster, No. CIV 07-532 JB/ACT (D.N.M. Apr. 26, 2007), and, as discussed in greater detail below, the court in that case rejected the Commission's position and permitted the defendants' general counsel to have access to confidential information. The defendants' interests here are just as compelling. Accordingly, the Court should modify the interim protective order to grant Ms. Lang full access to discovery material and pleadings filed with the Court. See Whole Foods' proposed "Protective Order Regarding Discovery Material" (copies attached and incorporated herein as Exhibits "A" and "B", reflecting native and redline versions of the proposed order, respectively).

### Background

Whole Foods' General Counsel, Roberta L. Lang, has been an integral part of the legal team involved in the FTC proceedings leading up to this lawsuit. She advised the Company with respect to the negotiation of the underlying transaction, and she has supervised the legal strategy for the administrative process while the Commission was reviewing the proposed transaction. See Declaration of Roberta Lang ("Lang Decl.") (attached as Exhibit "C" and incorporated herein by reference) ¶ 8. She also is responsible for advising her senior management and board of directors on litigation strategy, and she cannot provide informed legal advice without full access to relevant information. See id. ¶ 10.

$-3-$

The Commission alleges that Whole Foods' proposed acquisition of Wild Oats will increase prices and reduce quality and services among premium natural and organic supermarkets by reducing competition in the industry. During its inquiry, the Commission collected confidential information from Whole Foods, Wild Oats, and their competitors. Although defendants have not yet received the information collected by the Commission, they expect that the Commission has collected information about prices, margins, competitive strategy, and other matters. They also anticipate that they may seek additional discovery from competitors in discovery.

The Commission alleges that the relevant product market in this case is "premium natural and organic supermarkets." Complaint ¶ 20. It has defined the product market so narrowly that the only participants in the relevant market are Whole Foods, Wild Oats, and perhaps one or two others that are not located in any of the geographic markets at issue. In short, the third party competitors whose information is at issue are ones that the Commission alleges are outside the relevant product market and are, in the Commission's view, distant competitors of Whole Foods. We expect to show that there is robust competition, but the Commission's position on this protective order is at odds with its central position on the merits.

The Interim Protective Order provides that "Restricted Confidential Discovery Material," a highly sensitive subset of Confidential Information, is eligible for additional protection. This category is defined to include critical information such as "marketing plans, pricing plans, financial information, trade secrets, or Documents of a like nature." Paragraph 8 of the FTC's Interim Protective Order lists certain classes of persons who are entitled to access Restricted Confidential Discovery Material, and it does not include inside counsel. Theoretically an inside

-4-

counsel could see Confidential Information, but as the blank in Paragraph 9 illustrates, the Commission will not let Ms. Lang see even Confidential Information.

Importantly, Ms. Lang has no involvement in the competitive decisionmaking of Whole Foods. See Lang Decl. ¶ 4. Most competitive decisions at Whole Foods are handled at the regional level by each of the eleven Regional Presidents and their teams. See id. ¶ 5. Ms. Lang is also not a member of Whole Foods' six-member "E Team," its group of senior executives with ultimate responsibility for those competitive decisions that are made at the national level. See id. ¶ 6. Ms. Lang does not participate in decisions on pricing, how much inventory to purchase, the mix of products to carry, or where and how to sell these products. See id. ¶ 4. Also, Wild Oats has voluntarily agreed that Ms. Lang should have access to all of its confidential information pursuant to the terms of the proposed protective order. See id. ¶ 13.

While other personnel at Whole Foods make competitive business decisions, Ms. Lang is deeply involved in the legal affairs of Whole Foods and is uniquely positioned to advise her management on important legal issues, including the pending litigation that will decide the fate of her company. See id. ¶¶ 8-11. Ms. Lang has worked at Whole Foods since 1998, serving as General Counsel since 2000, and has unique and in-depth knowledge of the company and its business. See id. ¶ 11. Ms. Lang is uniquely positioned to understand the evidence in this case, to appreciate its legal significance, and to identify sources of information within the company to develop responses as appropriate. See id. ¶¶ 8-11. Further, as General Counsel, she must provide fully informed legal advice to the executives of the company and its board of directors about this litigation and the transaction. See id. ¶ 10.

– 5 –

## Argument

### A.    Rule 26(c)(7) Gives Courts Discretion to Fashion Appropriate Protective Orders.

Rule 26(c)(7) of the Federal Rules of Civil Procedure permits a court to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way . . . ." Fed. R. Civ. P. 26(c)(7). Thus, "the district court has discretion in managing discovery" and may "undertake 'an individualized balancing of the many interests that may be presented in a particular case.'" Diamond Ventures, LLC v. Barreto, 452 F.3d 892, 898 (D.C. Cir. 2006).

### B.    Inside Counsel Not Involved in Competitive Decisionmaking Should Have Access to Confidential Information

With respect to distinctions between outside and inside counsel in protective orders, the most important factor is whether the inside counsel is involved in "competitive decisionmaking." U.S. Steel Corp. v. United States, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984) (granting access to inside counsel). Competitive decisionmaking includes "advising on decisions about pricing or design 'made in light of similar or corresponding information about a competitor.'" Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1470 (9th Cir. 1992) (quoting U.S. Steel "as the leading authority" on the matter). Courts should not adopt a per se rule categorically restricting inside counsel access to confidential information, but instead must examine the role that the inside counsel plays in the company. See Matsushita Elec. Indus. Co. v. United States, 929 F.2d 1577, 1580 (Fed. Cir. 1991) ("denial of access sought by in-house counsel on the sole ground of status as a corporate officer is error").

–6–

Accordingly, courts have frequently held that inside counsel who demonstrate the requisite detachment from competitive decisionmaking are entitled access to confidential information. See Intervet, Inc. v. Merial Ltd., 241 F.R.D. 55 (D.D.C. 2007) (Facciola, J.) (permitting inside counsel not involved in competitive decisions to "access[] all materials in discovery."); United States v. Sungard Data Systems, Inc., 173 F. Supp. 2d. 20, 24 (D.D.C. 2001) (Facciola, J.) (granting four inside counsel access to all confidential information); Volvo Penta, Inc. v. Brunswick Corp., 187 F.R.D. 240, 242-45 (E.D. Va. 1999) (granting inside counsel complete access to confidential information); Glaxo Inc. v. Genpharm Pharm, Inc., 796 F. Supp. 872, 874 (E.D.N.C. 1992) (granting access to inside counsel whose affidavits suggest no role in competitive decisionmaking); Carpenter Tech. Corp. v. Armco, Inc., 132 F.R.D. 24, 27-29 (E.D. Penn. 1990) (granting access to one inside counsel who demonstrated detachment from competitive decisions and denying it to another whose affidavit suggested possible involvement in such decisions). Conversely, the D.C. Circuit has recognized that, in those instances where inside counsel are shown to be inextricably involved in competitive decisionmaking, it is appropriate to limit their access to confidential information. See FTC v. Exxon Corp., 636 F.2d 1336, 1350 (D.C. Cir. 1980). Importantly, this Court has also considered the accelerated pace of a merger challenge to be a factor weighing in favor of granting complete access to in-house counsel who are most intimately familiar with their businesses. See Sungard, 173 F. Supp. 2d. at 24.

In a similar dispute between the Commission and the defendants in an antitrust merger challenge less than two months ago, the United States District Court for the District of New Mexico rejected the Commission's argument that general counsel of the defendants should not have access to confidential information. See FTC v. Foster, No. 07-cv-532 JB/ACT,

-7-

Mem. Op. & Order (D.N.M. Apr. 26, 2007) (attached as Exhibit "D"). The court instead fashioned a protective order granting defendants' general counsel access to confidential information with limited restrictions that had been suggested by the defendants. See id. at 11.[1]

## C.    The Commission's Proposed Restrictions are Overbroad.

Paragraphs 8 and 9 of the Commission's Interim Protective Order are overbroad in that they would entirely prohibit Whole Foods' General Counsel from having access to the most sensitive and important information on the competitive issues central to this case. The Interim Protective Order also creates cumbersome distinctions between "Confidential Discovery Material" and "Restricted Confidential Discovery Material" that are wholly unnecessary in a case where, as here, the inside counsel to be given selective access has no role in making competitive decisions and has freely submitted herself to the jurisdiction of the Court.

The Commission's protective order prohibits Ms. Lang from seeing any confidential information, regardless of whether designated Confidential or Restricted. See Interim Protective Order ¶ 9 (leaving blank the identity of an inside lawyer who could see Confidential Information). It thus would prevent her from seeing, evaluating, and helping outside counsel respond to the vast majority of the factual arguments that the Commission will be raising. In short, she would be denied access to the most important factual information in the case. She would be unable to render legal advice to the company, and Whole Foods' arms would be tied behind its back as it prepares its defense. As in Carpenter, "the advice of in-house counsel with specialized knowledge of [this] industry could be essential to the proper handling of this litigation by outside counsel." 132 F.R.D. at 27. See also Lang Decl. ¶¶ 8-9.

---

[1]    The extensively redacted public versions of the pleadings in Foster underscore the importance of granting in-house counsel access to confidential material. See Foster, Plaintiff's Pre-Hearing Brief on Plaintiff's Motion for Preliminary Injunction (Public Version), Docket No. 212 (attached as Exhibit "E"). Left to rely on such incomplete documents, Ms. Lang would be severely hampered in her ability to advise Whole Foods on this critical litigation.

Although the Interim Protective Order would theoretically permit another inside lawyer to see the information (if the Commission agreed), there are no other inside lawyers at Whole Foods who could fill Ms. Lang's shoes in this matter. She is the company's first general counsel, she has in-depth knowledge of the company and its business, and she is the only "generalist" lawyer on its staff. She is the lead inside lawyer on this transaction and the prior agency proceedings. She is thus the inside lawyer most knowledgeable about the transaction, the issues, the sources of information in the company, and the company's likely responses to arguments made by the Commission. The more junior lawyers in the company are specialized in areas such as contracts, labor, and SEC disclosure and are not able to fulfill the role of coordinating the defense and advising senior management about the litigation. Lang Decl. ¶ 11. Because there are no other inside attorneys at Whole Foods with the depth of knowledge about the company and this transaction as Ms. Lang, no other inside attorney could adequately assist in the defense of this action or provide informed legal advice to senior management or the board of directors.

### Conclusion

For the foregoing reasons, defendant Whole Foods Market, Inc. respectfully requests that the Court vacate the existing Interim Protective Order with a Final Protective Order that properly balances the need to protect confidential information with the needs of Whole Foods to defend itself with the unrestricted assistance of its General Counsel and without artificial burdens that would complicate discovery in this fast-paced case.

– 9 –

Defendant Whole Foods renews its request for oral argument in connection with its
Motion for Entry of a Final Protective Order.

Respectfully submitted,

/s/ Alden L. Atkins
Alden L. Atkins (DC Bar No. 393922)
Neil W. Imus (DC Bar No. 394544)
David E. Hawkins (DC Bar No. 482016)
VINSON & ELKINS L.L.P.
The Willard Office Building
1455 Pennsylvania Avenue, N.W., Suite 600
Washington, DC  20004-1008
Telephone (202) 639-6500
Facsimile (202) 639-6604
Email  aatkins@velaw.com
      nimus@velaw.com
      dhawkins@velaw.com

Attorneys for Whole Foods Market, Inc.

June 11, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 1:07-CV-01021-PLF |
| WHOLE FOODS MARKET, INC. | ) ) ) | |
| and | ) ) | |
| WILD OATS MARKETS, INC. | ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE MOTION OF DEFENDANT WHOLE FOODS MARKET, INC.
FOR ENTRY OF A FINAL PROTECTIVE ORDER**

**Exhibit "A"**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION )<br><br>                        Plaintiff,    )<br><br>                    v.              )<br><br>WHOLE FOODS MARKET, INC.          )<br><br>and                               )<br><br>WILD OATS MARKETS, INC.           )<br><br>                        Defendants.   ) | Civil Action No. 1:07-CV-01021-PLF |

### PROTECTIVE ORDER GOVERNING DISCOVERY MATERIAL

For the purpose of protecting the interests of the Parties and Third Parties against the improper use and disclosure of confidential information submitted or produced in connection with this Matter:

IT IS HEREBY ORDERED THAT this Protective Order Governing Discovery Material (the "Protective Order") shall govern the handling of all Discovery Material in the above captioned Matter.

### DEFINITIONS

For purposes of this Protective Order, the following definitions shall apply:

1.    "Whole Foods" means defendant Whole Foods Market, Inc., a corporation organized, existing, and doing business under and by virtue of the laws of the State of Texas, with its office and principal place of business at 550 Bowie Street, Austin, Texas 78703, and its predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures.

– 1 –

2.    "Wild Oats" means defendant Wild Oats Markets, Inc., a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 3375 Mitchell Lane, Boulder, Colorado 80301, and its predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures.

3.    "Commission" or "FTC" means the Federal Trade Commission, or any of its employees, agents, attorneys, and all other persons acting on its behalf, excluding persons retained as consultants or experts for the purposes of this Matter.

4.    "Confidential Discovery Material" means all Discovery Material that is confidential or proprietary information produced in discovery. Such material is referred to in, and protected by, Rule 26(c)(7) of the Federal Rules of Civil Procedure. Confidential Discovery Material shall include non-public trade secret or other research, development, or commercial information, the disclosure of which would likely cause commercial harm to the Producing Party or to Defendants, in instances where the Producing Party produces information generated by the Defendants. The following is a non-exhaustive list of examples of information that likely will qualify for treatment as Confidential Discovery Material: strategic plans (involving pricing, marketing, research and development, product road maps, corporate alliances, or mergers and acquisitions) that have not been fully implemented or revealed to the public; trade secrets; customer-specific evaluations or data (e.g., prices, volumes, or revenues); sales contracts; system maps; personnel files and evaluations; information subject to confidentiality or non-disclosure agreements; proprietary technical or engineering information; proprietary financial data or projections; and proprietary consumer, customer, or market research or analyses applicable to current or future market conditions, the disclosure of which could reveal Confidential Discovery Material. Discovery Material will not be considered confidential if it is in the public domain.

5.    "Counsel of Record" means counsel who file a notice of appearance in this Matter.

6.    "Disclosing Party" means a party that is disclosing or contemplating disclosing Discovery Material pursuant to this Protective Order.

7.    "Discovery Material" includes without limitation deposition testimony, deposition exhibits, interrogatory responses, admissions, affidavits, declarations, Documents produced pursuant to compulsory process or voluntarily in lieu thereof, and any other Documents or information produced or given to one Party by another Party or by a Third Party in connection with discovery in this Matter.  Information taken from Discovery Material that reveals its substance shall also be considered Discovery Material.

8.    "Document" means the complete original or a true, correct, and complete copy and any non-identical copies of any written or graphic matter, no matter how produced, recorded, stored, or reproduced.  "Document" includes, but is not limited to, any writing, letter, envelope, telegraph, e-mail, meeting minute, memorandum, statement, affidavit, declaration, book, record, survey, map, study, handwritten note, working paper, chart, index, tabulation, graph, drawing, chart, photograph, tape, phono record, compact disc, video tape, data sheet, data processing card, printout, microfilm, index, computer readable media or other electronically stored data, appointment book, diary, diary entry, calendar, organizer, desk pad, telephone message slip, note of interview or communication, and any other data compilation from which information can be obtained, and includes all drafts and all copies of such Documents and every writing or record that contains any commentary, notes, or marking whatsoever not appearing on the original.

9.     "Expert/Consultant" means testifying or consulting experts or other persons who are retained to assist Plaintiff's Counsel or Defendants' Counsel in preparation for the hearing or to give testimony at the hearing.

10.     "Matter" means the above captioned matter pending in the United States District Court for the District of Columbia, and all subsequent administrative, appellate or other review proceedings related thereto.

11.     "Outside Counsel" means the law firms that are Counsel of Record for Defendants in this Matter, their partners and associated attorneys, or other persons regularly employed by such law firm(s) including legal assistants, clerical staff, vendors assisting with electronic discovery and information management personnel and temporary personnel retained by such law firm(s) to perform legal or clerical duties, or to provide logistical litigation support with regard to this Matter; provided that any attorney associated with Outside Counsel shall not be a director, officer, or employee of Defendants. The term Outside Counsel does not include persons retained as consultants or experts for the purposes of this Matter.

12.     "Party" means either the FTC, Whole Foods, or Wild Oats.

13.     "Person" means any natural person, business entity, corporate entity, sole proprietorship, partnership, association, governmental entity, or trust.

14.     "Producing Party" means a Party or Third Party that produced or intends to produce Confidential Discovery Material to any of the Parties. With respect to Confidential Discovery Material of a Third Party that is in the possession, custody, or control of the FTC, or has been produced by the FTC in this Matter, the Producing Party shall mean the Third Party that originally provided such material to the FTC. The Producing Party shall mean the FTC for purposes of any Document or Discovery Materials prepared by, or on behalf of, the FTC.

– 4 –

15. "Defendants" means Whole Foods and Wild Oats.

16. "Third Party" means any natural person, partnership, corporation, association, or other legal entity not named as a Party to this Matter and its employees, directors, officers, attorneys, and agents.

### TERMS AND CONDITIONS OF PROTECTIVE ORDER

1. Discovery Material, or information derived therefrom, shall be used solely by the Parties for purposes of this Matter, and shall not be used for any other purpose, including without limitation any business or commercial purpose. Notwithstanding the foregoing, nothing contained in this Protective Order shall prevent the Commission from using any material produced as part of the investigation in this Matter, including any Discovery Material, for any authorized law enforcement purpose, provided that the Commission may only use or disclose Discovery Material as provided by (a) its Rules of Practice, and any cases so construing them, (b) Sections 6(f) and 21 of the Federal Trade Commission Act, and any cases so construing them, and (c) any other legal obligation imposed upon the Commission. The Parties, in conducting discovery from Third Parties, shall attach to all discovery requests a copy of this Protective Order and a cover letter that will apprise such Third Parties of their rights hereunder.

2. Confidential Discovery Material may be designated as such by (a) placing or affixing on each page of a Document containing such material, in a manner that will not interfere with its legibility, the notation "CONFIDENTIAL - FTC v. Whole Foods," or (b) any Party or Third Party instructing the court reporter, with notice to all Parties, within five (5) business days of the receipt of the transcript, to designate as "Confidential" each page of the deposition transcript containing the Confidential Discovery Material. Such designations constitute a good-faith representation by counsel for the Party or Third Party making the designation that the

Document or transcript constitutes or contains Confidential Discovery Material. All deposition transcripts shall be treated as Confidential Discovery Material until the expiration of five (5) business days after the receipt of the transcript. A Producing Party will use reasonable care to avoid designating any Discovery Material as Confidential Discovery Material that is not entitled to such designation.

3.    Confidential Discovery Material shall not be copied or reproduced for use in this Matter except to the extent such copying or reproduction is reasonably necessary to the conduct of this Matter. All such copies or reproductions of the Discovery Material and any documents generated by the Parties containing information drawn from such Discovery Material shall be subject to the terms of this Protective Order. If the duplication process by which copies or reproductions of Confidential Discovery Material are made does not preserve the confidentiality designations that appear on the original Documents, all such copies or reproductions shall be stamped with the same confidentiality designation as the original.

4.    All Documents obtained by compulsory process or voluntarily in lieu of process from any Party or Third Party, regardless of whether designated or marked confidential by the Party or Third Party, and transcripts of any investigational hearings, interviews, or depositions that were obtained before this Protective Order was adopted, shall be treated as Confidential Discovery Material for a period of ten (10) days from the time notice of the intent to produce is given to the Producing Party. At the expiration of that time, this material shall be treated as non-confidential unless documents or transcripts pages are otherwise designated with specificity by the Producing Party as Confidential Discovery Material.

5.    If any Party seeks to challenge a Producing Party's designation of material as Confidential Discovery Material, the challenging Party shall notify the Producing Party and all

other Parties of the challenge.  Such notice shall identify with specificity (*i.e.*, by document control numbers, deposition transcript page and line reference, or other means sufficient to locate easily such materials) the designation being challenged.  The Producing Party may preserve its designation by providing the challenging Party and all other Parties a written statement of the reasons for the designation within three (3) business days of receiving notice of the confidentiality challenge.  If the Producing Party timely preserves its rights, the Parties shall continue to treat the challenged material as Confidential Discovery Material, absent a written agreement with the Producing Party or order of the Court providing otherwise.

6.      If any conflict regarding a confidentiality designation arises and the Parties involved have failed to resolve the conflict via good-faith negotiations, a Party seeking to disclose Confidential Discovery Material or challenging a confidentiality designation may make written application to the Court for relief.  The application shall be served on the Producing Party and the other Parties to this Matter, and shall be accompanied by a certification that good-faith negotiations have failed to resolve the outstanding issues.  The Producing Party and any other Party shall have three (3) business days after receiving a copy of the motion to respond to the application.  While an application is pending, the Parties shall maintain the pre-application status of the Confidential Discovery Material.  Nothing in this Protective Order shall create a presumption or alter the burden of persuading the Court of the propriety of a requested disclosure or change in designation.

7.      The Parties shall not be obligated to challenge the propriety of any designation or treatment of information as Confidential Discovery Material and the failure to do so promptly shall not preclude any subsequent objection to such designation or treatment, or any motion seeking permission to disclose such material to Persons not otherwise entitled to access under the

terms of this Protective Order.  If Confidential Discovery Material is produced without the

designation attached, the material shall be treated as Confidential from the time the Producing

Party advises Plaintiff's Counsel and Defendants' Counsel in writing that such material should

be so designated and provides all the Parties with an appropriately labeled replacement.  The

Parties shall return promptly or destroy the unmarked materials.

      8.    Confidential Discovery Material shall not, directly or indirectly, be disclosed or

otherwise provided to anyone except:

      (a)    Plaintiff's counsel and the Commission, as permitted by the Commission's
Rules of Practice;

      (b)    Outside Counsel;

      (c)    Roberta L. Lang, General Counsel of Whole Foods Market, Inc.;

      (d)    Experts/Consultants;

      (e)    court reporters and deposition transcript reporters;

      (f)    judges and other court personnel of any court having jurisdiction over any
proceedings involving this Matter;

      (g)    any author or recipient of the Discovery Material; any individual who was
in the direct chain of supervision of the author at the time the Discovery
Material was created or received; any employee or agent of the entity that
created or received the Discovery Material; or anyone representing the
author or recipient of the Discovery Material in this Matter; and

      (h)    any other Person(s) authorized in writing by the Producing Party.

      9.    Confidential Discovery Material shall not, directly or indirectly, be disclosed or

otherwise provided to an Expert/Consultant until such person has executed and transmitted to

counsel for the party retaining such person a declaration in the form attached as Exhibit "A."

Each Party's counsel shall maintain a file of all such declarations for the duration of the

litigation.

      – 8 –

10.    If any Party desires to disclose Confidential Discovery Material to (a) either any Expert/Consultant, any deponent, or any witness that is or was an officer, director or employee of Whole Foods or Wild Oats, or (b) any Person other than those referred to in paragraph 8 of this Protective Order, the Disclosing Party shall notify the Producing Party any other Party of its desire to disclose such material. The notice shall identify those materials sought to be disclosed with specificity (*i.e.*, by document control numbers, deposition transcript page and line reference, or other means sufficient to locate easily such materials) and the specific Person to whom the Confidential Discovery Material is to be disclosed. For disclosure to any Expert/Consultant, deponent, or witness that is or was an officer, director, or employee of Whole Foods or Wild Oats, the identification of the Person shall include, but not be limited to, the full name, professional address and/or affiliation, and current curriculum vitae of the identified Person. The Producing Party may object to the disclosure of the Confidential Discovery Material within five (5) business days of receiving notice of an intent to disclose such material to the Person by providing the Disclosing Party with a written statement of the reasons for objection. If the Producing Party timely objects, the Disclosing Party shall not disclose the Confidential Discovery Material to the identified Person, absent a written agreement with the Producing Party or order of the Court permitting the disclosure. If the Producing Party does not object to the disclosure of Confidential Discovery Material to the identified Person within five (5) business days, the Disclosing Party may disclose the Confidential Discovery Material to the identified Person.

11.    If the FTC (a) receives a discovery request that may require the disclosure by it of a Third Party's Confidential Discovery Material, or (b) intends to or is required to disclose, voluntarily or involuntarily, a Third Party's Confidential Discovery Material (whether or not

– 9 –

such disclosure is in response to a discovery request), the FTC promptly shall notify the Third Party of the receipt of such request or its intention to disclose such material. Such notification shall be in writing and, if not otherwise done, sent for receipt by the Third Party at least five (5) business days before disclosure, and shall include a copy of this Protective Order and a cover letter that will apprise the Third Party of its rights hereunder.

12.    If any Person receives a discovery request in another proceeding that may require the disclosure of a Producing Party's Confidential Discovery Material, the recipient of the discovery request shall promptly notify the Producing Party of receipt of the request. The notification shall be in writing and be received by the Producing Party at least five (5) business days before production in the other proceeding, and shall include a copy of this Protective Order and a cover letter apprising the Producing Party of its rights. Nothing herein shall be construed as requiring the recipient of the discovery request or anyone else covered by this Protective Order to challenge or appeal an order requiring production of Confidential Discovery Material, to subject itself to any penalties for noncompliance with such an order, or to seek any relief from the Court. The recipient shall not oppose the Producing Party's efforts to challenge the discovery request calling for the production by the recipient of the Producing Party's Confidential Discovery Material. In addition, nothing herein shall limit the applicability of Section 4.11(e) of the FTC Rules of Practice, 16 C.F.R. § 4.11(e), to discovery requests in another proceeding that are directed to the Commission.

13.    Counsel for the Parties or any Producing Party shall have the right to exclude from oral depositions any person not authorized to receive Confidential Discovery Material, during periods of examination or testimony relating to such material.

