## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION

            Plaintiff,

     v.

WHOLE FOODS MARKET, INC.

and

WILD OATS MARKETS, INC.,

           Defendants.

Case No. 1:07-CV-01021 (PLF)

## THIRD PARTY TRADER JOE'S COMPANY'S OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER

Trader Joe's Company ("Trader Joe's") is a retail seller of groceries with stores located in many of the same communities in which Whole Foods Market, Inc.'s ("Whole Foods") does business. The Company is a third party intervenor to this action who provided materials and information to the Federal Trade Commission ("FTC") pursuant to compulsory process during the FTC's initial investigation of Whole Foods' proposed acquisition of Wild Oats Markets, Inc. ("Wild Oats"). Trader Joe's has been informed that the FTC has produced those materials to the Defendants in this action. Trader Joe's has also received a subpoena from the FTC requesting further information. Trader Joe's files this opposition pursuant to this Court's June 8, 2007 Interim Protective Order, Paragraph 22, which allows "Third Parties to apply for further protective orders or for modification of any provision of this Interim Protective Order by application to the Court for good cause shown." As a third party in this litigation with a

significant interest in who will have access to its highly confidential and competitively sensitive information, Trader Joe's hereby files this Opposition to Defendant's Motion for Final Protective Order.

Trader Joe's position is simple: Whole Foods' general counsel should not be allowed access to any documents designated "Restricted Confidential Discovery Material" as that term is defined in the Interim Protective Order. Interim Prot. Order, Terms and Conditions, ¶ 16 (June 8, 2007). Trader Joe's does not oppose access by Whole Foods' General Counsel to documents designated "Confidential" pursuant to that same Interim Protective Order. With its pending Motion, Whole Foods is now attempting to lump all "Restricted Confidential" and "Confidential" documents into one category and allow access by its General Counsel to the entirety of Trader Joe's document production. Such broad access is inappropriate. The materials produced by Trader Joe's to the FTC contain highly sensitive competitive information, the disclosure of which would cause substantial commercial harm to Trader Joe's. Further, access to this particular information is not relevant or necessary for the General Counsel to provide fully informed legal advice to Whole Foods. Accordingly, Trader Joe's urges the Court to deny Defendant's Motion and enter the Interim Protective Order, with minor modifications, as the Final Protective Order in this matter.

## I.      <u>STATEMENT OF THE FACTS</u>

On March 27, 2007, the FTC issued a Civil Investigative Demand to Trader Joe's. On March 30, 2007, it issued a subpoena *duces tecum* and a subpoena *ad testificandum* as well. On April 4, 2007 and April 13, 2007, Trader Joe's provided data and materials to the FTC in response to these requests. On April 16, 2007, Daniel Bane, CEO of Trader Joe's, was deposed by the FTC.

On or about June 5, 2007, the FTC filed a complaint challenging Whole Foods' acquisition of Wild Oats, seeking a temporary restraining order and preliminary injunction pending an administrative trial on the merits.  On or about June 8, 2007, the Court entered an Interim Protective Order in the matter.  The Interim Protective Order - stipulated by all parties, including Whole Foods - allows for two levels of confidentiality and restricts access of "Restricted Confidential Discovery Material" - those of the highest sensitivity - to outside counsel only.[1]

Three days after agreeing to the Interim Protective Order, Whole Foods filed a Motion for Final Protective Order which significantly limits the protection afforded by the Interim Protective Order:  it designates only one level of confidentiality and would allow General Counsel, Roberta Lang, unrestricted access to all documents produced by anyone in this litigation.  *See* Def.'s Mot. for Final Prot. Order at 3.

## II.    **ARGUMENT**

There is a well-established, "acknowledged concern with protecting confidential commercial information, notwithstanding generally recognized liberal discovery procedures favoring disclosure."  *A. Hirsch, Inc. v. United States*, 657 F. Supp. 1297, 1301 (Ct. Int'l Trade 1987); *see Hickman v. Taylor*, 329 U.S. 495, 515-16 (1947); *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682-83 (1958).  Rule 26(c) of the Federal Rules of Civil Procedure and associated case law recognize the inherent risk of improper use of confidential information

---

[1]    In-house counsel are allowed access to "Confidential" documents pursuant to Paragraph 9, although the Interim Protective Order is incomplete in that it does not name the Whole Foods representative it would be granting this access to: "Confidential Discovery Material shall not, directly or indirectly, be disclosed or otherwise provided to anyone other than those persons listed in paragraph 8 of this Protective Order and to the following representative of Whole Foods: _____ [sic]; . . . ."  Trader Joe's suggests that the Interim Protective Order be modified to specifically include Ms. Lang as Whole Foods' representative to provide clarity as to the extent of access to the "Confidential" documents.

produced during discovery.  This Court has broad powers to protect the parties from "undue

burden" in discovery by ordering "that a trade secret or other confidential research, development,

or commercial information not be revealed or be revealed only in a designated way."  Fed. R.

Civ. P. 26(c); *see also Pulsecard, Inc. v. Discover Card Servs., Inc.*, Civ. A. No. 94-2304-EEO,

1995 WL 526533, at *10 (D. Kan. Aug. 31, 1995) ("the court finds a restrictive protective order

preferable to risking the loss of confidentiality"); *Quotron Sys., Inc. v. Automatic Data

Processing, Inc.*, 141 F.R.D. 37, 40 (S.D.N.Y. 1992) ("Protective orders that limit access to

certain documents to counsel and experts only are commonly entered in litigation involving trade

secrets and other confidential research, development, or commercial information.")

  In fact, once an entity establishes "good cause" to protect confidential commercial

information – something Trader Joe's and a number of other third parties clearly can do here –

the burden shifts to the party seeking disclosure to demonstrate why disclosure of specific

information is relevant and necessary to the case.  *See Coca-Cola Bottling Co. of Shreveport,

Inc. v. Coca-Cola Co.*, 107 F.R.D. 288, 292 (D. Del. 1985) ("If [the requisite good cause]

showing is made, the burden shifts to the party seeking discovery to establish that the disclosure

of trade secrets is relevant and necessary to the action.") (internal quotation marks omitted);

*Plough Inc. v. Nat'l Academy of Sciences*, 530 A.2d 1152, 1155 (D.C. 1987); 8 Charles Alan

Wright & Arthur R. Miller, *Fed. Prac. & P.* § 2043 (2d ed. 2006).  If the party seeking disclosure

fails to show that the trade secret or other confidential information is necessary and relevant to

making its case, a court should deny disclosure.  Wright & Miller § 2043.

  The Interim Protective Order struck the right balance, allowing access to most

documents, but restricting (although not eliminating) access to a smaller category of "Restricted

Confidential" documents.  This provided protection to the non-parties to the FTC action against

Whole Foods. The "final" protective order proposed by Whole Foods, by contrast, would relieve Whole Foods of its burden to demonstrate, on specific facts, why its General Counsel needs access to particular highly confidential information. Whole Foods' attempt to now turn that protection on its head, and gain unrestricted access for its General Counsel, would fly in the face of the FTC action, which is to protect fair competition, not enable unfair competition.

A.     **The Potential Harm to Trader Joe's Far Outweighs the Potential Burden on Whole Foods and Access by the General Counsel to "Restricted Confidential Discovery Material" Should be Denied.**

In determining the appropriateness of a protective order, courts analyze the risk of disclosure of one party's trade secrets against the risk that such additional protection will impair the other party's ability to defend itself in litigation. *See Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992) (approving protective order that limited disclosure of trade secrets to outside counsel and experts). Under this standard, the Court should enter the modified Interim Protective Order.

The risk to Trader Joe's of Whole Foods' misuse of Trader Joe's commercially confidential information is substantial. Trader Joe's is a private, closely held corporation. Decl. of Bryan Palbaum ("Palbaum Decl.") ¶¶ 1, 4 (June 15, 2007) (attached as Ex. A). There is no publicly available information regarding how Trader Joe's business operates, or the results of those operations, including financials, marketing, sales or margins, and other areas of competitive interest, and Trader Joe's has the right to keep it that way. *Id. ¶* 4. If the Court accepts Whole Foods' proposed protective order, Whole Foods will gain access to records that could give them a competitive advantage - the very thing the FTC is seeking to prevent in its challenge to Whole Foods' attempted acquisition of Wild Oats. *See Akzo N.V. v. United States Int'l Trade Comm'n*, 808 F.2d 1471, 1483 (Fed. Cir. 1986) (where court grants access to data for

litigation purposes, "the risk of the competitor's obtaining an unfair business advantage may be substantially increased."). Access to this information - inadvertent or not - would provide Whole Foods with a distinct competitive advantage and would cause Trader Joe's irreparable commercial harm. Palbaum Decl. ¶ 4. Once disclosed and used, nothing could redress the irreparable harm that Trader Joe's would have incurred. *See id*.

**B.    Limiting Access by Whole Foods General Counsel to "Confidential" Material Will Not Impair Whole Foods Ability to Litigate this Matter.**

Once a party has established that the information sought is competitively sensitive and that its disclosure might be harmful, the burden then shifts to the party seeking discovery to establish that the disclosure of the information is relevant and necessary to the action. *Am. Standard, Inc. v. Pfizer, Inc.,* 828 F.2d 734, 741 (Fed. Cir. 1987); *see also Brown Bag Software,* 960 F.2d at 1470; *Heat & Control, Inc. v. Hester Indus., Inc.,* 785 F.2d 1025 (Fed. Cir. 1986)*; Centurion Indus. v. Warren Steurer & Assocs.,* 665 F.2d 323, 325 (10th Cir. 1981)*; Coca-Cola Bottling Co. of Shreveport,* 107 F.R.D. at 292. Whole Foods has not made such a showing.

Rather, Whole Foods relies solely on its General Counsel's unsupported declaration that it is not enough that Whole Foods' outside counsel have access to the highly confidential, commercially sensitive information, but that it is "essential" that she personally have access to all material in this litigation, regardless of the level of confidentiality:

> "It is essential that I be provided access to the information in order to use my knowledge of the company and the grocery industry to assist outside counsel in formulating a defense to this action. It is also essential for me to provide fully informed legal advice to the company, and to do so it is essential that I be given access to all confidential information." Decl. of Roberta L. Lang in Support of the Mot. of Def. Whole Foods Market, Inc. for Entry of a Final Prot. Order (June 11, 2007) ("Lang Decl.") ¶ 2 (attached as Ex. C to Def.'s Mot. for Final Prot. Order).

"Although our outside counsel know a great deal about Whole Foods, they do not have the in-depth knowledge that I do of the company and the industry, and my knowledge and assistance is essential to help counsel defend the case." *Id.* ¶ 9.

"In addition, it is essential that I be allowed to have access to all Discovery Material in order to be an active member of the trial team and in order to provide informed legal advice to [executive management] and the board of directors. . .  I cannot provide informed legal advice to the company unless I have access to all information - including confidential information - at issue in this matter. *Id.* ¶ 10.

It is simply not believable that prohibiting Whole Foods' in-house counsel from accessing Trader Joe's or other third parties' "Restricted Confidential Discovery Material" -- while allowing her access to the "Confidential" material -- will substantially impair Whole Foods' ability to litigate this case. *See Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc.*, 682 F. Supp. 20, 22 (D. Del. 1988) (claim that party's president was "uniquely qualified" to understand technical issues in litigation and thus should be allowed access to other party's confidential information was rejected where that party had not investigated the availability of outside experts).  Whole Foods has hired outside counsel who are experienced antitrust litigators. Ms. Lang's statement that unless she is able to review *all* discovery material in this matter, Whole Foods will be severely limited in its ability to defend itself fully in this action is simply untrue.  Seeing information about third party margins, sales figures and future store locations is not necessary for Ms. Lang to provide informed legal advice to Whole Foods' senior executives and board of directors.  Access to "Confidential" information should be more than sufficient for those purposes.

Ms. Lang further declares that "she cannot provide informed advice to the company unless I have access to all information - including confidential information - at issue in this matter."  Lang Decl. ¶ 10.  This assertion is likewise unsupportable.  Under the Interim Protective Order, Ms. Lang is not barred from seeing all confidential information, but only those

defined as "Restricted Confidential." As to those, Ms. Lang's outside counsel can inform her of any information necessary for her to give informed advice to Whole Foods without divulging "Restricted Confidential" information that could provide Whole Foods with a competitive advantage over Trader Joe's.

**C.      Whole Foods' Assertion Regarding Lang's Lack of "Competitive Decision Making" Duties Does Not Justify the Proposed Modification of the Stipulated Protective Order.**

*U.S. Steel Corp. v. United States*, 730 F.2d 1465 (Fed. Cir. 1984)*, is the leading authority on protective orders distinguishing between outside and in-house counsel. *Brown Bag Software,* 960 F.2d at 1470; *see also Matsushita Elec. Indus. Co. v. United States*, 929 F.2d 1577, 1579 (Fed. Cir. 1991) (applying *U.S. Steel* analysis); *Glaxo Inc. v. Genpharm Pharma., Inc.,* 796 F. Supp 872, 874 (E.D.N.C. 1992) (same). The *U.S. Steel* court concluded that a determination of whether any particular counsel should have access to confidential information requires an assessment of the specific circumstances and responsibilities of the counsel. 730 F.2d. at 1468*.

A crucial factor in the *U.S. Steel* case was whether in-house counsel was involved in "competitive decision-making" *Id.* at 1468 n.3. An in-house counsel participates in "competitive decision-making" if she has any role "in making company decisions that affect contracts, marketing, employment, pricing, product design, or 'any or all of the client's decisions . . . made in light of similar or corresponding information about a competitor.'" *See id.*; *Intervet, Inc. v. Merial Ltd., et al.*, 241 F.R.D. 55, 58 (D.D.C. 2007). In determining whether counsel participates in competitive decision-making, courts have considered, among other things:

>  (1) the extent of the counsel's contact with the company's senior management, *Intel Corp. v. VIA Tech, Inc*., 198 F.R.D. 525, 530 (N.D. Cal. 2000);

(2) whether the in-house counsel is a corporate officer, *Carpenter Tech. Corp. v. Armco, Inc*., 132 F.R.D. 24 (E.D. Pa. 1990);

(3) whether the in-house counsel is a specialist or generalist, *Brown Bag Software*, 960 F.2d at 1471 (counsel advised employer on a "gamut" of legal issues); and

(4) whether the in-house counsel participates in aspects of the business other than supervising legal matters, *Intervet,* 241 F.R.D. at 57.

The essence of these and other facts considered under these circumstances is to ascertain whether the particular counsel has the ability to influence strategic or competitive decisions, even if the counsel is not the ultimate decision-maker.

In short, while courts have not imposed a bright-line rule requiring automatic disqualification of in-house counsel from accessing other parties' confidential documents, an in-house attorney's duties *can* disqualify that person from access. *See, e.g.*, *U.S. Steel Corp,*, 730 F.2d at 1468 (although status as in-house counsel insufficient to deny access to confidential documents, inquiry regarding specific duties must be undertaken); *Brown Bag Software*, 960 F.2d at 1471 (after comprehensive evidentiary hearing, barring access to documents where in-house counsel tied to business decisions of firm, including "contracts, marketing, and employment" issues); *Intel Corp.*, 198 F.R.D. at 530 (denying access to in-house counsel based upon testimony about counsel's involvement in contract negotiation, licensing and patent enforcement, and direct reports to executives involved in competitive decision-making); *cf. Intervet,* 241 F.R.D. at 58 (permitting in-house counsel to access information where her responsibilities did not extend to marketing, vendors, or any strategic decision-making).

Here, Whole Foods' in-house General Counsel plainly participates in competitive decision-making under the test set forth above. Ms. Lang is Whole Foods Chief Legal Advisor (and indeed was the only legal advisor for a time), the only "generalist attorney" in the legal department, and member of the "Whole Foods Leadership Network" that "may discuss the

competitive landscape generally."  Lang Decl. ¶¶ 7, 11.  Further, Ms. Lang is deeply involved in

the management of Whole Foods:

- "I am the only 'generalist' in the legal department." Lang. Decl. ¶ 4.
- "I am called upon daily to provide legal advice to the Eteam, the board of directors, and our senior leadership."  *Id.*
- No other lawyer "shares my comprehensive knowledge of the company." *Id.* ¶ 5.

Those admissions establish that Ms. Lang is sufficiently involved in the competitive decision-

making process to justify precluding access to "Restricted Confidential Discovery Material."

*See Carpenter Technology Corp.,* 132 F.R.D. at 28 ("[u]pon the absence of a complete

explanation of the extent of [in-house counsel's] involvement in competitive decisions," court

denies access to confidential information).

