**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 07-cv-01021-PLF |
| | ) | |
| WHOLE FOODS MARKET, INC., | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| WILD OATS MARKETS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**NOTICE OF FILING**

Pursuant to the Court's Order entered on July 9, 2007 [Docket No. 98], Plaintiff Federal Trade Commission files herewith the Public Version of the Memorandum in Support of Plaintiff's Motions for Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,

Dated: July 10, 2007

/s/ Thomas J. Lang
Thomas J. Lang (DC Bar # 452398)
Federal Trade Commission
601 New Jersey Avenue, N.W.
Washington, D.C. 20580
Telephone: (202) 326-2665
Facsimile: (202) 326-2071
tlang@FTC.gov

*Counsel to the Federal Trade Commission*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this date I filed and served the foregoing via CM/ECF and served the foregoing via electronic mail to:

Alden L. Atkins, Esq.
The Willard Office Building
1455 Pennsylvania Ave., N.W., Suite 600
Washington, D.C. 20004-1008
Aatkins@velaw.com

Counsel for Defendant Whole Foods Market, Inc.

Paul T. Denis, Esq.
Dechert LLP
1775 I Street
Washington, DC 20006-2401
Paul.denis@dechert.com
Counsel for Defendant Whole Foods Market, Inc.

Clifford H. Aronson, Esq. (Counsel for Defendant Wild Oats Markets, Inc.)
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Caronson@skadden.com

Counsel for Defendant Wild Oats Markets, Inc.

Dated: July 10, 2007

/s/ Thomas J. Lang
Thomas J. Lang

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION )
600 Pennsylvania Avenue, N.W. )
Washington, D.C. 20580 )
) Civ. No.
Plaintiff, )
)
) **PUBLIC VERSION**
v. )
)
WHOLE FOODS MARKET, INC. )
550 Bowie Street )
Austin, Texas 78703 )
)
and )
)
WILD OATS MARKETS, INC. )
1821 30th Street )
Boulder, Colorado 80301 )
)
)
Defendants. )

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTIONS
FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Dated: June 6, 2007

WILLIAM BLUMENTHAL
General Counsel

JEFFREY SCHMIDT
Director

KENNETH L. GLAZER
Deputy Director
Bureau of Competition
Federal Trade Commission
600 Pennsylvania Ave, N.W.
Washington, DC 20580

MICHAEL J. BLOOM
CATHARINE M. MOSCATELLI (D.C. Bar No. 418510)
JOAN L. HEIM
THOMAS H. BROCK (D.C. Bar No. 939207)
MICHAEL A. FRANCHAK
ABIGAIL SLATER
JEANNE H. LIU
Federal Trade Commission
601 New Jersey Ave., N.W.
Washington, DC 20001
(202) 326-2475 (direct dial)
(202) 326-2284 (facsimile)
mjbloom@ftc.gov

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . 5

I. SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT ESTABLISHES A PUBLIC INTEREST STANDARD FOR GRANTING INJUNCTIVE RELIEF . . . . . . . . . . 5

II. THE FTC IS LIKELY TO SUCCEED IN ESTABLISHING THAT THE PROPOSED ACQUISITION VIOLATES THE ANTITRUST LAWS . . . . . . . . 6

A. A Relevant Product Market in Which to Analyze the Proposed Acquisition Is the Operation of Premium Natural and Organic Supermarkets . . . . . . . 9

1. *The Market Definition* . . . . . . . . . . 9

2. *Premium Natural and Organic Supermarkets Are Differentiated from Other Retailers* . . . . . . . . . . 10

a. Premium Natural and Organic Supermarkets Carry a Unique Inventory of Products. . . . . . . . . . . 11

b. Premium Natural and Organic Supermarkets Are "Lifestyle Retailers," Offering Superior Service in a Unique Shopping Environment. . . . . . . . . . . 13

c. Significant Differentiation Between Premium Natural and Organic Supermarkets and Other Retailers Is Reflected in Sales Diversion and Gross Margin Data. . . . . . . . . . . 16

d. The Defendants Recognize Premium Natural and Organic Supermarkets as an Economically Distinct Market. . . . . 17

B. Relevant Geographic Markets in Which to Analyze the Proposed Acquisition Are Local. . . . . . . . . . . 19

C. The Relevant Markets Are Highly Concentrated and Whole Foods' Acquisition of Wild Oats Will Greatly Increase Concentration, Significantly Increasing Market Power. . . . . . . . . . . 20

D. The Proposed Acquisition Would Injure Competition in Numerous Areas of the Country. . . . . . . . . . . 22

1. *There Is Abundant Evidence of Unique Price Competition Between the Defendants.* . . . . . . . . . . 22

2. *There Is Abundant Evidence of Unique Non-Price Competition Between the Defendants.* . . . . . . . . . . 24

3. *Wild Oats Is a Viable and Aggressive Competitor.* . . . . . . . . . . 25

E. Other Retailers Will Not Reposition into the Operation of Premium Natural and Organic Supermarkets, Nor Will Other Companies Enter *De Novo* . . . . . . . . . . 27

F. Summary: Whole Foods' Acquisition of Wild Oats Will Harm Competition . . . . . . . . . . 37

III. THE EQUITIES FAVOR ISSUING THE REQUESTED INJUNCTIONS . . . . 38

CONCLUSION . . . . . . . . . . 40

# TABLE OF AUTHORITIES

## CASES

*Bon-Ton Stores, Inc. v. May Dep't Stores Co.*,
881 F. Supp. 860 (W.D.N.Y. 1994) . . . . . . . . 8

*Brown Shoe Co., Inc. v. United States*,
370 U.S. 294 (1962) . . . . . . . . 6, 8, 9

*Columbia Broad. Sys., Inc. v. FTC*,
414 F.2d 974 (7th Cir. 1969) . . . . . . . . 8

*FTC v. Cardinal Health, Inc.*,
12 F. Supp. 2d 34 (D.D.C. 1998) . . . . . . . . 5-7, 9, 28, 38

*FTC v. Elders Grain, Inc.*,
868 F.2d 901 (7th Cir. 1989) . . . . . . . . 38, 39

*FTC v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) . . . . . . . . 5, 6, 21, 38, 39

*FTC v. Lancaster Colony Corp., Inc.*,
434 F. Supp. 1088 (S.D.N.Y. 1977) . . . . . . . . 6, 38

*FTC v. PPG Indus., Inc.*,
798 F.2d 1500 (D.C. Cir. 1986) . . . . . . . . 38, 39

*FTC v. Staples, Inc.*,
970 F. Supp. 1066 (D.D.C. 1997) . . . . . . . . 5, 6, 8-10, 28, 38

*FTC v. Swedish Match N. Am., Inc.*,
131 F. Supp. 2d 151 (D.D.C. 2000) . . . . . . . . 5, 28

*FTC v. Univ. Health, Inc.*,
938 F.2d 1206 (11th Cir. 1991) . . . . . . . . 5, 6

*FTC v. Warner Communications, Inc.*,
742 F.2d 1206 (9th Cir. 1984) . . . . . . . . 5, 6, 38

*FTC v. Weyerhaeuser Co.*,
665 F.2d 1072 (D.C. Cir. 1981) . . . . . . . . 5, 39

*Greyhound Computer Corp., Inc. v. Int'l Bus. Mach. Corp.*,
559 F.2d 488 (9th Cir. 1977) . . . . . . . . 8

*Hosp. Corp. of Am. v. FTC*,
807 F.2d 1381 (7th Cir. 1986) . . . . . . . . 21

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
792 F.2d 210 (D.C. Cir. 1986) . . . . . . . . 8

*Tampa Elec. Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961) . . . . . . . . 19

*Times-Picayune Publ'g Co. v. United States*,
345 U.S. 594 (1953) . . . . . . . . 9

*U.S. v. United Tote, Inc.*,
768 F. Supp. 1064 (D. Del. 1991) . . . . . . . . 28

*United States v. Archer-Daniels-Midland Co.*,
866 F.2d 242 (8th Cir. 1988) . . . . . . . . 9

*United States v. Baker Hughes, Inc.*,
908 F.2d 981 (D.C. Cir. 1990) . . . . . . . . 7, 21, 28

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) . . . . . . . . 9

*United States v. Marine Bancorporation, Inc.*,
418 U.S. 602, 613 (1974) . . . . . . . . 7

*United States v. Philadelphia Nat'l Bank*,
374 U.S. 321 (1963) . . . . . . . . 7, 19

**STATUTES**

Clayton Act, Section 11
15 U.S.C. § 21 . . . . . . . . 5

Clayton Act, Section 7
15 U.S.C. § 18 . . . . . . . . 5, 6

Federal Trade Commission Act, Section 13(b)
15 U.S.C. § 53(b) . . . . . . . . 4, 5

Federal Trade Commission Act, Section 5
15 U.S.C. § 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## OTHER AUTHORITIES

4 Areeda, Hovenkamp & Solow, *Antitrust Law* (rev. ed. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Commentary on the Horizontal Merger Guidelines*,
Exhibit 16 (PX01341) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

Len Lewis, *The Trader Joe's Adventure* 20 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Organic Food Production Act of 1990,
7 U.S.C. § 6501-22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 29, 32

U.S. Dept. of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines,
4 Trade Reg. Rep. (CCH) ¶ 13,104 (Apr. 8, 1997) . . . . . . . . . . . . . . . . . . . . . . . 7, 21, 28

USDA Organic Rule,
7 C.F.R. § 205 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 29

## INTRODUCTION

This lawsuit is brought to prevent the anticompetitive acquisition of Wild Oats Markets, Inc., by Whole Foods Market, Inc. Whole Foods and Wild Oats are the two largest retailers specializing in "natural and organic" foods. As the former CEO of Wild Oats testified, "[T]here's really only two players . . . of any substance in the organic and all natural, and that's Whole Foods and Wild Oats." Exhibit 3 (Transcript of Investigational Hearing of Perry Odak, Former CEO of Wild Oats, at 58:21-24, PX01325 at 058).

