**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FEDERAL TRADE COMMISSION

                :

                Plaintiff,

                :

       - against -

                :

WHOLE FOODS MARKETS, INC.; and      No. 1:07-CV-01021 (PLF)
WILD OATS MARKET, INC.,          :

              Defendants    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF DEFENDANT WILD OATS MARKETS,
INC. IN OPPOSITION TO PLAINTIFF'S MOTION TO
<u>COMPEL TESTIMONY OF THIRD PARTY PERRY ODAK</u>**

       Defendant Wild Oats Markets, Inc. ("Wild Oats") respectfully submits its Opposi-

tion to the Motion to Compel Testimony of Third Party Perry Odak by Plaintiff, the Federal

Trade Commission (the "FTC").  Wild Oats opposes this motion because (i) at the time the

communications between Mr. Odak and counsel for Wild Oats occurred, a valid joint defense

agreement (the "JDA") existed protecting those communications from discovery; (ii) as Wild

Oats' long-time Chief Executive Officer during most of the time period relevant to the FTC's

prior investigation and the current litigation, those communications were directly protected by

the attorney-client privilege under the *Upjohn* doctrine; and (iii) the FTC seeks extraordinarily

late discovery of non-competent evidence on issues that are completely collateral to the underly-

ing litigation (*i.e.*, what a Skadden attorney supposedly may have told Mr. Odak about the rea-

sons why a particular Wild Oats store has not been opened in Boulder, CO).  Significantly, each

of these reasons is an independent and sufficient basis for denying the FTC's motion.  After al-

ready having had approximately 10 hours of examination of Mr. Odak over two previous ses-

1

sions (one time without any defendant present), the FTC should not be allowed yet a third "bite

at the apple."

1.      **Joint Defense Agreement Protects Communications Between Wild Oats and Mr.
        Odak During the Time It Was in Effect.**

"'In order to establish the existence of a joint defense privilege, the party asserting

the privilege must show that (1) the communications were made in the course of a joint defense

effort, (2) the statements were designed to further the effort, and (3) the privilege has not been

waived.'" *Minebea Co. v. Pabst*, 226 F.R.D. 13, 16 (D.DC 2005). A joint defense agreement or

common interest privilege may exist where the parties have a common interest in actual or *pro-

spective* litigation, including in the context of a government investigation prior to litigation. *See

U.S. v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989); *Minebea*, 226 F.R.D. at 15. Thus, the fact

that Mr. Odak is not a defendant in the current litigation is simply not relevant – neither was

Wild Oats at the time the JDA was entered into. Nonetheless, at that time, Wild Oats and Mr.

Odak shared a common legal (not business) interest relating to the FTC's then-ongoing investi-

gation of the Whole Foods-Wild Oats transaction. Specifically, as Wild Oats' former long-time

CEO during most of the time period relevant to the FTC's prior investigation (and to its current

lawsuit), Mr. Odak shared Wild Oats' interest in limiting and closing that investigation and

avoiding potential litigation, which would likely cause (and actually has caused) substantial bur-

den to both Wild Oats *and* Mr. Odak.

Moreover, Mr. Odak is not just a routine third party – he was its CEO from 2001

through October 2006, during the vast majority of the relevant time period. Eventually, Mr.

Odak's views of the direction of the company substantially diverged from that of Wild Oats'

Board, which led to his resignation as of October 23, 2006, pursuant to the Resignation, Waiver,

Settlement Agreement and General Release, dated as of October 23, 2006 (the "Resignation

Agreement," attached as Exhibit A). However, because of his long-standing and important role

in the company and the potentiality (now reality) that he would have information (much of it

confidential) relevant to Wild Oats' claims or defenses in future litigation or proceedings, the

Resignation Agreement expressly provided for Mr. Odak's cooperation with Wild Oats:

> Cooperation with respect to Claims.  Executive [Mr. Odak] will cooperate with the Group Companies [Wild Oats and its subsidiaries] in any current or future litigation, arbitration or processing of any claims involving any Group Company as reasonably requested by Wild Oats and where Executive's interests are not adverse to those of such Group Company.  Any such cooperation will be at no costs to any Group Company other than reimbursement of reasonable out-of-pocket costs of Executive submitted as per the Company's reimbursement policy or otherwise approved in writing by Wild Oats.

Resignation Agreement, § 3(a).  In addition, commensurate with his former position, Mr. Odak

owes common-law and contractual obligations to maintain Wild Oats' confidential information,

as set forth in Section 4(a) of the Resignation Agreement:

> Executive acknowledges and agrees that, in the performance of the services on behalf of the Group Companies, Executive had access to, received and was entrusted with Confidential Information (as defined below).  From and after the Effective Date, Executive will not, except as required by applicable law, disclose to others or use, whether directly or indirectly, any Confidential Information regarding any Group Company without the prior written consent of Wild Oats.  "Confidential Information" will mean information about the Group Companies, and their respective suppliers, employees, business partners, clients and customers that is not available to the general public or generally known in the industry and that was learned by Executive through his relationship with any Group Company.  Executive acknowledges that such Confidential Information is specialized, unique in nature and of great value to the Group Companies, and that such information gives the Group Companies a competitive advantage.

Once the FTC brought its case, and the Court ruled that it would consider Mr.

Odak's prior testimony at his investigational hearing, but that the defendants would have the

right to depose him, that previous common interest no longer existed, and the JDA was accord-

ingly terminated.  However, those changed circumstances do not in any way affect the validity of

the JDA, and the attendant joint defense or common interest privilege that protects communica-

tions between Wild Oats and Mr. Odak through their respective counsel, *during the time when the JDA was in effect.* Indeed, "[u]nless the parties to the joint defense agreement consent to terminating the privilege, it can only be waived by subsequent litigation between the parties." *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 213 B.R. 433, 436 (Bkrtcy. S.D.N.Y., 1997). While Wild Oats chose to terminate the JDA, neither it nor Mr. Odak has agreed to waive the associated privilege, nor are they currently in litigation with each other.[1] This situation is no different than when a client decides to end its retention of its attorney (or vice versa), even on unfriendly terms; their contractual relationship may have ended, but the privileged nature of communications between them survives unless waived. *In re Richard Roe Inc.*, 168 F.3d. 69, 72 (2nd Cir. 1999); *Kevlik v. Goldstein*, 724 F. 2d. 844, 849 (1st Cir. 1984).

Thus, plaintiff's citation to *Minebea* is inapposite. In that case, the Court unsurprisingly held that the joint defense agreement at issue did not cover certain parties, because they *never agreed* to such an arrangement. 226 F.R.D. at 17-18.[2] In contrast, there is no dispute that Mr. Odak and Wild Oats had expressly agreed to the JDA.

2.    **Wild Oats Has a Direct Privilege Over Communications with Mr. Odak.**

Moreover, Wild Oats can directly assert privilege over any communications between its counsel and Mr. Odak under the doctrine set forth by the Supreme Court in *Upjohn Co. v. U.S.*, 449 U.S. 383 (1981), in which the Court dispensed with the old "control group test" and

---

[1]    Wild Oats recognizes that all communications between itself and Mr. Odak on and after June 20 are not covered by the JDA. Accordingly, it has produced those documents to plaintiff, as well as the April 20, 2007 letter from Thomas Pak to Charles M. Rosenberg, Mr. Odak's counsel, memorializing the JDA (attached as Exhibit B); the Resignation Agreement; and certain other non-privileged communications and documents in response to the FTC's Rule 34 requests relating to the JDA.

