# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:07-cv-01021-PLF |
| | ) | |
| WHOLE FOODS MARKET, INC., | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| WILD OATS MARKETS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S NOTICE OF FILING OF PUBLIC VERSION MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION *IN LIMINE*  TO EXCLUDE THE EXPERT REPORT  AND TESTIMONY OF KELLYANNE CONWAY

Notice is given that a redacted public version of Plaintiff's Memorandum in Support of

Its Motion *in Limine* to Exclude the Expert Report and Testimony of Kellyanne Conway (Doc.

No. 128), is filed via CM-ECF as an attachment to this notice.

Respectfully submitted,

Dated: July 26, 2007

   /s/ Thomas J. Lang
Thomas J. Lang
Bureau of Competition
Federal Trade Commission
601 New Jersey Avenue, N.W.
Washington, DC  20001
(202) 326-3665 (direct dial)
(202) 326-2071 (facsimile)
tlang@ftc.gov

Counsel for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION          )
600 Pennsylvania Avenue, N.W.      )
Washington, D.C. 20580             )
                                   )
                    Plaintiff,     )
                                   )
            v.                     )       Civil Action No. 1:07-CV-01021
                                   )
WHOLE FOODS MARKET, INC.          )       **PUBLIC VERSION**
550 Bowie Street                   )
Austin, Texas 78703                )
                                   )
and                                )
                                   )
WILD OATS MARKETS, INC.           )
1821 30th Street                   )
Boulder, Colorado 80301            )
                                   )
                    Defendants.    )

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION *IN LIMINE*
TO EXCLUDE THE EXPERT REPORT
AND TESTIMONY OF KELLYANNE CONWAY

MICHAEL J. BLOOM
THOMAS J. LANG (D.C. Bar No. 452398)
REID B. HORWITZ (D.C. Bar No. 440612)
Attorneys
Federal Trade Commission
Washington, D.C. 20580
(202) 326-2608

Dated:  July 26, 2007

## <u>INTRODUCTION AND SUMMARY</u>

Plaintiff, the Federal Trade Commission ("FTC"), submits this memorandum in support of its motion to exclude the survey and expert report authored by Defendants' expert witness, Ms. Kellyanne Conway, for her use of unreliable principles and methods, which render her work inadmissible under the standards enunciated by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and  Fed. R. Evid. 702.

The Conway survey was commissioned by the Defendants to support the report authored by their economic expert, Dr. David Scheffman, and to corroborate his analysis. Expert Report of Dr. David Scheffman, ¶ 59, PX02066 at 019.  Although Defendants have spent more than a quarter of a million dollars on this survey (PX02076) (Exhibit 1), and despite Dr. Scheffman himself selecting the markets to survey (Deposition of Dr. David Scheffman at 211:9-13, PX04362 at 211 (Exhibit 2)), Dr. Scheffman stated at his deposition that he did not rely on any conclusions of this survey (Scheffman Dep. at 222:8-9, PX04362 at 222(Exhibit 2).

Ms. Conway's survey and report suffer from serious and fatal design flaws, poor execution, and conclusions that are inconsistent with the survey's results, as summarized below:

<u>Survey and Sample Design Are Fatally Flawed</u>

- ***Ms. Conway mistakenly believes that the relevant target population is unknown and unknowable, and so her survey sample was not designed to accurately reflect the target population of Whole Foods and Wild Oats shoppers.***  A critical step in conducting any survey is to ensure that the survey sample accurately reflects a relevant target population – in this case, Whole Foods and Wild Oats shoppers.  Ms. Conway testified that such shoppers were unknown and unknowable.  This makes it impossible to determine whether the survey sample used accurately reflects actual Whole Foods and Wild Oats shoppers.   This survey design flaw makes the survey itself unreliable and inadequate as a tool for understanding the preferences of the consumers who actually shop at Whole Foods and Wild Oats.

o ***The survey results cannot be extrapolated accurately to the relevant target population.***
Ms. Conway did not take steps to measure and adjust for potential selection bias
introduced by her survey methods.  First, she uses a type of quota sampling that is not the
product of reliable principles and methods, and which incorrectly weights her data based
on these quotas when making extrapolations, thus introducing bias.  Second, she fails to
measure key demographic information, particularly education, and fails to determine
whether her sample results need to be weighted to correct for the under or over
representation of various demographic groups.  Third, her sampling methods cause her to
create an underinclusive sample that fails to include two important groups:  likely or
potential new customers in the disputed markets and shoppers in the disputed markets
that are not in the eight cities chosen by Dr. Scheffman.  As a result of these errors, there
is no reliable basis for extrapolating her survey results to any relevant target population.

• ***Results from the survey questions are unreliable.***  The survey questions were
complicated and confusing to respondents, thereby leading to inconsistent results.  For
example, there are respondents who said that they shop mostly at Whole Foods or Wild
Oats for various product categories but responded to later questions by saying they
purchased most or all of the same product categories from *other* food retailers.
Inconsistent survey results reveal the presence of underlying flaws in the survey design
itself, such as the presentation of questions that are confusing, complex, and poorly
worded, which here led to unreliable results.

Ms. Conway's Survey Was Poorly Executed

• ***Twenty percent of the survey respondents come from outside the zip codes and,
therefore, outside of the areas that Ms. Conway and Dr. Scheffman sought to survey.***
Notwithstanding the flaws in survey design, the failure to carry out the study as designed
reveals errors in the way the survey was conducted.  Ms. Conway attempts to correct for
this error by excluding individuals who live outside the zip codes that were to be
surveyed, but this is insufficient.

