**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 07-cv-01021 – PLF |
| | ) | |
| WHOLE FOODS MARKET, INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILD OATS MARKETS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**JOINT MEMORANDUM OF POINTS AND AUTHORITIES
OF WHOLE FOODS MARKET, INC. AND WILD OATS MARKETS, INC.
IN OPPOSITION TO PLAINTIFF'S MOTION _IN LIMINE_ TO EXCLUDE THE
EXPERT REPORT AND TESTIMONY OF KELLYANNE CONWAY**

Paul T. Denis (DC Bar No. 437040)
Paul H. Friedman (DC Bar No. 290635)
Jeffrey W. Brennan (DC Bar No. 447438)
James A. Fishkin (DC Bar No. 478958)
Michael Farber (DC Bar No. 449215)
Rebecca Dick (DC Bar No. 463197)

DECHERT LLP
1775 I Street, N.W.
Washington, DC  20006
Telephone: (202) 261-3430
Facsimile: (202) 261-3333

*Of Counsel:*

Roberta Lang
Vice-President of Legal Affairs
   and General Counsel
Whole Foods Market, Inc.
550 Bowie Street
Austin, TX  78703-4677

Alden L. Atkins (DC Bar No. 393922)
Neil W. Imus (DC Bar No. 394544)
John D. Taurman (DC Bar No. 133942)

VINSON & ELKINS L.L.P.
The Willard Office Building

1455 Pennsylvania Avenue, N.W., Suite 600
Washington, DC  20004-1008
Telephone: (202) 639-6500
Facsimile (202) 639-6604

*Attorneys for Whole Foods Market, Inc.*

Clifford H. Aronson (DC Bar No. 335182)
Thomas Pak (Pro Hac Vice)
Matthew P. Hendrickson (Pro Hac Vice)

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, NY  10036
Telephone: (212) 735-3000
caronson@skadden.com

Gary A. MacDonald (DC Bar No. 418378)

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC  20005
Telephone: (202) 371-7000
gmacdona@skadden.com

Terrence J. Wallock (Pro Hac Vice)
2224 Pacific Dr.
Corona Del Mar, CA  92625
(949) 375-0683

*Attorneys for Defendant Wild Oats Markets, Inc.*

July 26, 2007

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

MS. CONWAY'S SURVEY..............................................................................................2

ARGUMENT ......................................................................................................................3

I.      MS. CONWAY HAS APPROPRIATELY SAMPLED HER TARGET POPULATIONS,
        THE 16 GROUPS OF FREQUENT AND CUSP WHOLE FOODS OR WILD OATS
        SHOPPERS IN EIGHT LOCALITIES. .............................................................................4

II.     THE DIALING ERROR BY MS. CONWAY'S CALLING CENTER HAD NO
        MATERIAL EFFECT ON THE SURVEY'S FINDINGS. .................................................7

III.    MS. CONWAY'S SURVEY QUESTIONNAIRE IS NOT UNCLEAR OR TOO
        COMPLEX AND DID NOT CONFUSE RESPONDENTS................................................9

CONCLUSION .................................................................................................................13

## TABLE OF AUTHORITIES

### Cases

*AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611(7th Cir. 1993) .......................... 9

*Brooks Shoe Mfg. Co. v. Suave Shoe Corp.,* 716 F.2d 854 (11th Cir. 1983) .......................... 6

*Groobert v. President and Directors of Georgetown College*, 219 F. Supp. 2d 1 (D.D.C. 2002) .................................................................................................. 8

*Marvin Lumber and Cedar Co. v. PPG Industries, Inc.*, 401 F.3d 901 (8th Cir. 2005) ........... 8

*Revlon Consumer Products Corp. v. Jennifer Leather Broadway, Inc.*, 858 F. Supp. 1268 (S.D.N.Y. 1994) ....................................................................................................... 9

*In re Salem*, 465 F.3d 767 (7th Cir. 2006) ........................................................................ 3

*Simon Property Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033 (S.D. Ind. 2000) ........... 9

*Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112 (2d Cir. 1984) ................... 6

### Other Authorities

*FTC 1992 Horizontal Merger Guidelines* (rev. 1997) ............................................................ 7

Defendants Whole Foods Market, Inc. ("Whole Foods") and Wild Oats Markets, Inc. ("Wild Oats") respectfully submit this Joint Memorandum of Points and Authorities in Opposition to Plaintiff's Motion *in Limine* to Exclude the Expert Report and Testimony of Kellyanne Conway ("Motion *in Limine*").

## <u>INTRODUCTION</u>

The FTC's Motion *in Limine* should be denied. None of the points raised justifies exclusion of Ms. Conway's survey or undermines its central finding: pervasive cross-shopping at other grocery outlets by the randomly-selected Whole Foods and Wild Oats shoppers she surveyed. Contrary to the Motion *in Limine's* suggestion, and as reiterated in Defendants' Joint Reply Memorandum filed yesterday, evidence of cross-shopping by Whole Foods and Wild Oats shoppers "goes to the heart of the issues in contention." *See* Motion *in Limine*, p. 1. The high proportion of Whole Foods and Wild Oats shoppers who already shop regularly at other grocery outlets would have little difficulty shifting their patronage in response to any attempted post-merger price increase by the merged companies, rendering the increase unprofitable. *See, e.g.*, Joint Reply Memorandum of Points and Authorities of Whole Foods Market, Inc. and Wild Oats Markets, Inc. in Opposition to Motion for a Preliminary Injunction, filed July 25, 2007, pp. 2-5. In this regard, Ms. Conway's survey confirms the consistent findings of numerous studies performed by Whole Foods and Wild Oats in the ordinary course of business. *See* Expert Report of Dr. David Scheffman, ¶¶ 129-179.

The Motion *in Limine* rests largely on a persistent, almost to the point of willful, misunderstanding of what Ms. Conway set out to do and accomplished. Viewing the Motion *in Limine* most charitably, it appears that the FTC, which has offered no consumer shopping survey of its own, believes Ms. Conway should have undertaken a different sort of survey than the one

she carried out. Such criticisms should be weighed as a part of the Court's fact-finding process. They are not grounds for exclusion.

## MS. CONWAY'S SURVEY

The FTC does not, and cannot, challenge Ms. Conway's qualifications as an expert in market research. *See* Declaration of Kellyanne Conway, Exhibit 1 (CV); Conway Dep. at 31:15-42:23, 45:14-51:16, 54:21-55:16, 67:14-94:18 (Plaintiff's Exhibit 3). Nor does the FTC question the well-established survey methodology Ms. Conway employed, a random-digit-dialing ("RDD") telephone survey. Indeed, the brief in support of the Motion acknowledges the value of a RDD survey where, as here, there is no list of the target population from which a sample can be drawn. *See* Memorandum in Support of Plaintiff's Motion *in Limine* to Exclude the Expert Report and Testimony of Kellyanne Conway ("FTC Brief"), pp. 13-14.

Ms. Conway's expert report lays out clearly what she set out to do. In eight cities selected by Dr. Scheffman, defendants' economic expert, Ms. Conway surveyed two groups of Whole Foods or Wild Oats shoppers: those who reported shopping at Whole Foods or Wild Oats at least once a month ("Frequent" shoppers) and those who reported shopping there less frequently ("Cusp" shoppers). *See* Conway Expert Report, p. 2. For each of these 16 groups, Ms. Conway's calling center screened randomly-dialed telephone respondents until it identified a quota of 100 eligible respondents, who were asked the remaining questions in Ms. Conway's survey instrument. *Id.* at pp. 2-3. The result was approximately 1,600 completed telephone interviews. Ms. Conway explained her methodology succinctly at the outset of her expert report:

2

> "As indicated above, the *target populations* for this survey are
> Frequent and Cusp Whole Foods and Wild Oats shoppers in each
> of the eight metropolitan areas defined by zip codes provided to
> the polling company.  The survey yielded 16 randomly-selected
> groups of shoppers fitting those criteria.  The survey responses are
> reported for various groupings of respondents, including all
> respondents, as *indicative of shopping patterns and shopper
> characteristics in the selected areas.*"

Conway Expert Report, p. 4 (emphasis added).

