# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,    )
    )
    Plaintiff,    )
    )
    v.    )    Civ. No. 1:07-cv-01021 – PLF
    )
WHOLE FOODS MARKET, INC.,    )    REDACTED - PUBLIC VERSION
    )
And    )
    )
WILD OATS MARKETS, INC.,    )
    )
    Defendants.    )
_____ )

## JOINT MEMORANDUM OF POINTS AND AUTHORITIES
## OF WHOLE FOODS MARKET, INC., AND WILD OATS MARKETS, INC.
## IN OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION

Paul T. Denis (DC Bar No. 437040)
Paul H. Friedman (DC Bar No. 290635)
Jeffrey W. Brennan (DC Bar No. 447438)
James A. Fishkin (DC Bar No. 478958)
Michael Farber (DC Bar No. 449215)
Rebecca Dick (DC Bar No. 463197)

DECHERT LLP
1775 I Street, N.W.
Washington, DC 20006
Telephone: (202) 261-3430
Facsimile: (202) 261-3333

*Of Counsel:*

Roberta Lang
Vice-President of Legal Affairs
    and General Counsel
Whole Foods Market, Inc.
550 Bowie Street
Austin, TX

Alden L. Atkins (DC Bar No. 393922)
Neil W. Imus (DC Bar No. 394544)
John D. Taurman (DC Bar No. 133942)

VINSON & ELKINS L.L.P.
The Willard Office Building
1455 Pennsylvania Avenue, N.W., Suite 600
Washington, DC 20004-1008

Telephone (202) 639-6500
Facsimile (202) 639-6604

*Attorneys for Whole Foods Market, Inc.*

Clifford H. Aronson (DC Bar No. 335182)
Thomas Pak (Pro Hac Vice)
Matthew P. Hendrickson (Pro Hac Vice)

SKADDEN, ARPS, SLATE, MEAGHER
      & FLOM LLP
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
caronson@skadden.com

Gary A. MacDonald (DC Bar No. 418378)

SKADDEN, ARPS, SLATE, MEAGHER
      & Flom LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000
gmacdona@skadden.com

Terrence J. Wallock (Pro Hac Vice)
2224 Pacific Dr.
Corona Del Mar, CA 92625
(949) 375-0683

*Attorneys for Defendant Wild Oats Markets, Inc.*

July 20, 2007

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................. 1

II.    THE FTC CANNOT MEET ITS BURDEN FOR INJUNCTIVE RELIEF ...................... 3

       A.     The FTC Must Show a Reasonable Probability of Success on the
              Merits To Prevail Here............................................................... 4

       B.     The FTC Has Ignored Its Own Horizontal Merger Guidelines and
              Past Enforcement Practice Repeatedly in This Case and That
              Should Give Rise to Skepticism About Its Case.............................. 6

              1.     The FTC's Alleged Product Market Makes No Sense................. 7

              2.     The FTC's Position on Geographic Market Definition
                    Keeps on Shifting......................................................... 10

       C.     The FTC's "Could Be Better" and Potential Competition Claims
              Are Speculative. ..................................................................... 13

              1.     The FTC Is Unlikely to Prevail on the Merits of Its Novel
                    "Could-Be-Better" Claim, Which Lacks Basis in the Statute
                    or Precedent .............................................................. 13

              2.     The FTC's Potential Competition Claims Have No
                    Reasonable Probability of Success .................................. 13

III.   THE FTC CANNOT PROVE THE ALLEGED PRODUCT MARKET ....................... 14

       A.     Product Market Definition Requires Assessment of Where
              Customers Would Shop if Prices Rose or Quality Declined ............... 14

       B.     The Product Market Alleged by the FTC Is Fatally Flawed............... 16

              1.     The FTC Confuses the Products With the Type of Store in
                    Which They Are Sold .................................................... 16

              2.     The Market Alleged Is Not Susceptible to Objective
                    Testing..................................................................... 17

              3.     There Is No Evidence That The Proposed Product Market
                    Reflects Local Market Realities in The Alleged Geographic
                    Markets .................................................................... 20

4.    The FTC's Backward-Looking Market View Is Inconsistent
With the Forward-Looking Focus Required by Precedent
and the FTC's Own Horizontal Merger Guidelines.................................. 21

C.    Differentiation Does Not Define a Relevant Product Market............................... 24

D.    Many Other Supermarkets Are Responding to Increasing
Consumer Demand for Natural and Organic By Expanding Their
Product Offering ............................................................................................... 26

E.    Customers of Whole Foods and Wild Oats Regularly Cross-Shop
at Other Supermarkets........................................................................................ 27

F.    Whole Foods Price-Checks Against All Other Supermarkets and
Significant Food Retailers, and Vice Versa......................................................... 30

G.    Whole Foods' Private Label Program Is Designed to Compete
Against Other Supermarkets ............................................................................... 32

H.    Other Supermarkets and Food Retailers Increasingly Offer the
Same Ambiance as Whole Foods and Wild Oats ................................................ 33

I.    New Supermarkets Impact the Full Range of Existing
Supermarkets...................................................................................................... 34

J.    The Site-Selection Process For New Whole Foods Supermarkets
Considers the Locations of All Other Supermarkets ........................................... 35

K.    Wild Oats Won Customers From Other Supermarkets During the
California Supermarket Strike ............................................................................. 36

L.    The Economic Evidence Confirms That All Supermarkets
Participate In  the Relevant Market .................................................................... 36

1.    Dr. Scheffman's Critical Loss Analysis Confirms That the
Relevant Market Includes Supermarkets .................................................. 36

2.    Dr. Scheffman's Entry Analysis Confirms that the Relevant
Market Includes Supermarkets .................................................................. 39

IV.   THE FTC FAILS TO ESTABLISH A RELEVANT GEOGRAPHIC
      MARKET ........................................................................................................ 40

V.    THE MERGER WILL NOT HARM COMPETITION ..................................... 43

      A.   The FTC's Proposed Market Definition Implies That Dozens of
           "Monopolies" Already Plague the Country .......................................... 44

      B.   There Is No Evidence That the Number of Premium Natural or
           Organic Supermarkets Affects Market Pricing .................................... 45

           1.   Dr. Scheffman's Cross-Sectional Pricing Analysis
                Confirms that Whole Foods and Wild Oats Do Not Price in
                Response to One Another .......................................................... 46

           2.   The FTC's Economic Expert Confirms That Wild Oats
                Does Not Constrain Whole Foods' Prices ................................ 47

           3.   Policies and Practices of Whole Foods and Wild Oats Do
                Not Suggest That Either Prices in Response to the Other ........ 48

      C.   Wild Oats Prices Are Generally Higher Than Whole Foods' Prices .... 49

      D.   If the Merged Firm's Quality Declines, It Will Lose an Attribute
           that Currently Differentiates It From Other Supermarkets .................. 49

VI.   SUPERMARKET REPOSITIONING AND ENTRY WILL EXERT
      ADDITIONAL COMPETITIVE PRESSURE ON THE COMBINED
      FIRM ........................................................................................................... 50

      A.   Repositioning by Other Supermarkets Is Ongoing ............................. 51

           1.   Delhaize (Operator of Hannaford, Food Lion, Bloom, and
                Sweetbay) ................................................................................. 52

           2.   Safeway Has Also Been Repositioning .................................... 55

           3.   Many Other Supermarkets Are Repositioning to Take
                Advantage of Growing Consumer Demand ............................. 56

      B.   Consumer Demand for Natural and Organic Goods Is On the Rise,
           So Repositioning Will Continue .......................................................... 59

      C.   A Major British Natural and Organic Firm is Entering the United
           States .................................................................................................. 59

D.   Dr. Scheffman Demonstrates that Repositioning and Entry Will Defeat Any Competitive Slip by the Combined Firm ........................................... 60

VII.   THE COMBINED FIRM WILL BE A MORE EFFICIENT AND EFFECTIVE COMPETITOR ........................................................................................ 60

A.   Whole Foods Has Improved the Prices, Quality, and Performance of the Stores It Has Purchased Previously ............................................. 60

B.   Wild Oats Is a Weakened Firm Whose Competitive Position Must Be Discounted ....................................................................................... 62

C.   Whole Foods Expects to Lower Prices to Increase Profits at Wild Oats Stores ......................................................................................... 66

VIII.   THE FTC'S INTENT EVIDENCE IS NOT PROBATIVE OF ANY ISSUE BEFORE THE COURT ................................................................................ 68

A.   Attention to Intent Distracts From Analysis of the Marketplace Conduct Relevant to a Clayton Act Determination ............................... 68

B.   The FTC Quotes Selections of Mackey's Statements that Do Not Reflect All of His Views, and It Distorts the Meaning of the Selections It Quotes .............................................................................. 70

C.   The Testimony of Perry Odak Should Be Discounted as Unreliable and Biased. ........................................................................................... 72

IX.   THE BALANCE OF THE EQUITIES DOES NOT FAVOR ISSUANCE OF AN INJUNCTION ....................................................................................... 74

X.   CONCLUSION .............................................................................................. 75

# TABLE OF AUTHORITIES

**Page**

## CASES

*A.A. Poultry Farms v. Rose Acre Farms,*
    881 F.2d 1396 (7th Cir. 1989) ........................................................................ 69

*Beatrice Foods Co. v. FTC,*
    540 F.2d 303 (7th Cir. 1976) ......................................................................... 24

*Bell Atlantic Corp. v. Twombly,*
    127 S. Ct. 1955 (2007) ................................................................................... 69

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962) ............................................................... 5-7, 14-16, 24

*California v. Sutter Health Sys.,*
    130 F. Supp. 2d 1109 (N.D. Cal. 2001) ....................................................... 37

*Community Publishers v. Donrey Corp.,*
    892 F. Supp. 1146 (W.D. Ark. 1995), *aff'd sub nom. Community Publishers v. DR Partners,* 139 F.3d 1180 (8th Cir. 1998) ................................................... 15

*Freuhaf Corp. v. FTC,*
    603 F.2d 345 (2d Cir. 1979) ........................................................................... 5

*FTC v. Arch Coal, Inc.,*
    329 F. Supp. 2d 109 (D.D.C. 2004) ...................................................*passim*

*FTC v. Exxon Corp.,*
    636 F.2d 1336 (D.C. Cir. 1980) ..................................................................... 3

*FTC v. Foster,* (*Western Refining*) Memorandum Op.
    No. CIV-07-352 JB/ACT (D. N.Mex. April 13, 2007) ...................... 10, 41, 75

*FTC v. H.J. Heinz Co.,*
    246 F.3d 708 (D.C. Cir. 2001) ....................................................................... 6

*FTC v. The Kroger Co. & Winn-Dixie Stores, Inc.,*
    No. 3-00cv1196-R (N.D. Tex. June 6, 2000) ............................................... 17

*FTC v. National Tea Co.*,
   603 F.2d 694 (8th Cir. 1979) ....................................................................... 64

*FTC v. Occidental Petroleum Corp.*,
   1986-1 Trade Cas. (CCH) ¶ 67,071 (D.D.C. 1986) ......................................... 4

*FTC v. Staples, Inc.*,
   970 F. Supp. 1066 (D.D.C. 1997) ..........................................................*passim*

*FTC v. Swedish Match*,
   131 F. Supp.2d 151 (D.D.C. 2000) ...............................................14-16, 37, 75

*FTC v. Weyerhaeuser Co.*,
   665 F.2d 1072 (D.C. Cir. 1981) ........................................................... 3, 6, 75

*H.J. , Inc. v. ITT Corp.*,
   867 F.2d. 1531(8th Cir. 1989) ..................................................................... 15

*In re Super Premium Ice Cream Distrib. Antitrust Litig.*,
   691 F. Supp. 1262 (N.D. Cal. 1988), *aff'd sub nom. Haagen-Dazs Co. v. Double Rainbow
   Gourmet Ice Creams., Inc.*, 895 F.2d 1417 (9th Cir. 1990)............................. 24

*Liggett & Myers, Inc. v. FTC*,
   567 F.2d 1273 (4th Cir. 1977) ..................................................................... 24

*Morgan v. Ponder*,
   892 F.2d 1355 (8th Cir. 1989) ..................................................................... 69

*R.R. Donnelley & Sons Co.*,
   120 F.T.C. 36 (1995)..................................................................................... 15

*Tel. & Tel. Corp. v. General Telephone and Electronics Corp.*,
   518 F.2d 913 (9th Cir. 1975) ....................................................................... 16

*Tenet Healthcare Corp. v. FTC*,
   186 F.3d 1045 (8th Cir. 1999) ............................................................ 5, 37, 41

*United States v. Baker Hughes Inc.*,
   908 F.2d 981 (D.C. Cir. 1990) .....................................................4, 6-7, 14, 68

*United States v. Central State Bank*,
   817 F.2d 22 (6th Cir. 1984) ......................................................................... 10

*United States v. Connecticut Nat'l Bank,*
 418 U.S. 656 (1974) .................................................................... 41

*United States v. Consolidated Foods Corp.,*
 455 F. Supp. 108 (E.D. Pa. 1978) ............................................... 64

*United States v. E.I. du Pont de Nemours & Co.,*
 353 U.S. 586 (1957) .................................................................... 14

*United States v. General Dynamics Corp.,*
 415 U.S. 486 (1974) .................................................................... 63

*United States v. Gillette Co.,*
 828 F. Supp. 78 (D.D.C. 1993) ................................................... 14

*United States v. International Harvester Co.,*
 564 F.2d 769 (7th Cir. 1977) ...................................................... 64

*United States v. Joseph Schlitz Brewing Co.,*
 253 F. Supp. 129 (N.D. Cal. 1966), *aff'd per curium,* 385 U.S. 37 (1966) .................... 24

*United States v. Long Island Jewish Med. Ctr.,*
 983 F. Supp. 121 (E.D.N.Y. 1997) ...................................... 10, 44, 62

*United States v. Marine Bancorp.,*
 418 U.S. 602 (1974) ............................................................. 5, 13

*United States v. Mercy Health Servs.,*
 902 F. Supp. 968 (N. D. Iowa 1995) ........................................... 37

*United States v. Oracle Corp.,*
 331 F. Supp. 2d 1098 (N.D. Cal. 2004) ........................... 14, 20 24-25, 29

*United States v. Philadelphia Nat'l Bank*
 374 U.S. 321 (1963) ...................................... 4, 6, 20, 40-41

*United States v. SunGard Data Sys.,*
 172 F. Supp. 2d 172 (D.D.C. 2001) ........................... 14-16, 24, 28

## **STATUTES**

Clayton Act § 7, 15 U.S.C. § 18 .............................. 4, 6, 13-14, 40, 63, 68, 72

FTC Act § 13(b), 15 U.S.C. § 53(b) ........................................................................ 4

## MERGER GUIDELINES

1992 Horizontal Merger Guidelines § 1.11 (1997 rev.)................................................ 15

## FTC STATEMENTS

FTC Press Release, "FTC Announced Actions" (March 8, 1996) ............................... 13

FTC Press Release, "FTC Wraps Up Record Year," (October 13, 2000) ................................... 10

Other FTC Statements......................................................................................... 9

Whole Foods Market Inc. ("Whole Foods") and Wild Oats Market, Inc. ("Wild Oats") respectfully submit this Joint Memorandum of Points and Authorities in Opposition to the Motion for a Preliminary Injunction.

## I.    INTRODUCTION

Plaintiff, the Federal Trade Commission ("FTC"), has failed to satisfy its burden of proof, and therefore the merger of Whole Foods and Wild Oats should not be enjoined. The FTC does not and cannot show a reasonable probability of success on the merits because:

- Wild Oats consistently charges prices above the Whole Foods prices, which means that the merger *will lower the prices charged at Wild Oats stores.*

- Neither Whole Foods' nor Wild Oats' pricing or promotional activity is materially affected by proximity to the other.

- Both Whole Foods and Wild Oats track, monitor, and respond to competition from the same wide variety of other supermarkets.

