# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:07-cv-01021-PLF |
| | ) | |
| WHOLE FOODS MARKET, INC., | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| WILD OATS MARKETS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S NOTICE OF FILING OF THE PUBLIC VERSION
## OF ITS CORRECTED BRIEF ON ITS MOTION FOR PRELIMINARY INJUNCTION

Notice is given that a redacted public version of Plaintiff's Corrected Brief re [4] Its

Motion for Preliminary Injunction (Doc. No. 122), is filed via CM-ECF as an attachment to this

notice.

Respectfully submitted,

Dated: August 1, 2007

   /s/ Eric M. Sprague
Eric M. Sprague
Bureau of Competition
Federal Trade Commission
601 New Jersey Avenue, N.W.
Washington, DC  20001
(202) 326-2101 (direct dial)
(202) 326-2071 (facsimile)
esprague@ftc.gov

Counsel for Plaintiff

**Exhibit 1A–Part 1 of Plaintiff's Public Version of Its Corrected Brief on Its Motion for Preliminary Injunction**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civ. No. 07-cv-01021 - PLF |
| v. | ) | |
| | ) | **PUBLIC VERSION** |
| WHOLE FOODS MARKET, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILD OATS MARKETS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## <u>PLAINTIFF FEDERAL TRADE COMMISSION'S CORRECTED BRIEF ON ITS MOTION FOR PRELIMINARY INJUNCTION</u>

Dated: August 1, 2007

JEFFREY SCHMIDT
Director

KENNETH L. GLAZER
Deputy Director

WILLIAM BLUMENTHAL
General Counsel

Bureau of Competition
Federal Trade Commission
600 Pennsylvania Ave, N.W.
Washington, DC 20580

MICHAEL J. BLOOM
RICHARD B. DAGEN (D.C. Bar No. 388115)
THOMAS J. LANG (D.C. Bar No. 452398)
CATHARINE M. MOSCATELLI (D.C. Bar No. 418510)
MICHAEL A. FRANCHAK

Federal Trade Commission
601 New Jersey Ave., N.W.
Washington, DC 20001
(202) 326-2475 (direct dial)
(202) 326-2284 (facsimile)
mjbloom@ftc.gov

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.    SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT ESTABLISHES A
      PUBLIC INTEREST STANDARD FOR GRANTING INJUNCTIVE RELIEF . . . . . . . 9

II.   THE FTC IS LIKELY TO SUCCEED IN ESTABLISHING THAT THE PROPOSED
      ACQUISITION VIOLATES THE ANTITRUST LAWS . . . . . . . . . . . . . . . . . . . . . . . 10
      A.    Premium Natural and Organic Supermarkets Constitute a Relevant
            Product Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
            1.    "Non-Competitive" Markets . . . . . . . . . . . . . . . . . . . . . . . 17
            2.    Project Goldmine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
            3.    Competitive Intrusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
            4.    Unique Head-to-Head Competition: Economic Analysis
                  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
                  a.    Wild Oats Pricing . . . . . . . . . . . . . . . . . . . 26
                  b.    Whole Foods Pricing and Sales . . . . . . . . 27
                  c.    Summary of Economic Analysis . . . . . . . 28
            5.    Peculiar Characteristics and Product Differentiation . . . . 29
                  a.    Unique Inventory of Products . . . . . . . . . 30
                  b.    "Lifestyle Retailers" - Superior Service in a
                        Unique Shopping Environment . . . . . . . . 35
                        i.    Defendants' Views . . . . . . 35
                        ii.   Industry Expert Views . . . 37
                  c.    Characteristics of Conventionals and Other
                        Retailers . . . . . . . . . . . . . . . . . . . . . . . . . . 38
                  d.    Distinct Customers . . . . . . . . . . . . . . . . . 45
      B.    The Relevant Geographic Markets Are Local . . . . . . . . . . . . . . . . . . . 47
      C.    The Relevant Markets Are Highly Concentrated and Whole Foods'
            Acquisition of Wild Oats Will Greatly Increase Concentration,
            Significantly Increasing Market Power . . . . . . . . . . . . . . . . . . . . . . . . . 49
      D.    The Proposed Acquisition Would Injure Competition in Numerous Cities
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
            1.    Unique Price Competition Between the Defendants Will Be Lost
                  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
            2.    Unique Non-Price Competition Between the Defendants Will Be
                  Lost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
            3.    Wild Oats Is a Viable and Aggressive Competitor . . . . . . . . . . 56
      E.    Other Retailers Will Not Reposition into the Operation of Premium

               Natural and Organic Supermarkets, Nor Will Other Companies Enter *De Novo* .................................................................. 64

    F.    Defendants Have Not Demonstrated That the Alleged Efficiencies from the Merger Will Counteract its Anticompetitive Effects ............. 77

    G.    Summary: Whole Foods' Acquisition of Wild Oats Will Harm Competition ............................................... 80

III.    JUDGED BY THE STATUTORY STANDARD OF SECTION 13(b) OF THE FTC ACT, THE COMMISSION IS ENTITLED TO A FULL-STOP PRELIMINARY INJUNCTION ...................................................... 81

CONCLUSION .......................................................... 84

# TABLE OF AUTHORITIES

## CASES

*BOC Int'l Ltd. v. FTC*,
  557 F.2d 24 (2d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Brown Shoe Co., Inc. v. United States*,
  370 U.S. 294 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 14, 31, 46

*California v. Am. Stores*,
  495 U.S. 271 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14, 15, 65

*Columbia Broad. Sys., Inc. v. FTC*,
  414 F.2d 974 (7th Cir. 1969)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*FTC v. Cardinal Health, Inc.*,
  12 F. Supp. 2d 34 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12, 14, 65, 78, 80, 82

*FTC v. Coca-Cola Co.*,
  641 F. Supp. 1128 (D.D.C. 1986), *vacated as moot*, 264 U.S. App. D.C. 406, 829 F.2d
  191 (D.C. Cir. 1987)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*FTC v. Elders Grain, Inc.*,
  868 F.2d 901 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 82, 83

*FTC v. Food Town Stores, Inc.*,
  539 F.2d 1339 (4th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-11, 49, 77, 79, 81-83

*FTC v. Lancaster Colony Corp., Inc.*,
  434 F. Supp. 1088 (S.D.N.Y. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 82

*FTC v. PPG Indus., Inc.*,
  798 F.2d 1500 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 81-83

*FTC v. Procter & Gamble Co.*,
  386 U.S. 568 (1967)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*FTC v. Staples, Inc.*,
      970 F. Supp. 1066 (D.D.C. 1997)   3, 10, 11, 14-16, 18, 19, 22, 30, 40, 46, 63, 65, 76, 80-
                                                                                                  83

*FTC v. Swedish Match N. Am., Inc.*,
      131 F. Supp. 2d 151 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 65, 82

*FTC v. Univ. Health, Inc.*,
      938 F.2d 1206 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 82

*FTC v. Warner Communications, Inc.*,
      742 F.2d 1206 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 82

*FTC v. Weyerhaeuser, Co.*,
      665 F.2d 1072 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Hosp. Corp. of Am. v. FTC*,
      807 F.2d 1381 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14, 49, 81

*Photovest v. Fotomart*,
      606 F.2d 704 (7th Cir. 1979)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 37

*Rothery Storage & Van Co. v. Atlas Van Lines*,
      792 F.2d 210 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Tampa Elec. Co. v. Nashville Coal Co.*,
      365 U.S. 320 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Times-Picayune Pub. Co. v. United States*,
      345 U.S. 594 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Aluminum Co. of Am.*,
      377 U.S. 271 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

*United States v. Archer-Daniels-Midland Co.*,
      866 F.2d 242 (8th Cir. 1988), *on remand*, 781 F. Supp. 1400 (S.D. Iowa 1991)  . . . 11, 14

*United States v. Baker Hughes, Inc.*,
      908 F.2d 981 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 49

*United States v. E.I. du Pont de Nemours & Co.*,
      351 U.S. 377 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*United States v. General Dynamics Corp.,*
    415 U.S. 486 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Marine Bancorporation, Inc.,*
    418 U.S. 602 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 64

*United States v. Oracle,*
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Philadelphia Nat'l Bank,*
    374 U.S. 321 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 47

*United States v. Phillips Petroleum Co.,*
    367 F. Supp. 1226 (C.D. Cal. 1973), *aff'd,* 418 U.S. 906 (1974) . . . . . . . . . . . . . . . . . . 64

*United States v. Rockford Memorial Corp.,*
    717 F. Supp. 1251 (N.D. Ill. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*United States v. United Tote, Inc.,*
    768 F. Supp. 1064 (D. Del. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

## STATUTES

Clayton Act, Section 11,
    15 U.S.C. § 21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Clayton Act, Section 7,
    15 U.S.C. § 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10, 80

Federal Trade Commission Act, Section 13(b),
    15 U.S.C. § 53(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 82

Federal Trade Commission Act, Section 5,
    15 U.S.C. § 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Organic Food Production Act of 1990,
    7 U.S.C. §§ 6501-22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 31, 75

## OTHER AUTHORITIES

Areeda, Hovenkamp & Solow, *Antitrust Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16, 50, 51, 79

Daniel P. O'Brien & Abraham L. Wickelgren, *A Critical Analysis of Critical Loss Analysis*, 71 Antitrust L.J. 161 (2003) ........................................................ 21

Jonathan Baker, *Unilateral Competitive Effects Theories in Merger Analysis*, 11 Antitrust L.J. 21 (1997) ............................................................... 16

Len Lewis, *The Trader Joe's Adventure* (2005) ...................................... 39

Michael L. Katz and Carl Shapiro, *Further Thoughts on Critical Loss*, Antitrust Source, March 2004 ............................................................... 21

Robert G. Harris & Thomas M. Jorde, *Market Definition in the Merger Guidelines: Implications for Antitrust Enforcement*, 71 Cal. L. Rev. 464 (1983) ................................. 13

U.S. Dept. of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines,
4 Trade Reg. Rep. (CCH) ¶ 13,104 (Apr. 8, 1997) ........... 11, 13, 14, 49, 65, 76-78

USDA Organic Rule,
7 C.F.R. § 205 ........................................................ 7, 31

## INTRODUCTION

In buying Wild Oats, Whole Foods is, in effect, paying its principal rival a large sum of money to close its nearby stores. That makes financial sense because, and only because, Whole Foods knows that in locality after locality ███████ customers of the closed Wild Oats stores–in some instances more than ███–will be captured by Whole Foods. These projections come directly from Whole Foods' own evaluation of the proposed acquisition of Wild Oats, aptly named "Project Goldmine."

The extraordinary capture rate, emblematic of the fact that a substantial portion of consumers regard Whole Foods and Wild Oats as uniquely close substitutes, is why the combination of Whole Foods and Wild Oats will substantially lessen competition. For Whole Foods, the acquisition may be a goldmine, but the gold it mines will be taken from the pockets of consumers.

The Chief Executive Officer of Whole Foods, John Mackey said as much when he candidly told his Board of Directors:

> By buying them we will . . . avoid nasty price wars in Portland (both Oregon and Maine), Boulder, Nashville, and several other cities which will harm our gross margins and profitability. OATS may not be able to defeat us but they can still hurt us. Furthermore we eliminate forever the possibility of Kroger, Super Value, or Safeway using their brand equity to launch a competing national natural/organic food chain to rival us. . . . [Wild Oats] is the only existing company that has the brand and number of stores to be a meaningful springboard for another player to get into this space. Eliminating them means eliminating this threat forever, or almost forever.

Exhibit 1 (PX00773 at 001) (Feb. 15, 2007). In his testimony, Mr. Mackey reaffirmed that a major reason for the acquisition is to keep Wild Oats out of the hands of other supermarkets:

1

So it is either Whole Foods buy them or we potentially see someone like Kroger or Safeway or Tesco or God knows who else, a private equity firm, buy them and recapitalize them, potentially bring in new management. And we would rather not see that happen.

Exhibit 2 (Transcript of Investigational Hearing of John Mackey, at 54:22-55:2, PX01324 at 054-055). And he reiterated that the purchase price includes "a premium for taking it off the table for Kroger or Safeway to use it to harm Whole Foods with." *Id.* at 246:7-8, PX01324 at 246.

In these plain words, Whole Foods explained how the acquisition would harm competition and consumers. The harm is particularly troubling, given that Whole Foods is paying a significant premium while planning to close                    of the acquired stores. Exhibit 3 (PX00553 at 001); Exhibit 4 (Transcript of Investigational Hearing of Elisabeth Griffin Foster, at 95:5-11, PX01338 at 095); Exhibit 5 (PX01349). In fact, Mr. Mackey testified that:

> One of the motivations is to eliminate a competitor. I will not deny that. That is one of the reasons why we are doing this deal. That is one of the reasons we are willing to pay $18.50 for a company that has lost $60 million in the last six years. If we can't eliminate those stores, then Wild Oats, frankly, isn't worth buying.

Exhibit 2 (Transcript of Investigational Hearing of John Mackey, at 75:13-21, PX01324 at 075). As Plaintiff's economic expert, Kevin M. Murphy, Ph.D., the George J. Stigler Distinguished Service Professor of Economics at the University of Chicago Graduate School of Business, explained, these store closings "will unambiguously reduce competition and harm consumers in these markets." Exhibit 6 (Expert Report of Kevin M. Murphy, Ph.D., PX02878 at 003).

Organic and natural foods have been available for many years at traditional health food stores, which typically are small, independent "mom and pop" stores or coops. But starting in the 1980s, a new breed of natural and organic food retailer came onto the scene – larger, attractive supermarkets offering a wide variety of high-quality fruits and vegetables, meats and

2

fish, prepared foods and other perishables, with strong branding and a prominent emphasis on healthy lifestyles and environmental sustainability.

Some in the industry referred to this new type of food retailer as "super naturals," to distinguish it from the old-style health food store. Exhibit 7 (Transcript of Deposition of Irwin Simon, at 134:8-11, 135:2-18, PX02866 at 134, 135). Whatever the name, it was a distinctly new concept in food retailing and it became very successful. Whole Foods and Wild Oats are the best known of this type of store, which we will refer to as "premium natural and organic supermarkets." Others were Bread & Circus and Fresh Fields, both of which were purchased by Whole Foods in the 1990s. Today, apart from Defendants, only a few regional firms compete in this product space, including Earth Fare in a few Southeastern states and New Seasons in Oregon. As the former CEO of Wild Oats testified, "[T]here's really only two players . . . of any substance in the organic and all natural, and that's Whole Foods and Wild Oats." Exhibit 8 (Transcript of Investigational Hearing of Perry Odak, PX01325 at 058). While there was a substantial third office superstore in *Staples*,[1] Mr. Mackey testified, "There ain't no Office Max in the room here." Exhibit 2 (Transcript of Investigational Hearing of John Mackey at 206, PX01324 at 206). In fact, the acquisition would result in substantial increases in concentration as measured by the HHI, to as high as 10,000 in many markets.

Defendants participate in a market comprising stores that focus on high-quality perishables, specialty and natural organic produce, prepared foods, meat, fish, and bakery goods. Premium natural and organic supermarkets are significantly differentiated from conventional supermarkets by their emphasis on natural and organic products, and on perishables rather than

---

[1]     *FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997).

3

on dry goods. The product market also is characterized by stores that offer substantially higher levels of customer service than conventionals provide. Finally, the product market includes stores that are, in the words of Defendants, "mission driven," with an emphasis on "authenticity," including "social and environmental responsibility." Premium natural and organic supermarkets offer customers a perspective of a "third place," as an alternative to work or home; they provide the customer with the confidence of "lifestyle brand" and added confidence and trust in the provision of the natural and organic products that are good for the consumer; they provide a "unique environment," in stores that meet "core values" and offer a "superior store experience." In short, although participants in this market compete with conventionals, they also compete in unique ways among each other.

Even though conventional supermarkets now frequently carry some natural and organic products, Whole Foods and Wild Oats recognize that their primary competitors are the other premium natural and organic supermarkets. In Mr. Mackey's opinion, conventional supermarkets cannot effectively compete in this market:

> Safeway and other conventional retailers will keep doing their thing – trying to be all things to all people. . . . They can't really effectively focus on Whole Foods Core Customers without abandoning 90% of their own customers.

Exhibit 9 (PX00785).

The unique competition between the Defendants is captured by their documents. Wild Oats' "Competitor Intrusion" studies show that Whole Foods will capture a large percentage of Wild Oats sales upon entry into a Wild Oats' "monopoly" markets. Similarly, in its "Project Goldmine" documents Whole Foods expects to capture substantially more customers upon the closing of a Wild Oats than would be expected if all supermarkets were fungible. In other words,

Defendants provide direct evidence of what constitutes the "next best" choice in the mind of consumers.

For example, Whole Foods projected, after closing Wild Oats stores, that as much as ▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ of the closed Wild Oats store's revenue would transfer to Whole Foods, despite many other supermarkets in close proximity. Exhibit 3 (PX00553). Diversions ▇▇▇▇▇▇▇▇▇ would not be possible unless Wild Oats and Whole Foods were uniquely close substitutes. Plaintiffs' expert, Professor Murphy finds these revenue transfer projections from Project Goldmine to be strong evidence of what Whole Foods regards as the next-best option for current Wild Oats shoppers.

These diversion estimates were not low-level, idle, "back of the envelope" calculations; they were used ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Exhibit 12 (Transcript of Investigational Hearing of Jim Sud, at 69:23-73:20, PX01340 at 063-073 (discussing Project Goldmine model)); Exhibit 4 (Transcript of Investigational Hearing of Elisabeth Griffin Foster, at 94:10-95:16, PX01338 at 094-095). Wild Oats' business documents reflect similar predictions. Exhibit 13 (PX00919). Thus, conventional supermarkets do not currently constrain premium natural and organic supermarkets in nearly the same way that Whole Foods and Wild Oats constrain one another.

Repositioning by conventional supermarkets is unlikely to replace this unique competition in any reasonable time period. This conclusion is confirmed by a February 2007 study by The Hartman Group, a research firm well-regarded by both Defendants. Exhibit 88 (Transcript of Investigational Hearing of Laura Coblenz, at 23:12-25, PX01323 at 023). The

5

study concluded:

> **It is our belief that WFM will not encounter significant, if any, competition from leading mainstream retailers['] (Safeway, Wal-Mart, Costco, etc.) entry into organics.**
> Most other major retailers lack the ability to consistently generate authentic, high-quality food experiences.

Exhibit 15 (PX02508 at 026) (emphasis in original). In the words of one senior Whole Foods

officer, for conventionals seeking to reposition, it is "[n]ot as easy as it looks folks." Exhibit 16

(PX00180 at 001). Another added: "[s]tarting up a brand from scratch is very risky and

expensive." Exhibit 17 (PX00565 at 002).

Focusing its attention on its closest rival, Whole Foods regularly initiated numerous

forays into what Whole Foods described as Wild Oats' "monopoly" markets. Exhibit 18

(PX00712 at 001). In March 2006, for example, Mr. Mackey, using a pseudonym, wrote:

> Whole Foods says they will open 25 stores in OATS territories in the next 2 years. . . .
> The writing is on the wall. The end game is now underway for OATS. . . . Whole Foods
> is systematically destroying their viability as a business – market by market, city by city.

Exhibit 19 (PX00801 at 001).[2] But Whole Foods decided that the "systematic destruction" of

Wild Oats through competition would involve more time, expense, and uncertainty than simply

acquiring Wild Oats. Whole Foods saw the acquisition of Wild Oats as a quick and certain way

of "destroying" Wild Oats and the unique competition it represented. That is why Whole Foods

is "doing this deal." And that is why Whole Foods is willing to pay an admittedly substantial

premium for Wild Oats and incur the additional cost of at least ▓▓▓▓▓▓ for each of the ▓▓▓

stores Whole Foods intends to close. *See* Exhibit 5 (PX01349). As a result, Whole Foods

---

[2]    As here, Mr. Mackey often posted to Internet sites pseudonymously, often using the name Rahodeb.

