IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civ. No. 07-cv-01021 - PLF |
| v. | ) | |
| | ) | **PUBLIC VERSION** |
| WHOLE FOODS MARKET, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILD OATS MARKETS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

PLAINTIFF FEDERAL TRADE COMMISSION'S
PROPOSED FINDINGS OF FACT

Dated: August 3, 2007

JEFFREY SCHMIDT
Director

KENNETH L. GLAZER
Deputy Director

Bureau of Competition
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, DC 20580

WILLIAM BLUMENTHAL
General Counsel
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, DC 20580

MICHAEL J. BLOOM
RICHARD B. DAGEN (D.C. Bar No. 388115)
THOMAS J. LANG (D.C. Bar No. 452398)
CATHARINE M. MOSCATELLI (D.C. Bar No. 418510)
MICHAEL A. FRANCHAK

Federal Trade Commission
601 New Jersey Ave., N.W.
Washington, DC 20001
(202) 326-2475 (direct dial)
(202) 326-2284 (facsimile)
mjbloom@ftc.gov

**TABLE OF CONTENTS**

PROPOSED FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.     Nature of This Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       B.     Merging Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

              1.     Whole Foods Market, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

              2.     Wild Oats Markets, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       C.     The Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       D.     Witness Credibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.   RELEVANT PRODUCT MARKET IS THE OPERATION OF PREMIUM NATURAL
       AND ORGANIC SUPERMARKETS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

       A.     Premium Natural and Organic Supermarkets Stand Apart from Other Retailers
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

              1.     Avoiding Nasty Price Wars and Buying Potential Springboard into Market
                     Demonstrates Product Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

              2.     Peculiar Characteristics and Product Differentiation Distinguish the
                     Market for Premium Natural and Organic Supermarkets . . . . . . . . . . . 10

                     a.     Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                     b.     Unique Format . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                            (1)   Premium Natural and Organic Supermarkets offer
                                  customers the largest selection of natural and organic
                                  products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                            (2)   Premium Natural and Organic Supermarkets offer
                                  customers the largest selection of perishables and prepared
                                  foods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                            (3)   Premium Natural and Organic Supermarkets offer
                                  customers the highest quality products . . . . . . . . . . . . . 15

                            (4)   Premium Natural and Organic Supermarkets offer
                                  customers the most amenities and service venues . . . . . . 17

                            (5)   Premium Natural and Organic Supermarkets offer
                                  customers knowledgeable service personnel . . . . . . . . . . 17

                     c.     Premium Natural and Organic Supermarkets engage in lifestyle
                            marketing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                            (1)   Premium Natural and Organic Supermarkets Offer
                                  Customers a Unique Shopping Experience . . . . . . . . . . . 19

   (2)  Premium Natural and Organic Supermarkets Support Environmental and Animal Welfare Causes that Are Valued by Their Shoppers . . . . . . . . . . . . . . . . . . . . . . . 20

  d. Premium Natural and Organic Supermarkets appeal to a specific customer demographic . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

     (i)  Premium Natural and Organic Supermarkets Affect One Another's Sales and Profits More Than Other Food and Grocery Retailers Do . . . . . . . . . . . . . 25

     (ii)  Conventional Supermarkets Adding Organic Products items do <u>not</u> hurt Whole Foods sales revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

     (iii)  Conventional supermarkets adding organic products actually serves as a gateway for more consumers to Whole Foods and Wild Oats . . . . . . . . . . . . . . . . 27

   (2)  Upscale Conventionals, Such as Safeway Lifestyle, Are Significantly Differentiated from Premium Natural and Organic Supermarkets . . . . . . . . . . . . . . . . . . . . . . . . . 29

     (i)  Not Same Offerings . . . . . . . . . . . . . . . . . . . . . . . 29

     (ii)  Safeway causes little to no impact on Whole Foods or Wild Oats . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

   (3)  Hannaford is significantly differentiated from Premium Natural and Organic Supermarkets . . . . . . . . . . . . . . . . . 31

     (i)  Not Same Offerings . . . . . . . . . . . . . . . . . . . . . . . 32

   (4)  Trader Joe's is significantly differentiated from Premium Natural and Organic Supermarkets . . . . . . . . . . . . . . . . . 32

     (i)  Not Same Offerings . . . . . . . . . . . . . . . . . . . . . . . 32

     (ii)  No Impact or Not Same Impact as Whole Foods or Wild Oats . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

   (5)  Mass merchandisers and club stores such as Wal-Mart and Costco are significantly differentiated from Premium Natural and Organic Supermarkets . . . . . . . . . . . . . . . . . 37

     (i)  Not Same Offerings . . . . . . . . . . . . . . . . . . . . . . . 37

     (ii)  No Impact or Not Same Impact as WF or WO . . 38

   (6)  Other regular conventionals are significantly differentiated from Premium Natural and Organic Supermarkets . . . . . 39

     (i)  Not Same Offerings . . . . . . . . . . . . . . . . . . . . . . . 39

     (ii)  No Impact or Not Same Impact as WF or WO . . 40

   (7)  Gourmet markets are significantly differentiated from Premium Natural and Organic Supermarkets . . . . . . . . 40

     (i)  Not Same Offerings . . . . . . . . . . . . . . . . . . . . . . . 40

    (ii) No Impact or Not Same Impact as Whole Foods or Wild Oats . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

 B. Plaintiff's Economic Analysis Confirms the Product Market Definition . . . . . . 41

  1. Professor Murphy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

   a. Ordinary Course of Business Documents Support Professor Murphy's Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    (1) Head to head competition between Whole Foods and Wild Oats . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    (2) Wild Oats Pricing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    (3) Whole Foods pricing . . . . . . . . . . . . . . . . . . . . . . . . . 58

    (4) Competitive Remodelings . . . . . . . . . . . . . . . . . . . . . . . 58

    (5) Other evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

 C. Defendants' Experts Are Unreliable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

  1. The Conway Survey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

  2. The Stanton Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

  3 Dr. Scheffman's Reports and Testimony Are Flawed and Unreliable . . . 68

IV. THE RELEVANT GEOGRAPHIC MARKETS ARE LOCAL AREAS IN WHICH WHOLE FOODS AND WILD OATS COMPETE OR WILL COMPETE . . . . . . . . . 74

V. THE MERGER WILL REDUCE COMPETITION BECAUSE IT WILL COMBINE THE TWO CLOSEST COMPETITORS IN HIGHLY CONCENTRATED MARKETS . . . . 87

 A. Market Share and Concentration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

 B. Other Evidence Confirms That Anticompetitive Harm Will Result From the Acquisition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

  1. Unique Price Competition Will Be Lost . . . . . . . . . . . . . . . . . . . . . . . . 87

   a. Economic Evidence Shows Price Effects of Whole Foods-Wild Oats Competition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

   b. Evidence of the Constraining Effect on Whole Foods from PNOS Competition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

   d. Loss of Choice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

   e. Summary of Economic Analysis . . . . . . . . . . . . . . . . . . . . . . . . 98

VI. OTHER RETAILERS WILL NOT ENTER THE PREMIUM NATURAL AND ORGANIC SUPERMARKET PRODUCT MARKET . . . . . . . . . . . . . . . . . . . . . . . . . 99

 A. *De Novo* Entry Would Not Be Timely, Likely or Sufficient . . . . . . . . . . . . . . . 99

  1. *De Novo* Entry Would Not Be Timely . . . . . . . . . . . . . . . . . . . . . . . . . 100

  2. *De Novo* Entry Is Unlikely . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

  3. *De Novo* Entry Would Not Be Sufficient to Defeat a Price Increase . . . 102

 B. Repositioning Is Unlikely . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

| | | | |
|---|---|---|---|
| | 1. | Safeway . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 108 |
| | 2. | Kroger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 111 |
| | 3. | Tesco . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 112 |
| | 4. | Wal-Mart . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 112 |
| | 5. | Trader Joe's . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 113 |
| | 6. | Delhaize . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 115 |
| | 7. | Other Retailers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 117 |
| | 8. | Defendants' Industry Expert on Repositioning Knows Very Little About The Extent of Conventionals' Repositioning into Natural and Organic Items . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 117 |
| VII. | | WILD OATS IS NOT A FAILING FIRM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 118 |
| | A. | Wild Oats Is Not a "Weakened" Competitor . . . . . . . . . . . . . . . . . . . . . . . . | 119 |
| | B. | Wild Oats Is a Viable Competitor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 120 |
| | C. | Wild Oats Is An Aggressive Competitor . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 122 |
| | D. | Wild Oats Has Opportunities for Further Financing . . . . . . . . . . . . . . . . . . | 123 |
| | E. | Wild Oats Is Not a High-Priced Competitor . . . . . . . . . . . . . . . . . . . . . . . . | 123 |
| | F. | No Evidence Wild Oats Is Likely To Exit the Relevant Markets . . . . . . . . . . | 126 |
| | G. | Perry Odak is a competent and credible Wild Oats witness . . . . . . . . . . . . . | 126 |
| VIII. | | THE TRANSACTION PRODUCES NO VERIFIABLE, MERGER-SPECIFIC EFFICIENCIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 127 |
| | A. | Efficiencies Not Verified or Quantified . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 129 |
| | B. | Significant Costs To Achieve Alleged Efficiencies . . . . . . . . . . . . . . . . . . . . | 130 |
| | C. | The Alleged Efficiencies Result from a Reduction in Output . . . . . . . . . . . . . | 131 |

## PROPOSED FINDINGS OF FACT

### I.  INTRODUCTION

In spending nearly $700 million to acquire Wild Oats, Whole Foods is telling the world

what its lawyers now deny, that Wild Oats is a very valuable, and for Whole Foods, strategic,

asset.  How else can one explain Whole Foods' acquisition of the number two premium natural

and organic supermarket operator in the nation for the purpose of closing down ███ or more of its

stores.  PX 02878.

The contemporaneous business documents of both Whole Foods and Wild Oats provide

insight as to why Whole Foods places a substantial premium on the purchase of Wild Oats.  The

answer lies in the unique and intense competition between the two.  This competition goes back

for years, as Whole Foods sought "to crush" its only national competitor in the Premium Natural

and Organic Supermarket market ("PNOS market") through every available means up to and

including opening large and lavish stores as close to Wild Oats stores as possible.  And more

recently, Wild Oats began its own aggressive expansion and pricing programs to take the

competitive fight to Whole Foods.  Unique and uniquely important (for consumers) competition

continued up to January of this year.  And then it stopped, with the launching of the proposed

purchase.

Then, companies that had not shied away from competition–indeed, that in some

instances delighted in competitive warfare–found a surer and faster way to create shareholder

value.  PX00553.  Greg Mays, CEO of Wild Oats, struck a deal whereby the shares of Wild Oats,

then being traded at approximately $15 per share, would bring $18.50 per share.  John Mackey,

CEO of Whole Foods bluntly justified the price tag to a member of his Board of Directors

stressing that by acquiring Wild Oats, Whole Foods would avoid "nasty price wars" in numerous cities across the country. PX0773.

The defendants here have tried to convince the Court that the facts here compare unfavorably with the facts that led Judge Hogan to enjoin the proposed acquisition in *Staples*, They have failed, as a close comparison of the "practical indicia" of relevant market in *Staples* with the facts here show. Premium natural and organic supermarkets sell distinct products–tens of thousands of natural and organic SKUs figuratively wrapped in lifestyle branding, to distinct customers–far more educated and affluent than conventional supermarket customers on average, in distinct ways, as industry participants and watchers acknowledge.

In addition to *Staples*, we respectfully direct the Court's attention to the most recent Section 7 decision of the D.C. Circuit, the *Heinz* decision. *Heinz*, in which the Court preliminarily enjoined a proposed acquisition, involved a very similar set of circumstances to those present here:

> Heinz's own documents recognize the wholesale competition and anticipate that the merger will end it. Indeed, those documents disclose that Heinz considered three options to end the vigorous wholesale competition with Beech-Nut: two involved innovative measures while the third entailed the acquisition of Beech-Nut. Heinz chose the third, and least pro-competitive, of the options.

*FTC v. Heinz*, 246 F.3d 708, 717 (D.C. Cir. 2001). In *Heinz*, as here, the defendants presented the Court with an insubstantial study intended to draw the Court to an overbroad market definition. Here is what the Court said of the defendants' evidence:

> Moreover, the number of data points on the chart were few; they were limited to launches in a single year . . . . Assessing such data's statistical significance in establishing the proposition at issue . . . is thus highly speculative. The district court did not even address the question of the data's statistical significance and the appellees' counsel could offer no help at oral argument.

2

*Heinz*, 246 F.3d at 723. The work of Defendant's economist, Dr. Scheffman, on which Defendants pin their hopes that the Court will reject the well-founded PNOS market is based on a one-day pricing study that compares unfavorably with the defendants' study rejected in *Heinz*. In contrast, here the Commission relies on contemporaneous business documents, credible testimony of disinterested persons, and thorough and sound economic analysis, each element of which is itself potent evidence *and* is supported by each other element.

Indeed, *Heinz* presented the Court with a greater challenge than is present here. In *Heinz*, the parties proffered an efficiencies defense, prepared and supported by an outside efficiencies expert, that merited consideration. Here, there are not even colorable efficiencies to offset the likely anticompetitive effects. Whole Foods and Wild Oats provide the Court with nothing to balance against the likely anticompetitive effects of the proposed acquisition.

Here, as in *Heinz* and *Staples* before it, the Commission has demonstrated *a reasonable likelihood* that the proposed acquisition *likely* would injure competition. Whole Foods and Wild Oats, like the parties in *Heinz* and *Staples*, must be required to forgo the anticompetitive option in favor of continued competition in innovation, service, quality, and price pending an administrative trial on the Section 7 merits before the Federal Trade Commission.

## II.    BACKGROUND

### A.    Nature of This Action

1.    Plaintiff Federal Trade Commission ("FTC" or "Commission") seeks a preliminary injunction under Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b) against the proposed merger of Whole Foods Market, Inc. ("Whole Foods") and Wild Oats Markets, Inc. ("Wild Oats"). Preliminary injunctive relief is necessary to allow the Commission to determine, in administrative adjudication, whether the merger would violate Section 7 of the Clayton Act, 15 U.S.C. § 21, or Section 5 of the Federal Trade

3

Commission Act, 15 U.S.C. § 45, because it may substantially reduce competition among premium natural and organic supermarkets.

**B.    Merging Parties**

    **1.    Whole Foods Market, Inc.**

2.    Defendant Whole Foods Market, Inc. ("Whole Foods") is a Texas corporation with its office and principal place of business located at 550 Bowie Street, Austin, Texas. (PX01302 at 001)

3.    Whole Foods came into existence as a result of the merger of Safer Way Natural Foods and Clarksville Natural Grocery (PX02878 at 010), and was incorporated in 1980 (PX01302 at 004).

4.    Whole Foods launched a new breed of national and organic food stores. From that beginning, Whole Foods carried a vast and unique product offering of premium natural and organic fruits, vegetables, meats, and other perishables and offered a superior shopping experience than conventional supermarket. Murphy Report (PX02878) ¶ 25.

5.    Whole Foods is the largest operator of premium natural and organic supermarkets. As of September 24, 2006, it operated 186 stores: 177 stores in 31 United States and the District of Columbia; 3 stores in Canada; and 6 stores in the United Kingdom. PX01302 at 004; *see also* PX00011 at 003.

6.    Whole Foods seeks "to transform food shopping from a chore into a dynamic experience by building and operating stores with colorful decor, well-trained team members, exciting product mixes, teams of in-store chefs, ever-changing selections, samples, open kitchens, scratch bakeries, hand-stacked produce, prepared foods stations and European-style charcuterie departments." PX01302 at 012.

7.    Whole Foods has articulated five "Core Values" that it emphasizes "reflect what is truly important to us as an organization." Among these is "selling the highest quality natural and organic products available." PX01302 at 006. Whole Foods provides a broad, high-quality, and unique food product selection which it acquires from natural food vendors around the world. *Id.* at 006, 007. Another of its "Core Values" is "satisfying and delighting our customers." *Id.* at 006.

8.    John Mackey, Chief Executive Officer of Whole Foods, describes Whole Foods as "authentically committed to its mission of natural/organic/healthy foods. Its core customers recognize this authenticity and it creates a customer loyalty that will not be stolen away by conventional markets who sell the same products. Whole Foods has created a 'brand' that has real value for millions of people." PX00806A at 002.

9.    Over two decades, it has expanded by opening new stores and acquiring several other premium natural and organic supermarkets: Blue Bonnet Natural Foods Grocery in 1984, Whole Food Company in 1988, Wellspring Grocery in 1991, Bread & Circus in 1992, Mrs. Gooch's in 1993, Bread of Life (San Francisco) in 1995, Unicorn Village in 1995, Oak Street Market in 1995, Fresh Fields in 1996, Granary Market in 1997, Bread of Life (Florida) in 1995, Merchant of Vino in 1997, Nature's Heartland in 1999, Food 4 Thought Natural Food Market and Deli in 2000, Harry's Farmers Market in 2001, and Whole Grocer in 2006.  Murphy Report (PX02878) ¶ 25; Chamberlain Dep. (JX 40) at 32-33:23-5.

10.   The average square footage of Whole Foods' stores is 34,000 (PX01302 at 004), and its stores typically stock around 30,000 stock keeping units ("SKUs") of natural and organic products.  PX00182 at 004; PX01333 at 003.  The sales from Whole Foods' stores for the 2006 fiscal year totaled $5.6 billion.  PX01302 at 004.

**2.    Wild Oats Markets, Inc.**

11.   Defendant Wild Oats Markets, Inc. ("Wild Oats") is a Delaware corporation with its office and principal place of business located at 1821 30th Street, Boulder, Colorado.  PX00613 at 001.

12.   Wild Oats is the second largest operator of premium natural and organic supermarkets with 110 stores in 24 states and British Columbia, Canada.  PX00613 at 005; PX2705.

13.   Founded in 1987, Wild Oats operates in "two store formats: natural foods supermarkets, which emphasize gourmet, natural and organic products and a higher level of service; and farmers market stores, which emphasize fresh produce and natural living products at a competitive price."  PX00613 at 007.  Wild Oats presently operates under four banners across the continent: the Wild Oats Marketplace name nationwide, the Capers Community Market name in Canada, the Henry's Farmers Market name in southern California, and the Sun Harvest name in Texas.  PX00613 at 027.

14.   Wild Oats (by which name we now and hereafter refer to the stores operated under the Wild Oats banner) is committed to selling the "best variety of high-quality products made with wholesome ingredients."  PX00601 at 003.  Similar to Whole Foods, Wild Oats sells a large array of natural and organic products that appeal to "health-conscious shoppers," and include "dry groceries, produce, meat, poultry, seafood, dairy, frozen, prepared foods, bakery" offered in a manner "that emphasizes customer service."  PX00613 at 005.  In addition to offering a broad selection of natural, organic, and gourmet foods and environmentally friendly produce, Wild Oats sells natural vitamins, remedies, and body care products.  PX00613 at 005.  Some of Wild Oats' store features include olive bars,

5

pizza stations, juice and java bars, sushi bars, cheese islands, and holistic health centers. PX00670 at 035; PX04846; Martin IH (JX 14) at 105:6-9, 108:5-9.

15.   Wild Oats' Vice President of Marketing Laura Coblentz described Wild Oats as "more than a retail chain – it's about a lifestyle, and that's how we market ourselves." PX1303A at 002. Wild Oats emphasizes that it has "Come to represent the essence of living a natural and organic lifestyle." PX01249 at 005. According to Wild Oats' CEO Gregory Mays "when you look at Wild Oats you don't think of their stores as much as you think of a name, a lifestyle, a value for your family." PX00340 at 002.

16.   Wild Oats has expanded over the past two decades by opening new stores and acquiring several other premium and organic supermarkets; Alfalfa's Markets in 1996, Henry's Marketplace stores in 1999, Sun Harvest stores in 1999, and Natures stores in 1999. PX04449 at 047; PX04449 at 002.

17.   The average square footage of Wild Oats stores ranges from 27,000 to 34,000. PX00613 at 006. Its stores' net sales for the 2006 fiscal year total $1.183 billion. PX00613 at 025.

### C.    The Transaction

18.   In February 2007, Whole Foods and Wild Oats announced that Wild Oats would be acquired by Whole Foods. PX01266.

19.   On February 21, 2007, Whole Foods and Wild Oats executed an Agreement and Plan of Merger. PX00167. Whole Foods has agreed to acquire 100% of the voting securities of Wild Oats. The combined transaction value for the tender offer and merger and assumed debt is approximately $700 million. Murphy Report (PX02878) ¶ 24.

20.   Whole Foods plans to close at least ■ Wild Oats stores that compete with Whole Foods stores. Murphy Report (PX02878) ¶ 22.4.

21.   In addition to the Wild Oats stores that Whole Foods intends to close, Whole Foods announced in a June 20, 2007, press release that, subject to the closing of its acquisition of Wild Oats, it will sell off all 35 Henry's and Sun Harvest stores (located in California and Texas) to be acquired from Wild Oats. PX00329.

22.   On February 26, 2007, Whole Foods filed its Premerger Notification and Report Forms with the Federal Trade Commission and the Department of Justice. On June 5, 2007, Plaintiff FTC authorized staff to seek both a temporary restraining order and a preliminary injunction to prevent Whole Foods from acquiring Wild Oats pending the outcome of an administrative trial under Section 7 of the Clayton Act and Section 5 of the Federal Trade Commission Act. Complaint for Temporary Restraining Order and Preliminary Injunction (filed June 6, 2007).

6

23. Plaintiff FTC filed a motion for a temporary restraining order and preliminary injunction to block this proposed merger in the United States District Court for the District of Columbia on June 6, 2007.  Complaint for Temporary Restraining Order and Preliminary Injunction (filed June 6, 2007).

24. On June 28, 2007, the Federal Trade Commission issued its Complaint initiating an administrative proceeding on the substantive merits.

**D.    Witness Credibility**

25. The evidence presented by the Federal Trade Commission is highly credible.

26. The Federal Trade Commission's documentary evidence consists in important part of the contemporaneous business documents of Defendants.  These business documents reflect the facts and business judgments underlying very significant business decisions, including strategic and marketing plans, store siting studies, surveys conducted for the parties in the ordinary course of business, and documents relating to Whole Foods' decision to acquire Wild Oats for approximately $700 million.  They accurately reflect competitive conditions and considerations, among other things.

27. The Federal Trade Commission's third party witness statements (in the form on Investigational Hearing transcripts and otherwise) are highly credible.  The Federal Trade Commission's third party witness statements are from disinterested persons.

28. The testimony of Wild Oats' former CEO, Perry Odak, aggressively challenged by Defendants, is credible and highly probative.

29. Mr. Odak testified under oath in an Investigational Hearing in the Federal Trade Commission investigation that led to this proceeding. Odak IH (JX 37).  At that time Mr. Odak's financial and legal interests were intertwined with the defendants'.  He was to receive substantial future payments from Wild Oats under his termination agreement with the company (PX02722), and was joined with Wild Oats in a joint defense agreement in the Federal Trade Commission investigation. Odak IH (JX 37) at 8:14-25.  He was prepared for his Investigational Hearing, at which he was represented by counsel, by attorneys from Wild Oats (JX 37) at 8:14-25.  His testimony at his investigational hearing was complete and credible.

30. After receiving the transcript of Mr. Odak's testimony the defendants appear to have withheld certain payments due to Mr. Odak and plainly did abrogate the joint defense agreement, which also had conveyed financial benefits to Mr. Odak   Odak Dep. (JX 16) at 8:12-25; 9:1-25.  Not surprisingly, Mr.Odak was perturbed by what he identified as retaliation on the part of Wild Oats.  Odak Dep. (JX 16) at 8:12-14.  Nevertheless, Mr.

7

Odak's testimony at that proceeding was wholly consistent with his prior credible testimony. As Mr. Odak testified at his deposition in response to a question from Wild Oats' counsel suggesting bias on his part: "[w]hat I said in the [investigational hearing] transcript is the truth and the whole truth and nothing but the truth. I am sorry that Wild Oats doesn't like what I have to say, but the reality is it's the truth." Odak Dep. (JX 16) at 9:9-13.

31.    The defendants have further sought to discredit Mr. Odak by pointing to alleged mistakes or untruths in Mr. Odak's testimony. Def. Response Brief at 72-74. The Federal Trade Commission has presented the court with contemporaneous documentary evidence that corroborates Mr. Odak's testimony. Mr. Odak's testimony is not only based on five years of experience at Wild Oats as CEO, it is corroborated by every nearly every independent piece of evidence in the record and, ironically for the defendants, by Wild Oats documents. Mr. Odak's testimony that Whole Foods, not Trader Joe's was its key competitor, is supported by current Wild Oats executives. *See, e.g.,* Exhibit 96 (PX01238 at 003) (Davidson plan: "▮▮▮▮▮▮▮to obtain ▮▮▮▮▮▮▮with Whole Foods," and for Henry's, "▮▮▮▮▮▮▮▮▮▮▮▮needed ▮▮▮▮▮▮with Trader Joe's"). Mr. Odak's testimony in support of a premium natural and organics market is confirmed by Wild Oats website with Mr. Mays listed as Chairman of the Board and Interim CEO (PX1331 at 002). According the Wild Oats' website: "[t]he natural food segment of retail is currently experiencing industry growth in the 5% to 8% range, compared to 0% to 2% for conventionals." The same website observes that: "[i]n terms of customer profile, the natural foods shopper tends to be highly educated, upper income, informed and committed and will pay a higher price for health, while the conventional food shopper . . . she tends to shop for convenience and value and isn't typically committed to a particular store."

32.    The claims in Defendants Wild Oats' declarations of its senior managers are to be taken with a great deal of caution, if at all. All of those declarations were prepared for this litigation by persons with substantial financial and other interests in its outcome. As reflected in the defendants' abortive attack on former Wild Oats' CEO's credibility, the credibility of the Defendants' declarants is itself quite open to challenge. Under *Gypsum* such documents and testimony prepared for litigation are to be given little or no weight when controverted by contemporaneous business documents. To the extent that the testimony contained in Wild Oats' declarants' testimony is in conflict with contemporaneous business documents, this testimony should be rejected.

**III.    RELEVANT PRODUCT MARKET IS THE OPERATION OF PREMIUM NATURAL AND ORGANIC SUPERMARKETS**

A relevant product market defines the product boundaries within which competition meaningfully exists. *United States v. Cont'l Can Co.*, 378 U.S. 441, 449 (1964). "The outer

boundaries of a product market are determined by the reasonable interchangeability of use [by

consumers] or the cross-elasticity of demand between the product itself and substitutes for it."

*Brown Shoe*, 370 U.S. at 325; *see also United States v. E.I. du Pont de Nemours & Co.*, 351 U.S.

377, 395 (1956).

### A.    Premium Natural and Organic Supermarkets Stand Apart from Other Retailers

33.    A relevant product market in which the competitive effects of the proposed merger may be assessed is the operation of premium natural and organic supermarkets ("PNOS"). Premium natural and organic supermarkets are a relevant product market because a hypothetical monopolist could profitably raise prices above competitive levels. In markets where more than one premium natural and organic supermarket is present, prices and margins are lower. Pl.'s Br. at 51 (filed July 23, 2007); PX01337 at 002; Murphy Report (PX02878) ¶ 69. These facts help establish that premium natural and organic supermarkets constitute a separate product market for antitrust purposes. Murphy Report (PX02878) ¶ 104.

### 1.    Avoiding Nasty Price Wars and Buying Potential Springboard into Market Demonstrates Product Market

34.    In a December 2006 e-mail to John Mackey and Jim Sud, Glenda Chamberlain, the CFO of Whole Foods, discussed a "Kroger scenario," after which she concluded that "[s]ure it would be expensive to Kroger to acquire [Wild] Oats, but they might look at the risk/reward ratio and conclude that it is worth doing." PX00555.

35.    Two months later, John Mackey reported to a member of the Whole Foods Board of Directors that: "By buying [Wild Oats] we will . . . avoid nasty price wars in Portland (both Oregon and Maine), Boulder and Nashville, and several other cities which will harm our gross margins and profitability. [Wild Oats] may not be able to defeat us but they can still hurt us . . . . [Wild Oats] is the only existing company that has the brand and number of stores to be a meaningful springboard for another player to get into this space. Eliminating them means eliminating this threat forever, or almost forever." PX00773 at 001.

36.    Ms. Chamberlain and Mr. Mackey's ordinary course-of-business documents are consistent only with a premium natural and organic supermarket market.

37.    John Mackey testified, as he stated in his documents, that an acquisition of Wild Oats would "make it a lot easier" for a conventional to "rival" Whole Foods. Mackey IH (JX

28) at 96:2-5. Mr. Mackey elaborated, that compared to anyone else out there, "Wild Oats has more intellectual capital. It has a better brand. It has been in business 20 years. . . . So it is easier for [conventionals] to use that to compete with Whole Foods than a start-up would be." *Id.* at 73:3-22. As a result, Mr. Mackey testified that he wanted to "emphasize" to the Board the primacy of "eliminating this potential threat of Kroger or Safeway or somebody else, Super Value, using this brand equity and the ability to rationalize the store base . . . ." *Id.* at 73:16-20; *see also* Chamberlain Dep. (JX 40) at 130:5-132:8.

38.    According to Mr. Mackey, "Wild Oats needs to be removed from the playing field. . . . It's just a question of do you want Kroger or Safeway to be the ones to remove them. Wild Oats doesn't want that because Kroger and Safeway will probably pay them $8 a share or $6 after Whole Foods has continued to batter them around over the next few years. . . ." Mackey IH (JX 28) at 67:20-68:1; *see also* Sud IH (JX 30) at 97:7-14 (Whole Foods "has opened stores in close proximity to Wild Oats and competed aggressively" and will continue to do so if the acquisition does not go forward.).

39.    The import of this document is two-fold: (1) the acquisition would not be expected to eliminate "nasty price wars" if the market included conventional supermarkets, and Whole Foods did not consider any of these conventionals to be in the market; and (2) in terms of repositioning, if Kroger, Supervalu, or Safeway easily could create a new brand to effectively enter this market, Mr. Mackey and the Board of Directors would not attribute so much value to taking the Wild Oats brand off the market. In fact, Mr. Mackey also made clear how long he thought it would take a third party to build a credible *de novo* brand: "forever, or almost forever." PX00773. This expectation regarding the time it would take for a third party to obtain a credible brand is reflected in the fact that Project Goldmine, the deal valuation workbooks, anticipates retaining fully at Whole Foods the substantial sales volumes diverted from closed Wild Oats stores for a period of at least ten and a half years. Murphy Rebut. Report (PX02884) ¶ 39.

### 2.    Peculiar Characteristics and Product Differentiation Distinguish the Market for Premium Natural and Organic Supermarkets

#### a.    Generally

40.    Whole Foods often referred to Wild Oats' markets where Whole Foods was not present as "non-competitive," "cash cow," and even "monopoly" markets. OX00712; PX00719; PX01372 (showing a list of stores that if there is no Whole Foods, there is "no Major Competitor" in the market). This, too, is consistent only with a PNOS market.

41.    Premium natural and organic supermarkets focus on high-quality perishables, specialty and natural organic produce, prepared foods, meat, fish, and bakery goods. They are

significantly differentiated from regular supermarkets, with an extraordinary emphasis on natural and organic products rather than conventional products and an emphasis on perishables rather than dry goods. PX06613 at 005; PX01333 at 003-004; Odak IH (JX 37) at 77-79; LaMacchia IH (JX 32) at 40.

42.   The core shoppers of premium natural and organic supermarkets have a preference for natural and organic products, and premium natural and organic supermarkets offer an extensive selection of natural and organic products to enable those shoppers to purchase substantially all of their food and grocery requirements during a single shopping trip. PX04413 at 008.

43.   Premium natural and organic supermarkets also emphasize high levels of customer services. The customers targeted by premium natural and organic supermarkets are affluent and well educated. Premium natural and organic supermarket operators select new store locations based on the attributes of the targeted customer, based on extensive psychographics and demographic modeling. PX00718 at 001; Odak IH (JX 37) at 95:1-25; 96:1-6; Paradise IH (JX 31) at 59:4-7; Paradise Dep. (JX 11) at 69:17-70:7); Coblentz IH (JX 33) at 18:22-19:6.

44.   Premium natural and organic supermarkets are "mission driven," with an emphasis on "social and environmental responsibility." Their stores offer customers a perspective of a "third place," as an alternative to work or home; they provide the customer with the confidence of a "lifestyle brand" and added confidence and trust in the provision of natural and organic products that are good for the consumer; they offer a "unique environment," in stores that satisfy "core values" of a lifestyle of health and ecological sustainability and provide a "superior store experience."

45.   "Natural foods" are foods that are minimally processed and largely or completely free of artificial ingredients, preservatives, and other non-naturally occurring substances. Robb Dep. (JX2) at 13:24-14:6; Gallo Dep. (JX2) at 39:14-24; Boardman Dep. (JX5) at 12:12-21; Martin IH (JX34) at 87:18-20.

46.   "Organic foods" are foods that are produced using agricultural practices that promote healthy ecosystems; no genetically engineered seeds or crops, sewage sludge, long-lasting pesticides or fungicides; healthy and humane livestock management practices including use of organically grown feed, ample access to fresh air and the outdoors, and no antibiotics or growth hormones; and food processing that protects the healthfulness of the organic product, including the avoidance of irradiation, genetically modified organisms, and synthetic preservatives. Robb Dep. (JX2) at 15:6-16:8; Martin IH (JX34) at 87:1-3; Organic Food Production Act of 1990, 7 U.S.C. §§ 6501-22.

47.   Pursuant to the Organic Foods Production Act of 1990, 7 U.S.C. §§ 6501-6522, the U.S. Department of Agriculture (USDA) issued the "Organic Rule," 7 C.F.R. § 205 (2000), by

11

which all products labeled "organic" must be certified by a federally accredited certifying agency as satisfying USDA standards for organic foods. The Organic Rule establishes standards for handling, storage, and other practices to protect the integrity of organically-labeled products, including: preventing commingling of organic and non-organic products; protecting organic products from contact with prohibited substances; and maintaining records that document adherence to the USDA standards.

48.    The natural and organic foods industry generated $22.7 billion in sales in 1997, $36.4 billion in sales in 2002, and $51.4 billion in sales in 2005, and is expected to grow at a compound annual growth rate of ten percent over the next few years. PX02954 at 006.

49.    Whole Foods describes itself as the world's leading natural and organic foods supermarket. PX00011 at 003; PX01302 at 004; *see also* Gallo Dep. (JX2) at 165:3-9. *See also* DX 16 at 24; DX 17 at 19, 32. Whole Foods represents quality, integrity and trust for organic and natural foods. PX01273.

50.    In its 2007 10-K, Wild Oats stated "We offer a broad range of products meeting our product standards throughout our merchandise categories, and emphasize unique products and brands not typically found in conventional supermarkets." PX00613-006. "We offer our customers a broad selection of unique products that are natural and organic alternatives to those found in conventional supermarkets, as well as gourmet and ethnic foods." PX00613-007.

51.    Wild Oats is "a natural and organic specialty foods retailer that serves a consumer interested in the freshest ingredients, gourmet cooking, and health and wellness." PX02954 at 004. According to its November 2006 Strategic Marketing Plan, Wild Oats "will be the 'FIRST TO MARKET' with all new items in our retailing sphere; including organic, natural and holistic health." DX579 at 13.

52.    Wild Oats is one of the largest natural foods supermarket chains in North America. PX00613 at 005. Wild Oats' goal is to become a "dominant force" and the "leading national brand for natural, organic and farm fresh products" with a "foundation of social and environmental responsibility." PX01332 at 005, 026; PX02954 at 003. According to Wild Oats' November 2006 Strategic Marketing Plan, "We will highlight products and services that demonstrate a commitment to the health and well being of our customers. We will build a strong correlation between the Wild Oats brand and products which enable our customers to more proactively manage their health. The healthy attributes of our products will be clear throughout our stores and in our media efforts." DX 579 at 16.

53.    According to its website, "Wild Oats was founded on the vision of enhancing the lives of our customers and our people with products and education that support health and well-being. Wild Oats is committed to providing the highest quality, organic and natural food,

health and wellness products in vibrant stores with people who are friendly, eager to serve and ready to educate." PX04660.

54.  In its 2007 10-K, Wild Oats stated "Our stores are one-stop, full-service supermarkets for customers seeking quality natural, organic and gourmet foods and related products." PX00613-006.

