# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:07-cv-01021-PLF |
| | ) | |
| WHOLE FOODS MARKET, INC., | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| WILD OATS MARKETS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S NOTICE OF FILING OF THE PUBLIC VERSION OF ITS PROPOSED CONCLUSIONS OF LAW

Notice is given that a redacted public version of Plaintiff's Proposed Conclusions of Law is filed via CM-ECF as an attachment to this notice.

Respectfully submitted,

Dated: August 16, 2007

   /s/ Eric M. Sprague
Eric M. Sprague
Bureau of Competition
Federal Trade Commission
601 New Jersey Avenue, N.W.
Washington, DC  20001
(202) 326-2101 (direct dial)
(202) 326-2071 (facsimile)
esprague@ftc.gov

Counsel for Plaintiff

# Exhibit 1–Plaintiff's Public Proposed Conclusions of Law

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION )
                        )
              Plaintiff, )
                        )    Civ. No. 07-cv-01021 - PLF
     v. )
                        )    **PUBLIC VERSION**
WHOLE FOODS MARKET, INC. )
                        )
     and )
                        )
WILD OATS MARKETS, INC. )
                        )
             Defendants. )

## PLAINTIFF FEDERAL TRADE COMMISSION'S PROPOSED
## CONCLUSIONS OF LAW

Dated: August 15, 2007

JEFFREY SCHMIDT         MICHAEL J. BLOOM
Director                   RICHARD B. DAGEN (D.C. Bar No. 388115)
                             THOMAS J. LANG (D.C. Bar No. 452398)
KENNETH L. GLAZER     CATHARINE M. MOSCATELLI (D.C. Bar No. 418510)
Deputy Director           MICHAEL A. FRANCHAK

Bureau of Competition      Federal Trade Commission
Federal Trade Commission   601 New Jersey Ave., N.W.
600 Pennsylvania Ave, N.W.  Washington, DC 20001
Washington, DC 20580       (202) 326-2475 (direct dial)
                                 (202) 326-2284 (facsimile)
WILLIAM BLUMENTHAL   mjbloom@ftc.gov
General Counsel
Federal Trade Commission
600 Pennsylvania Ave, N.W.
Washington, DC 20580

## TABLE OF CONTENTS

**CONCLUSIONS OF LAW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

I.    NATURE OF THE ACTION, JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . -1-

II.   THE STANDARD FOR A PRELIMINARY INJUNCTION – SERIOUS AND
      SUBSTANTIAL QUESTIONS GOING TO THE MERITS  – IS MET HERE . . . . . . -2-

III.  IN EVALUATING THE QUALITY OF THE EVIDENCE, THE COURT SHOULD
      DISCOUNT DEFENDANTS' MADE-FOR-LITIGATION EVIDENCE . . . . . . . . . . -4-

IV.   PREMIUM NATURAL AND ORGANIC SUPERMARKETS IS A RELEVANT
      PRODUCT MARKET . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

V.    THE RELEVANT GEOGRAPHIC MARKET IS LOCAL  . . . . . . . . . . . . . . . . . . . . -10-

VI.   THIS COMBINATION IS PRESUMPTIVELY ILLEGAL . . . . . . . . . . . . . . . . . . . . -11-

      A.    The Speculative Prospect of Repositioning Is Insufficient to Obviate the
            Anticompetitive Effects of the Acquisition . . . . . . . . . . . . . . . . . . . . . . . . . -13-

      B.    Defendants Have Not Demonstrated That the Alleged Cost Savings from the
            Transaction Will Counteract its Anticompetitive Effects . . . . . . . . . . . . . . . -14-

      C.    The "Flailing Firm" Defense is Unavailable . . . . . . . . . . . . . . . . . . . . . . . . . -16-

VII.  THE ACQUISITION WOULD RESULT IN A SIGNIFICANT LESSENING OF
      COMPETITION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

VIII. INJUNCTIVE RELIEF IS NECESSARY HERE . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

## CONCLUSIONS OF LAW

I.    **NATURE OF THE ACTION, JURISDICTION AND VENUE**

1.    This is an action pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), by which the Federal Trade Commission ("FTC" or "the Commission") seeks a preliminary injunction against the acquisition of Wild Oats by Whole Foods.

2.    This Court has jurisdiction over the subject matter of this action, seeking preliminary injunctive relief pending administrative adjudication of the underlying merits of whether the acquisition violates the Clayton Act § 7, 15 U.S.C. § 18, or Federal Trade Commission Act ("FTC Act") § 5, 15 U.S.C. § 45.  FTC Act § 13(b), 15 U.S.C. § 53(b).

3.    This Court has jurisdiction over the persons of defendants.  Wild Oats Answer ¶¶ 9, 10; Whole Foods Answer ¶ 9, 10; *see* 15 U.S.C § 53(b).

4.    The FTC is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to seek a preliminary injunction in order to enforce Section 7 of the Clayton Act.

5.    The proposed acquisition is a transaction subject to Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

6.    At all times relevant herein, defendants Whole Foods Market, Inc. and Wild Oats Markets, Inc. are each engaged in "commerce," as defined in Section 4 of the FTC Act, 15 U.S.C. § 44 and Section 1 of the Clayton Act, 15 U.S.C. § 12.  Wild Oats Answer ¶¶ 9; Whole Foods Answer ¶ 9.

7.    Venue is proper in this district under Section 13(b) of the FTC Act and 28 U.S.C. § 1391(c).  *See* Whole Foods Answer ¶ 9.

8.    The FTC has jurisdiction, pursuant to Section 11 of the Clayton Act, 15 U.S.C. § 21, to bring administrative proceedings against the proposed merger challenged in this action. The Commission has jurisdiction to issue a cease and desist order, after an administrative hearing on the merits, against defendants Whole Foods and Wild Oats, if the Commission determines that consummation of the proposed merger would violate Section 7 of the Clayton Act.  *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 45 (D.D.C. 1998).

9.    This Court has jurisdiction, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53 (b), to issue a preliminary injunction against Whole Foods and Wild Oats, enjoining their proposed merger.

## II.   THE STANDARD FOR A PRELIMINARY INJUNCTION – SERIOUS AND SUBSTANTIAL QUESTIONS GOING TO THE MERITS  – IS MET HERE

10.   Section 13(b) of the FTC Act provides that a preliminary injunction may be granted "upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest."

11.   Section 13(b) of the FTC Act imposes a two-part "public interest" standard for a court to use in order to determine whether a preliminary injunction should be granted.  *FTC v. H.J. Heinz Co.,* 246 F.3d 708, 714 (D.C. Cir. 2001);  *Cardinal Health,* 12 F. Supp. 2d at 44.

12.   Under this standard, this Court should:  (1) determine the likelihood that the Commission will ultimately succeed on the merits in its case under Section 7 of the Clayton Act, and (2) balance the equities.  *Heinz,* 246 F.3d at 714; *FTC v. University Health, Inc.,* 938 F 2d 1206, 1217-18 (11th Cir. 1991).  This standard differs from the traditional four-part test for preliminary injunctive relief applicable to suits brought by private parties.  11A Wright, Miller and Kane, Federal Practice and Procedure § 2948 at 131-33.

