# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 07-cv-01021-PLF |
| | ) | |
| WHOLE FOODS MARKET, INC., | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| WILD OATS MARKETS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' NOTICE OF FILING

Notice is given that the public version of the Joint Reply Memorandum of Points and Authorities of Whole Foods Market, Inc. and Wild Oats Markets, Inc. in Opposition to Motion for a Preliminary Injunction (Docket No. 131) is being filed herewith.


Paul T. Denis (DC Bar No. 437040)
DECHERT LLP
1775 I Street, N.W.
Washington, D.C. 20006
(202) 261-3430
(202) 261-3333


/s/ Alden L. Atkins
Alden L. Atkins (DC Bar No. 393922)
VINSON & ELKINS L.L.P.
The Willard Office Building
1455 Pennsylvania Avenue, N.W., Suite 600
Washington, DC  20004-1008
(202) 639-6500
(202) 639-6604

Attorneys for Defendant Whole Foods Market, Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,     ) | |
|     ) | |
| Plaintiff,     ) | |
|     ) | |
| v.     ) | Civil Action No. 1:07-CV-01021 (PLF) |
|     ) | |
| WHOLE FOODS MARKET, INC.,     ) | |
|     ) | |
| and     ) | |
|     ) | |
| WILD OATS MARKETS, INC.,     ) | |
|     ) | |
| Defendants.     ) | |
|     ) | |

**EXHIBIT 1**

Public Version of Joint Reply of Memorandum of Points
and Authorities of Whole Foods Market, Inc. and Wild Oats Markets, Inc.
in Opposition to Motion for a Preliminary Injunction

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:07-cv-01021 – PLF |
| | ) | |
| WHOLE FOODS MARKET, INC., | ) | **PUBLIC VERSION** |
| | ) | |
| and | ) | |
| | ) | |
| WILD OATS MARKETS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| ————————————————— | ) | |

## JOINT REPLY MEMORANDUM OF POINTS AND AUTHORITIES
## OF WHOLE FOODS MARKET, INC. AND WILD OATS MARKETS, INC.
## IN OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION

Paul T. Denis (DC Bar No. 437040)
Paul H. Friedman (DC Bar No. 290635)
Jeffrey W. Brennan (DC Bar No. 447438)
James A. Fishkin (DC Bar No. 478958)
Michael Farber (DC Bar No. 449215)
Rebecca Dick (DC Bar No. 463197)
DECHERT LLP
1775 I Street, N.W.
Washington, DC 20006
Telephone: (202) 261-3430
Facsimile: (202) 261-3333

*Of Counsel:*

Roberta Lang
Vice-President of Legal Affairs
    and General Counsel
Whole Foods Market, Inc.
550 Bowie Street
Austin, TX

Alden L. Atkins (DC Bar No. 393922)
Neil W. Imus (DC Bar No. 394544)
John D. Taurman (DC Bar No. 133942)
VINSON & ELKINS L.L.P.
The Willard Office Building
1455 Pennsylvania Avenue, N.W., Suite 600
Washington, DC 20004-1008
Telephone: (202) 639-6500
Facsimile: (202) 639-6604

*Attorneys for Whole Foods Market, Inc.*

Clifford H. Aronson (DC Bar No. 335182)
Thomas Pak (Pro Hac Vice)
Matthew P. Hendrickson (Pro Hac Vice)
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, NY  10036
Telephone: (212) 735-3000
caronson@skadden.com

Gary A. MacDonald (DC Bar No. 418378)
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC  20005
Telephone:  (202) 371-7000
gmacdona@skadden.com

Terrence J. Wallock (Pro Hac Vice)
2224 Pacific Dr.
Corona Del Mar, CA  92625
Telephone:  (949) 375-0683

*Attorneys for Defendant Wild Oats Markets, Inc.*

July 25, 2007

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 2

I.   THE FTC HAS FAILED TO PROVE A COHERENT PRODUCT MARKET. .............. 2

    A.   The FTC Has Not Offered the Types of Evidence That the Courts
        and Guidelines Have Used to Establish a Product Market ...................................... 2

    B.   The FTC Cannot Prove a Product Market by Relying on Sales Lost
        by Wild Oats Stores to Whole Foods Stores ......................................................... 5

    C.   The Selective Quotation of the Parties' Documents Does Not
        Substitute for the Analysis Required to Prove a Product Market .......................... 9

    D.   Economic Analysis Applied to the Evidence Shows that Premium
        Natural and Organic Supermarkets Are Not a Distinct Relevant
        Product Market ...................................................................................................... 10

    E.   The FTC's Alleged Product Market Is a Hodge Podge of Attributes
        That Does Not Meet the Requirements of a Product Market Definition. ............. 13

II.  THE FTC HAS FAILED TO PROVE THE GEOGRAPHIC MARKETS. .................... 18

III. THE FTC HAS FAILED TO SHOW THAT THE MERGER WOULD
    HAVE ANTICOMPETITIVE EFFECTS. ........................................................................ 19

    A.   The FTC's Assertion that the Merger Is "Presumptively Unlawful"
        Is Based on Unproven Product and Geographic Markets ..................................... 19

    B.   Statements by John Mackey Cannot and Do Not Prove that the
        Transaction Would Be Anticompetitive ............................................................... 20

    C.   The FTC Says that Whole Foods and Wild Oats Compete "Uniquely,"
        But Its Evidence Does Not Prove It ...................................................................... 21

    D.   The FTC Has Not Shown that Prices Would Be Higher or that Quality
        Would Be Lower After the Merger ....................................................................... 24

    E.   Store Closures Do Not Prove Anticompetitive Effects ......................................... 28

IV.  THE FTC HAS FAILED TO DISPROVE THE OVERWHELMING EVIDENCE
    OF REPOSITIONING IN THE SUPERMARKET INDUSTRY ..................................... 29

V.    THE FTC'S ARGUMENT THAT WILD OATS IS AN "AGGRESSIVE"
      COMPETITOR IS BASED ON A MISPLACED RELIANCE ON SELECTED
      WILD OATS DOCUMENTS AND THE ODAK TESTIMONY ................................... 31

CONCLUSION ..................................................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

**Page**

*Beatrice Foods Co. v. FTC*, 540 F.2d 303 (7th Cir. 1976) ............................................................ 13

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .................................................... 1, 2, 7, 13

*California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109 (N.D. Cal. 2001) ..................................... 19

*FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004) ............................................... *passim*

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998) .................................................. 18

*FTC v. Freeman Hosp.*, 69 F.3d 260 (8th Cir. 1995) .................................................................... 19

*FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34 (D.D.C. 2002) ............................................................... 19

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ....................................................... *passim*

*Liggett & Myers, Inc. v. FTC*, 567 F.2d 1273 (4th Cir. 1977) ..................................................... 13

*In re Super Premium Ice Cream Distrib. Antitrust Litig.*,
    691 F. Supp. 1262 (N.D. Cal. 1988), *aff'd sub nom.*
    *Haagen-Dazs Co. v. Double Rainbow Gourmet Ice*
    *Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990) .......................................................................... 13

*Thurman Indus. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369, 1377 (9th Cir. 1989) ....................................................................................... 14

*United States v. Baker-Hughes, Inc.*, 731 F. Supp. 3 (D.D.C.),
    *aff'd*, 908 F.2d 981 (D.C. Cir. 1990) ...................................................................................... 21

*United States v. Connecticut Nat'l Bank*, 418 U.S. 656 (1974) .................................................. 18

*United States v. Consol. Foods Corp.*,
    455 F. Supp. 108 (E.D. Pa. 1978) ............................................................................................ 34

*United States v. General Dynamics Corp.*, 415 U.S. 486 (1974) ................................................ 34

*United States v. Gillette Co.*, 828 F. Supp. 78 (D.D.C. 1993) ...................................................... 4

*United States v. Jos. Schlitz Brewing Co.*, 253 F. Supp. 129
    (N.D. Cal.), *aff'd*, 385 U.S. 37 (1966) ................................................................................... 13

**Public Version**

*United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) ............................................. 1

*United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004) .............................. *passim*

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) ................................................. 18

*United States v. Sungard Data Systems, Inc.*,
    172 F. Supp. 2d 172 (D.D.C. 2001) ....................................................................... 2, 4, 13

### <u>Other Authorities</u>

7 Phillip E. Areeda & Herbert Hovenkamp,
    *Antitrust Law* § 1506 (2d ed. 2003) ................................................................................... 9

William Blumenthal & David A. Cohen,
    *Channels of Distribution as Merger "Markets": Interpreting
    Staples and Cardinal*, Antitrust Rep., Nov. 1998 ....................................................... 13, 15

FTC/DOJ Commentary on the Horizontal Merger
    Guidelines (Mar. 2006) ........................................................................................................ 2

FTC Statement of the Comm'n Concerning Federated Department
    Stores, Inc./The May Department Stores Co., FTC File No.
    051-0111 (Aug. 2005). ....................................................................................................... 14

*FTC 1992 Horizontal Merger Guidelines* (rev. 1997) ............................................................ *passim*

Geoffrey A. Manne & E. Marcellus Williamson,
    *Hot Docs vs. Cold Economics: The Use and Misuse of Business
    Documents in Antitrust Enforcement and Adjudication*,
    47 Ariz. L. Rev. 609 (2005) ................................................................................................. 9

## INTRODUCTION

The brief of the Federal Trade Commission ("FTC") is striking for what it does *not* show:

- The FTC has *not* shown how customers, particularly on the margin, would behave in response to a small but significant nontransitory price increase (a "SSNIP"). Yet, the law and the FTC's *Merger Guidelines* require an analysis of customer behavior to define the product market.