14.    In the event that any Confidential Discovery Material is contained in any pleading, motion, exhibit, brief, or other paper filed or to be filed with the Court, the Party filing the papers shall inform the Clerk of Court, and the papers shall be filed under seal pursuant to the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Columbia.    Confidential Discovery Material contained in papers (including Confidential Discovery Material from the Parties and Third Parties) shall remain under seal until further order of the Court; provided, however, that the papers may be furnished to persons or entities who may receive Confidential Discovery Material pursuant to this Protective Order. After filing any paper containing Confidential Discovery Material, the filing Party must file on the public record a duplicate copy of the paper with the Confidential Discovery Material deleted, within five (5) business days of the original filing.    Further, if the protection for any such material ceases, any Party may file on the public record a copy that also contains the formerly protected material.

15.    If counsel for a Party plans to introduce into evidence at trial any Document or transcript containing Confidential Discovery Material produced by a Third Party or any other Party, the counsel shall provide forty-eight (48) hours advance notice before such introduction to the Producing Party and any other Party, or as much notice before the introduction as practicable under the circumstances, for purposes of allowing that Party to seek an order that the Document or transcript be granted *in camera* treatment.  Except where an order seeking *in camera* treatment is granted, all Documents and transcripts shall be part of the public record.  If *in camera* treatment is granted, a copy of the Document or transcript with the Confidential Discovery Material deleted must be placed on the public record.

16.    The inadvertent production or disclosure of (i) material provided to the FTC during its investigation under the Hart-Scott-Rodino Antitrust Improvement Act, 15 U.S.C. § 18a, or (ii) any Discovery Material, which a Producing Party claims should not have been produced or disclosed because of a privilege, will not be deemed to be a waiver of any privilege to which the Producing Party would have been entitled had the privileged Discovery Material not inadvertently been produced or disclosed. In the event of such claimed inadvertent production or disclosure, the procedures of Federal Rules of Civil Procedure 26(b)(5)(B) shall apply. The inadvertent production of a privileged document shall not be deemed a waiver of any privilege applicable to any other documents relating to that subject matter.

17.    Nothing in this Protective Order shall be construed to conflict with the provisions of Sections 6, 10, and 21 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 50, 57b-2, or with Rules 3.22, 3.45, or 4.11 (b)-(e), 16 C.F.R. §§ 3.22, 3.45, and 4.11 (b)-(e). Any Party or Producing Party may move at any time for *in camera* treatment of any Confidential Discovery Material or any portion of the proceedings in this Matter to the extent necessary for proper disposition of this Matter.

18.    At the conclusion of this Matter, the Defendants shall (a) return or destroy all Documents obtained in this Matter that contain or refer to Confidential Discovery Material, other than materials that have been made part of the public record in this Matter, and (b) provide the Producing Party with an affidavit of destruction, provided that the provisions of 15 U.S.C. § 18a and § 4.12 of the FTC Rules of Practice, 16 C.F.R. § 4.12, shall govern the retention, return, or destruction of any documents obtained by the FTC prior to the filing of the Complaint to the extent the provisions of that statute or regulation is inconsistent with the provisions of this Protective Order. At the time that any Expert/Consultant or other person retained to assist

counsel in the preparation of this Matter concludes participation in this Matter, that person shall return to counsel all copies of Documents or portions thereof designated Confidential Discovery Material that are in the possession of that person, together with all notes, memoranda, or other papers containing Confidential Discovery Material.

19.    The provisions of this Protective Order, insofar as they restrict the communication and use of Confidential Discovery Material shall, without written permission of the Producing Party or further order of the Court, continue to be binding after the conclusion of this Matter.

20.    This Protective Order shall not apply to the disclosure by a Producing Party or its Counsel of the Producing Party's Confidential Discovery Material to the Producing Party's current or former employees, agents, board members, directors, and officers.

21.    Entry of the foregoing Protective Order is without prejudice to the right of the Parties or Third Parties to apply for further protective orders or for modification of any provision of this Protective Order by application to the Court for good cause shown,

ORDERED:

_____
Paul L. Friedman
United States District Judge

Dated:

WE ASK FOR THIS:

Alden L. Atkins
Vinson & Elkins L.L.P.
1455 Pennsylvania Ave., N.W., Suite 600
Washington, D.C. 20004-1008
(202) 639-6613
aatkins@velaw.com

Counsel for Whole Foods Market, Inc.


WITH ADDITIONAL COPIES TO:

Thomas H. Brock
Bureau of Competition
Federal Trade Commission
600 New Jersey Ave., N.W.
Washington, D.C. 20580
(202) 326-2813
TBrock@FTC.gov

Counsel for the Federal Trade Commission

Clifford H. Aronson
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
(212) 735-3000
caronson@skadden.com

Counsel for Wild Oats Markets, Inc.

**EXHIBIT A**
**TO THE PROTECTIVE ORDER GOVERNING DISCOVERY MATERIAL**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:07-CV-01021-PLF |
| | ) |
| WHOLE FOODS MARKET, INC., | ) |
| | ) |
| - and - | ) |
| | ) |
| WILD OATS MARKETS, INC., | ) |
| | ) |
| Defendants. | ) |

**DECLARATION CONCERNING PROTECTIVE**
**ORDER GOVERNING DISCOVERY MATERIAL**

I, [NAME], hereby declare and certify the following to be true:

1.      [Statement of employment]

2.      I have read the "Protective Order Governing Discovery Material" ("Protective Order") issued by the Court on [Date], in connection with the above captioned Matter.  I understand the restrictions on my access to and use of any Confidential Discovery Material (as that term is used in the Protective Order) in this Matter, and I agree to abide by the Protective Order.

3.      I understand that the restrictions on my use of such Confidential Discovery Material include:

      a.      that I will use such Confidential Discovery Material only for the purpose of preparing for this proceeding, and hearing(s) and any appeal of this proceeding and for no other purpose;

      b.      that I will not disclose such Confidential Discovery Material to anyone, except as permitted by the Protective Order;

      c.      that I will use, store and maintain the Confidential Discovery Material in such a way as to ensure its continued protected status; and

– 15 –

      d.     that, upon the termination of my participation in this proceeding, I will promptly return all Confidential Discovery Material and all notes, memoranda, or other papers containing Confidential Discovery Material, to Plaintiff's Counsel or Defendants' Outside Counsel, as appropriate.

    4.    I understand that if I am receiving Confidential Discovery Material as an Expert/Consultant, as that term is defined in this Protective Order, the restrictions on my use of Confidential Discovery Material also include the duty and obligation to:

      a.     maintain such Confidential Discovery Material in separate locked room(s) or locked cabinet(s) when such Confidential Discovery Material is not being reviewed;

      b.     return such Confidential Discovery Material to Plaintiff's Counsel or Defendants' Outside Counsel, as appropriate, upon the conclusion of my assignment or retention, or upon conclusion of this Matter; and

      c.     use such Confidential Discovery Material and the information contained therein solely for the purpose of rendering consulting services to a Party to this Matter, including providing testimony in judicial or administrative proceedings arising out of this Matter.

    5.    I am fully aware that, pursuant to Rule 26, Federal Rules of Civil Procedure, Rule 37, Federal Rules of Civil Procedure, and Section 3.42(h) of the FTC Rules of Practice, 16 C.F.R. § 3.42(h), my failure to comply with the terms of the Protective Order may constitute contempt of the Commission and may subject me to sanctions imposed by the Court or the Commission.


_____     Date:  _____

Full Name [Typed or Printed]


_____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION )<br><br>Plaintiff, )<br><br>v. )<br><br>WHOLE FOODS MARKET, INC. )<br><br>and )<br><br>WILD OATS MARKETS, INC. )<br><br>Defendants. ) | Civil Action No. 1:07-CV-01021-PLF |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE MOTION OF DEFENDANT WHOLE FOODS MARKET, INC. FOR ENTRY OF A FINAL PROTECTIVE ORDER

**Exhibit "B"**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION~
~~600 Pennsylvania Avenue, N.W.~~
~~Washington, DC  20580,~~                          )

                                                    **Plaintiff,**

            ~~Plaintiff,~~

        ~~v.~~                        ~~No.~~

            **v.**                              **Civil  Action  No.**
**1:07-CV-01021-PLF**

WHOLE FOODS MARKET, INC.~              )
~~550 Bowie Street,~~
~~Austin, Texas 78703,~~

    —and—

WILD OATS MARKETS, INC.~              )
~~3375 Mitchell Lane,~~
~~Boulder, Colorado 80301~~

        Defendants.              )

~~INTERIM~~ **PROTECTIVE ORDER GOVERNING DISCOVERY MATERIAL**

For the purpose of protecting the interests of the Parties and Third Parties against the

improper use and disclosure of confidential information submitted or produced in connection

with this Matter:

– 1 –

IT IS HEREBY ORDERED THAT this ~~Interim~~ Protective Order Governing Discovery Material (**the** "~~Interim~~ Protective Order") shall govern the handling of all Discovery Material ~~during the proceedings~~ in the above captioned Matter~~. until such time as a final protective order shall be entered~~.

DEFINITIONS

For purposes of this Protective Order, the following definitions shall apply:

1.      "Whole Foods" means defendant Whole Foods Market, Inc., a corporation organized, existing, and doing business under and by virtue of the laws of the State of Texas, with its office and principal place of business at 550 Bowie Street, Austin, Texas 78703, and its predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures.

2.      "Wild Oats" means defendant Wild Oats Markets, Inc., a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 3375 Mitchell Lane, Boulder, Colorado 80301, and its predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures.

3.      "Commission" or "FTC" means the Federal Trade Commission, or any of its employees, agents, attorneys, and all other persons acting on its behalf, excluding persons retained as consultants or experts for the purposes of this Matter.

4.      "Confidential Discovery Material" means all Discovery Material that is confidential or proprietary information produced in discovery. Such material is referred to in, and protected by, Rule 26(c)(7) of the Federal Rules of Civil Procedure. Confidential Discovery Material shall include non-public trade secret or other research, development, or commercial information, the disclosure of which would likely cause commercial harm to the Producing Party or to Defendants, in instances where the Producing Party produces information generated by the

– 2 –

Defendants.  The following is a non-exhaustive list of examples of information that likely will qualify for treatment as Confidential Discovery Material: strategic plans (involving pricing, marketing, research and development, product road maps, corporate alliances, or mergers and acquisitions) that have not been fully implemented or revealed to the public; trade secrets; customer-specific evaluations or data (e.g., prices, volumes, or revenues); sales contracts; system maps; personnel files and evaluations; information subject to confidentiality or non-disclosure agreements; proprietary technical or engineering information; proprietary financial data or projections; and proprietary consumer, customer, or market research or analyses applicable to current or future market conditions, the disclosure of which could reveal Confidential Discovery Material.  Discovery Material will not be considered confidential if it is in the public domain.

5.    "Counsel of Record" means counsel who file a notice of appearance in this Matter.

6.    "Disclosing Party" means a party that is disclosing or contemplating disclosing Discovery Material pursuant to this Protective Order.

7.    "Discovery Material" includes without limitation deposition testimony, deposition exhibits, interrogatory responses, admissions, affidavits, declarations, Documents produced pursuant to compulsory process or voluntarily in lieu thereof, and any other Documents or information produced or given to one Party by another Party or by a Third Party in connection with discovery in this Matter.  Information taken from Discovery Material that reveals its substance shall also be considered Discovery Material.

8.    "Document" means the complete original or a true, correct, and complete copy and any non-identical copies of any written or graphic matter, no matter how produced, recorded, stored, or reproduced.  "Document" includes, but is not limited to, any writing, letter,

– 3 –

envelope, telegraph, e-mail, meeting minute, memorandum, statement, affidavit, declaration, book, record, survey, map, study, handwritten note, working paper, chart, index, tabulation, graph, drawing, chart, photograph, tape, phono record, compact disc, video tape, data sheet, data processing card, printout, microfilm, index, computer readable media or other electronically stored data, appointment book, diary, diary entry, calendar, organizer, desk pad, telephone message slip, note of interview or communication, and any other data compilation from which information can be obtained, and includes all drafts and all copies of such Documents and every writing or record that contains any commentary, notes, or marking whatsoever not appearing on the original.

9.    "Expert/Consultant" means testifying or consulting experts or other persons who are retained to assist Plaintiff's Counsel or Defendants' Counsel in preparation for the hearing or to give testimony at the hearing.

10.    "Matter" means the above captioned matter pending in the United States District Court for the District of Columbia, and all subsequent administrative, appellate or other review proceedings related thereto.

11.    "Outside Counsel" means the law firms that are Counsel of Record for Defendants in this Matter, their partners and associated attorneys, or other persons regularly employed by such law firm(s) including legal assistants, clerical staff, vendors assisting with electronic discovery and information management personnel and temporary personnel retained by such law firm(s) to perform legal or clerical duties, or to provide logistical litigation support with regard to this Matter; provided that any attorney associated with Outside Counsel shall not be a director, officer, or employee of Defendants. The term Outside Counsel does not include persons retained as consultants or experts for the purposes of this Matter.

12.    "Party" means either the FTC, Whole Foods, or Wild Oats.

13.    "Person" means any natural person, business entity, corporate entity, sole proprietorship, partnership, association, governmental entity, or trust.

14.    "Producing Party" means a Party or Third Party that produced or intends to produce ~~Restricted Confidential or~~ Confidential Discovery Material to any of the Parties. With respect to ~~Restricted Confidential or~~ Confidential Discovery Material of a Third Party that is in the possession, custody, or control of the FTC, or has been produced by the FTC in this Matter, the Producing Party shall mean the Third Party that originally provided such material to the FTC. The Producing Party shall mean the FTC for purposes of any Document or Discovery Materials prepared by, or on behalf of, the FTC.

15.    "Defendants" means Whole Foods and Wild Oats.

~~16.    "Restricted Confidential Discovery Material" means Confidential Discovery Material designated as "Restricted Confidential Discovery Material" that contains non-public, current information that is highly sensitive (e.g., marketing plans, pricing plans, financial information, trade secrets, or Documents of a like nature) and the disclosure of which would likely cause substantial commercial harm to the Producing Party or to Defendants. It is the intention of the Parties that this particularly restrictive designation should be utilized for only a select number of Documents. Such a designation shall constitute a representation by counsel for the Producing Party or Defendants, in instances where the Producing Party produces information generated by the Defendants, that the material is properly subject to Restricted Confidential treatment under this Order.~~

**16.**     ~~17.~~   "Third Party" means any natural person, partnership, corporation, association, or other legal entity not named as a Party to this Matter and its employees, directors, officers, attorneys, and agents.

## TERMS AND CONDITIONS OF PROTECTIVE ORDER

1.     Discovery Material, or information derived therefrom, shall be used solely by the Parties for purposes of this Matter, and shall not be used for any other purpose, including without limitation any business or commercial purpose.   Notwithstanding the foregoing, nothing contained in this Protective Order shall prevent the Commission from using any material produced as part of the investigation in this Matter, including any Discovery Material, for any authorized law enforcement purpose, provided that the Commission may only use or disclose Discovery Material as provided by (a) its Rules of Practice, and any cases so construing them, (b) Sections 6(f) and 21 of the Federal Trade Commission Act, and any cases so construing them, and (c) any other legal obligation imposed upon the Commission.   The Parties, in conducting discovery from Third Parties, shall attach to all discovery requests a copy of this Protective Order and a cover letter that will apprise such Third Parties of their rights hereunder.

2.     Confidential ~~or Restricted Confidential~~ Discovery Material may be designated as such by (a) placing or affixing on each page of a Document containing such material, in a manner that will not interfere with its legibility, the notation "CONFIDENTIAL - FTC v. Whole Foods," or ~~"RESTRICTED CONFIDENTIAL, OUTSIDE COUNSEL ONLY - FTC v. Whole Foods," or~~ (b) any Party or Third Party instructing the court reporter, with notice to all Parties, within five (5) business days of the receipt of the transcript, to designate as "Confidential" ~~or "Restricted Confidential"~~ each page of the deposition transcript containing the ~~Confidential or Restricted~~ Confidential Discovery Material.   Such designations constitute a good-faith

– 6 –

representation by counsel for the Party or Third Party making the designation that the Document

or transcript constitutes or contains Confidential Discovery Material ~~or Restricted Confidential~~

~~Discovery Material~~.    All deposition transcripts shall be treated as ~~Restricted~~ Confidential

Discovery Material until the expiration of five (5) business days after the receipt of the

transcript.    A Producing Party will use reasonable care to avoid designating any Discovery

Material as Confidential ~~or Restricted Confidential~~**Discovery Material** that is not entitled to

such designation.

    3.    ~~Restricted Confidential or~~ Confidential Discovery Material shall not be copied or

reproduced for use in this Matter except to the extent ~~:~~such copying or reproduction is

reasonably necessary to the conduct of this Matter.    All such copies or reproductions of the

**Discovery** Material and any documents generated by the Parties containing information drawn

from such **Discovery** Material~~:~~ shall be subject to the terms of this Protective Order.    If the

duplication process by which copies or reproductions of ~~Restricted Confidential or~~ Confidential

Discovery Material are made does not preserve the confidentiality designations that appear on

the original Documents, all such copies or reproductions shall be stamped with the same

confidentiality designation as the original.

    4.    All Documents obtained by compulsory process or voluntarily in lieu of process

from any Party or Third Party, regardless of whether designated or marked confidential by the

Party or Third Party, and transcripts of any investigational hearings, interviews, or depositions

that were obtained before this Protective Order was adopted, shall be treated as ~~Restricted~~

Confidential Discovery Material for a period of ten (10) days from the time notice of the intent

to produce is given to the Producing Party.    At the expiration of that time, this material shall be

treated as ~~Confidential Discovery Material~~**non-confidential** unless documents or transcripts

– 7 –

pages are otherwise designated with specificity by the Producing Party as ~~either Restricted~~ Confidential Discovery Material ~~or non-confidential~~.

5.    If any Party seeks to challenge a Producing Party's designation of material as ~~Restricted Confidential or~~ Confidential Discovery Material, the challenging Party shall notify the Producing Party and all other Parties of the challenge. Such notice shall identify with specificity (*i.e.*, by document control numbers, deposition transcript page and line reference, or other means sufficient to locate easily such materials) the designation being challenged. The Producing Party may preserve its designation by providing the challenging Party and all other Parties a written statement of the reasons for the designation within three (3) business days of receiving notice of the confidentiality challenge. If the Producing Party timely preserves its rights, the Parties shall continue to treat the challenged material as ~~Restricted Confidential or~~ Confidential Discovery Material, absent a written agreement with the Producing Party or order of the Court providing otherwise.

6.    If any conflict regarding a confidentiality designation arises and the Parties involved have failed to resolve the conflict via good-faith negotiations, a Party seeking to disclose ~~the Restricted Confidential or~~ Confidential Discovery Material or challenging a confidentiality designation may make written application to the Court for relief. The application shall be served on the Producing Party and the other Parties to this Matter, and shall be accompanied by a certification that good-faith negotiations have failed to resolve the outstanding issues. The Producing Party and any other Party shall have three (3) business days after receiving a copy of the motion to respond to the application. While an application is pending, the Parties shall maintain the pre-application status of the ~~Restricted Confidential or~~ Confidential Discovery Material. Nothing in this Protective Order shall create a presumption or alter the

burden of persuading the Court of the propriety of a requested disclosure or change in designation.

7.     The Parties shall not be obligated to challenge the propriety of any designation or treatment of information as ~~Restricted Confidential or~~ Confidential Discovery Material and the failure to do so promptly shall not preclude any subsequent objection to such designation or treatment, or any motion seeking permission to disclose such material to Persons not otherwise entitled to access under the terms of this Protective Order.  If ~~Restricted Confidential or~~ Confidential Discovery Material is produced without the designation attached, the material shall be treated as ~~Restricted Confidential or~~ Confidential from the time the Producing Party advises ~~Plaintiffs~~**Plaintiff's** Counsel and Defendants' Counsel in writing that such material should be so designated and provides all the Parties with an appropriately labeled replacement.  The Parties shall return promptly or destroy the unmarked materials.

8.     ~~Restricted~~ Confidential Discovery Material shall not, directly or indirectly, be disclosed or otherwise provided to anyone except:

(a)     ~~Plaintiffs~~**Plaintiff's** counsel and the Commission, as permitted by the Commission's Rules of Practice;

(b)     Outside Counsel;

**(c)     Roberta L. Lang, General Counsel of Whole Foods Market, Inc.;**

**(d)**     ~~(c)~~ Experts/Consultants;

**(e)**     ~~(d)~~ court reporters and deposition transcript reporters;

**(f)**     ~~(e)~~ judges and other court personnel of any court having jurisdiction over any ~~appeal~~ proceedings involving this Matter;

**(g)**     ~~(f)~~ any author or recipient of the Discovery Material; any individual who was in the direct chain of supervision of the author at the time the Discovery Material was created or received; any employee or agent of the entity that created or received the Discovery Material; or anyone

– 9 –

representing the author or recipient of the Discovery Material in this Matter; and

**(h)** ~~(g)~~ any other Person(s) authorized in writing by the Producing Party.

~~9. Confidential Discovery Material shall not, directly or indirectly, be disclosed or otherwise provided to anyone other than those persons listed in paragraph 8 of this Protective Order and to the following representative of Whole Foods: _____; provided that each such representative executes a declaration in the form attached as Exhibit A. Defendants' Counsel shall maintain a file of all such declarations for the duration of the litigation.~~

**9.** ~~10.~~ ~~Restricted Confidential or~~ Confidential Discovery Material shall not, directly or indirectly, be disclosed or otherwise provided to an Expert/Consultant until such person has executed and transmitted to counsel for the party retaining such person a declaration in the form attached as Exhibit "A." Each Party's counsel shall maintain a file of all such declarations for the duration of the litigation.

**10.** ~~11.~~ If any Party desires to disclose ~~Restricted Confidential or~~ Confidential Discovery Material to (a) either any Expert/Consultant, any deponent, or any witness that is or was an officer, director or employee of Whole Foods or Wild Oats, or (b) any Person other than those referred to in ~~paragraphs~~**paragraph** 8 ~~and 9~~ of this Protective Order, the Disclosing Party shall notify the Producing Party any other Party of its desire to disclose such material. The notice shall identify those materials sought to be disclosed with specificity (*i.e.*, by document control numbers, deposition transcript page and line reference, or other means sufficient to locate easily such materials) and the specific Person to whom the Confidential ~~or Restricted Confidential~~**Discovery** Material is to be disclosed. For disclosure to any Expert/Consultant, deponent, or witness that is or was an officer, director, or employee of Whole Foods or Wild Oats, the identification of the Person shall include, but not be limited to, the full name,

professional address and/or affiliation, and current curriculum vitae of the identified Person. The Producing Party may object to the disclosure of the ~~Restricted Confidential or~~ Confidential Discovery Material within five (5) business days of receiving notice of an intent to disclose such material to the Person by providing the Disclosing Party with a written statement of the reasons for objection. If the Producing Party timely objects, the Disclosing Party shall not disclose the ~~Restricted Confidential or~~ Confidential Discovery Material to the identified Person, absent a written agreement with the Producing Party or order of the Court permitting the disclosure. If the Producing Party does not object to the disclosure of ~~Restricted Confidential or~~ Confidential Discovery Material to the identified Person within five (5) business days, the Disclosing Party may disclose the ~~Restricted~~ Confidential Discovery Material to the identified Person.

**11.** ~~12.~~ If the FTC (a) receives a discovery request that may require the disclosure by it of a Third Party's ~~Restricted Confidential or~~ Confidential Discovery Material, or (b) intends to or is required to disclose, voluntarily or involuntarily, a Third Party's ~~Restricted Confidential or~~ Confidential Discovery Material (whether or not such disclosure is in response to a discovery request), the FTC promptly shall notify the Third Party of the receipt of such request or its intention to disclose such material. Such notification shall be in writing and, if not otherwise done, sent for receipt by the Third Party at least five (5) business days before disclosure, and shall include a copy of this Protective Order and a cover letter that will apprise the Third Party of its rights hereunder.

**12.** ~~13.~~ If any Person receives a discovery request in another proceeding that may require the disclosure of a Producing Party's ~~Restricted Confidential or~~ Confidential Discovery Material, the recipient of the discovery request shall promptly notify the Producing Party of receipt of the request. The notification shall be in writing and be received by the Producing

– 11 –

Party at least five (5) business days before production in the other proceeding, and shall include a copy of this Protective Order and a cover letter apprising the Producing Party of its rights. Nothing herein shall be construed as requiring the recipient of the discovery request or anyone else covered by this Protective Order to challenge or appeal an order requiring production of ~~Restricted Confidential or~~ Confidential Discovery Material, to subject itself to any penalties for noncompliance with such an order, or to seek any relief from the Court. The recipient shall not oppose the Producing Party's efforts to challenge the discovery request calling for the production by the recipient of the Producing Party's ~~Restricted Confidential or~~ Confidential Discovery Material. In addition, nothing herein shall limit the applicability of Section 4.11(e) of the FTC Rules of Practice, 16 C.F.R. § 4.11(e), to discovery requests in another proceeding that are directed to the Commission.

**13.** ~~14.~~ Counsel for the Parties or any Producing Party shall have the right to exclude from oral depositions any person not authorized to receive ~~Restricted Confidential or~~ Confidential Discovery Material, during periods of examination or testimony relating to such material.

**14.** ~~15.~~ In the event that any ~~Restricted Confidential or~~ Confidential Discovery Material is contained in any pleading, motion, exhibit, brief, or other paper filed or to be filed with the Court, the Party filing the papers shall inform the Clerk of Court, and the papers shall be filed under seal pursuant to the Federal Rules of Civil Procedure and the **Local** Rules of the United States District Court for the District of Columbia. ~~Restricted Confidential or~~ Confidential Discovery Material contained in papers (including ~~Restricted Confidential or~~ Confidential Discovery Material from the Parties and Third Parties) shall remain under seal until further order of the Court; provided, however, that the papers may be furnished to persons or entities who may

receive ~~Restricted Confidential or~~ Confidential Discovery Material pursuant to this Protective Order. After filing any paper containing ~~Restricted Confidential or~~ Confidential Discovery Material, the filing Party must file on the public record a duplicate copy of the paper with the ~~Restricted Confidential or~~ Confidential Discovery Material deleted, within five (5) business days of the original filing. Further, if the protection for any such material ceases, any Party may file on the public record a copy that also contains the formerly protected material.