Ms. Lang's declaration is consistent with other statements she has given, in which she

makes clear that she is involved in strategic decisions made by Whole Foods, including

manufacturer communications, regulatory responsibilities, and real estate contracts.  "Lang, a

self-described generalist, said there is no such thing as a typical day . . . She participates in

various projects with the firm's executive staff and national vice presidents.  She sits on internal

board committees as well . . . if necessary, she will work directly with a manufacturer. . . Lang

was recently involved in . . . a 'large lease' for a new Whole Foods market."  *See* Roger Adler,

*Keeping it Natural:  Roberta Lang, Whole Foods Market, Inc.*, 28 NAT'L L.J. 8 (2006).  She sits

on the Whole Foods "Leadership Team" and works closely with the "Executive Team."  Whole

Foods Market Leadership Team, *available at* http://www.wholefoodsmarket.com/

investor/corporategovernance/leadership.html; Whole Planet Foundation Board, *available at*

http://www.wholeplanetfoundation.org/foundation/board.html.

What was ***not*** mentioned in Ms. Lang's affidavit are the legal and non-legal senior management, officer and/or director positions that she holds in seventy-one (71) subsidiaries of Whole Foods. Decl. of Michael Franchak Opposing Defendant Whole Foods Market, Inc.'s Motion for Entry of a Final Protective Order (June 19, 2007) ¶ 3 (attached as Ex. 1 to Pl.'s Opp. to Def.'s Mot. for Final Prot. Order (June 20, 2007)). We can only reiterate what the FTC has already stated: "it simply strains all credulity to believe that she is not involved in *any* competitive decision-making in *any* of her legal and non-legal roles with defendant Whole Foods or *any* of the 70 subsidiaries on which she serves in a management role." Pl.'s Opp. to Def.'s Mot. for Prot. Order (June 20, 2007), at 6.

Ms. Lang does assert that she does not participate in "decisions about formulating or implementing strategies to compete." Lang Decl. ¶ 4. What Ms. Lang appears to be saying is that she is not the final decisionmaker on these issues. But that is not the test under *U.S. Steel* and related cases. Those cases recognize that participating in or influencing discussions on strategic or competitive decisions can disqualify counsel under these circumstances. For example, Ms. Lang is surely charged with reviewing contracts relating to the purchase or lease of property by Whole Foods. If Ms. Lang learns – through access to highly confidential information in this case – about the operating statements of other company's supermarkets, including real estate costs and data, Ms. Lang could use that information to Whole Foods' benefit in lease or real estate negotiations. It is simply unfair and unjustified to provide Whole Foods with this kind of a competitive advantage through this suit. *See Akzo N.V.*, 808 F.2d at 1483 ("Obviously, where confidential material is disclosed to an employee of a competitor, the risk of the competitor's obtaining an unfair business advantage may be substantially increased."); *F.T.C. v. Exxon Corp.*, 636 F.2d 1336, 1350 (D.C. Cir. 1980) ("in-house counsel stand in a

unique relationship to the corporation in which they are employed . . . . their continuing employment often intimately involves them in the management and operation of the corporation of which they are a part."); *D & L Supply Co. v. United States*, 693 F. Supp. 1179, 1182 (Ct. Int'l Trade 1988) ("The attorneys are not in-house counsel who might be susceptible to demands of their corporate employers to violate a protective order.").

> **D.**   **The Fact that Lang is Bound by the Rules of Professional Responsibility is Insufficient Alone to Warrant Granting Access to Highly Confidential Material.**

The rules of professional responsibility are insufficient because the inadvertent use or disclosure of confidential information remains a major concern. *Allegheny Ludlum Corp. v. Nippon Steel Corp.,* 1990 U.S. Dist. LEXIS 867, at *6-7 No. 89-5940 (E.D. Pa. Jan. 25, 1990); *see also A. Hirsh, Inc. v. United States,* 657 F. Supp. 1297, 1301 (Ct. Int'l Trade 1987). Indeed, as numerous courts have recognized, simply ordering a party to refrain from abusing its access to a party's highly confidential information cannot provide adequate protection. Even assuming the highest levels of good faith and care, "[i]t is humanly impossible to control the inadvertent disclosure of some of this information in any prolonged working relationship." *U.S. Steel Corp.,* 730 F.2d at 1467. Other courts have come to the same conclusion, even when the party seeking access was an attorney subject to both the court's contempt powers as well as professional discipline. *See Brown Bag Software*, 960 F.2d at 1471 (attorney involved in competitive decision making was properly denied access to competitor's highly confidential information: held he could not "lock-up trade secrets in his mind, safe from inadvertent disclosure to his employer"); *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 50 U.S.P.Q.2d 1783, 1785-86 (D. Nev. 1998) (patent counsel not allowed access to its client's competitor's confidential technical

information: "it is unrealistic to expect that his knowledge of Mikohn's secret technology would not or could not influence the nature of his advice to Acres").

By her own admission, Ms. Lang is called upon daily to provide legal advice to the executive level managers, the board of directors, and senior leadership regarding this transaction. Lang Decl. ¶ 10.  Daily updates on the status of this litigation, combined with Ms. Lang's assertion that she plans to review every single piece of evidence produced in this matter, indicate that the risk that she will inadvertently divulge confidential information that she should not is very high.  Trader Joe's, a non-party to this litigation, would be the party injured by such disclosure - whether it is inadvertent or not.  Trader Joe's should not be forced to bear such a risk.

## III.    WHOLE FOODS' PUBLICITY CAMPAIGN HEIGHTENS THE NEED FOR PROTECTION OF CONFIDENTIAL INFORMATION.

Of further concern is Whole Foods' apparent strategy of trying this case in the media. Mr. Mackey, CEO of Whole Foods, has created a page on the Whole Foods website to provide updates on the FTC's challenge of the acquisition.  *See* http://www.wholefoods.com/ftchearingupdates/index.html (attached as Ex. B).  Mr. Mackey posted on his weblog ("blog") a "memo that we sent to our Board of Directors, prior to our first Board Meeting to discuss the deal." http://www.wholefoods.com/blogs/jm/archives/2007/06/whole_foods_mar.html (attached as Ex. C).  In that blog, Whole Foods also indicates an interest in the kinds of information that Trader Joe's is trying to protect from disclosure:

> Trader Joe's competes very vigorously with us on price and ***their sales per sq. ft. appear to be possibly greater than Whole Foods are***.  Whole Foods considers Trader Joe's the national company that we have the most difficulty competing against and it is Trader Joe's, not Wild Oats, against whom we price most aggressively.  *Id.* (emphasis added).

This context provides yet another reason to deny this motion.

## IV.     <u>CONCLUSION</u>

For the reasons stated above, this Court should deny Defendant's Motion for Final Protective Order and adopt the Interim Protective Order, with minor edits, as the Final Protective Order in this matter.  The minor edits recommended are the insertion of Ms. Lang's name into the blank on page 9 of the Interim Protective Order, and deletion of Paragraph 23 regarding stipulation and the status of the Order as interim.  A revised Proposed Final Protective Order is attached.


Dated:  June 22, 2007                          ____/s/ Richard G. Parker_____
                                                             Richard G. Parker (D.C. Bar No. 327544)
                                                             Karin F.R. Moore (D.C. Bar No. 480275)
                                                             O'MELVENY & MYERS LLP
                                                             1625 Eye Street, N.W.
                                                             Washington, D.C.  20006-4001
                                                             Telephone:  (202) 383-5300
                                                             Facsimile:   (202) 383-5414

                                                             *Attorneys for Third Party Trader Joe's Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of June 2007, I electronically filed the foregoing **THIRD PARTY TRADER JOE'S COMPANY'S OPPOSITION TO DEFENDANT'S MOTION FOR FINAL PROTECTIVE ORDER** with the Court using ECF, which will send notification of such filing to counsel of record in this matter who are registered on the CM/ECF.  I have also sent separate copies of the foregoing directly to the individuals below by first class mail:

Matthew P. Hendrickson
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036

Christopher James MacAvoy
HOWREY, LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004

Thomas Pak
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036

Terrence J Wallock
LAW OFFICE OF TERRENCE J. WALLOCK
2224 Pacific Drive
Corona Del Mar, CA 92625

__/s/ Karin F.R Moore___
Karin F. R. Moore

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>       Plaintiff,<br><br>     v.<br><br>WHOLE FOODS MARKET, INC.<br><br>and<br><br>WILD OATS MARKETS, INC.,<br><br>       Defendants. | Case No. 1:07-CV-01021 (PLF) |

## THIRD PARTY TRADER JOE'S COMPANY'S OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER

## "EXHIBIT A"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION

        Plaintiff,

      v.

WHOLE FOODS MARKET, INC.

and

WILD OATS MARKETS, INC.,

        Defendants.

Case No. 1:07-CV-01021 (PLF)

## DECLARATION OF BRYAN PALBAUM

I, Bryan Palbaum, hereby declare and state as follows:

1.    I am Senior Vice President - Finance and Administration and Chief Financial Officer of Trader Joe's Company ("Trader Joe's"). The Company is a privately owned and operated chain of 279 specialty grocery stores headquartered in California.

2.    Trader Joe's is an innovative company with a distinctive format. Trader Joe's considers itself a chain of neighborhood grocery stores that sells a limited number of high quality products at good values.

3.    Notwithstanding Trader Joe's unique and distinctive format, the Company competes with any other retailer that sells similar grocery products. For example, Trader Joe's sells, among other things, meat, dairy and produce items - thus the Company competes with all other retailers that sell similar products - namely grocery stores, including Whole Foods and Wild Oats.

4.    As a closely held private company, Trader Joe's does not publicly disclose any information, other than what is on its website. The Company considers any information about how its business operates, or the results of those operations, as highly confidential, the disclosure of which would cause substantial commercial harm. For example, the process of obtaining new store locations is extremely competitive. Disclosure of any information related to our potential future store locations to any other retail company would cause substantial commercial harm to Trader Joe's ability to fairly compete for new store locations in the real estate marketplace.

5.    The confidential and competitively sensitive information at issue here is not known outside Trader Joe's business.  Trader Joe's has taken great measure to ensure that all officers, employees and agents of Trader Joe's guard the confidentiality of such information.    Trader Joe's requires everyone with access to such information to execute an affidavit that requires them to maintain the confidentiality of, and not divulge, any learned corporate information.

6.    Trader Joe's is not a party to this litigation and is not a publicly held company.  As a private company, Trader Joe's wishes to fully exercise its rights to protect its highly confidential and competitively sensitive information.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on this 15th day of June, 2007.

_____
Bryan Palbaum


Subscribed and sworn to me this 15th day of ___June_____, 2007.

★ see attached ★

_____
Clerk or Notary Public
My commission expires: Jan 10, 2011

# JURAT

State of California

County of _Los Angeles_

Subscribed and sworn to (or affirmed) before me on

this_15th ******_ day of _June ********************************_ ,20 07_____,

by _Bryan Palbaum_

personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.



GLORIA WONG CHAU
COMM. # 1714738
NOTARY PUBLIC·CALIFORNIA
LOS ANGELES COUNTY
MY COMM. EXP. JAN. 10, 2011

(seal)                    Signature_____

Re: Declaration of Bryan Palbaum
    In the US District Court for the
    District of Columbia
                Case No. 1:07-CV-01021 (PLF)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>                Plaintiff,<br><br>       v.<br><br>WHOLE FOODS MARKET, INC.<br><br>and<br><br>WILD OATS MARKETS, INC.,<br><br>                Defendants. | Case No. 1:07-CV-01021 (PLF) |

**THIRD PARTY TRADER JOE'S COMPANY'S OPPOSITION TO DEFENDANT'S
MOTION FOR PROTECTIVE ORDER**

**"EXHIBIT B"**

| Title: | Whole Foods Market : FTC Hearing Updates | Date: | Fri Jun 22 2007 |
|--------|-------------------------------------------|-------|------------------|
| URL: | http://www.wholefoodsmarket.com/ftchearingupdates/index.html | | |

# FTC Hearing Updates

Our approach at Whole Foods Market is to be as open and transparent as reasonably possible. This new section on our website, which includes a link to my blog, is an outlet for the Company to proactively share information regarding the Federal Trade Commission's (FTC) attempt to block our proposed merger with Wild Oats. We hope it will help our stakeholders understand Whole Foods Market's position as we move though the legal process of challenging the FTC's claims. The first posting below is a document that was presented to FTC commissioners prior to their decision to seek a preliminary injunction to block the merger. It outlines the Company's position that the Whole Foods Market–Wild Oats Markets transaction poses no threat to competition.

Best Regards,

*John Mackey*

John P. Mackey, Chairman and CEO

Information Currently Available:

- Whole Foods Market, Wild Oats, and The Federal Trade Commission, June 19th, 2007
- The Proposed Acquisition of Wild Oats by Whole Foods Market Will Not Substantially Lessen Competition in Any Relevant Market, May 30th 2007

Additional Terms of Use

## What Can I Do?

Many stakeholders have contacted us asking how they can voice their opinions to the FTC in support of the proposed merger. If you feel compelled, you may email them directly at antitrust@ftc.gov. Please remember, though, that the FTC has already made their decision and filed a lawsuit to block the merger, so the case will now be decided in court.

## Media Articles and Editorials

Learn what others are saying about the FTC's concerns.

*FTC's Whole Foods complaint: still bulls**t*
Geoffrey Manne, Truth on the Market

*Granola and Antitrust*
Editorial, The Wall Street Journal

*Bush's War on Whole Foods*
Daniel Gross, Slate

*Is Whole Foods Building an Evil Empire?*
Alyce Lomax, Motley Fool

*Whole Foods Isn't a Supermarket?*
Samuel Fromartz, Chews Wise

*Unnatural move by the FTC*
Editorial Board, The Denver Post

*Nothing busted but our chops*
Aimee Witteman, Gristmill

*Whole Foods + Wild Oats = Monopoly?*
Jonathan Weber, New West

*Premium Natural and Organic Bulls**t*
Geoffrey Manne, Truth on the Market

Copyright 2000–2003. Whole Foods Market IP, L.P.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION

               Plaintiff,

       v.

WHOLE FOODS MARKET, INC.

and

WILD OATS MARKETS, INC.,

              Defendants.

Case No. 1:07-CV-01021 (PLF)

**THIRD PARTY TRADER JOE'S COMPANY'S OPPOSITION TO DEFENDANT'S
MOTION FOR PROTECTIVE ORDER**

**"EXHIBIT C"**

| Title: | Whole Foods Market : Company : John Mackey's Blog : Whole Foods Market, Wild Oats, and The Federal Trade Commission | Date: | Fri Jun 22 2007 |
|---|---|---|---|
| URL: | http://www.wholefoodsmarket.com/blogs/jm/archives/2007/06/whole_foods_mar.html | | |

# Whole Foods Market, Wild Oats, and The Federal Trade Commission

by John Mackey

### Executive Summary

The Federal Trade Commission (FTC) recently filed a complaint challenging the merger of Whole Foods Market and Wild Oats. Whole Foods Market intends to fight this complaint in court. My blog posting provides a detailed look into Whole Foods Market's decision-making process regarding the merger, as well as our company's experience interacting with the FTC staff assigned to this merger. I provide explanations of how I think the FTC, to date, has neglected to do its homework appropriately, especially given the statements made regarding prices, quality, and service levels in its complaint. I also provide a glimpse into the bullying tactics used against Whole Foods Market by this taxpayer-funded agency. Finally, I provide answers in my FAQ section to many of the questions that various Team Members have fielded from both the media and company stakeholders.

As stated in our initial press release about Whole Foods Market's challenge to the FTC's complaint, we set an intention as a company to be as transparent as possible throughout this process. This is my first detailed effort at transparency. We will provide additional information as we field new questions and receive updates on the proceedings from the FTC and the courts.

### Table of Contents

**Whole Foods Market, Wild Oats, and The Federal Trade Commission**

Executive Summary

Why Does Whole Foods Market Want to Buy Wild Oats?

Whole Foods Market's Objections to the FTC's Investigation

What is the FTC Claiming in its Objections to the Merger?

Frequently Asked Questions

   Why does the FTC believe this merger is anti-competitive?

   What about the competition in the supermarket industry as a whole is the FTC failing to recognize here?

   What about this quote from you that the FTC released in its complaint?

   Will customers be harmed by this merger?

   Will Wild Oats employees benefit from this merger?

   How are Whole Foods Market's product suppliers reacting to the possible merger?

   Will vendors be disadvantaged in negotiating with Whole Foods as a result of this

merger?

What is Whole Foods Market's strategy for fighting the FTC's attempt to block the merger?

How long are you willing to fight this fight?

In the Company's history, has Whole Foods Market had more success with acquisitions than with organic growth?

Why has the media compared this deal with the failed Staples-Office Depot merger from a decade ago? Is this similar?

What is Whole Foods Market's continued growth plan if this merger doesn't go through?

How important is this merger to Whole Foods Market?

What is Whole Foods Market seeking out of this merger?