There is no mystery as to why Whole Foods wants to buy its closest rival. In justifying the payment of a significant premium for Wild Oats, Whole Foods' CEO John Mackey explained to his Board of Directors:

> By buying them we will . . . avoid nasty price wars in Portland (both Oregon and Maine), Boulder, Nashville, and several other cities which will harm our gross margins and profitability. OATS may not be able to defeat us but they can still hurt us. Furthermore we eliminate forever the possibility of Kroger, Super Value, or Safeway using their brand equity to launch a competing national natural/organic food chain to rival us. . . . [Wild Oats] is the only existing company that has the brand and number of stores to be a meaningful springboard for another player to get into this space. Eliminating them means eliminating this threat forever, or almost forever.

Exhibit 1 (PX00773 at 001). He explained that "these two [reasons] alone make the deal worth doing." *Id.*

In his deposition, Mr. Mackey reaffirmed that a major reason for the acquisition was to keep Wild Oats out of the hands of other supermarkets:

> So it is either Whole Foods buy them or we potentially see someone like Kroger or Safeway or Tesco or God knows who else, a private equity firm, buy them and recapitalize them, potentially bring in new management. And we would rather not see that happen.

Exhibit 2 (Transcript of Investigational Hearing of John Mackey, at 54:22-55:2, PX01324 at 054-055). And he reiterated that the purchase price includes a "premium for taking it off the table for Kroger or Safeway to use it to harm Whole Foods with." *Id.* at 246:7-8. Mr. Mackey also intends to take the stores "off the table" for consumers as well: Whole Foods plans to close ██████ of the 110 acquired stores. Exhibit 14 (PX00553 at 001); Exhibit 15 (PX01338 at 95) Exhibit 7 (PX01349).

Organic and natural foods have been available for many years at traditional health food stores, which typically are small, independent "mom and pop" stores or coops. But starting in the 1980s, a new breed of natural and organic food retailer came onto the scene – large, attractive supermarkets offering a wide variety of high-quality fruits and vegetables, meats and fish, prepared foods and other perishables, with a strong branding and a prominent emphasis on healthy lifestyles and environmental sustainability.

Some in the industry referred to this new type of food retailer as "super naturals," to distinguish them from the old-style health food store. Whatever the name, it was a distinctly new concept in food retailing and it became very successful. Whole Foods and Wild Oats are the best known of this type of store, which we will refer to as "premium natural and organic supermarkets." Others were Bread & Circus and Fresh Fields, both of which were purchased by Whole Foods in the 1990s. Today, apart from the defendants, only a few regional firms compete in this product space, including Earth Fare in a few Southeastern states and New Seasons in Oregon.

Premium natural and organic supermarkets distinguish themselves from other food retailers by offering an extensive selection of natural and organic products to enable their

customers to purchase substantially all of their food and grocery requirements during a single shopping trip. They offer a vast selection of very high quality fresh fruits and vegetables (including exotic and hard-to-find items), prepared foods, other perishables, more amenities and service venues, and higher levels of service such as more knowledgeable service personnel. They also target shoppers with strong preferences for natural and organic products who are, in the words of one of the defendants, "affluent, well educated, health oriented, quality food oriented people." Exhibit 10 (PX00718); *see also* Exhibit 11 (PX01331 at 002).

Through the blending together of these elements and others, premium natural and organic supermarkets create a varied and dynamic experience for shoppers, inviting them to make the premium natural and organic supermarket a destination to which shoppers come not merely to shop, but to gather together, interact, and learn, often while enjoying shared eating and other experiences. Premium natural and organic supermarkets expend substantial resources on developing a brand identity that connotes this blend of elements, especially the qualities of trustworthiness (*e.g.*, that all products are natural, that products labeled "organic" are properly labeled, that the store's suppliers practice humane animal husbandry, and that the store's actions are ecologically sound) and qualitative superiority to other retailers. This creates substantial brand equity for premium natural and organic supermarkets in general, and Whole Foods and Wild Oats in particular.

Even though conventional supermarkets now frequently carry some natural and organic products, Whole Foods and Wild Oats recognize that their primary competitors are other premium natural and organic supermarkets:

> [O]rganic and natural foods retailers have emerged as a competitive market all their

> own. . . . [T]hey are . . . building a brand that not only promotes the lifestyle, but takes the concept of lifestyle marketing one step further by creating and promoting a sense of community around the lifestyle.

Exhibit 8 (PX01303 at 002). In Mr. Mackey's opinion, conventional supermarkets cannot effectively compete in this market:

> Safeway and other conventional retailers will keep doing their thing – trying to be all things to all people. . . . They can't really effectively focus on Whole Foods Core Customers without abandoning 90% of their own customers.

Exhibit 9 (PX00785).

Focusing its attention on its closest rival, Whole Foods regularly initiated numerous forays into what Whole Foods described as Wild Oats' "monopoly" markets.[1] In March 2006, for example, Mr. Mackey wrote:

> Whole Foods says they will open 25 stores in OATS territories in the next 2 years. . . . The writing is on the wall. The end game is now underway for OATS. . . . Whole Foods is systematically destroying their viability as a business – market by market, city by city.[2]

But Whole Foods decided that the "systematic destruction" of Wild Oats through competition would take more time and expense and involve more uncertainty than simply acquiring Wild Oats. Whole Foods saw the acquisition of Wild Oats as a quick and certain way of "destroying" Wild Oats and the competition it uniquely represented. That is why Whole Foods is "doing this deal." And that is why Whole Foods is willing to pay an admitted substantial premium for Wild

---

1 Exhibit 4 (PX00712 at 001); *see also* Exhibit 5 (PX00080 at 001-002) (May 2006 email, forwarded by Mr. Mackey to his executive team, in which a Whole Foods-executive observed that "prices were higher at [the newly opened Wild Oats store in Tampa, Florida, because] *[b]eing the only game in town* gives them that freedom. . . . Their pricing was high since they are the only large natural food store in the area.") (emphasis added).

2 Exhibit 6 (PX00801 at 001). As here, Mr. Mackey often posted to Internet sites pseudonymously, often using the name Rahodeb.

Oats, and incur the additional cost of at least $2-3 million per store for each of the many stores Whole Foods intends to close. *See* Exhibit 7 (PX01349).

To prevent this destruction of competition, plaintiff Federal Trade Commission ("FTC" or the "Commission") seeks a temporary restraining order and preliminary injunction pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to prevent Whole Foods' acquisition of Wild Oats pending a determination by the Commission of the legality of the acquisition under Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18 and 21, and Section 5 of the FTC Act, 15 U.S.C. § 45. Absent the requested injunctions, Whole Foods will complete the acquisition of Wild Oats resulting in the following: Whole Foods will close down many Wild Oats stores;[3] Wild Oats' infrastructure will be dismantled; and the possibility of restoring competition in the operation of premium natural and organic supermarkets in numerous geographic areas will be lost, resulting in substantial harm to consumers.

## ARGUMENT

### I. SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT ESTABLISHES A PUBLIC INTEREST STANDARD FOR GRANTING INJUNCTIVE RELIEF.

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides that a preliminary injunction may be granted "upon a proper showing that, weighing the equities and considering the FTC's likelihood of ultimate success, such action would be in the public interest." In enacting Section 13(b), Congress adopted a "public interest" standard. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001); *see FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1081-82 (D.C. Cir. 1981). Under that standard, the court "must (1) determine the likelihood that the FTC will ultimately succeed

---

[3] Exhibit 14 (PX00553 at 001); Transcript of Investigational Hearing of Elisabeth Griffin Foster, Whole Foods VP of Business Development, 95:2-11, Exhibit 15 (PX01338 at 95).

on the merits and (2) balance the equities." *Heinz*, 246 F.3d at 714. The court's "task is not to make a final determination on whether the proposed [acquisition] violates Section 7, but rather to make only a preliminary assessment of the [acquisition]'s impact on competition."[4] The FTC satisfies its burden if it "raise[s] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals."[5]

## II. THE FTC IS LIKELY TO SUCCEED IN ESTABLISHING THAT THE PROPOSED ACQUISITION VIOLATES THE ANTITRUST LAWS.

Section 7 of the Clayton Act prohibits any acquisition "where in any line of commerce in any section of the country, the effect of such acquisition *may be* substantially to lessen competition or to tend to create a monopoly." 15 U.S.C. § 18 (emphasis added). Section 7 is intended to arrest anticompetitive acquisitions in their incipiency. *Univ. Health*, 938 F.2d at 1218. "All that is necessary is that the merger create an *appreciable danger* of [anticompetitive] consequences in the future. A predictive judgment, necessarily probabilistic and judgmental rather than demonstrable, is called for." *Heinz*, 246 F.3d at 719 (citations omitted) (emphasis added); *see also Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 323 (1962) (The inquiry

---

[4] *Heinz*, 246 F.3d at 714 (citing *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217-18 (11th Cir. 1991)); *FTC v. Warner Communications, Inc.*, 742 F.2d 1156, 1164 (9th Cir. 1984); *see also FTC v. Swedish Match N. Am., Inc.*, 131 F. Supp. 2d 151, 156 (D.D.C. 2000); *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 45 (D.D.C. 1998); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1070-71 (D.D.C. 1997). This Court need not resolve all conflicts of evidence or analyze extensivelly all antitrust issues; that is the province of the administrative proceeding. *Warner Communications*, 742 F.2d at 1164 (citing *FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088, 1094, 1096 (S.D.N.Y. 1977)).