[2]    The Court did hold that those parties that had agreed to the joint defense agreement were protected by the joint defense privilege. *Id.*

held that communications between a corporation's counsel and any of its employees were protected by the *corporation's* attorney-client privilege, so long as the employee was put on notice that those communications were made at the direction of the corporation in order to secure legal advice for the corporation. *Id.* at 394. The majority opinion in *Upjohn* did not address the issue of whether this rule extended to former employees of a corporation, but Chief Justice Burger's concurring opinion expressly would have extended the corporation's attorney-client privilege to communications with former employees. *Id.* at 402-03 (Burger, C.J., concurring). Numerous federal courts have followed Chief Justice Burger's direction to extend the *Upjohn* doctrine to former employees. *See, e.g.*, *Allen v. McGraw*, 106 F.3d 582, 605-06 (4th Cir. 1997); *Amiral Ins. Co. v. U.S. District Court for the District of Arizona*, 881 F.2d 1486, 1492 (9th Cir. 1989); I*n re Coordinated Pretrial Proceedings*, 658 F.2d 1355, 1361 n.7 (9th Cir. 1981); *Command Transportation, Inc. v. Y.S. Line (USA) Corp.*, 116 F.R.D. 94, 96-97 (D. Mass. 1987).

When the FTC began its extensive investigation of the proposed acquisition, it subpoenaed Mr. Odak, presumably because it believed he had information relevant to its investigation. *For that same reason*, Wild Oats invoked the cooperation provision of the Resignation Agreement discussed above and directed both its own counsel, Skadden, Arps, and Mr. Odak to confer with each other in connection with Mr. Odak's investigational hearing (under the terms of the JDA) and to facilitate Skadden's legal advice to Wild Oats. The substance of those communications has remained confidential and neither Wild Oats nor Mr. Odak has waived this privilege. Thus, the *Upjohn* criteria have been met with regard to all communications between Wild Oats counsel and Mr. Odak that are at issue in this motion.

**3.    The FTC's Motion Seeks Untimely Discovery on Collateral Issues.**

Moreover, regardless of the merits of the privilege issues, the FTC's motion is wholly untimely, and should be denied on that ground alone. Indeed, nowhere in its motion does

the FTC justify or explain the reasons for seeking such late discovery – a full week after the close of fact discovery.  This delay is even more inexplicable given that the FTC was aware of the JDA at least since April 24, 2007, when Mr. Odak's counsel, Charles Rosenberg, expressly instructed Mr. Odak at his prior investigational hearing not to answer questions regarding communications with Wild Oats' counsel made pursuant to that JDA (the very same communications at issue in this motion):

> Q:    Mr. Odak, how did you prepare for the hearing here today?
>
> A:    I was – did preparation with the Wild Oats attorneys.
>
> Q:    Who are they?
>
> A:    A Mr. Thomas Pak, I believe his name is, and a Randall Doud [of Skadden Arps].
>
> Q:    What did you discuss with them?
>
> A:    Is that not attorney-client?
>
> MR. ROSENBERG:  Yeah
> I'm going to object.  There's a joint cooperation agreement, and that would be protected by the attorney-client privilege.
>
> MS. SLATER:  And just so I understand it, there's a joint cooperation agreement between Mr. Odak and Wild Oats?
>
> MR. ROSENBERG:  Yes.[3]

Indeed, it is Wild Oats' understanding that, prior to the filing of its lawsuit, the

FTC repeatedly denied Mr. Rosenberg's requests for a copy of Mr. Odak's investigational hearing transcript, contrary to the FTC's own practice rules,[4] expressly because of the JDA.  Having

---

[3]    Transcript of Perry Odak Investigational Hearing, April 24, 2007, at 8:9-9:5 (attached as Exhibit C).

[4]    "Any person compelled to submit data to the Commission or to testify in an investigational hearing shall be entitled to retain a copy or, on payment of lawfully prescribed costs, procure a copy of any document submitted by him and of his own testimony as stenographically re-

*(cont'd)*

used the existence of JDA to its tactical benefit, the FTC now (at the thirteenth hour) is trying to exploit the tactical benefit of claiming that no valid JDA ever existed.[5]

In any event, plaintiff expressly concedes that this issue had become ripe at least since Mr. Odak's deposition in this litigation on June 29, 2007 (FTC Motion at 3), two weeks prior to the filing of this motion and a full week prior to the fact discovery cut-off.[6] Plaintiff even failed to raise this issue before the Court at the July 9, 2007 hearing (10 days after the Odak deposition) that was intended to address a variety of outstanding discovery issues. Rather, the FTC has strategically waited until July 13, 2007 to file their motion, the date on which all fact affidavits were exchanged under the terms of the Case Management Order. Thus, plaintiff's delay has forced the Court to decide this issue only after all other fact witness testimony, whether in the form of deposition or affidavit, have been developed.

On top of this unjustified delay, the issue of whether a valid JDA existed between Wild Oats and Mr. Odak is wholly collateral to the key issues relevant to the underlying litigation, *e.g.*, product and geographic market definitions, ease of entry and expansion, etc. Moreover,

_____

*(cont'd from previous page)*

ported, except that in a nonpublic hearing the witness may for good cause be limited to inspection of the official transcript of his testimony." Federal Trade Commission Rules of Practice, § 2.9(a), available at http://www.ftc.gov/os/rules/2sec9.shtm.

[5]  Wild Oats further understands that plaintiff has contacted Mr. Odak's counsel on at least two occasions after this lawsuit was filed (and on one of those occasions, prior to Mr. Odak's deposition) in unsuccessful attempts to induce Mr. Odak to breach that JDA by revealing the substance of protected communications between himself and Wild Oats' counsel.

[6]  While the FTC learned at Mr. Odak's deposition on June 29 that the JDA was terminated, that termination in no way undermines the validity of the JDA during the time it was in effect, as noted above. Moreover, nothing in Mr. Odak's deposition suggested that (i) either Mr. Odak or Wild Oats had waived the privileges of the JDA (indeed, to the contrary, both parties expressly invoked the JDA at his deposition), or (ii) the parties were in litigation with each other. *See Stratton Oakmont*, 213 B.R. at 436. Thus, the FTC has no *additional* basis for now claiming that the JDA is invalid beyond what it already knew as of April 24, 2007.

any testimony regarding communications by Skadden to Mr. Odak and/or Mr. Rosenberg about the reasons for the delay in the 29th Street store (or on any other topic) would involve multiple levels hearsay, *i.e*, what Mr. Pak supposedly told Mr. Odak about what Wild Oats told Mr. Pak about what Whole Foods management told Wild Oats management.[7]  In contrast, as the defendants will make clear to the Court in their opposition on the merits to be filed on July 20, 2007, the consistent and unequivocal testimony from Wild Oats *current* senior management is that opening of the 29th Street store was unilaterally delayed and then suspended by Wild Oats due to a host of significant design, construction and operational problems unrelated to the pending transaction.

Presumably, the FTC would like to develop evidence that Whole Foods' senior management instructed Wild Oats not to open 29th Street (which Whole Foods had the contractual right to do under the terms of the publicly disclosed acquisition agreement).  Yet, the FTC never squarely asked this question at the depositions of Greg Mays, Wild Oats' current CEO, or Sam Martin, Wild Oats' Senior Vice President of Operations, who are the two individuals most knowledgeable about the current status of 29th Street, and both of whom were deposed *after* Mr. Odak.  Nor did plaintiff raise this issue at any of the numerous depositions of Whole Foods' executives, most of which also occurred after the Odak deposition.

Most importantly, granting the FTC's motion would be prejudicial to defendants, who would have no way to rebut any facts that may be developed at a third Odak deposition. This is particularly problematic because, as even the brief snippets of his testimony cited in plaintiff's motion clearly demonstrate, Mr. Odak is highly biased against Wild Oats and particu-

---

[7]    Thus, with apologies to *Lawrence of Arabia*, the factual issues at the root of plaintiff's motion are not just a sideshow, they are a "sideshow of a sideshow."

larly against its current senior management, who replaced him as CEO.  *See* FTC Motion at 2.