• ***Ms. Conway failed to use simple validation techniques to catch zip code errors even
though this information had been collected for this purpose.***  Validation of the data that
were collected is a critical part of conducting a survey.  Ms. Conway's failure to employ
basic validation techniques post-survey to catch errors in the execution of the survey
further casts doubt on the reliability of the survey results independent of the flaws in the
design of the survey.

Ms. Conway's Conclusions are not Supported by the Survey's Results

• ***Ms. Conway's conclusion that Whole Foods and Wild Oats shoppers buy the "same"
products at other food retailers is unsupported by her results.***

- ***Ms. Conway's analysis of shopper behavior fails to take into consideration inconsistent responses among respondents, and are therefore unsupportable.***

- ***Ms. Conway's conclusions about the population of Whole Foods and Wild Oats shoppers are unsupportable based on her use of quota sampling.***

Given the single day of live expert testimony in this proceeding and the survey's unreliability, we urge the Court to exclude both Ms. Conway's report and associated deposition testimony. Importantly, this would eliminate the need to call two witnesses during the hearing (Ms. Conway and Plaintiff's rebuttal expert witness, Dr. Kent Van Liere), and would allow the Court to focus on the critical and relevant expert testimony in this case.

## FACTS

Sometime on or after June 13, 2007, Kellyanne Conway and her firm, the polling company™, inc., were asked by Defendants to assist in the design and implementation of a consumer survey relating to the effects of the proposed merger. *See* Deposition of Kellyanne Conway at 7:16-20; 8:20-9:2, PX02873 at 003-004 (Exhibit 3). Ms. Conway and Dr. Scheffman designed a telephone survey that was conducted June 22-28, 2007. The survey was conducted using Random Digit Dialing (RDD) to zip codes purportedly near Whole Foods and/or Wild Oats stores in eight cities selected by Dr. Scheffman.[1] *See id*. at 9:24-10:6, PX02873 at 004 (Exhibit 3). Neither Ms. Conway nor her firm had any input into the selection of these specific cities. *Id*. at 11:1-5, PX02873 at 004 (Exhibit 3). The survey consisted of approximately 55 questions. Calls were made to 427,397 randomly generated telephone numbers and surveys were completed by 1,607 respondents. According to Ms. Conway's report, in each city surveyed,

calling was done until a quota of 100 "Frequent" shoppers and 100 "Cusp" shoppers was

completed in each city.  Ms. Conway defined the number of visits to a Whole Foods or Wild

Oats store for the Frequent and Cusp categories prior to setting the quotas.

## ARGUMENT

I.     **Ms. Conway's Survey and Sample Design are Fatally Flawed**

    A.     **Ms. Conway's Survey Sample was not Designed to Accurately Reflect the Target Population of Whole Foods and Wild Oats Shoppers.**

One of the most fundamental requirements of a proper survey is that the survey sample

accurately reflect the target population.  Noting that one of two "fundamental goals" of designing

a sample is to "choos[e] a sample that reflects relevant characteristics of the population," the DC

Circuit has remarked that "[t]he validity of a survey's results is undermined if the sample is not

representative of the population it purports to represent or is not selected in a sufficiently random

manner." *United Parcel Service, Inc. v. U.S. Postal Service*, 184 F.3d 827, 840 n.14 (D.C. Cir.

1999).  *See, e.g., Troublé v. Wet Seal Inc.*, 179 F. Supp. 2d 291, 307 (S.D.N.Y. 2001) ("To be

probative and meaningful, a survey must rely upon responses from all potential consumers of the

product in question."); *Universal City Studios*, *supra*, 746 F.2d at 118 (rejecting survey that

relied on improper sample); *Jackson v. National Action Financial Services, Inc.*, 441 F. Supp. 2d

877, 880 (N.D. Ill. 2006) (holding that "the imprecision with which the target population was

obtained casts doubt on the reliability of the survey's outcome" and excluding survey because it

"was not tailored to exclude individuals" outside of the target population).  In fact, "[n]o matter

---

[1]    The cities surveyed are Portland, Maine; Medford/ Saugus, Massachusetts; Hinsdale, Illinois; Los Angeles, California; Washington, DC; Bloomfield, Michigan; Memphis, Tennessee, and Salt Lake City, Utah. Expert Report of Kellyanne Conway at 2, PX02082 at 002.

how accurate or proper the question posed, placing the survey before an inappropriate subject renders the data worthless."  Robert C. Bird, *Streamlining Consumer Confusion Analysis*, 88 Trademark Rep. 269, 271-72 (1998).  This is because "there is some value in a slanted question asked of the right witness, but no value in asking the right question of the wrong witness." *See* 5 McCarthy § 32:159, at 32-248 n.2 (citation omitted).

As a result, where surveys have relied on improper samples, courts have not hesitated to conclude that their methodologies are so flawed that they should be entitled to no weight at all. *See, e.g.*, *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004) ("Usually, methodological flaws in a survey bear on the weight the survey should receive, not the survey's admissibility. . . .   In some cases, however, serious flaws in a survey will make any reliance on that survey unreasonable); *Troublé*, 179 F. Supp. 2d at 307-308 (noting that "[t]he resulting flaws in the survey's universe reduce its probative value" and excluding survey).