Ms. Conway's expert report lays out a series of findings based on the responses to her survey instrument.  Among them are:

- The Frequent and Cusp Whole Foods and Wild Oats shoppers surveyed reported buying groceries at a myriad of other stores.  (*Id*. at 7)

- Very few of the Whole Foods and Wild Oats shoppers surveyed, even those who were Frequent shoppers, spent more than one half of their grocery budget at Whole Foods or Wild Oats.  (*Id*. at 9, 12)

- For eight product categories, including natural and organic food, a large majority of Frequent Whole Foods and Wild Oats shoppers surveyed reported that they patronized other grocery stores, and many reported purchasing products in the category as often, or more often, at other grocers.  (*Id*. at 14)

## ARGUMENT

The Motion *in Limine* is an odd *Daubert* motion.  Given that the Court will be sitting as the trier of fact, it is difficult to discern the "gatekeeping" function the Motion invokes.  *See*, *e.g*., *In re Salem*, 465 F.3d 767, 776-77 (7th Cir. 2006) (where "the gatekeeper and the factfinder are one and the same," reliability determinations may be made during rather than before trial).  Instead, the Motion says it is aimed at saving time at the hearing by eliminating any examination of Ms. Conway and the FTC's rebuttal survey witness, Dr. Kent Van Liere.  *See* Motion, p. 1.[1]

---

[1]    In line with the discussion at the Court's status conference on Monday, Defendants have proposed to the FTC that each side have a total of 30 minutes for examination of the survey experts.

Perhaps consistent with the objective of saving time at the hearing, the Motion offers up a grab bag of criticisms more appropriate for cross-examination than a motion for exclusion. As shown below, the criticisms are in any event unfounded.

## I.  MS. CONWAY HAS APPROPRIATELY SAMPLED HER TARGET POPULATIONS, THE 16 GROUPS OF FREQUENT AND CUSP WHOLE FOODS OR WILD OATS SHOPPERS IN EIGHT LOCALITIES.

Much of the FTC's brief is based on a fundamental misconception about the "target populations" of Ms. Conway's survey. *See* FTC Brief, pp. 5-18.[2]  Because Ms. Conway specifically explained this point in her expert report and at her deposition, the FTC's protestations are hard to fathom.

As indicated above (pp. 2-3), Ms. Conway's survey inquired into the characteristics and shopping patterns of Frequent and Cusp Whole Foods and Wild Oats shoppers in eight localities, or a total of 16 target populations. No more and no less. Because she was interested in Frequent shoppers as a group and Cusp shoppers as a group in each area, she obtained a random sample of a "quota" of 100 respondents in each group, for a total of approximately 1,600 respondents. As specifically pointed out in her expert report, she did not purport to determine "the actual ratio of Frequent to Cusp shoppers in any particular geographic area." Conway Expert Report, p. 2. She also did not purport to extrapolate the survey responses she received to Whole Foods and Wild Oats shoppers in other localities or nationwide. The FTC labels her testimony in this regard as concessions, *see* FTC Brief, pp. 8, 9, but she was merely confirming what is obvious to anyone who carefully reads her expert report.

---

[2]  The FTC variously and erroneously asserts that Ms. Conway's target population includes, or should include, "Whole Foods and Wild Oats shoppers" generally; all Whole Foods and Wild Oats shoppers "who live within six miles of a Whole Foods or Wild Oats store in selected cities"; "all Whole Foods and Wild Oats shoppers," including those not located in the eight areas surveyed; and people who have "never shopped" at Whole Foods and Wild Oats. *See* FTC Brief, pp. 2-5, 7, 8, 12, 14-15, and 16. The FTC also alleges, again erroneously, that Ms. Conway's target population should exclude people who *have* shopped at Whole Foods and Wild Oats but may never shop there again. *See id.*, p. 17. The FTC then takes Ms. Conway to task for not properly sampling these target populations Ms. Conway never undertook to sample in the first place.

It is apparent that the FTC believes Ms. Conway should have conducted a different survey, without separate quotas for Frequent and Cusp shoppers, so that the actual ratio of Frequent and Cusp shoppers in each area could be determined.  *See* FTC Brief, p. 9.  Ms. Conway's choice not to conduct such a survey is just that, a choice; it is not a "defect."  The FTC's speculations about what the ratio of Frequent to Cusp shoppers in each area might be (FTC Brief, p. 10) are both unfounded and irrelevant.  Dr. Van Liere also offered such speculations in his report, but admitted at his deposition he has no data to back them up.  *See* Van Liere Expert Report, p. 9; Van Liere Dep. at 160:4-161:18 (Plaintiff's Exhibit 12).  The speculation is irrelevant because, despite the FTC's repeated mischaracterizations (*see* note 2, *supra*), Ms. Conway's "target population" was not the actual combination of all Frequent and Cusp shoppers in each area, but the separate groups of Frequent and Cusp shoppers in each area.  Of course, nothing prevented the FTC from designing and conducting its own consumer survey to try to meet its burden of proof on market definition, but the FTC has not done so.

Given its position on extrapolation, the FTC's argument that the demographics of the groups of Frequent and Cusp shoppers in each of the eight areas are "known" is surprising.  The basis for the argument is several statements about the general characteristics of Whole Foods and Wild Oats shoppers.  *See* FTC Brief, pp. 7, 11-13.  Ms. Conway has rightly taken the position that extrapolating her findings "up" to the population of all Whole Foods and Wild Oats shoppers is not appropriate given her focus on Frequent and Cusp shopper groups in eight selected areas.  *See* Conway Dep. at 154:22-155:9 (Plaintiff's Exhibit 3).  As noted below, the FTC wrongly accuses her of engaging in such an extrapolation.  Nonetheless, the FTC takes the position that the broad "customer profile" of Whole Foods and Wild Oats nationally should be extrapolated "down" to the eight local areas Ms. Conway surveyed.  The FTC points to no

demographic data about the shoppers in Ms. Conway's 16 target populations to compare to the demographic data Ms. Conway collected in her survey.

Even more off point is the FTC's suggestion that Ms. Conway should have collected information from "future or potential" Whole Foods and Wild Oats shoppers. *See* FTC Brief, p. 15. An inquiry into the characteristics and shopping patterns of people who shop at Whole Foods or Wild Oats would not be advanced by surveying people who "have never shopped there in the past." *See id*. Nor was the survey directed to shoppers' future intentions, but only their actual reported behavior.[3]

Finally, the FTC and Dr. Van Liere accuse Ms. Conway of engaging in the kind of extrapolation that her survey design was not intended to support, quoting sentences from her report that refer to "shoppers" and alleging that the sentences must be read as statements about "the **total** population of Whole Foods/Wild Oats shoppers." *See* FTC Brief, pp. 24-25 (emphasis in original). In light of Ms. Conway's careful explanation of what she did and what she found, this accusation is quite a stretch. For example, relying on Dr. Van Liere, the FTC quotes this sentence from Ms. Conway's report as implying that she purported to make findings about the "total population" of shoppers: "Overall, 17 percent of shoppers said they visit Whole Foods at least once a week." *See id*., p. 24. The word "said" alone indicates that Ms. Conway is referring to the shoppers who participated in her survey. Moreover, the immediately preceding sentence makes the context clear: "The Whole Foods shoppers surveyed were split evenly between 'Frequent' and 'Cusp' shoppers – as defined in the nearby text box [which shows the 17%

---

[3]    The FTC's arguments are not aided by citations (*see* FTC Brief, pp. 5-6, 14, 16-18) to trademark cases where consumer confusion is alleged, because in those cases (unlike here) as a matter of law the target population of consumer surveys must include prospective purchasers of the products in question. *See, e.g., Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984) (consumer confusion survey in a trademark infringement action used a legally improper universe of past purchasers rather than potential customers); *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 860-61 (11th Cir. 1983) (consumer survey in trademark case failed to use required universe of prospective purchasers). There are no such legal rules governing sample design or target populations for cross-shopping surveys.

numbers]." Conway Expert Report, p. 8. It is doubtful that the Court would be confused here, or elsewhere in Ms. Conway's expert report, into thinking that references to the shoppers surveyed are intended to be statements about all Whole Foods and Wild Oats shoppers nationwide.