- A wide variety of food and grocery retailers carry a large (and ever growing) number of the same or equivalent natural and organic products as do Whole Foods and Wild Oats. These competing retailers are present in every geographic area in which the parties operate.

- There is no precedent for the market definition that the FTC has proposed – the so-called "premium natural and organic food supermarkets."

- The FTC's market definition improperly focuses on subjectively defined attributes of stores, which courts have held cannot establish a proper product market, and does not address the issue required by law – the alternatives available to consumers.

- Neither Whole Foods nor Wild Oats can identify, much less price discriminate against, any purportedly "core" customers. A majority of all organic food consumers – and a majority of Whole Foods' and Wild Oats' best customers – regularly shop at and fulfill their organic purchases at other supermarkets like Safeway or Giant.

- **Wild Oats is not a close or effective competitor to Whole Foods today –**
  ███████████████████████████████████████████
  ████████████████████████████

The evidence comes primarily from the ordinary course business records and testimony of people who participate in these markets every day. It is uncontroverted by any fact witness. The FTC's failure to come forward with factual evidence to support its theory and controvert this evidence is fatal to the FTC's motion.

At the end of the day, the FTC's case depends largely on selected excerpts from the testimony and writings of Whole Foods' CEO John Mackey. To be sure, Mr. Mackey is an extremely competitive individual, and it is not surprising (or even unwelcome to antitrust enforcers) that he does not care for his competitors. But courts have long recognized that such statements of intent have little, if any, probative value when contrasted, as here, with actual market facts of vigorous competition from every direction. Surely even the FTC has seen enough hot rhetoric in its time to recognize the difference between elimination of a competitor (every horizontal merger does that) and a lessening of competition (most horizontal mergers do not). Indeed, notwithstanding Mr. Mackey's statements, the FTC's own *Horizontal Merger Guidelines* recognize that the vast majority of horizontal mergers are either competitively beneficial or benign. This transaction, which would combine two relatively small supermarket chains, will be overwhelmingly good for competition and for consumers.

The acquisition will enable Whole Foods to compete more effectively with its larger, better-capitalized rivals like Safeway, Ahold (Giant Food and Stop & Shop), and Delhaize (Hannaford, Food Lion, and Bloom), to name a few. Whole Foods' geographic reach will extend into a number of new areas. The transaction will create operating, purchasing, and distribution

efficiencies, particularly in ████████████████, where Whole Foods operates only

a few stores.  As a result of the acquisition, Whole Foods will:  i) realize significant

administrative cost savings (Sud Decl. ¶ 32; Robb Decl. ¶ 7; DX 401); and ii) realize cost

savings on food and grocery items due to its increased purchases, which it can in turn pass on to

consumers (Sud Decl. ¶ 38).  Based on its success with past acquisitions, Whole Foods also

expects to bring the sales volume per square foot at Wild Oats stores, currently half the Whole

Foods level, into line with its own with no price increases.  (Robb Decl. ¶ 7, Gallo Decl. ¶ 5; Sud

Decl. ¶ 33).  Indeed, the financial viability of this acquisition is predicated on Whole Foods'

ability to expand sales at the former Wild Oats stores, at the expense of other supermarket

competitors.  DX 401.  This output expansion is the *sine quo non* of a procompetitive

transaction.

## II.     THE FTC CANNOT MEET ITS BURDEN FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary and drastic remedy."  *FTC v. Exxon Corp.*,

636 F.2d 1336, 1343 (D.C. Cir. 1980) (internal quotation marks omitted).  If an injunction is

granted, there will often be no trial on the merits -- financial and business exigencies may

prevent a merger from closing at all if it is delayed.[1]  And, as we are here dealing with a

prediction about the future rather than a provable past event, the Court must also take into

account the "costs entailed should its prediction prove erroneous."  *FTC v. Weyerhaeuser Co.*,

665 F.2d 1072, 1083 (D.C. Cir. 1981).  These costs include the "harm to the parties and to the

---

[1]     In this case, the merger agreement between Whole Foods and Wild Oats can be terminated by either party after August 31, 2007.  In addition, Whole Foods' financing commitments expire, as does Whole Foods' agreement to sell to a third party the Sun Harvest and Harry's stores presently owned by Wild Oats.

public that would flow from [an unwarranted] injunction." *FTC v. Occidental Petroleum Corp.*, No. 86-900, 1986-1 Trade Cas. (CCH) ¶ 67071, at *12 (D.D.C. 1986).

A.     *The FTC Must Show a Reasonable Probability of Success on the Merits To Prevail Here*

The FTC has sued under Section 7 of the Clayton Act, 15 U.S.C. §18. Section 7 provides:

> no person subject to the jurisdiction of the Federal Trade
> Commission shall acquire . . . another person . . . , where in any
> line of commerce or . . . section of the country, the effect of such
> acquisition may be substantially to lessen competition, or to tend to
> create a monopoly.

To prevail on its Section 7 claim, the FTC must prove the following three elements by a preponderance of the evidence: i) a relevant antitrust product market; ii) a relevant antitrust geographic market; and iii) a substantial lessening of competition due to the proposed transaction in the market or markets so proven. *United States v. Philadelphia National Bank*, 374 U.S. 321 (1963); *United States v. Baker-Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990). In its complaint, the FTC alleges that the proposed transaction will adversely affect competition in 32 local antitrust markets. The FTC's burden at trial will be to prove each of the elements of its claim for each market alleged. If there is a failure of proof as to any essential element for any proposed relevant market, the FTC's claim as to that local market likewise must fail.

The FTC has moved for preliminary injunction under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). To obtain a preliminary injunction, the FTC must establish both that entry of an injunction is in the public interest, and that the Commission will likely succeed in proving, in a subsequent administrative trial on the merits, that the merger violates Section 7 of the Clayton Act, 15 U.S.C. § 18. If there is no likelihood of success on the merits, the public interest alone

will not justify granting an injunction. *FTC v. Arch Coal, Inc.* 329 F. Supp. 2d 109, 116 (D.D.C. 2004).

To obtain an injunction under Section 13(b), the FTC must demonstrate at least a "reasonable probability" of success on the merits. *FTC v. Arch Coal*, 329 F. Supp. 2d at 116; *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1072 (D.D.C. 1997). "A showing of a fair or tenable chance of success on the merits will not suffice for injunctive relief." *Tenet Healthcare Corp. v. FTC*, 186 F.3d 1045, 1051 (8th Cir. 1999); *see also Freuhaf Corp. v. FTC*, 603 F.2d 345, 351 (2d Cir. 1979) ("mere possibility" will not justify injunction). This means at the hearing in this matter the FTC must present evidence on each essential element sufficient to demonstrate a reasonable probability of prevailing at trial. If it fails to meet that burden as to the relevant product market, the relevant geographic market, or the competitive effects in any of the local markets alleged, then it is not entitled to the relief requested as to that market.[2]

The FTC bears the burden of proof. To meet that burden, the FTC must come forward with credible evidence demonstrating the probability of competitive harm in a properly defined antitrust market. The Clayton Act deals in "probabilities, not ephemeral possibilities." *United States v. Marine Bancorporation,* 418 U.S. 602, 622-23 (1974), *quoting Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962). For that reason, "[A] plaintiff [must] demonstrate that the substantial lessening of competition will be 'sufficiently probable and imminent' to warrant relief." *FTC v. Arch Coal*, 329 F. Supp. 2d at 115.

---

2    Given this standard, and the consequences of erroneous decisions, courts quite properly are reluctant to grant preliminary injunctions in merger cases. In fact, the FTC has not prevailed in any merger preliminary injunction case it has litigated in the last five years.

As Judge Bates noted in the *Arch Coal* decision,

> The Supreme Court has observed that 'only examination of the particular market – its structure, history, and probable future – can provide the appropriate setting for judging the probable anticompetitive effects of the merger.' *General Dynamics*, 415 U.S. at 498 (quoting *Brown Shoe*, 370 U.S. at 322 n.28). Hence, antitrust theory and speculation cannot trump facts, and even Section 13(b) cases must be resolved on the basis of the record evidence relating to the market and its probable future. *See Eastern Kodak Co. v. Image Technical Services*, 504 U.S. 451, 460-67 (1992); *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1080 (D.C. Cir. 1981) ("Hearings on preliminary injunctions [under Section 13(b)] necessarily look to the future and decisions must rest on comparative, tentative assessments of the course of events if the injunction is issued, and if it is not."); *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko*, 124 S. Ct. 872, 882 (2004) (focus on actual rather than theoretical guards against false condemnation that may chill conduct that antitrust laws designed to protect).

*FTC v. Arch Coal*, 329 F. Supp 2d at 116-17. The FTC cannot meet this burden because it lacks persuasive, market-based evidence to support the claims it is making.

B.    *The FTC Has Ignored Its Own Horizontal Merger Guidelines and Past Enforcement Practice Repeatedly in This Case and That Should Give Rise to Skepticism About Its Case*

Analysis of a merger challenge under the Clayton Act is a three-step process. First, the FTC must establish analytically robust relevant product and geographic markets in which the merger will lead to "undue concentration." *U.S. v. Philadelphia National Bank*, 374 U.S. 321; *U.S. v. Baker-Hughes*, 908 F.2d at 982; *see also FTC v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001).

The burden of production then shifts to the merging parties. *U.S. v. Baker-Hughes*, 908 F.2d at 982; see also *FTC v. Heinz*, 246 F.3d at 715. If the merging parties meet this burden, the burden of producing additional evidence of anticompetitive effects shifts back to the FTC, "and

merges with the ultimate burden of persuasion, which remains with the government at all times."

*U.S. v. Baker-Hughes*, 908 F.2d at 983; *FTC v. Heinz*, 246 F.3d at 715.

As shown below, the FTC fails even to pass the first hurdle of proving a properly defined product and relevant geographic market.

The FTC, along with the Department of Justice, has promulgated *Horizontal Merger Guidelines* ("*Guidelines*"). The FTC's *Guidelines* describe the analytical framework the FTC will use to analyze mergers between competitors. The FTC has departed from its own *Guidelines* and past precedent involving supermarket mergers in its prosecution of this case. This departure, in and of itself, raises serious questions about the likelihood that the FTC will be able to establish an appropriate product or geographic market, much less demonstrate an adverse competitive effect in well-defined markets.

     *1.*    *The FTC's Alleged Product Market Makes No Sense*

In its *Guidelines*, the FTC states:

> A market is defined as a product or group of products and geographic area in which it is produced or sold such that a hypothetical profit-maximizing firm . . . that was the only present and future . . . seller of those products in that area likely would impose a "small but significant and nontransitory" increase in price. . . .

Once a market is defined, the FTC's *Guidelines* provide that:

> [A] relevant market must be measured in terms of its participants and concentration.

The FTC's Complaint departs from these *Guidelines* and past precedent applying them.[3] Here, the FTC has alleged a product market that has nothing to do with products that consumers buy, but instead is based on the subjective characteristics the FTC perceives to be unique about the sellers of the products consumers buy. This approach to product market definition is not some minor drafting error. Rather, it suggests either a fundamental confusion about or deliberate departure from the FTC's own *Guidelines* and past enforcement practice, either of which calls into question the FTC's probability of success in establishing the alleged relevant product market.

In all 18 supermarket merger enforcement matters prior to this one since the 1992 *Guidelines* were adopted, the FTC has followed precisely the same approach to product market definition: First, identify the market basket of goods most consumers buy -- food and grocery

---

[3] How else can one explain the fact that the FTC recognized that Wild Oats is in the same product market as other supermarkets when, in connection with a supermarket merger, it approved the divestiture of one of the parties' stores to Wild Oats pursuant to an order "designed to restore supermarket competition"? *See* FTC Press Release, "FTC Announced Actions" (March 8, 1996), available at http://www.ftc.gov/opa/1996/03/petapp12.shtm.

items -- and then, identify the firms that sell that market basket -- supermarkets.[4] The FTC's

approach in this case instead yields some vaguely-defined subsets of supermarkets (which could

include a never-ending list, given that differentiation is *how* supermarkets compete with each

other), such as: "*low-price / no-frills*" supermarkets market, "*upscale / gourmet*" supermarkets

market, "*high-quality / high-service*" supermarkets market, "*every-day-low-price*" supermarkets

market, "*hi-low-format*" supermarkets market, "*super center / mass-merchandiser-owned*"

---

[4]  In the Matter of Winn-Dixie Stores, Inc., Complaint ¶ 1, Docket No. C-4001 (2001), *available at* http://www.ftc.gov/os/2001/01/winndixiecmp.htm;

*FTC v. The Kroger Co.*, Complaint ¶ 12.a, No. 3-00CV1196-R (N.D. Tex. 2000), *available at* http://www.ftc.gov/os/2000/06/krogercomp.htm;

In the Matter of Etablissements Delhaize Freres, Complaint ¶ 1, Docket No. C-3962 (2000), *available at* http://www.ftc.gov/os/2000/07/hannafordcmp.htm;

In the Matter of The Kroger Co., Complaint ¶ 1, Docket No. C-3905 (1999), *available at* http://www.ftc.gov/os/1999/08/krogercomplaint.htm;

In the Matter of Shaw's Supermarkets, Inc., Complaint ¶ 1, Docket No. C-3934 (1999), *available at* http://www.ftc.gov/os/1999/06/shawcmp.htm;

In the Matter of Albertson's Inc., Complaint ¶ 1, Docket No. C-3986 (1999), *available at* http://www.ftc.gov/os/1999/06/alameristorescmp.pdf;

In the Matter of The Kroger Co., Complaint ¶ 1, Docket No. C-3917 (1999), *available at* http://www.ftc.gov/os/1999/05/krogercomp.htm;

In the Matter of Koninklijke Ahold NV, Complaint ¶ 1, Docket No. C-4027 (1998), *available at* http://www.ftc.gov/os/1998/10/9810254cmp.htm;

In the Matter of Albertson's, Inc., Complaint ¶ 1, Docket No. C-3838 (1998), *available at* http://www.ftc.gov/os/1998/09/9810134.cmp.htm;

In the Matter of Jitney-Jungle Stores of America, Inc., Complaint ¶ 1, Docket No. C-3784 (1997), *available at* http://www.ftc.gov/os/1998/01/JITNEYcmp.htm;

In the Matter of Kononklijke Ahold nv, Complaint ¶ 1, Docket No. C-3687 (1996), *available at* http://www.ftc.gov/os/1996/10/c3687cmp.pdf;

In the Matter of Stop and Shop Companies, Complaint ¶ 1, Docket No. C-3649 (1995);

In the Matter of Schegmann Giant Super Markets, Inc., Complaint ¶ 1, Docket No. C-3584 (1995);

In the Matter of Schnuck Markets, Inc., Complaint ¶ 1.a., Docket No. 3585 (1995);

In the Matter of The Penn Traffic Company, Complaint ¶ 1, Docket No. 3577 (1995);

In the Matter of Red Apple Companies, Complaint ¶ 1.a., Docket No. C-9266 (1994);

In the Matter of The Vons Companies, Complaint ¶ 11, Docket No. C-3391 (1992).

*See also*, FTC Press Release, "FTC Wraps Up Record Year," (October 13, 2000) (mentioning an additional "supermarket merger" that was abandoned by the parties, Ahold and Pathmark), *available at* http://www.ftc.gov/opa/2000/10/antitrustfy2000.shtm.  In challenging a merger in Puerto Rico, the FTC expanded its market definition to include supercenters and club stores, in addition to supermarkets.  *See* In the Matter of Wal-Mart Stores, Inc., Complaint ¶¶ 8-9, Docket No. C-4066 (2002), *available at* http://www.ftc.gov/os/2002/11/walmartamigocmp.pdf.

supermarkets market, or as they have alleged here, *"premium natural and organic"* supermarkets market.