6

shareholders may be better off (avoiding "nasty price wars"), and Wild Oats shareholders may be

better off (receiving a premium even though ▓▓▓▓▓▓ are being closed), but consumers

are left holding the (more expensive grocery) bag.

To prevent this destruction of competition, plaintiff Federal Trade Commission ("FTC"

or the "Commission") seeks a preliminary injunction pursuant to Section 13(b) of the Federal

Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to prevent Whole Foods' acquisition of

Wild Oats pending a determination by the Commission of the legality of the acquisition under

Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18 and 21, and Section 5 of the FTC Act, 15

U.S.C. § 45.  Absent the requested injunction, Whole Foods will complete the acquisition of

Wild Oats, with the following results: Whole Foods will close down ▓▓ Wild Oats stores;[3]

Wild Oats' infrastructure will be dismantled; and the possibility of restoring competition in the

operation of premium natural and organic supermarkets in numerous geographic areas will be

lost, causing substantial harm to consumers.

## BACKGROUND

Whole Foods, a Texas corporation, is the world's leading natural and organic

supermarket.[4]  It opened its first store in Austin, Texas, in 1980 and has expanded its operations

both by opening new stores and acquiring existing stores from third parties.  Exhibit 20

---

[3]    Exhibit 3 (PX00553 at 001); Exhibit 4 (Transcript of Investigational Hearing of
Elisabeth Griffin Foster, at 95:2-11,PX01338 at 095).

[4]    In the United States, the Organic Food Production Act of 1990 (7 U.S.C.A. §§
6501-22) required that the USDA develop national standards for organic products.  The
regulations (7 C.F.R. Part 205) are enforced by the USDA through the National Organic
Program.  These laws require that any product that claims to be organic must be manufactured
and handled according to NOP requirements.  A USDA Organic seal identifies products with at
least 95% organic ingredients.

7

(PX01302 at 004). Whole Foods operates 194 stores in North America and the United Kingdom. It has acquired many other premium natural and organic supermarkets in the past.[5] Whole Foods' sales for the 2006 fiscal year were $5.6 billion. Exhibit 23 (PX00011). The average square footage per store is 34,000. Exhibit 20 (PX01302 at 004, 010).

As of February 26, 2007, Wild Oats, a Delaware corporation founded in 1987 and headquartered in Boulder, Colorado, operated 110 natural foods stores in 24 states and British Columbia, Canada. Exhibit 128 (PX00613 at 005). Its sales for the 2006 fiscal year were $1.183 billion. Exhibit 128 (PX00613). Wild Oats operates under four banners: Wild Oats Marketplace, Henry's Farmers Market, Sun Harvest, and Capers Community Market. Wild Oats prototype stores range from 27,000 to 34,000 square feet. Exhibit 128 (PX00613 at 006).

Both Wild Oats and Whole Foods are on a path toward bigger, fancier stores. Over the last five years, the average store size for Whole Foods has increased by 20%.[6] Similarly, Wild Oats has plans to build a number of larger stores.

---

[5]    Whole Foods has acquired Bread & Circus, Fresh Fields, and numerous others. Exhibit 6 (Expert Report of Kevin M. Murphy, Ph.D., ¶ 25, PX02878 at 009). *Cf.* Exhibit 21 (PX04354 (discussing a potential acquisition by Mackey)); Exhibit 22 (PX04356) ("60 Minutes" DVD).

[6]    *See, e.g.,* Exhibit 25 (PX00102 at 004) (Mackey Analyst Call):

The first store we opened back in 1980 was 10,000 square feet which at the time was one of the largest natural and organic foods stores. Since then, we have continued to increase the size of our stores which we believe has been a significant factor in broadening our customer appeal. For example, over the last five fiscal years, while our average store size has increased 22%, our average weekly sales per store have increased 65% or triple that amount. We also believe that larger stores will lead to higher returns as they will take longer to reach capacity while creating a higher barrier to entry. . . .

We currently operate eight stores within the 60,000 to 80,000 square foot range and have 29 stores of that size in development through 2009.

8

In February 2007, Whole Foods and Wild Oats announced that Wild Oats would be

acquired by Whole Foods. Exhibit 26 (PX00167). The transaction is valued at $700 million.

Whole Foods plans to close at least ▮ Wild Oats stores that compete with Whole Foods stores.[7]

On June 6, 2007, the Commission filed a motion for a temporary restraining order and

preliminary injunction to block this merger pending an administrative hearing before the Federal

Trade Commission.

## ARGUMENT

## I.   SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT ESTABLISHES A PUBLIC INTEREST STANDARD FOR GRANTING INJUNCTIVE RELIEF

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides that a preliminary injunction

may be granted "upon a proper showing that, weighing the equities and considering the FTC's

likelihood of ultimate success, such action would be in the public interest." In enacting Section

13(b), Congress adopted a "public interest" standard. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714

(D.C. Cir. 2001); *see FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1501-02 (D.C. Cir. 1986). Under

that standard, the court "must (1) determine the likelihood that the FTC will ultimately succeed

on the merits and (2) balance the equities." *Heinz*, 246 F.3d at 714. The court's "task is not to

make a final determination on whether the proposed [acquisition] violates Section 7, but rather to

---

[7]      In addition to the Wild Oats stores that Whole Foods intends to close, Whole Foods announced in a June 20, 2007, press release that, subject to the closing of its acquisition of Wild Oats, it will sell off all 35 Henry's and Sun Harvest stores (located in California and Texas) to be acquired from Wild Oats. *See* Exhibit 27 (PX00329, *available at* http://www.wholefoods.com/investor/pr07_06-20.html).

9

make only a preliminary assessment of the [acquisition]'s impact on competition."[8] This Court need not resolve all conflicts of evidence or analyze extensively all antitrust issues; that is the province of the administrative proceeding. *Warner Communications*, 742 F.2d at 1164 (citing *FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088, 1094, 1096 (S.D.N.Y. 1977)). The FTC satisfies its burden if it "raise[s] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals."[9]

## II. THE FTC IS LIKELY TO SUCCEED IN ESTABLISHING THAT THE PROPOSED ACQUISITION VIOLATES THE ANTITRUST LAWS

Section 7 of the Clayton Act prohibits any acquisition "where in any line of commerce in any section of the country, the effect of such acquisition *may be* substantially to lessen competition or to tend to create a monopoly." 15 U.S.C. § 18 (emphasis added). The statutory language *"may be,"* according to the Supreme Court, "creates a relatively expansive definition of antitrust liability." *California v. American Stores*, 495 U.S. 271, 284 (1990) (emphasis in original); 15 U.S.C. § 18. Section 7 is intended to arrest anticompetitive acquisitions in their incipiency. *Univ. Health*, 938 F.2d at 1218. "All that is necessary is that the merger create an *appreciable danger* of [anticompetitive] consequences in the future. A predictive judgment,

---

[8]     *Heinz*, 246 F.3d at 714 (citing *FTC v. Univ. Health, Inc.*, 938 F.2d 1156, 1217-18 (11th Cir. 1991)); *FTC v. Warner Communications, Inc.*, 742 F.2d 1156, 1164 (9th Cir. 1984); *see also FTC v. Swedish Match N. Am., Inc.*, 131 F. Supp. 2d 151, 156 (D.D.C. 2000); *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 45 (D.D.C. 1998); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1070-71 (D.D.C. 1997).

[9]     *Heinz*, 246 F.3d at 714-15; *Univ. Health*, 938 F.2d at 1218; *Warner Communications*, 742 F.2d at 1162; *Swedish Match*, 131 F. Supp. 2d at 156; *Cardinal Health*, 12 F. Supp. 2d at 45; *Staples*, 970 F. Supp. at 1071.

necessarily probabilistic and judgmental rather than demonstrable, is called for." *Heinz*, 246

F.3d at 719 (citations omitted) (emphasis added); *see also Brown Shoe Co., Inc. v. United States*,

370 U.S. 294, 323 (1962) (The inquiry "deals in probabilities, not certainties . . . ."); *Staples*, 970

F. Supp. at 1072 ("the government need only show that there is a 'reasonable probability' that the

challenged transaction will substantially impair competition"); *FTC v. Elders Grain*, 868 F.2d

901, 906 (7th Cir. 1989) (high probability not needed). All "doubts are to be resolved against the

transaction." *Id.*

The lawfulness of a merger "turns upon the transaction's potential for creating,

enhancing, or facilitating the exercise of market power"– that is, the ability of a firm, unilaterally

or in coordination with others, "to raise price above competitive levels for a significant period of

time." *United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246 (8th Cir. 1988) (citing

*DuPont*, 351 U.S. 391, 393 (1956)); U.S. Department of Justice and Federal Trade Commission,

*Horizontal Merger Guidelines* § 2.0-2.22 ("*Merger Guidelines*" or "*Guidelines*"), Exhibit 28

(PX01310).[10] Hence, the ultimate question in any Section 7 case is whether the transaction

creates an "appreciable danger" of anticompetitive effects. *Hosp. Corp. of Am. v. FTC*, 807 F.2d

at 1386. The answer to this question depends upon (1) the "line of commerce" or relevant

product market; (2) the "section of the country" or relevant geographic market; and (3) the

---

[10]     *See also* Exhibit 28 (*Guidelines, Purpose and Underlying Policy Assumptions of the Guidelines*, at 0.1, PX01310) ("The Guidelines are designed primarily to articulate the analytical framework the Agency applies in determining whether a merger is likely substantially to lessen competition, not to describe how the Agency will conduct the litigation of cases that it decides to bring. Although relevant in the latter context, the factors contemplated in the Guidelines neither dictate nor exhaust the range of evidence that the Agency must or may introduce in litigation. . . . The unifying theme of the Guidelines is that mergers should not be permitted to create or enhance market *power* or to facilitate its exercise.").

11

transaction's probable effect on competition in the product and geographic markets. Evidence establishing undue concentration in the relevant market makes out the government's *prima facie* case and gives rise to a presumption of unlawfulness. *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963); *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990); *Cardinal Health*, 12 F. Supp. 2d at 52; *see also United States v. General Dynamics Corp.*, 415 U.S. 486, 497 (1974), *quoting Aluminum Co. of America*, 377 U.S. at 279 ("if concentration is already great, the importance of preventing even slight increases in concentration is correspondingly great.").

Once a *prima facie* violation is established, the burden shifts to defendants to rebut the *prima facie* case by demonstrating that other market characteristics make the presumption of anticompetitive effects implausible. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 613 (1974); *Baker Hughes,* 908 F.2d at 982-83; *Cardinal Health*, 12 F. Supp. 2d at 54. If defendants offer evidence to rebut the presumption from concentration and market share, the burden returns to the Commission to prove that the merger is likely to reduce competition.

## A.    Premium Natural and Organic Supermarkets Constitute a Relevant Product Market

Market definition is designed to distinguish close competitive constraints from those more distant to assess whether the acquisition significantly reduces competition between or among *close* constraints. *See, e.g.,* 4 Areeda, Hovenkamp & Solow, *Antitrust Law* ¶ 929c. The Supreme Court has explained that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use [by consumers] or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325; *see also United*

12

*States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).

The analytical framework set forth in the Merger Guidelines approaches the inquiry regarding the reasonable interchangeability of use or cross-elasticity of demand by asking whether a "hypothetical monopolist . . . would profitably impose at least a 'small but significant and nontransitory' [price] increase" ("SSNIP"). *Merger Guidelines* § 1.11, Exhibit 28 (PX01310). The Merger Guidelines speak of a 5% SSNIP test, but recognize that in some cases it is appropriate to use a smaller percentage. *Id.* Defendants' own expert economist acknowledges that for retail markets characterized by high volume of sales but low profit margin per dollar of sales, a hypothetical price increase as low as 1% may be appropriate.[11]

---

[11]    Exhibit 29 (Expert Report of David T. Scheffman, Ph.D.,¶ 114, PX02066) ("Given the relatively low net profit margins (e.g., income to sales) associated with supermarket retailing, it is common to use a small hypothetical price increase, because a larger increase in price would lead to implausibly large margins given what we know about supermarket margins.") At a recent conference, Dr. Scheffman elaborated:

> A hypothetical 5 percent price increase for a supermarket would lead it to being the most profitable supermarket in history. Their margins are tiny. You would have a multiple of any existing margins if you had that big a price increase. . . .
>
> That's not to say we shouldn't worry about supermarket mergers. The usual argument is 1 percent of people's savings of their expenditures on grocery products is a lot of money, so we should care about it.

Exhibit 30 (David Scheffman, Comments at "Grocery Store Antitrust: Historical Retrospective and Current Developments," May 24, 2007, PX00322); *see also* Harris & Jorde, *Market Definition in the Merger Guidelines: Implications for Antitrust Enforcement*, 71 Cal. L. Rev. 464, 482 (1983) ("In the high-volume grocery business . . . net income typically represents 0.5% of sales, so a 5% increase in price would represent a 1000% increase in profit . . . . the managers of any recently merged grocery firm would know better than to try to raise prices by 5% across the board."); Exhibit 31 (FTC Bureau of Economics, "The Petroleum Industry, Mergers, Structural Change and Antitrust Enforcement (August 2004)," PX00330 at 22 & n.13) ("The FTC staff frequently has used a one-cent-per gallon price increase in defining relevant markets for petroleum mergers").

In identifying substitutes and defining the relevant product market, courts typically review a number of "practical indicia." *See generally Brown Shoe*, 370 U.S. at 325. These include industry or public recognition of the market, the product's peculiar characteristics and uses, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. *Id.* A relevant product market "must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn . . . ." *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 n.31 (1953).

> [T]he Court must determine whether . . . there is reason to find that if the defendants were to raise prices after the proposed merger[], their customers would switch to alternative sources of supply to defeat the price increase.

*Cardinal Health*, 12 F. Supp. 2d at 46; *accord, United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246 (8th Cir. 1988) ("[T]hese concepts help evaluate the extent competition constrains market power and are, therefore, indirect measurements of a firm's market power.").[12]

Significantly, the fact that a product has some constraining effect on another product or similar functionality does not necessarily mean that they are in the same relevant market. In markets where the products are differentiated (*i.e.*, the products are not perfect substitutes for one another), competition may be localized, meaning individual sellers compete more directly with those competitors selling close substitutes. *Merger Guidelines* § 2.21, Exhibit 28 (PX01310);

---

[12]    Numerous courts have held that a "cluster" of products and services may be a relevant product market, based on the benefit to consumers accruing from the convenience of purchasing complementary products from a single supplier. Supermarkets, department stores, office superstores, commercial banks, and hospitals are a few examples. *Staples*, 970 F.Supp. 1066 (office superstores); *Philadelphia Nat'l Bank* 374 U.S. at 356 (banking services); *California v. American Stores*, 697 F. Supp. 1125, 1129 (C.D. Cal. 1988) (supermarkets), *aff'd in part and rev'd on other grounds*, 872 F.2d 837 (9th Cir. 1989), *rev'd on other grounds*, 495 U.S. 271 (1990); *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986).

14

Exhibit 6 (Murphy Report, PX02878 at 004). In such a market, a merger between firms that are close substitutes may facilitate unilateral price increases. A price increase by the merged firm may be profitable because some of the sales lost on the product for which the price has been increased is diverted to the merged firm's other product.

The *Staples* decision provides an example. This Court in *Staples* (overcoming its initial reaction) concluded that the sale of consumable office supplies through office superstores was a sound relevant product market, notwithstanding that "[t]he products in question are undeniably the same no matter who sells them" and many types of retailers do sell them:

> [T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes. The Supreme Court has recognized that within a broad market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."[13]

The courts in a number of cases have found certain types of retailers to constitute a relevant product market distinct from other retailers selling the same product.[14] Even firms enjoying monopoly power may be constrained in their pricing by other products -- but that constraint does not mean that the firm lacks monopoly power. *See United States v. Alum. Co. of Am.*, 148 F.2d 416, 426 (2d Cir. 1945) ("substitutes are available for almost all commodities, and to raise the price enough is to evoke them. . . . [T]hese limitations also exist when a single

---

[13]    *Staples,* 970 F. Supp. at 1075; *Brown Shoe*, 370 U.S. at 325 (1962).

[14]    *See Photovest v. Fotomart*, 606 F.2d 704 (7th Cir. 1979) (relevant market of "drive-thru retail photo processing," based on consumer perception that drive-thru offered greater convenience and service); *Am. Stores*, 872 F.2d at 840 (supermarkets comprised a relevant submarket–exclusive of convenience stores, smaller independent grocery stores and other food retailers–because supermarkets are the only retailers that meet consumers' needs for variety); *see also Columbia Broad. Sys., Inc. v. FTC*, 414 F.2d 974 (7th Cir. 1969) (relevant market for records sold through mail-order subscription services).

15

producer occupies the whole market: even then, his hold will depend upon his moderation in exerting his immediate power."); Areeda & Hovenkamp, Antitrust Law, ¶ 506a, 2d Ed. (2002); Jonathan Baker, *Unilateral Competitive Effects Theories in Merger Analysis*, 11 Antitrust L.J. 21, 24-25 (1997) (imperfect substitutes in pharmacy networks and cable television insufficient to constrain post-merger market power).

The decision in *United States v. Oracle*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004), to which Defendants have directed the Court's attention, *see* Exhibit 33 (PX00327), is not inapposite but simply provides another illustration of the fact-intensive inquiry required to define an antitrust market. The Court laid out the relevant factors: (1) the merging firms' products are differentiated from one another; (2) the merging firms' products are close substitutes for each other; (3) other products are sufficiently different from the merging firms' products that a merger would make a small but significant and non-transitory price increase profitable for the merging firms; and (4) repositioning by the non-merging firms is unlikely. *Id.*

The *Oracle* legal analysis is fundamentally the same as in *Staples*. The cases turn on the facts: while defendants in *Staples*, like the defendant in *Oracle*, maintained that the market definition was "contrived" with no basis in law or fact, *Staples*, 970 F. Supp. at 1073, this Court in *Staples* properly focused on the parties' recognition of competition among superstores. The *Oracle* decision also emphasized the difficulty of drawing lines between competitors in the software industry. Here, as in *Staples*, the lines are much easier to discern. *See, e.g.*, *Staples*, 970 F. Supp. at 1079 ("the unique combination of size, selection, depth and breadth of inventory offered by the superstores distinguishes them from other retailers").

The conclusion that the relevant product market is premium natural and organic

16

supermarkets is supported by several lines of evidence:

- Markets in which the Defendants do not overlap with each other. Where one of the Defendants is the only premium natural and organic supermarket in a geographic area, it is viewed by the Defendants as having a monopoly–a perception that makes sense only if PNOS is a separate market.

- Whole Foods' valuation of this deal ("Project Goldmine"). These documents show Whole Foods projecting that it will capture ▮▮▮▮▮ revenue from each Wild Oats store that it plans to close. Such projections are consistent only if premium natural and organic supermarkets is a separate market.

- Defendants reaction to prospective new entry. Wild Oats "Competitive Intrusion" analysis, for example, evaluated situations in which ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Like Whole Foods "Project Goldmine," ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that is consistent only if premium natural and organic supermarkets is a separate market.

- Markets where the two firms compete head-to-head. In those markets, economic analysis performed by Professor Murphy confirms what the parties' own documents show–namely that premium natural and organic supermarkets are constrained by each other in ways in which they are not constrained by any other retailers.

- Peculiar characteristics differentiating premium natural and organic supermarkets from other types of retailers.