55.  According to John Mackey, Whole Foods' CEO, Earth Fare, Wild Oats, and "some other onesies and twosies" are "closest" or most similar to Whole Foods. Mackey IH (JX28) at 132:3-6; *see also* Mackey IH (JX28) at 131:12-15 (Earth Fare is similar to Whole Foods and attempts to copy it); Hasker Dep. (JX25) at 129:7-13, 129:25-130:5 (███████████████████████████████████████████ ██████████████████); Odak IH (JX 37) at 91:16-92:5 (Whole Foods and New Seasons are the closest to Wild Oats on service.); Robb IH (JX 29) at 211:2-5; 213:9-11 (Wild Oats closest to Whole Foods on quality standards.)

### b.  Unique Format

56.  Whole Foods and Wild Oats operate premium natural and organic supermarkets that offer consumers tens of thousands of natural and organic products. Murphy Report (PX02878) ¶¶ 5, 33. While conventional supermarket retailers carry a limited selection of natural and organic SKUs, Whole Foods and Wild Oats typically carry as many as 30,000 natural and organic SKUs. PX01333 at 002-004; PX03425; Odak IH (JX37) at 48:23-49:2.

57.  Whole Foods and Wild Oats are referred to as "supernaturals" by industry publications, such as *Supermarket News*, because they are "two chains that do a very nice job of differentiating themselves based on natural." Stanton Dep. (JX19) at 71:14-22; PX03815A; Simon Dep. (JX22) at 37:18-38:11.

58.  The former CEO of Wild Oats testified, "[t]here's really only two players . . . of any substance in the organic and all natural, and that's Whole Foods and Wild Oats." Odak IH (JX37) at 58:21-24.

### (1)  Premium Natural and Organic Supermarkets offer customers the largest selection of natural and organic products

59.  Whole Foods distinguishes itself from other food retailers by emphasizing natural and organic products. PX00819 (Organics are the cornerstone of Whole Foods philosophy and culture); PX01301 at 001 ("We appreciate and celebrate the difference natural and organic products can make in the quality of one's life."); Mackey IH (JX28) at 270:20-274:11; PX00011 at 005 ("authentic retailer of natural and organic products").

13

60. 

61.

62. . PX04736.

63. New Seasons Market has "a wide variety of Home Grown, organic and direct-from-grower fruits and vegetables" and a variety of quality produce, including 20 varieties of local apples and nine kinds of berries in season. PX04646. The FTC's economic expert, Professor Murphy, considers New Seasons to be in the same product market as Whole Foods and Wild Oats. July 21, 2007 A.M. Tr. Mot, Hr'g at 51:18-22 (Murphy test.).

64. 
PX04736.

65. . PX04736.

66. Another premium natural and organic supermarket firm, Earth Fare, operates several stores in North Carolina, South Carolina, Georgia and Tennessee, and offers more than 45,000 natural and organic SKUs, all without artificial ingredients like added trans-fats and high fructose corn syrup. PX00336.

67. According to Professor Murphy, "Earth Fare is a PNOs (premium natural and organic supermarket) competitor that we identified and people in the record identified as a firm that competed directly with Whole Foods in these markets." July 31, 200 A.M. Tr. Mot. Hr'g at 126:3-5 (Murphy test.).

> **(2)    Premium Natural and Organic Supermarkets offer
> customers the largest selection of perishables and
> prepared foods**

68. A heavy emphasis on perishables differentiates Whole Foods, Wild Oats and other premium natural and organic supermarkets from conventional supermarkets. PX01302 at

008.  Defendants offer high-quality perishables, including produce, meat, seafood, bakery, and prepared food products.  *Id.*; Gallo Dep. (JX2) at 165:3-9; Bradley Dep. (JX6) at 29:2-6;  PX00749A at 001.

69.  Over 60% of Wild Oats' revenues derive from the sale of perishables.  Odak IH (JX37) at 39:9-13; PX02704 at 008 (Wild Oats CFO presentation stating, "Our stores have about 60% to 65% perishables with an emphasis on freshness.  The traditional grocery chains have a much larger skew towards non-perishable shelf stable products."); *see also* PX00333; PX01332 at 018 ("Full range of products, with perishables emphasis"); PX02704 at 010; Odak IH (JX 37) at 153:1-7; Coblentz IH (JX 33) at 51:11-24 (A conventional supermarket may do well on consumer packaged goods, but it does less well on perishables.).

70.  Nearly 70% of Whole Foods sales are natural or organic perishables.  PX00182; PX01333 at 003; PX00532 at 001;  PX00749A;  PX01002b at 004; PX01302 at 004, 008; Foster IH (JX 41) at 104:1-2; *see also* Bradley Dep. (JX6) at 31:3-21; Meyer Dep. (JX10) at 99:19-25.

71.  Whole Foods generally has between ███████████████ of produce in a store, ███████ ███████ of which are organic.  LaMacchia IH (JX 32) at 38:3-5, 40:13-17; see also Bradley Dep. (JX6) at 128:14-132:19.

72.  Whole Foods carries ███████████████, all of which are natural or organic.  LaMacchia IH (JX32) at 38:7-49:11-19.

73.  Whole Foods carries ███████████████, of which about 30 to 35% are organic.  LaMacchia IH (JX32) at 38:7-8, 101:10-15.  It's employees will assist its customers with free samples.  *Id.* at 102:11-24.

74.  Wild Oats offers approximately ███ organic produce SKUs.  Odak IH (JX37) at 78:5-6.

75.  ███████████████████████████████████████████████████████████████████████████. PX04736.

### (3)    Premium Natural and Organic Supermarkets offer customers the highest quality products

76.  Premium natural and organic supermarkets impose stringent ingredient restrictions for the products sold at their stores and share almost identical basic food philosophies:  no additives, no artificial preservatives, no artificial colors, no artificial flavors, no antibodies or hormones in the meats, no hydrogenated oils, and cruelty-free body care products.  PX00532 at 001-002; PX00011 at 007; PX00613 at 006-008; PX01302 at 006-008; PX04413 at 015; Allshouse Dep. (JX 4) at 70:10-15;  Lannon Dep. (JX 8) at 36:19-

15

37:1, 108:17-19;  LaMacchia IH (JX 32) at 49:14-19; PX04691 (Earth Fare's product philosophy).

77.  Whole Foods' core values include selling the highest quality natural and organic food products.  PX01002b at 004;  PX01301 at 001;  Boardman Dep. (JX 5) at 31:17-23;  Robb Dep. (JX 2) at 25:21-25;  Bradley Dep. (JX 6) at 21:7-13; PX04413 AT 008 ("I can trust Whole Foods to keep the crap out of the food that I feed my family.");  PX04413 at 014.

78.  Wild Oats believes its product standards are among the highest in the industry.  It sells only products that are free from synthetic additives including artificial preservatives, colors or flavors, hydrogenated oils, antibiotic and growth hormone free meats, cruelty-free bodycare products and sustainable seafood.  PX00613 at 006-008; PX00518 at 008; *accord*, PX01302 at 006-008.

79.  John Mackey posted to Yahoo! Internet message boards under the pseudonym "Rahodeb."  PX03425 at 003.

80.  In June 2005, Mackey/rahodeb wrote about Whole Foods: "A. They don't sell foie gras.  Why not? B. They don't sell eggs from caged chickens.  Why not? C. They don't sell Chilean sea bass.  Why not? D. They don't sell veal from tethered anemic calves.  Why not?  Whole Foods has strict animal welfare standards in place throughout their supply chain."  PX00757.

81.  In June 2006, Mackey/rahodeb wrote Whole Foods has "always had quality standards that don't permit them to sell many products.  When was the last time you bought a Pepsi or a Coke at Whole Foods?  They stopped selling products with hydrogenated fats (like Pepperidge Farm Cookies) 4 or 5 years ago.  Regarding animal welfare standards: they stopped selling foie gras back in 1997, Chilean sea bass 5 years ago, caged eggs in 2002, and now live lobsters and crabs in 2006.  I expect this won't be the last product ban either."  PX00761.

82.  According to The Hartman Group, "In terms of quality, shoppers position the 365 brand on par with the Trader Joe's brand, slightly lower than the local/niche brands with a strong legacy (Spectrum, Organic Valley), but higher than mainstream brands (Kraft, Campbell's), and higher still than mainstream private label natural and organic brands (Safeway's "O" brand).  PX04413 at 003.

83.  In its 2006 10-K, Wild Oats stated "We believe our product standards for natural and organic products are among the highest in the industry and only include products that are free from synthetic additives including artificial preservatives, colors or flavors, hydrogenated oils, antibiotic and growth hormone-free meats, cruelty-free bodycare products and sustainable seafood.  We also routinely conduct quality assurance checks of

16

our corporate branded manufacturers' facilities to verify compliance with our standards."
PX00613 at 006.

84. Wild Oats is closest to Whole Foods on quality standards. Robb IH (JX 29) at 211:2-
211:5, 213:9-11.

### (4) Premium Natural and Organic Supermarkets offer customers the most amenities and service venues

85. Premium natural and organic supermarkets, such as those operated by Whole Foods and
Wild Oats, feature amenities and service venues unavailable at most conventional
supermarkets. For example, Whole Foods offers "teams of in-store chefs, ever-changing
selections, samples, open kitchens, scratch bakeries, hand-stacked produce, prepared
foods stations and European-style charcuterie departments." PX01302 at 012.

86. Premium natural and organic supermarkets, such as those operated by Whole Foods and
Wild Oats, also offer specialized in-store services. For example, Whole Foods offers
specialized services including pizza ovens in the store, sushi bars, salad stations, seafood
stations, barbecue stations, candy islands, trattorias, pommes frites stations (with a variety
of different dipping sauces), and mini restaurants in which customers can have meal
cooked and served in-store. Foster IH (JX 41) at 120:10-123:10.

87. Wild Oats' specialized departments include juice bars, java bars, custom sandwiches,
sushi bars, taco shops, prepared entrees, service meat, and Mediterranean bars. PX00670
at 035; DX 579 at 14. *See also* PX00518 at 008; PX00666 (Wild Oats' Tampa
prototype included indoor/outdoor café, prepared meals, juice and java bar, and state-of-
the-art holistic health center); PX04846 (Wild Oats store features include service meat
and seafood counters, coffee and juice bars, service sushi or wok station, café, service
gelato or ice cream, cosmetic counter with sink, and spa). *Cf.* Hasker Dep. (JX25) at
170:19-172:5 (describing Whole Foods unique products and service levels).

### (5) Premium Natural and Organic Supermarkets offer customers knowledgeable service personnel

88. Premium natural and organic supermarkets offer a higher level of service than do the
majority of conventional supermarket retailers. PX01301; PX01302 at 004, 012
("unparalleled customer service" at Whole Foods); Mackey IH (JX28) at 109:13-16,
113:18-21; LaMacchia IH (JX32) at 102:11-24 (Whole Foods employees will help the
customer by describing the large variety of ▋▋▋▋types of cheese that Whole Foods
offers and offering free samples of any cheese the customer would like to try); Foster IH
(JX41) at 119:6-12; Bradley Dep. (JX6) at 21:7-13; PX00670 at 006 ("superior service
with sincerely friendly and knowledgeable people – World Class Service" at Wild Oats);
PX00670 at 034 (Wild Oats "seek[s] to offer a higher level of service than conventional

17

supermarkets."); PX00518 at 008 (discussing higher level of service, knowledgeable personnel, and more money spent on store labor than conventionals).

89. 

90. On April 21, 2005, Mackey/rahodeb wrote "Whole Foods customer service is so far superior to Safeway and other conventional stores that it is ridiculous." PX00809. Mackey/rahodeb added that Whole Foods has "[n]o unions. Safeway is almost completely unionized and that creates the adversarial and untrusting relationship that we saw so clearly in Southern California last year during the big grocery strike. Bad employee relationships with unions results in bad customer service. Safeway won't be able to change this." PX00809.

91. In its 2006 10-K, Wild Oats stated, "[d]espite the increase in natural foods sales within conventional supermarkets, we believe that conventional supermarkets still lack the concentration on a wide variety of natural and organic products, and emphasis on service and consumer education that our stores offer." PX00613 at 005.

92. Whole Foods and New Seasons are closest to Wild Oats on service. Odak IH (JX 37) at 91:16-92:5.

### c.    Premium Natural and Organic Supermarkets engage in lifestyle marketing

93. The Whole Foods shopping bag serves as a vehicle for the Whole Foods brand: "When chicks see me with it, it earns me brownie points. I know what's good in life and I can afford it." PX04413 at 018.

94. Defendants provide "lifestyle stores" oriented to people seeking self-improvement and well-being. Foster IH (JX41) at 183:12-184:9; PX01002b at 004; PX01303A at 002 (lifestyle marketing); PX01243 at 002 ("When you look at a Wild Oats you don't think of their stores as much as you think of a name, a lifestyle. . ."); PX02026 at 003 ("the culture and lifestyle of the Wild Oats brand"); PX04413 at 018 ("When I bring in my office snacks, it lets people know that I'm taking care of myself.").

18

### (1)    Premium Natural and Organic Supermarkets Offer Customers a Unique Shopping Experience

95.    Defendants position themselves as a destination or "third place" for customers. According to Betsy Foster, Vice President of Business Development at Whole Foods, a third place "means a place that people like to go.  You have home, you have office.  The analogy is Starbucks, is a place that people like to go, hang out, meet people, spend time." Foster IH (JX41) at 137:21-25; PX00011 at 005; PX01302 at 012 (Whole Foods' stores "play a unique role as a third place, besides the home and office, where people can gather, interact and learn while at the same time discovering the many joys of eating and sharing food."); PX00613 at 006 (Wild Oats has a destination format).

96.    "Whole Foods Market is about much more than just selling 'commodity' natural and organic products.  We are a lifestyle retailer and have created a unique shopping environment built around satisfying and delighting our customers."  PX01333 at 003.  *See also* PX01301 (inviting and educational store environment that emphasizes customer service); PX01302 at 012 ("transform[s] food shopping from a chore into a dynamic experience by building and operating stores with colorful decor. . . ."); PX00011 at 005; PX04413 at 018 ("██████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████.");  PX04413 at 015.

97.    Customers "like shopping in Whole Foods because the service is better, the people are nicer, it is a better environment, or, as many people tell me, 'it just feels good to be in your stores.'"  Mackey IH (JX28) at 113:18-:21; LaMacchia IH (JX32) at 92:18-:21 ("We have done a great job with creating an environment in our stores that's conducive with customers lingering and looking at our products and doing that sort of thing."); Foster IH (JX41) at 119:3-5, 120:4-9 (differentiate with ambiance).

98.    "[Wild Oats is] a high-end lifestyle retailer that is selling more than just products . . . we are selling an overall experience.  This serves as a major draw to our stores, and to the shopping centers where we locate."  PX02954 at 006.

99.    On September 1, 2004, Mackey/rahodeb wrote, "Whole Foods is a company that is authentically committed to its mission of natural/organic/healthy foods. Its core customers recognize this authenticity and it creates a customer loyalty that will not be stolen away by conventional markets who sell the same products. Whole Foods has created a 'brand' that has real value for millions of people . . . there are tens of millions of people in the U.S. who are willing to pay higher prices for higher quality, better service, and a better shopping experience.  It is so blatantly obvious to me that I find it mystifying that so many other people don't seem to get this simple truth."  PX00802A.

100.  According to Laura Coblentz, VP of Marketing for Wild Oats, "succeeding in this business is about staying true to your message and mission but also . . . creating a community that will attract new customers. . . . It's about mind, body and soul through food, information, vitamins and supplements, recipes, books, body care – you name it. Wild Oats is more than a retail chain – it's about a lifestyle, and that's how we market ourselves. . . . Consumers have to trust your brand and your products. Without trust, there is no relationship, and trust can only be built with credibility, commitment, and consistency." PX01303A at 002.

101.  In 2005 Wild Oats attempted to introduce a limited number of mainstream national brands into its stores and this initiative failed due to negative customer response. The company brand was diluted by this initiative and it had to be discontinued. Odak IH Tr. (JX 37) at 87:25-88:5. On March 28, 2006, Mackey/rahodeb wrote, "Why shouldn't OATS sell to many conventional products? It alienates the core natural foods customers who believe in the mission of natural/organic foods." PX00801.

102.  On April 21, 2005, Mackey/rahodeb wrote, Whole Foods has "authenticity, integrity, and the power of their brand with their customers. This creates strong loyalty from their customer base – something Safeway doesn't have and likely never will have." PX00809.

103.  On April 21, 2005, Mackey/rahodeb wrote Whole Foods' "Commitment to their Mission and Core Values" set it apart from Safeway, which "has no Mission except to maximize shareholder value." PX00809.

**(2)   Premium Natural and Organic Supermarkets Support Environmental and Animal Welfare Causes that Are Valued by Their Shoppers**

104.  Whole Foods and Wild Oats promote a lifestyle of heath and ecological sustainability that is important to their shoppers. The natural and organic food industry has accorded the "lifestyle of health and [ecological] sustainability" ethos an acronym: "LOHAS." Robb Dep. (JX2) at 28:25-30:4; PX01308.

105.  Whole Foods supports sustainable agriculture, wise environmental practices, and community and non-profit organizations. PX01301 at 002 (Whole Foods supports "organic farmers, growers and the environment through our commitment to sustainable agriculture and by expanding the market for organic products," respecting "our environment and recycle, reuse, and reduce our waste wherever and whenever we can," and recognizing "our responsibility to be active participants in our local communities."); *see also* Mackey IH (JX28) at 33:7-11; PX01375 at 006; LaMacchia IH (JX32) at 120:17-18, 122:6-8 (Whole Foods sponsors an Animal Compassion Foundation); *id.* at 122:6-7; ("[We] have the content in our welfare standards on our web site."); PX00011 at

035-039; PX02026 at 003; PX04413 at 005 (Lifestyle cues: organic, local, not tested on animals, uses recycled packaging, 200% recyclable.).

106.  Wild Oats engages in social and environmental causes, such as selling eggs from cage-free chickens, using polylactic acid ("PLA") compostable "corn-tainers," and selling Free Trade products.  PX00601 at 009; PX01332 at 053 (Wild Oats organic products made with ingredients grown by farmers who practice sustainable agriculture with no synthetic pesticides, herbicides or fertilizers); PX02954 at 003; Martin IH (JX34) at 92:4-10; PX000518 at 010; PX01298.

107.  According to its website, premium natural and organic supermarket firm Earth Fare believes "in supporting a healthy environment" and supports "the empowerment, development and wellness of our customers and staff by operating a successful business focused on education, fair trade, organic and local foods, and other healthy choices for the environment and ourselves."  PX04658.

108.  A National Marketing Institute Report "emphasizes the strong organic orientations, the lifestyle of health and environmental sustainability, all the attributes [the FTC] described as being common to premium natural and organic supermarkets". These customers "represent the majority of customers." Aug. 1, 2007 pm Tr. Mot. Hr'g at 103:22-104:5 (Bloom Arg.).

109.  The website of premium natural and organic supermarket firm New Seasons Market indicates that it gives preference to local growers, fishers, farmers and ranchers.  It notes that New Seasons Market takes a "proactive role in everything from the health of our food supply and those who consume it, to the health of our environment and those who reside in it.  New Seasons Market is proud to donate 10 percent of our after-tax profits to nonprofit . . . organizations in the Portland area.  Greatest attention is given to organizations dedicated to feeding the hungry, educating our youth and improving our environment."  PX04659.

### d.  Premium Natural and Organic Supermarkets appeal to a specific customer demographic

110.  Whole Foods and Wild Oats target shoppers who are . PX00718; PX01331A at 001 ("In terms of customer profile, the natural foods shopper tends to be ⬛⬛⬛⬛⬛⬛⬛⬛⬛. . . ."); Coblentz IH (JX33) at 18:22-19:6 ("demographic and psychographic profile" of the Wild Oats shopper is "⬛⬛⬛⬛⬛⬛ and interested in certain lifestyle issues"); PX02954 at 016; PX00677 at 018; PX04413; Meyer Dep. (JX10) at 92:9-20; Lannon Dep. (JX8) at 23:23-25; Bradley Dep. (JX6) at 19:12-20; PX00171; Paradise Dep. (JX 11) at 69:17-70:7.

21

111.   Wild Oats advertises on National Public Radio because the "demographic and psychographic profile" of the Wild Oats shopper is, like NPR listeners, "educated and affluent and interested in certain lifestyle issues." Coblentz IH (JX 33) at 18:22-19:6; *accord* Davidson Dep. (JX 13) at 23:13-:21 (████████████████████████████ ██████████████████████████████████████ ).

112.   Whole Foods documents discuss the "Whole Foods" demographic. PX04731 at 003 ("The world of ideas, as manifest in journalism, academia, and philanthropy, is largely controlled by a marketing demographic that might be described as the 'Whole Foods/Montessori parent/NPR listener' demographic . . . henceforth simply the 'Whole Foods' demographic").

113.   Customers who shop primarily at Defendants' stores are less likely to be price-sensitive than customers who shop primarily at conventional retailers. PX01045; PX01331A at 002; PX00671 at 004.

114.   Defendants' new store site selection decisions are based, in large part, on customer demographics, including ███████████████████████. Odak IH (JX 37) at 102:19-103:2, 106:10-12; Foster IH (JX 41) at 131:19-25, 133:24-25; PX02954 at 015; PX04360; Coblentz IH (JX 33) at 19:10-20:5; Chamberlain Dep. (JX 40) at 75:14-25; Paradise Dep. (JX 11) at 69:17-19; PX04448 at 002.

115.   The key finding in a SPINS/IRI research found that 12% of households account for 53% of natural sales and 85% of organic sales. PX00671 at 6.

116.   Wild Oats has used ████████████████████████████████████████ since at least the development of the ████████████████████ PX2901 at 013, 014; DX 487 at 32. Whole Foods' Vice-President of Corporate Development and Research for Whole Foods Gene Kadish stated that the psychographic clusters provided by ████████████ ████████████████████ of what we do in research. It's the basis of everything." PX02858 at 027.

117.   A Whole Foods' executive, Mr. Kadish, provided four psychographic clusters that he considered to be "immediate acceptors" of Whole Foods: ████████████████ █████████████████████████████████████. PX02858 at 027. Three of the same ██████████████████████████████████████████████████ ) also ranked in the top ██████████████████████ for Wild Oats. PX02901 (other high ranking clusters for Wild Oats included the ██████████████████████████████ ██████████████████████ ).

118.   Defendants take customer demographics into account when developing branding and marketing strategies. *See, e.g.,* PX01319; PX01321 at 001.

119.   In a speech given in late 2004, Whole Foods' CEO John Mackey said, "[A]s a food retailer we [Whole Foods] have a very unique brand. If you think about it, very, very few food retailers have any kind of brand at all. Most people could not tell you what Safeway or Kroger or Albertsons actually means. But Whole Foods Market has a position in the market's mind. It stands for something. It has a mission statement. It has quality standards. It is authentic, and this sets us apart and gives us competitive advantage." PX04692 at 002.

120.   Conventional retailers have a combination of features that are distinctly different from that of premium natural and organic supermarkets. They offer a wide selection of conventional products and compete aggressively on price. Murphy Report (PX2878) at ¶ 34. Conventional supermarket customers are less concerned about the breadth and quality of natural and organic items available, the shopping experience, or the appeal of a healthier lifestyle. PX01331A at 001; Foster IH (JX41) at 119:3-120:9.

121.   The "Natural Products Industry" section of Wild Oats' 2006 10-K states that "[d]espite the increase in natural foods sales within conventional supermarkets, we believe that conventional supermarkets still lack the concentration on a wide variety of natural and organic products, and emphasis on service and consumer education that our stores offer." PX00613 at 005.

122.   The Whole Foods Market brand connotes a "healthy, more healthful alternative to supermarkets." Boardman Dep. (JX 5) at 113:7-13.

123.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Hasker Dep. (JX25) at 129:2-20.

124.   "The natural food segment of retail is currently experiencing industry growth in the 5% to 8% range, compared to 0% to 2% for conventional food retailers." PX01331A at 001.

125.   "[A]verage gross margins for natural food retailers are in the 30% to 50% range, compared to 25% to 30%, on average, for conventional food retailers." PX01331A at 001.

126.   "In terms of pricing, natural foods retailers are premium priced, whereas conventional grocers' pricing is highly promotional and is deflationary in selected categories." PX01331A. *See also* PX01202; DX52; DX509; DX510; DX519.

23

127.   "[T]he conventional food shopper is more difficult to define and spans the socioeconomic continuum, she tends to shop for convenience and value and isn't typically committed to a particular store." PX01331A at 001.

128.   Only about 30% of conventional supermarkets' revenues are from the sale of perishables, compared to over 60% perishable revenues for Wild Oats. Odak IH (JX37) at 39:9-21.

129.   Whole Foods and Wild Oats provide shopping experiences that are significantly different from conventionals. The Organics 2006 national study conducted by the Hartman Group found that:

> Consumers have varied expectations depending upon the retail environment they are in. In other words, a shopper has different expectations about organic products depending upon whether they are shopping at mainstream grocers such as Safeway or a large-format natural foods store such as Wild Oats or Whole Foods Market. While this same consumer shops at both retailers, they tend to shop at each for different things (*e.g.*,. Wild Oats for fresh and specialty items, Safeway for canned and packaged goods). Consumers are typically not expecting a mainstream grocery store to be an environment in which to discover new organic products. Rather, they are utilizing the store habitually, for functional needs, for convenience, or for shopping advertised sales. In contrast, these same consumers may be taking the extra time and energy to find organic products at Wild Oats. This extra time and energy are spent because consumers expect that the natural foods store will deliver a natural and organic experience, a 'treasure hunt' of sorts. This is especially true in the produce, bakery or meat departments.

PX02072 at 110.

130.   Whole Foods does not "feel like Kroger and Albertson's and those guys." Mackey IH (JX28) at 33:12-13. *See also* DX565 (conventional supermarkets "are chasing a moving target. Although you can get organic produce and different things at Safeway and Wal-Mart, is that the kind of place you want to hang out?").

131.   Unlike Whole Foods and Wild Oats, conventional supermarkets do not emphasize natural and organic products, environmental and social responsibility, superior customer service, and lifestyle in their 10-K Reports. *See, e.g.*, PX04402 (SuperValu); PX04403 (Wal-Mart); PX04404 (Kroger); PX04405 (Delhaize); PX04406 (Publix).

132.   "Both the Wild Oats and Whole Foods brands, as specialty/destination retailers, represent a superior grocery shopping alternative for consumers. Both stores offer a more

24

premium, pleasant and relaxed shopping environment. Both brands focus almost exclusively on food (unlike conventionals who are increasingly adding non-food items – from toys to office supplies to clothing – in their attempts to compete with Wal-Mart, club stores, etc.). And, both stores offer a more high-touch customer service emphasis compared to conventional grocery stores. Both Wild Oats and Whole Foods offer the consumer a more epicurean experience. Our offerings deliver the highest taste experience possible: produce is the freshest available; meats, the most tender; our coffee, the most robust, etc. Additionally, we both carry unique items not commonly found in conventional supermarkets. And we both carry extensive varieties/sku's within a category (*i.e.*, breadth of offerings within categories. For example, while almost all conventionals carry soy milk, we both offer significantly more flavors and pack sizes."). DX571 at 2, 3.

133. In asserting that premium natural and organic supermarkets are in the same relevant market as conventional supermarkets, Defendants have created declarations in conflict with their own contemporaneous business documents. Paradise Decl (DX 368) at 46-47 states: "In Boulder, Whole Foods initially lost █████████████████████ to the new Safeway Lifestyle, in spite of a █████████████████ and an action plan to respond." Mr. Paradise's own contemporaneous documents in fact paint a different picture, to illustrate: "Safeway impact seems to have leveled off as we [Whole Foods] hover around the pre-[Safeway] opening sales totals" (PX00054) and "natural beef [at Safeway Boulder] was not moving and "fresh fish look tired." (DX480).

134. "[L]ittle weight can be given to testimony which is in conflict with contemporaneous documents." United States v. U.S. Gypsum, 333 U.S. 364, 396 (1948).

135. 68% of Whole Foods shoppers are "core" or infra-marginal customer with a strong preference for health, natural and organic products, and social and environmental consciousness. Scheffman Report (PX02066) ¶¶ 160-61.

> (i)  **Premium Natural and Organic Supermarkets Affect One Another's Sales and Profits More Than Other Food and Grocery Retailers Do**

136. Wild Oats' former CEO, Perry Odak, testified that Whole Foods was the only retailer capable of causing a significant drop in Wild Oats' sales. Odak IH (JX37) at 120:5-9.

137. Wild Oats' data and projections treated the opening of nearby conventional and other types of retailers as causing ██████████████████ by Wild Oats than the opening of a Whole Foods nearby. For example, the opening of a Trader Joe's four miles from ██████████████████████ generated only a ██████████████ in Wild Oats sales. PX00914 at 005. The opening of a Super Wal-Mart in ██████████████, virtually across the street (0.25 miles) from a Wild Oats, was projected to ██████████████ at the Wild Oats

25

store by only ████ percent.  PX00914 at 007.  In contrast, when a Whole Foods opens within a several mile radius, revenue ████████████████████.  PX00914.

138.  Whole Foods' CEO, John Mackey wrote, "Please produce any evidence that Wal-Mart, Costco, Ralph's, Safeway, Kroger, etc. ha[s] ever hurt Whole Foods by selling organic foods. . . .  Whole Foods is successful not because it sells organic foods – any idiot can do that – but because it has higher quality perishable foods across the entire store – better, fresher produce, seafood, meat, bakery, and prepared foods.  The company you love so much, Wal-Mart, does a particularly poor job selling perishable foods.  Whole Foods quality is better, its customer service is far superior, and the store ambience and experience it provides its customers is fun, entertaining, and educational – something none of those other companies you named can claim."  PX00751A.

139.  Whole Foods' South Regional President testified "[m]y opinion is that Publix, Kroger, Harris Teeter price competitively lower on items that they compete -- specifically like let's say Coke or Pepsi, they price items that -- like that, but in items that are natural and organic, they don't price them as competitive, and we sell more of those products, so I believe we get better pricing on it, and that affords us the opportunity to sell them lower than they do.  So if you're talking about Annie's Mac and Cheese as an example, my opinion is that we can sell that product cheaper than they do."  Allshouse Dep. (JX 4) at 65:11-21.

140.  The Hartman Group, a well-respected industry analyst, in a report prepared for Whole Foods, concluded: "It is our belief that WFM will not encounter significant, if any, competition from leading mainstream retailers (Safeway, Wal-Mart, Costco, etc) entry into organics. . .  Most other major retailers lack the ability to consistently generate authentic, high quality food experiences."  PX02508 at 026; *see also* Boardman Dep. (JX 5) at 96:8-97:3.

141.  Whole Foods' "Known Value Items" ("KVI") are products that consumers purchase frequently across retailers and are important to a store's pricing image.  PX00131 at 027.  KVIs represent only between ████████████████████) of the total store SKU count of Whole Foods.  PX00131 at 027.  ████████████████████████████████████████████████.  Paradise Dep. (JX11) at 130:12-25.  According to Whole Foods' VP of Procurement, Whole Foods quit doing this KVI program nationally.  LaMacchia IH (JX 32 at 199:17-200:25).

142.  Whole Foods and Wild Oats executives believe that conventional supermarkets do not constrain Whole Foods' and Wild Oats' pricing.  Allshouse Dep. (JX4) at 65:11-21; *see also* Odak IH (JX37) at 122:10-123:12.  In many price checks, conventionals are priced higher than premium natural and organic supermarkets on natural and organic items.  *See* PX01202; DX52; DX508; DX509; DX510; DX519.

26

          **(ii)**     **Conventional Supermarkets Adding Organic Products items do <u>not</u> hurt Whole Foods sales revenues**

143.    According to Wild Oats' 2006 10-K, "In recent years, several of the larger conventionals have significantly expanded their natural and organic foods and body care products, and have expanded their offerings of vitamins and supplements. We believe that the principal competitive factors in offering natural foods include customer service, quality and variety of selection, store location and convenience, price and store atmosphere." PX00613 at 012; PX02171 at 002.

144.    According to one Whole Foods executive, "Other retailers are always picking up organic products and we keep seeing double-digit comps. We keep gaining share and we don't see them adding these products as having a great impact." PX00819 at 001.

145.    Conventional supermarkets increase in offering natural and organic products helps Whole Foods' sales, rather than hurts them. PX00532 at 001-002 ("We believe that the fact that our comparable store sales have been running above our historical average over the same time frame that conventional supermarkets have stepped up their offering of natural and organic products is evidence that, rather than hurting us, they are in fact helping us.")

146.    Whole Foods' CEO John Mackey explained in an analyst call that although "we've seen many competitors over the years add a limited selection of natural and organic commodity products . . . that has not hurt us . . ." PX00182 at 005.

147.    According to Whole Foods' CEO, John Mackey, "All those [conventional supermarkets and club stores] you named have been selling organic foods for many years now. The only thing 'new' is that they are now beginning to sell private label organic foods for the first time. However, they've been selling organic produce and organic milk for many years now. Doing so has never hurt Whole Foods." PX00751A at 001.

148.    On April 21, 2005, Mackey/rahodeb wrote "All this move [by Safeway into more natural products] will do is help Whole Foods get even stronger by introducing more customers to Whole Foods type products. Eventually thousands of these people will trade up to Whole Foods." PX00809.

          **(iii)**     **Conventional supermarkets adding organic products actually serves as a gateway for more consumers to Whole Foods and Wild Oats**

149.    According to Wild Oats' former CFO, Bob Dimond: "With regard to conventionals getting into natural and organic foods, we really see this as serving as a gateway to our stores rather than a competitive threat. The focus [of the conventionals] so far has been

on the nonperishable categories and what they are doing is introducing new customers to the brands we carry, and when customers want more information, service and selection, they come to our stores." PX02704 at 010; *see also* PX00532 at 001-002.

150.  In a Q3 2006 investor call, Whole Foods CEO John Mackey told investors that: "due to [Whole Foods'] success, we have seen many competitors over the years add a limited selection of 500 to 2,000 natural and organic SKUs. This has created a gateway experience as evidenced by our comps." PX2026 at 003.

151.  Whole Foods regularly dismissed conventional supermarkets' efforts to offer natural and products: "We believe that by offering natural and organic products, supermarkets are raising customers' awareness and interest levels in these products and serving as a "gateway experience" to shopping with us. Once customers try natural and organic products and want to experiment further, they come to Whole Foods Market . . . . We believe that the fact that our comparable store sales have been running above our historical average over the same time frame that conventional supermarkets have stepped up their offering of natural and organic products is evidence that, rather than hurting us, they are in fact helping us." PX00532; PX04413 at 007 ("Whole Foods shoppers trust WFM to be the gatekeeper for natural and organic product.).

152.  Whole Foods told its investors that it had "seen many competitors over the years add a limited selection of 500 to 2,000 natural and organic SKUs. To understand why this has not hurt us, but has instead created a gateway experience as evidenced by our strong historical comps, you have to understand that Whole Foods Market is about much more than just selling "commodity" natural and organic products. We are a lifestyle retailer and have created a unique shopping environment built around satisfying and delighting our customers. Our stores feature over 30,000 natural and organic SKUs and our emphasis on the highest quality perishables, which are just under 70 percent of our sales and gradually increasing, broadens our appeal beyond the core natural and organic food customer." PX01002.

153.  A SPINS study prepared for Wild Oats to "[h]elp Wild Oats better understand the Natural Products consumers and make recommendations to target the different natural/organic consumer groups" found that the "exposure of natural products to consumers who shop in conventional retailers is benefiting natural retailers by - creating interest in the segment - Increasing awareness of the segment - Generating trial of natural/organic products." PX00671 at 001, 010.

> **(2)    Upscale Conventionals, Such as Safeway Lifestyle, Are Significantly Differentiated from Premium Natural and Organic Supermarkets**
>
> **(i)    Not Same Offerings**

28

**154.** ███████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████. Hasker Dep. (JX25) at 23-24, 32-34.

155. A Safeway Lifestyle store may offer 40 to 45 SKUs of organic perishable products, compared to approximately ███ at a Wild Oats store and ████████████ of organic produce alone (not to mention other perishables) at a Whole Foods store. Odak IH (JX 37) at 77-79 ("So you can walk into any Safeway today, and I've walked hundreds of Safeways and counted the number of organic items even in their new stores, in produce, and it's 48 to 50 SKUs. . . . Whole Foods/Wild Oats probably has ████████ in the department." Odak IH (JX37) at 78:2-6; LaMacchia IH (JX32) at 40.