13.   In this suit for preliminary relief, the Commission is not required to prove that, and the Court is not required to make a final determination on whether, defendants' proposed merger would violate Section 7 of the Clayton Act.  *Heinz Co.,* 246 F.3d at 714, citing *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1342 (4th Cir. 1976);  *Cardinal Health,* 12 F. Supp. 2d at 45 .  The determination of whether the acquisition *actually* violates the antitrust laws is reserved for the Commission and is not before the Court.  *FTC v. Staples, Inc.,* 970 F. Supp. 1066, 1071 (D.D.C. 1997).  Nor is the Court required to resolve all conflicts in the evidence, or to conduct an extensive analysis of all the antitrust issues.  Those matters are reserved to the Commission (subject to appellate review), upon completion of administrative proceedings before the Commission, including a full trial on the merits.  In the instant proceeding, the Court's task is to make a preliminary assessment of the proposed merger's effect on competition.  *FTC v. Alliant Techsystems*, 808 F. Supp. 9, 19 (D.D.C. 1992).

14.   The Commission satisfies its burden to show likelihood of success if it "raises questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the Commission in the first instance and ultimately by the Court of Appeals." *University Health*, 938 F.2d at 1218; *FTC v. Warner Communications*, 742 F.2d 1156, 1162 (9th Cir. 1984) (quoting *FTC v. National Tea Co.*, 603 F.2d 694, 698 (8th Cir. 1979)); *Alliant Techsystems*, 808 F. Supp. at 19.

15. In deciding whether a significant showing has been made, doubts are to be resolved against the transaction and in favor of a preliminary injunction. *FTC v. Elders Grain*, 868 F.2d 901, 906 (7th Cir. 1989) (citing *Philadelphia Nat'l Bank*, 374 U.S. 321, 362-63 (1962)).

16. Section 7 of the Clayton Act prohibits mergers that "may . . . substantially lessen competition, or tend to create a monopoly." 15 U.S.C. § 18.

17. Section 7 of the Clayton Act is concerned with preventing the creation or enhancement of market power. *FTC v. Proctor & Gamble Co.*, 386 U.S. 568, 577 (1967); *United States v. Archer-Daniels-Midlands, Corp.*, 866 F.2d 242, 246 (8th Cir. 1988), *cert. denied*, 493 U.S. 809 (1989). The lawfulness of an acquisition turns on the purchaser's "potential for creating, enhancing, or facilitating the exercise of market power -- the ability of one or more firms to raise prices above competitive levels for a significant period of time." *Id.*

18. The focus of Section 7 is on arresting anticompetitive mergers "in their incipiency" (*Brown Shoe Co. v. United States*, 370 U.S. 294, 317 (1962)) and thus requires a prediction as to the merger's impact on future competition. *Philadelphia Nat'l Bank*, 374 U.S. at 362. Because Section 7 addresses the probable future effects of an acquisition, it necessarily requires predictions and inherently "deals in probabilities, not certainties." *Brown Shoe.*, 370 U.S. at 323. Accordingly, to establish a violation, the government need show only a reasonable probability, not a certainty, that the proscribed anticompetitive activity may occur. *University Health*, 938 F.2d at 1218; *see Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986), *cert. denied*, 481 U.S. 1038 (1987).

19. Analysis of the likely competitive effects of a merger requires determinations of (1) the "line of commerce" or product market in which to assess the transaction; (2) the "section of the country" or geographic market in which to assess the transaction; and (3) the transaction's probable effect on competition in the product and geographic markets. *See United States v. Marine Bancorporation,* 418 U.S. 602, 618-23 (1974); *FTC v. Harbour Group Investments, L.P.,* 1990-2 Trade Cas. (CCH) ¶ 69,247 at 64,914 n.3 (D.D.C. 1990).

20. Evidence establishing undue concentration in the relevant market makes out the government's *prima facie* case and gives rise to a presumption of unlawfulness. *Philadelphia Nat'l Bank*, 374 U.S. at 363; *Cardinal Health*, 12 F. Supp. 2d at 52; *see also United States v. General Dynamics Corp.*, 415 U.S. 486, 497 (1974), *quoting Aluminum Co. of Am.*, 377 U.S. 271, 279 (1964) ("if concentration is already great, the importance of preventing even slight increases in concentration is correspondingly great.").

III.    **IN EVALUATING THE QUALITY OF THE EVIDENCE, THE COURT SHOULD DISCOUNT DEFENDANTS' MADE-FOR-LITIGATION EVIDENCE**

21.    In defining markets, courts and the antitrust agencies normally look at all available evidence, including in particular the ordinary course of business documents of the merging parties, *e.g., Warner Communications*, 742 F.2d at 1163 ("record company documents"); *Cardinal Health*, 12 F. Supp. 2d at 49; *Staples*, 970 F. Supp. at 1076; *Olin Corp.*, 113 F.T.C. 400, 597 (1990), *aff'd sub nom. Olin Corp. v. FTC*, 986 F.2d 1295 (9th Cir. 1993), *cert. denied*, 510 U.S. 1110, 114 S. Ct. 1051 (1994); and on the testimony of competitors and customers (including intermediate purchasers such as retailers). *E.g., FTC v. PPG Indus.*, 798 F.2d 1500, 1504 (D.C. Cir. 1986) ("buyers' and sellers' perceptions"); *Reynolds Metal Co. v. FTC*, 309 F.2d 223, 228-29 (D.C. Cir. 1962); *Warner Communications*, 742 F.2d at 1163; *Borden v. FTC*, 674 F.2d 498, 507-08 (6th Cir. 1982) ("buyers for large supermarket chains and representatives of processed lemon juice companies").

22.    Documents created by the merging parties prior to litigation are most probative as to the likely competitive impact of a transaction.  In *Heinz*, the DC Circuit noted that

>    "Heinz's own documents recognize the wholesale competition and anticipate that the merger will end it.  Indeed, those documents disclose that Heinz considered three options to end the vigorous wholesale competition with Beech-Nut: two involved innovative measures while the third entailed the acquisition of Beech-Nut.  Heinz chose the third, and least pro-competitive, of the options."  246 F.3d at 717 (citations to record omitted).

23.    Documents from the defendants' own files -- exposing the "business reality" of "how the market is perceived by those who strive to profit in it" -- support finding a PNOS product market.  PFF 33-40, 49-61, 333-336.  *Cf. FTC v. PPG Indus.*, 628 F. Supp. 881, 884 n.5 (D.D.C.), *aff'd*, 798 F.2d 1500 (D.C. Cir. 1986);  *Reynolds Metal*, 309 F.2d at 228-29 (finding florist foil to be a product market separate from other types of aluminum foil based on, *inter alia*, evidence in company documents); *Community Publrs. v. Donrey Corp.*, 892 F. Supp. 1146, 1153-54 (W. D. Ark. 1995) (when firms routinely concentrate on some presumptively competitive products and ignore others, they may be providing a practical assessment of the products that are inside or outside the relevant product market); *California v. American Stores*, 697 F. Supp. 1125, 1129 (C.D. Cal. 1988) (supermarkets), *aff'd in part and rev'd on other grounds*, 872 F.2d 837 (9th Cir. 1989), *rev'd on other grounds*,  495 U.S. 271 (1990) ("[T]he State has presented evidence that defendants' own marketing documents focus on supermarket shoppers and competition from other supermarkets and do not evaluate convenience stores, gasoline service stations, etc. as competitors.").

24. Defendants' presentation of evidence that other retailers sell some organic or natural products and believe they "compete" with premium natural and organic supermarkets does not establish a broader market. The mere fact that two different classes of retail vendors both sell a particular type of merchandise does not mean that they are in the same product market. *American Stores,* 697 F. Supp at 1129 ("[e]ven if convenience stores competitively price a few food items, such as bread and milk, in direct competition with supermarkets, such is not sufficient to justify inclusion of all retail grocery sales from whatever outlet in the relevant product market").