- The FTC has *not* shown that prices are higher in "monopoly" markets compared to markets in which Whole Foods and Wild Oats compete. This is the fundamental question of merger analysis and was essential evidence in *FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997), yet it is not answered.

- The FTC has *not* shown how its product market definition—a hodge-podge of highly subjective attributes—can be applied in a principled way to determine which firms are in the alleged market.

- The FTC has *not* shown which stores meet its criteria to be in a product market. It does not show which Whole Foods and Wild Oats stores have those attributes. Nor does it show that other stores do not.

- The FTC has *not* proven a geographic market. It points to ways that the parties measure how far their customers travel to their stores, but not the geographic area in which customers in any market would accept a SSNIP rather than travel to another store.

- The FTC has *not* shown that there would be anticompetitive effects from the merger. The FTC says that Whole Foods and Wild Oats compete "uniquely," yet it reaches that conclusion by looking only at Whole Foods and Wild Oats.

- Most importantly, the FTC has *not* shown that prices would increase if Wild Oats is eliminated as a competitor. In fact, because Wild Oats' prices are higher than Whole Foods' prices, the merger will lower prices at Wild Oats stores. Wild Oats does not constrain Whole Foods' prices today, so its elimination will not free Whole Foods of any competitive constraint.

The FTC must prove that "the substantial lessening of competition will be 'sufficiently probable and imminent' to warrant relief." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 115 (D.D.C. 2004). It must prove "'probabilities,' not 'ephemeral possibilities.'" *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 622-23 (1974) (quoting *Brown Shoe Co. v. United*

*States*, 370 U.S. 294, 323 (1962)).  The FTC has failed to meet that burden.  Its motion for a preliminary injunction must be denied.

## ARGUMENT

## I.    THE FTC HAS FAILED TO PROVE A COHERENT PRODUCT MARKET.

### A.    The FTC Has Not Offered the Types of Evidence that the Courts and *Guidelines* Have Used to Establish a Product Market.

The law and the *Guidelines* make clear that the central issue in defining product markets is determining what *customers* would do in response to a noncompetitive price increase.  *See, e.g., Brown Shoe v. U. S.*, 370 U.S. at 325 (the relevant market is determined according to the "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it"); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1111-12 (N.D. Cal. 2004); *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 182 (D.D.C. 2001); *FTC 1992 Horizontal Merger Guidelines* § 1.0 (rev. 1997) *("Guidelines")* ("Market definition focuses solely on demand substitution factors—i.e., possible consumer responses."); FTC/DOJ Commentary on the Horizontal Merger Guidelines 5 (Mar. 2006) ("Product market definition depends critically upon demand-side substitution—i.e., consumers' willingness to switch from one product to another in reaction to price changes.").  To meet its burden to prove a relevant market, the FTC must prove how customers would respond to a price increase by all "premium natural and organic supermarkets."  The FTC has not even tried.

### 1.    The FTC has not offered evidence that would satisfy the SSNIP test set forth in its own *Guidelines*.

The FTC's *Guidelines* approach market definition through a forward-looking test that asks where customers would turn if a hypothetical monopolist of the candidate product imposed a "small but significant and nontransitory" price increase in a proposed relevant market. *Guidelines* § 1.11.  If there are alternatives to which customers could readily take their business

such that the price increase would be unprofitable, the proposed product market is too narrow and additional alternatives must be included, even if customers did not view them as substitutes at the lower price. *Id.* The FTC acknowledges (at p. 13) that the SSNIP test is the analytical framework set out in its own *Guidelines*, but despite its burden it fails to offer any proof that the proposed product market satisfies its own SSNIP test.

### 2. *Staples* does not support the FTC's product market definition.

The FTC embraces (at pp. 15-16) *Staples,* yet it fails to follow the roadmap that the *Staples* Court charted to determine the boundaries of the product market. There, Staples and Office Depot charged prices that were 5% to 13% higher where there was only one office superstore compared to locations where there was more than one superstore. *FTC v. Staples*, 970 F. Supp. at 1075-77. That Staples or Office Depot could charge and sustain higher prices where they were the only superstore demonstrated that customers would not turn to other types of stores in numbers sufficient to defeat a price increase. Thus, office superstores met the *Guidelines* test for a product market. *Id.* at 1078.[1]

The FTC has no such proof here. To the contrary, the evidence shows that Whole Foods' and Wild Oats' prices do *not* vary depending on whether the other is present. *See* section III.D.2., *infra.* In addition, unlike *Staples*, even the FTC acknowledges (at pp. 57-62) that Wild Oats' prices are generally higher than Whole Foods' prices. *Compare FTC v. Staples*, 970 F. Supp. at 1083 (merger would eliminate competition "between the two lowest cost and lowest priced firms in the superstore market").

---

[1] Although the Court in *Staples* discussed other *Brown Shoe* factors that differentiated office superstores from other types of stores, the Court made clear that the pricing evidence was the key to its holding on product market definition. *See, e.g.,* 970 F. Supp. at 1081 ("The Court is aware that litigants have not always been successful in proving submarkets similar to the one found by the Court in this case. . . . However, . . . [n]one [of those cases] possessed the compelling pricing evidence submitted to the Court in this case.").

3.     **The FTC has not offered any other evidence from which the Court could draw conclusions about customer behavior in response to a price increase.**

The FTC's inability to offer the type of evidence critical in *Staples* is emblematic of the fundamental flaw with its entire product market analysis. The FTC concentrates on the attributes of the stores rather than the behavior of consumers. To the extent the FTC considers customers at all, it focuses on a hypothetical "core" customer that would be less inclined to go to another supermarket if prices increased. Product markets are not defined by "core" customers, but instead by customers at the margin. The fact that *some* customers would not or could not switch from one product to another in the event of a price increase does not mean that the second product can be excluded from the relevant market. *See, e.g., FTC v. Arch Coal*, 329 F. Supp. 2d at 122; *United States v. Gillette Co.,* 828 F. Supp. 78, 83 (D.D.C. 1993). Whole Foods cannot target price increases at its "core" customers but must charge the same prices to everyone. And if it were to raise prices to all customers, it would lose marginal customers. Thus, the relevant question is not whether any customers would switch, but whether enough customers would switch to make a price increase unprofitable. *U.S. v. Sungard*, 172 F. Supp. 2d at 191-92; *see also FTC v. Arch Coal*, 329 F. Supp. 2d at 122; *U.S. v. Gillette,* 828 F. Supp. at 83; *U.S. v. Oracle*, 331 F. Supp. 2d at 1156, 1167. The FTC has not even addressed this critical point.

The defendants, on the other hand, have submitted substantial evidence showing that Whole Foods and Wild Oats customers already regularly shop at other supermarkets and therefore could readily shift their purchases to other supermarkets should prices rise post-merger. *See* section I.D. *infra.* Market research done by the parties in the ordinary course of business shows that their customers: (a) frequently shop at other supermarkets; (b) purchase the same categories of products from the same departments at other supermarkets; and (c) spend the

majority of their grocery dollars at other supermarkets. *See* DX 728 (Scheffman Report) ¶¶ 122-72; Robb Decl. ¶ 19; DX 24; DX 37; DX 38; DX 40. Those findings of widespread cross-shopping are corroborated by a customer survey that was conducted in this litigation. *See generally* DX 731 (Conway Report). That survey found, among other things, that even "frequent" Whole Foods and Wild Oats customers in the eight areas surveyed reported doing more than half of their grocery shopping elsewhere and reported buying foods in the product categories tested—produce, natural and organic foods, dairy, fresh meat and fish, prepared foods, frozen foods, and bread and bakery items—at more than one grocer. *Id.* at 5, 9, 12, 14. The fact that customers move between firms so frequently at essentially no marginal cost is powerful evidence that there are so many marginal customers that enough of them could, and would, shift their purchases away from the merged firm in response to a SSNIP such that the price increase would be defeated. *FTC v. Arch Coal*, 329 F. Supp. 2d at 122.