**15.**    ~~16.~~ If counsel for a Party plans to introduce into evidence at trial any Document or transcript containing ~~Restricted Confidential or~~ Confidential Discovery Material produced by a Third Party or any other Party, the counsel shall provide forty-eight (48) hours advance notice before such introduction to the Producing Party and any other Party, or as much notice before the introduction as practicable under the circumstances, for purposes of allowing that Party to seek an order that the Document or transcript be granted *in camera* treatment. Except where an order seeking *in camera* treatment is granted, all Documents and transcripts shall be part of the public record. If *in camera* treatment is granted, a copy of the Document or transcript with the ~~Restricted Confidential or~~ Confidential Discovery Material deleted must be placed on the public record.

**16.**    ~~17.~~ The inadvertent production or disclosure of (i) material provided to the FTC during its investigation under the Hart-Scott-Rodino Antitrust Improvement Act, 15 U.S.C. § 18a, or (ii) any Discovery Material, which a Producing Party claims should not have been produced or disclosed because of a privilege, will not be deemed to be a waiver of any privilege to which the Producing Party would have been entitled had the privileged Discovery Material not inadvertently been produced or disclosed. In the event of such claimed inadvertent production or disclosure, the procedures of Federal Rules of Civil Procedure 26(b)(5)(B) shall apply. The

inadvertent production of a privileged document shall not be deemed a waiver of ~~the~~**any** privilege ~~for all~~**applicable to any other** documents relating to that subject matter.

**17.** ~~18.~~ Nothing in this Protective Order shall be construed to conflict with the provisions of Sections 6, 10, and 21 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 50, 57b-2, or with Rules 3.22, ~~3.45~~**3.45,** or 4.11 (b)-(e), 16 C.F.R. §§ 3.22, ~~3.45~~**3.45,** and 4.11 (b)-(e). Any Party or Producing Party may move at any time for *in camera* treatment of any Confidential Discovery Material or any portion of the proceedings in this Matter to the extent necessary for proper disposition of this Matter.

**18.** ~~19.~~ At the conclusion of this Matter, the Defendants shall (a) return or destroy all Documents obtained in this Matter that contain or refer to ~~Restricted Confidential or~~ Confidential Discovery Material, other than materials that have been made part of the public record in this Matter, and (b) provide the Producing Party with an affidavit of destruction, provided that the provisions of 15 U.S.C. § 18a and § 4.12 of the FTC Rules of Practice, 16 C.F.R. § 4.12, shall govern the retention, return, or destruction of any documents obtained by the FTC prior to the filing of the Complaint to the extent the provisions of that statute or regulation is inconsistent with the provisions of this Protective Order.    At the time that any Expert/Consultant or other person retained to assist counsel in the preparation of this Matter concludes participation in this Matter, that person shall return to counsel all copies of Documents or portions thereof designated ~~Restricted Confidential or~~ Confidential Discovery Material that are in the possession of that person, together with all notes, memoranda, or other papers containing ~~Restricted Confidential or~~ Confidential Discovery Material.

**19.** ~~20.~~ The provisions of this Protective Order, insofar as they restrict the communication and use of ~~Restricted Confidential and~~ Confidential Discovery Material shall,

– 14 –

without written permission of the Producing Party or further order of the Court, continue to be binding after the conclusion of this Matter.

**20.** ~~21.~~ This Protective Order shall not apply to the disclosure by a Producing Party or its Counsel of the Producing Party's ~~Restricted Confidential or~~ Confidential Discovery Material to the Producing Party's current or former employees, agents, board members, directors, and officers.

**21.** ~~22.~~ Entry of the foregoing Protective Order is without prejudice to the right of the Parties or Third Parties to apply for further protective orders or for modification of any provision of this Protective Order by application to the Court for good cause shown,

~~23.     The parties stipulate to the foregoing interim protective order in order to facilitate the prompt exchange of pleadings, documents, and information, but without prejudice to their right to move for the entry of a final protective order with differing provisions.~~

~~Respectfully submitted,~~

**ORDERED:**

**Paul L. Friedman**
**United States District Judge**

Dated: ~~June 6, 2007~~ _____

– 15 –

**WE ASK FOR THIS:**

**Alden L. Atkins**
**Vinson & Elkins L.L.P.**
**1455 Pennsylvania Ave., N.W., Suite 600**
**Washington, D.C. 20004-1008**
**(202) 639-6613**
**aatkins@velaw.com**

**Counsel for Whole Foods Market, Inc.**

**WITH ADDITIONAL COPIES TO:**

Thomas H. Brock, ~~Esq.~~

~~D.C. Bar No. 939207~~

Bureau of Competition
Federal Trade Commission
600 New Jersey Ave., N.W.
Washington, D.C. 20580
(202) 326-2813
TBrock@FTC.gov

Counsel for the Federal Trade Commission

~~Dated: June 6, 2007~~

_____
~~Alden L. Atkins~~
~~D.C. Bar No. 393922~~
~~Vinson & Elkins~~
~~The Willard Office Building~~
~~1455 Pennsylvania Ave., N.W.~~
~~Suite 600~~
~~Washington, D.C. 20004-1008~~
~~(202) 639-6613~~
~~Aatkins@VELaw.com~~

~~Counsel for Whole Foods Market, Inc.~~

~~Dated: June 6, 2007~~

_____
Clifford H. Aronson, ~~Esq.~~

~~D.C. Bar No. 335182~~

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square

– 16 –

New York, New York 10036
(212) 735-3000

~~Caronson@Skadden.com~~

**caronson@skadden.com**

Counsel for Wild Oats Markets, Inc.


~~ORDERED:~~


_____

~~United States District Judge~~
~~District of Columbia~~

~~Dated~~

**EXHIBIT A**
**TO THE PROTECTIVE ORDER GOVERNING DISCOVERY MATERIAL**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ~~No.~~ **Civil Action No. 1:07-CV-01021-PLF** |
| | ) | |
| WHOLE FOODS MARKET, INC., | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| WILD OATS MARKETS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION CONCERNING PROTECTIVE**
**ORDER GOVERNING DISCOVERY MATERIAL**

I, [NAME], hereby declare and certify the following to be true:

1.      [Statement of employment]

2.      I have read the "Protective Order Governing Discovery Material" ("Protective Order") issued by the Court on **[Date]**, in connection with the above captioned Matter. I understand the restrictions on my access to and use of any ~~Restricted Confidential or~~ Confidential Discovery Material (as ~~these terms are~~**that term is** used in the Protective Order) in this Matter, and I agree to abide by the Protective Order.

3.      I understand that the restrictions on my use of such ~~Restricted Confidential or~~ Confidential Discovery Material include:

    a.      that I will use such ~~Restricted Confidential or~~ Confidential Discovery Material only for the purpose of preparing for this proceeding, and hearing(s) and any appeal of this proceeding and for no other purpose;

    b.      that I will not disclose such ~~Restricted Confidential or~~ Confidential Discovery Material to anyone, except as permitted by the Protective Order;

    c.    that I will use, store and maintain the ~~Restricted Confidential and~~ Confidential Discovery Material in such a way as to ensure its continued protected status; and

    d.    that, upon the termination of my participation in this proceeding, I will promptly return all ~~Restricted Confidential or~~ Confidential Discovery Material, and all notes, memoranda, or other papers containing ~~Restricted Confidential or~~ Confidential Discovery Material, to ~~Plaintiffs'~~ **Plaintiff's** Counsel or Defendants' Outside Counsel, as appropriate.

4.    I understand that if I am receiving Confidential Discovery Material as an Expert/Consultant, as that term is defined in this Protective Order, the restrictions on my use of Confidential Discovery Material also include the duty and obligation to:

    a.    maintain such ~~Restricted Confidential or~~ Confidential Discovery Material in separate locked room(s) or locked cabinet(s) when such ~~Restricted Confidential or~~ Confidential Discovery Material is not being reviewed;

    b.    return such ~~Restricted Confidential or~~ Confidential Discovery Material to ~~Plaintiffs'~~**Plaintiff's** Counsel or Defendants' Outside Counsel, as appropriate, upon the conclusion of my assignment or retention, or upon conclusion of this Matter; and

    c.    use such ~~Restricted Confidential or~~ Confidential Discovery Material and the information contained therein solely for the purpose of rendering consulting services to a Party to this Matter, including providing testimony in judicial or administrative proceedings arising out of this Matter.

5.    I am fully aware that, pursuant to Rule 26, Federal Rules of Civil Procedure, Rule 37, Federal Rules of Civil Procedure, and Section 3.42(h) of the FTC Rules of Practice, 16 C.F.R. § 3.42(h), my failure to comply with the terms of the Protective Order may constitute contempt of the Commission and may subject me to sanctions imposed by the Court or the Commission.

_____       Date: _____
Full Name [Typed or Printed]

_____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-CV-01021-PLF |
| | ) | |
| WHOLE FOODS MARKET, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILD OATS MARKETS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE MOTION OF DEFENDANT WHOLE FOODS MARKET, INC. FOR ENTRY OF A FINAL PROTECTIVE ORDER

**Exhibit "C"**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-CV-01021-PLF |
| | ) | |
| | ) | |
| WHOLE FOODS MARKET, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILD OATS MARKETS, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF ROBERTA L. LANG IN SUPPORT OF THE MOTION OF DEFENDANT WHOLE FOODS MARKET, INC. FOR ENTRY OF A FINAL PROTECTIVE ORDER

1.     My name is Roberta L. Lang.  I am over 21 years of age, and I am competent to make this affidavit. The statements herein are true and are within my personal knowledge unless stated otherwise.

2.     I make this declaration in support of the Motion of Whole Foods Market, Inc. for entry of a final protective order.  Specifically, I make this affidavit to demonstrate why I should be permitted to receive and review all Discovery Material described in the proposed Protective Order.  It is essential that I be provided access to the information in order to use my knowledge of the company and the grocery industry to assist outside counsel in formulating a defense to this action.  It is also essential for me to provide fully informed legal advice to the company, and to do so it is essential that I be given access to all confidential information.

$-1-$

3.    I am the General Counsel of defendant Whole Foods Markets, Inc. ("Whole Foods"). As General Counsel, I give legal advice to the senior management of Whole Foods and its board of directors.  I am an attorney licensed to practice law in the states of Illinois and Indiana.

4.    I do not participate in competitive decisionmaking at Whole Foods.  I do not participate in any decisions about formulating or implementing strategies to compete with our competitors or any decisions about formulating or implementing pricing strategies.  I am not involved in pricing decisions, selection of vendors, purchasing decisions, marketing, or other competition-related issues that are the subjects of confidential information in this case. I am also not involved in decisions about how much product to purchase at wholesale, the mix of products to carry, where to sell those products, or how to transport those products.

5.    Whole Foods is divided into eleven geographic regions, and the Regional President of each region is responsible for making competitive decisions and implementing competitive strategies in his or her region.  Most competitive decisions at Whole Foods, particularly with respect to product pricing, product mix, and competitive strategy, are made at the regional level by Regional Presidents and those working under them.

6.    Competitive decisions at Whole Foods are made at the national level by a group of the most senior executives of the company known as the "Executive Team" or "Eteam."  The members of the Eteam are the Chief Executive Officer, the Chief Financial Officer, the Co-Presidents, and two Executive Vice Presidents. The Eteam makes decisions about Whole Foods business and policy at a national level.  Most decisions about pricing and competitive strategy are made at the regional level rather than at the national level by the Eteam.  I am not a member of the Eteam, although as General Counsel I have occasion to give legal advice to the Eteam.

−2−

7.     As the General Counsel, I am one of approximately 27 voting members of the Whole Foods Leadership Network ("WFLN"), a group of Vice Presidents and Regional Presidents that meets periodically to make decisions about policy matters unrelated to competition.   For example, we make decisions about the company's benefit programs, the company's compensation and bonus programs, and whether products meet our quality standards. In addition, we have established charitable programs to further the mission of our company, such as the Animal Compassion Foundation, a nonprofit dedicated to achieving more compassionate treatment of farm animals, and the Whole Planet Foundation, a nonprofit providing assistance to micro-entrepreneurs in developing countries.   While WFLN may discuss the competitive landscape generally, this body does not make decisions about competitive strategies, responding to the strategies of our competitors, pricing, product mix, or other matters relating to competition.   Competitive strategies are made at the regional level by the Regional Presidents and their teams.

8.     This case arises out of the proposed acquisition of Wild Oats Markets, Inc. ("Wild Oats") by Whole Foods.   I am the inside lawyer who worked on the negotiation of the transaction. After the parties signed the merger agreement, they submitted a notification of the transaction to the Federal Trade Commission (the "Commission").   Thereafter, the Commission issued a second request for documents and information.   I am the inside lawyer who supervised the collection of information in response to the Commission's request and who advised the company during the agency's investigation.   Therefore, I am the only inside lawyer for the company with comprehensive knowledge of the transaction and the proceedings which have transpired to date with the Commission.

9.     The Commission alleges that Whole Foods and Wild Oats are in a unique product market that does not include other grocery or supermarket retailers. In order to respond, Whole Foods must collect and analyze information from all levels of the company concerning its operations, its pricing strategies, its product strategies, its responses to competitors, the entities it considers its competitors and why, and the witnesses, data, and documents it has available. Although I do not participate in decisions concerning competition, I am the inside attorney most familiar with the company and I know where that information can be found. Further, if I am informed about factual assertions made by the Commission, I can use my detailed knowledge of the company and my experience in the grocery industry to help our outside counsel develop a response and collect the information needed for that response. Although our outside counsel know a great deal about Whole Foods, they do not have the in-depth knowledge that I do of the company and the industry, and my knowledge and assistance is essential to help counsel defend this case. Unless I am able to review all Discovery Material in this matter, Whole Foods will be severely limited in its ability to defend itself fully in this action.

10.     In addition, it is essential that I be allowed to have access to all Discovery Material in order to be an active member of the trial team and in order to provide informed legal advice to the Eteam and the board of directors. This transaction is the largest acquisition ever undertaken by Whole Foods, and it is of great importance to the company. In addition, the Commission's decision to challenge the proposed transaction and to file this lawsuit is a matter of extreme importance to the company. I am called upon daily to provide legal advice to the Eteam, the board of directors, and our senior leadership concerning this transaction. I cannot provide informed legal advice to the company unless I have access to all information – including confidential information – at issue in this matter. Because I understand the company, the grocery

– 4 –

industry, and the questions and concerns of our management, I am more able than outside counsel to advise the company about the arguments being raised, the strength of the arguments, and the strength of the evidence in terms that the business executives can understand. Of course, in providing that advice, I would not disclose the confidential information itself.

11. Although there are other attorneys in the Whole Foods legal department, none shares my comprehensive knowledge of the company and the legal issues it presently faces. I joined Whole Foods in 1998 as the first attorney ever to be employed by the company, and I was promoted to General Counsel in 2000. I am uniquely qualified to represent the company due to my many years in the food industry. Other attorneys now work in the legal department in specialty areas such as contracts, labor law, and securities disclosure, but I am the only "generalist" attorney in the legal department. Importantly, I am the only attorney to have been involved in all aspects of the proposed merger and the Commission's review of the transaction. As its long-serving General Counsel and the attorney responsible for handling the proposed merger, I am uniquely positioned to assist our outside counsel and to advise Whole Foods management on this important litigation.

12. My office is located at Whole Foods' headquarters in Austin, Texas. Because both the court handling this litigation and the offices of Whole Foods' lead outside counsel are located in the District of Columbia, my ability to participate in the defense of this case would be severely restricted if I were required to review certain confidential information only in the offices of our outside counsel.

13. With the understanding that I would not use its confidential information for any improper purpose, Wild Oats has consented to my having access to such information pursuant to the terms of the proposed protective order.

14.    As an attorney, I acknowledge and agree that I am subject to the jurisdiction of this Court and to its contempt powers. I agree to remain subject to the Court's jurisdiction at all times, including after this litigation is concluded.

15.    I further represent that I will not make use of any confidential discovery material, directly or indirectly, for any purpose other than the defense of this action.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 11, 2007.

Roberta L. Lang

– 6 –

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-CV-01021-PLF |
| | ) | |
| WHOLE FOODS MARKET, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILD OATS MARKETS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE MOTION OF DEFENDANT WHOLE FOODS MARKET, INC.
FOR ENTRY OF A FINAL PROTECTIVE ORDER**

**Exhibit "D"**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

FEDERAL TRADE COMMISSION,

        Plaintiff,

vs.                                                           No. CIV 07-532 JB/ACT

PAUL L. FOSTER and
WESTERN REFINING,

        and

GIANT INDUSTRIES, INC.

        Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>[1]

**THIS MATTER** comes before the Court on: (i) the Plaintiff's Motion for Protective Order,

filed April 12, 2007 (Doc. 8); and (ii) the Plaintiff's Corrected Motion for Protective Order, filed

April 19, 2007 (Doc. 67). The Court held hearings on the motions on April 13, 2007 and April 23,

2007. The primary issue is whether the Court should prohibit, via protective order, the General

Counsels of Defendants Western Refining, Inc. ("Western") and Giant Industries, Inc. ("Giant")

from accessing confidential discovery material that Plaintiff Federal Trade Commission ("FTC")

possesses. Because the Court believes that a protective order is warranted, and that one balancing

the needs of Western and of Giant for information against the injury that may result from disclosure

can be fashioned, the Court will adopt the Proposed Protective Order under which the parties have

been laboring except insofar as its language enjoins Western's and Giant's General Counsels from

---

[1] The Court does not believe that this Memorandum Opinion and Order contains any sensitive information requiring filing under seal. If the parties would prefer that the filing be sealed, they may contact the Court and make that request.

viewing confidential discovery materials the FTC holds

## **FACTUAL BACKGROUND**

Capable outside counsel represents the Defendants. See Clerk's Minutes, filed April 13, 2007 (Doc. 36). The Defendants' General Counsels are officers of their respective corporations. See Plaintiff's Corrected Response in Support of Plaintiff's Motion for a Protective Order at 6, filed April 22, 2007 (Doc. 99)("Plaintiff's Response"). Western's General Counsel, Lowry Barfield, is a Vice President and Secretary of Western. See id. Kim Bullerdick, Giant's General Counsel, is a Senior Vice President and Secretary of Giant. See id. Western's legal department consists of Mr. Barfield and one relatively young attorney. See Hearing Transcript at 4:7-9 (Smith)(taken April 23, 2007)("April 23 Transcript").[2] Giant's legal department consists of Mr. Bullerdick and three other attorneys. See id. at 4:10-14 (Smith). Because both Mr. Barfield and Mr. Bullerdick are corporate officers, each presumably owes a fiduciary duty to his company that goes beyond the law to other aspects of their businesses.

Certain documents have suggested to the FTC that Mr. Barfield engages in "competitive decision making." Submissions PX00017, PX00018, and PX00019 are e-mails from Mr. Barfield's file. See Appendix to Plaintiff's Corrected Response in Support of Plaintiff's Motion for Protective Order to Cure Deficiency in Document 54 Noticed to Plaintiff in Document 57, filed April 21, 2007 (Doc. 98)("Plaintiff's Appendix"), PX00017, E-mail from Mike Whentley to Lowry Barfield, Paul Foster, Jeff Stevens, Scott Weaver, and Ralph Schmidt (dated November 4, 2005)("PX00017"); id. PX00018, E-mail from Gary Dalke to Lowry Barfield (dated August 19, 2006)("PX00018"); id. PX00019, E-mail from Leroy Crow to Lowry Barfield (dated October 6, 2006)("PX00019").

---

[2] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

PX00017 is an e-mail addressed to Mr. Barfield and others, discussing a possible pipeline venture and soliciting "any other finished product ideas." PX00017. PX00018 is an e-mail addressed to Mr. Barfield discussing capital expenditures. See PX00018. PX00019 is an e-mail addressed to Mr. Barfield, describing facilities inspection and construction progress. See PX00019.

The FTC's investigation has resulted in the production of sensitive and confidential information. See Plaintiff's Corrected Memorandum in Support of Motion for Protective Order at 1, filed April 19, 2007 (Doc. 68)("Plaintiff's Memo"). The Defendants have submitted documents and information pursuant to requests under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a. See id. at 3. Both Western and Giant have indicated that most of the documents submitted contain confidential material unknown to their competitors and the public in general. See id. Similarly, third parties have submitted and may be asked to submit additional information to the FTC that is relevant to this case and that contains non-public, competitively sensitive material. See id.

## PROCEDURAL BACKGROUND

On April 12, 2007, the FTC filed a Complaint seeking a temporary restraining order and a preliminary injunction halting Western's acquisition of Giant to preserve the competitive status quo while the FTC conducts an administrative proceeding to determine whether the transaction would violate antitrust laws. See Complaint for Temporary Restraining Order and Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act ("FTCA") at 1-2, filed April 12, 2007 (Doc. 1)("Complaint"). The FTC represents that it has reason to believe that such acquisition would violate Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, and Section 7 of the Clayton Act, 15 U.S.C. § 18. See Complaint at 4, 11.

The FTC's Complaint was filed pursuant to a Stipulated Interim Protective Order designed

-3-

to protect competitively sensitive commercial information, especially that of third parties. <u>See</u> Plaintiff's Motion for Protective Order, filed April 12, 2007 (Doc. 8)("Motion for Protective Order"), Stipulated Interim Protective Order (dated April 12, 2007)("Stipulated Order"). In accordance with D.N.M. LR-Civ. 7.1(a), the FTC represents that it discussed its Motion for a Protective Order with opposing counsel, and that the Defendants advised they would not oppose the motion. <u>See</u> Motion for Protective Order at 1-2. The FTC moves the Court, pursuant to rule 26(c) of the Federal Rules of Civil Procedure, for a protective order preserving the confidentiality of information that the Defendants or third parties have provided, or will be providing, to the FTC, and that the FTC has provided, or will be providing, to the Defendants. <u>See</u> Motion for Protective Order at 1. The FTC submitted a proposed order with its request for a protective order. <u>See</u> Stipulated Order.

In the Stipulated Interim Protective Order, counsel for the parties agree that they will abide by the terms of the Proposed Protective Order appended to the Stipulation, unless and until such time as the Court enters a protective order. <u>See id.</u> at 1. The Stipulation also states that it shall not prejudice the Defendants from opposing or seeking modification of any of the provisions of the protective order, and that it is intended only to secure confidentiality for documents related to this litigation pending the Court's acting on the Motion for Protective Order. <u>See id.</u> Thomas J. Lang, counsel for the FTC, Marc D. Schildkraut, counsel for Defendants Paul L. Foster and Western, and Tom D. Smith, counsel for Defendant Giant signed the Stipulated Interim Protective Order adopting the Proposed Protective Order on April 12, 2007, the day that it was submitted to the Court. <u>See id.</u> at 1-3.

Under the Proposed Protective Order, "Confidential Discovery Material" is "non-public trade secret or other research, development or commercial information, the disclosure of which would

likely cause commercial harm to the Producing Party." Stipulated Order, Proposed Protective Order

¶ 4, at 2. The Proposed Protective Order includes the following examples of Confidential Discovery

Material:

> strategic plans (involving pricing, marketing, research and development, corporate alliances, or mergers and acquisitions) that have not been fully implemented or revealed to the public; trade secrets; customer-specific evaluations or data (e.g., prices, volumes, or revenues); sales contracts; system maps; personnel files and evaluations; information subject to confidentiality or non-disclosure files and evaluations; information subject to confidentiality or non-disclosure agreements; proprietary technical or engineering information; proprietary financial data or projections; and proprietary consumer, customer, or market research or analyses applicable to current or future market conditions, the disclosure of which could reveal Confidential Discovery Material.

Id. ¶ 4 at 2-3. Pursuant to the Proposed Protective Order, each corporate defendant may give

Confidential Discovery Material to one in-house counsel who "does not have any influence over the

direction of [that company's] business or its operations (in addition to outside counsel and experts

or consultants retained to assist in this action)." Stipulated Order, Proposed Protective Order ¶ 8,

at 9.

Specifically with regard to in-house counsel, paragraph 8 of the Proposed Protective Order

provides that Confidential Discovery Material is not to be provided to any person except "one in-

house counsel designated by Western who does not have any influence over the direction of

Western's business or its operations," and "one in-house counsel designated by Giant who does not

have any influence over the direction of Giant's business or its operations . . ." Id. ¶ 8, at 8.

Paragraph 9 of the Proposed Protective Order states that, if any party desires to disclose Confidential

Discovery Material to in-house counsel for Western or for Giant not designated in paragraph 8 of

the protective order, the disclosing party shall notify the producing party of its desire to disclose

such Confidential Discovery Material. See id. ¶ 9, at 9. Paragraph 9 allows the producing party to

object to the disclosure of the Confidential Discovery Material within five days of receiving notice of an intent to disclose such material. See id. ¶ 9, at 10. If the producing party timely objects, the disclosing party shall not disclose the Confidential Discovery Material to the identified person, absent a written agreement with the producing party or Court order permitting disclosure. See id. The Proposed Protective Order also permits any party to ask the Court to enter a protective order with different terms. See id. ¶ 18, at 14.

The FTC requests that the Court issue an advance ruling in the form of the Proposed Protective Order. See Motion for Protective Order, Plaintiff's Memorandum in Support of Motion for Protective Order at 2 ("Plaintiff's Protective Order Memo"). The FTC requests that the Court enter the Proposed Protective Order to expedite the litigation of the case, to protect the parties' ability to secure and use confidential information in an appropriate matter, and to protect the interest of the Defendants and third parties against inappropriate disclosure of confidential material. See id. at 3-4.

On April 13, 2007, the Court granted the FTC's request for a Temporary Restraining Order. See Memorandum Opinion and Order at 1, 8, filed April 13, 2007 (Doc. 37). On April 16, 2007, the Court set the hearing on the FTC's request for Preliminary Injunction for May 7, 2007. See Hearing Transcript at 10:10 (Court)(taken April 16, 2007)("April 16 Transcript").

On April 16, 2007, the Defendants also orally moved to amend the Proposed Protective Order so that their General Counsels could access confidential information. See id. at 14:17-16:4 (Smith). At that time, the Court indicated that it was inclined to grant the Defendants' request, see id. at 17:20-21 (Court), but the parties requested to serve simultaneous briefing within forty-eight hours, see id. at 18:4-12 (Lang), id. at 18:15-19 (Smith). Both parties filed their briefs on the issue on April 18, 2007. See Plaintiff's Response in Opposition to Defendants' Motion to Amend the

-6-

Protective Order, filed April 18, 2007 (Doc. 53); Defendants' Memorandum in Opposition to Plaintiff's Motion for Protective Order, filed April 18, 2007 (Doc. 55)("Defendants' Opposition Memo").