If Wild Oats is not your primary competitor, which companies are?


Greetings Everyone,

We recently posted on our website a presentation that we produced for the Federal Trade Commissioners concerning our proposed acquisition of Wild Oats. It is our intention to be as transparent as possible to the outside world and to provide as much relevant information as possible to our customers, team members, shareholders, suppliers, media, and the government concerning this proposed deal. What I want to do with this blog entry is to share my personal perspective about why Whole Foods' purchase of Wild Oats is a good thing and exactly how and why the FTC is wrong in bringing suit to stop it. I will follow up this blog entry with additional blog entries as necessary to answer the FAQ's that pop up over the next several weeks.

**Why Does Whole Foods Market Want to Buy Wild Oats?**

What follows below is a memo that we sent to our Board of Directors, prior to our first Board Meeting to discuss the deal. It was written of course in confidentiality, but we believe that the FTC is using this memo (one of the 20+ million documents they required from us-more than the Exxon/Mobil merger I'm told) as one of their documents to prove their case against the deal. This document very accurately states all the major reasons we want to buy Wild Oats.


*Hi all,*

*This email is to outline the agenda for tomorrow's call and to give some preliminary information. Please note that significant contingencies still exist with respect to our ability to complete this transaction — including but not limited to negotiation of a purchase price and definitive agreement, completion of all due diligence, and of course board approval. Also, please note that this is highly confidential — we ask that you do not discuss the potential transaction with even one other person outside the group on this email.*

*First of all, we remain very excited about the potential acquisition. We believe the timing is right and there are many advantages, some of which are as follows:*

*Reasons to do this deal:*

1. *Elimination of an acquisition opportunity for a conventional supermarket — our targeted company is the only existing company that has the brand and number of stores to be a meaningful springboard for another player to get into this space. Eliminating them means eliminating this threat forever, or almost forever.*
2. *Elimination of a competitor — they compete with us for sites, customers and Team Members.*

   *Note: these two points add tremendous value that does not show up in any of the pro formas.*

3. *Synergistic geography — their stores are spread around the whole country with each region gaining from 1 to 10 stores — three regions especially (Rocky Mountain, Florida and Pacific Northwest) gain critical mass and can now afford a full slate of coordinators and other regional support. Additionally, we get entries into 10 to 15 new markets where we have no stores currently.*
4. *Immediate financial accretion — we get an immediate boost in sales growth and comps. EPS accretion will occur as we cut their g&a costs and install EVA incentives.*
5. *Continuing boost to comps — as we close some of their stores and transfer volume to our existing stores, as we relocate their stores to new and better locations and as we improve their stores with investments in people and capital, this will provide an added boost to our comps.*
6. *Low risk — stock price is likely to rise enough to pay for the cost of the deal; even if financial gain is less than expected, number one and two are worth a significant amount of money to us; we are not putting the company or our growth at risk — existing cash flow can support growth and debt service.*
7. *Gain of TM talent — we can leverage their talent to help us support our new store growth ahead.*
8. *Opportunity to learn — we have learned something from almost every acquisition we have done in our history and it is likely that we will be able to learn from them as well.*

Let me now go into greater detail about each of the eight reasons listed above:

*1. Elimination of an acquisition opportunity for a conventional supermarket — our targeted company is the only existing company that has the brand and number of stores to be a meaningful springboard for another player to get into this space. Eliminating them means eliminating this threat forever, or almost forever.*

Whole Foods Market has been the leading supermarket company dedicated to the sale of natural and organic foods for over 20 years now. That leadership designation has been very important to us because it has resulted in tremendous media coverage around our store openings and special events, as well as giving us an excellent team member recruiting tool, and probably a much higher stock market valuation. If Kroger, Safeway, SuperValu, or Wal-Mart (all much, much larger companies than Whole Foods) were to acquire Wild Oats and commit their enormous capital resources to growing the company and improving its execution, then this could threaten Whole Foods' #1 leadership position, with consequently a large negative impact on our media coverage, team member recruitment, and our stock market valuation. By buying Wild Oats, we would greatly lessen or even eliminate this risk. If one of these other supermarket companies wanted to challenge our #1 position without using Wild Oats as a growth platform, then they would have to do it from scratch.

*2. Elimination of a competitor — they compete with us for sites, customers and Team Members.*

Reason #2 seems to be one that particularly bothers the FTC—eliminating a competitor. I'm not sure why this is so troubling to the FTC because every merger between companies that compete with each other necessarily means eliminating a competitor. If eliminating a competitor is inherently "bad" or "wrong" then the FTC should probably never allow any mergers to ever occur, because most mergers necessarily mean the elimination of a competitor from the marketplace. Whole Foods has a 27 year long history of buying companies and eliminating them as competitors. Indeed, Whole Foods was created back in 1980 when two small competitive natural foods companies merged together-Safer Way Natural Foods and Clarksville Natural Grocery in Austin, Texas. Since then we have bought 18 different retail companies including such companies as Bread & Circus, Mrs. Gooch's, Fresh Fields, and Harry's Farmers Markets. In each case we eliminated a competitor, but we also greatly improved the stores that we acquired from these companies (the proof of this is the very significant increase of sales that occurred in virtually every store that we have ever acquired).

It is very important to understand that eliminating any one particular competitor such as Wild Oats doesn't mean eliminating all of our competitors—quite the contrary. Whole Foods has more competition today than we have ever had in our entire history! Numerous competitors to Whole Foods exist in every market we do business in, whether Wild Oats is in that market or not.

For the FTC to prove its case against this merger they would need to do at least two things:

> A. Prove that quality or service would probably decrease at Whole Foods or Wild Oats as a result of this deal.

> B. Prove that prices at Whole Foods or Wild Oats would increase as a result of this deal.

However, the FTC will never be able to prove either of these allegations because the exact opposite will happen (just as it has always happened before with all of our previous 18 retail acquisitions). Whole Foods quality, service, and prices are totally unrelated to whether Wild Oats competes with us in any particular market or not. For example, there are no Wild Oats in Washington D.C. Are our service and quality lower or our prices in D.C. stores higher because Wild Oats isn't there? Of course not! Why not? Because Whole Foods has vigorous competition from a number of alternatives-Trader Joe's, Wegman's, Safeway, Giant, Balducci's, farmers' markets, and food co-ops.

Trader Joe's competes very vigorously with us on price and their sales per sq. ft. appear to be possibly greater than Whole Foods are. Whole Foods considers Trader Joe's the national company that we have the most difficulty competing against and it is Trader Joe's, not Wild Oats, against whom we price most aggressively.

Wegman's operates huge stores with excellent quality of perishables and low prices and it is difficult for us to effectively compete against them. Wegman's has frequently been rated as the top supermarket company in the United States by both consumer and trade publications. They have also routinely ranked above Whole Foods as a great place to work by Fortune Magazine. They are a very formidable competitor to us—far more formidable than Wild Oats.

Safeway has been upgrading and remodeling many of their stores into upscale Lifestyle Stores and has developed an excellent organic private label line called "O" (which was developed by former team members of Whole Foods, who were also responsible for developing our own 365 Organic private label). These improvements at Safeway have made them much more difficult to compete against. A great example of this is in Boulder, Colorado where Safeway remodeled one of their stores into a Lifestyle store. This store negatively impacted Whole Foods more than all of the Wild Oats stores in Boulder combined. Safeway recently announced that they did $162 million in sales in their organic private label line over the past 12 months. These sales are very strong and comparable to Whole Foods own organic private label sales.

Balducci competes aggressively with Whole Foods in the gourmet and specialty food market. Farmers' Markets are the fastest growing food retailing phenomenon in the United States right now, offering a huge selection of fresh, local, and organic produce and other foods with the opportunity for personal connection with the farmers producing the food. Food co-ops remain a very vigorous competitor with Whole Foods, offering an excellent selection of natural and organic foods, good prices, and an additional ideological payoff for customers who don't want to shop at a for-profit business (consumer co-ops being owned by their customers).

All of the vigorous competition with Whole Foods discussed above is going on in a market where Wild Oats has ZERO stores (although interestingly in the FTC's official complaint document against the merger they incorrectly stated that Wild Oats does business there). The absence of Wild Oats in the D.C. marketplace hasn't lowered our quality or our service nor has it raised our prices. The burden of proof lies squarely on the FTC to prove that it has and I am certain that this impossible to do because it simply isn't true-not in Washington D.C. or anywhere else.

If Whole Foods acquires Wild Oats will quality or service decline at the Wild Oats stores or will prices be raised? The answer is no. The exact opposite is true. Whole Foods will invest considerable capital into Wild Oats stores to upgrade and improve them. We will intensify the training of their leadership and employees toward higher quality and better service-just as we have done in all of our previous retail acquisitions. We will also lower Wild Oats prices. Our pricing surveys indicate that in markets where Whole Foods directly competes with Wild Oats that on average Whole Foods prices are significantly lower than Wild Oats average prices. Once the deal is completed and Wild Oats is integrated into Whole Foods then Wild Oats overall prices will be lowered to be consistent with Whole Foods prices. The truth is that Whole Foods as a company is 500% larger than Wild Oats is. We are able to buy our products cheaper than Wild Oats can buy them because of our greater scale, and we are able to pass these savings on to our customers in the form of lower prices. Why would we do this? Why wouldn't we raise prices and lower quality and service if Wild Oats wasn't competing against us? Because improving quality and service and lowering prices is absolutely necessary to be successful in the highly competitive food retailing world that currently exists today. There are ZERO markets in the United States that Whole Foods competes in that do not have vigorous competition from many, many alternatives, whether Wild Oats is one of those competitors or not.

> 3. Synergistic geography — their stores are spread around the whole country with each region gaining from 1 to 10 stores — three regions especially (Rocky Mountain, Florida and Pacific Northwest) gain critical mass and can now afford a full slate of coordinators and other regional support. Additionally, we get entries into 10 to 15 new markets where we have no stores currently.

One of the most important reasons that Whole Foods wants to buy Wild Oats is to acquire stores in several new markets where we don't yet have any stores and to provide greater critical scale in several geographical regions where we are smaller and lacking sufficient scale. There are several markets that Wild Oats currently has stores where Whole Foods Market doesn't. Some examples are: Memphis, Little Rock, Eugene, Bend, Tulsa, Westport, Indianapolis, Salt Lake City, Tampa, Naples, and Cincinnati. Buying Wild Oats gives Whole Foods immediate entry into about 15 new markets and allows us to begin building long-term relationships with tens of thousands of customers sooner rather than later. This is greatly valuable to Whole Foods because it is much more expensive to enter a new market than it is to expand in a market that we already compete in.

Wild Oats stores (not including Henry's which is a different store format) are primarily concentrated into three geographical regions-Rocky Mountain (Colorado, Utah, New Mexico), Pacific Northwest (Oregon, Washington, and British Columbia), and Florida (Miami, Ft. Lauderdale, Tampa, and Naples). These three geographical regions also happen to be Whole Foods Market's three smallest regions in terms of number of stores. In fact, we only created Rocky Mountain and the Pacific Northwest Regions about three years ago. Because these three regions are relatively young and small they also are currently unable to afford having the full support structure that is standard for our other eight geographical regions. These three regions lack Regional Vice Presidents and Coordinators which provide important and valuable operational support to the

stores. The acquisition of Wild Oats would create sufficient scale to upgrade and increase regional operational support in all three regions. It will therefore accelerate Whole Foods operational excellence in these smaller regions. This will prove very beneficial to our customers in these markets as increased investment in operational support will upgrade both quality and service.

> *4. Immediate financial accretion — we get an immediate boost in sales growth and comps. EPS accretion will occur as we cut their g&a costs and install EVA incentives.*

Immediate financial accretion means that this deal will help Whole Foods financially almost immediately after it is completed and we determine which stores to close down and which to sell off. The first thing Whole Foods intends to do is to sell off the farmers' market stores under the Henry's and Sun Harvest brand names. These farmers markets primarily sell cheaper, and frequently lower quality produce, as well as a number of products that don't meet Whole Foods quality standards. They don't fit into Whole Foods store strategy going forward. Because of this Whole Foods negotiated and signed a deal with a large Private Equity firm to sell these stores to after our deal with Wild Oats closes. Henry's and Sun Harvest stores are equal to approximately 30% of Wild Oats total company sales.

The remaining Wild Oats and Capers stores will be merged into Whole Foods Market after the acquisition has been completed. Some of the Wild Oats stores will be closed down post-merger. Which ones? We aren't completely sure yet, because for sensitive competitive reasons Whole Foods has not been allowed by Wild Oats to look at or study individual store financial statements. Until we are able to study the financial performance of each and every Wild Oats we won't know for sure which stores we will close. However, it is almost certain than in some markets where stores are located right across the street or less than a mile away that we will choose to close some of these stores down. Closing these redundant stores down will result in some of the business being transferred to the existing Whole Foods store which will increase sales, comps, and profits for the remaining store.

In our discussions with the FTC they indicated that in some instances they might like us to sell off some of these stores we intend to close to another food retailer so that competition and choice to consumers won't be reduced. That sounds reasonable at first glance, and perhaps it would be if the stores we are likely to close are roughly equal in size and quality to the Whole Foods stores that they compete against. However, the flaw in the FTC reasoning is their assumption that another food retailer would be interested in acquiring a much smaller store that is no longer competitive in the marketplace. That is highly unlikely in our experience.

Let us take a market in the northeastern US (which I'll call Northeast), where earlier this year Whole Foods opened a 56,000 square foot store right across the street from a 25,000 square foot Wild Oats store. Our new store has averaged over $700,000 per week since it opened. While we don't know exactly what Wild Oats store sales volume is, we believe that they were doing about $375,000 per week before our store opened. We also believe our store took approximately $125,000 per week from them, reducing their Northeast store to about $250,000 per week (which also means that $475,000+ of our store's sales volume came from our other competitors in this market besides Wild Oats and $95,000 came from a small store we bought near the store that we relocated). If Whole Foods acquires Wild Oats we will almost certainly choose to close down their store since it is right across the street from our store. If we do this we believe approximately 50% of the volume their store does will transfer to our store, with the other 50% migrating to our other competitors (these estimates are based on our past experience with similar situations). If the FTC argues that we should sell this store to another food retailer, it is fair to ask: "sell it to whom?" Who would want to buy this small store that is greatly outclassed by our store directly across the street? The answer is obvious: the store is simply too small and competitively disadvantaged to be of value to another food retailer. This store needs to be closed, because selling to another food retailer simply isn't a realistic alternative.

If our assumptions about Wild Oats' Northeast store are correct ($250,000 in sales and 50% of the sales volume transferring to our store if it is closed) let's take a look at what closing this store does for our store:

1. $125,000 per week sales increase for our store increases our sales approximately 18%. This will increase this store's same-store-sales (also referred to as comps) significantly when it begins its second year of sales and enters the comp base. Multiply this likely scenario by a probable factor of 10+ for other similar store closings around the United States and it can be seen that the Wild Oats acquisition would have an almost immediate positive impact on Whole Foods sales growth and comps, just as #4 above predicts.

2. It would also have a very positive effect on our store profitability. How? As a general guideline every dollar increase in sales at a store produces just about a $.10 increase in after-tax profit at that store. So a $125,000 per week increase in sales at our Northeast store results in a $6.5 million annual increase in sales. At a 10% marginal profit rate on that increase in sales, we see that closing the Wild Oats store would result in an estimated increase in after-tax profits at our store of approximately $650,000 per year.

What about the other claims we make in #4 above, regarding EPS accretion by cutting G&A expenses and creating EVA incentives? Cutting G&A expenses is very easy to understand: Wild Oats G&A (General and Administrative overhead) percentage is approximately 4.5% of sales. This means that if Wild Oats annual sales are $1.2 billion that their G&A is 4.5% of that or $54 million. However, most of Wild Oats G&A isn't needed by Whole Foods and we can eliminate most of it (for example we don't need to pay Wild Oats interim CEO $100,000 per month any longer because I'm already doing that job at a fairly modest salary of $1 per year). Since Whole Foods is intending to sell off the Henry's and Sun Harvest stores, and is also planning on closing down some undetermined number of stores post-merger let us estimate that approximately $700 million of Wild Oats current sales will remain after the sale of the farmers market stores and the redundant store closures. Whole Foods own G&A percentage is approximately 3.1% of sales. We believe that we will get significant financial leverage on Wild Oats additional $700 million sales and that the additional G&A cost on that $700 million is approximately 50% of our 3.1% G&A cost, or 1.55% , which is equal to $10.85 million. This compares to 4.5% of $700 million or $31.5 million. Whole Foods will therefore be able to save approximately $20.65 million in G&A expense before tax. This savings will flow directly to Whole Foods bottom-line.