[5] *Heinz*, 246 F.3d at 714-15; *Univ. Health*, 938 F.2d at 1218; *Warner Communications*, 742 F.2d at 1162; *Swedish Match*, 131 F. Supp. 2d at 156; *Cardinal Health*, 12 F. Supp. 2d at 45; *Staples*, 970 F. Supp. at 1071.

"deals in probabilities, not certainties . . . ."); *Staples*, 970 F. Supp. at 1072 ("the government need only show that there is a 'reasonable probability' that the challenged transaction will substantially impair competition").

Merger analysis under Section 7 requires determinations of: (1) the "line of commerce" or relevant product market; (2) the "section of the country" or relevant geographic market; and (3) the transaction's probable effect on competition in the product and geographic markets. Evidence establishing undue concentration in the relevant market makes out the government's *prima facie* case and gives rise to a presumption of unlawfulness. *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963); *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990); *Cardinal Health*, 12 F. Supp. 2d at 52.

Once a *prima facie* violation is established, the burden shifts to defendants to rebut the *prima facie* case by demonstrating that other market characteristics make the presumption of anticompetitive effects implausible. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 613 (1974); *Baker Hughes*, 908 F.2d at 982-83; *Cardinal Health*, 12 F. Supp. 2d at 54. If defendants offer evidence seeking to rebut the presumption from concentration and market share, the Commission stands ready to prove that the merger is likely to reduce competition, by showing that defendants view each other as significant competitors, and that the merger will increase Whole Foods' ability to exercise market power.

A merger may create adverse competitive effects in two ways. First, a merger may diminish competition by enabling the remaining firms in the market to more successfully engage in coordinated interaction. Second, a merger may enable the merging firms to profitably alter their behavior following the acquisition by unilaterally increasing price and reducing output.

U.S. Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* § 2.0-2.22 ("*Merger Guidelines*" or "*Guidelines*"), Exhibit 17 (PX01310).

In markets where the products are differentiated (*i.e.*, the products sold by different participants in the market are not perfect substitutes for one another), competition may be localized, meaning individual sellers compete more directly with those competitors selling close substitutes. *Id.* § 2.21. In such a market, a merger between firms that are close substitutes may cause unilateral price increases. A price increase by the merged firm may be profitable because some of the sales lost on the product for which the price has been increased is diverted to the other product. *Id.*

The *Staples* decision provides an example. This Court in *Staples* (overcoming its initial reaction) concluded that the sale of consumable office supplies through office superstores was a sound relevant product market, notwithstanding that "[t]he products in question are undeniably the same no matter who sells them," and many types of retailers sell them.

> [T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes. The Supreme Court has recognized that within a broad market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."[6]

---

[6] *Staples*, 970 F. Supp. at 1075; *Brown Shoe*, 370 U.S. at 325 (1962); *see also Rothery Storage & Van Co. v. Atlas Van Lines Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986). *Cf. Greyhound Computer Corp., Inc. v. Int'l Bus. Mach. Corp.*, 559 F.2d 488 (9th Cir. 1977) (relevant market for computer rentals versus computer sales); *Columbia Broad. Sys., Inc. v. FTC*, 414 F.2d 974 (7th Cir. 1969) (relevant market for records sold through mail-order subscription services); *Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860, 868-75 (W.D.N.Y. 1994) (relevant market for department stores even though similar merchandise was available through other outlets). The courts in each of these cases recognized that where distinct demand exists for a product through a particular distribution channel such that prices within that channel are constrained more directly by in-channel competitors than out-of-channel suppliers, the particular form of distribution of the product comprises a distinct relevant product market.

The transaction here, if consummated, will result in substantial anticompetitive unilateral effects. As we explain below, Whole Foods and Wild Oats are by far each other's most direct rival. While they compete to some limited extent with other supermarkets, that competition is demonstrably not sufficient to constrain Whole Foods, after the merger, from profitably raising prices or reducing services.

A. A Relevant Product Market in Which to Analyze the Proposed Acquisition Is the Operation of Premium Natural and Organic Supermarkets.

1. *The Market Definition.*

Market definition is designed to distinguish close competitive constraints from those more distant so that one can then examine whether the acquisition significantly reduces competition among *close* constraints. *See, e.g.*, 4 Areeda, Hovenkamp & Solow, *Antitrust Law* ¶ 929c (rev. ed. 1998). The Supreme Court has explained that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use [by consumers] or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325; *see also United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). In making the relevant product market determination, courts typically review a number of "practical indicia." *See generally Brown Shoe*, 370 U.S. at 325. These include industry or public recognition of the market, the product's peculiar characteristics and uses, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. *See, e.g.*, *Staples*, 970 F. Supp. at 1079 ("the unique combination of size, selection, depth and breadth of inventory offered by the superstores distinguishes them from other retailers"). A relevant product market "must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only

a limited number of buyers will turn . . . ." *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 n.31 (1953).

> [T]he Court must determine whether . . . there is reason to find that if the defendants were to raise prices after the proposed merger[], their customers would switch to alternative sources of supply to defeat the price increase.

*Cardinal Health*, 12 F. Supp. 2d at 46; *accord United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246 (8th Cir. 1988) ("[T]hese concepts help evaluate the extent competition constrains market power and are, therefore, indirect measurements of a firm's market power.").

Significantly, the fact that a product has some constraining effect on another product or similar functionality does not necessarily mean that they are in the same relevant market. The evidence shows that premium natural and organic supermarkets are a relevant market in which to assess the effects of Whole Foods' proposed acquisition of Wild Oats. That is not to say that premium natural and organic supermarkets do not compete at all with other retailers. Rather, it is to recognize, as the evidence requires, that competition between and among premium natural and organic supermarkets is pervasive and powerful, and competition between premium natural and organic supermarkets and other retailers is appreciably less so. As noted above, this Court in *Staples* (overcoming its initial reaction) concluded that the sale of consumable office supplies through office superstores was a sound relevant product market, notwithstanding that "[t]he products in question are undeniably the same no matter who sells them," and many types of retailers sell them. *Staples*, 970 F. Supp. at 1075.

2. *Premium Natural and Organic Supermarkets Are Differentiated from Other Retailers.*

Whole Foods describes itself as the "[w]orld's leading natural & organic foods supermarket." Exhibit 18 (PX00011 at 003). Wild Oats' goal is to "[b]ecome the leading

national brand for natural, organic and farm fresh products." Exhibit 19 (PX01332 at 005, 026). Like conventional supermarkets, premium natural and organic supermarkets carry a sufficiently large and diverse inventory of products to enable shoppers to buy most of their weekly food and grocery needs in a single shopping trip. However, as compared with conventional supermarkets and other retailers, premium natural and organic supermarkets sell different products to different people in different ways.

a. Premium Natural and Organic Supermarkets Carry a Unique Inventory of Products.

A significant difference between premium natural and organic supermarkets and conventional retailers is in the number and variety of natural and organic SKUs. Substantially all of those products are "natural," meaning they are minimally processed, with minimal or no artificial ingredients, preservatives, and other non-naturally occurring substances. A great many of the food products are "organic" – vastly more than are carried by other retailers. "Organic foods" are foods that are produced using agricultural practices that promote healthy ecosystems: no genetically engineered seeds or crops, sewage sludge, long-lasting pesticides or fungicides; healthy and humane livestock management practices; and food processing that protects the healthfulness of the organic product, including the avoidance of irradiation, genetically modified organisms, and synthetic preservatives. Organic foods sell at a premium to conventional foods, but the large-scale sale of organic products also imposes unique burdens and costs.

Pursuant to the Organic Food Production Act of 1990, 7 U.S.C. §§ 6501-22, the United States Department of Agriculture ("USDA") developed national standards for organic products, articulated in the USDA's "Organic Rule," 7 C.F.R. § 205. Pursuant to the Organic Rule, retailers of products labeled "organic" must use handling, storage, and other practices to protect

the integrity of organically-labeled products, including: preventing commingling of organic and non-organic ("conventional") products; protecting organic products from contact with prohibited substances; and maintaining records that document adherence to the USDA requirements.

The differentiation between premium natural and organic supermarkets and conventional supermarkets is not simply one of natural/organic products versus conventional products. Premium natural and organic supermarkets also differ from conventional supermarkets in their relative emphasis on perishables and dry groceries. For example, Whole Foods stores

> feature over 30,000 natural and organic SKUs, and our emphasis on the highest quality perishables, which are just under 70 percent of our [dollar] sales and gradually increasing, broadens [Whole Foods'] appeal beyond the core natural and organic food customer.