Accordingly, Wild Oats respectfully requests, that if the Court were to grant plaintiff's motion,

that it also extend to defendants the right to submit in a timely fashion a supplemental declaration

or declarations limited to rebutting Mr. Odak's testimony.

## CONCLUSION

For the reasons set forth herein, Wild Oats respectfully submits that the extraordi-

nary relief sought by plaintiff of yet another extension of fact discovery would be wholly inap-

propriate and, accordingly, plaintiff's motion should be denied.

Respectfully submitted.

July 17, 2007                    By:  _____/s/_____
                                 Clifford H. Aronson (DC Bar No. 335182)
                                 Thomas Pak (*Pro Hac Vice*)
                                 Matthew P. Hendrickson (*Pro Hac Vice*)
                                 Skadden, Arps, Slate, Meagher & Flom LLP
                                 Four Times Square
                                 New York, New York 10036
                                 212-735-3000
                                 caronson@skadden.com

                                 Gary A. MacDonald (DC Bar No. 418378)
                                 Skadden, Arps, Slate, Meagher & Flom LLP
                                 1440 New York Avenue, N.W.
                                 Washington, DC 20005
                                 202-371-7000
                                 gmacdona@skadden.com

                                 Terrence J. Wallock (*Pro Hac Vice*)
                                 2224 Pacific Dr.
                                 Corona Del Mar, CA 92625
                                 949-375-0683

                                 *Attorneys for Defendant Wild Oats Markets, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 17th day of June, 2007, I caused the foregoing Plaintiff's

Motion to Unseal its Memorandum in Support of Its Motions for Temporary Restraining Order

and Preliminary Injunction to be served on the persons listed below by the ECF system and by

electronic mail to Mr. Rosenberg:


**Attorneys for Plaintiff**
Michael J. Bloom, Esq.
Thomas H. Brock, Esq.
FEDERAL TRADE COMMISSION
601 New Jersey Ave., NW
Washington, D.C. 20001
mjbloom@ftc.gov

**Attorney for Defendant Whole Foods Market, Inc.**
Alden L. Atkins, Esq.
John D. Taurman, Esq.
VINSON & ELKINS LLP
The Willard Office Building
1455 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
atkins@velaw.com

Paul T. Denis, Esq.
Dechert LLP
1775 I Street, NW
Washington, D.C. 20006-2401
Paul.denis@dechert.com

**Attorney for Third Party Perry Odak**
Charles M. Rosenberg, Esq.
Carlton Fields
4000 International Place
100 S.E. Second Street
Miami, Florida 33131-2114
CRosenberg@CarltonFields.com

/s/ Thomas Pak_____
Attorney for Wild Oats Markets, Inc.

EXECUTION COPY

# RESIGNATION, WAIVER, SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Resignation, Waiver, Settlement Agreement and General Release (this "Settlement Agreement") is made by and between Perry D. Odak ("Executive"), on the one hand, and Wild Oats Markets, Inc., a Delaware corporation ("Wild Oats" or the "Company"), on the other hand, as of October 23, 2006 (the "Effective Date").

## RECITALS

A.    Executive is party to an Employment Agreement with the Company dated March 6, 2001, as amended by the amendments referenced in the Sixth Amendment dated as of August 14, 2006 (as so amended, the "Employment Agreement"). Capitalized terms used herein without definition but defined in the Employment Agreement have the meanings given to such terms in the Employment Agreement.

B.    The parties desire to, among other things, (i) provide for the resignation by Executive of his employment and other positions with Wild Oats and each of its direct and indirect subsidiaries (each, a "Group Company" and, collectively, the "Group Companies"), (ii) settle and resolve all existing and potential disputes between Executive, on the one hand, and the Group Companies, on the other hand, and (iii) provide for certain other arrangements, in each case subject to the terms and conditions herein.

NOW, THEREFORE, in consideration of the recitals above, the covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending legally to be bound, covenant and agree as follows:

1.    **Resignation**.  Executive hereby resigns, effective as of the Effective Date, from his position as Chief Executive Officer, President, and a member of the Board of Directors of Wild Oats, and in each other capacity that Executive serves with Wild Oats or any of the other Group Companies. Concurrently with the execution and delivery of this Settlement Agreement, Executive shall deliver to Wild Oats a signed letter in the form of Exhibit A hereto reflecting the foregoing resignation.

2.    **Payments and Benefits**.

(a)    Provided this Settlement Agreement has not been revoked in accordance with its terms, Wild Oats shall pay to Executive $1,943,346 (the "Payment Amount"), in full settlement of any and all amounts claimed by Executive from Wild Oats or any of the other Group Companies under the Employment Agreement or otherwise, except for any other amounts payable as provided elsewhere herein. The Payment Amount is being made, among other things, in recognition of the increased profitability of Wild Oats and in light of the Company's obligations under the Employment Agreement. The Payment Amount shall be subject to legally required withholdings and deductions and shall be paid as provided in Section 2(i) hereof. Wild Oats and Executive agree and acknowledge that, as of the Effective Date, Executive has no accrued and unpaid vacation.

(b)    In addition to the Payment Amount, Wild Oats shall pay to Executive the Base Amount (as defined in the Employment Agreement) at the rate in effect on the Effective Date, for a period of thirty-six months commencing on the Effective Date, with payments at the Company's regular bi-weekly payroll intervals, as provided in Section 5(d) of the Employment Agreement. Wild Oats acknowledges that Executive shall have no obligation to seek other employment in mitigation of the Base Amounts payable to the Executive pursuant to this provision of the Settlement Agreement, nor will there be any offset against these payments of any future earnings by the Executive. In the event of the death of the Executive, payments shall be made to his Estate.

(c)    From the Effective Date through the third anniversary hereof, Wild Oats shall continue to contribute to the cost of Executive's participation (including his immediate family) in the Company's medical, dental and vision benefit plans and group life insurance plan or to provide reimbursement to Executive, as provided in and subject to the conditions set forth in the last two sentences of Section 5(d) of the Employment Agreement. During such period, Wild Oats shall continue to provide Executive with the benefit of the Company's discount card plan. Executive acknowledges and agrees that such arrangements shall be in full satisfaction of the Company's obligations under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"). Rosalie Vitrano, Executive's spouse, will retain any rights that she has under COBRA in respect of Executive's resignation, without duplication of the provisions of the first sentence of this subsection.

(d)    The benefits in Sections 2(b) and (c) hereof shall remain subject to the provisions of Section 6(b) and Section 9(d) of the Employment Agreement.

(e)    All options to purchase Wild Oats common stock held by Executive that are vested on the Effective Date will remain exercisable for thirty (30) days after the Effective Date and shall terminate thereafter. The Company has accelerated the vesting of the grant of 4,167 restricted stock units which were otherwise scheduled to vest on or about February 8, 2007, subject to the expiry of the revocation period set forth in Section 7(c)(iv) hereof. All unvested options to purchase Wild Oats common stock and unvested restricted stock units or unvested restricted shares are cancelled and terminated.

(f)    During the ninety (90) day period following the Effective Date, the Company shall furnish secretarial services to Executive at the Company's expense.

(g)    The Company shall continue to pay, or reimburse Executive for, the monthly lease payments on his current Company leased car for the unexpired balance of the term of the lease as well as for the cost of insurance and maintenance during such time. Executive shall have the right, as between the Company and Executive, to exercise the purchase option under such lease.

(h)    Nothing in this Settlement Agreement shall constitute a waiver of any benefits which are already vested under any Company 401(k) or employee welfare plan.

(i)    The Payment Amount shall be payable as follows (in each case without interest): $250,000 shall be paid to the Executive by the Company by not later than 48 hours of the Effective Date, $200,000 shall be paid by the Company to the Executive on December 10, 2006, and the balance of the Payment Amount shall be paid by the Company to the Executive on January 2, 2007, in each case subject to the right of the Company to defer payment until Executive's revocation rights referenced in Section 7(c)(iv) have expired.