Indeed, "the most common reason for a survey to be held inadmissible or minimally probative [is] the use of an improper universe." *Streamlining Consumer Confusion Analysis*, *supra*, at 272. *See also Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 487 (5th Cir. 2004) ("For a survey to be valid, 'the persons interviewed must adequately represent the opinions which are relevant to the litigation.'") (citing *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980).

**1.  Proper survey sampling requires at a minimum knowing the relevant target population.**

The first step in any proper survey is to identify the target population (also known as the "universe"). (Exhibit 4) Reference Guide on Survey Research (hereafter "Reference Guide") at

6

239.[2]  The target population consists of all individuals whose characteristics or perceptions the survey is intended to represent.  *Id*.  That population must be relevant to the purpose of the survey.  *Id*. at 241 ("A survey that provides information about a wholly irrelevant universe of respondents is itself irrelevant.").  The target population consists of all the individuals that the researcher would like to study.  *Id*. at 240.  The sampling frame is the source (or sources) from which the sample is actually drawn.  *Id*.  It is critical that the sampling frame accurately represents the target population.  The researcher's job generally is easier if a complete list of every eligible member of the population is available.  In this case, the sampling frame would list the identity of all members of the target population and members could be selected at random with known probabilities of selection.  *Id*.  However, frequently it is too onerous or expensive to list all the members of the target population; in other cases the target population includes members who are inaccessible or who cannot be identified in advance.  *Id*.  As a result, compromises are often required in developing the sample frame.  *Id*.

Here, the target population that Dr. Scheffman deems relevant is Whole Foods and Wild Oats shoppers who live within six miles of a Whole Foods or Wild Oats store in selected cities. Scheffman Report at 66 n. 119.  As discussed below, these shoppers have a certain demographic and psychographic profile , and that profile is known to Whole Foods and Wild Oats.  Ms.

---

[2]    Diamond, Shari Seidman, *Reference Guide on Survey Research* in *Reference Manual on Scientific Evidence*, 2nd ed. (Federal Judicial Center, 2000) ("Reference Guide").  The Federal Judicial Center's Reference Guide delineates the basic standards that surveys should meet to be considered reliable for the purposes of litigation. It is one of the judicial guides that is included as part of the Federal Judicial Center's Manual on Scientific Evidence. Although the Manual notes that the guides are not intended to instruct judges concerning what evidence should be admissible or to establish minimum standards for acceptable scientific evidence, *id.* at vi, Ms. Conway confirmed that she considers the *Reference Guide* to be authoritative and admitted that she routinely consults the *Reference Guide* to provide her with guidance for surveys that are used as evidence in court.  *See* Conway Dep. at 72: 1-23; Conway Dep. at 124:23-125:14.

Conway should have defined her target population as Whole Foods Wild Oats shoppers whose behavioral, demographic, and psychographic distribution matches the behavioral, demographic, and psychographic composition of all Whole Foods and Wild Oats shoppers. Instead, Dr. Scheffman selected eight cities for Ms. Conway to survey. Ms. Conway concedes that she does not believe that her survey results in those eight cities can be extrapolated to Whole Foods and Wild Oats shoppers in other locations. Conway Dep. at 154:22-155:23, PX02873 at 040 (Exhibit 3) ("Q: So, your survey can tell how Whole Foods or Wild Oats shoppers behave in one of those eight cities, but you can offer no opinion about how Whole Foods or Wild Oats shoppers elsewhere may behave. Is that correct? A: Correct").

Ms. Conway next developed her sample frame. This is where she misunderstands basic sampling science and makes her most critical mistake. She testified that she did not have a list of every eligible member of the target population to use to construct this frame. Conway Dep. 88:2-10 (PX02873) (Exhibit 3). As a consequence, she conducted a random digit dialing survey of consumers in the eight cities selected until she found in each city 100 Whole Foods or Wild Oats customers that met her definition of "Frequent" shoppers and 100 customers that met her definition of "Cusp" shoppers. These customers constitute her survey sample. But Ms. Conway admits that she is unable to know whether this "sample" accurately reflects the actual distribution of Whole Foods and Wild Oats shoppers in these eight cities or anywhere else because she mistakenly believes that these facts "cannot" be known without a fully listed sample.

Each target population has a certain distribution of individuals. These populations consist of a specific mix of individuals meeting certain demographic and psychographic

characteristics.[3]  One target population can be very different from another.  For example, the

demographic composition of the target population of "X" Box consumers is likely very different

from the demographic composition of the target population for consumers of long-term care

insurance, although there may be some overlap between the two.

>    **2.   It is Highly Unlikely that Ms. Conway's survey sample accurately reflects
>    the distribution of individuals within the Whole Foods and Wild Oats
>    target population.**

A survey sample must reflect the behavioral, demographic and psychographic

distribution of individuals of the target population from which it is drawn in order to provide any

meaningful information about that target population.  See *Reference Guide* at 242 (Exbibit 4).