The FTC's multiple attacks concerning Ms. Conway's target population are based on an inexcusable misreading of her expert report and are wholly without merit.

## II.    THE DIALING ERROR BY MS. CONWAY'S CALLING CENTER HAD NO MATERIAL EFFECT ON THE SURVEY'S FINDINGS.

Ms. Conway used a calling center she has worked with for a decade to execute the RDD survey in this case. *See* Conway Expert Report, p. 3. Unfortunately, particularly in the Los Angeles area, the calling center did not follow her instructions and dialed numbers not located in the zip codes she specified. *See* Conway Dep. at 168:3-21 (Plaintiff's Exhibit 3). The fact that this error occurred, and was not caught, is certainly an area for cross-examination. It does not require that the survey be excluded.

In the first place, the survey respondents who were not in the designated zip codes, like the ones who were, reported being Whole Foods or Wild Oats shoppers. What distinguishes them is that they likely traveled a greater distance to a Whole Foods or Wild Oats store to do their shopping than the shoppers within the designated zip codes, which were clustered around a 6-mile radius of the stores. Particularly in a city like Los Angeles, a greater traveling distance to the grocery store may not be unexpected, but the sample design was to focus on more nearby shoppers in all areas.[4]

---

[4]    The calling center's mistake has the unexpected consequence of proving how badly the FTC has failed to meet its burden of proving geographic markets. To prove a geographic market, the FTC must show that consumers within a particular location would accept a price increase rather than travel to another location. *Merger Guidelines* § 1.21. The FTC has engaged in arbitrary line drawing rather than analyzing consumer behavior. The calling center's error shows how far those customers apparently travel to shop at Whole Foods, which illustrates why the FTC should have analyzed consumer behavior rather than drawn 6-mile radii on maps.

In his report, Dr. Van Liere offered the critique that the error in Los Angeles "may" have affected the survey results. *See* Expert Report of Kent Van Liere, p. 13. Because most survey respondents in Los Angeles traveled greater distances to shop at Whole Foods and Wild Oats than in other areas surveyed, whether the survey results were *in fact* affected is a legitimate area of inquiry. Dr. Van Liere did not inquire; Ms. Conway did. She promptly re-ran her calculations excluding all respondents who reported zip codes outside the ones she had specified, or who failed to report their zip codes, and turned the results over to the FTC before her deposition. The recalculations show results that even Dr. Van Liere conceded were not materially different from those in Ms. Conway's report. *See* Conway Dep. Ex. 14 (Exhibit 1 hereto); Van Liere Dep. at 173:6-174:19; 176:14-177:7 (Plaintiff's Exhibit 12).

In short, although the zip code error was unfortunate, we are fortunate to be able to assess precisely its significance to the findings Ms. Conway has reported. The key characteristics and shopping patterns of respondents more distant from Whole Foods and Wild Oats stores are in line with those of the shoppers in more nearby zip codes, leaving Ms. Conway's initial findings intact.

In the end, the calling center's undetected dialing error goes to the weight to be accorded the survey results. *See Marvin Lumber and Cedar Co. v. PPG Industries, Inc.*, 401 F.3d 901, 915-16 (8th Cir. 2005) (criticisms of an expert's statistical studies as not adhering to the Federal Judicial Center's Reference Guide by, for example, not taking a sample from a "representative geographical cross-section" or performing reliability tests go to the weight, not admissibility, of the expert's findings); *Groobert v. President and Directors of Georgetown College*, 219 F. Supp. 2d 1, 11-12 (D.D.C. 2002) (survey based on 97 responses sufficiently reliable to be admitted). The error does not approach the magnitude of the errors found in the cases the FTC cites, which

were pervasive and had unknown effects on the survey's reliability. *See Simon Property Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033 (S.D. Ind. 2000) (three proposed surveys on likelihood of consumer confusion not approved because of multiple defects); *Revlon Consumer Products Corp. v. Jennifer Leather Broadway, Inc.*, 858 F. Supp. 1268, 1275-76 (S.D.N.Y. 1994) (survey on consumer confusion involved so many errors that it was entitled to no weight). As the court in the *Simon Property* case noted, "[n]o survey is beyond criticism," and "many criticisms of surveys used in litigation are appropriate topics for cross-examination and contrary evidence to reduce the weight of the survey without requiring that … it be excluded." *See* 104 F. Supp. 2d at 1039. *See also AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993) (it is "rare" that a survey is "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible"). This is not such a case.

### III. MS. CONWAY'S SURVEY QUESTIONNAIRE IS NOT UNCLEAR OR TOO COMPLEX AND DID NOT CONFUSE RESPONDENTS.

The FTC's and Dr. Van Liere's complaints about the way questions were posed in Ms. Conway's survey instrument (FTC Brief, pp. 18-21) are unfounded and do not remotely support exclusion of Ms. Conway's testimony.

On the question of complexity, Dr. Van Liere gets carried away, converting questions about everyday grocery purchases into a cognitive and mathematical exercise reminiscent of Rube Goldberg. *See* FTC Brief, pp. 18-19. These questions are posed in common terms, *e.g.*, "typical," and address a common experience for grocery shoppers, *i.e.*, buying groceries. Unlike Ms. Conway, Dr. Van Liere has not conducted surveys for grocery (or even retail) clients in the past, *see* Conway Dep. at 77:3-82:8; 117:1-15 (Plaintiff's Exhibit 3), Van Liere Dep. at 99:7-100:7 (Plaintiff's Exhibit 12), and he sees problems that do not exist in the real world.

On the matter of clarity, Dr. Van Liere also sees troubling ambiguity in phrases such as "total grocery budget." *See* FTC Brief, p. 19. Asked of grocery shoppers, on its face this concept does not seem too elusive, and Dr. Van Liere does not back up his observations with any data or analysis, or even suggestions of better phraseology.[5]

On the other hand, Dr. Van Liere does purport to find actual respondent confusion by comparing answers to two sets of survey questions and concluding that the comparison produces "nonsensical" results. *See* FTC Brief, p. 20. The problem with his analysis is that he is comparing apples to oranges (metaphorically, of course).

The first set of questions in Dr. Van Liere's comparison relates to respondents' frequency of purchasing certain product categories and starts at Question 9 of the survey instrument. *See* Conway Expert Report, Appendix C, p. 5. These questions have a preamble read by the interviewer that clearly sets up what is being asked of the respondent:

> "I am now going to read you those different types of products one by one. For each one, please tell me how often you purchase this type of product at Whole Foods: only at Whole Foods Market and never at *another grocery store*, mostly at Whole Foods and rarely at *another grocery store*, half of the time at Whole Foods and half of the time at *another grocery store*, mostly at *another grocery store* and rarely at Whole Foods, or only at *another grocery store* and never at Whole Foods. If you never purchase a certain type of product, just tell me and we will move on."

*Id.* (emphasis added). The repetition of "another grocery store" in the preamble and in the options repeated in the specific questions for each product category leaves no doubt that the frequency being inquired into relates to purchases at Whole Foods versus other grocery stores.

---

[5]    Relying on Dr. Van Liere, the FTC argues that the survey's cross-shopping questions do not ask specifically about cross-shopping between Whole Foods and Wild Oats. *See* FTC Brief, pp. 19-20. At his deposition, Dr. Van Liere was shown cross-tabulations of cross-shopping answers by Whole Foods and Wild Oats shoppers, which he admitted indicated that very few of the respondents reported cross-shopping between the stores. *See* Van Liere Dep. at 231:18-238:2 (Plaintiff's Exhibit 12).

Later in the survey, starting at Question 27, the respondents are asked about how much they spend in a typical month on specific product categories. *See id.* at p. 10. They are then asked what percentage of the money they spend on that category is spent at Whole Foods and at Wild Oats and, importantly, at what "**other** stores or types of stores" they buy the product category, with a list of options that include "a supermarket or grocery store," "a warehouse or super store," "a discount club," "a specialty, organic, or ethnic store," and "a farmer's market or food co-op." *See id.* p. 11 (emphasis in original). Accordingly, this later set of questions goes beyond a comparison of shopping frequency among grocery stores and inquires into shoppers' total budgets and the various retail outlets where that budget may be spent, including *but not limited to* Whole Foods, Wild Oats, and other grocery stores.