Courts have rejected market definitions that depart from precedent. See *United States v. Long Island Jewish Medical Center*, 983 F. Supp. 121, 138 (E.D.N.Y. 1997) (rejecting alleged "anchor hospital" market as inconsistent with prior hospital merger precedent); *see also, United States v. Central State Bank*, 817 F.2d 22, 23 (6th Cir. 1987) ("the government failed to factually support its claim that existing circumstances in this case warranted a departure from the definition of the relevant product market as the cluster of banking services traditionally offered in the commercial banking industry adopted by the Supreme Court"); *FTC v. Foster*, Memorandum Op. ¶ 181, No. CIV-07-352 JB/ACT (D.N.M. May 29, 2007), appeal pending ("Western Refining") ("The FTC's position has not been entirely consistent in this case or entirely consistent with positions it has taken in other cases."). The FTC's unexplained departure from its own *Guidelines* should be rejected here, as well.

2.    *The FTC's Position on Geographic Market Definition Keeps on Shifting*

Since filing the Complaint in this action, the FTC has taken at least six different positions regarding the scope of the geographic markets at issue and even the general location of those markets. In the Complaint, the FTC alleged that there were twenty-five geographic markets where Whole Foods and Wild Oats compete head to head, Complaint ¶ 38, and seven geographic markets where only one is present today, but where, but for the merger, the other plans "to enter to offer direct and unique competition to the other." Complaint ¶ 40.

In the Complaint, the FTC alleged that the markets were "as small as approximately five or six miles in radius from premium natural and organic supermarkets or as large as a

metropolitan area." Complaint ¶ 35. The Complaint did not address the dramatic disparity in size between the two alleged definitions, or how to determine, for a particular area, which definition applies.

From that point forward, relevant geographic market definition has been a moving target. See Appendix B. In its initial responses to defendants' discovery requests, the FTC referred to the locations identified in the Complaint, and identified the relevant markets as the "overlapping draw areas of each Defendant." It also described draw areas as reaching 5-6 miles in radius or a 16-minute drive time around a store. Instead of metropolitan areas, it now described Metropolitan Statistical Areas ("MSAs") as an alternative market definition.[5] Plaintiff's Objections and Responses to First Set of Interrogatories of Defendant Whole Foods Market, Inc. (June 26, 2007) (answer to Interrogatory 1), DX 550; Plaintiff's Objections and Responses to First Set of Interrogatories of Defendant Wild Oats Markets, Inc. (June 26, 2007) (answer to Interrogatory 5a, 5b) (collectively "June 26 Responses").

In its second supplemental responses to the interrogatories. The FTC for the first time asserted that it did not have to prove relevant geographic markets at all. Plaintiff's Second Supplemental Responses and Objections to Interrogatories of Defendants Wild Oats (July 3, 2007) (answer to Interrogatory 5) ("July 3 Supp. Responses"), DX 552. This time it alleged eighteen direct competition markets (including Ft. Collins, Colorado but not Portland, Oregon) and eight potential competition markets (including Indianapolis). It also again alleged a five-to-six mile radius around each store or a 16-minute drive time; or, where there was overlap, "all or

---

[5] MSAs are the only well defined concept used by the FTC in its responses to Defendants' discovery.

part of each store's market." Finally, it also alleged Metropolitan Statistical Areas as a possibility, "depending on the number and relative location of the stores in the area." The Court found this answer wanting, and ordered the FTC to respond more fully. Memorandum Opinion and Order (July 12, 2007).

The most recent supplemental responses settled on a six-mile radius and 16-minute drive time as a general proposition, while contending that the areas likely vary and "could be much larger." *See* Plaintiff's Supplemental Reponses and Objections to Interrogatory 1 in the First Set of Interrogatories of Defendant Whole Foods Market, Inc. (July 16, 2007) (answer to Interrogatory 1 of Whole Foods and 5a of Wild Oats) ("July 16 Supp. Responses"), DX 553. The FTC has also drawn circles on maps and described these as "draw" areas of the merging firms' supermarkets without regard to local demographics or topography. *Id.* at Interrogatory 5a, 5d. The FTC now proposes to offer evidence about eighteen alleged direct competition markets (now including Portland, Oregon, but no longer including Ft. Collins, Colorado) and seven potential competition markets (no longer including Indianapolis). July 16 Supp. Responses.

At bottom, the FTC has not bothered to prove a relevant geographic market, because it takes the view that, if it prevails on the product market definition, the scope of the geographic market will not matter. The FTC is wrong on both counts. Its product market definition is flawed, and, in any event, proof of a relevant geographic market remains an essential element of its case.

C.    *The FTC's "Could Be Better" and Potential Competition Claims Are Speculative.*

    *1.    The FTC Is Unlikely to Prevail on the Merits of Its Novel "Could-Be-Better" Claim, Which Lacks Basis in the Statute or Precedent*

    The FTC contends that if the transaction is blocked, another supermarket might acquire Wild Oats to use it as a springboard to offering a wider array of natural and organic products. *See, e.g.,* Complaint, Introduction; FTC's TRO Brief at 38 ("Whole Foods seeks to . . . foreclose entry"). There is no precedent for barring a merger simply because a different purchaser might improve competition more. Indeed, the language of the Clayton Act does not admit such a claim: it prohibits only transactions whose effects may be "substantially to *lessen* competition." 15 U.S.C. § 18.

    Moreover, the FTC fails to offer any evidence in support of its claim. ████████ ████████████████████████████████████████████████████ Absent that, everything else is speculation.

    *2.    The FTC's Potential Competition Claims Have No Reasonable Probability of Success*

    The FTC's potential competition claims relate to seven alleged local markets where today only Wild Oats or Whole Foods operates a store, but, the FTC alleges, absent the merger the other party likely would enter the market *de novo*. Complaint ¶ 40. These claims likewise fail due to failure to prove the alleged product and geographic markets.

    Moreover, the actual potential competition theory has never been adopted by the Supreme Court. *U.S. v. Marine Bancorporation*, 418 U.S. at 625. While the FTC asserts that the alleged seven potential competition areas have no other "premium natural and organic"

supermarkets, it submits no evidence that those areas suffer from the characteristics of a true

monopoly market, such as higher prices or diminished quality. The evidence is to the contrary.

### III.    THE FTC CANNOT PROVE THE ALLEGED PRODUCT MARKET

A.    *Product Market Definition Requires Assessment of Where Customers Would Shop if Prices Rose or Quality Declined*

Proof of the relevant product and geographic markets is a "necessary predicate" of any

claim under Section 7 of the Clayton Act. *United States v. E.I. du Pont de Nemours & Co.,* 353

U.S. 586, 593 (1957); *U.S. v. Baker-Hughes,* 908 F.2d at 982; *FTC v. Arch Coal,* 329 F. Supp.2d

at 119; *FTC v. Swedish Match*, 131 F. Supp.2d 151, 156 (D.D.C. 2000); *FTC v. Staples, Inc.*, 970

F. Supp. at 1072; *U.S. v. Gillette Co.*, 828 F. Supp. 78, 80-81 (D.D.C. 1993). For that reason, a

plaintiff cannot demonstrate a reasonable probability of success on the merits of a section 7

claim without proving properly defined relevant markets. *See, e.g., FTC v. Arch Coal* 329 F.

Supp.2d at 119; *U.S. v. Gillette*, 828 F. Supp. at 80-81, 84.

The relevant product market is determined according to the "reasonable inter-

changeability of use" or cross-elasticity of demand between the product sold by the merging

parties and "substitutes for it." *Brown Shoe v. U.S.*, 370 U.S. at 325; *see also U.S. v. Baker-*

*Hughes,* 908 F.2d at 223. The market encompasses all products for which, if the price of one of

them rose or its quality declined, a customer could feasibly turn to another. *United States v.*

*Sungard Data Systems, Inc.*, 172 F. Supp. 2d 172, 182 (D.D.C. 2001). In other words, the

relevant product market includes all products whose price and quality competitively constrain the

product at issue in the merger. *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1112 (N.D.

Cal. 2004).

The FTC's *Guidelines*[6] define markets based on cross-elasticity of demand using a forward-looking test that focuses on where consumers would turn if a hypothetical monopolist raised prices on all products in a proposed relevant market. *Guidelines* § 1.11. If there are alternatives to which customers could readily take their business in the event of a rise in prices, such that the price increase would be defeated in the marketplace, the proposed relevant product market is too narrow and those additional alternatives are part of the relevant market even if customers did not view them as substitutes at the lower price. The product market therefore includes the smallest set of products a hypothetical monopolist would have to control in order to impose a "small but significant and nontransitory" price increase without losing so many customers that the price increase would not be profitable. *Id.; see also, R.R. Donnelley & Sons Co.*, 120 F.T.C. 36, 153 (1995) (*citing H.J., Inc. v. ITT*, 867 F.2d. 1531, 1537 (8th Cir. 1989) (a market is "any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could raise prices significantly above the competitive level.").

In addition to cross-elasticity of demand, courts also consider "practical indicia" such as "industry or public recognition of the [   ] market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors" when defining the relevant market. *Brown Shoe v. U.S.*, 370 U.S. at 325. Courts do not apply these factors rigidly or exclusively, but rather use them as "practical aids" to ensure that the market definition comports with business reality.

---

6   The FTC's Guidelines have been widely adopted by the courts. *See U.S. v. Sungard Data Systems*, 172 F. Supp. 2d at 182; *FTC v. Swedish Match*, 131 F. Supp. 2d at 160; *FTC v. Staples*, 970 F. Supp. at 1076. *See also Community Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146, 1161 (W.D. Ark. 1995) ("defendants correctly contend that courts do not usually allow the government to take positions that are inconsistent with the Merger Guidelines").

*See, e.g., FTC v. Swedish Match*, 131 F. Supp.2d 15 at 160 (*quoting International Tel. & Tel. Corp. v. General Telephone and Electronics Corp.*, 518 F.2d 913, 932 (9th Cir. 1975)).

The courts have also identified several types of evidence that are ***not*** sufficient to establish a product market. For example, the fact that customers may prefer one product over another is not sufficient to exclude the less desirable product from the market definition. *See, e.g., FTC v. Arch Coal*, 329 F. Supp. 2d at 122 ("Some customers did indicate they *prefer* [one type of coal to another] but the evidence also shows that customers having that preference nevertheless can use and have used other [types of coals]."). Nor does the fact that ***some*** customers would not or could not switch from one product to another in the event of a price increase, mean that the second product can be excluded from the relevant market. *See, e.g., FTC v. Arch Coal*, 329 F. Supp. 2d at 122 (rejecting arguments that two grades of coal were in different product markets because some customers could not switch between grades); *U.S. v. Gillette,* 828 F. Supp. at 83. The relevant question is not whether all customers would switch, but whether enough customers would switch to make a price increase unprofitable. *See, e.g., U.S. v. Sungard*, 172 F. Supp. 2d at 191-92.

B.      *The Product Market Alleged by the FTC Is Fatally Flawed*

      *1.      The FTC Confuses the Products With the Type of Store in Which They Are Sold*

The FTC alleges that the product market is "premium natural and organic supermarkets," Complaint ¶ 34, a term that it invented for this case. The definition suffers from a conceptual flaw – the products sold by the merging parties are not "supermarkets," but instead are food and grocery items. Thus, more accurately defined, the relevant product market alleged is the retail sale of food and grocery items at something called a "premium natural and organic

supermarket." That focus on retail sale comports with the product market definition used by the FTC in all past supermarket cases over nearly two decades. *See, e.g.,* Complaint, *FTC v. The Kroger Co. & Winn-Dixie Stores, Inc.*, No. 3-00cv1196-R (N.D. Tex. June 6, 2000) ¶ 12(a), available at http://www.ftc.gov/os/2000/06/ krogercomp.htm (the product market "is the retail sale of food and grocery items in supermarkets"). (*See supra*, Section II-B-2).

That flaw may seem subtle, but it reveals the more fundamental flaw in the FTC's product market definition. Absent the mention of "retail sale," the analysis shifts away from the central issue of product market definition – the reasonable interchangeability of the products being purchased by consumers at the merging stores. *See U.S. v. du Pont*, 351 U.S. at 404. By describing the store rather than the products it offers for "retail sale," the FTC diverts attention from the post-merger options available to consumers and toward some of the common attributes of the stores of the merging parties. The market definition process becomes circular, and the market is defined as only those stores exactly like the FTC's description of the merging parties. That is a fatal flaw in the FTC's product market definition.

### 2.     *The Market Alleged Is Not Susceptible to Objective Testing*

The FTC's definition is also hopelessly ambiguous and subjective. The phrase, "premium natural and organic supermarket," does not identify which stores participate in the alleged product market and which do not. In its Complaint, the FTC alleged that premium natural and organic supermarkets "offer a distinct set of products and services to a distinct group of customers in a distinctive way," that they "promote a lifestyle of health and ecological sustainability," that they "focus on perishable products, offering a vast selection of very high quality fresh fruits and vegetables — including exotic and hard-to-find items — and other

perishables," that they cater to "core shoppers . . . [with] a preference for natural and organic

products," that they "offer more amenities and service venues," "higher levels of service and

more knowledgeable service personnel," "special features such as in-store community centers,"

they are "priced at a premium," that they have "an extensive selection of natural and organic

products," that they have larger "square footage, number of products offered, inventory for each

product offered, and annual dollar sales" than other natural food stores. Complaint ¶¶ 20-32. On

its face, the resort to such vague terms make the proposed definition suspect. On inquiry, the

FTC's definition turns into a list of even more highly qualified and vague attributes. *See* Hearing

6/11/07 Tr. at 7-8. The FTC provided no more precise definition in its first two rounds of

responses to interrogatories. *See* June 26 Responses, DX 551; July 3 Supp. Responses, DX 552.

Only after ordered by the court did the FTC list ten alleged attributes of premium natural and

organic supermarkets:

- "generally focus on high-quality perishables, specialty and natural organic produce, prepared foods, meat, fish and bakery goods;"
- "generally have high levels of customer services;"
- "generally target affluent and well educated customers;"
- "generally select store sites based on the targeted customer;"
- "generally are mission driven with an emphasis on social and environmental responsibility;"
- "generally are a 'third place;'"
- "generally provide the customers with the confidence of a 'lifestyle' brand;"
- "generally provide the customer with added confidence and trust in the provision of the natural and organic products that are good for the consumer;"
- "generally provide a 'unique' environment;" and
- "generally are stores that meet 'core values' and a 'superior store experience.'"

Plaintiff's Third Supplemental Responses and Objections to Interrogatory No. 6 in the First Set

of Interrogatories of Defendant Wild Oats Markets, Inc., July 15, 2007, DX 590 ("July 15 Supp.

Responses"). The word "generally" in each item is revealing, because the FTC has also said that

"[n]ot all stores in the relevant product market necessarily will possess each and every one of these listed attributes or possess them to the same degree or level." July 3 Supp. Responses at 6, DX 552.

In other words, the FTC admits that there is no objective way to tell whether a particular store participates within its alleged product market. The FTC's definition boils down to a subjective determination that there is "something different" about a premium natural and organic supermarket that cannot be precisely defined. The court in *Oracle* rejected a similarly vague definition:

> But the court cannot delineate product boundaries in multi-billion dollar merger suits based upon the mere notion that there is 'something different' about the merging products and all others, especially when that 'something different' cannot be expressed in terms to make a judgment of the court have meaning. More is required.

331 F. Supp.2d at 1159. There, just as here, the government could not offer a "reliable or articulable basis to distinguish" products allegedly in the product market from those that were not. *Id.* at 1158. The alleged characteristics were "too vague . . . [to] meet section 7's requirement that the relevant market be well defined." *Id.* at 1121 (quotation omitted). "Judicial experience cautions against the use of qualitative factors to define narrow markets," *id.* at 1118, yet that is exactly what the FTC has done in this case.