### 1. "Non-Competitive" Markets

Until the acquisition was announced, Whole Foods often referred to Wild Oats' markets (where Whole Foods was not present) as "non-competitive," "cash cow" markets, and even "monopoly" markets. Exhibit 34 (PX00713) (from 2001); Exhibit 18 (PX00712) (from 2001). As Mr. Mackey wrote in October 2004, "[i]t seems highly probable to me that OATS is dependent upon its stores in non-competitive markets for any profits that it is currently generating . . . ." Exhibit 35 (PX00719). In a May 2006 email, forwarded by Mr. Mackey to his executive team, a Whole Foods executive observed that "prices were higher at [the newly opened Wild Oats store in Tampa, Florida, because] *[b]eing the only game in town* gives them that

17

freedom . . . . Their pricing was high since they are the only large natural food store in the area."

Exhibit 16 (PX00080 at 001-002 (emphasis added)). One high level Whole Foods executive

observed, ". . . I'd say that ▮▮▮▮▮ currently has a dominant position in the marketplace . . . ."

Exhibit 37 (PX00774); *see also* Exhibit 38 (PX01372 (Fall 2006 list of stores showing that if

there is no ▮▮▮▮▮▮▮, there is "no Major Competitor" in the market)). Similarly, Wild Oats

called Whole Foods "▮▮▮▮▮▮▮▮▮▮▮" Exhibit 39 (PX00469).

In fact, Wild Oats displayed the premium market it occupies graphically. *See, e.g.,*

Exhibit 40 (PX00902 at 004) (graph showing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Exhibit 41

(PX2979 at 004, 012) (chart showing ▮▮▮▮▮▮▮); Exhibit 42 (PX02704

at 010) (chart contrasting Wild Oats competition ("other natural foods stores") with "Traditional

Grocery" competition ("major chains, club stores, independents")).

Such characterizations by the Defendants are consistent *only* with a premium natural and

organic supermarket market. The views of the Defendants, as industry participants, are highly

probative. As this Court explained in *Staples*,

> another of the "practical indicia" for determining the presence of a submarket
> suggested by Brown Shoe is "industry or public recognition of the submarket as a
> separate economic entity." *See also Rothery Storage & Van Co. v. Atlas Van
> Lines*, 253 U.S. App. D.C. 142, 792 F.2d 210, 219 (D.C. Cir. 1986) (Bork, J.)
> ("The industry or public recognition of the submarket as a separate economic unit
> matters because we assume that economic actors usually have accurate
> perceptions of economic realities."), *cert. denied*, 479 U.S. 1033, 93 L. Ed. 2d
> 834, 107 S. Ct. 880 (1987); *FTC v. Coca-Cola Co.*, 641 F. Supp. 1128, 1132
> (D.D.C. 1986) ("Analysis of the market is a matter of business reality-a matter of

18

how the market is perceived by those who strive for profit in it."), *vacated as moot*, 264 U.S. App. D.C. 406, 829 F.2d 191 (D.C. Cir. 1987).[15]

*Staples*, 970 F. Supp. at 1079.

### 2.    Project Goldmine

In analyzing how much to pay for Wild Oats, Whole Foods projected that it would capture ⬛⬛⬛ Wild Oats stores it planned to close following the proposed acquisition. Exhibit 3 (PX00553); *see also* Exhibit 43 (PX00784 at 015 (Project Goldmine Board Discussion Materials)). These documents indicate that a ⬛⬛ percentage of customers from each closed Wild Oats would switch to Whole Foods rather than one of the many other food retailers in the immediate area. Whole Foods aptly titled this analysis "Project Goldmine." The Project Goldmine estimates were in line with Whole Foods experience. *See, e.g.,* Exhibit 44 (Transcript of Investigational Hearing of Will Paradise, at 238:15-240:23, PX02874 at 238-240) (Whole Foods captured ⬛⬛⬛⬛ Wild Oats store despite presence of numerous closer conventional supermarkets).

Professor Murphy explained why the Project Goldmine evidence supports the product market here:

> The magnitude of these diversions is large–typically over ⬛ percent and sometimes reaching ⬛ or ⬛ percent–indicating that Whole Foods must be viewed as a good substitute by Wild Oats customers. In Appendix C I have mapped the local area around these Wild Oats stores, noting the location of the parties' stores and various other food retail outlets. Despite the presence of all these third party competitors, some located

---

[15]    Regarding the use of the term submarkets, this Court in *Staples* observed

As other courts have noted, use of the term "submarket" may be confusing. Whatever term is used--market, submarket, relevant product market--the analysis is the same.

970 F. Supp. at 1080 n.11 (citations omitted).

closer to Wild Oats than is the Whole Foods store, Whole Foods anticipates that Wild
Oats customers will divert to its own stores in ▮▮▮▮▮▮▮▮▮▮▮▮▮ Since more closely
located third party stores would be better substitutes for Wild Oats if all else were equal,
these maps illustrate that the ▮▮▮ diversions from Wild Oats to Whole Foods indicated in
Project Goldmine reveal Whole Foods' perception that there exists a uniqueness of
substitutability between Wild Oats and Whole Foods among Wild Oats customers.

Exhibit 6 (Murphy Report, ¶ 70, PX02878); Exhibit 45 (Murphy Report, App. C, Project

Goldmine maps, PX02881).

In addition to providing direct evidence of what constitutes the "next-best" choice in the

minds of consumers, sales diversion estimates yield critical insight into the profitability of a post-

acquisition price increase. The Defendants, through Dr. Scheffman, have offered a "Critical

Loss" argument in which they assert that the loss of customers resulting from a post-acquisition

price increase by the combined Whole Foods-Wild Oats (a SSNIP) would make the price

increase unprofitable. As Professor Murphy and other economic commentators have explained,

Critical Loss analysis can be useful, but not when conducted as Dr. Scheffman has done here.

Exhibit 11 (Murphy Rebuttal Report, ¶ 6, PX02884).

Dr. Scheffman estimates the Critical Loss–the point at which increased profits from a

sales at an increased price are precisely balanced by lost profits due to the loss of customers

unwilling to pay the increased price–at between 11.1% and 12.5% of sales for a 5% price change.

But after doing so, he makes no effort whatsoever to empirically–even logically–assess the

amount of sales that *actually* would be lost to the combined Whole Foods-Wild Oats due to a

price increase. He simply piles high various articles standing for the unremarkable proposition

that other food/grocery retailers compete with premium natural and organic supermarkets, and

20

then asserts that surely, with all of those competitors, an 11 or 12% Critical Loss would be exceeded in the event of a SSNIP.

But asserting that it must be so is not a substitute for economic empiricism. A fundamental illogic–one well-understood by economists who have considered Critical Loss such as Drs. Katz, Shapiro, O'Brien, and Wickelgren[16]–fatally infects Dr. Scheffman's claim. Dr. Scheffman's conclusion that the Critical Loss is a relatively small number rests on his finding that price-cost margins on premium natural and organic supermarket sales are about 40%. In asserting that more than an 11 or 12% sales diversion from the combined Whole Foods-Wild Oats would follow a SSNIP, Dr. Scheffman side steps that a 40% price-cost margin also indicates that customers at premium natural and organic supermarkets are relatively *insensitive* to changes in price. *See, e.g.,* Katz and Shapiro, *supra* note 16, at 2. That is to say, premium natural and organic supermarket customers would not be inclined to divert sales outside of the premium natural and organic market in response to a SSNIP. And that is an empirical conclusion. As Professor Murphy explains, Dr. Scheffman must be wrong either about price-cost margins (although the evidence suggests that he is not), or wrong in his assertion that customers readily would desert the combined Whole Foods/Wild Oats after a SSNIP. He simply cannot be right on both accounts. *See, e.g.,* Exhibit 11 (Murphy Rebuttal Report, ¶ 29, PX02884).

Professor Murphy, in his Rebuttal Expert Report, provides a more detailed and precise description of Dr. Scheffman's contradiction. Professor Murphy then goes on to demonstrate empirically, that unless substantially all of the combined Whole Foods/Wild Oats' marginal sales

---

[16]     *See* Katz and Shapiro, *Further Thoughts on Critical Loss*, Antitrust Source, March 2004; O'Brien, Daniel P. and Abraham L. Wickelgren, *A Critical Analysis of Critical Loss Analysis*, 71 Antitrust L.J. (2003).

21

were to be diverted outside of premium natural and organic supermarkets (rather than to another Whole Foods-owned store), a SSNIP would be profitable. In fact, Professor Murphy shows that the diversion ratios used by Whole Foods in its Project Goldmine (which projects the percentage of Wild Oats store sales that would be diverted to Whole Foods if it closed various Wild Oats stores after the acquisition) tell us that the number of marginal sales that would be lost to the combined Whole Foods/Wild Oats would have to be many times that predicted by Whole Foods to defeat even a 5% post-acquisition price increase. *See, e.g.,* Exhibit 11 (Murphy Rebuttal Report, ¶ ¶ 28, 31, PX02884).[17]

### 3.    Competitive Intrusion

In documents prepared in connection with Wild Oats' 2007 Budget, Wild Oats estimated the effect of "Competitive Intrusion" across the country. The analysis included the distance of the new store from Wild Oats, the anticipated starting date of the competitor, and the projected impact on Wild Oats' sales. Wild Oats estimated that Whole Foods accounted for approximately ███ of Wild Oats revenue losses.[18] Whole Foods store openings even as far away as two and three miles were projected to ██████████████████████ Wild Oats.[19]  Wild Oats

---

[17]    Dr. Scheffman inexplicably uses a 5% SSNIP after acknowledging in his report, as he has done elsewhere, that a 1% SSNIP is more appropriate in applying the hypothetical monopolist test to supermarkets.

[18]    Percentage derived from Exhibit 50 (PX00458). *Cf. Staples*, 970 F. Supp. at 1079 ("Office Depot notes all competitor store closings and openings, but the only competitors referred to for its United States stores are Staples and OfficeMax.").

[19]    A new Trader Joe's located across the street from Wild Oats' store in ███████ ████████████████████████████████. In contrast, a Whole Foods in ██████████████████████, three miles away from the existing Wild Oats, █████████████ ████████ This striking █████████████ is seen throughout the country. Exhibit 47 (PX00454); Exhibit 13 (PX00919).

22

projected similar losses from the entry of other premium natural and organic supermarkets.

Exhibit 48 (PX00914 at 007) (projecting a ████████████ of sales from the opening of a ████

████████████████ miles away). Data from these competitor intrusion documents is visually

represented in a series of maps. *See* Exhibit 49 (PX04355).

Notably, Wild Oats' data and projections treated conventional and other types of retailers

as significantly less intrusive. For example, a ████████████ four miles from Wild Oats in

████████████ generated only a ████████████ Exhibit 48 (PX00914 at 004). And a ████████

████████ in ████████████ located virtually across the street (0.25 miles) from Wild Oats was

projected to ████████████████████. Exhibit 48 (PX00914 at 006).[20]

A similar picture emerges from "Wild Oats' Sales Forecasting Model and National

Marketing Screening," Exhibit 51 (PX02901) (March 2005), a report prepared for Wild Oats by

an outside consulting firm "to assist Wild Oats in making future real estate decisions." The study

shows the most sales diversion from Wild Oats resulted from Whole Foods ████████████████

████████████████████████████████████████████████████████████████████

████████████████. Traditional supermarkets were also included in the study for Wild Oats, ████

████████████████████████████████████████████████████████████████

████████████████████████████████████. These numbers are reenforced

by the deposition testimony of Wild Oats' former CEO, Perry Odak. Mr. Odak testified that no

other supermarket retailers had an impact equivalent to Whole Foods during his tenure at the

───────────────────

[20]    A Wild Oats document titled "████████████████████████████,"
Exhibit 50 (PX00458), shows that a Whole Foods in ████████████████ entered five miles
away in May 2006 and impacted the ████████████████████ This same
document projected that a ████████████ away from the Wild Oats would have a
revenue impact of less than ████ percent.

23

company. Exhibit 8 (Transcript of Investigational Hearing of Perry Odak, at 120:8-9, PX01325 at 008-009).

The same is true for entry by Wild Oats. The Wild Oats 29th Street store in Boulder, Colorado, the leading edge of a Wild Oats competitive initiative, would have opened months ago but for the proposed acquisition. Whole Foods' documents and testimony reveal that by heading off that store opening, Whole Foods ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ that would have been ▮▮▮▮▮▮▮▮▮▮▮ Wild Oats store in Boulder. *See* Exhibit 52 (Transcript of Investigational Hearing of Walter Robb, at 126:14-127:1, PX01327 at 126-127); Exhibit 3 (PX00533 at 126-127); Exhibit 54 (Transcript of Deposition of Will Paradise, at 216:17-217:25, PX02863 at 055-056) (▮▮▮▮▮▮▮▮▮▮▮ expected).

In contrast, Whole Foods lost ▮▮▮▮▮▮▮ per week in revenues after the February 2006 opening of Safeway's flagship Lifestyle store in Boulder, and that for only a ▮▮▮-month period before its revenues returned to prior levels. *See* Exhibit 55 (PX00543); Exhibit 56 (PX01004 at 023). Whole Foods Regional President observed:

> Boulder: The Safeway impact seems to have leveled off as we hover around the pre opening sales totals. We have seen a drop off in Safeway's commitment to service as their opening budget seems to have gone away (typical with all Safeway lifestyle stores that after 8 weeks the labor from other stores and regional goes away.[21]

---

[21]    In this same document, the Regional President also focused on competition with Wild Oats, noting initially that execution had taken a step back, but then added:

> [t]hey have adjusted many Grocery retails down and we have matched those prices. Oats has broken new ground on their new building at 29[th] St. It will be interesting to see what they do now that the news is out . . . about our new store.

Exhibit 57 (PX00054). As noted *infra*, Whole Foods planned numerous counterattacks against Wild Oats' 29th Street store, in addition to the price matching mentioned here.

24

Exhibit 57 (PX00054). This evidence further confirms that competition between Whole Foods and Wild Oats matters uniquely.

Whole Foods' business records are equally compelling. Whole Foods' plan of action for the planned opening of Wild Oats' flagship store in Boulder indicates that the "intrusion" of another premium natural and organic supermarket into a Whole Foods' market was a uniquely salient competitive event for Whole Foods – far more so than the entry of other retailers. Exhibit 58 (PX00186) ("very vulnerable to a substantial competitive opening, such Wild Oats" ). Whole Foods' Regional President, Will Paradise, said:

> [A]s we approach the opening on the new Wild Oats flagship in Boulder in March . . . [m]y goal is simple – I want to crush them and am willing to spend a lot of money in the process. We are going to run a ▮▮ day strategy against Oats that includes many different aspects but value is a key component.

Exhibit 59 (PX00234 at 001); *see also* Exhibit 60 (PX00233 at 001). Whole Foods' concern with the Boulder opening did not go unnoticed by Wild Oats. Exhibit 61 (PX01353) ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮[22]

---

[22]     Whole Foods reacted similarly to the entry of ▮▮▮▮, another premium natural and organic supermarket chain (though one ▮▮▮▮ any relevant geographic markets at issue here). *See, e.g.,* Exhibit 62 (PX00539 at c-4) ("In June we will have an ▮▮ market opening up about a half-mile from our ▮▮ store and expect some fierce competition. We have been remodeling the ▮▮ store, getting it ready to show ▮▮ that it is a bad idea to open up too close to us."); Exhibit 63 (PX00540 at c-5) ( '▮▮ opened a store in ▮▮ less than a mile from our store at the beginning of ▮ . We responded by aggressively matching all of their prices and specials and by doing a strong special program of our own."); Exhibit 64 (PX01006 at 004) ("We have heard from management at ▮▮ that they were surprised by our aggressive pricing and that their coming to the ▮▮ was probably a mistake.").

25

### 4.   Unique Head-to-Head Competition: Economic Analysis

Another line of evidence relates to those markets in which the Defendants compete against each other or, in a few instances, other premium natural and organic supermarkets. Professor Murphy studied the effect that entry by the Defendants and other putative competitors has on sales and operating margins at Wild Oats and Whole Foods. As Professor Murphy explains, Exhibit 6 (Murphy Report at 17, ¶ 45, PX02878), "The key idea is that entry by sellers of products that are the best substitutes for those offered by Whole Foods and Wild Oats will tend to have the largest effects on Whole Foods' and Wild Oats' prices and/or sales." His study focuses on entry by the first store of a food retailer into a given geographic market. Thus, his results represent the effects of changes in the number of potential competitors, not merely the effects of changes in the number of stores.

### a.   Wild Oats Pricing

Plaintiff's economic expert, Professor Murphy, testified that the entry of a Whole Foods near a Wild Oats had a substantially greater negative effect on Wild Oats than entry by other stores. A Whole Foods entry reduced sales at Wild Oats by    . Entry by New Seasons, another premium store, caused a          . Exhibit 6 (Murphy Report at 19, ¶ 49 (PX02878); Exhibit 65 (Murphy Report, ex. 3, PX02882). Similarly, Whole Foods entry has a substantially greater impact on Wild Oats' margins than does entry by others; entry by Whole Foods causes margins at Wild Oats to          , while the entry of other stores affects margins by          , depending on the retailer. Exhibit 6 (Murphy Report, ¶¶ 50-51, PX02878); Exhibit 65 (Murphy Report, ex. 3, PX02882).

26

Professor Murphy also explored the impact of entry by Whole Foods on Wild Oats prices. In this analysis, Professor Murphy uses a "treatment-control" methodology that compares the price change at the Wild Oats store near to where Whole Foods entered, to the counterpart price change at Wild Oats stores that did not experience entry. For two of the events, there are long enough post-entry time periods to discern whether entry by Whole Foods had a durable impact on Wild Oats' price. Professor Murphy finds that even in the second year following entry by Whole Foods, prices were ▮▮▮▮▮▮▮▮▮ at the Wild Oats store in ▮▮▮▮▮▮▮▮▮, and three percent lower at the Wild Oats store in ▮▮▮▮▮▮▮. Exhibit 6 (Murphy Report, ¶¶ 58-59, PX02883); Exhibit 65 (Murphy Report, ex. 5 (PX02882).

### b.    Whole Foods Pricing and Sales

Professor Murphy also examined the impact of entry upon Whole Foods. Although there were no Wild Oats entries, similar stores within the product market, like ▮▮▮▮▮, did enter, and had substantially greater impact on Whole Foods' margins and sales than entry by conventionals. Exhibit 6 (Expert Report of Kevin M. Murphy, Ph.D., ¶ 52, at 21, PX02878); Exhibit 65 (Murphy Report, ex. 4, PX02882).

Professor Murphy further explored the impact of entry by ▮▮▮▮▮ using Whole Foods' pricing data. Professor Murphy concluded that entry by ▮▮▮▮▮▮▮▮▮ led to a Whole Foods price decrease of ▮▮ percent, while entry by ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮, caused Whole Foods' prices to fall by ▮▮ percent. Exhibit 65 (Supplemental Expert Report of Kevin M. Murphy, Ph.D., ¶¶ 4-5, at 2 (PX02883). This analysis demonstrates the intense competition among premium natural and organic supermarkets.

Professor Murphy could not explore the impact of Wild Oats entry on Whole Foods since

27

the data contain no such events. Professor Murphy did, however, undertake a cross-sectional

econometric analysis that explored the effect of competition from Wild Oats on Whole Foods'

margins. This analysis looks at the difference between markets that contain two Whole Foods

stores on the one hand, and markets with one Whole Foods store and one Wild Oats store on the

other. As Professor Murphy explains, Exhibit 6 (Murphy Report, ¶ 65, at 26, PX02878), "This

difference estimates the change in margin that might occur if independent ownership of the two

stores were changed to joint ownership by Whole Foods." Professor Murphy concludes that at

the store-level, Whole Foods margins are about███percentage points lower in Whole

Foods/Wild Oats locales relative to areas with two Whole Foods stores. Even larger effects were

found in certain departments, such as produce and seafood, where Whole Foods and Wild Oats

are more greatly differentiated from conventionals. *Id.* ¶ 66-67, 26 (PX02878).