**156.** ███████████████████████████████████████
███████████████████████████████████████
████████████.

**157.** ███████████████████████████████████████
██████████. Hasker Dep. (JX25) at 60:23-61:3 ("█████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████").

158. Wild Oats' former CEO explains: "I never believed it was the same shopper that was shopping Safeway, you know, so it was – it was more in relation to Whole Foods . . . ." Odak IH (JX37) at 46:13-16.

**159.** ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████).

160. Whole Foods' CEO, John Mackey, stated that "[Whole Foods'] supply chain management for perishable foods is a decade ahead of any of these conventional markets. Safeway will never be able to match it or even come close to it. . . . Whole Foods [has] authenticity, integrity, and the power of their brand with their customers. This creates strong loyalty from their customer base--something Safeway doesn't have and likely never will have." PX00809A.

**161.**  . PX00193.

      **(ii)**    **Safeway causes little to no impact on Whole Foods or Wild Oats**

162. According to Whole Foods' CEO John Mackey, "A competitor to WF must be nearly as good as WF to have an impact. If within 2-3 years there are 30-60 of these new Safeways and many of them are within WF's trade area, I have considerable doubt that WF will be negatively impacted at all." PX00799.

163. Whole Foods' CEO, John Mackey, says he has "never seen Safeway or any other conventional supermarket operator ever hurt Whole Foods at any time or in any place in the past. I've watched many of them try, though. Kroger with their 'Fresh Fare' concept and 'Signature Stores.' Safeway has tried in Northern California to hurt Whole Foods by 'upscaling' their stores without success." PX00799.

164. On April 21, 2005, Mackey/rahodeb wrote "Do you really want to state that 144 Safeways converting to its new format is harmful to WF? A competitor to WF must be nearly as good as WF to have an impact. If within 2-3 years there are 30-60 of these new Safeways and many of them are within WF's trade area, I have considerable doubt that WF will be negatively impacted at all." PX00798.

165. Whole Foods Regional President of the Rocky Mountain Region, William Paradise, commented, "The Safeway impact seems to have leveled off as we hover around the pre opening sales totals. We have seen a drop off in Safeway's commitment to service as their opening budget seems to have gone away (typical with all Safeway lifestyle stores that after 8 weeks the labor from other stores and regional goes away)." PX00054.

166. In February 2007, Whole Foods' CEO John Mackey explained to Whole Foods' Board of Directors that Safeway had a negligible impact on Whole Foods: "Safeway is continuing to roll out their 'Lifestyle Stores.' I don't believe these stores have had much real impact on us, although they've increased Safeway's comps a couple of hundred basis points (not that much when you consider the immense amount of capital invested)." PX01304.

167. Whole Foods lost $30,000 per week in revenues after the February 2006 opening of Safeway's flagship Lifestyle store in Boulder. However, that loss lasted for only a ▮▮▮- month period before Whole Foods revenues returned to prior levels. Whole Foods Regional President observed: "Boulder: The Safeway impact seems to have leveled off as we hover around the pre opening sales totals. We have seen a drop off in Safeway's commitment to service as their opening budget seems to have gone away (typical with all

30

Safeway lifestyle stores that after 8 weeks the labor from other stores and regional goes away." *See* PX00543; PX00131, Slide 20; PX01004 at 023

168.   According to Safeway, Whole Foods is very different from Safeway or Safeway Lifestyle:



Hasker Dep. (JX25) at 128:18-129:20, 171:5-172:3.

**169.**   25.

        **(3)**    **Hannaford is significantly differentiated from Premium Natural and Organic Supermarkets**

        **(i)**    **Not Same Offerings**

**170.**   

171. ███████████████████████████████████
███████████ Vail Dep. (JX21) at 108:6-11.]

172. [███████████████████████████████████
█████. Vail Dep. (JX21) at 110:7-110:15.]

173. [███████████████████████████████
█████. Vail Dep. (JX21) at 110:16-110:21.]

174. ███████████████████████████████
███████████ Vail Dep. (JX21) at 139:4-9, 142:1-2.]

175. [███████████████████████████
█████. Vail Dep. (JX21) at 50:16-50:19.]

176. [███████████████████████████████████
█████████████████████. Vail Dep. (JX21) at
14:4-10.]

177. [█████████████████████████████
███████████████████. Vail Dep. (JX21) at 143:10-
147:9]

178. [███████████████████████. Vail Dep. (JX21) at
143:23-144:14.]

**(4)    Trader Joe's is significantly differentiated from
Premium Natural and Organic Supermarkets**

**(i)    Not Same Offerings**

179.    "Whole Foods Market and Trader Joe's are different. They overlap but they are
different." Mackey IH (JX28) at 209:12-13, 211:10-13. Whole Foods does not consider
Trader Joe's a conventional store: "they're kind of their own little market." Bradley Dep.
(JX6) at 40:23-41:4. ██████████████████████████████
███████████████████████████.

180.    According to Whole Foods' CEO John Mackey, "TJ's is a completely different concept
than WFMI. WFMI's business is all about perishables--fresh produce, fresh seafood,
fresh meat, in store delis, juice bars, and bakeries. WFMI has stated that more than 50%
of their sales are in these categories of products--categories which TJ's doesn't even have.
TJ's is primarily a discount private label company with a large wine selection. I like their
stores. They have some pretty good prices on their stuff. However, they are not WFMI's

primary competitor because their concept and product mix is so different than WFMI."
PX01307A.

181. Trader Joe's does not offer meat, seafood, bakery, prepared foods or cheese counters with
knowledgeable staff. Bane IH (JX 39) at 62:5-63:4 ("[O]ur format is going after value,
and I just don't see that, you know, adding a service department provides value for our
customers so we don't do it. We're real dogmatic about it, because our stores are the size
that we can't – we can't support service departments.").

182. Trader Joe's does not provide its customers with services such as sushi counters,
cafeterias, pizza, or juice bars. Bane IH (JX 39) at 47:4-48:11; Bane Dep. (PX02865) at
52:11-:24.

183. Trader Joe's would reject the idea of adding service departments, Bane IH (JX 39) at
62:16-18, because "[they] don't want you to stay in the store sipping your coffee." Bane
IH (PX01322) at 48:3-4; Bane Dep. (PX02865) at 109:5-110:4.

184. The CEO of Trader Joe's, Daniel Bane, testified that "[Trader Joe's is] a very focused
format. We don't offer service departments . . . ██████████████████████
████████████." Bane IH (JX 39) at 47:4-5, 116:23-24.

185. Trader Joe's cannot be described as a "third place." Bane IH (JX 39) at 48:15-22.

186. ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████." Bane IH (JX
39) at 71:18-23; see LaMacchia IH (JX 32) at 84:11-16 ("Trader Joe's is essentially a
cherry-picker. If they've got– if they've got 65 SKUs in their meat case, only half of
them or less than half of them are really natural. The others are conventional. They
won't have the full spectrum of SKUs that the customer comes into our store expecting to
get."); see also Bane IH (JX 39) at 55:7-10 ("████████████████████████████
████████████).

187. Whole Foods' Co-President and COO Walter Robb testified "Let's say you go into
Trader Joe's and you go to the olive oil section . . . all their olive oils sell for $7.99. You
go into Whole Foods. We have the same $7.99 olive oil, but we have olive oils from
Spain and Turkey and all over the world that are up to 15, 16, 19.99. So what he's saying
is the perception is that we are more expensive. We have the same price point as they do,
but they put most of their SKUs at that price point." Robb IH (JX 29) at 289:3-6.

188. Trader Joe's stores follow a simple layout and design that cannot be described as high-
end. Bane IH (JX 39) at 105:2-10 (stating that if anyone tried to change a Trader Joe's
format to include services such as kitchens, bakeries, and cafeterias, he would "bite their

33

head off". . . "Because it's not us. Part of my job is staying very true and focused to what we do. We don't assume that we would be good at doing what we don't do, and we don't -- we don't stray from that**.").**

189.    Trader Joe's "format is far simpler and less service-oriented and less perishables, prepared foods oriented" than is Whole Foods. Foster IH (JX 41) at 189:3-5.

190.    ███████████████████████████████████████████. PX00163 at 002; PX00749A.

191.    Trader Joe's is not "a natural and organic supermarket retailer," "a gourmet supermarket," "upscale," "epicurean," "expensive," or a "third place." Bane IH (JX 39) at 162:8-165:15; 48:15-22; *see also* Bane IH (JX 39) at 154:5-7 ("██████████████████████████████████████████████████.").

192.    In 2000, Whole Foods' CEO John Mackey, as Rahodeb, noted that while he admires Trader Joe's, "they are not WFMI's main competitor – OATS is." PX 00710. Mr. Mackey also said that "Whole Foods Market co-exists very well with Trader Joe's in most markets that we compete with." Mackey IH (JX28) at 209:12-13.

193.    Conventional and premium natural and organic supermarkets typically carry at least 25,000 different items, *see, e.g.,* PX01002b; Paradise IH (PX02874) at 52:20-23; Trader Joe's only carries about 2,000. L. Lewis, *The Trader Joe's Adventure* 20 (2005); PX00196.

194.    Whole Foods "[has] between 30,000 and 40,000 great products in our stores. Our customers no longer need to make that special trip to Trader Joes's to buy the 15 items they buy there because it is a better price." PX04415; PX02026 at 3.

195.    Trader Joe's carries a limited product selection of around 2,000 items. L. Lewis, *The Trader Joe's Adventure* 20 (2005); PX00179.

196.    ████████████████████████████████████████████████
████████████████████████████████████████

197.    ████████████████████████████████████████████████
███████████████████████████████████

198.    ███████████ stocks natural and organic product across the various categories in its stores, but it does not emphasize natural and organic product over conventional in any category. ████████████████████████████████████████
████████████████████████████████████.**").**

199.  . Bradley Dep. (JX6) 50:22-24.

200.  Around 80% of the items Trader Joe's sells are sold under a Trader Joe's store or control brand. Bane IH (JX 39) at 85:7-86:23.

201.  ███████████████████████████████████████████████
      ███████████." PX00670 at 50.

202.  Trader Joe's stores average just under 11,000 square feet in size; conventional supermarkets and premium natural and organic supermarkets typically exceed 25,000 square feet and may be as large as 80,000 square feet. Bane IH (JX 39) at 44:20-25; Bane Dep (PX02865) at 8:16-:17, 120:1-:3 ███████████████████████
      ███████████████████); Odak IH (JX37) at 113:8-12; 118:19-23; PX00171; Foster IH (JX41) at 135:23-36:2.

203.  "While Trader Joe's has a marked appeal to some [Whole Foods] consumers, the overall Trader Joe's experience fails to resonate at the same high level of quality of the [Whole Foods] retail experience." PX02508 at 010.

204.  According to Whole Foods Co-President Walter Robb, Wild Oats' quality standards are closer to Whole Food's standards than are those of a store like Trader Joe's that sells some organic and some conventional products. Robb IH (PX01327) at 212:15-213:8.

205.  "High quality perishable foods (both commercial and organic) is the key to [Whole Foods'] business model – produce, meat, seafood, bakery, prepared foods. This is over 70% of Whole Foods total sales. Wal-Mart doesn't sell high quality perishables and neither does Trader Joe's while we are on the subject. That is why Whole Foods coexists so well with TJ's and it is also why Wal-Mart isn't going to hurt Whole Foods." PX00749A (John Mackey/rahobed).

206.  Trader Joe's makes it "a point not to be involved in" environmental issues. Bane IH (JX 39) at 165:3-9.

207.  Trader Joe's does not position itself to be an environmentally or socially aware retailer. Bane IH (JX 39) at 165:1-2 ("We're not leading some - - some revolution in being green."); *see also* Bane IH (JX 39) at 162:18-20 ("We don't try to lead our customers on issues we think are important, because we don't think that's out – purview").

         **(ii)**      **No Impact or Not Same Impact as Whole Foods or Wild Oats**

208.    Trader Joe's often locates stores close to Whole Foods or Wild Oats stores without intense competition developing between the two. PX00162 at 003 (Whole Foods' CEO explains: "Trader Joe's continues to rapidly expand, but our new large store format has created a large comparative gap with them. TJ's is now a "fill-in" store for Whole Foods, but lacks a wide enough product selection to be considered to be a complete alternative to our stores.").

209.    "Whole Foods coexists so well with TJs . . . ." PX00749A at 001; PX00162 at 003 (September 2006) (Mackey reports that Trader Joe's still a "fill-in" store for Whole Foods' customers); *see also* PX02072 at 010 ("While Trader Joe's products have a marked appeal to *some* (italics in original) WFM consumers, the overall Trader Joe's experience fails to resonate at the same high level of quality the WFM retail experience.").

210.    "Wild Oats stores never had an issue about competing against Trader Joe's [because]. . . . Trader Joe's to the consumer is considered a budget, eclectic alternative. . . It's not where you go to get groceries on a regular basis because, you know, what goes in there, you know, one, it's not a complete shop, and two, it changes so frequently. We were deathly afraid of Trader Joe's until we opened up Long Beach, and the Trader Joe's is two or three blocks up the street, probably does a thousand dollars a square foot. That store has performed exceptionally well. Trader Joe's doesn't bother it whatsoever. . . . If you were the farmers' market format, a big issue. Okay? But in Oats, my memory is it became a nonfactor, not -- something we did not worry about." Odak IH (JX37) at 122:10-123:12.

211.    Wild Oats monitored a new █████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████" PX00520 at 002.

212.    █████████data and projections treated conventional and other types of retailers as significantly less intrusive than ████████████. For example, a ████████████four miles from ██████████████████generated only a ████████████. PX00914 at 004.

213.    "We can compete well with a new conventional store, but when Whole Foods opens a new store in one of our markets, we lose significant sales." PX01260 at 005; *see also* DX487.

         **(5)**      **Mass merchandisers and club stores such as Wal-Mart and Costco are significantly differentiated from Premium Natural and Organic Supermarkets**

### (i)    Not Same Offerings

214.    Wal-Mart is not a premium natural and organic supermarket. PX00819. ("Comparing Whole Foods Market and Wal-Mart is like comparing apples to oranges. [They] are just two different types of businesses. Whole Foods Market has created a unique shopping experience built around satisfying and delighting our customers. We're a lifestyle brand more about the quality of experience for the customers -- service, prepared foods mix, our bakeries.").

215.    Wild Oats ordinary course of business documents do not mention mass merchandisers like Wal-Mart as one of Wild Oats' competitors. PX00670 at 45-51.

216.    Whole Foods' CEO John Mackey described the differences between his stores and Wal-Mart: "Whole Foods quality is better, its customer service is far superior, and the store ambience and experience it provides its customers is fun, entertaining, and educational." PX00751A.

217.    Club stores and mass merchandisers do not offer a large selection of natural and organic products. PX01045.

218.    Wal-Mart does not sell high quality perishables. Gallo Dep. (JX2) at 165:10-14; PX00749A.

219.    Wal-Mart and Whole Foods appeal to two different types of customers. PX04420 at 005 ("It means that the mass market is segmenting in food – just like it is doing in every other category as well. Some people want the cheapest food and some people want the highest quality food with high levels of customer service. Wal-Mart meets the first group of people and Whole Foods meets the needs of the second group."). *See also* Murphy Report (PX02878) at ¶ 34 (mass merchandisers such as Wal-Mart differ in their overall business model).

220.    "Whole Foods doesn't operate in the same markets as Wal-Mart and it caters to a higher-income shopper." PX04447 at 002 ("Right now I don't see too much of a customer overlap between Whole Foods and Wal-Mart.").

221.    Wal-Mart has "backed off aggressive plans to offer more organic foods." PX01045. ("A number of organic farmers across the country say that Wal-Mart has backed off aggressive plans to offer more organic foods. After placing large orders for organic apples and juices last year, the retailer is cutting back or stopping orders altogether. Wane Groetsch, president of the Florida Juice producer Blue Lake Citrus Products, says he stopped shipping his organic orange/tangerine blend to Wal-Mart after a few months. 'The sales there just weren't enough to justify our costs of packing and shipping,' he

says.”); *see also* Sud IH (PX01340) at 122:20-128:24-25 (  ).

222.   “A year ago last March, Wal-Mart grabbed headlines by announcing its organic push. Steven Quinn, a top marketing executive, told investors at a Bear Stearns conference that the company would double the number of organic food items in its stores to 400 and offer them 'at the Wal-Mart price.' But now Karen Burke, a spokeswoman for the company, says that the majority of Wal-Mart stores are offering between 100 and 200 organic food items. She says the company does not have a target, at least not a public one, of stocking 400 organic items in the average store.” PX1045.

223.   
PX04411.

224.   On March 4, 2007, John Mackey thanked Irwin Simon, a third party witness from Hain Celestial, for ‘defend[ing]” Whole Foods in an interview, and invited him to “talk about how we can optimize our business relationship together.” PX00767-002. Walter Robb added that Mr. Simon “does it with the analysts too who call constantly looking to say WFM has poor vendor relationships.” PX00767-001. Mackey noted that “Irwin [Simon] has already made some tough decisions - foregoing the expansion of Earths Best into Wal Mart for example - and in favor of partnering and growing with us.” PX00767-001.

225.   ███████████████████████████████████████████. Boardman Dep. (JX5) at 80:12-22.

### (ii)    No Impact or Not Same Impact as WF or WO

226.   “Wal-Mart isn’t going to hurt Whole Foods,” according to John Mackey. PX00749A.

227.   As recently as February 2007, CEO John Mackey reported to the Whole Foods Board of Directors that “Wal-Mart, despite the hoopla in the media, hasn’t had much impact in the organic market. I doubt they will because their core customers don’t want to pay the higher prices and their non-core customers don’t want to shop there for various reasons.” PX01304 at 2.

228.   Market participants agree that Whole Foods and Wild Oats appeal to different customers than Wal-Mart does. One market analyst said, "Right now I don't see too much of a customer overlap between Whole Foods and Wal-Mart. Whole Foods doesn't operate in

the same markets as Wal-Mart and it caters to a higher-income shopper." A retail consulting group agrees: "I don't see Wal-Mart as a great threat to Whole Foods right now . . . The disparity of their customer base is too great." Wild Oats spokeswoman Sonja Tuitele said the company was not too worried. "There's very little overlap between our shoppers and Wal-Mart's. We're a specialty retailer and our customers don't focus on price first." PX04447 at 002-003.

229.    A Whole Foods manager noted that "[t]here doesn't seem to have been any significant impact on total sales from the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮]. The revised ▮▮▮▮ ▮▮▮▮▮▮, based more on ▮▮▮▮▮▮▮▮▮▮▮▮, continues to show a positive impact on both ▮▮▮▮▮▮vs. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮." PX00770.

230.    A ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, located virtually across the street (0.25 miles) from ▮▮▮▮▮was projected to ▮▮▮▮▮▮▮▮▮▮▮▮. PX00914 at 006.

231.    On September 28, 2005, Mackey/rahodeb wrote that "If you are waiting for Trader Joe's or Wegmans to slow down the Whole Foods express train you're going to be waiting the rest of your life. It ain't gunna happen." PX00796.

### (6)    Other regular conventionals are significantly differentiated from Premium Natural and Organic Supermarkets

#### (i)    Not Same Offerings

232.    In contrast to premium natural and organic supermarkets, only about 30% of conventional supermarkets' revenues are from the sale of perishables. Odak Dep. (JX37) at 39:9-10.

233.    Conventional retailers generally aim to provide a wide selection of conventional products for price-conscious shoppers who are not as concerned about the breadth of natural and organic products offered, the shopping experience, or the appeal of a healthier lifestyle. PX01331A at 001.

234.    Mr. Bradley, one of Whole Foods' Regional Presidents, observed limited organic produce offerings at conventional supermarkets in Chicago and found that stores like Jewel and Dominicks carried only one variety of organic bananas, potatoes, and oranges, and no organic onions. Bradley Dep. (JX6) at 128:14-132:19.

235.    []

236.    . (JX25) at 128:16-
131:4.].

237.   According to Wild Oats, it "regularly introduces new natural, organic gourmet and locally
grown products in [its] stores to differentiate [its] merchandise selection from products
carried by conventional supermarkets." PX02026 at 1.

### (ii)    No Impact or Not Same Impact as WF or WO

238.   John Mackey dismissed the possibility that Safeway or Kroger could reposition in any
manner capable of impacting Whole Foods: "I've never seen Safeway or any other
conventional supermarket operator ever hurt Whole Foods at any time or in any place in
the past.  I've watched many of them try, though.  Kroger with their 'Fresh Fare' concept
and 'Signature Stores.'" PX00799A.

239.   Whole Foods' CEO  John Mackey predicts that "Safeway and other conventional retailers
will keep doing their thing – trying to be all things to all people.  They can't really
effectively focus on Whole Foods Core Customers without abandoning 90% of their own
customers."  PX00785A.

### (7)    Gourmet markets are significantly differentiated from Premium Natural and Organic Supermarkets

### (i)    Not Same Offerings

240.   Gourmet grocers focus on prepared foods and unique, upscale offerings rather than the
assortment of natural and organic SKUs found in a Whole Foods or Wild Oats.  Murphy
Report (PX02878) at ¶34; Foster IH (JX41) at 97:24-98:3.

241.   Whole Foods reported that gourmet grocer Balducci's New York City flagship store
"seems to be a dud and . . . has not really affected us."  PX01005 at 006.

242.   Whole Foods and Wild Oats do not view upscale "foodie" supermarkets as significant
competitive constraints even though these gourmet grocers offer perishables than
conventional supermarkets.  Coblentz IH (JX33) at 51:18-53:25.  In this regard, Whole
Foods reported that Central Market, Fresh Market, and Plum Market were unlikely to
impact Whole Foods.  *See* PX00034 at 013-014.

243. Wegman's, Central Market and Plum Market are not present in any of the overlap markets. Murphy Report (PX02878) at ¶ 79; *see also* Odak IH (JX37) at 154:2-5 ("they're a small -- not small, but they're a regional player, you know, in a regional marketplace, so you know, is Wegmans going to all of a sudden go national? I don't think so."); PX01011. Gourmet grocer, Dean & Deluca, is characterized by senior Whole Foods management as being "the most expensive operator in the market," having a "very limited" selection. Paradise IH (JX 31) at 153:5-17.

**(ii)    No Impact or Not Same Impact as Whole Foods or Wild Oats**

244. HEB's Central Market has not affected Whole Foods. Walter Robb reported that "███████████ completed a ███████████ of their ███████████ location in anticipation of our new ██████ store. This has had no impact on our ██████ stores." PX04414 at 004.

**245.** 
.").

246. Major gourmet supermarket chains, Wegman's, Central Market and Plum Market, are not present in any Whole Foods/Wild Oats overlap market. Murphy Report (PX02878) at ¶ 79.

**B.    Plaintiff's Economic Analysis Confirms the Product Market Definition**

**1.    Professor Murphy**

247. The Expert Reports and testimony in court of Professor Kevin Murphy are highly credible.

248. Professor Murphy is a highly distinguished expert in applied economics, industrial organization, and econometrics. He carefully educated himself about the factual record in this proceeding, and conducted several careful and objective empirical analyses in support of his Expert Reports and testimony.

249. Professor Murphy applied the same diligence and methodological integrity to his work in this matter that he has applied to his many works published in peer-reviewed economics journals.

250.    The analyses and conclusions of Professor Murphy, especially when considered in the light of the totality of other evidence in this proceeding, must be accepted as well supported and correct.

251.    Professor Murphy's key conclusions are that:

a.    Wild Oats and Whole Foods are both premium brands that specialize in offering consumers natural and organic products. Murphy Report (PX02878) ¶ 5.

b.    The similarity of the product offerings and target demographic of Whole Foods and Wild Oats makes them particularly goods substitutes in the eyes of many consumers. Murphy Report (PX02878) ¶ 5.

c.    Statistical analyses of prices, margins and sales confirm that Whole Foods and Wild Oats are each other's most significant competitors in many local markets. Entry by Whole Foods into a local market where Wild Oats currently operates causes Wild Oats sales to fall by roughly 37%, margins to fall by 1-3%, and prices to fall by 1-2%. No competitor other than a premium natural and organic supermarket has similar effects on either Whole Foods or Wild Oats. Murphy Report (PX02878) ¶ 6.

d.    The statistical evidence on entry illustrates, and the factual evidence from documents, deposition testimony, and industry accounts confirms, that changes in the level of competition between and among PNOSs, and Whole Foods and Wild Oats in particular, can adversely affect outcomes, prices, and margins. Murphy Report (PX02878) ¶ 7.

e.    In the local markets in which 19 Wild Oats stores compete head-to-head with Whole Foods or but for the proposed acquisition soon would do so, the proposed acquisition will reduce competition and harm consumers. Murphy Report (PX02878) ¶ 8.

f.    In the roughly ███ markets in which Whole Foods plans to close acquired Wild oats stores, the proposed acquisition will reduce competition and harm consumers in a variety of price and non-price dimensions. Both Whole Foods and Wild Oats respond to competition from one another uniquely. This increment of competitive discipline will be lost in these markets. Murphy Report (PX02878) ¶ 9.

g.    In addition, Wild Oats shoppers will be compelled to shop at a less-favored option. ████████████████ of Wild Oats shoppers will, according to Whole Foods' documents, be diverted to Whole Foods. As a result, they will unambiguously be worse off, suffering a substantial quality adjusted price increase. Murphy Report (PX02878) ¶ 10.

42

h.  Using the framework of the *1992 Horizontal Merger Guidelines*, customers in the Premium Natural and Organic Supermarket market defined by the Commission will be harmed by the proposed acquisition, which is anticompetitive in numerous geographic markets. Murphy Report (PX02878) ¶ 12, 13.

252.  Murphy Report (PX02878) ¶ 6.

253. Whole Foods and Wild Oats compete directly with one another. Murphy Report (PX02878) at ¶ 22. According to Wild Oats' November 2006 Strategic Marketing Plan, ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

254. The services provided by Whole Foods and Wild Oats are much better substitutes for one another than are the services provided by either of them as compared with the services provided by conventional supermarkets and other types of retailers such as Trader Joe's. Murphy Report (PX02878) ¶ 22.

255. Entry by Whole Foods into a geographic market has a significant impact on profit margins as well as on the prices and quantity of products sold at Wild Oats stores. Murphy Report (PX02878) ¶ 22.

256. Other types of retailers that may compete to some degree with Whole Foods and Wild Oats include other premium natural and organic supermarkets, premium supermarkets, specialty stores, conventional supermarkets, farmer's market stores, independent health foods stores, and mass merchandisers. Murphy Report (PX02878) ¶ 27.

257. Other purveyors of premium and organic foods such as Earth Fare and New Seasons provide the most direct competition to Whole Foods and Wild Oats. Murphy Report (PX02878), ¶ 28.

258. Specialty stores such as Trader Joe's, premium supermarkets such as Wegman's, farmer's market style stores and small health food stores compete with Wild Oats and Whole Foods to a certain extent on some dimensions but typically carry a different mix of products and/or target a different client base. Murphy Report (PX02878) ¶ 31.

259. Premium supermarkets represent another potential platform for entry into the relevant market. One potential entrant from this space is Wegman's. Wegman's format, however,

43

makes rapid expansion difficult. In particular, Wegman's built its business model on providing high quality products and exceptional services to its customers. In order for entry to leverage this reputation effectively, it would be essential to carry that expertise over to any new venture. Providing such a high level of service means that adding capacity requires significant effort in training new management and employees. Murphy Report (PX02878) ¶ 128.

260.    Conventional supermarkets such as Kroger and mass merchandisers such as Wal-Mart also have some overlap with the product mix and customer base targeted by Whole Foods and Wild Oats. Some stores of both types offer a more limited selection of natural and organic items than do Whole Foods and Wild Oats and differ in terms of product focus and the attributes that they emphasize. Murphy Report (PX02878) ¶ 32.

261.    Whole Foods and Wild Oats are highly differentiated, premium positioned brands. Both firms have focused historically on the sale of natural and organic foods and holistic health and beauty aids, and they premise their respective strategies on providing exceptional service and quality in ways that fit an upscale, gourmet/epicurean and "socially responsible" lifestyle. Murphy Report (PX02878) ¶ 33.

262.    Conventional supermarkets offer a wide range of products and compete aggressively on price. More upscale markets like Wegman's offer premium meats and produce items that compete for some of the same high-end customers targeted by Whole Foods and Wild Oats, but put less emphasis on natural and organic products. Specialty stores like Trader Joe's also sell some products that overlap with those sold by Whole Foods and Wild Oats, but do not focus to the same extent on the sale of perishable items (which account for roughly 70% of Whole Foods' business versus roughly 30% for Trader Joe's). Mass merchandisers such as Wal-Mart also overlap on some items but differ even more in their overall business model. All of these types of stores compete to some limited extent with Whole Foods and Wild Oats, but they are significantly differentiated relative to Defendants. Murphy Report (PX02878) ¶ 34.

263.    Econometric analyses indicate that the acquisition of Wild Oats by Whole Foods is likely to result in anticompetitive price effects. Murphy Report (PX02878) ¶ 41.

264.    The competition between Whole Foods and Wild Oats is best characterized as that between differentiated sellers offering products with similar characteristics. Murphy Report (PX02878) ¶ 42.

265.    Other supermarket retailers compete with both Whole Foods and Wild Oats and constrain the prices that either firm can charge for its services. Other supermarket retailers with a similar mix of characteristics (such as Earth Fare and New Seasons) are likely to provide the most direct competition in the geographic markets where they compete with Whole Foods and/or Wild Oats. Competition from other firms, such as traditional supermarkets

44

or mass merchants, is less direct because their product offerings are poorer substitutes for those of Whole Foods and Wild Oats. Murphy Report (PX02878) ¶ 42.

266.    Econometric analysis designed to estimate the effects that competition from different parties has on prices and quantities of goods sold by Whole Foods and Wild Oats provide direct evidence on the degree of substitutability between the services provided by different suppliers and provide a clear picture of the differentiated products competition. The results of Prof. Murphy's econometric analyses are amply corroborated by documents created by Defendants in their ordinary course of business, and in the sworn testimony of their former and current senior executives. Murphy Report (PX02878) ¶ 43.

267.    The econometric results also inform the definition of the relevant antitrust market as defined in the 1992 *Horizontal Merger Guidelines*. Murphy Report (PX02878) ¶ 44.

268.    A banner entry event is the entry of the first store of a given brand into a given geographic market. Murphy Report (PX02878) ¶ 48.

269.    The estimated impact of banner entry on Wild Oats' existing-store dollar sales indicates that entry by Whole Foods reduces sales at nearby Wild Oats stores by more than one-third. Moreover, entry by Whole Foods has by far the largest impact on Wild Oats sales of all the candidate market participants. The next largest impacts are for New Seasons and Sun Flower Market, whose entry reduces Wild Oats sales by 15.2% and 13.9% respectively, followed by Trader Joe's, with an impact of 9.3%. This pattern of effects indicates that the introduction of competition from Whole Foods has a larger effect on Wild Oats than does the introduction of competition from other sources. Murphy Report (PX02878) ¶ 49.

270.    Gross margin is defined as store-wide revenues less costs of goods sold, expressed as a fraction of revenues. Murphy Report (PX02878) ¶ 50.

271.    ████████████████████████████████████████████████
████████████████████████. Murphy Report (PX02878) ¶ 50.

272.    "Shrinkage" refers to the loss of saleable product (e.g., perishables rot). Shrinkage can be expected to occur after significant competitive entry, as customers are diverted to the entrant store. The very fact that significant shrinkage occurs due to competitive entry indicates the existence of strong cross-elasticity between the stores. Murphy Report (PX02878) at n.16.

273.    ████████████████████████████████████████████████
████████████████████████████████████████████████.
Murphy Report (PX02878) ¶ 50.

45

274. Econometric analyses demonstrate that entry by Whole Foods has a much larger impact on Wild Oats' gross margins than does entry by any other food/grocery retailer. Murphy Report  (PX02878) ¶ 51.

275. The next largest impact after Whole Foods is for ███████████████████ ███████████████████████. Other sellers have negligible effects on Wild Oats margins. Murphy Report  (PX02878) ¶ 51.

276. The econometric results imply that Whole Foods is Wild Oats' closest competitor. Murphy Report (PX02878) ¶ 51.

277. Econometric analysis indicates that the impact of entry by other food/grocery retailers on Whole Foods' sales and margins is typically small.  The largest impact is for ███████ ████], another Premium Natural and Organic Supermarket, whose entry reduces Whole Foods' sales by about [████████] and Whole Foods' margins by about [█████████]. Magnitudes for the effects of entry by other sellers on Whole Foods are roughly the same—though slightly smaller—than the effects for the same sellers on Wild Oats. Murphy Report (PX02878) ¶ 52.

278. The totality of the econometric evidence supports the conclusion that Whole Foods and Wild Oats are closer competitors to each other than to the other supermarket operators studied.  Murphy Report (PX02878) ¶ 53.

279. An econometric analysis of individual items' price changes corresponding to five entry events in which a Whole Foods banner entry occurred within five miles of an existing Wild Oats store produces estimated impacts on Wild Oats prices and sales.  Murphy Report (PX02878) ¶ 56, 57.

280. Of the five entry events studied, two -- ███████████████████████, in October of 2005 and ██████████████████, in June of 2004 – offer sufficient post-entry price and volume data to discern a long run time-pattern of effects.  Murphy Report (PX02878) ¶ 58.

281. Compared to Wild Oats "control" stores that did not face entry, prices in Wild Oats' ████████████store were █████ lower in the 6 months immediately following entry by Whole Foods, █████ lower in months ████ following entry, and █████ lower after ████ ████or more.  The corresponding percentage reductions in sales in ██████████were ████████████████for these time intervals.  Murphy Report (PX02878) ¶ 58.

282. The initial (0-6 months) price effect in ████████████████ and remains about ███ below its pre-entry level even after a year.  And, as in ████████████, the effects on sales grow substantially over time.  In the second year post-entry, sales in Wild Oats' ████

46

██████ store had fallen by over 60% compared to control stores. The ████████Wild Oats store was closed in December 2006. Murphy Report (PX02878) ¶ 59.

283. Econometric analysis shows that sales of the affected Wild Oats stores fall abruptly at the time the Whole Foods store enters and do not recover. The effects of Whole Foods entry on sales are large and persistent—the typical Wild Oats "treatment" store suffers nearly a [████] reduction in sales due to new competition from Whole Foods and never recovers. Murphy Report (PX02878) ¶ 61.

284. Margins fall somewhat pre-entry and then fall very sharply at the time the competing Whole Foods store enters. Margins then recover somewhat over the subsequent several quarters. After a year, margins in Wild Oats "treatment" stores remain roughly████ ████████████████below the margins of stores that did not experience entry. At fixed unit costs these margin reductions would imply price declines of ███ at the ███ gross margin typical of a Wild Oats store. Murphy Report (PX02878) ¶ 61.

285. These econometric studies support the conclusion that the products offered by Whole Foods and Wild Oats are uniquely good substitutes for one another and that Whole Foods stores have the largest competitive effects on Wild Oats. Murphy Report (PX02878) ¶ 62.

286. Another econometric study done by Professor Murphy compares Whole Foods' margins across two groups of markets. The first group comprises those Whole Foods stores that do not have a competing Wild Oats store within 5 miles but do have a Whole Foods within 5 miles (the "control" or WF-WF group) and the second group is composed of those Whole Foods stores that do have a competing Wild Oats store within 5 miles (the "treatment" or WF-WO group). Estimated margin differences between WF-WO locales and WF-WF locales at the store level show Whole Foods' margins are about ███████of a percentage point ███████) lower in WF-WO locales than in WF-WF locales–equating to a ██████████████████assuming constant unit costs–with a p-value for the estimate of ███████. Murphy Report (PX02878) ¶ 66.

287. A p-value represents the chance that the estimated difference can be obtained when the actual difference is zero. Murphy Dep. (JX 26) at 146:4-6. Thus, using a one-sided test, there is only about an 8%, or one in twelve, chance that the estimated price difference of 1% would be obtained when the actual difference is zero. Id. at 8-11.

288. The results at the department level show that Whole Foods' margins are substantially higher in the WF-WF stores for ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████. These equate to lower prices of ████████████████ ████████████████████████████in WF-WO stores than in WF-WF stores assuming constant unit costs. The estimates for ████████████████are statistically significant at

the .05 level, and the estimate for ███ is within a shade of that, with a p-value of .051. Murphy Report (PX02878) ¶ 67.