25. Defendants' business records and testimony reflect defendants' intense efforts to maintain a premium distinction that distinguishes their stores from conventional supermarkets and other food retailers. PFF 44-142. Defendants' numerous internal documents show the interaction of their unique price and nonprice competition within the market with disregard to participants in the larger market. PFF 337-366. Those documents are far more probative of the "business reality" of the market than the defendants' self-serving, post-Complaint employee declarations.

26. Defendants' made-for-litigation declarations are entitled to little weight to the extent they are "in conflict with contemporaneous documents." *United States v. Gypsum Co.*, 333 U.S. 364, 396 (1948).

## IV. PREMIUM NATURAL AND ORGANIC SUPERMARKETS IS A RELEVANT PRODUCT MARKET

27. A relevant product market defines the product boundaries within which competition meaningfully exists. *United States v. Continental Can Co.*, 378 U.S. 441, 449 (1964). "The outer boundaries of a product market are determined by the reasonable interchangeability of use [by consumers] or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325; *see also United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).

28. Although the Horizontal Merger Guidelines issued by the Federal Trade Commission and the U.S. Department of Justice ("Merger Guidelines") (PX01310) are not binding on the courts, courts have considered them in determining the impact on competition of a proposed acquisition. *See PPG*, 798 F.2d at 1503; *University Health*, 938 F.2d at 1211 n.12; *Olin*, 986 F.2d at 1299; *FTC v. Swedish Match N. Am., Inc.*, 131 F. Supp. 2d. 151, 160, 168, n.11, n.12 (D.D.C. 2000); *Cardinal Health*, 12 F. Supp. 2d at 53 (measuring market shares), 55-58 (analyzing entry), 61-62 (analyzing efficiencies).

29. The analytical framework set forth in the Merger Guidelines simulates the inquiry regarding the reasonable interchangeability of use or cross-elasticity of demand by asking whether a "hypothetical monopolist . . . would profitably impose at least a 'small but significant and nontransitory' increase in price" ("SSNIP"). *Merger Guidelines* § 1.11 (PX01310). The Merger Guidelines approach is routinely applied by courts in their

market definition exercises. *E.g., Cardinal Health*, 12 F. Supp. 2d at 46 ("[T]he Court must determine whether . . . there is reason to find that if the [d]efendants were to raise prices after the proposed merger[], their customers would switch to alternative sources of supply to defeat the price increase."). *Accord, Archer-Daniels-Midland Co.*, 866 F.2d at 246 ("[T]hese concepts help evaluate the extent competition constrains market power and are, therefore, indirect measurements of a firm's market power.").

30.     A one (1) percent SSNIP in certain product markets, such as here, is appropriate to use for market definition purposes. The Merger Guidelines speak of a five (5) percent SSNIP test but recognize that in some cases depending on the industry it is appropriate to use a smaller percentage. *Merger Guidelines* § 1.11 (PX01310). Defendants' own expert economist acknowledges that for retail markets characterized by high volume of sales but low profit margin per dollar of sales, a hypothetical price increase as low as 1% may be appropriate. *See* Expert Report of David T. Scheffman, Ph.D., ¶ 114 (PX02066) ("Given the relatively low net profit margins (e.g., income to sales) associated with supermarket retailing, it is common to use a small hypothetical price increase, because a larger increase in price would lead to implausibly large margins given what we know about supermarket margins."); David Scheffman, Comments at "Grocery Store Antitrust: Historical Retrospective and Current Developments," May 24, 2007, (PX00322); *see also* Harris & Jorde, *Market Definition in the Merger Guidelines: Implications for Antitrust Enforcement*, 71 Cal. L. Rev. 464, 482 (1983) ("In the high-volume grocery business . . . net income typically represents 0.5% of sales, so a 5% increase in price would represent a 1000% increase in profit . . . . the managers of any recently merged grocery firm would know better than to try to raise prices by 5% across the board."); FTC Bureau of Economics, "The Petroleum Industry, Mergers, Structural Change and Antitrust Enforcement (August 2004)," (PX00330 at 22 & n.13) ("The FTC staff frequently has used a one-cent-per gallon price increase in defining relevant markets for petroleum mergers").

31.     Market definition is designed to distinguish close competitive constraints from those more distant to assess whether the acquisition significantly reduces competition between or among *close* constraints. *See, e.g.,* 4 P. Areeda, H. Hovenkamp & J. Solow, *Antitrust Law* ¶ 929c  (rev. ed. 1998) (hereinafter "Areeda")

32.     The fact that a product has some constraining effect on another product or similar functionality does not necessarily mean that they are in the same relevant market. In markets where the products are differentiated (*i.e.*, the products are not perfect substitutes for one another), competition may be localized, meaning individual sellers compete more directly with those competitors selling close substitutes. *Staples,* 970 F. Supp. at 1075 ("[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes.").

33.  This Court in *Staples* observed: "[a]s other courts have noted, use of the term "submarket" may be confusing.  Whatever term is used – market, submarket, relevant product market – the analysis is the same."  Staples, 970 F. Supp. at 1080 n.11 (citations omitted).

34.  Within the broad range of "reasonably interchangeable" products, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."  *Brown Shoe*, 370 U.S. at 325, *citing E.I. du Pont de Nemours*, 353 U.S. at 593-95; *see Staples*, 970 F. Supp. at 1075-81 (finding submarket of office supply superstores within broader market of sale of office supplies).  *See also Merger Guidelines* § 2.21 (PX01310); Murphy Report (PX02878 at 004).

35.  Even firms enjoying monopoly power may be constrained in their pricing by other products -- but that constraint does not mean that the firm lacks monopoly power.  *See* 2A Areeda, *Antitrust Law*, ¶ 506a (2d Ed. 2002) ("As Judge Learned Hand put it, "substitutes are available for almost all commodities, and to raise the price enough is to evoke them."  [footnote omitted]  But, as he further noted, the existence of substitutes does not necessarily preclude "monopoly" power.  It depends on how close the substitutes are in the minds of buyers, on how many buyers consider them to be close, and upon the price-output decisions of those producing the substitutes.") paraphrasing *Aluminum Co. of Am.*, 148 F.2d 416, 426 (2d Cir. 1945).  *See* Jonathan Baker, *Unilateral Competitive Effects Theories in Merger Analysis*, 11 Antitrust L.J. 21, 24-25 (1997) (imperfect substitutes in pharmacy networks and cable television insufficient to constrain post-merger market power).

36.  "[I]t is ordinarily quite difficult to measure cross-elasticities of supply and demand accurately.  Therefore, it is usually necessary to consider other factors that can serve as useful surrogates for cross-elasticity data."  *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir. 1993), *quoting In re Int'l Tel. & Tel. Corp.*, 104 F.T.C. 280, 286 (FTC 1984).  Since it can be quite difficult to measure cross-elasticity directly, evidence of cross-elasticity may not be available and other evidence may be used as surrogate.  *Swedish Match*, 131 F. Supp. 2d at 160-61.

37.  Because it is usually difficult to measure cross-elasticities of demand, courts also have identified "practical indicia" of product market boundaries, such as

> industry or public recognition of the submarket [or market] as a separate economic entity, the product's particular characteristics and uses, unique production facilities, distinct customers, sensitivity to price changes, and specialized vendors.