**B.     The FTC Cannot Prove a Product Market by Relying on Sales Lost by Wild Oats Stores to Whole Foods Stores.**

Rather than looking at the potential losses by the merged firm to other supermarkets in response to a SSNIP, the FTC tries to infer product market definition estimates of sales "transfers" from Wild Oats stores to Whole Foods stores when a store enters or exits. First, it relies on Project Goldmine (at pp. 19-22) and then refers to documents estimating sales losses from Wild Oats to Whole Foods (at pp. 22-25). The FTC says (at p. 24) that ███████████ ████████████████████████ competition between the stores "matters uniquely," whatever that means. But that is not the test for a product market. The movement of customers from Wild Oats to Whole Foods in response to a store closure or an entry is not the issue. Rather, the test for product market definition is whether consumers would move from a hypothetical monopolist in the alleged market ("premium natural and organic supermarkets") to other supermarkets in

response to a SSNIP.   The FTC is looking at the wrong customers under the wrong set of conditions.  The FTC appears intent on skipping product market definition and going directly to a competitive effects analysis.[2]

### 1.   The revenue transfers estimated in Project Goldmine do not prove a product market.

The FTC emphasizes (at pp. 19-22) Project Goldmine, the financial model used by Whole Foods to evaluate the transaction. ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

To begin, the FTC's reliance on the model is misplaced.  ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[2] The FTC argues (at pp. 14-15) that the parties are "close substitutes" in a differentiated market, citing section 2.21 of the *Guidelines*.  The analysis of close substitutes under that part of the *Guidelines* is not, however, part of product market definition but instead is part of the competitive effects analysis. *See Guidelines* § 2.211.  Unilateral effects analysis requires showing that a significant share of sales in the *market* are accounted for by consumers who regard the products of the merging parties as their first and second choices." *Id.* (emphasis added).  The competitive effects analysis is performed only *after* the product and geographic markets have been properly defined.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████

More importantly, the model says nothing about the issue here—whether other supermarkets would constrain "premium natural and organic supermarket" prices post-merger. It does not address the behavior of consumers who are cross-shopping at "premium natural and organic supermarkets" and other supermarkets, or whether they would purchase less at "premium natural and organic supermarkets" at higher prices. Indeed, the model assumes that *competition will continue to constrain Whole Foods* post-merger, because it does not assume price increases. Sud Decl. ¶ 50. It does, however, assume that Whole Foods would expand the sales of the Wild Oats stores it operates (*id.*), a pro-competitive benefit of the transaction. Ultimately, the model shows only the effect of eliminating a competitor rather than eliminating competition, but the antitrust laws are concerned only with the effect on competition. *Brown Shoe v. U.S.*, 370 U.S. at 320.

### 2. The so-called "competitive intrusion" documents do not prove a product market.

The FTC also cites (at 22-24) a series of the parties' documents estimating the effects of "competitive intrusion" by each other and by other supermarkets. The FTC's blizzard of figures has many errors.[3] At most, the FTC's evidence shows that the entry of a Whole Foods may have a greater impact on Wild Oats than the entry of other stores, which suggests only that Wild Oats customers may prefer Whole Foods (at current price levels) and that Wild Oats is a relatively

---

[3] For example, the FTC says (at p. 22 & n.18) that ███████████████████████████████
███████████████████████████████████████████████
████████████████████████

weak competitor. But customer preference for one product over another is not sufficient to exclude the less desirable product from the market definition. *See, e.g., FTC v. Arch Coal*, 329 F. Supp. 2d at 122. The intrusion analyses show only the percentages of sales that Wild Oats loses when different competitors enter; they do not address whether enough customers of the merged firm would shop at other stores to defeat a price increase.

The FTC also says (at pp. 24-25) that Whole Foods loses more business from the entry of Wild Oats than Safeway. The issue, however, is not which store might cause the greatest loss but rather is whether there would be competitive discipline to Whole Foods post-merger. ▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ The record is replete with evidence of significant price competition between Whole Foods and other supermarkets and with evidence that Whole Foods has lost significant business to other supermarkets.[6] Similarly, the evidence is overwhelming that when

---

[4] The FTC claims (at p. 53) that Whole Foods "apparently did not consider [a renovation] when Safeway opened its flagship Lifestyle store" in Boulder. Not true. Whole Foods spent ▉▉▉▉▉▉ for a renovation in anticipation of Safeway, and it has plans to spend more on an even larger expansion, largely in response to Safeway. Paradise Decl. ¶ 46.

[5] The FTC says (at p. 25) that the competition between Whole Foods and Wild Oats is "unique," citing an email that Will Paradise wants "to crush them." FTC Ex. 59 (PX234). The only reason that appears unique is that the FTC chose to ignore the others. *U.S. v. Oracle*, 331 F. Supp. 2d at 1169. There are similarly aggressive competitive plans directed toward Trader Joe's, Publix, Safeway Lifestyle, and others. *See, e.g.*, Paradise Decl. ¶ 50 & n.2; DX 361 ("We need to get back in competition with Safeway"); DX 362 ("competing to win"); DX 371 (concerning Trader Joe's, "We are playing to win here!"); DX 502 ("honestly it is not about Wild Oats anymore"); *see also* DX 40; DX 48; DX 49; DX 63; DX 81; DX 96; DX 366; DX 367; DX 480; DX 516.

[6] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Whole Foods opens, the majority of its business comes from stores other than Wild Oats. DX

602 at 146-48 (Sud Dep.); DX 728 (Scheffman Report) ¶¶ 60-94.

### C.    The Selective Quotation of the Parties' Documents Does Not Substitute for the Analysis Required to Prove a Product Market.

The FTC also tries to prove a product market by relying upon selective quotations from a

limited number of documents. FTC Br. at 17-19. It says (at p. 17) that the parties' use of

phrases like "non-competitive," "cash cow" and "monopoly" markets proves that a narrow

product market must exist. However, a "businessperson often uses a colorful and combative

vocabulary far removed from the lawyer's linguistic niceties." 7 Phillip E. Areeda & Herbert

Hovenkamp, *Antitrust Law* § 1506 (2d ed. 2003). Section 7 of the Clayton Act prohibits

mergers only when they have an anticompetitive market effect. Thus, the use of antitrust terms

like "monopoly," "non-competitive" and "cash cow" by lay business persons is not probative to

the economic analysis the Court must engage in to determine the competitive effects of this

merger. *See* Geoffrey A. Manne & E. Marcellus Williamson, *Hot Docs vs. Cold Economics: The

Use and Misuse of Business Documents in Antitrust Enforcement and Adjudication*, 47 Ariz. L.

Rev. 609, 646 (2005); 7 Areeda & Hovenkamp, *supra*, § 1506 ("a merger of two small firms in a

competitive market will be left alone no matter how anticompetitive the managers' designs.").

For example, while a Whole Foods email (FTC Ex. 36 (PX80)) may speculate that Wild Oats

could charge higher prices in Tampa because it is "non-competitive," the relevant question is

whether Wild Oats actually did charge higher prices, on which the FTC offers no evidence. The

FTC's reliance on a small number of colorful documents does not mask its failure to perform the SSNIP analysis required by Section 7.

### D. Economic Analysis Applied to the Evidence Shows that Premium Natural and Organic Supermarkets Are Not a Distinct Relevant Product Market.

Even though the FTC failed to apply the SSNIP analysis set forth in its own *Guidelines* (*see* section I.A.1, *supra*), Dr. David T. Scheffman demonstrates that the FTC's proposed market here—the novel "premium natural and organic supermarket"—cannot pass the SSNIP test and thus is not a viable antitrust market. DX 728 (Scheffman Report) at ch. 1.

Dr. Scheffman uses critical loss analysis (among other analytical methods) to debunk the FTC's claimed product market. Critical loss is an analytical tool that recognizes that price increases improve the profit on units sold, but also result in fewer units sold. Critical loss is "the amount of lost sales at which the economic detriment [from lost sales] equals the economic gain [from higher profits]." DX 728 (Scheffman Report) ¶ 96. If the actual loss from a price increase exceeds the critical loss, then the price increase is not profitable. This is the test implicitly proposed by the *Guidelines* "hypothetical monopolist" test. *Id.* ¶ 110.

Here, Dr. Scheffman applied a hypothetical price increase of 5% to the store-level average gross margins of ███████████████████████████████ and found that defendants' critical loss is between ████████████ *Id.* ¶ 115. This is the approximate "breakeven" point at which a price increase becomes unprofitable. Dr. Scheffman concludes, from the record facts and drawing upon his expertise as an economist, including years reviewing supermarket mergers at the FTC, that the actual loss from such a post-merger price increase by Whole Foods would exceed the critical loss—and thus that "premium natural and organic supermarkets" cannot constitute a relevant product market.

The hypothetical price increase of 5% that Dr. Scheffman uses in his critical loss analysis matches the SSNIP that the FTC uses "in most contexts" under the *Guidelines* to define markets. *Guidelines* § 1.11. The *Guidelines* also state that "at times [the Agencies] may use a price increase that is larger or smaller than five percent," depending on the nature of the industry. *Id.* The FTC (at p. 13) criticizes Dr. Scheffman for not using a SSNIP far smaller than 5%—indeed, for not using a SSNIP "as low as 1%"—and asserts that his application of a 5% test for critical loss "invalidates" his testimony (*id.* at 29). The FTC is wrong.