The FTC opposes the Defendants' suggested amendments to paragraphs 8(c) and 8(d), which would appear to allow the General Counsels of Western and Giant to access all confidential discovery material produced in this litigation, including sensitive commercial information that the Defendants' competitors have supplied. See Plaintiff's Response at 4. The Defendants assert that the full participation of their General Counsels is essential to their defense. See Defendants' Opposition Memo at 1-2. They also submit that Mr. Bullerdick and Mr. Barfield, in particular, are experienced litigators, who will play a significant role in defending the contested transaction. See April 16 Transcript at 15:2-11 (Smith). Western and Giant also represent that Mr. Barfield and Mr. Bullerdick have no involvement in the competitive decision making of their companies. See Defendants' Opposition Memo at 2-3.

At the April 23, 2007 hearing on the filings relating to the Motion for Protective Order, Western and Giant represented that Mr. Barfield and Mr. Bullerdick would submit affidavits to the Court attesting that they do not take part in competitive decision making. See April 23 Transcript at 5:9-13 (Smith). Further, at the hearing, Western and Giant stated that they seek to allow their General Counsels access to only deposition transcripts, transcripts of the FTC's investigative hearings, and un-redacted pleadings -- not the actual documents produced to the FTC. See id. at 10:22-11:2.

On April 24, 2007, Mr. Barfield and Mr. Bullerdick submitted affidavits stating that they are not involved in the competitive decision making of their companies. See Affidavit of Kim Bullerdick in Support of Defendants' Memorandum in Opposition to Plaintiff's Motion for

Protective Order ¶ 3, at 1-2, filed April 24, 2007 (Doc. 118)("Bullerdick Affidavit"); Affidavit of

Lowry Barfield in Support of Defendants' Memorandum in Opposition to Plaintiff's Motion for

Protective Order ¶ 3, at 1, filed April 24, 2007 (Doc. 119)("Barfield Affidavit").

## FTCA

Section 21(d)(2) of the FTCA provides:

> Any disclosure of relevant and material information in Commission adjudicative
> proceedings or in judicial proceedings to which the Commission is a party shall be
> governed by the rules of the Commission for adjudicative proceedings or by court
> rules or orders, except that the rules of the Commission shall not be amended in a
> manner inconsistent with the purposes of this section.

15 U.S.C. § 57b-2(d)(2). In furtherance of the requirements of Section 21, the FTC promulgated

Rule 4.10(g). See 16 C.F.R. § 4.10(g)(1996). Rule 4.10(g)(3) provides that a person submitting

confidential information to the FTC will be "afforded an opportunity to seek an appropriate

protective or in camera order" before the disclosure of such documents in court proceedings. See

id.

## RULE 26(c)(7)

Rule 26(c)(7) permits a court to "make any order which justice requires to protect a party

or person from annoyance, embarrassment, oppression, or undue burden or expense, including . .

. that a trade secret or other confidential research, development, or commercial information not be

revealed or be revealed only in a designated way . . . ." Fed. R. Civ. P. 26(c)(7). Rule 26 creates

a presumption of openness in discovery matters, and "it is well established that there is no absolute

privilege for trade secrets or similar confidential information." Sears v. Nissan Motor Co., Ltd., No.

90-2169, 1991 WL 80741, at *2 (10th Cir. May 16, 1991).

> To resist discovery under Rule 26(b)(7), a person must first establish that the
> information sought is a trade secret and then demonstrate that its disclosure might
> be harmful. If these requirements are met, the burden shifts to the party seeking

-8-

> discovery to establish that the disclosure of trade secrets is relevant and necessary
> to the action. The district court must balance the need for the trade secrets against
> the claim of injury resulting from disclosure.

Centurion Indus., Inc. v. Warren Steurer & Assocs., 665 F.2d 323, 325 (10th Cir. 1981). Generally,

in determining whether to require disclosure, a court should weigh the competing interests involved

within the context of the total situation and consider factors such as the dangers of abuse, good faith,

adequacy of protective measures, and the availability of other means of proof. See id. at 326 n.6.

> It is within the sound discretion of the trial court to decide whether trade secrets are
> relevant and whether the need outweighs the harm of disclosure. Likewise, if the
> trade secrets are deemed relevant and necessary, the appropriate safeguards that
> should attend their disclosure by means of a protective order are also a matter within
> the trial court's discretion.

Id. at 326.

With respect to distinguishing between outside and in-house counsel in protective orders that

seek to guard against the disclosure of competing companies' confidential information, an important

factor is whether the in-house counsel is involved in "competitive decision making." Brown Bag

Software v. Symantec Corp., 960 F.2d 1465, 1470 (9th Cir. 1992)(citing U.S. Steel Corp. v. United

States, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984))(affirming a district court's upholding of a

magistrate's protective order denying in-house counsel access to a competitor's confidential

information where the in-house counsel was involved in competitive decision making and outside

counsel had over six months to review the sensitive information to which the in-house counsel was

not privy). Competitive decision making encompasses "a counsel's activities, association, and

relationship with a client that are such as to involve counsel's advice and participation in any or all

of client's decisions (pricing, product design, etc.) made in light of similar or corresponding

information about a competitor." Glaxo Inc. Genpharm Pharm, Inc., 796 F. Supp. 872, 874

(E.D.N.C. 1992)(quoting U.S. Steel Corp. v. United States, 730 F.2d at 1468)(internal quotations

omitted).    See Akzo v. U.S. Int'l Trade Comm'n, 808 F.2d 1471, 1482-83 (Fed. Cir. 1986)(reviewing administrative law and upholding an administrative law judge's protective order denying in-house counsel access to confidential information about a competitor company where the party to which in-house counsel belonged failed to demonstrate that the information sought was needed).    "[I]n-house counsel stand in a unique relationship to the corporation in which they are employed.    Although in-house counsel serve as legal advocates and advisors for their client, their continuing employment often intimately involves them in the management and operation of the corporation of which they are a part."    Fed. Trade Comm'n v. Exxon Corp., 636 F.2d 1336, 1350 (D.C. Cir. 1980)(finding that the district court did not abuse its discretion when it did not allow in-house counsel access to the competitively sensitive information of a subsidiary subject to divestment).

In Carpenter Tech. Corp. v. Armco, Inc., 132 F.R.D. 24 (E.D. Penn. 1990), the Honorable Daniel H. Huyett III, United States District Court Judge for the Eastern District of Pennsylvania, considered whether in-house counsel could have access to a competitor's confidential information. See id. at 27-29.    Judge Huyett held that a senior staff attorney, who was not an officer or a director, was not related, by blood or marriage, to an officer or employee of the company, and who submitted an affidavit to the court stating that he was not involved in competitive decision making, could have access to the information in question.    See id. at 27-28.    Judge Huyett also ruled, however, that the Director of Law, who was an officer, was not a director, was not related, by blood or marriage, to another officer or company employee, and who filed an affidavit with the court declaring that he had no "direct" involvement in competitive decision making, was barred from accessing the information sought.    Id. at 28.

In Glaxo Inc. v. Genpharm Pharm, Inc., the Honorable Terrence William Boyle, United

-10-

States District Judge for the Eastern District of North Carolina, overruled a magistrate's protective order denying one of the party's in-house counsel access to confidential materials obtained from the opposing party through discovery. See id. at 874. The magistrate had barred the in-house counsel from accessing the information in question on the grounds that he was a high-level employee and substantial investor in the party-company, his company had retained three outside law firms that could provide adequate representation, and that the opposing party had no in-house counsel. See id. Judge Boyle held that the in-house counsel, who was a member of three different bars and attested in two un-controverted affidavits that he had no involvement in competitive decisions involving pricing, scientific research, sales, or marketing, could access the opposing party's confidential materials. See id.

## ANALYSIS

The Court believes that the nature of the confidential discovery materials in this case warrants a protective order. The Court also concludes that it can craft one that balances the need of Western and Giant for information against the injury that may result from disclosure. Accordingly, the Court will modify the Proposed Protective Order to allow Western's and Giant's General Counsel, subject to meeting certain conditions, to access certain categories of the confidential discovery information.

## I.    THE COURT WILL ENTER A PROTECTIVE ORDER IN THIS CASE.

The confidential information at issue here includes competitors' cost data, customer lists, prices, and volumes sold. See Affidavit of Bradley Barron, General Counsel, NuStar Energy, L.P. ¶ 5, at 1 (executed April 18, 2007); Declaration of Thomas D. Carmel, Senior Counsel, Conoco Phillips ¶ 3, at 1 (executed April 18, 2007); Declaration of Darby L. Reid, Senior Manager, Valero Energy Corporation ¶ 3, at 1 (executed April 18, 2007). Under rule 26(c)(7), such information fits

within categories of information that may be protected.  See American Standard, Inc.v. Pfizer, Inc.,

828 F.2d 734, 740 (Fed. Cir. 1987)(stating that confidential information includes trade secrets and

marketing plans); Diamond State Ins. Co. v. Rebel Oil Co., Inc., 157 F.R.D. 691, 697 (D. Nev.

1994)(holding that confidential information includes that which would cause substantial economic

harm to the competitive position of the producer); Fed. R. Civ. P. 26(c)(7).  The parties do not

dispute the harm that disclosure of competitively sensitive information to competitors can inflict on

a business.

     Litigation of this case may require that all parties engage in discovery of confidential

material in the possession of third parties and may require the disclosure of confidential material to

the Court.  The FTC represents that, in litigating similar cases, it has found that courts frequently

receive several requests for protective orders pursuant to rule 26(c), 15 U.S.C. § 57b-2(d)(2), and

16 C.F.R. § 4.10(g).  In the interests of efficiency and fairness to the Defendants and to all third

parties who have provided or may provide competitively sensitive information, the FTC seeks this

relief to establish a uniform procedure to safeguard certain confidential material that the parties to

this litigation have discovered or will discover.  There is no doubt that such an order would alleviate

the burden on the Court to respond to numerous requests for orders protecting confidential

information on a case-by-case basis, and effect a more orderly discovery process.

     The proposed order seeks to ensure, to the extent possible, that matters raised in this

proceeding will be open to the public, while simultaneously limiting the number of persons who

have access to the confidential information generated during the discovery phase of the litigation

and providing a mechanism for the proper dissemination of discoverable documents.  Furthermore,

such material submitted by the Defendants, as well as material submitted by third parties, may be

entitled to confidential treatment under Sections 6(f) and 21 of the FTC Act, 15 U.S.C. §§ 46(f),

57b-2.

The Court will adopt the Proposed Protective Order subject to the amendments introduced below.

## II.     THE COURT WILL AMEND THE FTC'S PROPOSED PROTECTIVE ORDER TO ALLOW WESTERN'S AND GIANT'S GENERAL COUNSEL LIMITED ACCESS TO SOME CONFIDENTIAL INFORMATION.

The FTC seeks a protective order that would bar Mr. Barfield and Mr. Bullerdick from viewing confidential discovery materials. See Plaintiff's Response at 2. The FTC asserts that it is crucial that this information remain confidential and unexploited, because, if it is used to gain competitive advantage, companies will be reluctant to provide information to the FTC in the future. See Plaintiff's Response at 9-10.

Western and Giant assert that it is essential to their defense that their General Counsels have access to the confidential discovery material in this case. See Defendants' Opposition Memo at 1. Western and Giant contend that Mr. Barfield and Mr. Bullerdick are responsible for advising their management on litigation strategy, and that they cannot do so without full access to relevant information. See id. at 2. They also represent that Mr. Barfield is an experienced commercial litigator who desires to take a leading role in this litigation. See April 23 Transcript at 9:14-24. Western and Giant concede that the discovery materials should be subject to protection and that they should remain confidential. See id. at 1. Western and Giant seek only limited access to information for their General Counsels: they seek to allow Mr. Barfield and Mr. Bullerdick access to deposition transcripts, transcripts of FTC investigative hearings, and un-redacted pleadings, see April 23 Transcript at 10:22-11:2, in their outside counsels' office(s) in a manner that would allow them to take notes but not remove the notes from the outside counsels' office(s), see Defendants' Opposition Memo at 1. The Court finds that the limited nature of this request substantially lessens the danger

-13-

that Western and Giant will be able to view, yet alone use, any information that could provide them advantages over their competitors.   Moreover, addressing the issue of in-house counsel and competitive decision making, Western and Giant represent that Mr. Barfield and Mr. Bullerdick do not take part in competitive decision making, see Defendants' Opposition Memo at 2-3, and Mr. Barfield and Mr. Bullerdick have submitted affidavits to the Court affirming that representation, see Barfield Affidavit ¶ 3, at 1; Bullerdick Affidavit ¶ 3, at 1-2.

The FTC presents three e-mail communications, PX00017, PX00018, and PX00019, to dispute the assertion that Mr. Barfield is not involved in competitive decision making.   The Defendants respond that those three e-mails were the only ones out of approximately 900,000 documents submitted to the FTC that indicate that Mr. Barfield may have a role in competitive decision making at Western. April 23 Transcript at 8:6-11.  Further, the Defendants represent that PX00017 was simply a solicitation of interest sent to multiple parties, and that PX00018 and PX00019 related to due diligence concerning the Giant transaction.  See id. at 8:11-24.  The Court finds that the number and nature of the communications the FTC submits do not override the declarations regarding competitive decision making contained in the affidavits of Mr. Barfield and Mr. Bullerdick.

Acknowledging that it is within the trial Court's discretion to determine which safeguards are appropriate for protecting commercial information, see Centurion Indus., Inc. v. Warren Steurer & Assocs., 665 F.2d at 326, recognizing the FTC's significant interest in safeguarding information cooperating companies give it and the significant interest the Defendants have in putting on the strongest defense they can, because the FTC has not demonstrated that harm will result from allowing the limited access to confidential information that Western and Giant seek, because Western and Giant have shown that their defense would be prejudiced if their General Counsels

-14-

were prohibited from providing them with well-informed strategic legal advice, noting that Western's and Giant's in-house counsel are limited in number, and because Mr. Barfield and Mr. Bullerdick attest that they do not take part, directly or indirectly, in their companies' competitive decision making, the Court will adopt the Proposed Protective Order after amending paragraphs 8(c) and 8(d) to balance Western's and Giant's need for information with the FTC's concern for potential harm from the disclosure of confidential competitive information.

Based on the foregoing, and based upon Mr. Barfield's and Mr. Bullerdick's entering affidavits declaring of which bars they are members and remaining subject to the Court's jurisdiction at all times, including after the case is concluded, the Court will amend paragraphs 8(c) and 8(d) to read:

(c)     Lowry Barfield, General Counsel of Western Refining, Inc., who may have access to confidential deposition transcripts, transcripts of FTC investigative hearings, and un-redacted pleadings, without exhibits, in the office(s) of Western's outside counsel, and who may take notes regarding such material but may not remove these notes from the office(s) of Western's outside counsel;

(d)     Kim Bullerdick, General Counsel of Giant Industries, Inc., who may have access to confidential deposition transcripts, transcripts of FTC investigative hearings, and un-redacted pleadings, without exhibits, in the office(s) of Giant's outside counsel, and who may take notes regarding such material but may not remove these notes from the office(s) of Giant's outside counsel;

**IT IS ORDERED** that the Plaintiff's Motion for Protective Order and the Plaintiff's Corrected Motion for Protective Order are granted in part and denied in part. The Court adopts, based on Mr. Barfield's and Mr. Bullerdick's agreeing to meet the terms stated herein, the Proposed Protective Order with the stated amendments to paragraphs 8(c) and 8(d). Mr. Barfield and Mr. Bullerdick must enter affidavits listing the bar(s) of which they are members, acknowledge that the are subject to the Court's contempt powers, and agree to remain subject to the Court's jurisdiction

-15-

at all times, including after the case is concluded. Mr. Barfield and Mr. Bullerdick are also instructed not to use the confidential information, directly or indirectly, for any purpose other than defending against this lawsuit.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Deyonna Young
  Assistant Attorney General
  Special Deputy to the Federal Trade
    Commission
Litigation Division (Antitrust)
Office of the New Mexico Attorney General
Albuquerque, New Mexico

-- and --

Thomas J. Lang
  Senior Litigation Counsel
Bureau of Competition
Federal Trade Commission
Washington, D.C.

*Attorneys for the Plaintiff*

Henry M. Bohnhoff
Andrew G. Schultz
Thomas A. Outler
Patrick Shay
Rodey, Dickason, Sloan, Akin
  & Robb, P.A.
Albuquerque, New Mexico

*Attorneys for the Defendants*

-16-

Lowry Barfield
General Counsel
Western Refining, Inc.
El Paso, Texas

-- and --

Marc G. Schildkraut
Michael P.A. Cohen
Heller Ehrman, LLP
Washington, D.C.

> *Attorneys for Defendants Paul L. Foster*
> *and Western Refining, Inc.*

Kim H. Bullerdick
General Counsel
Giant Industries, Inc.
Scottsdale, Arizona

-- and --

Hugh R. Whiting
Tom D. Smith
Jones Day
Houston, Texas
Washington, D.C.

> *Attorneys for Defendant Giant Industries, Inc.*

-17-

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:07-CV-01021-PLF |
| WHOLE FOODS MARKET, INC. | ) ) ) | |
| and | ) ) | |
| WILD OATS MARKETS, INC. | ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE MOTION OF DEFENDANT WHOLE FOODS MARKET, INC.
FOR ENTRY OF A FINAL PROTECTIVE ORDER**

**Exhibit "E"**

**IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

FEDERAL TRADE COMMISSION,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀Civil Action No. 07cv352 JB/ACT
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
PAUL L. FOSTER,⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀**PUBLIC VERSION**
WESTERN REFINING, INC.⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
and⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
GIANT INDUSTRIES, INC.⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀Defendants.⠀⠀⠀)

---

**PLAINTIFF'S PRE-HEARING BRIEF
ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

# TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.    THE RELEVANT MARKET IS BULK SUPPLY OF GASOLINE
        INTO NORTHERN NEW MEXICO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    II.   GIANT AND WESTERN COMPETE IN THE BULK SUPPLY OF
        GASOLINE INTO NORTHERN NEW MEXICO . . . . . . . . . . . . . . . . . . . . . . . 9

    III.  THE ACQUISITION WILL SUBSTANTIALLY REDUCE
        COMPETITION IN NORTHERN NEW MEXICO GASOLINE MARKET . . . 11

        A.    The Proposed Acquisition Is Presumptively Unlawful . . . . . . . . . . . . . . 11

        B.    The Acquisition Will Raise Gasoline Prices to Northern New
               Mexico Consumers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        C.    Other Suppliers Will Not Defeat Supracompetitive Gasoline Prices
               Resulting from the Acquisition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        D.    The Relevant Market Is Insulated from New Entry or Expansion
               . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        E.    The Proposed Transaction Will Not Enhance Competition By
               Producing Cognizable Efficiencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## **TABLE OF AUTHORITIES**

## **CASES**

Brown Shoe Co. v. United States,
    370 U.S. 294 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

California v. Am. Stores Co.,
    697 F. Supp. 1125 (C.D. Cal. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

FTC v. Aloha Petroleum, LTD.
    No. 05-00471 (D. Haw. filed July 27, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

FTC v. Bass Bros. Enters.,
    1984-1 Trade Cas. (CCH) ¶ 66,041 (N.D. Ohio 1984) . . . . . . . . . . . . . . . . . . . . . 13, 17

FTC v. Cardinal Health,
    12 F.Supp.2d 34 (D.D.C., 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

FTC v. Elders Grain, Inc.,
    868 F.2d 901 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

FTC v. Food Town Stores, Inc.,
    539 F.2d 1339 (4th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

FTC v. H.J. Heinz Co.,
    246 F.3d 708 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 24, 25

FTC v. PPG Indus., Inc.,
    628 F. Supp. 881 (D.D.C.), aff'd 798 F.2d 1500 (D.C. Cir. 1986) . . . . . . . . . . . . . 16, 25

FTC v. Staples, Inc.,
    970 F. Supp. 1066 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 16, 24, 25

FTC v. Warner Communications, Inc.,
    742 F.2d 1156 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

Hosp. Corp. of Am. v. FTC,
    807 F.2d 1381 (7th Cir. 1986), cert. denied, 481 U.S. 1038 (1987) . . . . . . . . . . . . 12, 17

Illinois Brick Co. v. State of Ill.,
    431 U.S. 720 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Monfort of Colo., Inc. v. Cargill, Inc.,
    761 F.2d 570 (10th Cir. 1985), rev'd on other grounds, 479 U.S. 104 (1986) . . . . . . . . 23

Rebel Oil Co. v. Atl. Richfield Co.,
    51 F.3d 1421 (9th Cir. 1995), cert. denied, 516 U.S. 987 (1995) . . . . . . . . . . . . . . . . 5, 20

i

Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.,
      1995-2 Trade Cas. (CCH) ¶ 71,254(N.D. Cal. 1995) ............................ 8

Shell Oil Co.,
      125 F.T.C. 769 (1998) ...................................................... 12

United States v. Eastman Kodak Co.,
      853 F. Supp. 1469 (W.D.N.Y. 1994) ..................................... 8

United States v. Phila. Nat'l Bank,
      374 U.S. 357 (1963) ........................................................ 6

United States v. UPM-Kymmene OYJ,
      2003-2 Trade Cas. (CCH) ¶ 74,101 (N.D. Ill. 2003)  ........................... 13

## **STATUTES**

Federal Trade Commission Act, Section 13(b)
      15 U.S.C. § 53(b) ......................................................... 4

## **OTHER AUTHORITIES**

Complaint, Phillips Petroleum Co., (2003) (FTC Docket No. C-4058) .................. 12

William M. Landes & Richard A. Posner, Market Power in Antitrust Cases,
      94 HARV. L. REV. 937, (1981) ............................................ 8

## PRELIMINARY STATEMENT

Western Refining, Inc. ("Western") proposes to acquire Giant Industries, Inc. ("Giant") in a $1.4 billion transaction that would combine two of the leading bulk suppliers of gasoline to the northern New Mexico market.[1] **[Redacted**

**]** With the transaction, the incentives to do so will be significantly diminished, resulting in millions of dollars in harm via higher gasoline prices to New Mexico consumers and businesses.

Today, Giant owns and operates two refineries in the Four Corners region of New Mexico,[2] which have a combined crude oil capacity of 36,800 barrels per day ("bpd"). **[Redacted**

**]** The

---

[1]    The northern New Mexico market includes the counties of Rio Arriba, Taos, Mora, San Miguel, Los Alamos, Valencia, Torrence, Bernalillo, Sandoval, Guadalupe, and Santa Fe. This is an area that can be reached by truck from Giants' refineries and Albuquerque area terminals. **[Redacted**

**]**

[2]    There are six refineries that supply gasoline and other light petroleum products to Albuquerque: Giant's refineries in Ciniza and Bloomfield; Valero Energy Corporation's ("Valero") refinery in McKee; ConocoPhillips' refinery in Borger; Western's refinery in El Paso; and Holly Corporation's ("Holly") refinery in Artesia. Three pipelines deliver product into Albuquerque: Plains All American Pipeline, L.P.'s New Mexico Pipeline ("Plains Pipeline"); the Holly Energy Partners, L.P. pipeline ("HEP pipeline"); and NuStar, L.P./ConocoPhillips' Albuquerque-to-Amarillo pipeline ("ATA pipeline"). There are five terminals in Albuquerque, which are owned by Giant, Chevron Corporation ("Chevron"), Holly, NuStar, L.P., and ConocoPhillips. **[Redacted**

**]** Holly Energy Partners ("HEP") also owns a terminal in Moriarty, which is supplied by the HEP pipeline. White p. 5, ¶ 14 (PX04063 at 008).

capacity utilization rates at these two refineries have declined 25% over the past fifteen years due to declining availability of local sources of crude oil.  Ownby p. 26, ¶ 55 (PX04061 at 026); White p. 23, ¶ 70 (PX04063 at 026-027); PX00610 at 027; Giant Industries, Inc. Form 10-K (Dec. 31, 2003) at 17.  To bring Giant's refineries back to full utilization levels, Giant acquired the idle Texas New Mexico pipeline, **[Redacted**

**]**

---

[3]     **[Redacted**

**]**

Western's incentives are quite the opposite.[4]  Western owns and operates a 124,000 bpd refinery and a related terminal in El Paso. **[Redacted**

**]** Western also faces significant losses on its own sales in Albuquerque should gasoline prices fall.  Because of the enormous ramifications to Western of even slight decreases in Albuquerque prices, Western has a strong incentive and ability to keep prices from falling in the northern New Mexico market by diverting Giant's incremental volumes to other areas.  Indeed, Dr. White has concluded that the merged entity would have the incentive and ability to increase prices **[Redacted                    ]** above the level that would prevail absent the merger.  White p. 35, ¶ 105 (PX04063 at 038)

No other firm would be able to defeat price increases generated by the combined firm's output reduction scheme.  Existing suppliers are unlikely to respond by delivering more product into the market, **[Redacted**

**]** And additional supply from other markets such as the Gulf Coast has no significant impact on northern New Mexico.

---

[4]        **[Redacted                                              ]**

[5]        **[Redacted**

**]**

3

The Plains Pipeline, the only conduit to bring product to the market, is fully utilized by current

shippers [Redacted

]

The Federal Trade Commission seeks to enjoin the proposed merger to prevent the

considerable harm that would be inflicted on northern New Mexico consumers as a result of the

proposed transaction.[6] Pursuant to Section 13(b) of the Federal Trade Commission Act, 15

U.S.C. § 53(b),[7] the Commission respectfully requests injunctive relief to preserve the status quo

---

[6]     "In order to protect the public interest in competitive markets . . . the Commission has consistently required merger parties to bear the risk that relief might be overinclusive, rather than imposing on the public the risk that relief might be underinclusive." FTC, THE PETROLEUM INDUS.: MERGERS, STRUCTURAL CHANGE, & ANTITRUST ENFORCEMENT at 14 (Aug. 2004) ("FTC PETROLEUM STUDY"). The Commission has a long history of preserving competition in the petroleum industry. It has conducted well over 200 merger investigations in the industry in the last 10 years. During the last 25 years, the Commission has obtained divestitures of refineries and other remedies, and caused the parties to abandon the transaction in 11 mergers where it feared that competition would suffer in bulk refined products markets. Id. at 35-36.