The installation of EVA incentives is more difficult to explain and not particularly relevant for my purposes here. Let me just say that all the leadership at Whole Foods from Store Team Leader on up have bonus incentives based on our ability to increase EVA. EVA stands for Economic Value Added and it equates to Net Operating Profits After Tax minus the Cost of Capital. EVA bonus incentives give leadership a strong motivation to use capital wisely and to produce higher returns on capital invested. We believe our EVA program is a strong competitive advantage and we believe that installing it in all the surviving Wild Oats stores will increase their sales, profits, and return on invested capital. Maximizing long-term EVA is very important for the long-term success of our company.

> 5. Continuing boost to comps — as we close some of their stores and transfer volume to our existing stores, as we relocate their stores to new and better locations and as we improve their stores with investments in people and capital, this will provide an added boost to our comps.
> I talked briefly about comps in the Northeast store example above. Closing nearby competitive stores will provide and immediate boost to comps. However, buying Wild Oats will also provide a longer term boost to Whole Foods comps. How? Over the longer term we will relocate most of the remaining smaller Wild Oats stores to larger locations, which will very significantly increase their sales. These relocations are counted in Whole Foods comp store sales calculations, but not in our identical store sales calculations. Whole Foods reports both numbers each Quarter.

Whole Foods will also receive another long-term boost to our comps through buying Wild Oats because we will also be able to significantly increase the sales of all the remaining stores. How?-- through investments of additional financial and intellectual capital to remodel and improve the stores. Whole Foods sales per square foot are more than 100% greater than Wild Oats are ($925

compared to $450). As we upgrade and improve Wild Oats stores we expect to see steady and continuous increases in sales until Wild Oats sales per square foot eventually equal the company average. This will probably take 5 years of continuous improvement in their stores before they are the equal of Whole Foods own stores, so we expect to see steady comp gains for at least the first 5 years after the merger is completed, and possibly for many additional years as well.

Is the above scenario realistic? We believe it is, and it is one of the most important reasons why Whole Foods decided to buy Wild Oats. Consider this one interesting statistical fact: Wild Oats highest sales volume store would not rank in the top 150 stores at Whole Foods! Think about that for a moment and then realize what Whole Foods will be able to do to improve the Wild Oats stores that we retain. We believe we will be able to eventually double the sales of the Wild Oats stores that we acquire within 5 years. This is exactly what we have done with most of the stores we have acquired from other companies in the past, such as Fresh Fields, and we see no reason to believe that it will be any different with Wild Oats.

As Whole Foods financial and intellectual capital flows into Wild Oats, possibly doubling their sales within a 5 year period, this will create tremendous value for all of the various stakeholders. Wild Oats customers will gain in numerous ways-lower prices, improved quality, and greater selection (these are the reasons why sales will so radically increase under Whole Foods management). Wild Oats employees (team members at Whole Foods) will see improved wages and benefits and superior training and working conditions through this merger (Whole Foods has been named by Fortune Magazine as one of the Hundred Best Companies to Work For the last 10 consecutive years). Whole Foods investors will gain through increased sales, comps, profits, and earnings per share (and probably the stock price too). Whole Foods suppliers will benefit through the increased sales the larger company will provide to them.

> *6. Low risk — stock price is likely to rise enough to pay for the cost of the deal; even if financial gain is less than expected, number one and two are worth a significant amount of money to us; we are not putting the company or our growth at risk — existing cash flow can support growth and debt service.*

Whole Foods doesn't see this acquisition as particularly very risky. We've done 18 retail acquisitions very successfully in the past and we believe that Wild Oats will be very similar. After selling off the Henry's and Sun Harvest stores, and closing down a few redundant stores, we will add about $700 million in new sales. This sounds like a large number, but consider that it is only about 11% of Whole Foods current sales and equal to only about 9 months of our current sales growth without the acquisition (consider also that Fresh Fields sales back in 1996 were equal to about 50% of Whole Foods sales at that time). It really isn't a particularly large deal for Whole Foods relative to the current size and growth rate of the company. Also, the amount of money we are spending to buy Wild Oats is relatively speaking, not a huge amount of money for us, only equal to about one year's cash flow for Whole Foods. Even if the deal went completely sour after it was completed it wouldn't threaten Whole Foods future growth or our financial viability. We therefore consider it to be within acceptable risk parameters.

We also believe that our stock price will significantly increase post-merger as the considerable financial synergies that I have outline above come into play. In fact, we believe our market capitalization increase from the acquisition will likely pay for Wild Oats many times over.

> *7. Gain of TM talent — we can leverage their talent to help us support our new store growth ahead.*

One of the most important reasons Whole Foods likes to buy other retail food stores is the gain in talent from the new team members that we also acquire. Instead of having to recruit and train new team members from scratch as we do when we open a new store, an acquisition provides us with a veteran base of team members who already are well trained and highly skilled. This input of new

brains and talent improves the entire company over time. Consider this interesting fact: Whole Foods is organized into 11 geographical regions. Seven of the Presidents in charge of those regions came from previous mergers, while only four are "homegrown" within Whole Foods. We are hopeful that we will gain great new leadership from Wild Oats, who will flourish in the Whole Foods empowerment culture, and will greatly contribute to the continued progressive evolution of our company. That is exactly the way it has been in our past acquisitions and that is how we believe it will be with Wild Oats too.

> *8. Opportunity to learn — we have learned something from almost every acquisition we have done in our history and it is likely that we will be able to learn from them as well.*

Number 8 here is very similar to #7 above. Whole Foods is a learning organization. We are always learning and continually evolving and improving ourselves. Indeed, that is possibly our most important competitive advantage we have against the larger and better capitalized supermarket companies that we must compete against every day. Whole Foods has learned a tremendous amount from previous acquisitions such as Bread & Circus, Mrs. Gooch's, Fresh Fields, Unicorn, Harry's Farmers Markets, and many, many others. Wild Oats will also teach Whole Foods many things, just as Whole Foods will teach these Wild Oats' stores many things. Both companies will therefore improve as a result of the merger.

**Whole Foods Market's Objections to the FTC's Investigation**

Let me begin this section by registering an objection to the way the FTC conducted their investigation into this deal. From the first day the FTC began their investigation they were very hostile and adversarial towards Whole Foods. Instead of conducting a dispassionate, impartial, and fair investigation into this merger the FTC consistently behaved in a biased, adversarial, and arrogant manner, while engaging in "bullying tactics" again and again and again. Whole Foods was always presumed to be "guilty" and had to try to prove our "innocence" to the satisfaction of the FTC. However, the FTC seemed to us to be completely uninterested in Whole Foods explanations for why we were doing the deal. From the very beginning the FTC staff began to build their case against the deal. It is Whole Foods' opinion that the FTC had already decided to try to prevent this merger before they even began their investigation!

To give one example of FTC bullying tactics, let's look at how they behaved toward us in order to gain multiple time extensions beyond the original deadline. Whole Foods has spent thousands and thousands of hours trying to comply with the enormously burdensome requests that the FTC placed upon us and which have cost us millions of dollars in staff time, lawyers' fees, consultants' fees, supplies, and other expenses. We have produced over 20 million documents for them to "study" (which is of course impossible for them to effectively do since this amount of information is simply too large to be digested, no matter how many tax-payer funded lawyers are working on it), but the FTC could still always claim that we left something valuable out of the documentation and could then force us to start the entire process over again. On more than one occasion we came up against the time deadlines and the FTC "asked" for Whole Foods to agree to extensions. If we expressed any reluctance then the FTC brought up the threat of starting over. Needless to say, we didn't want to start over again so we agreed to the extensions. The entire process was inherently coercive.

My second objection to this entire FTC process is that I personally consider the way the FTC gathered its information on the deal to be unethical (even if it is "legal") and a complete invasion of privacy. <u>The FTC has the legal power to look at absolutely anything about our company that they want to.</u> They can look at all of our financial information, all of our strategic documents, all of our e-mails-absolutely anything and everything that they want to. Think about that for a moment and imagine how you would personally feel if every single e-mail you had ever written was to be read by governmental bureaucrats you didn't know, and then could be selectively revealed publicly to the entire world if those governmental bureaucrats decide that it is "relevant to their legal argument". Whole Foods is powerless to prove that a particular e-mail isn't relevant or that it

contains competitively sensitive information.

While the FTC can look at absolutely anything and everything it wants to about our company does Whole Foods have the same reciprocal rights with the FTC? Of course not! We can't go look at all the FTC e-mails concerning Whole Foods and Wild Oats (which no doubt say some pretty interesting things about how the FTC really operates!). We can't download all the various minutes of their meetings or get a look at the FTC "strategy" concerning Whole Foods. It is totally one-sided. It is unfair. It should not be legal for the FTC to do this in my opinion. There is obviously no evidence that Whole Foods or Wild Oats are "terrorists" or pose some kind of threat to national security. The FTC should not have the legal right to look at sensitive and private corporate documents simply because they want to.

Since Whole Foods now has a first hand understanding of how the FTC really operates in the United States today and the power that they legally wield, one of the consequences to our company going forward is that we are very unlikely to ever again attempt to buy a company that requires FTC approval. We don't need permission from the FTC (yet) to open new stores. However, we do need their approval to buy stores from another company in many instances—consequently we'll simply open stores in the future and not try to buy any that require FTC "permission".

In addition, since the United States government has the right to look at all of our e-mails, all of our strategic documents, all of our company memorandums, and all of our financial information we will likely reduce the creation of these in the future. I would suggest that any company operating in the United States take to heart our experience and beware of its digital exposure. As far as we know the United States government is not yet recording all of our phone conversations and isn't yet bugging our meeting rooms (we hope) so most of our most important discussion and decisions in the future won't have a "digital trail" that can be involuntarily taken from us and then very selectively used against us to attempt to publicly embarrass us.

The FTC is going to selectively pick out certain e-mails and certain documents that will portray Whole Foods (and especially me) as very aggressive and seeking to "destroy" Wild Oats and to "dominate" the natural/organic products market. What is important to realize here is how selective the FTC is going to be about all of this. They aren't going to place these private e-mails, or documents, or web postings in their proper context of an ongoing conversation, debate, brainstorming, or in many cases "macho posturing" by executives within the normal business flow of any competitive corporation.

No the FTC will rip them out of context to try to establish our "guilt" for being aggressive and competitive (guilt to which I'll confess right now). Taken selectively, out of proper context, and without simultaneously showing similar competitive statements about Trader Joe's, HEB, Wegman's, Publix, Andronico's, Safeway, Sunflower, Sprouts, food co-ops, Wal-Mart, and many other food retailers, Whole Foods is going to look to be hyper competitive concerning Wild Oats. I want to reiterate, however, that almost everything the FTC is going to reveal publicly to try to embarrass Whole Foods are e-mails, documents, and web postings that were not written to express official Whole Foods attitudes or policies or actual actions. A corporation, like a person, should not be held responsible for what it thinks or says in private, but for what it actually does in the world.

**What is the FTC Claiming in its Objections to the Merger?**

Below is the press release the FTC made about blocking the merger:

> (Media-Newswire.com) — The Federal Trade Commission today approved a complaint challenging Whole Foods Market, Inc.'s approximately $670 million acquisition of its chief rival, Wild Oats Markets, Inc., and authorized the staff to seek a temporary restraining order and preliminary injunction in federal district court to halt the deal pending an administrative trial on the merits. According to the complaint, the

transaction would violate federal antitrust laws by eliminating the substantial competition between these two uniquely close competitors in numerous markets nationwide in the operation of premium natural and organic supermarkets. If the transaction continues unopposed, the FTC contends that Whole Foods is likely to raise prices and reduce quality and services unilaterally.

Whole Foods and Wild Oats are each other's closest competitors in premium natural and organic supermarkets, and are engaged in intense head-to-head competition in markets across the country, said Jeffrey Schmidt, Director of the FTC's Bureau of Competition. If Whole Foods is allowed to devour Wild Oats, it will mean higher prices, reduced quality, and fewer choices for consumers. That is a deal consumers should not be required to swallow.

The Proposed Transaction: On February 21, 2007, Whole Foods and Wild Oats entered into a merger plan under which the former would acquire 100 percent of the voting shares of the latter, with WFMI Merger Co., a wholly owned subsidiary of Whole Foods, merging with and into Wild Oats. WFMI Merger Co. would then commence a tender offer for all shares of Wild Oats common stock and after completion, Whole Foods would merge WFMI Merger Co. and Wild Oats. The combined value of the tender offer and merger and assumed debt is approximately $670 million.

The Commission's Complaint: The FTC's complaint charges that Whole Foods acquisition of Wild Oats, as proposed, would violate Section 5 of the FTC Act and Section 7 of the Clayton Act, as amended. Through the transaction, Whole Foods, the largest premium natural and organic supermarket chain in the United States, would acquire its closest competitor and longtime rival, Wild Oats. In each of the markets in which they overlap, Whole Foods and Wild Oats are each other's closest substitute and compete in quality and prices, according to the Commission. After the merger, Whole Foods likely would be able to raise prices unilaterally, to the detriment of customers of premium natural and organic supermarkets.

In defining the relevant markets, the Commission found that premium natural and organic supermarkets, such as Whole Foods and Wild Oats, are differentiated from conventional retail supermarkets in several critical respects. These include the breadth and quality of their perishables, produce, meats, fish, bakery items, and prepared foods, and the wide array of natural and organic products and services and amenities they offer. In addition, premium natural and organic supermarkets seek a different customer than do traditional grocery stores. Whole Foods and Wild Oats customers are buying something more than just the food product, they are seeking a shopping experience, where environment can matter as much as price.

The complaint alleges that through the transaction, Whole Foods would acquire its closest rival in premium natural and organic supermarkets, reducing direct competition and leading to the exercise of unilateral market power, resulting in higher prices and reduced quality, service and choice for consumers. In addition, according to the complaint, entry would not be timely, likely, or sufficient to replace the competition lost in the relevant geographic markets.

The Commission voted 5-0 to authorize the staff to seek a temporary restraining order and preliminary injunction blocking the transaction pending an administrative trial. The complaint will be filed by June 6, 2007, in the U.S. District Court for the District of Columbia. It will be available on the FTC's Web site as a link to this press release upon filing.

NOTE: The Commission issues or files a complaint when it has reason to believe that the law has been or is being violated, and it appears to the Commission that a

proceeding is in the public interest. The complaint is not a finding or ruling that the named parties have violated the law.

The FTC's Bureau of Competition works with the Bureau of Economics to investigate alleged anticompetitive business practices and, when appropriate, recommends that the Commission take law enforcement action. To inform the Bureau about particular business practices, call 202-326-3300, send an e-mail to antitrust@ftc.gov, or write to the Office of Policy and Coordination, Room 394, Bureau of Competition, Federal Trade Commission, 600 Pennsylvania Ave, N.W., Washington, DC 20580. To learn more about the Bureau of Competition, read Competition Counts at http://www.ftc.gov/competitioncounts.

MEDIA CONTACT:

Mitchell J. Katz,

Office of Public Affairs

202-326-2161

STAFF CONTACT:

Catharine M. Moscatelli,

Bureau of Competition

202-326-2749

Let's take a look at this FTC press release paragraph by paragraph on all the relevant objections and deconstruct it:

"According to the complaint, the transaction would violate federal antitrust laws by eliminating the substantial competition between these two uniquely close competitors in numerous markets nationwide in the operation of premium natural and organic supermarkets. If the transaction continues unopposed, the FTC contends that Whole Foods is likely to raise prices and reduce quality and services unilaterally".

Do Whole Foods and Wild Oats compete against each other as the FTC claims? The answer is obvious: Of course we do. We compete in numerous markets and it is a simple truism to say that if we merge together that we will no longer compete against each other. However, as I pointed out earlier in this blog entry that is also true of the 18 other retail mergers that Whole Foods has previously done and it is true of the great majority of mergers that occur everywhere today. If the FTC is opposed to eliminating competition between companies then it should never approve any mergers. However, it is also clear that the FTC approves the great majority of mergers that reduce competition. They approve dozens and dozens of similar mergers every single year. In the short-run, such mergers as Whole Foods and Wild Oats, obviously reduce competition between the companies merging, but do such mergers necessarily reduce overall competition in the larger marketplace, and is this merger necessarily bad for consumers as the FTC contends?

As I pointed out in the first section Whole Foods has more competition in the marketplace right now than at any time in our history. For about the first 20 years of our existence Whole Foods largely "flew under the radar" and our company was largely ignored by our larger supermarket competitors. We weren't taken very seriously. Why not? Primarily, we didn't show up on retail radars because our stores were smaller and catered to a relatively small niche of health conscious consumers. We simply weren't perceived as a threat to conventional supermarket companies and so they didn't pay that much attention to us. None of our stores took very much business from them.