Exhibit 23 (PX01333 at 003-004). Similarly, approximately ████ of Wild Oats' revenues are from the sale of perishables. Exhibit 3 (Odak Tr. at 39:9-10, PX01325 at 039). In contrast with premium natural and organic supermarkets, only about 30% of conventional supermarkets' revenues are from the sale of perishables. *Id.* at 39:9-21 (PX01325 at 039).

The quality of perishables also is a differentiating point between premium natural and organic supermarkets and other retailers. In 2006, Mr. Mackey wrote

> High quality perishable foods (both commercial and organic) is the key to [Whole Foods'] business model – produce, meat, seafood, bakery, prepared foods. . . . Wal-Mart doesn't sell high quality perishables and neither does Trader Joe's while we are on the subject. That is why Whole Foods coexists so well with TJ's [as Trader Joe's is known familiarly] and it is also why Wal-Mart isn't going to hurt Whole Foods.

Exhibit 24 (PX00749 at 001). The make-up of those perishables offers still further evidence of the distinctness of premium natural and organic supermarkets. For instance, a Safeway Lifestyle store[7] may offer 40 to 45 different organic produce SKUs; mass merchants, fewer still. In

[7] A Safeway Lifestyle store is a remodeled Safeway store with a greater emphasis on natural and organic produce. Exhibit 25 (Transcript of Investigational Hearing of Walter

comparison, a Whole Foods store may offer 200 to 275 different organic produce SKUs and a Wild Oats store approximately 300 organic produce SKUs. Exhibit 3 (Odak Tr. at 77-79, PX01325 at 077-079); Exhibit 26 (Transcript of Investigational Hearing of Edmund Lamacchia, at 40(PX01326 at 040).

Premium natural and organic supermarkets differ importantly from most other retailers in the products they eschew, as well as those they carry. Premium natural and organic supermarkets sell a healthy lifestyle. As explained in a 2005 Wild Oats marketing presentation:

> Wild Oats and Whole Foods brands dominate the Natural and Organic channel. Wild Oats established its brand position via an extensive and authentic "all-natural" and "organic" offering targeting a broadening health/well being consumer segment.

Exhibit 19 (PX01332 at 102). Whole Foods' senior management agrees.

> It's about more than just food. We are a mission-driven company and that is important to our customers. We are the authentic retailer of natural and organic products.

Exhibit 18 (PX00011 at 5). It is not surprising, therefore, that a study done for Whole Foods cautions that shoppers at premium natural and organic supermarkets are turned off by unhealthy products, and that premium natural and organic supermarkets that carry unhealthy products risk their credibility and their customers. Exhibit 27 (PX01344); Exhibit 2 (PX01324 at 125:1-19). By way of comparison, what would a conventional supermarket be without Twinkies and tobacco?

b. <u>Premium Natural and Organic Supermarkets Are "Lifestyle Retailers," Offering Superior Service in a Unique Shopping Environment</u>.

Premium natural and organic supermarkets are not mere resellers of packaged goods, like other retailers. Rather, as Whole Foods' CEO John Mackey explains

---

Robb, 20-22, PX01327 at 020-022).

> [s]uperior quality, superior service, superior perishable product, superior marketing, superior branding, and superior store experience working together are what makes Whole Foods so successful.

Exhibit 20 (PX01346); *see also* Exhibit 21 (PX01345). Laura Coblentz, VP of Marketing for Wild Oats, concurred

> Succeeding in this business is about staying true to your message and mission but also . . . creating a community that will attract new customers. . . . It's about mind, body and soul through food, information, vitamins and supplements, recipes, books, body care – you name it. Wild Oats is more than a retail chain – it's about a lifestyle, and that's how we market ourselves.
>
> . . .
>
> Consumers have to trust your brand and your products. Without trust, there is no relationship, and trust can only be built with credibility, commitment, and consistency.

Exhibit 8 (PX01303 at 002).

Building a premium natural and organic supermarket brand requires the investment of appreciable time and money. Such investments reflect a commitment to a lifestyle of health and ecological sustainability and entitlement to superior – even epicurean – goods and services all at once. *See, e.g.*, Exhibit 8 (PX01303 at 001-002); *see also* Exhibit 18 (PX00011 at 007); Exhibit 13 (PX00613 at 005). Premium natural and organic supermarkets have, as Mr. Mackey says of Whole Foods

> authenticity, integrity, and the power of their brand with their customers. This creates strong loyalty from their customer base – something Safeway doesn't have and likely never will have.

Exhibit 22 (PX00809 at 001). Whole Foods and Wild Oats each aims to be considered a "lifestyle store" oriented to people seeking self-improvement and well-being. Exhibit 15 (Foster Tr. at 183:12-184:9, PX01338 at 183-184). Whole Foods' CEO John Mackey explains that

> Whole Foods Market is about much more than just selling "commodity" natural and organic products. We are a lifestyle retailer and have created a unique shopping environment built around satisfying and delighting our customers.

Exhibit 23 (PX01333 at 003).

Premium natural and organic supermarkets strive, as Whole Foods publicists say of Whole Foods itself,

> to transform food shopping from a chore into a dynamic experience by building and operating stores with colorful decor, well-trained team members, exciting product mixes, teams of in-store chefs, ever-changing selections, samples, open kitchens, scratch bakeries, hand-stacked produce, prepared foods stations and European-style charcuterie departments.

Exhibit 32 (PX01302 at 11). In contrast, conventional retailers generally aim to provide a wide selection of conventional products for price-conscious shoppers who are not as concerned about the breadth of natural and organic products offered, the shopping experience, or the appeal of a healthier lifestyle. Exhibit 11 (PX01331 at 002); *see also* Exhibit 15 (Foster Tr. at 119:3-5, 120:4-9, PX01338 at 019, 020).

Whole Foods and Wild Oats target very different customers than do other retailers. *See, e.g.*, Exhibit 3 (Odak Tr. at 40:13-16, PX01325 at 040) ("I never believed it was the same shopper that was shopping Safeway, you know, so it was–it was more in relation to Whole Foods."). Laura Coblentz, VP of Marketing for Wild Oats, testified that Wild Oats advertises on National Public Radio because the "demographic and psychographic profile" of the Wild Oats shopper is, like NPR listeners, "educated and affluent and interested in certain lifestyle issues." Exhibit 28 (Coblentz Tr. at 18:22-19:6, PX01323 at 018-019). The Whole Foods customer

profile is identical and is reflected in all facets of its operations, beginning with its site selection[8] and continuing through to its branding and marketing strategies.[9] In contrast, shoppers at most other supermarket venues are more price-conscious, less concerned about the breadth of natural and organic products offered, and less committed to health and ecological sustainability. *See, e.g.*, Exhibit 11 (PX01331 at 002).

c. Significant Differentiation Between Premium Natural and Organic Supermarkets and Other Retailers Is Reflected in Sales Diversion and Gross Margin Data.

The closeness of sellers in product/geographic space can be discerned by examining customer diversion patterns that emerge from entry and exit of other sellers. In June 2006, Whole Foods studied the impact on it of entry by other premium natural and organic supermarkets and other retailers. *See* Exhibit 33 (PX00131 at 016-022). Whole Foods found that entry by other premium natural and organic supermarkets – specifically Wild Oats, New Seasons, and Earth Fare – had the largest and longest impact on Whole Foods' sales and margins. *See* Exhibit 33 (PX00131, Slide 19). Entry by a Trader Joe's generally led to a modest decline in sales but no decline in margins. *See* Exhibit 33 (PX00131, Slide 17). Entry by a conventional supermarket generally led to a still more modest decline in sales (and interestingly, entry by Safeway's flagship Lifestyle store in Boulder, Colorado, had little or no impact), Exhibit 33

---

8 *See, e.g.*, Exhibit 29 (PX01319) ("This area is composed of first generation, ethically [sic] diverse residences [sic] that are less likely to support WFM than second & third generation relatives. . . . [T]his Mall's demographic is not compatible with the WFM target customer.").

9 *See, e.g.*, Exhibit 30 (PX01321 at 001) ("Our partnership with the Denver Botanic Gardens has just blossomed . . . [t]he largest demographic in our zip code, Bohemian Mix, is THE Botanic Gardens member. We are getting great exposure . . . and it really allows us ample opportunity to tell our story and focus on educating them on our value lines.").

(PX00131, Slide 20), and mass merchandisers, including Wal-Mart and Target, had no impact at all. Exhibit 33 (PX00131, Slide 22).



Wild Oats reports vastly higher margins for natural food retailers (25% to 30%) than for conventional food retailers (30% to 50%). Such margin differences also are reflective of significantly differentiated products. Exhibit 11 (PX01331 Wild Oats Web Page, Investor Section).

d. The Defendants Recognize Premium Natural and Organic Supermarkets as an Economically Distinct Market.

The defendants' business records detail the unique competition between Whole Foods and Wild Oats. For example, a Wild Oats marketing plan states this objective:



> between WFMI and Wild Oats ... [Wild Oats must]

Exhibit 35 (PX00677 at 078). Similarly, a Wild Oats' 2007 Business and Financial Plan concludes that a "$ K investment [is] needed for with WFMI." Exhibit 36

(PX00458 at 005). Notwithstanding this high price tag, Wild Oats' Senior VP for Merchandising and Marketing instructed his Director of Pricing Schematics to "[redacted]" Exhibit 37 (PX01202 at 001).