3.    **Covenants**.

(a)    <u>Cooperation with respect to Claims</u>. Executive will cooperate with the Group Companies in any current or future litigation, arbitration or processing of any claims involving any Group Company as reasonably requested by Wild Oats and where Executive's interests are not adverse to those of such Group Company. Any such cooperation will be at no cost to any Group Company other than reimbursement of reasonable out-of-pocket costs of Executive submitted as per the Company's expense reimbursement policy or otherwise approved in writing by Wild Oats.

(b)    <u>Transition Assistance; Cooperation</u>. During the period of 90 working days following the Effective Date, Executive agrees to provide reasonable assistance to transition his Company responsibilities. At the request of the Company, Executive agrees to make himself reasonably available to provide such services by telephone or during pre-arranged meetings, for up to five (5) hours per week, in each case at mutually acceptable times and locations. Any such work will be at no cost to any Group Company other than reimbursement of reasonable out-of-pocket costs of Executive submitted as per the Company's expense reimbursement policy or otherwise approved in writing by Wild Oats.

(c)    <u>SEC Filing</u>. Upon execution of this Agreement, Executive provides the representations and warranties set forth in Schedule 1. Executive also agrees promptly (but in no event more than 3 business days) after delivery to Executive of the Company's draft Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2006 (the "<u>Q3 10-Q</u>"), to provide good faith comments, if any, to the Q3 10-Q (including such comments, the "<u>Modified Q3 10-Q</u>"), and (i) to provide certifications to the Company with respect to the Modified Q3 10-Q substantially in the forms that would be required of the Company's certifying officers pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, and (ii) to provide customary representations to the Company (and, if requested by Company, to Ernst & Young LLP) with respect to the SAS 71 review of the Company's consolidated financial statements contained in the Modified Q3 10-Q as of and for the period ended September 30, 2006 and the related attestation regarding control over financial reporting.

(d)    <u>Termination of Employment Agreement</u>. The parties agree that, as of the Effective Date, the Employment Agreement, and the employment Term contemplated thereby, is terminated, except that Section 6(b) and Sections 7 through 16 of the Employment Agreement (including but not limited to Section 13 thereof entitled "No Duty to Mitigate," and Section 12 relating to "Indemnification") shall survive in accordance with their respective terms and are incorporated by reference herein as if set forth herein. Executive acknowledges and agrees that he is entitled to no further payments, rights, wages, bonuses, or other compensation or benefits pursuant to the Employment Agreement, or any other agreements with the Company or any Group Company, except as set forth herein. Regardless of anything else contained herein, from and after the Effective Date, Executive will have no authority to act for or bind any Group Company and will not hold himself out as having any such authority or as being an employee, officer, director or agent of any Group Company.

(e)    <u>Indemnity</u>. Executive agrees to indemnify and hold harmless the Company Releasees (as defined below) from all material Losses (as defined below) resulting from any material breach of any representation, warranty or covenant of Executive contained herein. Wild Oats agrees to indemnify and hold harmless Executive from all material Executive Losses (as defined below) resulting from any material breach of any representation, warranty or covenant of Wild Oats contained herein.

4.    **Restrictive Covenants.**

(a)    Executive acknowledges and agrees that, in the performance of the services on behalf of the Group Companies, Executive had access to, received and was entrusted with Confidential Information (as defined below). From and after the Effective Date, Executive will not, except as required by applicable law, disclose to others or use, whether directly or indirectly, any Confidential Information regarding any Group Company without the prior written consent of Wild Oats. "<u>Confidential Information</u>" will mean information about the Group Companies, and their respective suppliers, employees, business partners, clients and customers that is not available to the general public or generally known in the industry and that was learned by Executive through his relationship with any Group Company. Executive acknowledges that such Confidential Information is specialized, unique in nature and of great value to the Group Companies, and that such information gives the Group Companies a competitive advantage.

(b)    Executive recognizes that Executive possesses extensive Confidential Information of the Group Companies. Executive recognizes that such Confidential Information is not generally known, is of substantial value to Group Companies in developing its business, and was acquired by Executive because of Executive's employment with the Company. Executive also acknowledges that if Executive violated this <u>Section 4</u>, Executive would be unable, despite Executive's best efforts and intentions, to avoid using, disclosing, or compromising in some material way such confidential information and that such violation would result in

an inevitable disclosure of the Confidential Information in a manner that would be materially injurious to the Company. Therefore, Executive agrees that the limitations set forth in this Section 4 are reasonably necessary to protect such confidential information from such disclosure.

(c)     Executive, on the one hand, and Wild Oats, on the other hand, agrees that such party will not, directly or indirectly, disparage or talk negatively about the other party or any of its affiliates (including, in the case of Wild Oats, any Company Releasee) to any person or entity (including without limitation to any former, existing, or prospective clients or employees or any person or entity with whom any such other party does business) and will not, directly or indirectly, make or ratify any public statement, oral or written, that disparages or talks negatively about any such other party or any of its affiliates (including, in the case of Wild Oats, each Company Releasee). Notwithstanding the foregoing, nothing in this Section shall prevent any person or entity from (i) responding publicly to any incorrect, disparaging or derogatory public statement to the extent reasonably necessary to correct or refute such public statement or (ii) making any truthful statement to the extent (x) necessary with respect to any litigation, arbitration or mediation involving this Settlement Agreement, including, but not limited to, the enforcement of this Settlement Agreement or (y) required by law or by any court, arbitrator, mediator or administrative or legislative body (including any committee thereof) with actual or apparent jurisdiction to order such person to disclose or make accessible such information.

(d)     The parties agree and acknowledge that each of the covenants set forth in this Section 4 are separate, distinct, and independent of each other. Furthermore, if it is finally determined that any covenant in this Section 4 is unenforceable or invalid in any respect under applicable law, it is the express intention of all of the parties that such covenant should be modified or amended to render it enforceable to the maximum extent permitted by applicable law.

5.     **Representations and Warranties of the Executive**. Executive represents and warrants that:

(a)     Authority. (i) He has the capacity, power, and legal right to execute and deliver this Settlement Agreement and to consummate the transactions contemplated hereby, (ii) he has duly executed and delivered this Settlement Agreement, (iii) this Settlement Agreement is valid, binding on and enforceable against him, (iv) no approval or consent of any third party, including without limitation any spouse or former spouse or any children or trust therefor, is necessary for the execution, delivery, or performance by him of this Settlement Agreement, and (v) the execution, delivery and performance by Executive of this Settlement Agreement does not and will not conflict with or constitute a breach under any law, order, contract or other arrangement to which Executive is subject or bound.

(b)     Compensation. He was paid all payments, rights, wages, bonuses, and other compensation and benefits to which he was entitled through the Effective Date

except for amounts to be included in the initial regular bi-weekly payroll payment to be paid under Section 2(b) hereof.

(c)  <u>Return of Documents and Property</u>. On the Effective Date, Executive shall return to the Company any and all property of a Group Company not previously delivered to the Company and that is in his possession or under his control. Regardless of the foregoing, Executive has returned any and all Confidential Information (as defined below) of a Group Company not previously delivered to the Company and that is in his possession or under his control and is in physical, electronic of other form (including any such information on his laptop computer, and Executive and has retained no copies thereof in any form.

(d)  <u>Tax and Legal Matters</u>. He (i) is a U.S. resident for tax purposes, (ii) has reviewed with his own legal and tax advisors the consequences of this Settlement Agreement and whether the consideration payable hereunder is subject to any taxation, and (iii) has relied solely on such advisors and not on any statements, advice or representations of any Company Releasee (as defined below) as to the necessity for withholding or the taxability of such payments, whether pursuant to foreign, federal, provincial, state or local income tax statutes or otherwise. Executive agrees that he shall be exclusively responsible and liable for the payment of all foreign, federal, provincial, state and local taxes in connection with the consideration paid to him under this Settlement Agreement, and Executive represents and warrants that he shall make payments of such taxes at the appropriate time and in the amount required of each of them, if any.