Ms. Conway has no ability to assess whether her survey sample reflects the demographic and

psychographic distribution of Whole Foods and Wild Oats shoppers because she does not use

behavioral screening questions to correctly estimate the proportion of Frequent and Cusp

shoppers as she defines that term as they occur in the distribution of Whole Foods and Wild Oats

shoppers.  In other words, although she randomly surveyed shoppers in eight cities, and found

200 who shopped at least once in their lifetime at a Whole Foods or Wild Oats, she did not

determine the *correct* distribution of these shoppers within the population that she randomly

dialed.  This is why she concedes in her report that "[t]his survey was not meant to represent the

actual ratio of Frequent to Cusp shoppers in any particular geographic area."  Conway Report at

2, PX02082 at 002.  The "sample" used by Ms. Conway is a random selection of 100 "Frequent"

and 100 "Cusp" shoppers in areas supposedly six miles from a Whole Foods or Wild Oats store

location in eight cities.   Conway Report at 2, PX02082 at 002.  However, as Dr. Van Liere

---

[3]    Demographics are categories of individuals grouped by important socio-economic attributes such

notes, this does not result in an accurate estimate of the *actual* proportion of "Frequent" and

"Cusp" shoppers in the population.  Van Liere Report at ¶ 20, PX02890 at 009-010.  Instead, Ms.

Conway's method *forces* the results to be 50 percent "Frequent" buyers and 50 percent "Cusp"

buyers in each city.  *Id*.

In the actual population of shoppers, the true proportion of these two groups are not likely

to be 50/50, and, in fact, it is quite possible that the true population of "Frequent" and "Cusp"

shoppers varies across the different cities and varies significantly from the 50/50 split Ms.

Conway imposed on her survey sample.  *Id*.  Indeed, it is highly likely that the distribution of

"Frequent" and "Cusp" shoppers at Whole Foods and Wild Oats is both very different from the

50/50 split Ms. Conway created and varies across each of the eight locations.  That is because

Ms. Conway's decision to assign the number of "Frequent" and "Cusp" shoppers into a 50/50

quota is based on nothing more than a desire to be "fair":

```
5    Q.  And why did you choose 100 for each category?
6    A.  The precise numbers of either population are
7    unknown.  And to be fair, we wanted to have an equal
8    number of members of each target population in each of
9    the eight areas surveyed.
10   Q.  To be fair.  Is that correct?  You did that in
11   order to be fair?
12   A.  That's what I just said.  Do you have a
13   different meaning for fair that you want to present to
14   me?
```

Conway Dep. at 112:5-14, PX02873 at 034 (Exhibit 3).

Given the lack of methodological reasoning behind this decision, it is highly unlikely that her

---

as income, age, gender and marital status.  Psychographics categorize individuals based on important attitudes, opinions and values that they hold.  Behavioral patterns reflect shopping and purchasing tendencies or habits.

survey sample's distribution of shoppers accurately reflects the target population.

Because she does not know the correct behavioral, demographic and psychographic proportions of Whole Foods and Wild Oats customers, she cannot tell if those who make up her sample accurately reflect the composition of all such shoppers in the relevant target population.[4]

Ms. Conway cited two reasons for failing to choose a proper sample from the population and failing to determine what the correct distribution of Whole Foods and Wild Oats shoppers were within the population that she randomly dialed. First, she stated that the target population of Whole Foods and Wild Oats shoppers was unknown to her:

> Q.    Okay. I would like to direct your attention back to the survey guide again, that same sentence, it also says that the survey report should contain a discussion of the difference between the two populations; in other words, the target and the survey, and the sample population. Do you agree with that?
> A.    Yes, and the reason it probably says should instead of must are for cases that exclude where the target population is not known. . .
> Q.    Is there a discussion in Exhibit 1 of the difference between the two populations?
>                                *    *    *
> A.    There is no discussion of it because this survey -- that group is unknown, and this --
> Q.    The "that group" being which group?
> A.    The target population or survey universe.
> Q.    Is unknown?
> A.    Is unknown.

---

[4]    For example, Ms. Conway cannot tell if her sample accurately reflects the proportion of individuals in the target population that have college degrees. She cannot know this for two reasons. First, she does not know what percentage of the target population has such degrees. Second, she did not even measure this demographic when she collected her survey sample. ████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

Conway Dep. at 144:13-146:3, PX02873 at 037-038 (Exhibit 3).

Ms. Conway said that she routinely asks for information from her clients for whom she performs surveys about their customer base to help her identify who to survey. Conway Dep. at 85:16-23, PX02873 at 023 (Exhibit 3). Ms. Conway conceded that she did not receive any information from the Defendants that would help her identify who are the target population of Whole Foods and Wild Oats customers. Conway Dep. 155:12-18, PX02873 at 040 (Exhibit 3) ("I don't have the information. In other words, if it exists, it wasn't provided to me. As far as I know, that type of data does not exist.").

However, in truth there was substantial customer profile information that Ms. Conway could have used to help construct a target population of Whole Foods and Wild Oats customers. Both Whole Foods and Wild Oats are well aware of their customer demographics and psychographics. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Numerous Wild Oats documents discuss Wild Oats' actual target market (e.g., PX04390 (Exhibit 9)), and the percentage of sales of Wild Oats' regular customers. (PX04392 (Exhibit 10)) Whole Foods relies on ██████████████████████████████ ████████████████████████████████████████ (Kadish Dep. 74:13-22

12

(PX02858) (Exhibit 11).[5]  Notably, none of these materials was made available to Ms. Conway

to assist her in her task.  Moreover, Ms. Conway could have gathered target population data but

instead she used a quota methodology that ignores the target population by arbitrarily setting the

number of shoppers.

Second, and more importantly, Ms. Conway stated that absent this and other information

such as a list of customers, the target population of Whole Foods and Wild Oats customers was

unknowable.