Dr. Van Liere takes these quite different sets of questions and imposes certain "rules" of "consistency." *See* Van Liere Expert Report, p. 16; Van Liere Dep. at 185:11-188:22, 198:6-199:5 (Plaintiff's Exhibit 12). For example, if a respondent said he or she purchased a category "mostly at Whole Foods/rarely at another grocer," but reported spending less than 50% of his or her total budget for the category at Whole Foods, Dr. Van Liere labeled the respondent an "under-estimator" who is guilty of giving "inconsistent" answers. *See* Exhibit 4 (last page) to the Van Liere Deposition (Exhibit 2 hereto).

Dr. Van Liere's elaborate exercise is misguided. He has failed to account for the other (non-grocery store) outlets at which respondents reported spending part of their product category budgets. There is nothing inconsistent or nonsensical about a respondent's report of buying the category "mostly at Whole Foods and rarely at another grocer" and spending less than 50 percent of his or her budget at Whole Foods, given the outlets *besides grocery stores* where the respondent may be buying the category. This is not merely a logical possibility, as many

11

respondents did in fact report devoting some of their category budgets to non-grocery store outlets. *See* Conway Expert Report, Appendix D, pp. 17-27. Dr. Van Liere's flawed approach is evident in the tabulations in Tables 2A and 2B of his report: his alleged "under-estimators" – the people who report high frequency of shopping at Whole Foods or Wild Oats versus other grocers, but lower total budget percentages when other types of retail outlets are in the mix – greatly outnumber the alleged "over-estimators." *See* Van Liere Expert Report, p. 16 and Tables 2A and 2B. If respondents were simply confused or not paying attention, there is no reason that the alleged misestimation would go so strongly in one direction and not the other.

The FTC's attack on Ms. Conway's questionnaire lacks substance, and the FTC's brief resorts to improper advocacy to prop it up. *See* FTC Brief, p. 21. The FTC makes this claim:

> "In her deposition, Ms. Conway agreed that unclear and imprecise questions in her survey may threaten the validity of the survey's results. *See* Conway Dep. at 113:9-18."

*Id*. Later in the same paragraph, the FTC again refers to "Ms. Conway's own admission that unclear and imprecise questions may threaten the validity of her survey results." *Id*. Here is the innocuous passage on which these arguments are based:

> "Q.  I think you would agree with me that it's also critical to the reliability of the results of the survey, *any survey*, that the survey questions used are framed to be clear, precise, and unbiased. Wouldn't you agree with that?
>
> "A.  Yes.
>
> "Q.  If unclear questions are included in a survey, they may threaten the validity of the survey. Isn't that right?
>
> "A.  Correct."

Conway Dep. at 113:9-18 (Plaintiff's Exhibit 3) (emphasis added). Ms. Conway made no "admission" about the presence of any unclear or imprecise questions in her survey, and it is wrong to imply otherwise.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the FTC's Motion *in Limine* be denied.

Respectfully submitted,

_____/s/_____
Paul T. Denis (DC Bar No. 437040)
Paul H. Friedman (DC Bar No. 290635)
Jeffrey W. Brennan (DC Bar No. 447438)
James A. Fishkin (DC Bar No. 478958)
Michael Farber (DC Bar No. 449215)
Rebecca Dick (DC Bar No. 463197)

DECHERT LLP
1775 I Street, N.W.
Washington, DC  20006
Telephone: (202) 261-3430
Facsimile: (202) 261-3333

*Of Counsel:*

Roberta Lang
Vice-President of Legal Affairs
   and General Counsel
Whole Foods Market, Inc.
550 Bowie Street
Austin, TX  78703-4677

_____/s/_____
Alden L. Atkins (DC Bar No. 393922)
Neil W. Imus (DC Bar No. 394544)
John D. Taurman (DC Bar No. 133942)

VINSON & ELKINS L.L.P.
The Willard Office Building
1455 Pennsylvania Avenue, N.W., Suite 600
Washington, DC  20004-1008
Telephone: (202) 639-6500
Facsimile (202) 639-6604

*Attorneys for Whole Foods Market, Inc.*

Clifford H. Aronson (DC Bar No. 335182)
Thomas Pak (Pro Hac Vice)
Matthew P. Hendrickson (Pro Hac Vice)

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, NY  10036
Telephone: (212) 735-3000
caronson@skadden.com

13

Gary A. MacDonald (DC Bar No. 418378)

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC  20005
Telephone: (202) 371-7000
gmacdona@skadden.com

Terrence J. Wallock (Pro Hac Vice)
2224 Pacific Dr.
Corona Del Mar, CA  92625
(949) 375-0683

*Attorneys for Defendant Wild Oats Markets,
    Inc.*

July 26, 2007

14

## CERTIFICATE OF SERVICE

I hereby certify that, on this 26th day of July, 2007, I caused the foregoing Joint Memorandum of Points and Authorities in Opposition to Plaintiff's Motion *in Limine* to Exclude the Expert Report and Testimony of Kellyanne Conway to be filed and served using the Court's ECF system and also caused the same to be served on the persons listed below by electronic mail:

Matthew P. Hendrickson
Thomas A. Pak
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
mhendric@skadden.com
tpak@skadden.com

John Shin
MORGAN LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
jshin@morganlewis.com

Terrence J. Wallock
2224 Pacific Drive
Corona Del Mar, CA  92625
terry@wallock.com

/s/ John D. Taurman
John D. Taurman

**EXHIBIT 1**

**TO**

**JOINT MEMORANDUM OF POINTS AND AUTHORITIES
OF WHOLE FOODS MARKET, INC. AND WILD OATS MARKETS, INC.
IN OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE THE
EXPERT REPORT AND TESTIMONY OF KELLYANNE CONWAY**

**Income division of Whole Foods Shoppers.**
**Analysis Page 8.**

|          | Frequent | Cusp |
|----------|----------|------|
| <$30K    | 12%      | 11%  |
| $30-$50K | 13%      | 12%  |
| $50-$70K | 14%      | 13%  |
| $70-$90K | 11%      | 9%   |
| $90K+    | 28%      | 29%  |

**Recalculated.**

|          | Frequent | Cusp |
|----------|----------|------|
| <$30K    | 11%      | 11%  |
| $30-$50K | 14%      | 12%  |
| $50-$70K | 13%      | 12%  |
| $70-$90K | 10%      | 11%  |
| $90K+    | 31%      | 30%  |

**Income division of Wild Oats Shoppers.**
**Analysis Page 11.**

|          | Frequent | Cusp |
|----------|----------|------|
| <$30K    | 18%      | 17%  |
| $30-$50K | 19%      | 15%  |
| $50-$70K | 10%      | 16%  |
| $70-$90K | 12%      | 8%   |
| $90K+    | 21%      | 20%  |

**Recalculated.**

|          | Frequent | Cusp |
|----------|----------|------|
| <$30K    | 18%      | 18%  |
| $30-$50K | 17%      | 16%  |
| $50-$70K | 11%      | 13%  |
| $70-$90K | 12%      | 9%   |
| $90K+    | 20%      | 20%  |

PX02090

**Whole Foods Shopping Frequency.**
**Analysis Page 8.**

| *How often do you shop at **Whole Foods Market**?* |
|---|
| **46%    TOTAL FREQUENT (NET)** |
| 6%    MORE THAN ONCE A WEEK |
| 11%    ONCE A WEEK |
| 14%    A FEW TIMES A MONTH |
| 15%    ONCE A MONTH |
| **46%    TOTAL CUSP (NET)** |
| 28%    A FEW TIMES A YEAR |
| 8%    ONCE  A YEAR OR LESS |
| 10%    HAVE SHOPPED THERE ONCE OR TWICE |
| 9%    NEVER |