The FTC's criteria are so subjective and so imprecise that the FTC can only have arrived at its definition backwards. It plainly started with the result it desired – that Whole Foods and Wild Oats are in their own separate product market – and worked backwards to identify attributes that these stores have in common but that may differ from those of most other supermarkets. Of course, Whole Foods and Wild Oats stores do not always have exactly the

same attributes, hence the qualifier that not every store will have every alleged attribute. *See* June 26 Responses at 6, DX 552. Precedent and the FTC's *Guidelines*, however, require far more than a laundry list of subjectively defined characteristics. *U.S. v. Oracle*, 331 F. Supp.2d at 1120. Proof of a product market requires analysis of the realities of the market to identify the "reasonable interchangeability" of the products in question with other similar but not identical products, based upon "price, use and qualities." *U.S. v. du Pont*, 351 U.S. at 404. The FTC must demonstrate product differences sufficient to sustain a small but significant and non-transitory price increase. *U.S. v. Oracle*, 331 F. Supp.2d at 1120.  As shown below, the real world evidence shows that Whole Foods and Wild Oats compete aggressively with other supermarkets for the sale of the same products, and that that competition is growing more intense each day.

> 3. *There Is No Evidence That The Proposed Product Market Reflects Local Market Realities in The Alleged Geographic Markets*

The purpose of defining the relevant product and geographic markets is to assess the merger's competitive effects. *Philadelphia National Bank,* 374 U.S. at 325. Thus, the two definitions should be interrelated. Where there are local markets, it is necessary to establish that the alleged product market exists in the local area alleged to be a relevant geographic market. Here, the FTC has alleged a nationwide product market, and then simply assumed that the product market is the same in, for example, Boulder, Colorado, and Omaha, Nebraska. Consumers in those two locales, however, may have different shopping habits, as a result, among other things, of the very lifestyle considerations that the FTC asserts are particularly relevant to the market definition in this case. The FTC's case suffers from yet another failure of proof in its unsupported application of a nationwide product market analysis to a variety of very different alleged local geographic markets.

4.    *The FTC's Backward-Looking Market View Is Inconsistent With the Forward-Looking Focus Required by Precedent and the FTC's Own Horizontal Merger Guidelines*

The FTC's product market definition cannot stand for the further reason that it reflects a stale view of the market and fails to apply the teachings of the case law and the FTC's *Guidelines*. Product market definition is a forward-looking inquiry requiring consideration both of consumer patterns today, and an assessment of where consumers would turn in the event of an increase in price or a decline in quality at the combined firm in the future. If there are alternatives to which customers could readily take their business in the event of a rise in prices post-merger, those alternatives are part of the relevant market even if customers do not go to them before the merger.

All of the available evidence demonstrates that other supermarkets, including Safeway, Wegman's and Delhaize (Hannaford, Food Lion, and Bloom), compete vigorously today for the food purchases of customers who shop at Whole Foods and Wild Oats. All of these stores carry many of the same products and, increasingly, many offer some of the same ambiance as the merging parties. ████████████████████████████████████ ████████████████ Thus, if the combined firm were to increase its price or reduce its quality, it would quickly lose more in sales than it would recover from higher prices or saved expenses — in the words of Whole Foods Co-President Walter Robb,[7] raising our prices would be "competitive suicide." Robb Decl. ¶ 15. *See* Appendix A.

---

[7]    Whole Foods' operations are overseen by two Co-Presidents and Chief Operating Officers, A.C. Gallo and Walter Robb. Many important strategic decisions, including the assessment of and response to competitors, are made by regional presidents who report to one of them. Robb, Gallo, and the seven regional presidents provided testimony, via declarations, about the competitive landscape.

The evidence shows that Whole Foods' customers already turn for some of their food purchases to the full range of supermarkets. *See, e.g.*, DX 609 at 18, 57 – 60 (Meyer Dep.); 57:5 – 60:21; Gallo Decl . ¶¶ 23-24; Robb Decl. ¶¶ 23-24; Sud Decl. ¶ 26; Paradise Decl. ¶ 17; Allshouse Decl. ¶ 7, ███████████████████ Conway Report 5 – 36; Stanton Report ¶ 27. Today more supermarkets offer more natural and organic products, more high-quality perishables, and more and better service departments and, as a result, exert direct price pressure on Whole Foods. *See, e.g.,* Paradise Decl. ¶ 19 ("███████ has been aggressively expanding its offerings of organic, natural and fresh products"), ¶ 20 ███████████████ line carries many of the same organic products as Whole Foods and is priced similar to us); DX 365 ███████████ ad boasts that "Nobody sells more organic produce ███████ – Nobody"); Stanton Report ¶¶ 28 – 30, 32 - 34.   Whole Foods has responded with price cuts and even better products and services to keep customers coming through its doors.  Bradley Decl. ¶ 18.  Paradise Decl. ¶¶ 29 and 35 (preparation and response ███████████ ¶ 43 (response to price pressure from ███████ ¶ 46 (preparation and response ███████████; DX 358 ("Action to take ASAP is to ███████████ no questions asked when you see ███████ like this").  ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

Whole Foods' regional presidents testified that they, their staff, and the store teams all ███████████████████████████████████████ ███████████████ They do this to ███████████ and ███████ the options their customers have.  Paradise Decl. ¶ 8.  For example, South Regional President Scott

Allshouse  imitating

Whole Foods); DX 359 at 2 ("███████████ are obviously walking our store regularly

and pricing accordingly"); DX 357 ("If imitation is the highest form of flattery we should be

thrilled as ███████████████████████████

████████████████████

     Post-merger, all of these existing competitive substitutes will remain. If the combined

firm raised prices or permitted quality to slide, customers could and would readily shift more of

their purchases to any of these alternative sources of natural and organic foods where they

already shop. Indeed, the vast majority of Whole Foods' customers shop more often at

competing supermarkets than they do at Whole Foods, and they spend more of their food and

grocery dollars at these other stores. *See* Section III-E, *infra*. These data establish that any

potential profit generated for the combined firm by a price rise or relaxed quality would be

quickly overcome by the profit lost from the resulting lost sales. *See* summaries of ordinary

course surveys described in Expert Report of David Scheffman 32-91 ("Scheffman Report").

C.    *Differentiation Does Not Define a Relevant Product Market*

The FTC relies heavily on allegations that Whole Foods and Wild Oats are different from other supermarkets, that they carry more natural and organic products, and that their stores are more attractive. *See* Plaintiff's Memorandum in Support of Its Motions for Temporary Restraining Order and Preliminary Injunction at 13-16 ("FTC's TRO Brief"). "But merely demonstrating that the merging parties' products are differentiated" is not enough to establish that those products are in a product market separate from other possible substitutes. *U.S. v. Oracle Corp.*, 331 F. Supp. 2d at 1121 (rejecting proposed market definition limited to select types of "high function" enterprise application software). Accordingly, numerous courts, including the Supreme Court in *Brown Shoe,* have rejected artificially narrow product market definitions based on qualitative factors that differentiate the products in question from other, similar products without demonstrating a lack of substitutability. *See, e.g., Brown Shoe Co. v. U.S.*, 370 U.S. at 326 (rejecting argument that "medium-priced" shoes are in a different product market than "low-priced" shoes); *Beatrice Foods Co. v. FTC*, 540 F.2d 303, 309-10 (7th Cir. 1976) (holding that "professional" and "do-it-yourself" paint brushes are in the same market despite price and quality differences between the two); *Liggett & Myers, Inc. v. FTC*, 567 F.2d 1273, 1274-75 (4th Cir. 1977) (rejecting argument that "economy" and "premium" dog foods were separate product markets); *U.S. v. Sungard*, 172 F. Supp. 2d at 183 (rejecting market definition that was limited to only one type of computer disaster recovery service); *United States v. Jos. Schlitz Brewing Co.*, 253 F. Supp. 129, 145-46 (N.D. Cal. 1966) (rejecting a submarket for "premium" beer); *see also In re Super Premium Ice Cream Distribution Antitrust Litigation*,

691 F. Supp. 1262 (N.D. Cal. 1988), (holding, in a case brought under Section 2 of the Sherman Act, that "super premium ice creams" compete in the same market as lower-grade ice creams).

All supermarkets differentiate themselves in some way from their competitors in order to compete for the same supermarket shoppers.  Stanton Report ¶¶ 3, 22-23; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Whole Foods and, to some extent, Wild Oats, tout their quality, including excellent perishables, healthful groceries, high-quality prepared foods, and natural and organic products.  Some other supermarkets advertise their everyday prices, their special markdowns, or their broad selection of products, advantages that Whole Foods also tries to offer but that are not a central part of its brand image.  Differentiation, however, does not equate to a unique relevant antitrust market.  Stanton Report ¶ 3.  The fact that supermarkets seek to differentiate themselves from one another does not address the relevant question for product market definition – are the differences among supermarkets so substantial that Whole Foods could retain most of its customers even if, post-merger, it were to raise price or reduce quality?

The determinative question is not, "are there any differences?" but "would customers switch?"  Courts, therefore, routinely include in the relevant product market products that are not identical to those of the merging parties.  Thus, in analyzing a merger of two makers of premium fountain pens, the court included other premium writing instruments in the relevant market, even though pre-merger customers purchasing from the merging parties demonstrated a preference for fountain pens rather than other writing instruments.  *U.S. v. Gillette*, 828 F.Supp. at 84.  In analyzing a merger of two makers of enterprise application software, the court noted that "a plaintiff must demonstrate product differentiation sufficient to sustain a small but significant and non-transitory price increase."  *U.S. v. Oracle Corp.*, 331 F. Supp. 2d at 1121.  In a merger of

- 25 -

two providers of computer disaster recovery services, the court found that the plaintiff

improperly focused "on just a portion of the continuum," excluding alternatives to which

customers could switch in the event of a price increase. *U.S. v. Sungard*, 172 F. Supp. 2d at 183.

Here, the FTC tries to establish, with an almost comic level of detail,[8] that differentiation by

Whole Foods and Wild Oats leads to a narrow product market. It utterly fails, however, to

address the alternatives available to customers should the combined firm raise its prices or

reduce its quality.

D.    *Many Other Supermarkets Are Responding to Increasing Consumer Demand for Natural
        and Organic By Expanding Their Product Offering*

Consumer demand for natural and organic products has sky-rocketed over the past

several years. DX 601 at 56-57 (Robb Dep.); ███████████████████████

███████████████████████████ Stanton Report ¶¶ 31, 66-71; DX

573. These products have entered the mainstream, and supermarkets have responded.

Supermarket chains throughout the country have been expanding and growing their natural and

organic offerings, and most are steadily increasing their offerings of these products. ██████

███████████████████ Stanton Report ¶¶ 31-34. Most supermarkets have even

added full lines of private-label natural and organic products. Stanton Report ¶¶ 33, 35, 39, 44,

48, 56, 62; ███████████████████.

---

[8]    The FTC's product market definition requires proof that significant numbers of the merging parties' customers
in the Chicago area would not turn to supermarkets like Dominick's and Jewel in response to a price increase
because the latter stores do not carry, *e.g.,* organic onions. *See* Plaintiff's July 16 Supp. Responses, DX 353.
It does not offer this proof.

The FTC also contends that premium natural and organic supermarkets offer a unique "third place" for
customers to meet for coffee. *See* Plaintiff's July 16 Supp. Responses, DX 353. Even Whole Foods'
advertising, however, does not claim that there are no convenient substitutes for its stores' coffeehouse
venues.

As other supermarkets expand their offerings of natural and organic products, Whole Foods and Wild Oats have seen their respective points of differentiation become less and less significant.  Stanton Report ¶ 33.

E.    *Customers of Whole Foods and Wild Oats Regularly Cross-Shop at Other Supermarkets*

Whole Foods customers could readily shift their purchases to other supermarkets carrying natural and organic products should prices rise post-merger, because Whole Foods customers already regularly shop at those other supermarkets.  More than ███ of Whole Foods customers also shop at these other supermarkets and at grocers ██████████.  Boardman Decl. ¶ 5; *see generally,* Conway Report.  ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████[9] Often they shop in these other stores as often as once a week.  DX 609 at 66 – 67 (Meyer Dep.) ("the reality we're in is our . . . core customer base, shops at ████████████ and then they shop at Whole Foods Market, and as those competitors add product to their stores that are like our products, with a halfway decent experience, they're going to not make that second trip.  It's the inevitable reality.").  *See also,* ████████████ Stanton Report ¶ 27; Allshouse Decl. ¶ 7.  Whole Foods is keenly aware of this fact.  If a Whole Foods customer sees, for example, that grapes have been priced higher at Whole Foods, he will have an opportunity to

---

[9]  Indeed, Whole Foods' quality standards virtually assure that its customers will shop elsewhere.  Whole Foods does not carry some products that the average consumer wants to buy, like Diet Coke.  Customers are forced to go to other stores to get these products.  DX 622 (Mackey I.H.); Sud Decl. ¶ 12.  Nonetheless, any attempt by the FTC to define a market by what the parties do not carry, simply a point of differentiation, is equally wrongheaded.

compare the price and the quality of grapes at another supermarket when he next visits one, often within the week.

A June 2006 Whole Foods analysis expressed the phenomenon succinctly:

- Channel blurring is becoming especially noticeable as the natural foods class of trade is rapidly losing insulation from competition.

- With easy and widespread access to alternate channels offer the same brands at cheaper prices, consumers are splitting their purchases.

- For each type of shopping trip, consumers look for the channel that provides the most value.

DX 8 at 4 ("WFM Value Strategy"). Both of Whole Foods' Co-Presidents testified that this channel-blurring continues, resulting in Whole Foods' customers finding the same products that it sells available at other supermarkets and other retail outlets. Robb Decl. ¶ 19; Gallo Decl. ¶ 21. Whole Foods' future success depends on continuing to attract supermarket cross-shoppers. The FTC's case is predicated on harm to Whole Foods' most loyal customers, but Whole Foods is vulnerable to losing some sales even from these customers and, in any event, could not survive with those customers alone. A product market is defined not by the core shopper but by the customers who could move their business elsewhere, *i.e.*, the customers at the margin. *See, e.g.*, *U.S. v. Sungard*, 172 F. Supp. 2d at 191-92.

Extensive market research commissioned in the ordinary course of business by the parties over the course of several years repeatedly confirms and corroborates the observations of the parties' executives. In particular, the market research shows that Whole Foods and Wild Oats customers a) frequently shop at other supermarkets; b) purchase the same classes of products from the same departments at other supermarkets that they also purchase at Whole Foods and

Wild Oats; and c) spend the majority of their grocery dollars at other supermarkets.[10]  By way of

example, a study conducted for Whole Foods by National Marketing Institute ("NMI") in

February 2007 surveyed ██████████.  The survey asked existing Whole Foods shoppers

where they currently shopped on a regular and consistent basis for groceries.  The response was

as follows: ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████  *See* Scheffman Report at

para. 152.  Similar studies were conducted in 2003, 2004, 2005, and 2006.

     Customer accounts of their own present practices, pre-merger, are of significant value in

merger analysis.  *See, e.g., U.S. v. Oracle*, 331 F. Supp. 2d at 1133 ("the Oracle witnesses

testified about concrete and specific actions that they had taken and been able to complete in

order to meet their firms' . . . needs").

     These contemporaneous surveys and other company business records, showing

widespread cross-shopping, are corroborated by a customer survey that was conduced in

connection with this litigation.  Results and Analysis of Whole Foods and Wild Oats Shopper

Survey (July 2007) ("Conway Report").  The customer survey was conducted in four areas

where both Whole Foods and Wild Oats are present today – Portland, Maine; Medford and

Saugus (both near Boston), Massachusetts; Hinsdale (near Chicago), Illinois; and Los

Angeles/Santa Monica/Brentwood, California; two areas with Whole Foods stores but no Wild

Oats store – greater Washington, D.C., and West Bloomfield, Michigan; and two areas with Wild

---

[10]   These market research studies are identified individually and discussed at length in The Scheffman Report, paragraphs 122-172.

Oats stores but no Whole Foods store – Memphis, Tennessee; and Salt Lake City, Utah.  Conway

Report 2.  All four of the alleged overlap areas surveyed are among the markets for which the

FTC has stated an intention to present evidence, as is Salt Lake City.  July 16 Supp. Responses,

DX 553.

    The survey labeled those Whole Foods or Wild Oats customers who shopped at one of

those stores at least once a month "frequent shoppers."  The majority of even the most frequent

shoppers surveyed reported spending less than ██████████ in a typical visit to either store.