The results thus show that Whole Foods' margins and sales are constrained significantly

more by premium natural and organic supermarkets than by conventionals.

### c.    Summary of Economic Analysis

In sum, Professor Murphy finds:

> The econometric evidence presented above is consistent with the proposition that Whole
> Foods and Wild Oats are indeed the closest substitutes for one another, and that the entry
> of other supermarkets that target the same customers with a similar format (e.g., Earth
> Fare) also have economically significant effects. . . . Finally, the econometric estimates
> show no substantial effect of the entry of conventional supermarkets, premium markets or
> mass merchants.

Exhibit 6 (Murphy Report ¶ 69, at 28, PX02878).

Based on the results of his econometric analyses, and other evidence from the factual

record, Professor Murphy concludes, "Premium Natural and Organic Supermarkets represent a

28

relevant product market as defined in the *1992 Horizontal Merger Guidelines* if one applies a

price increase standard of one to two percent." Exhibit 6 (Murphy Report, ¶ 104, at 47,

PX02878). As discussed previously, in the supermarket context, a SSNIP of 1% is commonly

accepted as substantial in terms of defining the relevant product market, and Dr. Scheffman

concurs that a 5% test is inappropriate. Exhibit 29 (Scheffman Report, ¶ 114, at 38, PX02066).

So given the general consensus that the 5% test is inapplicable in the supermarket context, Dr.

Scheffman's decision to nonetheless use a 5% test constitutes a critical error that invalidates his

analysis. As Professor Murphy explains in his rebuttal report:

> So, in spite of his opinion that a 5 percent SSNIP standard is vastly too high for the
> industry and market at issue here, he uses it anyway. The effect is to make it more likely
> that the FTC's proposed PNOS market definition will fail his hypothetical monopolist
> test of his analysis.

Exhibit 11(Murphy Rebuttal Report, ¶ 18, PX02884).

This econometric analysis confirmed Wild Oats' description of Whole Foods as its "█████

███████████ when we are head to head," Exhibit 67 (PX00670), and Mr. Mackey's belief

that this acquisition would "avoid nasty price wars."

### 5.    Peculiar Characteristics and Product Differentiation

Defendants participate in a distinct market composed of stores that focus on high-quality

perishables, specialty and natural organic produce, prepared foods, meat, fish, and bakery goods.

Premium natural and organic supermarkets are significantly differentiated from conventional

supermarkets by their emphasis on natural and organic products, and on perishables rather than

on dry goods. The product market also is characterized by stores that offer substantially higher

levels of customer service than conventionals provide. Finally, the product market includes

stores that are, in the words of Defendants, "mission driven," with an emphasis on "authenticity,"

including "social and environmental responsibility." Premium natural and organic supermarkets

offer customers a perspective of a "third place," as an alternative to work or home;[23] provide a

"lifestyle brand" and an added confidence and trust in the provision of the natural and organic

products that are good for the consumer; and offer a "unique environment" in stores that meet

"core values" and offer a "superior store experience." In short, although participants in this

market compete to some degree with conventionals, they also compete in unique ways with each

other. *See Staples*, 970 F. Supp. at 1079-80 ("While it is clear to the Court that Staples and

Office Depot do not ignore sellers such as warehouse clubs, Best Buy, or Wal-Mart, the evidence

clearly shows that Staples and Office Depot each consider the other superstores as the primary

competition.").

### a.    **Unique Inventory of Products**

Like conventional supermarkets, premium natural and organic supermarkets carry a

sufficiently large and diverse inventory of products to enable shoppers to buy most of their

weekly food and grocery needs in a single shopping trip. However, as compared with

conventional supermarkets and other retailers, premium natural and organic supermarkets sell

different products to different people in different ways. This section focuses on the "peculiar

characteristics" of the product. *See Brown Shoe*, 370 U.S. at 325.

---

[23]    *See* Exhibit 4 (Transcript of Investigational Hearing of Elisabeth Griffin Foster, at
137-138, PX01338 at 137-138) ("You have home, you have office. The analogy is Starbucks, is
a place that people like to go, hang out, meet people, spend time. . . . It's something we create as
part of the [Whole Foods] culture of our stores.").

A significant difference between premium natural and organic supermarkets and conventional retailers is both the number and variety of natural and organic stock keeping units ("SKUs"), and the relative absence of "non-conforming" products. Substantially all products carried by those in the relevant market are "natural," meaning they are minimally processed, with minimal or no artificial ingredients, preservatives, or other non-naturally occurring substances. A great many of the food products carried by premium natural and organic supermarkets are "organic" – vastly more than are carried by other retailers. "Organic foods" are foods that are produced using agricultural practices that promote healthy ecosystems: no genetically engineered seeds or crops, sewage sludge, long-lasting pesticides or fungicides; healthy and humane livestock management practices; and food processing that protects the healthfulness of the organic product, including the avoidance of irradiation, genetically modified organisms, and synthetic preservatives. Organic foods sell at a premium to conventional foods, but the large-scale sale of organic products also imposes unique burdens and costs.

Pursuant to the Organic Food Production Act of 1990, 7 U.S.C. §§ 6501-22, the United States Department of Agriculture ("USDA") developed national standards for organic products, articulated in the USDA's "Organic Rule," 7 C.F.R. § 205. Pursuant to the Organic Rule, retailers of products labeled "organic" must use handling, storage, and other practices to protect the integrity of organically-labeled products, including: preventing commingling of organic and non-organic ("conventional") products; protecting organic products from contact with prohibited substances; and maintaining records that document adherence to the USDA requirements.

Compared to its conventional cousins, Whole Foods and Wild Oats have a vastly greater number of organic and natural products. As Mr. Mackey explained repeatedly, "we have seen

31

many competitors over the years add a limited selection of 500 to 2,000 natural and organic

SKUs. . . . Our stores feature over 30,000 natural and organic SKUs . . . ." Exhibit 14 (PX01333

at 003-004).    Premium natural and organic supermarkets differ from conventional supermarkets

in their relative emphasis on perishables versus dry groceries.[24]  For example, nearly ██% of

Whole Foods sales are perishables. Exhibit 14 (PX01333 at 003-004).  Similarly, over ██% of

Wild Oats' revenues are from the sale of perishables.  Exhibit 8 (Transcript of Investigational

Hearing of Perry Odak, at 39:9-13, PX01325 at 039); Exhibit 42, PX02704 (Wild Oats CFO

presentation stating, "Our stores have about ██% to ██% perishables with an emphasis on

freshness.  The traditional grocery chains have a much larger skew towards non-perishable shelf

stable products.").  In contrast to premium natural and organic supermarkets, generally only

about 30% of conventional supermarkets' revenues are from the sale of perishables.  Exhibit 8

(Transcript of Investigational Hearing of Perry Odak, at 39:9-21, PX01325 at 039).

The emphasis on natural and organic perishables is reflected in particular departments.

Wild Oats carries over ███████████████ of organic produce SKUs carried by ██████ and ██

███████████ organic produce SKUs carried by ████████.  Whole Foods refused to

provide data responsive to our request.  For Whole Foods, there are generally ██████████████

█████████ of produce in a store.  Of that amount, about ██████████████ are organic.  Exhibit 72

(Transcript of Investigational Hearing of Edmund LaMacchia, at 38:3-5; 40:13-17, PX01326 at -

038-040).  Whole Foods carries between ██████████ meat SKUs, and they are all natural or

---

[24]    Perishables generally includes items, other than frozen goods, that may spoil
without refrigeration over a period of days.  Examples are produce (fruits and vegetables), meats,
fish, and prepared foods.  Exhibit 68 (Transcript of Deposition of Walter Robb at 21:18-25,
PX002862 at 21).

organic meat. *Id.* at 38:7-49:17 (PX01326 at 038); Exhibit 72 (Transcript of Investigational

Hearing of Edmund LaMacchia, at 49:11-13, PX01326 at 049). Finally, Whole Foods carries a

significantly larger number of cheese SKUs (          ), of which about      percent

are organic. *Id.* at 38:7-8; 101:10-15 (PX01326 at 038, 101).

Aside from mere quantity, the quality of produce and other perishables also is a

differentiating point between premium natural and organic supermarkets and other retailers. In

2006, Mr. Mackey wrote:

> High quality perishable foods (both commercial and organic) is the key to [Whole
> Foods'] business model – produce, meat, seafood, bakery, prepared foods. . . . Wal-Mart
> doesn't sell high quality perishables and neither does Trader Joe's while we are on the
> subject. That is why Whole Foods coexists so well with TJ's and it is also why Wal-Mart
> isn't going to hurt Whole Foods.

Exhibit 73 (PX00749 at 001). In 2005, Wild Oats' CEO observed, "The health and wellness

consumer is a predominantly perishables shopper." Exhibit 74 (PX04359).

Premium natural and organic supermarkets differ importantly from most other retailers in

the products they avoid, as well as those they carry. Premium natural and organic supermarkets

sell a healthy lifestyle. As explained in a 2005 Wild Oats marketing presentation:

> Wild Oats and Whole Foods brands dominate the Natural and Organic channel. Wild
> Oats established its brand position via an extensive and authentic "all-natural" and
> "organic" offering targeting a broadening health/well being consumer segment.

Exhibit 75 (PX01332 at 102). Whole Foods' senior management agrees.

> We're about more than just food. We are a mission-driven company and that is important
> to our customers. We are the authentic retailer of natural and organic products.

Exhibit 23 (PX00011 at 005). It is not surprising, therefore, that a study done for Whole Foods

cautions that shoppers at premium natural and organic supermarkets are turned off by unhealthy

33

products, and that premium natural and organic supermarkets that carry unhealthy products risk

their credibility and their customers. Exhibit 2 (Transcript of Investigational Hearing of John

Mackey, at 125:1-19, PX01324 at 125); *see* Exhibit 128 (PX00613 at 007) ("We generally do not

offer conventional brands").

Whole Foods and Wild Oats have almost identical basic "food philosophies:" no

additives, no preservatives, no artificial colors, no artificial flavors, no antibodies or hormones in

the meats. Exhibit 76 (Transcript of Deposition of Scott Allshouse, at 15:17-239, PX02864 at

005); Exhibit 77 (Transcript of Deposition of David Lannon, at 36:19-37:1, PX02855 at 010-

011). Wild Oats states:

> We offer a broad range of products meeting our product standards throughout our
> merchandise categories, and emphasize unique products and brands not typically found in
> conventional supermarkets. We believe our product standards for natural and organic
> products are among the highest in the industry and only include products that are free
> from synthetic additives including artificial preservatives, colors or flavors, hydrogenated
> oils, antibiotic and growth hormone free meats, cruelty-free bodycare products and
> sustainable seafood.
> . . .
> Quality standards. We strive to offer products that taste great and meet the following
> standards:
>
> - foods free of hydrogenated oils and synthetic additives, such as artificial color,
> flavors, and preservatives;
> - meats that are humanely raised and contain no antibiotics or added growth
> hormones;
> - locally and organically grown produce, unique regional products; and
> - natural personal care and household items that are not tested on animals.

Exhibit 128 (PX00613 at 006-008); *accord*, Exhibit 20 (PX01302 at 006-008). In fact, after the

acquisition at issue here was announced, the Whole Foods' Regional Presidents were instructed

to conduct "Town Hall" meetings with Wild Oats employees. *See, e.g.*, Exhibit 77 (Transcript of

Deposition of David Lannon, 101:9-104:20, PX02855); Exhibit 78 (Transcript of Deposition of

Patrick Bradley, at 96:15-97:2, PX02857).  At these meetings, a power point slide on Food

Philosophy "was a very short slide, because essentially we said that the food philosophy is

exactly the same as Wild Oats."  Exhibit 77 (Transcript of David Lannon, at 108:17-19,

PX02855 at 028 ).

The few other premium natural and organic supermarkets share the same philosophy.  For

example, Earth Fare's website proclaims that "Earth Fare brings you the best natural foods and

products around.  Our stores feature more than 45,000 different organic and all natural items to

choose from, all without artificial ingredients like added trans-fats and high fructose corn syrup.

Because real food tastes better in their natural state."  Exhibit 80 (PX00336).

> **b.**    **"Lifestyle Retailers" - Superior Service in a Unique Shopping Environment**
>
> > **i.**    **Defendants' Views**

Whole Foods CEO explained:

> Whole Foods Market is about much more than just selling "commodity" natural and
> organic products.  We are a lifestyle retailer and have created a unique shopping
> environment built around satisfying and delighting our customers.

Exhibit 14 (PX01333 at 003).

> Premium natural and organic supermarkets strive

> to transform food shopping from a chore into a dynamic experience by building and
> operating stores with colorful decor, well-trained team members, exciting product mixes,
> teams of in-store chefs, ever-changing selections, samples, open kitchens, scratch
> bakeries, hand-stacked produce, prepared foods stations and European-style charcuterie
> departments.

35

Exhibit 20 (PX01302 at 012). In short, premium natural and organic supermarkets are not mere

resellers of packaged goods, like other retailers. Rather, as Whole Foods' CEO John Mackey

explains,

> [s]uperior quality, superior service, superior perishable product, superior prepared foods,
> superior marketing, superior branding, and superior store experience working together are
> what makes Whole Foods so successful.

Exhibit 81 (PX01346 at 001); *see also* Exhibit 82 (PX01345 at 002). Laura Coblentz, VP of

Marketing for Wild Oats, concurred:

> Succeeding in this business is about staying true to your message and mission but also . . .
> creating a community that will attract new customers. . . . It's about mind, body and soul
> through food, information, vitamins and supplements, recipes, books, body care – you
> name it. Wild Oats is more than a retail chain – it's about a lifestyle, and that's how we
> market ourselves.
> . . .
> Consumers have to trust your brand and your products. Without trust, there is no
> relationship, and trust can only be built with credibility, commitment, and consistency.

Exhibit 83 (PX01303 at 002). So important to shoppers at premium natural and organic

supermarkets is the "lifestyle of health and [ecological] sustainability" ethos that the industry has

accorded it an acronym: "LOHAS." *See* Exhibit 84 (Transcript of Deposition of Walter Robb, at

28:25-30:4, PX01308).

Building a premium natural and organic supermarket brand requires the investment of

appreciable time and money. Such investments reflect a commitment to a lifestyle of health and

ecological sustainability and entitlement to superior goods and services all at once. *See, e.g.*,

Exhibit 83 (PX01303 at 001-002); *see also* Exhibit 23 (PX00011 at 007); Exhibit 24, 128

(PX00613 at 005).

36

All of these differences are reflected in the fact that the premium natural and organic

supermarkets enjoy higher margins than conventionals. Wild Oats reports vastly higher margins

for natural food retailers (30% to 50%) than for conventional food retailers (25% to 30%).

Exhibit 85 (PX01331A at 002). In its most recent Form 10-K, Whole Foods reported a gross

profit margin of 34.9% for fiscal 2006. Exhibit 20 (PX01302 at 025). Such margin differences

are often reflective of significantly differentiated products and different markets. *Photovest v.*

*Fotomart*, 606 F.2d 704 (7th Cir. 1979).

ii.    **Industry Expert Views**

The Hartman "Organic 2006" Study, "one of the benchmarks to understand the

marketplace," Exhibit 68 (Transcript of Deposition of Walter Robb, at 225:20-25, PX02862 at

058),[25] tells us that Whole Foods and Wild Oats provide shopping experiences that are

significantly different than conventionals:

> Consumers have varied expectations depending upon the retail environment they are in.
> In other words, a shopper has different expectations about organic products depending
> upon whether they are shopping at mainstream grocers such as Safeway or a large-format
> natural foods store such as Wild Oats or Whole Foods Market. While this same
> consumer shops at both retailers, they tend to shop at each for different things (e.g. Wild
> Oats for fresh and specialty items, Safeway for canned and packaged goods).
> . . .
> Consumers are typically not expecting a mainstream grocery store to be an environment
> in which to discover new organic products. Rather, they are utilizing the store habitually,
> for functional needs, for convenience, or for shopping advertised sales. In contrast, these
> same consumers may be taking the extra time and energy to find organic products at Wild
> Oats. This extra time and energy are spent because consumers expect that the natural
> foods store will deliver a natural and organic experience, a "treasure hunt" of sorts. This
> is especially true in the produce, bakery or meat departments. Core and more intensely

---

[25]     Exhibit 68 (Transcript of Investigational Hearing of Laura Coblentz, at 23:22-24,
PX01323 at 023) (The Hartman Group has "broad knowledge of this space of health and
wellness and lifestyle and food.").

37

involved Mid-level consumers say they expect to find new and exciting products in center-store within this channel.

Exhibit 86 (PX02072 at 110).[26]

### c.    Characteristics of Conventionals and Other Retailers

An examination of the characteristics of conventionals, Trader Joe's and the mass merchants confirms Hartman's conclusion that the shopping experiences are quite different.

### i.    Upscale Conventional

Safeway's Lifestyle Operations is an upscale conventional, which has modestly increased the number of organic and natural SKUs that it carries. The President ███████████████

███████████████, however, pointed out that Whole Foods is still very different from

███████:



_____

[26]    The Hartman Group's report that 58% of consumers buy organics from conventional supermarkets while 49% buy from "Natural Food Store (e.g, Whole Foods, Wild Oats)" simply confirms that some consumers do indeed buy from both types of stores, but provides no indication whether a merger of the two "Natural Food Stores" would be anticompetitive. Exhibit 86 (PX02072).



Exhibit 89 (Transcript of Deposition of⬛⬛⬛⬛⬛, at 128:18-129:20, 171:5-172:3, PX02870

at 032, 033, 043).

> [Whole Foods] has authenticity, integrity, and the power of their brand with their customers. This creates strong loyalty from their customer base – something Safeway doesn't have and likely never will have.

Exhibit 90 (PX00809). As a result of these recognized differences, just this past February, Mr.

Mackey explained to the Whole Foods Board that Safeway had a negligible impact on Whole

Foods:

> Safeway is continuing to roll out their "Lifestyle Stores." I don't believe these stores have had much real impact on us, although they've increased Safeway's comps a couple of hundred basis points (not that much when you consider the immense amount of capital invested).

Exhibit 46 (PX01304).

### ii.    Trader Joe's

Trader Joe's sees itself as substantially differentiated from Whole Foods. Of particular

importance here is Trader Joe's limited product offering. Whereas conventional and premium

natural and organic supermarkets typically carry at least 25,000 items, *see, e.g.,* Exhibit 52

(PX01002), Trader Joe's only carries about 2,000. L. Lewis, *The Trader Joe's Adventure* 20

(2005). Roughly 80% of these are sold under Trader Joe's private label brands. Exhibit 93

(Transcript of Investigational Hearing of Daniel Bane, at 85:7-86:23, PX01322 at 085-086).

Trader Joe's stores average just under 11,000 square feet in size, whereas conventional

supermarkets and premium natural and organic supermarkets typically exceed 25,000 square feet

and are as large as 80,000 square feet. Exhibit 93 (Transcript of Investigational Hearing of

Daniel Bane, at 44:20-25, PX01322 at 044); Exhibit 8 (Transcript of Investigational Hearing of

Perry Odak, at 113:8-12; 118:19-23, PX01325 at 113, 118); Exhibit 94 (PX00171); Exhibit 4

(Transcript of Investigational Hearing of Elisabeth Griffin Foster, at 135:23-36:2, PX01338 at

135-136).[27] *Cf.* Exhibit 78 (Transcript of Deposition of Patrick Bradley, at 40:23-41:4, PX02857

at 011-012) (Trader Joe's is not considered "a conventional. They sell many of the things that

conventional stores sell, but they're kind of their own little market.").