289. To the extent that this econometric experiment replicates the change in ownership structure contemplated by the proposed acquisition, it implies that Whole Foods' prices likely would rise by more than ███ overall, and by about or more than ███ in the ████████████████████████████████ in markets where now separate Whole Foods and Wild Oats stores would come under common ownership. Murphy Report (PX02878) ¶ 66.

290. The fact that margins/prices would be higher in ████████████████████when the two stores in an area are jointly owned by Whole Foods is consistent with the more unique nature of Whole Foods and Wild Oats in these departments. Murphy Report (PX02878) ¶ 67.

291. The difference between the effects reflects the owner of the existing store – whether the current store is owned by the entrant, Whole Foods, or a different firm, in this case Wild Oats. These results suggest an ownership effect of roughly [███████████████] on margins (corresponding to a [████████████] on prices assuming fixed unit costs). Murphy Report (PX02878) ¶ 68.

292. Earth Fare is another premium natural and organic supermarket. ████████████████ ████████████████████████████████████████████████ ████████████████████████████. Murphy Supp. Rebut. Report (PX02883) ¶¶ 4-5. Entry by a variety of other food and grocery retailers having various formats did not have any appreciable effect on Whole Foods' prices.

293. The totality of the econometric evidence is consistent with the proposition that Whole Foods and Wild Oats are indeed the closest substitutes for one another and that the entry of other supermarkets that target the same customers with a similar format (e.g., Earth Fare) also has economically significant effects. The econometric evidence also suggests that the entry of ████████ has some effect on Whole Foods and Wild Oats but significantly less than the effect of entry by Whole Foods on Wild Oats. Finally, the econometric estimates show no appreciable effect from the entry of conventional supermarkets, premium supermarkets or mass merchants. Murphy Report (PX02878) ¶ 69.

294. Project Goldmine documents created by Whole Foods indicate that Whole Foods intends to close roughly ███ Wild Oats stores, most of which currently overlap with Whole Foods stores. Murphy Report (PX02878) ¶ 70.

295. The Project Goldmine documents estimate the revenues that Whole Foods expects it will capture after closing each Wild Oats store. These revenue diversions typically are quite



—typically ▮▮▮▮ and sometimes ▮▮▮▮▮▮. This indicates that Whole Foods that there exists a uniqueness of substitutability between Wild Oats and Whole Foods among Wild Oats customers. Murphy Report (PX02878) ¶ 70. The Project Goldmine documents indicate that Whole Foods expects substantially to maintain these diversions for in excess of 10 years.

296. ▮▮▮▮▮ competes with Whole Foods and Wild Oats but to a significantly smaller degree than Wild Oats and Whole Foods compete with each other and other stores with a more similar format, such as Earth Fare and New Seasons. Murphy Report (PX02878) ¶ 76.

297. Consistent with the econometric evidence, other record evidence indicates that conventional supermarkets lack Whole Foods' or Wild Oats' variety of organic offerings. It is difficult for conventional markets to compete on organic offerings. If conventional supermarkets offer a lot of organic items, they do not sell enough with their current customer base, and many of the products spoil, reducing margins. But if conventional supermarkets offer only a few organic items, they cannot add customers with a high demand for organic offerings to their customer base. Murphy Report (PX02878) ¶ 77.

298. From the point of view of market definition, the issue of how to treat premium supermarkets is somewhat moot since the major gourmet market chains, Wegman's, Central Market and Plum Market, are not present in any of the overlap markets. Murphy Report (PX02878) ¶ 79.

299. The proposed acquisition will have anticompetitive effects in the local markets where Wild Oats and Whole Foods currently compete.

300. The closure of the Wild Oats stores would be harmful to consumers even if prices were not changed by the acquisition. Consumers that currently shop at Wild Oats have revealed that they prefer the combination of price, selection, quality, location, etc. to that offered by the competing Whole Foods stores. For each of these consumers the loss from the closure could be measured by the price increase required at Wild Oats to make them shift from Wild Oats to Whole Foods or another store. Thus the closure of Wild Oats stores is economically equivalent to a large nontransitory increase in price at Wild Oats stores. Murphy Report (PX02878) ¶ 70.

301. Another way of characterizing this is that, pre-acquisition, Wild Oats customers could be induced to leave Wild Oats for Whole Foods as a result of a significant price reduction at Whole Foods. The purchase and closing of Wild Oats stores by Whole Foods accomplishes the same thing without need of Whole Foods reducing its prices. Thus, the proposed acquisition will deprive consumers of their preferred choice of PNOS and a relatively large non-transitory price reduction at Whole Foods.

302.   This substantial competitive harm to consumers would not be eroded by entry or repositioning of non-PNOS competitors, and will continue for as long as the Wild Oats store would have remained in the market or is replaced by another PNOS other than Whole Foods. Murphy Report (PX02878) ¶ 87.

303.   The bottom line is that the acquisition will reduce competition and thereby raise prices by something on the order of one percent (with a larger impact in product categories predominantly shopped by consumers with relatively inelastic demand such as produce, meat, and seafood). It will also reduce non-price aspects of competition and the variety of offerings available to consumers in these markets. Murphy Report (PX02878) ¶ 93.

304.   The 1992 *Horizontal Merger Guidelines* provide a framework for identifying the "relevant antitrust market" for purposes of analyzing a merger. Murphy Report (PX02878) ¶ 96.

305.   The market definition of premium natural and organic supermarkets effectively captures the competitive impact of the proposed acquisition. Murphy Report (PX02878) ¶ 95. That market definition satisfies the *Guidelines* definition of a relevant antitrust product market based on a price increase standard of one percent. Murphy Report (PX02878) ¶ 12.

306.   The same market definition provides a useful economic framework for understanding the effects of the acquisition and the broader economic context in which it takes place. Murphy Report (PX02878) ¶ 95.

307.   Under the *1992 Horizontal Merger Guidelines*, the anticompetitive effects of this acquisition may be viewed as a reduction in competition in the relevant market defined as "Premium Natural and Organic Supermarkets." Murphy Report (PX02878) ¶ 12.

308.   In order to determine which products should be included in the relevant antitrust market the *Guidelines'* method begins with each of the products sold by the two firms in question and perform the hypothetical monopolist test. That test asks whether a hypothetical firm that was the sole seller of a given set of products would find it profitable to impose a small but significant (usually, but not always, taken to be 5%) non-transitory increase in the price of any of those products. If the answer is "yes" then the given set satisfies the relevant market test. If not then the product which is the next best substitute (defined in the *Guidelines* as the product that gains the largest share of the revenue diverted by a price increase) is added. The test is then repeated. Products are added sequentially in this way until a sole seller would find it profitable to increase price by the amount deemed to be "small but significant." Murphy Report (PX02878) ¶ 96.

309.   Given the thousands of products sold by supermarkets, a product-by-product analysis is not feasible. Such an analysis would also be misleading because consumers do not

typically choose retailers of the goods in question on a product-by-product basis; rather, they typically purchase an array of products from a single source. Murphy Report (PX02878) ¶ 97.

310.    The hypothetical monopolist is then the sole seller of the goods and services offered by a given collection of firms. If a sole seller in control of that collection of firms was able to raise price a small but significant amount for a non-transitory period of time, that collection of firms would constitute a relevant antitrust market. Murphy Report (PX02878) at ¶ 97.

311.    The FTC's relevant market of Premium Natural and Organic Supermarkets ("PNOS") constitutes a well-defined relevant antitrust market for purposes of evaluating the competitive impact of this proposed transaction. Murphy Report (PX02878) at ¶ 99-100.

312.    The entry events of Whole Foods in███████████████████████████████████ ████████, used by Professor Murphy to address the degree of substitution are also informative about the hypothetical monopolist question. The results of the econometric analysis of these events indicate that entry reduces storewide margins by an average of██ percentage points and prices by an average of███ in the first 6 months. On average, sales of the existing store fall by half. Based on the econometric estimates one would predict that eliminating Wild Oats as a competitor would allow Whole Foods to increase prices between ████████. Murphy Report (PX02878) ¶ 101.

313.    Moreover, the econometric studies indicate that price and margin reductions tend to dissipate over time, but they do not vanish. The evidence from Whole Foods entry events—there are 5 such events, of which 2 provide evidence beyond one year post-entry—support a price effect of ████ in the ████████after entry. Murphy Report (PX02878) ¶ 102.

314.    Results from a cross-sectional analysis, which tends to reflect long-run impacts, are less precisely estimated but imply that changes in ownership structure affect prices by a similar amount. Murphy Report (PX02878) ¶ 102.

315.    The evidence from a comparison of entry events across ownership types provides further confirmation of effects in excess of one percent. Murphy Report (PX02878) ¶ 102.

316.    Prof. Murphy conducted a rigorous and exhaustive econometric analysis of the impact that various competitor openings have had on the prices, margins and sales volume of Whole Foods and Wild Oats that was characterized by Dr. Scheffman as one of "enormous complexity" and "by far the most complex modeling I have seen in pricing analyses of proposed mergers". (Scheffman Rebuttal Report (PX00301) ¶99). Professor Murphy's analysis rigorously quantified the impact of approximately 1,000 different opening/closing events, representing over 200 different store brands, in over 100

51

cities, on the prices, margins and sales volume of Whole Foods and Wild Oats over the course of the last three years (i.e. as far back as Defendants produced data).

317. In conclusion, the FTC's econometric evidence supports the hypothesis that Premium Natural and Organic Supermarkets represent a relevant product market as defined in the *1992 Horizontal Merger Guidelines* if one applies a price increase standard of one to two percent. This does not imply that other retailers do not compete with these stores. Rather, it means that a sole seller that controlled all of the stores in the Premium Natural and Organic market could raise price by one percent above the currently prevailing level without losing sufficient sales to retailers outside of this market to make the price increase unprofitable. Murphy Report (PX02878) ¶ 104.

318. As Professor Murphy emphasized in his Rebuttal Reports and during his in-court examination, a hypothetical monopolist of premium natural and organic supermarkets would profitably impose a small but significant nontransitory increase in price (a SSNIP). Murphy Report (PX02878) ¶¶ 34, 42, 77; July 31, 2007 AM Tr. Mot. Hr'g at 45:22-25, 46:1-3, 127:17-25, 128:1-24.

319. Competition among food and grocery retailers is multidimensional. For many consumers and purchases, premium natural and organic supermarkets are uniquely strong substitutes for one another, and premium natural and organic supermarket competitors constrain one another across a broad array of product/service dimensions. Murphy Report (PX02878) ¶¶ 42, 145, 146.

320. Other food and grocery retailers constrain premium natural and organic supermarkets on some product/services dimensions. However, other food and grocery retailers, even in combination, do not fully constrain premium natural and organic supermarkets.

321. Premium natural and organic supermarkets are highly knowledgeable about the purchasing patterns and demand elasticities of their customers. A hypothetical monopolist of premium natural and organic supermarkets cannot charge different "list" prices to customers having different sensitivities to price changes, that is to say, customers with different elasticities of demand. However, a hypothetical monopolist of premium natural and organic supermarkets would impose a SSNIP by selectively increasing quality adjusted prices for those goods and services purchased most by consumers who are relatively insensitive to price changes, that is to say, customers with relatively inelastic demand for those goods and services. PX02519 at 002 ("To offset margin burn it woudl be advisable to review the unique and non-competitive items on as a regular as the price competitive items to achieve maximum margin potential.").

322. The fact that a hypothetical monopolist of premium natural and organic supermarkets would be able to impose a small but significant nontransitory increase in price is another

way of stating that the Actual Loss that would result from an increase in price in response to a SSNIP be less than the Critical Loss. Murphy Rebut. Report (PX02884) ¶¶ 25-28.

### a.  Ordinary Course of Business Documents Support Professor Murphy's Analysis

323.  Whole Foods found that entry by other premium natural and organic supermarkets – specifically Wild Oats, New Seasons, and Earth Fare – had the largest and longest impact on Whole Foods' sales and margins. PX00131 at 019.

324.  Entry by a Trader Joe's generally led to a modest decline in sales at Whole Foods but no decline in margins. PX000131 at 017.

325.  Entry by a conventional supermarket generally led to a still more modest decline in sales (and entry by Safeway's flagship Lifestyle store in Boulder, Colorado, had little or no impact). PX000131 at 020 (even the Flagship Boulder Safeway Lifestyle store's impact on Whole Foods leveled off several months after its opening); PX00054; Robb IH (JX 29) at 128. Mass merchandisers, including Wal-Mart and Target, had no impact at all. PX000131 at 022.

326.  

327.  Whole Foods has found that entry by other premium natural and organic supermarkets-specifically [███████████████████████] had the largest and longest impact on Whole Foods' sales and margins. PX00131, Slide 19.

328.  Entry by a [███████████] generally led to a modest decline in sales at the nearby Whole Foods, but no decline in margins. PX00131, Slide 17.

329.  The asymmetrical sales diversions between Whole Foods and Wild Oats when compared to all other retailers are also reflected in Wild Oats' documents. The greatest sales diversion for Wild Oats resulted from Whole Foods [██████████████████████████████████████████████ ████████]). PX02901 at 11-12. Wild Oats estimated in 2007 that Whole Foods accounted for [████████████████████████] in the United States. PX00458 at 027-028; PX04630.

330.  Whole Foods reported a gross profit margin of 34.9% for fiscal year 2006. PX01302 at 025. Wild Oats reports higher margins as a natural food retailer (30% to 50%) than most conventional food retailers have (25% to 30%). PX01331A at 002. Such margin

differences are often reflective of significantly differentiated products and different product markets. PX01331A.

331.  Entry by Whole Foods near a Wild Oats store reduces sales at Wild Oats by [████] and causes Wild Oats profit margins to decline by [███] – a figure several times the margin decline caused by entry of a conventional supermarket. Murphy Report (PX02878) ¶¶ 49-50.

332.  Plaintiff's economic expert, Professor Murphy, shows that the diversion ratios used by Whole Foods in its Project Goldmine (which projects the percentage of Wild Oats store sales that would be diverted to Whole Foods if it closed various Wild Oats stores after the acquisition) tell us that the number of marginal sales that would be lost to the combined Whole Foods/Wild Oats would have to be many times that predicted by ████████████ to defeat even a 5% post-acquisition price increase. *See, e.g.,* Murphy Rebuttal Report (PX02884) ¶¶ 28, 31.

333.  Project Goldmine documents were created in the ordinary course of business, not for the purpose of litigation. July 31, 2007 p.m. Tr. Mot. Hr'g at 59:15-20.  Under the Project Goldmine scenario, Whole Foods projected revenue gains are as high as [████████████], depending on the proximity of Wild Oats stores to be closed following the proposed acquisition. PX00553; PX00784 at 015; PX01339; Murphy Report (PX02878) ¶ 70; Murphy Report Appendix C (PX02881).

334.  The Project Goldmine scenario is corroborated by Whole Foods ordinary course of business documents.  In a recent presentation to debt rating agencies, Whole Foods wrote: "[w]e have made a store level assessment of the entire company and have a high level of certainty on which ██ [Wild Oats] stores will remain open, ██ stores will be closed immediately and ██ stores will be relocated to an existing WFM site in development . . Each Wild Oats store was analyzed along with its sister WFM store - on average 45% revenue transfer ratio to nearby WFM locations is assumed (we believe this to be a very conservative estimate). DX547 at 27 (emphasis added); DX401 at 12; *Cf.* 8/1/07 PM Tr. Mot. Hr'g at 23 (includes Defendants' misrepresentation of "say less than a third").

335.  By preventing the Wild Oats' 29th Street store in Boulder from opening, Whole Foods projected it would avoid ████████████████ in lost revenue per week to the new store. Robb IH (JX 29) at 126:14-127:1; Paradise Dep. (JX 11) at 216:17-217:25.

336.  Whole Foods' Project Goldmine is also corroborated by Wild Oats' competitive intrusion plans, which were created in the ordinary course of business.  These plans thoroughly monitor competitive intrusions from Whole Foods and similar to the Goldmine scenario, they anticipate significant levels of sales diversions from Wild Oats to Whole Foods. Wild Oats' competitive intrusion plans focus significantly on Whole Foods' entry plans and rarely concentrate on conventional supermarket entry. *See e.g.* PX 00454; PX 00456;

PX 00457; PX 00458; PX 00463; PX 00469; PX 00500; PX 00651; PX 00661; PX 00662; PX 00678; PX 00763; PX 00913; PX00914; PX 01317; PX 2101-005; PX 02142; PX 03818; PX 03820; PX 03822; PX 03835 at 036-071; PX 03835 at 047 (Wild Oats sales comps were 6.85% to 5.4% without WFMI affected stores, -17.64 to -21.02% with); PX 04355; PX 04392; PX 04865; PX 04866; PX 04869; PX 04872.

(1)    <strong>Head to head competition between Whole Foods and Wild Oats</strong>

337.  The former Wild Oats CEO, Perry Odak, testified that "there's really only two players . . . of any substance in the organic and all natural, and that's Whole Foods and Wild Oats." Odak IH (JX 37) at 58:21-24.

338.  Whole Foods' CEO John Mackey wrote, "By buying [Wild Oats] we will . . . avoid nasty price wars in Portland (both Oregon and Maine), Boulder, Nashville, and several other cities which will harm our gross margins and profitability." PX00773.

339.  Whole Foods is building stores in new locations and vigorously competing with Wild Oats. PX00719A; PX02977; PX00197 at 003; PX00520 (Wild Oats memorandum monitoring competition in various areas); PX00197. *see* PX00801A (Whole Foods is destroying their [Wild Oats] viability as a business – market by market, city by city.).

340.  In April 2006, Whole Foods Co-President A.C. Gallo responded to an e-mail from CEO John Mackey: Whole Foods "will just have to keep kicking his [Perry Odak and Wild Oats] ass wherever we compete and let the customers decide." He went on to state that: "I can't wait to open our Portland, Maine, store and squash them [Wild Oats] with both higher quality and lower prices." PX01312.

341.  Whole Foods planned on opening new stores in areas where there would have been overlap with existing Wild Oats stores, including Nashville, Tennessee; Fairfield County, Connecticut; and Miami and Naples, Florida. PX04357. Both Whole Foods and Wild Oats had plans to open new locations in Palo Alto, California. PX04357.

342.  Until this acquisition was announced, executives from both Whole Foods and Wild Oats repeatedly stated in contemporaneous business documents that the other firm was the primary competitor in the markets they shared. PX00613 at 010; PX00670; PX01317; PX00016 at 005; PX00763 at 001; PX00677 at 078; PX00670 at 046; PX01337 (Whole Foods and Wild Oats compared to Yankee/Red Sox rivalry).

343.  John Mackey describes geographic markets where only one – not both – has stores as "monopoly markets" or "uncontested cash cow markets." PX00712 at 001; PX000713 at 001.

55

344. Chad Smith, Wild Oats' Director of Pricing, testified that competitive openings and competition from Whole Foods resulted in Wild Oats creating new price zones in ████████████████████████████████. Smith IH (JX 38) at 96:3-5, 99:5-6. ██████



345. Wild Oats engaged in detailed planning to respond to the "competitive impact of a new Whole Foods market which will open a stone's throw away from our ████████ ████████████████████] by using both price and non-price tactics. PX01367; PX00460; PX01366; PX01370.

346. Whole Foods planned to respond to the new (but as yet unopened) Wild Oats store in Boulder, Colorado, by using price and non-price competition. PX00233; PX00065; PX00234 (Will Paradise wrote, "as we approach the opening on [sic] the new Wild Oats flagship in Boulder in March. My goal is simple – I want to crush them and I am willing to spend a lot of money in the process."); PX01353; PX04730; PX0233 at 001; PX04419 (plan to add more employees); PX00186 ("very vulnerable to a substantial competitive opening, such Wild Oats").

347. Defendants' documents illustrate that they monitor and match each other's pricing in various markets. *See, e.g.*, PX00028 (Whole Foods ████████████████ to meet Wild Oats); PX00187 ("Buy one Get one Free" in Boulder); PX00054 (Wild Oats ████████████████ to match prices in Boulder).

348. Documentary evidence shows that an important vehicle for price competition at Wild Oats is discounting in the form of store-wide couponing and promotions such as Buy One Get One Free (BOGOs). *See, e.g.,* PX00029, PX00051, PX01367, PX00187.

349. Glenda Flanagan Chamberlain, Whole Foods CFO and director, helped explain Mackey's Wild Oats strategy as follows: "I think it is worth noting that his [Mackey's] highly controversial strategy for competing with Wild Oats has been extremely successful. This strategy was to go head to head against their biggest money making locations, open bigger better stores and compete aggressively with them on price. Our sales and earnings

never suffered, yet we basically destroyed them. Their downfall means serious rewards for our shareholders – currently it is much easier and cheaper for us to get the sites we want without competition from them; they are no longer a viable acquirer which puts us in a much better negotiating position on potential acquisitions; many of their team members have called us looking for employment; their store closings are benefitting our own store sales etc." PX01371.

350. Whole Foods projected that by preventing the Boulder Wild Oats store opening, it avoided lost revenues of more than $150,000 per week that would have been diverted to the new Wild Oats store. Robb IH (JX 29) at 126:14-127:1; PX0553; Paradise Dep. (JX 11) at 217:13-25 (would lose "roughly" $180,000 per week). In contrast, Whole Foods lost only $30,000 per week in revenues after Safeway's flagship Lifestyle store in Boulder opened in February 2006, and after ███ months its revenues returned to normal. PX00543; PX1004 at 023.

### (2)    Wild Oats Pricing

351. Wild Oats planned to lower prices to match or beat Whole Foods' prices. *See, e.g.,* PX00469; PX01202; PX01203. A recent Wild Oats marketing plan states Wild Oats should minimize ████████ between Whole Foods and Wild Oats ██████████ to maximize customer retention. PX00677 at 78.

352. In May 2006, John Mackey forwarded an email to his executive team in which the President of Whole Foods Florida region observed that "prices were higher" at the newly opened Wild Oats store in Tampa, Florida, because] "[b]eing the only game in town gives them that freedom . . . . Their pricing was high since they are the only large natural food store in the area." PX00080 at 001 (emphasis added).

353. Plaintiff's economic expert, Dr. Murphy, testified that the entry of a Whole Foods near a Wild Oats had a substantially greater negative effect on Wild Oats than entry by other stores. Entry by Whole Foods reduced sales at Wild Oats by ████. Entry by New Seasons, another premium natural and organic supermarket caused a sales decrease of ████. Murphy Report (PX02878) ¶ 49; Murphy Report (PX02882) at Exhibit 4.

354. Whole Foods entry has a substantially greater impact on Wild Oats' margins than entry by other retailers. Whole Foods entry causes margins at Wild Oats to fall by nearly ████ percentage points, while the entry of other stores affects margins by only ████ percentage point, depending on the retailer. Murphy Report (PX02878) ¶¶ 50-51; Murphy Report (PX02882) at Exhibit 4.

355. Professor Murphy explored the impact of Whole Foods entry on Wild Oats prices. Professor Murphy used a "treatment-control" methodology in his analysis that compared

the price change at the Wild Oats store near the location of Whole Foods entry, to the counterpart price change at Wild Oats stores that did not experience entry.  Two events have long enough post-entry time periods to discern whether entry by Whole Foods had a durable impact on Wild Oats' price.  Professor Murphy found that even in the second year following entry by Whole Foods, ███████████████████████████ ███████████████████████████████████████████████████████ ████████████████████].  Murphy Supplemental Rebuttal Report (PX02883) ¶¶ 58-59; Murphy Report (PX02882) at Exhibit 6.

### (3)     Whole Foods pricing

356.   Plaintiff's economic expert, Professor Murphy, examined the impact of entry on Whole Foods.  Although no Wild Oats entries occurred, similar stores within the product market, *e.g.*, Earth Fare, entered, and had substantially greater impact on Whole Foods' margins and sales than entry by conventionals.  Murphy Report (PX02878) ¶ 52; Murphy Report (PX02882) at Exhibit 5.

357.   Professor Murphy explored the impact of Earth Fare's entry by using Whole Foods' pricing data.  Professor Murphy concluded that [██████████████████████████ ███████████████████████████████████████████████████████ █████████████████].  7/31/07 AM Tr. Mot. Hr'g at 125:1-131:25 (Murphy test.); Murphy Supplemental Report (PX02883) ¶¶ 4-5.  This analysis demonstrates the intense competition among premium natural and organic supermarkets.  Four other competitive banner openings – Target, Sam's Club, Kroger, and Costco – occurred during this time period and produced essentially no response.  7/31/07 AM Tr. Mot. Hr'g at 127:19-128:24 (Murphy test.)

358.   Professor Murphy could not explore the impact of Wild Oats entry on Whole Foods since the data contain no such events.  Professor Murphy did, however, undertake a cross-sectional econometric analysis that explored the effect of competition from Wild Oats on Whole Foods' margins.  Murphy Report (PX02878)  ¶¶ 65-67.

### (4)     Competitive Remodelings

359.   Wild Oats spent $500,000 to renovate its Cleveland, Ohio, store in anticipation of Whole Foods store opening.  PX03813.

360.   Wild Oats scheduled a remodel of its Indianapolis, Indiana, store in anticipation of Whole Foods opening there.  PX02910.

361.  Whole Foods spent ███████ remodeling it Boulder, Colorado, store in anticipation of
      Whole Foods opening there.  Paradise Dep (JX11) at 85:1-21.

### (5)     Other evidence

362.  Until the acquisition was announced, Whole Foods frequently referred to Wild Oats'
      markets (where Whole Foods was not present) as "non-competitive," "cash cow"
      markets, and even "monopoly" markets.  *See, e.g.*, PX00713; PX0712.

363.  In a graphic depicting brand positioning, Wild Oats identified only ███████████
      ████████████████████ in the premium natural and organic section.  *See* PX00902 at
      004; *see also* PX2979 at 004, 012 (chart showing ██████████████████████);
      PX02704 at 010 (chart contrasting Wild Oats competition ("other natural foods stores")
      with "Traditional Grocery" competition ("major chains, club stores, independents").

364.  Perishable items constitute only [███] of the items that Whole Foods price checks at
      conventional supermarkets, yet perishable items constitute nearly 70% of Whole Foods'
      revenues.  PX03204A.

365.  Of its 30,000 SKUs, Whole Foods price checks and matches prices on only [█████]
      against Trader Joe's.  Murphy Report (PX02878) ¶ 75; PX00211; PX00548.

366.  In January 2007, Wild Oats conducted a price check for [██] regions.  Wild Oats checked
      prices at a Whole Foods in each of its [██] regions while checking a total of only ███ of
      the dozens of conventional supermarket chains throughout all [██] regions.  PX01202 at
      02.

### C.     Defendants' Experts Are Unreliable

### 1.     The Conway Survey

367.  The Reports of Defendants' pollster, Kellyanne Conway, are entitled to no weight.

368.  Ms. Conway and her firm, the polling company™, inc., were commissioned by
      Defendants to conduct a survey that would support a report authored by their economic
      expert, Dr. David T. Scheffman, and that would corroborate his analysis.  Scheffman
      Report ¶ 59; PX02066 at 023; Conway Dep. (JX 20) at 7:16-20; 8:20-9:2.

369.  Ms. Conway and Dr. Scheffman designed a telephone survey that was conducted June 22-
      28, 2007.  The survey was conducted using Random Digit Dialing (RDD) to zip codes
      purportedly near Whole Foods and/or Wild Oats stores in eight cities selected by Dr.
      Scheffman.  Conway Dep. (JX 20) at 9:9-10:6.

370.    The cities surveyed were Portland, Maine; Medford/Saugus, Massachusetts; Hinsdale,
        Illinois; Los Angeles, Santa Monica, and Brentwood, California; Washington, DC;
        Bloomfield, Michigan; Memphis, Tennessee, and Salt Lake City, Utah. Conway Report
        (PX02082 Part A-002) at 2. These cities were selected by LECG staff acting under Dr.
        Scheffman's direction. Scheffman Report (PX02066-069) ¶ 184. Neither Ms. Conway
        nor her firm had any input into the selection of these specific cities. Conway Dep. (JX
        20) at 11:1-5.

371.    Calls were made to 427,397 telephone numbers and surveys were completed by 1,607
        respondents. Conway Report (PX02082-003) at 3. According to Ms. Conway's Report,
        calling was done until a quota of 100 "Frequent" shoppers and 100 "Cusp" Whole Foods
        and Wild Oats ("WFWO") shoppers was completed in each city. Conway Report
        (PX02082-002) at 2. Ms. Conway defined the number of visits to a Whole Foods or Wild
        Oats store for the Frequent and Cusp categories prior to setting the quotas. Conway
        Report (PX02082-002) at 1.

372.    The 55-question survey was designed, administered, analyzed and summarized in an
        expert report authored by Ms. Conway during a 3 ½ week period between June 13, 2007
        and July 9, 2007. Conway Dep. (JX 20) at 11:6-16; Declaration of Kellyanne E. Conway
        (PX02076).

373.    Ms. Conway, the proprietor of the polling company, Conway Dep. (JX 20) at 6:21-25, has
        no formal education in sampling methodology. Conway Dep. (JX 20) at 32:18-33:4,
        33:17-25. She has never published any of her survey work in any peer-reviewed journals,
        or published in peer-reviewed journals or monographs on survey topics. Conway Dep.
        (JX 20) at 52:7-12. She has never served as an independent reviewer of manuscripts
        involving surveys for peer-reviewed journals. Conway Dep. (JX 20) at 53:12-54:9. Ms.
        Conway has never served on a faculty staff as a professor of survey research
        methodology. Conway Dep. (JX 20) at 55:17-19.

374.    Dr. Kent Van Liere was retained by the Federal Trade Commission principally to review
        and evaluate the survey conducted by Ms. Conway. Van Liere Report (PX02890-002) ¶
        2. Dr. Van Liere has an M.A. and a Ph.D. in Sociology from Washington State
        University where he specialized in social psychology and research methods and statistics,
        including survey research. Van Liere Report (PX02890-003) ¶ 4. From 1978 to 1985, he
        served as an Assistant, then Associate Professor with tenure, at the University of
        Tennessee where he taught classes in attitudes and opinions, survey research, research
        methods and statistics. Van Liere Report (PX02890-003) ¶ 4. He also regularly
        published academic research in leading journals based on data collected using surveys.
        Van Liere Report (PX02890-003) ¶ 4. Dr. Van Liere has published papers in peer-
        reviewed journals and monographs on a range of topics involving surveys. Van Liere
        Report (PX02890-004) ¶ 8.

375.    Through his education and work experience, which are detailed in his report, Dr. Van Liere has substantial expertise using qualitative research and surveys to measure consumer opinions regarding products and services including purchase processes, branding and positioning, market segmentations and communications strategies. Van Liere Report (PX02890 at 003-004) ¶ 5. He is a member of the American Statistical Association and the American Association for Public Opinion Research ("AAPOR"). Van Liere Report (PX02890-004) at ¶ 8.

376.    After reviewing Ms. Conway's report and the survey backup materials, Dr. Van Liere concluded that her survey methodology and procedures were fundamentally flawed, which rendered her data and results unreliable. Van Liere Report (PX02890-002) ¶ 3. Dr. Van Liere authored a report that details the evidence supporting his conclusions.

377.    The first step in any proper survey is to identify the target population (also known as the "universe"). Diamond, Shari Seid, *Reference Guide on Survey Research* in *Reference Manual on Scientific Evidence*, 2d (Federal Judicial Center, 2000) (hereafter *Ref. Guide*), (PX02083-011). The target population consists of all individuals whose characteristics or perceptions the survey sample is intended to represent. That population must be relevant to the purpose of the survey. *Ref. Guide* (PX02083 at 011-013); Conway Dep. (JX 20) at 27:16-21.

378.    In her report, Ms. Conway defines the "target populations" as "Frequent and Cusp Whole Foods and Wild Oats shoppers in each of the eight metropolitan areas defined by the zip codes provided to the polling company." Conway Report (PX02082-004) at 4.

379.    A key issue in evaluating the reliability of survey results is the response rate to the survey. Van Liere Report (PX02890-007) ¶ 16. An issue that arises in any survey is whether those who respond and make up the survey sample are different from those who do not respond when individuals are randomly sampled—this is called nonresponse or selection bias. Van Liere Report (PX02890-007) ¶ 16. To the extent that responders are different from nonresponders, the results from the sample may be biased if they are extrapolated to the target population. Van Liere Report (PX02890-007) ¶ 16..

380.    Ms. Conway testified that she recognized the *Reference Guide on Survey Research* as an authoritative text in the survey field, routinely consults the guide in constructing and analyzing surveys that she prepares for litigation purposes, and consulted the guide in preparing the survey submitted in this case. Conway Dep. (JX 20) at 124:14-125:14.

381.    The *Reference Guide on Survey Research* says that an expert report "should contain a description of the target population, a description of the survey population actually sampled, a discussion of the difference between the two populations, and an evaluation of the likely consequences of that difference." *Ref. Guide* (PX02083-012). Ms. Conway's Report is deficient on its face because it contains no discussion of the difference(s)

between the survey sample and the target population nor an evaluation of the likely consequences of that difference. Conway Dep. (JX 20) at 145:6-24. Such a discussion provides critical insight as to whether a sample accurately reflects the distribution of individuals in a target population or suffers from selection bias. Van Liere Report (PX02890 at 007-008) ¶ 16. This omission renders her report unreliable.

382.    At her deposition, Ms. Conway attempted to excuse her failure to explain in her report why her samples do not differ from the target population by testifying that the target population – WFWO shoppers in the eight geographies surveyed – was "unknown," Conway Dep. (JX 20) at 145:23-146:3; 112:6-7, 21-24 (numbers of frequent and cusp shoppers unknown), 132:15-133:5 ("unknowable"). While Ms. Conway may not know who they were, they were "knowable." Her position that this population was unknowable is at odds with basic survey research methods because there are probability sampling techniques that can be used to make such estimations. Memorandum in Support of Plaintiff's Motion *In Limine* to Exclude the Expert Report and Testimony of Kellyanne Conway (hereafter "Motion In Limine") at 13. Defendants offered no rebuttal to this point in their Joint Memorandum.

383.    Because in her opinion the target population was unknown and unknowable, Ms. Conway testified that she could not weight her sample to ensure that it reflected the target population; i.e., to ensure that responders are no different than the nonresponders and accurately reflect the distribution of individuals in the target population. Conway Dep. (JX 20) at 112:24-113:8 ("Q. And because they are unknown, there is no weighting that you could apply? . . . A. You could apply weighting, it doesn't mean that's correct. Q. And in this case, you did not apply, in this case being the survey that you performed, you did not do any weighting? A. Correct."). Accordingly, Ms. Conway has no way of knowing whether her survey sample was subject to selection bias. Motion *In Limine* at 11.

384.    Defendants tried curing this fatal error by re-writing Ms. Conway's report to say that there were really 16 *separate* target populations, implying that Ms. Conway's conclusions were never generalized beyond any one of the 16 populations. Defendants Joint Memorandum at 4 ("Ms. Conway's survey [had] a total of 16 target populations. No more and no less").

385.    Defendants' argument fails for two reasons: (1) the conclusions in Ms. Conway's report are based on aggregating these supposedly separate target populations; and (2) Ms. Conway has failed to demonstrate that any of her 16 samples accurately reflects any one of the corresponding target populations.

386.    If Ms. Conway's sample data from each of the 16 separate target populations is intended, as Defendants imply, to be generalizable only to the single corresponding target population, then basic survey methodology required Ms. Conway to present her analysis

and conclusions in such a manner.  Specifically, each of her conclusions should have been split into 16 parts—one for each of the 16 target populations.

387.  Virtually every single conclusion in Ms. Conway's report summarizes survey data that she has tabulated into 47 tables and charts in her report.  For example, in her conclusion she states that "a 70%+ majority of shoppers of each company reported spending 20% of [sic] less of their total grocery budgets at either Whole Foods or Wild Oats, meaning *most Whole Foods and Wild Oats shoppers* do *most* of their grocery shopping elsewhere." Conway Report (PX02082-036) at 36.  This conclusion is based on the fifth and tenth tables in her report, each of which combine all Whole Foods and Wild Oats shoppers in each of the eight geographies surveyed, as well as all "frequent" and "cusp" shoppers in those geographies.  Conway Report (PX02082 at 009-012) at 9, 12.  Ms. Conway makes no distinction in drawing this conclusion about patterns and behavior among shoppers in any of the specific geographies or shopping frequency categories.  Indeed, Defendants are guilty of doing the same when they repeat this conclusion in their brief.