*Brown Shoe*, 370 U.S. at 325; *see also Cardinal Health,* 12 F. Supp. 2d at 46; *Staples,* 970 F. Supp. at 1075.  These "practical indicia" are "evidentiary proxies for direct proof of substitutability" among products.  *Rothery Storage & Van Co. v. Atlas Van Lines*, 792 F.2d 210, 218 (D.C. Cir. 1986).

38.     One of the *Brown Shoe* indicia, public recognition of the market, includes within it the basic notion that consumer preferences, *i.e.*, demand for a product or service, no matter how subjective or fickle, define a relevant market.  Indeed, this goes to the heart of the mechanics used by the Merger Guidelines to define markets.  *Merger Guidelines* § 1.0 (PX01310)  ("Market definition focuses solely on demand substitution factors – i.e., possible consumer responses.").

39.     Another one of the *Brown Shoe* indicia, distinct prices, recognizes that higher priced or premium products or services may belong in separate relevant markets.  *See Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) ("A price differential between two products may reflect a low cross-elasticity of demand, if the higher priced product offers additional service for which consumers are willing to pay a premium.")

40.     Relevant product markets often are defined with reference to the type of store at issue.  *See Staples*, 970 F. Supp. at 1074-77 (office superstores constitute a relevant product market despite sale of many of the same products through other retail channels); *Photovest v. Fotomart*, 606 F.2d 704 (7th Cir. 1979) (relevant market of "drive-thru retail photo processing" based on consumer perception that drive-thru offered greater convenience and service); *American Stores*, 872 F.2d at 840 (supermarkets comprised a relevant submarket–exclusive of convenience stores, smaller independent grocery stores and other food retailers–because supermarkets are the only retailers that meet consumers' needs for variety); *see also Columbia Broad. Sys., Inc. v. FTC*, 414 F.2d 974 (7th Cir. 1969) (relevant market for records sold through mail-order subscription services).

41.     Relevant product markets are often defined as a service or group of services.  *Merger Guidelines* § 1.0 (PX01310).

42.     Numerous courts have held that a "cluster" of products and services may be a relevant product market, based on the benefit to consumers accruing from the convenience of purchasing complementary products from a single supplier.  Supermarkets, department stores, office superstores, commercial banks, and hospitals are a few examples.  *Staples*, 970 F. Supp. at 1066 (office superstores); *Philadelphia Nat'l Bank* 374 U.S. at 356 (banking services); *American Stores*, 697 F. Supp. at 1129 (supermarkets)*; Hospital Corp.,* 807 F.2d at 1389.  *See also United States v. Grinnell Corp.*, 384 U.S. 563, 572-73 (1966) (central station protective services for burglary protection, fire protection and other services); *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805 (8th Cir. 1987) (pet supplies); *Alliant Techsystems*, 808 F. Supp. at 20 (munitions systems); *In re Hospital Corp. of Am.*, 106 F.T.C. 361, 434-37, 465-66 (1985) (acute inpatient hospital services), *aff'd*, 807 F.2d 1381 (7th Cir. 1986), *cert. denied*, 481 U.S. 1038

(1987).

43.    Market definition is a fact-intensive exercise that turns on the marketplace realities in each case.  Precedent regarding methodology and economics is relevant, but market definition remains a factual finding.  *See Weiss v. York Hosp.*, 745 F.2d 786, 825 (3d Cir. 1984) ("Market definition is question of fact . . . ."); *General Indus.*, 810 F.2d at 805 (8th Cir. 1987) (in defining a market, "the reality of the marketplace must serve as the lodestar").

44.    The decisions in *United States v. Oracle*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004), and *Staples*, 970 F. Supp. at 1072–77, illustrate the fact-intensive inquiry required to define an antitrust market.  In *Oracle*, the court discussed several relevant factors: (1) the merging firms' products are differentiated from one another; (2) the merging firms' products are close substitutes for each other; (3) other products are sufficiently different from the merging firms' products that a merger would make a small but significant and non-transitory price increase profitable for the merging firms; and (4) repositioning by the non-merging firms is unlikely.  *Id.; cf. Merger Guidelines,* § 2.21 (PX01310)*; Hovenkamp, Federal Antitrust Policy* § 12.7a2 (1994).  The *Oracle* legal analysis is fundamentally the same as in *Staples*.  While defendants in *Staples*, like the defendant in *Oracle*, maintained that the market definition was "contrived" with no basis in law or fact, *Staples*, 970 F. Supp. at 1073, this Court in *Staples* properly focused on the parties' recognition of competition among superstores.  The *Oracle* decision also emphasized the difficulty of drawing lines between competitors in the software industry.  Here, as in *Staples*, the lines are much easier to discern.  *See, e.g., Staples*, 970 F. Supp. at 1079 ("the unique combination of size, selection, depth and breadth of inventory offered by the superstores distinguishes them from other retailers").

45.    The fact that conventional supermarkets carry some natural and organic products does not by itself establish that conventional supermarkets and premium natural and organic supermarkets belong in the same relevant product market.  *American Stores*, 697 F. Supp at 1129 ("[e]ven if convenience stores competitively price a few food items, such as bread and milk, in direct competition with supermarkets, such is not sufficient to justify inclusion of all retail grocery sales from whatever outlet in the relevant product market").

46.    Markets need not be defined with scientific precision.  In Judge Posner's words, defendants seek to engage the Court in "a hunt for the snark of delusive exactness." *Blue Cross & Blue Shield United* v. *Marshfield Clinic,* 65 F.3d 1406, 1411 (7th Cir. 1995), *cert. denied,* 516 U.S. 1184 (1996).  Indeed, "[t]he tendency to see relevant market definition as an all-or nothing proposition rather than as an array of estimates with no market description being exactly right has led to the most serious errors in antitrust enforcement." Robert Pitofsky, *New Definitions of Relevant Market and the Assault on Antitrust,* 90 Colum. L. Rev. 1805, 1812-13 (1990).

47.    The proper focus in product market definition is not on whether other retailers sell some of the same products or believe that they "compete" in a very broad sense, but whether a sufficient number of consumers would defect to these alternatives to make a small but significant price increase by the PNOS stores unprofitable. *U.S. Anchor Mfg.*, 7 F.3d at 995.

48.    Evidence shows premium natural and organic supermarkets are constrained by each other in ways in which they are not constrained by any other retailers. Conventional supermarkets and mass merchants cannot effectively constrain premium natural and organic supermarkets because they cannot replicate the blend of characteristics of the premium natural and organic supermarkets. PFF 154-246, 323-336. The econometric work preformed by Professor Murphy corroborates this conclusion. PFF 251, 254, 262, 293, 297.

49.    The lynchpin for defendants' defense is that the product market includes conventional supermarkets, and for this they highlight the one-day, non-statistical study from their expert economist. PFF 420-421. However, this study has no more validity than a study rejected by the D.C. Circuit in *Heinz*:

> Moreover, the number of data points on the chart were few; they were limited to launches in a single year. . . . Assessing such data's statistical significance in establishing the proposition at issue. . . is thus highly speculative. The district court did not even address the question of the data's statistical significance and the appellees' counsel could offer no help at oral argument.

*Heinz*, 246 F.3d at 723. In contrast, the Commission's case relies on contemporary business documents and statistically sound economic analysis. PFF 33-40, 49-61, 247-332.

50.    The operation of premium natural and organic supermarkets constitutes a relevant product market under the antitrust laws and a "line of commerce" within the meaning of Clayton Act § 7, 15 U.S.C. § 18.