Dr. Scheffman notes that low net profit margins in industries like the supermarket industry may make it appropriate to use a smaller rather than a larger hypothetical price increase. DX 728 (Scheffman Report) ¶ 114. But in this case, the FTC claims that "premium natural and organic supermarkets" are economically different from other supermarkets. Dr. Scheffman concluded that a traditional SSNIP is appropriate and consistent with his experience at the FTC, including two periods as Director of the FTC's Bureau of Economics, most recently from 2001-03. Scheffman Dep. at 34-37.[7] In any event, Dr. Scheffman explains that using a smaller SSNIP would also result in a smaller critical loss, and therefore that a SSNIP of 1-2% would be rendered unprofitable from a loss of business of ████████████ DX 729 (Scheffman Rebuttal Report) ¶¶ 104-05; Scheffman Dep. at 66.

While admitting that critical loss "can be useful" in merger analysis, the FTC (at pp. 20-22) states that Dr. Scheffman has an insufficient basis upon which to opine that a hypothetical

---

[7] The FTC (at p. 13 n.11) misunderstands Dr. Scheffman's statements at its "Grocery Store Antitrust Conference" (where the FTC invited Dr. Scheffman to speak). The FTC quotes Dr. Scheffman's reference to a hypothetical 5% price increase to suggest he is discussing a SSNIP test for market definition, but that is not so. The FTC neglects to quote Dr. Scheffman's preceding sentence, which makes plain that he was referring to comments by a prior speaker regarding a "hypothetical 5 percent price increase *after a merger*." FTC Ex. 30 (PX322) at 132 (emphasis added). The phrase "after a merger" clarifies that Dr. Scheffman was referring to the competitive effects analysis of a merger, and not market definition. Product market definition using the SSNIP test is not about what happens "after a merger." Rather, it is about identifying the correct market within which to assess the effects that are likely to occur "after a merger." *See* Scheffman Dep. at 38-39.

"premium natural and organic supermarket" monopolist's actual loss from a SSNIP would exceed the critical loss. According to the FTC (at p. 20), Dr. Scheffman has done little more than "pile[] high various articles standing for the unremarkable proposition that other food/grocery retailers compete with" them. Everyone agrees that "premium natural and organic supermarkets" compete with other supermarkets and grocery retailers, and that the "pile" of articles that describe and verify this state of competition stacks up very "high." But the FTC ignores volumes of record evidence showing that a SSNIP – be it at 5%, or at the 1-2% level that the FTC urges – would quickly result in sales losses that exceed the critical loss.

The evidence identified in Dr. Scheffman's Expert Report that the FTC would dismiss as a "pile of articles" is a catalogue of some 47 extensive market studies—commissioned and relied upon by the parties in the ordinary course of business. DX 728 (Scheffman Report) ¶ 129. Those studies detail consumer cross-shopping between "premium natural and organic supermarkets" and other supermarkets and grocery retailers, the price sensitivity of Whole Foods and Wild Oats shoppers, effective competitive encroachments by other supermarkets into natural and organic products, and numerous other insights into consumer attitudes and purchasing behavior. This evidence belies any claim that Whole Foods could profitably charge monopoly prices after the merger. Defendants' declarations, buttressed by still more ordinary course documents, do the same.

Further, Dr. Scheffman explains that when Whole Foods enters as the second (after Wild Oats) "premium natural and organic supermarket" in a local area, ███████████████████ ██████████████████████████████████████████████████████████ ████████████ *Id.* ¶¶ 63-94. The lion's share of Whole Foods' sales arise from competition between it and supermarkets that the FTC contends are not "in the relevant market." These are

powerful indicators that Whole Foods compete very substantially with non-"premium natural and organic supermarkets," and that consumers can, and do, quickly shift their shopping habits in response to changes in relative value among the numerous shopping alternatives that they patronize regularly. *Id.* ¶ 93.

> **E.    The FTC's Alleged Product Market Is a Hodge Podge of Attributes that Does Not Meet the Requirements of a Product Market Definition.**
>
> **1.    The FTC's definition is too vague and subjective.**

To define its product market, the FTC offers only a laundry list of subjective attributes that supposedly distinguishes "premium natural and organic supermarkets" from other supermarkets.    However, consumer behavior and substitutes define a product market, not differentiation. *U.S. v. Oracle*, 331 F. Supp. 2d at 1131; *Brown Shoe v. U.S.*, 370 U.S. at 326; *Beatrice Foods Co. v. FTC*, 540 F.2d 303, 309-10 (7th Cir. 1976); *Liggett & Myers, Inc. v. FTC*, 567 F.2d 1273, 1274-75 (4th Cir. 1977); *U.S. v. Sungard*, 172 F. Supp. 2d at 182-83; *United States v. Jos. Schlitz Brewing Co.*, 253 F. Supp. 129, 145-46 (N.D. Cal.), *aff'd*, 385 U.S. 37 (1966); *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988), *aff'd sub nom. Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990) (table).    "Judicial experience cautions against the use of qualitative factors to define narrow markets." *U.S. v. Oracle*, 331 F. Supp. 2d at 1118.    *See also* William Blumenthal & David A. Cohen, *Channels of Distribution as Merger "Markets": Interpreting* Staples *and* Cardinal, Antitrust Rep., Nov. 1998, at 13 (criticizing "ad hoc" standards for product market definition that concentrate on store attributes rather than consumer behavior).

The FTC throws caution to the wind.    In discovery, it identified ten qualitative attributes that "generally" define the alleged product market.    July 15 Supp. Responses, DX 590.    In its brief (at pp. 29-47), the FTC groups the characteristics into broader categories like "Unique

Inventory of Products" and "'Lifestyle Retailers'- Superior Service in a Unique Shopping Environment," but the characteristics remain the same ill-defined and highly subjective factors. The FTC still offers no principled way to assess whether a store meets those criteria. Its failure is acute because, it says, "[n]ot all stores in the relevant product market necessarily will possess each and every one of these listed attributes or possess them to the same degree or level." July 3 Supp. Responses at 6, DX 552. Apparently the attributes can be mixed and matched, but the FTC does not say what mixture(s) makes a premium natural and organic supermarket. Dr. Murphy does not help because he neither endorses the factors nor explains how to apply them. Characteristics like those are "too vague . . . [to] meet section 7's requirement that the relevant market be 'well-defined.'" *U.S. v. Oracle*, 331 F. Supp. 2d at 1121. Even if terms like "focus on high-quality perishables" could be meaningfully defined (July 3 Supp. Responses at 5, DX 552), one would still need to determine how much "focus" is necessary, which the FTC has not done. Rather than proving a definition that can be objectively applied, the FTC offers only its say-so.

The attributes are not helpful to define an antitrust market. To be sure, supermarkets have different formats, with different stores emphasizing different points along the continuum of price, service, product variety, ambience, organic products and so on. DX 730 (Stanton Report) ¶ 22-26. The courts and the FTC have recognized that stores with different formats compete with other formats and even specialty stores. *E.g., Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1377 (9th Cir. 1989) (allowing merger because home products stores compete with specialty, department and other stores); FTC Statement of the Comm'n Concerning Federated Department Stores, Inc./The May Department Stores Co., FTC File No. 051-0111, at 4 (Aug. 2005)[8] (allowing department store merger because department store format

---

[8] The FTC's statement is available at http://www.ftc.gov/os/caselist/0510001/050830stmt0510001.pdf.

competes with other formats selling similar goods). The relevant issue is not the stores' attributes, but rather whether "consumers in fact typically buy the entire cluster of merchandise from a single source" and if "consumers typically compare prices across the entire cluster?" Blumenthal & Cohen, *supra,* at 15. The FTC has not answered those questions. Once again, the analysis comes back to consumer behavior, an issue which the FTC fails to address.