[7]     Section 13(b) "provides for the grant of a preliminary injunction where such action would be in the public interest—as determined by a weighing of the equities and a consideration of the Commission's likelihood of success on the merits." FTC v. H.J. Heinz Co., 246 F.3d 708, 714 (D.C. Cir. 2001). The Commission is not required to establish that the proposed acquisition would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, which prohibits an acquisition "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition or to tend to create a monopoly." Id. at 714 (citing FTC v. Staples, Inc., 970 F. Supp. 1066, 1071 (D.D.C. 1997). See also FTC v. Food Town Stores, Inc., 539 F.2d 1339, 1342 (4th Cir. 1976) ("The district court is not authorized to determine whether the antitrust laws have been or are about to be violated. That adjudicatory function is vested in F.T.C. in the first instance.").

4

pending consideration of the issues in a full administrative trail and to prevent the difficulty of obtaining adequate relief if the parties are now allowed to merge.[8]

## ARGUMENT

## I.     THE RELEVANT MARKET IS BULK SUPPLY OF GASOLINE INTO NORTHERN NEW MEXICO

The relevant product market is the bulk supply of gasoline because, if gasoline prices increase, consumers are unable to substitute gasoline for other refined petroleum products for automobiles and other vehicles designed to use gasoline. Ownby p. 6, ¶ 12 (PX04061 at 006); White p. 8, ¶ 29 (PX04063 at 011) ("demand for gasoline tends to be highly price inelastic").[9]

---

[8]     [Redacted


] Because wholesalers routinely pass on increased supply costs to their customers, they have no reason to complain about higher gasoline prices post-merger. See Illinois Brick Co. v. State of Ill., 431 U.S. 720 (1977). [Redacted


]

[9]     Plaintiff's First Amended Complaint for Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act narrows the relevant product market definition to gasoline only to streamline the prosecution of this preliminary injunction case. [Redacted


] The Commission nonetheless believes that a broader market covering all light petroleum products, including gasoline, continues to be appropriate [Redacted                                                                                          ]
Contrary to Defendant's claims, both demand-side and supply-side substitution are "the relevant
                                                                                              (continued...)

Bulk supply involves delivery of large quantities of gasoline produced at local refineries or otherwise shipped by pipeline or ship (for areas near water) to an area. Because Albuquerque is land-locked, bulk supply refers to "pipeline tender" quantities of 5,000 to 25,000 barrels of light petroleum products. Ownby p. 6, ¶ 11 (PX04061 at 006). Bulk deliveries are feasible only at the refinery, via a pipeline, or, in the case of relatively short hauls, via tanker trucks delivering from a refinery or terminal. Customers for bulk deliveries of gasoline include fuel terminals, wholesale resellers, fleet customers with private service stations, and retail service stations. White p. 8, ¶ 31 (PX04063 at 011).

The relevant geographic market is northern New Mexico, which is the "area that would be adversely affected" by the proposed acquisition. United States v. Phila. Nat'l Bank, 374 U.S. 32, 357 (1963). Ownby p. 15, ¶¶ 30, 31 (PX04061 at 015); White p. 8, ¶ 33 (PX04063 at 011); [Redacted                                                                          ] As demonstrated by Dr. White, "demand for bulk deliveries of gasoline to Albuquerque is inelastic at prices prevailing today, and likely would remain inelastic in the face of any insignificant increase in Albuquerque prices for bulk delivery of gasoline." White p. 7, ¶ 25 (PX04063 at 010). [Redacted


] Moreover, as Dr. White concludes, because "Giant's capacity expansion likely will lead to significantly reduced prices in Albuquerque . . . the

---

[9]    (...continued)
inquiry for product market definition." Id. at 3. See, e.g., Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1436 (9th Cir. 1995), cert. denied, 516 U.S. 987 (1995) ("But defining a market on the basis of demand considerations alone is erroneous. A reasonable market definition must also be based on "supply elasticity.") (citations omitted). Regardless, if an acquisition is likely to harm competition in any relevant product market alleged—in this case, either bulk gasoline or bulk light petroleum products—the acquisition would violate Section 7 of the Clayton Act. See Staples, 970 F. Supp. at 1075.

appropriate starting price for the market definition . . . is significantly lower than the prevailing price." White p. 7, ¶ 26 (PX04063 at 010). "At prices below the prevailing price, demand will be even more inelastic than it is at the prevailing price," therefore confirming that northern New Mexico is an appropriate geographic market. White p. 7, ¶ 26 (PX04063 at 010).

**[Redacted**

**]** But a relevant geographic market must also "correspond with the commercial realities of the industry . . ." Brown Shoe Co. V. United States, 370 U.S. 294, 336 (1962). **[Redacted**

**]** The only economic way to deliver Gulf Coast product from El Paso to Albuquerque is via the Plains Pipeline. **[Redacted**

**]** The Plains Pipeline, however, is fully utilized by current shippers **[Redacted**

**]**

Trucking is a physically possible alternative, but is similarly not economically viable over an extended time period. **[Redacted**

---

<sup>10</sup>  **[Redacted**

**]**

7

] Ownby pp. 23-24, ¶¶ 50, 51

(PX04061 at 023-024); White p. 9, ¶ 36 (PX04063 at 012).  The relevant price differential

between El Paso and Albuquerque would need to be greater than **[Redacted**

] transport cost just to break even.  Ownby pp. 23, ¶ 49 (PX04061 at 023).  The trucking

cost from Amarillo to Albuquerque is even higher **[Redacted**            ] Ownby pp. 23-24, ¶

50 (PX04061 at 023-024). **[Redacted**

] Thus, trucking does not expand the

relevant geographic market beyond northern New Mexico.

---

<sup>11</sup>      In any event, it is "improper [ ] to include in the market substitutes that may have been attractive . . . only because the market price was far above the competitive level."  United States v. Eastman Kodak Co., 853 F. Supp. 1454, 1469 (W.D.N.Y. 1994) (certain alterations in original) (quoting William M. Landes & Richard A. Posner, Market Power in Antitrust Cases, 94 HARV. L. REV. 937, 970-71 (1981)), aff'd, 63 F.3d 95 (2d Cir. 1995); cf. Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp., 1995-2 Trade Cas. (CCH) ¶ 71,254 at *33 & n.10 (N.D. Cal. 1995) (discussing Cellophane fallacy and geographic market definition).

## II.    GIANT AND WESTERN COMPETE IN THE BULK SUPPLY OF GASOLINE INTO NORTHERN NEW MEXICO

Giant and Western are both bulk gasoline suppliers to the northern New Mexico market.

Ownby pp. 8-9; ¶ 17 [Redacted

] Giant owns and operates two refineries that supply northern New Mexico by truck.

[Redacted                                    ] Western supplies the area through the Plains Pipeline,

[Redacted

]

Defendants would ignore this reality by claiming that Western's product is effectively

absent from the market because Western does not own any storage space in Albuquerque

terminals.[12] [Redacted

---

[12]    [Redacted

]

9

]

Defendants attempt to rely on a prior Commission investigation where—based on the unique features of the Hawaii market—the Commission argued that bulk suppliers of gasoline "included refiners and owners and operators of terminals." FTC v. Aloha Petroleum, LTD. No. 05-00471 (D. Haw. filed July 27, 2005). However, Aloha Petroleum did not establish a per se rule that bulk suppliers of gasoline may only include refiners and those with control of storage space in local terminals.[13] The Commission's long-standing view has been that "the delineation of relevant antitrust markets requires a careful, realistic assessment of practical demand and supply alternatives."[14] Unlike Defendants' simplistic approach to antitrust analysis where "one-size fits all," the Commission engages in a rigorous, fact-intensive analysis of each proposed merger and seeks the appropriate enforcement action based on the evidence in that particular investigation. In the context of the refined petroleum products markets, the Commission has also repeatedly emphasized that "[a] consuming area's bulk supply comes from either local refineries

---

[13]     Aloha Petroleum LTD, a half-owner of only two marine import terminals on Oahu, proposed to acquire the remaining 50% equity interest in the terminals from Trustreet Properties, Inc. The Commission argued that the only competitive response to the two refiners on Oahu could come from imported cargoes coming through the two marine terminals. Unless imported gasoline could be delivered into the terminals and thus directly into Oahu, it was immaterial how many potential bulk suppliers had the theoretical ability to bring the product to the shores of Oahu. The Commission, therefore, rationally argued that the relevant bulk suppliers were limited to the two Oahu refiners and the owners of the marine terminals. The Aloha Petroleum case is inapposite as firms have terminal access to six terminals serving northern New Mexico and Western does deliver its product into Albuquerque.

[14]     FTC PETROLEUM STUDY at 4.

10

or more distant refineries that supply the market by pipeline, barge, or tanker," whether or not such outside refineries directly control terminal space in the destination market.[15]

[Redacted

] As explained before, all gasoline shipped on the Plains Pipeline is delivered to Albuquerque and therefore is part of that market. The significance of the Plains Pipeline being full is that, should northern New Mexico prices increase, new shippers cannot gain space in any meaningful way, [Redacted

] In this context, the question is not whether the pipeline-supplied product is in the market, but whether more product can be delivered on the pipeline in case of the likely price increases that will result from the proposed acquisition.

## III.    THE ACQUISITION WILL SUBSTANTIALLY REDUCE COMPETITION IN NORTHERN NEW MEXICO GASOLINE MARKET

### A.    The Proposed Acquisition Is Presumptively Unlawful

Acquisitions that significantly increase market concentration are presumptively unlawful because the fewer the competitors and the larger the respective market shares, the greater the

---

[15]    Id. (emphasis added) ("Relevant product markets in petroleum mergers . . . include: 1) exploration and production of crude oil; 2) bulk transportation of crude oil; 3) bulk supply (refining and bulk transportation) of refined products; 4) terminaling of refined products; and 5) marketing (wholesale and retailing) of refined products").

[16]    [Redacted

]

11

likelihood that the combined firm, or group of firms, could raise prices above competitive levels.[17] The Commission has historically acknowledged that mergers in this industry require particular vigilance on account of the competitive harm resulting from increases in concentration. "The FTC has taken a strict approach in reviewing petroleum-related mergers and has obtained relief in markets at lower concentration levels than it has in other industries." FTC PETROLEUM STUDY AT 13.[18]

Under even the most conservative analysis, the contemplated transaction satisfies the thresholds for presumptive illegality. Viewed conservatively, the transaction would reduce the number of relevant bulk gasoline suppliers to northern New Mexico from six to five, **[Redacted**

---

[17]     MERGER GUIDELINES PX04051 at 015-016; Hosp. Corp. of Am. v. FTC, 807 F.2d 1381, 1389 (7th Cir. 1986), cert. denied, 481 U.S. 1038 (1987). The Herfindahl-Hirschman Index ("HHI") measures market concentration by summing the squares of the individual market shares of all firms in the market. Under Section 1.51 of the MERGER GUIDELINES, an HHI over 1,800 indicates a "highly concentrated" market. If the post-merger HHI exceeds 1,800 and the HHI increase from the merger exceeds 100, a rebuttable presumption is created that the merger would "create or enhance market power or facilitate its exercise." PX04051 at 013-015.

[18]     For example, in the merger of Shell and Texaco Inc., the Commission required the divestiture of Shell's refinery at Anacortes, Washington, when the merger would have increased the HHI for the bulk supply of gasoline in California by as little as 154, to a post-merger level as low as 1,635. Shell Oil Co., 125 F.T.C. 769 (1998). Likewise, in the ConocoPhillips merger, the Commission required the divestiture of Phillips' Salt Lake City refinery and its northern Utah marketing assets when the merger would have increased the HHI in the bulk light petroleum products market to northern Utah by 300, to a post-merger level of 2,100. The Commission also required the divestiture of Conoco's Denver refinery and all of Phillips' eastern Colorado marketing assets when the merger would have increased the HHI by 500, to a post-merger level of 2,600. Complaint, Phillips Petroleum Co., (2003) (FTC Docket No. C-4058), at http://www.ftc.gov/os/2002/08/conocophillipscmp.pdf; Decision and Order (2003) (FTC Docket No. C-4058), at http://www.ftc.gov/os/2003/02/conocophillipsdo.htm.

12

]

**B.      The Acquisition Will Raise Gasoline Prices to Northern New Mexico Consumers**

[Redacted

---

[19]      Courts have granted preliminary injunctions where mergers resulted in equivalent or lower HHI concentration levels or market shares than those found here.  See, e.g., FTC v. Elders Grain, Inc., 868 F.2d 901, 902 (7th Cir. 1989) (acquisition increased market share of largest firm from 23% to 32%); FTC v. Warner Communications, Inc., 742 F.2d 1156,1163 (9th Cir. 1984) (preliminary injunction warranted where merger combined second largest firm with sixth largest firm, resulting in combined 26% market share); FTC v. Bass Bros. Enters., 1984-1 Trade Cas. (CCH) ¶ 66,041 at **18, 20 (N.D. Ohio 1984) (preliminary injunction warranted where mergers increased the HHI by 518 points to 2,320); United States v. UPM-Kymmene OYJ, 2003-2 Trade Cas. (CCH) ¶ 74,101 at **24-25, 36-37 (N.D. Ill. 2003) (injunction warranted where merger resulting in three-firm concentration would account for 80% of production).

[20]      [Redacted

]

]

The promise of impending price competition **[Redacted**

] was echoed in interviews Giant gave to the media on the topic.  Mr.

---

[21]    Giant's ability and willingness to increase gasoline supply to Albuquerque and Santa Fe makes it a "maverick" in antitrust terms.  A competitor is considered a "maverick" if it can easily expand its sales because of excess capacity:

> [I]n a market where capacity constraints are significant for many competitors, a firm is more likely to be a maverick <u>the greater is its excess or divertable capacity in relation to its sales or its total capacity,</u> and the lower are its direct and opportunity costs of expanding sales in the relevant market.

PX04051 at 018-019 (emphasis added) (footnotes omitted).  Acquisition of a maverick may make coordination among the remaining firms "more likely, more successful, or more complete." <u>Id.</u>

14

Leland Gould, Giant's Executive Vice President for Governmental Affairs [**Redacted**   ] confirmed the direct relationship between Giant's production volumes and gasoline prices in the area in a news story published by The New Mexican on May 7, 2006.[22]  In the article, titled "The Whys Behind Highs," the author writes that "Gould said [gasoline] prices are currently higher in northwest New Mexico because both of Giant's refineries are running at 50 percent capacity." Later in the article the author notes that "Gould said he couldn't estimate how much gasoline prices in New Mexico might drop once the [Giant] refineries are running at full capacity."  Id.

Post-acquisition, the combined Western/Giant would have different economic incentives than Giant alone, and would likely send less total gasoline into the northern New Mexico market than would Giant and Western acting independently. [**Redacted**

]

By re-directing or restricting supply away from northern New Mexico, the combined Western/Giant would capture a substantial portion of the resulting price increase due to its large post-merger share of the market.  White p. 10, ¶ 38, Exh. 1 (PX04063 at 012-013); pp. 32, 34, ¶¶ 95, 101, 104 (PX04063 at 035, 037, 038); [**Redacted**

]

--------

[22]      Wendy Brown, The Whys' Behind the 'Highs', SANTA FE NEW MEXICAN, May 7, 2006, available at http://www.freenewmexican.com/search_archives.php?num=25&st=basic& QryTxt=&sortby=REVERSE_CHRON&datetype=7

There are several ways by which the combined Western/Giant could reduce the overall supply of gasoline to northern New Mexico, thus causing market prices to increase or to fall less than they otherwise would have fallen had Giant remained independent.[23] **[Redacted**

**]**

Eliminating a maverick competitor such as Giant and reducing the overall number of competitors in a market also increases the risk of coordinated interaction among the remaining firms. The ability of firms to coordinate their actions—to pull their competitive punches, with the expectation that their competitors would do the same—depends in substantial part on the number of significant participants in the market. "The relative lack of competitors eases coordination of actions, explicitly or implicitly, among the remaining few to approximate the performance of a monopolist." FTC v. PPG Indus., Inc., 628 F. Supp. 881, 885 n.9 (D.D.C.), aff'd 798 F.2d 1500 (D.C. Cir. 1986). Coordination need not consist of illegal price-fixing, or agreements to allocate customers or restrict output, but may include tacit coordination and interdependent behavior. Elders Grain, 868 F.2d at 905 (". . . if conditions are ripe sellers may

---

[23]     See Staples, 970 F. Supp. at 1092 ("[c]onsumers would still be hurt if prices after the merger did not fall as far as they would have absent the merger.").

[24]     Ownby, p. 28, ¶ 65 (PX04061 at 028).

[25]     Ownby, pp. 28-29, ¶¶ 65, 66 (PX04061 at 028-029).

16

not have to communicate or otherwise collude overtly in order to coordinate their price and output decisions") (reduction of competitors from 6 to 5); see also PX04051 at 016-017.

By reducing the number of effective bulk suppliers of gasoline from six to five, the acquisition thus also increases the likelihood of coordinated interaction. Together, these five firms would account for essentially all of the bulk supply of gasoline to the market. Courts have blocked mergers where the number of competitors post-acquisition was greater than those here.[26]

### C.     Other Suppliers Will Not Defeat Supracompetitive Gasoline Prices Resulting from the Acquisition

Three firms **[Redacted                                              ]** could theoretically respond to a Western-generated output decrease or price increase by shipping additional gasoline to the northern New Mexico market.[27]  Ownby, pp. 10-11, ¶¶ 20, 21 (PX04061 at 010-011).[28] Such competitive response appears highly unlikely, however, even if Albuquerque prices rose as much as three cents per gallon. Ownby, p. 15, ¶ 31 (PX04061 at 015).

---

[26]     See Hosp. Corp. of Am., 807 F.2d at 1387 (reduction from 11 to 7 competitors); Bass Bros. Enters., at *23 (reduction from 7 to 5 competitors); Warner Communications, 742 F.2d at 1163 (reduction from 6 to 5 competitors).

[27]     **[Redacted**


**]**

[28]     As indicated, supply from the Gulf Coast is not viable, primarily because of the high trucking costs and the fact that the Plains Pipeline operates at full capacity. Ownby, p. 21, ¶ 42 (PX04061 at 021); **[Redacted**
**]**

17

**[Redacted**

**]** Dr. White's econometric analysis confirms that "if the supply of gasoline to Albuquerque were restricted in the post-merger era relative to what it otherwise would be, then [the] third-party supplier responses would do little to mitigate price increase within the range of the observed data." White, p. 20, ¶ 62 (PX04063 at 023).

The reason for the lack of competitive responses are varied. **[Redacted**

**]** Pure economics drives those suppliers' decisions to supply more profitable markets before sending additional gasoline to Albuquerque. Ownby, pp. 16-18, ¶¶ 34,35 (PX040610 at 016-018); **[Redacted**

**]** Existing supply obligations also prevent the firms from shifting significant volumes into the Albuquerque market, or from the Albuquerque market to alternative markets, in response to changes in supply or prices. Ownby, p. 18, ¶ 35 (PX04061 at

18); [**Redacted**                                          ] Finding new

customers and building incremental demand is also exceedingly difficult.[29]

      Another consideration is the risk of an unexpected oversupply of Albuquerque terminals

and the threat of a resulting "fire-sale." Ownby, pp. 18-19, ¶ 36 (PX04061 at 018-019).  Should

Albuquerque prices fall after a decision were made to send more gasoline to the market, the

suppliers would have no ability to then divert product to a higher-priced market, meaning they

could potentially incur losses on the added supply.  Ownby, pp. 18-19, ¶¶ 35, 36 (PX04061 at

018-019).  Last but not least, physical constraints such as refinery interruptions or pipeline

problems occasionally prevent these firms from sending additional product to the market to

respond to a small price increase. [**Redacted**

 

                                                               ]

---

[29]    One reason it is difficult and time-consuming for these suppliers to build
incremental demand in northern New Mexico is because the market is largely a "branded" retail
area, with limited demand for unbranded gasoline.  Ownby, p. 21, ¶ 43 (PX04061 at 021);
[**Redacted**                                       ]

**D.    The Relevant Market Is Insulated from New Entry or Expansion[30]**

Existing pipeline bottlenecks prevent new suppliers from entering the northen New Mexico bulk gasoline supply market. Two pipelines, Longhorn and Magellan, bring product from Gulf Coast refineries to El Paso. **[Redacted**

**]** However, the Plains Pipeline is the only pipeline capable of delivering Gulf Coast product to the northern New Mexico market. Ownby, p. 12, ¶ 24 (PX04061 at 012). The Plains Pipeline has been full for several years and operates under proration, meaning that current shippers receive a pro rata share of the pipeline space. **[Redacted** **]** Ownby, p. 13, ¶ 25 (PX04061 at 013); PX01200 at 037. New shippers can annually reserve 5% of the total Plains pipeline space, but each individual new shipper can use only 1.25% of the total line capacity. Ownby, p. 13, ¶ 25 (PX04061 at 013); **[Redacted**

**]** A new shipper could therefore ship an average of only 350 barrels daily, the equivalent of less than two truckloads of gasoline or diesel fuel. **[Redacted** **]** Ownby, p. 13, ¶ 25 (PX04061 at 013). Moreover, the lilliputian volume would not increase supply to northern New Mexico because it would displace an equivalent volume of shipments on the same pipeline by the other current shippers. **[Redacted**

---

[30]     If entry or expansion is unlikely, the merged entity can raise prices without attracting new competition or offsetting supply. California v. Am. Stores Co., 697 F. Supp. 1125, 1131 (C.D. Cal. 1988). Entry is considered "easy" if it would be "timely, likely and sufficient in its magnitude, character and scope to deter or counteract the [anti]competitive effects" of a proposed transaction. PX04051 at 21, quoted with approval, Rebel Oil, 51 F.3d at 1440. Entry is timely if a new entrant would have a significant market impact within two years. PX04051 at 023. Entry is sufficient if it would be on a large enough scale to counteract the anticompetitive effects of the transaction. Id. at 024.

]

The other pipelines that supply the northern New Mexico market—the ATA pipeline and the Four Corners pipeline—are not available to new suppliers. Both pipelines are owned by current suppliers to the market and, more importantly, the only access to the pipelines is through the refineries owned by the suppliers. As a result, in order to supply the northern New Mexico market, a new supplier would have to bring product by truck from El Paso (266 highway miles) or Amarillo (288 highway miles).[31] **[Redacted**

]

New entry within the next two years by building new refineries or pipelines is also extremely unlikely given the enormous cost, permitting, and construction issues involved. FTC PETROLEUM STUDY AT 238. No publicly announced pipeline projects serving Albuquerque are under way. Building or expanding a new pipeline is expensive and time consuming, would not

---

[31]     The Plains pipeline tariff to transport a barrel of light petroleum products from El Paso to Albuquerque is approximately 2.5 cents per gallon. PX1200 at 050. **[Redacted**

]

21

be undertaken without firm volume commitments by shippers, and requires surmounting onerous permitting issues.  Id.

 **[Redacted**

]

---

[32]     See, e.g., Monfort of Colo., Inc. v. Cargill, Inc., 761 F.2d 570, 580-81 (10th Cir. 1985), rev'd on other grounds, 479 U.S. 104 (1986) (entry barriers in meat packing market suggested by facts that new plant would cost $20 to $40 million, that it would take 12 to 18 months to complete, and that profit margins were low); FTC v. Cardinal Health, 12 F.Supp.2d 34,
(continued...)

E.    **The Proposed Transaction Will Not Enhance Competition By Producing Cognizable Efficiencies**

[Redacted

                                                          ]

  For efficiencies to be credited they must be "merger-specific" and "verifiable." PX04051 at 024-026. "Merger-specific" means they must be "likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects." Id. The claimed efficiencies cannot be efficiencies that could "be achieved by either company alone." Heinz, 246 F.3d at 722. Claimed efficiencies must also be verifiable. PX04051 at 024-026; see also Staples, 970 F. Supp. at 1089 (efficiency claims must be backed by "credible evidence").

  Defendants' few, half-hearted claims of efficiencies from the transaction are not merger-specific. [Redacted

                    ] In short, none of the claimed efficiencies are merger specific and thus should not be given any weight by the Court.[33]

_____

[32] (...continued)
58-59 (D.D.C., 1998) (new entry insufficient to defeat anticompetitive effects caused by the merger).

[33] Even if the claimed efficiencies were assumed to be specific to this acquisition, Western concedes that they are not verifiable. In a recent 10-Q filed with the Securities
                                                          (continued...)

**CONCLUSION**

Where, as here, the Commission has demonstrated a likelihood of success on the merits,

Defendants face a difficult task of "justifying anything less than a full stop injunction." PPG

Indus., 798 F.2d at 1506; see Heinz, 246 F.3d at 726; Staples, 970 F. Supp. at 1091. To preserve

competition pending administrative adjudication the Court should grant the Commission's

motion for preliminary injunction.

Respectfully submitted,


Electronically Filed

Dated: May 4, 2007                     /s/ Thomas J. Lang (N.M. Bar. No. 0739)
                                       Senior Litigation Counsel
                                       Bureau of Competition
                                       Federal Trade Commission
                                       600 Pennsylvania Avenue, N.W.
                                       Washington, DC  20580
                                       (202) 326-3665


DEYONNA YOUNG (N.M. Bar No. 2980)
Assistant Attorney General, Litigation Division (Antitrust)
Office of the New Mexico Attorney General
Special Deputy to the Federal Trade Commission
111 Lomas Boulevard NW, Suite 300
Albuquerque, NM  87102
(505) 222-9089

---

[33]      (...continued)

Exchange Commission Western admits that "We can give no assurance that our expectations
with regards to integration and synergies [from the Giant acquisition] will materialize."
PX00021 at 047.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 11th day of May, 2007, I filed the foregoing

electronically through the CM/ECF system.