However, as Whole Foods began to open up much larger stores and improved our operational execution we began to appeal to more mainstream customers and we began to have a much greater impact on conventional supermarket companies. In addition, our tremendous success in Manhattan created huge media attention on our company, and our growth and financial success helped drive our stock price much higher. About five years ago the world woke up to Whole Foods Market. We were no longer flying under the radar. We were no longer ignored. Quite the contrary: our supermarket competition has probably increased by a factor of 10 or so over the past five years.

Most of our products that we sell in our stores can now be found in every large supermarket store in every market we compete. In addition, Trader Joe's has very rapidly expanded by more than doubling its store base in the past five years and has entered into numerous new markets to directly compete against us. Excellent supermarket companies such as Wegman's, HEB, and Publix have very good perishable departments that compete very favorably with our own stores and they also have very large selections of natural and organic products. Competition with Whole Foods has never been greater than it is right now and Wild Oats is only a relatively small part of that greater competition.

> "Whole Foods and Wild Oats are each other's closest competitors in premium natural and organic supermarkets, and are engaged in intense head-to-head competition in markets across the country," said Jeffrey Schmidt, Director of the FTC's Bureau of Competition. If Whole Foods is allowed to devour Wild Oats, it will mean higher prices, reduced quality, and fewer choices for consumers. That is a deal consumers should not be required to swallow."

> "The Commission's Complaint: The FTC's complaint charges that Whole Foods' acquisition of Wild Oats, as proposed, would violate Section 5 of the FTC Act and Section 7 of the Clayton Act, as amended. Through the transaction, Whole Foods, the largest premium natural and organic supermarket chain in the United States, would acquire its closest competitor and longtime rival, Wild Oats. In each of the markets in which they overlap, Whole Foods and Wild Oats are each other's closest substitute and compete in quality and prices, according to the Commission. After the merger, Whole Foods likely would be able to raise prices unilaterally, to the detriment of customers of premium natural and organic supermarkets".

The claims that the FTC makes in the above two paragraphs are simply astounding because they have ZERO evidence to support several of the statements. Let's start with the pricing issue: The FTC claims that if we "devour" Wild Oats it will mean "higher prices" and "Whole Foods likely would be able to raise prices unilaterally". What is so interesting about this statement is that the FTC did not bother to actually gather any pricing information from Whole Foods or Wild Oats. Let me repeat that last statement because it is so important: **the FTC did not bother to actually gather any pricing information from Whole Foods or Wild Oats.** Why am I emphasizing this by repetition? Because the FTC did not go to the trouble of actually comparing prices in any of our markets. Nor did they ask either Whole Foods or Wild Oats for any pricing information . They asked for 20 million Whole Foods' documents, but didn't ask us for any pricing information! Pretty incredible in my opinion!

Full disclosure — approximately one week before the final timing agreement was set to expire, the FTC realized the flaw in their method of using gross profit to analyze the impact of competition between Wild Oats and Whole Foods Market. At that time, they then asked us for an extension of the timing agreement and for a significant amount of pricing information. We declined their request, choosing instead to move ahead with the anticipated court battle which we believed was inevitable anyway.

If the FTC had made the effort to actually get comparative price information on a timely basis they would have made some pretty interesting discoveries:

1. Whole Foods Market's prices aren't higher in any markets where Wild Oats doesn't have any stores than in markets where they do.
2. Whole Foods Market's prices don't rise when Wild Oats closes a store and exits a market.

3. Whole Foods Market's prices are much more strongly impacted by competition with Trader Joe's, HEB, Wegman's, and other supermarkets than they are by Wild Oats.

4. Although some internal e-mails at Whole Foods express concern about potential "price wars" with Wild Oats in certain competitive markets such as Portland, Maine; Portland, Oregon; Boulder, Colorado; and Nashville, Tennessee there is in fact no statistical evidence that such a "price war" between the two companies has ever occurred in the past nor is there any evidence that it will necessarily occur in the future (other than some macho internal company posturing in a few e-mails).

5. On average Whole Foods Market's prices are lower than Wild Oats prices are in those markets we compete with them and in markets where we don't compete.

Since the FTC never actually compared prices between Wild Oats and Whole Foods, how can they in good conscience claim that this merger will mean higher prices for consumers? They didn't conduct adequate research prior to making this claim! In fact, the exact opposite is true. Why? Because after the merger is complete, the acquired Wild Oats stores will be brought into Whole Foods system and their overall prices will be lowered. Consumers will be receiving lower prices, not higher prices after this merger is completed. Whole Foods is five times larger than Wild Oats and has greater purchasing scale. We simply buy better than Wild Oats. We are in the position to be able to pass our purchasing economies of scale on to the Wild Oats stores we acquire and to lower their prices to their customers. This will make the Wild Oats stores more competitive in the marketplace and will be part of our overall strategy to improve Wild Oats and to increase their sales per square foot.

How did the FTC reach the conclusion about Whole Foods raising prices after the merger is completed without any actual pricing evidence to support this claim? It is a good question and only the FTC knows for sure (and perhaps even they don't know!). However, we do know that the FTC pursued a different strategy instead of using pricing data to determine competitive impacts between Whole Foods and Wild Oats. They compared gross profit percentages before and after new competitive stores opened up to see if they varied. If they varied significantly then they assumed that prices must also have varied. This strategy proved to be a huge mistake for the FTC and resulted in faulty data and therefore faulty conclusions because while gross profit percentages varied tremendously before and after competitive store openings occurred, prices did not.

For many retail companies gross profits are determined very simply: sales minus cost of goods sold = gross profits. We believe that is the basic formula that the FTC assumed when comparing gross profit changes. However, that isn't the formula that either Whole Foods or Wild Oats uses for the information that they share publicly. Rather the formula is: sales minus cost of goods minus occupancy costs (rent and utilities) minus distribution costs (shipping and distribution center costs) = gross profit. Both companies do this to try to prevent our competitors from getting too accurate information on our product gross profit percentages because we consider these numbers to be competitively sensitive information. Unfortunately the FTC did not factor out the impact of occupancy costs or distribution costs from their calculations and that mistake distorted their data so badly as to render it virtually useless.

For example, let's go back to the example from the store in the northeastern US I used before. Let's suppose Wild Oats were doing $375,000 per week or $19.5 million per year prior to Whole Foods opening and fell to $250,000 per week or $13 million after we opened up (all figures here are strictly hypothetical for explanatory purposes only). Let us suppose their cost of goods is 60% of sales or $11.7 million pre-Whole Foods opening and remain at 60% or $7.8 million post-Whole Foods opening (it is probable, however, that spoilage of perishable products would increase as a

percentage at the lower sales volume, which would raise cost of goods above the 60%). Let us also suppose that occupancy costs and distribution costs combined are $1.5 million both before and after Whole Foods opens up. This is a reasonable assumption because these are largely fixed costs and won't vary much whether sales volume increases or decreases. Let's therefore look at what this does to gross profit calculations in both cases:

Pre-Whole Foods Opening

Sales = $19.5 million

Cost of Goods = $11.7 million (60% of sales)

Occupancy & Distribution Costs = $1.5 million (7.7% of sales)

Gross Profit = $6.3 million

Gross Profit % of Sales = 32.3%

Post-Whole Foods Opening

Sales = $13 million

Cost of Goods = $7.8 million (60% of sales)

Occupancy & Distribution Costs = $1.5 million (11.5%)

Gross Profit = $3.7 million

Gross Profit % of sales = 28.5%

Notice what has happened in the above example. While the cost of goods sold remains the same percentage both before and after Whole Foods opened in the northeastern US (60%), the gross profit percentage of sales drops from 32.3% to 28.5% because occupancy and distribution costs (both large fixed expenses) are now a much larger percentage of sales after Whole Foods opened up.

When the FTC economist studied the gross profit percentages for Wild Oats in markets like the store in the northeastern US he saw significant declines in gross profit percentages after Whole Foods opened up its store. He assumed that those declines in gross profit percentages were due to Wild Oats being forced to lower its prices to compete with Whole Foods Market and failed to understand that the declines were due to occupancy and distribution costs becoming a larger percentage due to the significant decline in sales (as well as increased spoilage due to lower sales). He did not adequately account for the way both Wild Oats and Whole Foods Market report their gross profit numbers (including occupancy and distribution costs in their figures). Consequently the FTC's calculations are way off base.

One very interesting event has transpired since the FTC Commissions voted against our proposed merger: The FTC is now requesting comparative pricing information from Whole Foods and Wild Oats-a request for a mere 5 billion pricing data points (another huge compliance cost to both Whole Foods & Wild Oats)! They know they'll need this pricing information in Court. Too bad they couldn't have asked for this pricing data before issuing their decision, because if they had done so they would have discovered that what I've said previously here is true-Wild Oats and Whole Foods do not constrain each others prices, rather the larger competitive retail food market does. The five points I make above about prices are all true. At this stage I have little doubt that the FTC will try to twist and manipulate the pricing data that they receive to try to prove their case. I have absolutely no hope that the FTC will approach the pricing data they receive with an open mind seeking to truly understand what is really going on. That is the approach Whole Foods assumed they would adopt in investigating the proposed merger, but that certainly wasn't the case.

In defining the relevant markets, the Commission found that premium natural and organic supermarkets, such as Whole Foods and Wild Oats, are differentiated from conventional retail supermarkets in several critical respects. These include the breadth and quality of their perishables, produce, meats, fish, bakery items, and prepared foods, and the wide array of natural and organic products and services and amenities they offer. In addition, premium natural and organic supermarkets seek a different customer than do traditional grocery stores. Whole Foods and Wild Oats customers are buying something more than just the food product, they are seeking a shopping experience, where environment can matter as much as price.

The complaint alleges that through the transaction, Whole Foods would acquire its closest rival in premium natural and organic supermarkets, reducing direct competition and leading to the exercise of unilateral market power, resulting in higher prices and reduced quality, service and choice for consumers. In addition, according to the complaint, entry would not be timely, likely, or sufficient to replace the competition lost in the relevant geographic markets.

In the above two paragraphs the FTC is arguing that Whole Foods and Wild Oats are different from other supermarkets, that we are in a category called "premium natural and organic supermarkets" and that if Wild Oats is merged into Whole Foods Market that we will be able to "exercise unilateral market power, resulting in higher prices and reduced quality, service and choice for consumers." The FTC seems totally unaware that they are making a contradictory claim in these assertions. On the one hand they are claiming that Whole Foods and Wild Oats are different from conventional supermarkets: "the breadth and quality of their perishables, produce, meats, fish, bakery items, and prepared foods, and the wide array of natural and organic products and services and amenities they offer". On the other hand they argue that if we are allowed to merge that this will "lead to the exercise of unilateral market power, resulting in higher prices and reduced quality, service and choice for consumers". Which statement is true? If Whole Foods and Wild Oats are truly different from conventional supermarkets because of our quality of perishables and our superior services, then how can we manage to stay different from them if our merger would "reduce our quality and service" as the FTC claims? If the merger reduces our quality and service, therefore making us more like other supermarkets, then why is the FTC objecting to the merger? If Whole Foods reduces its quality and service and makes its store shopping experience less distinctive, then how would we be in the position to "unilaterally raise prices"? The exact opposite would of course be true! If we lower quality, reduce our service, and make the shopping experience less unique and fun then competition from conventional supermarkets would hardly permit us to raise prices! To try to raise prices while reducing quality, service, and store experience is an excellent strategy for bankruptcy, a strategy we don't plan on following.

A big part of the FTC's argument is their belief that Wild Oats and Whole Foods exist in a very narrowly defined category that they call "premium natural and organic food supermarkets". We aren't sure exactly what other companies the FTC believes exist in this narrowly defined category, perhaps only Earth Fare, with about 10 stores all existing in the southern United States. The "premium natural and organic food supermarket" category therefore apparently consists of only three companies-Whole Foods Market, Wild Oats, and Earth Fare.-and of course the FTC apparently believes that if Whole Foods Market acquires Wild Oats then there would only be two companies left in this category.

The FTC is going to try to prove the existence of this very narrow category of "premium natural and organic supermarkets" by quoting many of my own personal e-mails and Whole Foods own internal documents in support of the category. I want to make the following points here:

1. Is there actually a separate category of "premium natural and organic supermarkets"? Let me state quite clearly up front that there absolutely is! However, that category actually consists of only one company-Whole Foods Market. We created the category and to-date we are the only company that actually belongs in it. Wild Oats, Earth Fare, and a few other companies have tried copying us in the past, but with very little historical success to actually show for it. Consider the three following interesting facts:

A. I am aware of no natural and organic food supermarket companies (with average store size greater than 15,000 sq. ft.) in all of history with more than 3 stores that has ever been profitable and financially successful besides Whole Foods Market. Has Wild Oats been financially successful? No they have not. Wild Oats has been in business now for 20 years. Over that 20 year period they have lost $97 million (with the great majority of those losses occurring over the past 7 years). Whole Foods bought the 22 store chain Fresh Fields back in 1996 and they had lost $35 million in their 5 year history as an independent company. We bought Bread & Circus back in 1992 with 6 stores and they were not a profitable company when we acquired them. We acquired Mrs. Gooch's with 7 stores back in 1993 and while this was a profitable company, their average store size was only about 10,000 sq. ft. Earth Fare, with about 10 stores based in North Carolina, may or may not be a profitable company at this point. I don't know because I haven't seen their financial statements. However, I do know that they recently closed stores in Chapel Hill and Raleigh, North Carolina that they had opened that were less than two years old so it is very unlikely that this company is overall particularly profitable.

Why has it been so difficult for all other natural food supermarket companies besides Whole Foods Market to be financially successful? I believe the main reason is that setting high quality product standards (no artificial flavors, colorings, sweeteners, no caged eggs, etc.) creates a "handicap" on the business that must be overcome to be successful. The natural food supermarket company with rigorous product standards refuses to sell thousands and thousands of products that most customers want to buy. This necessarily forces the great majority of the company's customers to shop at other stores because they can't get all the products they want at the natural food supermarket and prevents most potential customers from ever shopping there. This is a huge business handicap that most natural food supermarkets are not able to completely overcome and so their business is limited to the hard-core committed natural foods customer. Of course, there are some customers who do 100% of their shopping with a natural food supermarket, but they are a distinct minority of the population.

Whole Foods Market has been financially successful, when other natural food supermarkets haven't been, because we have been able to overcome the handicap that our strict quality product standards put on us. We have been able to successfully reach beyond the committed core natural foods customer into the mainstream market by having fresher and higher quality perishable products-fruits and vegetables, meats, seafood, cheeses, bakery, and prepared foods. We have also created a more pleasant shopping experience and better customer service than most conventional supermarkets are capable of. This operational superiority has caused more mainstream customers to do part of their food shopping at our stores. Other natural food supermarkets such as Wild Oats have not successfully "cracked this code" of providing what mainstream customers are seeking.

Whole Foods toughest competitors are not companies such as Wild Oats, which has never hurt us badly in any location where we directly compete, but discounter Trader Joe's and upscale perishable supermarkets such as Wegman's and Central Market. Trader Joe's is very aggressive with their pricing and this company more than any other acts as a market constraint on our pricing. They are expanding aggressively all over the United States. Wegman's and Central Market are two examples of companies which do a very good job on selling fresh, high quality perishable products. We have a very hard time competing against both Wegman's and Central Market because our handicap of product quality standards limits what we can sell and these companies don't have this handicap. As a result, Whole Foods is able to market to the hard-core natural foods customer, but has a much tougher time pulling the mainstream customer away from either of these well executed perishable focused companies.

B. Wild Oats highest sales volume stores would not rank in the top 150 stores that Whole Foods operates! If Wild Oats stores belong in the same category as Whole Foods Market stores then why don't they have higher sales similar to Whole Foods? Not only do none of Wild Oats stores crack our top 150 stores (remember that Whole Foods has less than 200 stores), but their sales per sq. ft. are less than 50% as high as Whole Foods are. The FTC wants to lump Wild Oats into the same narrowly defined category that they've placed Whole Foods in, but Wild Oats sales and profits are so much lower than Whole Foods, that I don't believe Wild Oats is deserving of this distinction.

Wild Oats may be a "natural and organic foods supermarket company", but it doesn't deserve the distinction of "premium" that the FTC gives it, because by all objective measurements Wild Oats doesn't compare favorably with Whole Foods Market.

C. Once Whole Foods buys a company such as Fresh Fields, Harry's Farmer's Market, or Nature's Heartland, we fairly quickly upgrade and improve their operations. The quality of products and customer service are greatly upgraded, the store ambience and customer experience are enhanced, and the prices are on average lowered. This is exactly what will happen if we are allowed to buy Wild Oats. We've tested this process many times in the past and it works.