Whole Foods' business records are even more compelling. Consider, for example, Whole Foods' plan of action in response to a planned opening of Wild Oats' flagship store in Boulder – an opening that Wild Oats has put on indefinite hold because of the proposed acquisition. The impact that Whole Foods expected was so great that it planned to respond by reducing prices 10% across the board. Exhibit 38 (PX00233 at 001) ("give customers 10% off a purchase for recycling a Wild Oats bag at our store"). This "intrusion" of another premium natural and organic supermarket into a Whole Foods' market was a uniquely salient competitive event for Whole Foods – far more so than the entry of other retailers. Here is what Whole Foods' Regional President, Will Paradise, said:

> [A]s we approach the opening on the new Wild Oats flagship in Boulder in March . . . [m]y goal is simple – I want to crush them and am willing to spend a lot of money in the process. We are going to run a [redacted] day strategy against Oats that includes many different aspects but value is a key component.

Exhibit 39 (PX00234 at 001). But, instead of "crushing" Wild Oats' new flagship store in Boulder by "run[ning] a [redacted] day strategy against Oats . . . [with] value [as] a key component" – presumably that means giving shoppers more for less in retail jargon – Whole Foods endeavors to avert the competitive threat by purchasing Wild Oats.

The Boulder store, the leading edge of a Wild Oats competitive initiative, would have opened months ago but for the proposed acquisition. Whole Foods projects that by heading off that store opening, it is avoiding more than $150,000 in lost revenues per week that would have

been diverted to the new Wild Oats store in Boulder. *See* Robb Tr. 126:14-127:1, Exhibit 25 (PX01327); Exhibit 40 (PX00533). In contrast, Whole Foods lost only $30,000 per week in revenues after the February 2006 opening of Safeway's flagship Lifestyle store in Boulder, and that for only a three-month period before its revenues returned to prior levels. *See* Exhibit 41 (PX00543); Exhibit 42 (PX01004 at 023). This further confirms that competition between Whole Foods and Wild Oats matters uniquely. When Mr. Mackey confirms that the elimination of competition with another premium natural and organic supermarket will enable Whole Foods to avoid "nasty price wars," *i.e.*, increase relative prices, he is admitting that competition between premium natural and organic supermarkets results in lower prices at those supermarkets than does competition between premium natural and organic supermarkets and other retailers (of which there are many in the cities he lists). More simply put, competition among premium natural and organic supermarkets matters uniquely. And that is the very definition of a relevant product market.

B. Relevant Geographic Markets in Which to Analyze the Proposed Acquisition Are Local.

Relevant markets have geographic as well as product dimensions. The relevant geographic market is "the 'area of effective competition . . . in which the seller operates, and to which the purchaser can practicably turn for supplies.'" *Philadelphia Nat'l Bank*, 374 U.S. at 359 (1963) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)). The [REDACTED] stores tend to draw shoppers from a distance of five miles or a sixteen minute drive-time. [REDACTED] Therefore, each relevant geographic market's lower bound is that distance/drive-time. In determining the

[redacted] suggesting that the competitive interactions among premium natural and organic supermarkets tail off quickly at a distance of more than six miles. Therefore the local geographic markets for premium natural and organic supermarkets generally cover a distance of approximately six miles from each store, but may be as large as a metropolitan area.

The specific relevant geographic markets in which the Commission believes the proposed acquisition will injure competition and consumers are: Albuquerque, NM; Medford, MA (suburban Boston); Saugus, MA (suburban Boston); Boulder, CO; Hinsdale, IL (suburban Chicago); Evanston, IL (suburban Chicago); Cleveland, OH; Denver, CO; Lakewood, CO; Ft. Collins, CO; West Hartford, CT; Henderson, NV; Indianapolis, IN; Kansas City-Overland Park, KS; Las Vegas, NV; Los Angeles-Santa Monica-Brentwood, CA; Louisville, KY; Omaha, NE; Pasadena, CA; Phoenix, AZ; Portland, ME; Portland, OR; Princeton, NJ; St. Louis, MO; and Tualatin, OR. If in any one of these relevant markets the proposed acquisition is likely to injure competition, the acquisition is illegal. The evidence indicates that it will do so in all of them, eliminating Whole Foods' sole competitor in the operation of premium natural and organic supermarkets.

The proposed acquisition likely would injure competition in numerous additional markets where, but for the proposed acquisition, one or the other of the defendants would open a premium natural and organic supermarket to compete with a pre-existing store of the other. *See* evidence discussed in Part D.3. *infra*.

C. The Relevant Markets Are Highly Concentrated and Whole Foods' Acquisition of Wild Oats Will Greatly Increase Concentration, Significantly Increasing Market Power.

Mergers that significantly increase market concentration are presumptively unlawful because the fewer the competitors and the larger the respective market shares, the greater the likelihood that a single firm or a group of firms could raise prices above competitive levels. *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986); *Merger Guidelines* § 2.0, Exhibit 17 (PX01310). Concentration typically is measured using the Herfindahl-Hirschman Index ("HHI").[10] Where the pre-acquisition HHI exceeds 1800 points, it is "presumed that mergers producing an increase in the HHI of more than 100 points are likely to create or enhance market power or facilitate its exercise." *Merger Guidelines* § 1.51, Exhibit 17 (PX01310). Courts have adopted similar thresholds.

In this case, the combined shares of Whole Foods and Wild Oats in the premium natural and organic supermarkets would be 100% in all of our relevant geographic markets. *See Heinz*, 246 F.3d at 725; *Baker Hughes, Inc.*, 908 F.2d at 991 (D.C. Cir. 1990) ("The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully."). These percentages are far in excess of the levels raising a presumption of illegality.

While in some areas of the country other companies operate premium natural and organic supermarkets, only Whole Foods and Wild Oats operate premium natural and organic supermarkets in the relevant markets about which we complain before this Court. In those markets, concentration in already very highly concentrated markets jumps to its theoretical limit,

10 The HHI is calculated by summing the squares of the market shares of each participant, so as to give greater weight to the market shares of larger firms in accord with their relative importance in competitive interactions. Exhibit 17 (PX01310 *Merger Guidelines* § 1.5).

an HHI of 10,000. Thus, there is a very strong presumption that in each of the identified markets Whole Foods' proposed acquisition of Wild Oats is anticompetitive, injurious to consumers, and illegal. However, we need not rest on that presumption. Documents and testimony provide abundant evidence that the acquisition would cause anticompetitive price and non-price effects.

D. <u>The Proposed Acquisition Would Injure Competition in Numerous Areas of the Country</u>.

1. *There Is Abundant Evidence of Unique Price Competition Between the Defendants.*

We begin by reviewing some of the evidence of the aggressive price competition that takes place between Whole Foods and Wild Oats, whether or not other retailers are located nearby. This competition would be eliminated by the proposed acquisition.

We already have quoted Whole Foods' CEO's statement to the Whole Foods Board explaining that Whole Foods' purchase of Wild Oats "will avoid nasty price wars." Exhibit 1 (PX00773 at 001). Given Whole Foods' business records, he could not maintain otherwise. [REDACTED] (Exhibit 62, PX01008 at 002), Whole Foods reports that Louisville's margins are low "because we are having to match some ridiculously low special pricing at Wild Oats." And consider Exhibit 64 (PX00016 at 005-006):

> [REDACTED] opened . . . [REDACTED] . . . We have put in place a competitive pricing strategy to beat [REDACTED] to the punch. . . . [REDACTED] is now trying desperate measures such as buy one get one free promotions and 20% to 50% off with very limited success. . . . The [REDACTED] store [REDACTED] is still operating in a desperation mode heavily discounting product to try and drive sales;

and Exhibit 65 (PX00015 at 001):

> WILD OATS: Competitive Intrusion @ 29th Street [in Boulder, Colorado.] We've known about it for awhile, so we've been remodeling in preparation for it. . . . We're also focusing on competitive pricing.

Wild Oats' business records show the same head-to-head price competition. Consider, for example, Exhibit 66 (PX01316), instructing Wild Oats employees to "[p]rice check on WFMI perishables to look for price increase opportunities"; and Exhibit 67 (PX01317): "[redacted]"; and Exhibit 68 (PX00187 at 001), which shows that Whole Foods had to lower prices in Boulder, Colorado, to match advertised "Buy One Get One Free" promotions at Wild Oats; and Exhibit 69 (PX01315 at 001-002):

> Perhaps we could drop an aggressive fresh flyer or two into WF zip codes [in Columbus, Ohio] in the coming weeks? . . . As you can see, the heaviest effected [sic] departments are Seafood, Produce, Meat . . . . These departments are at least 15% down from August. . . . During the time of September 1st through October 4th, we ran bounce back coupons. Save $5 off an order of $20 or more, and save $10 off an order of $40 or more. . . . We have also started a 10% off student discount program at the begin [sic] of September.

All of this is consistent with Mr. Odak's testimony at his Investigational Hearing:

> [W]e [at Wild Oats] knew that from a competitive standpoint that [redacted] Whole Foods and expect that we're going to build the business, so we as a pricing policy strove, where Whole Foods was a competitor, to [redacted]

Exhibit 3 (Odak Tr. at 39:25-40:5, PX01325 at 039-040).