(e)  <u>Payment Amount</u>. The Payment Amount was determined through arm's-length negotiations between the parties and does not represent the result of any specific calculation or formula.

(f)  <u>Ownership of Claims; No Claims Filed</u>.  (i) The Releasing Parties (as defined below) are the sole and lawful owners of all right, title and interest in and to every claim being released by each and any of them hereunder and every other matter which they purport to release hereby (collectively, the "<u>Released Claims</u>"), (ii) Executive has the sole and exclusive right and authority to execute and deliver this Settlement Agreement, to release the Released Claims on behalf of Executive and the Releasing Parties, and to receive one hundred percent (100%) of the sums payable hereunder free and clear of any interest or claims of any third party, as to which Executive shall indemnify the Company against any claims by any third party related hereto and any expenses incurred by the Company in connection therewith, (iii) the Releasing Parties have not heretofore assigned or transferred, or purported or attempted to assign or transfer, and will not hereafter assign or transfer, to any person or entity any Released Claim or other matter herein released, and (iv) no Releasing Party has filed any complaints, charges, lawsuits, or other legal actions with any court or government agency relating to any Released Claim or other matter herein released.

6.     **Representations and Warranties of Wild Oats and the Company**. Wild Oats represents that (i) this Settlement Agreement has been duly approved by all requisite corporate action required by Wild Oats and it has the authority, power, and legal right to execute and deliver this Settlement Agreement and to consummate the transactions contemplated hereby, (ii) it has duly executed and delivered this Settlement Agreement, (iii) this Settlement Agreement is valid, binding on and enforceable against it, (iv) no approval of any third party is necessary for the execution, delivery, or performance by it of this Settlement Agreement, and (v) the execution, delivery and performance by Wild Oats of this Settlement Agreement does not and will not conflict with or constitute a breach under any law, order, contract or other arrangement to which either is subject or bound

7.     **Waivers and Releases**.

(a)     (i)     Executive Release. Executive, on behalf of himself, and each of his respective controlled affiliates, heirs, executors, administrators, conservators, and successors and assigns (the "Releasing Parties"), fully and forever RELEASES, DISCHARGES and COVENANTS NOT TO SUE Wild Oats and each other Group Company and each of their respective predecessors, parents, direct and indirect subsidiaries, and affiliates, and each of their respective officers, employees, directors, stockholders, managers, members, agents, attorneys, insurers, accountants, heirs, executors, administrators, conservators, and successors and assigns (collectively, the "Company Releasees") from any and all claims, demands, liens, actions, suits, causes of action, obligations, controversies, debts, costs, attorneys' fees, expenses, damages, judgments, orders, and liabilities of whatever kind or nature at law, in equity, or otherwise, whether now known or unknown, suspected or unsuspected, and whether or not concealed or hidden, that have existed or may have existed, or that do exist or that hereafter can, will or may exist, based on any facts, events, or omissions occurring from the beginning of time to the date of this Settlement Agreement (each, a "Loss") relating to or arising out of any Group Company, the operation, management and/or ownership of any Group Company, the rendering of services by Executive as director, employee, officer or otherwise to any Group Company and the complete termination thereof, and all matters reasonably related to or arising from the foregoing, including but limited to any claims arising under any foreign, federal, provincial, state or local statute, including, without limitation, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Older Workers' Benefit Protection Act, the Rehabilitation Act of 1973 (including Section 504 thereof), the Family Medical Leave Act, Title VII of the 1964 Civil Rights Act, the Civil Rights Act of 1866 (42 U.S.C. § 1981), the Civil Rights Act of 1991, the Equal Pay Act, the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the New York State Human Rights Law, the New York City Human Rights Law, and the Employee Retirement Income Security Act of 1974, all as amended, except in any case for Executive's rights under this Agreement. This release also specifically includes, but is not limited to, any rights that Executive may have arising under applicable laws prohibiting discrimination and/or harassment on the basis of race, color, age,

religion, sexual orientation, creed, sex, national origin, ancestry, alienage, citizenship, nationality, mental or physical disability, marital status, harassment or any other basis prohibited by law as well as under applicable securities laws.

(b)      (ii)    <u>Company Release</u>.  The Company, on behalf of itself and each of its affiliates, and each of their respective officers, employees, managers, members, agents, attorneys, insurers, accountants, heirs, executors, administrators, conservators, and successors and assigns (the "<u>Company Releasing Parties</u>"), fully and forever RELEASES, DISCHARGES and COVENANTS NOT TO SUE Executive from any and all claims, demands, liens, actions, suits, causes of action, obligations, controversies, debts, costs, attorneys' fees, expenses, damages, judgments, orders, and liabilities of whatever kind or nature at law, in equity, or otherwise, whether now known or unknown, suspected or unsuspected, and whether or not concealed or hidden, that have existed or may have existed, or that do exist or that hereafter can, will or may exist, based on any facts, events, or omissions occurring from the beginning of time to the date of this Settlement Agreement (each, an "<u>Executive Loss</u>") relating to or arising out of any Group Company, the operation or management of any Group Company, the rendering of services by Executive as director, employee, officer or otherwise to any Group Company and the termination thereof, and all matters reasonably related to or arising from the foregoing, except in any case for (i) the Company Releasing Parties' rights under this Agreement, (ii) any right or claim that Wild Oats may have in connection with any assertion by Executive of any right to or claim for indemnity, and (iii) any claim based upon fraudulent or illegal activity discovered subsequent to the date hereof, or arising from any claim, investigation or proceeding by any regulatory or other governmental agency or entity.

(c)      <u>Unknown Claims</u>.  Except for those obligations arising out of this Agreement and as otherwise provided in <u>Section 7(a)</u> above, the releases contained in <u>Section 7(a)</u> are intended to be effective as a general release of and bar to any and all claims. Executive and the Company each acknowledges that a Releasing Party or Company Releasing Party, as the case may be, later may discover claims or facts in addition to or different from those which Executive or Company now knows or believes to exist with respect to the subject matter of this Agreement and which, if known or suspected at the time of executing this Agreement, may have materially affected its terms and/or Executive's or Company's decision to execute this Agreement.  Executive and Company acknowledges and agrees that by reason of this Agreement, and the release contained in <u>Section 7(a)</u>, Executive, Company and their respective Releasing Parties are assuming any risk of such unknown facts and such unknown and unsuspected claims and that this Agreement is intended to be effective as a bar to all such claims.

(d)      <u>ADEA</u>.  Executive acknowledges and agrees that, among the matters Executive is waiving and releasing hereunder, are any and all rights or claims that Executive may have arising under the Age Discrimination in Employment Act of 1967, as amended (the "<u>ADEA</u>"), which have arisen on or before the date of execution of this Settlement Agreement.  Because the ADEA contains special provisions

affecting the release of ADEA claims, Executive also expressly acknowledges and agrees that:

(i)     In return for this Settlement Agreement, Executive will receive consideration beyond that which Executive was already entitled to receive before entering into this Settlement Agreement.

(ii)     Executive was orally advised by the Company and is hereby advised in writing to consult with an attorney before signing this Settlement Agreement.

(iii)     Executive was given a copy of this Settlement Agreement on October 20, 2006 and informed that Executive had 21 days within which to consider this Settlement Agreement although Executive may sign it sooner if Executive so determines.

(iv)     Executive was informed that he has seven days following the date of execution of this Settlement Agreement in which to revoke in writing the release of rights or claims that Executive may have arising under the ADEA.

(v)     Executive has voluntarily chosen to enter into this Settlement Agreement and has not been forced or pressured in any way to sign it.