> Q.     And what do you mean by "unknowable?"
> A.     … we just don't have independent information about frequent and cusp Whole
>        Foods and Wild Oats shoppers in these eight areas.  And we certainly don't know
>        them by name and by shopping behavior.
> Q.     And when you say it's unknowable, you're saying that information doesn't exist
>        there and there's no way, other than a survey, to find out?
> A.     .... yes, that's what I mean in this case.

*Id*. at 132:15-19, PX02873 at 034 (Exhibit 3).

Ms. Conway's position is at odds with basic survey research methods.  When a list of the

target population is unavailable, estimating target populations is commonly done through

sampling techniques.  As one 1989 sampling text notes, it can easily be done by telephone survey

using random digit dialing:

> Access to a representative sample has also been enhanced by recently developed
> techniques associated with Random Digit Dialing (RDD).  These procedures
> make it possible for each member of a population to be eligible for the sample

---

[5]     ▮▮▮▮ provides an industry-accepted system that divides consumers into 66 specific marketing
segments, such as "Money & Brains," which describe consumer demographics and psychographics.  ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  These intercept
surveys specifically asked Wild Oats customers at the stores questions related to the customers' income level,
education level, driving distance to the store, and home address (Odak I.H. Tr.100:1-10).

13

> without having to depend on a sampling frame containing a complete list of
> potential respondents.

Frey, Survey Research by Telephone (1989). Indeed, the Reference Guide states that probability

sampling techniques are used to develop a sample that accurately reflects the target population.

*Reference Guide* at 242 (Exhibit 4). This technique, among other things, maximizes the

representativeness of the survey results. *Id.* But Ms. Conway did not do this. As Dr. Van Liere

explained, "the procedures she's used could, in fact, be used to make a reliable estimate of that --

of that characteristic, but she seems to have the opinion she couldn't do it." Van Liere Dep. at

58:1-25; 59:1-25 (PX04368) (Exhibit 12).

Ms. Conway's failure to take steps to ensure that her sample design was an appropriate

one given the target population prevents her from being able to extrapolate her results, no matter

how well she performed any of the other tasks associated with survey methodology. Because she

says the target population is unknown to her, and unknowable, there is no way for her to evaluate

whether and to what degree her survey sample suffers from selection bias, *i.e.*, whether the

sample used is representative of the true target population. Her failure to do that renders all of

her results unreliable, and her report should be excluded as a matter of law on this point alone.

*See Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.*, 533 F. Supp. 75, 80 (S.D. Fla. 1981), *aff'd*,

716 F.2d 854 (11th Cir. 1983) (noting that the Plaintiff's failure to select the proper survey

universe was its most critical methodological failure").

### 3. Ms. Conway's survey sample is likely to be underinclusive and hence unreliable.

Not only does Ms. Conway not know the target population, her sampling methods

prevent her from identifying known groups of shoppers who are part of the target population.

14

This type of sampling error, known as underinclusiveness, biases her results for at least two reasons.

First, Ms. Conway's sample excludes future or potential shoppers of Whole Foods or Wild Oats as respondents. The survey fails to ask whether respondents intend to shop in the future at Whole Foods or Wild Oats, even if such respondents have never shopped there in the past. This problem is particularly pronounced by virtue of Dr. Scheffman's decision to include Portland, Maine, as one of the four overlap areas to study. The Whole Foods there opened only five months ago. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███ Hence, while the number of "Frequent" or even "Cusp" Whole Foods shoppers is currently low in this area, there is a significant subset of future or potential Whole Foods or Wild Oats customers in this geographic area who have been systematically excluded from Ms. Conway's survey. The resulting survey thus fails to include the full range of potential customers for whom the parties would compete in this market. Accordingly, the survey is likely to substantially under represent the impact on consumer choices of the new Whole Foods store vis-à-vis other food retailers in that geographic area.

---

6 ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

The second way the survey is underinclusive is that it surveys shoppers in only eight cities. *See* Conway Dep. at 154:14-21, PX02873 at 040 (Exhibit 3).  Whole Foods and Wild Oats stores are located in over 100 cities, and over 20 markets are at issue in this litigation.  Ms. Conway testified that she cannot extrapolate her results to any city other than the eight she surveyed.  Conway Dep. at 154:22-155:23, PX02873 at 040 (Exhibit 3).  This is especially problematic because, by her own admission, her survey results are meaningless in the cities that she did not survey.

The Reference Guide explains that when a sample is underinclusive relative to the target population, the survey's value depends on the extent to which the excluded population is likely to react differently from the included population.  *Reference Guide* at 241 (Exhibit 4).  *See, e.g., Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 120-122 (D.D.C. 2003) (extrapolating the results of a survey of views purportedly held by Native Americans to the Native American population as a whole was not supported by substantial evidence where the record indicated, among other things, the exclusion of large numbers of Native Americans); *Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.*, 533 F. Supp. 75, 80 (S.D. Fla. 1981), *aff'd*, 716 F.2d 854 (11th Cir. 1983) (survey flawed for underinclusion when only participants and spectators of running events, instead of those likely to purchase running shoes, were surveyed regarding the strength of trade dress design of a company's running shoes).  The Reference Guide warns that if a "sample is drawn from an underinclusive universe, there is generally no way to know how the unrepresented members would have responded." *Reference Guide* at 242 (Exhibit 4).  *See, e.g., Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263-264 (5th Cir.) (court found both plaintiff's and defendant's surveys substantially defective for failure to include parts of the

16

relevant population), *cert. denied*, 449 U.S. 899 (1980); *Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 487-488 (5th Cir. 2004) (survey underinclusive because it failed to include potential consumers).