**Recalculated.**

| *How often do you shop at **Whole Foods Market**?* |
|---|
| **44%    TOTAL FREQUENT (NET)** |
| 6%    MORE THAN ONCE A WEEK |
| 10%    ONCE A WEEK |
| 13%    A FEW TIMES A MONTH |
| 15%    ONCE A MONTH |
| **46%    TOTAL CUSP (NET)** |
| 28%    A FEW TIMES A YEAR |
| 8%    ONCE  A YEAR OR LESS |
| 10%    HAVE SHOPPED THERE ONCE OR TWICE |
| 10%    NEVER |

2

**Wild Oats Shopping Frequency.**
**Analysis Page 11.**

| | *How often do you shop at **Wild Oats Market**?* |
|---|---|
| **29%** | **TOTAL FREQUENT (NET)** |
| 3% | MORE THAN ONCE A WEEK |
| 7% | ONCE A WEEK |
| 8% | A FEW TIMES A MONTH |
| 11% | ONCE A MONTH |
| **36%** | **TOTAL CUSP (NET)** |
| 18% | A FEW TIMES A YEAR |
| 9% | ONCE A YEAR OR LESS |
| 9% | HAVE SHOPPED THERE ONCE OR TWICE |
| 35% | NEVER |

**Recalculated.**

| | *How often do you shop at **Wild Oats Market**?* |
|---|---|
| **30%** | **TOTAL FREQUENT (NET)** |
| 3% | MORE THAN ONCE A WEEK |
| 7% | ONCE A WEEK |
| 9% | A FEW TIMES A MONTH |
| 11% | ONCE A MONTH |
| **39%** | **TOTAL CUSP (NET)** |
| 20% | A FEW TIMES A YEAR |
| 9% | ONCE A YEAR OR LESS |
| 10% | HAVE SHOPPED THERE ONCE OR TWICE |
| 30% | NEVER |

**Whole Foods Spending per Visit.**
**Analysis Page 8.**

❖ There was very little difference between shoppers in overlap and non-overlap areas with respect to dollars spent per typical trip to Whole Foods Market. The mean per trip expenditure in overlap areas was $44.90 compared to $48.70 among those in non-overlap area.

| | | | *How much do you typically spend on a single visit to Whole Foods Market? (OPEN-ENDED. PRE-CODED LIST.)* |
|---|---|---|---|
| Total | Freq. | Cusp | |
| *$46.30* | *$55.90* | *$36.70* | *MEAN* |
| 11% | 4% | 18% | $10 OR LESS |
| 25% | 22% | 28% | $11-$25 |
| 33% | 33% | 33% | $26-$50 |
| 10% | 14% | 6% | $51-$75 |
| 9% | 11% | 6% | $76-$100 |
| 3% | 4% | 2% | $101-$125 |
| 2% | 3% | 1% | $126-$150 |
| * | 1% | * | $151-$175 |
| 1% | 1% | * | $176-$200 |
| 2% | 3% | 1% | $201 OR MORE |
| | | | |
| 4% | 3% | 4% | DO NOT KNOW |
| 1% | 1% | * | REFUSED |

**Recalculated.**

❖ There was very little difference between shoppers in overlap and non-overlap areas with respect to dollars spent per typical trip to Whole Foods Market. The mean per trip expenditure in overlap areas was $43.90 compared to $48.10 among those in non-overlap area.

| | | | *How much do you typically spend on a single visit to Whole Foods Market? (OPEN-ENDED. PRE-CODED LIST.)* |
|---|---|---|---|
| Total | Freq. | Cusp | |
| *$45.70* | *$55.30* | *$36.00* | *MEAN* |
| 12% | 5% | 18% | $10 OR LESS |
| 26% | 22% | 30% | $11-$25 |
| 32% | 33% | 31% | $26-$50 |
| 11% | 16% | 6% | $51-$75 |
| 8% | 10% | 6% | $76-$100 |
| 3% | 4% | 2% | $101-$125 |
| 2% | 3% | 1% | $126-$150 |
| * | 1% | - | $151-$175 |
| 1% | 2% | * | $176-$200 |
| 2% | 3% | 1% | $201 OR MORE |
| | | | |
| 3% | 2% | 4% | DO NOT KNOW |
| 1% | * | 1% | REFUSED |

4

**Wild Oats Spending per Visit.**
**Analysis Page 11.**

✧  Wild Oats shoppers in overlap and non-overlap areas reported similar spending per typical trip to Wild Oats.  Those in overlap areas spent an average of $34.70 per trip and those in non-overlap areas spent an average of $38.60.

| | | | How much do you typically spend on a single visit to *Wild Oats Market*?  (OPEN-ENDED. PRE-CODED LIST.) |
|---|---|---|---|
| Total | Freq. | Cusp | |
| $36.80 | $47.30 | $27.80 | MEAN |
| 18% | 9% | 26% | $10 OR LESS |
| 29% | 24% | 33% | $11-$25 |
| 28% | 34% | 23% | $26-$50 |
| 8% | 11% | 6% | $51-$75 |
| 7% | 12% | 2% | $76-$100 |
| 2% | 3% | 1% | $101-$125 |
| 1% | 1% | 1% | $126-$150 |
| * | 1% | - | $151-$175 |
| 1% | 1% | * | $176-$200 |
| * | 1% | - | $201 OR MORE |
| | | | |
| 5% | 3% | 6% | DO NOT KNOW |
| 1% | 1% | 1% | REFUSED |

**Recalculated.**

✧  Wild Oats shoppers in overlap and non-overlap areas reported similar spending per typical trip to Wild Oats.  Those in overlap areas spent an average of $34.00 per trip and those in non-overlap areas spent an average of $38.10.

| | | | How much do you typically spend on a single visit to *Wild Oats Market*?  (OPEN-ENDED. PRE-CODED LIST.) |
|---|---|---|---|
| Total | Freq. | Cusp | |
| $36.20 | $47.30 | $27.50 | MEAN |
| 19% | 9% | 27% | $10 OR LESS |
| 30% | 25% | 34% | $11-$25 |
| 27% | 33% | 22% | $26-$50 |
| 8% | 11% | 7% | $51-$75 |
| 6% | 12% | 2% | $76-$100 |
| 2% | 3% | 1% | $101-$125 |
| 1% | 1% | 1% | $126-$150 |
| * | 1% | - | $151-$175 |
| 1% | 1% | * | $176-$200 |
| * | 1% | - | $201 OR MORE |
| | | | |
| 4% | 3% | 5% | DO NOT KNOW |
| 1% | * | 1% | REFUSED |

**Whole Foods Percent of Grocery Budget.
Analysis Page 9.**

❖ Though a much smaller percentage, a majority of even Frequent Whole Foods shoppers qualified as "Light" shoppers when it comes to actual register sales, as 53% of them said they spend 20% or less of their grocery budget at the Whole Foods. A full 89% of Cusp shoppers met this definition.

❖ Only 14% of Frequent shoppers also qualified as "Heavy" shoppers, reinforcing the finding that even the most loyal and regular Whole Foods patrons still dedicate most of their food and goods dollars to other grocers.

❖ Whole Foods shoppers in overlap and non-overlap areas allocated very similar portions of their total grocery budgets to Whole Foods (18.3% and 20.7%, respectively).

| What percentage of your total grocery budget do you spend at _Whole Foods Market_? (OPEN-ENDED. PRE-CODED LIST.) | |
|---|---|
| 19.2% | MEAN |
| **71%** | **TOTAL LIGHT SHOPPERS** |
| 58% | 10% OR LESS |
| 13% | 11%-20% |
| **15%** | **TOTAL MODERATE SHOPPERS** |
| 8% | 21%-30% |
| 3% | 31%-40% |
| 4% | 41%-50% |
| **7%** | **TOTAL HEAVY SHOPPERS** |
| 2% | 51%-60% |
| 1% | 61%-70% |
| 2% | 71%-80% |
| 1% | 81%-90% |
| 1% | 91%-100% |

**Recalculated.**

❖ Though a much smaller percentage, a majority of even Frequent Whole Foods shoppers qualified as "Light" shoppers when it comes to actual register sales, as 55% of them said they spend 20% or less of their grocery budget at the Whole Foods. A full 90% of Cusp shoppers met this definition.