Conway Report 8, 12.  Moreover, even the relatively few surveyed customers who devoted ████

████ of their overall grocery budget to one of the merging parties reported buying foods in all of

the product categories tested – produce, natural and organic foods, organic produce, dairy, fresh

meat and fish, prepared foods, frozen foods, and bread and bakery items – at more than one food

retailer.  Conway 9, 12, 16-35.  The majority of the most frequent Whole Foods and Wild Oats

customers surveyed do ███ of their grocery shopping elsewhere.  Conway Report 5.  These

results corroborate the survey results the parties regularly received in their ordinary course of

business.  *See, e.g.*, DX 2.

F.    *Whole Foods Price-Checks Against All Other Supermarkets and Significant Food
      Retailers, and Vice Versa*

    Because Whole Foods recognizes that other supermarkets are its competitors, it

constantly checks its prices against their prices.[11]  *See, e.g.*, Robb Decl. ¶ 27; Gallo Decl. ¶ 28;

---

[11] ████████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████████

DX 609 at 48 (Meyer Dep.); DX 81 ███████████████████████████

███████████████████████; DX 90 (lengthy e-mail discussion of appropriate

response to ████████████████████████████████████

████████████████████; Lannon Decl. ¶ 25; Paradise Decl. ¶¶ 7-10 (comp shopping done to

ensure we are competitive with other supermarkets on both price and non-price aspects of the

business); Megahan Decl. ¶¶ 38 – 42 (describing extensive comp shopping against many rivals in

████████████.

　　　Whole Foods then adjusts its prices in response.  Allshouse Decl. ¶ 8; DX 609 at 42 – 43

(Meyer Dep.); Paradise Decl. ¶ 10.  Whole Foods has directed its regional personnel to price-

check at least against ████████████████████████; stores price-check

other competitors as well, if they choose.  DX 600 at 193 – 94 (Gallo Dep.).[12]

　　　In turn, other supermarkets, such as Giant and Wegman's, price-check against Whole

Foods. Meyer Decl. ¶ 22.  ████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████

---

[12]  The vast majority of Whole Foods' pricing decisions are ████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████



not only price-checks against Whole Foods in all markets in which they both operate, but also posts the results in its stores. DX 609 at 48 (Meyer Dep.). ████████ has also posted the results of price-checks with Whole Foods. DX 93 (February 2007 e-mail from E. Zambito to K. Meyer and others); *see also* DX 72, DX 74 (████████ ads about Whole Foods' pricing); DX 359 at 2 (observing that ████████ is "walking" Whole Foods and pricing accordingly).

Whole Foods also posts price-check information in its stores to highlight products that it prices below those of its competitors. Allshouse Decl. ¶ 8. This is one form of direct, ongoing price competition between Whole Foods and other supermarkets and food retailers.

G.    *Whole Foods' Private Label Program Is Designed to Compete Against Other Supermarkets*

Whole Foods has a private label program that exists primarily to enhance competition with other supermarkets. A decade ago, Whole Foods recognized that it was losing sales █ ████████████████████████████████████████████████ Boardman Decl. ¶ 4. In response, Whole Foods began to develop its own private label products. *Id.* Although the private label program was originally focused on competition

██████████, over time its goals have expanded. Now, Whole Foods uses its private label products to compete with other supermarkets as well. *Id.* ¶ 5. It closely follows the private label products offered not only by ████████████████████████████████████ ████████████████████████ and others. *Id.* ¶¶ 13, 14, 23. It identifies where it has a product gap compared to competitors, and it develops competing products. *Id.* ¶¶ 13-14. Then, to ensure that its products are competitive, it carefully studies the prices being charged by competitors and sets prices to meet or beat competing brands. *Id.* ¶¶ 15-22. It recognizes it will lose sales if it prices above its competitors. *Id.* ¶ 15. Importantly, Whole Foods does not even bother to check Wild Oats prices for its private label products. *Id.* ¶ 22.

The private label program is intended to encourage cross-shopping consumers to purchase more of their everyday items at Whole foods rather than another supermarket. Boardman Decl. ¶ 5. It is also designed to help promote Whole Foods' value image, to show customers that they can buy either a premium item at a premium price or an alternative private label product at a price comparable to what they see at other supermarkets. *Id.* ¶ 6. Thus, the private label program was created to respond to competitive pressures from other supermarkets and to enhance Whole Foods' ability to compete with, and attract consumer dollars from, other supermarkets.

H.    *Other Supermarkets and Food Retailers Increasingly Offer the Same Ambiance as Whole Foods and Wild Oats*

As Whole Foods began to attract more and more customers, other supermarkets took note of the various aspects of the store that appealed to customers. One was the look of the stores, which are more attractively designed than other supermarkets. One of the FTC's attributes for a premium natural and organic supermarket is that it promotes a "lifestyle," and Safeway is

spending billions to do exactly that by upgrading all of its stores to its aptly named "Lifestyle"

format. It has decided to remodel all of its stores nationwide as "Lifestyle" stores at significant

expense. Stanton Report ¶¶ 39, 40; DX 561. Other supermarkets have implemented

significantly improved store designs in recent years. DX 601 at 30-31 (Robb Dep.). Wegmans

in the mid-Atlantic states has always been known for attractive stores, high-quality perishables,

and a pleasant shopping experience. Stanton Report ¶¶ 44-45. Bashas in the Southwest has

created dedicated natural and organic sections in its supermarkets, with distinctive flooring,

lighting, and signage. *Id.* at ¶ 63. While not offering the sleek, modern design of Whole Foods,

Trader Joe's has taken a page from Whole Foods' playbook by decorating its stores with a

nautical island theme intended to differentiate itself from the institutional style of many

supermarkets.

I.    *New Supermarkets Impact the Full Range of Existing Supermarkets*

One test of whether two sets of stores compete with another is whether, when a store of

one set opens, it draws customers from existing stores of the other set. The opening of any new

or remodeled supermarket impacts local Whole Foods and Wild Oats supermarkets. For

example, ███████████████████ supermarkets around Washington, D.C. attracted ████████

of the sales from Whole Foods supermarkets in their respective areas, and sales at the Whole

Foods supermarkets have not rebounded. DX 609 at 69 – 71 (Meyer Dep.) ("the compelling

reason to make the two stops diminishes"); DX 609. ██████████████████████

████████████████████████████████████████████████████

████████ In turn, as demonstrated by widespread repositioning, the opening of a Whole Foods

supermarket impacts other local supermarkets. These are direct market tests of customer

shopping practices. This is precisely the type of evidence the FTC -- in its recently promulgated commentary to the *Guidelines* -- stated would be most probative in defining product markets. Commentary on the Merger Guidelines, Federal Trade Commission and U.S. Department of Justice (2006) at 9. This evidence further confirms that Whole Foods and Wild Oats compete directly against other supermarkets today.

J.    *The Site-Selection Process For New Whole Foods Supermarkets Considers the Locations of All Other Supermarkets*

Consistent with the other marketplace evidence that Whole Foods and Wild Oats compete with other supermarkets, the selection of sites for new Whole Foods supermarkets (as well as for new Wild Oats supermarkets) considers the competition the new store would face from the full range of other local supermarkets. Early on, ███████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ Bradley Decl. ¶ 6. When a potential site passes the informal initial test, a more thorough study is undertaken. Sud Decl. ¶ 56; Bradley Decl. ¶ 6. A major feature of all of these studies ████████████████████

███████████████████████ *See, e.g.*, DX 144 at 7 (Nashville); DX 120 at 16 (Naples, Florida); DX 160 at 20 (Cleveland, Ohio); DX 184 at 16 (Salt Lake City, Utah). A Whole Foods

████████████████████████████████████████████████████████

████████████ *See* Allshouse Decl. ¶ 13. ████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

- 35 -



**L.**    *The Economic Evidence Confirms That All Supermarkets Participate In the Relevant Market*

   **1.**    *Dr. Scheffman's Critical Loss Analysis Confirms That the Relevant Market Includes Supermarkets*

The information assembled and analyzed by Dr. Scheffman confirms that if the combined

firm were to raise prices or reduce quality by a small but significant and non-transitory amount,

that increase would result in enough sales lost to other supermarkets and other food retailers that the increase would not be profitable. This determination, called a critical loss analysis, is a basic tool of market definition.[13]

Critical loss analysis accurately captures the FTC's *Guidelines* test for defining relevant markets when evaluating whether to challenge a merger. *Tenet Healthcare v. FTC*, 186 F.3d at 1053; Department of Justice/Federal Trade Commission Horizontal Merger Guidelines 57 Fed. Reg. 41552 § 1.21 (1992). The Commission, in fact, frequently applies this test. *See, e.g.,* Statement of the FTC Concerning Royal Caribbean Cruises, Ltd. / P&L Princess Cruises plc and Carnival Corp. / P&L Princess Cruises plc, File No, 021 0041, text at n.8 (October 4, 2002), *available at* http://www.ftc.gov/os/2002/10/ cruisestatement.htm. Critical loss analyses are also often relied upon by courts in merger cases. *See, e.g., Tenet Health Care v. FTC,* 186 F.3d at 1050, 1053; *FTC v. Arch Coal,* 329 F. Supp. 2d 109, 122-23; *FTC v. Swedish Match,* 131 F. Supp. 2d at 160-62; *United States v. Mercy Health Services,* 902 F. Supp. 968, 978 (D. Iowa 1995), *vacated as moot,* 107 F.3d 632 (8th Cir. 1997); *see also, California v. Sutter Health System,* 130 F. Supp. 2d 1109, 1128-32 (N.D. Cal. 2001).

Dr. Scheffman first calculated the critical loss percentage – the amount of lost sales at which the gains from a price increase would be equaled by the losses. Scheffman Report ¶ 115. Dr. Scheffman then found that Whole Foods and Wild Oats customers shop at other supermarkets frequently, and purchase the same classes of products, including natural and

---

13 As Dr. Scheffman explains, whenever there is an increase in price, the seller gains some profit from the higher prices at which some products are sold, but it also loses some revenue from potential purchasers who refuse to buy at the higher price and either do without, go to another supplier, or substitute another product. The "critical loss" is the amount of post-price-rise lost sales at which the added profits and the lost profits are equal. Scheffman Report ¶ 96.

organic products, that they purchase at the merging parties' stores. Scheffman Report ¶ 131; ¶

185; *see also* Allshouse Decl. ¶ 7.[14]

      Dr. Scheffman found that Whole Foods and Wild Oats customers today spend ▓▓▓▓▓

▓▓▓▓ their grocery dollar at other supermarkets.  Scheffman Report ¶¶ 131, 147; *see also*

Allshouse Decl. ¶ 7 (most Whole Foods customers spend "much more of their food dollar in

other outlets").  In one study, the most loyal group of Whole Foods shoppers, ▓▓▓ of all Whole

Foods customers studied shopped at Whole Foods about twice a month and spent ▓▓▓▓ of

their monthly grocery dollar there.  Scheffman Report at ¶ 161.  In another study, ▓▓▓ of

Whole Foods and Wild Oats shoppers reported spending ▓▓▓▓ of their grocery budgets at

those stores.  *Id.* at ¶ 185; Conway Report at 5.  These findings held true not only for shoppers

who made modest or less frequent purchases at Whole Foods or Wild Oats stores, but also for

many of the most frequent customers and those whose made the largest purchases.  This shows

that Whole Foods has "substantial sales 'in play,'" that is, sales to customers who could easily

divert their purchases to other supermarkets.  *Id.* at ¶ 119.

      Dr. Scheffman also reviewed the competitive moves of other supermarkets, including

their introduction of natural and organic branded and private label product lines.  Scheffman

Report ¶ 219 and Appendix I.  Finally, he considered the price-checking that Whole Foods

conducts against other supermarkets and food retailers.  *Id* at ¶¶ 222-229; DX 219, DX 226-27,

243-44, DX 250-52, DX 281-350, DX 355-56, DX 370-79, DX 383-94, DX 438-54, DX 459-79,

---

14  Dr. Scheffman also found that the various marketing studies of Whole Foods and Wild Oats customers divided
the shoppers in a variety of ways.  He concluded that there is no clearly definable "core" Whole Foods or Wild
Oats shopper.  People shop at those stores for a wide variety of reasons, with no one or even small group of
reasons consistently predominating.  Scheffman Report ¶ 132.

DX 485, DX 495. A major price-checking initiative by Whole Foods in 2006 identified five

types of competitors: "conventional supermarkets" 

"super naturals"

"mass market"

"club stores"

"specialty stores"

. *Id.* at ¶ 226. Whole Foods' price checking study showed that overall, Whole

Foods was at parity in pricing against other supermarkets.

Taking all these facts into account, Dr. Scheffman concluded that in the event of a price

increase by the combined firm, the actual loss would clearly exceed the critical loss. *Id.* at ¶ 128.

In other words, a hypothetical price increase by premium natural and organic supermarkets

would be wildly unprofitable due to customer substitution away from premium natural and

organic supermarkets to other supermarkets. Because Whole Foods clearly priced in response to

other supermarkets, and because of the other evidence he had reviewed, Dr. Scheffman

concluded "the relevant product market . . . must be at least as broad as the retail sale of food and

grocery items in supermarkets." Scheffman Report ¶ 235.

2.    *Dr. Scheffman's Entry Analysis Confirms that the Relevant Market Includes Supermarkets*

Dr. Scheffman reviewed data regarding the sales at newly opened Whole Foods stores.

Scheffman Report ¶¶ 60-94. New store openings are a real-world experiment in how customers

change their purchasing patterns in response to a change in their store options. *Id.* at ¶ 61.

Dr. Scheffman noted first that Whole Foods has opened some stores in locations where there is

no other supermarket that the FTC would define as a "premium natural and organic

supermarket." Those new Whole Foods stores succeeded, even though they had to draw all of their customers from other supermarkets and grocery retailers. *Id.* at ¶¶ 65-66.

Dr. Scheffman then examined the sources of sales at new stores that Whole Foods opened near existing Wild Oats stores. He found that: (1) on average, the opening of a new Whole Foods store generated substantially more sales of natural and organic products than existed in the area prior to the opening, and (2) in every instance, the new Whole Foods store generated substantially more in sales than the Wild Oats store previously had. Scheffman Report ¶ 76. He observed, "[c]ontrary to the prediction implied by the FTC's product market, in all cases . . . [Whole Foods'] sales are much larger than the reduction in sales of . . . [Wild Oats]." *Id.* Dr. Scheffman also made further calculations, which showed that ███████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ These facts in their entirety show that most of Whole Foods' sales came from non "premium natural and organic" supermarkets and other grocery retailers.

## IV.    THE FTC FAILS TO ESTABLISH A RELEVANT GEOGRAPHIC MARKET

Section 7 of the Clayton Act requires the FTC to prove that the effect of the acquisition may be substantially to lessen competition in a "section of the country." 15 U.S.C. § 18. The Supreme Court has held that the "section of the country" provision means that the FTC must prove the "relevant geographic market." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 356 (1963). Although the FTC tries to meet this requirement by referring to where Whole Foods and Wild Oats believe they draw customers, that is not the test for geographic market. "The proper question to be asked in this case is not where the parties to the merger do business or even

where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." *Id.* at 357. It is "the market area in which the seller operates, and to which the purchaser can practically turn for supplies." *Id.* at 359 (citation omitted, emphasis omitted). In mergers involving local markets, the plaintiff must "come forward with evidence delineating the rough approximation of" those markets. *United States v. Connecticut National Bank*, 418 U.S. 656, 669-70 (1974). Geographic market is "charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn" for alternatives. *United States v. Philadelphia National Bank*, 374 U.S. at 359. In more than a few merger challenges, when the FTC or the Justice Department has failed to delineate the geographic market with sufficient care the claim has been dismissed. *See, e.g., United States v. Connecticut National Bank*, 418 U.S. 656 (1974); *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045; *FTC v. Foster* (Western Refining), Memorandum Op. ¶ 181, No. CIV-07-352 JB/ACT, *appeal pending*.