Nor does Trader Joe's have services remotely comparable to those of premium natural

and organic supermarkets. According to Mr. Bane, Trader Joe's format is

> going after value, and I just don't see that, you know, adding a service department
> provides the value for our customers so we don't do it. We're real dogmatic about it,
> because our stores are the size that we can't–we can't support service departments.

Exhibit 93 (Transcript of Investigational Hearing of Daniel Bane, at 62:13-18, PX01322 at 062).

Further, premium natural and organic supermarkets conspicuously promote a "lifestyle of

health and [ecological] sustainability." Trader Joe's manifestly does not. Trader Joe's CEO has

testified that Trader Joe's does not "try to lead our customers on issues that we think are

important, because we don't think that's our–our purview." Exhibit 93 (Transcript of

---

[27]     *See Staples*, F. Supp. at 1079 ("Other retailers devote only a fraction of their
square footage to office supplies as opposed to Staples or Office Depot. The evidence shows that
the typical club, mass merchant, or computer store offers only 210 to 2000 square feet of office
supplies, compared to over 11,182 square feet at a typical Staples. This was evident to the Court
when visiting the various stores. Superstores are simply different in scale and appearance from
the other retailers.").

Investigational Hearing of Daniel Bane, at 162:18-20, PX01322 at 162). Whole Foods has

articulated environmental and other standards of social responsibility and sponsors an Animal

Compassion Foundation. Exhibit 72 (Transcript of Investigational Hearing of Edmund

LaMacchia, at 120:17-18, 122:6-8, PX01326 at 120, 122). Wild Oats is similarly engaged.

Exhibit 95 (PX00601 at 008-010). Trader Joe's makes it "a point not to be involved in" such

things. Exhibit 93 (Transcript of Investigational Hearing of Daniel Bane, at 165:3-9, PX01322 at

165). Finally, Mr. Bane further testified that Trader Joe's was not an upscale or epicurean

retailer. As a result, shoppers were not invited to, or expected to, linger, as at a coffee bar. *See*

Exhibit 93 (Transcript of Investigational Hearing of Daniel Bane, at 48:3-4, 162:1-6, PX01322 at

048, 162) (Trader Joe's does ████████████████████████).

Perry Odak, a former Wild Oats CEO, confirmed that Trader Joe's is substantially

different from Wild Oats and consequently does not serve as a significant competitive constraint:

> Wild Oats stores never had an issue about competing against Trader Joe's [because]. . . .
> Trader Joe's to the consumer is considered a budget, eclectic alternative. . . It's not where
> you go to get groceries on a regular basis because, you know, what goes in there, you
> know, one, it's not a complete shop, and two, it changes so frequently.
> We were deathly afraid of Trader Joe's until we opened up Long Beach, and the Trader
> Joe's is two or three blocks up the street, probably does a thousand dollars a square foot.
> That store has performed exceptionally well. Trader Joe's doesn't bother it
> whatsoever. . . . If you were the farmers' market format, a big issue. Okay? But in Oats,
> my memory is it became a nonfactor, not -- something we did not worry about.[28]

Exhibit 8 (Transcript of Investigational Hearing of Perry Odak, at 122:10-123:12, PX01325 at

122-123). Similarly, "Whole Foods coexists so well with TJs . . . ." PX00749 at 001; PX00162

at 003 (September 2006) (Mackey reports that although Trader Joe's was having some impact in

---

[28]    Mr. Odak's testimony is corroborated by Wild Oat's documents. *See, e.g.,*
Exhibit 96 (PX01238 at 003) (███████ to obtain ███████ with Whole Foods, and for
Henry's, "███████████ needed for ███ with Trader Joe's").

41

some areas, Trader Joe's was still a "fill-in" store for Whole Foods' customers);[29] *see also*

Exhibit 86 (PX02072 at 010) ("While Trader Joe's products have a marked appeal to *some*

(italics in original) WFM consumers, the overall Trader Joe's experience fails to resonate at the

same high level of quality the WFM retail experience.").

### iii.    Other Supermarkets

Mr. Mackey agrees that conventional supermarkets and mass merchants cannot

effectively constrain premium natural and organic supermarkets because they cannot replicate the

blend of characteristics of the premium natural and organic supermarkets:

> Please produce any evidence that Wal-Mart, Costco, Ralph's, Safeway, Kroger, etc
> ....ha[s] ever hurt Whole Foods by selling organic foods. . . . Whole Foods is successful
> not because it sells organic foods – any idiot can do that – but because it has higher
> quality perishable foods across the entire store – better, fresher produce, seafood, meat,
> bakery, and prepared foods. The company you love so much, Wal-Mart, does a
> particularly poor job selling perishable foods. Whole Foods quality is better, its customer
> service is far superior, and the store ambience and experience it provides its customers is
> fun, entertaining, and educational – something none of those other companies you named
> can claim.

Exhibit 98 (PX00751A) (May 2006 posting as "Rahodeb"). And then this past February, in a

report to the Board, Mr. Mackey again dismissed ▮▮▮▮▮▮ competitive significance:

> ▮▮▮▮▮▮ despite the hoopla in the media, hasn't had much impact in the organic market.
> I doubt they will because their core customers don't want to pay the higher prices and
> their non-core customers don't want to shop there for various reasons.

---

[29]     The limited impact is in part due to the limited overlap. ▮▮▮▮▮▮▮▮▮▮



carried by
Whole Foods. Exhibit 52 (Transcript of Investigational Hearing of Walter Robb, at 273:8-274:7,
PX01327 at 273-274). In perishables, which generally includes any product that might spoil
without refrigeration (*e.g.*, fruits, vegetables, meat, seafood), Exhibit 68 (Transcript of
Deposition of Walter Robb at 21:16-25, PX02862 at 007), the match ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ Exhibit 72 (Investigational Hearing of Edmund LaMacchia, at
224:11-225:22, PX01326 at 224-225).

Exhibit 91 (PX01304); *see also* Exhibit 99 (Transcript of Deposition of A.C. Gallo, at 165:10-14,

PX02851 at 043) ("         doesn't sell high quality perishables"). *See generally* PX00182 at

005 (2Q06) (Mackey explains in analyst call that although "we've seen many competitors over

the years add a limited selection of natural and organic commodity products . . . that has not hurt

us . . .); Exhibit 128 (PX00613) ("Despite the increase in natural foods sales within conventional

supermarkets, we believe that conventional supermarkets still lack the concentration on a wide

variety of natural and organic products, and emphasis on service and consumer education that our

stores offer.").

Further, even on the limited overlap, the conventionals still may not constrain pricing by

the Defendants. As explained by Scott Allshouse, Whole Foods Regional President for the

South:

> My opinion is that Publix, Kroger, Harris Teeter price competitively lower on items that
> they compete -- specifically like let's say Coke or Pepsi, they price items that -- like that,
> but in items that are natural and organic, they don't price them as competitive, and we sell
> more of those products, so I believe we get better pricing on it, and that affords us the
> opportunity to sell them lower than they do.

> So if you're talking about Annie's mac and cheese as an example, my opinion is that we
> can sell that product cheaper than they do.

Exhibit 76 (Transcript of Deposition of Scott Allshouse, at 65:11-18, PX02864 at 018).

### iv.    Gourmet

Although upscale "foodie" supermarkets have significantly more perishables than

conventional supermarkets have, Exhibit 88 (Transcript of Investigational Hearing of Laura

Coblentz, at 51:18-53:25, PX01323 at 051-053), Whole Foods and Wild Oats do not view them

43

as significant competitive constraints. In this regard, Whole Foods reported that Central Market, Fresh Market, and Plum Market were unlikely to impact Whole Foods. *See* Exhibit 101 (PX00034). The lack of impact of Central Market is particularly notable, given that the co-President of Whole Foods had previously noted: "HEB/CM is one of the very best operators in the country and this will be a litmus test for WFM.[30]

**v.   Summary**

In summary, with respect to both Trader Joe's and conventionals, Whole Foods and Wild Oats have succeeded at differentiating themselves by creating both authenticity and a lifestyle shopping experience. This conclusion was stated explicitly by The Hartman Group in a report for Whole Foods completed just as this deal was being finalized. Exhibit 15 (PX02508); *see* Exhibit 102 (Transcript of Deposition of Linda Boardman, at 96:8-97:3, PX02869 at 025-026).[31] The report leaves little doubt that the premium natural and organic supermarkets are very different from other supermarkets:

---

[30]    Importantly, however, as explained by Professor Murphy:

> From the point of view of market definition, the issue of how to treat premium supermarkets is somewhat moot since the major gourmet market chains, Wegman's Central Market and Plum Market, are not present in any of the overlap markets.

Exhibit 6 (Murphy Report at ¶ 79, PX02878); *see also* Exhibit 8 (Transcript of Deposition of Perry Odak, at 154:2-5, PX01325 at 154) (ex-Wild Oats CEO: "they're a small -- not small, but they're a regional player, you know, in a regional marketplace, so you know, is Wegmans going to all of a sudden go national? I don't think so.").

[31]    The cover of the report states, "In association with The Hartman Group Inc. - A Tinderbox Ethnography." Exhibit 15 (PX02508). Tinderbox is The Hartman Group. Exhibit 102 (Transcript of Deposition of Linda Boardman, at 117:2, PX02869 at 031).

**"It is our belief that WFM will not encounter significant, if any, competition from leading mainstream retailers (Safeway, Wal-Mart, Costco, etc) entry into organics."** (Bold in original) (026)

Most other major retailers lack the ability to consistently generate authentic, high quality food experiences" (026)

In fact, both Wild Oats and Whole Foods repeatedly refer to other retailers as "gateways" to their stores. Exhibit 103 (PX00532) ("rather than hurting us, they are in fact helping us"); Exhibit 104 (PX04361) ("serving as a gateway to our stores"). In fact, the Wild Oats CFO remarked: "With regard to the conventionals getting into natural and organic foods, we really see this as serving as a gateway to our stores rather than a competitive threat". Exhibit 42 (PX02704).

### d.    Distinct Customers

Whole Foods and Wild Oats are both "lifestyle stores" oriented to people seeking self-improvement and well-being. Whole Foods' CEO John Mackey explains that

> Whole Foods Market is about much more than just selling "commodity" natural and organic products. We are a lifestyle retailer and have created a unique shopping environment built around satisfying and delighting our customers.

Exhibit 14 (PX01333 at 003).

Conventional retailers generally aim to provide a wide selection of conventional products for price-conscious shoppers who are not as concerned about the breadth of natural and organic products offered, the shopping experience, or the appeal of a healthier lifestyle. Exhibit 14 (PX01331 at 002); *see also* Exhibit 4 (Transcript of Investigational Hearing of Elisabeth Griffin Foster, at 119:3-120:9, PX01338 at 019-020). Whole Foods and Wild Oats target very different customers than do other retailers. *Brown Shoe*, 370 U.S. at 325 (distinct customers relevant to

45

**Exhibit 1B–Part 2 of Plaintiff's Public Version of Its Corrected Brief on Its Motion for Preliminary Injunction**

market definition); *Staples*, 970 F. Supp. at 1078 ("In addition to the differences in SKU numbers and variety, the superstores are different from many other sellers of office supplies due to the type of customer they target and attract.").

Wild Oats' former CEO explains: "I never believed it was the same shopper that was shopping Safeway, you know, so it was – it was more in relation to Whole Foods . . . ." Exhibit 8 (Transcript of Investigational Hearing of Perry Odak, at 46:13-16, PX01325 at 046). After responding that Whole Foods is not a conventional, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Exhibit 89 (Transcript of Deposition of ▮▮▮▮▮▮▮▮▮▮ at 60:23-61:3, PX02870 at 015-016).

Laura Coblentz, VP of Marketing for Wild Oats, testified that the "demographic and psychographic profile" of the Wild Oats shopper is "educated and affluent and interested in certain lifestyle issues." Exhibit 105 (Transcript of Investigational Hearing of Laura Coblentz, at 18:22-19:6, PX01323 at 018-019).

The Whole Foods customer profile is quite similar and is reflected in all facets of its operations, beginning with its site selection and continuing through to its branding and marketing strategies. *See, e.g.,* Exhibit 105 (Transcript of Deposition of Ken Meyer, at 11:21-24, PX02868 at 004) ▮▮▮▮▮▮▮▮ with ▮▮▮▮▮▮▮▮▮▮▮▮ strong, you know, ▮▮▮▮▮▮▮▮")); Exhibit 78 (Transcript of Deposition of Patrick Bradley, at 19, PX02857).[32]

---

[32]    *See, e.g.,* Exhibit 106 (PX01321 at 001) ("Our partnership with the Denver Botanic Gardens has just blossomed . . . [t]he largest demographic in our zip code, Bohemian Mix, is THE Botanic Gardens member. We are getting great exposure . . . and it really allows us

46

The store site selection criteria at both Whole Foods and Wild Oats reflect this narrower demographic customer target. Just two months before this deal was announced (December 2006), Freya Brier, General Counsel for Wild Oats, explained at the International Council of Shopping Centers in New York:

> We receive on average 400 calls in the Wild Oats Answer Line every week related to requests from people wanting a store in their community.
>
> Wild Oats is differentiated from other retailers with more local products and more premium products. We are a high-end lifestyle retailer that is selling more than just products . . . we are selling an overall experience. This serves as major draw to our stores, and to the shopping centers where we locate.

Exhibit 106 (PX02954) (December 2006 Wild Oats Site Criteria Guidelines stating that Wild Oats requires sites with a population of more than █████████████ the median household income is ██████ and ████ of the population have a college degree.). Whole Foods has similar site requirements. Exhibit 108 (PX04360).

## B.    The Relevant Geographic Markets Are Local

Relevant markets have geographic as well as product dimensions. The relevant geographic market is "the 'area of effective competition . . . in which the seller operates, and to which the purchaser can practically turn for supplies.'" *Philadelphia Nat'l Bank*, 374 U.S. at 359 (1963) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)). The ████████████████████████████████████████████ stores tend to draw shoppers from a distance of five miles or a sixteen minute drive-time. ████████████████████████ In determining the ████████████████████████████████████████████████████████ ████████████████████████████████████████ located within six miles of one another, ample opportunity to tell our story and focus on educating them on our value lines.").

47

suggesting that the competitive interactions among premium natural and organic supermarkets tail off quickly at a distance of more than six miles. Therefore the local geographic markets for premium natural and organic supermarkets generally cover a distance of approximately five or six miles from each store, but may be smaller or larger depending on geography and other factors. *See* Exhibit 6 (Murphy Report, ¶¶105-07, at 47-48, PX02878).

The specific relevant geographic markets in which the Commission has determined the proposed acquisition will injure competition and consumers are shown in Exhibit 66 (PX02883), and for ease of discussion, are referred to as: Albuquerque, NM; Boston, MA; Boulder, CO; Hinsdale, IL (suburban Chicago); Evanston, IL (suburban Chicago); Cleveland, OH; Denver, CO; West Hartford, CT; Henderson, NV; Kansas City-Overland Park, KS; Las Vegas, NV; Los Angeles, CA; Louisville, KY; Omaha, NE; Pasadena, CA; Portland, ME; Portland, OR; and St. Louis, MO. If in any one of these relevant markets the proposed acquisition is likely to injure competition, the acquisition is illegal. The evidence indicates, and the Commission's expert has testified, that it will do so in all of them, eliminating Whole Foods' sole competitor in the operation of premium natural and organic supermarkets.

The proposed acquisition likely also would injure competition in numerous additional markets where, but for the proposed acquisition, one or the other of the Defendants would open a premium natural and organic supermarket to compete with a pre-existing store of the other. These markets are: Fairfield County, CT; Miami Beach, FL; Naples, FL; Nashville, TN; Palo Alto, CA; Reno, NV; and Salt Lake City, UT. Exhibit 110 (PX04357).

> **C.** **The Relevant Markets Are Highly Concentrated and Whole Foods'**
> **Acquisition of Wild Oats Will Greatly Increase Concentration, Significantly**
> **Increasing Market Power**

Mergers that significantly increase market concentration are presumptively unlawful because the fewer the competitors and the larger the respective market shares, the greater the likelihood that a single firm or a group of firms could raise prices above competitive levels. *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986); *Merger Guidelines* § 2.0, Exhibit 28 (PX01310 at 007). Concentration typically is measured using the Herfindahl-Hirschman Index ("HHI").[33] Where the post-acquisition HHI exceeds 1800 points, it is "presumed that mergers producing an increase in the HHI of more than 100 points are likely to create or enhance market power or facilitate its exercise." *Merger Guidelines* § 1.51, Exhibit 28 (PX01310 at 007). Courts have adopted similar thresholds.

In this case, the combined shares of Whole Foods and Wild Oats in the premium natural and organic supermarkets would be 100% in all of the current overlap markets except Portland, Oregon. *See Heinz*, 246 F.3d at 725; *Baker Hughes, Inc.*, 908 F.2d at 991 (D.C. Cir. 1990) ("The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully."). These percentages are far in excess of the levels raising a presumption of illegality.

While in some areas of the country other companies operate premium natural and organic supermarkets, only Whole Foods and Wild Oats operate premium natural and organic supermarkets in essentially all of the relevant markets at issue in this proceeding. In these markets, the concentration levels in already very highly concentrated markets jump to the

---

[33]     The HHI is calculated by summing the squares of the market shares of each participant, so as to give greater weight to the market shares of larger firms in accord with their relative importance in competitive interactions. *Merger Guidelines* § 1.5, Exhibit 28 (PX01310).

49

theoretical limit, an HHI of 10,000. Thus, there is a very strong presumption that in each of the identified markets Whole Foods' proposed acquisition of Wild Oats is anticompetitive, injurious to consumers, and illegal. In fact, because post-acquisition Whole Foods may be a monopolist, the presumption is even stronger.[34] However, we need not rest on that presumption. Defendants' documents and the testimony of their senior executives provide abundant evidence that the acquisition would cause anticompetitive price and non-price effects.

---

[34]     Where a merger may result in a monopoly, the presumption of anticompetitive effects is greatest. This is consistent with Section 2 monopolization law. According to Areeda & Hovenkamp, the acquisition of even a small competitor by a monopolist should be prevented

> even if we assume that the small firm would probably continue to play only a very minor role. To find a § 2 monopoly is necessarily to declare the preciousness of any viable rival. Notwithstanding its minor position, such a rival offers an alternative source to buyers, an additional locus of decision-making and possible innovation, an actual or possible check on the monopolist's pricing or other laxity, and a center of production or marketing experience that might come into more aggressive hands and thus facilitate a more substantial competitive challenge to the monopolist.

3A Areeda, Hovenkamp & Solow, *Antitrust Law* ¶ 701c (rev. ed. 1998). The treatise also explains that removal of a potential competitor is more problematic when undertaken by a monopolist:

> Merger with a potential competitor acquires special significance when one of the firms is a monopolist. . . . [W]hen one of the merging firms is a monopolist and the other is a potential entrant into the same market in which the monopolist has its power, anticompetitive concerns are much more realistic. In this case no speculation is needed about the impact of a perceived entrant on an oligopoly whose members must coordinate their behavior. The single firm monopolist is in a position to make unilateral decisions about the risk and impact of new entry and, where other forms of entry deterrence are not promising, use acquisition as an alternative. As a general matter, a monopolist's acquisition of a "likely" entrant into the market in which monopoly power is held is presumptively anticompetitive. The case for condemnation is strongest where the acquired firm has actually made attempts to enter the monopolist's market or where its entry is imminent.