388.  The tables immediately preceding each of the above tables referred to above provide another set of examples of how Ms. Conway reports the results for all "Frequent" and "Cusp" shoppers without making any geographic distinctions, and then reports in a third column the average of *all* "Frequent" and "Cusp" shoppers by dollar ranges spent.

389.  Every one of the 47 tables and charts in Ms. Conway's report is either the sum of her survey results from two or more of the eight geographies, or the sum of Frequent and Cusp shoppers across more than one geography.  Not a single table in Ms. Conway's report is the product of an analysis of any single geography or single shopper frequency category in a given geography.

390.  Either Ms. Conway's conclusions should have been reported separately for each of the 16 subgroups – or, if mathematically combined, they should have been weighted correctly and in accordance with generally accepted sampling methodologies to create aggregated groups that accurately reflect the combined target populations by adjusting for sample bias.  The language of Ms. Conway's report indicates that she did not do the former.  Ms. Conway could not have done the latter because at her deposition she testified that she did not weight any of her survey samples for her extrapolations, Conway Dep. (JX 20) at 113:5-8, other than weighting each geography by arbitrarily sampling to a quota of 100 "Cusp" and 100 "Frequent" WFWO shoppers.  *See* Conway Report (PX02082-002) at 12.

391.  Indeed, Ms. Conway testified that she defined the target population not as 16 separate target populations but as one group of WFWO shoppers that lived in the eight geographies surveyed.  Conway Dep. (JX 20) at 155:1-11 ("A. Well, sir, it depends on how you're defining 'target population.'  In my survey, we're not defining it the way I think you are suggesting it right now.  The target population that is being represented by way of the surveys is not Whole Foods and Wild Oats shoppers *nationwide*.  Q. So, it is

63

only those Whole Foods or Wild Oats shoppers that live in those eight cities? A. Yes.
Q. Is that – that is your target population? A. For purposes of this survey, yes.")
(emphasis added).

392. Moreover, Ms. Conway testified that she did not interpret her report as drawing separate
conclusions about 16 different populations. When confronted with the fact that her effort
to subtract erroneously-included zip codes in Los Angeles left her with only 15
"Frequent" and 16 "Cusp" shoppers, she testified that her survey results for a given
sample should not be "taken in isolation," Conway Dep. (JX 20) at 162:3-4, and that they
should be "[t]aken as part of a larger sample size in the report across eight areas [which]
is what my report actually talks about." *Id.* at 162:5-7. When pressed as to whether the
low sample left in Los Angeles invalidated *any* of her conclusions, her response was "Not
necessarily. It [i.e., her conclusions] need[] to be taken in totem, not in isolation."
Conway Dep. (JX 20) at 162:18-19.

393. Even had Ms. Conway's report analyzed behavior within each of the 16 target
populations without attempting to extrapolate beyond any single target population, her
methodology would still be unreliable. She must still determine whether each of her
samples -- e.g., frequent WFWO shoppers in Los Angeles -- accurately reflects the
distribution of shoppers in each target population and does not suffer from selection bias.
Ms. Conway's report fails to discuss how she dealt with potential selection bias. See
Conway Dep. (JX 20) at 152:17-153:2 (defining selection bias as when the sample does
not accurately represent the overall target population), 153:3-10 (agreeing that random
digit dialing could introduce selection bias and that screening questions do not always
eliminate that bias); 145:7-23 (stating that there is no discussion in her report of the
differences between the survey sample and target population); 144:13-21 (acknowledging
that the Reference Guide says expert reports "should" contain such a discussion).

394. There is strong reason to believe that there is selection bias within Ms. Conway's 16
samples for which she has not accounted.

395. First, the survey's response rate ranges between 0.5% and 19%. *See* Van Liere Report
(PX02890-009) ¶ 19 (stating that her response rate varied between 0.5% and 6%
depending on which AAPOR formula was used): Van Liere Dep. (JX 27) at 116:7-14
(0.5% to 18.9% according to Ms. Conway's subsequently provided calculation). The
Reference Guide on Survey Research articulates response rate standards for surveys that
are admitted as evidence in courts. Ms. Conway's response rate is extremely low by these
standards. *Ref. Guide* (PX02083 at 017) at 245 (representativeness of sample "should be
regarded with significant caution" if response rate drops below 50%).

396. The survey's extremely low response rate is not necessarily fatal if Ms. Conway can
demonstrate that the respondents are still representative of the target population. *Ref.
Guide* (PX02083 at 017) at 245 ("The survey expert should be prepared to provide

evidence on the potential impact of nonresponse on the survey results"). Ms. Conway's
Report makes no effort to do that. Conway Dep. (JX 20) at 138:12-23 (stating that she
calculated the response rate but did not include any discussion or calculation of the
response rate in her report other than including call disposition numbers that could be
plugged into a calculator to derive the response rate). Accordingly, her survey results
must be viewed as unreliable for purposes of making extrapolations to any target
population of WFWO shoppers. Van Liere Report (PX02890-009) ¶ 19.

397.    Second, Ms. Conway's survey fails to measure for education in her samples—a ██
        ████████demographic. Accordingly, Ms. Conway cannot tell if her samples accurately
reflect the proportion of individuals in the target populations that have college degrees.
*See* Conway Report, Appendix C (PX02079) (no question going to education). Her
failure to screen for education levels is critical. If the nonrespondents to the study were
those with higher education levels (e.g., more likely to work longer hours, less likely to
answer the phone or more likely to screen calls, etc.) then her survey sample would over-
represent the opinions of those with lower education levels. Van Liere Report (PX02890-
008) ¶ 17. Here, a ██████████████████████████████████████████████████
████████████is the education level ██████████████████████████████████
███████████████. The current CEO of Whole Foods, and the recent CEO of Wild Oats
have both ██████████████████████████(PX00718-001 and Odak IH
(JX 37) at 95:1-25; 96:1-6); *see also* Paradise Dep. (JX 11) at 155:9-11 ("As a company,
███████████████████████████████████████████████████████████████
████████████████████].")"; Paradise IH (JX 31) at 59:4-7 (██████████████
███████████████████████████████.").

398.    Third, Ms. Conway's sampling methods create overinclusive samples. Although the
Reference Guide states that survey experts should include the study's purpose in their
reports, Conway Dep. (JX 20) at 125:15-126:2, Ms. Conway did not do this. Conway
Dep. (JX 20) at 126:3-8. Ms. Conway did testify at her deposition that the purpose of her
survey was to examine the shopping behavior of WFWO shoppers, Conway Dep. (JX 20)
at 126:13-17, but she includes shoppers who may have only shopped at Whole Foods or
Wild Oats once in their entire lifetime, and who have no intention of ever returning.
Conway Dep. (JX 20) at 142:10-19.

399.    Fourth, the survey samples are also overinclusive because almost 20% of Ms. Conway's
respondents come from zip codes that Ms. Conway and Dr. Scheffman did not intend to
include. Van Liere Report (PX02890-013) at ¶ 23, 25. According to Defendants, those
outside the targeted zip codes "likely traveled a greater distance to a Whole Foods or
Wild Oats store to do their shopping than the shoppers within the designated zip codes,
which were clustered around a 6-mile radius of the stores. Defendants Joint
Memorandum at 7. The fact that subtracting these zip codes does not appreciably change
Ms. Conway's results, Defendant Joint Memorandum at 8, reinforces rather than reduces
concerns about the reliability of her survey results. It is questionable logic to assume that

shoppers residing (in many cases substantially) further than six miles are likely to exhibit the same shopping patterns as those who live closer to Whole Foods or Wild Oats. If anything, the lack of an appreciable change in her results when more distant shoppers were eliminated should have put Ms. Conway on notice that there was something wrong with her survey instrument.

400.    Fifth, Ms. Conway's sample size in Los Angeles is too small to provide meaningful results. Of the 200 completed interviews in Los Angeles, only 31 respondents, or 16%, lived in zip codes that were meant to be included. Van Liere Report (PX02890-013) ¶ 24. About 84% of respondents lived outside the targeted zip codes. Van Liere Report (PX02890-013) ¶ 24.

401.    After Dr. Van Liere exposed this error, Ms. Conway re-ran her survey results to exclude the wrongfully included zip codes. Defendants Joint Memorandum at 8. When she did, the number of "Frequent" and "Cusp" WFWO shoppers in Los Angeles fell dramatically from 100 in each category to 15 and 16 each, respectively. Conway Dep. (JX 20) at 160:13-18. By Ms. Conway's own admission, sample sizes "represented by just 39 people in the entire survey ... are ... a very small population from which to draw conclusions." Conway Report (PX02082-019) at 19. Further, all of Ms. Conway's conclusions are tainted by her missteps in Los Angeles because she has aggregated her survey results in her report.

402.    Questions on surveys should be clear and precise. *Ref Guide* (PX02083-020) at 248. Phrasing questions that are clear and precise is often a difficult goal. *Ref Guide* (PX02083-020) at 248. If the crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting a survey. *Ref Guide* (PX02083-020) at 248.. Texts on survey research generally recommend pretests as a way to increase the likelihood that questions are clear and unambiguous. *Ref Guide* (PX02083-020) at 248. Although she says pretesting was done, Ms. Conway provided no description in her report of any pretesting efforts rendering it difficult to assess whether such efforts were sufficient. Van Liere Report (PX02890 at 015-016) ¶ 29.

403.    Ms. Conway's results indicate that respondents did not comprehend and could not accurately respond to her questions. Van Liere Report (PX02890 at 015-016) ¶ 29. The survey questions here are complicated and require the respondents to make mathematical estimations that are quite complex. Van Liere Report (PX02890 at 015-017) ¶ 29-30. Dr. Van Liere's analysis of the actual responses demonstrates that anywhere from 15%-25% of all respondents gave inconsistent or non-sensical responses. Van Liere Report (PX02890 at 017) ¶ 31. Ms. Conway's failure to discover the existence of this confusion through her pretesting and take steps to correct it is further evidence that her survey results are unreliable.

66

404.   Ms. Conway and survey administrators failed to use simple validation techniques to prevent the zip code errors even though this information had been collected for this purpose. *See* Conway Report, Appendix C (question 55 of the questionnaire) (PX020879-019).

405.   Ms. Conway's cross shopping analysis is further flawed by her conclusion that WFWO shoppers not only visit many different food retailers, they also buy the "same" products from these retailers. Conway Report (PX02082-036) at 36. Her survey results do not support this conclusion. At her deposition, Ms. Conway conceded that her survey questions only went to food categories and not specific foods. Conway Dep. (JX 20) at 121:15-22 (agreeing that there "is no way of knowing" from the survey whether "respondents view Whole Foods and the other grocers as a substitute for one another for specific foods").

406.   Although Defendants have spent more than a quarter of a million dollars on Ms. Conway's survey (PX02076), and despite Dr. Scheffman himself selecting the geographies to survey, Scheffman Dep. (JX 18) at 211:9-13, Dr. Scheffman stated at his deposition that he did not rely on any conclusions of this survey. *Id.* at 222:8-9.

407.   Ms. Conway's survey was poorly designed and poorly analyzed. The 16 separate samples she collected cannot be extrapolated to any target populations consisting of single or multiple geographies and/or categories of WFWO shoppers. Ms. Conway's unsupported conclusion that Whole Foods and Wild Oats shoppers buy the "same" products at other food retailers is further evidence that her analysis is unreliable. Ms. Conway's survey was poorly executed as illustrated by the failure to use simple validation techniques to catch the zip codes errors. Finally, Ms. Conway's failure to identify and explain the significant confusion rates among her respondents further invalidates the survey's results. Her survey is entitled to no weight.

## 2.    The Stanton Report

408.   The Reports of Dr. Stanton, also submitted on behalf of Defendants, are entitled to no weight.

409.   Further, Dr. Stanton's Reports do not assist the court in understanding the evidence or any fact in issue in this proceeding. Therefore, Dr. Stanton's Report should be rejected under Rule 701 of the Federal Rules of Evidence.

410.   Further, the opinions expressed by Dr. Stanton are not supported by appropriate study and analysis. For example, Dr. Stanton purports to identify and explain the significance of various competitors of PNOS' in various localities. However, Dr. Stanton did so on the basis of "sitting with Yahoo! And, you know, keying in the zip code." Stanton Dep. (JX 19) at 119:18-24, 142:7-144:1, 192:2-194:13.

411.   Dr. Stanton reviewed only two of the numerous investigational hearing and deposition transcripts in this matter to familiarize himself with relevant facts. Stanton Report, Appendix C.

412.   Dr. Stanton either did not seek or was denied access to non-public information produced by Defendants in this very proceeding. Stanton Report, Appendix C; Stanton Dep. (JX 19) at 136:24-137:3, 189:2-13.

413.   Dr. Stanton's personal knowledge did not even extend to a rough knowledge of the natural and organic product SKU counts at premium natural and organic supermarkets, on the one hand, and other food and grocery retailers, on the other, a fundamental matter in this proceeding. Stanton Dep. (JX 19) at 142:16-144:14, 145:20-148:5, 192:12-194:13.

414.   Defendants' industry expert, Mr.Stanton, specifically testified that, both in this case and in a prior case, he was unable to testify as to what a relevant product market is. Stanton Dep. (JX 19) at 63:20-66:6 ("[T]hat's how I look at markets. I'm not sure how anyone else looks at markets, non-marketing people.").

### 3    Dr. Scheffman's Reports and Testimony Are Flawed and Unreliable

415.   The Report and testimony of Defendants' economist, Dr. David Scheffman, are entitled to little or no weight.

416.   Dr. Scheffman's methodology of comparing the Critical Loss for a hypothetical monopolist with qualitative evidence on the price sensitivity of customers is not reliable. Murphy Rebuttal Report (PX02884) at ¶ 4.

417.   Dr. Scheffman's use of Critical Loss analysis fails to recognize that the fundamental issue in this acquisition is how the competitive constraints on the combined entity will change as a result of the acquisition, not whether Whole Foods currently competes, at some level, with other firms in addition to Wild Oats. Murphy Rebuttal Report (PX02884) at ¶ 4.

418.   Correctly done, a Critical Loss analysis that uses precisely the evidence cited by Dr. Scheffman indicates that the proposed acquisition would have significant anticompetitive effects. Murphy Rebuttal Report (PX02884) at ¶ 4.

419.   Dr. Scheffman uses a 5% standard for what constitutes a "small but significant non-transitory increase in price" (SSNIP), even though he accepts and recently publicly opined that such a standard is inappropriate for mergers in low net margin industries like supermarkets. Murphy Rebuttal Report (PX02884) at ¶ 4; PX00322 at 132.

420.   Dr. Scheffman's one-day price comparison focuses largely on pricing from Whole Foods' perspective and thereby misses the anticompetitive motive for the closure of many Wild Oats stores that currently compete against Whole Foods. Murphy Rebuttal Report (PX02884) at ¶ 4.

421.   Dr. Scheffman's one-day price comparison is inconsistent with the evidentiary record indicating that Whole Foods competes by both lowering prices and increasing the quality of service when it competes directly with Wild Oats and other premium/natural organic supermarkets ("PNOS"). Murphy Rebuttal Report (PX02884) at ¶ 4.

422.   Critical Loss (CL) analysis has been applied in many merger cases. CL analysis can be useful, but as with most tools, care must be taken to use it properly. When, as in Dr. Scheffman's report, CL is applied poorly it can yield very misleading results and incorrect conclusions. Murphy Rebuttal Report (PX02884) at ¶ 6.

423.   Dr. Scheffman begins with the calculation of the CL. This part of the analysis is indeed just arithmetic. If a hypothetical monopolist of a given set of products were to raise price by a small amount, there would be two effects on its profits. First, the higher price would cause the monopolist to sell fewer units, reducing profits. Second, the units that buyers still purchase fetch a higher price, raising profits. The CL is the reduction in sales that balances these two effects, leaving the hypothetical monopolist's profits unchanged. Murphy Rebuttal Report (PX02884) at ¶ 9.

424.   Any "Actual Loss" that is larger than the CL would make the price increase unprofitable. Murphy Rebuttal Report (PX02884) at ¶ 9.

425.   While Dr. Scheffman concludes that the Actual Loss for a hypothetical PNOS monopolist would "greatly exceed" or "swamp" the CL thresholds, the entirety of the basis for these conclusions consists of surveys of "cross-shopping" that did not even ask consumers where they would shop following a change in prices. Murphy Rebuttal Report (PX02884) at ¶¶ 10-11.

426.   The survey on which Dr. Scheffman relied were not conducted for the purpose of determining the Actual Loss that would accompany a SSNIP. The Court is unable to assess the methodological integrity of the surveys relied on by Dr. Scheffman, especially for the purposes for which Dr. Schffman invoked them.

427.   Dr. Scheffman provides no quantitative evidence for the magnitude of the Actual Loss that could be compared to these thresholds, and no methodology for calculating the Actual Loss. He simply asserts that the Actual Loss would "swamp" or "far exceed" the thresholds. In his deposition Dr.Scheffman testified that the Actual Loss could be as high as 5% and that he was comfortable with this number. Scheffman Dep. Tr. (JX 18) at 87:22 – 88:2; 90:12-24.

69

428.  In a properly implemented Critical Loss analysis, the Critical Diversion Ratio is the smallest aggregate diversion ratio that allows a hypothetical monopolist of all products in a candidate product market to profitably increase price by a certain magnitude given prevailing industry margins. (Murphy Rebuttal Report (PX02884) ¶ 26) The aggregate diversion ratio is the fraction of lost sales that would be diverted to other products in a candidate product market following the increase in price of one product in the candidate product market. (Murphy Rebuttal Report (PX02884) ¶ 23).

429.  The Critical Diversion Ratio is central to evaluating how the incentive to increase price changes when firms in an industry merge, and, therefore, it is a central element that is required to properly implement and apply Critical Loss analysis to evaluate the competitive impact of a merger/acqusition. When two firms merge, the combined entity internalizes the sales that would have been diverted from one of the formerly independent firms to the other following a price increase. (Murphy Rebuttal Report (PX02884) at ¶ 22) This internalization of diverted sales increases the merged firm's incentive to raise price. A properly formulated Critical Loss analysis must take this change in incentives into account. (Murphy Rebuttal Report (PX02884) at ¶ 24).

430.  Dr. Scheffman's analysis is internally inconsistent. Assuming linear demand and Dr. Scheffman's gross margin of ███, the implied Critical Diversion from Wild Oats to Whole Foods that is required to profitably raise price by 1% is ███. Murphy Rebuttal Report (PX02884) Exhibit 1. Dr. Scheffman has testified that the actual loss following a 1% price increase is 5%. Dr. Scheffman also testified that he has conducted no analyses and has no basis to conclude that the quantity response following a price decrease is different from that following a similar price increase (Scheffman Dep. (JX 18) at 87:22 – 88:2. The critical gain for a 1% price decrease is ███ (Murphy Rebuttal Report (PX02884) at ¶ 32). In other words, Dr. Scheffman's Critical Loss analysis concludes that Whole Foods would currently find it profitable to reduce prices by at least 1% even though his analysis began by assuming that Whole Foods has set its current price to maximize its profits.

431.  Dr. Scheffman also utilizes a 5% SSNIP even though he cites a prior opinion of this court and economic literature that smaller SSNIPS are appropriate for retailing markets. Expert Report of David Scheffman (PX02066) at ¶ 114.

432.  To assess correctly whether it would be profitable for the hypothetical monopolist to increase price by some critical amount, $X$, above the current level, one needs to determine whether the profit increase to other firms in the proposed market more than compensates for the profit loss suffered by the candidate firm that raises its price. Murphy Rebuttal Report (PX02884) at ¶ 23.

70

433.    The amount of profits gained by the other firms in the market can be directly assessed if two things are known. First, what fraction of any sales lost by the firm raising price will be captured by other firms in the candidate market – these are sales that would be lost to an individual firm raising price but would be retained by the hypothetical monopolist. This is commonly referred to as the <u>aggregate diversion ratio</u>. Second, the incremental profit on these transferred sales. Together the diversion ratio and the profit margin will determine how much the other firms gain when an individual firm raises price. Murphy Rebuttal Report (PX02884) at ¶ 23.

434.    A larger fraction of sales diverted to other firms in the market and/or a larger profit margin on these sales will make the incentive to increase price greater for the hypothetical monopolist. Murphy Rebuttal Report (PX02884) at ¶ 24.

435.    Although the precise shape of the demand curve and therefore the exact level of the critical diversion ratio is not known, claims based on the condition that the majority, or even an overwhelming majority, of the hypothetical monopolist's marginal customers would shift outside of the candidate relevant market (rather than shift to other firms within the relevant market) in response to a price increase by one of the firms are implausible. Under linear demand, the fraction of marginal consumers that would shift their purchases to sources outside the candidate market would need to be at least 88.9 percent. Under constant elasticity demand it would need to be 97%. Murphy Rebuttal Report (PX02884) at ¶ 27.

436.    Therefore, a very large fraction of marginal customers could substitute outside of the market rather than within the market and still make a five percent increase in price profitable. For a SSNIP price increase standard of 1 percent the corresponding thresholds for the diversion ratio would be 97.6% and 99.3%—all marginal customers could move elsewhere and the price increase would still be profitable. Murphy Rebuttal Report (PX02884) at ¶ 27.

437.    In terms of market definition, Dr. Scheffman's conclusions lack substantial support. Murphy Rebuttal Report (PX02884) at ¶ 28.

438.    Dr. Scheffman's opinions also ignore quantitative evidence that directly contradicts those opinions. Murphy Rebuttal Report (PX02884) at ¶ 30.

439.    Evidence of what Whole Foods regards as the next–best option for current Wild Oats shoppers is contained in the "Project Goldmine" spreadsheet, which was prepared by Whole Foods' management to assess the value of the proposed merger with Wild Oats. The spreadsheet provides Whole Foods' estimate of what fraction of business from each closed Wild Oats store will come to nearby Whole Foods stores. Murphy Rebuttal Report (PX02884) ¶ 31.

440. Closing a store is like a very large price increase—that is, a price increase that is large enough to drive all customers away. At large price increases, consumers consider options that would otherwise be unacceptably poor substitutes. Thus, the Project Goldmine diversions understate the diversion from Wild Oats to Whole Foods that would occur in response to a small price increase. Murphy Rebuttal Report (PX02884) at ¶ 31.

441. Based on the Project Goldmine spreadsheet, Whole Foods estimates an average diversion ratio for the closed stores of ███████████. This estimate is at least ███████████ the diversion ratios needed to make a price increase of 5 percent profitable for a joint owner of the two stores. It is more than ███████████ the threshold diversion ratio that would make a 1 percent price increase profitable. Murphy Rebuttal Report (PX02884) at ¶ 32.

442. Despite Dr. Scheffman's qualitative arguments and assertions, the substantial diversions between Whole Foods and Wild Oats in those markets where they compete head-to-head as reflected in the Project Goldmine spreadsheet supports a conclusion that Wild Oats customers will not move their purchases to non-PNOS stores in competitively significant numbers. Murphy Rebuttal Report (PX02884) at ¶ 32.

443. The key insight for correctly applying Critical Loss analysis to a merger or market definition is how much profit the other party (in the case of a merger) or other parties (in the case of the SSNIP analysis) gains from an increase in price by one of the firms. The loss in sales from increasing price when each seller acts unilaterally is already factored in to setting the existing (pre-SSNIP) price. In particular, the degree of customer price sensitivity at the store level and the ability of consumers to substitute to other firms outside of the market as well as inside the relevant market are reflected in each seller's chosen margin. The incentive for the merged firm or the hypothetical monopolist to increase price above the current level comes from the profits that would be gained by the other firm(s) when one firm increases its price. Murphy Rebuttal Report (PX02884) at ¶ 33.

444. Applying this insight to the planned closure of Wild Oats stores by Whole Foods, given the high diversion ratios identified in Project Goldmine means that closing Wild Oats' stores would transfer substantial revenues to Whole Foods. This harms consumers in the form of higher prices and reduced choice. Murphy Rebuttal Report (PX02884) at ¶ 40.

445. Dr. Scheffman's calculations of price differences across stores do not meet even minimum standards of analysis, and the conclusions he draws from these calculations are unsupported by both economics and the evidentiary record. Murphy Rebuttal Report (PX02884) ¶ 41.

446. ████████████████████████████████████████████████████

   ███████████████████████ He finds that register prices on this particular day do not vary much

72

across stores within a given region—the vast majority of UPC's (universal product codes) have identical prices at all stores. He takes this finding as evidence that "WFM prices by regions … the prices are determined at the region level (not at the store level) and prices across stores are the same." Expert Report of David Scheffman (PX02066) at ¶289.

447.    Dr. Scheffman's conclusions about pricing are also inconsistent with econometric evidence on Whole Foods' margins, which vary across stores according to the presence or absence of local competition from Wild Oats. Murphy Rebuttal Report (PX02844) at ¶ 47].

448.    Professor Murphy found that Whole Foods' price-cost margins in such perishable departments as seafood, produce, and meat are about █ percent lower when a Wild Oats store is located nearby. Assuming constant unit costs, this implies that Whole Foods' prices on perishables are about █percent lower in locales where Whole Foods and Wild Oats compete head-to-head. Murphy Rebuttal Report (PX02844) at ¶ 47.

449.    These findings are consistent with what one would expect from economics — price effects from competition are largest in the departments where Whole Foods and Wild Oats are most similar to each other and most distinctive from other sellers. Murphy Rebuttal Report (PX02844) at ¶ 47.

450.    Even if the claim that Whole Foods prices uniformly across stores within a region were factually accurate, the existence of uniform pricing does not negate or dilute the anticompetitive effects of eliminating Wild Oats as a competitor. Murphy Rebuttal Report (PX02844) at ¶ 49.

451.    First, it does not alter the reduction in consumer welfare from closing Wild Oats stores. This loss to consumers occurs whether or not Whole Foods raises prices after the merger. This loss to consumers is however equivalent to their loss from raising Wild Oats' prices. Murphy Rebuttal (PX02844) at ¶ 49.

452.    Second, it ignores the fact that even a seller that prices uniformly across areas will set prices that reflect the degree of competition in each of the local markets in which it sells. When a seller prices purely "to market" in each locale, the prices it sets will reflect the degree of competition and the ability of consumers to substitute in each locale. Then areas with more competition will have lower prices, and so on. But if a seller sets uniform prices, those prices will reflect the average amount of competition (formally, the sales-weighted average of demand elasticities) across locales. Then a reduction in competition in some local markets will cause the uniform pricing seller to raise prices "uniformly"—that is, in all the local markets where it sells. Murphy Rebuttal Report (PX02844) at ¶ 50.

453. An analysis of a single day's pricing, even if otherwise will done, cannot provide any reliable conclusions. Professor Murphy's analysis of the entry of Earth Fare in competition with Whole Foods in certain North Carolina markets graphically demonstrates this fact.

454. Had Dr. Scheffman's pricing study reviewed prices on any of numerous days spanning a period of months, he would entirely have missed the localized reductions in Whole Foods' prices that were caused by Earth Fare entry.

455. Further, Dr. Scheffman's use of "in-register" prices in his pricing study would have made his study unreliable even had he assessed pricing over an appropriate span of time. Many price reductions by PNOS are in the form of discounts and promotions not captured by "in-register prices, such as "buy one, get one" free and "10% off of all purchases in excess of $50" offers.

456. Dr. Scheffman's pricing study is unscientific and entitled to no weight whatever.

## IV. THE RELEVANT GEOGRAPHIC MARKETS ARE LOCAL AREAS IN WHICH WHOLE FOODS AND WILD OATS COMPETE OR WILL COMPETE

457. Plaintiff and Defendants agree that local areas are the appropriate geographic markets for analyzing the competitive effects of the proposed acquisition. Professor Murphy and Dr. Scheffman evaluated the impact of the acquisition in geographic markets in which the parties closely compete. Murphy Report (PX02878) ¶¶ 105-07 (PX02878); Murphy Supp. Rebut. Report (PX02883) ¶8; Scheffman Report, App. F (PX02062) ¶1.

458. Defendants' business records and testimony establish that they focus on customers within a distance of three to six miles of their stores when selecting site locations and making other competitive assessments. PX02212 ("3 miles is a general area that we commonly use to compare our stores trade areas"); PX01011 (charting all stores within six miles of Whole Foods in a competitive analysis document); PX00186 at 007 (focusing on customers within a 16 minute driving distance of store); Bradley Dep. (JX 6) at 44:24-45:12; Megahan Dep. (JX 9) at 28:19-21; Meyer Dep. (JX10) at 90:16-18; Lannon Dec. ¶ 23; Besancon Dec. ¶¶ 42, 44, 46, 57, 61, 63, 65, 68-70; Megahan Dec. ¶¶ 7, 8, 25, 28; Martin Dec. ¶ 25; Allshouse Dec. ¶¶ 14; Robb Dec. ¶¶ 36, 38; Paradise Dec. ¶¶ 26-30, 33-37, 39-43, 45-46, 51, 54; PX04733, at 005; PX01374.

459. The Commission's expert, Professor Kevin Murphy, identified relevant geographic markets by analyzing overlaps of store trade areas, using a six mile radius around each store as its trade area. Murphy Report (PX02878) ¶¶ 105-8; Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 012-026.

74

460.   The geographic market definitions proposed by the Federal Trade Commission appropriately represent the area of effective competition between or among premium natural and organic supermarkets in each locality. According to Professor Murphy, "As a matter of logic, there would be competitive interaction in those areas where there is meaningful overlap between the circles around the stores of different participants in the relevant market. The union of these circles approximates the geographic area that will be competitively impacted by this proposed acquisition, and thus represents the relevant geographic market within which the competitive impact of this proposed acquisition can be evaluated." Murphy Supp. Rebut. Report (PX02883) at ¶ 8.

461.   Defining the geographic markets based on the overlapping of trade areas in this manner is consistent with Professor Murphy's econometric analysis. July 31, 2007 AM Tr. Mot. Hr'g at 43:18-44:1 (Murphy test.). ("[T]he markets you get are not sensitive exactly to the distance that you use. So whether you use five or six, you're going to get the same markets. And that's the sense to which six miles was an appropriate distance to use. Had there been a different configuration of markets, in some hypothetical world you might have had to address the question of whether five or six made more sense. But in the markets that we had, they led to the same results, so both lead to acceptable geographic market definitions.").

462.   Defendants' documents and testimony suggest that a larger trade area might be appropriate in a few instances. *See, e.g.* Gallo Dep. (JX 1) 138:25-139:4 (competitive area tends to be smaller in urban areas; larger in suburban areas); Kadish Dep. (JX 7) at 119:10-19 (Whole Foods will consider physical characteristics of terrain such as rivers in assessing an area); Meyer Dep. (JX10) at 90:13-15 (highway access may lead to a broader area); Lannon Dec. ¶ 10 (most customers for Whole Foods' ▮▮▮▮▮▮▮ store come from a 10-15 mile driving radius); Lannon Dep. (JX8) 197:3-5 (customers of Whole Foods' ▮▮▮▮▮▮ store come from a 20 mile radius); Robb Dep. (JX 2) at 91:14-16 [(▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮)]; PX00920 (Wild Oats considered stores within a ten mile radius).

463.   In each instance, if the trade area, and consequently the geographic market, were expanded, no additional premium natural and organic supermarket competitors would be included in the larger area. *See* Murphy Supp. Rebut. Report (PX02883) Exhibit 2 at 012-026. Professor Murphy testified that for "a large number of the markets – of the 18 markets I identify, I think it's something like 14 – . . . they're very much invariant to different assumptions. . . . [T]here are other markets where the existence and type of effects that would occur are not sensitive to those assumptions. What would vary is the precise number of [the Defendants'] stores that would be included in those markets. But the economic analysis would not be substantively changed." Murphy Dep. (JX 26) at 68:22-69:15; July 31, 2007 AM Tr. Mot. Hr'g at 109:16-110:1 (Murphy test.) (Professor Murphy testified that one would have to go "a long ways," "definitely think more than ten

75

miles," and "certainly" more than a state in some instances before you picked up another premium natural supermarket.).

464.  The proposed merger will eliminate Whole Foods' only premium natural and organic supermarket competitor in defined areas within the following 17 localities: Albuquerque, NM; Boston, MA; Boulder, CO; Hinsdale, IL (suburban Chicago); Evanston, IL (suburban Chicago); Cleveland, OH; Denver, CO; West Hartford, CT; Henderson, NV; Kansas City-Overland Park, KS; Las Vegas, NV; Los Angeles, CA; Louisville, KY; Omaha, NE; Pasadena, CA; Portland, ME; and St. Louis, MO. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 012-023, 025-026. The proposed merger will reduce the number of competitors from three to two in a defined area within Portland, OR. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 024. (For convenience, we will refer to each defined relevant market by the city of which it is a part.)

465.  In Albuquerque, NM, the transaction will reduce the number of premium natural and organic supermarket retailers from two to one. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 012. Whole Foods currently operates one premium natural organic supermarket in the Albuquerque, NM, geographic market at 5815 Wyoming Blvd. NE, Albuquerque, NM 87109. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 012; Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates three premium natural organic supermarkets in the Albuquerque, NM, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 012. The Wild Oats in the Albuquerque, NM geographic market are located at the following addresses: 6300 A San Mateo NE, Albuquerque, NM 87109; 2103 Carlisle Boulevard NE, Albuquerque, NM 87110; and 11015 Menaul Boulevard NE, Albuquerque, NM 87112. Wild Oats Response to Specification No. 2 (PX04846). There are no other premium natural and organic supermarkets in the Albuquerque market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 012.

466.  

467.  In Boston, MA, the transaction will reduce the number of premium natural and organic supermarket retailers from two to one. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 013. Whole Foods currently operates 11 premium natural organic supermarkets in the Boston, MA, geographic market. The Whole Foods in the Boston, MA, geographic market are located at the following addresses: 15 Washington Street, Brighton, MA 02135; 115 Prospect Street, Cambridge, MA 02139; 181 Cambridge Street, Charles River Plaza, MA 02114; 200 Alewife Brook Parkway, Cambridge, MA 02138; 916 Walnut Street, Newton, MA 02459; 647 Washington Street, Newtonville,

MA 02458; 340 River Street, Cambridge, MA 02139; 331 Paradise Road, Swampscott, MA 01907; 15 Westland Avenue, Boston, MA 02115; 278 Washington Street, Wellesley Hills, MA 02481; and 400 Cambridge Road, Woburn, MA 01801. Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates two premium natural and organic supermarkets in the Boston, MA geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 013. The Wild Oats in the Boston, MA geographic market are located at the following addresses: 2151 Mystic Valley Parkway, Medford, MA 02155 and 375 Broadway (Route 1), Saugus, MA 01906. Wild Oats Response to Specification No. 2 (PX04846). There are no other premium natural and organic supermarkets in the Boston, MA geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 013.

468.    In the Boston, MA, area, the Wild Oats locations are located in close proximity to the Whole Foods stores. For instance, Whole Foods is located about one and a half miles from the Wild Oats store in Medford. Additionally, the Whole Foods store in Swampscott is about 5 miles from the Wild Oats store in Saugus. Lannon Dec. ¶ 19.

469.    In Boulder, CO, the transaction will reduce the number of premium natural and organic supermarket retailers from two to one. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 014. Whole Foods currently operates one store in the Boulder, CO market at 2905 Pearl Street, Boulder, CO 80301. Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates three premium natural organic supermarkets in the Boulder, CO, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 014. The Wild Oats in the Boulder, CO, geographic market are located at the following addresses: 2584 Baseline Road, Boulder, CO 80303; 1645-1651-1655 Broadway, Boulder, CO 80302; and 303 Marshall Road, Superior, CO 80027. Wild Oats Response to Specification No. 2 (PX04846). Wild Oats also operates store under the Ideal Market banner on Apline Avenue, Boulder, CO 80304. Wild Oats Response to Specification No. 2 (PX04846). There are no other premium natural and organic supermarkets in the Boulder, CO, geographic market. Murphy Supp. Rebut. Report (PX02883) ¶ 8, Exhibit 2 at 014.

470.    Wild Oats planned to open its flagship store in Boulder at 1601 29th Street, Boulder, CO 80401. However, that store has not yet opened and Whole Foods does not plan to operate the 29th Street store if the transaction is consummated. PX00038.