## V.    THE RELEVANT GEOGRAPHIC MARKET IS LOCAL

51.    Section 7 of the Clayton Act prohibits acquisitions that are likely to lessen competition in "any section of the country," otherwise known as a geographic market. *Philadelphia Nat'l Bank*, 374 U.S. at 357.

52.    The relevant geographic market is that geographic area "to which consumers can practically turn for alternative sources of the product and in which the antitrust defendant[s] face[] competition." *Staples,* 970 F. Supp. at 1073 (quoting *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 (8th Cir. 1994), cert denied, 523 U.S. 1150 (1995)).

53.     The relevant geographic market is the area that would be adversely affected by the proposed acquisition.  *Philadelphia Nat'l Bank*, 374 U.S. at 357.

54.     The relevant geographic market must "correspond with the commercial realities of the industry. . . ."  *Brown Shoe*, 370 U.S. at 336.

55.     As with product market, the geographic boundaries of a relevant market do not need to be defined with precision.  *Cardinal Health*, 12 F. Supp  at 49, citing *United States v. Connecticut National Bank*, 418 U.S. 656, 669 (1966); *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966) ("[t]he geographic market need not be identified with 'scientific precision'" or "by metes and bounds as a surveyor would lay off a plot of ground.").  *See also United States.* v. *General Dynamics Corp.,* 415 U.S. 486, 521 (1974) ("the Government is not required to delineate § 7 markets by 'metes and bounds.'").

56.     The FTC is likely to establish, after an administrative trial on the merits, that the relevant geographic markets are 25 local areas: Albuquerque, NM; Boston, MA; Boulder, CO; Hinsdale, IL (suburban Chicago); Evanston, IL (suburban Chicago); Cleveland, OH; Denver, CO; Fairfield County, CT; West Hartford, CT; Henderson, NV; Kansas City-Overland Park, KS; Las Vegas, NV; Los Angeles, CA; Louisville, KY; Naples, FL; Nashville, TN; Omaha, NE; Miami Beach, FL; Palo Alto, CA; Pasadena, CA; Portland, ME; Portland, OR; Reno, NV; Salt Lake City, UT; and St. Louis, MO.  PFF 457-511.

## VI.     THIS COMBINATION IS PRESUMPTIVELY ILLEGAL

57.     Mergers that significantly increase market concentration are presumptively unlawful because the fewer the competitors and the larger the respective market shares, the greater the likelihood that a single firm or a group of firms could raise prices above competitive levels.  *Philadelphia Nat'l Bank,* 374 U.S. at 363;  *PPG*, 798 F.2d at 1502-03; *Cardinal Health*, 12 F. Supp. 2d at 52 ("under Section 7 of the Clayton Act, a *prima facie* case can be made if the government establishes that the merged entities will have a significant percentage of the relevant market–enabling them to raise prices above competitive levels"); *Hospital Corp.*, 807 F.2d at 1389; *Merger Guidelines* § 2.0 (PX01310).

58.     The Supreme Court explained the rationale for this principle in *U.S. v. General Dynamics Corp.*, 415 U.S. 486, 497 (1974):

> The effect of adopting this approach to a determination of a "substantial" lessening of competition is to allow the Government to rest its case on a showing of even small increases of market share or market concentration in those industries or markets where concentration is already great or has been recently increasing, since "if concentration is already great, the importance of preventing even slight increases in concentration is correspondingly great."  *Alcoa*, 377 U.S. at 279, 84 S. Ct. 1283,

1289, *citing Philadelphia Nat'l Bank*, 374 U.S. at 365, n.42, 835 S. Ct. 1715, 1743 n.42.

59.   Concentration typically is measured using the Herfindahl-Hirschman Index ("HHI"). The HHI is calculated by summing the squares of the market shares of each participant, so as to give greater weight to the market shares of larger firms in accord with their relative importance in competitive interactions.  *Merger Guidelines* § 1.5 (PX01310). Courts have adopted and relied on the HHI as a measure of market concentration.  *E.g., Cardinal Health*, 12 F. Supp. 2d at 53-54;  *Staples*, 970 F. Supp. at 1081-82;  *PPG*, 798 F.2d at 1503; *University Health*, 938 F.2d at 1211 n.12 (HHI is "most prominent method" of measuring market concentration); *U.S. v. Ivaco*, 704 F. Supp. 1409, 1419 (W.D. Mich. 1989).

60.   Where the post-acquisition HHI exceeds 1800 points, it is "presumed that mergers producing an increase in the HHI of more than 100 points are likely to create or enhance market power or facilitate its exercise."  *Merger Guidelines* § 1.51 (PX01310).  Courts have adopted similar thresholds.  *See Cardinal Health*, 12 F. Supp. 2d at 53.

61.   Where a merger may result in a monopoly, the presumption of anticompetitive effects is greatest.  3A Areeda, *Antitrust Law* ¶ 701c (rev. ed. 1998).

62.   The FTC has established that the proposed merger will increase concentration in the relevant markets significantly.  The proposed merger will result in a premium natural and organic supermarket monopoly in 17 local areas.  PFF 463-511.  In Portland, Oregon, the number of premium natural and organic supermarket competitors will be reduced from three to two, which is still an extraordinarily high concentration.  PFF 498-499.  Post-merger, the concentration levels in these very highly concentrated markets jump to the theoretical limit, an HHI of 10,000.

63.   The FTC need only demonstrate an anticompetitive effect in one relevant geographic market in which Defendants compete to prove a violation of Section 7.  *Pabst Brewing*, 384 U.S. at 549 ("[t]he Government may introduce evidence which shows that as a result of a merger competition *may* be substantially lessened throughout the country, or on the other hand it may prove that competition may be substantially lessened *only in one* or more sections or the country.  In any event a violation of § 7 would be proved.") (emphasis added).

## VI.   EVIDENCE PRESENTED BY DEFENDANTS DOES NOT REBUT THE PRESUMPTION OF LIKELY ANTICOMPETITIVE EFFECTS OF THE MERGER

64.   Once a *prima facie* violation is established, "the defendants must produce evidence that 'shows that the market-share statistics [give] an inaccurate account of the [merger's] probable effects on competition" in the relevant market."  *Heinz*, 246 F.3d at 715

-12-

(quoting *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120 (1975)); *Cardinal Health*, 12 F. Supp. 2d at 54. If defendants offer evidence to rebut the presumption from concentration and market share, the burden returns to the Commission to prove that the merger is likely to reduce competition. *Heinz*, 246 F.3d at 715. By proving that the acquisition will increase concentration significantly in premium natural and organic supermarkets, the burden of production shifts to the defendants to rebut this presumption of anticompetitive harm. *Marine Bancorporation*, 418 U.S. at 631; *Heinz*, 246 F.3d at 715.

65.    In order "to meet this burden, the defendants must show that the market share statistics "give an inaccurate prediction of the proposed acquisition's probable effect on competition." *Swedish Match*, 131 F. Supp. 2d at 167, *quoting Staples*, 970 F. Supp. at 1083.

66.    Courts have examined evidence of ease of entry, *Cardinal Health*, 12 F. Supp. 2d at 54-58; *United States v. United Tote, Inc.*, 768 F. Supp. 1064, 1071-82 (D. Del. 1991); *see Heinz*, 246 F.3d at 715 n.7; and efficiencies, *Heinz, id.* at 720-22; *Staples*, 970 F. Supp. at 1086-88; among other issues, in considering whether the market share statistics "give an inaccurate prediction of the proposed acquisition's probable effect on competition." *Cardinal Health*, 12 F. Supp. 2d at 54, *quoting Staples*, 970 F. Supp. at 1083.