2.      <strong>The FTC has not proven which stores do and do not meet its criteria.</strong>

Beyond the definition itself, the FTC has not proven which stores do and do not have those attributes. The FTC relies almost entirely on Whole Foods and Wild Oats documents, which say in broad terms that the stores carry many organic and natural products, promote a mission, have a pleasant ambiance, provide good service and sell gourmet products. FTC Br. at 29-47. The FTC's evidence does not show which Whole Foods or Wild Oats stores in which locations actually have all, or even any, of the necessary attributes. That failure is significant because in many respects Wild Oats stores differ from Whole Foods stores in many ways. DX 728 (Scheffman Report) ¶¶ 259-77; Mays Decl. ¶¶ 20-23. Notably, Whole Foods is certified as an "organic" retailer by an industry-recognized organization, but Wild Oats is not. Mays Decl. ¶ 29. Dr. Murphy apparently concluded that Wild Oats stores smaller than 25,000 square feet should be excluded (FTC Ex. 6 (PX2878) at 1 n.2, 26), ██████████████████████ ████████████████

Just as glaringly, the FTC has failed to prove whether other supermarkets in the relevant locations do or do not have those attributes. It says (at pp. 30-35) that Whole Foods and Wild Oats offer "unique products," but it does not cite *anything* from a competitor showing that its products are different. That failure is glaring because of the overwhelming evidence that the products are increasingly similar. The majority of natural and organic products are sold by "conventional" supermarkets. Mays Decl. ¶ 19; FTC Ex. 86 at 96 (PX2072); *see also* DX 728

(Scheffman Report) ¶ 131.  Virtually all of the products sold by Whole Foods are available elsewhere.  Sud Decl. ¶ 12; DX 730 (Stanton Report) ¶ 19.  Whole Foods carries a wide array of conventional products, and approximately 50% of its produce and even more of its prepared foods, bakery and specialty items are not organic.  Sud Decl. ¶ 25; DX 730 (Stanton Report) ¶ 19. Its private label program offers 1,700 everyday products that consumers purchase at other supermarkets.  Boardman Decl. ¶¶ 4-5, 12-14.  At the same time, competitors are carrying an increasing number of natural and organic products and are developing their own successful private label products.  Silva Decl. ¶ 10; ███████████████████████; Paradise Decl. ¶¶ 19, 20; DX 730 (Stanton Report) ¶¶ 31-35, 39, 44, 48, 54, 56, 62; ████████████████████

████████████████████████████████████████████████████████████

DX 365 (King Sooper's flyer saying "Nobody sells more organic in Colorado – Nobody");  DX 481; DX 593.  The FTC does not, and cannot, say how much product differentiation is necessary to be a "premium natural and organic supermarket."

Similarly, the FTC asserts (at pp. 35-38) that Whole Foods and Wild Oats offer a "Lifestyle" with "superior service" in a "unique shopping environment."[9]  Again, the FTC does not prove that any particular Whole Foods or Wild Oats store has those attributes, ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████  Nor has the FTC proven that other supermarkets lack those

---

[9] The FTC also emphasizes (at pp. 45-47) that Whole Foods and Wild Oats target customers with similar demographic/psychographic characteristics.  That would support the FTC only if those customers did not shop elsewhere.  In fact, they do shop at competing supermarkets in their area, which strongly suggests that they would readily change their shopping patterns in response to a SSNIP.  Although the FTC claims (at p. 45) that Whole Foods and Wild Oats "target very different customers than do other retailers," it cites nothing.  Nor does it make sense that other retailers would not target and welcome customers from the demographic groups targeted by Whole Foods and Wild Oats.

qualities.[10]   It ignores the evidence that stores like Safeway "Lifestyle" and Ralph's Fresh Fare

promote a lifestyle and ambiance, and other stores promote environmental themes.   DX 728

(Scheffman Report) ¶ 333 & App. E ¶¶ 3, 7, 55; Paradise Decl. ¶¶ 21, 46; Besancon Decl. ¶¶ 11-

14, 16-19, 43-44, 51, 56, 63, 68, 70; DX 49; DX 357; DX 480; DX 623 at 21 (Robb I.H.); DX

730 (Stanton Report) ¶¶ 29, 31-34, 44-45, 63; ████████████████████ Bradley Decl. ¶ 25;

Allshouse Decl. ¶ 18; Meyer Decl. ¶ 25; Lannon Decl. ¶ 21; DX 561; Robb Decl. ¶¶ 16-20.   The

evidence is overwhelming that other supermarkets are rapidly repositioning to offer the same

gourmet foods, venues, superior service and upscale stores that allegedly differentiate Whole

Foods and Wild Oats.   DX 728 (Scheffman Report) ¶¶ 327-37 & App. E.; *e.g.*, Besancon Decl.

¶¶ 11-14, 16-19, 23, 43-44, 50, 56, 61, 63, 68, 70.

--------------------------------------------------------------------------------

[10] The FTC says (at p. 43) that "conventional" supermarkets charge higher prices for natural and organic products than Whole Foods, and therefore they do not constrain Whole Foods' prices.  But the same is true of Wild Oats because it too has higher prices than Whole Foods, as the FTC admits.  FTC Br. at 57-58.

██████████████████████████████████████████████████████

█████████████████████████████████

Similarly, the FTC offers no evidence that the two firms it says are in the product market—Earth Fare and New Seasons—do have the attributes.[11]   Nor does it say how it measured the vague attributes to determine that they were "in" but that Safeway Lifestyle was "out."[12]   Its failure illustrates how impossible it is to apply the FTC's standard.   There is a complete failure of proof on this essential element of a claim under section 7 of the Clayton Act.

## II.     THE FTC HAS FAILED TO PROVE THE GEOGRAPHIC MARKETS.

The FTC's cavalier approach to geographic market definition fails to "'chart[] . . . [the markets] by careful selection of the market area in which the seller operates, and to which the purchaser can practically turn for (alternatives).'"   *United States v. Connecticut Nat'l Bank*, 418 U.S. 656, 668 (1974) (quoting *United States v. Philadelphia Nat'l  Bank*, 374 U.S. 321, 359 (1963)).   The FTC's failure "to sufficiently define" the geographic markets is, by itself, grounds for denying the preliminary injunction.   *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 49 (D.D.C. 1998).   The FTC offers a one-size-fits-all, line-drawing exercise based on one factor it has selected from among the many that Whole Foods uses to assess the draw area of a possible new store.   *See, e.g.*, DX 171 at 11, 24, 30-31, DX 187 at 32 ██████████████████

██████████████████████████████████████████████████████

█████████████   Given the multiplicity of factors considered by Whole Foods and the diversity of areas at issue, clearly a 5- or 6-mile measure is not even consistently accurate as a measure of

---

[11] Its failure to prove the attributes of Earth Fare is significant because Dr. Murphy's new work is a study not of Wild Oats but of Earth Fare's entry in Chapel Hill.   Without proof that Earth Fare meets the criteria, Dr. Murphy's work is meaningless.   Defendants have moved to strike Dr. Murphy's work as untimely.

[12] At a minimum, other supermarket operators should be regarded as "uncommitted entrants" and thus included as market participants in whatever market the FTC is defining.   *See Guidelines* § 1.32.

draw area. While the FTC offhandedly admits (at pp. 47-48) that "geography and other factors" may be relevant, it offers no evidence of their effects in any individual market.

More importantly, draw areas do not address the determinative antitrust question: where could and would a store's customers look for retail alternatives in the event of a price increase? *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995). The area within which a store draws most of its customers pre-merger says nothing about the alternatives that customers would adopt in the face of a price increase. *See, e.g., FTC v. Staples,* 970 F. Supp. at 1073; *California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1124 (N.D. Cal. 2001 (rejecting tests that reflect "only current market behavior").

The inquiry is one about customer behavior in the specific geographic markets alleged. Yet the FTC offers no evidence on this question. Neither of its experts examined consumer behavior in any local geographic areas. The FTC's evidence remains wholly insufficient for the required "careful" review by this Court of how far "consumers can practically turn for alternative sources." *FTC v. Staples*, 970 F. Supp. at 1073 (internal quotations and citation omitted); *FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 45 (D.D.C. 2002). There is a failure of proof on this essential element of the FTC's case.

## III.    THE FTC HAS FAILED TO SHOW THAT THE MERGER WOULD HAVE ANTICOMPETITIVE EFFECTS.

### A.    The FTC's Assertion that the Merger Is "Presumptively Unlawful" Is Based on Unproven Product and Geographic Markets.

The FTC claims it is entitled to a presumption that the merger is unlawful based on high post-acquisition market concentration levels, but it reaches that conclusion by limiting the universe to the sales of the merging firms. The *Guidelines* require that relevant product and geographic markets be properly defined before any presumptions can be made based on the post-

merger market concentration. *See Guidelines* § 1.5. The FTC cannot short-cut the process by calling the two merging firms "a market" and then claiming that it is entitled to a presumption that the merger is anticompetitive because the post-acquisition market shares are allegedly 100% in almost all areas. Until the markets are properly defined, there is no basis for any presumption of anticompetitive effects based on market concentration levels.

**B.      Statements by John Mackey Cannot and Do Not Prove that the Transaction Would Be Anticompetitive.**

The FTC repeatedly cites statements made by John Mackey, Whole Foods' CEO, about Wild Oats. The statements say that Mr. Mackey believes that Whole Foods competes with Wild Oats. But Mr. Mackey's competitive energies are not reserved for Wild Oats. The FTC ignores Mr. Mackey's blunt assessment of a full range of competitors, in which he states:

> We don't like Wild Oats. They are a competitor. We don't like Trader Joe's. We don't like Wegman's. We don't like HEB. We don't like Wal-Mart. We don't like any of these guys. They are our competitors. They are competing against us. They are making it more difficult for us to be successful."

DX 622 at 53-54 (Mackey I.H.). He added, "[o]ur success has created more competition, it has bred more competition, has caused all these supermarkets to try to want to steal Whole Foods' mojo." *Id.* at 32-33.