I FURTHER CERTIFY that on such date I served the foregoing on the following counsel

via electronic mail:

Marc G. Schildkraut, Counsel for Defendants Paul L. Foster and Western Refining, Inc.
Heller Ehrman, LLP
1717 Rhode Island Avenue, N.W.
Washington, DC 20036
marc.schildkraut@hellerehrman.com
(202) 912-2140

Tom D. Smith, Counsel for Defendant Giant Industries, Inc.
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001
tdsmith@jonesday.com
(202) 879-3971

Thomas A. Outler, Counsel for Defendants
Rodey, Dickason, Sloan, Akin & Robb, P.A.
P.O Box 1888
Albuquerque, NM 87103
toutler@rodey.com
(505) 768-7256

_____/s/_____
Thomas J. Lang, Attorney for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION )
)
Plaintiff, )
)
)
v. )           Civil Action No. 1:07-CV-01021-PLF
)
)           Judge: Paul L. Friedman
WHOLE FOODS MARKET )
)
and )
)
WILD OATS MARKETS, INC. )
)
Defendants. )
)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## MOTION OF THE KROGER CO. TO INTERVENE

### Exhibit B

**RECEIVED**

JUN 1 8 2007



NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION <br><br> Plaintiff, <br><br> v. <br><br> WHOLE FOODS MARKET <br><br> and <br><br> WILD OATS MARKETS, INC. <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Civil Action No. 1:07-CV-01021-PLF

## DECLARATION OF TODD A. FOLEY

Pursuant to 28 U.S.C. § 1746, I, Todd A. Foley, do hereby depose and state as follows:

1.    I am over 18 years of age and have personal knowledge of the matter stated herein.

2.    I serve as Assistant Corporate Controller for The Kroger Co. ("Kroger" or the "Company").

3.    Kroger was founded in 1883 and incorporated in 1902. As of February 3, 2007, the Company was one of the largest retailers in the United States based on annual sales.

4.    The Company's principal executive offices are located in Cincinnati, Ohio, and its shares are publicly traded on the New York Stock Exchange.

5.    The Company employs approximately 310,000 full and part-time employees, and as of February 3, 2007, the Company operated, either directly or through its subsidiaries, 2,468 supermarkets and multi-department stores.

6.    The Company's stores operate under several banners.  Supermarkets are generally operated under one of the following formats: combination food and drug stores ("combo

stores"); multi-department stores; price impact warehouses; or marketplace stores. In addition to supermarkets, the Company operates, either directly or through subsidiaries, 779 convenience stores and 412 fine jewelry stores. Kroger operates stores throughout the United States, and sells products that are also sold in other grocery and supermarket stores. Whole Foods Market ("Whole Foods") and Wild Oats Market, Inc. ("Wild Oats"), among others, generally compete with Kroger.

7.      Kroger is aware that Whole Foods has proposed acquiring Wild Oats. Kroger is also aware that the Federal Trade Commission ("FTC") commenced an investigation into this proposed acquisition.

8.      After the investigation was initiated, FTC requested that Kroger provide documents and other information pursuant to a formal Civil Investigative Demand ("CID").

9.      Kroger agreed to provide the requested information and provide additional information. But because Kroger routinely takes great care in assuring its business and trade secrets are protected and maintained as confidential, Kroger requested that its confidential business and trade secrets be protected from disclosure to unauthorized third parties including its competitors.

10.     The FTC made clear that it would treat the documents and information produced by Kroger confidentially consistent with its obligations under law and regulations, including the Hart-Scott-Rodino Act.

11.     After receiving assurances from the FTC that Kroger's confidential documents would not be disclosed, Kroger produced a compact disc ("CD") containing twenty-one (21) separate electronic files, comprising approximately 5.9 megabytes of data, to the FTC. The CD is clearly labeled "Highly Confidential." These files included the following:

    A.    Employee headcount information, including data on the number of employees by store.

    B.    "4-12-07 Progress Reports for 2007-2010" ("Progress Reports"), which provides data on Kroger's real estate and strategic expansion program for the next three years, including remodels, expansions and new stores. This

information is closely guarded within the organization and would never been furnished to anyone that generally competes with Kroger.

C.    Inventory information for Kroger's stores, which includes a representation of the number of SKUs by department for one store in each of three different divisions.

D.    "Operating Statement" data, which contains operating information, including sales and gross profit, by store and by department. For obvious reasons, this information is highly confidential and trade secret information, and is among Kroger's most sensitive data.

E.    Sixteen Files containing data for Kroger's supermarket divisions, including data regarding the number of transactions by store and by department. This information is highly sensitive because it could help competitors and other retailers to identify the relative performance of stores or departments within stores.

F.    Store Data Charts, which contain a wide range of factual information regarding each store facility, including departments and expansion and remodel information.

12.    Certain information set forth in paragraph 11 is not highly confidential and Kroger does not object to that information being shared with in-house counsel at Whole Foods. Those categories include 11(A), 11(C) & 11(F) above.

13.    However, the Progress Reports (11(B)), Operating Statements (11(D)), and Supermarket Division Data (11(E)) do contain highly confidential strategic information that Kroger's cannot share with anyone outside Kroger absent extreme circumstances. This information includes data on Kroger's strategic plans and its sales performance and profitability that would be highly damaging to Kroger if shared with anyone at Whole Foods.

14.    These documents are not technical documents. They can be easily understood without the aid of consultants or experts in the field. That is one of the reasons why Kroger considers the documents highly sensitive.

15.    In addition to producing the requested documents to the FTC, Kroger provided information during interviews that also disclosed its business and trade secrets.

16.    Kroger understands that on or about June 6, 2007, the FTC filed an action against Whole Foods and Wild Oats in the United States District Court for the District of Columbia seeking to prevent Whole Food's proposed acquisition of Wild Oats.

17.    In connection with this litigation, on June 8, 2007, the Court entered an Interim Protective Order that prevented certain highly confidential information from being shared with in-house employees at Whole Foods or Wild Oats.

18.    On June 11, 2007, Kroger learned that Whole Foods had filed a motion for entry of a substitute protective order that would permit even the most highly confidential information produced by Kroger to be shared with in-house counsel at Whole Foods.

19.    Kroger believes that the proposed protective order submitted by Whole Foods would irreparably harm Kroger's proprietary interests and provide Whole Foods with an unfair business advantage.  By gaining access to Kroger's most sensitive documents, Whole Foods would immediately learn Kroger's confidential business plans and strategies, learn Kroger's customers' preferences and demands, and learn how Kroger's individual stores and departments in those stores operate, including sales and gross profit.  In sum, the very essence of Kroger's business would be open to Whole Foods' scrutiny.  As a result, Kroger will suffer substantial and irreparable harm, including certain economic harm.

20.    Whole Foods and Wild Oats both generally compete with Kroger.  As a result, disclosure of Kroger's most sensitive trade secrets to Whole Foods would be improper under these circumstances, especially where there has been no specific showing that in-house counsel at Whole Foods needs to review the specific information at issue.

21.    Kroger's sole focus for seeking intervention into this matter is the protection of its confidential business and trade secrets.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 15, 2007

Todd A. Foley

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION          )
                                  )
              Plaintiff,          )
                                  )
        v.                        )        Civil Action No. 1:07-CV-01021-PLF
                                  )
                                  )        Judge: Paul L. Friedman
WHOLE FOODS MARKET                )
                                  )
and                               )
                                  )
WILD OATS MARKETS, INC.           )
                                  )
              Defendants.         )
                                  )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## MOTION OF THE KROGER CO. TO INTERVENE

### Exhibit C

# RECEIVED

### JUN 1 8 2007



NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Jennifer K. Schwab, Esq.
Bureau of Competition
Mergers IV Division
601 New Jersey Avenue, N.W.
Washington, DC 20001
(202) 326-2335 (direct dial)
(202) 326-2286 (fax)
jschwab@ftc.gov

June 7, 2007

## VIA ELECTRONIC MAIL

Bruce Gack, Esq.
Assistant General Counsel
The Kroger Company
1014 Vine Street
Cincinnati, OH 45202
Email: bruce.gack@kroger.com

**Re:     Whole Foods Market, Inc.'s Proposed Acquisition of Wild Oats Markets, Inc., File No. 071-0114**

Dear Mr. Gack:

On June 5, 2007, the Federal Trade Commission (the "Commission") authorized Commission staff to seek a preliminary injunction and other necessary temporary relief to prevent Whole Foods Market, Inc. from acquiring Wild Oats Markets, Inc. pending an administrative hearing before the Commission to determine whether the proposed merger would violate federal antitrust laws. The Kroger Company provided information to the Commission in connection with its initial investigation of the proposed merger, and the merging parties may seek to obtain access to this information during the preliminary injunction or any subsequent proceedings.

The Commission takes very seriously its obligation to protect confidential information from disclosure, and it understands that businesses are more willing to cooperate with Commission investigations if they know that the government will protect their sensitive information. Accordingly, the Commission and the parties have jointly moved for the entry of an interim protective order to ensure that the disclosure of confidential documents and information is appropriately limited. Enclosed please find a copy of the interim protective order, which I ask that you review so that you generally understand the procedures that may be required of you to protect your confidential documents and information.

Please note that the Commission will file under seal any non-public information obtained during the initial merger investigation that is used in the preliminary injunction proceedings, and it will advise the court that such information has been designated as confidential.

I will forward you a copy of any final protective order if such order is entered by the court. If you have any questions or concerns regarding this process, please contact me at (202) 326-2335. Thank you again for your cooperation.

Sincerely,

Jennifer K. Schwab

Enclosure

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,   )
600 Pennsylvania Avenue, N.W.   )
Washington, DC 20580,   )
   )
               Plaintiff,   )
   )
          v.   )   No.
   )
WHOLE FOODS MARKET, INC.,   )
550 Bowie Street,   )
Austin, Texas 78703,   )
   )
   - and -   )
   )
WILD OATS MARKETS, INC.,   )
3375 Mitchell Lane,   )
Boulder, Colorado 80301,   )
   )
          Defendants.   )

### INTERIM PROTECTIVE ORDER
### GOVERNING DISCOVERY MATERIAL

For the purpose of protecting the interests of the Parties and Third Parties against the improper use and disclosure of confidential information submitted or produced in connection with this Matter:

IT IS HEREBY ORDERED THAT this Interim Protective Order Governing Discovery Material ("Interim Protective Order") shall govern the handling of all Discovery Material during the proceedings in the above captioned Matter, until such time as a final protective order shall be entered.

### DEFINITIONS

For purposes of this Protective Order, the following definitions shall apply:

1

1.     "Whole Foods" means defendant Whole Foods Market, Inc., a corporation

organized, existing, and doing business under and by virtue of the laws of the State of Texas,

with its office and principal place of business at 550 Bowie Street, Austin, Texas 78703, and its

predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures.

2.     "Wild Oats" means defendant Wild Oats Markets, Inc., a corporation organized,

existing, and doing business under and by virtue of the laws of the State of Delaware, with its

office and principal place of business located at 3375 Mitchell Lane, Boulder, Colorado 80301,

and its predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures.

3.     "Commission" or "FTC" means the Federal Trade Commission, or any of its

employees, agents, attorneys, and all other persons acting on its behalf, excluding persons

retained as consultants or experts for the purposes of this Matter.

4.     "Confidential Discovery Material" means all Discovery Material that is

confidential or proprietary information produced in discovery. Such material is referred to in,

and protected by, Rule 26(c)(7) of the Federal Rules of Civil Procedure. Confidential Discovery

Material shall include non-public trade secret or other research, development or commercial

information, the disclosure of which would likely cause commercial harm to the Producing Party

or to Defendants, in instances where the Producing Party produces information generated by the

Defendants. The following is a non-exhaustive list of examples of information that likely will

qualify for treatment as Confidential Discovery Material: strategic plans (involving pricing,

marketing, research and development, product road maps, corporate alliances, or mergers and

acquisitions) that have not been fully implemented or revealed to the public; trade secrets;

customer-specific evaluations or data (*e.g.*, prices, volumes, or revenues); sales contracts; system

2

maps; personnel files and evaluations; information subject to confidentiality or non-disclosure

agreements; proprietary technical or engineering information; proprietary financial data or

projections; and proprietary consumer, customer or market research or analyses applicable to

current or future market conditions, the disclosure of which could reveal Confidential Discovery

Material. Discovery Material will not be considered confidential if it is in the public domain.

     5.    "Counsel of Record" means counsel who file a notice of appearance in this

Matter.

     6.    "Disclosing Party" means a party that is disclosing or contemplating disclosing

Discovery Material pursuant to this Protective Order.

     7.    "Discovery Material" includes without limitation deposition testimony, deposition

exhibits, interrogatory responses, admissions, affidavits, declarations, Documents produced

pursuant to compulsory process or voluntarily in lieu thereof, and any other Documents or

information produced or given to one Party by another Party or by a Third Party in connection

with discovery in this Matter. Information taken from Discovery Material that reveals its

substance shall also be considered Discovery Material.

     8.    "Document" means the complete original or a true, correct and complete copy and

any non-identical copies of any written or graphic matter, no matter how produced, recorded,

stored or reproduced. "Document" includes, but is not limited to, any writing, letter, envelope,

telegraph, e-mail, meeting minute, memorandum, statement, affidavit, declaration, book, record,

survey, map, study, handwritten note, working paper, chart, index, tabulation, graph, drawing,

chart, photograph, tape, phono record, compact disc, video tape, data sheet, data processing card,

printout, microfilm, index, computer readable media or other electronically stored data,

3

appointment book, diary, diary entry, calendar, organizer, desk pad, telephone message slip, note

of interview or communication, and any other data compilation from which information can be

obtained, and includes all drafts and all copies of such Documents and every writing or record

that contains any commentary, notes, or marking whatsoever not appearing on the original.

9.     "Expert/Consultant" means testifying or consulting experts or other persons who

are retained to assist Plaintiff's Counsel or Defendants' Counsel in preparation for the hearing or

to give testimony at the hearing.

10.     "Matter" means the above captioned matter pending in the United States District

Court for the District of Columbia, and all subsequent administrative, appellate or other review

proceedings related thereto.

11.     "Outside Counsel" means the law firms that are Counsel of Record for Defendants

in this Matter, their partners and associated attorneys; or other persons regularly employed by

such law firm(s) including legal assistants, clerical staff, vendors assisting with electronic

discovery and information management personnel and temporary personnel retained by such law

firm(s) to perform legal or clerical duties, or to provide logistical litigation support with regard to

this Matter; provided that any attorney associated with Outside Counsel shall not be a director,

officer or employee of Defendants.  The term Outside Counsel does not include persons retained

as consultants or experts for the purposes of this Matter.

12.     "Party" means either the FTC, Whole Foods, or Wild Oats.

13.     "Person" means any natural person, business entity, corporate entity, sole

proprietorship, partnership, association, governmental entity, or trust.

14.     "Producing Party" means a Party or Third Party that produced or intends to

4

produce Restricted Confidential or Confidential Discovery Material to any of the Parties. With

respect to Restricted Confidential or Confidential Discovery Material of a Third Party that is in

the possession, custody, or control of the FTC, or has been produced by the FTC in this Matter,

the Producing Party shall mean the Third Party that originally provided such material to the FTC.

The Producing Party shall mean the FTC for purposes of any Document or Discovery Materials

prepared by, or on behalf of, the FTC.

15.    "Defendants" means Whole Foods and Wild Oats.

16.    "Restricted Confidential Discovery Material" means Confidential Discovery

Material designated as "Restricted Confidential Discovery Material" that contains non-public,

current information that is highly sensitive (*e.g.*, marketing plans, pricing plans, financial

information, trade secrets, or Documents of a like nature) and the disclosure of which would

likely cause substantial commercial harm to the Producing Party or to Defendants. It is the

intention of the Parties that this particularly restrictive designation should be utilized for only a

select number of Documents. Such a designation shall constitute a representation by counsel for

the Producing Party or Defendants, in instances where the Producing Party produces information

generated by the Defendants, that the material is properly subject to Restricted Confidential

treatment under this Order.

17.    "Third Party" means any natural person, partnership, corporation, association, or

other legal entity not named as a Party to this Matter and its employees, directors, officers,

attorneys, and agents.

## TERMS AND CONDITIONS OF PROTECTIVE ORDER

1.    Discovery Material, or information derived therefrom, shall be used solely by the

5

Parties for purposes of this Matter, and shall not be used for any other purpose, including without limitation any business or commercial purpose. Notwithstanding the foregoing, nothing contained in this Protective Order shall prevent the Commission from using any material produced as part of the investigation in this Matter, including any Discovery Material, for any authorized law enforcement purpose, provided that the Commission may only use or disclose Discovery Material as provided by (a) its Rules of Practice, and any cases so construing them, (b) Sections 6(f) and 21 of the Federal Trade Commission Act, and any cases so construing them, and (c) any other legal obligation imposed upon the Commission. The Parties, in conducting discovery from Third Parties, shall attach to all discovery requests a copy of this Protective Order and a cover letter that will apprise such Third Parties of their rights hereunder.

2.    Confidential or Restricted Confidential Discovery Material may be designated as such by (a) placing or affixing on each page of a Document containing such material, in a manner that will not interfere with its legibility, the notation "CONFIDENTIAL - FTC v. Whole Foods," or "RESTRICTED CONFIDENTIAL, OUTSIDE COUNSEL ONLY - FTC v. Whole Foods," or (b) any Party or Third Party instructing the court reporter, with notice to all Parties, within five (5) business days of the receipt of the transcript, to designate as "Confidential" or "Restricted Confidential" each page of the deposition transcript containing the Confidential or Restricted Confidential Discovery Material. Such designations constitute a good-faith representation by counsel for the Party or Third Party making the designation that the Document or transcript constitutes or contains Confidential Discovery Material or Restricted Confidential Discovery Material. All deposition transcripts shall be treated as Restricted Confidential Discovery Material until the expiration of five (5) business days after the receipt of the transcript. A

6

Producing Party will use reasonable care to avoid designating any Discovery Material as Confidential or Restricted Confidential that is not entitled to such designation.

3.    Restricted Confidential or Confidential Discovery Material shall not be copied or reproduced for use in this Matter except to the extent such copying or reproduction is reasonably necessary to the conduct of this Matter. All such copies or reproductions of the Material and any documents generated by the Parties containing information drawn from such Material, shall be subject to the terms of this Protective Order. If the duplication process by which copies or reproductions of Restricted Confidential or Confidential Discovery Material are made does not preserve the confidentiality designations that appear on the original Documents, all such copies or reproductions shall be stamped with the same confidentiality designation as the original.

4.    All Documents obtained by compulsory process or voluntarily in lieu of process from any Party or Third Party, regardless of whether designated or marked confidential by the Party or Third Party, and transcripts of any investigational hearings, interviews, or depositions that were obtained before this Protective Order was adopted, shall be treated as Restricted Confidential Discovery Material for a period of ten (10) days from the time notice of the intent to produce is given to the Producing Party. At the expiration of that time, this material shall be treated as Confidential Discovery Material unless documents or transcripts pages are otherwise designated with specificity by the Producing Party as either Restricted Confidential Discovery Material or non-confidential.

5.    If any Party seeks to challenge a Producing Party's designation of material as Restricted Confidential or Confidential Discovery Material, the challenging Party shall notify the Producing Party and all other Parties of the challenge. Such notice shall identify with specificity

7

(*i.e.*, by document control numbers, deposition transcript page and line reference, or other means sufficient to locate easily such materials) the designation being challenged. The Producing Party may preserve its designation by providing the challenging Party and all other Parties a written statement of the reasons for the designation within three (3) business days of receiving notice of the confidentiality challenge. If the Producing Party timely preserves its rights, the Parties shall continue to treat the challenged material as Restricted Confidential or Confidential Discovery Material, absent a written agreement with the Producing Party or order of the Court providing otherwise.

6.     If any conflict regarding a confidentiality designation arises and the Parties involved have failed to resolve the conflict via good-faith negotiations, a Party seeking to disclose the Restricted Confidential or Confidential Discovery Material or challenging a confidentiality designation may make written application to the Court for relief. The application shall be served on the Producing Party and the other Parties to this Matter, and shall be accompanied by a certification that good-faith negotiations have failed to resolve the outstanding issues. The Producing Party and any other Party shall have three (3) business days after receiving a copy of the motion to respond to the application. While an application is pending, the Parties shall maintain the pre-application status of the Restricted Confidential or Confidential Discovery Material. Nothing in this Protective Order shall create a presumption or alter the burden of persuading the Court of the propriety of a requested disclosure or change in designation.

7.     The Parties shall not be obligated to challenge the propriety of any designation or treatment of information as Restricted Confidential or Confidential Discovery Material and the failure to do so promptly shall not preclude any subsequent objection to such designation or

8

treatment, or any motion seeking permission to disclose such material to Persons not otherwise entitled to access under the terms of this Protective Order. If Restricted Confidential or Confidential Discovery Material is produced without the designation attached, the material shall be treated as Restricted Confidential or Confidential from the time the Producing Party advises Plaintiff's Counsel and Defendants' Counsel in writing that such material should be so designated and provides all the Parties with an appropriately labeled replacement. The Parties shall return promptly or destroy the unmarked materials.

8.     Restricted Confidential Discovery Material shall not, directly or indirectly, be disclosed or otherwise provided to anyone except:

      (a)     Plaintiff's counsel and the Commission, as permitted by the Commission's Rules of Practice;

      (b)     Outside Counsel;

      (c)     Experts/Consultants;

      (d)     court reporters and deposition transcript reporters;

      (e)     judges and other court personnel of any court having jurisdiction over any appeal proceedings involving this Matter;

      (f)     any author or recipient of the Discovery Material; any individual who was in the direct chain of supervision of the author at the time the Discovery Material was created or received; any employee or agent of the entity that created or received the Discovery Material; or anyone representing the author or recipient of the Discovery Material in this Matter; and

      (g)     any other Person(s) authorized in writing by the Producing Party.

9.     Confidential Discovery Material shall not, directly or indirectly, be disclosed or otherwise provided to anyone other than those persons listed in paragraph 8 of this Protective Order and to the following representative of Whole Foods: _____; provided that each

9

such representative executes a declaration in the form attached as Exhibit A. Defendants'
Counsel shall maintain a file of all such declarations for the duration of the litigation.

      10.     Restricted Confidential or Confidential Discovery Material shall not, directly or
indirectly, be disclosed or otherwise provided to an Expert/Consultant until such person has
executed and transmitted to counsel for the party retaining such person a declaration in the form
attached as Exhibit A. Each Party's counsel shall maintain a file of all such declarations for the
duration of the litigation.

      11.     If any Party desires to disclose Restricted Confidential or Confidential Discovery
Material to (a) either any Expert/Consultant, any deponent, or any witness that is or was an
officer, director or employee of Whole Foods or Wild Oats, or (b) any Person other than those
referred to in paragraphs 8 and 9 of this Protective Order, the Disclosing Party shall notify the
Producing Party any other Party of its desire to disclose such material. The notice shall identify
those materials sought to be disclosed with specificity (*i.e.*, by document control numbers,
deposition transcript page and line reference, or other means sufficient to locate easily such
materials) and the specific Person to whom the Confidential or Restricted Confidential Material
is to be disclosed. For disclosure to any Expert/Consultant, deponent or witness that is or was an
officer, director or employee of Whole Foods or Wild Oats, the identification of the Person shall
include, but not be limited to, the full name, professional address and/or affiliation, and current
curriculum vitae of the identified Person. The Producing Party may object to the disclosure of
the Restricted Confidential or Confidential Discovery Material within five (5) business days of
receiving notice of an intent to disclose such material to the Person by providing the Disclosing
Party with a written statement of the reasons for objection. If the Producing Party timely objects,

10

the Disclosing Party shall not disclose the Restricted Confidential or Confidential Discovery

Material to the identified Person, absent a written agreement with the Producing Party or order of

the Court permitting the disclosure. If the Producing Party does not object to the disclosure of

Restricted Confidential or Confidential Discovery Material to the identified Person within five

(5) business days, the Disclosing Party may disclose the Restricted Confidential Discovery

Material to the identified Person.

      12.     If the FTC (a) receives a discovery request that may require the disclosure by it of

a Third Party's Restricted Confidential or Confidential Discovery Material, or (b) intends to or is

required to disclose, voluntarily or involuntarily, a Third Party's Restricted Confidential or

Confidential Discovery Material (whether or not such disclosure is in response to a discovery

request), the FTC promptly shall notify the Third Party of the receipt of such request or its

intention to disclose such material. Such notification shall be in writing and, if not otherwise

done, sent for receipt by the Third Party at least five (5) business days before disclosure, and

shall include a copy of this Protective Order and a cover letter that will apprise the Third Party of

its rights hereunder.

      13.     If any Person receives a discovery request in another proceeding that may require

the disclosure of a Producing Party's Restricted Confidential or Confidential Discovery Material,

the recipient of the discovery request shall promptly notify the Producing Party of receipt of the

request. The notification shall be in writing and be received by the Producing Party at least five

(5) business days before production in the other proceeding, and shall include a copy of this

Protective Order and a cover letter apprising the Producing Party of its rights. Nothing herein

shall be construed as requiring the recipient of the discovery request or anyone else covered by

11

this Protective Order to challenge or appeal an order requiring production of Restricted

Confidential or Confidential Discovery Material, to subject itself to any penalties for

noncompliance with such an order, or to seek any relief from the Court. The recipient shall not

oppose the Producing Party's efforts to challenge the discovery request calling for the production

by the recipient of the Producing Party's Restricted Confidential or Confidential Discovery

Material. In addition, nothing herein shall limit the applicability of Section 4.11(e) of the FTC

Rules of Practice, 16 C.F.R. § 4.11(e), to discovery requests in another proceeding that are

directed to the Commission.

  14. Counsel for the Parties or any Producing Party shall have the right to exclude from

oral depositions any person not authorized to receive Restricted Confidential or Confidential

Discovery Material, during periods of examination or testimony relating to such material.