The simple truth is that there is no other food retailing company that exists right now that belongs in the same unique category of "premium natural and organic supermarkets" besides Whole Foods Market. We created this category and no one else besides Whole Foods, including Wild Oats, belongs in it. Whole Foods is currently "unique and one of a kind". If the FTC wants Wild Oats stores to be accurately classified with Whole Foods stores then they should let us buy them, because we are the only ones who have the intellectual capital to upgrade and transform Wild Oats' stores into "premium natural and organic supermarkets" worthy of that designation. Wild Oats hasn't been able to do it on their own.

2. The FTC also seems to be making a very curious argument concerning market differentiation here. If Whole Foods were more like other supermarkets then apparently this merger would be o.k. with the FTC (since neither Whole Foods nor Wild Oats has a very large share of any food retailing market anywhere in the United States) It therefore logically follows that if Whole Foods were to lower its quality of products to be more like other supermarkets then this merger would be approved. Apparently, the fact that Whole Foods Market doesn't sell cigarettes, Coca-Cola, or Kraft's Macaroni & Cheese is the main reason that this deal hasn't been approved. Perhaps if Whole Foods were to start being indifferent or rude to customers, make our customers wait in longer checkout lines, and make our stores look more like warehouses or sterile white hospitals (as many other supermarkets do) then presumably this merger could go through. The FTC appears to be discriminating against Whole Foods for no more legitimate reason than that we successfully operate at a higher quality level than most other supermarkets do.

3. The fact that Whole Foods has successfully created a distinct retailing strategy and category for ourselves does not give us any kind of "monopoly" or "market dominance" that prevents other food retailers from successfully copying us or competing with us in other ways. The truth, of course, is that supermarkets all over the United States are copying many different aspects of Whole Foods successful retailing strategy—selling more and more natural and organic products, improving customer service, and upgrading the look and feel of their stores.

4. The creation of a unique business strategy or a unique category doesn't force consumers to shop with us. Most successful businesses attempt to differentiate themselves from their competitors in various ways. This has certainly been one of Whole Foods competitive strategies. Although Whole Foods has been successful and has created differentiation in the marketplace the simple truth is that very few customers do all of their shopping at our stores. In fact, most of our customers shop at multiple food stores, meeting some of their needs and desires at Whole Foods and various other needs and desires at other stores. Just ask yourself this question: "Do you do all your shopping at Whole Foods or do you shop at different supermarkets"? The answer is obvious: most people shop at a variety of different food stores. Differentiation in the marketplace doesn't guarantee customer acceptance or success. Successful differentiation also creates imitation and more competition in the future.

5. There are no legal "barriers to entry" to compete with Whole Foods Market on price, products, quality, service, or store experience. Whole Foods has no technological patents that preclude anyone from competing with us. Whole Foods has been successful primarily because we simply execute in many facets of the retail food business better than most of our competitors do.

6. Competition with Whole Foods is increasing everywhere at a very rapid rate. It is forcing us to

innovate faster, improve our quality, lower our prices, and upgrade the customer experience. However, Wild Oats has had very little to do with the increase in competition that Whole Foods is currently struggling against. Indeed, Wild Oats is caught up in the exact same whirlwind of increased competition. One of the main reasons Whole Foods and Wild Oats need to merge is to combine our knowledge and resources together so that we are able to more successfully compete with other food retailers in the future.

## Frequently Asked Questions

### Why does the FTC believe this merger is anti-competitive?

I've answered this question in detail already. See the section on the FTC narrowly defining the market as "premium natural and organic supermarkets". I answer this question over several pages.

### What about the competition in the supermarket industry as a whole is the FTC failing to recognize here?

The FTC is failing to recognize how quickly the competition in the supermarket industry is evolving. Whole Foods doesn't merely compete with other natural foods supermarket companies such as Wild Oats, but also with natural foods discount chain Trader Joe's, upscale perishable supermarkets such as Wegman's and Central Market, new supermarket created natural foods stores such as Green Wise by Publix and Sunflower by SuperValu, over 200 food co-ops around the United States, remodeled upscale supermarket stores such as Safeway's Lifestyle stores and HEB's Platinum stores, Sprouts, thousands of local farmers' markets, and thousands and thousands of supermarkets selling natural and organic foods, and most recently Wal-Mart. Soon Tesco, one of the largest retailers in the world will be opening hundreds of stores in western United States-stores which are rumored will compete with Trader Joe's and Whole Foods. Indeed, Whole Foods faces more competition today than ever before in our entire history! The FTC needs to get out of Washington D.C. once in a while and look around at what is happening out in the real marketplace. Actually if they'll just get out of their offices in D.C. and go look at Wegman's, Trader Joe's, and Safeway Lifestyle stores they'll see how dynamic and rapidly evolving the food retailing market is today.

### What about this quote from you that the FTC released in its complaint?

"OATS remains a relevant competitor. By buying them we will greatly enhance our comps over the next few years and will avoid nasty price wars in Portland (both Oregon and Maine), Boulder, Nashville, and several other cities which will harm our gross margins and profitability. OATS may not be able to defeat us but they can still hurt us. Furthermore we eliminate forever the possibility of Kroger, SuperValu, or Safeway using their brand equity to launch a competing national natural/organic food chain to rival us."

This quote appeared in an e-mail that we sent to our Board of Directors prior to the Board Meeting to vote on whether to approve the acquisition of Wild Oats. Is Wild Oats a relevant competitor of Whole Foods? Of course they are. We have never claimed that we don't compete with Wild Oats. We do. Please refer back to my explanations about eliminating Wild Oats as a competitor in the first part of my blog. Part of the reason to do almost any merger is to eliminate a competitor. This is so self-evident to me that I really can't understand why the FTC wants to make a big deal out of it. If the FTC is opposed to the elimination of all competition then I don't understand why they approve any mergers? Is this the only reason why Whole Foods wants to buy Wild Oats? No it isn't. There are many reasons. See my detailed explanation of our reasons to acquire Wild Oats in the first section of this blog. The really relevant question is whether or not buying Wild Oats severely limits competition with Whole Foods in the larger marketplace. It clearly does not limit overall competition since we have more competition than ever before.

Will we "avoid nasty price wars in Portland, Boulder, Nashville, and several other cities which will harm our gross margins and profitability"? Of course we want to avoid price wars with Wild Oats (and everyone else for that matter if it were possible). However, it is important to realize that in our 14 year history of competing directly with each other that there has never been a price war between Wild Oats and Whole Foods Market. The references to Portland, Boulder, and Nashville were references to stores in development by both companies that will be competing directly with each other. Price wars are always a possibility that must be considered in developing a company's strategy. Any price wars between Whole Foods Market and Wild Oats would be a much more terrible thing for Wild Oats than Whole Foods due to their much smaller size, comparatively lack of financial resources, lower cash flow to sustain losses, and their overall history of losing money ($97 million of losses over their 20 year history). Since neither company wants a price war it is highly probable that one won't occur.

Does Whole Foods want to prevent Kroger, Safeway, SuperValu, or someone else from acquiring Wild Oats? Of course we do. I discussed this at some length earlier in this blog posting.

### Will customers be harmed by this merger?

Every retail merger that Whole Foods has ever undertaken has benefited customers. How? By significantly improving the operations of the acquired companies, raising customer service levels, improving the quality of perishables and other products sold, and lowering overall prices. The proof of this claim is how well the acquired stores have flourished under our management with sales and sales per sq. ft. rapidly and steadily increasing for many years into the future. Customers vote with their pocketbooks about whether they approve of a merger of not. They have always approved of our retail mergers with natural foods companies as evidenced by the large increases in sales all these acquired stores experienced.

That doesn't mean, of course, that every customer is happy when Whole Foods buys the store where they have been shopping. A minority of customers don't like the changes and innovations that Whole Foods implements in the acquired stores. However, the great majority of customers are excited when their store is bought by Whole Foods because of the steady, continuous improvement in the physical plant, store operations, quality of products, and customer service that takes place at the store. The great majority of Wild Oats customers will really like the improvements that Whole Foods implements at Wild Oats stores and they will let us know by increasing the frequency of their shopping and the amount they spend when they do shop.

### Will Wild Oats employees benefit from this merger?

The great majority of Wild Oats team members will benefit from this merger. We have already guaranteed that no store team members of any of the Wild Oats stores will by laid off as a result of this merger or lose their jobs. As Whole Foods implements its empowerment and benefits programs at Wild Oats stores team members will see their pay and benefits increase and their enjoyment of their work going significantly upward. Again, not every Wild Oats team member will be happy with the deal. Some will prefer the "old ways" better, but the great majority will be better off.

What about the team members at their corporate offices? We will offer as many opportunities to these corporate employees as we possibly can, but we intend to eliminate the redundant jobs. Whole Foods corporate offices are in Austin, while Wild Oats are in Boulder. Many of these jobs are redundant and unnecessary. Some positions are necessary, but will be transferred to Austin.

It is important to realize that Whole Foods has created more than 44,000 jobs in our history and with our rapid growth will create many more than this in the future.

### How are Whole Foods Market's product suppliers reacting to the possible merger?

Many of these product suppliers have grown, expanding the group of grocers to which they sell, as Whole Foods Market has grown. Because Whole Foods Market is not nearly as large as many of our competitors, we are not in a position to limit the marketplace of our vendors. More importantly, we have a long history of integrity in all business dealings. Our vendor partners are our allies in serving our shoppers. We treat our product suppliers with respect, fairness, and integrity at all times — and we expect the same in return.

**Will vendors be disadvantaged in negotiating with Whole Foods as a result of this merger?**

It is important to realize that Wild Oats will not significantly increase Whole Foods size or growth. After we sell off the farmers' market stores and close some of the redundant stores, we expect only about $700 million in sales from Wild Oats stores to remain. This represents approximately 11% of Whole Foods' current sales and only about 10% of the combined company. It also represents only about 9 months of internal growth by Whole Foods Market at our current rate. Whole Foods is already a relatively large company that enjoys good economies of scale when negotiating with its vendors. This merger will not change this fact nor will it significantly increase Whole Foods Market's overall size or our own negotiating leverage beyond what it already is.

**What is Whole Foods Market's strategy for fighting the FTC's attempt to block the merger?**

Whole Foods Market intends to fight the FTC's contention that this merger would result in an anticompetitive effect—in court. This blog posting lays out in some detail our perspective on this merger in an open, candid, and transparent way. It is our intention to be as open and transparent as possible during this entire process going so our customers, team members, investors, vendors, and the media understand the process.

**How long are you willing to fight this fight?**

The deadline under the filed merger agreement is August 31, 2007; on that date, both parties have the right to terminate if it is not completed. We have asked the court for an expedited schedule to seek a resolution by that date.

**In the Company's history, has Whole Foods Market had more success with acquisitions than with organic growth?**

Throughout the history of Whole Foods Market, we have successfully grown through both acquisitions and organic growth. Currently about 25% of our stores came from acquisitions and 75% we have opened ourselves. It is important to note that, even when the natural and organic foods industry was a very small niche industry many years ago, the FTC never challenged a previous Whole Foods Market merger, including the merger with Fresh Fields in 1996. Given the size of Whole Foods Market at that time this was an even larger merger in scope.

**Why has the media compared this deal with the failed Staples-Office Depot merger from a decade ago? Is this similar?**

Not at all! While the media, and possibly the FTC, have made this comparison, we do not believe this is accurate. Please refer to page 12 of the document we posted on our blog called "The Proposed Acquisition of Wild Oats by Whole Foods Market Will Not Substantially Lessen Competition in Any Relevant Market, May 30th 2007. The URL is listed below: http://www.wholefoodsmarket.com/ftchearingupdates/presentation5-30_07.pdf

**What is Whole Foods Market's continued growth plan if this merger doesn't go through?**

We are hopeful that the merger will proceed; however, we have a record number of stores in development in the pipeline at this time (over 90), and we expect to execute our goal to open more

stores in 2007 than we ever have in our history as a company.

**How important is this merger to Whole Foods Market?**

This would be our largest acquisition to date in terms of the number of stores acquired. However, as a percentage of the combined company's sales (approximately 10%) that Wild Oats stores will represent after divestitures and closures, it is far smaller than our Fresh Fields merger in 1996 which represented about 33% of the combined company. By combining the strengths of Whole Foods Market and Wild Oats, we see an opportunity to deliver a wider selection and a richer, more authentic experience to our shoppers at both companies.

**What is Whole Foods Market seeking out of this merger?**

I give a very detailed answer to this question in the first part of this blog.

**If Wild Oats is not your primary competitor, which companies are?**

It depends upon the market because competition varies around the United States. In many markets our primary competitor is Trader Joe's. In the Mid-Atlantic Region our toughest competition is from Wegman's. In Texas it is HEB's Central Market, while in California it is Trader Joe's, Safeway, and Bristol Farms (owned by SuperValu), in Boston it is Trader Joe's, and in New York it is Fairway and Trader Joe's. There is actually no market in the entire United States where Whole Foods considers Wild Oats its primary competitor, except possibly in Boulder, Colorado, and even there we price more competitively against Safeway's Lifestyle store than we do Wild Oats. Recently we have begun to feel competitive pressure from Wal-Mart, especially in Plano, Texas where they opened a Super Center store with a large selection of natural and organic products close to our own store.

Posted by John Mackey on June 19, 2007

## Trackback Pings

TrackBack URL for this entry:
http://www.wholefoods.com/blogs/mt/mt-tb.cgi/14

## Comments

Join the discussion by posting a comment below. Only comments specifically addressing issues discussed in John Mackey's blog post will be posted. If you have a question or comment for Whole Foods Market that is unrelated to this blog, please use our Contact Us page so we may respond to you accordingly. Business propositions sent to this blog will not be reviewed.

———————————————————————

John, i found this to very infomative and helpfulin understanding the merger. i am a team member @ the largest store in CO. and i am also a shareholder so this goes a long way in understaning how the goverment works in these matters. i will watching for other blogs in the future. thanks and good luck.

Posted by: **anthony connor** at June 19, 2007 06:53 PM

———————————————————————

I really appreciate your open and candid communication with public (includes customers and shareholders). I am not sure if you read about the recent FTC challenge to merger of Western Refining and Giant Industries.
But, what happened finally ? FTC was defeated because their arguments did not make sense. I am sure same will happen with this (WFMI and OATS) merger challenge.

Good Luck !

Posted by: **Amit Gupta** at June 19, 2007 07:11 PM

---

Your comments about "eliminating the competition" further supports the need for a legal strategy that directly counters the FTC's narrow view rather than try to convince the courts that Whole Foods competes in the supermarket industry.

Posted by: **John Hauser** at June 19, 2007 08:01 PM

---

John Mackey continue to stand by your principals. I am writing to my Congress women and Senators about this. The FTC has never protected the public by blocking a merger, Telco and big Oil are prime examples of mergers that have cost consumers billions of dollars. WFM and Wild Oats are mere specs and flies as they relate to the food industry and real good giants. Those of us that shop and understand the brand and the quality products and protections WFM provides should be allowed to grow prosper and merge...Lets just hope the Safeways of the world don't make a pitch for WFM and destroy the brand and employees as they have done with their markets and employees. SHAME on you FTC...but then again SHAME on all things from this administration.

Posted by: **Ron Blitzer** at June 19, 2007 09:06 PM

---

What a crock of crap!

Posted by: **RLH** at June 19, 2007 09:23 PM

---

It's about time someone told the FTC (as well as all the other small minded bureaucrats) the realities of Capitalism.

Competitors come and go. If marketshare is improved by either merger or acquistion so much so that it creates a "monopoly" that would increase prices on the consumer, reduce choice, etc, as the government alleges, then (in a free market) a new competitor would open up to exploit those very conditions to make (what else?) a PROFIT!

Posted by: **EmployerReport.com** at June 19, 2007 09:43 PM

---

Hello Mr. Mackey:

You should be proud of yourself for standing up to the underhanded practices of these predatory lawyers.

I am thoroughly disgusted that this is happening in the United States of America. This is the defining example of the dangers of a bureaucracy with unchecked power.

What they are doing reminds me of what the IRS was doing to innocent business people back in the 1990's. Remember when we would read headlines about IRS agents busting into family restaurants brandishing firearms and terrorizing innocent taxpayers?

This is dead serious John and I am going to be calling my congressman and Senators to demand that they investigate these lawyers,

Hang in there and please keep fighting the good fight. I believe the rule of law will win out. It is unfortunate that millions of people are being plundered by them along with you as these gunslingers have directly caused a 20% PRICE DECLINE in WFMI, including money invested in pension funds, URA's, Mutual Funds and so on!

"YOU are being "MIKE NIFONGED" BY THE LIKES OF THIS Jeffrey Schmidt, Director of the FTC's Bureau of Competition" AND WHEN ALL IS SAID AND DONE, speaking as an "outsider" who purchased a diminutive number of shares in WFMI weeks before the Jeff Schmidt / debacle - I would hope that you not only seek to complete this merger but also I want to see WFMI make every effort to recapture legal fees and expenses associated with this FTC chicanery.