Mr. Odak further explained how this knowledge played out in Wild Oats' responses to industry-wide trade promotions:

> [I]t depended on the competitive environment how much you passed on [to consumers]. . . . . [redacted] If you were worried about the competition, *i.e.*, [redacted]

> ███████ you, you know, passed those price promotions on most of the time penny for penny. If you were less worried about or it was not an issue either because Whole Foods was above you or not in the marketplace, you had the opportunity to pocket some of that money . . . .

Exhibit 3 (Odak Tr. at 64:7-66:10, PX01325 at 064-066).

2. *There Is Abundant Evidence of Unique Non-Price Competition Between the Defendants.*

Whole Foods and Wild Oats increased their spending on remodeling and updating stores, expanding product offerings, and adding service workers and amenities when confronting one another, irrespective of what other retailers are located nearby. This competition too would be eliminated by the proposed acquisition.

Whole Foods' business records created in response to the anticipated launch of Wild Oats' flagship store in Boulder, Colorado (again, a store that would have opened by now but for the proposed acquisition), are illuminating. Consider first Exhibit 70 (PX01314 at 008), in which Whole Foods' Rocky Mountain Region ███████████, urges



and Exhibit 71 (PX001337 at 002), in which Whole Foods acknowledges that without premium natural and organic supermarket competition "we potentially become slow and lazy. Our prices go up and our customer service goes down." In fact, Whole Foods substantially remodeled its Boulder, Colorado, store to meet the competitive threat posed by Wild Oats' entry (something it

apparently did not consider when Safeway opened its flagship Lifestyle store in Boulder). And Exhibit 72 (PX00018 at 001):

> The Rocky Mountain Region is excited to present (at long last!) an opportunity to expand our Boulder store. . . . Wild Oats is opening their 40,000 square foot flagship store three blocks south of us. Our expanded store, opening 12 months after their scheduled opening, will put another nail in the Oats coffin.

And, finally, Exhibit 73 (PX01313 at 001, 007), which exhorts the Whole Foods team:

> Colorado, New Mexico Wild Oats- ATTACK! We can beat them on all fronts. . . . Stay aggressive with pricing, quality, variety/specialty and customer service.

Nor was this exceedingly aggressive competition limited to Colorado and New Mexico. Consider Exhibit 74 (PX01312-001), a 2006 email in which A.C. Gallo, Co-President and COO of Whole Foods, boasted to Mr. Mackey,

> [w]e will just have to keep kicking [Mr. Odak's] ass wherever we compete and let the customers decide. I can't wait until we open our Portland store next year and squash them with both higher quality and lower prices.

No longer willing to "let the customers decide" and to challenge Wild Oats "with both higher quality and lower prices," Whole Foods proposes to eliminate Wild Oats through acquisition instead.

Wild Oats reacted similarly to competitive intrusions into its territories by Whole Foods. For example, Exhibit 75 (PX00763 at 001), an email forwarded by Roger Davidson, Wild Oats' Sr. VP for Marketing, to CEO Greg Mays, indicates that Wild Oats will respond to Whole Foods' entry into Portland, Maine (which occurred at the end of February 2007), with [REDACTED] [REDACTED] and the

provision of value-added services such as nutritionists, naturopaths, *gratis*. *See also* Exhibit 76 (PX00469 at 006, 009-010, 018-019, 020, 023-025).

3. *Wild Oats Is a Viable and Aggressive Competitor.*

The defendants may claim that Wild Oats is competitively unimportant. This would be unsupportable. Before it agreed to be acquired by Whole Foods, Wild Oats had developed a radical new store format, [REDACTED]

[REDACTED]

[REDACTED]. Exhibit 3 (Odak Tr. at 116:2-117:19, PX01325 at 116-117); *see also* Exhibit 59 (PX00676 at 100) ("Real Estate Strategy–2007 and Beyond ... Three-pronged strategy for Board Consideration . . . Focus on Whole Foods' high demand natural and organic markets where: Whole Foods has older, smaller boxes (older than 1998 and smaller than 30,000 ft.)"). Consider, for example, the following excerpts from Wild Oats' May 1, 2006, "Competitive Intrusion Plan," Exhibit 60 (PX00661):

> Competitive Tactics. We will be pre-emptive versus reactive. Pricing. Merchandising. Shopping Experience. Employee retention and morale. Service. [at 011];
>
> Pricing . . . [REDACTED] [at 012];
> Field Merchandising . . . [REDACTED] up to the competitive opening. Decrease margin targets for in-store promotions. Aggressive perishables sampling plan and budget. Service and selling training. [REDACTED]" [at 013];
>
> Service . . . Elevate service levels on a department by department basis." [at 017];

> Facility . . . Evaluate facilities needs [redacted] prior to opening. Internal equipment and décor issues. External attractiveness and visibility issues. Develop an appropriate remodel/refresh plan." [at 018].

For its part, Whole Foods was single-mindedly determined to drive Wild Oats out of business by systematically challenging Wild Oats in what Mr. Mackey referred to as Wild Oats' "monopoly" markets.[11] In March 2006, Mr. Mackey proudly declaimed

> Whole Foods says they will open 25 stores in OATS territories in the next 2 years. . . . The writing is on the wall. The end game is now underway for OATS. . . . Whole Foods is systematically destroying their viability as a business–market by market, city by city.

Exhibit 6 (PX00801 at 001). But the systematic destruction of Wild Oats apparently would have taken more time and expense than Whole Foods cared to invest, and the outcome could not have been seen as a certainty. For Whole Foods, the proposed acquisition likely is a less costly, and more certain, way of destroying Wild Oats and of destroying competition.

The fact of the matter is that but for the proposed acquisition, Whole Foods and Wild Oats will compete aggressively along price and non-price dimensions as Whole Foods seeks to eliminate Wild Oats as a going business, and Wild Oats takes the fight to Whole Foods by expanding into additional Whole Foods-dominated towns and cities. Again, we turn to Mr. Mackey for confirmation. "Wild Oats," he declares

> needs to be removed from the playing field. . . . It is just a question of do you want Kroger or Safeway to be the ones to remove them. Wild Oats doesn't want that because Kroger and Safeway will probably pay them $8 a share or $6 after Whole Foods has continued to batter them around over the next few years . . . .

---

[11] Exhibit 4 (PX00712 at 001); *see also* Exhibit 5 (PX00080 at 001-002) (Regional President of Whole Foods observing that "prices were higher at [the newly opened Wild Oats store in Tampa, Florida, because] [b]eing the only game in town gives them that freedom . . . . Their pricing was high since they are the only large natural food store in the area.") (emphasis added).

Exhibit 2 (Mackey Tr. at 67:20-68:1, PX01324 at 067-068); *see also* Exhibit 61 (Sud Tr. at 97:7-14, PX01340 at 097) (Whole Foods "has opened stores in close proximity to Wild Oats and competed aggressively" and will continue to do so if the acquisition does not go forward).

E. Other Retailers Will Not Reposition into the Operation of Premium Natural and Organic Supermarkets, Nor Will Other Companies Enter *De Novo*.

The anticompetitive effects of Whole Foods' acquisition of Wild Oats would be mitigated if companies outside the premium natural and organic supermarket market repositioned into that space or entered it *de novo*. For entry to rebut the presumption of anticompetitive effect, the evidence must show not only that a firm might enter, but that "entry into the market would likely avert the anticompetitive effects from the acquisition." *Staples*, 970 F. Supp. at 1086 (quoting *Baker Hughes*, 908 F.2d at 989); *accord Swedish Match*, 131 F. Supp. 2d at 170; *Cardinal Health*, 12 F. Supp. 2d at 55. Entry must be "timely, likely and sufficient in its magnitude, character and scope to deter or counteract the competitive effects" of a proposed transaction. *Merger Guidelines* § 3.0, Exhibit 17 (PX01310 at 010); *see Cardinal Health*, 12 F. Supp. 2d at 55-58. This is an intensely practical inquiry.

> [I]nformation regarding such factors as technical capability, know-how, sunk costs, and other requirements for successful entry is necessary, but not sufficient. . . . The Agencies must also determine whether firms would have an adequate incentive to enter at prices prevailing before the merger, *i.e.*, the prices to which the market likely would return following entry sufficient to deter or counteract the merger's anticompetitive effects.

*Commentary on the Horizontal Merger Guidelines*, Exhibit 16 (PX01341 at 043). Importantly, the relevant inquiry is not *could* non-incumbents reposition or enter *de novo*, rather, it is *would* they. *Id.* In order for entry to be sufficient to restore competition, it must be entry that replaces the competition that existed prior to the acquisition. *Cardinal Health*, 12 F. Supp. 2d at 58; *see*

*also United States v. United Tote, Inc.*, 768 F. Supp. 1064, 1082 (D. Del. 1991) (finding entry insufficient to constrain anticompetitive price increase).