8.    **Confidentiality of Agreement; Filings.**

(a)    Each party, for itself and its representatives, agrees that, except as may be required by law, such party shall keep confidential all communications related to the negotiation of this Settlement Agreement and shall not, except as may be required by law, directly or indirectly, whether orally, in writing, disclose any of the foregoing to any third party, or in any way respond to, participate in, or contribute to, whether orally, in writing, by signal, gesture, or any other means, any inquiry, discussion, notice, or publicity concerning any aspect of any of the foregoing. The only exceptions to the obligations imposed by this Section 8 are that a party may disclose any of the foregoing: (a) to such party's agents, employees, attorneys, potential financing sources, accountants and tax advisers who agree to keep the foregoing confidential; (b) as necessary to enforce this Settlement Agreement, (c) as necessary to comply with applicable laws, including but not limited to any disclosures required to be made under applicable rules and regulations under securities laws, and (d) if called as a witness or as may be required by process of law or by court order.

(b)    Executive shall have the right to review to the full extent practical and suggest edits to the Company's press release and Form 8-K filing relating to this Settlement Agreement. Such press release and Form 8-K shall state that Executive has resigned because the Company and he were unable to reach agreement on the terms of a new or modified employment agreement.

9.    <u>Governing Law</u>.  The rights and obligations of the parties hereunder shall be construed and enforced in accordance with, and shall be governed by, the laws of the State of Delaware, without regard to principles of conflict of laws.

10.    <u>Arbitration</u>.

(a)    <u>Arbitration</u>. Any controversy, claim or dispute between Executive, on the one hand, <u>and</u> the Group Companies and their respective officers, directors, employees and/or agents, on the other hand, in any way arising out of, relating in any way to, or connected with this Settlement Agreement, its enforcement or interpretation, or because of an alleged breach, default or misrepresentation in connection with any of its provisions, or any controversy or claim arising out of, related to, or connected with any Released Claim and every other matter which such party purports to release hereby, will be submitted to final and binding arbitration in Denver, Colorado, in accordance with the then existing National Rules for the Resolution of Employment Disputes of the American Arbitration Association.  In the event of arbitration each party will initially pay the fees of their respective attorneys, the expenses of their witnesses and any other expenses connected with presenting their claim.  Other costs of the arbitration, including the fees of the arbitrator, administrative fees of the American Arbitration Association, and any costs relating to arbitration facilities ("<u>Arbitration Costs</u>"), shall be borne by Wild Oats (any party ordering the preparation of a transcript of proceedings shall bear transcription costs, or this cost will be shared equally if both parties order a transcript). The arbitrator has the power to award to the substantially prevailing party the reimbursement of such party's reasonable attorneys' fees and costs (including, but not limited to, expert fees and Arbitration Costs) in connection with such arbitration. Any dispute as to the reasonableness of any fee or cost will be resolved by the arbitrator.  Except as may be necessary to enter judgment upon the award or to the extent required by applicable law, all claims, defenses and proceedings (including, but not limited to, the existence of a controversy and the fact that there is an arbitration proceeding) will be treated in a confidential manner by the arbitrator and all those involved in the proceeding. Any controversy relating to the arbitration presented to a court will be filed under seal to the extent permitted by law.  An arbitration award rendered pursuant to this <u>Section 10</u> will be final and binding on the parties and may be submitted to a court of competent jurisdiction for entry of a judgment thereon.

(b)    <u>Temporary or Injunctive Relief</u>:  Notwithstanding the parties' agreement to submit all disputes to final and binding arbitration, the parties shall have the right to seek and obtain temporary or preliminary injunctive relief in any court of competent jurisdiction. Such courts shall have authority to, among other things, grant temporary or provisional injunctive relief (with such relief effective until the arbitrator has rendered a final award) in order to protect any party's rights under this Settlement Agreement or its intellectual property rights.

(c)    <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES ACKNOWLEDGES AND AGREES THAT BY ENTERING THIS SETTLEMENT AGREEMENT, SUCH

PARTY IS WAIVING THE RIGHT TO PURSUE ANY SUCH CLAIMS IN STATE OR FEDERAL COURT BEFORE A JUDGE OR JURY.

11.  **Integrated Agreement**.  This Settlement Agreement is an integrated document and constitutes and contains the entire agreement and understanding with respect to the subject matter addressed, and supersedes and replaces all prior negotiations and all agreements proposed or otherwise, whether written or oral, including the Employment Agreement (except to the extent it is incorporated herein by reference, or otherwise continues in force and effect pursuant to the terms of this Settlement Agreement), the Rights Agreement and the Subscription Agreement, concerning the subject matter hereof.

12.  **Severability**.  If any provision of this Settlement Agreement or the application thereof is held invalid, such invalidation shall not affect other provisions or applications of this Settlement Agreement which can be given effect without the invalid provisions or application and to this end the provisions of this Settlement Agreement are declared to be severable.

13.  **Drafting**.  Each party has cooperated in the drafting and preparation of this Settlement Agreement.  Hence, in any construction or interpretation of this Settlement Agreement, the same shall not be construed against any party on the basis that the party was the drafter.

14.  **Counterparts**.  This Settlement Agreement may be executed in counterparts, and each counterpart, when executed, shall have the efficacy of a signed original.  Photographic and facsimile copies of such signed counterparts may be used in lieu of the originals for any purpose.

15.  **Modification**.  This Settlement Agreement cannot be modified except in a written document signed by all of the parties to this Settlement Agreement.

16.  **Voluntary and Knowing Agreement.**  By their authorized signatures below, the parties certify that they have carefully read and fully considered the terms of this Settlement Agreement, that they have had a reasonable time in which to consider the terms of this Settlement Agreement, that they have had an opportunity to discuss these terms with attorneys or advisors of their own choosing, that they agree to all of the terms of this Settlement Agreement, that they intend to be bound by them and to fulfill the promises set forth herein, and that they voluntarily and knowingly enter into this Settlement Agreement with full understanding of its binding legal consequences.

17.  **Notices**.  All notices, and all documents, instruments, shares, certificates or other materials required, to be delivered pursuant to this Settlement Agreement, shall be given (a) in person; (b) by registered or certified mail, postage prepaid, return receipt requested to the address set forth below, or (c) by a generally recognized same-day, next-day, or second-day courier or messenger service that provides written acknowledgement of receipt by the addressee, to the address set forth below. Notices are deemed delivered when actually delivered to the recipient party (or when such delivery is refused by such

recipient party). Any party may furnish, from time to time, other addresses for notices to it.

|                     |                                                                                                                                    |
| ------------------- | ---------------------------------------------------------------------------------------------------------------------------------- |
| <u>If to Executive</u>: | Perry D. Odak<br>22101 Bear Tooth Drive<br>Golden, Colorado  80403                                                                 |
| <u>With a copy to</u>:  | Carlton Fields, P.A.<br>4221 West Boy Scout Boulevard, Suite 1000<br>Tampa, Florida  33607<br>Attention: John P. McAdams, Esq.     |
| <u>If to Wild Oats</u>: | Wild Oats Markets, Inc.<br>3375 Mitchell Lane<br>Boulder, Colorado  80301<br>Attention:  Gregory Mays                              |
| <u>With a copy to</u>:  | Kaye Scholer LLP<br>1999 Avenue of the Stars, Suite 1700<br>Los Angeles, California  90067<br>Attention: Barry L. Dastin, Esq.     |

18.    **Further Assurances; Additional Acts**.  Each party agrees to cooperate fully with the other party, to take such actions, to execute such further instruments, documents, and agreements and to give such further written assurances, as may be reasonably requested by the other party to evidence and reflect the transactions described herein and contemplated hereby, and to carry into effect the intents and purposes of this Settlement Agreement.

**IN WITNESS WHEREOF,** the parties hereto, intending to be legally bound, have caused this Settlement Agreement to be executed as of the dates set forth below:

_____          Date: _____10/24/06_____
Perry D. Odak


WILD OATS MARKETS, INC.