### 4. The Survey Sample Likely Includes Non-Whole Foods or Wild Oats Shoppers, Rendering it Overinclusive.

The survey sample is also overinclusive; i.e., it includes respondents who are not part of the target population. Specifically, Ms. Conway has failed to screen out past shoppers who never intend to shop at Whole Foods or Wild Oats again. *See* Conway Dep. 141:13-142:24, PX002873 at 037 (Exhibit 3 ("I have no idea who never intends to return to the store, because no future behavior questions were asked."). Ms. Conway qualified as "Cusp" shoppers Respondents who have only shopped at Whole Foods or Wild Oats once in their lifetime regardless of the fact that they may never intend to return to Whole Foods or Wild Oats. Moreover, Ms. Conway's survey did not include a "temporal screen" to determine the recentness of a respondent's visit(s) to Whole Foods or Wild Oats. In other words, Ms. Conway's survey would qualify a respondent as a "Cusp" shopper who shopped at Whole Foods once in the past two years, as well as a respondent who shopped there once in their lifetime. Due to these defects, Ms. Conway's survey is not tailored to exclude respondents from outside of the target population. Ms. Conway is, therefore, unable to demonstrate that a sufficiently large and representative subset of respondents was drawn from the appropriate universe. This defect renders her survey unreliable. *See American Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655, 660 n.4 (2d Cir. 1979) (universe improper because although survey participants may have once purchased hiking boots, it does not follow that they were presently interested in purchasing hiking boots); *Cumberland Packing Corp. v. Monsanto Co.,* 32 F. Supp. 2d 561, 572 (E.D.N.Y. 1999) (criticizing survey for

17

not distinguishing " between past users who intend to purchase sugar-substitutes in the future and

those who do not").

> **B.    The Survey's Questions Were Too Complex and/or Confusing to Generate Meaningful Results.**

A survey that uses confusing or complex questions can be rejected as unreliable.  See,

e.g., U.S. v. Dentsply Intern, Inc., 277 F. Supp. 2d. 387, 472 (D. Del. 2003); *rev.,* 399 F.3d 181

(3rd Cir. 2005); *cert. denied*, 126 S.Ct. 1023 (2006) (rejecting confusing, complex survey

questionnaire where there was no pretesting and the response rate was low).  The Reference

Guide states that phrasing clear and precise questions is often a difficult goal, and that even

questions that appear clear can convey unexpected meanings and ambiguities to potential

respondents.  *Reference Guide* at 248 (Exhibit 4).

Ms. Conway's survey questions were complex.  *See* Van Liere Report at ¶ 30, PX02890

at 016-017.  For example, the survey questionnaire asks respondents to make complicated

mathematical estimations.  *Id.*  Respondents were asked to estimate how much they spend on

fresh produce in a month, then what percent of that produce was purchased at Whole Foods or

Wild Oats, then what percent of the produce they buy is natural or organic, then how much they

spend on organic produce in a typical month, and finally what percent of that organic produce

was bought at Whole Foods or Wild Oats.  *Id.*  To answer these questions, a respondent must

first determine what a "typical month" is.  *Id.*  Given that most consumers shop for groceries

multiple times each month, the respondent must add up how many times a month she shops, how

often within each of these shopping trips she buys produce, and, for each of the trips when she

bought produce, how much she spent.  *Id.*  Only then can the respondent calculate the "typical"

total monthly expenditure for fresh produce.  *Id.*  After this, the respondent is asked to take the

total amount of money spent and calculate what share is spent on items in Whole Foods or Wild Oats. *Id*. This is even more complicated as it asks respondents to estimate the relative items and prices for the produce purchased over a month. *Id*. As Dr. Van Liere points out, such questions place an extremely large burden on respondents and are likely to generate answers that are simply guessed, as opposed to actual estimations. *Id*.

Ms. Conway's survey questions were also ambiguous. For example, Dr Van Liere notes that the study questionnaire's use of a series of terms and concepts that are important to the analysis such as "typically," "total grocery budget," and "supermarket" have many different meanings that affect how respondents understand the questions. Van Liere Report at ¶ 29, PX02890 at 015-016. Dr. Van Liere testified that question ambiguity is a concern in the Conway study, and is demonstrated by the survey results which show that a number of frequent Whole Foods or Wild Oats shoppers also said they did not shop at organic and specialty stores. Kent Van Liere Dep. 181:8-18, PX04368 at 181 (Exhibit 12) ("that suggests to me … [that] [s]he has no way of knowing where they're putting Whole Foods").