❖ Only 15% of Frequent shoppers also qualified as "Heavy" shoppers, reinforcing the finding that even the most loyal and regular Whole Foods patrons still dedicate most of their food and goods dollars to other grocers.

❖ Whole Foods shoppers in overlap and non-overlap areas allocated very similar portions of their total grocery budgets to Whole Foods (18.1% and 20.5%, respectively).

| What percentage of your total grocery budget do you spend at _Whole Foods Market_? (OPEN-ENDED. PRE-CODED LIST.) | |
|---|---|
| 19.1% | MEAN |
| **73%** | **TOTAL LIGHT SHOPPERS** |
| 59% | 10% OR LESS |
| 14% | 11%-20% |
| **15%** | **TOTAL MODERATE SHOPPERS** |
| 8% | 21%-30% |
| 3% | 31%-40% |
| 4% | 41%-50% |
| **7%** | **TOTAL HEAVY SHOPPERS** |
| 2% | 51%-60% |
| 1% | 61%-70% |
| 2% | 71%-80% |
| 1% | 81%-90% |
| 1% | 91%-100% |

**Wild Oats Percent of Grocery Budget.
Analysis Page 9.**

❖ Among Wild Oats Frequent shoppers, 62% spend less than 20% of their total grocery budget at the store, and 9% allocate more than half (51% or more) of their grocery dollars there, qualifying them as "Heavy" shoppers.

❖ Wild Oats shoppers in overlap and non-overlap areas were similar in the percent of their grocery budget allocated to Wild Oats (14.6% and 18.7%, respectively).

| | |
|---|---|
| *What percentage of your total grocery budget do you spend at* Wild Oats Market*? (OPEN-ENDED. PRE-CODED LIST.)* | |
| *16.7%* | *MEAN* |
| **77%** | **TOTAL LIGHT SHOPPERS** |
| 66% | 10% OR LESS |
| 11% | 11%-20% |
| **12%** | **TOTAL MODERATE SHOPPERS** |
| 7% | 21%-30% |
| 3% | 31%-40% |
| 2% | 41%-50% |
| **5%** | **TOTAL HEAVY SHOPPERS** |
| 1% | 51%-60% |
| 1% | 61%-70% |
| 1% | 71%-80% |
| 1% | 81%-90% |
| 1% | 91%-100% |

**Recalculated.**

❖ Among Wild Oats Frequent shoppers, 62% spend less than 20% of their total grocery budget at the store, and 9% allocate more than half (51% or more) of their grocery dollars there, qualifying them as "Heavy" shoppers.

❖ Wild Oats shoppers in overlap and non-overlap areas were similar in the percent of their grocery budget allocated to Wild Oats (14.1% and 18.4%, respectively).

| | |
|---|---|
| *What percentage of your total grocery budget do you spend at* Wild Oats Market*? (OPEN-ENDED. PRE-CODED LIST.)* | |
| *16.4%* | *MEAN* |
| **77%** | **TOTAL LIGHT SHOPPERS** |
| 67% | 10% OR LESS |
| 10% | 11%-20% |
| **10%** | **TOTAL MODERATE SHOPPERS** |
| 8% | 21%-30% |
| 2% | 31%-40% |
| 2% | 41%-50% |
| **5%** | **TOTAL HEAVY SHOPPERS** |
| 1% | 51%-60% |
| 1% | 61%-70% |
| 1% | 71%-80% |
| 1% | 81%-90% |
| 1% | 91%-100% |

7

**Cross-Shopping Among Frequent Shoppers.**
**Analysis Page 14.**

| | Whole Foods Frequent Shoppers | | | | Wild Oats Frequent Shoppers | | | |
|---|---|---|---|---|---|---|---|---|
| | Only at Whole Foods | Mostly at Whole Foods | Half and Half | Only/Mostly at Another Grocer | Only at Wild Oats | Mostly at Wild Oats | Half and Half | Only/Mostly at Another Grocer |
| Produce | 11% | 17% | 25% | 42% | 9% | 17% | 22% | 45% |
| Natural and Organic Foods | 16% | 25% | 19% | 22% | 19% | 24% | 18% | 22% |
| Dairy Products | 7% | 12% | 19% | 52% | 5% | 10% | 15% | 53% |
| Fresh Meat and Fish | 9% | 14% | 17% | 47% | 6% | 10% | 14% | 52% |
| Prepared Foods | 9% | 15% | 13% | 33% | 7% | 10% | 14% | 40% |
| Breads, Rolls, and Other Bakery Items | 7% | 14% | 23% | 46% | 7% | 10% | 15% | 51% |
| Frozen Foods | 5% | 7% | 15% | 49% | 5% | 6% | 11% | 46% |

**Recalculated.**

| | Whole Foods Frequent Shoppers | | | | Wild Oats Frequent Shoppers | | | |
|---|---|---|---|---|---|---|---|---|
| | Only at Whole Foods | Mostly at Whole Foods | Half and Half | Only/Mostly at Another Grocer | Only at Wild Oats | Mostly at Wild Oats | Half and Half | Only/Mostly at Another Grocer |
| Produce | 11% | 16% | 25% | 44% | 8% | 15% | 24% | 47% |
| Natural and Organic Foods | 16% | 26% | 18% | 23% | 20% | 23% | 18% | 23% |
| Dairy Products | 6% | 12% | 20% | 53% | 5% | 10% | 16% | 55% |
| Fresh Meat and Fish | 10% | 14% | 17% | 50% | 6% | 10% | 14% | 53% |
| Prepared Foods | 9% | 15% | 13% | 33% | 8% | 9% | 15% | 39% |
| Breads, Rolls, and Other Bakery Items | 7% | 14% | 24% | 48% | 7% | 10% | 16% | 52% |
| Frozen Foods | 5% | 6% | 14% | 54% | 5% | 6% | 11% | 47% |

8

**EXHIBIT 2**

**TO**

**JOINT MEMORANDUM OF POINTS AND AUTHORITIES**
**OF WHOLE FOODS MARKET, INC. AND WILD OATS MARKETS, INC.**
**IN OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE THE**
**EXPERT REPORT AND TESTIMONY OF KELLYANNE CONWAY**

**Taurman, John D.**

| | |
|---|---|
| **From:** | Horwitz, Reid [rhorowitz@ftc.gov] |
| **Sent:** | Sunday, July 15, 2007 9:54 AM |
| **To:** | Taurman, John D. |
| **Subject:** | Data requested |
| **Attachments:** | Response rate.xls; Zips.xls; Check Table 2.xls |

Jack,

Here are the spreadsheets requested.  All of the analyses were done using the data supplied by Ms. Conway.

Reid Horwitz
Mergers II
Federal Trade Commission
202-326-2037
rhorwitz@ftc.gov


EXHIBIT
Van Liere
4
7/18/07  86

**Pct produce bought at WFs in Typical Month * How Often Buy at WFs-- Produce Crosstabulation**

Count

| | | How Often Buy at WFs-- Produce | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ONLY AT WFs | MOSTLY AT WFs | RARELY AT OTHER | HALF TIME AT WFs | HALF TIME AT OTHER | MOSTLY AT OTHER | RARELY AT WFs | ONLY AT OTHER | DO NOT PURCHASE | DO NOT KNOW | REFUSED | |
| Pct produce bought at WFs in Typical Month | 0% | 3 | | | 7 | | 137 | 107 | 49 | | 0 | 306 |
| | 1%-10% | 8 | 15 | 50 | 225 | 23 | 8 | | 0 | 379 |
| | 11%-20% | 8 | 18 | 39 | 43 | 4 | 2 | | 0 | 114 |
| | 21%-30% | 9 | 6 | 25 | 13 | 4 | | 0 | 57 |
| | 31%-40% | 8 | 11 | 4 | | 0 | 34 |
| | 41%-50% | 15 | 23 | 7 | 0 | 0 | 52 |
| | 51%-60% | 2 | 9 | 1 | 0 | 0 | 14 |
| | 61%-70% | 4 | 4 | 0 | 0 | 10 |
| | 71%-80% | 1 | 19 | 7 | 1 | 0 | 38 |
| | 81%-90% | 2 | 2 | 0 | 2 | 0 | 15 |
| | 91%-100% | 17 | 8 | 0 | 2 | 1 | 0 | 29 |
| | DO NOT KNOW | 5 | 10 | 17 | 1 | 5 | 3 | 60 |
| | REFUSED | 0 | 1 | 1 | 0 | 1 | 1 | 7 |
| Total | | 69 | 114 | 188 | 505 | 143 | 67 | 5 | 1 | 1092 |