The FTC's *Guidelines* require a rigorous analysis to determine the geographic market. They require the agency to consider what would happen if a hypothetical monopolist raised prices in a geographic area. The FTC's *Guidelines* § 1.21.

> If, in response to the price increase, the reduction in sales of the product at that location would be large enough that a hypothetical monopolist producing or selling the relevant product at the merging firm's location would not find it profitable to impose such an increase in price, then the Agency will add the location from which production is the next-best substitute for production at the merging firm's location.

*Id.* The *Guidelines* require consideration of "evidence that buyers have shifted or have considered shifting purchases between different geographic locations in response to relative

changes in price or other competitive variables;" "evidence that sellers base business decisions on the prospect of buyer substitution between geographic locations in response to relative changes in price or other competitive variables;" "the influence of downstream competition faced by buyer in their output markets;" and "the timing and costs of switching suppliers." *Id.*

Here, the FTC must prove relevant geographic markets comprising the areas within which there are stores to which customers of one of the merging firms could reasonably turn – in the event of a price increase or drop in quality at the stores of the combined firm – to purchase the goods that they currently purchase at one of the merging stores. After repeatedly changing positions, *see* Appendix B, the FTC – at least for now – has apparently settled on the view that the relevant geographic markets are a six-mile radius around each store, or the area within a 16-minute drive of the store, while continuing to assert that the definitions are "highly variable." July 16 Supp. Responses at 1, 4-6, DX 553.

While the FTC may have planted its feet, it has not come forward with evidence for each (or any) of the local markets alleged showing that this is the geographic area in which buyers have shifted or considered shifting purchases in response to price changes. Because each local area varies – in traffic, geography, and demographics, among other ways – Whole Foods measures a new store's ***potential*** reach in a number of different ways. *See, e.g., DX 171* (Portland, Maine); DX 183 (South Denver). Whole Foods considers ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The resulting projection ▮▮▮▮▮▮▮▮ *See, e.g.,* DX 171 at 13-14; DX 183 at 12-15. For example, when projecting the potential reach of its new Nashville store, Whole Foods studied an area around the

site that ███████████████████████████████████████████████████████

████████████████ Allshouse Decl. ¶ 14.[15] This site analysis differs from geographic

market definition. It projects where a store, under existing competitive conditions, could expect

to draw a certain percentage of its customers. Whole Foods' reliance on ████████████████

however, demonstrates ██████████████████████ a new store's potential reach is

adequate. There is no benchmark that works effectively ████████████████. The

FTC's cookie-cutter approach ignores these local variations even though its own *Guidelines*

require strict attention to them.

The FTC's *Guidelines* and the case law require evidence showing the location of

reasonable options that customers would have if Whole Foods raised its prices or let its quality

decline. *Guidelines* § 1.21. *FTC v. Arch Coal*, 329 F. Supp. 2d at 120-21. The FTC has simply

ignored this essential element.

## V.    THE MERGER WILL NOT HARM COMPETITION

The FTC has also failed to establish the third necessary element of a § 7 claim, proof that

the challenged transaction is likely to substantially lessen competition in a properly defined

product and geographic market. There can be no presumption of adverse competitive effects

where, as here, the FTC cannot establish either its alleged product or geographic markets. But

even if the FTC were entitled to some presumption of adverse competitive effects, that

presumption is conclusively rebutted by the evidence presented by both defendants' and

plaintiff's economic experts showing that pricing in premium natural and organic supermarkets

---

15  In assessing competition at existing stores, Whole Foods also considers ████████████████
████████████████ (E-mail June 2006 K. Meyer to A.C. Gallo).

"monopolies" does not differ from pricing in "markets" with two or more premium natural or organic supermarkets. Any presumption of adverse competitive effects also is rebutted by evidence of ongoing repositioning by supermarket competitors and the increased efficiency and competitiveness of the combined firm. *See* Sections VI and VII, *infra*.

A.    *The FTC's Proposed Market Definition Implies That Dozens of "Monopolies" Already Plague the Country*

Here, the FTC defined the relevant product market as premium natural and organic supermarkets. The FTC further contends that only four firms -- the defendants, Earth Fare, and New Seasons – participate in that market. Finally, the FTC claims the relevant geographic market is marked by a 6-mile radius around each participant.

Accepting these definitions, there are 276 premium natural and organic supermarkets nationwide that participate in the FTC's alleged product market. Of these stores, 184 are monopolies because there is not another premium natural and organic supermarket participating in the FTC's alleged geographic market.

If the FTC's market definition were correct, one would expect to see evidence showing that prices were higher in the monopoly markets than in the competitive markets. But, as discussed below, the evidence -- both that developed by Defendants' economic expert and that developed by the FTC's economic expert -- shows no difference between the "monopoly" markets and those charged in the competitive markets. *See U.S. v. Long Island Jewish Medical Center*, 983 F. Supp. at 138 ("Under the Government's theory, Stoney Brook would be in a position to raise prices in an anticompetitive manner. However, the evidence revealed that Stoney Brook was and is charging competitive prices.") This shows both that the FTC has

defined the market incorrectly and that the acquisitions of Wild Oats will not produce any anticompetitive effects.

**B.     There Is No Evidence That the Number of Premium Natural or Organic Supermarkets Affects Market Pricing**

The FTC repeatedly cites the *Staples* case, *see, e.g.,* FTC's TRO Brief 10, but the evidence in this case stands in stark contrast to the evidence there.  The evidence in *Staples* showed that, over a number of local markets, Staples charged more in office supply superstore monopolies and less where one of the other two office supply superstores competed.  *FTC v. Staples*, 970 F. Supp. at 1075-77.[16]  Unlike in *Staples*, here the FTC has presented no analysis of the pricing data it received from Whole Foods to test whether Whole Foods' prices were affected by the presence or absence of Wild Oats.  Here, in contrast, Whole Foods does not price its goods in response to Wild Oats.  Boardman Decl. ¶ 15 ("Wild Oats is not one of the supermarkets that we comp shop against with regard to private label pricing, so it does not limit our prices"); Gallo Decl. ¶ 28; Lannon Decl. ¶ 14 ("do not price check much at all"); ¶ 24 (no price check of Wild Oats in Portland, Maine); Bradley Decl. ¶ 13; Meyer Decl. ¶ 13.  Rather, Whole Foods prices in response to all other supermarkets, with an eye to the prices ███████ ███████ the other food retailers as well.  Allshouse Decl. ¶ 29; Bradley Decl. ¶ 12; Boardman Decl. ¶¶ 18-22 ("[b]efore we release a new [private-label] product, we carefully study the prices charged by . . . ████████████████████████████████████████ and

---

16  The Court discussed pricing patterns in connection with its analysis of the relevant product market, but an inquiry into the buyer's pricing patterns in the presence or absence of the other party also informs an assessment of the competitive effects of the merger.

others"); DX 371 (Rocky Mountain and Southwest Region National/Regional Vision and Goals 2005 does not discuss Wild Oats in the section about strategic assessment of competition).[17]

    1.    *Dr. Scheffman's Cross-Sectional Pricing Analysis Confirms that Whole Foods and Wild Oats Do Not Price in Response to One Another*

Dr. Scheffman studied the pricing patterns at Whole Foods and Wild Oats to determine whether, like Staples and Office Depot, the prices of either firm were lower where they faced competition from the other merging party, or whether competition from other supermarkets, or other factors altogether, drove their pricing. ███████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████. More important to assessment of the competitive effects of the merger is the impact of Wild Oats' pricing on Whole Foods. Reviewing Whole Foods prices on June 9, 2007, he found that the presence or absence of a Wild Oats supermarket in the same area as a Whole Foods supermarket had no effect on the prices at the Whole Foods store. *Id.* at ¶ 314; Scheffman Rebuttal Report ¶ 60. Rather, Whole Foods prices reflected competitive pressures from the full range of area supermarkets.

Thus, the same inquiry that established anticompetitive effects in the *Staples* case establishes the absence of anticompetitive effects in this case. This merger will not remove a competitive pricing constraint on Whole Foods because Wild Oats today does not constrain Whole Foods' pricing.

---

17  Whole Foods' price zones have nothing to do with the presence or absence of a local Wild Oats store. Most Whole Foods stores have the ████████████████████████████████
    Scheffman Rebuttal Report ¶ 60.

2.    *The FTC's Economic Expert Confirms That Wild Oats Does Not Constrain Whole Foods' Prices*

The FTC's economic expert, Dr. Murphy, actually confirms Dr. Scheffman's finding that Wild Oats does not constrain Whole Foods' pricing. While Dr. Murphy conducted no econometric analysis of Whole Foods prices in response to the entry, exit, presence, or absence of Wild Oats, he did perform a regression analysis in which he tested whether there was a statistically significant difference between Whole Foods' margins when there was a Wild Oats within five miles of Whole Foods and when there was not. Dr. Murphy's conclusion was that there was no statistically significant difference.

Dr. Murphy did study the long-term effect of Whole Foods' entry on Wild Oats prices in five "markets." Only one of those markets, Ft. Collins, Colorado, had sufficient data – more than two years after entry – to support an opinion on the long term effect Whole Foods' entry had on Wild Oats' prices in that single "market." According to Dr. Murphy, the data and his analysis suggest that ███████████████████████████████████████████.[18]

What is most striking about Dr. Murphy's reliance on the Ft. Collins entry analysis is his failure to analyze what happened to Whole Foods prices in the months after the Wild Oats store closed in December 2006. Although his report is silent on this subject, Dr. Murphy claimed for the first time at deposition that he had not analyzed the effect Wild Oats' exit had on Whole Foods' prices because he had been unable to solve data problems in the Whole Foods transaction pricing data. This, of course, underscored the fact that Dr. Murphy failed to ask the critical and

---

[18]    There are serious questions about the reliability of Dr. Murphy's analysis. ███████████████
████████████████████████

- 47 -

dispositive question:  Would the loss of Wild Oats as a separate entity remove a constraint on

Whole Foods' prices?  Perhaps Dr. Murphy did not run this test because he knew the answer.

Whole Foods' Regional President, Will Paradise, testified that prices did not increase in Ft.

Collins after Wild Oats exited because there was a ██████████████████████████

██████████████  DX 610 at 240 – 41 (Paradise Dep.).

      3.     *Policies and Practices of Whole Foods and Wild Oats Do Not Suggest That Either Prices in Response to the Other*

      The pricing policies and practices of both Whole Foods and Wild Oats confirm that their

respective prices are set in response to factors other than each other.  For most products, Whole

Foods' prices are not determined by ████████████.  Sud Decl. ¶ 9 ("nearly all pricing

decisions are made ██████████  Paradise Decl. ¶ 5; Allshouse Decl. ¶ 29.  Whole Foods

does not have price zones that reflect, even in part, whether there is a local Wild Oats

supermarket.  *Id.* ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

████████████████████████████

C.    *Wild Oats Prices Are Generally Higher Than Whole Foods' Prices*

It is uncontradicted that Wild Oats' prices are generally higher than Whole Foods prices. All Whole Foods and Wild Oats executives whose testimony addressed this issue reached the same conclusion. *See, e.g.,* Gallo Decl. ¶ 9; Robb Decl. ¶ 15; DX 491.

Dr. Scheffman also reviewed a study that compared Wild Oats' pricing to that of Whole Foods and other supermarkets. ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

████████████████████

D.    *If the Merged Firm's Quality Declines, It Will Lose an Attribute that Currently Differentiates It From Other Supermarkets*

The FTC alleges that the loss of competition post-merger will enable the combined firm to allow its ambiance and other aspects of its quality to decline. Complaint ¶¶ 21, 24-25, 41-42. This allegation is purely speculative and flies in the face of years of investment made to attract the mainstream customer. Whole Foods has invested in larger stores and new formats precisely to complete with other supermarkets for mainstream customers. Sud Decl. ¶¶ 17, 29. These investments do not depend on the presence of Wild Oats. Whole Foods invested, for example, in Boulder ███████████████████████ Paradise Decl. ¶ 46, DX 480; and in Santa Fe and Albuquerque ███████████████ Paradise Decl. ¶¶ 29, 35, DX 363. The allegation is

at odds with Whole Foods' plans to invest in Wild Oats stores and how Whole Foods has behaved in so-called monopoly markets, such as Washington, D.C. DX 602 at 50 (Sud Dep.).

Moreover, ambiance is one of the attributes of the FTC's alleged product market. *Id.* at ¶¶ 21, 24-25. If the combined firm permitted its stores' ambiance to decline, it would lose part of what the FTC contends makes it unique. In other words, even under the FTC's definitions, the combined firm would be just like everyone else, competing directly with other supermarkets. Whole Foods developed an attractive style because it wanted to differentiate itself from its other supermarket competitors and, as it continues to face that competition, will be unwilling to forgo whatever competitive advantage that its ambiance provides. Once again, it is readily apparent that supermarkets will impose a significant competitive constraint on the merged firm.

VI.    SUPERMARKET REPOSITIONING AND ENTRY WILL EXERT ADDITIONAL
       COMPETITIVE PRESSURE ON THE COMBINED FIRM

Any hypothesized anticompetitive effect from the proposed transaction would be effectively countered by repositioning response of supermarket rivals, including expanded natural and organic product lines, remodeled and upgraded stores, and new store formats. Under the FTC's own *Merger Guidelines*, a merger is not likely to lead to unilateral elevation of prices of differentiated products if, in response to such an effect, rival sellers likely would replace any localized competition lost through the merger by repositioning their product lines. *Merger Guidelines* at § 2.212. Repositioning by supermarket firms is already occurring – not because of the merger or any type of price effects – but because of changing consumer demand. The pace of that change would accelerate and be focused on the alleged relevant geographic markets if prices where to increase. Competing supermarkets could defeat any increase in price or decrease

in quality by the merging firm, and, therefore the merger is unlikely to have anticompetitive effects. *See, e.g., FTC v. Staples*, 970 F. Supp. at 1087-88.

A.    *Repositioning by Other Supermarkets Is Ongoing*

Within the past five years, other supermarkets observed customers' rapidly growing demand for natural and organic foods and responded to that growing demand. These other supermarkets are expanding their product offering and repositioning themselves at Whole Foods' and Wild Oats' pre-merger prices and pre-merger quality. *See* Stanton Report ¶ 32 – 65; ██████ ████████████████████████████████████████████████████████; Scheffman Report ¶ 256. Today, over 60% of all natural and organic products are sold by conventional stores. Mays Decl. ¶ 19. Should prices rise or quality fall post-merger, repositioning is likely to accelerate.

Analyses of competition by Whole Foods' co-presidents, who oversee its operations, reflect a keen appreciation of the added competition they face from other supermarkets. For example, Co-President A.C. Gallo wrote in June 2006:

> This is a time of unprecedented competition for us. We have gone through a very long period of time when we had the advantage of offering a unique selection of products [during] a strong decline in the quality of the conventional supermarkets . . . . We had a lot of regular supermarket shoppers come to us to get fresh produce, meat and seafood even if they were not natural/organic shoppers.
>
> Allot [sic] has been made lately about Wal Mart.... What I am more concerned about is the erosion of sales to the newly improving supermarket competition.... Supers are likely to keep the cross over customer that was coming to us.... Many of our stores have people drive from a very long distance. If when they get there, the parking lots are crowded, the stores too small, the products not that unique and the experience that much better than their local store, we will loose [sic] visits to more occasional shops or not at all.

DX 1 (A.C. Gallo e-mail "Thoughts on Competition").

The record is replete with examples of effective repositioning that already is imposing a competitive constraint on Defendants' operations.  Several prominent examples are summarized below.