*Id.* ¶ 701d (citing *United States v. El Paso Nat. Gas Co.*, 376 U.S. 651 (1964)).

50

**D.    The Proposed Acquisition Would Injure Competition in Numerous Cities**

**1.    Unique Price Competition Between the Defendants Will Be Lost**

There is abundant evidence of aggressive price competition between Whole Foods and Wild Oats, whether or not other retailers are located nearby.  This competition would be eliminated by the proposed acquisition.

We already have quoted Whole Foods' CEO's statement to the Whole Foods Board explaining that Whole Foods' purchase of Wild Oats "will avoid nasty price wars."  Exhibit 1 (PX00773 at 001).  In addition, Whole Foods similarly reported that Louisville's margins are low "because we are having ▮▮▮▮ some ridiculously low special pricing at Wild Oats."  Exhibit 111 (PX01008 at 002).  Whole Foods reacted vigorously to competition from Wild Oats:

> ▮▮▮▮ opened . . . [its ▮▮▮▮ store] on May 19th, 2004. . . .  We have put in place a competitive pricing strategy to beat ▮▮▮▮ to the punch. . . .  ▮▮▮▮ is now trying desperate measures such as buy one get one free promotions and 20% to 50% off with very limited success. . . .  The ▮▮▮▮ store ▮▮▮▮ is still operating in a desperation mode heavily discounting product to try and drive sales; Exhibit 112 (PX00016 at 005-006)

> WILD OATS: Competitive Intrusion @ 29th Street [in Boulder, Colorado.]  We've known about it for awhile, so we've been remodeling in preparation for it. . . .  We're also focusing on competitive pricing.

Exhibit 113 (PX00015 at 001); *see also* Exhibit 114 (PX00187 at 001) ▮▮▮▮

▮▮▮▮ "); Exhibit 57 (PX00054) (▮▮▮▮

' ▮▮▮▮ '); Exhibit 115

(PX00028) (▮▮▮▮ ) *See*

*generally* Exhibit 116 (PX00035) (▮▮▮▮

▮▮▮▮ ).

Wild Oats' business records show the same head-to-head price competition. Wild Oats employees were instructed to "price check on WFMI perishables ▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓ Exhibit 117 (PX01317). Wild Oats' management also noted that: "[a]fter WF opens [in Reno, Nevada], we would probably do ▓▓▓▓▓▓▓ Exhibit 117 (PX01317). As Wild Oats suggested:

> ▓▓▓▓▓ns we could drop an aggressive fresh flyer or two into WF zip codes▓▓▓
> ▓▓▓▓▓ the coming weeks? ▓ . As you can see, the heaviest effected [sic] departments
> are ▓▓▓▓▓▓▓▓▓▓▓▓ . These departments are at least ▓▓▓ down from
> August. . . . During the time of September 1st through October 4th, we ran bounce back
> coupons. Save $5 off an order of $20 or more, and save $10 off an order of $40 or
> more. . . . We have also started a 10% off student discount program at the begin [sic] of
> September.

Exhibit 118 (PX01315 at 001-002).

Mr. Odak further explained how Wild Oats' effort to compete on price with Whole Foods played out in Wild Oats' responses to industry-wide trade promotions:

> [I]t depended on the competitive environment how much you passed on [to
> consumers]. . . . . I mean, I can't remember where we were really worried about the
> conventionals in terms of the temporary price reductions in this category. . . . [W]here
> there was less competition you had more pricing room, so if Whole Foods wasn't your
> major issue or the Whole Foods pricing was above you, you could, you know, be more
> comfortable in terms of moving prices up. But that also went for the temporary price
> reductions. If you were worried about the competition, *i.e.*, Whole Foods in many cases
> or most cases, you, you know, passed those price promotions on most of the time penny
> for penny. If you were less worried about or it was not an issue either because Whole
> Foods was above you or not in the marketplace, you had the opportunity to pocket some
> of that money . . . .

Exhibit 8 (Transcript of Investigational Hearing of Perry Odak, at 64:7-66:10, PX01325 at 064-066). As discussed below, the post-Odak management at Wild Oats was building on this plan to achieve price parity.

## 2.    Unique Non-Price Competition Between the Defendants Will Be Lost

Whole Foods and Wild Oats, being far and away the closest competitors, increased their spending on remodeling and updating stores, expanding product offerings, and adding service workers and amenities when confronting one another, irrespective of other nearby retailers. This competition too would be eliminated by the proposed acquisition.

Whole Foods' business records created in response to the anticipated launch of Wild Oats' flagship store in Boulder, Colorado (again, a store that would have opened by now but for the proposed acquisition), are illuminating. For example, a regional Whole Foods' executive said:



Exhibit 119 (PX01314 at 008). Whole Foods also acknowledges that without premium natural and organic supermarket competition "we potentially become slow and lazy. Our prices go up and our customer service goes down." Exhibit 120 (PX001337 at 002). In fact, Whole Foods substantially remodeled its Boulder, Colorado, store to meet the competitive threat posed by Wild Oats' entry (a response it apparently did not consider when Safeway opened its flagship Lifestyle store there):

> The Rocky Mountain Region is excited to present (at long last!) an opportunity to expand our Boulder store. . . . Wild Oats is opening their 40,000 square foot flagship store three blocks south of us. Our expanded store, opening ▮▮▮▮▮▮▮ their scheduled opening, will put another nail in the Oats coffin.

Exhibit 121 (PX00018 at 001).[35] But this merger, if permitted, will result in the loss of that

competition; the Boulder Wild Oats store will never open. *See* Exhibit 122 (PX00166 at 004)

("They are also not to open the 29[th] Street store per our definitive agreement. The lease there

says they have to open by a certain number of days from lease turnover and it must operate for 5

years, etc. but once the deal is done we will obviously negotiate out of this based on our

strategy."). Indeed, the loss of competition in the Denver, Colorado, market alone is sufficient to

condemn the transaction.

There are many other examples of head-to-head competition between the Defendants. In

response to a two-week 20% off sale by Wild Oats in June 2006 in New Mexico, Whole Foods

reacted aggressively:

> So what does this mean for us,
>
>> Start shifting gears and get more presence on private label out on your sales floor
>> starting now and should hold until the end of their sale
>> If customer bring this to your attention we will match the price of the item they
>> are asking about
>> Have them do a taste test
>> Give free samples

Exhibit 123 (PX00051). Nor is this intense competition limited to Colorado and New Mexico.

Consider Exhibit 124 (PX01312 at 001), a 2006 email in which A.C. Gallo, Co-President and

COO of Whole Foods, boasted to Mr. Mackey,

> We will just have to keep kicking [Mr. Odak's] ass wherever we compete and let the
> customers decide. I can't wait until we open our Portland [Maine] store next year and
> squash them with both higher quality and lower prices.

---

[35]    The Boulder competitive remodel described above did not simply slap on a coat of
paint–it cost close to          Exhibit 54 (Transcript of Deposition of Will Paradise, at 85:1-
21, PX02863 at 023).

No longer willing to "let the customers decide" and to challenge Wild Oats "with both higher quality and lower prices," Whole Foods now proposes to eliminate Wild Oats through acquisition instead.

Wild Oats reacted similarly to competitive intrusions into its territories by Whole Foods. For example, an email forwarded by Roger Davidson, Wild Oats' Sr. VP for Marketing, to CEO Greg Mays, shows that Wild Oats would respond to Whole Foods' entry into Portland, Maine (in mid-February 2007), with "█████████████████████████, as well as non-price responses such as increased in-store demonstrations and increased value-added services such as nutritionists and naturopaths, *gratis*. Exhibit 125 (PX00763 at 001); *see also* Exhibit 39 (PX00024) (planning by Wild Oats in ████ 2007 for a $500,000 renovation to compete with Whole Foods █████████████); Exhibit 39 (PX00469 at 006, 009-010, 019, 021, 023-025).[36]

### 3.    Wild Oats Is a Viable and Aggressive Competitor

---

[36]    Another benefit to consumers of the competition between Whole Foods and Wild Oats is that the Defendants put pressure on their suppliers to better compete with one another. *See* Exhibit 125 (PX00763 at 001) (Jan. 2007) ("Start contacting the vendors regarding the sample packets - █████████████████ The Whole Foods Opens on 2/14 so [we will] need samples before then . . .."); Exhibit 59 (PX00234 at 001) (Nov. 2006) (Regional President implementing ███████████████████████████ to better compete against Wild Oats); Exhibit 119 (PX01314 at 008 (as part of impending war against Wild Oats, "██████████████████████████████████████████████ .")); Exhibit 127 (PX01202 (Davidson, Jan. 22, 2007: "You can see ███████████ ██████████████████ Whole Foods at retail. ██████████████████████ ████████  It will therefore be necessary for your departments to offset these retail reductions with cost reductions.")).

Wild Oats has become increasingly aggressive in recent years in its competition with Whole Foods. When Perry Odak first arrived at Wild Oats in 2001, it was 90 days from running out of cash. Exhibit 8 (Transcript of Investigational Hearing of Perry Odak, at 166:25-167:1, PX01325 at 166-167). By the end of 2006, Wild Oats had $53 million in cash available, as well as an unused line of credit of some $50 million dollars, for a total of about $104 million in readily accessible funds. Exhibit 8 (Transcript of Investigational Hearing of Perry Odak, at 167:24-168:19, PX01325 at 167-168).

Wild Oats also has access to additional financing. In the summer of 2006, Wild Oats had "banks, investment banks and traditional banks, banging on our doors wanting to raise that money for us." Exhibit 8 (Transcript of Investigational Hearing of Perry Odak, at 144:18-20, PX01325 at 144). It had proposals from JP Morgan Chase, Bank of America, Wells Fargo, and Merrill Lynch to raise $75 to $150 million. Exhibit 8 (Transcript of Investigational Hearing of Perry Odak, at 145:12-22, PX01325 at 145). Perry Odak explained why investment banks were banging on their door to provide the money:

> Number one, we had a great track record of us managing cash. I mean, I never missed a number. I never missed our cash forecast all through even when we had a difficult year. They were seeing the progress that had been made. They saw that we went and raised two – two previous times we had come to the market, everything we said was coming true, so they had confidence that the team knew what they were doing.

Exhibit 8 (Transcript of Investigational Hearing of Perry Odak, at 144:22-145:8, PX01325 at 144-145).

Since 2001, Perry Odak successfully turned Wild Oats around as he had done at several other companies in the past. Sales at Wild Oats have been growing over the last few years. Exhibit 8 (Transcript of Investigational Hearing of Perry Odak, at 156:20-23) (referring to Wild

56

Oats 10-K). For example, according to a recent 10K, in fiscal year 2006, Wild Oats sales rose 5.3% to $1.183 billion. In 2006, three of Wild Oats' new stores set records for the highest grand opening in the company's history in their respective formats. In 2006, seven new stores were opened and four underwent major remodeling. Exhibit 128 (PX00613 at 026-029). This successful turnaround led the new Chairman and CEO of Wild Oats to acknowledge:

> We are grateful for the leadership and direction provided by Mr. Odak during his time here. He stepped in during a difficult period, executed a successful turnaround and helped establish the Company as a true lifestyle brand.

Exhibit 129 (PX01236).

Securities analysts, and even Mr. Mackey, echoed the news of the Wild Oats turnaround. *See, e.g.,* Exhibit 110 (PX00337) (From May 4, 2006: "New management's initiatives are paying off, and the turnaround appears to be priced into the stock."); Exhibit 130 (PX00337); Exhibit 130 (PX00340) ("[T]he turnaround phase is at or near an end, and the platform for growth has been set."). Mr. Mackey testified that Wild Oats is a "a stronger and a better company than they were 6½ years ago." Exhibit 2 (Transcript of Investigational Hearing of John Mackey, at 225:21-22, PX01324 at 225). And, according to the new Wild Oats CEO, the trend and the plan, before this attempted merger, was more of the same:

> Simply put – our plan is to become more aggressive with our marketing and merchandising and with enhancing our "customers' experience." Supported by our "Marquee Name" – a name that represents quality, integrity and trust for organic and natural foods.

Exhibit 132 (PX01249). How did this transition occur? In July 2005, Wild Oats set out the long-term strategic vision that is now unfolding. As part of its growth strategy, Wild Oats determined to "Focus on Whole Foods' high demand natural and organic markets." Exhibit 133

(PX00677 at 026).[37]  In July 2005, Wild Oats also created a "Whole Foods Competitive Marketing Plan," with page after page of ways to combat Whole Foods.  Exhibit 39 (PX00469).  And more recently, a "Competitive Intrusion Plan" (May 2006) evaluated how to "maintain a good price perception relative ██████████ Exhibit 134 (PX00661 at 012). ████████

██████████████████████████████ *Id.*  Furthermore, Perry Odak, Wild Oats' former CEO, testified that Wild Oats had no competitive marketing plan for any conventional, mass merchant, or club store during his tenure.  Exhibit 8(Transcript of Investigational Hearing of Perry Odak, at 260:15-25; 261:1-16, PX01325).

Similarly, a Wild Oats 2007 Business and Financial Plan concluded that a ████████ investment [is] needed for ████████ with WFMI."  Exhibit 46 (PX00458 at 005). Notwithstanding this price tag, Wild Oats determined to ███████████████████████ in areas ████████████████████████ Exhibit 127 (PX01202 at 001).  No competitor other than Whole Foods commanded this type of attention or response.

The immediate focus would be on Whole Foods stores smaller than 30,000 square feet. Wild Oats used a forecasting tool, MapInfo, to assist in identifying these markets.  Exhibit 133 (PX00677 at 026); Exhibit 51 (PX02901 at 004 (March 2005) ("forecasting model to assist Wild Oats in making future real estate decisions")).

---

[37]     A Wild Oats marketing plan states this objective:

████████████████WFMI and Wild Oats████████████████████

████████████████████████████████████████████████

Exhibit 133 (PX00677 at 078).

Recently, Wild Oats planned to ramp up its expansion. In the months and weeks before the announcement of the proposed merger, Wild Oats developed a new store format. The new store prototype was first rolled out at the new Wild Oats Tampa store in 2006. Exhibit 8 (Transcript of Investigational Hearing of Perry Odak, at 137:1-4, PX01325 at 137). After the Tampa store exceeded initial projections, Wild Oats decided to adopt this new store format for all new store openings, including the 29th Street Store in Boulder, Colorado, and it determined to tap some $150 million in equity and debt financing to fund plans to enter Whole Foods-dominated markets in thirty different cities. Exhibit 8 (Transcript of Investigational Hearing of Perry Odak, at 139:15-21, PX01325 at 139). By October 2006, Wild Oats had plans to open ▇ stores in 2007 and ▇ stores in 2008. Exhibit 135 (PX00455 (showing Wild Oats store openings)). Wild Oats also planned to remode ▇ stores in ▇ many in close proximity to Whole Foods stores. Exhibit 135 (PX00455) (outlining leases near Whole Foods in ▇

▇ In the third quarter 2006 earnings conference call on November 7, 2006, Wild Oats' CEO, Greg Mays, stated that "we will have opened seven stores by the end of this year and we have 21 leases or letters of intent signed for stores opening in the remainder of this year, 2007 and into 2008." Exhibit 136 (PX01273 at 004). Many of these locations were identified in 2005 as specifically targeting Whole Foods.

At the same time, Wild Oats created a new pricing objective:

Exhibit 133 (PX00677 at 078 (July 2005) ( ████████████████████

████████; Exhibit 137 (PX00021) (showing the establishment of price zones for

████████████████████████████████ Exhibit 138

(Transcript of Investigational Hearing of Chad Smith, at 95:21-96:5, 99:12-20, 135:16-136:6,

PX2876 at 095-096, 099, 135-136) (showing ████████████ price zone); Exhibit 139

(PX00041 at 001); *see also* Exhibit 138 (Transcript of Investigational Hearing of Chad Smith,

100:5-102:16, PX02876 at 100-102) (showing ████████████ price change due to

Whole Foods and ████████████[38]

These strategies were having some success even before the late 2006 change in

management. For example, in April 2006, Wild Oats' Director of Operations explained in

connection with a new Whole Foods "intrusion" into █████ (PX01317):

> Past history has been good. WIL and SAM both [in Santa Monica] had a WF come in
> between them. They both rebounded ███████████████████████████████████████
> █████████████████████ (which Perry always mentions). WF put a store between our two
> Omaha stores (within 5 miles), and ███████████████████ WF is hurting
> because they can't sustain their store on $ ████ a week. . . .
>
> So one side, I am glad you are already worrying about it . . . - we need to . . . improve the
> service levels, and really make ██████ Wild Oats a place to shop for the service and
> organic lines. That's what we have over WF - people are already coming back to ███████
> ████████████████████████ and saying it ████████████ was too much money, not

---

[38]   *See also* Exhibit 140 (PX00030 at 002) (Hartford: "develop weekly in-store
specials and conduct weekly competitive price audits throughout the end of 2005 to ensure an
active promotional and pricing strategy that will compete well against Whole Foods. Again,
these specials and pricing adjustments will focus primarily on staple organic offerings as well as
peak of the season conventional products."); Exhibit 141 (PX00029 at 002) (Portland, Maine:
"We will price on par with our competitor on key commodity items."); Exhibit 142 (PX00032)
(Oregon: "Our normal procedure is to price check the market every 2 weeks (our Ad cycle). We
are checking the Tualatin Whole Foods weekly until further notice . . . . Since the changes are
made at store level we will be able to react in the same day.").

enough organic, not friendly people, etc. so I don't want you to make everyone frantic over this intrusion. We've dealt with them before, and in some markets have come out just fine. They're going to keep coming into our areas, it's a fact of life – I still don't get John Mackey's business sense why he goes for less sales just to harm us, but we are not completely helpless.

. . . Let's stay focused on continuing to build your sales, improve the service and execute at the highest levels in all departments.

And another "Competitive Intrusion Plan" was in place elsewhere:

Competitive Tactics. We will be pre-emptive versus reactive. Pricing. Merchandising. Shopping Experience. Employee retention and morale. Service. [at 011];



Pricing . . .

Field Merchandising ... BIG focus on                    execution for the six months leading up to the competitive opening.

                                                Service and selling training.                                                [at 013];

Service . . . Elevate service levels on a department by department basis." [at 017];

Facility . . . Evaluate facilities needs   months prior to opening. Internal equipment and décor issues. External attractiveness and visibility issues. Develop an appropriate remodel/refresh plan." [at 018].

Exhibit 134 (PX00661) (May 2006).

This emphasis on price competition increased even further when new management

arrived. In fact, less than three weeks before the merger announcement, Wild Oats' Senior Vice

President Roger Davidson's talking points for his presentation to the Board stated: "We will

invest        in retail price        o maintain     with Whole Foods in grocery and

holistic health." Exhibit 143 (PX02102); Exhibit 96 (PX01238 at 003).

61

PX02102; PX01238 at 012.[39] The decision to ▮▮▮▮▮▮▮ was prompted by Mr.

Davidson's discovery that Wild Oats had not yet ▮▮▮▮▮▮ with Whole Foods. Exhibit 145

(PX02109 at 003) (Dec. 8, 2006) ("We are ▮▮▮▮ Whole Foods.").

Even before the February 2007 Board meeting, Mr. Davidson had taken his first steps

▮▮▮▮▮▮ Whole Foods when he ordered a ▮▮▮▮▮

▮▮▮▮ With his single-minded focus on Whole Foods, this ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ than Whole

Foods." Exhibit 146 (PX00040) (Wild Oats expected Whole Foods ▮▮▮▮▮▮▮); *see*

*also* Exhibit 147 (PX02119).