471.    ██████████████████████████████████████████████
        ██████████████████████████████████████████████████
        ██████████████████████████████████████████████████
        ██████████████████████████████████████████████████
        █████████████████████████████

472.  In Hinsdale, IL, the transaction will reduce the number of premium natural and organic supermarket retailers from two to one. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 017. Whole Foods currently operates three premium natural organic supermarkets in the Hinsdale, IL geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 017. The Whole Foods in the Hinsdale, IL geographic market are located at the following addresses: 7245 Lake Street, River Forest, IL 60305; 201 W. 63rd Street, Willowbrook, IL 60527; and 151 Rice Lake Square, Wheaton, IL 60187. Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates one premium natural organic supermarket in the Hinsdale, IL geographic market at 500 E. Ogden Avenue, Hinsdale, IL 60521. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 017. Wild Oats Response to Specification No. 2 (PX 04846). There are no other premium natural and organic supermarkets in the Hinsdale, IL geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 017.

473.  

474.  In Evanston, IL, the transaction will reduce the number of premium natural and organic supermarket retailers from two to one. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 017. Whole Foods currently operates three premium natural and organic supermarkets in the Evanston, IL, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 017. The Whole Foods in the Evanston, IL, geographic market are located at the following addresses: 1640 Chicago Avenue, Evanston, IL 60201; 3300 N. Ashland, Chicago, IL 60657; and 6020 N. Cicero Avenue, Chicago, IL 60646. Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates one premium natural organic supermarket in the Evanston, IL, geographic market at 1101-1137 Chicago Avenue, Evanston, IL 60202. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 017. Wild Oats Response to Specification No. 2 (PX04846). There are no other premium natural and organic supermarkets in the Evanston, IL geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 017.

475.  

476.  In Cleveland, OH, the transaction will reduce the number of premium natural and organic supermarket retailers from two to one. Murphy Supp. Rebut. Report (PX02883) at ¶ 8,

Exhibit 2 at 015; DX160 at 5 (defining the trade area as three miles for 180 degrees to the west and 7 ½ miles to the east to the Cuyahoga/Geauga County line). Whole Foods currently operates one premium natural and organic supermarket in the Cleveland, OH, geographic market at Cedar & Warrensville Rd, Cleveland, OH 44118. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 015; Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates one premium natural and organic supermarket in the Cleveland, OH, geographic market at 27249 Chagrin Blvd., Cleveland, OH 44122. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 015; Wild Oats Response to Specification No. 2 (PX04846). There are no other premium natural and organic supermarkets in the Cleveland, OH, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 015.

477.    In Denver, CO, the transaction will reduce the number of premium natural and organic supermarket retailers from two to one. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 016. Whole Foods currently operates four premium natural and organic supermarkets in the Denver, CO, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 016. The Whole Foods in the Denver, CO, geographic market are located at the following addresses: 444 South Wadsworth Boulevard, Lakewood, CO 80226; 2375 E. First Ave, Denver, CO 80206; 9366 South CO Boulevard, Ste B, Highlands Ranch, CO 80126; and 7400 E. Hampden Ave, Tamarac-Denver, CO 80237. Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates six premium natural and organic supermarkets in the Denver, CO, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 016. The Wild Oats in the Denver, CO, geographic market are located at the following addresses: 900 E 11th Avenue, Denver, CO 80218; 870 S Colorado Blvd., Glendale, CO 80246; 8194 S. Kipling Parkway, Littleton, CO 80127; 5910 S. University, Littleton, CO 80121; 1111 S. Washington Street, Denver, CO 80210; and 14357 W. Colfax Avenue, Lakewood, CO 80401. Wild Oats Response to Specification No. 2 (PX04846). There are no other premium natural and organic supermarkets in the Denver, CO, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 016.

478.    ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

479.    ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

480.    

481.    In West Hartford, CT the transaction will reduce the number of premium natural and organic supermarket retailers from two to one. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 026. Lannon Dec. ¶ 10 (80% of the customers who shop at the Whole Foods in West Hartford, CT, come from a surrounding 10-15 mile drive radius). Whole Foods currently operates one premium natural and organic supermarket in the West Hartford, CT, geographic market at 50 Raymond Road, West Hartford, CT 06107. Whole Foods Response to Specification No. 2 (PX02052); Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 026. Wild Oats currently operates one premium natural and organic supermarket in the West Hartford, CT geographic market at 340 North Main Street, West Hartford, CT 06117. Wild Oats Response to Specification No. 2 (PX04846). Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 026. There are no other premium natural and organic supermarkets in the West Hartford, CT, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 26.

482.    In Henderson, NV the transaction will reduce the number of premium natural and organic supermarket retailers from two to one. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 018; Bensacon Dec. ¶ 59 (noting that Wild Oats is located approximately 4 miles from the Whole Foods store). Whole Foods currently operates one premium natural and organic supermarket in the Henderson, NV, geographic market at 100 S. Green Valley Parkway, Henderson, NV 89012. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 018; Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates one premium natural and organic supermarket in the Henderson, NV, geographic market at 517 N. Stephanie Street, Henderson, NV 89104. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 018; Wild Oats Response to Specification No. 2 (PX04846). There are no other premium natural and organic supermarkets in the Henderson, NV, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 018.

483.    In Kansas City-Overland Park, KS, the transaction will reduce the number of premium natural and organic supermarket retailers from two to one. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 019. Whole Foods currently operates one premium natural and organic supermarket in the Kansas City-Overland Park, KS, geographic market at 7401 West 91st Street, Overland Park, KS 66212. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 019; Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates three premium natural and organic supermarkets in the Kansas City-Overland Park, KS, geographic market. Murphy Supp.

Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 019. The Wild Oats in the Kansas City-Overland Park, KS, geographic market are located at the following addresses: 5101 Johnson Drive, Mission, KS 66205; 6621 W. 119th Street, Overland Park, KS 66209; and 4301 Main Street, Kansas City, MO 64111. Wild Oats Response to Specification No. 2 (PX04846). There are no other premium natural and organic supermarkets in the Kansas City-Overland Park, KS, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 019.

484.



485. In Las Vegas, NV, the transaction will reduce the number of premium natural and organic supermarket retailers from two to one. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 018; DX 126 at 5, 6 (focusing on customers within a three mile radius and 8-16 minute drive time to assess the competitive conditions in the area). Whole Foods currently operates one premium natural and organic supermarket in the Las Vegas, NV, geographic market at 8855 West Charleston Boulevard, Las Vegas, NV 89117. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 018; Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates one premium natural and organic supermarkets in the Las Vegas, NV, geographic market at 7250 W. Lake Mead Boulevard, Las Vegas, NV 89128. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 018; Wild Oats Response to Specification No. 2 (PX04846). There are no other premium natural and organic supermarkets in the Las Vegas, NV, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 018.

486.



487. Los Angeles, CA the transaction will reduce the number of premium natural and organic supermarket retailers from two to one. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 20. Whole Foods currently operates six premium natural and organic supermarkets in the Los Angeles, CA, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 020; Besancon Dec. ¶ 48 (noting that the Wild Oats stores in the Los Angeles area are located about 1 to 1 ½ miles from the Whole Foods stores). The Whole Foods in this market are located at the following addresses: 11737 San Vincente Boulevard, Los Angeles, CA 90049; 239 North Crescent Drive, Beverly Hills,

81

CA 90210; 6350 West 3rd Street, Los Angeles, CA 90036; 2201 Wilshire Boulevard, Santa Monica, CA 90403; 11666 National Boulevard, Los Angeles, CA 90066; and 1050 S. Gayley St., Westwood, CA 90024. Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates two premium natural and organic supermarkets in the Los Angeles, CA, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 020. The Wild Oats in this geographic market are located at the following addresses: 1425 Montana Avenue, Santa Monica, CA 90403; and 500 Wilshire Boulevard, Santa Monica, CA 90401. Wild Oats Response to Specification No. 2 (PX04846). There are no other premium natural and organic supermarkets in the Los Angeles, CA geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 020

488. In Louisville, KY, the transaction will reduce the number of premium natural and organic supermarket retailers from two to one. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 021; DX 80 at 27 (focusing on up to a 16-minute drive time and a three mile radius to assess the competitive conditions in the area). Whole Foods currently operates one premium natural and organic supermarket in the Louisville, KY, geographic market at 4944 Shelbyville Road, Louisville, KY 40207. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 21; Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates one premium natural and organic supermarkets in the Louisville, KY geographic market at 4600 Shelbyville Road, St. Matthews, KY, 40207. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 021; Wild Oats Response to Specification No. 2 (PX04846). There are no other premium natural and organic supermarkets in the Louisville, KY, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 021.

489. 

490. In Omaha, NE the transaction will reduce the number of premium natural and organic supermarket retailers from two to one. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 022. Whole Foods currently operates one premium natural and organic supermarket at 10020 Regency Circle, Regency-Omaha, NE 68114. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 022; Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates one premium natural and organic supermarkets in the Omaha, NE geographic market at 7831 Dodge Street, Omaha, NE 68114. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 022; Wild Oats Response to Specification No. 2 (PX04846). There are no other premium

natural and organic supermarkets in the Omaha, NE geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 022.

491. 

492. In Pasadena, CA, the transaction will reduce the number of premium natural and organic supermarket retailers from two to one. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 020. Whole Foods currently operates two premium natural and organic supermarkets in the Pasadena, CA, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 020. The Whole Foods in the Pasadena, CA, geographic market are located at the following addresses: 331 North Glendale Avenue, Glendale, CA 91206; and 3751 East Foothill Boulevard, Pasadena, CA 91107. Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates one premium natural and organic supermarket in the Pasadena, CA geographic market at 603 S. Lake Avenue, Pasadena, CA 91106. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at0 20; Wild Oats Response to Specification No. 2 (PX04846). There are no other premium natural and organic supermarkets in the Pasadena, CA, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 020.

493. 

494. In Portland, ME, the transaction will reduce the number of premium natural and organic supermarket retailers from two to one. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 023; DX 171 at 4 (Whole Foods profiled a 12-mile radius of a potential site for a store). Whole Foods currently operates one premium natural and organic supermarket in the Portland, ME, geographic market at 127 Marginal Way, Portland, ME 04101. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 023; Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates one premium natural and organic supermarket in the Portland, ME, geographic market at 87 Marginal Way Portland, ME 04101. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 023; Wild Oats Response to Specification No. 2 (PX04846). There are no other premium natural and organic supermarkets in the Portland, ME, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 023.

495. 

496. In St. Louis, MO, the transaction will reduce the number of premium natural and organic supermarkets from two to one. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 025; DX 104 at 5, 29-30 (focusing on customers with a 3, 8, and 16-minute drive time of the store and 3 and 10-mile radii). Whole Foods currently operates one premium natural and organic supermarket in the St. Louis, MO, geographic market at 1601 S. Brentwood Boulevard, St. Louis, MO 63144. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 025; Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates one premium natural and organic supermarket in the St. Louis, MO, geographic market at 8819-8833 Ladue Road, St. Louis, MO 63124. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 25; Wild Oats Response to Specification No. 2 (PX04846). There are no other premium natural and organic supermarkets in the St. Louis, MO, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 025.

497. 

498. In Portland, OR the transaction will reduce the number of premium natural and organic supermarket retailers from three to two. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 024. Whole Foods currently operates two premium natural and organic supermarkets in the Portland, OR, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 024. The Whole Foods in this market are located at the following addresses: 7380 SW Bridgeport Road, Lake Oswego, OR 97224; and 1210 NW Couch Street, Portland, OR 97209. Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates four premium natural and organic supermarkets in the Portland, OR, geographic market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 024. The Wild Oats in this geographic market are located at the following addresses: 3535 NE 15th Avenue, Portland, OR 97212; 6344 SW Capitol Highway, Portland, OR 97239; 2825 E. Burnside Street, Portland, OR 97214; and 7485 SW Bridgeport Road, Tualatin, OR 97062. Wild Oats Response to Specification No. 2 (PX04846). New Seasons Market is also a premium natural and organic retailer in the Portland, OR, geographic market. New Seasons currently operates seven stores in this relevant market. Murphy Supp. Rebut. Report (PX02883) at ¶ 8, Exhibit 2 at 024.

499.   

500.   The proposed transaction will also eliminate future competition in seven local areas in which Whole Foods and Wild Oats had planned to compete with one another. These areas are located within: Fairfield County, CT; Miami, FL; Naples, FL; Nashville, TN; Palo Alto, CA; Reno, NV; and Salt Lake City, UT. PX04357. (For convenience, we will refer to each defined relevant market by the city of which it is a part.)

501.   Whole Foods plans to open two stores in the Fairfield County, CT, area in 2008 and 2009, respectively. PX04357 at 001. The future stores will be located at the following addresses: Interstate Hwy 95 at Leroy Avenue, Darien, CT 06820; and Kings Hwy at Garsmere Avenue, Fairfield, CT 06824. PX04357 at 001. Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates one store in Fairfield County at 399 Post Road West, Westport, CT, 06880. PX04357 at 001. Wild Oats Response to Specification No. 2 (PX04846). The trade areas of these Whole Foods and Wild Oats stores would overlap, but would not overlap with the trade area of any other premium natural and organic supermarket.

502.   Whole Foods plans to open one store in the Miami, FL, geographic market in 2007. PX04357 at 002. The planned store will be located at Red Road & San Remo Drive, Coral Gables, FL 33146. Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates one store in the market at 11701 South Dixie Highway, Pinecrest, FL 33156. Wild Oats Response to Specification No. 2 (PX04846). The trade areas of these Whole Foods and Wild Oats stores would overlap, but would not overlap with the trade area of any other premium natural and organic supermarket.

503.   Whole Foods plans to open one store in the Naples, FL, area in 2008. PX04357 at 003. The planned store is to be located at Tamiami Trail, Naples, FL 34108. Whole Foods Response to Specification No. 2 (PX02052). Wild Oats currently operates one store in the area at 6424 Naples Boulevard, Suite #601, Naples, FL 34109. Wild Oats Response to Specification No. 2 (PX04846).

504.   

85



505.   Whole Foods plans to open one store in the Nashville, TN area in 2007 at Hillsboro
       Circle, Nashville, TN 37215.  PX04357 at 004; Whole Foods Response to Specification
       No. 2 (PX02052). Wild Oats currently operates one store in the area at 3909 Hillsboro
       Pike, Nashville, TN 37203.  Wild Oats Response to Specification No. 2 (PX04846).

506.   

507.   Whole Foods plans to open one store in the Palo Alto, CA, geographic market in 2008.
       Whole Foods Response to Specification No. 2 (PX02052).  It currently operates 7 stores
       in the market.  PX04357 at 005.  Wild Oats plans to open two stores in the same area.
       Wild Oats Response to Specification No. 2 (PX04846); PX04357 at 005  The trade areas
       of these Whole Foods and Wild Oats stores would overlap, but would not overlap with
       the trade area of any other premium natural and organic supermarket.  PX04357 at 005.

508.   Whole Foods plans to open one store in Reno, NV in 2007 at 5695 S. Virginia & Del
       Monte, Reno, NV 89502. PX-4357 at 006; Whole Foods Response to Specification No. 2
       (PX02052).  Wild Oats currently operates one store in the market at 5695 S. Virginia,
       Reno, NV  89502.  Wild Oats Response to Specification No. 2 (PX04846).

509.   

510.   Whole Foods plans to open one store in Salt Lake City in 2008 at 400 So. 700 East, Salt
       Lake City, UT  84102. Whole Foods Response to Specification No. 2 (PX02052).  Wild
       Oats currently operates two stores in the area at 645 East 400 South, Salt Lake City, UT
       84101 and 1131 Wilmington Avenue, Salt Lake City, UT  84106.  PX04357 at 007; Wild
       Oats Response to Specification No. 2 (PX04846).

511.  

## V.  THE MERGER WILL REDUCE COMPETITION BECAUSE IT WILL COMBINE THE TWO CLOSEST COMPETITORS IN HIGHLY CONCENTRATED MARKETS

### A.  Market Share and Concentration

512.  Mergers that significantly increase market concentration are presumptively unlawful because the fewer the competitors and the larger the respective market shares, the greater the likelihood that a single firm or group of firms could raise prices above competitive levels. *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986); Merger Guidelines (PX01310) § 2.0.

513.  Concentration typically is measured by market share and by the Herfindahl-Hirschman Index ("HHI"). The HHI is calculated by summing the squares of the market shares of each market participant, so that greater weight is given to market shares of larger firms, consistent with their relative importance in competitive interactions. Merger Guidelines (PX01310) § 1.5.

514.  Where the pre-acquisition HHI exceeds 1800 points, it "is presumed that mergers producing an increase in the HHI of more than 100 points are likely to create or enhance market power or facilitate its exercise." Merger Guidelines (PX01310) § 1.51.

515.  In this case, the combined shares of Whole Foods and Wild Oats in the premium natural and organic supermarkets would be 100% in 17 of the 18 relevant geographic markets, as they are the only premium natural and organic supermarkets in those geographic markets. This reaches the theoretical maximum HHI of 10,000 points. PX01302 at 020; PX00613 at 018-019; PX01011.

516.  The combined share of Whole Foods and Wild Oats creates a strong presumption that the proposed transaction is anticompetitive, injurious to consumers, and illegal.

### B.  Other Evidence Confirms That Anticompetitive Harm Will Result From the Acquisition

1.    **Unique Price Competition Will Be Lost**

a.    **Economic Evidence Shows Price Effects of Whole Foods-Wild Oats Competition**

517.    The closeness of competition between the merging parties is a significant factor in the competitive effects analysis. Scheffman Dep. (JX 18) at 127:15-25, 128:1-4.

518.    The closure of the Wild Oats stores will transfer significant revenues to Whole Foods. On the whole, Whole Foods expects to capture ▮▮▮▮▮ of current Wild Oats sales in these markets. Aug. 1, 2007 AM Tr. Mot. Hr'g at 68-69; Murphy Report (PX02878) ¶ 85; DX 547 at 27 ("very conservative" estimate of ▮▮); DX 0401 at 12. The ▮▮ diversions show the closeness of competition between Wild Oats and Whole Foods. Murphy Report (PX02878) ¶ 53; PX00553; PX01339; PX00547.

519.    The empirical analysis supports the conclusion that Whole Foods and Wild Oats are each other's closest competitors. Murphy Report (PX02878) ¶ 143.

520.    The evidence on substitution and the degree of competition between Whole Foods, Wild Oats and other retailers provides direct evidence for understanding the competitive effects of the proposed acquisition. Murphy Report (PX02878) ¶ 80.

521.    The direct econometric evidence on the extent of consumer harm is not affected by the market definition chosen – the market definition chosen simply highlights the nature and extent of that harm. Murphy Report (PX02878) ¶ 149.

522.    The proposed acquisition will eliminate significant, direct, head-to-head competition in at least 18 local markets in which Wild Oats and Whole Foods presently compete. Murphy Report (PX02878) ¶ 2. The reduction in competition will result both where Wild Oats stores will be closed by Whole Foods and in markets where Wild Oats stores will be turned into Whole Foods stores. Murphy Report (PX02878) ¶ 2, 9, 11, 22.

523.    The competition between premium natural and organic supermarkets results in unique downward pressure on price and margins. Murphy Report (PX02878) ¶¶ 6-7, 11.

524.    Professor Murphy explored the impact of Earth Fare's entry by using Whole Foods' pricing data. Professor Murphy concluded that [

▮▮▮▮▮▮▮▮]. Murphy Supplemental Report (PX02883) ¶¶ 4-5. This analysis demonstrates the intense competition among premium natural and organic supermarkets.

525.  Professor Murphy conducted a rigorous econometric analysis of the impact that various
      competitor openings have had on the prices, margins and sales volume of Whole Foods
      and Wild Oats.  Murphy Report (PX02878).

526.  Store closings do not typically constitute appropriate "natural experiments" for
      econometric study of the price impacts of structural changes in the market because: (a)
      there is little incentive for the surviving incumbent(s) to endanger customer goodwill by
      sharply or noticeably increasing prices immediately upon the exit of a competitor; (b) the
      fact that stores typically close because they were unable to succeed in the face of
      competition implies that closing stores would have stopped being competitively
      significant in the marketplace at some earlier time that is unknown to the analyst.
      Murphy Dep. (JX 26) at 173:14-76:16; July 31, 2007 AM Tr. Mot. Hr'g at 91:15-92:13
      (Murphy test.).

527.  Entry by Whole Foods into a local market where Wild Oats currently operates has a
      substantial effect on Wild Oats.  Margins, prices and sales at the Wild Oats store fall
      substantially, with sales falling by roughly ▮▮▮▮▮, margins falling by▮▮▮▮▮▮▮
      and ▮▮▮▮▮▮▮▮▮▮▮.  No other putative competitors have similar effects on
      either Whole Foods or Wild Oats.  Murphy Report (PX02878) ¶ 7.

528.  The econometric evidence shows that banner entry by Whole Foods into markets where
      Wild Oats was already present caused Wild Oats to reduce prices.  On average during the
      first year, prices were ▮▮▮▮▮▮▮▮and remained roughly ▮▮▮▮▮▮lower in the
      ▮▮▮▮▮▮ after entry.  Murphy Report (PX02878) ¶ 81.

529.  Conceptually, the closure of the Wild Oats stores is essentially the reverse of the entry
      experiment with a move from having both firms present to having one firm present rather
      than a movement from one present to both present.  However, we might expect the effects
      of Wild Oats exit to be somewhat smaller owing to the greater size of Whole Foods in
      most of the overlap markets.  Murphy Report (PX02878) ¶ 82.

530.  The entry of▮▮▮▮▮▮into direct competition with Whole Foods provides an
      alternative estimate of the effect of Wild Oats exit.  Murphy Report (PX02878) ¶ 83.

531.  A price study by Professor Murphy showed that entry by ▮▮▮▮▮▮caused Whole
      Foods' *prices to decline* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮in June
      through August 2005.  Murphy Supp. Rebut. Report (PX02883) ¶¶ 4-5.  The significant
      effect that ▮▮▮▮▮▮entry had on Whole Foods' pricing is corroborated in high level
      Whole Foods planning documents.  PX00131 at 019; DX 8 at 19; PX03206 at 019.

532.  The Earth Fare price study and the documents demonstrate how effects on price can be
      substantially higher than effects on margins, which Professor Murphy found to be in the
      range of ▮▮ percent.  Murphy Report (PX02878) ¶¶ 83, 143 and Exhibit 4 (PX02882).

533.  Econometric analysis indicates that Whole Foods margins are about 7-tenths of a percentage point (-.0070) lower in in markets where there are two Whole Foods stores than in markets where there is one Whole Foods store and one Wild Oats store. This estimated margin difference implies a 1.1% price drop, assuming constant unit costs. The p-value for the estimate of 0.1625. Murphy Report  (PX02878) ¶ 66.

534.  A p-value represents the chance that the estimated difference can be obtained when the actual difference is zero. Murphy Dep. (JX 26) at 146:4-6.

535.  Econometric evidence indicates that Whole Foods' margins are significantly higher in markets where Whole Foods operates two stores than in markets where Whole Foods and Wild Oats each operate one store. The estimated effects on gross margins are 2.1 percentage points higher for produce items and 1.9 higher for seafood. The effect for meat is 1.8 percentage points. The fact that margins are higher in produce, seafood and meat when the two stores in an area are jointly owned by Whole Foods is consistent with the more unique nature of Whole Foods and Wild Oats in these departments. In contrast, the effect for groceries – where the two sellers are less differentiated from others – is essentially zero. Murphy Report (PX02878) ¶ 67.

536.  To the extent that this econometric experiment replicates the change in ownership structure contemplated by the proposed acquisition, it implies that Whole Foods' prices likely would rise by more than ▆▆ overall, and by about or more than ▆▆ in the ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ in markets where now separate Whole Foods and Wild Oats stores would come under common ownership. Murphy Report (PX02878) ¶ 66; July 31, 2007 AM Tr. Mot. Hr'g at 135:16-24 (Murphy test.).

**b.    Evidence of the Constraining Effect on Whole Foods from PNOS Competition**

537.  ▆▆▆▆▆▆▆, a regional premium natural and organic supermarket,  is "a good analogy to use to try to understand what the effect of PNOS competition was." July 31, 2007 AM Tr. Mot. Hr'g at 126:14-16 (Murphy test.).

538.  Professor Murphy's analysis of the ▆▆▆▆▆▆ episode demonstrates that Whole Foods changes the prices it charges at particular stores in response to competitive pressures felt uniquely at that store, and that prices do vary systematically across stores within a region. Murphy Supp. Rebut. Report (PX02883) ¶ 2.

539.  In 2005, Whole Foods operated five stores in North Carolina, located in Raleigh, Durham, Chapel Hill, Cary, and Winston-Salem. Whole Foods responded to ▆▆▆▆▆ ▆▆▆▆▆ entry by selectively cutting local prices. Murphy Supp. Rebut. Report (PX02883)

90

¶ 3; *see also* PX01005 at 005 ("We have been very successful keeping ███████from getting established in Chapel Hill and Raleigh. We have upped our execution and been very aggressive with our pricing."); PX01006 at 004 ("The regional team did a nice job getting the Chapel Hill, Raleigh and Durham stores ready to compete by . . . taking an aggressive price stance. . . . We have heard from ████████that they were surprised by our aggressive pricing and that their coming to the Triangle was probably a mistake."); PX04827 at 002-003.

540.    There were virtually no price differences among stores in North Carolina prior to███ ████████entry in June 2005. But in mid-June, precisely when ████████opened in Chapel Hill, prices in Whole Foods' Chapel Hill store fell sharply. By the beginning of July, Whole Foods' prices in Chapel Hill were more than ██ below the prices in the benchmark stores. Importantly, Whole Foods' prices in Raleigh and Durham – where ████████had not yet opened – did not fall at that time. Murphy Supp. Rebut. Report (PX02883) ¶ 4 and Exhibit 1 (PX02882).

541.    Whole Foods' prices in Raleigh and Durham did fall 11 weeks later, precisely when ████████opened in Raleigh-Durham. Murphy Supp. Rebut. Report (PX02883) ¶ 5 and Exhibit 1 (PX02882).

542.    Whole Foods cut prices in the Raleigh and Durham stores by about ███, on average, and for some months thereafter the price reductions in the three "competing" Whole Foods stores moved in near lock-step. Murphy Supp. Rebut. Report (PX02883) ¶ 5 and Exhibit 1 (PX02882).

543.    Although the size of price cuts dissipated over time, perhaps reflecting the weakening of ████████as a competitive threat – it exited the Chapel Hill market in January of 2007 – consumers in Chapel Hill enjoyed the benefits of substantial price reductions for roughly a year after the advent of competition in that market. Murphy Supp. Rebut. Report (PX02883) ¶ 5 and Exhibit 1 (PX02882).

544.    These episodes, including the eventual closure of ████████Chapel Hill store, illustrate the types of local market price wars that Whole Foods will be able to avoid by acquiring Wild Oats. Murphy Supp. Rebut. Report (PX02883) ¶ 6.

545.    The econometric evidence relating to ████████is reflected in Whole Foods' contemporaneous documents. Those documents showed that Whole Foods executives planned to match ████████sales prices and to make strategic price cuts that would "really punish ██ and make a statement about any competition that thinks about competing with US." The documents recommended specific ████████████ on particular items. Murphy Supp. Rebut. Report (PX02883) ¶ 2; PX03206 at 019; PX04665; PX04667; PX04668; PX04697; PX04699; PX04700; PX04805; PX04821; PX04818; PX04840.

91

> c.    **Unique Price and Non-Price Competition Has Occurred, and Would Continue, but for This Acquisition**

546.    The episode with Earth Fare has been repeated many times with Wild Oats, and will occur again in Boulder and other local markets if Wild Oats remains an independent competitor. PX00773. Although Whole Foods claims a total absence of any meaningful localized competition with Wild Oats, the expert testimony highlighted above, Whole Foods rationale for the deal, and the competition described below belie that. PFF 517-32, 533-39, 545-89.

547.    In a report to its Board, Whole Foods said that margins in Louisville, Kentucky, were low "because we are having to match some ridiculously low special pricing at Wild Oats." PX01008 at 002.

548.    In another report to the Board, Whole Foods reported on price competition with███ ████████████opened . . . [its ██████ store] on May 19, 2004. . . . We have put in place a competitive pricing strategy to beat █████████to the punch. . . . █████████is now trying desperate measures such as buy one get one free promotions and 20% and 50% off with very limited success. . . . The ████████store [in ██████████████] is still operating in a desperation mode heavily discounting product to try and drive sales . . . ." PX00016 at 005-006.

549.    Whole Foods had to reduce prices in Boulder, Colorado, to match advertised "Buy One Get One Free" promotions at Wild Oats. PX00187; *see also* PX00039 (Whole Foods matching Wild Oats prices in Evanston).

550.    Both Whole Foods and Wild Oats respond to competition from one another by improving product service and other aspects of product quality when they face nearby competition from each other. This non-price competition will be lost in the local markets in which Whole Foods would close Wild Oats stores. Murphy Report (PX02878), ¶ 9. *See also* PX01314 at 008; PX01337 at 002.

551.    Whole Foods remodeled its Boulder, Colorado, store in anticipation of competition from Wild Oats' new store. "WILD OATS: Competitive Intrusion @ 29th Street [in Boulder]. We've known about it for awhile, so we've been remodeling in preparation for it . . . . We're also focusing on competitive pricing." PX00015 at 001; PX00007; PX00078 (big labor expense planned in anticipation of Wild Oats opening).

552.    Whole Foods anticipated competition on many elements: "Eleven months from now we will have a serious competitor coming in across the street from our highest volume store in the region. This means we must go to war. Craftsmanship, execution, retail pricing strategies, customer service, and quality is how we will win against Wild Oats in Boulder.

92

It will be my commitment not to let them take our market share away. We will work with producers in every category to make sure we are not under sold. In my opinion there is nothing we cannot do to be competitive . . . ." PX01314 at 008.

553. A Whole Foods' document acknowledged that without competition from a premium natural and organic supermarket, "we potentially become slow and lazy. Our prices go up and our customer service goes down." PX001337 at 002.

554. Whole Foods and Wild Oats in competition with each other increased their spending on remodeling and updating stores, expanding product offerings, and adding customer service and amenities in competition with one another. This competition would be eliminated by the proposed acquisition.

555. Whole Foods expanded its store in anticipation of competition from Wild Oats: "Wild Oats is opening their 40,000 square foot flagship store three blocks south of us. Our expanded store, opening 12 months after their scheduled opening, will put another nail in the Oats coffin." PX00018 at 001; DX204 at 2 (Mackey report to the Board stating that expansion of Boulder store will "severely cripple" Wild Oats' 29th Street store); PX00026 (in an "organic war" with Wild Oats).

556. Wild Oats also anticipated price competition with Whole Foods in Boulder. PX00025 ("When we open 29th Street I do not want Whole Foods to have a lower retail on any items in our top 400").

557. In stark contrast, after the merger agreement, Whole Foods immediately benefitted in its Boulder store from the lack of competition against Wild Oats new flagship. DX 202 at C16 ("We had been gearing up for a battle with Wild Oats in Boulder in Q2, but of course as of today that has now changed.").

558. In 2002, Whole Foods exhorted its team to "beat Oats": "Colorado, New Mexico Wild Oats – ATTACK! We can beat them on all fronts. . . . Stay aggressive with pricing, quality, variety/specialty and customer service." PX01313 at 001, 007.

559. A.C. Gallo, Co-President and COO of Whole Foods, in 2006 boasted to CEO John Mackey: "We will just have to keep kicking [Mr. Odak's] ass wherever we compete and let the customers decide. I can't wait until we open our Portland store next year and squash them with both higher quality and lower prices." PX01312 at 001.

560. ██████████████████████████████████████████
████████████████████████████████████████████████. DX 487.

561. Wild Oats' employees were instructed to "[p]rice check on WFMI perishables to look for price increase opportunities." PX01316.

93

562.   Wild Oats anticipated price competition with Whole Foods: "After WF opens [in Reno, Nevada], we would probably do ██████████████████." PX01317.

563.   Wild Oats competed with Whole Foods on price and promotions: "Perhaps we could drop an aggressive fresh flyer or two into WF zip codes [in ████████████] in the coming weeks? . . . As you can see, the heaviest effected [sic] departments are Seafood, Produce, Meat . . . . These departments are at least 15% down from August. . . . During the time of September 1st through October 4th, we ran bounce back coupons. Save $5 off an order of $20 or more, and save $10 of an order of $40 or more. . . . We have also started a 10% off student discount program at the begin [sic] of September." PX01315 at 001-002.

564.   Wild Oats aimed to keep its prices competitive with Whole Foods. Perry Odak testified that "we [at Wild Oats] knew that from a competitive standpoint that we could not price above Whole Foods and expect that we're going to build the business, so we as a pricing policy strove, where Whole Foods was a competitor, to price at parity with Whole Foods on a market basket." Odak IH (JX 37) at 39:25-40:5; *see also* PX02102 ("We will invest ████████████████████████ with Whole Foods in Grocery & Holistic Health."); PX01238 at 003; PX00032; PX00035; PX00040.

565.   Wild Oats believed it had more pricing discretion to raise prices when Whole Foods was not a local competitor. Perry Odak, the former CEO of Wild Oats, testified that "where there was less competition you had more pricing room, so if Whole Foods wasn't your major issue or the Whole Foods pricing was above you, you could, you know, be more comfortable in terms of moving prices up. But that also went for temporary price reductions. If you were worried about the competition, *i.e.*, Whole Foods in many cases or most cases, you, you know, passed those price promotions on [to consumers] most of the time penny for penny. If you were less worried about or it was not an issue either because Whole Foods was above you or not in the marketplace, you had the opportunity to pocket some of that money . . . ." Odak IH (JX 37) at 64:7-66:10.

566.   In the fall of 2006, Perry Odak directed Chad Smith, Wild Oats' Director of Pricing, to evaluate stores where they could ████████. Smith IH (JX 38) at 139:2-140:5. The list consisted entirely of stores in markets ████████████████████. PX01372 (██████ ████████████████████████████████"); PX01374 (maps prepared by Wild Oats depicting three-mile radius around Wild Oats stores); PX04401 (maps depicting six-mile radius around the specific Wild Oats stores selected by Odak). The list also noted locations where ████████████████. PX01372. In two cities where Wild Oats did not think ████████████████████ ████), Wild Oats ultimately ████████. Smith IH (JX 38) at 140:6-14. In one of the cities where Wild Oats had information that Whole Foods ████████, Wild Oats ████████. *Id.* at 144:3-17.

94

567.   Roger Davidson, Wild Oats' Senior Vice President for Marketing, sent CEO Greg Mays an email showing that Wild Oats would respond to Whole Foods' entry in Portland, Maine, (in February 2007) with "███████" and non-price competition in the form of increased ████████████████ and additional services such as nutritionists and naturopaths, provided free of charge.  PX00763 at 001.

568.   Wild Oats developed a plan in 2005, called "Whole Foods Competitive Marketing Plan." PX00469.  In the slide entitled "Competitive Tactics: Pricing," the report states: "Objective: ████████████████ WFMI and Wild Oats regarding ████████ ████████████████████████████████." *Id.* at 009.

569.   ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████

570.   Wild Oats 2007 Business and Financial Plan called for the company to "Reduce Retail Pricing.  Wild Oats Grocery and Natural Living (██ on WFMI). ████████████ investment needed ████████ with WFMI." PX00458 at 005.

571.   Wild Oats' Senior Vice President for Merchandising & Marketing Roger Davidson told his Director of Pricing Schematics Chad Smith to "████████████████ ████████████████████████████████." PX01202.

572.   On ████████████, Wild Oats' Senior Vice President for Merchandising & Marketing Roger Davidson told his Director of Pricing Schematics Chad Smith to implement ██ ████████████████████████████████████████ PX01203.

573.   In an April 2005 presentation for a Project Greenspace meeting, Wild Oats depicted itself as "1 of 2 National Natural & Organic Chains.  Wild Oats and Whole Foods brands dominate the Natural and Organic channel.  Wild Oats established its brand position via an extensive and authentic 'all-natural' and 'organic' offering targeting a broadening health/well-being consumer segment." PX01332 at 102.

574.   In its 2005 10-K, Wild Oats stated: "We directly compete with Whole Foods Markets, Inc. in 18 states and in British Columbia.  We believe our natural foods supermarket concept is differentiated from that of Whole Foods through our higher product standards and more competitive pricing." PX00612 at 012.