67.    High levels of concentration establish a strong *prima facie* case. "[T]he more compelling the *prima facie* case, the more evidence the defendant must present to rebut it successfully." *Heinz*, 246 F.3d at 725, *quoting Baker Hughes*, 908 F.2d at 991. The mergers to monopoly in most local markets create the strongest prima facie case.

68.    Defendants have not produced significant evidence rebutting the presumption of violation. *Cardinal Health*, 12 F. Supp. 2d at 54; *Staples*, 970 F. Supp. at 1083.

## A.    The Speculative Prospect of Repositioning Is Insufficient to Obviate the Anticompetitive Effects of the Acquisition

69.    The burden of production is on Defendants to demonstrate that entry would resolve the competitive concerns raised by the government. In *Cardinal Health*, the court found that defendants had failed to come forward with enough evidence of sufficiency of entry (and of likelihood of entry) to rebut the presumption created by the high concentration levels. *Cardinal Health*, 12 F. Supp. 2d at 58.

70.    To rebut the presumption of anticompetitive effects, defendants' evidence must show that a firm would enter, and that "entry into the market would likely avert the anticompetitive effects from the acquisition." *Staples*, 970 F. Supp. at 1086 (quoting *Baker Hughes,* 908 F.2d at 989); *see Swedish Match*, 131 F. Supp. 2d at 170; *Cardinal Health*, 12 F. Supp. 2d at 55.

71.    Entry must be "timely, likely and sufficient in its magnitude, character and scope to deter or counteract the competitive effects" of a proposed transaction. *Merger Guidelines* § 3.0 (PX01310); *see Cardinal Health*, 12 F. Supp. 2d at 55-58. (adopting "timely, likely, and sufficient" test). *See also United Tote*, 768 F. Supp. at 1082 (finding entry insufficient to constrain anticompetitive price increase).

72.    Entry is timely only if a new entrant would have a significant market impact within two years. *Merger Guidelines* § 3.2 (PX01310).

73.    Entry is likely only if it would be profitable at premerger prices. *Id.* at § 3.3 (PX01310).

74.    Entry is sufficient only if it would be on a large enough scale to replace the competition that existed prior to the acquisition. *Cardinal Health*, 12 F. Supp. 2d at 58.

75.    For entry to obviate concern about a merged entity's market power, it must be so easy that it "would likely avert anticompetitive effects from [the] acquisition." *Baker Hughes*, 908 F.2d at 989; *University Health*, 938 F.2d at 1219-1220; *Merger Guidelines* § 3.0, *quoted with approval, Rebel Oil Co.*, 51 F.3d at 1440. Where entry is "difficult and improbable," that fact "largely eliminates the possibility that the reduced competition caused by the merger will be ameliorated by new competition from outsiders and further strengthens the FTC's case." *Heinz*, 246 F.3d at 717.

76.    Conventional supermarkets, mass merchandisers, and other food retailers like Trader Joe's are unlikely to reposition to compete effectively with premium natural and organic supermarkets. Repositioning would require them to dramatically change their operations: 1) by establishing a large, expensive distribution system to supply natural and organic products; 2) by allocating substantially more selling space for perishables; and 3) by focusing less on their customer base of price conscious shoppers in favor of customers who can afford more value-priced natural and organic products. PFF 623-642.

77.    The costs of entry into the market for premium natural and organic retailers are a substantial deterrent. In order to compete effectively against a premium natural and organic supermarket, a new entrant must locate and develop or buy a suitable site to open a supermarket, establish a distribution system, and build its reputation and customer loyalty. PFF 624, 625, 701. This endeavor would take more than two years.

78.    It is defendants' burden to rebut the presumption of illegality. *University Health*, 938 F.2d at 1213, 1218. The defendants have not satisfied this burden with respect to entry.

### B.    Defendants Have Not Demonstrated That the Alleged Cost Savings from the Transaction Will Counteract its Anticompetitive Effects

79.    To establish a valid efficiencies defense, Defendants' claimed efficiencies must, as a threshold matter, be "merger-specific" and "verifiable." *Merger Guidelines* § 4

(PX01310).

80.    Merger-specific means that the efficiencies must be "likely to be accomplished with the
       proposed merger and unlikely to be accomplished in absence of either the proposed
       merger or another means having comparable anticompetitive effects." *Merger
       Guidelines* § 4 (PX01310). The claimed efficiencies cannot be efficiencies that could "be
       achieved by either company alone." *Heinz*, 246 F.3d at 722.

81.    The claimed efficiencies must also be verifiable. *Merger Guidelines* § 4 (PX01310).
       Efficiencies must be subjected to "rigorous analysis" by the Court. *Heinz*, 246 F.3d at
       720. This is because even "efficiencies projected reasonably and in good faith by the
       merging firms may not be realized." *Merger Guidelines* § 4 (PX01310). Moreover,
       because "information relating to the efficiencies is uniquely in the possession of the
       merging firms," the merging firms carry the burden of proof on efficiencies and must
       substantiate efficiency claims so that the Agency can verify by reasonable means the
       likelihood and magnitude of each asserted efficiency, how and when each would be
       achieved. . . how each would enhance the merging firm's ability and incentive to
       compete, and why each would be merger specific. *Merger Guidelines* § 4 (PX01310).

82.    Even assuming the purported efficiencies from the acquisition were verifiable and merger
       specific, the proffered efficiencies must "create a net economic benefit for the . . .
       consumer" when balanced against the potential anticompetitive harm. *United States v.
       Rockford Memorial Corp.*, 717 F. Supp. 1251, 1291 (D. Ill. 1989); *see Merger Guidelines*
       § 4 (PX01310).

83.    Efficiencies rarely, if ever, can justify a merger to monopoly. *Cardinal Health*, 12 F.
       Supp. 2d at 63. As a general rule, "extraordinary efficiencies" will be required "where
       the HHI is well above 1800 and the HHI increase is well above 100." *Heinz*, 246 F.3d at
       720 quoting 4A Areeda, *Antitrust Law* ¶ 971f, at 44.

84.    Even if an efficiencies defense can be entertained, Defendants must show that the
       "proven" efficiencies will be passed on and that they overwhelm any possible
       anticompetitive effects of the merger. *Cardinal Health*, 12 F. Supp. 2d at 63; *Staples*,
       970 F. Supp. at 1090-91.

85.    Defendants failed to provide a rigorous analysis of the transaction's efficiencies as
       required by the Merger Guidelines. Instead of relying on verifiable estimations,
       Defendants reached their purported benefits based on unverified assumptions and
       ▇▇▇▇▇▇▇▇▇▇▇▇▇▇    PFF 771, 781.

86.    Defendants' estimated cost savings are unreliable. Although some cost savings are
       likely, Defendants have failed to demonstrate that the merger will lead to any substantial
       cost savings. Defendants' projected general and administrative cost savings of ▇▇▇▇
       ▇▇▇▇▇▇▇▇▇▇▇▇ are not unverified but based on specified assumptions gleaned from

-15-

prior experience with acquisitions, therefore not calculated specifically for the current transaction. PFF 787, 788.

87. The product cost savings that the defendants claim are largely speculative. Defendants lack sufficient information to estimate any projected cost savings from renegotiating a supplier contract, including if the contract can be negotiated. PFF 783, 782, 787.