In other statements the FTC ignores, Mr. Mackey explained the competitive realities faced by Whole Foods—it competes day-to-day with supermarkets and other retailers. Mr. Mackey said that while Whole Foods "flew under the radar," its business grew and became "a threat to the mainstream supermarket industry, and they started to pay attention to us;" stating on many occasions that "we [have] never face[d] more competition than we are facing today. It is a highly competitive market, and it is becoming more competitive." DX 622 at 40-41 (Mackey I.H.); *see also id.* at 272 ("Originally our products were differentiators. But that has been

systematically undermined by competition"); DX 11 ("I predict that there aren't any 'extra profit dollars.' They are all going to be spent being more price competitive with TJs, Wegmans, Safeway, Wal-Mart, etc.").

The full record of Mr. Mackey's statements prove that he is intensely competitive, but nothing more. In any event, what he truly meant is irrelevant because intent is not an element of a claim under Section 7 of the Clayton Act. *See United States v. Baker-Hughes, Inc.*, 731 F. Supp. 3, 12 n.8 (D.D.C.), *aff'd*, 908 F.2d 981 (D.C. Cir. 1990).

C.    **The FTC Says that Whole Foods and Wild Oats Compete "Uniquely," But Its Evidence Does Not Prove It.**

It is easy for the FTC to conclude that competition between Whole Foods and Wild Oats is "unique" when it looks only at evidence of competition between those two firms. Remarkably, the FTC fails to acknowledge the clear evidence of intense ongoing, real world competition between the parties and other supermarkets.

The pricing evidence that the FTC failed to consider when it concluded that the competition between Whole Foods and Wild Oats is unique includes, but is not limited to:

- In response to price competition from other supermarkets, Whole Foods price checks competing supermarket chains. *See* Gallo Decl. ¶ 28; Robb Decl. ¶¶ 27, 47; Allshouse Decl. ¶ 8; Bradley Decl. ¶¶ 10-11; Lannon Decl. ¶ 12; Meyer Decl. ¶¶ 19-21; Paradise Decl. ¶¶ 6-7, 25; DX 728 (Scheffman Report) ¶ 224.

- Based on those price checks, Whole Foods changes its prices to remain competitive. *See* Allshouse Decl. ¶ 8; Lannon Decl. ¶ 12; Meyer Decl. ¶ 31; Paradise Decl. ¶¶ 6-10, 43.

- Whole Foods has a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ program against supermarkets across the country to ensure that its prices on ▮▮▮▮▮▮▮ items are competitive. *See* Meyer Decl. ¶ 31; Paradise Decl. ¶¶ 15-16. Under this program, Whole Foods price checked ▮▮ competitors, almost all of which were other supermarkets, along with supercenters and club stores. DX 728 (Scheffman Report) ¶ 226. For instance, Whole Foods has a policy to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Megahan Decl. ¶ 21; Paradise Decl. ¶ 20.

- Whole Foods has a national strategy to ███████████████████████ ██████████████████ *See* Sud Decl. ¶ 9; Gallo Decl. ¶ 26; Robb Decl. ¶ 26; Besancon Decl. ¶¶ 7, 8, 29; Lannon Decl. ¶ 16; Meyer Decl. ¶¶ 8-9; Paradise Decl. ¶ 11; Boardman Decl. ¶¶ 4, 17; Scheffman Report ¶ 225.

*See generally* Def. Br., App. A. Despite that overwhelming evidence, the FTC says that the price competition between Whole Foods and Wild Oats is "unique." But the FTC has only shown there is price competition between the two firms in a limited number of instances, which is quite unremarkable. In reality, Wild Oats is generally higher priced than Whole Foods.

The FTC claims that *non*-price competition between Whole Foods and Wild Oats is "unique" too, but it offers no evidence that Whole Foods' strategies to improve service, stores and product offerings differ in response to other supermarkets. The evidence proves otherwise:

- As a result of competition from other supermarket chains, Whole Foods has expanded its private label products to compete with other private label organic products (such as Safeway "O" Organics). *See* Sud Decl. ¶ 26; *see generally* Boardman Decl.

- Whole Foods ████████████████████████████ in response to ███████████████ store and is planning ██████████ Paradise Decl. ¶ 46.

- Whole Foods ██████████████████████ in response to a planned ████████ store ████████████. Sud Decl. ¶ 28.

- Whole Foods █████████████████████ in response to competition from ████████ Meyer Decl. ¶ 17.

- Whole Foods ████████████████████████ in response to openings by ████████. Paradise Decl. ¶¶ 29, 35.

- Whole Foods is ████████████████████████████ in response to ██████████████. Meyer Decl. ¶ 35.

Those are just a few recent examples of Whole Foods responding to competing supermarkets.

But the competition between Whole Foods and other supermarkets does not stop there. Other supermarkets are responding to Whole Foods and consumers' increasing demand for natural and organic products. For example:

22

- Whole Foods faces competition everywhere as competitors like Safeway, Kroger, Ahold (Giant and Stop & Shop), Delhaize (Hannaford, Bloom, Food Lion), Harris Teeter, Wegmans, Supervalu, Dominick's, Publix, HEB and Fred Meyer sell more organic and natural food products.  *See* Gallo Decl. ¶¶ 16-17; Robb Decl. ¶ 23; Bradley Decl. ¶ 16; ███████████████████████████████ ████ Allshouse Decl. ¶ 6.

- Whole Foods ██████████████████████ HEB, Wegmans, Publix, Safeway, Giant, Stop & Shop, Harris Teeter, Food Lion, Albertson's, Wal-Mart, Randall's, Tom Thumb, Kroger, Trader Joe's and Costco because they now sell significant amounts of organic and natural foods.  *See* Gallo Decl. ¶¶ 19-25, 30; Robb Decl. ¶¶ 16-18, 20.

- Competing supermarkets also regularly price check Whole Foods.  *See* Meyer Decl. ¶¶ 14, 21; Paradise Decl. ¶¶ 19, 43; ██████████████████████ ████

- Supermarkets respond to Whole Foods with price comparison advertisements. For example, Hy-Vee, Giant Food and Trader Joe's have all posted signs comparing their prices to those of Whole Foods.  *See* Bradley Decl. ¶ 19;  Meyer Decl. ¶¶ 23, 24.

Competing supermarkets also engage in non-price strategies to improve service, stores and product offerings in response to Whole Foods.  For example:

- HEB, Wegmans, Publix, Safeway, Ahold and other supermarkets are improving the quality and selection of perishables to compete with Whole Foods.  *See* DX 1; DX 600 at 143-44, 158 (Gallo Dep.); Gallo Decl. ¶ 19; Robb Decl. ¶ 18.

- Baker's, a division of Kroger, remodeled a store in Omaha in response to Whole Foods' entry by adding a sushi bar and an artisan bakery and cheese area and promoting natural and organic products.  *See* Bradley Decl. ¶ 18. ███████████ ████████████████████████        *Id.*



- Byerly's in Minneapolis remodeled a store to resemble the flagship Whole Foods store in Austin.  Bradley Decl. ¶ 25.

- Shaw's in the Boston area announced plans to remodel two stores to look like Whole Foods. Lannon Decl. ¶ 21.

- Ralph's, Vons, Fry's, Smith's and Albertsons have upgraded stores when a Whole Foods enters or renovates nearby. *See* Besancon Decl. ¶¶ 12, 13, 16, 17, 18, 22, 43, 44, 50, 56, 61, 63, 68, 70.

In evaluating whether the competition between Whole Foods, Wild Oats and other supermarkets is "unique," the FTC fails to acknowledge that supermarkets do not have to offer identical SKUs to be in direct competition. ███████████████████████ It also fails to acknowledge that when Whole Foods opens stores, it takes a substantial amount of business from nearby supermarkets. DX 728 (Scheffman Report) ¶¶ 60-94.

### D. The FTC Has Not Shown that Prices Would Be Higher or that Quality Would Be Lower After the Merger.

The FTC acknowledges (at pp. 58, 61-62) that Wild Oats' prices are higher than Whole Foods' prices. This merger will have the pro-competitive effect of enabling Whole Foods to lower prices at those stores. Even the FTC's economic expert, Dr. Murphy, does not show that prices would be higher after the merger. He studies margins rather than prices, which is flawed. He finds no statistically significant difference in margins at the store level, and his review of department level data is inconsistent with the alleged product market.

#### 1. Dr. Murphy's analysis is flawed.

None of Dr. Murphy's economic evidence shows that Whole Foods' prices likely would be higher after the merger. Indeed, while Dr. Murphy acknowledges that the "ultimate interest is in prices," he admits that none of his economic experiments "offer[s] a direct test of the extent to which Wild Oats presents unique constraints to Whole Foods that will disappear as a result of the proposed transaction." Murphy Report ¶¶ 63, 68 n.22.

Such direct tests were available to Dr. Murphy; he simply chose not to conduct them. Wild Oats' banner exits within some reasonable distance of Whole Foods provide the best

experiment to test whether, as Dr. Murphy asserts, Wild Oats actually constrains Whole Foods'
prices—and whether the loss of Wild Oats as an independent entity would permit Whole Foods
to raise prices. There are at least two such events in the data produced by the parties that meet
precisely the arbitrary criteria selected by Dr. Murphy (Wild Oats store of at least 25,000 sq. ft.
within five miles of a Whole Foods store): Scottsdale, AZ ██████, 3.05 miles from
Whole Foods) and Ft. Collins, CO ██████, 1.12 miles from Whole Foods).