  15. In the event that any Restricted Confidential or Confidential Discovery Material is

contained in any pleading, motion, exhibit, brief, or other paper filed or to be filed with the

Court, the Party filing the papers shall inform the Clerk of Court, and the papers shall be filed

under seal pursuant to the Federal Rules of Civil Procedure and the Rules of the United States

District Court for the District of Columbia. Restricted Confidential or Confidential Discovery

Material contained in papers (including Restricted Confidential or Confidential Discovery

Material from the Parties and Third Parties) shall remain under seal until further order of the

Court; provided, however, that the papers may be furnished to persons or entities who may

receive Restricted Confidential or Confidential Discovery Material pursuant to this Protective

Order. After filing any paper containing Restricted Confidential or Confidential Discovery

Material, the filing Party must file on the public record a duplicate copy of the paper with the

Restricted Confidential or Confidential Discovery Material deleted, within five (5) business days of the original filing. Further, if the protection for any such material ceases, any Party may file on the public record a copy that also contains the formerly protected material.

16.    If counsel for a Party plans to introduce into evidence at trial any Document or transcript containing Restricted Confidential or Confidential Discovery Material produced by a Third Party or any other Party, the counsel shall provide forty-eight (48) hours advance notice before such introduction to the Producing Party and any other Party, or as much notice before the introduction as practicable under the circumstances, for purposes of allowing that Party to seek an order that the Document or transcript be granted *in camera* treatment. Except where an order seeking *in camera* treatment is granted, all Documents and transcripts shall be part of the public record. If *in camera* treatment is granted, a copy of the Document or transcript with the Restricted Confidential or Confidential Discovery Material deleted must be placed on the public record.

17.    The inadvertent production or disclosure of (i) material provided to the FTC during its investigation under the Hart-Scott-Rodino Antitrust Improvement Act, 15 U.S.C. § 18a, or (ii) any Discovery Material, which a Producing Party claims should not have been produced or disclosed because of a privilege will not be deemed to be a waiver of any privilege to which the Producing Party would have been entitled had the privileged Discovery Material not inadvertently been produced or disclosed. In the event of such claimed inadvertent production or disclosure, the procedures of Federal Rules of Civil Procedure 26(b)(5)(B) shall apply. The inadvertent production of a privileged document shall not be deemed a waiver of the privilege for all documents relating to that subject matter.

13

18.    Nothing in this Protective Order shall be construed to conflict with the provisions of Sections 6, 10, and 21 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 50, 57b-2, or with Rules 3.22, 3.45 or 4.11 (b)-(e), 16 C.F.R. §§ 3.22, 3.45 and 4.11 (b)-(e).  Any Party or Producing Party may move at any time for *in camera* treatment of any Confidential Discovery Material or any portion of the proceedings in this Matter to the extent necessary for proper disposition of this Matter.

19.    At the conclusion of this Matter, the Defendants shall (a) return or destroy all Documents obtained in this Matter that contain or refer to Restricted Confidential or Confidential Discovery Material, other than materials that have been made part of the public record in this Matter, and (b) provide the Producing Party with an affidavit of destruction, *provided that* the provisions of 15 U.S.C. § 18a and § 4.12 of the FTC Rules of Practice, 16 C.F.R. § 4.12, shall govern the retention, return, or destruction of any documents obtained by the FTC prior to the filing of the Complaint to the extent the provisions of that statute or regulation is inconsistent with the provisions of this Protective Order.  At the time that any Expert/Consultant or other person retained to assist counsel in the preparation of this Matter concludes participation in this Matter, that person shall return to counsel all copies of Documents or portions thereof designated Restricted Confidential or Confidential Discovery Material that are in the possession of that person, together with all notes, memoranda, or other papers containing Restricted Confidential or Confidential Discovery Material.

20.    The provisions of this Protective Order, insofar as they restrict the communication and use of Restricted Confidential and Confidential Discovery Material shall, without written permission of the Producing Party or further order of the Court, continue to be binding after the

14

conclusion of this Matter.

21.    This Protective Order shall not apply to the disclosure by a Producing Party or its Counsel of the Producing Party's Restricted Confidential or Confidential Discovery Material to the Producing Party's current or former employees, agents, board members, directors, and officers.

22.    Entry of the foregoing Protective Order is without prejudice to the right of the Parties or Third Parties to apply for further protective orders or for modification of any provision of this Protective Order by application to the Court for good cause shown.

23.    The parties stipulate to the foregoing interim protective order in order to facilitate the prompt exchange of pleadings, documents, and information, but without prejudice to their right to move for the entry of a final protective order with differing provisions.

Respectfully submitted,

Dated: June 6, 2007

Thomas H. Brock, Esq.
D.C. Bar No. 939207
Bureau of Competition
Federal Trade Commission
600 New Jersey Ave., N.W.
Washington, D.C.  20580
(202) 326-2813
TBrock@FTC.gov

Counsel for the Federal Trade Commission

15

Dated: June 6, 2007

Alden L. Atkins, Esq.
D.C. Bar No. 393922
Vinson & Elkins
The Willard Office Building
1455 Pennsylvania Ave., N.W.
Suite 600
Washington, D.C. 20004-1008
(202) 639-6613
Aatkins@VELaw.com

Counsel for Whole Foods Market, Inc.

Dated: June 6, 2007

Clifford H. Aronson, Esq.
D.C. Bar. No. 335182
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Caronson@Skadden.com

Counsel for Wild Oats Markets, Inc.

ORDERED:

_____
United States District Judge
District of Columbia

Dated

16

## EXHIBIT A

## TO THE PROTECTIVE ORDER GOVERNING DISCOVERY MATERIAL

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| WHOLE FOODS MARKET, INC. | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| WILD OATS MARKET, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION CONCERNING PROTECTIVE
## ORDER GOVERNING DISCOVERY MATERIAL

I, [NAME], hereby declare and certify the following to be true:

1.    [Statement of employment]

2.    I have read the "Protective Order Governing Discovery Material" ("Protective Order") issued by the Court _____ on _____, in connection with the above captioned Matter. I understand the restrictions on my access to and use of any Restricted Confidential or Confidential Discovery Material (as these terms are used in the Protective Order) in this Matter and I agree to abide by the Protective Order.

3.    I understand that the restrictions on my use of such Restricted Confidential or Confidential Discovery Material include:

      a.    that I will use such Restricted Confidential or Confidential Discovery Material only for the purpose of preparing for this proceeding, and hearing(s) and any appeal of this proceeding and for no other purpose;

      b.    that I will not disclose such Restricted Confidential or Confidential Discovery Material to anyone, except as permitted by the Protective Order;

17

c.     that I will use, store and maintain the Restricted Confidential and Confidential Discovery Material in such a way as to ensure its continued protected status; and

d.     that upon the termination of my participation in this proceeding I will promptly return all Restricted Confidential or Confidential Discovery Material, and all notes, memoranda, or other papers containing Restricted Confidential or Confidential Discovery Material, to Plaintiff's Counsel or Defendants' Outside Counsel, as appropriate.

4.     I understand that if I am receiving Confidential Discovery Material as an Expert/Consultant, as that term is defined in this Protective Order, the restrictions on my use of Confidential Discovery Material also include the duty and obligation to:

a.     maintain such Restricted Confidential or Confidential Discovery Material in separate locked room(s) or locked cabinet(s) when such Restricted Confidential or Confidential Discovery Material is not being reviewed;

b.     return such Restricted Confidential or Confidential Discovery Material to Plaintiff's Counsel or Defendants' Outside Counsel, as appropriate, upon the conclusion of my assignment or retention, or upon conclusion of this Matter; and

c.     use such Restricted Confidential or Confidential Discovery Material and the information contained therein solely for the purpose of rendering consulting services to a Party to this Matter, including providing testimony in judicial or administrative proceedings arising out of this Matter.

5.     I am fully aware that, pursuant to Rule 26, Federal Rules of Civil Procedure, Rule 37, Federal Rules of Civil Procedure, and Section 3.42(h) of the FTC Rules of Practice, 16 C.F.R. § 3.42(h), my failure to comply with the terms of the Protective Order may constitute contempt of the Commission and may subject me to sanctions imposed by the Court or the Commission.

_____       Date: _____

Full Name [Typed or Printed]

_____

18

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-CV-01021-PLF |
| | ) | |
| | ) | Judge: Paul L. Friedman |
| WHOLE FOODS MARKET | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILD OATS MARKETS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## MOTION OF THE KROGER CO. TO INTERVENE

**Exhibit D**

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2001 WL 34088808 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)
н

In re Vitamins Antitrust Litigation
D.D.C.,2001.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
In re: VITAMINS ANTITRUST LITIGATION
No. MISC. 99-197(TFH), MDL 1285.

March 19, 2001.

*MEMORANDUM OPINION Re: CANADIAN
PLAINTIFFS' MOTION TO INTERVENE*
HOGAN, J.
**\*1** THIS DOCUMENT RELATES TO: ALL
ACTIONS.

Pending before this Court is the Motion of Canadian
Plaintiffs to Intervene for the Limited Purpose of
Seeking Modification to Protective Order, entered
by this Court on November 3, 1999. Based upon
careful consideration of the intervention motion,
Defendants' opposition, Defendants' Motion to Stay
and the opposition thereto, oral argument at the
March 7, 2001 status conference, and the entire
record herein, this Court will grant that portion of
Canadian Plaintiffs' Motion seeking intervention.
However, the Court will defer ruling on the portion
of the Canadian Plaintiffs' Motion seeking
modification of the Protective Order, access to
Verilaw, and attendance at depositions of the Niacin
Defendants until the appeals process in the Canadian
courts is exhausted or otherwise concluded, or until
such time as this Court determines that it is
otherwise appropriate to decide these issues.FN1

FN1. Also pending before the Court is a related
motion, Defendants' Motion to Stay Proceedings on
the Intervention Motion of Certain Canadian
Plaintiffs Pending the Disposition of an Application
for Injunctive Relief in the Ontario Courts. To the
extent that the Court grants intervention to the
Canadian Plaintiffs, Defendants' Motion to Stay will
be denied. To the extent that the Court defers ruling
on the remainder of the Canadian Plaintiffs' Motion,
Defendants' Motion to Stay will be granted.

I. BACKGROUND

Movants ("Canadian Plaintiffs" or "Movants") are
Plaintiffs in three cases pending in Canadian courts.
FN2 The Canadian Plaintiffs have filed suit in

various Canadian provincial courts alleging price
fixing, market allocation, and other anti-competitive
behavior in violation of Canadian fair competition
laws.FN3 The Canadian actions are in large part
similar to the *Vitamins* action filed in the United
States.FN4 Pursuant to Fed.R.Civ.P. 24(b), the
Canadian Plaintiffs seek to intervene in litigation
pending before this Court, *In re Vitamins Antitrust
Litigation,* for the limited purpose of modifying the
stipulated Protective Order FN5 ("Protective Order"
or "Order") entered by this Court in the *Vitamins*
case on November 3, 1999.   FN6 This Order
governs the disclosure and use of confidential
information FN7 in the *Vitamins* litigation.FN8

FN2. *Ford v. F. Hoffman-LaRoche Ltd., et al.,*
Sup.Ct. Justice File No. 771/99 (Ontario, Canada);
*Ritchie-Smith Feeds, Inc. v. F. Hoffman-LaRoche, et
al.,* Supreme Ct. No. C994010 (British Columbia,
Canada); and *Vitapharm Canada Ltd., et al. v. F.
Hoffman-LaRoche, Ltd.,* Sup.Ct. Justice File No.
99-GD-46719 (Ontario, Canada).

FN3. *See, e.g., Competition Act,* R.S. ch. 19, § 19
(1985 & 2d Supp.). As recounted by Justice
Cumming in his Reasons for Decision, there are
seven pending Ontario actions, four additional
Ontario actions that have been stayed as a result of a
carriage motion, a class action commenced in British
Columbia, *Ritchie-Smith,* and two class proceedings
in Quebec. *See* Reasons for Decision ¶¶ 10-12 at 7.
Plaintiffs in the British Columbia *Ritchie-Smith*
action joined with the Ontario *Ford* and *Vitapharm*
actions for purposes of bringing the intervention
motion in this Court; however, the *Ritchie-Smith*
plaintiffs do not accede that the Ontario court's
disposition of the Defendants' Canadian injunction
motion governs these plaintiffs regarding the
motions pending in this Court.

FN4. The Canadian actions differ from the U.S.
actions in one key respect, namely that the Canadian
actions are brought on behalf of vitamins
purchasers, both direct and indirect, who are located
in Canada.

FN5. The Protective Order provides, *inter alia,* that
"[a]ll information produced or discovered in this
litigation, regardless whether designated confidential
shall be used solely for the prosecution or defense of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

this litigation, unless that information has become publicly available without a breach of the terms of this Order." Protective Ord. ¶ 1. The Order further provides that "Confidential Information," as defined *infra* note 7 may be disclosed to and used only by: employees, including in-house counsel, or officials of parties to the litigation; the Court; court reporters; Special Masters; mediators; parties' outside counsel; consulting or testifying experts; others specially identified and authorized by a disclosing source; and the direct staff of the foregoing persons. *See id.* ¶ 8.

FN6. Canadian Plaintiffs seek to modify the Protective Order as follows:
A. Paragraph 1 of the Protective Order is modified by striking the first word "All" and substituting for it: "Except as otherwise provided in Paragraph 20 herein, 'all.' "
B. New paragraph 20 is added to the Protective Order as follows: "Plaintiffs in *Ford v. Hoffman-LaRoche Ltd., et al.,* Sup.Ct. Justice File No. 771/99 (Ontario, Canada), *Vitapharm Canada, Ltd. et al. v. F. Hoffman-LaRoche, Ltd., et al.,* Sup.Ct. Justice File No. 99-GD-46719 (Ontario, Canada), and *Ritchie-Smith Feeds, Inc. v. F. Hoffman-LaRoche, Ltd., et al.,* Supreme Ct. C994010 (British Columbia, Canada), shall be deemed 'Parties' hereunder for the purpose of obtaining access to discovery materials. The Plaintiffs in the above-listed Canadian actions shall be permitted to use such discovery materials in their cases in any manner permitted by the courts in which those cases are pending, and their counsel shall be deemed 'counsel' for all purposes under the Protective Order. For the purposes of this Paragraph, the persons and entities listed in Paragraph 8 in the Order shall be deemed to include all of their respective counterparts in the Canadian actions listed in this Paragraph. The Plaintiffs in the Canadian actions are bound by the terms of this Order not to use such materials for any purpose other than for the prosecution of their own litigation, and are bound to abide by the non-disclosure provisions of this Order except as modified in this Paragraph."
Prop. Order ¶ 4.

FN7. The Protective Order defines "Confidential Information" as "information that the disclosing party or non-party (hereafter 'source') designates 'Confidential' or 'Confidential and Lawyers Only' (collectively referred to as 'Confidential

Information'). *Id* . ¶ 3. Pursuant to the Order, "[t]he designation 'Confidential' shall be limited to information that the source reasonably believes is of a proprietary or commercially sensitive nature, or should otherwise be subject to confidential treatment." *Id.* "Confidential and Lawyers Only" is limited to information that contains trade secrets, is of a highly sensitive commercial nature, or otherwise derives from Confidential Information regarding "pricing, production, cost, marketing, strategic planning or customers." *Id.* ¶ 4.

FN8. On September 13, 2000, this Court entered a Consent Order modifying the November 3, 1999 Protective Order. The September 13, 2000 Order modifies Paragraphs 8 and 9 of the November 3, 1999 Protective Order to encompass "[d]ocument copying services or other document vendors utilized by the parties" as persons to whom Confidential Information may be revealed.

Canadian Plaintiffs request that this Court modify the Order so as to allow them access, on the same terms as parties to the *Vitamins* action, to discovery materials, including documents, interrogatory responses, responses to requests for admission, and other discovery papers produced by the Niacin Defendants. FN9 Movants also seek a further order that (1) will allow Canadian Plaintiffs to access, at their cost, the Verilaw service,FN10 and (2) will permit Canadian Plaintiffs to attend depositions, through their counsel, of Niacin Defendants and those Defendants' current and former officers and employees.

FN9. Canadian Plaintiffs seek access to discovery by defendants who participated in the manufacture and sale of niacin and niacinamide ("Niacin Defendants" or "Defendants"), all of whom have been sued by the Canadian Plaintiffs in Canadian courts. These defendants include Lonza Inc., Lonza AG, Alusuisse Lonza Group Ltd., Degussa-Huls AG, Degussa-Huls Corp., Reilly Industries, Inc., Reilly Chemicals, and Nepera, Inc. Prop. Order ¶ 4. Nine corporate members and three individuals have pled guilty to charges in Canada and have paid fines to the Canadian government. Canadian Plaintiffs seek discovery of documents and testimony from the Niacin Defendants who have not pled guilty to criminal charges in Canada. The Canadian Plaintiffs do not seek access to materials produced by *Vitamins* plaintiffs.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN10. Verilaw is an electronic service website, accessible only to parties to the *Vitamins* litigation, through which the parties effectuate service of process, schedule depositions, and post correspondence relevant to the *Vitamins* litigation.

Certain Defendants oppose this motion and further moved for a stay pending the disposition of injunctive proceedings in Ontario.FN11 A hearing on the Canadian injunction motion was held on January 12, 2001 before Justice Cumming. On January 26, 2001, Justice Cumming dismissed the motion for an injunction against prosecution of the Canadian intervention motion. On March 6, 2001, the Ontario Superior Court of Justice granted leave to appeal Justice Cumming's decision. At the March 7, 2001 *Vitamins* status conference, this Court heard oral arguments on the pending intervention motion.

FN11. The parties seeking an injunction in Canadian courts are BASF Canada, Inc., Hoffman-LaRoche, Ltd., Degussa-Huls Canada, Inc., Takeda Chemical Industries, Ltd. and Alusuisse-Lonza Canada, Inc.

## II. DISCUSSION

### A. Motion to Intervene

**\*2** The Canadian Plaintiffs seek permissive intervention in this action pursuant to Fed.R.Civ.P. 24(b).FN12 In this case, the Canadian Plaintiffs do not seek to intervene for the purpose of litigating a substantive claim, but rather for the limited purpose of modifying the Protective Order entered by this Court on November 3, 1999. In this Circuit, there are three necessary prerequisites for allowing permissive intervention pursuant to Rule 24(b). FN13 In deciding whether or not to grant a motion to intervene, the Court must strike a "balance between keeping class litigation manageable and allowing affected parties to be adequately heard." *Twelve John Does v. District of Columbia,* 117 F.3d 571, 575 (D.C.Cir.1997). Rule 24 states that in exercising its discretion, "the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Fed.R.Civ.P. 24(b).

FN12. In order to intervene in an action in federal court, a party must proceed according to Rule 24 of the Federal Rules of Civil Procedure. Rule 24 provides for two different types of intervention-

intervention of right and permissive intervention. Rule 24(b) provides that "[u]pon timely application anyone may be permitted to intervene in an action: (1) when a statute confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of fact or law in common." Fed. R. Civ. P. 24(b). The instant case involves only permissive intervention, as the Canadian Plaintiffs have not asserted a basis for intervention of right.

FN13. *See* discussion *infra* Part II.A.2.

Accordingly, this Court will first assess whether the Canadian Plaintiffs meet the threshold criteria for permissive intervention. If these three criteria are met, the Court will then engage in a balancing of the interests of the parties to determine whether to grant the motion to intervene. Even if the Court grants the motion to intervene, the Court still must determine whether to modify the Protective Order as requested by the Canadian Plaintiffs.

### 1. Fed.R.Civ.P. 24(b)

Rule 24(b) provides that "[u]pon timely application anyone may be permitted to intervene in an action: (1) when a statute confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of fact or law in common ." Fed.R.Civ.P. 24(b). Ostensibly, Rule 24 would appear to impose a procedural barrier upon parties seeking to intervene for the purpose of challenging a protective order. Rule 24(b)(2) requires that a potential intervenor assert a "claim or defense" in common with the original parties to the action in which intervention is sought. Rule 24(c) similarly appears to impose upon a would-be intervenor a requirement of seeking to intervene for the purpose of litigating a substantive claim insofar as the rule requires "a pleading setting forth the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). However, federal appellate courts considering the issue have interpreted the requirements of Rule 24 flexibly and have uniformly concluded that third parties may permissively intervene for the purpose of contesting protective orders. *See EEOC v. Nat'l Children's Center, Inc.,* 146 F.3d 1042, 1045 (D.C.Cir.1998) (surveying decisions from the First, Second, Third, Fifth, Sixth, Seventh, Ninth, and Tenth Circuits that have granted permissive intervention for the purpose

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

of challenging a protective order). Moreover, courts considering the issue are nearly uniform in holding that intervention is the proper means for challenging or modifying a protective order. *See, e.g., Nat'l Children's Center,* 146 F.3d 1042; *Autry v. K Mart Corp., Inc.,* No. 92-105-Civ-3-BR, 1995 U.S. Dist. LEXIS 18253, at *2-3 (E.D.N.C. Nov. 22, 1995) (citing cases from First, Second, Sixth, Ninth, and Tenth Circuits); *Beckman Indus. Inc. v. Int'l Ins. Co.,* 966 F.2d 470, 472 (9th Cir.1992) (citing cases from First, Second, Fifth, Sixth, and Tenth Circuits).

### 2. Three criteria for granting Rule 24(b) permissive intervention

**\*3** The traditional requirements for permissive intervention pursuant to Rule 24(b)(2) are: (1) an independent basis for subject matter jurisdiction, (2) a timely motion, and (3) a claim or defense that shares a common question of law or fact with the action in which intervention is sought. *See Nat'l Children's Center,* at 146 F.3d 1046. The requirements for permissive intervention are to be construed liberally, "with all doubts resolved in favor of permitting intervention." Fed. R. Civ. P. 24. The criteria are interpreted flexibly when a non-party seeks to intervene for the limited purpose of contesting or modifying a protective order. *See Nat'l Children's Center,* at 146 F.3d at 1047.

### a. An independent basis for jurisdiction

"The first requirement for permissive intervention-an independent basis for jurisdiction-stems not from any explicit language in Rule 24(b), but rather from the basic principle that a court may not adjudicate claims over which it lacks subject matter jurisdiction." *Nat'l Children's Center,* 146 F.3d at 1046 (citing Fed. R. Civ. P. 82). However, courts have crafted a narrow exception to this jurisdictional requirement where a third party seeks to intervene for the limited purpose of contesting or modifying a protective order. *See id.,* 146 F.3d at 1047 (explaining that "[t]he rationale for this exception is simple-such intervenors do not ask the district court to exercise jurisdiction over an additional claim on the merits, but rather to exercise a power that it already has, namely the power to modify a previously entered confidentiality order"); *see also In re "Agent Orange" Product Liability Litigation,* 821 F.2d 139, 145 (2d Cir.) (noting the power of a

district court to modify protective orders that it has entered), *cert. denied,* 484 U.S. 953 (1987), *aff'g* 104 F.R.D. 559, 567 (E.D.N.Y.1985). In cases such as the instant motion, where intervention is sought for the limited purpose of modification to a protective order, it is not necessary for the Court to find an independent basis for jurisdiction. Accordingly, the Canadian Plaintiffs satisfy the first prong for permissive intervention.

### b. Timeliness of the motion

The second requirement for permissive intervention pursuant to Rule 24(b)(2) is a timely motion. Courts have flexibly interpreted the requirement of a timely motion in the context of intervention for the purposes of contesting a protective order. *See Nat'l Children's Center,* 146 F.3d at 1047.

Although addressing the timeliness issue in the context of Rule 24(b) intervention as of right, this Circuit has stated that "timeliness is to be judged in consideration of all the circumstances, especially weighing the factors of time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties in the case." *United States v. AT & T,* 642 F.2d 1285, 1295 (D.C.Cir.1980).

**\*4** The Canadian Plaintiffs seek to intervene in ongoing litigation in which the parties have not yet even concluded discovery. Given that many courts have held that intervention is timely long after the termination of litigation, *see Nat'l Children's Center,* 146 F.3d at 1047, the Canadian Plaintiffs' motion certainly appears to meet the timeliness requirement.

### c. Commonality of questions of law or fact

The third requirement for Rule 24(b)(2) permissive intervention is a commonality requirement. Rule 24 states that a party may be entitled to intervene "when an applicant's claim or defense and the main action have a question of fact or law in common." Fed. R. Civ. P. 24. As with the jurisdictional and timeliness requirements, courts have liberally construed the commonality requirement in the context of challenges to protective orders. Some courts have held that a movant satisfies the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

commonality requirement simply by virtue of having raised a common question in a suit in another jurisdiction. *See Nat'l Children's Center,* 146 F.3d at 1047. Other courts have interpreted this requirement even more liberally, holding that "the issue of the scope or need for the confidentiality order itself presents a common question that links the movant's challenge with the main action." *Id.* However, as in *Nat'l Children's Center,* in the instant case, there is no need to rely upon the more liberal construction of the commonality requirement afforded by some circuits because the Canadian Plaintiffs' suits share many common questions with the *Vitamins* action.FN14 Moreover, when intervention is sought in an action alleging anticompetitive conduct, "no stringent showing of a strong nexus of common fact or law is required." *Kerasotes Michigan Theaters, Inc. v. Nat'l Amusements, Inc.,* 139 F.R.D. 102, 103 (E.D.Mich.1991) (citing *Meyer Goldberg, Inc. of Lorain v. Fisher Foods, Inc.,* 823 F.2d 159, 164 (6 th Cir.1981)).

FN14. As stated in Movants brief, "Movants' cases are based on the identical factual core as [the *Vitamins* ] case: the global cartel, comprised mostly of multinational firms, to fix and control the prices charged to vitamins purchasers throughout the world, including Canada." Can. Pls.' Mem. P & A at 6.

Given the common questions raised by both the Vitamins action and the Canadian Plaintiffs' actions, coupled with the antitrust basis of both suits, the Canadian Plaintiffs meet the third criteria for permissive intervention.

### 3. Balancing the interests of the parties

However, even if a prospective intervenor satisfies all three requirements of Rule 24(b)(2), a court may still deny a motion to intervene. *See Nat'l Children's Center,* 146 F.3d at 1048 (describing the "considerable discretion" that district courts have to either grant or deny a motion for permissive intervention, even if the requirements of Rule 24(b) are met); *see also H.L. Hayden Co. of New York, Inc. v. New York,* 797 F.2d 85, 89 (7th Cir.1986) (stating that " 'a denial of permissive intervention has virtually never been reversed' ") (quoting *United States v. Hooker Chemicals & Plastics Corp.,* 749 F.2d 968, 990 n. 19 (2d Cir.1984)). Rule 24 states

that in exercising its discretion, "the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Fed. R. Civ. P. 24(b).