I made a public appeal regarding this matter on Youtube this past weekend. I must say it was a bit caustic (although not profane). However, our founders such as Alexander Hamilton were rather abrasive on matters of such weight. I must say that the serious nature of your plight will have repercussions reaching far beyond Whole Foods if not "nipped in the bud".

Following is the link to my disquisition.

http://youtube.com/watch?v=9pDxJO1hEEg

Best regards,

Scott A.
West Palm Beach, Florida

Posted by: **Scott A.** at June 19, 2007 09:48 PM

---

As an active trader, I've been involved in quite a few M&A deals the past 2 years, and this is the first time I've seen a CEO blog-out on his proposed deal.

My comments thusfar ,,, the WFMI CEO comes off looking quite arrogant in public.

If WFMI's deal lawyers can't muzzle the blog, suggest they just fold their tent and watch the WFMI CEO continue to appear the public fool.

Elsewise, it seems both sides are wrong.

Market barriers to establishing further competition are low to non-existent, which gives lie to Complainant's rationale for blocking the deal. This is not a spacecraft, nuclear plant, airplane, or other endeavor that's technologically difficult to assemble.

WFMI CEO's claim that ,,,

"we eliminate forever the possibility of Kroger, SuperValu, or Safeway using their brand equity to launch a competing national natural/organic food chain to rival us."

,,, is bluster in the first degree.

Apparently, WFMI's CEO never took to heart the first thing learned in business, namely ,,, never say 'never' (or in this case, forever).

Continuing to yell out at the SEC, like one just came from unloading a vegetable truck, seems pointless. It's no wonder SEC staff refused discuss methods for resolution prior to filing a complaint ,,,

Posted by: e9racer at June 19, 2007 11:30 PM

---

Mackey,

You're one of my heros now. I am so glad you responded as you did to this FTC nonsense. I bet you kinda feel like John Galt, but please don't go on strike.

p.s. I've canceled my plans to start my own company, "Just Hamburgers, Inc", a company that would sell hamburgers and ONLY hamburgers. Apparently I'd have a monopoly as McDonald's & Wendy's aren't competion because they sell other stuff too, according to the FTC. Unbelieveable!

Posted by: **Lord Westfall** at June 20, 2007 12:03 AM

---

I tend to agree with FTC re: the proposed merger. Competition is great for consumers, and if Whole Foods can't take the heat, then get out of the kitchen.

Posted by: **Mark Woodward** at June 20, 2007 07:42 AM

---

A suggestion: In your answer to the first FAQ you refer to your lengthy answer above. It would be more helpful to summarize that argument in one or two sentences. That way people who skip directly to the FAQ could get the essence of your argument.

Good luck!

Posted by: **Bill Meacham** at June 20, 2007 11:06 AM

---

Yeah, quit your whining and watch what you say and you might have had a chance. Sounds to me like the

cries of baby who didn't get his way. Wild Oats 4 Eva!!!!!!

Posted by: **Boulder Rulez** at June 20, 2007 11:08 AM

---

John,

I appreciate your comments, the story in the WSJ was certainly missing your POV.

Considering what the Bush Administration has been doing making GOP appointees in the DOJ, maybe they've done the same in the FTC.

Consider Billionaire Ron Burkle's major holdings in Wild Oats. He's the playboy buddy of Bill Clinton who stands to make millions in this deal if it goes through.

Don't you know a GOP operative at the FTC would gain great pleasure in reducing his fortune?

Posted by: **Mark H. in Boulder** at June 20, 2007 11:43 AM

---

Sounds like someone at the FTC didn't get their kickback.

Remember, you can't spell bureaucracy without ca-ca!

Good luck, John!

Posted by: **Z Red** at June 20, 2007 11:59 AM

---

MARK: I tend to agree with FTC re: the proposed merger. Competition is great for consumers, and if Whole Foods can't take the heat, then get out of the kitchen.
-----
Well, you know Mark, after reading Mackey's huge blog where he clearly points out how this merger would be benificial to consumers, and in no way would create anti-trust concerns, I was kinda siding with him, but then you came out that brillant one-sentance strawman-arguement/cheesy cliche, and totally refute all of his points.

Yeah man, now I believe this merger is a horrible idea. Do you even realize there would be no WFM if it weren't for aqusitions? It's people like you that are draining the productivity of this nation. More and more I am seeing Atlas Shrugged more as a prophecy than a work of fiction.

Posted by: **Lord Westfall** at June 20, 2007 12:26 PM

---

I am an investor in this company and although I agree with your decisions to buy Wild Oats I disagree with the premium price that we are willing to pay. I would appreciate a reconsideration of the terms of the agreement.

Regarding the recent dispute with the FTC rulings; you will catch more flies with honey than with vinegar.

Get it?

Treat the FTC with respect and work with them to resolve their concerns. The FTC exists for the benefit of the consumer and business alike. Please take more time to consider your position and choose your words and your tone more carefully.

Thank You for your leadership and wise decisions in helping this company prosper like it has in the past few years.

p.s - please reconsider providing guidance since it is not required by the SEC. The fortune telling aspects many times has deliterious effects on my value in the company and the considered need for investors is not healthy nor profitable for the long term.

Posted by: **Mark** at June 20, 2007 02:19 PM

------

Whole Foods is buying Wild Oats to gain a monopoly over the premium organic foods segment, so that they can turn around and raise prices and reduce quality, effectively destroying the segment they now monopolize? And the FTC voted unanimously for this position? Were they reading the economics textbooks upside down?

I feel bad for the Wild Oats customers coerced into shopping at Whole Foods by unsympathetic titans of the premium organic markets business.

It's a shame how dimwitted the government believes the average customer is, especially the above-average affluent customer of a market like Wild Oats.

John, I appreciate your openness and honesty.

Posted by: **Justin Burkett** at June 20, 2007 03:01 PM

------

You're right: it is absolutely UNETHICAL for the government to be able to force you to turn over your complete record of internal company e-mails. Think of all the private and personal e-mail conversations between Whole Foods employees and their friends and significant others OUTSIDE OF WHOLE FOODS that have been read by government workers. Think about it: if you've ever exchanged a personal e-mail with a Whole Foods employee, the government now has a record of that e-mail. Absolutely unethical and totally contrary to American principles.

Posted by: **Paul** at June 20, 2007 03:08 PM

------

The FTC is ridiculous. I got a feeling the people at FTC get paid for being busy, not for being reasonable.

Ron Paul for President!

Posted by: **joshua wallis** at June 20, 2007 03:13 PM

_____

John,

I have been considering a change of careers from the entertainment business to public relations and marketing. Following in the footsteps of my father John McCarty, the former VP and head of advertising and public relations for Frito-Lay, Inc, I will give you my first 'unofficial' and 'unsolicited' two cents worth of public relations advice on one particular aspect of the accusations that have been leveled at you and Whole Foods. (Not to mention that it's for free)

Having recently moved to Boulder I saw in the Daily Camera today an ugly headline which read;

'Eliminating' Wild Oats: Documents reveal Whole Foods CEO's comments on deal

Whoa Nelly!! Slow down there investigative journalist Alicia Wallace and your hotheaded headline writer at the Daily Camera.

This headline and subsequent story smacked of lurid tabloid journalism that is obviously geared toward an easily outraged granola eating, soy milk saturated Boulder readership. Stirring up Boulder's civic pride in a homegrown company like Wild Oats and all that.

To continue with the Daily Camera's rant, "Whole Foods' chief executive officer told his board that buying Wild Oats would allow his grocery chain to "avoid nasty price wars" in Boulder and other cities and "eliminate forever" the threat of a conventional grocer becoming a rival in the natural and organic industry, according to court documents unsealed Tuesday. As well as, Buying Wild Oats "will greatly enhance our comps over the next few years and will avoid nasty price wars in Portland (both Oregon and Maine), Boulder, Nashville and several other cities, which will harm our gross margins and profitability," Mackey said, according to the filing.

Didn't they read your entire blog about these issues, John? Didn't they understand the facts about the even greater competition from Trader Joe's, Wegman's, Safeway, Giant, Balducci's, farmers' markets, and food co-ops? To quote you John, "It is very important to understand that eliminating any one particular competitor such as Wild Oats doesn't mean eliminating all of our competitors, quite the contrary. Whole Foods has more competition today than we have ever had in our entire history! Numerous competitors to Whole Foods exist in every market we do business in, whether Wild Oats is in that market or not."

If the deal goes south then watch out for the 'big boys' buying out the Wild Oats franchise. It is my belief that to allow interlopers like Kroger, Safeway, SuperValu, or Wal-Mart into the "whole foods" and "organic" marketplace would only end up diluting the longtime efforts of Wild Oats, Whole Foods and others to bring the "real deal" to market.

We all know it would just be a matter of time before the reality of "organic" and "whole foods" would be disregarded or at the very least "watered down" to fit these big companies insatiable profit margins. Look at how Frito-Lay tried to market the diarrhea inducing fat-free food additive oil known as Olestra. Their deceptive ads painted images of wheat fields and wild flowers.

I'm reminded of a parable from the Bible and the words of Jesus, "The kingdom of Heaven," he said, "is like a man who sowed good seed in his field. But while his men were asleep his enemy came and sowed weeds among the wheat, and went away. When the crop came up and ripened, the weeds appeared as well..."

All I can say, John, is to keep up the good fight, keep your prices down and don't lay off any Wild Oats employees if the acquisition goes through!

Sincerely,

CB "Chris" McCarty

Posted by: **CB McCarty** at June 20, 2007 03:32 PM

---

## Post a comment

Join the discussion by posting a comment below. Only comments specifically addressing issues discussed in John Mackeyâ€™s blog post will be posted. If you have a question or comment for Whole Foods Market that is unrelated to this blog, please use our Contact Us page so we may respond to you accordingly. Business propositions sent to this blog will not be reviewed.

Name:

Email Address:

URL:

Remember Me? ◯ Yes    ◯ No

Comments:

[ Preview ]  [ Post ]

---

Copyright 2000–2003. Whole Foods Market IP, L.P.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>               Plaintiff,<br><br>    v.<br><br>WHOLE FOODS MARKET, INC.<br><br>and<br><br>WILD OATS MARKETS, INC.,<br><br>             Defendants. | Case No. 1:07-CV-01021 (PLF) |

## [PROPOSED] FINAL PROTECTIVE ORDER
## GOVERNING DISCOVERY MATERIAL

For the purpose of protecting the interests of the Parties and Third Parties against the improper use and disclosure of confidential information submitted or produced in connection with this Matter:

IT IS HEREBY ORDERED THAT this Final Protective Order Governing Discovery Material ("Final Protective Order") shall govern the handling of all Discovery Material during the proceedings in the above captioned Matter.

### DEFINITIONS

For purposes of this Protective Order, the following definitions shall apply:

1.      "Whole Foods" means defendant Whole Foods Market, Inc., a corporation organized, existing, and doing business under and by virtue of the laws of the State of Texas,

with its office and principal place of business at 550 Bowie Street, Austin, Texas 78703, and its

predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures.

2.     "Wild Oats" means defendant Wild Oats Markets, Inc., a corporation organized,

existing, and doing business under and by virtue of the laws of the State of Delaware, with its

office and principal place of business located at 3375 Mitchell Lane, Boulder, Colorado 80301,

and its predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures.

3.     "Commission" or "FTC" means the Federal Trade Commission, or any of its

employees, agents, attorneys, and all other persons acting on its behalf, excluding persons

retained as consultants or experts for the purposes of this Matter.

4.     "Confidential Discovery Material" means all Discovery Material that is

confidential or proprietary information produced in discovery.  Such material is referred to in,

and protected by, Rule 26(c)(7) of the Federal Rules of Civil Procedure.  Confidential Discovery

Material shall include non-public trade secret or other research, development or commercial

information, the disclosure of which would likely cause commercial harm to the Producing Party

or to Defendants, in instances where the Producing Party produces information generated by the

Defendants.  The following is a non-exhaustive list of examples of information that likely will

qualify for treatment as Confidential Discovery Material: strategic plans (involving pricing,

marketing, research and development, product road maps, corporate alliances, or mergers and

acquisitions) that have not been fully implemented or revealed to the public; trade secrets;

customer-specific evaluations or data (*e.g.*, prices, volumes, or revenues); sales contracts; system

maps; personnel files and evaluations; information subject to confidentiality or non-disclosure

agreements; proprietary technical or engineering information; proprietary financial data or

projections; and proprietary consumer, customer or market research or analyses applicable to

current or future market conditions, the disclosure of which could reveal Confidential Discovery

Material.  Discovery Material will not be considered confidential if it is in the public domain.

5.     "Counsel of Record" means counsel who file a notice of appearance in this

Matter.

6.     "Disclosing Party" means a party that is disclosing or contemplating disclosing

Discovery Material pursuant to this Protective Order.

7.     "Discovery Material" includes without limitation deposition testimony, deposition

exhibits, interrogatory responses, admissions, affidavits, declarations, Documents produced

pursuant to compulsory process or voluntarily in lieu thereof, and any other Documents or

information produced or given to one Party by another Party or by a Third Party in connection

with discovery in this Matter.  Information taken from Discovery Material that reveals its

substance shall also be considered Discovery Material.

8.     "Document" means the complete original or a true, correct and complete copy and

any non-identical copies of any written or graphic matter, no matter how produced, recorded,

stored or reproduced.  "Document" includes, but is not limited to, any writing, letter, envelope,

telegraph, e-mail, meeting minute, memorandum, statement, affidavit, declaration, book, record,

survey, map, study, handwritten note, working paper, chart, index, tabulation, graph, drawing,

chart, photograph, tape, phono record, compact disc, video tape, data sheet, data processing card,

printout, microfilm, index, computer readable media or other electronically stored data,

appointment book, diary, diary entry, calendar, organizer, desk pad, telephone message slip, note

of interview or communication, and any other data compilation from which information can be

obtained, and includes all drafts and all copies of such Documents and every writing or record

that contains any commentary, notes, or marking whatsoever not appearing on the original.

9.     "Expert/Consultant" means testifying or consulting experts or other persons who are retained to assist Plaintiffs Counsel or Defendants' Counsel in preparation for the hearing or to give testimony at the hearing.

10.     "Matter" means the above captioned matter pending in the United States District Court for the District of Columbia, and all subsequent administrative, appellate or other review proceedings related thereto.

11.     "Outside Counsel" means the law firms that are Counsel of Record for Defendants in this Matter, their partners and associated attorneys; or other persons regularly employed by such law firm(s) including legal assistants, clerical staff, vendors assisting with electronic discovery and information management personnel and temporary personnel retained by such law firm(s) to perform legal or clerical duties, or to provide logistical litigation support with regard to this Matter; provided that any attorney associated with Outside Counsel shall not be a director, officer or employee of Defendants.  The term Outside Counsel does not include persons retained as consultants or experts for the purposes of this Matter.

12.     "Party" means either the FTC, Whole Foods, or Wild Oats.

13.     "Person" means any natural person, business entity, corporate entity, sole proprietorship, partnership, association, governmental entity, or trust.

14.     "Producing Party" means a Party or Third Party that produced or intends to produce Restricted Confidential or Confidential Discovery Material to any of the Parties.  With respect to Restricted Confidential or Confidential Discovery Material of a Third Party that is in the possession, custody, or control of the FTC, or has been produced by the FTC in this Matter, the Producing Party shall mean the Third Party that originally provided such material to the FTC.

The Producing Party shall mean the FTC for purposes of any Document or Discovery Materials prepared by, or on behalf of, the FTC.

15. "Defendants" means Whole Foods and Wild Oats.

16. "Restricted Confidential Discovery Material" means Confidential Discovery Material designated as "Restricted Confidential Discovery Material" that contains non-public, current information that is highly sensitive (*e.g*., marketing plans, pricing plans, financial information, trade secrets, or Documents of a like nature) and the disclosure of which would likely cause substantial commercial harm to the Producing Party or to Defendants. It is the intention of the Parties that this particularly restrictive designation should be utilized for only a select number of Documents. Such a designation shall constitute a representation by counsel for the Producing Party or Defendants, in instances where the Producing Party produces information generated by the Defendants, that the material is properly subject to Restricted Confidential treatment under this Order.

17. "Third Party" means any natural person, partnership, corporation, association, or other legal entity not named as a Party to this Matter and its employees, directors, officers, attorneys, and agents.

## TERMS AND CONDITIONS OF PROTECTIVE ORDER

1. Discovery Material, or information derived therefrom, shall be used solely by the Parties for purposes of this Matter, and shall not be used for any other purpose, including without limitation any business or commercial purpose. Notwithstanding the foregoing, nothing contained in this Protective Order shall prevent the Commission from using any material produced as part of the investigation in this Matter, including any Discovery Material, for any authorized law enforcement purpose, provided that the Commission may only use or disclose Discovery Material as provided by (a) its Rules of Practice, and any cases so construing them;

(b) Sections 6(f) and 21 of the Federal Trade Commission Act, and any cases so construing them; and (c) any other legal obligation imposed upon the Commission.  The Parties, in conducting discovery from Third Parties, shall attach to all discovery requests a copy of this Protective Order and a cover letter that will apprise such Third Parties of their rights hereunder.