Entry into the operation of any kind of supermarket is a complex and time-consuming endeavor. Timely and sufficient entry would not be likely in any of the localities implicated by the acquisition. Indeed, the evidence indicates that quite apart from any other impediments to entry, finding and developing suitable real estate on which to locate a supermarket often is a multi-year task in many metropolitan areas. *See, e.g.*, Exhibit 43 (PX00538 at 002) (Mr. Mackey touting his new White Plains store to investors after a "ten year search for the perfect location"); Exhibit 44 (PX00556). And then, of course, there are the specialized burdens of establishing a large-scale and certifiably organic supply and distribution chain. *See* Organic Food Production Act of 1990, 7 U.S.C. §§ 6501-22. Finally, any entrant would require substantial time to establish the reputation for "authenticity and integrity" that shoppers for natural and organic products demand. *See, e.g.*, Exhibit 22 (PX00809); Exhibit 8 (PX01303 at 002); *see Guidelines Commentary*, Exhibit 16 (PX01341 at 051) ("[i]n evaluating timeliness of entry, the Agencies include the time to complete any necessary preliminary steps, such as establishing a reputation of the development of specialized inputs into the production of the product in question"). There is no reasonable prospect that sufficient *de novo* entry would occur within two years of the acquisition, as required by the *Merger Guidelines*. Exhibit 16 (PX01341 § 3.2 at 045).

Substantial evidence also indicates that a post-acquisition exercise of market power by the combined Whole Foods/Wild Oats would not cause other retailers to reposition into the market so as to defeat a post-acquisition exercise of market power. To be clear, we do not

suggest that other retailers do not or cannot sell fresh and organic produce. Clearly, they do to a degree. The point is that they would not reposition in a way that replaces the close, constraining competition that Wild Oats provides to Whole Foods. We first consider conventional supermarkets and mass merchandisers.

As previously explained, conventional supermarkets and mass merchandisers offer a utilitarian value proposition – relatively low prices on mostly conventional products to be sold to consumers seeking to buy most of their weekly groceries at a single time and place. The value proposition of premium natural and organic supermarkets is not merely different: it is in many ways an antithesis. Premium natural and organic supermarkets charge premium prices on specialized products appealing to a relatively narrow segment of consumers who are highly educated, upper income, informed and committed, and willing to pay a higher price for health and ecological sustainability. Exhibit 11 (PX01331 at 002). These value propositions cannot be offered at the same time and place. Hence, Mr. Mackey's acknowledgment that

> Safeway and other conventional retailers will keep doing their thing--trying to be all things to all people . . . . They can't really effectively focus on Whole Foods Core Customers without abandoning 90% of their own customers.

Exhibit 9 (PX00785).

Further, there would be substantial costs associated with repositioning into Whole Foods' and Wild Oats' product space. First among these would be establishing a large-scale Organic Rule-compliant supply chain and distribution system, which is no simple matter and would raise costs to all shoppers, most of whom are price-oriented. As Wild Oats' former CEO Mr. Odak explained,

> until you have a predictable demand or takeaway at the store, you don't know how much to buy. If you buy too much and you don't sell it because you're trying to get in the market, you shrink it out [*i.e.*, it spoils] and you lose money. If you buy too little, the consumer comes in your store and says you're not in the business . . . of organic and I'll go buy it someplace else.
>
> So . . . the conventionals have a very difficult time getting into this business. One . . . it's primarily a or predominantly a perishable business. And two, they have never been able to establish a predictable takeaway from the product.
>
> So you can walk any Safeway today, and I've walked hundreds of Safeways and counted the number of organic items even in their new stores, in produce, and it's 48 to 50 SKUs. You know, Whole Foods/Wild Oats probably has [REDACTED]s in the department.
>
> . . . .
>
> And we've seen this for the five or six years I ran the company. This has been a consistent pattern. They have a big push on. It doesn't sell through. Their margins aren't where they ought to be, and it shrinks back and shrinks back and shrinks back. There's less and less organic in those stores.

Exhibit 3 (Odak Tr. at 77:14-78:23, PX01325 at 077-078).

In addition, conventional supermarkets seeking to reposition would face substantial opportunity costs. Whereas conventional supermarket inventories skew heavily toward "dry grocery" items, premium natural and organic supermarket shoppers demand extensive perishables. Exhibit 3 (Odak Tr. at 78:18-23, PX01325 at 078); Exhibit 2 (Mackey Tr. at 249:24-251:25, PX01324 at 249). In order to attract Whole Foods and Wild Oats customers, the conventional stores would have to substantially increase their focus on perishables and devote substantially more of their stores' selling space to perishables. Allotting additional space to perishables (and many other natural and organic items) would require conventional supermarkets

to forgo some of the slotting-fee revenues on which they depend. Mr. Odak explained that conventional stores

> get so much money for slotting fees and promotional trade allowances from the big CPG companies, that's where they make . . . the bulk of their money in the store. . . . [I]f you took out the amount of money they make in slotting fees, they would not be profitable.

Exhibit 3 (Odak Tr. at 60:13-21, PX01325 at 060). Moreover, even if a conventional retailer were willing to bear these various costs, it still would have to invest substantial time to establish the reputation for "authenticity and integrity" that shoppers for natural and organic products demand. *See, e.g.*, Exhibit 22 (PX00809 at 001); Exhibit 8 (PX01303). A single publicized incident in which a non-organic product inadvertently is commingled with organic-labeled ones is all it might take to destroy that investment and more. *See, e.g.*, Organic Food Production Act of 1990, 7 U.S.C. §§ 6501-22 (regarding the USDA's Organic Rule requirement that processes and procedures be established to prevent commingling of conventional and organic-labeled food). A conventional retailer seeking to reposition could not establish that reputation within the requisite two-year period.

The defendants may claim that conventional supermarkets nevertheless are seeking to reposition into Whole Foods' and Wild Oats' product space. But consider, for example, the lack of impact on Whole Foods of Safeway's Lifestyle store in Boulder, Colorado. That Safeway store was intended to compete more directly with Whole Foods, and it offers an expanded line of organic, prepared, and gourmet foods. Exhibit 45 (PX01330 at 001). Although Whole Foods was concerned before the Safeway opening, the Safeway had little impact on Whole Foods.

Thus, in his Q2-FY06 report to the Board (written three months after the opening of the Safeway Lifestyle store), Walter Robb, Co-President of Whole Foods, said



Exhibit 42 (PX01004 at 023). And by Q1-FY07, Mr. Mackey could report to the Board that

> Safeway is continuing to roll out their "Lifestyle Stores." I don't believe these stores have had much real impact on us, although they've increased Safeway's comps a couple of hundred basis points (not that much when you consider the immense amount of capital invested).

Exhibit 46 (PX01304).

Indeed, Whole Foods, in effect, admits that conventional supermarkets can not reposition into its product space. As Mr. Mackey advised the Whole Foods Board of Directors,

> By buying [Wild Oats] . . . we eliminate forever the possibility of Kroger, Super Value, or Safeway using their brand equity to launch a competing national natural/organic food chain to rival us.
>
> . . .
>
> [Wild Oats] is the only existing company that has the brand and number of stores to be a meaningful springboard for another player to get into this space. Eliminating them means eliminating this threat forever, or almost forever.

Exhibit 1 (PX00773); *see also* Exhibit 48 (PX00555), *quoted in* Exhibit 1 (PX00773). Whatever it may now say, if Whole Foods believed that repositioning by conventional supermarkets is practicable, it would not have placed so high a value on "eliminat[ing]" forever the threat that Wild Oats might become "a meaningful springboard for another player to get into [the premium natural and organic supermarket] space."

Wal-Mart appears to have made some effort to reposition with little effect on Whole Foods. In March 2006, Wal-Mart opened a new Supercenter in Plano, Texas, two miles from a Whole Foods. The story is much like that surrounding the opening of the Safeway Lifestyle store in Boulder. In prospect, the opening concerned Whole Foods management. Those concerns were quickly allayed. By the first quarter of 2007, Mr. Mackey was able to report to the Whole Foods Board that

> [redacted], despite the hoopla in the media, hasn't had much impact in the organic market. I doubt they will because their core customers don't want to pay the higher prices and their non-core customers don't want to shop there for various reasons.

Exhibit 46 (PX01304). In a separate initiative in May 2006, Wal-Mart announced that it would "doubl[e] the number of organic items in 10 percent of its stores." Exhibit 49 (PX01305). One year later, Wal-Mart appears to be pulling back due to continuity of supply problems, among other issues. *See* Exhibit 50 (PX01306).

So the question regarding repositioning is this: if not Wal-Mart, who? According to the defendants, the answer is Trader Joe's. That is simply wrong. Trader Joe's is fundamentally different from premium natural and organic supermarkets, and it could not move to the premium natural and organic supermarket product space without losing its identity, its customers, and, perhaps, its profitability. According to Trader Joe's CEO Daniel Bane, natural and organic products are "important to a subset of [Trader Joe's] customers in all sections in the store, but it's no–it's not a unique focus in any section." Exhibit 51 (Bane Tr. at 71:21-23, PX01322 at 021-023). Of particular importance here is Trader Joe's limited product offering. Whereas conventional and premium natural and organic supermarkets typically carry at least 25,000 items,

*see, e.g.*, Exhibit 52 (PX01002), Trader Joe's carries about 2,000. L. Lewis, *The Trader Joe's Adventure* 20 (2005). Roughly 80% of these are sold under Trader Joe's private label brands. Bane Tr. at 85:7-86:23, Exhibit 51 (PX01322 at 085-086).