_____          Date: _____10/24/06_____
By: Gregory Mays
Title: Authorized Signatory

**EXHIBIT A**

**LETTER OF RESIGNATION**

October 19, 2006

Wild Oats Markets, Inc.
3375 Mitchell Lane
Boulder, Colorado  80301

      Re:    Resignation

Ladies and Gentlemen:

      I resign, effective as of the date written above, from my position as Chief Executive Officer and a member of the Board of Directors of Wild Oats Markets, Inc. (the "Company"), and from each and every other capacity that I hold with the Company and its direct and indirect subsidiaries and affiliates.  As discussed, I am resigning because the Company and I were unable to reach agreement on the terms of a new or modified employment agreement.

      Sincerely,

      Perry D. Odak

**Schedule 1**

**Representations and Warranties**

I hereby represent and warrant, to the best of my actual knowledge and belief as of the date hereof:

(1)    The financial and other information contained in Wild Oat's quarterly and annual reports filed during my employment with Wild Oats, as of the date of filing of such reports, did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in the light of the circumstances under which such statements were made, not misleading.

(2)    There are no transactions between Wild Oats or its subsidiaries with me (or any parties related to me), that would be required to be publicly disclosed by Wild Oats in an SEC filing that have not been so disclosed, except for those that are not required to be disclosed as of the date of this Settlement Agreement consisting of the transaction contemplated herein.

(3)    I have not entered into any agreements on behalf of Wild Oats which contravenes Wild Oats' policies in any material respect.

(4)    No violation of law has occurred that would have a material adverse effect on the financial statements or the financial position of Wild Oats that have not been disclosed in an SEC filing, and I am not aware of any fraud of any magnitude (including fraud resulting in immaterial misstatements) on the part of Wild Oat's senior management, with the exception of such issues, if any, which have been previously disclosed to the Board of Directors of Wild Oats or the audit committee of the Board of Directors.

(5)    The representations in the letters to Ernst & Young LLP signed by me in connection with financial information contained in Wild Oat's SEC filings were, as of the dates of such letters, accurate in all material respects.

(6)    During the period of my employment, Wild Oat's chief financial officer and I were responsible for supervising the establishment and maintenance of disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) and the internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) for Wild Oats which were disclosed to the Audit Committee of the Wild Oats Board of Directors, and:

    (a)    I, with the assistance of the Wild Oats chief financial officer, have designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision,

to ensure that material information relating to Wild Oats, including its consolidated subsidiaries, is made known to us by others within those entities;

(b)   I, with the assistance of the Wild Oats chief financial officer, have designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   I, with the assistance of the Wild Oats chief financial officer, have evaluated the effectiveness of Wild Oat's disclosure controls and procedures, and I am aware of no change since June 30, 2006, about the effectiveness of the disclosure controls and procedures, as of September 30, 2006; and;

(d)   I am aware of no material change since June 30, 2006, in Wild Oat's internal control over financial reporting that occurred during the fiscal quarter ended September 30, 2006 that has materially affected, or is reasonably likely to materially affect, Wild Oat's internal control over financial reporting.

(7)   I have disclosed, based on the most recent evaluation by me of internal control over financial reporting, to Wild Oat's auditors and the audit committee of Wild Oat's board of directors (or persons performing the equivalent function).

(a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting of which I was aware which are reasonably likely to adversely affect Wild Oat's ability to record, process, summarize and report financial information; and;

(b)   any fraud, whether or not material, of which I was aware that involves management or other employees who have a significant role in Wild Oat's internal control over financial reporting.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE

NEW YORK 10036-6522

TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

DIRECT DIAL
212-735-2747
DIRECT FAX
917-777-2747
EMAIL ADDRESS
TPAK@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

ATTORNEY WORK PRODUCT
COMMON INTEREST PRIVILEGE
PRIVILEGED AND CONFIDENTIAL

April 20, 2007

VIA ELECTRONIC MAIL &
FACSIMILE
Charles M. Rosenberg, Esq.
Carlton Fields
4000 International Place
100 S.E. Second Street
Miami, Florida 33131-2114

RE:    Joint Defense Agreement with Perry Odak

Dear Mr. Rosenberg:

I am writing on behalf of Wild Oats Markets, Inc. ("Wild Oats" or the "Company") in response to your letter sent to me earlier today regarding Mr. Odak's testimony before the FTC scheduled for next Tuesday. Specifically, you have asked for written confirmation that Wilds Oats will not "retaliate" against Mr. Odak in response to his testimony. Without waiving any of its rights, I can confirm that Wild Oats does not intend to take any actions against Mr. Odak resulting from his testimony to the FTC, but only to the extent that Mr. Odak does not breach any or duties or obligations to Wild Oats. As I mentioned in our telephone conversation, Wild Oats reserves the right to take any appropriate actions against Mr. Odak in the event his testimony before the FTC (or any other action he may take) violates any rights of, or breaches any obligations to, the Company, including without limitation, any rights, duties or obligations arising from the Resignation, Waiver, Settlement

Charles M. Rosenberg, Esq.
April 20, 2007
Page 2


Agreement and General Release, dated as of October 23, 2006 (the "Resignation Agreement").

  I can also confirm that the Company will reimburse Mr. Odak's reasonable out-of-pocket legal expenses consistent with its reimbursement policy, so long as Mr. Odak cooperates with the Wild Oats with regard to the FTC investigation of the pending Whole Foods/Wild Oats transaction, as set forth in section 3(a) of the Resignation Agreement. Such cooperation includes, *inter alia*, the entering into a joint defense agreement, Wild Oats' participation (through its counsel, Skadden Arps) in preparing Mr. Odak for his testimony and Mr. Odak's debriefing us on his testimony, providing us a copy of his testimony transcript, and updating us on any further communications between the FTC and Mr. Odak (through his counsel, you).

  With those understandings in mind, I also write to memorialize the joint defense and common interest agreement (the "Joint Defense Agreement") that you and I agreed to orally yesterday and between Wild Oats and Mr. Odak in recognition that the parties have a common interest to exchange certain information, pool individual work product and cooperate in a joint defense effort in connection with the FTC investigation. By entering into the Joint Defense Agreement, Wild Oats and Mr. Odak each acknowledge that such agreement shall not be construed to affect the separate and independent representation of each party by its respective outside counsel, nor shall anything be deemed herein to create an attorney-client relationship between any attorney and anyone other than the party represented by that outside counsel. Specifically, neither party shall claim that any counsel is disqualified in any litigation or proceeding relating to or deriving from the FTC investigation by reason of this Joint Defense Agreement.

  If the foregoing does not accurately represents our understanding, please contact me immediately.