Moreover, Dr. Van Liere states in his report that the way in which Ms. Conway constructed her cross-shopping questions does not clarify whether Whole Foods shoppers are cross shopping at Wild Oats (and vice versa) in cities where both exist or whether they are cross shopping at other food retailers. Van Liere Report at ¶ 36, PX02890 at 020-021. Dr. Van Liere notes that this distinction becomes important in the sequencing of her remaining questions if the purpose of the survey is to distinguish between the cross shopping that occurs between Whole Foods and Wild Oats shoppers (in the four overlap cities surveyed) on one hand, and cross

19

shopping that occurs between shoppers at either Whole Foods and Wild Oats across other food retailers on the other hand. *Id.*

After examining the responses, Dr. Van Liere concluded that it is clear that respondents provided inconsistent or nonsensical answers. Van Liere Report at ¶ 31, PX02890 at 017. Referring to Table 2A and Table 2B of Dr. Van Liere's Report, anywhere from 15 percent to 25 percent of all respondents were unable to accurately estimate the percent of a product category purchased at Whole Foods/Wild Oats when that estimation is compared with an earlier response. *Id.* Specifically, an early question in the survey asks respondents to determine how often a particular product type is purchased at Whole Foods/Wild Oats. *Id.* The answer categories range from "Only at Whole Foods/Wild Oats" to "Do not purchase." *Id.* Later in the survey, respondents are asked to calculate the percent of their typical monthly budget spent in the product category at Whole Foods/Wild Oats. *Id.* Many of the answers to these two questions are inconsistent. *Id.* Frequently, respondents underestimate the percent of their budget they spend on a particular product. *Id.* For example there are 35 respondents who respond early in the survey that they ONLY buy their produce at Whole Foods but later in the survey estimate the share of their produce budget that they spend at Whole Foods as anything between zero and 80 percent. *Id.* Tables 2A and 2B attached to Dr. Van Liere's report demonstrate that across a variety of questions, respondents were unable to consistently report their shopping habits. *Id.* Moreover, nowhere in Ms. Conway's report does she acknowledge these inconsistencies, attempt to deal with them, or provide some explanation for why her conclusions still apply despite their existence.

Furthermore, according to the *Reference Guide*, standard survey practice requires some form of pretest be undertaken if the researcher is going to claim that respondents understood and were able to answer the questions posed in a meaningful way. *Reference Guide* at 243 (Exhibit 4). In her deposition, Ms. Conway agreed that unclear and imprecise questions in her survey may threaten the validity of the survey's results. *See* Conway Dep. at 113:9-18, PX02873 at 030 (Exhibit 3). Although she maintained at her deposition that her survey had been pretested, Ms. Conway also confirmed that there is no mention of any pretest work having been done in her report. Conway Dep. at 116:14-16, PX02873 at 030 (Exhibit 3) (agreeing that her report does not mention any pretest work having been performed). Ms. Conway's pretest of the survey was not among the work papers that she provided to the FTC in discovery. As a result, there remains considerable doubt and uncertainty about whether Ms. Conway performed the appropriate inquiry into the effectiveness of the survey instrument and the potential for confusion among respondents about the questions that they were asked. This uncertainty is particularly troubling in light of Ms. Conway's own admission that unclear and imprecise questions may threaten the validity of her survey results. Moreover, her failure to disclose any pretests is especially problematic here where there is an obvious issue of respondent confusion. As Dr. Van Liere testified, the need for pretesting is important, even when dealing with certain words that may have a common everyday meaning. Van Liere Dep. at 183:6-184:1, PX04368 at 183 (Exhibit 12).

## II.    Ms. Conway's Survey Was Poorly Executed

The Reference Guide states that in order for a survey to be found reliable by a finder of fact, each respondent must be carefully screened to determine whether they are, in fact, eligible

to participate.  *Reference Guide* at 241 (Exhibit 4).  The lack of adequate quality control may

render a survey unreliable.  *See Revlon Consumer Products Corp. v. Jennifer Leather Broadway,*

*Inc.*, 858 F.Supp. 1268, 1275-1276 (S.D.N.Y. 1994), *aff'd,* 57 F.3d 1062 (2d Cir. 1995) (survey

deemed unreliable and entitled to no weight because it was so poorly executed); *Simon Prop.*

*Group L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1039 (S.D. Ind. 2000) ("If the flaws in the

proposed survey are too great, the court may find that the probative value of the survey is

substantially outweighed by the prejudice, waste of time, and confusion it will cause at trial.").

As discussed below, there were serious methodological flaws in the execution of Ms. Conway's

survey.  These flaws call into question the reliability of the survey's data as there is no way to

determine what other significant errors in data collection and coding may have occurred.

  In his report, Dr. Scheffman indicated that the specific areas used to sample consumers

for the survey were to be within six miles of a Wild Oats or a Whole Foods store.  Scheffman

Report at 8 n.4, 66 n. 119.  Ms. Conway's survey sample, however, includes a substantial

number of households both she and Dr. Scheffman never intended to include: almost twenty

percent (20%) of respondents were not in the designated zip codes.  To illustrate the significance

of this error, it is helpful to see its effects on the survey results for Los Angeles.  Los Angeles is

one of only four cities in the study that include both Whole Foods and Wild Oats stores.

  In Los Angeles, 51 zip codes were targeted for inclusion in Ms. Conway's survey.  Of the

200 completed interviews from the Los Angeles area, only 31 respondents or sixteen percent

(16%) of respondents had zip codes from the sample list.  In other words, *eighty-four percent*

(84%) of the Los Angeles area respondents came from locations that should not have been

included in Ms. Conway's survey or report.  Additional analysis of Ms. Conway's data shows

that 60 percent of the Los Angeles respondents polled were further than six miles from a Whole

Foods or Wild Oats store, one of Dr. Scheffman's criteria.  In fact, a total of twenty-two percent

(22%) of Los Angeles respondents were more than twenty miles from the nearest Whole Foods

or Wild Oats store, and a few respondents were up to *100 miles* away from a Whole Foods or

Wild Oats store.  After this error was pointed out by Dr. Van Liere, Ms. Conway re-ran her

survey results on the eve of her deposition to exclude the wrongfully included zip codes.  When

she did so, the number of "Frequent" and "Cusp" Whole Foods and Wild Oats shoppers in the

Los Angeles area *fell dramatically* from 100 in each category to 15 and 16 each, respectively.