**Pct dairy bought at WFs in typical month * How Often Buy at WFs-- Dairy Crosstabulation**

Count

| | | How Often Buy at WFs-- Dairy | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ONLY AT WFs | MOSTLY AT WFs | RARELY AT OTHER | HALF TIME AT WFs | HALF TIME AT OTHER | MOSTLY AT OTHER | RARELY AT WFs | ONLY AT OTHER | DO NOT PURCHASE | DO NOT KNOW | REFUSED | |
| Pct dairy bought at WFs in typical month | 0% | 6 | 11 | 18 | 187 | 204 | 81 | 1 | 511 |
| | 1%-10% | 9 | 14 | 31 | 200 | 29 | 11 | 3 | 297 |
| | 11%-20% | 8 | 18 | 32 | 8 | 4 | 0 | 75 |
| | 21%-30% | 3 | 9 | 10 | 12 | 7 | 2 | 0 | 43 |
| | 31%-40% | 1 | 5 | 3 | 4 | 1 | 0 | 17 |
| | 41%-50% | 3 | 8 | 22 | 6 | 2 | 1 | 0 | 42 |
| | 51%-60% | 2 | 4 | 0 | 0 | 0 | 6 |
| | 61%-70% | 1 | 2 | 0 | 0 | 0 | 5 |
| | 71%-80% | 1 | 6 | 2 | 0 | 1 | 0 | 9 |
| | 81%-90% | 3 | 10 | 3 | 1 | 0 | 0 | 17 |
| | 91%-100% | 9 | 4 | 1 | 7 | 6 | 1 | 28 |
| | DO NOT KNOW | 4 | 6 | 4 | 1 | 3 | 1 | 35 |
| | REFUSED | 0 | 0 | 1 | 0 | 1 | 0 | 6 |
| Total | | 47 | 83 | 127 | 455 | 262 | 107 | 5 | 1092 |

**Pct meat and fish bought at WFs in typical month * How Often Buy at WFs-- Meat and Fish Crosstabulation**

Count

| | | How Often Buy at WFs-- Meat and Fish | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ONLY AT WFs | MOSTLY AT WFs | RARELY AT OTHER | HALF TIME AT WFs | HALF TIME AT OTHER | MOSTLY AT OTHER | RARELY AT WFs | ONLY AT OTHER | DO NOT PURCHASE | DO NOT KNOW | REFUSED | |
| Pct meat and fish bought at WFs in typical month | 0% | 7 | 9 | 13 | 205 | 228 | 103 | 2 | 567 |
| | 1%-10% | 1 | 7 | 33 | 135 | 18 | 8 | 1 | 209 |
| | 11%-20% | 1 | 11 | 19 | 26 | 7 | 0 | 1 | 65 |
| | 21%-30% | 3 | 4 | 18 | 14 | 4 | 2 | 0 | 43 |
| | 31%-40% | 1 | 4 | 11 | 6 | 1 | 1 | 0 | 36 |
| | 41%-50% | 1 | 11 | 8 | 6 | 1 | 0 | 37 |
| | 51%-60% | 1 | 4 | 0 | 0 | 0 | 10 |
| | 61%-70% | 1 | 6 | 1 | 0 | 0 | 0 | 6 |
| | 71%-80% | 6 | 12 | 3 | 2 | 0 | 23 |
| | 81%-90% | 3 | 5 | 0 | 0 | 0 | 10 |
| | 91%-100% | 20 | 15 | 1 | 1 | 1 | 0 | 40 |
| | DO NOT KNOW | 1 | 2 | 8 | 8 | 6 | 10 | 1 | 38 |
| | REFUSED | 0 | 6 | 2 | 5 | 3 | 1 | 8 |
| Total | | 58 | 89 | 133 | 407 | 268 | 130 | 5 | 1092 |

**Pct prepared foods bought at WFs in typical month * How Often Buy at WFs-- Prepared Foods Crosstabulation**

Count

| | | How Often Buy at WFs-- Prepared Foods | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ONLY AT WFs | MOSTLY AT WFs | RARELY AT OTHER | HALF TIME AT WFs | HALF TIME AT OTHER | MOSTLY AT OTHER | RARELY AT WFs | ONLY AT OTHER | DO NOT PURCHASE | DO NOT KNOW | REFUSED | |
| Pct prepared foods bought at WFs in typical month | 0% | 14 | 111 | 14 | 146 | 151 | 251 | 1 | 590 |
| | 1%-10% | 13 | 21 | 29 | 105 | 29 | 30 | 0 | 218 |
| | 11%-20% | 4 | 8 | 11 | 16 | 2 | 4 | 0 | 65 |
| | 21%-30% | 6 | 11 | 9 | 10 | 2 | 2 | 0 | 40 |
| | 31%-40% | 3 | 4 | 3 | 4 | 3 | 2 | 0 | 13 |
| | 41%-50% | 3 | 8 | 13 | 4 | 3 | 0 | 33 |
| | 51%-60% | 0 | 4 | 0 | 2 | 1 | 0 | 6 |
| | 61%-70% | 3 | 2 | 1 | 1 | 0 | 0 | 6 |
| | 71%-80% | 3 | 12 | 8 | 2 | 1 | 0 | 26 |
| | 81%-90% | 1 | 6 | 1 | 3 | 1 | 0 | 12 |
| | 91%-100% | 15 | 15 | 1 | 1 | 2 | 0 | 42 |
| | DO NOT KNOW | 1 | 3 | 6 | 5 | 22 | 1 | 43 |
| | REFUSED | 0 | 2 | 9 | 3 | 1 | 18 |
| Total | | 64 | 105 | 95 | 306 | 190 | 324 | 4 | 1092 |

**Pct produce bought at WGs in Typical Month * How Often Buy at WGs-- Produce Crosstabulation**

Count

| | | How Often Buy at WGs-- Produce | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ONLY AT WGs | MOSTLY AT WGs | RARELY AT OTHER | HALF TIME AT WGs | HALF TIME AT OTHER | MOSTLY AT OTHER | RARELY AT WGs | ONLY AT OTHER | DO NOT PURCHASE | DO NOT KNOW | REFUSED | |
| Pct produce bought at WGs in Typical Month | 0% | 1 | 90 | 135 | 49 | 0 | 292 |
| | 1%-10% | 14 | 13 | 31 | 1663 | 22 | 9 | 0 | 260 |
| | 11%-20% | 3 | 7 | 17 | 24 | 1 | 1 | 0 | 53 |