### 1.    *Delhaize (Operator of Hannaford, Food Lion, Bloom, and Sweetbay)*

Over the past several years, Delhaize – especially through its Hannaford and Bloom banners – has been rapidly responding to growing consumer demand for natural and organic product offerings.  ████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████

Delhaize's Hannaford banner has transformed into a leading supermarket offering natural and organic products████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████

    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████

Further evidence of repositioning can be seen from the effect of Whole Foods' entry into Portland, Maine in February 2007. Hannaford made significant changes in their Portland, Maine store in anticipation of the opening of the Whole Foods store that occurred in that area on February 14, 2007. ████████████████████████████████████████████████

████████████████████████████████████████

    ██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████

- 53 -



Whole Foods' primary competitor in Portland. Lannon Decl. ¶ 24; DX 337. Whole Foods recognizes the effect of the recent repositioning by ███████ David Lannon, Whole Foods' North Atlantic regional president, told the Whole Foods Leadership Team in a February 15, 2007 email, the day after Whole Foods opened its new store in Portland, Maine that "We are focusing on ████████ are the true competitors in the market." DX 277.

2.     *Safeway Has Also Been Repositioning*

Safeway is repositioning itself to focus on perishables, produce, more upscale consumers and a more positive shopping experience. ███████████████████ to bring design features like wood floors and softer lighting to all of its stores, making them "look a little bit more like Whole Foods." DX 623 at 21 (Robb I.H.).  To date it has remodeled about half of its stores nationwide.  *Id.* at 21:9-24.  Just yesterday, Safeway announced favorable quarterly earnings, and it attributed its success to its Lifestyle stores.[19]  Whole Foods considers Safeway a competitor and has observed the success Safeway has reported at its remodeled stores.  DX 22 (E-mail December 2006 K. Meyer to Whole Foods executives)  Paradise Decl. ¶ 21 (Safeway Lifestyle stores designed to compete with Whole Foods and imitates strategies Whole Food has used to compete against other supermarkets).  In California, Safeway has also repositioned its Vons' Pavilions supermarkets to add natural and organic products, which are modeled on Whole Foods stores.  Besancon Decl. ¶¶ 16-19.

In Boulder, Colorado, for example, Safeway repositioned to respond to the demands of the local customer base by offering an expanded variety of organic and natural products. ████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

In these and its not-yet-remodeled supermarkets, Safeway carries an expanded line of natural and organic products, which has increased competitive pressure on Whole Foods.  Robb

---

[19]     A statement about this can be found at http://shop.safeway.com.

Decl. ¶ 23 ("Safeway's ████████████████████████████ important and

challenging development for Whole Foods."); *see also*, DX 609 at 18, 54 (Meyer Dep.)

("Safeway has put together a format, their Lifestyle format██████████████████

█████████████████████████████ Safeway is also actively

recruiting suppliers of natural and organic products, ██████████████ Whole Foods to

be ████████████████████ DX 7 at 1 (February 2006 e-mail, R. Megahan).

Safeway has launched 150 SKUs [stock-keeping units] of natural and organic private label

products and discussed launch of another 100.  DX 623 at 20 – 21 (Robb I.H.).

Because of its larger overall size, Safeway from the outset has cost and other advantages

over Whole Foods in negotiating with vendors of natural and organic goods.  DX 561.  Safeway

orders in larger quantities than Whole Foods, so it can secure better prices.  *Id*.  Also, Safeway

can order larger production runs, while Whole Foods must █████████████████

█████████████████████████████ Finally, producers

may favor Safeway because of its larger sales potential.  Boardman Decl. ¶¶ 28-30.

### 3.    *Many Other Supermarkets Are Repositioning to Take Advantage of Growing Consumer Demand*

Other supermarkets are also repositioning in order to attract and retain customers

interested in buying natural and organic foods, and are also developing their own natural and

organic private-label lines.  Boardman Decl. ¶ 13; DX ███████████████ Publix

introduced a successful private label natural and organic line, called GreenWise, over five years

ago, and is planning to launch GreenWise stores in September 2007.  Allshouse Decl. ¶¶ 26-27;

Stanton Report at ¶¶ 56 – 57.  SuperValu has developed a line of Sunflower supermarkets with

expanded lines of natural and organic foods.  It has developed a store-within-a-store concept at a

number of its chains, including its Shaw's and Star banners.  Additionally, SuperValu's line of

private label natural and organic products, called "Nature's Best" and "Wild Harvest," are now

sold at its company-owned banners throughout the country (including Albertson's, Shaw's/Star,

Jewel-Osco, Cub, Acme and others) as well as to the thousands of  independent grocery stores to

which SuperValu distributes products.  Stanton Report at ¶¶ 48 – 51.  Other chains have likewise

increased their natural and organic product offerings, including private label offerings.  These

retailers include, among others, Harris Teeter, Wegmans, Giant Eagle, Bashas' and many others.

Stanton Report at ¶¶ 43 – 46; 53 – 65.

A Kroger affiliate, Ralph's, has opened a line of stores in California, Arizona, and

Nevada called Ralph's Fresh Fare.  Kroger has routinely renovated its stores to Ralph's Fresh

Fare in response to new or renovated Whole Foods stores.  Besancon Decl. ¶¶ 11-14.  Other

supermarkets are emulating Whole Foods' look and feel as well.  For example, in Minneapolis,

the Byerly's supermarket was remodeled to resemble Whole Foods' flagship store in Austin,

Texas, and together with a new Trader Joe's and nearby Super Target, drove year-over-year

comparative sales at a local Whole Foods store ████████████████████████████████████████

Bradley Decl. ¶ 25.

Even Costco now carries natural and organic products and attracts customers from Whole

Foods.  In 2006, ██████████ of customers who regularly shopped at Whole Foods also shopped

at Costco, up from ████ the previous year.  DX 15 at 16 ("2006 Health & Wellness Trends

Database"), prompting the conclusion that "Costco ████████████████████████████████████

████████████████████ *Id.* at 39; Boardman Decl. ¶ 23 ("research shows that more and more of

Whole Foods' customers ██████████████████ DX 496 ("Costco is becoming ███████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████.

This repositioning has affected Whole Foods ███████  In June 2006, Whole Foods

Co-President A.C. Gallo surveyed the effects on Whole Foods of repositioning by other

supermarkets over several regions.  DX 1.  He reported that in New England, ██████████

introduced natural and organic products and ████████████████. DX 1 at 3

("█████ comps have been weak.  We think it is due to a ████████ . . . The Boston

stores have had a ████████ . . . . I think some of it is . . . that . . . ██████████████

large selection of natural/OG foods.").  In Florida, ████████████████ its natural and

organic product array.  *Id.* at 4.  DX 601 at 61 (Robb Dep.).  Gallo reiterated his views in

October 2006:

> After a total slump by the supermarket industry we are seeing a
> comeback by the survivors.  Safeway, Giant Eagle, Giant, Stop &
> Shop, Harris Teeter, Food Lion, Publix are all opening lots of new
> stores and remodeling existing stores on the East Coat.  Every time
> they open a new store or remodel an existing one with better
> perishables and natural foods ████████.  There is an amazing
> amount of activity here that we had not seen in the past 5 years . . .

DX 2 at 1; *see also,* Lannon Decl. ¶ 11 ████████████████████  Supermarkets

can and have quickly repositioned themselves to more effectively meet consumer demand and, in

the process, to more effectively compete with Whole Foods and Wild Oats.  *See* Bradley Decl. ¶

18; Allshouse Decl. ¶ 20.

B.    *Consumer Demand for Natural and Organic Goods Is On the Rise, So Repositioning Will Continue*

Consumer demand for natural and organic food products is still growing.  Stanton Report ¶ 83.  For many consumers, price has been the main obstacle to buying more natural and organic products.  Meyer Dep. l; Scheffman Report ¶ 144.  As more supermarkets and other retail outlets add more natural and organic products to their shelves, more of these products will be produced and their average costs will decline.  Prices will fall as well, and demand will be further swelled by consumers who would have purchased natural and organic products in the past but for their higher prices.  ███████████████████████████

In these circumstances, it is not surprising that virtually every major food retailer that has not offered a wide array of natural and organic products in the past is now repositioning itself to meet the burgeoning demand.  In response to existing and future demand for natural and organic products, moreover, repositioning by supermarkets will continue.  Stanton Report ¶ 83.

C.    *A Major British Natural and Organic Firm is Entering the United States*

The leading natural and organic grocery chain in the United Kingdom, Tesco, has announced plans to enter food retailing in the United States in 2007 ████████████████████

████████████████████████████████████████.  Whole Foods believes Tesco will ███████████████.  DX 600 at 145 – 46 (Gallo Dep.); Besancon Decl. ¶ 25.  Tesco has been highly successful in the U.K., where it has its own private-label organic line of foods.  DX 623 at 19 (Robb I.H.); DX 600 at 147 (Gallo Dep.).  Tesco has signed leases for 71 stores in Southern California and Arizona.  DX 600 at 147 ████████

████████████████████████████████████.  Whole Foods ██████████

█████████████████████████████████████████ to the new

competition.  Besancon Decl. ¶¶ 26-27.  It expects Tesco to compete with a range of U.S. food

retailers ranging from Wal-Mart to Trader Joe's to Whole Foods.  Gallo Decl. ¶ 27; DX 217,

DX 272.

D.    *Dr. Scheffman Demonstrates that Repositioning and Entry Will Defeat Any Competitive*
      *Slip by the Combined Firm*

Dr. Scheffman has reviewed the recent history of repositioning by supermarkets and the

changes that are expected to continue.  His study demonstrates that any relaxation in the

combined firm's quality, and any attempt by it to increase price, would be swiftly defeated in the

marketplace by the full array of other supermarkets, with an assist from other food retailers.

Given the clear direction of these marketplace developments and the ongoing expansion of

consumer demand for natural and organic products, post-merger competition among

supermarkets will continue to intensify.  Scheffman Report ¶¶ 332 – 37.

VII.    THE COMBINED FIRM WILL BE A MORE EFFICIENT
        AND EFFECTIVE COMPETITOR

A.    *Whole Foods Has Improved the Prices, Quality, and Performance of the Stores It Has*
      *Purchased Previously*

Whole Foods has made eighteen previous retail acquisitions.  Much of Whole Foods'

success reflects its skill at turning around supermarkets that were unfocused or struggling before

it acquired them.  It has consistently improved sales at acquired stores, and it considers the

efficient integration of acquired supermarkets into its existing network to be a "core

competency."  PX01349 at 1-3, 6 (Whole Foods Responses to Second Request Specification 21);

*see also* Allshouse Decl. ¶ 11.  The leading chains acquired by Whole Foods – Bread & Circus

and Fresh Fields – were both losing money when Whole Foods acquired them, and Whole Foods

made those assets productive. This is what made the prior acquisitions valuable, and that is what

makes this acquisition attractive to Whole Foods. Sud Decl. ¶¶ 33-34.

     In each of the prior acquisitions, Whole Foods successfully ███████████████

███████████████████████ to each store that performed below Whole Foods

standards to ███████████████████████████████████████

Gallo Decl. ¶ 11; Sud Decl. ¶ 34. For example, after acquiring twenty-two stores from Fresh

Fields Markets in 1996 that had never shown a profit, Whole Foods turned them into successful,

high quality supermarkets, without raising prices. Sud Decl. ¶ 34; Gallo Decl. ¶ 13; Lannon

Decl. ¶ 9; Meyer Decl. ¶ 37. In 1998 and 2001, Whole Foods repeated this success in its

acquisitions of four stores from Nature's Heartland in Massachusetts, Gallo Decl. ¶ 14; and

Harry's Farmer Market chain in Atlanta, Georgia. Meyer Decl. ¶ 38.

     Whole Foods' record of bringing success to previous failures has not gone unnoticed in

the industry. Irwin Simon, Chairman and CEO of Hain Celestial Group, a leading supplier of

natural and organic food and personal care products, predicted another successful merger for

Whole Foods:

> If the merger is completed, I expect Whole Foods will improve
> these stores operations, improve the quality and service levels, and
> ultimately increase sales volumes. I have seen Whole Foods
> acquire supermarket operators in the past, such as Fresh Fields,
> Bread & Circus, Mrs. Gooch's and others. In every instance,
> Whole Foods was able to improve the stores, the operations,
> service levels, quality and, as a result, the sales volume. I fully
> expect that Whole Foods will be able to improve and increase the
> sales levels at the Wild Oats stores as well.

Simon Decl. ¶ 10.

Whole Foods has a proven track record in transforming sub-par Wild Oats stores into robust, high-volume stores, with lower rather than higher resulting prices. In 2002, Whole Foods took over a failed Wild Oats store in Madison, New Jersey that ███████████████ ███████ had charged higher prices than Whole Foods' nearby store in Milburn, New Jersey. After making modest capital improvements and integrating the store into its system, Whole Foods turned it into a success. Lannon Decl. ¶¶ 5-7; Sud Decl. ¶ 34. Whole Foods also took over a closed Wild Oats store in Framingham, Massachusetts, undertook major renovations, and converted it into a profitable store. Lannon Decl. ¶ 8; Sud Decl. ¶ 34.[20]

B.    *Wild Oats Is a Weakened Firm Whose Competitive Position Must Be Discounted*



---

[20] Wild Oats has been closing some of its under-performing stores in recent years. Whole Foods plans to continue that process, but, contrary to the FTC's assertions, the number of stores it will close has not been determined. Nor have the stores to be remodeled, relocated, or retained as is been identified, although there will be stores in each of these categories. *See, e.g.*, Gallo Decl. ¶ 10; Robb Decl. ¶ 12.

The closing of a store, especially an unsuccessful one, does not in and of itself harm competition, if other stores in the area provide effective competition without it. Moreover, by saving costs and building sales at surviving stores, it may enable them to operate more efficiently. *See U.S. v. Long Island Jewish Medical Center*, 983 F. Supp. at 148. Indeed, most retail mergers involve the closing of some outlets in order to rationalize the resulting network.

The FTC points in particular to a store that Wild Oats once planned to open in Boulder, Colorado ████████ ██████████████████████████████████████████████████████████



[21]

In *U.S. v. General Dynamics Corp.*, 415 U.S. 486 (1974), the Supreme Court upheld the district court's finding that the merger of two coal producers did not violate Section 7 of the Clayton Act because the acquired company's "current and future power to compete for subsequent long-term contracts was severely limited by its scarce uncommitted resources," *id.* at 503, notwithstanding that "the statistical showing proffered by the Government in this case …would under this approach have sufficed to support a finding of 'undue concentration' in the absence of other considerations." *Id.* at 497-98. Following *General Dynamics*, federal courts have developed the "weakened" or "flailing" firm doctrine:

> "[A] presumption of illegality based on market concentration alone can be rebutted if defendants can prove that the acquired firm's current market shares overstate its future competitive significance due to its weak financial condition." FTC Post-Hearing Br. at 42. A weak financial condition, or limited reserves, may mean that a company will be a far less significant competitor than current market share, or production statistics, appear to indicate.

*FTC v. Arch Coal,* 329 F.Supp.2d at 153 (quoting FTC's brief).

Among the factors that courts consider in assessing the weakened state of a merging party are:

---

[21]

- ███████████████████████████, *see U.S. v. International Harvester Co.*, 564 F.2d 769, 775-76 (7th Cir. 1977); *Arch Coal*, 329 F.Supp.2d at 154-55;

- ████████████████████████, *see International Harvester*, 564 F.2d at 775; *Arch Coal*, 329 F. Supp.2d at 156 ("To date, Triton's prospects for refinancing are questionable.");

- ██████████████████████, *see FTC v. National Tea Co.*, 603 F.2d 694, 699 (8th Cir. 1979);

- ███████████████████████ *see Arch Coal*, 329 F. Supp.2d at 147 ("Triton's goal is not to increase its market share by pricing under its competitors"; thus "Triton does not lead or even influence pricing in the market, does not compete aggressively, and does not have a history of bidding on contracts consistent with the behavior of a maverick in the [relevant] market."); Consolidated Foods, 455 F.Supp. at 136 ("[T]he president of Sara Lee attributed his company's lack of success in the retail pie market to its inability to match other manufacturers in either quality or price.");

- ████████████████████████, *see International Harvester*, 564 F.2d at 773, n.7 ("in a rapidly expanding industry in which plant expansion and an ability to keep pace with demand are, as Judge Leighton concluded, 'needed … to take advantage of the growing … market' (finding 33), current sales and production, taken apart from the availability of capital, are no less 'unreliable indicators of actual market behavior'") (ellipses in original); *Arch Coal*, 329 F. Supp.2d at 147; *U.S. v. Consolidated Foods Corp.*, 455 F.Supp. 108, 123 (E.D. Pa. 1978);

- ████████████████████████, *see International Harvester*, 564 F.2d at 776; *Arch Coal*, 329 F. Supp.2d at 156-57.