With respect to the then imminent Boulder store opening, Mr. Davidson further ordered,

"When we open 29th Street I do not want ▮▮▮▮▮▮▮▮▮

Exhibit 148 (PX01354).

The revised pricing strategy was not just local ▮▮▮▮▮▮▮

▮▮▮▮ t was part of a broad based strategic vision. As noted above, Mr. Davidson

created a plan to invest ▮▮▮ n achieving ▮▮▮▮ with Whole Foods. Exhibit 96

(PX01238 at 003) (Feb. 1, 2007).

These actions were consistent with Wild Oats' strategic goals:

> [W]e [at Wild Oats] knew that from a competitive standpoint that we could not ▮▮▮▮
> ▮▮▮▮ Whole Foods and expect that we're going to build the business, so we as a pricing
> policy strove, where Whole Foods was a competitor, to ▮▮▮▮▮ Whole Foods
> on a market basket.

---

[39]     The Powerpoint presentation discusses competition between Wild Oats and
Whole Foods. The presentation also mentions achieving ▮▮▮▮▮ but only in
connection with ▮▮▮ *not* Wild Oats. Exhibit 96 (PX01238 at 003).

Exhibit 8 (Transcript of Investigational Hearing of Perry Odak, at 39:25-40:5, PX01325 at 039-040).

For its part, Whole Foods was determined to drive Wild Oats out of business by systematically challenging Wild Oats in what Mr. Mackey referred to as Wild Oats' "monopoly" markets.[40] In March 2006, Mr. Mackey proudly declaimed:

> Whole Foods says they will open 25 stores in OATS territories in the next 2 years. . . .
> The writing is on the wall. The end game is now underway for OATS. . . . Whole Foods
> is systematically destroying their viability as a business–market by market, city by city.

Exhibit 19 (PX00801 at 001). But the systematic destruction of Wild Oats, the same destruction Mackey predicted seven years ago, apparently would have taken more time and expense than Whole Foods cared to invest, and the outcome could not have been seen as a certainty. For Whole Foods, the proposed acquisition is a less costly, and more certain, way of destroying Wild Oats and of destroying competition. *See Staples*, 970 F. Supp. at 1083 (quoting *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1345 (4th Cir. 1976)) (enjoining merger when merging firms had been "aggressive competitors in the past," by opening stores in each other's markets).

The fact of the matter is that but for the proposed acquisition, Whole Foods and Wild Oats will compete aggressively along price and non-price dimensions as Whole Foods seeks to

---

[40]    Exhibit 18 (PX00712 at 001); *see also* Exhibit 36 (PX00080 at 001-002)
(Regional President of Whole Foods observing that "prices were higher at [the newly opened Wild Oats store in Tampa, Florida, because] [b]eing the only game in town gives them that freedom . . . . Their pricing was high since they are the only large natural food store in the area.")
(emphasis added).

63

eliminate Wild Oats as a going business,[41] and Wild Oats takes the fight to Whole Foods by

expanding into additional Whole Foods-dominated towns and cities. *See* Exhibit 12

(Transcript of Investigational Hearing of Jim Sud, at 97:7-14, PX01340 at 097 (Whole Foods has

"opened stores in close proximity to Wild Oats and competed aggressively" and will continue to

do so if the acquisition does not go forward)).[42] Or alternatively, a potentially "more dangerous

scenario is Kroger or potentially Pathmark (Burkle putting his two big investments together

there) buying Oats." Exhibit 17 (PX00565 at 002).[43]

## E.   Other Retailers Will Not Reposition into the Operation of Premium Natural and Organic Supermarkets, Nor Will Other Companies Enter *De Novo*

Defendants rest their attempted rebuttal primarily on the assertion that even if

conventional supermarkets do not currently constrain Whole Foods and Wild Oats, they *could* in

---

[41]     *See* Exhibit 6 (Murphy Expert Report ¶¶ 80, at 26, PX02878 at 037) ("the proposed acquisition will have anticompetitive effects in the local markets where Wild Oats and Whole Foods currently compete head-to-head.").

[42]     The loss of this actual potential competition between Whole Foods and Wild Oats also violates Section 7. *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967) (instructing that a court must look at a merger's impact on competition "present and future"). First, the markets are highly concentrated. *Marine Bancorporation*, 418 U.S. at 631. Second, independent entry will result in significant procompetitive effects. *Id.* at 633. Third, Whole Foods and Wild Oats are two of only a few equally likely potential entrants. *Procter & Gamble Co.*, 386 U.S. at 581. Fourth, Whole Foods or Wild Oats would have been likely entrants but for this merger. *Marine Bancorporation*, 418 U.S. at 633; see *United States v. Phillips Petroleum Co.*, 367 F. Supp. 1226, 1257 (C.D. Cal. 1973), *aff'd*, 418 U.S. 906 (1974). Finally, entry into these markets by either or both of these firms would occur in the near future. *BOC Int'l Ltd. v. FTC*, 557 F.2d 24, 29 (2d Cir. 1977).

[43]     The Yucaipa Companies, the investment company founded by Ronald Burkle, is the largest shareholder in Wild Oats and Pathmark.

the future.[44] According to Defendants, this would occur through either repositioning by the conventionals or *de novo* entry. The evidence does not support such a defense. *See Am. Stores,* 697 F. Supp. at 1132 ("Entrants into the supermarket industry, unlike the trash collection market, can face a much more complex array of barriers.").

To rebut the presumption of anticompetitive effects, the evidence must show that a firm would enter, and that "entry into the market would likely avert the anticompetitive effects from the acquisition." *Staples,* 970 F. Supp. at 1086 (quoting *Baker Hughes,* 908 F.2d at 989); *accord Swedish Match,* 131 F. Supp. 2d at 170; *Cardinal Health,* 12 F. Supp. 2d at 55. Entry must be "timely, likely and sufficient in its magnitude, character and scope to deter or counteract the competitive effects" of a proposed transaction. *Merger Guidelines* § 3.0, Exhibit 28 (PX01310 at 010); *see Cardinal Health,* 12 F. Supp. 2d at 55-58. For entry to be sufficient to restore competition, it must replace the competition that existed prior to the acquisition. *Cardinal Health,* 12 F. Supp. 2d at 58; *see also United States v. United Tote, Inc.,* 768 F. Supp. 1064, 1082 (D. Del. 1991) (finding entry insufficient to constrain anticompetitive price increase).

Whole Foods admitted in pre-complaint documents that conventional supermarkets cannot reposition into its product space. As Mr. Mackey advised the Whole Foods Board of Directors,

> By buying [Wild Oats] . . . we eliminate forever the possibility of Kroger, Super Value, or Safeway using their brand equity to launch a competing national natural/organic food chain to rival us.

---

[44]     The Defendants also make a half-hearted effort to justify the merger to monopoly based on efficiencies. Defendants' proffered efficiencies cannot salvage the likely anticompetitive effects of this merger. The law requires that these efficiencies be verifiable, cognizable, merger-specific, and sufficient to outweigh the anticompetitive effects of the merger. They fail on all counts.

...

[Wild Oats] is the only existing company that has the brand and number of stores to be a meaningful springboard for another player to get into this space. Eliminating them means eliminating this threat forever, or almost forever.

Exhibit 1 (PX00773); *see also* Exhibit 149 (PX00555). Whatever it may now say, if Whole

Foods believed that repositioning by conventional supermarkets were practicable, it would not

have placed so high a value on "eliminat[ing]" forever the threat that Wild Oats might become "a

meaningful springboard for another player to get into [the premium natural and organic

supermarket] space." Exhibit 1 (PX00773) The recent study by The Hartman Group supports

Whole Foods' pre-complaint position that conventional supermarkets could not reposition into

the premium natural and organic supermarket space. Exhibit 15 (PX02508).

We do not suggest that other retailers do not or cannot sell fresh and organic produce.

Clearly, they do to a degree. Exhibit 8 (Transcript of Deposition of Perry Odak, at 12:16-18,

PX01325 at 011) (noting Safeway carries "48 to 52 SKUs of organic product" in the produce

section where Wild Oats and Whole Foods probably carry "300 to 400 SKUs"). The point is that

they would not reposition in a way that replaces the close, constraining competition that Wild

Oats provides to Whole Foods. We first consider conventional supermarkets and mass

merchandisers.

Conventional supermarkets and mass merchandisers offer a utilitarian value

proposition[45]–relatively low prices on mostly conventional products to be sold to consumers

seeking to buy most of their weekly groceries at a single time and place. The value proposition

of premium natural and organic supermarkets is not merely different–it is in many ways an

---

[45]      *See* Exhibit 150 (PX02872).

66

antithesis. Premium natural and organic supermarkets charge premium prices on specialized

products appealing to a relatively narrow segment of consumers who are highly educated, upper

income, informed and committed, and willing to pay a higher price for health and ecological

sustainability. Exhibit 85 (PX01331 at 002). These value propositions cannot be offered at the

same time and place. Hence, Mr. Mackey's acknowledgment that

> Safeway and other conventional retailers will keep doing their thing--trying to be all
> things to all people . . . . They can't really effectively focus on Whole Foods Core
> Customers without abandoning 90% of their own customers.

Exhibit 9 (PX00785) (May 2005); PX809 (Apr. 2005) (laundry list of reasons why Safeway

Lifestyles will not hurt Whole Foods). *See also* Exhibit 151 (PX00799) (discounting effect on

Whole Foods from Kroger's Signature and Fresh Fare stores).[46]

Further, there would be substantial costs associated with repositioning into Whole Foods'

and Wild Oats' product space. First among these would be establishing a large-scale Organic

Rule-compliant supply chain and distribution system, which difficult and expensive and would

raise prices for all shoppers, most of whom are price-oriented. As Wild Oats' former CEO Mr.

Odak explained regarding produce,

> until you have a predictable demand or takeaway at the store, you don't know how much
> to buy. If you buy too much and you don't sell it because you're trying to get in the
> market, you shrink it out [*i.e.*, it spoils] and you lose money. If you buy too little, the
> consumer comes in your store and says you're not in the business . . . of organic and I'll
> go buy it someplace else.

---

[46] One of the latest conventionals to reposition somewhat is ▮▮▮▮▮▮▮▮▮▮▮
recently increased its natural and organic SKU count to between ▮▮▮▮▮ comprising
about ▮ of its total product offering. Exhibit 152 (Transcript of Deposition of ▮▮▮▮ at
107-108, PX02871 at 090-092). Whole Foods and Wild Oats, on the other hand, are almost
exclusively natural and organic, typically carrying well more than 30,000 natural and organic
SKUs, and do not carry the 90% of conventional items that ▮▮▮▮▮ continues to carry.

So . . . the conventionals have a very difficult time getting into this business. One . . . it's primarily a or predominantly a perishable business. And two, they have never been able to establish a predictable takeaway from the product.

And we've seen this for the five or six years I ran the company. This has been a consistent pattern. They [the conventionals] have a big push on. It doesn't sell through. Their margins aren't where they ought to be, and it shrinks back and shrinks back and shrinks back. There's less and less organic in those stores.

Exhibit 8 (Transcript of Investigational Hearing of Perry Odak, at 77:14-78:23, PX01325 at 077-

078).[47] Mr. Odak's testimony tracks the ███████ experience almost exactly, as recounted by a

witness from ███████████



Exhibit 89 (PX02890); *see also* PX1045 (Wal-Mart scaling back number of organic SKUs).

In addition, conventional supermarkets seeking to reposition would face substantial

opportunity costs. Whereas "[t]he traditional grocery chains have a much larger skew towards

---

[47]    One way that Whole Foods and Wild Oats distinguish themselves from conventionals is by carrying local product and large numbers of natural products. This may require dealing with numerous suppliers, many of which may be Direct-Store-Delivery. This model is not typically consistent with conventionals and mass merchants. *See* Exhibit 153 (PX00339) ██████████████████████████████████ Exhibit 158 (PX01306 at 002) (Wal-Mart: "Our ideal supplier . . . has the ability to grow as we grow so you don't have thousands and thousands of suppliers").

non-perishable shelf stable products," Exhibit 42 (PX02704 at 009), premium natural and organic

supermarket shoppers demand extensive perishables.  Exhibit 8 (Transcript of Investigational

Hearing of Perry Odak, 78:18-23, PX01325 at 078); Exhibit 2 (Transcript of Investigational

Hearing of John Mackey, at 249:24-251:25, PX01324 at 249).  To attract Whole Foods and Wild

Oats customers, the conventional stores would have to substantially increase their focus on

perishables, devote substantially more of their stores' selling space to perishables, and markedly

improve quality.  *See* Exhibit 86 (PX02072 at 093 (Organics often not even noticed in

conventionals "due to poor merchandising tactics such as 'natural foods ghettos.'")).

An additional cost would involve better "segmentation" of organic foods so they are not

in contact with non-organic food.  *See* Exhibit 86 (PX02072 at 113) (Hartman Organic 2006);

Exhibit 20 (PX01302 at 005) ("[R]etailers . . . must implement measures to protect their organic

integrity by preventing the commingling of organic and conventional products . . . ."); Organic

Food Production Act of 1990, 7 U.S.C. §§ 6501-22 (USDA's Organic Rule requirement).

Whole Foods' Co-President describes the rigorous requirements:

> Essentially it's mostly around commingling and handling standard, so, for example, in the
> cooler you can't have conventional broccoli above organic broccoli so that it melts and
> drips down and so forth.  Basically you run proper segregation of the product and
> handling.  On the butcher block you can't have conventional meat and organic meat on the
> block at the same time.  You've got to have separate tools, wash the tools, that sort of
> thing.

Exhibit 68 (Transcript of Deposition of Walter Robb, at 18:14-24, PX02862 at 006).

Further, allotting additional space to perishables (and many other natural and organic

items) would require conventional supermarkets to forgo some of the slotting-fee revenues on

which they depend.  Mr. Odak explained that conventional stores

69

get so much money for slotting fees and promotional trade allowances from the big CPG companies, that's where they make . . . the bulk of their money in the store. . . . [I]f you took out the amount of money they make in slotting fees, they would not be profitable.

Exhibit 8 (Transcript of Investigational Hearing of Perry Odak, at 60:13-21, PX01325 at 060);

Exhibit 86 (PX02072 at 095) (Safeway 2006 10-K showing vendor allowances nearly four times

net income); Exhibit 99 (Transcript of Deposition of A.C. Gallo, at 162:6-9, PX02851 at 162)

(Whole Foods receives no slotting allowances).

Moreover, even if a conventional retailer were willing to bear these various costs, it still

would have to invest substantial time to establish the reputation for "authenticity and integrity"

that shoppers for natural and organic products demand. *See, e.g.*, Exhibit 90 (PX00809 at 001);

Exhibit 83 (PX01303). A single publicized incident in which a non-organic product

inadvertently is commingled with organic-labeled ones is all it might take to destroy that

investment and more. A conventional retailer seeking to reposition could not establish that

reputation within the requisite two-year period, Wild Oats' interim CEO explained.

Not that conventionals haven't tried to reposition. But the reasons discussed above and

the history of such efforts plainly suggest that future repositioning is unlikely to prevent the

anticompetitive effects of the merger. Consider, for example, the lack of impact on Whole Foods

of Safeway's Lifestyle store in Boulder, Colorado. As ███████████████████████

███████████████████████ compete more directly with Whole Foods, and it

offers an expanded line of organic, prepared, and gourmet foods. Exhibit 89 (Transcript of

Deposition of ████████ PX01330 at 001). Whole Foods' President claimed it was "the very

best" lifestyle store he has seen. Exhibit 52 (Transcript of Investigational Hearing of Walter

Robb, at 21:9-5, 23:14-2, PX01327 at 021-023). Although Whole Foods was concerned before

70

the Safeway opening, the Safeway ultimately had little impact on Whole Foods. Thus, in his Q2-

FY06 report to the Board (written three months after the opening of the Safeway Lifestyle store),

Walter Robb, President of Whole Foods, said

> [t]he [Boulder Safeway Lifestyle] opening initially hit [the] Pearl [Whole Foods store] by
> about ███████████████████ and pushed us into ████████████ but as of this
> writing, the store has reduced that to a less than ████ impact.

PX01004 at 023. According to Mr. Odak, Wild Oats' experience was very similar. Exhibit 8

(PX01325 at 124) ("not unlike what happened with a lot of Safeway stores, it started off

extremely well and then over time the offering went down, down, down, and that was their

Boulder store. . . . it was what I would call the usual, you know, stores trying to find some excuse

why their business wasn't as strong as we had expected it. So the answer is no. The Lifestyle

stores were not a big issue for us.").

These issues compel the conclusion, reached by Mr. Odak, that adequate repositioning by

any of the conventional retailers would be difficult and unlikely:

> In my opinion, as I think I've said in a roundabout or different way, is this is a format that
> is very difficult for them to get into because it's largely perishable and their business is
> not largely perishable. This business has a high service level component and their
> business is based on low labor, which means low service level. They don't understand at
> all the whole vitamins, minerals and supplement area, you know, and some of those
> suppliers won't -- many of those suppliers won't do business with them.
>
> So it is very difficult and they've tried for years to get into this business and they have not
> succeeded.

Exhibit 8 (Transcript of Investigational Hearing of Perry Odak, at 153:1-14, PX01325 at 153).

Wal-Mart's short-lived effort to reposition itself also had little effect on Whole Foods. In

May 2006, Wal-Mart announced that it would "doubl[e] the number of organic items in ten

percent of its stores." Exhibit 154 (PX01045) (plans to add approximately 200 organic

products). Just two months earlier, Wal-Mart had opened a new Supercenter in Plano, Texas,

two miles from a Whole Foods. The story is much like that surrounding the opening of the

Safeway Lifestyle store in Boulder. Although the opening and the Wal-Mart initiative may have

concerned Whole Foods' management, those concerns were quickly allayed. Exhibit 2

(Transcript of Investigational Hearing of John Mackey, at 265:18-19, PX01324 at 265) ("they

haven't really hurt us too much at all.").

Only one year later, Wal-Mart appears to be pulling back due to continuity of supply

problems, among other issues. As Ron McCormick, Wal-Mart Vice President of Produce and

Floral, explained in a March 12, 2007, *Business Week* article: "whenever growers are straining to

meet your volume it means they're forced almost into selling you something that would not be

their best crop because they're desperate to get you something to meet your demand." Exhibit

158 (PX01306). *See generally* Exhibit 8 (Transcript of the Investigational Hearing of Perry

Odak, at 154, PX01325 at 154-55) ("So if you look at the history of a more successful retailer,

i.e., Wal-Mart, they've done a great job except in the produce perishable area. That's a long,

tough road for them, you know, to go head to head, you know, and rechange their format of their

stores to take this on. I mean, it's a huge investment for them to do this. . . .  Well, if you're

saying do they have the financial wherewithal, yes. You know, would they have the desire? I

don't think so whatsoever. I mean, you know, they have a format that works incredibly, so why

would I totally restart and build, you know, this format. I don't know why they would do that.");

Exhibit 154 (PX01045). The failure of prior repositioning efforts amply support Whole Foods'

decision to deter entry by purchasing the only viable "springboard" for entry into the premium

natural and organic space.

So the question regarding repositioning is this: if not Wal-Mart, who? Trader Joe's is clearly on Whole Foods' collective mind, but Trader Joe's is fundamentally different from premium natural and organic supermarkets, and it could not move to the premium natural and organic supermarket product space without losing its identity, its customers, and, perhaps, its profitability.

As Trader Joe's CEO has suggested, Trader Joe's is *sui generis* and not about to do anything that would threaten that position:

> [W]e try to stay true to what we do. If we do what we're going to do, we don't really worry about the competition. We look at them. We understand what we need to understand, but we're not–we're not keen on changing anything we're doing because of what somebody else is doing.