575.    A December 2006 Wild Oats Strategic Marketing Position document entitled "Product is Hero," the cornerstone of its current market strategy, asserts: "Competition. Whole Foods Markets. ███████████████████ when we are head to head." PX00670 at 046.

576.    Wild Oats developed a strategy in May 2006 called its "Competitive Intrusion Plan," for competing with a new Whole Foods store. The plan addressed many elements of the consumer shopping experience: "Competitive Tactics. We will be preemptive versus reactive. Pricing. Merchandising. Shopping Experience. Employee retention and morale. Service." PX00661 at 011.

577.    Wild Oats' Competitive Intrusion Plan addressed pricing: "Pricing . . . █████████████
███████████████████████████████
████████████████████. Field Merchandising . . . BIG focus on
███████████████████████ leading up to the
competitive opening. ████████████████████████
███████████████████████. Service and selling training.█████████
████████████████████████." PX00661 at 12-13; *see also*
PX00023 ("███████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████). 



578.    Wild Oats' Competitive Intrusion Plan for responding to entry by a Whole Foods store included service elements: "Service . . . . Elevate service levels on a department by department basis." PX00661 at 017.

579.    Wild Oats' Competitive Intrusion Plan for responding to entry by a Whole Foods store included the store's physical space: "Facility . . . Evaluate facilities needs ██ months prior to opening. Internal equipment and decor issues. External attractiveness and visibility issues. Develop an appropriate remodel/refresh plan." PX00661 at 018.

580.    Wild Oats' documents reflect price changes where Whole Foods had entered or planned to enter. PX00021 at 001 (Wild Oats' price zones created or changed as a result of a Whole Foods store opening); PX00023 (review of Wild Oats' pricing strategy includes section "Store's (sic) with Whole Foods coming").

581.    Wild Oats' strategy in response to Whole Foods' entry into certain markets was to upgrade facilities, increase service, price on par on key commodity items, retain key employees, and provide additional training. PX00029 (also PX00460) (████████████); PX00030 (produce and floral update in anticipation of Whole Foods store opening in ████████████); PX02909 at 001 (████████████).

582. Whole Foods aggressively opened stores in areas that CEO John Mackey called Wild Oats' "monopoly" markets. PX00712 at 001. In one of his anonymous posts, Mr. Mackey said, "Whole Foods says they will open 25 stores in OATS territories in the next 2 years. . . . The writing is on the wall. The end game is now underway for OATS. . . . Whole Foods is systematically destroying their viability as a business – market by market, city by city." PX00801 at 001; *see also* PX00550 (In 1998, referring to a previous attempt to acquire Wild Oats, Jim Sud of Whole Foods noted the importance of the "elimination of a competitor in the marketplace, competition for sites, competition for acquisitions, and operational economies of scale. We become the Microsoft of the natural foods industry.").

583. According to John Mackey, "Whole Foods has taken significant market share from OATS wherever they have opened competing stores – Boulder, Santa Fe, Denver, Boca Raton, Ft. Lauderdale and St. Louis. Whole Foods has plans to open new stores in Oats cash-cow markets of Portland, Las Vegas, Santa Monica, Phoenix, Chicago, and Kansas City all within the next 12 months. It is also likely that Whole Foods will continue to aggressively pursue OATS other cash cow markets such as Albuquerque, Eugene, Cleveland, Columbus, Salt Lake, etc." PX00815.

584. Mr. Mackey said, "Whole Foods is killing [Oats] in direct competition, with new stores in Portland, Santa Monica, [and] Albuquerque opening soon. It appears to me that WFMI's management is going to keep aggressively attacking their uncontested (currently) markets. It would have been foolish and tactless for the CEO of Whole Foods to criticize OATS on a conference call." PX00791.

585. Mr. Mackey additionally said, "I believe that Whole Foods will continue to aggressively enter their markets and will pressure and harass them at every opportunity." PX00816 at 001-002.

586. In May 2005, Mr. Mackey said, "[C]ongratulations on finally getting your store in Nashville. I didn't hear the company mention how long it will take to develop, but they did say something about the average being around 20 months. You still have a bit of waiting ahead of you. At least Wild Oats will likely improve their store there in anticipation of Whole Foods eventually opening and you'll benefit from that." PX00786.

587. Prices were higher when the two were not in competition. One Whole Foods executive observed that "prices were higher at [the newly opened Wild Oats in Tampa, Florida]. Being the only game in town gives them that freedom . . . . Their pricing was high since they are the only large natural food store in the area." PX00080 at 001-002.

588. In November 2006, the Director of Marketing at C&S Wholesale Grocers sent John Mackey a notice that Wild Oats was going to close eight stores. PX00766. Mr. Mackey

responded that "[m]ost of those stores competed directly against us." *Id.* The C&S Marketing Director replied that it "just goes to show them they should be cautious opening future stores to [sic] close to WFM stores." *Id.*

589.    Whole Foods and Wild Oats provide unique levels of service and quality. PX01003 (John Mackey 3Q06 Investment Script: "we walk our talk when it comes to our quality standards and our commitment to the environment").

590.    Even when a lower price competitor acquires a higher priced competitor, the merger can be anticompetitive if the parties are substantial competitors in a relevant market. Scheffman Dep. (JX 18) at 124:8-17.

### d.    Loss of Choice

591.    Whole Foods plans to close some of the acquired Wild Oats stores. The criteria used to decide which stores to close include how close the store is to a Whole Foods store and the number of Wild Oats customers that would begin shopping at Whole Foods once the Wild Oats store was closed. Chamberlain Dep. (JX 40) at 137:8-22.

592.    Whole Foods anticipated increased comps from closing nearby Wild Oats stores. PX00823; *accord* Chamberlain Dep. (JX 40) at 157:10-159:16.

593.    Anticompetitive effects will also be felt in the markets where Whole Foods plans to leave open a competing Wild Oats store but "reflag" it as a Whole Foods store. Current Wild Oats shoppers in these markets will lose their current preferred choice among PNOS. Murphy Report (PX02878) ¶ 146.

594.    The closure of the Wild Oats stores would be harmful to consumers even if nominal prices were not changed by the acquisition. Consumers that currently shop at Wild Oats have revealed that they prefer the combination of price, selection, quality, location etc. to that offered by the competing Whole Foods store – that is why they shop at Wild oats rather than Whole Foods or another supermarket. All of these consumers are unambiguously worse off due to a loss of their top choice in addition to any loss from higher prices and reduced service. For each of these customers, the appropriate loss from the closure is equivalent to the price increase required to make them shift from Wild Oats to Whole Foods or another store. Murphy Report (PX02878) ¶¶ 10, 86.

### e.    Summary of Economic Analysis

595.    The  medium to long-term price effects from the acquisition may range from a low of 1% to as high as 5%. Murphy Report (PX02878) ¶ 83-84; Murphy Supp. Rebut. Report (PX02883) ¶¶ 4-5.

596.    Defendants' expert economist (Dr. Scheffman) concurs that it is appropriate to analyze the competitive effects of supermarket mergers in terms of one or two percent price increases.  Scheffman Dep. (JX 18) at 39:1-5; Murphy Rebuttal Report (PX02878) ¶ 17.

597.    Anticompetitive effects, without any countervailing pro-competitive effects, will be realized on price and non-price dimensions (breath of choice, quality and service) in each of the markets where Whole Foods plans simply to close a competing Wild Oats store. Murphy Report (PX02878) ¶ 145.

598.    Anticompetitive effects will also be felt in the markets where Whole Foods plans to leave open a competing Wild Oats store but "reflag" it as a Whole Foods store.  Current Wild Oats shoppers in these markets will lose their current preferred choice, and all consumers will lose the benefit of head–to-head price and non-price competition.  Murphy Report (PX02878) ¶ 146.

599.    This proposed acquisition poses the risk of substantial, non-transitory price increases and non-price anti-competitive effects that will persist for at least two years.  Murphy Report (PX02878) ¶ 147.

600.    Competition may also be affected in other markets where Whole Foods plans to close ███ additional ████████ Wild Oats stores and ███████████████████████ that was scheduled to open.  Murphy Report (PX02878) ¶ 22; PX04355; Foster IH (JX 41) at 94:20-95:11 (Whole Foods initially planned to operate only 35 of the 110 Wild Oats Stores.).

601.    Competition may also be reduced in local markets where Whole Foods currently does not compete head-to-head with Wild Oats and Wild Oats might have entered in the future, but for the acquisition.  Murphy Report (PX02878) ¶ 22.

## VI.    OTHER RETAILERS WILL NOT ENTER THE PREMIUM NATURAL AND ORGANIC SUPERMARKET PRODUCT MARKET

602.    Referring to problems facing one recent aspirant to the premium natural and organic market, Whole Food's Co-President and Chief Operating Officer Walter Robb summed it up best: "Not as easy as it looks folks."  PX00180 at 001.

603.    The evidence on this question is that competition from other sources through entry and or repositioning is unlikely to prevent consumer harm arising from the acquisition from persisting for a number of years.  Murphy Report (PX02878) ¶ 148.

### A.    *De Novo* Entry Would Not Be Timely, Likely or Sufficient

604.    As with any industry, there is always the possibility of *de novo* entry.  The key question is whether such entry would occur in a timely fashion and would be of sufficient magnitude

to make a small but significant price increase unprofitable. Murphy Report (PX02878) ¶ 137. While it is possible that a new retailer, a conventional supermarket, or even a PNOS, could enter one of the relevant geographic markets with a new store, it is unlikely that retailers would do so in each relevant geographic market to the extent necessary to make price increases unprofitable. *Id.* ¶¶ 119, 121, 126, 129, 138.

### 1.    *De Novo* Entry Would Not Be Timely

605.    Entry and growth in the PNOS market takes significantly longer than two years. *See* Merger Guidelines (PX01310) § 3.2. Whole Foods' ordinary course of business documents establish the length of time, high cost, and difficulty of *de novo* entry into the market for premium natural and organic retailers. As Professor Murphy stated, entry "would not occur in a timely manner." *See* Murphy Report (PX02878) ¶ 138.

606.    Even for a PNOS, *de novo* entry into a new geographic market would take well over two years. For example, Whole Foods devotes a tremendous amount of time and resources to carefully selecting a site, conducting an in depth analysis, reviewing the findings, designing the store, and finally building on the site. Kenneth Meyer, President of Whole Foods' Mid-Atlantic Region, stated "a lot of people think, you know, we want a store, and then within 12 months there will be a store there. They don't realize that it's about a three-year process at a minimum of taking a store from the point of idea to opening, at a minimum." Meyer Dep. (JX 10) at 107:8-14. *See generally* Kadish Dep. (JX 7) at 40:25-60:21 (His team conducts an in-depth analysis of each site location, including evaluating the area's psychographic profile, demographic profile, and traffic patterns. They also create detailed thematic maps depicting population density, household income, racial composition, residential psychographic compatibility, and college graduate density.).

607.    Apart from other impediments to entry, finding and developing suitable real estate on which to locate a supermarket is often a multi-year task in many metropolitan areas. It can easily take three or more years from conception to site selection. *See, e.g.,* Meyer Dep. (JX 10) at 20:15-21, 107:3-25; PX00538 at 002 (Mr. Mackey touting his new White Plains store to investors after a "ten year search for the perfect location").

608.    According to John Mackey, "It took [Whole Foods] almost 10 years to open a second store in San Francisco." PX00803.

609.    In addition to the three or more years that it can take from conception to site selection, the process from site selection to the actual opening of a store can take several more years. Even a successful and sophisticated PNOS like Whole Foods takes anywhere from two to seven years to accomplish this process. *See, e.g.,* PX00179; DX 101 (site selection for ███████████, store was completed on April 21, 2003. The store is scheduled to open almost five years later on March 31, 2008); DX 129 (site selection for ███████████, store was completed on March 7, 2003. The store is scheduled to open over seven years

100



later on July 3, 2010); DX 123 (site selection for ███████████, store was completed on April 29, 2002. The store is scheduled to open approximately 5½ years later on September 15, 2007); DX 110 (site selection for ██████████████████████ was completed on February 18, 2002. The store is scheduled to open over five years later on June 27, 2007); DX 159 (site selection for █████████, store relocation was completed on July 20, 2004. The store is scheduled to open over 4½ years later on January 15, 2009); DX 165 (site selection for ███████████, store was completed on November 12, 2002); Meyer Dep. (JX 10) at 15:2-7 (the ██████████, store is not scheduled to open until early 2009, almost seven years later); DX 162 (site selection for the store in ███████████, was completed on April 18, 2005; Meyer Dep. (JX 10) at 15:2-7 (the ██████████, store is not scheduled to open until Spring 2009, almost four years later.

610.    Furthermore, for any retailer that does not already have a PNOS brand, entry would take even longer as the new PNOS entrant would have to effectively build a brand presence and an appropriate supply and distribution system. Current interim Wild Oats CEO Greg Mays was quoted in a November 4, 2006, article as saying "It takes five or six years to develop a label that has natural and organic integrity to it. Their choices are to waste five years or get immediate recognition on the shelf." PX01243 at 002. CEO Mays was talking about the time required to develop a natural and organic private label brand, a much more detailed and involved activity than selling Wild Oats' private label brand products on retailers' shelves.

611.    A new PNOS entrant would have to establish a large scale supply chain and distribution system for natural and Organic Rule-compliant products. Establishing such a system from scratch would be expensive, timely, and difficult to accomplish. Odak IH (JX 37) at 68:1-79:25; see also Mackey IH (JX 28) at 96:15-21 ("It is a lot easier to take an acquisition as a platform to grow from than it is to greenfield it from scratch. Because you are gaining – in our case, going over to the U.K., we gained – they had a supply chain that we were able to tap into."); PX01305; PX01306 (In May 2006, Wal-Mart announced that it would double the number of organic items in ten percent of its stores; one year later, Wal-Mart appears to be pulling back due to continuity of supply problems, among other issues.).

612.    While de novo entry would likely be most beneficial to consumers because it involves creating a new brand that resonates with PNOS customers and would open a fleet of new stores in the overlap markets, it would not occur in a timely manner. Murphy Report (PX02878) ¶ 138.

### 2.    De Novo Entry Is Unlikely

613.    A February 2007 study by The Hartman Group, a research firm well-regarded by both Defendants, see Coblentz IH (JX 33) at 23:16-24, corroborates that entry or repositioning

by conventional supermarkets or other food retailers is unlikely. The Hartman Study reported that:

> It is our belief that WFM will not encounter significant, if any, competition from leading mainstream retailers (Safeway, Wal-Mart, Costco, etc.) entry into organics.
> Most other major retailers lack the ability to consistently generate authentic, high-quality food experiences. PX02508 at 026 (bold in original).

████████████████████████████████████████████; *accord* Odak IH (JX 37) at 77:18-78:23.

614. Expansion by other PNOS into the relevant geographic markets is also unlikely. The only other PNOS are Earth Fare in North Carolina and New Seasons in Portland, Oregon. Mackey IH (JX 28) at 132:4-6; Murphy Report (PX02878) ¶ 120.

615. ████████ entered against Whole Foods in █████████████████████████████, albeit unsuccessfully. Although record evidence suggests that Earth Fare's entry generated pro-competitive price and quality responses from Whole Foods, it was ultimately unsuccessful from ████████ point of view. Murphy Report (PX02878) ¶ 118.

616. ███████ closed its ████████ store in ████████ Given its experience in ████████, it is an open question whether ███████ would be willing to enter against Whole Foods in the future. Murphy Report (PX02878) ¶ 119; PX01006 at 004 ("We have heard from management at ███████ that . . . their coming to ███████ was probably a mistake.").

617. New Seasons is also unlikely to enter any of the relevant geographic markets. New Seasons founder Brian Rohter was quoted as saying that New Seasons does not plan to expand beyond the Portland, Oregon, area. PX04647 at 003; Murphy Report (PX02878) ¶ 120.

### 3. *De Novo* Entry Would Not Be Sufficient to Defeat a Price Increase

618. *De novo* entry would unlikely be "of a character and magnitude that it would 'deter or counteract the competitive effects of concern.'" Commentary on the Horizontal Merger Guidelines (PX01341) at 46, *quoting* Merger Guidelines (PX01310) §3.0. Whole Foods' documents establish how long it takes to develop the authenticity and integrity of a PNOS brand. Its Project Goldmine deal valuation workbooks anticipate Whole Foods fully retaining the volumes diverted from closed Wild Oats stores for a period of ███ years. Murphy Rebuttal Report (PX02884) ¶ 39.

619.    Whole Foods was concerned about the threat of Wild Oats being used as a springboard; it
        was not concerned about *de novo* entry. CEO Mackey sent an e-mail to his Board of
        Directors six days before announcing the deal with the following rationale for the
        acquisition: "Furthermore we eliminate forever the possibility of Kroger, Super Value
        (sic), or Safeway using [Wild Oats'] brand equity to launch a competing national
        natural/organic food chain to rival us . . . . [Wild Oats] is the only existing company that
        has the brand and number of stores to be a meaningful springboard for another player to
        get into this space. Eliminating them means eliminating this threat forever, or almost
        forever." PX00773.

620.    Whole Foods management worried that unless they preemptively acquired Wild Oats, a
        conventional operator like Kroger or Safeway could enter the PNOS market by buying
        Oats. *See* PX00565 at 002:

                We keep Kroger or Safeway from acquiring [Wild Oats] and using their
                brand name to roll out a strong competing concept. How realistic a risk is
                this, however? Safeway seems happy with their Lifestyle Store remodels
                and likely wouldn't want to waste time and money on OATS. Kroger,
                however, operates a diversity of brands and formats. They might
                potentially be interested. How dangerous would this be to us? Potentially
                – very dangerous.

        *Accord*, PX00555 ("[In my opinion], it is the Kroger situation that requires the most
        discussion . . . Sure, it would be expensive to Kroger to acquire Oats, but they might look
        at the risk/reward ratio and conclude that it is worth doing.").

621.    Whole Foods' CEO Mackey said:  Whole Foods brand "creates strong loyalty from their
        customer base – something [conventionals like] Safeway doesn't have and likely never
        will have." PX00809A at 001.

622.    SuperValu's recently launched limited assortment food stores, Sunflower, have not been
        effective at competing with Whole Foods. In assessing the launch, Whole Foods
        executives CEO John Mackey and Senior Vice-President of Growth & Business
        Development Jim Sud said that "[s]tarting up a brand from scratch is very risky and
        expensive as Super Value [sic] is now discovering with Sunflower." PX00565 at 002.
        Co-President A.C. Gallo wrote with respect to Sunflower, "Maybe they [SuperValu
        Sunflower] will bag the whole thing or at least not try to come head to head with us for
        awhile." PX00180 at 001.

623.    Similarly, in the late 1990s, Star Markets attempted to provide a more gourmet-type store
        with Wild Harvest. It was not successful with that format. Stanton Dep (JX 19) at
        165:16-25.

103

## B.    Repositioning Is Unlikely

624.    Existing retailers could reposition to provide increased competition for existing premium natural and organic supermarkets. In principle, such repositioning could increase competition from outside the relevant market enough to compensate for the loss of pricing restraint within the market. Murphy Report (PX02878) ¶ 130.

625.    In principle, many retailers could reposition in response to an increase in prices in the relevant market. One common problem all these potential entrants would face is that repositioning is not costless. Moving one's attribute mix in one direction will typically result in a less suitable fit with one's current customer base. To the extent that a company's current position came about through costly investments in reputation and other assets, such repositioning will likely cause the firm to forgo economic rents on those investments. Although these firms may have some advantages that make their entry easier than the *de novo* entry of other firms, they also have these additional costs. Murphy Report (PX02878) ¶ 131.

626.    Other retailers are unlikely to reposition because, in order to compete effectively in the PNOS space, they would have to dramatically change the nature of their operations. They would have to expand the amount of space dedicated to natural and organic products and also offer slower-moving products and extra services and maintain a large inventory of a broad range of premium natural and organic items. The failure of prior repositioning efforts amply supports Whole Foods' decision to deter entry by purchasing the only viable "springboard" for entry into the premium natural and organic space. *See* Murphy Report (PX02878) ¶ 132.

627.    Expanding their natural and organic offerings would jeopardize the successful formats of conventional supermarkets like Safeway, Kroger, and Wal-Mart. As CEO Mackey said, "Safeway and other conventional retailers will keep doing their thing--trying to be all things to all people . . . . They can't really effectively focus on Whole Foods Core Customers without abandoning 90% of their own customers." PX00785; *accord*, PX00180 at 001.

628.    Before the Complaint in this matter was issued, Whole Foods management publicly dismissed the notion that old line supermarket chains like Safeway, Giant Eagle, Publix, or Wal-Mart could reposition successfully into the PNOS space. Whole Foods Co-President Walter Robb told USA Today in June 2006 that the addition of natural and organic items to grocers shelves is merely an attempt to "chas[e] our shadow. We won't be tomorrow what we are today." PX02086 at 002; *accord* PX02201 ("By the time these other companies add organics to their mix or possibly change their store layouts, we will have evolved to the next generation of retailing.").

104

629.   Wild Oats' previous CEO agrees that conventional supermarkets will be unable to successfully reposition:

> [T]his is a format that is very difficult for them to get into because it's largely perishable and their business is not largely perishable. This business has a high service level component and their business is based on low labor, which means low service level. They don't understand at all the whole vitamins, minerals and supplement area, you know, and some of those suppliers won't -- many of those suppliers won't do business with them.
>
> So it is very difficult and they've tried for years to get into this business and they have not succeeded.

Odak IH (JX 37) at 153:2-14.

630.   Efforts by conventional stores to offer natural and organic foods have led to limited offerings that actually grow the business at premium natural and organic supermarkets. "With regard to the conventionals getting into natural and organic foods, [Wild Oats] really see[s] this as serving as a gateway to our stores than a competitive threat. The focus [of the conventionals] so far has been on the nonperishable categories and what they are doing is introducing new customers to the brands we carry, and when customers want more information, service and selection, they come to our stores." PX02704 at 010.

631.   Whole Foods summarized its limited concern for conventional supermarkets offering natural and organic products in two investor conference calls:

> a.      "Throughout our history, we have been asked about the potential effect on our business should conventional supermarkets start to offer or increase their offering of natural and organic products. We believe that by offering natural and organic products, supermarkets are raising customers' awareness and interest levels in these products and serving as a "gateway experience" to shopping with us. Once customers try natural and organic products and want to experiment further, they come to Whole Foods Market. With approximately 64% of our sales in perishables, we have the broadest selection as well as the 'authentic advantage.' We have offered natural & organic products for over 22 years because we believe that food in its purest state – unadulterated by artificial additives, sweeteners, colorings and preservatives – is the best tasting and most nutritious food available. We believe that the fact that our comparable store sales have been running above our historical average over the same timeframe that conventional supermarkets have stepped up their offering of natural and

105

organic products is evidence that, rather than hurting us, they are in fact helping us." PX00532 at 001.

    b.    "Due to our success, we have seen many competitors over the years add a limited selection of 500 to 2,000 natural and organic SKUs. To understand why this has not hurt us, but has instead created a gateway experience as evidenced by our strong historical comps, you have to understand that Whole Foods Market is about much more than just selling 'commodity' natural and organic products.

    We are a lifestyle retailer and have created a unique shopping environment built around satisfying and delighting our customers. Our stores feature over 30,000 natural and organic SKUs and our emphasis on the highest quality perishables, which are just under 70 percent of our sales and gradually increasing, broadens our appeal beyond the core natural and organic food customer. We adhere to the highest quality standards, and our non-union empowerment culture comprised of 90 percent full-time team members fosters continual improvement and innovation. We are a leader, not a follower, and we walk our talk when it comes to our quality standards and our commitment to the environment." PX02026 at 003.

632.    In an investor conference call, Wild Oats stated that the natural and organic product offerings at conventional supermarkets were not a significant concern: "[W]hen a new competitor opens in our markets, we experience a short-term hit to comp sales in the affected store or stores . . . . [O]ver time, they are helping to build awareness of natural and organic foods among their customers, thereby serving as a gateway to our stores." PX04361 at 002; *see also* PX02704 at 010.

633.    Defendants' economic expert, Dr. Scheffman, testified that Whole Foods has not faced substantial or sustained pressure on its pricing as a result of conventional repositioning. Scheffman Dep. (JX 18) at 155:12-24; *see also* July 31, 2007 PM Tr. Mot. Hr'g at 52:24-53:4 (Scheffman test.) (Dr. Scheffman testified that "[t]here is a document, one or more document says, well this [repositioning by conventional supermarkets] makes people more interested in organic and [Whole Foods] can benefit from that.").

634.    To the extent conventional supermarket chains would try to reposition as premium natural and organic supermarkets they would likely experience supply difficulties. Former Wild Oats CEO explained those difficulties regarding produce purchases: "Whole Foods and Wild Oats are the two big dogs or the two big buyers of produce that's organic and all natural. They're going to get preference over everybody else . . . . If you're coming into the marketplace as a conventional, you're not the big buyer, you don't get that preference, and you have supply problems." Odak IH (JX 37) at 70:1-14; *see also id.* at 76:11-77:2 (detailing the difficulties SuperValu, one of the nation's largest wholesalers and retailers, experienced while trying to purchase organic produce for its organic market Sunflower).

635. ███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████ 18-164:1. *Accord,*
Odak IH (JX 37) at 71:14-23 ("[I]n '06 there was a shortage of organic milk, but you
know – and the two big buyers never got shorted. It's everybody else that got shorted in
the industry.").

636. The supply of organic meat is very limited. "If the conventionals wanted all of that, they
couldn't get it all . . . there's just not enough of it to go around . . . the big buyers, which
would be Wild Oats, Whole Foods, are going to get preference in that particular
business." Odak IH (JX 37) at 70:16-71:5.

637. The substantial costs associated with repositioning into Whole Foods' and Wild Oats'
product space would prevent a conventional supermarket from attempting this even if it
was so inclined. Whereas "[████████████████████████████████

███████████████████," (PX02704 at 008), PNOS shoppers
demand extensive perishables. Odak IH (JX 37) at 78:18-23; Mackey IH (JX 28) at
249:24-251:25.

638. To attract Whole Foods and Wild Oats customers, conventional supermarkets would have
to substantially increase their focus on perishables, devote substantially more selling
space to perishables, markedly improve quality, and forgo certain slotting allowances.
*See* Odak IH (JX 37) at 60:11-23; PX02704 at 008.

639. A retailer considering becoming a PNOS would need to establish a large-scale Organic
Rule-compliant supply chain and distribution system. This is not only expensive, but it is
also difficult and would raise prices for conventional store shoppers, most of whom are
price-oriented. *See* Odak IH (JX 37) at 77:11-78:23.

640. Former Wild Oats CEO Odak explained why conventional supermarkets would not be
able to reposition into the PNOS market:

> [U]ntil you have a predictable demand or takeaway at the store,
> you don't know how much to buy. If you buy too much and you
> don't sell it because you're trying to get in the market, you shrink it
> out [*i.e.*, it spoils] and you lose money. If you buy too little, the
> consumer comes in your store and says you're not in the business
> . . . of organic and I'll go buy it someplace else.
>
> So . . . the conventionals have a very difficult time getting into this
> business. One . . . it's primarily a or predominantly a perishable

107

> business. And two, they have never been able to establish a
> predictable takeaway from the product.
>
> And we've seen this for the five or six years I ran the company. This has
> been a consistent pattern. They [the conventionals] have a big push on. It
> doesn't sell through. Their margins aren't where they ought to be, and it
> shrinks back and shrinks back and shrinks back. There's less and less
> organic in those stores.

Odak IH (JX 37) at 77:14-78:23; *see also* Odak Dep. (JX 16) at 28:7-24 (Conventionals
are not successful in the PNOS space.).

641.    A retailer seeking to reposition would need to spend money to better "segregate" its
organic foods so they do not touch the non-organic food. *See* PX02072 at 115 (Hartman
Organic 2006); PX01302 at 005 ("[R]etailers . . . must implement measures to protect
their organic integrity by preventing the commingling of organic and conventional
products . . . ."); Organic Food Production Act of 1990, 7 U.S.C. §§ 6501-22 (USDA's
Organic Rule requirement). Whole Foods' Co-President, Walter Robb, describes the
rigorous requirements:

> Essentially it's [the Organic Rule] mostly around commingling and
> handling standard, so, for example, in the cooler you can't have
> conventional broccoli above organic broccoli so that it melts and drips
> down and so forth. Basically you run proper segregation of the product
> and handling. On the butcher block you can't have conventional meat and
> organic meat on the block at the same time. You've got to have separate
> tools, wash the tools, that sort of thing.

Robb Dep. (JX 2) at 18:14-24.

642.    The attempts by conventional supermarkets to reposition have failed, in part from
substantial opportunity costs. Whereas "███████████████████████████████████
████████████████████████████████████████████," PX02704 at 008, premium
natural and organic supermarket shoppers demand extensive perishables. Odak IH (JX
37) at 60:2-10; Mackey IH (JX 28) at 249:24-251:25.

643.    Allotting additional space to perishables (and many other natural and organic items)
would require conventional supermarkets to forgo some of the slotting fee revenues on
which they depend. Mr. Odak explained that conventional stores "get so much money for
slotting fees and promotional trade allowances from the big CPG companies, that's where
they make . . . the bulk of their money in the store. . . . [I]f you took out the amount of
money they make in slotting fees, they would not be profitable." Odak IH (JX 37) at
60:13-21; Gallo Dep. (JX 1) at 162:6-9 (Whole Foods receives no slotting allowances).

1.    **Safeway**



649. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██.

650. ████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████.

651. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████; *accord* Odak IH. (JX 37) at 13 (Whole Foods and Wild Oats carry around 300-400 SKUs of fresh organic produce.).

652. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████.

653. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████.

654. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████.

655.  Safeway's Lifestyle re-format is accomplishing its goal: Safeway just announced favorable quarterly earnings, and it attributes this success to its Lifestyle stores. *See* PX04749.

656.  

657.  As recently as February 2007, Mr. Mackey dismissed the impact of Safeway's Lifestyle reformat on Whole Foods. In discussions with his Board of Directors, he stated that Safeway had a negligible impact on Whole Foods: "Safeway is continuing to roll out their 'Lifestyle Stores.' I don't believe these stores have had much real impact on us, although they've increased Safeway's comps a couple of hundred basis points (not that much when you consider the immense amount of capital invested)." PX01304 at 002.

658.  Although Whole Foods was concerned before the Safeway opened its flagship Lifestyle store in Boulder, CO, that Safeway store ultimately had little impact on Whole Foods. In his Q2-FY06 report to the Board (written three months after the opening of the Safeway Lifestyle store), Walter Robb, Co-President of Whole Foods, said, "." PX01004 at 023.

659.  In fact, Whole Foods conducted an evaluation of the Safeway in Boulder, Colorado. Some observations made included: "natural beef was not moving;" "fresh fish looked tired;" prepared foods quality was not improved;" expanded S/S hot foods bar. . . food quality was poor;" "S/S olive bar with. . . all domestic inferior quality;" and "customers were confused all day and Safeway leadership did not react. . ." DX 480.

660.  Safeway's Boulder Lifestyle store had little impact on the Boulder Wild Oats. Former Wild Oats CEO Odak stated that "not unlike what happened with a lot of Safeway stores, it [Safeway's Boulder Lifestyle store] started off extremely well and then over time the offering went down, down, down, and that was their Boulder store. . . . it was what I would call the usual, you know, stores trying to find some excuse why their business wasn't as strong as we had expected it. So the answer is no. The Lifestyle stores were not a big issue for us." Odak IH (JX 37) at 124:1-13.

   **2.  Kroger**

661.  ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
      ⬛⬛⬛⬛⬛⬛⬛⬛ Kroger is not a premium natural and organic retailer like

either Whole Foods or Wild Oats. Defendants' industry consultant, Dr. Stanton, describes Kroger's repositioning efforts as being focused on developing its private label and Kroger brands. Stanton Dep. (JX 19) at 128:21-129:4.

662. ████████████████████████████████████████████████████
     ████████████████████████████████████████

663. In April 2005, John Mackey dismissed the possibility that Kroger would reposition in any manner capable of affecting Whole Foods. He stated, "I've never seen Safeway or any other conventional supermarket operator ever hurt Whole Foods at any time or in any place in the past . . . Kroger with their 'Fresh Fare' concept and 'Signature Stores'." PX 00799A.

### 3.   Tesco

664. Defendants describe Tesco as "a major British natural and organic firm" about to enter the United States. They state that Tesco's U.S. stores will carry a large supply of natural and organic items. *See* Gallo Dec. ¶ 10; Scheffman Report (PX02066) ¶ 336.

665. 

666. A.C. Gallo, Whole Foods Co-President, states that Wild Oats stores of 15,000 to 20,000 square feet "are simply too small to operate as full service supermarkets." Gallo Dec. (PX04622) ¶ 10. It stands to reason, therefore, that Tesco's planned markets at 10,000 square feet will also be too small to operate as full-service supermarkets.

667. Defendants' industry consultant, Dr. Stanton, expressed his belief that Tesco will not compete against supermarkets. Stanton Dep. (JX 19) at 154:5-6.

### 4.   Wal-Mart

668. In 2005, Wal-Mart began testing organic produce at a store near Albuquerque, New Mexico. PX1306A at 002. In early 2006, a top Wal-Mart marketing executive told investors that the company planned to double the number of organic food items available in its stores to 400 items and offer them "at the Wal-Mart price." PX01045A at 001.

669. Wal-Mart's attempted push into the organic space was unsuccessful. First, it was difficult for Wal-Mart to obtain consistent quality product. "Whenever growers are

straining to meet your volume it means they're forced almost into selling you something that would not be their best crop because they're desperate to get you something to meet your demand." PX1306A at 003. Second, Wal-Mart's customers tend to be very price conscious and were unwilling to pay a premium for organic product, whereas "consumers who go to Whole Foods Markets or Wild Oats Markets are less price sensitive and may not be lured to Wal-Mart with low prices." PX01045A at 002.

670. In April 2007, a Wal-Mart spokesperson stated that the majority of Wal-Mart stores cut their organic offering in half. Wal-Mart now offers only 100 to 200 organic food items and no longer plans to offer 400 organic items in most Wal-Mart stores. PX01045A.

671. In March 2006, Wal-Mart's opened a new supercenter in Plano, Texas, two miles from a Whole Foods, complete with a full Wal-Mart line of organic products. Analyzing Wal-Mart's competitive impact on Whole Foods, a Whole Foods executive reported, "[t]here doesn't seem to be any significant impact on total sales from the Wal-Mart opening." PX00770 at 001. John Mackey agreed: "We are going head to head with them in Plano, and they . . . haven't really hurt us too much at all." Mackey IH (JX 28) at 265:17-19.

672. As recently as February 23, 2007, in his report to the Board of Directors, CEO Mackey dismissed the notion that ▓▓▓▓▓▓▓ expansion into the PNOS market was having any competitive impact on Whole Foods, or that it would in the future. He stated: [▓▓▓▓▓▓ ▓▓▓▓,] despite the hoopla in the media, hasn't had much impact in the organic market. I doubt they will because their core customers don't want to pay the higher prices and their non-core customers don't want to shop there for various reasons." PX01304 at 002.

673. Wild Oats former CEO analyzed Wal-Mart's failed attempt to reposition as follows: "So if you look at the history of a more successful retailer, *i.e.*, Wal-Mart, they've done a great job except in the produce perishable area. That's a long, tough road for them, you know, to go head to head, you know, and rechange their format of their stores to take this on. I mean, it's a huge investment for them to do this . . . . Well, if you're saying do they have the financial wherewithal, yes. You know, would they have the desire? I don't think so whatsoever. I mean, you know, they have a format that works incredibly, so why would I totally restart and build, you know, this format. I don't know why they would do that." Odak IH (JX 37) at 154:20-155:13.

### 5.    Trader Joe's

674. 

675. Trader Joe's sells natural and organic product ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Trader Joe's has no

plans to reposition itself as a natural and organic retailer. Its CEO refused to describe his company as a "natural and organic retailer." *Id.* at 161:15-25.

676.    Whole Foods acknowledges that Trader Joe's offers only a limited range of natural products, not nearly the range that a Whole Foods customer expects to find. LaMacchia IH (JX 32) at 84-85.

677.    Trader Joe's makes it a point not to be involved in animal welfare organizations. Bane IH (JX 39) at 165:3-9.

678.



679.

680.

681.