88. Consequently, defendants' showing here is the essence of the speculative and unverified claims that courts have rejected out of hand in past cases. *University Health*, 938 F.2d at 1223.

89. Finally, defendants have failed to show that cost savings will be passed on, and produce a significant economic benefit to consumers. *United Tote*, 768 F. Supp. at 1084-85 (efficiencies rejected because "there are no guarantees that these savings will be passed on to the consuming public"); *American Stores*, 697 F. Supp. at 1132 (rejecting claim of over $50 million in efficiencies since savings will not "invariably" be passed on to consumers).

90. Thus, the merger-related efficiencies will not outweigh the substantial anticompetitive effects of the merger and result in a more competitive market. *University Health*, 938 F.2d at 1222-23 ("significant economies and that these economies ultimately would benefit competition, and hence, consumers."); *Ivaco, supra; United Tote, supra.*

## C.    The "Flailing Firm" Defense is Unavailable

91. Courts recognize that the "flailing firm" doctrine is "probably the weakest ground of all for justifying a merger." *University Health,* 938 F.2d at 1221(citing *Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1339 (7th Cir. 1981)).

92. A court should credit such a defense only in rare cases, when the defendant makes a substantial showing that the acquired firm's weakness, which cannot be resolved by any competitive means, would cause that firm's market share to fall to a level that would undermine the government's prima facie case. *University Health,* 938 F.2d at 1221.

93. In *General Dynamics*, the Supreme Court held that the reserves of one of the coal mining parties to the merger "were either depleted or already committed by long-term contracts with large customers, and that United Electric's power to affect the price of coal was thus severely limited and steadily diminishing." *United States v. General Dynamics Corp.*, 415 U.S. 486, 504-505 (1974). Similarly, in *FTC v. Arch Coal*, this Court held that Triton, the mining company being acquired, was becoming "less and less of an active competitor" because its coal reserves were becoming harder to mine and Triton's North Rochelle mine was due to exhaust its reserves in just seven and one half years. *FTC v. Arch Coal, Inc.,* 329 F. Supp. 2d 109, 156 (D.D.C. 2004). In contrast, Wild Oats faces no such limitations of finite resources. PFF 720, 721, 725-740.

94.    Moreover, in many other competitive dimensions, Triton – unlike Wild Oats – was
       severely damaged or incapacitated as a competitor.  First, Triton lost money in all but one
       year of existence since its inception.  *Arch Coal,* 329 F. Supp. 2d at 155.  In contrast,
       Wild Oats has usually delivered a net profit to its investors, and to the extent it has not,
       its losses were largely due to non-cash accounting charges and not losses on operations.
       PFF 728.  Both Wild Oats' recent performance and projected future performance
       demonstrate a trend of continuous improvement.  PFF 728, 729, 739, 740.  Wild Oats has
       consistently delivered a gross profit (i.e., its sales exceeded its cost of goods sold).

95.    Second, Triton's mining costs at its North Rochelle mine (one of only two) exceeded the
       coal's market value.  *Arch Coal,* 329 F. Supp. 2d at 155.  Because of Triton's mining
       costs, it was "wholly indifferent to competitors' production levels or their likely
       uncommitted tonnage in pricing its North Rochelle coal."  *Arch Coal,* 329 F. Supp. 2d at
       147.  In contrast, Wild Oats matches Whole Foods prices both historically and
       prospectively.  Wild Oats is not indifferent to its competitors' activities, nor is it a high-
       price competitor.  PFF 527, 528, 532, 545-548, 523, 519, 522, 517.

96.    Third, Triton could not obtain bank financing and did not have an adequate credit rating
       to obtain even junk bond financing, a prerequisite for expansion.  *Arch Coal,* 329 F.
       Supp. 2d at 156.  Here, Wild Oats has opportunities for further financing, including ███
       ███ in an unused credit facility that it believes it can expand to ████████.  PFF
       730, 731, 738, 768.  Wild Oats' current plans are to continue to expand.  PFF 731, 741-
       745.

97.    Fourth, Triton made unsuccessful good faith efforts to elicit reasonable alternative offers
       from "every potential purchaser worldwide" in addition to its acquirer, Arch, and the
       Court found that it had "no realistic prospects for other buyers."  *Arch Coal*, 329 F. Supp.
       2d at 157.  *See* Merger Guidelines ¶ 5.1 (PX01310).  Here, there is no evidence that Wild
       Oats has been shopped to other possible purchasers and that there are no other companies
       willing to purchase Wild Oats.

98.    The "flailing firm" cases cited by Defendants are inapplicable to Wild Oats.  *See, e.g.,*
       *United States v. Int'l Harvester Co.*, 564 F.2d 769, 775-76 (7th Cir. 1977) (precarious
       financial condition and suppliers refusing to ship); *FTC v. Nat'l Tea Co.*, 603 F.2d 694,
       699 n.7 (8th Cir. 1979) (firm likely to leave the market absent the acquisition); *United
       States v. Consol. Foods Corp.*, 455 F. Supp. 108, 116 (E.D. Pa. 1978) (36%  sales
       decline).

## VII.    THE ACQUISITION WOULD RESULT IN A SIGNIFICANT LESSENING OF
         COMPETITION

99.    Closing a store, like a reduction in quantity, is tantamount to a price increase.  In
       *Cardinal Health,* 12 F. Supp. 2d at 63, this Court noted in issuing its preliminary

injunction preventing the merger of prescription drug wholesalers that "the driving force behind removing excess capacity in the market was to ease pricing pressures and return prices to 'rational levels.'" *Id.  See also PPG*, 798 F.2d at 1503 (a reduction in output yielded supracompetitive prices); *Antitrust Law Developments* 87 (5th Ed. 2002) ("Because the laws of supply and demand indicate an agreement to limit output is tantamount to an agreement to fix price, courts have also applied the *per se* rule to an agreement to limit production or set quotas . . ." (citing cases)); *FTC v. Bass Bros. Enters.*, 1984-1 Trade Cas. (CCH) ¶ 66,401 at *37-*38 (N.D. Ohio 1984) (reduction in supply is anticompetitive).

100.    Defendants have ignored facts that contradict their efficiency claims.  While Whole Foods asserts efficiencies from the improved profitability and quality of the acquired Wild Oats stores, it plans to close ███████ Wild Oats stores.  PFF 590, 466, 471, 473, 475, 478-480, 484, 486, 489, 491, 493, 495, 497, 499, 504, 506, 509, 511.

101.    Whole Foods' proffered explanation for acquiring Wild Oats as a preemptive acquisition that would keep it out of the hands of other companies is not a cognizable efficiency claim and cannot outweigh the anticompetitive effects of the proposed transaction. PFF 594-600.   *See In re B.F. Goodrich Co.,* Dkt No. 9159, Federal Trade Comm'n, 110 F.T.C. 207 (1988) ("Although Goodrich believed that Diamond duplicated rather than complemented its own PVC capabilities, with "only a *suggestion of synergy*," it viewed the acquisition as "an attractive defense against acquisition [of Diamond] by another PVC producer.") (emphasis added).

102.    Defendants' Whole Foods' post merger plans to close Wild Oats stores will lessen competition because the output of goods and services presently available in the stores will be reduced.  *FTC v. Bass Bros. Enters.*, 1984-1 Trade Cas. (CCH) ¶ 66,041 at 68,614 (N.D. Ohio 1984) (postmerger plans to shut down acquired plants would diminish productive capacity and lessen competition).  Defendants rely on *U.S. v. Long Island Jewish Medical Center*, 983 F.Supp 121, 149 (E.D.N.Y. 1997), where contrary to here, a well-documented decreasing demand marked by "increasing empty hospital beds" might justify closing a facility post merger.  By contrast, it is undisputed that demand is increasing here.