Dr. Murphy offered no explanation in his report for his failure to study the Ft. Collins exit
event, which is odd because he included Whole Foods' entry into Ft. Collins in his entry study.
Dr. Murphy does not even acknowledge the Scottsdale exit. In addition to those banner exits,
Dr. Murphy could have studied the banner exit in Irvine, CA ██████ except that
store was 5.67 miles from Whole Foods. When asked about his failure to study that exit, Dr.
Murphy said he had to draw a line somewhere. DX 795 at 198-201 (Murphy Dep.). Similarly,
Dr. Murphy could have studied the banner exit in Ft. Lauderdale, FL ██████. store that
was 1.11 miles from Whole Foods), but he considered that store not competitively significant
because it was ██████.

More troubling than Dr. Murphy's failure to perform direct tests of whether Wild Oats
uniquely constrains Whole Foods was his destruction of the data output files from the sensitivity
tests he ran to see whether his selection of store size (25,000 sq. ft. minimum) and distance to
Whole Foods (five miles maximum) significantly affected his results. DX 795 at 83-90 (Murphy
Dep.). His data destruction eliminated any way to test his assertion that his results were
unaffected by his selection of store size minimum (a criteria that he applied uniquely to Wild
Oats) or proximity to Whole Foods. Then, on the eve of his deposition, Dr. Murphy submitted
an untimely Supplemental Rebuttal Report in which he changed his view of relevant geographic

market from five miles to drawing six mile circles around Whole Foods and Wild Oats stores and then combining the areas covered by those circles. Notwithstanding this change of opinion, Dr. Murphy refused to concede that it might be appropriate to study the Irvine banner exit, which he had refused to study because it was 5.67 miles away from Whole Foods.

So what did Dr. Murphy do? He studied the effect of banner entry on margins. For example, Dr. Murphy studied a number of examples of Whole Foods banner entry to evaluate the effect of that entry on Wild Oats' margins. Significantly, he was unable to study the effect of Wild Oats' banner entry on Whole Foods' margins because Wild Oats did not enter any "market" to compete with Whole Foods.

There are many reasons that Dr. Murphy's margin studies are unreliable. First, margins are not prices. He admits that "margins can be a misleading indicator of price effects." Murphy Report ¶ 55. Second, he asserts that "conceptually, the closure of the Wild Oats stores is essentially the reverse of the entry experiment." *Id.* ¶ 82. Dr. Murphy cites no authority for this proposition, and there is none. Third, Dr. Murphy contradicts himself by admitting that "the effects may not be exactly symmetric due to the fact that Whole Foods and Wild Oats are not identical competitors and we are adding Whole Foods in the entry analysis and eliminating Wild Oats in the candidate closures." *Id.* Translated, this means one cannot reliably infer that the impact of Wild Oats exit will be the inverse of Whole Foods entry. Indeed, it makes no sense that the exit of a high-priced firm would have the same effect as the entry of a lower-priced higher-quality firm. So, in addition to being unreliable, Dr. Murphy's margin analyses are not probative of the effect of Wild Oats' exit (*i.e.*, elimination) on Whole Foods' prices.

Dr. Murphy also conducted a "two-firm, cross-sectional" analysis. The FTC places great weight (at pp. 27-28) on this study. Dr. Murphy conducted this study to test whether Whole

Foods' margins were higher in "markets" in which there were two Whole Foods and no Wild Oats than in "markets in which there was one Whole Foods and one Wild Oats." What Dr. Murphy determined, contrary to the FTC's claims, was that there was *no* statistically significant difference in Whole Foods' margins in the two scenarios he studied. Murphy Report ¶ 66.

Finally, Dr. Murphy studied the effect of Whole Foods banner entry on Wild Oats' prices. He selected five entry events to study, but he relied on the results from only two – West Hartford, CT and Ft. Collins, CO. Dr. Murphy concludes from these two events that Wild Oats' prices are lower following Whole Foods' entry. This conclusion should not seem that remarkable given the FTC's admission (at pp. 61-62) that Wild Oats' prices are higher than Whole Foods. But this study says nothing about what would happen to Whole Foods' prices post-merger. Indeed, Dr. Murphy's admission that "the effects may not be exactly symmetric" applies equally to this study. So Dr. Murphy's determination that *Wild Oats'* prices are ███ ███████ after Whole Foods entered West Hartford says nothing about the likelihood that *Whole Foods'* prices would increase after the acquisition in West Hartford or anywhere else.

Dr. Murphy also fails to disclose that his analysis does not control for entry by other firms. In Ft. Collins, for example, a King Soopers entered within five miles of Wild Oats at essentially the same time as Whole Foods entered, yet Dr. Murphy inexplicably attributes the entire price effect to Whole Foods. And, since Dr. Murphy seeks to infer from Whole Foods' entry a prediction of the effect on Whole Foods of a Wild Oats exit, he cannot justify his failure to study Whole Foods' prices in Ft. Collins after Wild Oats exited. The uncontroverted evidence, which was available to Dr. Murphy, shows that Whole Foods did not raise its prices in Ft. Collins after Wild Oats exited precisely because of the constraining effect of King Soopers.

DX 625 at 239-42 (Paradise I.H.); Paradise Decl. ¶ 52; DX 369. Nevertheless, Dr. Murphy tries to infer the effect of the transaction in all alleged relevant markets from only those two events.

### 2. Dr. Scheffman's analysis shows that prices are not higher in "monopoly" areas.

The FTC speculates about the consequences of Whole Foods acquiring Wild Oats and becoming a "monopolist" in many markets. It is unnecessary to speculate about the effects of such "monopolies" because there is real world evidence about prices in them. Dr. Scheffman analyzed the prices of Whole Foods and Wild Oats stores in "monopoly" markets and "duopoly" markets where both Whole Foods and Wild Oats compete. He found that Whole Foods and Wild Oats do not price higher in the "monopoly" versus "non-monopoly" areas. DX 728 (Scheffman Report) ¶¶ 289-326. This evidence is consistent with evidence showing that Whole Foods and Wild Oats compete with other supermarkets, and that the competition between them is "not uniquely important." *Id.* ¶ 284.

### E. Store Closures Do Not Prove Anticompetitive Effects.

The FTC contends that the merger will harm consumers because Whole Foods plans to close stores. The only support it offers is Dr. Murphy's broad assertion that store closures "will unambiguously reduce competition and harm consumers in these markets." Murphy Report ¶ 9. The FTC, however, fails to offer any evidence of analysis that store closures will cause the anticompetitive effects that concern the antitrust laws—higher prices, reduced output or consumer harm. The fact that some Wild Oats shoppers may start shopping at Whole Foods instead is not evidence of consumer harm. Other supermarkets will aggressively compete for as much of the Wild Oats business as possible. Sud Decl. ¶ 48. Competition will remain.

While the FTC claims that store closures will harm consumers, the evidence is to the contrary. The Project Goldmine model upon which Dr. Murphy relies assumes that prices will

remain constant and constrained by other competitors. FTC Ex. 3 (PX 553); Sud Decl. ¶ 50.

Moreover, Whole Foods projects that it will significantly improve the financial performance of

the stores it operates. DX 624 at 91-92 (Sud I.H.); Gallo Decl. ¶¶ 5-10. In fact, Whole Foods

plans ███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████ Contrary to the FTC's assertion (at p. 2), it is certainly not true

that store closures would "unambiguously reduce competition and harm consumers."

The Wild Oats stores that may be closed do not competitively constrain Whole Foods

today. Because ██████████████████████████████████, their closing would not lift any

existing competitive pressure on Whole Foods. ██████████████████████████████

██████████████████████████████, which Dr. Murphy says is too small to be

competitively significant. DX 795 at 78-81, 282 (Murphy Dep.); ██████████████████

████████████████████████ Closing those stores will not impact competition.

## IV.    THE FTC HAS FAILED TO DISPROVE THE OVERWHELMING EVIDENCE OF REPOSITIONING IN THE SUPERMARKET INDUSTRY.

The evidence is overwhelming that other firms are repositioning themselves in response

to consumer demand. Safeway (with its Lifestyle and Vons Pavilion format), ██████████

██████████████████████████ Kroger (through its Ralph's Fresh Fare), Publix (with its

Greenwise private label and stores), SuperValu (with its Sunflower format) and others are far

along in repositioning their stores to carry more organic foods, more natural and perishable

products, and to enhance their ambiance and service.[13] ███████████████████████████

---

[13] *See, e.g.,* █████████████████████████████████████████████ DX 623
at 21 (Robb I.H.) (Safeway Lifestyle); Besancon Decl. ¶¶ 11-14,16-19 (Ralph's Fresh Fare and Safeway Vons
Pavilion); Allshouse Decl. ¶¶ 26-27; DX 730 (Stanton Report) ¶¶ 56-57 (Publix Greenwise); DX 3 at 1 (noting
competitors opening stores and remodeling existing stores); ██████████████████; Silva (White Wave) Decl. ¶¶ 7-
8; DX 728 (Scheffman Report) ¶ 256.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ The

repositioning is under way in response to consumer demand, without regard for the merger or

any price effects. Competing firms could easily adjust to defeat a price increase by the merged

firm, and therefore the merger is unlikely to have anticompetitive effects. *See* DX 728

(Scheffman Report) ¶¶ 332-37. *See, e.g., FTC v. Staples*, 970 F. Supp. at 1087-88.