**\*5** Defendants assert that the intervention motion raises two important questions: (1) whether the special intervention doctrine ... is available to litigants who are not [sic] litigants in foreign courts; and (2) whether it is proper to require that discovery materials brought to the United States ... be automatically available in a third country when the countries from which such documents originated require resort to judicial assistance for civil discovery pursuant to the Hague Convention ... or pursuant to other laws for non-Hague-signatory nations. Defs.' Mot. Stay at 3-4.

Like every other circuit to consider the issue, this Circuit has held that permissive intervention is the proper procedure for a non-party to seek modification of a protective order. *See Nat'l Children's Center,* 146 F.3d at 1045. And federal courts have granted sharing of discovery to litigants outside the court's jurisdiction. While the Court is cognizant of the fact that this is a case of first impression, because no other court has been called upon to consider foreign comity interests in deciding whether or not to grant intervention to a foreign plaintiff for the purpose of modifying a protective order, this Court finds no special exception to the limited intervention doctrine for non-party intervenors from foreign fora.

This Court also finds Justice Cumming's Reasons for Decision to be instructive on this issue. Although a fair portion of the opinion centers on a discussion of 28 U.S.C. § 1782, a statute not invoked by Movants,FN15 Justice Cumming's Reasons for Decision reflects a permissive attitude toward the Canadian Plaintiffs' efforts to gain access to U.S. discovery materials. In dismissing the injunction motion, the court explained that "[t]he plaintiffs' action in seeking access to the U.S. discovery is not oppressive or unfair to the defendants in the Canadian proceedings. To the contrary. Such access is consistent with the three policy objectives underlying the CPA." Reasons for Decision ¶ 49 at 13. The court also noted that "[a] Canadian court generally will be reluctant to prevent someone from gathering evidence extraterritorially, as its ultimate admissibility in a Canadian

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



proceeding will be determined by the Canadian courts." *Id.* ¶ 45. In making its determination, the court ultimately reasoned that "[t]he plaintiffs' request for access to discovery evidence which they believe necessary to prepare their case in Canada ... does not violate the rules and procedure of this court. There is no consequential unfairness to the defendants in the Canadian class proceedings." *Id.* ¶ 50 at 14.

FN15. The Canadian Plaintiffs do not seek judicial assistance pursuant to 28 U.S.C. § 1782, but rather seek permissive intervention pursuant to Rule 24(b) of the Federal Rules of Civil Procedure.

As discussed above, the Movants appear to meet the three criteria for permissive intervention. And Justice Cumming's rationale bolsters Movants' position, at least as far as intervention is concerned. However, even if this Court grants the Motion to Intervene, it still must determine whether to modify the Protective Order as requested by the Canadian Plaintiffs. As noted by Defendants, the Motion raises a question of first impression insofar as whether it is proper to allow intervention by nonparties who are not United States residents and seek to use the requested discovery in litigation outside of the United States.

B. Modification of the November 3, 1999 Protective Order

*6 Concluding that the Canadian Plaintiffs satisfy the requirements for permissive intervention pursuant to Rule 24(b) does not mandate that this Court must modify the contested Protective Order. *See. e .g., Florida ex. rel. Butterworth v. Jones,* 148 F.R.D. 282 (M.D.Fla.1993) (explaining that although the movants had met the requirements for intervention, that the court must still undertake a separate inquiry to determine whether to modify the protective order). A district court has broad discretion to modify a protective order. *See Agent Orange,* 821 F.2d at 147 (noting that [w]hether to lift or modify a protective order is a decision committed to the sound discretion of the trial court); *Bayer AG v. Barr Laboratories, Inc.,* 162 F.R.D. 456, 460 (S.D.N.Y.1995) (stating that "the case law is clear [ ] that the Court has discretion to modify a protective order"). Generally, "[t]he decision to lift or modify a protective order is proper where changed circumstances eliminate 'a continued need

for protection." ' *Autry,* 1995 U.S. Dist. LEXIS 18253, at *5 (quoting *Omega Homes, Inc. v. Citicorp Acceptance Co.,* 656 F. Supp 393, 403 (W.D.Va.1987)). Protective orders may also be modified to meet the need of parties in other litigation. *See Meyer Goldberg, Inc. of Lorain v. Fisher Foods, Inc.,* 823 F.2d 159164 (6th Cir.1987). Courts have used various formulae in determining whether to modify a protective order. FN16 In balancing competing interests, courts have weighed, *inter alia,* efficiency concerns,FN17 reliance interests upon the continued integrity of the protective order,FN18 and the public interest in open access to records and documents.FN19 A significant factor for many courts is whether the discovery sought will obviate the need for that party to engage in duplicative discovery. *See, e.g., Wilk v. American Medical Ass'n,* 635 F.2d 1295, 1300 (7 th Cir.1980). Implicit in this consideration is a determination of the discoverability of the materials sought. *See id.* (stating the principle that "a collateral litigant has no right to obtain discovery materials that are privileged or otherwise immune from eventual involuntary discovery in the collateral litigation") (citing *AT & T v. Grady,* 594 F.2d 594, 597 (7th Cir.1978)). In the instant case, such a determination would require this Court to engage in an exegesis of Canadian procedure and discovery principles. Although Justice Cumming has stated that granting access to Plaintiffs does not offend Canadian procedure, this is only one Ontario court's interpretation of existing Canadian law.FN20 And the decision does not purport to be binding on the litigation pending in other Canadian provinces.FN21 A decision by this Court to modify the Protective Order would surely require this Court to engage in its own evaluation of various Canadian provincial procedures. Based on pragmatic considerations, this Court determines that such an inquiry, if undertaken at all, is best left until the conclusion of the Canadian appellate process. This Court is reluctant to rule on issues that are a matter of first impression not only in the U.S., but in Canadian courts as well, particularly in light of the fact that subsequent Canadian appellate decisions may effectively moot the Motion pending before this Court.FN22 Even if the Canadian courts decline to overturn Justice Cumming's denial of the injunction sought by the Defendants, the appellate opinions are likely to provide valuable guidance to this Court in making its determination. Accordingly, the Court will defer ruling on the portion of the Canadian Plaintiffs'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Motion requesting modification to the Protective Order until the appellate process in the Canadian courts is exhausted or otherwise concluded, or until such time as this Court determines that it is otherwise appropriate to decide these issues.

FN16. Courts have considered factors such as: whether the movant is a party to the original litigation or non-party intervenor, whether the protective order was agreed upon by the parties, whether the party seeking intervention is the government or a private party, and whether modification is sought for purely private reasons or for public reasons.

FN17. *See, e.g., Grove Fresh Distributors, Inc. v. Everfresh Juice Co.,* 24 F.3d 893, 896 (7th Cir.1994) (explaining that "where a third party wishes to modify a protective order so as to avoid duplicative discovery in collateral litigation, policy considerations favoring the efficient resolution of disputes justifies modification unless such an order would tangibly prejudice substantial rights of the party opposing modification"); *but see Kerasotes Michigan Theaters, Inc. v. Nat'l Amusements, Inc.,* 139 F.R.D. 102, 104-05 (E.D.Mich.1991) (noting that permitting modification for the benefit of third party intervenors tends to undermine efficient discovery, but also acknowledging the countervailing efficiency of avoiding duplicative discovery).

FN18. *See, e.g., Jochims v. Isuzu Motors. Ltd.,* 145 F.R.D. 499, 502 n. 7 (S.D.Iowa 1992). In evaluating a motion for modification of a stipulated order by a party to that order, the court described approaches taken by various courts:
One line of authorities, illustrated by the decisions in *Grady* and *Ernst & Ernst,* place the burden on the intervening party moving for modification. The rationale for this line of cases is that a party to a protective order is entitled to rely upon it. A second line of cases, however, hold that the party seeking to continue a protective order bears the burden of demonstrating good cause. The rationale underscoring this line of cases is that to place the burden on the party seeking discovery of documents covered by a protective order would place an undue burden on the public's right of access and generally ignores the fact that civil litigants have an obligation to produce all relevant information.
*Id.* (quotations and citations omitted).

FN19. *See, e.g., Wilk v. American Medical Ass'n,* 635 F.2d 1295, 1299 (7th Cir.1980) (articulating the widely cited proposition that "pretrial discovery must take place in the [sic] public unless compelling reasons exist for denying the public access to proceedings").

FN20. Although the injunction motion was heard in Ontario, one of the applicants is from British Columbia. Additionally, there are actions pending in Quebec. If this Court grants access to the Ontario Canadian Plaintiffs, this will set the precedent for plaintiffs in other Canadian provinces to gain access to discovery materials.

FN21. As an additional consideration, the Canadian court asserts that it has "plenary jurisdiction to control its own process" and thus the authority to grant or deny the requested injunction, *id.* ¶ 25, at 9-10, but this Court queries whether such jurisdiction extends to supervising Movants' compliance with provisions of a U.S. protective order. The Canadian Plaintiffs have agreed to submit to the jurisdiction of this Court for the purposes of enforcing the provisions of the Protective Order, but Defendants argue that there is no realistic way for this Court to enforce the Protective Order against the Canadian Plaintiffs. Defs' Opp. Mem. P & A at 19. In his Reasons for Decision, Justice Cumming notes that the Canadian Plaintiffs "will consent to an order of this court if the defendants see that to be of assistance in maintaining confidentiality and the sanctity of the Protective Order." Reasons for Decision ¶ 47, at 13. Unfortunately, the Canadian court does not provide this Court with any insight as to the nature of such a hypothetical order. Nor does the Canadian court clearly delineate the jurisdiction of the Canadian court to enforce a U.S. protective order.

FN22. As a further consideration, discovery is not slated to begin in Canada until early 2002. Defs.' Mot. Stay at 3. Therefore, this Court does not see the urgency in issuing a ruling that may usurp the autonomy of Canadian courts to decide matters of first impression currently pending before those courts.

C. Access to Verilaw and Attendance at Depositions

*7 As a final matter, in addition to requesting modification of the Protective Order, the Canadian

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

Plaintiffs also request access to the Verilaw system, including the deposition scheduling feature, and also seek to attend depositions of the Niacin Defendants. The Court will defer ruling on these issues as well until it considers the Canadian Plaintiffs' requested modification to the Protective Order.FN23

FN23. Although not ruling on these issues at this time, the Court notes that in regard to Verilaw access, the Court is chiefly concerned with granting access under the current site setup. Specifically, granting the Canadian Plaintiffs access to Verilaw at this time would give them access not only to documents pertaining to the specified Niacin Defendants, but also to the entire site.

### III. CONCLUSION

The Canadian Plaintiffs meet the criteria for permissive intervention and the Court accordingly will Grant that portion of the Canadian Plaintiffs' Motion that seeks intervention in the *Vitamins* litigation at this time. However, the Court will defer ruling on the portion of Canadian Plaintiffs' Motion seeking modification to the Protective Order, access to Verilaw, and attendance at depositions of the Niacin Defendants until the appeals process in the Canadian courts is exhausted or otherwise concluded, or until such time as this Court determines that it is otherwise appropriate to decide these issues. An Order will accompany this Opinion.

### ORDER Re: CANADIAN PLAINTIFFS' MOTION TO INTERVENE

In accordance with the accompanying Memorandum Opinion, it is hereby:

ORDERED that Canadian Plaintiffs' Motion to Intervene is GRANTED in part, to the extent that it seeks limited intervention in the *Vitamins* litigation pending before this Court. However, the Court will DEFER ruling on the portion of the Motion to Intervene seeking modification to the Court's November 3, 1999 Protective Order, access to Verilaw, and attendance at depositions of the Niacin Defendants until the appeals process in the Canadian courts is exhausted or otherwise concluded, or until such time as this Court determines that it is otherwise appropriate to decide these issues. It is further

ORDERED that Defendants' Motion for a stay is DENIED in part to the extent that it seeks to have this Court enjoin Canadian Plaintiffs' intervention in the *Vitamins* action, but GRANTED in part to the extent that the Court defers ruling on the remainder of the Canadian Plaintiffs' Motion.

D.D.C.,2001.
In re Vitamins Antitrust Litigation
Not Reported in F.Supp.2d, 2001 WL 34088808
(D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:07-CV-01021-PLF |
| | ) | Judge: Paul L. Friedman |
| WHOLE FOODS MARKET | ) | |
| and | ) | |
| WILD OATS MARKETS, INC. | ) | |
| Defendants. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF THE KROGER CO. TO INTERVENE

**Exhibit E**

LEXSEE 1995 US DIST LEXIS 18253

**ALTON D. AUTRY, Plaintiff, V. K MART CORPORATION, INC., Defendant.**

**NO. 92-105-CIV-3-BR**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA, WESTERN DIVISION**

*1995 U.S. Dist. LEXIS 18253*

**November 22, 1995, Decided**
**November 22, 1995, FILED**

## CASE SUMMARY:

**PROCEDURAL POSTURE:** Plaintiff claimant filed a discrimination against defendant corporation under the Age Discrimination in Employment Act (Act), *29 U.S.C.S. § 623*. The claimant and corporation filed a stipulation of dismissal. The Equal Employment Opportunity Commission (EEOC) filed a motion to intervene under *Fed. R. Civ. P. 24(b)* for the purpose to request a modification of a protective order. The corporation opposed the motion to intervene.

**OVERVIEW:** The claimant filed an action against the corporation under the Act for age discrimination. The court issued a protective order that prohibited disclosure of information discovered in the action to other attorneys or witnesses unless those individuals were involved in the action. The claimant and corporation subsequently filed a stipulation to dismiss the action. The EEOC filed a motion to intervene under *Fed. R. Civ. P. 24(b)(2)* so that it could seek a modification of the protective order to gain access to the information for use in a separate age discrimination case. The corporation opposed the motion to intervene and asserted that the information sought was not relevant to the separate case. The court held that the intervention of the EEOC would serve the interest of judicial economy and prevent duplicative effort. The court held that the protective order would remain in effect to the extent that the information would only be released to those individuals involved in the separate age discrimination case.

**OUTCOME:** The EEOC's motion to intervene in the claimant's action against the corporation under the Act was granted for the limited purpose to allow the EEOC access to information discovered in the action to use in a separate age discrimination case.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > General Overview*
*Civil Procedure > Parties > Intervention > Limited Interventions*
*Civil Procedure > Parties > Intervention > Permissive Interventions*
[HN1] *Fed. R. Civ. P. 24(b)(2)* allows intervention in an action when an applicant's claim or defense and the main action have a question of law or fact in common. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties. *Fed. R. Civ. P. 24(b)(2)*. The requirements for permissive intervention generally are: (1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law or fact between the movant's claim or defense and the main action. Intervention, pursuant to *Fed. R. Civ. P. 24(b)(2)*, is the proper means by which a nonparty should pursue modification of a protective order. A district court's decision regarding whether an individual or entity is permitted to intervene in an action is reviewed only for abuse of discretion. Of preeminent concern when application is made for permissive intervention is whether the original parties will be prejudiced. No independent jurisdictional basis is required where a nonparty seeks permissive intervention


LexisNexis™   LexisNexis™   LexisNexis™

Case 1:07-cv-01021-PLF    Document 39-6    Filed 06/18/2007    Page 3 of 5

1995 U.S. Dist. LEXIS 18253, *    Page 2

for the limited purpose of challenging or seeking modification of a protective order. Where a collateral litigant seeks permissive intervention solely to gain access to discovery subject to a protective order, no particularly strong nexus of fact or law need exist between the two suits.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Discovery > Protective Orders*
[HN2] A district court has the power to modify a protective order entered by the court. The court retains such power even where the underlying suit has been dismissed. The decision to lift or modify a protective order is proper where changed circumstances eliminate a continued need for protection.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Discovery > Protective Orders*
[HN3] Where an appropriate modification of a protective order can place private litigants in a position they would otherwise reach only after repetition of another's discovery, such modification can be denied only where it would tangibly prejudice substantial rights of the party opposing modification. Once such prejudice is demonstrated, however, the district court has broad discretion in judging whether that injury outweighs the benefits of any possible modification of the protective order.

COUNSEL: [*1] For ALTON D. AUTRY, plaintiff: Richard Woodson Rutherford, Anderson, Rutherford, Geil & Scherer, Raleigh, NC.

For K-MART CORPORATION, INC., defendant: Bruce A. Petesch, Raleigh, NC. James M. Powell, Haynsworth, Baldwin, Johnson & Greaves, Greensboro, NC.

JUDGES: W. EARL BRITT, UNITED STATES DISTRICT JUDGE

OPINION BY: W. EARL BRITT

OPINION

*ORDER*

Plaintiff, Alton D. Autry, brought this action against defendant, K Mart Corporation, Inc., alleging discrimination based on age in violation of the Age Discrimination in Employment Act, *29 U.S.C. § 623*. On 10 February 1995, the parties filed a stipulation of dismissal pursuant to *Federal Rule of Civil Procedure 41(a)*. The matter is now before the court upon motion of the Equal Employment Opportunity Commission (EEOC) to intervene in the action for the limited purpose of seeking modification of a protective order previously entered by the court. Defendant opposes such intervention.

The EEOC recently intervened in another age discrimination case filed against defendant, *Helton, et al. v. K Mart Corporation* (No. 1:92-CV-2564-MHS), in the United States District Court for the Northern District of Georgia. The EEOC alleges that defendant engaged in a pattern and practice of discrimination in defendant's Southern Region from January 1990 through December 1992. The EEOC contends that discovery materials generated in the instant case contain information relevant to the *Helton* litigation. Information was [*2] sought from plaintiff's counsel, but the request for the discovery materials was not honored due to the existence of a protective order entered by this court on 24 January 1994. The order prohibited disclosure of information discovered in the instant case. The EEOC seeks to intervene in this action, pursuant to *Federal Rule of Civil Procedure 24(b)*, for the sole purpose of requesting modification of the court's 24 January 1994 protective order.

[HN1] *Rule 24(b)(2)* allows intervention in an action "when an applicant's claim or defense and the main action have a question of law or fact in common . . . .. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Fed.R.Civ.P. 24(b)(2)*. The requirements for permissive intervention generally are: (1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law or fact between the movant's claim or defense and the main action. *See, e.g., Garza v. County of Los Angeles, 918 F.2d 763, 777 (9th Cir. 1990), cert. denied, 498 U.S. 1028, 112 L. Ed. 2d 673, 111 S. Ct. 681 (1991)*. Intervention, pursuant to [*3] *Rule 24(b)(2)*, is the proper means by which a nonparty should pursue modification of a protective order. *Beckman Indus. Inc. v. International Ins. Co., 966 F.2d 470, 472 (9th Cir.), cert. denied sub nom., International Ins. Co. v.*

  

Case 1:07-cv-01021-PLF     Document 39-6     Filed 06/18/2007     Page 4 of 5

1995 U.S. Dist. LEXIS 18253, *3                                    Page 3

*Bridgestone/Firestone, Inc., U.S. , 113 S. Ct. 197 (1992); United Nuclear Corp. v. Cranford Ins. Co., 905 F.2d 1424, 1427 (10th Cir. 1990), cert. denied sub nom., American Special Risk Ins. Co. v. Rohm & Haas Co., 498 U.S. 1073, 112 L. Ed. 2d 860, 111 S. Ct. 799 (1991); Public Citizen v. Liggett Group, Inc., 858 F.2d 775, 783-84 (1st Cir. 1988), cert. denied, 488 U.S. 1030, 102 L. Ed. 2d 970, 109 S. Ct. 838 (1989); Meyer Goldberg, Inc. v. Fisher Foods, 823 F.2d 159, 162 (6th Cir. 1987); Martindell v. International Tel. and Tel. Corp., 594 F.2d 291, 294 (2d Cir. 1979).* A district court's decision regarding whether an individual or entity is permitted to intervene in an action is reviewed only for abuse of discretion. *In Re Sierra Club, 945 F.2d 776, 779 (4th Cir. 1991) (citing Gould v. Alleco, Inc., 883 F.2d 281, 284 (4th Cir. 1989), cert. denied, 493 U.S. 1058, 107 L. Ed. 2d 953, 110 S. Ct. 870* [*4] *(1990)).* Of preeminent concern when application is made for permissive intervention is "whether the original parties will be prejudiced." *James City County, Va. v. United States E.P.A., 131 F.R.D. 472, 474-75 (E.D. Va. 1990) (citing Hill v. Western Elec. Co., Inc., 672 F.2d 381, 386 (4th Cir. 1982)).* No independent jurisdictional basis is required where a nonparty seeks permissive intervention for the limited purpose of challenging or seeking modification of a protective order. *Beckman Indus., 966 F.2d at 473; Jochims v. Isuzu Motors, Ltd., 148 F.R.D. 624, 627 (S.D. Iowa 1993), modified, 151 F.R.D. 338 (S.D. Iowa 1993).* Additionally, where "a collateral litigant seeks permissive intervention solely to gain access to discovery subject to a protective order, no particularly strong nexus of fact or law need exist between the two suits." *United Nuclear Corp., 905 F.2d at 1427; Beckman Indus., 966 F.2d at 474; Meyer Goldberg, 823 F.2d at 164; Jochims, 148 F.R.D. at 627.*

[HN2] A district court has the power to modify a protective order entered by the court. *Beckman Indus., 966 F.2d at 473; United Nuclear Corp., 905 F.2d at 1427; Liggett, 858 F.2d* [*5] *at 782-83.* The court retains such power even where the underlying suit has been dismissed. *United Nuclear Corp., 905 F.2d at 1427; see also Jochims, 148 F.R.D. at 627* ("post-judgment intervention is not a rare occurrence") (citations omitted). The decision to lift or modify a protective order is proper where changed circumstances eliminate "a continued need for protection." *Omega Homes, Inc. v. Citicorp Acceptance Co., 656 F. Supp. 393, 403 (W.D. Va. 1987)* (citations omitted).

The protective order at issue was entered by the court on 24 January 1994. The order provided that "information discovered in this case should not be released to other lawyers or witnesses unless those individuals are involved in this case." (Order, 1/24/94.) The EEOC desires access to the discovery produced in this action for use in the *Helton* litigation. The EEOC contends that if the protective order is lifted and the EEOC is allowed access to the discovery information, unnecessary duplication of effort will be prevented. Defendant answers that discovery in the *Helton* case is complete, that the information sought is not relevant to the *Helton* case, that the trial judge in *Helton* [*6] should determine the scope of any additional discovery, and that the EEOC has not shown appropriate cause to modify or set aside the protective order. Defendant urges the court to reject the EEOC's motion to intervene, or in the alternative, to defer ruling on the motion pending a decision by the Eleventh Circuit Court of Appeals which may impact the conduct of the *Helton* case. The EEOC disputes the effect the ruling of the Eleventh Circuit will have on the *Helton* litigation, and maintains that the information sought is relevant to that case.

Regardless of the effect of any ruling by the Eleventh Circuit, the court sees no reason to defer ruling on this matter. The court agrees that the EEOC should be allowed to intervene in this action, pursuant to *Rule 24(b),* for the limited purpose of pursuing modification of the protective order previously entered by the court. The court is of opinion that the Seventh Circuit Court of Appeals set out the appropriate standard to be applied when modification of a protective order is sought by a nonparty. In *Wilk v. American Medical Ass'n, 635 F.2d 1295, 1299 (7th Cir. 1980),* the court stated:

[HN3] Where an appropriate modification [*7] of a protective order can place private litigants in a position they would otherwise reach only after repetition of another's discovery, such modification can be denied only where it would tangibly prejudice substantial rights of the party opposing modification. Once such prejudice is demonstrated, however, the district court has broad discretion in judging whether that injury outweighs the benefits of any possible modification of

  
™ LexisNexis™     ™ LexisNexis™     ™ LexisNexis™

Case 1:07-cv-01021-PLF    Document 39-6    Filed 06/18/2007    Page 5 of 5

1995 U.S. Dist. LEXIS 18253, *7                    Page 4

the protective order.

(Citations omitted); *accord United Nuclear Corp., 905 F.2d at 1428; Grundberg v. Upjohn Co., 140 F.R.D. 459, 464 (D. Utah 1991).* Defendant has demonstrated no valid reason for the court to deny the EEOC's motion, and the EEOC has shown good cause to have the protective order lifted. Granting the motion will serve the interest of judicial economy and prevent duplicative effort. However, the court will require that counsel in the *Helton* litigation respect the terms of the court's previous protective order regarding information discovered in the instant case.

In sum, the EEOC's motion to intervene is hereby GRANTED. The court's 24 January 1994 protective order will be lifted for the sole purpose of allowing the EEOC

[*8] access to information discovered in this case for use in the *Helton* litigation. All questions regarding the admissibility of such information and the scope of discovery will, of course, be left to the discretion of the trial judge in *Helton.* The court's 24 January 1994 protective order will remain in effect to the extent that information discovered in this case will only be shared with those individuals involved in the *Helton* case.

This *22nd* of November 1995.

SO ORDERED.

W. EARL BRITT

UNITED STATES DISTRICT JUDGE

  

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> PLF ) <br> ) <br> ) <br> WHOLE FOODS MARKET, INC. ) <br> ) <br> and ) <br> ) <br> WILD OATS MARKETS, INC. ) <br> ) <br> Defendants. ) <br> ) <br> THE KROGER CO. ) <br> 1014 Vine Street ) <br> Cincinnati, OH 45202 ) <br> (513) 762-4000 ) <br> Proposed Intervenor ) <br> ) <br> ) | Civil Action No. 1:07-CV-01021- <br><br> Judge: The Hon. Paul L. Friedman |

## [PROPOSED] ORDER ON UNOPPOSED MOTION OF THE KROGER CO. TO INTERVENE FOR THE PURPOSE OF PROTECTING ITS CONFIDENTIAL BUSINESS INFORMATION

Upon consideration of the Unopposed Motion Of The Kroger Co. To Intervene For The Purpose Of Protecting Its Confidential Business Information ("Kroger's Motion to Intervene"), memorandum in support thereof, and related papers,

IT IS HEREBY ORDERED that Kroger's Motion to Intervene is GRANTED.

Entered this _____ of _____, 2007.

_____
The Hon. Paul L. Friedman