2.      Confidential or Restricted Confidential Discovery Material may be designated as such by (a) placing or affixing on each page of a Document containing such material, in a manner that will not interfere with its legibility, the notation "CONFIDENTIAL - FTC v. Whole Foods," or "RESTRICTED CONFIDENTIAL, OUTSIDE COUNSEL ONLY - FTC v. Whole Foods;" or (b) any Party or Third Party instructing the court reporter, with notice to all Parties, within five (5) business days of the receipt of the transcript, to designate as "Confidential" or "Restricted Confidential" each page of the deposition transcript containing the Confidential or Restricted Confidential Discovery Material. Such designations constitute a good-faith representation by counsel for the Party or Third Party making the designation that the Document or transcript constitutes or contains Confidential Discovery Material or Restricted Confidential Discovery Material.  All deposition transcripts shall be treated as Restricted Confidential Discovery Material until the expiration of five (5) business days after the receipt of the transcript. A Producing Party will use reasonable care to avoid designating any Discovery Material as Confidential or Restricted Confidential that is not entitled to such designation.

3.      Restricted Confidential or Confidential Discovery Material shall not be copied or reproduced for use in this Matter except to the extent such copying or reproduction is reasonably necessary to the conduct of this Matter.  All such copies or reproductions of the Material and any documents generated by the Parties containing information drawn from such Material, shall be subject to the terms of this Protective Order.  If the duplication process by which copies or

reproductions of Restricted Confidential or Confidential Discovery Material are made does not preserve the confidentiality designations that appear on the original Documents, all such copies or reproductions shall be stamped with the same confidentiality designation as the original.

4.      All Documents obtained by compulsory process or voluntarily in lieu of process from any Party or Third Party, regardless of whether designated or marked confidential by the Party or Third Party, and transcripts of any investigational hearings, interviews, or depositions that were obtained before this Protective Order was adopted, shall be treated as Restricted Confidential Discovery Material for a period of ten (10) days from the time notice of the intent to produce is given to the Producing Party.  At the expiration of that time, this material shall be treated as Confidential Discovery Material unless documents or transcripts pages are otherwise designated with specificity by the Producing Party as either Restricted Confidential Discovery Material or non-confidential.

5.      If any Party seeks to challenge a Producing Party's designation of material as Restricted Confidential or Confidential Discovery Material, the challenging Party shall notify the Producing Party and all other Parties of the challenge.  Such notice shall identify with specificity (*i.e.*, by document control numbers, deposition transcript page and line reference, or other means sufficient to locate easily such materials) the designation being challenged.  The Producing Party may preserve its designation by providing the challenging Party and all other Parties a written statement of the reasons for the designation within three (3) business days of receiving notice of the confidentiality challenge.  If the Producing Party timely preserves its rights, the Parties shall continue to treat the challenged material as Restricted Confidential or Confidential Discovery Material, absent a written agreement with the Producing Party or order of the Court providing otherwise.

6.      If any conflict regarding a confidentiality designation arises and the Parties involved have failed to resolve the conflict via good-faith negotiations, a Party seeking to disclose the Restricted Confidential or Confidential Discovery Material or challenging a confidentiality designation may make written application to the Court for relief.  The application shall be served on the Producing Party and the other Parties to this Matter, and shall be accompanied by a certification that good-faith negotiations have failed to resolve the outstanding issues.  The Producing Party and any other Party shall have three (3) business days after receiving a copy of the motion to respond to the application.  While an application is pending, the Parties shall maintain the pre-application status of the Restricted Confidential or Confidential Discovery Material.  Nothing in this Protective Order shall create a presumption or alter the burden of persuading the Court of the propriety of a requested disclosure or change in designation.

7.      The Parties shall not be obligated to challenge the propriety of any designation or treatment of information as Restricted Confidential or Confidential Discovery Material and the failure to do so promptly shall not preclude any subsequent objection to such designation or treatment, or any motion seeking permission to disclose such material to Persons not otherwise entitled to access under the terms of this Protective Order.  If Restricted Confidential or Confidential Discovery Material is produced without the designation attached, the material shall be treated as Restricted Confidential or Confidential from the time the Producing Party advises Plaintiffs Counsel and Defendants' Counsel in writing that such material should be so designated and provides all the Parties with an appropriately labeled replacement.  The Parties shall return promptly or destroy the unmarked materials.

8.      Restricted Confidential Discovery Material shall not, directly or indirectly, be disclosed or otherwise provided to anyone except:

      (a)      Plaintiffs counsel and the Commission, as permitted by the Commission's Rules of Practice;

      (b)      Outside Counsel;

      (c)      Experts/Consultants;

      (d)      court reporters and deposition transcript reporters;

      (e)      judges and other court personnel of any court having jurisdiction over any appeal proceedings involving this Matter;

      (f)      any author or recipient of the Discovery Material; any individual who was in the direct chain of supervision of the author at the time the Discovery Material was created or received; any employee or agent of the entity that created or received the Discovery Material; or anyone representing the author or recipient of the Discovery Material in this Matter; and

      (g)      any other Person(s) authorized in writing by the Producing Party.

9.      Confidential Discovery Material shall not, directly or indirectly, be disclosed or otherwise provided to anyone other than those persons listed in paragraph 8 of this Protective Order and to the following representative of Whole Foods:  Roberta Lang; provided that each such representative executes a declaration in the form attached as Exhibit A.  Defendants' Counsel shall maintain a file of all such declarations for the duration of the litigation.

10.      Restricted Confidential or Confidential Discovery Material shall not, directly or indirectly, be disclosed or otherwise provided to an Expert/Consultant until such person has executed and transmitted to counsel for the party retaining such person a declaration in the form

attached as Exhibit A.  Each Party's counsel shall maintain a file of all such declarations for the duration of the litigation.

11.    If any Party desires to disclose Restricted Confidential or Confidential Discovery Material to (a) either any Expert/Consultant, any deponent, or any witness that is or was an officer, director or employee of Whole Foods or Wild Oats, or (b) any Person other than those referred to in paragraphs 8 and 9 of this Protective Order, the Disclosing Party shall notify the Producing Party any other Party of its desire to disclose such material.  The notice shall identify those materials sought to be disclosed with specificity (*i.e.*, by document control numbers, deposition transcript page and line reference, or other means sufficient to locate easily such materials) and the specific Person to whom the Confidential or Restricted Confidential Material is to be disclosed.  For disclosure to any Expert/Consultant, deponent or witness that is or was an officer, director or employee of Whole Foods or Wild Oats, the identification of the Person shall include, but not be limited to, the full name, professional address and/or affiliation, and current curriculum vitae of the identified Person.  The Producing Party may object to the disclosure of the Restricted Confidential or Confidential Discovery Material within five (5) business days of receiving notice of an intent to disclose such material to the Person by providing the Disclosing Party with a written statement of the reasons for objection.  If the Producing Party timely objects, the Disclosing Party shall not disclose the Restricted Confidential or Confidential Discovery Material to the identified Person, absent a written agreement with the Producing Party or order of the Court permitting the disclosure.  If the Producing Party does not object to the disclosure of Restricted Confidential or Confidential Discovery Material to the identified Person within five (5) business days, the Disclosing Party may disclose the Restricted Confidential Discovery Material to the identified Person.

12.     If the FTC (a) receives a discovery request that may require the disclosure by it of a Third Party's Restricted Confidential or Confidential Discovery Material, or (b) intends to or is required to disclose, voluntarily or involuntarily, a Third Party's Restricted Confidential or Confidential Discovery Material (whether or not such disclosure is in response to a discovery request), the FTC promptly shall notify the Third Party of the receipt of such request or its intention to disclose such material. Such notification shall be in writing and, if not otherwise done, sent for receipt by the Third Party at least five (5) business days before disclosure, and shall include a copy of this Protective Order and a cover letter that will apprise the Third Party of its rights hereunder.

13.     If any Person receives a discovery request in another proceeding that may require the disclosure of a Producing Party's Restricted Confidential or Confidential Discovery Material, the recipient of the discovery request shall promptly notify the Producing Party of receipt of the request. The notification shall be in writing and be received by the Producing Party at least five (5) business days before production in the other proceeding, and shall include a copy of this Protective Order and a cover letter apprising the Producing Party of its rights. Nothing herein shall be construed as requiring the recipient of the discovery request or anyone else covered by this Protective Order to challenge or appeal an order requiring production of Restricted Confidential or Confidential Discovery Material, to subject itself to any penalties for noncompliance with such an order, or to seek any relief from the Court. The recipient shall not oppose the Producing Party's efforts to challenge the discovery request calling for the production by the recipient of the Producing Party's Restricted Confidential or Confidential Discovery Material. In addition, nothing herein shall limit the applicability of Section 4.11(e) of the FTC

Rules of Practice, 16 C.F.R. 44.1l(e), to discovery requests in another proceeding that are directed to the Commission.

14.     Counsel for the Parties or any Producing Party shall have the right to exclude from oral depositions any person not authorized to receive Restricted Confidential or Confidential Discovery Material, during periods of examination or testimony relating to such material.

15.     In the event that any Restricted Confidential or Confidential Discovery Material is contained in any pleading, motion, exhibit, brief, or other paper filed or to be filed with the Court, the Party filing the papers shall inform the Clerk of Court, and the papers shall be filed under seal pursuant to the Federal Rules of Civil Procedure and the Rules of the United States District Court for the District of Columbia.  Restricted Confidential or Confidential Discovery Material contained in papers (including Restricted Confidential or Confidential Discovery Material from the Parties and Third Parties) shall remain under seal until further order of the Court; provided, however, that the papers may be furnished to persons or entities who may receive Restricted Confidential or Confidential Discovery Material pursuant to this Protective Order.  After filing any paper containing Restricted Confidential or Confidential Discovery Material, the filing Party must file on the public record a duplicate copy of the paper with the Restricted Confidential or Confidential Discovery Material deleted, within five (5) business days of the original filing.  Further, if the protection for any such material ceases, any Party may file on the public record a copy that also contains the formerly protected material.

16.     If counsel for a Party plans to introduce into evidence at trial any Document or transcript containing Restricted Confidential or Confidential Discovery Material produced by a Third Party or any other Party, the counsel shall provide forty-eight (48) hours advance notice

before such introduction to the Producing Party and any other Party, or as much notice before the introduction as practicable under the circumstances, for purposes of allowing that Party to seek an order that the Document or transcript be granted *in camera* treatment.  Except where an order seeking in camera treatment is granted, all Documents and transcripts shall be part of the public record.  If in camera treatment is granted, a copy of the Document or transcript with the Restricted Confidential or Confidential Discovery Material deleted must be placed on the public record.

17.    The inadvertent production or disclosure of (i) material provided to the FTC during its investigation under the Hart-Scott-Rodino Antitrust Improvement Act, 15 U.S.C. § 18a, or (ii) any Discovery Material, which a Producing Party claims should not have been produced or disclosed because of a privilege will not be deemed to be a waiver of any privilege to which the Producing Party would have been entitled had the privileged Discovery Material not inadvertently been produced or disclosed.  In the event of such claimed inadvertent production or disclosure, the procedures of Federal Rules of Civil Procedure 26(b)(5)(B) shall apply.  The inadvertent production of a privileged document shall not be deemed a waiver of the privilege for all documents relating to that subject matter.

18.    Nothing in this Protective Order shall be construed to conflict with the provisions of Sections 6, 10, and 21 of the Federal Trade Commission Act, 15 U.S.C. § 46, 50, 57b-2, or with Rules 3.22, 3.45 or 4.11(b)-(e), 16 C.F.R. §§ 3.22, 3.45 and 4.11(b)-(e).  Any Party or Producing Party may move at any time for in camera treatment of any Confidential Discovery Material or any portion of the proceedings in this Matter to the extent necessary for proper disposition of this Matter.

19.    At the conclusion of this Matter, the Defendants shall (a) return or destroy all Documents obtained in this Matter that contain or refer to Restricted Confidential or Confidential Discovery Material, other than materials that have been made part of the public record in this Matter, and (b) provide the Producing Party with an affidavit of destruction, *provided that* the provisions of 15 U.S.C. § 18a and § 4.12 of the FTC Rules of Practice, 16 C.F.R. 4.12, shall govern the retention, return, or destruction of any documents obtained by the FTC prior to the filing of the Complaint to the extent the provisions of that statute or regulation is inconsistent with the provisions of this Protective Order.  At the time that any Expert/Consultant or other person retained to assist counsel in the preparation of this Matter concludes participation in this Matter, that person shall return to counsel all copies of Documents or portions thereof designated Restricted Confidential or Confidential Discovery Material that are in the possession of that person, together with all notes, memoranda, or other papers containing Restricted Confidential or Confidential Discovery Material.

20.    The provisions of this Protective Order, insofar as they restrict the communication and use of Restricted Confidential and Confidential Discovery Material shall, without written permission of the Producing Party or further order of the Court, continue to be binding after the conclusion of this Matter.

21.    This Protective Order shall not apply to the disclosure by a Producing Party or its Counsel of the Producing Party's Restricted Confidential or Confidential Discovery Material to the Producing Party's current or former employees, agents, board members, directors, and officers.

22.     Entry of the foregoing Protective Order is without prejudice to the right of the

Parties or Third Parties to apply for further protective orders or for modification of any provision

of this Protective Order by application to the Court for good cause shown.


DATE:  _____


 ORDERED:                                        _____
                                                 The Honorable Paul L. Friedman
                                                 United States District Judge
                                                 District of Columbia

**EXHIBIT A**

**TO THE PROTECTIVE ORDER GOVERNING DISCOVERY MATERIAL**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>           Plaintiff,<br><br>    v.<br><br>WHOLE FOODS MARKET, INC.<br><br>and<br><br>WILD OATS MARKETS, INC.,<br><br>           Defendants. | Case No. 1:07-CV-01021 (PLF) |

**DECLARATION CONCERNING PROTECTIVE
ORDER GOVERNING DISCOVERY MATERIAL**

I, [NAME], hereby declare and certify the following to be true:

      1.     [Statement of employment]

      2.     I have read the "Protective Order Governing Discovery Material" ("Protective Order") issued by the Court _____on _____, in connection with the above captioned Matter.  I understand the restrictions on my access to and use of any Restricted Confidential or Confidential Discovery Material (as these terms are used in the Protective Order) in this Matter and I agree to abide by the Protective Order.

      3.     I understand that the restrictions on my use of such Restricted Confidential or Confidential Discovery Material include:

              a.     that I will use such Restricted Confidential or Confidential Discovery Material only for the purpose of preparing for this proceeding, and hearing(s) and any appeal of this proceeding and for no other purpose;

     b.      that I will not disclose such Restricted Confidential or Confidential Discovery Material to anyone, except as permitted by the Protective Order;

     c.      that I will use, store and maintain the Restricted Confidential and Confidential Discovery Material in such a way as to ensure its continued protected status; and

     d.      that upon the termination of my participation in this proceeding I will promptly return all Restricted Confidential or Confidential Discovery Material, and all notes, memoranda, or other papers containing Restricted Confidential or Confidential Discovery Material, to Plaintiffs Counsel or Defendants' Outside Counsel, as appropriate.

4.     I understand that if I am receiving Confidential Discovery Material as an Expert/Consultant, as that term is defined in this Protective Order, the restrictions on my use of Confidential Discovery Material also include the duty and obligation to:

     a.      maintain such Restricted Confidential or Confidential Discovery Material in separate locked room(s) or locked cabinet(s) when such Restricted Confidential or Confidential Discovery Material is not being reviewed;

     b.      return such Restricted Confidential or Confidential Discovery Material to Plaintiff's Counsel or Defendants' Outside Counsel, as appropriate, upon the conclusion of my assignment or retention, or upon conclusion of this Matter; and

     c.      use such Restricted Confidential or Confidential Discovery Material and the information contained therein solely for the purpose of rendering consulting services to a Party to this Matter, including providing testimony in judicial or administrative proceedings arising out of this Matter.

5.     I am fully aware that, pursuant to Rule 26, Federal Rules of Civil Procedure, Rule 37, Federal Rules of Civil Procedure, and Section 3.42(h) of the FTC Rules of Practice, 16 C.F.R. § 3.42(h), my failure to comply with the terms of the Protective Order may constitute contempt of the Commission and may subject me to sanctions imposed by the Court or the Commission.


_____     Date: _____

Full Name [Typed or Printed]



_____