As Whole Foods' CEO Mr. Mackey admitted in mid-2000,

> TJ's is a completely different concept than WFMI. WFMI's business is all about perishables–fresh produce, fresh seafood, fresh meat, in store delis, juice bars, and bakeries. . . . [M]ore than 50% of [Whole Foods'] sales are in these categories of products–categories which TJ's doesn't even have.

Exhibit 53 (PX01307). Nor does Trader Joe's have services remotely comparable to those of premium natural and organic supermarkets. According to Mr. Bane, Trader Joe's format is

> going after value, and I just don't see that, you know, adding a service department provides value for our customers so we don't do it. We're real dogmatic about it, because our stores are the size that we can't–we can't support service departments.

Exhibit 51 (Bane Tr. at 62:5-63:4, PX01322 at 062-063). Trader Joe's stores average just under 11,000 square feet in size, whereas conventional supermarkets and premium natural and organic supermarkets typically exceed 20,000 square feet and are as large as 80,000 square feet. Exhibit 51 (Bane Tr. at 44:20-25, PX01322 at 044); Exhibit 3 (Odak Tr. at 113:8-12; 118:19-23, PX01325); Exhibit 54 (PX00171); Exhibit 15 (Foster Tr. at 135-36, PX01338 at 135-36).

Further, premium natural and organic supermarkets conspicuously promote a "lifestyle of health and [ecological] sustainability." Trader Joe's manifestly does not. So important to shoppers at premium natural and organic supermarkets is the "lifestyle of health and [ecological] sustainability" ethos that the industry has accorded it an acronym: "LOHAS." *See* Exhibit 55 (PX01308). In contrast, Trader Joe's CEO has testified that Trader Joe's does not "try to lead our customers on issues we think are important, because we don't think that's our purview."

Exhibit 51 (Bane Tr. at 162:13-14, PX01322 at 014). Whole Foods has articulated environmental and other standards of social responsibility and sponsors an Animal Compassion Foundation. Exhibit 26 (PX01326 at 120:17-18, 122:6-7). Wild Oats is similarly engaged. Exhibit 56 (PX00601 at 008-010). Trader Joe's makes it "a point not to be involved in" such things. Exhibit 51 (Bane Tr. at 159-65, PX01322 at 159-65).

FTC staff asked Mr. Bane at his Investigational Hearing whether Trader Joe's was an upscale or epicurean retailer. He replied, "no." The Commission asked him whether Trader Joe's was a destination in which shoppers were invited to linger, as at a coffee bar. Again, he said, "no." The Commission asked him whether consumers could use Trader Joe's for one-stop shopping. Again, "no." Exhibit 51 (Bane Tr. at 47:14-18:4, 162:1-10, PX01322 at 047, 162). As Whole Foods documents indicate, Trader Joe's is a "fill-in" store for Whole Foods' customers, Exhibit 57 (PX00162), and presumably for the customers of other retailers as well. Trader Joe's simply is not a supermarket of any kind.

As Trader Joe's CEO has suggested, Trader Joe's is *sui generis* and not about to do anything that would threaten that position:

> [W]e try to stay true to what we do. If we do what we're going to do, we don't really worry about the competition. We look at them. We understand what we need to understand, but we're not--we're not keen on changing anything we're doing because of what somebody else is doing.

Exhibit 51 (Bane Tr. at 106:19-107:15, PX01322 at 106-07). Turning again to Mr. Bane's testimony at his Investigational Hearing, FTC staff explicitly asked Mr. Bane about whether Trader Joe's would reposition. He was quite clear and definitive: if anyone at Trader Joe's tried

to alter the Trader Joe's format he would "bite their head off." Exhibit 51 (Bane Tr. at 105:2-10, PX01322 at 105). Why?

> Part of my job is staying very true and focused to what we do. We don't assume that we would be good at doing what we don't do, and we don't–we don't stray from that.

Exhibit 51 (Bane Tr. at 105:7-10, PX01322 at 105). FTC staff asked him point blank, does Trader Joe's have any plans to reposition itself as a natural and organic retailer? His answer, a simple "no." Exhibit 51 (Bane Tr. at 161:23-25, PX01322 at 161). Repositioning by Trader Joe's will not defeat post-acquisition anticompetitive effects in the premium natural and organic supermarket market.

In sum, a relevant market in which to analyze the proposed acquisition is the operation of premium natural and organic supermarkets, and repositioning by other retailers would not replace the competition Wild Oats provides, and thus would not defeat post-acquisition anticompetitive effects in that market.

F. Summary: Whole Foods' Acquisition of Wild Oats Will Harm Competition.

Whole Foods and Wild Oats are by far one another's closest substitute. The defendants' business records and other evidence, including "practical indicia," demonstrate that Whole Foods and Wild Oats have competed aggressively along price and non-price dimensions, and will continue to do so but for the proposed acquisition. The evidence further indicates that competition among premium natural and organic supermarket markets matters uniquely. Consumers benefit from that competition, whether or not other retailers are operating nearby. The proposed acquisition will give the combined Whole Foods/Wild Oats substantial market power in numerous markets, and neither *de novo* entry nor repositioning by other retailers will

defeat anticompetitive effects. Indeed, it is apparent that Whole Foods seeks to acquire Wild Oats for the purpose of eliminating a competitor that matters – to prevent "nasty price wars," and to foreclose entry by conventional supermarkets into the premium natural and organic supermarket space. There can be no question, under Section 7 of the Clayton Act, that the effect of this acquisition "may be substantially to lessen competition or to tend to create a monopoly." Accordingly, the applicable presumption is that the requested TRO and PI should be granted unless strongly disfavored by the balance of equities.

## III. THE EQUITIES FAVOR ISSUING THE REQUESTED INJUNCTIONS

The balance of equities strongly favors issuance of the requested injunctions, as well. Unless this Court issues the requested injunctions, the Commission likely will be unable, should it find the acquisition illegal, to "unscramble the eggs" and restore competition. *See Heinz*, 246 F.3d at 726 (Section 13(b) "embodies congressional recognition of the fact that [post-acquisition] divestiture is an inadequate and unsatisfactory remedy . . . ."); *see also FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1508 (D.C. Cir. 1986); *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 904 (7th Cir. 1989); *Lancaster Colony*, 434 F. Supp. 1088, 1096 (S.D.N.Y. 1977) ("[A]t best, divestiture is a slow, cumbersome, disruptive and complex remedy . . . ."). The public interest in the enforcement of the antitrust laws and in competition itself outweighs any private equity that the defendants may assert. *See Cardinal Health*, 12 F. Supp. 2d at 66 ("In balancing the public and private equities, benefits to the public are entitled to substantially more deference than the benefits to the private Defendants."); *see also Warner Communications*, 742 F.2d at 1165; *PPG*,

798 F.2d at 1506-07; *Elders Grain*, 868 F.2d 903. Accordingly, this Court should issue the requested injunctions pursuant to Section 13(b) of the Federal Trade Commission Act.

Where, as here, the Commission has shown a reasonable likelihood of success on the merits in an administrative challenge to the legality of an acquisition, the defendants are hard put to "justify[] anything less than a full stop injunction." *PPG*, 798 F.2d at 1506; *see also Heinz*, 246 F.3d at 726; *Staples*, 970 F. Supp. at 1091. To do so, the defendants must prevail in a balancing of the equities *and* demonstrate that a lesser remedy will not compromise the Commission's ability to effect meaningful relief if it determines that the acquisition is illegal. *PPG*, 798 F.2d at 1506-07; *Weyerhaeuser*, 665 F.2d at 1085. The defendants cannot make either showing.

Their equities are those that attend every horizontal acquisition: the parties' pecuniary interest in "getting the deal done" and the possibility that the acquisition will result in some potential, yet to be cognizable or defined as merger-specific, efficiencies from the avoidance of duplicative overheads. Defendants' claimed equities cannot stand where, as here, the acquisition will result in prompt scrambling of corporate assets so that the competitive *status quo ante* cannot later be restored. *See, e.g,, Heinz*, 246 F.3d at 708, 726; *PPG*, 798 F.2d at 1508; *Elders Grain*, 868 F.2d at 903, 904. Further, even if the Commission were to be able to restore the competitive *status quo ante* after a final determination that Whole Foods' acquisition of Wild Oats was illegal, the interim harm to competition and consumers resulting from the acquisition would remain.

## CONCLUSION

Accordingly, the Commission respectfully urges this Court to grant a TRO and PI precluding Whole Foods' acquisition of the common stock or any other interest in Wild Oats pending the outcome of a Federal Trade Commission challenge to the legality of the acquisition under the Clayton Act and Federal Trade Commission Act.

Respectfully submitted,

[signature]

Dated: June 6, 2007


MICHAEL J. BLOOM
CATHARINE M. MOSCATELLI (D.C. Bar No. 418510)
JOAN L. HEIM
THOMAS H. BROCK (D.C. Bar No. 939207)
MICHAEL A. FRANCHAK
ABIGAIL SLATER
JEANNE H. LIU
Federal Trade Commission
601 New Jersey Ave., N.W.
Washington, DC 20001
(202) 326-2475 (direct dial)
(202) 326-2284 (facsimile)
mjbloom@ftc.gov

WILLIAM BLUMENTHAL
General Counsel

JEFFREY SCHMIDT
Director

KENNETH L. GLAZER
Deputy Director
Bureau of Competition
Federal Trade Commission
600 Pennsylvania Ave, N.W.
Washington, DC 20580