     Very truly yours

     Thomas Pak, Esq.


cc: Terry Wallock, Esq.

```
 1                    FEDERAL TRADE COMMISSION

 2                         I N D E X

 3

 4    WITNESS:              EXAMINATION:              PAGE

 5    PERRY D. ODAK        BY MS. SLATER                4

 6                         BY MR. DelBUONO             156

 7

 8

 9                     EXHIBITS REFERENCED

10    EXHIBIT              PAGE

11    Number PX 00610         129

12    Number PX 00613         156

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    FEDERAL TRADE COMMISSION

 2

 3    In the Matter of:            )

 4    WHOLE FOODS MARKET, INC.,    )

 5                a corporation, ) File No. 071-0114

 6    and                          )

 7    WILD OATS MARKETS, INC.,     )

 8                a corporation. )

 9    -----------------------------)

10                              Tuesday, April 24, 2007

11

12                              Room 5100

13                              Federal Trade Commission

14                              601 New Jersey Avenue, N.W.

15                              Washington, D.C.  20001

16

17          The above-entitled matter came on for

18    investigational hearing, pursuant to notice, at

19    10:20 a.m.

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2

 3    ON BEHALF OF THE FEDERAL TRADE COMMISSION:

 4            ABIGAIL A. SLATER, ESQ.

 5            MICHAEL A. FRANCHAK, ESQ.

 6            Federal Trade Commission

 7            601 New Jersey Avenue, N.W.

 8            Washington, D.C.  20001

 9            (202) 326-3473

10            aslater@ftc.gov

11

12    ON BEHALF OF THE WITNESS:

13            CHARLES M. ROSENBERG, ESQ.

14            Carlton Fields

15            4000 International Place

16            100 S. E. Second Street

17            Miami, Florida  33131-9101

18            (305) 530-0050

19            crosenberg@carltonfields.com

20

21

22    ALSO PRESENT:

23            ARTHUR J. DelBUONO, Ph.D., Financial Analyst

24

25
```

```
 1                P R O C E E D I N G S
 2                  -   -   -   -   -
 3   Whereupon --
 4                     PERRY D. ODAK
 5   a witness, called for examination, having been first
 6   duly sworn, was examined and testified as follows:
 7                     EXAMINATION
 8        BY MS. SLATER:
 9        Q.  Good morning.
10            Would you please state your full name for the
11   record.
12        A.  Perry D. Odak.
13        Q.  And who is your current employer, Mr. Odak?
14        A.  I'm currently unemployed or not employed.  I
15   don't know how I wish to describe that.
16        Q.  Are you working on any projects specifically
17   aside from being in full-time employment?
18        A.  Am I working on any projects.
19            Recently I agreed to join an LBO firm as an
20   operating partner, and that will commence on May 1.
21        Q.  What is the name of that LBO?
22        A.  That's called Genstar, G-E-N-S-T-A-R.
23        Q.  Where is that LBO based out of?
24        A.  San Francisco.
25        Q.  My name is Gail Slater.  I am an attorney with
```

1     the Federal Trade Commission.  Today I will be asking

2     you a number of questions about supermarket retailing in

3     general and the proposed merger between Whole Foods and

4     Wild Oats in particular.

5          Mr. Odak, do you understand that you are

6     appearing here today pursuant to a subpoena from the

7     Federal Trade Commission?

8     A.  I do.

9     Q.  Have you ever been deposed or otherwise given

10    testimony before?

11    A.  Yes.

12    Q.  Can you describe to me the circumstances of

13    those depositions or testimony?

14    A.  It's, you know, through litigation, both

15    personal and business litigation.

16    Q.  Starting with the first occasion, could you give

17    me the particulars, please.

18    A.  I've been in business 30 years.  That's a long

19    time for me to remember.

20         I sued the IRS one time and was certainly

21    deposed by one of the AGs -- or no.  Excuse me.  It

22    wasn't the AGs -- one of the government attorneys that

23    was defending the case.

24         I've been deposed and appeared in court, in

25    federal court, on an unlawful termination.  The company

1    was accused of discriminating against a group of

2    employees or a specific employee.

3        Q.   Approximately when did this litigation occur?

4        A.   That was probably in '73 or '74 time frame.

5             I've been involved in personal litigation.  I

6    litigated against a former turnaround assignment to

7    collect the money that was owed me.

8        Q.   Approximately when did this take place?

9        A.   That was in 1995 through '98.

10            And then I've been deposed in '06 -- this is now

11   all personal I've covered so far, so far all I'm

12   covering is -- I guess it isn't all personal.  I

13   shouldn't have qualified it.

14            In '06 I was, you know, in several depositions

15   involved with a matrimonial dispute with my ex-wife as

16   part of the divorce proceeding.

17            I'm trying to remember other business

18   situations.  There has been.  I just don't recall them

19   at this moment.

20       Q.   Anything specific to Wild Oats?

21       A.   No.  I've never been deposed in any capacity

22   working for Wild Oats.

23       Q.   Before we continue, I'd like to explain some of

24   the ground rules for our hearing here today.

25            As you know, you were sworn in a few minutes ago

1    by the court reporter so that all of my questions and

2    all of your responses will be recorded by her.

3          For her benefit and so the record is clear, can

4    we agree that we will stick to verbal communication;

5    meaning, instead of a head nod or an "uh-huh," you will

6    say "yes" or "no"?

7    A.  We can agree to that.

8    Q.  Thank you.

9          Also so the record is clear, can we please

10   agree, to the extent possible, not to speak over one

11   another; meaning, you will let me finish my questions,

12   and I will wait until the end of your responses before

13   asking the next question?

14   A.  Certainly.

15   Q.  Thank you.

16         If you don't understand a question, please don't

17   hesitate to let me know, and I will do my best to

18   clarify the question for you.

19         If you don't ask me to clarify a question, I

20   will assume you've understood it.

21         Is that okay with you?

22   A.  Yes.

23   Q.  During the course of this hearing, your attorney

24   Mr. Rosenberg may object to my questions.  The grounds

25   for objecting under the Federal Trade Commission rules

1   are if the question calls for a response including legal

2   advice given to you by counsel or if the question

3   exceeds the scope of our investigation.

4       A.  I understand.

5       Q.  And aside from that, if your attorney objects

6   to one of my questions, you will ordinarily respond to

7   it.

8           Do you understand?

9       A.  Yes, I do.

10      Q.  Thank you.

11          We will take breaks throughout the day.  Again,

12  please don't hesitate to ask for a break, and I will do

13  my best to accommodate you.  Okay?

14          Mr. Odak, how did you prepare for the hearing

15  here today?

16      A.  I was -- did preparation with the Wild Oats

17  attorneys.

18      Q.  Who are they?

19      A.  A Mr. Thomas Pak, I believe his name is, and a

20  Randall Doud.

21      Q.  What did you discuss with them?

22      A.  Is that not attorney-client?

23          MR. ROSENBERG:  Yeah.

24          I'm going to object.  There's a joint

25  cooperation agreement, and that would be protected by

9

1    attorney-client privilege.

2         MS. SLATER:  And just so I understand it,

3    there's a joint cooperation agreement between Mr. Odak

4    and Wild Oats?

5         MR. ROSENBERG:  Yes.

6         BY MS. SLATER:

7    Q.  When did you enter into that agreement,

8    Mr. Odak?

9    A.  I believe it was last week, Thursday or Friday.

10        MS. SLATER:  And Mr. Rosenberg, is there

11   anything you'd care to tell us about the circumstances

12   or conditions of that agreement?

13        MR. ROSENBERG:  No.  Just in conversations I

14   had with counsel for Wild Oats we deemed it

15   appropriate.

16        BY MS. SLATER:

17   Q.  Did you speak with anyone else about the hearing

18   here today, Mr. Odak?

19   A.  No.

20   Q.  Did you review any documents in preparation for

21   the hearing?

22   A.  No.

23   Q.  Did you review any data in preparation for the

24   hearing?

25   A.  No.

1      Q.  Next I'd like to cover some questions about

2  your career history, starting with the year that you

3  graduated from college and what degree you graduated

4  in.

5      A.  I graduated as an undergraduate at

6  Cornell University in -- I don't know -- it was either

7  the winter of '68 or the winter of '69, that

8  December-January time period, and then stayed on to

9  graduate school in '6 -- I think it was '69.

10          I then went to work for a company called

11  Armour & Company for a division called Armour Dial,

12  which is today the Dial Corporation.

13      Q.  What were your responsibilities at Armour Dial?

14      A.  When I started, I was started as an accounting

15  associate, and I left nine years later and I was senior

16  vice president of worldwide operations.

17      Q.  When did you leave Armour Dial?

18      A.  1972.

19      Q.  And what was your next job?

20      A.  I went and became a partner in a privately held

21  corporation called Jovan, J-O-V-A-N, Inc. in Chicago,

22  Illinois.

23      Q.  What did Jovan do?

24      A.  We were in the fragrance and cosmetic business.

25      Q.  Specifically --