As Ms. Conway's own report notes, sample sizes "represented by just 39 people in the entire

survey … are … a very small population from which to draw conclusions."  Report at 19.

Ms. Conway testified that she is not concerned about the low number of respondents in

Los Angeles because she reaches no conclusions about the Los Angeles market specifically.

Conway Dep. 162:1-7 (PX02873) (Exhibit 3).  However, this admittedly "very small" sample

size combined with the serious questions raised about relying on Portland (where Defendants

chose to survey in a market that Whole Foods had not yet significantly penetrated) leaves only

two surveyed overlap cities, Medford/Saugus, Massachusetts, and Hinsdale, Illinois, on which

Ms. Conway relies for her conclusions.

Finally, the *Reference Guide* places a burden on the survey researcher to demonstrate that

appropriate quality controls were in place to assure reliable data.  The survey questionnaire

included a specific zip code question to validate the data.  Ms. Conway testified that she checked

the data scans on a daily basis.  Conway Dep. 15:7-22 (PX02873) (Exhibit 3).  Nevertheless, she

failed to see this obvious error.

**III.    Ms. Conway's Analysis of her Survey Results Is Unreliable**

    **A.    Ms. Conway's Conclusions Are Not Supported by Her Survey Data**

Ms. Conway's conclusion that Whole Foods and Wild Oats shoppers "buy the same or similar products at each of them," Conway Report at 36, is unsupported by the data. That is because Ms. Conway's survey inquires into the respondents' shopping habits only with respect to nine broad product categories, not any specific products  Van Liere Report at ¶ 33, PX02890 at 018. At her deposition, Ms. Conway conceded that her survey questions cannot be used to measure whether Whole Foods or Wild Oats shoppers would view other grocery retailers as a substitute for the specific foods they purchase at Whole Foods or Wild Oats. Conway Dep. at 121:4-22, PX02873 at 032 (Exhibit 3) ("those questions were not asked.").

    **B.    Ms. Conway's Conclusions Regarding the Population of Whole Foods and Wild Oats Shoppers are Not Supported Based on her Use of Quota Sampling**

As discussed above, Ms. Conway's study used a sampling procedure that arbitrarily assigned 100 "Frequent" shoppers and 100 "Cusp" shoppers in eight cities to her survey sample, Van Liere Report at ¶ 20, PX02890 at 009-010, acknowledging that her survey results cannot "represent the actual ratio of Frequent to Cusp shoppers in any particular geographical area." Conway Report at 2, PX 02082 at 002. Yet later and all throughout her report and in Dr. Scheffman's report, these survey results are regularly used to make statements about what the **total** population of Whole Foods/Wild Oats shoppers think or believe. Van Liere Report at ¶ 20, PX02890 at 009-010. For example in her report she states:

- "Overall, 17 percent of shoppers said they visit Whole Foods at least once a week"
- "A significant majority (71%) of Whole Food patrons allocate less than one of every five total dollars spent on groceries to Whole Foods"
- "Three-fourths (75%) of Wild Oats shoppers typically spend less than $50 during a single visit to a retailer"

*Id*. As Dr. Van Liere stated in his report, these types of statements cannot be accurately made given the nature of her sampling methods and it is inappropriate to represent that the data can be generalized in this way. *Id*. Ms. Conway did not collect her data in a manner that would allow her to know what the correct ratio of Frequent to Cusp shoppers is. As Dr. Van Liere further states, her findings that are based on the combined responses of Frequent and Cusp shoppers cannot be correctly extrapolated to the population of all Whole Foods or all Wild Oats shoppers. *Id.* at ¶ 21, PX02890 at 010-012. As Dr. Van Liere concludes, Ms. Conway's analysis is meaningless since there is no method to weight her data appropriately. *Id*.

As Dr. Van Liere further points out in his report, this problem is exacerbated by the fact that Ms. Conway chose to use frequency of shopping as the basis for her quotas. *Id.* at ¶ 21, PX02890 at 010-012. Frequent shoppers are defined as those who shop at Whole Foods/Wild Oats once a month, a few times a month, once a week, and more than once a week. *Id.* This arbitrarily combines shoppers who shop at Whole Foods/Wild Oats as few as 12 times a year with those that shop more than 100 times a year. *Id.* No analysis was reported that indicates that shoppers with this range of shopping frequencies are appropriately combined into a single group and it is reasonable to expect that their opinions and behaviours may vary substantially. *Id.* By grouping them in a single group for purposes of establishing quotas, Ms. Conway cannot break them back out in the correct proportions in the population. *Id.* This means the data related to frequency of shopping cannot be used to make estimates for the population of things like the average number of trips per year, the average expenditures per year, or related calculations.

## CONCLUSION

For this and the other foregoing reasons, the Court should grant the FTC's motion *in limine* to exclude Ms. Conway's testimony from this proceeding.

Respectfully submitted,

MICHAEL J. BLOOM
THOMAS J. LANG (D.C. Bar No. 452398)
REID B. HORWITZ (D.C. Bar No. 440612)
Attorneys
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
tlang@ftc.gov

By:     _____
Thomas Lang
Attorney for Plaintiff

July 26, 2007