Check Table 2.xls

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 92 | | 21%-30% | 3 | 3 | 16 | 14 | 3 | 0 | 0 | 1 | 45 |
| 93 | | 31%-40% | 3 | 2 | 7 | 3 | 1 | 0 | 0 | 0 | 16 |
| 94 | | 41%-50% | 1 | 9 | 14 | 1 | 0 | 0 | 0 | 0 | 25 |
| 95 | | 51%-60% | 3 | 1 | 8 | 1 | 0 | 0 | 0 | 0 | 15 |
| 96 | | 61%-70% | 0 | 1 | 11 | 1 | 0 | 0 | 0 | 0 | 3 |
| 97 | | 71%-80% | 2 | 10 | 1 | 0 | 0 | 0 | 0 | 0 | 15 |
| 98 | | 81%-90% | | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 10 |
| 99 | | 91%-100% | 9 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 12 |
| 100 | | DO NOT KNOW | 0 | | 2 | 6 | 8 | 5 | 6 | 0 | 30 |
| 101 | | REFUSED | 0 | 0 | 0 | 1 | 1 | 2 | 0 | 0 | 4 |
| 102 | Total | | 43 | 68 | 108 | 308 | 171 | 66 | 13 | 3 | 780 |
| 103 | | | | | | | | | | | |
| 104 | | | | | | | | | | | |
| 105 | | | | | | | | | | | |
| 106 | Pct dairy bought at WOs in typical month * How Often Buy at WOs-- Dairy Crosstabulation | | | | | | | | | | |
| 107 | Count | | | | | | | | | | |
| 108 | | | How Often Buy at WOs-- Dairy | | | | | | | | Total |
| 109 | | | ONLY AT WOs | MOSTLY AT WOs | RARELY AT OTHER | HALF TIME AT WOs | HALF TIME AT OTHER | MOSTLY AT OTHER | RARELY AT WO | ONLY AT OTHER | DO NOT PURCHASE | DO NOT KNOW REFUSED |
| 110 | Pct dairy bought at WOs in typical month | 0% | 6 | 3 | 3 | 8 | 130 | 224 | 94 | 5 | 3 | 463 |
| 111 | | 1%-10% | | 5 | 23 | 99 | 26 | 12 | 1 | 1 | 0 | 173 |
| 112 | | 11%-20% | 3 | 5 | 12 | 9 | 6 | 2 | 0 | 0 | 0 | 36 |
| 113 | | 21%-30% | 4 | 6 | 7 | 8 | 2 | 1 | 0 | 0 | 0 | 26 |
| 114 | | 31%-40% | 0 | 2 | 4 | 3 | 0 | 0 | 0 | 0 | 0 | 9 |
| 115 | | 41%-50% | 0 | 2 | 4 | 2 | 0 | 1 | 0 | 0 | 0 | 9 |
| 116 | | 51%-60% | 0 | 1 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 5 |
| 117 | | 61%-70% | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 118 | | 71%-80% | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 5 |
| 119 | | 81%-90% | 0 | 4 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 6 |
| 120 | | 91%-100% | 7 | 5 | 0 | 1 | 2 | 1 | 0 | 0 | 0 | 16 |
| 121 | | DO NOT KNOW | | | 3 | 6 | 1 | 5 | 6 | 6 | 0 | 23 |
| 122 | | REFUSED | 0 | 1 | 0 | 1 | 2 | 3 | 0 | 0 | 0 | 7 |
| 123 | Total | | 23 | 41 | 66 | 250 | 366 | 120 | 12 | 2 | 780 |
| 124 | | | | | | | | | | | |
| 125 | | | | | | | | | | | |
| 126 | | | | | | | | | | | |
| 127 | Pct meat and fish bought at WOs in typical month * How Often Buy at WOs-- Meat and Fish Crosstabulation | | | | | | | | | | |
| 128 | Count | | | | | | | | | | |
| 129 | | | How Often Buy at WOs-- Meat and Fish | | | | | | | | Total |
| 130 | | | ONLY AT WOs | MOSTLY AT WOs | RARELY AT OTHER | HALF TIME AT WOs | HALF TIME AT OTHER | MOSTLY AT OTHER | RARELY AT WO | ONLY AT OTHER | DO NOT PURCHASE | DO NOT KNOW REFUSED |
| 131 | Pct meat and fish bought at WOs in typical month | 0% | 10 | 5 | 11 | 121 | 239 | 115 | 3 | 3 | 509 |
| 132 | | 1%-10% | 5 | 10 | 13 | 78 | 13 | 5 | 0 | 0 | 124 |
| 133 | | 11%-20% | 1 | 2 | 13 | 13 | 0 | 4 | 0 | 1 | 34 |
| 134 | | 21%-30% | 1 | 5 | 2 | 5 | 1 | 2 | 7 | 0 | 17 |
| 135 | | 31%-40% | 0 | 2 | 2 | 1 | 1 | 0 | 0 | 0 | 5 |
| 136 | | 41%-50% | 1 | 6 | 9 | 4 | 0 | 0 | 0 | 0 | 21 |
| 137 | | 51%-60% | 0 | 4 | 4 | 1 | 0 | 0 | 0 | 0 | 9 |
| 138 | | 61%-70% | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 5 |
| 139 | | 71%-80% | 1 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| 140 | | 81%-90% | 0 | 6 | 2 | 0 | 0 | 1 | 0 | 0 | 9 |
| 141 | | 91%-100% | 7 | 1 | 1 | 2 | 0 | 1 | 0 | 0 | 12 |
| 142 | | DO NOT KNOW | 0 | 2 | 2 | 6 | 2 | 9 | 5 | 0 | 26 |
| 143 | | REFUSED | 0 | 0 | 0 | 2 | 5 | 5 | 1 | 0 | 7 |
| 144 | Total | | 29 | 46 | 60 | 294 | 257 | 141 | 9 | 4 | 780 |
| 145 | | | | | | | | | | | |
| 146 | | | | | | | | | | | |
| 147 | Pct prepared foods bought at WOs in typical month * How Often Buy at WOs-- Prepared Foods Crosstabulation | | | | | | | | | | |
| 148 | Count | | | | | | | | | | |
| 149 | | | How Often Buy at WOs-- Prepared Foods | | | | | | | | Total |
| 150 | | | ONLY AT WOs | MOSTLY AT WOs | RARELY AT OTHER | HALF TIME AT WOs | HALF TIME AT OTHER | MOSTLY AT OTHER | RARELY AT WO | ONLY AT OTHER | DO NOT PURCHASE | DO NOT KNOW REFUSED |
| 151 | Pct prepared foods bought at WOs in typical month | 0% | 17 | 11 | 14 | 103 | 167 | 173 | 5 | 5 | 495 |
| 152 | | 1%-10% | 6 | 14 | 18 | 63 | 19 | 12 | 1 | 0 | 132 |
| 153 | | 11%-20% | 2 | 5 | 15 | 11 | 1 | 2 | 0 | 0 | 36 |
| 154 | | 21%-30% | 1 | 2 | 4 | 8 | 0 | 0 | 0 | 0 | 14 |
| 155 | | 31%-40% | 2 | 1 | 2 | 5 | 0 | 1 | 0 | 0 | 10 |
| 156 | | 41%-50% | 0 | 4 | 4 | 4 | 1 | 0 | 0 | 0 | 16 |
| 157 | | 51%-60% | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| 158 | | 61%-70% | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| 159 | | 71%-80% | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| 160 | | 81%-90% | 6 | 5 | 4 | 1 | 1 | 2 | 0 | 0 | 20 |
| 161 | | 91%-100% | 1 | 0 | 4 | 2 | 9 | 4 | 12 | 0 | 33 |
| 162 | | DO NOT KNOW | 1 | 0 | 1 | 0 | 1 | 8 | 0 | 0 | 10 |
| 163 | | REFUSED | | 0 | | | | | | | |
| 164 | Total | | 34 | 46 | 70 | 305 | 196 | 211 | 13 | 5 | 780 |

Check Table 2.xls

|    | A | B | C | D | E | F | G | H | I | J | K | L |
|----|---|---|---|---|---|---|---|---|---|---|---|---|
| 1  | Under - estimators | | | | | | | | | | | |
| 2  | | | | | | | | | | | | |
| 3  | 1) Anyone who said they "only buy at WF" but said they buy between 0 and 80 percent | | | | | | | | | | | |
| 4  | 2) Anyone who said they "mostly buy at WF" but said they buy between 0 and 50 percent | | | | | | | | | | | |
| 5  | 3) Anyone who said they buy "half time at WF" but said they buy between 0 and 40 percent or said they buy 81 percent or more | | | | | | | | | | | |
| 6  | | | | | | | | | | | | |
| 7  | For the over - estimators | | | | | | | | | | | |
| 8  | | | | | | | | | | | | |
| 9  | 1) Anyone who said they buy "mostly at other" but said they buy 51 percent or more at WF | | | | | | | | | | | |
| 10 | 2) Anyone who said "only at other" but said they buy 11 percent or more at WF | | | | | | | | | | | |
| 11 | 3) Anyone who said "they do not purchase the item" but said they buy 1 percent or more at WF | | | | | | | | | | | |
| 12 | | | | | | | | | | | | |
| 13 | Removed all the don't knows and refused. | | | | | | | | | | | |

Details