███████████████████████████████ Wild Oats falls squarely within the parameters of a "weakened" competitor.[22] First, there is no real dispute that Wild Oats' recent

---

[22] Defendants are not raising the affirmative defense that Wild Oats is a "failing" firm, which is distinct from the "flailing" or "weakened" firm doctrine. *See Arch Coal*, 329 F. Supp.2d at 154 (even if company does not satisfy conditions for a complete "failing" firm defense, "the financial condition of the prospective acquired company may reveal that its future competitive significance in the relevant market has been overstated.").

financial performance has been poor; it has reported cumulative net losses of $102 million over the last six years (over half of that amount in the last three years) and a working capital deficit in each of the last five years. ████████████ Wild Oats' 2006 Form 10-K, at 14 (DX 494).

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

among others, who have been spending substantial capital to open new stores and renovate and reformat existing stores. ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████



C.     *Whole Foods Expects to Lower Prices to Increase Profits at Wild Oats Stores*

Whole Foods has examined Wild Oats and concluded that it can substantially improve

the stores' performance.[23]  Robb Decl. ¶ 7; Gallo Decl. ¶ 5.  Part of that calculation rests on its

---

23   The FTC observes that Whole Foods is paying a premium above the then-market price for Wild Oats stock,
      implying that the premium reflects the monopoly profit Whole Foods hopes to achieve.  FTC's TRO Brief 4-5.

historical successes with other supermarkets. Most importantly, Whole Foods' management skills can be expected to dramatically improve the output of Wild Oats stores. Currently, Wild Oats stores average about ▇▇▇ a square foot in sales, while Whole Foods averages over ▇▇▇ per square foot. DX 601 at 81 (Robb Dep.); *see also* Robb Decl. ¶ 7; Gallo Decl. ¶ 5; Sud Decl. ¶ 33.

 In addition, Whole Foods ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ as it serves some of the Wild Oats stores it is acquiring. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Scheffman Report ¶¶ 343-346. By making larger purchases, the combined store will also be able to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.* at ¶¶ 347-48.

 Walter Robb, Co-President and Chief Operating Officer, summed up Whole Foods' expectations from this transaction,

> I have been directly involved in a number of prior transactions in
> which Whole Foods has achieved savings similar to the savings
> that would be achieved through the proposed transaction with Wild
> Oats . . . . In each of these transactions, Whole Foods took over a

---



To the contrary, when setting the price Whole Foods and its Board carefully considered the efficiencies, cost savings, synergies, and growth opportunities presented by a combination with Wild Oats. Gallo Decl. ¶ 6; Robb Decl. ¶ 9; Sud Decl. ¶¶ 45 – 46. Whole Foods and its investment bankers ▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ When those objective factors were modeled, the price that Whole Foods agreed to pay was well within the range of values calculated by the model. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ The FTC's assertion that the premium reflects a value for achieving anticompetitive effects is simply wrong.

number of stores, invested in them, and improved their performance. In each of the above transactions, Whole Foods was able to substantially increase sales volumes, and provide better value and service to the customers.

Robb Decl. ¶ 11; Gallo Decl. ¶ 12.

VIII.    THE FTC'S INTENT EVIDENCE IS NOT PROBATIVE OF ANY ISSUE BEFORE THE COURT

Business documents revealing the parties' and their competitors' actions in the marketplace can significantly inform the antitrust analysis of a merger. Conversely, documents that simply express the hopes and intentions of a company official are not reliable evidence to gauge the likely competitive effects of a merger. Indeed, intent is not even an element of a claim under Section 7 of the Clayton Act. *See FTC v. Baker-Hughes*, 731 F. Supp. 3, 12 n.8 (D.D.C. 1990), *aff'd*, 908 F.2d 981.

The statements by John Mackey, Whole Foods' CEO, on which the FTC relies so heavily, are at best statements of Mr. Mackey's intent, and add little, if anything, to the antitrust analysis. In any event, Mr. Mackey's views are far more nuanced than the FTC's account suggests.

A.    *Attention to Intent Distracts From Analysis of the Marketplace Conduct Relevant to a Clayton Act Determination*

The leading treatise on antitrust law dismisses various types of subjective, predictive testimony by company officials as less reliable about a merger's likely effects than evidence of actual market conduct. 2A Areeda, *et al.*, Antitrust Law ¶ 538 at 239-40. Intent evidence is unreliable in part because the workings of the market are not always clear even to the participants. Frank Easterbrook, "The Limits of Antitrust," 63 Tex. L. Rev. 1, 5 (1984) ("Firms try dozens of practices. Most of them are flops . . . . Why do particular practices work? The

firms that selected the practices may or may not know . . . . ."). Reliance on evidence of intent tends to obscure less dramatic but more important evidence of business forces. 7 Areeda, *et al.*, Antitrust Law ¶ 1506 at 393 ("emphasizing purpose frequently masks a failure to analyze the conduct").

Antitrust plaintiffs often rely heavily on documents expressing the intent of various company executives, as the FTC does here. For the reasons discussed above, courts have correctly rejected this approach, looking beyond the parties' stated (and often boastful) intentions to evidence of actual marketplace conduct to assess or predict competitive effects. In its recent decision finding allegations of an antitrust conspiracy insufficient to withstand a motion to dismiss, for example, the Supreme Court rejected a purported admission of anticompetitive intent by the defendant's CEO that the plaintiffs had emphasized. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1973 n.13 (2007). *See also, A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1402 (7th Cir. 1989) (in a Robinson-Patman case, "[s]tripping intent away brings the real economic questions to the fore at the same time as it streamlines antitrust litigation"); *Morgan v. Ponder*, 892 F.2d 1355, 1359 (8th Cir. 1989) (in context of predatory pricing claim, "[e]vidence of predatory intent alone can be ambiguous or misleading").

The parties' documents here describe the companies' daily battle to retain customers who now have many sources of natural and organic foods, as well as the other items their customers purchase. *See, e.g.*, DX 1 (Gallo e-mail, "Thoughts on Competition"). Constant price checks of other supermarkets, frequent visits by senior Whole Foods officers to competitors' stores, and investments by Whole Foods and its competitors in response to improvements by other stores, provide real-world proof that Whole Foods is constrained by other supermarkets, rather than by

Wild Oats and therefore needs to know and respond to other supermarkets' competitive initiatives.

**B.**    *The FTC Quotes Selections of Mackey's Statements that Do Not Reflect All of His Views, and It Distorts the Meaning of the Selections It Quotes*

John Mackey is keenly aware of the stiff competition that Whole Foods faces from the full range of supermarkets. In response to reports that the company had negotiated better prices with some suppliers, he wrote, "I predict that there aren't going to be any 'extra profit dollars.' They are all going to be spent being more price competitive with TJs, Wegmans, Safeway, Wal-Mart, etc." DX 11 at 1 (October 2006). Later, in deposition testimony, he told an FTC attorney:

> If you were worried about us dominating some kind of lifestyle brand niche, that might have been true 10 years ago. Today, it's only Whole Foods trying to say 'we are this unique food retailer, please believe us . . .' Meanwhile, customers continue to erode to our competitors and our same-store sales are on a downward trek. . . ."

DX 622 at 48 – 49 (Mackey I.H.).

The FTC ignores Mackey's testimony about the competitive threats to Whole Foods from particular competitors that the FTC places outside the market. In response to the FTC's questions, Mackey testified that, "[i]f you think of the type of customer Whole Foods gets, take these different pots, you have this . . . hardcore natural/organic food customer, . . . this upscale foodie gourmet customer, . . . [and] mainstream customers who want a better experience at their food store, better service, better ambiance, not the sterile hospital-like, white, ugly, Muzak-type environment. . . . Well, the [Safeway] Lifestyle store hits all three of those customers in a way they weren't getting before. . . . the Lifestyle stores made Safeway more competitive to Whole Foods . . . ." DX 622 at 166-67 (Mackey I.H.). Of Costco, Mackey told his Board of Directors,

"In all honesty there is no real way to effectively compete with  . . ." DX 12 at 3 (J. Mackey, Board Presentation (May 2007)). For ██████████████████████████████ ████████████████████████████ competitor for us." DX 622 at 47 (Mackey I.H.).

The FTC points to Mackey's testimony about eliminating competition, but the FTC misses the mark in its characterization of that testimony. It is tautological that every merger between competitors eliminates the competition that previously existed between them. The FTC and the DOJ routinely approve hundreds of "horizontal" transactions every year. That is because the antitrust laws, and Section 7 in particular for our purposes, are concerned with the transaction's effect on competition, not on competitors. *Brown Shoe v. U.S.*, 370 U.S. 294. That is exactly the way Mackey views the transaction – it eliminates a competitor but it certainly does not eliminate or reduce competition. DX 622 at 129 (Mackey I.H.). Mr. Mackey's statements are not to the contrary and the FTC's burden, which it has failed to meet, is to come forward with reliable evidence of the likely effect of the acquisition on competition, which means evidence showing that it is more probable than not that Whole Foods will be able, on its own, to impose a significant, enduring price increase on the basket of goods it sells customers due to its acquisition of Wild Oats.

Thus, the FTC's reliance on Mackey's statements is misplaced. Many of the statements it cites are expressions of intent that are far less relevant to the merger's actual competitive effects

than the large body of operational business documents and witness testimony that demonstrate active, ongoing competition between Whole Foods and all other supermarkets.[24]

C.    *The Testimony of Perry Odak Should Be Discounted as Unreliable and Biased.*

The FTC has unsuccessfully attempted to adduce credible evidence that, notwithstanding these long-standing and fundamental problems, Wild Oats is on the cusp of becoming a "maverick" competitor that will be uniquely effective at battling Whole Foods.  It has also alleged, contrary to the overwhelming weight of evidence, that Wild Oats' considers its only effective competitor to be Whole Foods and vice versa.  Much of the "evidence" purportedly supporting these contentions comes from, or is based on, the testimony of Perry Odak, Wild Oats' former CEO.  However, defendants respectfully submit that the Court should substantially discount this testimony for two simple and interrelated reasons:  (i) Mr. Odak, who had no prior experience in food retailing (or any other form of retailing), was ███████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████ which has made Mr. Odak increasingly embittered towards Wild Oats' Board and it current management, thus making him a biased witness.

On the first point, one need only examine Mr. Odak's repeated and erroneous testimony on basic, objective facts relating to Wild Oats' operations.  █████████████████████████ ████████████████████████████████████████████████████

---

24 As explained above, to the extent that Mackey expressed a desire to buy Wild Oats so that another supermarket could not buy it instead, his intent raises no antitrust issue.  The Clayton Act only prohibits mergers that *lessen* competition substantially, not mergers that fail to improve it.  15 U.S.C. § 18.



Mr. Odak's ignorance of basic facts about Wild Oats was symptomatic of his overall

ignorance of the supermarket industry and Wild Oats competitive status in that industry. He

simply refused to believe, in the face of mounting evidence of customer erosion and financial

underperformance, that Wild Oats faced significant competition from anyone but Whole Foods.

While the FTC has cited Mr. Odak's views as support for its claims, ████████████

████████████████████████████████████████████████████████

██████████████████

---

<sup>25</sup> Wild Oats, consistent with others in the grocery business, defines perishables to include produce (including floral), meat, seafood, deli, bakery and food service, but to exclude dairy and frozen items, which, although literally perishable, are considered "grocery" items. Martin ¶ 23.

<sup>26</sup> ████████████████████████████████████████ Notwithstanding this, the FTC contends Safeway is not a participant in the market.

Understandably, Mr. Odak has become embittered towards Wild Oats' Board and its current senior management. Mr. Odak's bitterness has only grown as Wild Oats has decided for legitimate reasons: ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ Indeed, at that June 29, 2007 deposition, Mr. Odak was clearly an extraordinarily hostile witness to Wild Oats. DX 615 at 8-9, 140-42, 150, 179-82, 204-07, 333. Regardless of the business or legal merits of why Mr. Odak left Wild Oats, whether 29th Street is a "great" design or a disaster, ████████████████████████████████

██████████████████████████, it is abundantly clear from even a casual reading of his transcript (and graphically more so upon reviewing the video of that deposition) that Mr. Odak was an extraordinarily biased witness against Wild Oats.

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ This Court should likewise not rely on Odak's judgment or opinion.

## IX. THE BALANCE OF THE EQUITIES DOES NOT FAVOR ISSUANCE OF AN INJUNCTION

Absent proof of the FTC's likely success on the merits, the equities will not justify the granting of a preliminary injunction. *FTC v. Arch Coal*, 329 F. Supp. 2d at 159. Because the FTC has failed to establish that it is likely to succeed in a full hearing on the merits, the equities

do not favor entry of an injunction in this case. *FTC v. Foster (Western Refining)*, Memorandum

Opinion ¶ 17, CIV 07-352 JB/ACT, *appeal pending*.

The equities would be considered even if the FTC had established a likelihood of success.

*FTC v. Swedish Match*, 131 F. Supp. 2d at 172. The Court is to consider private equities,

including the corporate interests of the companies involved in the proposed merger, *id.,* and

public equities, including the public interest in appropriate enforcement of the antitrust laws and

the "potential benefits, both public and private, that may be lost by enjoining a merger." *Id.,*

*citing FTC v. Weyerhaeuser Co.*, 665 F.2d at 1082. Here, given the procompetitive promise of

the proposed merger and the parties' interest, the equities favor rejecting the motion for

preliminary injunction.

X.     CONCLUSION

For all the foregoing reasons, the FTC is unable to demonstrate a reasonable probability

that it will succeed on the merits of its claims. Therefore, its motion for a preliminary injunction

should be denied.

Respectfully submitted,

_____
Paul T. Denis (DC Bar No. 437040)
Paul H. Friedman (DC Bar No. 290635)
Jeffrey W. Brennan (DC Bar No. 447438)
James A. Fishkin (DC Bar No. 478958)
Michael Farber (DC Bar No. 449215)
Rebecca Dick (DC Bar No. 463197)

DECHERT LLP
1775 I Street, N.W.
Washington, DC 20006
Telephone: (202) 261-3430
Facsimile: (202) 261-3333

- 75 -

*Of Counsel:*

Roberta Lang
Vice-President of Legal Affairs
    and General Counsel
Whole Foods Market, Inc.
550 Bowie Street
Austin, TX

Alden L. Atkins (DC Bar No. 393922)
Neil W. Imus (DC Bar No. 394544)
John D. Taurman (DC Bar No. 133942)

VINSON & ELKINS L.L.P.
The Willard Office Building
1455 Pennsylvania Avenue, N.W., Suite 600
Washington, DC  20004-1008
Telephone (202) 639-6500
Facsimile (202) 639-6604

*Attorneys for Whole Foods Market, Inc.*


Clifford H. Aronson (DC Bar No. 335182)
Thomas Pak (Pro Hac Vice)
Matthew P. Hendrickson (Pro Hac Vice)

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
Four Times Square
New York, NY  10036
Telephone: (212) 735-3000
caronson@skadden.com

Gary A. MacDonald (DC Bar No. 418378)

SKADDEN, ARPS, SLATE, MEAGHER
    & Flom LLP
1440 New York Avenue, N.W.
Washington, DC  20005
Telephone:  (202) 371-7000
gmacdona@skadden.com

Terrence J. Wallock (Pro Hac Vice)
2224 Pacific Dr.
Corona Del Mar, CA  92625
(949) 375-0683

*Attorneys for Defendant Wild Oats Markets, Inc.*