Exhibit 93 (Transcript of Investigational Hearing of Daniel Bane, at 107:10-15, PX01322 at 107). FTC staff explicitly asked Mr. Bane about whether Trader Joe's would reposition. He was unequivocal: if anyone at Trader Joe's tried to alter the Trader Joe's format he would "bite their head off." Exhibit 93 (Transcript of Investigational Hearing of Daniel Bane, at 105:2-10, PX01322 at 105). Why?

> Part of my job is staying very true and focused to what we do. We don't assume that we would be good at doing what we don't do, and we don't–we don't stray from that.

Exhibit 93 (Transcript of Investigational Hearing of Daniel Bane, at 105:7-10, PX01322 at 105). FTC staff asked him directly, does Trader Joe's have any plans to reposition itself as a natural and organic retailer? His answer, a simple "no." Exhibit 93 (Transcript of Investigational Hearing of Daniel Bane, at 161:23-25, PX01322 at 161). Repositioning by Trader Joe's will not defeat post-acquisition anticompetitive effects in the premium natural and organic supermarket market.

73

And if repositioning is difficult, *de novo* entry is more so.  Whole Foods' own documents establish the difficulty of entry.  Entry into the operation of any kind of supermarket is a complex and time-consuming endeavor.  Timely and sufficient entry would not be likely in any of the localities implicated by the acquisition.  Indeed, the evidence indicates that quite apart from any other impediments to entry, finding and developing suitable real estate on which to locate a supermarket often is a multi-year task in many metropolitan areas.  The amount of time it takes from conception to even site selection can easily take four or more years.  *See, e.g.*, PX00538 at 002 (Mr. Mackey touting his new White Plains store to investors after a "ten year search for the perfect location"); *cf.* PX00556 (UK's Tesco "having a difficult time finding real estate and may even abort the plan all together").[48]  In sum, as Professor Murphy stated that although there is potential for *de novo* entry in the long run, "it would not occur in a timely manner."  *See* Exhibit 6 (Murphy Expert Report ¶ 138, at 60, PX02878).

This site selection and development process could be shortened if a conventional retailer could buy existing stores.  But, as discussed above, one of the primary reasons that Whole Foods was willing to pay a premium for Wild Oats was to forestall such an event.  PX00773 at 001.

---

[48]    The Tesco stores, when they come to the United States, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ Exhibit 161 (PX02896 ¶ 4 (▮▮▮▮▮▮▮▮▮▮▮ *see also* Exhibit 89 (Transcript of Deposition of ▮▮▮▮▮▮ at 166, PX02870 at 042).  This size is too small to serve as a significant constraint in the premium natural and organic market. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ Defendants' industry expert Dr. Stanton testified that "Tesco has decided not to take supermarkets on head to head and decided not to take on convenience stores head to head but to create somewhat of a hybrid format that would be different from either of those two formats."  Exhibit 150 (Transcript of Deposition of John Stanton, at 154 (PX02872).

And then, of course, there are the specialized burdens of establishing a large-scale and certifiably organic supply and distribution chain. *See* Organic Food Production Act of 1990, 7 U.S.C. §§ 6501-22. Furthermore, any entrant would require substantial time to establish the reputation for "authenticity and integrity" that shoppers for natural and organic products demand. As Mr. Mackey noted above, the acquisition prevents a conventional retailer from using the "Wild Oats" brand to enable repositioning. *See, e.g.*, PX00773; PX00809; PX01303 at 002. *See generally* Guidelines Commentary, Exhibit 162 (PX01341 at 051) ("[i]n evaluating timeliness of entry, the Agencies include the time to complete any necessary preliminary steps, such as establishing a reputation of the development of specialized inputs into the production of the product in question"). In a December 2006 email to CEO John Mackey, Senior Vice-President of Growth & Business Development Jim Sud confirmed that: "[s]tarting up a brand from scratch is very risky and expensive as Super Value [sic] is now discovering with Sunflower." Exhibit 17 (PX00565 at 2). Wild Oats' interim CEO stated that "It takes five or six years to develop a label that has natural and organic integrity to it. Their choices are to waste five years or get immediate recognition on the shelf" by pursuing sales of Wild Oats' private label products instead.[49]

Finally, the overall picture in this market is one of attempted entry, followed by exit. For example, as Mr. Mackey explained, Fresh Fields and Bread & Circus were losing money before Whole Foods acquired them. Exhibit 2 (Transcript of Investigational Hearing of John Mackey, 23:9-14, PX01324 at 023). Star Markets failed with their Wild Harvest chain in the Northeast.

---

[49]     As late February 27, 2007, six days after this deal was announced, Wild Oats' SVP Marketing & Merchandising told their interim CEO that the Wild Oats private label business could reach ▮▮▮▮▮▮▮▮▮▮▮▮. PX02126 at 001.

75

Exhibit 150 (Transcript of Deposition of John Stanton, at 165:20-25, PX02872 at 043).  Even

Wild Oats has struggled, prior to the Odak turnaround.  Whole Foods has observed others

suffering similar financial difficulties.  Indeed, the ▮▮▮▮▮ store ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ , was closed according to ▮▮▮▮▮ internal documents, due to "competition from

Whole Foods."  As Professor Murphy's report demonstrates prices at the ▮▮▮▮▮▮▮▮

▮▮ store increased following the dramatic decline in Whole Foods' pricing as a result of ▮▮

▮▮ exit.  Exhibit 66 (Murphy Supplemental Report, ¶ 5, at 3, PX02883); *see Staples*, 970 F.

Supp. at 1087 ("the recent trend . . . has actually been toward exiting the market rather than

entering.").  Thus, there is no reasonable prospect that sufficient *de novo* entry would occur

within two years of the acquisition, as contemplated by the *Merger Guidelines*.  Exhibit 28

(PX01341 § 3.2 at 045).

In sum, a relevant market in which to analyze the proposed acquisition is the operation of

premium natural and organic supermarkets, and neither repositioning nor de novo entry would

replace the competition Wild Oats provides.  Referring to problems facing one recent aspirant to

the premium natural and organic market, Whole Food's Co-President and Chief Operating

Officer Walter Robb summed it up best: "Not as easy as it looks folks."  Exhibit 16 (PX00180 at

001) ("Subject: RE: Sunflower; another one bites the dust?").[50]

---

[50]     Defendants' purported industry expert, Dr. John Stanton, disagrees, but the Court
should give Dr. Stanton's opinion little or no weight.  Dr. Stanton's work is divorced from the
entire factual record here.  Dr. Stanton did not review any non-public Defendants' documents or
transcripts of the Defendants' investigational hearings or depositions before reaching his
conclusions.  Instead, he relied primarily on press releases, internet web searches, and newspaper
articles.  Exhibit 150 (Transcript of Deposition of John Stanton, at 70:20-71:14, 136:8-137:3,
PX02872 at 035-036).  For example, he asserts that Defendants face "robust" competition
everywhere they do business yet states that his examination of this issue consisted of "literally
sitting with Yahoo! and, you know, keying in the zip code and trying to do it that way."  Exhibit

F.    **Defendants Have Not Demonstrated That the Alleged Efficiencies from the Merger Will Counteract its Anticompetitive Effects**

To establish a valid efficiencies' defense, Defendants' claimed efficiencies must, as a threshold matter, be "merger-specific" and "verifiable." *Merger Guidelines* § 4, Exhibit 28 (PX01310 at 011). Merger-specific means they must be "likely to be accomplished with the proposed merger and unlikely to be accomplished in absence of either the proposed merger or another means having comparable anticompetitive effects." *Id.* The claimed efficiencies cannot be efficiencies that could "be achieved by either company alone." *Heinz*, 246 F.3d at 722.

The evidence, however, demonstrates that the claimed efficiencies are neither specific to the proposed acquisition nor verifiable. James Sud, Senior Vice-President of Growth and Business Development of Whole Foods claimed, based on its prior experience with acquisitions, that Whole Foods' believed the corporate "general and administrative" ("G&A") savings – primarily in the form of personnel cuts – from the transaction would amount to about $20-30 million annually. Exhibit 165 (Transcript of Deposition of James Sud, at 125:9-19, PX02867 at 033). Yet Mr. Sud conceded that the purported savings were based on unspecified "assumptions." *Id.* at 127, PX02867.

Nor are any purported efficiencies from the acquisition verifiable. Efficiencies must be subjected to "rigorous analysis" by the Court. *Heinz*, 246 F.3d at 720. This is because even "efficiencies projected reasonably and in good faith the merging firms may not be realized." *Merger Guidelines* § 4, Exhibit 28 (PX01310). Moreover, because "information relating to the

---

150 (Transcript of Deposition of John Stanton, at 119:8-119:24, PX02872 at 031).

efficiencies is uniquely in the possession of the merging firms," the merging firms carry the
burden of proof on efficiencies and:

> must substantiate efficiency claims so that the Agency can verify by reasonable means the
> likelihood and magnitude of each asserted efficiency, how and when each would be
> achieved. . . how each would enhance the merging firm's ability and incentive to
> compete, and why each would be merger specific.

*Merger Guidelines* § 4, Exhibit 28 (PX01310 at 011).

Defendants here do not even approach the threshold for verifiable efficiencies.  For
example, Walter Robb, Co-President and Chief Operating Officer of Whole Foods testified that it
would be speculative to identify jobs that would be duplicative and could be eliminated until
Whole Foods had access to details of Wild Oats organization.  Exhibit 68 (Transcript of
Deposition of Walter Robb, at 183:18-185:7, PX02862 at 047-048).  Mr. Sud speculated that
Whole Foods might be able to obtain savings by renegotiating in 2008 its current seven-year
contract with a primary supplier, UNFI.  Exhibit 165 (Transcript of Deposition of Jim Sud, at
128:11-130:9, PX02867 at 033-034).  However, Mr. Sud testified that they did not have
sufficient information to estimate what any cost savings might be realized even assuming that the
contract could be renegotiated.  *Id.*

In addition, even assuming the purported efficiencies from the acquisition were verifiable
and merger specific – which they are not – when balanced against the potential anticompetitive
harm, the proffered efficiencies must "create a net economic benefit for the . . . consumer."
*Rockford Memorial Corp.*, 717 F. Supp. at 1291.  Efficiencies rarely, if ever, can justify a merger
to monopoly.  *See also Cardinal Health*, 12 F. Supp. 2d at 63.  As a general rule, "extraordinary
efficiencies" will be required "where the HHI is well above 1800 and the HHI increase is well

78

above 100." *Heinz*, 246 F.3d at 720 (quoting 4A Areeda, Hovenkamp & Solow, *Antitrust Law* ¶ 971f, at 44). Buying Wild Oats to close the stores and eliminate the brand will produce no cognizable efficiencies, let alone any efficiencies substantial enough to outweigh the significant consumer loss.

Dr. Scheffman criticizes Professor Murphy for not analyzing the transaction's purported efficiencies, but Defendants, in fact, have not put forward any cognizable efficiency defense. Even a casual review of Dr. Scheffman's report reveals a total absence of support for the minimal claimed efficiencies. For example, Dr. Scheffman reports "*WFM assumed,*" "*WFM estimated,*" and "*WFM forecasts*" cost reductions of varying types and amounts. Scheffman Report Appendix G (¶10, 15). While this might qualify as a good summary, an efficiencies analysis it is not. The most rigorous analysis was the addition of the word "reasonably" (once) to "*WFM projects*." Exhibit 29 (Scheffman Report ¶ 350, PX02066 at 138). Dr. Scheffman states that certain efficiencies are "plausible," *id.* ¶ 343-50 (PX02066 at 137-138), but this falls woefully short of the standard required in any merger, let alone where the concentration levels are so high. *See Heinz, 246 F.3d at 720.* In his deposition, however, Dr. Scheffman conceded that "I'm not putting forward a [Merger G]uidelines analysis of merger efficiencies." Exhibit 167 (Transcript of Deposition of David Scheffman, 233:24-25, PX04362 at 233). He also admitted that even his non-Merger Guidelines analysis of purported benefits from the transaction were based on what he described as "guesstimates" of Wild Oats future sales. *Id.* at 227:12.

Under well-established law, these assumptions and unverified in-house estimations are so totally lacking in substantiation as to not require a response. As explained above, the burden is

on Defendants to show that the assumptions, estimations and forecasts are accurate. Dr.
Scheffman has not done so.

Both *Cardinal Health* and *Staples* hold that, even if an efficiencies defense can be
entertained, Defendants must show that the "proven" efficiencies will be passed on and that they
overwhelm any possible anticompetitive effects of the merger. *Cardinal Health*, 12 F. Supp. 2d
at 63; *Staples*, 970 F. Supp. at 1090-91. Dr. Scheffman, even after uncritically accepting the
assumptions and estimates, fails to even try to show that these alleged efficiencies will be passed
on to consumers.

### G.    Summary: Whole Foods' Acquisition of Wild Oats Will Harm Competition

Whole Foods and Wild Oats are by far one another's closest substitute. The Defendants'
business records and other evidence, including "practical indicia," demonstrate that Whole Foods
and Wild Oats have competed aggressively along price and non-price dimensions, and will
continue to do so but for the proposed acquisition. The evidence further indicates that
competition among premium natural and organic supermarket markets matters uniquely.
Consumers benefit from that competition, whether or not other retailers are operating nearby.
The proposed acquisition will give the combined Whole Foods/Wild Oats substantial market
power in numerous markets, and neither *de novo* entry nor repositioning by other retailers will
defeat anticompetitive effects. Indeed, it is apparent for all to see that John Mackey was right
when he stated that Whole Foods seeks to acquire Wild Oats for the purpose of eliminating a
competitor that matters – to prevent "nasty price wars," and to foreclose entry by conventional
supermarkets into the premium natural and organic supermarket space. There can be no
question, under Section 7 of the Clayton Act, that the effect of this acquisition "may be

80

substantially to lessen competition or to tend to create a monopoly." Accordingly, the applicable

presumption is that the PI should be granted.

## III.    JUDGED BY THE STATUTORY STANDARD OF SECTION 13(b) OF THE FTC ACT, THE COMMISSION IS ENTITLED TO A FULL-STOP PRELIMINARY INJUNCTION

Although the evidence in this matter is extensive, a proper regard for the nature of this

proceeding and the standard for relief makes the correct outcome clear.  The merits are reserved

to the Commission in its administrative proceeding, because Congress "thought the assistance of

an administrative body would be helpful in resolving such questions and indeed expected the

FTC to take the leading role in enforcing the Clayton Act." *Hosp. Corp. of Am.*, 807 F.2d at

1386.  The voluminous documentary evidence, the complex economic issues, and the brevity of

this proceeding all counsel that an administrative trial is the proper forum for ultimate resolution

of this matter.

Section 13(b) authorizes a Court to enter preliminary relief where it is in the "public

interest." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001); *see FTC v. PPG Indus.,

Inc.*, 798 F.2d 1500, 1501-02 (D.C. Cir. 1986).  A preliminary injunction should be granted

"upon a proper showing that, weighing the equities and considering the FTC's likelihood of

ultimate success, such action would be in the public interest." *Id.*  "The traditional 'irreparable

harm' element is absent from the Section 13(b) standard.  In this respect, the section 13(b)

standard is 'lesser' than that which courts normally impose on private litigants seeking a

preliminary injunction." *Staples*, 970 F. Supp. at 1071 n.2.  The Commission satisfies its burden

81

if it "raise[s] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *Heinz*, 246 F.3d at 714-15.[51] The showing made by the Commission is more than adequate to assure this Court that the Commission has raised serious questions about the likely anticompetitive effects of this transaction that warrant final resolution in an administrative proceeding.

The balance of equities strongly favors issuance of the requested injunction as well. Unless this Court issues the requested injunction, the Commission likely will be unable, should it find the acquisition illegal, to "unscramble the eggs" and restore competition. *See Heinz*, 246 F.3d at 726 (Section 13(b) "embodies congressional recognition of the fact that [post-acquisition] divestiture is an inadequate and unsatisfactory remedy . . . ."); *see also FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1508 (D.C. Cir. 1986); *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 904 (7th Cir. 1989); *Lancaster Colony*, 434 F. Supp. 1088, 1096 (S.D.N.Y. 1977) ("[A]t best, divestiture is a slow, cumbersome, disruptive and complex remedy."). The public interest in the enforcement of the antitrust laws and in competition itself outweighs any private equity that the Defendants may assert. *See Cardinal Health*, 12 F. Supp. 2d at 66 ("In balancing the public and private equities, benefits to the public are entitled to substantially more deference than the benefits to the private Defendants."); *see also Warner Communications*, 742 F.2d at 1165; *PPG*, 798 F.2d at 1506-07; *Elders Grain*, 868 F.2d at 903. Accordingly, this Court should issue the requested injunction pursuant to Section 13(b) of the Federal Trade Commission Act.

---

[51]     *See also Univ. Health*, 938 F.2d at 1218; *Warner Communications*, 742 F.2d at 1162; *Swedish Match*, 131 F. Supp. 2d at 156; *Cardinal Health*, 12 F. Supp. 2d at 45; *Staples*, 970 F. Supp. at 1071.

Where, as here, the Commission has shown a reasonable likelihood of success on the merits in an administrative challenge to the legality of an acquisition, the Defendants are hard put to "justify[] anything less than a full stop injunction." *PPG*, 798 F.2d at 1506; *see also Heinz*, 246 F.3d at 726; *Staples*, 970 F. Supp. at 1091. To do so, the Defendants must prevail in a balancing of the equities *and* demonstrate that a lesser remedy will not compromise the Commission's ability to effect meaningful relief if it determines that the acquisition is illegal. *PPG*, 798 F.2d at 1506-07; *Weyerhaeuser*, 665 F.2d at 1085. The Defendants cannot make either showing.

Their equities are those that attend every horizontal acquisition: the parties' pecuniary interest in "getting the deal done" and the possibility that the acquisition will result in some potential, as yet not cognizable and not merger-specific, efficiencies from the avoidance of duplicative overheads. Defendants' claimed equities cannot stand where, as here, the acquisition will result in prompt scrambling of corporate assets so that the competitive *status quo ante* cannot later be restored. *See, e.g.,, Heinz*, 246 F.3d at 726; *PPG*, 798 F.2d at 1508; *Elders Grain*, 868 F.2d at 903-04. Further, even if the Commission were to be able to restore the competitive *status quo ante* after a final determination that Whole Foods' acquisition of Wild Oats was illegal, the interim harm to competition and consumers resulting from the acquisition would remain.

83

## <u>CONCLUSION</u>

Accordingly, the Commission respectfully urges this Court to grant a preliminary injunction precluding Whole Foods' acquisition of the common stock or any other interest in Wild Oats pending the outcome of a Federal Trade Commission challenge to the legality of the acquisition under the Clayton Act and Federal Trade Commission Act.

Respectfully submitted,

Dated: August 1, 2007

JEFFREY SCHMIDT                   MICHAEL J. BLOOM
Director                          RICHARD B. DAGEN (D.C. Bar No. 388115)
                                  THOMAS J. LANG (D.C. Bar No. 452398)
KENNETH L. GLAZER                 CATHARINE M. MOSCATELLI (D.C. Bar No. 418510)
Deputy Director                   MICHAEL A. FRANCHAK

WILLIAM BLUMENTHAL                Federal Trade Commission
General Counsel                   601 New Jersey Ave., N.W.
                                  Washington, DC 20001
Bureau of Competition             (202) 326-2475 (direct dial)
Federal Trade Commission          (202) 326-2284 (facsimile)
600 Pennsylvania Ave, N.W.        mjbloom@ftc.gov
Washington, DC 20580