682.    Trader Joe's does not offer customers in-store service departments like bakeries, prepared food, or service meat counters. Bane IH (JX 39) at 62:1-18; Meyer Dep. (JX 10) at 79:2-10; *accord* Bane Dep. (JX 24) at 109:5-110:4. Trader Joe's has no plans to add these services. CEO Bane said he would "bite their head off" any employee who recommended changing the format to include these types of departments. Bane IH (JX 39) at 105:2-10.

683.



684.    Eighty percent of the items sold in Trader Joe's stores are private label unavailable in any other stores. This is a very high number in the grocery industry. Bane IH (JX 39) at 86:15-23, 89:20-25.

685.



686. 

687. Wild Oats former CEO doesn't consider Trader Joe's to be a significant competitor. Odak Dep. (JX 16) at 320:25-321:4. The Hartman Group agrees. In February 2007, it told Whole Foods, "While Trader Joe's has a marked appeal to some WFM consumers, the overall Trader Joe's experience fails to resonate at the same high level of quality of the WFM retail experience." PX02508 at 010.

688. Trader Joe's has a strong business model. The company currently has about 270 stores. The current format for Trader Joe's uses a smaller format and a narrower range of SKUs than either Whole Foods or Wild Oats. A typical new Trader Joe's store is roughly 11,000 square feet while recently built Whole Foods stores are typically larger than 40,000 square feet. In addition, although Whole Foods and Wild Oats focus on perishables (accounting for roughly 70 percent of their sales), Trader Joe's places much less emphasis on perishables (roughly ▮ percent of sales). Murphy Report (PX02878) ¶ 133; *see* Bane IH (JX 39) at 44:20-25; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

689. "Trader Joe's differs significantly from Whole Foods and Wild Oats in terms of a number of attributes. In particular, Trader Joe's focuses much more on discount private label products and does not cultivate an upscale image." Murphy Report (PX02878) ¶ 135.

690. "Given that Trader Joe's differs significantly from both Whole Foods and Wild Oats in terms of product variety, product mix, store size, and image, Trader Joe's would need to reposition itself significantly in order to provide broad based price competition for Whole Foods and other premium natural and organic supermarkets. Even if such repositioning is possible, it would require that Trader Joe's sacrifice its current successful format. There is no evidence that it would choose to do so in response to a small but significant increase in the prices charged by Whole Foods." Murphy Report (PX02878) ¶ 136.

### 6. Delhaize

691.

115

692. Hannaford operates only one store in the Portland, Maine, overlap area.  Vail Dep. (JX 21) at 102:24-103:1, 141-142. ████████████████████████████████ ███████████████████████████. PX04645.

693. Hannaford and Bloom ███████████████████████████████████████ ████████████████████████. Vail Dep. (JX 21) at 21:1-22:11.

694. ████████████████████████████████████████████████████. Vail Dep. (JX 21) at 21:5-21.  *Accord* Stanton Dep. (JX 19) at 138:12 (Food Lion is a low-priced operator).

695. ███████████████████████████████████. Vail Dep. (JX 21) at 21:3-18; *accord* Stanton Dep. (JX 19) at 138:17-138:21.

696. ██████████████████████████████████." Vail Dep. (JX 21) at 21:5-21; *accord* Stanton Dep. (JX 19) at 15:23-16:11 (Bottom Dollar is targeted at the low end of the market).

697. ███████████████████████████████████. Vail Dep. (JX 21) at 141:12-142:2. ███████████████████████████████████████████████████████████ ██████████████████." *Id*. at 142:1-2.

698. Natural and organic SKUs represent only ███████████████████. Vail Dep. (JX 21) at 108:1-2. ███████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████. *Id*. at 110:17-21.

699. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████. Vail Dep. (JX 21) at 150:23-151:2.

700. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████. *Id*. at 105:5.

701. ███████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

116

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████
██████████████████

### 7.    Other Retailers

702.  Premium supermarkets represent another potential platform for entry into the relevant market. One potential entrant from this space is Wegman's. Wegman's format, however, makes rapid expansion difficult. In particular, Wegman's built its business model on providing high quality products and exceptional services to its customers. In order for entry to leverage this reputation effectively, it would be essential to carry that expertise over to any new venture. Providing such a high level of service means that adding capacity requires significant effort in training new management and employees. Murphy Report (PX02878) ¶ 128.

703.  Although super-competitive pricing might cause Wegman's to change its business model somewhat or accelerate its timing, there is no evidence that it would be willing or able to provide a meaningful restraint on the ability of the combined firm to raise prices in overlap markets. Murphy Report (PX02878) ¶ 129.

704.  Wegman's has demonstrated a pattern of slow and controlled growth in its core states. Meyer Dep. (JX 10) at 59 (Wegman's is a privately held company that opens only three stores per year). In 2006, Wegman's did open only three stores. *See* PX04644.

### 8.    Defendants' Industry Expert on Repositioning Knows Very Little About The Extent of Conventionals' Repositioning into Natural and Organic Items

705.  Dr. Stanton has no knowledge whether Whole Foods has even 100 identical SKUs with other supermarkets. Stanton Dep. (JX 19) at 118:23-119:5.

706.  Dr. Stanton has no knowledge whether Harris Teeter has more than 3 percent of its grocery sales in organics or more than 4 percent of its produce sales in organics. Stanton Dep. (JX 19) at 192:12-193:2.

707.  Dr. Stanton has no knowledge whether Supervalu's Premium Fresh & Healthy has more than 2 or 3 percent of its meat sales in organics, more than 4 to 7 percent of its produce sales in organics, more than 1 percent of its bakery sales in organics, more than 100 SKUs of organic produce, or more than 20 SKUs of natural or organic meat. Stanton Dep. (JX 19) at 193:5-194:13

117

708.    Dr. Stanton has no knowledge whether Publix has more than 2,000 natural and organic items.  Stanton Dep. (JX 19) at 193:5-194:13.

709.    Dr. Stanton has no knowledge whether Supervalu's Sunflower carries more than 5,000 SKUs of natural and organic products.  Stanton Dep. (JX 19) at 123:2-126:20.

710.    Dr. Stanton has no knowledge whether any of the following chains developed any organic private label brands:  Price Chopper, Pathmark, Hienen's, or Ukrops.  Stanton Dep. (JX 19) at 186:12-188:15.

711.    Instead of developing their own organic private label, Price Chopper and Pathmark signed supply agreements to sell Wild Oats private label products in their stores.  PX 00613 at 009.

712.    Defendants' expert testified that, in his business, "Spectra is the industry standard," not Prizm.  Stanton Dep. (JX 19) at 129:12-16.

713.    Gene Kadish, Vice President of Corporate Development and Research for Whole Foods, testified in his deposition that Spectra is "almost always wrong, and "totally unreliable" even for the size and volume of supermarkets in a given area.  Kadish Dep. (JX 7) at 57:7-58:2.

714.    Mr. Kadish testified that he has found the information provided by Spectra to be unreliable since the late 1970s or early 1980s.  Kadish Dep. (JX 7) at 57:7-58:2.

715.    Defendants' expert has no idea which psychographic and demographic research products Whole Foods or Wild Oats use.  Stanton Dep. (JX 19) at 129:5-7.

716.    Wild Oats has used ████████████████████████████ site selection model since its development.  PX2901 at 013-015.

717.    Mr. Kadish stated that the ████████████ clusters provided by ████████████████████ ██████ of what we do in research.  It's the basis of everything."  Kadish Dep. (JX 7) at 99:12-102:9.

## VII.    WILD OATS IS NOT A FAILING FIRM

718.    If the likely alternative to a merger is the failure (and exit) of one of the firms, an acquisition that preserves the assets in the business is preferred.  *Int'l Shoe Co. v. FTC*, 280 U.S. 291, 302-03 (acquired company's resources depleted, business failure was a "grave probability," and a less anticompetitive acquisition was not possible).

719. The factual showing necessary to make out a "failing firm" defense is stringent. The evidence must show that (1) failure is imminent, (2) the firm has no realistic prospect of reorganization, and (3) no viable, less anticompetitive purchaser is available. *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 138-39 (1969). To claim the benefit of the defense, the firm must show that it has made a diligent, good faith effort to find an alternative, less anticompetitive purchaser. *See, e.g., FTC v. Harbour Group Invs.*, 1990-2 Trade Cas. (CCH) ¶ 69,247 (D.D.C. 1990); *Pillsbury Co.*, 93 F.T.C. 966, 1032 (1979); *Merger Guidelines* (PX01310) § 5.

720. ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████).

721. When a natural resource company's reserves are depleted or committed under long-term, fixed price contracts with large customers, the company's market share (based on the quantity of its already committed reserves) may overstate its competitive significance. In *United States v. General Dynamics Corp.*, 415 U.S. 486, 493 (1974), when the company had no uncommitted coal to sell, the Court concluded that its power to affect the price of coal was "severely limited and steadily diminishing." *See also FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004). In *Olin Corp. v. FTC*, 986 F.2d 1295 (9th Cir. 1993), the court affirmed the FTC's decision that the defendants failed to prove the acquired firm lacked future competitive significance.

722. Defendants have not shown that Wild Oats lacks the ability to compete or that, even if so, that no less anticompetitive acquirer was not available.

**A.    Wild Oats Is Not a "Weakened" Competitor**

723. Section VII of Defendants' Preliminary Injunction Brief, in which Defendants argue Wild Oats is a weakened competitor and its elimination by Whole Foods will lead to a more efficient competitor, contains 54 factual cites. Thirty-eight of these cites, over 70%, are to declarations of Defendants' own employees.

724. Defendants refused to allow their employees' declarations, or any of the declarations, to be tested by deposition. Defendants' declarations were prepared for litigation, outside the ordinary course of business, and after the Complaint in this matter was filed.

725. Post complaint evidence that is in the control of Defendants must be evaluated very carefully, because of the potential for manipulation. *See B.F. Goodrich*, 110 F.T.C. 207, 341 (1988), *citing United States v. General Dynamics Corp*, 415 U.S. 486, 504 (1974); *United States v. E.I. duPont de Nemours & Co.*, 353 U.S. 586, 597, 602 (1957); *United States v. Continental Can Co.*, 378 U.S. 441, 463 (1964); *accord Weyerhaeuser Co.*, 106 F.T.C. at 284 n.59; *see also Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1384 (7th Cir.

1986, *cert. denied*, 481 U.S. 1038 (1987); *British Oxygen Co.*, 86 F.T.C.1241, 1365 n.26 (1975), *rev'd on other grounds sub nom. BOC Int'l Ltd v. FTC*, 557 F.2d 24 (2d Cir. 1977) (conclusory testimony of industry executives that their industry is "competitive" not particularly useful and cannot be given much weight).

### B.    Wild Oats Is a Viable Competitor

726.    Wild Oats is a viable competitor. At the end of 2006, the company reported that it had sufficient cash and cash flows to meet budget requirements, to fund necessary capital expenditures, to provide adequate working capital, and to expand as planned for the next year. PX00613 at 049-050. There is no evidence in the record that it was unable to meet current obligations, such as payroll, tax, or lease payments, or that any of its suppliers were refusing to ship.

727.    Wild Oats' sales have risen steadily from $919 million in 2002 to $1.2 billion in 2006, a compound annual growth rate of 6.5 percent. PX00613 at 025. Wild Oats' adjusted EBITDA in 2006 was $46.9 million, up from $41.6 million in 2005 and $22.3 million in 2004. PX00613 at 037, 059. Wild Oats' cash generated from operations has risen steadily from $17 million in 2004 to $31 million in 2005 to $32 million in 2006. PX00613 at 071.

728.    Wild Oats has steadily grown its cash and near-cash balance (cash and cash equivalents plus short-term investments) from $41.8 million in 2004 to $54.1 million in 2006, a growth rate of 29.4%. PX00612 at 56; PX00613 at 068. These figures do not include the $24.6 million Wild Oats has available through the unused portion of its $40.0 million credit facility from Bank of America, N.A. PX00613 at 089-090.

729.    Although Wild Oats experienced a net loss in 2006, this would have been a net profit but for restructuring and asset impairment charges. PX00613 at 025. The restructuring and asset impairment charges taken by Wild Oats in 2006 were mostly non-cash expenses (change in lease-related liability estimate, accretion expense on lease-related liabilities, and asset impairment charges). PX00613 at 035. Wild Oats has earned a net profit in three of the last five years. PX00613 at 025.

730.    Wild Oats' gross profit margin in 2005 was 29.1%, and its gross profit margin in 2006 was 30.0%. PX00613 at 032.

731.    

███████████████████████████████████████
███████████████████████████. PX00066 at 001.

732.  Wild Oats in its 2006 SEC Form 10-K told the investing public that:

> cash generated from operations, and available under our credit facility . . .
> will be sufficient to satisfy our budgeted cash requirements through fiscal
> 2007. . . . We believe that current cash and cash equivalents, short-term
> investments and cash flows from operations will be sufficient to fund
> necessary capital expenditures, to provide adequate working capital, and to
> expand as planned for the foreseeable future (the next 12 months).

PX00613 at 049-050.

733.  In its 2006 10-K, Whole Foods disclosed a cash balance of $2,252,000 versus
$509,770,000 in current liabilities, which is a cash ratio of 0.0044.  PX01302 at 038.  In
its 2006 10-K, Wild Oats disclosed a cash balance of $40,420,000 versus $152,078,000 in
current liabilities, which is a cash ratio of 0.2658.  PX00613 at 068.

734.  Wild Oats' capital expenditures were $48 million in 2006, $28 million in 2005, and $49
million in 2004.  PX00613 at 071.

735.  █████████████████████████████████████████
██████████████████████████████████
██████████████████). PPFF 725-29.

736.  Wild Oats reported positive financial results from ongoing operations (backing out non-
cash restructuring and impairment charges from operating income) in all but one year
from 2003-2005.  PX00612 at 53-54; PX00613 at 066.

737.  Wild Oats reported negative results from ongoing operations in 2004.  Former CEO Odak
attributed the loss to difficulties in starting up a new perishables warehouse in California
and in dealing with the repercussions of a strike.  Odak IH (JX 37) at 159:16-160:11.  The
strike affected the Henry's banner stores that Wild Oats owns.  Odak Dep. (JX 16) at
44:4-24.  Wild Oats' pre-tax loss of $6.5 million from ongoing operations (excluding the
non-cash valuation allowance change and other restructuring and impairment charges) is
less than one percent of its 2004 $1.0 billion sales.  PX00613 at 025.

738.  Income tax expense comprised $25.8 million of the $40 million net loss reported in 2004.
PX00612 at 54.  Given that Wild Oats reported a loss before income taxes, an income tax
credit, rather than an income tax expense, would have been expected.  However, the
reason so substantial an income tax expense was reported in 2004 was that Wild Oats

recorded a non-operating, non-cash, non-recurring valuation allowance against its deferred tax assets. PX00612 at 35.

739.  The 2004 results did not deter creditors as three months after the end of the fiscal year on March 31, 2005, Wild Oats entered into its current five-year, $40 million revolving line of credit with the Bank of America. Subject to certain conditions, this line can be increased to $100 million. PX00612 at 78.

740.  In 2005, Wild Oats reported a 10.3% increase in its gross profits (to $327.6 million). It also reported net income of $3.2 million, or $0.11 per share, compared with a net loss of $40.0 million or $1.37 per share in 2004. PX00612 at 54.

741.  In November2006, newly appointed Wild Oats CEO Greg Mays said in an earnings conference that sales and earnings growth were "positive" for year-to-date sales, "including positive year-over-year results for the last six consecutive quarters." PX01273 at 003.

**C.    Wild Oats Is An Aggressive Competitor**

742.  In November 2006, Wild Oats' current CEO, Greg Mays, stated "Our focus is really to accelerate the programs Perry [Odak] put in place for sales growth, new store openings, with probably a greater emphasis on remodeling. As we've focused on store growth, we haven't always reinvested in existing stores. Our offering is much better now, much greater – we're going to spend in the first and second quarters to increase our offering. We're going to invest in our store training and staffing. We'll launch an aggressive remodel program and spend more capital dollars on marketing and merchandising programs that will bring new energy to our stores." PX00340 at 001.

743.  In the third quarter 2006 earnings conference call on November 7, 2007, Wild Oats' CEO Greg Mays announced that Wild Oats will have opened seven new stores by the end of the year and represented that Wild Oats had 21 leases or letters of intent signed for stores that would open in 2006, 2007, or 2008. PX01273 at 004.

744.  According to a Wild Oats' ordinary course of business document, entitled "



. PX00455 at 001.

745.  Wild Oats opened new stores every year for the last five years. Wild Oats opened one store in 2002, eight stores in 2003, 12 stores in 2004, eight stores in 2005, seven stores in 2006, and one store in early 2007. PX00613 at 028.

746.  In the November 7, 2006, earnings conference call, Wild Oats' CEO Greg Mays also said:
      "Simply put – our plan is to become more aggressive with our marketing and
      merchandising and with enhancing our 'customers' experience.' Supported by our
      'Marquee Name' – a name that represents quality, integrity and trust for organic and
      natural foods. By using these assets more aggressively, we believe we can improve the
      top line 'sales' performance for fiscal 2007." PX01273 at 002.

747.  In the November 7, 2006, earnings conference call, Wild Oats' CEO Greg Mays said that
      "[t]he company has delivered positive sales and very positive earnings growth year-over-
      year for the full year 2005 and year-to-date 2006, including positive year-over-year results
      for the last six consecutive quarters. However, Wild Oats has the potential to do better,
      and I believe much better. . . . [W]e continue to formalize the strategic operational and
      marketing initiatives to step up our: product offerings, merchandising, and operational
      execution to maximize the sales growth being realized in this growing natural and organic
      space." PX01273 at 003.

      **D.    Wild Oats Has Opportunities for Further Financing**

748.  

      **E.    Wild Oats Is Not a High-Priced Competitor**

749.  Whole Foods's CEO John Mackey credited Wild Oats' price competition when he told
      his Board of Directors in February 2007 that one justification for the proposed acquisition
      was to eliminate "nasty price wars" with Wild Oats:

           [Wild Oats] remains a relevant competitor. By buying them we will
           greatly enhance our comps over the next few years and will avoid nasty
           price wars in Portland (both Oregon and Maine), Boulder, Nashville, and
           several other cities which will harm our gross margins and profitability.

      PX00773 at 001.

750.  Wild Oats' Executive Vice President Roger Davidson told other Wild Oats executives in
      January 2007, "███████████████Whole Foods at retail.█████████
      ████████████████. It will therefore be necessary for your departments to offset
      these retail reductions with cost reductions by department indicated at the bottom of the
      spreadsheet." PX01202 at 001 (redacted).

751.   In May 2006, Whole Foods Regional Vice President Will Paradise reported ████████ ████████████████████████████████████████████████ ████████████████████████████████.'' PX00054 (redacted).

752.   In 2001, when Perry Odak became CEO of Wild Oats, it was ██ days from running out of cash. Odak IH Tr. at 166:18-167:4, PX01325 at 166-167. By 2006, Wild Oats had $54.1 million in cash and near cash (cash and cash equivalents plus short-term investments). Wild Oats Markets, Inc. 2005 SEC Form 10-K (filed February 28, 2006) at 56, PX00612. During Mr. Odak's tenure as CEO of Wild Oats, Wild Oats never missed a cash forecast. Odak IH (JX 37) at 144:22-145:8.

753.   Whole Foods' CEO John Mackey recognized that over the last few years, Wild Oats' performance improved.  Mr. Mackey testified that Wild Oats is "a stronger and better company than they were 6 and a half years ago."  Mackey IH (JX28) at 225:18-22.

754.   According to February 2007 "Project Goldmine" valuation of Wild Oats prepared for Whole Foods' board, Whole Foods estimated Wild Oats would enjoy ██████EBITDA growth in FY2007 and ██████ EBITDA growth in FY2008.  DX 401 at 26; PX02899.

755.   In October 2006, Whole Foods Regional Vice President Will Paradise told the Whole Foods store in Boulder, Colorado, "to match these deals" offered by Wild Oats BOGO [Buy one, get one] sale, but he limited the price matching to "Boulder only since these deals are only in the four [Wild Oats] stores in the Boulder area."  PX00187 at 001.

756.   Wild Oats' "Financial and Business Overview:  2007 Plan" contains a document entitled "Reduce Retail Pricing":

- Wild Oats Grocery and Natural Living (████████on WFMI)
  - ████████Investment Needed ████████████████with WFMI

PX00458 at 005 (redacted).

757.   Wild Oats' May 2006 Competitive Intrusion Plan contains a document entitled "Pricing":

Competitive Issues
- Competitor may execute a new store pricing plan whereby ~ ████████████are priced below competition

Objective/Tactics
- Maintain a good price perception relative ████████████████

  - Run competitive price checks ████████ starting ████████after opening

124

- ██ ████████████████████████████████████
████████████████████████████████████████
████████████ .

PX00661 at 012 (redacted).

758. Wild Oats Director of Pricing Chad Smith testified that the "competitor opening that caused this price zone to be created" in ████████████████████ "was Whole Foods at ████████████████████ Mr. Smith said that Wild Oats Executive Vice President Roger Davidson instructed him to create the price zone in ████████████ to respond to the planned opening of a Whole Foods store in ████████ ████ Smith IH (JX 38) at 96:3-5, 99:5-6.

759. Wild Oats Director of Pricing Chad Smith testified that he was instructed by Wild Oats Executive Vice President Roger Davidson to make price changes in ████████████████ , in the ████████████ to respond to competition from the opening of a Whole Foods store directly across the street from Wild Oats and the opening of a ████████████ farther away. Smith IH (JX 38) at 100:1-101:20.

760. In contrast to this testimony and documentary evidence, Defendants' counsel asserted: "███████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████ ).

761. A Wild Oats planning document entitled "Whole Foods Competitive Marketing Plan: Pricing" states the "Objective: ████████████████ between WFMI [Whole Foods] and Wild Oats ████████████████████████████████████████████ ." PX00677 at 078. The document identifies the following steps to achieve the objective:

- WFMI executes a new store pricing plan whereby ████ key items are priced below competition

- Wild Oats needs to counter this tactic by creating a ███████████████████ ████████████████████████████████████████ ███████████████████████████

  – ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ ."'"

125

PX00677 at 078 (this document is undated, but internal evidence indicates it was prepared after mid-2005; *see* PX00677-044 (citing forecasting model installed June 27, 2005)) (redacted).

762.    In a 2Q 2005 report to the Board, A.C. Gallo, then a Whole Foods Regional Vice President, reported that "margins are a little low [at Whole Foods' Louisville store] because we are having to match some ridiculously low special pricing at Wild Oats." PX01008 at 002 (redacted).

763.    In November 2005**,** Walter Robb, now co-president and COO of Whole Foods,  reported to A.C. Gallo, ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████**."**  PX00028 at 001.

**F.    No Evidence Wild Oats Is Likely To Exit the Relevant Markets**

764.    There is no evidence in the record that Wild Oats is exiting or is likely, absent the proposed acquisition, to exit any of the geographic markets alleged in the Complaint.

**G.    Perry Odak is a competent and credible Wild Oats witness**

765.    Defendants unfairly attack Perry Odak, Wild Oats' former CEO, as biased and unreliable. When Mr. Odak first testified (at an investigational hearing before the FTC in April 2006), Mr. Odak had a "joint defense agreement" with Wild Oats because, according to Defendants, "Mr.Odak shared Wild Oats' interest in limiting and closing [the merger] investigation and avoiding potential litigation which would likely cause (and actually has caused) substantial burden to both Wild Oats *and* Mr.Odak." PX04601 at 1.  Mr. Odak's investigational hearing testimony was cited and relied on in the FTC's Complaint and pre-trial briefs.  Mr. Odak testified at his deposition in response to a question ███████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
Odak Dep. (JX 16) at 9:9-13.

766.    Perry Odak was CEO of Wild Oats from 2001-2006.  Greg Mays has been interim CEO of Wild Oats since late October 2006.  Sam Martin joined Wild Oats in January 2006 (PX00613 at 155), Greg Mays in July 2006.  Perry Odak testified that while he was with Wild Oats, neither Greg Mays nor Sam Martin was involved in any strategic decision making involving marketing, pricing, finance or real estate at Wild Oats.  Odak Dep.(JX 16) at 203-04, 239-40.

767.    Perry Odak had approximately five years experience at the helm of a premium natural and organic supermarket.  Greg Mays became CEO of Wild Oats in late October 2006, and

126

testified before the FTC after approximately four months running a premium natural and organic supermarket; he has significantly less experience than does Mr. Odak to testify to the business of Wild Oats. *See* PFF 28, 30.

768.    Walter Robb, the Co-President of Whole Foods, testified that Greg Mays "has really been in there [Wild Oats] such a short time, I mean, they took Perry [Odak] out and there isn't really evidence for him to be able to do that. And I think he [Mays] was only there as an interim caretaker until they [Wild Oats] could find a new CEO. I mean, I know they were looking for a new CEO because the headhunters called me." Robb IH (JX 29) at 179:14-23.

769.    When Perry Odak took up his CEO position at Wild Oats the company was within 90 days of running out of cash and had violated its loan covenants. Odak IH (JX 37) at 30:2-13. During Perry Odak's tenure (2001-October 2006), Wild Oats sales rose steadily from $919 million in 2002 to $1.2 billion in 2006, a compound annual growth rate of 6.5 percent. PX00613 at 025. Its adjusted EBITDA in 2006 was $46.9 million, up from $41.6 million in 2005 and $22.3 million in 2004. PX00613 at 037, 059. Wild Oats' cash generated from operations rose from $17 million in 2004 to $31 million in 2005 and $32 million in 2006. PX00613 at 071. This has allowed Wild Oats to steadily grow its cash and near-cash balance (cash and cash equivalents plus short-term investments) from $41.8 million in 2004 to $54.1 million in 2006. PX00612 at 56; PX00613 at 068. These figures do not include the $24.6 million available through the unused portion of its $40.0 million credit facility from Bank of America, N.A. PX00613 at 089-090.

770.    On every material issue, Mr. Odak's testimony is corroborated by evidence from, among others, the Whole Foods CEO John Mackey. To illustrate: (i) Mr. Odak and Mr. Mackey agree that Wild Oats has considerable brand equity and authenticity in the premium natural and organic market, *see* PX00773; PX00751; Odak Dep. (JX 16) at 236:4-9; (ii) Mr. Odak and Mr. Mackey agree that conventional supermarkets such as Safeway have been unsuccessful in their efforts to compete with Whole Foods and Wild Oats, *see* PX000785 and Odak Dep. (JX 16) at 343:19-25; and (iii) Mr. Odak and Mr. Mackey agree that both Whole Foods and Wild Oats have a well defined customer demographic that is affluent and well educated. *See* PX000718; Odak IH (JX 37) at 95:5-96:6.

771.    Mr. Odak had no financial incentive to testify to anything other than the truth in this matter. In contrast, the declarants for Defendants, most of whom are employees of Defendants, do have financial incentives to give statements favorable to Defendants. Similarly, Wild Oats' principal witnesses in this case, Mr. Mays and Mr. Martin, will realize considerable sums of money should the proposed merger be consummated. *See, e.g.,* PX00613 at 160.

## VIII.    THE TRANSACTION PRODUCES NO VERIFIABLE, MERGER-SPECIFIC EFFICIENCIES

772.    In order to be weighed against an anticompetitive merger, efficiencies must be cognizable, verifiable and merger-specific. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720 (D.C. Cir. 2001); *FTC v. Cardinal Health*, 12 F.Supp. 2d 34, 62 (D.D.C. 1998); Merger Guidelines (PX01310) § 4.

773.    Because "information relating to the efficiencies is uniquely in the possession of the firms," the merging firms carry the burden of proof on efficiencies and:

> must substantiate efficiency claims so that the Agency can verify by reasonable means the likelihood and magnitude of each asserted efficiency, how and when each would be achieved . . . how each would enhance the merging firm's ability and incentive to compete, and why each would be merger-specific. Efficiency claims will not be considered if they are vague or speculative or otherwise cannot be verified by reasonable means.

*Merger Guidelines* (PX01310) § 4.

774.    "Cognizable efficiencies are merger-specific efficiencies that have been verified and do not arise from anticompetitive reductions in output or service." *Merger Guidelines* (PX01310) § 4.

775.    The costs associated with achieving any efficiencies must be subtracted when quantifying such efficiencies. *Merger Guidelines* (PX01310) § 4 ("Cognizable efficiencies are assessed net of costs produced by the merger or incurred in achieving those efficiencies.").

776.    Certain types of efficiencies are more likely to be cognizable and substantial than others. For example, efficiencies resulting from shifting production among facilities formerly owned separately, which enable the merging firms to reduce the marginal cost of production, are more likely to be susceptible to verification, merger-specific, and substantial, and are less likely to result from anticompetitive reductions in output. Other efficiencies, such as those relating to research and development, are potentially substantial but are generally less susceptible to verification and may be the result of anticompetitive output reductions. Yet others, such as those relating to procurement, management, or capital cost are less likely to be merger-specific or substantial, or may not be cognizable for other reasons. *Merger Guidelines* (PX01310) § 4; *Heinz*, 246 F.3d at 722 n.20.

777.    Defendants must show that any asserted efficiencies from reducing general and administrative expenses could not be achieved by either party acting along. *Merger Guidelines* (PX01310) § 4.

128

778.    A showing of "extraordinary efficiencies" will be required "where the HHI is well above
        1800 and the HHI increase is well above 100." *Heinz*, 246 F.3d at 720, *quoting* IVA
        Areeda, Antitrust Law ¶ 971f at 44.  Efficiencies must be subjected to "rigorous analysis"
        by the Court.  *Heinz*, 246 F.3d at 720.

779.    To establish a valid efficiencies defense, Defendants' claimed efficiencies, when balanced
        against the potential anticompetitive harm, must create a net economic benefit for the . . .
        consumer."  *Rockford Mem'l Corp.*, 717 F. Supp. at 1251.

780.    An efficiencies defense will be rejected when monopoly rents would far outweigh the
        presented savings.  *Rockford Mem'l Corp.*, 717 F. Supp. at 1251; *Cardinal Health*, 12 F.
        Supp. 2d at 63.

**A.    Efficiencies Not Verified or Quantified**

781.    The Request for Additional Information ("Request") issued to Whole Foods in the
        investigation of the proposed acquisition that Whole Foods provide a "detailed
        description of all efficiencies that [Whole Foods] claims will or may arise from the
        proposed acquisition."   The Request also asked Whole Foods to describe the means by
        which each efficiency was to be accomplished, the investments required, the expected
        savings, and the time required for Whole Foods to achieve each efficiency.  Whole Foods
        in its response to the Request did not include a single efficiency nor did it specify the time
        in which it expected to achieve any efficiency.  PX01349 at 001-004.

782.    David Scheffman testified in his deposition that he was "not putting forward a [Merger
        G]uidelines analysis of merger efficiencies" and that his analysis of the purported benefits
        of the acquisition were based on "███████████" Scheffman Dep. (JX 18) at 227:12,
        233:24-25 (redacted).

783.    Whole Foods identified possible efficiencies from "rationalizing product flow from the
        parties' respective distribution centers" and "reductions in distribution costs . . . resulting
        from renegotiation of a new contract with United Natural Foods Inc. (UNFI) made
        possible by the merged entity's larger combined purchase volume."  PX01340-004.

784.    Dr. Scheffman ████████████████████████████████████████████████████
        ████████████████████████████████████. Scheffman Dep. (JX 18) at
        224:15-22, 165:7-15.

785.    The claimed efficiencies must be merger-specific, that is, Defendants must show that the
        efficiency could not be accomplished without the proposed transaction.  The D.C. Circuit
        in *FTC v. Heinz*, 246 F.3d 708 (D.C. Cir. 2001), rejected an asserted efficiencies defense
        that was based on an expert study lacking any statistical validity and that failed to show
        that the claimed efficiency was merger-specific.  The Court said that

129

> the number of data points on the chart were few; they were limited to launches in a single year. . . . Assessing such data's statistical significance in establishing the proposition at issue . . . is thus highly speculative. . . . In the absence of reliable and significant evidence that the merger will permit innovation that otherwise could not be accomplished, the district court had no basis to conclude that the FTC's showing was rebutted by an innovation defense.

786. The efficiencies must be those that cannot be achieved by either company alone because, if they can, the merger's asserted benefits can be achieved without the concomitant loss of a competitor. *Merger Guidelines* (PX01310) § 4.

787. Whole Foods President for the Pacific Northwest Region, Ronald R. Megahan, when asked if the sales volume at a Whole Foods distribution facility would increase after the acquisition, replied, "I don't have any idea." Megahan Dep. (JX 9) at 5:14-17, 248:6-14.

788. Whole Foods' Senior Vice-President of Growth and Business Development, James Sud, testified that the savings he expected the company to achieve was based on ███████████ ████████████ general and administrative expenses **as a percentage of sales.** Sud Dep. (JX 3) at 125:9-19, 127:19-128:10. ████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████). Sud Dep. (JX 3) at 128:11-130:9 (redacted).

789. Whole Foods' Co-President and COO, Walter Robb, testified that it would ██ ██████████████████████████████████████ ████████████████████████████████████████. Robb Dep. (JX 2) at 183:18-185:7. Mr. Robb testified that ██████████████ ████████████████████████████████████████ ████████████████████████████████████████ █████████████. Robb Dep. (JX 2) at 179:4-180:12. Robb testified it ███████ ████████████████████████████████████████. Robb Dep. (JX 2) at 185:20-186:4.

**B.    Significant Costs To Achieve Alleged Efficiencies**

790. Whole Foods expects to incur at least ██████████ in costs in implementing its acquisition of Wild Oats (██████████████████████████████████████ ██████████████████████████████████). PX01349 at 005-006. In addition, Whole Foods estimates it will incur at least ██████████ per store for

each store that it closes for lease breakage fees. *Id.*

### C.    The Alleged Efficiencies Result from a Reduction in Output

791.    Closing a store has the same effect on consumers as an immediate price increase. Murphy Report (PX02878) ¶ 9.

792.    Whole Foods CEO John Mackey testified:

> One of the motivations [for the acquisition of Wild Oats] is to eliminate a competitor.  I will not deny that.  That is one of the reasons why we are doing this deal.  That is one of the reasons we are willing to pay $18.50 for a company that has lost $60 million in the last six years.  If we can't eliminate those stores, then Wild Oats, frankly, isn't worth buying.

Mackey IH (JX 28) at 75:13-21.

793.    Whole Foods' valuation models for the acquisition include assumptions that Whole Foods will ██████████████████████████████████████████████████████ ███████████████████████████████████"; PX00553.

794.    Whole Foods intends to close some number of Wild Oats stores due to their proximity to Whole Foods locations.  James Sud said that Whole Foods does not have enough information on Wild Oats' stores to determine which stores it will close.  Sud Dec. ¶ 47.

_____

Respectfully submitted,

Dated: August 3, 2007

JEFFREY SCHMIDT
Director

KENNETH L. GLAZER
Deputy Director

Bureau of Competition
Federal Trade Commission
600 Pennsylvania Ave, N.W.
Washington, DC 20580

WILLIAM BLUMENTHAL
General Counsel
Federal Trade Commission
600 Pennsylvania Ave, N.W.
Washington, DC 20580

      /s/   Thomas J. Lang
MICHAEL J. BLOOM
RICHARD B. DAGEN (D.C. Bar No. 388115)
THOMAS J. LANG (D.C. Bar No. 452398)
CATHARINE M. MOSCATELLI (D.C. Bar No. 418510)
MICHAEL A. FRANCHAK

Federal Trade Commission
601 New Jersey Ave., N.W.
Washington, DC 20001
(202) 326-2475 (direct dial)
(202) 326-2284 (facsimile)
mjbloom@ftc.gov

132

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing papers were served by e-mailing a copy to:

>
> Alden L. Atkins, Esq.
> Vinson & Elkins LLP
> The Willard Office Building
> 1455 Pennsylvania Ave., N.W.
> Suite 600
> Washington, D.C.  20004-1008
> (202) 639-6613
> Aatkins@VELaw.com
>
> Clifford H. Aronson, Esq.
> Skadden, Arps, Slate, Meagher & Flom LLP
> Four Times Square
> New York, NY 10036
> (212) 735-2614
> Caronson@Skadden.com
>
>
> Paul T. Denis, Esq.
> Dechert LLP
> 1771 I Street, N.W.
> Washington, D.C. 20006-2401
> (202) 261-3300
> Pdenis@dechert.com

Dated: August 3, 2007           _____/s/   Thomas H. Brock_____