103.    The proposed merger between Whole Foods and Wild Oats would also eliminate significant future competition between the two firms.  PFF 582-584, 500-511.  Absent the merger the firms would enter each other's markets and that would lead to a deconcentration of the market. *Staples*, 970 F. Supp. at1073 & n.6; *Marine Bancorporation*, 418 U.S. at 631, 633; *FTC v. Proctor & Gamble Co.,* 386 U.S. 568, 581 (1967).

104.    Whole Foods and Wild Oats are current, actual competitors in premium natural and organic supermarkets. PFF 464.  The acquisition would eliminate that current, actual competition as well as future competition.  PFF 464, 500.

-18-

105. In a market with few players and no significant likelihood of entry, a merger that eliminates one of a small number of players is a matter of great concern. *Heinz*, 246 F.3d at 717 & n.13. Whole Foods and Wild Oats are the only two premium natural and organic supermarkets currently competing in 17 relevant geographic markets. PFF 464.

106. The acquisition would result in the elimination of an aggressive competitor (Wild Oats) in a highly concentrated market, which increases the risk that prices will rise after the acquisition. *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1345 (4th Cir. 1976) (enjoining merger when merging firms have been "aggressive competitors in the past," opening up stores in each other's markets and increasing sales by greater than the industry sales average).

107. Because it would eliminate competition from Wild Oats, the merger is likely to increase the merged firm's ability to raise prices charged in premium natural and organic supermarkets unilaterally. *Swedish Match*, 131 F. Supp. 2d. at 168-69; *United Tote*, 768 F. Supp. at 1071 (rejecting argument that merger would not reduce competition in light of finding that merging firms were direct, significant competitors).

108. "[T]he fact that prices might be lower than current prices after the merger does not mean that the merger will not have an anti-competitive effect. Consumers would still be hurt if prices after the merger did not fall as far as they would have absent the merger." *Staples*, 970 F. Supp. at 1092.

## VIII.  INJUNCTIVE RELIEF IS NECESSARY HERE

109. The Commission has satisfied its burden in this proceeding of showing likely ultimate success on the merits. After the conclusion of an administrative proceeding, this transaction is likely to be found to violate Section 7 of the Clayton Act.

110. The FTC has met its burden of showing that it has "raise[d] questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the Commission in the first instance and ultimately by the Court of Appeals." *University Health,* 938 F.2d at 1218.

111. The FTC's showing of likelihood of success creates a presumption in favor of preliminary injunctive relief. *Heinz*, 246 F.3d at 726. A full-stop injunction is *presumed* to be the appropriate remedy and the defendants "face a difficult task in justifying anything less than a full stop injunction." *PPG,* 798 F.2d at 1506-07 (emphasis added).

112. The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust laws. *Id.* citing *University Health*, 938 F.2d at 1225.

-19-

113.  While it is proper to consider private equities in deciding whether to enjoin a particular
      transaction, the court "must" afford such private concerns "little weight, lest we
      undermine section 13(b)'s purpose of protecting the public-at-large, rather than the
      individual private competitors." *Heinz*, 246 F.3d at 726, citing *University Health*, 938
      F.2d at 1225 (citation omitted); *cf. FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C.
      Cir. 1981) ("Private equities do not outweigh effective enforcement of the antitrust laws.
      When the Commission demonstrates a likelihood of ultimate success, a countershowing
      of private equities alone would not suffice to justify denial of a preliminary injunction
      barring the merger.").

114.  Consideration of private equities is especially unavailing where it can be shown that if
      the merger were allowed to proceed – permitting closings of portions of the acquired
      operations and making it impossible as a practical matter to undo the merger –
      subsequent administrative and judicial proceedings on the merits "will not matter."
      *Heinz*, 246 F.3d at 726 (noting the planned closing of a manufacturing facility and certain
      distribution channels as well as product relabelings).

115.  The acquisition of Wild Oats by Whole Foods would eliminate the Commission's ability
      to enter full and effective relief upon completion of an administrative proceeding.  Upon
      consummation of the merger, Whole Foods ███████████████████████████ now
      operated by Wild Oats.  PFF 590, 466, 471, 473, 475, 478-480, 484, 486, 489, 491, 493,
      495, 497, 499, 504, 506, 509, 511.  Thus,"[i]f the merger is ultimately found to violate
      section 7 of the Clayton Act, it will be too late to preserve competition if no preliminary
      injunction is issued." *See Heinz,* 246 F.3d at 726.  Therefore, the need for a preliminary
      injunction to preserve  the Commission's authority under 15 U.S.C. §  45, is never
      stronger than in this case.  *Cf. id.*

116.  Defendants did not offer any evidence to support a finding that Whole Foods' acquisition
      of Wild Oats could not be consummated were an injunction to issue, other than a single
      unsubstantiated sentence in a footnote in their opening brief.  Defendants' Joint
      Memorandum dated July 20, 2007, at 3 n.1, *see Heinz*, 246 F.3d at 726.  Therefore, if the
      Court enjoins the acquisition and it is ultimately determined that the acquisition would
      not violate the antitrust laws, the advantages of the transaction can be reclaimed by a
      renewed transaction.  *Cf. id.*

117.  Under section 13(b), the Court may presume that the public interest will be served by an
      injunction from the Commission's showing of a likelihood of success on the ultimate
      merits.  *Heinz*, 246 F.3d at 713-15; *PPG*, 798 F.2d at 1500.

118.  Weighing the relevant equities and considering the FTC's likelihood of ultimate success,
      it is in the public interest that the Court enter a preliminary injunction enjoining the
      acquisition pending completion of the FTC's administrative proceeding.

Respectfully submitted,

Dated: August 15, 2007

/s/ Michael J. Bloom

JEFFREY SCHMIDT                    MICHAEL J. BLOOM
Director                           RICHARD B. DAGEN (D.C. Bar No. 388115)
                                   THOMAS J. LANG (D.C. Bar No. 452398)
KENNETH L. GLAZER                  CATHARINE M. MOSCATELLI (D.C. Bar No. 418510)
Deputy Director                    MICHAEL A. FRANCHAK

Bureau of Competition              Federal Trade Commission
Federal Trade Commission           601 New Jersey Ave., N.W.
600 Pennsylvania Ave, N.W.         Washington, DC 20001
Washington, DC 20580               (202) 326-2475 (direct dial)
                                   (202) 326-2284 (facsimile)
WILLIAM BLUMENTHAL                 mjbloom@ftc.gov
General Counsel
Federal Trade Commission
600 Pennsylvania Ave, N.W.
Washington, DC 20580

## CERTIFICATE OF SERVICE

This 15th day of August, 2007, I certify that I caused to be served a copy of the foregoing papers on the following counsel:

Paul T. Denis, Esq.
Dechert LLP
1775 I Street
Washington, DC  20006-2401
(202) 261-3430
Paul.denis@dechert.com

Alden L. Atkins, Esq.
Vinson & Elkins
The Willard Office Building
1455 Pennsylvania Ave., N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6613
Aatkins@VELaw.com

Clifford H. Aronson, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Caronson@Skadden.com

*Attorneys for Defendants*

Dated: August 15, 2007                    ___/s/ Eric M. Sprague___
                                          Eric M. Sprague
                                          Attorney for Plaintiff