The FTC ignores that reality by contending (at pp. 63-75) that it is unusually difficult for

supermarkets to reposition. That flies in the face of the fact that the repositioning is already

occurring. It is also belied by Whole Foods' history of repositioning to attract a broader group of

customers. Sud Decl. ¶¶ 17-20.

The FTC's argument also proves its product market definition is unworkable. The FTC

expounds (pp. 66-67, 74) on the difficulties of obtaining organic certification. If organic

certification is critical to being a "premium natural and organic supermarket," then Wild Oats

fails the test. ████████████████████████████████████████

████████████████████████████████████████████████████████████████

Similarly, the FTC claims (at p.73) that it is a "multi-year task" to find a suitable site for a

"premium natural and organic" supermarket. If site selection is a criterion, again Wild Oats does

not measure up. Whole Foods is selective and chooses only "A" sites, ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

The FTC argues (at pp. 64-65) that Whole Foods is acquiring Wild Oats because

repositioning is so difficult. It cites John Mackey's email (FTC Ex. 1 (PX 773)), which says that

an acquisition would prevent Kroger, Supervalu or Safeway from using Wild Oats to launch a

new brand. ████████████████████████████████████████████████████

████████████████████    Further, Kroger, Supervalu and Safeway already have launched their

repositioned formats, so they do not need Wild Oats to reposition. *Id.*; Besancon Decl. ¶¶ 11-14;

DX 585.  This merger will not prevent anyone from repositioning.

## V.    THE FTC'S ARGUMENT THAT WILD OATS IS AN "AGGRESSIVE" COMPETITOR IS BASED ON A MISPLACED RELIANCE ON SELECTED WILD OATS DOCUMENTS AND THE ODAK TESTIMONY.

The FTC extols at length (at pp. 55-63) the supposed "turnaround" in Wild Oats' fortunes

and ability to compete aggressively with Whole Foods.  While the FTC implicitly acknowledges

that Wild Oats historically has not been a particularly effective competitor to Whole Foods, it

claims that Perry Odak, Wild Oats' ex-CEO, turned the company around and positioned it to go

head-to-head against Whole Foods.  But the FTC ignores the fact that:  (i) Mr. Odak's testimony

is clearly biased, self-serving and demonstrates unfamiliarity with the basic facts of the business

and thus deserves little weight; (ii) ██████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████    and (iii) Wild Oats has never been a significant constraint to

Whole Foods because ████████████████, and it has not recently opened a store in a market

served by Whole Foods.  The reality is that Wild Oats has not won ██████████████████

████████████████████████ a significant number of customers from Whole Foods.

Rather, based largely on the testimony and documents from its *prior* management, the

FTC argues that Wild Oats is on the cusp of a *future* turnaround.  The FTC touts (at pp. 55-58)

Mr. Odak's management and financial acumen ████████████████████████████████

31

████████████████████████████████. But the company did not renew Mr.

Odak's contract, instead opting for a new CEO with a different and more realistic strategic

vision. ████████████████████████████████████████

██████████████████████████████████ problems that severely limit

its ability to become an effective and "aggressive" competitor to Whole Foods for the

foreseeable future. *See* Defs. Br. at 62-66.

The FTC relies (at pp. 52, 55) on Mr. Odak's wholly subjective testimony to argue that

Wild Oats priced in parity with Whole Foods and that "investment banks were banging on [Wild

Oats'] door to provide money for us." ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[14]    DX 591, at 4.

[15]    DX 493 & 494.

███████████████████████████████████████████████████████████

██████████████████████████████████████████████ Wild Oats'

underperformance is the reason that the Wild Oats Board decided that it could no longer have

Odak serve as its CEO, which may explain why Odak referred to several Board members as

"idiots." DX 614 at 102-05, 119-24, 130-37 (Mays Dep.). Mr. Odak did not leave Wild Oats

poised to be a viable and aggressive competitor.

The FTC also relies upon Mr. Odak to claim that the 29th Street store in Boulder would

be the new "prototype" to drive Wild Oats' expansion. FTC Br. at 58-59. The FTC baldly

asserts (at pp. 23-24), without any citation, that the 29th Street Store "would have opened months

ago but for the proposed acquisition." ██████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████ Poor

real estate decisions have forced Wild Oats to close over a dozen stores over the last four years,

███████████████████████████████████████████████████████████

████████████████████████████████████████

Elsewhere, the FTC relies (at pp. 66-70) on Mr. Odak's testimony that ██████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[16] The FTC neglects to cite the substantial portions of Mr. Odak's testimony that undermine its case. For example,

███████████████████████████████████████████████████████████

█████████████████████████████████████████



In essence, the FTC is arguing the reverse of *United States v. General Dynamics Corp.*, 415 U.S. 486 (1974). There, despite the prior success of the acquired company, the Supreme Court held that an acquisition would not substantially lessen competition because the company's future prospects were not nearly so promising. *Id.* at 504-05. Here, in contrast, the FTC acknowledges (at p. 75) that "Wild Oats has struggled, prior to the Odak turnaround," yet it contends that Mr. Odak made the company's future prospects much more promising than its past performance. ███████████████████████████████████████████

███████████████████ At the end of his tenure, ██████████████████████. *E.g.*, Paradise Decl. ¶¶ 22, 30, 52, 60; Bradley Decl. ¶ 13; Megahan Decl. ¶¶ 21, 24-26; Besancon Decl. ¶¶ 24, 38, 51, 58, 64, 71-72; Meyer Decl. ¶¶ 12-13; Lannon Decl. ¶¶ 6, 14, 17-19, 24-25. It is in no position to be a "maverick" competitor any time in the foreseeable future. *See FTC v. Arch Coal*, 329 F. Supp. 2d at 147; *United States v. Consol. Foods Corp.*, 455 F. Supp. 108, 136 (E.D. Pa. 1978. That Mr. Odak left Wild Oats unable to be an effective competitor is demonstrated by the candid contemporaneous assessment by a long-time board member before

---

17 ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████

the proposed merger was a consideration, ████████████████████

████████████████████████████████████████

███████████████████

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the FTC's motion for a preliminary injunction be denied.

Respectfully submitted,

_____

Paul T. Denis (DC Bar No. 437040)
Paul H. Friedman (DC Bar No. 290635)
Jeffrey W. Brennan (DC Bar No. 447438)
James A. Fishkin (DC Bar No. 478958)
Michael Farber (DC Bar No. 449215)
Rebecca Dick (DC Bar No. 463197)

DECHERT LLP
1775 I Street, N.W.
Washington, DC 20006
Telephone: (202) 261-3430
Facsimile: (202) 261-3333

*Of Counsel:*

Roberta Lang
Vice-President of Legal Affairs
    and General Counsel
Whole Foods Market, Inc.
550 Bowie Street
Austin, TX

Alden L. Atkins (DC Bar No. 393922)
Neil W. Imus (DC Bar No. 394544)
John D. Taurman (DC Bar No. 133942)

VINSON & ELKINS L.L.P.
The Willard Office Building
1455 Pennsylvania Avenue, N.W., Suite 600
Washington, DC 20004-1008
Telephone: (202) 639-6500
Facsimile: (202) 639-6604

*Attorneys for Whole Foods Market, Inc.*

**Public Version**

Clifford H. Aronson (DC Bar No. 335182)
Thomas Pak (Pro Hac Vice)
Matthew P. Hendrickson (Pro Hac Vice)

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, NY  10036
Telephone: (212) 735-3000
caronson@skadden.com

Gary A. MacDonald (DC Bar No. 418378)

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC  20005
Telephone: (202) 371-7000
gmacdona@skadden.com

Terrence J. Wallock (Pro Hac Vice)
2224 Pacific Dr.
Corona Del Mar, CA  92625
Telephone: (949) 375-0683

*Attorneys for Defendant Wild Oats Markets, Inc.*

July 25, 2007

**Public Version**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 25th day of July, 2007, I caused the foregoing Joint Reply Memorandum of Points and Authorities of Defendants Whole Foods Market, Inc. and Wild Oats Markets, Inc. in Opposition to Motion for a Preliminary Injunction to be served on the persons listed below by hand:

**Attorneys for Plaintiff**

Michael J. Bloom
Thomas H. Brock
FEDERAL TRADE COMMISSION
601 New Jersey Ave., NW
Washington, D.C.  20001
mjbloom@ftc.gov

<br>
<br>

_____
Attorney for Whole Foods Market, Inc.