UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

AUG 1 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| WHOLE FOODS MARKET, INC., | ) |
| | ) |
| and | ) |
| | ) |
| WILD OATS MARKETS, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

Civil Action No. 07-1021 (PLF)

**PUBLIC VERSION**

OPINION

This matter is before the Court on plaintiff's motion for a preliminary injunction.[1]

Plaintiff, the Federal Trade Commission ("FTC"), filed this lawsuit on June 6, 2007 seeking to

enjoin defendant Whole Foods Market, Inc. from acquiring defendant Wild Oats Markets, Inc.

during the pendency of an administrative proceeding to be commenced by the FTC pursuant to

Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5(b) of the Federal Trade

---

[1]     The papers submitted to the Court in connection with this proceeding include:
plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction ("Mot.");
plaintiff's Memorandum in Support of Motion for Temporary Restraining Order and Preliminary
Injunction ("TRO Mem."); Plaintiff's Corrected Brief on its Motion for Preliminary Injunction
("PI Mem."); Joint Memorandum of Points and Authorities of Whole Foods Market, Inc. and
Wild Oats Markets, Inc. in Opposition to Motion for Preliminary Injunction ("Opp."); Plaintiff's
Response Brief ("Pl's Reply"); Joint Reply Memorandum of Points and Authorities [of
defendants] in Opposition to Motion for Preliminary Injunction ("Defs' Reply"); Defendants'
Joint Proposed Findings of Fact and Conclusions of Law ("Defs' FOF"); and Plaintiff's Proposed
Findings of Fact and Proposed Conclusions of Law ("Pl's FOF" and "Pl's COL").

Commission Act ("FTCA"), 15 U.S.C. § 45(b).  See Complaint at 2, 6.[2]  The FTC believes that

the acquisition of Wild Oats by Whole Foods "would violate Section 7 of the Clayton Act and

Section 5 of the Federal Trade Commission Act because [it] may substantially lessen competition

and/or tend to create a monopoly in the operation of premium natural and organic supermarkets

across the United States."  Complaint ¶ 15.

This lawsuit has been litigated on a very fast track.  Fact discovery took place in

the space of 30 days, expert reports were exchanged three days after the close of fact discovery,

and rebuttal expert reports and expert depositions took place within nine days thereafter.  Initial

briefs were filed two days later and reply briefs five days after that.  The Court held a two-day

hearing six days later.  The parties' respective economists, Dr. Kevin M. Murphy and Dr. David

T. Scheffman, Jr., were examined by counsel and by the Court on July 31, 2007, and counsel

presented their final arguments on the record in Court on August 1, 2007.

The evidence presented by the parties consists of:  (1) transcripts of the testimony

of 13 lay witnesses taken by the FTC at investigational hearings before it filed suit; (2) transcripts

of the deposition testimony of 22 lay witnesses and five expert witnesses taken after suit was

filed;[3] (3) the declarations of 16 lay witnesses submitted by defendants and of one lay witness

submitted by plaintiff;[4] (4) the expert reports (and exhibits thereto) of five expert witnesses;

---

[2]        The parties reached an agreement with respect to the issuance of a temporary
restraining order during the pendency of this preliminary injunction proceeding, and the Court
signed and entered the stipulated temporary restraining order on June 7, 2007.

[3]        Some of the lay witnesses were examined both at investigational hearings and at
depositions.

[4]        All but two of the declarations submitted by defendants were of officers or
employees of Whole Foods or Wild Oats.  The Court agrees with plaintiff that these declarations,

(5) 19 volumes of exhibits submitted by plaintiff, consisting of approximately a total of 700 exhibits; (6) 27 volumes of exhibits submitted by defendants, consisting of 811 exhibits; and (7) the examination and cross-examination of two of the expert witnesses in Court -- Dr. Kevin M. Murphy and Dr. David T. Scheffman, Jr. The Court has also considered the written and oral arguments presented by counsel and the exhibits and demonstrative exhibits used in connection with their arguments.

The fast track on which this litigation has proceeded has put immense pressure on counsel for the parties and their teams who, despite these pressures, have all acted professionally, civilly, effectively, and in a timely manner in presenting their evidence and argument. Unfortunately, the Court, too, has had to act under severe time constraints (and with fewer resources than counsel has had) in evaluating the evidence and arguments, reaching its decision and attempting quickly to articulate that decision in a reasonably thorough and comprehensible opinion -- so as to provide the losing side (as the Court promised it would) sufficient time to proceed promptly to the court of appeals for a decision before the consummation of the proposed merger, scheduled for August 31, 2007.

For the reasons set forth in this Opinion, the Court will deny plaintiff's motion for a preliminary injunction.

---

prepared for the purpose of litigation by defendants, should be viewed with caution and should be given less probative force than depositions taken of the same persons who were then subject to cross-examination. Such declarations are entitled to little weight to the extent they are "in conflict with contemporaneous documents." United States v. Gypsum Co., 333 U.S. 364, 396 (1948).

## I. BACKGROUND

Defendant Whole Foods Market, Inc. ("Whole Foods") is a Texas corporation which opened its first store in 1980. Whole Foods operates approximately 194 stores in North America and the United Kingdom. Defendant Wild Oats Markets, Inc. ("Wild Oats") is a Delaware corporation founded in 1987 and headquartered in Colorado. Wild Oats operates approximately 110 stores in the United States and Canada. Both firms are engaged in the business of selling grocery products, with an emphasis on natural and organic foods. In February 2007, the defendants announced that Whole Foods planned to acquire Wild Oats, and the two companies entered into a formal merger agreement on February 21, 2007.

The FTC alleges that the "operation of premium natural and organic supermarkets is a distinct 'line of commerce' within the meaning of Section 7 of the Clayton Act." Complaint ¶ 34. The FTC further alleges that Whole Foods and Wild Oats are "the only two nationwide operators of premium natural and organic supermarkets in the United States[,]" and "are one another's closest competitor in twenty-one geographic markets." Id. ¶¶ 37-38. According to the FTC, "[c]onsumers in those markets have reaped price and non-price benefits of competition between Whole Foods and Wild Oats." Id. ¶ 38. "[T]hose benefits will be lost if the acquisition occurs in the markets where the two currently compete and they will not occur in those markets where each is planning to expand." Id. ¶ 42.

## II. LEGAL FRAMEWORK

Section 13(b) of the Federal Trade Commission Act provides:

Whenever the Commission has reason to believe . . . that any person, partnership, or corporation is violating, or is about to

4

> violate, any provision of law enforced by the Federal Trade
> Commission, and . . . that the enjoining thereof pending the
> issuance of a complaint by the Commission and until such
> complaint is dismissed by the Commission or set aside by the court
> on review, or until the order of the Commission made thereon has
> become final, would be in the interest of the public . . . the
> Commission . . . may bring suit in a district court of the United
> States to enjoin any such act or practice.

15 U.S.C. § 53(b). "Upon a proper showing that, weighing the equities and considering the

Commission's likelihood of ultimate success, such action would be in the public interest, and

after notice to the defendant, a temporary restraining order or a preliminary injunction may be

granted . . . ." Id.; see also FTC v. Libbey, Inc., 211 F. Supp. 2d 34, 43 (D.D.C. 2002).  In

contrast to the four-part equity standard for the granting of a preliminary injunction in other

contexts, "[i]n deciding whether to grant preliminary injunctive relief under section 13(b), the

court evaluates whether it is in the public interest to enjoin the proposed merger." FTC v. H.J.

Heinz Co., 246 F.3d 708, 713 (D.C. Cir. 2001).  "This standard is broader than the traditional

equity standard that is normally applicable to requests for injunctive relief and is consistent with

Congress' intention that injunctive relief be broadly available to the FTC." FTC v. Libbey, Inc.,

211 F. Supp. 2d at 44 (quoting and citing FTC v. Weyerhaeuser, 665 F.2d 1072, 1080-81 (D.C.

Cir. 1981)) (internal quotations omitted).

      "The FTC is not required to *establish* that the proposed merger would in fact

violate section 7 of the Clayton Act." FTC v. H.J. Heinz Co., 246 F.3d at 713 (emphasis in

original) (citing FTC v. Staples, Inc., 970 F.Supp. 1066, 1071 (D.D.C. 1997) and FTC v. Food

Town Stores, Inc., 539 F.2d 1339, 1342 (4th Cir.1976) ("The district court is not authorized to

determine whether the antitrust laws have been or are about to be violated. That adjudicatory

5

function is vested in the FTC in the first instance.")); see also FTC v. Swedish Match, 131 F. Supp. 2d 151, 155 (D.D.C. 2000).  It is required only to show that it is "likely" to succeed in showing under Section 7 of the Clayton Act that the proposed merger "may substantially lessen competition" or "tend to create a monopoly." 15 U.S.C. § 18; see also FTC v. H.J. Heinz Co., 246 F.3d at 714; FTC v. Libbey, Inc., 211 F. Supp. 2d at 44; FTC v. Staples, Inc., 970 F. Supp. at 1071 (citing cases).   The FTC must show a "reasonable probability" that the proposed merger may substantially lessen competition in the future.  See FTC v. Arch Coal, Inc., 329 F. Supp. 2d 109, 116 (D.D.C. 2004); FTC v. Swedish Match, 131 F. Supp. 2d at 156;  FTC v. Staples, Inc., 970 F. Supp. at 1072 (citing cases).  "[T]he FTC's burden is not insubstantial, and '[a] showing of fair or tenable chance of success on the merits will not suffice for injunctive relief.'" FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 116 (quoting FTC v. Tenet Health Corp., 186 F.3d 1045, 1051 (8th Cir. 1999)).

            To meet its burden to establish its likelihood of success on the merits, the FTC may raise questions "going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." FTC v. H.J. Heinz Co., 246 F.3d at 714-15 (citing, inter alia, FTC v. Beatrice Foods Co., 587 F.2d 1225, 1229 (D.C. Cir. 1978); FTC v. Staples, Inc., 970 F. Supp. at 1071; FTC v. Warner Communications, Inc., 742 F.2d 1156, 1162 (9th Cir. 1984)) (internal quotations omitted).  "[T]he FTC does not have to prove . . . that the proposed merger will in fact violate Section 7 of the Clayton Act because the Congress used the words *may* be substantially to lessen competition . . . to indicate that its concern was with probabilities, not certainties." FTC v. Libbey, Inc., 211 F. Supp. 2d at 44

6

(internal quotations and citations omitted); see also FTC v. Staples, Inc., 970 F. Supp. at 1071

("The FTC is not required to prove, nor is the Court required to find, that the proposed merger

would in fact violate Section 7 of the Clayton Act. . . . The determination of whether the

acquisition actually violates the antitrust laws is reserved for the Commission and is, therefore,

not before this Court.").

"Merger enforcement, like other areas of antitrust, is directed at market power.  It

shares with the law of monopolization a degree of schizophrenia: an aversion to potent power

that heightens risk of abuse; and tolerance of that degree of power required to attain economic

benefits."  FTC v. H.J. Heinz Co.. 246 F.3d at 713 (internal citations omitted).  The Congress

therefore has empowered the FTC "to weed out those mergers whose effect 'may be substantially

to lessen competition from those that enhance competition.'"  Id. (internal citations omitted).

With respect to Section 7 of the Clayton Act, the D.C. Circuit has explained:

> Section 7 of the Clayton Act prohibits acquisitions . . . "where in
> any line of commerce or in any activity affecting commerce in any
> section of the country, the effect of such acquisition may be
> substantially to lessen competition, or to tend to create a
> monopoly." 15 U.S.C. § 18; see United States v. Philadelphia Nat'l
> Bank, 374 U.S. 321, 355 (1963) ("The statutory test is whether the
> effect of the merger 'may be substantially to lessen competition'
> 'in any line of commerce in any section of the country.'"). The
> "Congress used the words '*may* be substantially to lessen
> competition' (emphasis supplied), to indicate that its concern was
> with probabilities, not certainties." Brown Shoe Co. v. United
> States, 370 U.S. 294, 323 (1962) (emphasis original); see S.Rep.
> No. 1775, at 6 (1950), U.S.Code Cong. & Admin. News at 4293,
> 4298 ("The use of these words ["may be"] means that the bill, if
> enacted, would not apply to the mere possibility but only to the
> reasonable probability of the pr[o]scribed effect. . . .").

FTC v. H.J. Heinz Co.. 246 F.3d at 713 (parallel citations omitted) (brackets in original).

To reiterate, Section 7 deals "in probabilities, not ephemeral possibilities." <u>FTC v. Arch Coal, Inc.</u>, 329 F. Supp. 2d at 115; <u>see also</u> <u>United States v. Sungard Data Systems</u>, 172 F. Supp. 2d 172, 180 (D.D.C. 2001). "To determine whether the FTC has met its burden of establishing a prima facie case that the proposed acquisition in this matter may violate the antitrust laws, this court must initially analyze the likely anti-competitive effects the merger would have." <u>FTC v. Libbey, Inc.</u>, 211 F. Supp. 2d at 44-45 (internal quotations and citations omitted) (citing <u>FTC v. Staples, Inc.</u>, 970 F.Supp. at 1072-73); <u>see also</u> <u>FTC v. Swedish Match</u>, 131 F. Supp. 2d at 156. "Analysis of the likely competitive effects of a merger requires determinations of (1) the relevant product market in which to assess the transaction, (2) the geographic market in which to assess the transaction, and (3) the transaction's probable effect on competition in the relevant product and geographic markets." <u>FTC v. Arch Coal, Inc.</u>, 329 F. Supp. 2d at 117.

As Chief Judge Hogan has noted, "[a]s with many antitrust cases, the definition of the relevant product market in this case is crucial. In fact, to a great extent, this case hinges on the proper definition of the relevant product market." <u>FTC v. Staples, Inc.</u>, 970 F.Supp. at 1073; <u>see also</u> <u>FTC v. Swedish Match</u>, 131 F. Supp. 2d at 156. The general rule when determining a relevant product market is that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use [by consumers] or the cross-elasticity of demand between the product itself and substitutes for it." <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 325 (1962).

> Interchangeability of use and cross-elasticity of demand look to the availability of substitute commodities, i.e. whether there are other products offered to consumers which are similar in character or use

8

> to the product or products in question, as well as how far buyers
> will go to substitute one commodity for another. E.I. du Pont de
> Nemours, 351 U.S. [377, 393 [(1956)]. In other words, the general
> question is "whether two products can be used for the same
> purpose, and if so, whether and to what extent purchasers are
> willing to substitute one for the other." Hayden Pub. Co. v. Cox
> Broadcasting Corp., 730 F.2d 64, 70 n.8 (2d Cir.1984).

FTC v. Staples, Inc., 970 F.Supp. at 1074 (parallel citations omitted); see also United States v.

Sungard Data Systems, 172 F. Supp. 2d at 182; FTC v. Swedish Match, 131 F. Supp. 2d at 157.

In addition to cross-elasticity of demand, courts also consider "practical indicia"

such as "industry or public recognition of the [ ] market as a separate economic entity, the

product's peculiar characteristics and uses, unique production facilities, distinct customers,

distinct prices, sensitivity to price changes and specialized vendors" when defining the relevant

market. Brown Shoe Co. v. United States, 370 U.S. at 325.[5]  Courts do not apply these factors

rigidly or exclusively, but rather use them as "practical aids" to ensure that the market definition

comports with business reality. FTC v. Swedish Match, 131 F. Supp. 2d at 159.  Judge Bates has

explained:

> "[O]nly examination of the particular market -- its structure,
> history, and probable future -- can provide the appropriate setting
> for judging the probable anticompetitive effects of the merger."
> Hence, antitrust theory and speculation cannot trump facts, and
> even Section 13(b) cases must be resolved on the basis of the
> record evidence relating to the market and its probable future.

FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 116-17 (internal citations omitted).

In this case, if the relevant product market is, as the FTC alleges, a product market

---

[5]     As Judge Bork, himself a renowned antitrust expert, has pointed out, these
practical indicia "seem to be evidentiary proxies for direct proof of substitutability." Rothery
Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210, 218 (D.C. Cir. 1986).

of "premium natural and organic supermarkets" consisting only of the two defendants and two

other non-national firms, there can be little doubt that the acquisition of the second largest firm in

the market by the largest firm in the market will tend to harm competition in that market. If, on

the other hand, the defendants are merely differentiated firms operating within the larger relevant

product market of "supermarkets," the proposed merger will not tend to harm competition. As in

Staples, "this case hinges" -- almost entirely -- "on the proper definition of the relevant product

market." FTC v. Staples, Inc., 970 F. Supp. at 1073.

　　　　The government also has the burden of proving the relevant geographic market.

FTC v. Tenet Health Corp., 186 F.3d at 1052. "A geographic market is that geographic area to

which consumers can practically turn for alternative sources of the product and in which the

antitrust defendant faces competition." FTC v. Staples, Inc., 970 F.Supp. at 1073 (internal

quotations omitted). It is the geographic area that would be adversely affected by the proposed

acquisition. United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 357-58 (1962). As Judge

Bates put it in Arch Coal:

> The relevant geographic market in which to examine the effects of
> a merger is "the region in which the seller operates, and to which
> the purchaser can practically turn for supplies." FTC v. Cardinal
> Health, Inc., 12 F. Supp. 2d 34, 49 (D.D.C. 1998) (citing Tampa
> Elec. Co. v. Nashville Coal Co., 365 U.S. 320 (1961)). The
> Supreme Court has emphasized that the relevant geographic market
> must both "correspond to the commercial realities of the industry
> and be economically significant." Brown Shoe [Co. v. United
> States], 370 U.S. at 336-37 (internal citations omitted). The
> Merger Guidelines also provide guidance for determining the
> relevant geographic market. The geographic market should be
> delineated as "a region such that a hypothetical monopolist that
> was the only present or future producer of the relevant product at
> locations in that region would profitably impose at least a 'small
> but significant and nontransitory' increase in price, holding

>constant the terms of sale for all products produced elsewhere."
>Merger Guidelines § 1.21. If buyers would respond to the SSNIP
>by shifting to products produced outside the proposed geographic
>market, and this shift were sufficient to render the SSNIP
>unprofitable, then the proposed geographic market would be too
>narrow. Id.

FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 123 (parallel citations omitted). If the FTC shows

that the merger may lessen competition in any one of the alleged geographic markets, it is

entitled to injunctive relief. See 15 U.S.C. § 18.

After the relevant product and geographic markets have been established, the

ultimate question under Section 7 of the Clayton Act is whether the proposed merger will have

anticompetitive effect within those markets -- that is, whether the effect of the merger "may be

substantially to lessen competition" in the relevant market. 15 U.S.C. § 18. As the Supreme

Court has noted, "clearly, this is not the kind of question which is susceptible of a ready and

precise answer in most cases. It requires not merely an appraisal of the immediate impact upon

competition, but a prediction of its impact upon competitive conditions in the future. . . ." United

States v. Philadelphia Nat'l Bank, 374 U.S. at 362; see Brown Shoe Co. v. United States, 370

U.S. at 317 (focus is on arresting anticompetitive mergers "in their incipiency"); id. at 323

(Section 7 "deals in probabilities, not certainties"). "By focusing on the future, section 7 gives a

court the uncertain task of assessing probabilities." United States v. Baker Hughes Inc., 908 F.2d

981, 991 (D.C. Cir. 1990).

The "law allows both sides to make competing predictions about a transaction's

effects." United States v. Baker Hughes Inc., 908 F.2d at 991. It does so by "shifting the burden

of producing evidence." Id. As the D.C. Circuit has explained:

11

> In <u>United States v. Baker Hughes Inc.</u>, 908 F.2d 981, 982-83 (D.C.
> Cir. 1990), [the D.C. Circuit] explained the analytical approach by
> which the government establishes a section 7 violation.  First the
> government must show that the merger would produce "a firm
> controlling an undue percentage share of the relevant market, and
> would result in a significant increase in the concentration of firms
> in that market."  [<u>United States v.] Philadelphia Nat'l Bank</u>, 374
> U.S. at 363.  Such a showing establishes a "presumption" that the
> merger will substantially lessen competition.  <u>See</u> [<u>United States
> v.] Baker Hughes [Inc.]</u>, 908 F.2d at 982.  To rebut the
> presumption, the defendants must produce evidence that "shows
> that the market-share statistics give an inaccurate account of the
> merger's probable effects on competition" in the relevant market.
> <u>United States v. Citizens & S. Nat'l Bank</u>, 422 U.S. 86, 120
> (1975).  "If the defendant successfully rebuts the presumption of
> illegality, the burden of producing additional evidence of
> anticompetitive effect shifts to the government, and merges with
> the ultimate burden of persuasion, which remains with the
> government at all times."  <u>Baker Hughes Inc.</u>, 908 F.2d at 983; <u>see
> also</u> <u>Kaiser Aluminum [and Chemical Corp. v. FTC]</u>, 652 F.2d
> [1324,] 1340 & n. 12 [(7th Cir. 1981)].

<u>FTC v. H.J. Heinz Co.</u>, 246 F.3d at 715 (brackets, footnotes and parallel citations omitted).

The FTC generally can establish a <u>prima facie</u> case of anticompetitive effect by

showing that "the merged entity will have a significant percentage of the relevant market." <u>FTC</u>

<u>v. Swedish Match</u>, 131 F. Supp. 2d at 166.  In addition to market share, courts also must examine

"market concentration and its increase as a result of the proposed acquisition." <u>Id</u>.  As noted, the

defendants can then rebut the presumption of anticompetitive effect by showing that the

statistical data doesn't reflect reality in the relevant market.  One factor that is an important

consideration when analyzing possible anti-competitive effects is whether the acquisition "would

result in the elimination of a particularly aggressive competitor in a highly concentrated market

. . ." <u>FTC v. Libbey, Inc.</u>, 211 F. Supp. 2d at 47 (quoting <u>FTC v. Staples, Inc.</u>, 970 F. Supp.

at 1083 (citation omitted)).

12

## III.  WHOLE FOODS, WILD OATS, AND THE PROPOSED MERGER

### A. Whole Foods and Wild Oats

Whole Foods first opened its doors in 1980.  Today it operates 194 stores in the United States, with a broad array of conventional, natural, organic, gourmet, prepared and specialty product offerings.  Sud Decl. ¶¶ 14, 16, 17, 18.  It also operates three stores in Canada; and six stores in the United Kingdom.  PX01302 at 004; see also PX00011 at 003.  Whole Foods currently employs over 39,000 people across its U.S. stores.  DX 457 (Whole Foods 2006 10-K).  Its operations in the United States are divided into eleven regions.  Each region is headed by a regional president.  Each regional president reports to one of the two Whole Foods' Co-Presidents and Chief Operating Officers.

Over two decades, Whole Foods has expanded by opening new stores and by acquiring several other premium natural and organic supermarkets: Blue Bonnet Natural Foods Grocery in 1984, Whole Food Company in 1988, Wellspring Grocery in 1991, Bread & Circus in 1992, Mrs. Gooch's in 1993, Bread of Life (San Francisco) in 1995, Unicorn Village in 1995, Oak Street Market in 1995, Fresh Fields in 1996, Granary Market in 1997, Bread of Life (Florida) in 1995, Merchant of Vino in 1997, Nature's Heartland in 1999, Food 4 Thought Natural Food Market and Deli in 2000, Harry's Farmers Market in 2001, and Whole Grocer in 2006.  Murphy Report ¶ 25; JX 40 at 32-33:23-5 (Chamberlain Dep.).

Most competitive decisions at Whole Foods -- including decisions with respect to pricing – are made at the regional level under the supervision of Whole Foods' regional presidents.  Sud Decl. ¶¶ 7-9; Allshouse Decl. ¶ 5; Besancon Decl. ¶ 2; Bradley Decl. ¶¶ 1-3;

Lannon Decl. ¶ 4; Megahan ¶ 23; Meyer Decl. ¶ 3; Paradise Decl. ¶ 4; JX 41 at 51-52
(Foster I.H.).

        Whole Foods has articulated five "Core Values" that it emphasizes "reflect what
is truly important to us as an organization." Among these is "selling the highest quality natural
and organic products available." PX01302 at 006. Its stores typically stock around 30,000 stock
keeping units ("SKUs") of natural and organic products. PX00182 at 004; PX01333 at 003.
Whole Foods has evolved from a health food store into a supermarket. Whole Foods' new stores
typically range in size between 50,000 and 60,00 square feet. DX 457 (2006 Whole Foods
10-K). Its 92 stores in development average 54,500 square feet. Sud Decl. ¶ 18. Whole Foods
currently operates four stores in excess of 65,000 square feet and has an additional 17 stores of
that size in development. DX 457. Whole Foods' stores now carry a wide variety of
conventional products, everyday value private label items, and premium and gourmet offerings.
Many of these items are not organic, including more than half of the produce Whole Foods sells
and a significant portion of its prepared foods, bakery, and specialty items. Sud Decl. ¶¶ 17, 25.

        Wild Oats is headquartered in Boulder, Colorado and operates 115 stores in the
United States, under three different banners: Wild Oats Marketplace (nationwide), Henry's
Farmers Market (in Southern California), and Sun Harvest (in Texas). DX 494 at 3 (2006 Wild
Oats 10-K). It also has stores in British Columbia, Canada, under the name Capers Community
Market. PX00613 at 005, 027; PX2705. Wild Oats says it is committed to selling the "best
variety of high-quality products made with wholesome ingredients." PX00601 at 003. Wild
Oats sells a large array of natural and organic products that appeal to "health-conscious
shoppers," and include "dry groceries, produce, meat, poultry, seafood, dairy, frozen, prepared

14

foods, bakery" offered in a manner "that emphasizes customer service." PX00613 at 005.

Wild Oats has expanded over the past two decades by opening new stores and acquiring several other premium and organic supermarkets: Alfalfa's Markets in 1996, Henry's Marketplace stores in 1999, Sun Harvest stores in 1999, and Natures stores in 1999. PX04449 at 047; PX04449 at 002. The average square footage of Wild Oats' stores today are less than 25,000 square feet. DX 807 (Wild Oats Response to Spec. 2 of FTC's Second Request).

### B. The Proposed Merger and the FTC's Response

On February 21, 2007, Whole Foods and Wild Oats executed an Agreement and Plan of Merger ("Agreement"), pursuant to which Whole Foods would commence a tender offer for all of Wild Oats stock at a price of $18.50 per share. DX 811 (Agreement and Plan of Merger). At this share price, the total price of the transaction would be approximately $565 million.[6] The parties have agreed to close the transaction contemplated by the Agreement on or before August 31, 2007. Sud Decl. ¶ 45. After the merger, Whole Foods plans to close a number of Wild Oats stores. Murphy Report ¶ 22.4. It also will sell off all 35 Henry's and Sun Harvest stores (located in California and Texas) to be acquired from Wild Oats. PX00329.

On February 26, 2007, Whole Foods filed its Premerger Notification and Report Forms with the Federal Trade Commission and the Department of Justice. On June 5, 2007, the FTC authorized its staff to seek both a temporary restraining order and a preliminary injunction to prevent Whole Foods from acquiring Wild Oats pending the outcome of an administrative trial under Section 7 of the Clayton Act and Section 5 of the Federal Trade Commission Act.

---

[6]      The FTC asserts that with the assumed debt, the value of the transaction is approximately $700 million.

15

On June 6, 2007, the FTC filed a complaint in this Court seeking a temporary restraining order and preliminary injunction to halt the transaction pending an administrative trial on the merits.  On June 7, 2007, with the consent of the parties, the Court entered a temporary restraining order to delay completion of the transaction until the Court could rule on the motion for a preliminary injunction.

## IV.  THE EXPERT WITNESSES

The Federal Trade Commission proffered two expert witnesses:  Dr. Kevin M. Murphy, an economist, and Dr. Kent Van Liere, a sociologist.  The defendants proffered three expert witnesses:  Dr. David T. Scheffman, Jr., an economist; Dr. John L. Stanton, an expert in food marketing; and Ms. Kellyanne Conway, a polling expert.

Dr. Murphy is the George J. Stigler Distinguished Service Professor of Economics at the University of Chicago Graduate School of Business.  PX02878 at 002.  Dr. Murphy has a doctorate degree in economics from the University of Chicago.  His undergraduate degree from UCLA is also in economics.  Id. at 006.  He teaches courses and publishes "in a variety of areas in economics."  Id.  Dr. Murphy has consulted in the area of antitrust for over 20 years.  He has worked on over 50 antitrust cases.  PX02878 at 007.

Dr. Murphy is a Fellow of the Econometric Society and is a member of the American Academy of Arts and Sciences.  PX02878 at 007.  In 1997, he was awarded the John Bates Clark medal for economics.  Id.  In 2005, Dr. Murphy received a five-year unrestricted research award from the MacArthur Foundation in recognition of his past contributions and potential future contributions to economics.  Id.

16

Dr. Scheffman is an Adjunct Professor of Business Strategy and Marketing, Owen Graduate School of Management, Vanderbilt University, and a Director with LECG, LLC. Scheffman Report ¶ 1 and App. A at 1. He has twice served as Director of the Bureau of Economics at the Federal Trade Commission, most recently from 2001 to 2003. Id. at 1 & 3. He is an expert in the fields of economics, microeconomics, industrial organization economics, antitrust economics (including mergers), econometrics, statistics, marketing, financial analysis, and retailing. Scheffman Report ¶¶ 3-6, 13, 16.

Dr. Scheffman has experience analyzing the competitive and efficiency benefits of mergers. Scheffman Report ¶ 16. This experience, and experience from private economics consulting, includes extensive work involving the supermarket industry. JX 18 at 21-24 (Scheffman Dep.). The FTC invited Dr. Scheffman to speak at its May, 2007, conference on "Grocery Store Antitrust: Historical Retrospective & Current Developments." PX 322; Scheffman Report, Appendix A at 7; JX 18 at 38-39 (Scheffman Dep.).

Dr. Stanton is Professor of Food Marketing at Saint Joseph's University in Philadelphia, Pennsylvania. He received his Ph.D. in marketing from Syracuse University. He has been in the food industry for over 30 years. His research and consulting has been in both the retail side and the supplier side of food marketing. Stanton Report ¶ 4. Dr. Stanton previously held the first endowed chair in food marketing in the United States, entitled the C.J. McNutt chair in food marketing research, from 1985 to 1995. Stanton Report ¶ 6.

Dr. Stanton teaches a variety of food marketing courses in both the B.S. and M.S. programs including Food Marketing Strategy, Target Marketing in the Food Industry, Segmentation and Positioning, and Food Marketing Advertising. His M.S. courses include

17

elements of both retail food marketing and food service marketing.  Stanton Report ¶ 5.

Dr. Stanton has authored or co-authored 57 articles in refereed journals and has published several

industry books.  Stanton Report Appendix A.  Dr. Stanton has also been the editor of the Journal

of Food Products Marketing since 1994.  Stanton Report Appendix A.

       Dr. Stanton testified regarding his knowledge of the store formats and operations

of the following chains: Sunflower, Kroger, Supervalu, Albertson's, Shaw's, Jewel, Safeway,

Wal-Mart, Target, Giant Food, Food Lion, Hannaford, Bloom, Whole Foods, Wegmans, Wild

Oats, Meijer, HEB, Central Market, Publix, Shop Rite, Harris Teeter, Price Chopper, Giant

Eagle, A&P, Food Emporium, Waldbaum's, Pathmark, Trader Joe's, Tesco, Byerly's/Lund's,

and Andronico's.  See JX 19 at 123-167 (Stanton Dep.).

       Ms. Conway and her firm, the polling company™, inc., were commissioned by

defendants to conduct a survey that would support Dr. Scheffman's report and would corroborate

his analysis.  Scheffman Report ¶ 59; PX02066 at 023; JX 20 at 7:16-20; 8:20-9:2 (Conway

Dep.).

       Dr. Van Liere was retained by the Federal Trade Commission to review and

evaluate the survey conducted by Ms. Conway.  Van Liere Report (PX02890-002) ¶ 2. Dr. Van

Liere has an M.A. and a Ph.D. in Sociology from Washington State University where he

specialized in social psychology and research methods and statistics, including survey research.

Van Liere Report ¶ 4.  From 1978 to 1985, he served as an Assistant, then Associate Professor

with tenure, at the University of Tennessee, where he taught classes in attitudes and opinions,

survey research, research methods and statistics.  Id.  He also regularly publishes academic

research in leading journals based on data collected using surveys.  Id.  Dr. Van Liere has

published papers in peer-reviewed journals and monographs on a range of topics involving surveys. Van Liere Report ¶ 8.

After reviewing Ms. Conway's report and the survey backup materials, Dr. Van Liere concluded that her survey methodology and procedures were fundamentally flawed, which rendered her data and results unreliable. Van Liere Report ¶ 3. The Court agrees with Dr. Van Liere. It therefore will not give Ms. Conway's report any weight or consideration in evaluating the evidence before it.[7]

The FTC also maintains that the reports of Dr. Stanton, also submitted on behalf of defendants, are entitled to no weight. The Court disagrees. Plaintiff criticizes Dr. Stanton's report for not analyzing the facts of this case, but rather discussing the food retailing industry more generally. The Court notes, however, that the state of the industry itself is an important factor in a case like this. See supra at 9; infra at 23; see also FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 116-17, and Dr. Stanton is a recognized expert in this field. For that reason, the Court found Dr. Stanton's report to be helpful and will rely on it as appropriate. The Court also notes that plaintiff could have offered its own industry expert or rebuttal to Dr. Stanton's report, and chose not to do so.

The defendants and Dr. Scheffman criticize the methodology utilized by Dr. Murphy and the bases for his opinions and conclusions. The FTC and Dr. Murphy criticize the methodology, opinions and conclusions of Dr. Scheffman.

The defendants criticize Dr. Murphy because he has not conducted any direct test

---

[7]    The Court notes that Dr. Scheffman, for whom Ms. Conway's report was intended, has not relied on it.

of whether Wild Oats imposes unique constraints on Whole Foods that will disappear as a result of the proposed transaction. They also criticize him for analyzing and relying upon Whole Foods' banner entries in certain markets and its impact on Wild Oats, without examining the effects of either banner entry or (the more relevant) banner exit by Wild Oats on Whole Foods, because Whole Foods will be the surviving company if this deal is consummated.

Because a central concern of the Merger Guidelines is with the impact of competition on prices, the defendants also criticize Dr. Murphy for relying on margins rather than on prices. They maintain that Dr. Murphy's reliance on analyses of margins is not based on sound methodology in economics, accounting, and financial analysis. See Scheffman Rebuttal Report ¶ 15. They argue that any effects inferred from margins, however defined and estimated, are relevant only if a valid inference can be made about prices from margins. Defendants and their experts maintain that in this case reliable inferences about prices cannot be made from margins alone. See Scheffman Rebuttal Report ¶ 16.

The defendants also argue that Dr. Murphy's analyses of the effect of Whole Foods' entry on Wild Oats net sales, margin and prices do not control for the pricing or promotional strategies of all other supermarkets in response to Whole Foods' entry. Instead, Dr. Murphy includes the responses of competitors to Whole Foods' entry, and the effects caused by those competitors, as effects caused by Whole Foods. See JX 26 at 233 (Murphy Dep.); see also Scheffman Rebuttal Report ¶ 10 ("Dr. Murphy's analysis of why competitive effects implicitly but importantly *assume* that non-PNOS competitors are not significant factors impacting the competition between [Whole Foods] and [Wild Oats]. . . .").

Defendants criticize Dr. Murphy for inferring the price effect of a Wild Oats exit

20

by equating that event with a Whole Foods entry in reverse -- that is, Dr. Murphy's "exit"
analysis assumes that the effect of a Wild Oats exit would be exactly the same as a Whole Foods
entry, albeit in the opposite direction.  Where multiple firms enter simultaneously, Dr. Murphy's
regression analysis does not permit one to tell which of the firms is causing how much of the
effect on Wild Oats' margins, net sales, and prices.  See JX 26 at 228 (Murphy Dep.).

        Fundamentally, the defendants maintain, Dr. Murphy's analyses study the wrong
events.  He analyzes the effects of Whole Foods' banner entry on Wild Oats when he should be
looking at the price effects of Wild Oats exits.  July 31 a.m. Hearing Tr. at 23-24, 26
(Scheffman); Scheffman Rebuttal Report ¶ 41.  According to the defendants, the effect of Whole
Foods' banner entry on Wild Oats' prices, margins or sales does not directly test whether Wild
Oats imposes any constraint on Whole Foods.  July 31 a.m. Hearing Tr. at 28-30 (Scheffman);
see Murphy Report ¶ 63.

        Finally, the defendants maintain that Dr. Murphy's study of five Whole Foods'
entry events into Wild Oats "markets" was in fact based on only two areas (West Hartford,
Connecticut and Fort Collins, Colorado), Murphy Report ¶ 58; Scheffman Rebuttal Report ¶ 56,
only one of which offers sufficient post-entry "price" and volume data to discern a time-pattern
of effects.  Murphy Report ¶ 57; July 31 a.m. Hearing Tr. at 71-72 (Murphy).  In the end,
defendants maintain, Dr. Murphy's analysis of the effect of Whole Foods banner entry on Wild
Oats' prices really comes down to his analysis of Hartford, Connecticut, and even there, he failed
to account for all relevant variables, such as partial shrink, the idiosyncratic price observations
for the salad bar, and the simultaneous entry of Trader Joe's.

        The FTC has equally vigorous criticisms of Dr. Scheffman and his analysis. One

21

of the FTC's criticisms of Dr. Scheffman is that he used a 5% standard for what constitutes a "small but significant non-transitory increase in price" ("SSNIP") under the Merger Guidelines, even though he accepts and recently publicly opined that smaller SSNIPs are more appropriate for mergers in low net margin industries like supermarkets. See Murphy Rebuttal Report ¶ 4; PX00322 at 132.

The FTC also criticizes Dr. Scheffman's "critical loss" analysis. It maintains that while Dr. Scheffman concludes that the actual loss for a hypothetical premium natural and organic food supermarket ("PNOS") monopolist would "greatly exceed" or "swamp" the critical loss thresholds, Dr. Scheffman actually only "assumes" what the actual loss would be and provides no quantitative evidence for the magnitude of the actual loss that could be compared to these thresholds, and no methodology for calculating the actual loss. Murphy Rebuttal Report ¶¶ 10-11.

Finally, the FTC criticizes Dr. Scheffman for basing his pricing analysis on item-specific register prices at Whole Foods stores on a *single day* in June of 2007. The FTC maintains that an analysis of a single day's pricing, even if otherwise well done, cannot provide the basis for any reliable conclusions. It criticizes Dr. Scheffman for extrapolating from this single day to reach a variety of conclusions about pricing generally. The FTC also says Dr. Scheffman's conclusions about pricing are also inconsistent with econometric evidence on Whole Foods' margins, which vary across stores according to the presence or absence of local competition from Wild Oats. Murphy Rebuttal Report ¶ 47.[8]

---

[8]     The Court discusses this pricing analysis and the plaintiff's criticism of it infra at 70-71.

## V.  RELEVANT PRODUCT MARKET

As noted above, and as was the case in Staples, "the definition of the relevant

product market in this case is crucial.  In fact, to a great extent, this case hinges on the proper

definition of the relevant product market."  FTC v. Staples, Inc., 970 F. Supp. at 1073.  The FTC

believes the relevant product market is premium natural and organic supermarkets ("PNOS"), of

which it alleges there are four in the entire country -- Whole Foods (the largest), Wild Oats (the

second largest), Earth Fare (with 13 stores in only four states), and New Seasons (with eight

stores, all in Oregon).  Defendants Whole Foods and Wild Oats believe that the relevant product

market is one that includes all supermarkets.  "[O]nly examination of the particular market -- its

structure, history, and probable future" -- how it operates in the real world -- can provide the

appropriate setting for determining the relevant product (and geographic) market and for judging

the probable anticompetitive effects of a merger or acquisition.  FTC v. Arch Coal, Inc., 329

F. Supp. 2d at 116-17.  Antitrust theory "cannot trump facts, and even Section 13(b) cases must

be resolved on the basis of the record evidence relating to the market and its probable future."  Id.

The Court looks first at the Horizontal Merger Guidelines and the testimony and

reports of the economic experts and then examines what the evidence shows is really happening

in the marketplace.

### A.  The Horizontal Merger Guidelines and the Economic Evidence

The Horizontal Merger Guidelines issued by the Department of Justice and the

Federal Trade Commission in 1992, and revised in 1997 ("Merger Guidelines"), articulate the

analytical framework the Justice Department and the FTC apply in determining whether a merger

is "likely substantially to lessen competition." Merger Guidelines § 0.1. Under the Guidelines,

as under the case law, the relevant product market is determined according to the "reasonable

interchangeability of use" or cross-elasticity of demand between the product sold and "substitutes

for it." Merger Guidelines §§ 1.0, 1.11; Brown Shoe Co. v. United States, 370 U.S. at 325. The

analytical framework set forth in the Merger Guidelines approaches the inquiry regarding the

reasonable interchangeability of use or cross-elasticity of demand by asking whether a

"hypothetical monopolist . . . would profitably impose at least a 'small but significant and

nontransitory [price] increase'" ("SSNIP"). Merger Guidelines § 1.11.[9] Reasonable

interchangeability of use in effect means "substitutability" -- the practical ability of a consumer to

switch from one product to another. See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,

792 F.2d at 218-19; FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 119-20; FTC v. Swedish Match,

131 F. Supp. 2d at 158. The forward-looking test of the Horizontal Merger Guidelines therefore

asks where customers would turn if a hypothetical monopolist of the candidate product imposed

a SSNIP. Merger Guidelines § 1.11.

As the FTC explained it, the issue is whether there is a group of customers for

whom there are not sufficiently close substitutes that a price increase -- a "small but significant

nontransitory increase in price" -- can be inflicted on them. Aug. 1 a.m. Hearing Tr. at 42

(Bloom). If there are alternatives to which customers could readily take their business such that

the price increases would not be profitable for the hypothetical monopolist, the proposed product

---

[9]        The Merger Guidelines speak of a 5% SSNIP test, but recognize that in some
cases it is appropriate to use a smaller percentage. Merger Guidelines § 1.11. Dr. Murphy and
Dr. Scheffman agree that in some cases a hypothetical price increase as low as 1% may be
appropriate.

market is too narrow and additional alternatives must be included in the relevant product market, even if customers did not view them as substitutes at the lower price.

In order to determine which products should be included in the relevant product market, the Guidelines methodology begins with each of the products sold by the two firms in question and then performs the hypothetical monopolist test. If a hypothetical firm that was the sole seller of a given set of products would find it profitable to impose a small but significant non-transitory increase in the price of any of those products, then the given set of products satisfies the relevant product market test. If not, then the product which is the next best substitute (defined in the Guidelines as the product that gains the largest share of the revenue diverted by a price increase) is added. Merger Guidelines § 1.11. The test is then repeated. Products are added sequentially in this way until a sole seller would find it profitable to increase price by the amount deemed to be "small but significant." Murphy Report ¶ 96.[10]

Because the FTC contends that the relevant market is "premium and natural organic supermarkets" ("PNOS"), Dr. Scheffman applied the hypothetical monopolist test by focusing on how consumers likely would behave if the price of grocery products in PNOS rose relative to the price of grocery products in other supermarkets. JX 18 at 33-34, 49 (Scheffman Dep.); Scheffman Report ¶ 49. He stated that the economic implication of this framework is that product market definition must focus its attention on "consumers at the margin" rather than consumers who are "inframarginal." Scheffman Report ¶¶ 50, 99; see JX 18 at 95 (Scheffman

_____

[10]    Given the thousands of products sold by supermarkets, a product-by-product analysis was not feasible in this case. Such an analysis would also be misleading because consumers do not typically choose retailers of the goods in question on a product-by-product basis; rather, they typically purchase an array of products from a single source. Murphy Report ¶ 97.

Dep.).[11]

A marginal consumer is someone who would switch where he or she shops in response to a SSNIP -- that is, if his supermarket of choice imposed a small but significant and nontransitory price increase. According to Dr. Scheffman, in the context of supermarkets -- including premium natural and organic supermarkets -- such marginal consumers can switch or divert their purchases in any of three ways. First, they can reduce the size of their shopping basket at one supermarket and substitute by buying the same or similar items at another retailer -- if that other retailer offers similar products for sale. Second, from the set of supermarkets that the consumer currently frequents, the consumer can switch a particular shopping trip from one supermarket to another. Third, the consumer can change retailers by deciding to no longer frequent a particular supermarket that the consumer no longer believes offers good quality for value. Scheffman Report ¶ 51.

Dr. Scheffman concludes that firms compete to retain existing business and win new business by competing for marginal consumers. It is these consumers who are susceptible to being won or retained by offering better prices, improved service, higher quality or more diverse product offerings. Scheffman Report ¶ 52. Supermarket retailers make their pricing, quality and service decisions in ways designed to retain and attract marginal consumers. While businesses value "core" customers, they simply "cannot survive -- let alone grow and remain profitable -- solely by catering to this small segment of customers." Scheffman Report ¶ 55. The appropriate

---

[11] It appears that the terms "core customer," "committed customer" and "inframarginal customer" are being used by the parties interchangeably. Aug. 1 p.m. Hearing Tr. at 76 (Denis). It is these customers who are being compared to and contrasted with "consumers at the margin" or "marginal consumers." The Court will generally use the terms "core customer" and "marginal consumer."

focus for defining the relevant product (and geographic) market therefore is those marginal consumers. Dr. Scheffman concludes that the "marginal" consumer, not the so-called "core" or "committed" consumer, must be the focus of any antitrust analysis. Aug. 1 p.m. Hearing Tr. at 74-76 (Denis). He believes that this is consistent with the analytical framework set out in the Merger Guidelines. Scheffman Report ¶ 53. The Court agrees.

Dr. Scheffman used critical loss analysis to analyze the FTC's proposed product market. As the FTC acknowledges, this is a widely accepted analytical tool in antitrust cases both to analyze market definition and competitive effects. Scheffman Report ¶ 100; JX 18 at 33-34 (Scheffman Dep.); see also Aug. 1 a.m. Hearing Tr. at 64 (Bloom) (FTC agrees). That is because critical loss is implicit in the hypothetical monopolist test. Scheffman Report ¶ 100. The latter tests whether a SSNIP would be profitable over a candidate product; critical loss analysis assesses how much substitution in response to a SSNIP could occur before a SSNIP becomes unprofitable. Scheffman Report ¶ 110. To put it another way, SSNIP tests at what price increase a consumer will switch where he or she shops; critical loss tests at what point a purveyor's price increases lead to a sufficient amount of lost sales (and lost customers) that the economic loss exceeds the gain from having raised prices (the "critical" loss).

Critical loss analysis stems from the recognition that for almost any product, a price increase results in some lost sales as consumers make do with less, switch to other suppliers, or substitute other products. There is a profit detriment to the price increase equal to the product of the per unit gross margin and the number of units lost. But there is also an economic gain from the increased gross margin earned from the higher price on each remaining unit sold. The "critical loss" is the amount of lost sales at which the economic detriment equals

27

the economic gain.  It is a "critical" loss because any greater loss will result in the economic detriment exceeding the economic gain, thereby rendering the price increase unprofitable. Scheffman Report ¶ 96.

The application of the critical loss technique to market definition is a three step process.  The first step is to estimate the  incremental margin (gross margin) and determine the volume the hypothetical monopolist (or merged entity) would have to lose to render the price increase unprofitable (i.e., the critical loss).  The second step is to separately estimate what the actual loss in volume is likely to be as a result of the hypothesized price increase (i.e., the estimated "actual loss").  The last step is to compare the estimate of the actual loss with the critical loss.  If the actual loss is greater than the critical loss, the product market definition must be expanded.  Scheffman Report ¶ 112.

In calculating critical loss, Dr. Scheffman originally used a SSNIP of 5% across all products sold by "premium natural and organic supermarkets."  This is the SSNIP used in most contexts under the Merger Guidelines and (according to Dr. Scheffman) traditionally used by the FTC in supermarket mergers.  JX 18 at 34-37 (Scheffman Dep.).  As the FTC has pointed out, however, a lower SSNIP is sometimes used.  See also Merger Guidelines § 1.11.  According to the FTC, Dr. Scheffman himself has acknowledged that a 1% SSNIP may be appropriate to analyze markets characterized by high volume sales but low profit margins.  See PX0322 at 132 (May 2007 remarks of Dr. Scheffman at an FTC conference); Scheffman Report ¶ 114.

Whole Foods has an average gross margin at the store level of approximately ██████  A 5% price increase implies a critical loss for Whole Foods of about ███ in volume. Wild Oats stores typically have a gross margin at the store level of about ███ or less.  A 5%

28

price increase implies a critical loss for Wild Oats of about ▉ in volume. Scheffman Report ¶ 115. In response to Dr. Murphy's report and the FTC's criticism of his use of a 5% SSNIP, Dr. Scheffman also did exactly the same analysis again but this time calculated critical loss for a 1% SSNIP. Critical loss for Whole Foods at that price increase would be a little over ▉ in volume -- that is, if the hypothetical monopolist lost a little over ▉ of its sales, then a 1% SSNIP would not be profitable. JX 18 at 41-42 (Scheffman Dep.).

Critical loss analysis next considers what the actual loss is likely to be if prices increase. Actual loss depends on how many marginal customers are likely to exist and how likely they are to shift purchases in response to a SSNIP. Scheffman Report ¶ 98. There is no evidence in the record from which to determine cross-elasticity of demand between premium natural and organic supermarkets and other supermarkets and grocery retailers. July 31 p.m. Hearing Tr. at 13-14 (Scheffman); JX 18 at 70-71 (Scheffman Dep.). Nor is there statistical evidence of actual loss, as the SSNIP is hypothetical rather than actual. July 31 p.m. Hearing Tr. at 10 (Scheffman). Therefore, Dr. Scheffman based his estimate of actual loss on weighing the evidence in the case, including the 47 market studies he reviewed. JX 18 at 91 (Scheffman Dep.).

Dr. Scheffman summarized (and then discussed in detail) what the market studies show: (1) grocery shopping is a relatively highly price sensitive category of retail; (2) Whole Foods and Wild Oats customers are shifting purchases between PNOS and other supermarkets, and can further shift purchases costlessly, i.e., without having to change their shopping patterns; (3) most Whole Foods and Wild Oats shoppers shop frequently at other supermarkets and grocery retailers; (4) other supermarkets compete vigorously for the patronage of customers who also

shop at Whole Foods and Wild Oats; and (5) Whole Foods (and to a lesser degree Wild Oats) regularly and extensively price check other supermarkets and food retailers in order to gauge their pricing, their assortments, and other strategies that these competitors are using to attract Whole Foods shoppers and other customers into their stores. Scheffman Report ¶¶ 122, 123, 125, 127, 204, 212, 213, 216, 127, 224-29.

Dr. Scheffman concluded that a substantial portion of Whole Foods and Wild Oats business is at the margin such that in the event of a PNOS price increase, the actual loss would substantially exceed the critical loss. Scheffman Report ¶ 128. "Where marginal customers comprise such a significant portion of the business, there is no doubt that the actual loss from a PNOS price increase would greatly exceed the ▮▮critical loss." Scheffman Report ¶ 121 (discussing 5% SSNIP test results). Dr. Scheffman's conclusion obtains regardless if the SSNIP is 5% or 1%. JX 18 at 40, 89 (Scheffman Dep.); see id. at 89-93 (the actual loss on a 1% price increase would be more than ▮▮and is likely to be about▮▮.

Even accepting the possibility that certain products are sold only at Whole Foods or Wild Oats, or that certain consumers perceive that the quality they want is only available at those stores, Dr. Scheffman concluded that critical loss analysis shows that, particularly with a small SSNIP, a relatively small sales loss would make a price increase unprofitable. The record evidence, including market research studies and evidence of how both consumers and retailers are actually acting in the marketplace, suggests that because so many people are cross-shopping for natural and organic foods and are marginal rather than core customers, the actual loss from a SSNIP would exceed the critical loss. July 31 p.m. Hearing Tr. at 25-27 (Scheffman). The Court agrees with Dr. Scheffman.

30

Dr. Scheffman's critical loss analysis demonstrates that the relevant product market must be broader than the market proposed by the FTC: "If all PNOS raised prices, there would be a substantial loss in business," and the loss necessarily would be to other supermarkets. Scheffman Report ¶ 120. "Based on this qualitative and quantitative evidence, I have concluded that the relevant product market must encompass at least all supermarkets." Scheffman Report ¶ 120. Evidence of the significant amount of sales that are "at the margin" shows that it is not plausible that a 5% increase in prices attempted by the proposed merged entity would be profitable, since the actual loss in sales arising from such a price increase is likely to far exceed the critical loss. Scheffman Report ¶¶ 117, 121. Actual loss would also defeat a 1% price increase. Scheffman Rebuttal Report ¶¶ 104-105.

Applying the product market definition framework of the case law and the Merger Guidelines, it follows that the relevant product market within which to evaluate the proposed transaction must be at least as broad as the retail sale of food and grocery items in supermarkets. Scheffman Report ¶¶ 128, 235. As a result, the FTC's proposed relevant product market of PNOS fails. See JX 18 at 55-56 (Scheffman Dep.) ("[T]he FTC's relevant market is not supportable as a matter of economic analysis and [ ] it would have to include non-PNOS supermarkets and other grocery retailers. . . .").

Dr. Scheffman also reviewed data regarding the sales at newly opened Whole Foods stores in certain markets where Whole Foods had no other stores, so-called "banner"

31

entries. Scheffman Report ¶¶ 60-94.[12]  According to Dr. Scheffman, a study of these store

opening events is relevant to product market definition because it provides a natural experiment

regarding how consumers react to a change in their options. Scheffman Report ¶ 61; July 31

p.m. Hearing Tr. at 21-23 (Scheffman). His analysis demonstrates that when Whole Foods enters

a new local area, Whole Foods generates substantial sales that are overwhelmingly captured from

the local traditional or conventional supermarkets and grocery retailers regardless of whether

there are other PNOS in the area. Scheffman Report ¶ 60. Dr. Scheffman concludes from this

analysis that premium natural and organic supermarkets compete directly with other

supermarkets.

        In an area in which there are no other PNOS, all the sales for the new Whole

Foods store necessarily come from other grocery retailers. Scheffman Report ¶ 62.  Dr.

Scheffman nevertheless found that these new Whole Foods stores succeeded even though they

had to draw all of their customers from other grocery retailers and supermarkets. Scheffman

Report ¶¶ 65-66; see July 31 p.m. Hearing Tr. at 11 (Scheffman).  It is obvious that when Whole

Foods opens a new store in an area with no other PNOS it does not create new demand for

groceries; rather, consumers divert some of their grocery purchases from other grocery retailers

to Whole Foods. Scheffman Report ¶ 65.

        On the other hand, when a Whole Foods store opens in an area already served by a

Wild Oats store (or other PNOS), clearly Wild Oats stores can be expected to lose sales.

Scheffman Report ¶ 62. But combined Whole Foods and Wild Oats revenues after entry of the

---

        [12]     A "banner entry" event is the entry of the first store of a given brand into a given
geographic market.  Murphy Report ¶ 48.

Whole Foods store average more than ⬛ times the revenues of the Wild Oats store prior to

entry. Scheffman Report ¶¶ 75-76. Reviewing Whole Foods entry events in areas where Wild

Oats also operated, Dr. Scheffman found that the reduction in Wild Oats sales was only about

⬛ in most areas -- in some less than ⬛ In other words, when a Whole Foods enters an area

that has a Wild Oats store, its sales do not overwhelmingly come from Wild Oats, but primarily

from other supermarkets; the main competitive interaction is between Whole Foods and "other"

grocery retailers. Scheffman Report ¶¶ 83, 90.

      Dr. Scheffman found that: (1) on average, the opening of a new Whole Foods

store generated substantially more sales of natural and organic products than existed in the area

prior to the opening, and (2) in every instance, the new Whole Foods store generated

substantially more in sales than the Wild Oats store previously had. Scheffman Report ¶ 76. He

observed, "[c]ontrary to the prediction implied by the FTC's product market, in all cases . . .

[Whole Foods'] sales are much larger than the reduction in sales of . . . [Wild Oats]." Scheffman

Report ¶¶ 77-79. Thus, when Whole Foods opens a new store in an area that has a Wild Oats,

the data shows that Whole Foods gains a lot of sales, "and most of those sales by far did not

come from Wild Oats." JX 18 at 81-82 (Scheffman Dep.). From the data, it is clear that most of

the sales are coming from non-PNOS supermarkets. Id. at 82. Whole Foods is "overwhelmingly

. . . picking up its sales from non-PNOS markets and of course necessarily has to be . . .

competitive with those supermarkets to attract those sales and keep them." Id. at 83.

      Dr. Scheffman made calculations that showed that the combined revenue at a new

Whole Foods store and an existing area Wild Oats store was, on average, ⬛ times the revenue

that the Wild Oats store had attracted before the Whole Foods store opened. Id. ¶ 79. These

facts show that most of Whole Foods' sales came from non- "premium natural and organic" supermarkets and other grocery retailers. It follows that most of the customers who frequent the new Whole Foods store come not from Wild Oats but from other competitors. These facts lead to the inevitable conclusion that Whole Foods' and Wild Oats' main competitors are other supermarkets, not just each other. Scheffman Report ¶¶ 74-90.

Dr. Murphy conducted a number of economic analyses. He concluded, among other things, that the estimated impact of banner entry by Whole Foods on Wild Oats' existing-store dollar sales indicates that the entry by Whole Foods into a geographic area reduces sales at nearby Wild Oats stores by███████████ He further concluded that the introduction of competition from Whole Foods has a larger effect on Wild Oats than does the introduction of competition from other sources. Murphy Report ¶ 49.

Dr. Murphy studied five entry events in which a Whole Foods banner store entry occurred within five miles of an existing Wild Oats store. Murphy Report ¶¶ 56, 57. Of the five entry events studied, he focused on two -- West Hartford, Connecticut, and Fort Collins, Colorado -- because he believed they were the only ones that offered sufficient post-entry price and volume data to discern a long run time-pattern of effects. Murphy Report ¶ 58.

Compared to Wild Oats stores that did not face entry, Dr. Murphy found that prices in Wild Oats' West Hartford store were█████████six months immediately following entry by Whole Foods,█████████7 to 12 months following entry, and█████ ████████one year or more. The corresponding percentage reductions in sales in West Hartford were█████and████for these time intervals. Murphy Report ¶ 58. The initial (0-6 months) price effect in Fort Collins is████and remains about█████its pre-entry level even after a

34

year. In the second year post-entry, sales in Wild Oats' Fort Collins store had ████████████████

compared to control stores. Murphy Report ¶ 59. The Fort Collins Wild Oats store was closed in

December 2006. Dr. Murphy did not analyze what happened to Whole Foods prices in Fort

Collins in the months after the Wild Oats store closed in December 2006.

From his study of these Whole Foods entry events and his estimate for the effects

on Wild Oats and Whole Foods store-wide margins from the banner entries of Whole Foods,

Dr. Murphy reached certain conclusions by analogy to the likely exit events that will occur after

the merger when Whole Foods closes Wild Oats stores in many markets where they overlap. The

Court concludes that these "assumptions" cannot form the basis of a legitimate analysis of effects

on competition from the proposed transaction. The Court is unwilling to accept the assumption

that the effects on Wild Oats from Whole Foods' entries provide a mirror from which predictions

can reliably be made about the effects on Whole Foods from Wild Oats' future exits if this

transaction occurs.

Despite the fact that their own expert, Dr. Scheffman, also studied certain banner

entry events by Whole Foods and reached conclusions about the success of the new Whole Foods

stores and from whom they drew their customers, the defendants vigorously criticize Dr.

Murphy's study of banner entry events because they say Dr. Murphy studied the "wrong events"

-- banner entries by Whole Foods instead of banner exits by Wild Oats.[13] The FTC

acknowledges that Dr. Murphy's study is a study of only those individual markets and "not itself

a study beyond those markets." Aug. 1 a.m. Hearing Tr. at 62 (Bloom). It nevertheless is an

---

[13]     It may be that at least one reason Dr. Scheffman and Dr. Murphy reached different
conclusions from their respective studies is that they studied the entry of Whole Foods into
different markets. Dr. Scheffman looked at markets that Dr. Murphy excluded.

important study, according to the FTC, because this information when merged with other studies "casts additional light on what's going on in the marketplace." Id. While the Court is troubled that Dr. Murphy's pricing analysis is based on only two entry events and no exit events, the Court considers it, as the FTC suggests it should, to the extent it "casts additional light on what's going on in the marketplace."

The problem is that "what's going on in the marketplace," according to the credible evidence before the Court, is that (1) Wild Oats prices are higher than Whole Foods prices where the two companies compete, (2) Whole Foods prices are essentially the same at all of its stores in a region, regardless of whether there is a Wild Oats store nearby, and (3) when Whole Foods does enter a new market where Wild Oats operates Whole Foods takes most of its business from other retailers, not from Wild Oats. See Scheffman Report ¶¶ 56-66, 77-79. Furthermore, the market studies and other evidence show that Whole Foods competes vigorously with other supermarkets to retain the business of its many marginal customers.

### B. Product Differentiation or Separate Product Market; Consumer Demand for Natural and Organic Products

The complaint alleges that Whole Foods and Wild Oats are both supermarkets. Complaint ¶¶ 2, 4. According to the defendants' food marketing expert, Dr. John Stanton, a "supermarket" is a well-defined and widely accepted term within the food retailing industry -- it is a retail food store that carries a full-line and wide variety of food and non-food grocery items, and it typically maintains the selection and depth of products to provide one-stop shopping for a customer's food and grocery needs. Stanton Report ¶ 15. Whole Foods and Wild Oats are supermarkets, but ones that have focused on high-quality perishables, specialty and natural

36

organic produce, prepared foods, meat, fish, and bakery goods, rather than on dry goods.
PX06613 at 005; PX01333 at 003-004; JX 37 at 77-79 (Odak I.H.); JX 32 at 40 (LaMacchia
I.H.).

The evidence also shows that a typical Whole Foods store carries all the
traditional categories of products: fresh produce (both conventional and organic), frozen foods
(including ice cream), shelf-stable food and beverage products (including certain popular
brands), bread and bakery items, dairy, refrigerated foods, fresh and prepared meats and poultry,
fresh seafood, deli, prepared foods, as well as health and beauty aids, cleaning supplies, paper
products and other general merchandise, including pet products, kitchen tools, and magazines.
Stanton Report ¶ 18. While Whole Foods and Wild Oats had and still have as a primary focus
the sale of natural and organic fruits, vegetables, meats and other perishables of high quality,
Whole Foods and Wild Oats each target a large base of supermarket shoppers who shop for
larger categories of food products in competition with other supermarkets.  Stanton Report ¶¶ 3,
15, 18, 25, 80; Sud Decl. ¶ 14; JX 28 at 31 (Mackey I.H.).

Whole Foods and Wild Oats also emphasize high levels of customer service; they
are "mission driven," with an emphasis on "social and environmental responsibility;" they
provide the customer with the confidence of a "lifestyle brand" and a "unique environment," in
stores that satisfy "core values" of a lifestyle of health and ecological sustainability and provide a
"superior store experience."  PX00718 at 001; JX 37 at 95:1-25; 96:1-6 (Odak I.H.); JX 31
at 59:4-7 (Paradise I.H.); JX 11 at 69:17-70:7 (Paradise Dep.); JX 33 at 18:22-19:6 (Coblentz
I.H.).  Whole Foods and Wild Oats traditionally have offered a higher level of service than do the
majority of conventional supermarket retailers.  PX01301; PX01302 at 004, 012 ("unparalleled

customer service" at Whole Foods); JX28 at 109:13-16, 113:18-21(Mackey I.H.); JX32

at 102:11-24 (LaMacchia I.H.) (Whole Foods employees will help the customer by describing the

large variety of 450 to 600 types of cheese that Whole Foods offers and offering free samples of

any cheese the customer would like to try); PX00670 at 006 ("superior service with sincerely

friendly and knowledgeable people -- World Class Service" at Wild Oats); PX00670 at 034

(Wild Oats "seek[s] to offer a higher level of service than conventional supermarkets.");

PX00518 at 008 (discussing higher level of service, knowledgeable personnel, and more money

spent on store labor than conventionals).

      The FTC distinguishes between consumers who shop "casually" for natural and

organic foods and "customers that have decided that natural and organic is important, lifestyle of

health and ecological sustainability is important." The question, according to the FTC, is where

will this latter group shop after the merger and the closure of Wild Oats stores. Aug. 1 a.m.

Hearing Tr. at 43-44 (Bloom). As explained supra at 26-27 and infra at 62, however, the Court

concludes that the effect of the proposed merger on marginal consumers is more important than

the effect on such core consumers, as it is the marginal consumers for whom the stores must and

do compete most vigorously.

      According to Dr. Stanton, differentiation "is now the primary method a

supermarket operator uses to attract customers away from its supermarket competitors, just as

location and low prices [were] the primary method of competition several decades ago." Stanton

Report ¶ 26. Representatives of other supermarkets, including Delhaize and Trader Joe's, agree

with this view. See JX 21 at 25 (Vail Dep.) (supermarkets pick and choose what to focus on and

offer to consumers), 32 (even though all supermarkets in the United States are differentiated, they

all compete against each other); DX 644 at DZA 000089 (Delhaize, "DG Board of Directors");
Boardman Decl. ¶ 10; JX 24 at 112-14 (Bane Dep.) (Trader Joe's looks at what competing
supermarkets are doing to differentiate themselves).

   Dr. Stanton observed that in today's world of differentiation, most successful
supermarkets have developed certain benefits that distinguish them from the "average"
supermarket and give customers a reason for shopping their stores. Stanton Report ¶ 23.
Differentiating factors can include such things as low prices, ethnic appeal, quality prepared
foods, expanded variety within a specific category or department, customer service, or perishable
departments such as meats or produce. Id. The question is whether this differentiation creates
"sub-markets" or separate product markets for purposes of analyzing competitive impact.
Dr. Stanton believes that as the consumer's desires for various benefits change, supermarket
operators will continue to change with them, and that supermarkets modify, re-define and re-
format themselves all the time to meet the trends in consumer demand and the trends in
competition. Stanton Report ¶ 28.

   No one can doubt that consumer demand for natural and organic products has sky-
rocketed in recent years. Stanton Report ¶¶ 31, 66-71; Scheffman Report, Appendix E ¶ 4;
DX 573. Demand for the following specific types of organic products has increased dramatically
just over the past five years: organic milk (20-30% annually); soymilk (10% annually); organic
bread and grain products (13-21% annually); organic fruits and vegetables (10-20% annually);
organic meat, poultry and fish (32-120% annually); organic sauces and condiments (16-24%
annually); organic packaged and prepared foods (11-20% annually); and organic snack foods (15-
30% annually). DX 591 (Organic Trade Association's 2006 Manufacturers' Survey).

Nor is there any doubt that the dramatic growth in demand for natural and organic products is expected to continue. DX 591; Stanton Report ¶ 31; JX 21 at 72 (consumer demand for natural and organic products is not a fad and "is here to stay"); Sliva (WhiteWave) Decl. ¶ 6 ("I expect that consumer demand for natural and organic products will continue to increase into the foreseeable future."); Simon (Hain Celestial) Decl. ¶ 3 ("double-digit growth rates [for natural and organic food products] are expected to continue going forward as more and more consumers demand these products."); JX 21 at 37:20-38:5 (Vail Dep.) ("we have really looked at organic and natural foods as an emerging group within the industry . . .").

Traditional or conventional supermarkets have responded to this increased demand for natural and organic products. Supermarket chains throughout the country have been expanding and growing their natural and organic offerings, and most are steadily increasing their offerings of these products. Sliva (White Wave) Decl. ¶ 10; Simon Decl. ¶ 3; Mays Decl. ¶ 13; Stanton Report ¶¶ 31-34; Scheffman Report, Appendix E ¶ 8; JX 24 at 43-44 (Bane Dep.) (organic products available in virtually any supermarket); DX 663 (Kroger recognition of competitor activity, including Whole Foods, in organic products).

While this may not have been the case some years ago, the growth in consumer demand for these natural and organic products now has made them part of the mainstream. Manufacturers and distributors of these products no longer rely on "natural food" stores for distribution of their products. JX 23 at 34-35 (Sliva Dep.); DX 680 (Letter from President of Rainbow Blossom markets in Louisville, KY) ("Many items that used to be of a special nature have now become commodity items obtained almost anywhere food is sold, and have highly competitive pricing structures."); Mays Decl. ¶¶ 16-17, 19; Megahan Decl. ¶¶ 18-20.

The evidence also shows that Whole Foods' supermarket competitors have paid attention to Whole Foods' success and to the changing consumer demands for fresh, natural and organic foods. Stanton Report ¶ 29. Many conventional supermarkets have been refocusing their strategies and repositioning their formats to respond to the changes in consumer demands. Id.; Robb Decl. ¶ 19; Gallo Decl. ¶ 20.

Whole Foods' internal documents, prepared in the ordinary course of business, indicate that Whole Foods believes it faces "eroding product differentiation" as other supermarkets continue to stock many of the same products that Whole Foods offers. DX 12 (2007 Board Report). Whole Foods believes it is in "a time of unprecedented competition" where it increasingly does not have "the advantage of offering a unique selection of products." DX 1 (June 2006 e-mail from Gallo to Mackey entitled "Thoughts on Competition"); see also Robb Decl. ¶ 24 ("Losing customers to our supermarket competitors hurts, especially now since they are doing things that used to set Whole Foods apart."); Sud Decl. ¶ 28; DX 253 (competitors mimicking Whole Foods in offering high quality natural and organic foods); DX 259 (competitors copying the offerings and atmosphere of Whole Foods); DX 723 at 3 (Whole Foods' margins will be pressured "once the soccer moms stop shopping at Whole Foods so often now that the same or equivalent products are available at Safeway"); see also Stanton Report ¶¶ 3, 28-30, 79-83.

Most of the major supermarket chains (regional and national) are improving perishable departments and offering an increased selection of natural and organic foods. DX 1 (June 2006 e-mail from Gallo to Mackey entitled "Thoughts on Competition"). As a result, Whole Foods believes it is in a "new era of the natural foods revolution in which "we will all

have to work harder and smarter to compete and differentiate." DX 198; Robb Decl. ¶ 18; JX 28

at 33 (Mackey I.H.) (Whole Foods' success has "caused all these supermarkets to try to want to

steal Whole Foods' mojo."); see also Stanton Report ¶¶ 32-65 (the trend in supermarket retailing

is toward expanded selections of fresh, quality perishables, expanded selections of natural and

organic products, and improving the overall shopping experience); Scheffman Report, Appendix

E, ¶ 8 ("many large supermarkets are focusing on improving quality and freshness and expanding

natural and organic products in response to changing consumer demands."); DX 720; DX 721.

       Many supermarket companies have invested significant resources into developing

and opening new stores some of which mimic Whole Foods' store designs and product offerings.

Sud Decl. ¶ 28. Many supermarkets have modeled the look and feel of their stores, as well as

many of their current competitive strategies, on Whole Foods. Thus, remodeled competitors'

stores often include expanded produce and organic selection, pro-active customer service, in-

store demonstrations and promotions, and attractive, high quality fixtures and product cases.

See, e.g., JX 21 at 90-93 (Vail Dep.) (detailed account of Hannaford's remodel in Portland,

Maine in response to anticipated Whole Foods entry); Paradise Decl. ¶¶ 21, 46-47, DX 49,

DX 357, DX 368, DX 480 (discussing Safeway Lifestyle stores); DX 747 (discussing Publix

Greenwise stores); Lannon Decl. ¶ 21; DX 504 (Shaw's president, stating that its newly

remodeled store "sounds like a Whole Foods, looks like a Whole Foods, but it's a Shaw's").

       Nearly every national supermarket chain now carries a wide array of natural and

organic products, and many have significantly expanded their offerings of prepared and specialty

foods. Sud Decl. ¶¶ 20, 22; Gallo Decl. ¶ 24; Stanton Report ¶¶ 32-65; DX 21; DX 49 (Safeway

Lifestyle); DX 54 (Shop Rite); DX 56 (Publix); DX 77 (Wegmans); DX 216 (Ahold); DX 237

(Whole Foods private label strategy); DX 269 (Publix).

        In addition, many competing supermarket chains have launched their own private

label store brands of natural and organic products. See infra at 50-53, 79-89. These private

labels are intended in part to allow other supermarkets to begin competing with Whole Foods in

terms of product offerings and price. Sud Decl. ¶¶ 22, 26; DX 263 (Ahold); DX 269; DX 270

(Stop & Shop's private label advertised with tagline "Organic can be affordable.").

        The defendants argue that the FTC improperly uses differentiation or uniqueness

as the basis to define the market, while the defendants view differentiation as but one competitive

dimension in which Whole Foods and Wild Oats engage in competition with other firms.

According to the defendants, all supermarkets differentiate themselves in some way from their

competitors in order to compete for the same supermarket shoppers and/or dollars. Stanton

Report ¶¶ 3, 22-23; see also Martin Decl. ¶¶ 4, 5; DX 617 at 25-28, 32 (Vail Dep.). Whole

Foods and Wild Oats tout their quality, including excellent perishables, healthful groceries, high-

quality prepared foods, and natural and organic products. Some other supermarkets advertise

their everyday prices, their special markdowns, or their broad selection of products, advantages

that Whole Foods also tries to offer but that are not a central part of its brand image.

        Differentiation, however, does not equate to a unique relevant product market for

antitrust purposes. Stanton Report ¶ 3. The fact that supermarkets seek to differentiate

themselves from one another does not address the relevant question for product market definition

-- are the differences between conventional supermarkets and PNOS so substantial that Whole

Foods could retain most of its customers even if, post-merger, it were to raise price or reduce

quality? The determinative question is not "are there any differences?" but "would customers switch?"

### C. *Whole Foods and Wild Oats Customers Cross-Shop at Conventional Supermarkets and Retailers*

The evidence shows that many Whole Foods' customers also shop at other supermarkets and retailers, splitting their purchases and looking for the best price on a variety of different grocery items that they might purchase either at Whole Foods or elsewhere. Robb Decl. ¶ 21; Gallo Decl. ¶ 19; DX 8; Stanton Report ¶ 27; JX 21 at 25-27 (Vail Dep.).

A significant number of Whole Foods customers "cross-shop" between Whole Foods and other supermarkets, such as Delhaize, Kroger, Safeway, Albertsons, Ahold, Publix, and H-E-B. DX 2 at 16; see also DX 15 (frequent Whole Foods customers split purchases between Whole Foods and other stores such as Safeway, Costco, Wal-Mart, and Trader Joe's); DX 727; DX 735 at 5; JX 21 at 48:6-18 (Vail Dep.) ("if we can satisfy their needs on a particular shopping trip, then they will shop with us. If there's something they need that Whole Foods offers that we may not offer, then they will shop at Whole Foods, and that would apply to, potentially, other banners as well.").

Wild Oats customers also cross-shop at conventional supermarkets. DX 568 (national trade area study found that consumers considered food retailers such as █████████ █████████████████████ to be the best alternative for products that Wild Oats sells); DX 568; DX 567 (█████████████████████████████; DX 572; DX 575.

While cross-shopping has always existed -- a customer may have bought organic fruits and vegetables at Whole Foods and milk, coffee and cereal at Safeway -- cross-shopping

44

has become particularly prevalent as the different types of distribution channels for natural and organic goods have blurred. Whole Foods' points of differentiation from other stores has eroded because consumers now can purchase natural and organic foods from the same stores where they traditionally bought their milk, coffee and cereal. Robb Decl. ¶ 21; Gallo Decl. ¶ 19; DX 3; DX 8 at 4; DX 13 (Wal-Mart); DX 15 at 18 ("Organic Users and Specialty/Gourmet Users [are] shopping more in mainstream [supermarkets], less in [Whole Foods]. . . ."); DX 16 at 8; DX 24 (HEB); DX 25 (Wal-Mart); DX 31 (Safeway); DX 37 (Wal-Mart); DX 38 (Costco); DX 40 (all competitors); DX 370 (Costco, Trader Joe's, Safeway, Wal-Mart, and Food Lion all components of "New Era of Competition"); DX 384 (Wal-Mart); see also JX 21 at 44-46 (Vail Dep.) (Delhaize has conducted research that shows that its customers cross-shop at Whole Foods).

The evidence shows that some Whole Foods' customers shop in other stores as often as once a week. JX 10 at 66-67 (Meyer Dep.) ("the reality we're in is our . . . core customer base, shops at Safeway or Giant or Wegman's and then they shop at Whole Foods Market, and as those competitors add product to their stores that are like our products, with a halfway decent experience, they're going to not make that second trip. It's the inevitable reality."); see also JX 21 at 25-26 (Vail Dep.); Stanton Report ¶ 27; Allshouse Decl. ¶ 7.

Research by other supermarket chains also shows that their customers are cross-shopping at Whole Foods. ████████████████████

████████████████████████

████████████████████████

███████████████████████

███████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████.

Market research reviewed by Dr. Scheffman demonstrates that shoppers at Whole Foods and Wild Oats shop frequently at other supermarkets and grocery retailers, and often do so more frequently than they shop at Whole Foods or Wild Oats.  Indeed, some market research shows that many shoppers at Whole Foods and Wild Oats spend more than ███ of their total grocery shopping purchases at retailers other than Whole Foods and Wild Oats.  See Scheffman Report ¶¶ 131, 140, 148-49, 152, 161, 165-66; DX 568 (The Wild Oats' "core customer[s] only spend[] about ███ of their dollars at Wild Oats."); DX 691 (Natural Marketing Institute Organic Trends & Perspective Study); DX 694; DX 702 at 13-18 (most segments of Whole Foods shoppers spend less than ███ of total grocery budget at Whole Foods).

Market research and studies done even four and five years ago indicate that ███ ███ of Wild Oats customers did the majority of their food shopping at other stores.  DX 567 at 3; DX 568 at 6, 48-49 ("Even [Wild Oats'] core customer only spends about ███ of their dollars at Wild Oats," whereas ███ of their grocery dollars are spent in "traditional food stores" such as ████████████████████; DX 575, DX 576 (customer interviews); see JX 37 at 86-88 (Odak I.H.); JX 16 at 62-65 (Odak Dep.) (Wild Oats customers shop at other supermarkets and compare prices).

As other retailers move more and more aggressively into the sale of organic and natural foods, market research indicates that a substantial percentage of shoppers at Whole Foods and Wild Oats purchase "healthy," organic and natural products (as well as other products) at

other supermarkets. See Scheffman Report ¶¶ 131, 141, 150-51, 167-68; DX 568; DX 691; DX 694; DX 703. In fact, today, the majority of natural and organic goods sold in the United States are sold by so-called "conventional" supermarkets. Mays Decl. ¶ 19; PX 2072 at 96. Market research also demonstrates Whole Foods shoppers cross-shop for private label products with other supermarkets and grocery retailers. Scheffman Report ¶¶ 171-72; DX 16 at 8 ("Multiple channel options and a myriad of reasons for purchasing have blurred the marketplace."); DX 240 ("There are significant levels of cross shopping between WFM and [Trader Joe's]).

The FTC argues that whatever cross-shopping may occur, the customers at Whole Foods and Wild Oats -- or at least their "core" customers -- do not shop at other, more conventional supermarkets routinely and certainly not for premium natural and organic food products. That is because (at least) these "core" customers and perhaps others are looking not just for the premium products but also for the service and unique atmosphere that Whole Foods and Wild Oats provide. The FTC lists the attributes unique to premium and organic supermarkets that define them -- at least for their core customers -- as a unique product market different from conventional supermarkets and other retailers:

- "generally focus on high-quality perishables, specialty and natural organic produce, prepared foods, meat, fish and bakery goods;"
- "generally have high levels of customer services;"
- "generally target affluent and well educated customers;"
- "generally select store sites based on the targeted customer;"
- "generally are mission driven with an emphasis on social and environmental responsibility;"
- "generally are a 'third place;'"
- "generally provide the customers with the confidence of a 'lifestyle' brand;"
- "generally provide the customer with added confidence and trust in the

> provision of the natural and organic products that are good for the
> consumer;"
> - "generally provide a 'unique' environment;" and
> - "generally are stores that meet 'core values' and a 'superior store
>   experience."

Plaintiff's Third Supplemental Responses and Objections to Interrogatory No. 6 in the First Set

of Interrogatories of Defendant Wild Oats Markets, Inc., July 15, 2007, DX 590 ("July 15 Supp.

Responses").

Dr. Scheffman found, however, that the various marketing studies of Whole

Foods and Wild Oats customers divided the shoppers in a variety of ways, not just by any or all

of these attributes. He concluded that people shop at these stores for a variety of reasons, and

that there is no clearly definable "core" Whole Foods or Wild Oats shopper. Scheffman Report

¶ 132. His conclusion is supported by market research that shows that there is no definable "core

customer" for Whole Foods and that Wild Oats and that Whole Foods and Wild Oats customers

cannot be characterized by a unique set of descriptors. Scheffman Report ¶ 170. Whole Foods

shoppers "cannot be slotted into coherent categories because they shop at WFM or WO for such

a wide variety of reasons." Scheffman Report ¶ 132.

One study showed that ▮▮ of Whole Foods shoppers are infrequent shoppers,

shopping Whole Foods less than once every ▮▮▮▮▮▮ DX 16 (Natural Marketing Institute

2006 Market Corporate Tracker Study); see DX 240 at 9 (Natural Marketing Institute ESP

Research Summary). Another study identified "6 unique customer segments whose differing

attitudes and opinions impact their diverse shopping and buying behaviors"). DX 703 (2007

Natural Marketing Institute "Shopper Segmentation Study:  Identifying Unique Shopper

Segments").

Yet another study run for Whole Foods in early 2007 shows that categories of "core" Whole Foods customers are declining and switching to conventional grocery stores. The data shows that Whole Foods share of specialty/gourmet customers have fallen from ███ in 2005 to ███ in 2006, whereas for traditional grocery stores that percentage has risen from 80% in 2005 to 94% in 2006. DX 15 at 14 (2006 Health and Wellness Trends Database). Wild Oats estimates that so-called "core" customers comprise only approximately ███ of its total customers. Mays Decl. ¶ 18.

As the interest in natural and organic foods increases, the number of customers and potential customers for such foods increases. It logically follows that, with the prevalence of cross-shopping, some such consumers may be drawn to Whole Foods, while others will satisfy their new-found interest in natural and organic foods at their traditional, conventional supermarket. Either way, it increases the number of consumers who potentially will cross-shop between Whole Foods and conventional supermarkets.

### D. Whole Foods and Wild Oats Compete with Other Supermarkets and Other Supermarkets Compete with Them

The FTC acknowledges that there is competition between Whole Foods and conventional supermarkets to some extent. But "[t]he question is what are the dimensions of that competition, and what are consumers looking for when they shop at Whole Foods and Wild Oats." Aug. 1 a.m. Hearing Tr. at 31 (Bloom).

Whole Foods checks its prices against the prices of other supermarkets, and

"comp shops" their stores. Robb Decl. ¶ 27; Gallo Decl. ¶ 28.[14]  Whole Foods has offered

evidence that it price checks or comp shops against other supermarkets in every area in which it

operates. ████████Wild Oats████████████████████████████████████ it has price

checked certain other grocery stores.

      The evidence also shows that other supermarkets routinely price check Whole

Foods' stores and adjust prices based on their assessment of Whole Foods' prices. See, e.g.,

DX 359 (Whole Foods team member observing King Soopers employee walking Whole Foods'

store and thereafter adjusting prices); Meyer Decl. ¶ 22; JX 10 at 48 (Meyer Dep.); DX 74

(Wegmans directly comparing prices to Whole Foods); DX 72 (scan of two bib tags from

Wegmans' shelf directly comparing prices on two organic/natural products); Meyer Decl. ¶ 23

(Giant signage comparing prices to Whole Foods); DX 73 (Gallo email March 2007, forwarding

picture of a sign from D.C. metro Giant supermarket comparing its prices to Whole Foods in a

similar fashion as Trader Joe's as well as nearby store team member's report of Giant's

inaccuracies in its representations of Whole Foods' prices).

      Delhaize (consisting of Hannaford, Food Lion, Bloom, and Sweetbay

supermarkets) considers Whole Foods to be a competitor. See JX 21 at 90 (Vail Dep.) ("They

sell things that are core to our strategy, they're certainly a competitor.").  It conducts full price

checks on Whole Foods. JX 21 at 50-54 (Vail Dep.).  According to Peter Vail, the leader of

natural and organic foods for Hannaford/Delhaize, the Whole Foods price check is performed to

the same degree as all other primary competitors – "They would get a full price check just like

---

    [14]    A "comp shop" is a competitive assessment of another supermarket, including its
prices, product offerings, configuration, and other attributes.  Allshouse Decl. ¶ 10; Besancon
Decl. ¶ 33; Gallo Decl. ¶ 27; Robb Decl. ¶ 28.

we would do against Stop and Shop or anybody else." JX 21 at 54 (Vail Dep.).  These price

checks cover the whole store and include both branded and private label products.  Id. at 158.

The price checks are then used for purposes of pricing at the Delhaize stores – "We would price

check against all categories of Whole Foods and move [our prices] where we see appropriate."

Id. at 139-40.  Other supermarkets, such as Kroger and Supervalu, have also asked for permission

to price check Wild Oats stores.  JX 38 at 145 (Smith I.H.).



considers Whole Foods to be a

DX 674.

has identified Whole Foods as its



DX 810.

Whole Foods has three national private label programs: 365 Everyday Value ("365"), 365 Organic, and Whole Brands. Whole Foods' private label program is intended to be competitive with the natural and organic private label products of many supermarkets. A 2006 study by the Natural Marketing Institute shows that there is a significant overlap of private label offerings between Whole Foods, Safeway, Kroger, Costco, and Ahold, although each retailer has put "effort into diversifying their product line." DX 21 (Natural Marketing Institute Private Label Product Analysis). For many of these overlapped SKUs, "[Whole Foods'] prices are very competitive, and in many cases better than those of other stores (with the exception of Costco, most likely due to volume discounts, lower margins, and distribution structure)." Id. at 2.

According to Linda Boardman, Senior Coordinator for Private Label for Whole Foods, "[b]ecause more than ███ of Whole Foods shoppers cross-shop at Trader Joe's, other supermarkets, and mass market stores, we want customers to purchase from Whole Foods more of the products they purchase from competing stores." Boardman Decl. ¶ 5. Indeed, Whole

Foods specifically designed its private label program to compete against other supermarkets. The private label acts as "the entry point for crossover shoppers" and, according to Whole Foods internal documents, it faces competition from Trader Joe's and supermarket brands. Although the private label program was originally focused on competition with Trader Joe's, over time its goals have expanded and today Whole Foods uses its private label products to enhance competition with other supermarkets as well. Boardman Decl. ¶ 5; see also DX 27, DX 29; DX 733 (Whole Foods Private Label Review); DX 752 (Referring to Safeway, Whole Foods Director Mo Siegel opined that "[a]s competition increases the relevance of our private label increases."). For instance, Whole Foods actively checks against a list of over ██ Safeway "O" Organic items that overlap with Whole Foods private label SKUs. DX 26, 35. Evidence has been offered that Whole Foods' private label pricing strategy requires 365 and 365 Organic private label prices to match Trader Joe's prices on all like items. Boardman Decl. ¶ 17; 17 n.1, DX 27.

      The evidence shows that, when Whole Foods reviews a potential location for a store, it systematically considers every significant supermarket chain in the area a potential competitor for the new store. Sales projections presume that the Whole Foods store will draw the vast majority of its sales from other large supermarket chains. Sud Decl. ¶ 57. Before Whole Foods decides whether to open a new supermarket in a proposed area, it does a demographic study. Bradley Decl. ¶ 6; JX 6 at 34-35 (Bradley Dep.). The study lists all competitors in the expected draw area and presents key data for each competing store to understand the potential competitive implications of competitor proximity. There is evidence in the record that shows that in reviewing competitors, the study computes the sales of all supermarkets in the area, not

just those of so-called premium natural and organic supermarkets. See, e.g., DX 80 (Louisville, KY site study); DX 635 (Boulder, CO site study); Megahan Decl. ¶ 11-15.

A site location report also analyzes what the sales volume potential would be if a store opened in a given area on a given piece of property. JX 7 at 9 (Kadish Dep.). This analysis includes all supermarkets, not just premium natural and organic stores and attempts to ██████ ████████████████████████████████ ████████████ JX 7 at 116, 125 (Kadish Dep.). The analysis in the site selection reports include█████████████████████████████ ████████and█████████████████████████████████ See, e.g., DX 636 ██████████████████████████projecting that ████of Whole Foods sales would be drawn from retailers other than Wild Oats); see DX 171 ████████████████████projecting about████of its average weekly sales would be captured from non-Wild Oats retailers like██████████

According to Wild Oats internal documents, the site selection process for new Wild Oats stores also considers locations of all other supermarkets. DX 587 (Wild Oats maps all of its competitors on site plan maps); JX 37 at 105-06, 124 (Odak I.H.) ████████████████████ ██████████████████; JX 12 at 213-15 (Brier Dep.). Wild Oats analyzes the competitive impact of conventional grocery store openings████████████████████████████████ JX 34 at 140-141 (Martin I.H.).

There is evidence in the record that Whole Foods has been quite concerned about competition from conventional supermarkets and other retailers and that it has seen decreases in sales in some regions that are directly attributable to such stores. For example, in October 2006, Whole Foods Co-President A.C. Gallo noted:

Safeway, Giant Eagle, Giant, Stop & Shop, Harris Teeter, Food
Lion, and Publix are all opening lots of new stores and are
remodeling existing stores on the East Coast. Every time they
open a new store or remodel an existing one with better perishables
and natural foods we see a hit. There is an amazing level of
activity here that we had not seen the past 5 years and it is affecting
our older, smaller, parking challenged stores. Also there is the
factor that people who are mostly supermarket shoppers and come
to us for certain special items do not have to come to us as
frequently now.

DX 3.

According to Whole Foods' Kenneth Meyer, the ██████████Whole Foods store's
sales dropped ███ when a ████████████████████store opened up just down the street.
Meyer Decl. ¶¶ 4, 8; JX 10 at 18-19, 80, 82 (Meyer Dep.). According to Mr. Meyer, sales also
dropped at Whole Foods stores in ██████████████████████and ███████████████
█████████after ███████████stores opened in those areas, and sales dropped at Whole
Foods stores in █████████████████████████████and ███████████████after
████████stores opened in those areas. Meyer Decl. ¶ 4; JX 10 at 18-19 (Meyer Dep.).

Whole Foods believes it faces competition from Trader Joe's because Trader

Joe's now sells many natural and organic products. Whole Foods matches prices on a significant

number of items, both branded and private label. Gallo Decl. ¶ 26; Robb Decl. ¶ 26; DX 251;

DX 252; DX 257; DX 262 (Price matching necessary to "stop or minimize the loss of business

that [Whole Foods has] been experiencing whenever [Trader Joe's] opens near" a Whole Foods

store); DX 264; DX 267; DX 279 (E-mail regarding posters in Trader Joe's locations in Southern

California and New England that post comparative register receipts from Whole Foods); Meyer

Decl. ¶¶ 24, 32; JX 10 at 61-63 (Meyer Dep.); DX 75 at 3-6 (Meyer email October 2006,

detailing planned response in Mid-Atlantic region to Trader Joe's price comparison tactics).

Dr. Stanton's conclusions concerning the competition by Whole Foods and Wild

Oats with other, more conventional supermarkets can best be summarized by Paragraph 3 of his

Expert Report:

> Whole Foods and Wild Oats each compete in the supermarket
> industry with a plethora of other supermarket businesses. All
> supermarket retailers, including Whole Foods, attempt to
> differentiate themselves so as to give customers a reason to shop its
> stores over its competitors. *This does not, however, indicate that
> differentiated supermarkets do not compete with each other; to the
> contrary, it is how they compete with each other.* As consumer
> demand for fresh, healthy, organic and natural products has
> increased, more and more supermarket competitors have expanded
> their product offerings and store formats to more effectively
> compete for customers; the same customer base that Whole Foods
> is targeting. This trend has been dramatic, and will continue as
> consumer demand for these products, and competitor responses,
> continue to evolve. Whole Foods and Wild Oats face robust
> competition today in all the cities in which they compete, and
> Whole Foods will continue to face robust competition in the future
> after acquiring Wild Oats.

Stanton Report ¶ 3 (emphasis added).

As for the future, Dr. Stanton testified that "I believe that Wild Oats or Whole

Foods and/or Wild Oats will face robust competition just about any major area that they go into."

JX 19 at 120 (Stanton Dep.). When asked to explain what he meant by "robust competition," Dr.

Stanton testified, "I mean that other supermarket chains will fight tooth and nail for those

customers." JX 19 at 121 (Stanton Dep.). When asked if this competition includes price

competition, Dr. Stanton testified "It certainly does." JX 19 at 121 (Stanton Dep.).

In sum, the evidence before the Court demonstrates that other supermarkets,

including Safeway, Wegmans and Delhaize, compete today for the food purchases of customers

who shop at Whole Foods and Wild Oats and that Whole Foods' customers already turn for some

of their food purchases to the full range of supermarkets. See, e.g., DX 609 at 18, 57-60 (Meyer

Dep.); 57:5-60:21; Gallo Decl. ¶¶ 23-24; Robb Decl. ¶¶ 23-24; Sud Decl. ¶ 26; Paradise Decl.

¶ 17; Allshouse Decl. ¶ 7, DX 617 at 44-48 (Vail Dep.); Conway Report 5-36; Stanton Report

¶ 27. All of these stores carry many of the same products and, increasingly, many offer some of

the same ambiance as well. Customers who shop at one of these stores usually shop at others as

well. See, e.g., DX 617 at 48 (Vail Dep.).

Today more supermarkets offer more natural and organic products, more high-

quality perishables, and some even have more and improved service departments. See, e.g.,

Paradise Decl. ¶ 19 ("King Soopers has been aggressively expanding its offerings of organic,

natural and fresh products"), ¶ 20 ("Safeway's O Organic private label line carries many of the

same organic products as Whole Foods and is priced similar to us"); DX 365 (King Soopers ad

boasts that "Nobody sells more organic produce in Colorado -- Nobody"); Stanton Report

¶¶ 28-30, 32-34.

Post-merger, all of these existing competitive alternatives will remain.  If the

combined firm raised prices or permitted quality to slide, many customers could and would

readily shift more of their purchases to any of these alternative sources of natural and organic

foods, often stores where they already shop.  The evidence of substitutability or

"interchangeability of use" is striking.

### E. Whole Foods and Wild Oats Do Not Uniquely Compete with Each Other

The evidence shows that Whole Foods' does not have any specific competitive

policies, practices, or strategies directed specifically at Wild Oats -- its approach towards

57

competing in a geographic area is the same whether Wild Oats is present or not.  Gallo Decl.
¶ 29; Robb Decl. ¶ 29.

The evidence shows that Wild Oats' prices are generally higher than Whole
Foods' prices.  Gallo Decl. ¶ 9; Robb Decl. ¶ 15; Paradise Decl. ¶ 30; Lannon Decl. ¶¶ 14, 24;
Besancon Decl. ¶ 64; JX 28 at 186-87 (Mackey I.H.); DX 488; DX 491; DX 584; DX 580;
DX 581; DX 582; JX 37 at 41-46 (Odak I.H.).  Furthermore, Whole Foods price checks or comp
shops Wild Oats' stores less than it price checks or comp shops other supermarket competitors.
Mays Decl. ¶ 27.

Whole Foods does not regard Wild Oats as a significant competitor in areas where
they both operate.  Kenneth Meyer, the Whole Foods Mid-Atlantic Regional President, described
Whole Foods' view of Wild Oats as follows:

> Our experience with Wild Oats in Louisville, and most other areas
> in my region where we both operate, is that their prices are usually
> higher than ours, and that our true competition on price and other
> factors is the multitude of other grocery retailers in those areas --
> and not Wild Oats.

Meyer Decl. ¶ 13.

Sales data confirm the lack of competitive rivalry between Whole Foods and Wild
Oats in Louisville, Kentucky.  Whole Foods' stores averaged $423,900 in weekly sales in 2006.
Scheffman Rep., App. F at 57.  By comparison, Wild Oats' weekly sales in 2006 averaged
$█████ Scheffman Rep., App. F. at 57.  Mr. Meyer explained that sales at Whole Foods'
Louisville store are sufficiently high that the majority of its sales must be coming from grocery
retailers other than Wild Oats, because otherwise "Wild Oats would have closed its doors by
now." Meyer Decl. ¶ 7; JX 10 at 101-02 (Meyer Dep.).

Whole Foods and Wild Oats each have one store in the Portland, Maine area. Scheffman Report, Appendix F ¶ 307. Whole Foods and Wild Oats face substantial competition in Portland, Maine from Hannaford, Shaw's and others. Scheffman Report, Appendix F ¶ 309; Martin Decl. ¶¶ 17, 27; Gallo Decl. ¶ 33; DX 171 (2004 Portland, Maine site study); DX 497. Hannaford and Shaw's feature locally grown produce and sell a significant amount of natural and organic foods. Scheffman Report, Appendix F ¶¶ 310, 312; Gallo Decl. ¶ 33. The site report for Portland, Maine shows that Whole Foods expected conventional supermarkets, and not Wild Oats, to be its principal rivals. According to the Whole Foods Portland, Maine site study, Whole Foods expected ▆ of its average weekly sales would be captured from Wild Oats supermarkets other than Wild Oats, such as Hannaford and Shaw's. DX 171 at 6, 39; Lannon Decl. ¶ 23 (noting that Whole Foods expected sales to come from Hannaford and Shaw's "right off the bat," and not just Wild Oats).

Wild Oats' prices are significantly higher, on average, than those of Whole Foods in the ▆ area. Whole Foods Regional President David Lannon reported to the Whole Foods Leadership Team that, for ▆ Wild Oats' prices are "about ▆ higher" on average. DX 277 (February 2007 e-mail reporting on ▆ Whole Foods store opening); see also Lannon Decl. ¶ 24 (Whole Foods does not "find it necessary to price against Wild Oats, because Wild Oats' prices in ▆ as in areas throughout my region, are higher than all other supermarkets in the area.").

The lack of meaningful competition between Whole Foods and Wild Oats -- at least in the Mid-Atlantic region headed by Kenneth Meyer and in the North Atlantic region headed by David Lannon -- is confirmed by the absence of specific pricing comparisons against

Wild Oats. Stores in the North Atlantic region were directed to compare the prices of a "market basket" of items against the same basket purchased from its lowest priced competitor. But the Whole Foods store in ███████████ like other Whole Foods in that region, has "never targeted a Wild Oats [store]" and has never even requested to do so. Lannon Decl. ¶ 25.

Whole Foods created documents in the ordinary course of business documenting the proportion of Wild Oats current sales that might transfer to Whole Foods after the merger. PX 00553; DX 401 (Project Goldmine Board Discussion Materials) at 15. These "Project Goldmine" documents created by Whole Foods indicate that Whole Foods intends to close roughly ██ Wild Oats stores ██ more or less immediately), most of which currently overlap with Whole Foods stores. DX 402; see also Murphy Report ¶ 70. Of the Wild Oats stores that might be closed, the preliminary analysis projected that Whole Foods would capture less than ██ of Wild Oats' sales for ██ Wild Oats stores. PX 00553. The estimates of volume shifts average less than ██ despite the non-existence of any other premium natural and organic supermarkets in most of the relevant geographic markets. DX 401; PX 553. In each of these markets, ██ of the volume, on average, would be transferred to other supermarkets and other food retailers, not to Whole Foods.

The Project Goldmine estimates show the lowest transfers of sales from Wild Oats to Whole Foods in ███████████ (███████████ (███████████ ███████████ all stores where, after the merger, Whole Foods would be the only remaining PNOS. See DX 401. As defendant Whole Foods' counsel put it, "this is a strange monopoly if it results in a transfer of say less than a third of the store's volume. . . . [I]f two-thirds of the volume is going elsewhere in a market that is contended to be a

60

monopoly, what kind of a monopoly is this?" Aug. 1 p.m. Hearing Tr. at 23 (Denis).

### F. Conclusions Concerning Relevant Product Market

The economic evidence, market research studies, and evidence concerning the realities on the ground -- the "practical indicia" discussed by the Supreme Court in <u>Brown Shoe</u> and the facts concerning the structure, history and probable future of the particular market alluded to by Judge Bates in <u>Arch Coal</u> -- all lead to the conclusion that the relevant product market in this case is not premium natural and organic supermarkets ("PNOS") as argued by the FTC but, as Dr. Scheffman has said, at least all supermarkets.

Applying the SSNIP test of the Horizontal Merger Guidelines, the evidence shows that there are many alternatives to which customers could readily take their business if Whole Foods and Wild Oats merged and Whole Foods imposed small but significant and nontransitory price increases -- so that such price increases would not be profitable. It follows under this test, as explicated by the critical loss analysis done by Dr. Scheffman, that the product market proposed by the FTC is thus too narrow even under its own Merger Guidelines.

Furthermore, Dr. Scheffman's analysis of banner entries shows that when a new Whole Foods store opens -- both in areas where there are no other PNOSs like Wild Oats and in areas where there are one or more Wild Oats stores -- Whole Foods sales do not come primarily from Wild Oats (or other PNOSs) but overwhelmingly from other supermarkets operating in the area. The competitive interaction is between Whole Foods and all supermarkets, not just, or even primarily, with Wild Oats. Indeed, the evidence shows that Whole Foods and Wild Oats do not uniquely compete with each other, but with all other supermarkets in areas where both Whole

61

Foods and Wild Oats operate.

Preliminary studies show that after the merger Whole Foods would capture less

than ▆ (perhaps only ▆▆▆) of Wild Oats' sales, meaning that ▆▆▆▆ would go

to other supermarkets and other food retailers, not to Whole Foods. It follows that customers

view natural and organic food products at many stores other than Whole Foods as adequate

substitutes for those they can obtain at Wild Oats. Most consumers therefore would take their

business elsewhere if prices at Whole Foods increased significantly after the merger.

The Court also concludes, along with Dr. Scheffman, Dr. Stanton and others, that

the FTC is wrong to focus only on so-called "core" consumers or "committed" customers of

Whole Foods. The economic analysis and other evidence show that the proper focus is on

"marginal" customers. A fundamental problem with the FTC's reasoning is that it addresses

whether Whole Foods has *any* customers who are so dedicated to that store's product array and

other qualities that they would not switch *any* of their purchases to another supermarket if Whole

Foods began to compete less vigorously by raising prices or decreasing quality. The question is

whether *enough* customers would switch *enough* of their purchases that a post-merger price

increase or quality decline would be unprofitable for Whole Foods. The evidence presented

persuades the Court that certainly beyond the point of critical loss, enough customers would

answer this question in the affirmative and switch some or all of their purchases to other food

retailers, thus rendering unprofitable any post-merger effort by Whole Foods to increase prices

beyond a certain point.

The FTC is also wrong in looking to differentiation or uniqueness as the basis on

which to define a product market. The fact that supermarkets seek to differentiate themselves

from one another by emphasizing certain products or services does not address the relevant question for product market definition. The real question is whether the differences and points of uniqueness are so substantial that Whole Foods could retain most of its customers even if it were to raise prices or reduce quality after the merger. Because supermarket chains throughout the country now have recognized the interest of a broad range of consumers in natural and organic foods, conventional supermarkets and other retailers have increased and expanded their offerings of such food products and will continue to do so. Consumers therefore now have the practical ability to switch from Whole Foods to other supermarkets to obtain these products.

The fact is that a large number of Whole Foods and Wild Oats customers today shop frequently at other supermarkets for the same products they sometimes also buy at Whole Foods and Wild Oats -- so-called cross-shopping. At the same time, other supermarkets now sell many, and an increasing variety of, natural and organic products. Together, these facts further support the conclusion that the relevant product market for evaluating this merger includes, at a minimum, all supermarkets. While "cross-shopping" has always existed, as other retailers have moved more aggressively into the sale of natural and organic foods, market research shows that a substantial percentage of these cross-shoppers will purchase their natural and organic foods at stores other than Whole Foods more and more frequently, particularly if prices at Whole Foods increase. If, after the merger, Whole Foods raised its prices or permitted its quality to decline, customers could and would easily shift their purchases of natural and organic products from Whole Foods to other supermarkets.

There is yet another factor that leads to the conclusion that the relevant product market in this case must be broader than premium and organic supermarkets and, indeed, that it

63

must be at least as broad as supermarkets: how the players in the marketplace view each other and how their conduct reflects those views. Whole Foods and Wild Oats view other, more conventional supermarkets as their primary competitors, and they plan their strategies accordingly -- through "comp" shopping, price checking, and real estate site selection, among other things. The same is true in reverse. Conventional supermarkets like Delhaize, Publix, Safeway and Wegmans consider Whole Foods to be a significant competitor in the marketplace. In attempting to compete with Whole Foods for consumers interested in natural and organic products, stores like Safeway, Kroger and even Trader Joe's have developed so-called private labels -- Safeway's "O" organic label being prime among them. Whole Foods has responded in kind and designed its own private label programs, primarily to compete against other supermarkets, particularly for the kind of cross-over shoppers previously discussed.

In sum, while all supermarket retailers, including Whole Foods, attempt to differentiate themselves in some way in order to attract customers, they nevertheless compete, and compete vigorously, with each other. The evidence before the Court demonstrates that conventional or more traditional supermarkets today compete for the customers who shop at Whole Foods and Wild Oats, particularly the large number of cross-shopping customers -- or customers at the margin -- with a growing interest in natural and organic foods. Post-merger, all of these competing alternatives will remain. Based upon the evidence presented, the Court concludes that many customers could and would readily shift more of their purchases to any of the increasingly available substitute sources of natural and organic foods. The Court therefore concludes that the FTC has not met its burden to prove that "premium natural and organic supermarkets" is the relevant product market in this case for antitrust purposes.

64

## VI.  RELEVANT GEOGRAPHIC MARKET

The Merger Guidelines delineate the relevant geographic market to be a region such that a hypothetical monopolist that was the only present or future producer of the relevant product at locations in that region would profitably impose a "small but significant and nontransitory increase in price." Merger Guidelines § 1.21.  The question is what would happen if a hypothetical monopolist of the relevant product at that point imposed a SSNIP in that region. Id.  If the FTC shows that the merger may lessen competition in any one of the alleged geographic markets, it is entitled to injunctive relief.  See 15 U.S.C. § 18.

The FTC has identified 17 areas where there is a Whole Foods store and a Wild Oats store within a six mile radius of the other ("overlapping draw areas") or within a 16-minute drive of each other.  In an eighteenth area, Portland, Oregon, the FTC applies the same test, but there is also a New Seasons store in the area -- another PNOS alleged by the FTC.

The defendants criticize the FTC for defining geographic markets by reference only to distance and driving time because it has failed to consider a myriad of other factors, such as traffic, demographics, locations of other supermarkets, projected population growth, and geography -- all factors that likely would limit or expand the store's draw in various directions. Whole Foods notes that it considers these factors and more in siting its stores.  See, e.g., DX 171, 183, 514.  In addition, according to the defendants, because of local variations in traffic and geography, the 16-minute driving distances in each direction from a store are highly unlikely to be equal, and, if plotted on a map, are highly unlikely to produce an even circle at any distance around the store.

65

The FTC responds that defendants' business records and testimony establish that they generally focus on customers within a distance of three to six miles of their stores – and roughly 16 minutes driving time – when selecting site locations and making other competitive assessments. PX02212 ("3 miles is a general area that we commonly use to compare our stores trade areas"); PX01011 (charting all stores within six miles of Whole Foods in a competitive analysis document); PX00186 at 007 (focusing on customers within a 16 minute driving distance of store); JX 6 at 44:24-45:12 (Bradley Dep.); JX 9 at 28:19-21(Megahan Dep.); JX10 at 90:16-18 (Meyer Dep.); Lannon Decl. ¶ 23; Besancon Decl. ¶¶ 42, 44, 46, 57, 61, 63, 65, 68-70; Megahan Decl. ¶¶ 7, 8, 25, 28; Martin Decl. ¶ 25; Allshouse Decl. ¶¶ 14; Robb Decl. ¶¶ 36, 38; Paradise Decl. ¶¶ 26-30, 33-37, 39-43, 45-46, 51, 54; PX04733, at 005; PX01374.[15]

The Court agrees with the FTC that, in the context of this case and the evidence presented, this is a reasonable way to define the relevant geographic market. See United States v. General Dynamics Corp., 415 U.S. 486, 521 (1974) (markets need not be delineated by "metes and bounds"); United States v. Pabst Brewing Co., 384 U.S. 546, 549 (1966) (the geographic market need not be identified with scientific precision or "by metes and bounds as a surveyor would lay off a plot of ground").

---

[15]     The FTC concedes that defendants' documents and testimony suggest that a larger area might be appropriate in a few instances. See, e.g., JX 1 at 138:25-139:4 (Gallo Dep.) (competitive area tends to be smaller in urban areas; larger in suburban areas); JX 7 at 119:10-19 (Kadish Dep.) (Whole Foods will consider█████████████████████████ █████████████████ JX10 at 90:13-15 (Meyer Dep.)█████████████████████████████████ Lannon Decl. ¶ 10 (most customers for Whole Foods'█████████████store come from a█████ mile driving radius); JX8 at 197:3-5 (Lannon Dep.) (customers of Whole Foods'████████████ store come from a██mile radius); JX 2 at 91:14-16 (Robb Dep.) (data suggests that people do travel up to████miles to shop at Whole Foods, but it does vary); PX00920 (Wild Oats considered stores within a██mile radius).

Applying its six-mile overlapping draw area and 16-minute tests, the FTC maintains that the proposed merger will eliminate Whole Foods' only premium natural and organic supermarket competitor (Wild Oats) in defined areas within the following 17 localities: Albuquerque, New Mexico; Boston, Massachusetts; Boulder, Colorado; Hinsdale, Illinois (suburban Chicago); Evanston, Illinois (suburban Chicago); Cleveland, Ohio; Denver, Colorado; West Hartford, Connecticut; Henderson, Nevada; Kansas City-Overland Park, Kansas; Las Vegas, Nevada; Los Angeles, California; Louisville, Kentucky; Omaha, Nebraska; Pasadena, California; Portland, Maine; and St. Louis, Missouri. Murphy Supp. Rebut. Report ¶ 8, Exhibit 2 at 012-023, 025-026. In an eighteenth market, Portland, Oregon, the FTC maintains that because of the continuing presence of New Seasons, the proposed merger will reduce the number of competitors from three to two in a defined area within Portland, Oregon. Murphy Supp. Rebut. Report ¶ 8, Exhibit 2 at 024. While it identifies these 18 overlap markets, the FTC has provided data concerning what percentage of Wild Oats' revenues would transfer from Wild Oats to Whole Foods upon closure of the Wild Oats stores for only nine of the 18 markets in which it says the acquisition and subsequent closure of the Wild Oats stores by Whole Foods would have anti-competitive effect. See Pl's FOF ¶¶ 457-499.

In addition, the FTC maintains that the proposed transaction will also eliminate future competition in seven local areas in which Whole Foods has plans in the works to open stores and where Whole Foods and Wild Oats had planned to compete with one another. These areas are located within: Fairfield County, Connecticut; Miami, Florida; Naples, Florida; Nashville, Tennessee; Palo Alto, California; Reno, Nevada; and Salt Lake City, Utah. PX04357. But the FTC has offered no evidence to support this assertion. See Pl's FOF ¶¶ 500-511.

67

Because the Court already has concluded that the relevant product market is not premium natural and organic supermarkets but, rather, all supermarkets, none of this matters. That is, since the FTC has not met its burden with respect to the relevant product market, the Court need not closely examine the alleged relevant geographic market.

## VII.  HARM TO COMPETITION

### A.  General Principles/Market Share and Concentration

Mergers that significantly increase market concentration are presumptively unlawful because the fewer the competitors and the larger the respective market shares, the greater the likelihood that a single firm or group of firms could raise prices above competitive levels. United States v. Philadelphia Nat'l Bank, 374 U.S. at 363; Hospital Corp. of Am. v. FTC, 807 F.2d 1381, 1389 (7th Cir. 1986); FTC v. Cardinal Health, Inc., 12 F. Supp. 2d at 52; Merger Guidelines § 2.0.

Concentration typically is measured by market share and by the Herfindahl-Hirschman Index ("HHI"). The HHI is calculated by summing the squares of the market shares of each market participant, so that greater weight is given to market shares of larger firms, consistent with their relative importance in competitive interactions. Merger Guidelines § 1.5. See FTC v. Cardinal Health, Inc., 12 F. Supp. 2d at 53-54; FTC v. Staples, Inc., 970 F. Supp. at 1081-82. Where the pre-acquisition HHI exceeds 1800 points, it "is presumed that mergers producing an increase in the HHI of more than 100 points are likely to create or enhance market power or facilitate its exercise." Merger Guidelines § 1.51; FTC v. Cardinal Health, Inc., 12 F. Supp. at 53.

68

The FTC argues in this case that the combined shares of Whole Foods and Wild Oats in the premium natural and organic supermarkets would be 100% in 17 of the 18 alleged relevant geographic markets, as they are the only premium natural and organic supermarkets in those geographic markets. This reaches the theoretical maximum HHI of 10,000 points. See PX01302 at 020; PX00613 at 018-019; PX01011.

The premise of the FTC's argument, however, is that premium natural and organic supermarkets constitute the relevant product market, that Whole Foods and Wild Oats are unique price competitors, that Wild Oats' presence in a market has a constraining effect on Wild Oats, and that the consumer will lose the availability of significant choices in one or more of the 17 relevant geographic markets. As discussed earlier, however, the evidence does not support these arguments. Thus, any presumption of likely anticompetitive effects has been overcome both by the testimony of the defendants' economic expert and by the realities of the marketplace as reflected in credible evidence presented in this proceeding. Accordingly, there is no need to analyze specific HHI calculations.

### B. Presence or Absence of Another PNOS

The evidence shows that Whole Foods and Wild Oats pricing practices do not differ based on the presence or absence of the other in the area. Scheffman Report ¶ 291. Rather, both companies generally price based on relatively broad geographic areas and Wild Oats' prices typically are higher. Scheffman Report ¶ 286, JX 9 at 98 (Megahan Dep.); JX 38 at 71-73 (Smith I.H.); JX 37 at 35-36 (Odak I.H.)

Pricing for most products at Whole Foods is determined at the regional level rather than at the store level. Scheffman Report ¶ 289; JX 18 at 191 (Scheffman Dep.); JX 1

69

at 209-10 (Gallo Dep.).  Whole Foods does not have price zones or other pricing policies that

depend on whether a Whole Foods store is competing with a Wild Oats store.  Scheffman Report

¶ 289; Gallo Decl. ¶ 29 ("Whole Foods follows the same general pricing policies or strategies in

areas where WO operates as it does in areas where they do not.")

        Dr. Scheffman analyzed prices by comparing actual "in the register" prices for

June 9, 2007, for all items carried in multiple Whole Foods and Wild Oats stores within a region.

Scheffman Report ¶ 298.  "In the register" prices are those that are already programmed into the

scanner system.  Id.  He testified that he used this approach because Whole Foods does not

preserve historic register data due to storage capacity constraints.  JX 18 at 189 (Scheffman

Dep.); July 31 p.m. Hearing Tr. at 43 (Scheffman).  A "snapshot" of prices, rather than a time

series, is an appropriate analysis, according to Dr. Scheffman, since the objective was to

determine whether prices are higher in monopoly regions.  Scheffman Report ¶¶ 297-298.  While

the FTC criticizes this limited data basis for a variety of reasons, Dr. Scheffman looked at the

best evidence available that was directly related to price -- the one-day's worth of register prices.

While it would have been preferable to have more data, the companies do not keep historical

register data, and Dr. Scheffman's results are consistent with the other evidence in the record.

        The results of Dr. Scheffman's analyses of actual prices show that there is no

systematic pattern in pricing among Whole Foods and Wild Oats stores based on the presence or

absence of PNOS competition.  Scheffman Report ¶ 288.  Whole Foods stores with and without

PNOS competition have a low fraction of prices that differ from the regional mean, and the

distribution does not differ significantly between overlap and non-overlap stores.  Scheffman

Report ¶ 312.  Actual prices are consistent with the described practices for the two companies --

prices are generally common across broad areas, and any differences are not systematically

related to the presence or absence of competition with each other or with another PNOS.

Scheffman Report ¶¶ 312, 323.  Prices are not lower in areas in which Whole Foods and Wild

Oats compete with one another or with another PNOS than in areas where Whole Foods or Wild

Oats are PNOS monopolists.  Scheffman Report ¶¶ 314, 325.

      There is evidence, albeit based on a single example, that after Wild Oats closed its

Fort Collins store in December 2006, the Whole Foods store experienced no increase in gross

margins.  JX 31 at 240 (Paradise I.H.).  Whole Foods only gained ███████ to ███████ in sales per

week after the Wild Oats Fort Collins store closed.  JX 31 at 239-240 (Paradise I.H.).  Under the

FTC's theory, Whole Foods should have been able to raise prices after the Wild Oats Fort Collins

store closed.  Whole Foods did not raise prices after the Wild Oats' store closed because of

competition with King Soopers, Vitamin Cottage, and multiple Safeway stores in Fort Collins.

JX 31 at 240 (Paradise I.H.).

### C. Wild Oats Is Not a Unique Constraint on Whole Foods

      The evidence shows that Wild Oats prices are consistently higher than Whole

Foods prices.  JX 13 at 56-57, 60-61, 111-12 (Davidson Dep.)  ███████████████████████

████████████████████████.

      Market research commissioned by Wild Oats revealed that the "price gap between

Wild Oats and major food stores" ████████████████████████████  DX 572; see

also DX 570 ███████████████████████████████████

███████.  Wild Oats' documents confirm that its prices have been higher than Whole Foods.

For example, Wild Oats found that Whole Foods' prices were below ████████████████

71

and Whole Foods private label products are priced as much as ██████ comparable Wild Oats

products. DX 487 (noting that Wild Oats simply does "not have enough competitive advantages

against Whole Foods to compete directly against them.").

       Wild Oats' prices are higher than other competitors. DX 580, DX 582 (Wild Oats

██████████ price check reports that Wild Oats has higher prices than Whole Foods in every

category, and has higher prices than ████████████████ in some categories);

JX 37 at 41-46 (Odak I.H.) (Wild Oats price checked ██████████████████

██████████ and discovered Wild Oats was ████ percent higher than the competition in the

marketplace). Wild Oats price checking led it to conclude that Wild Oats is typically priced

higher than Whole Foods. A September 2006 price check of ████ SKUs revealed that Wild Oats'

pricing was above Whole Foods in every geographic area in which the price check was

conducted. DX 490. A Wild Oats January 2007 price analysis of ████ items in the ████████

showed that Whole Foods' prices were "significantly below" Wild Oats' prices. Wild Oats

estimated that it would need to reduce costs by about ██████ to achieve pricing parity with

Whole Foods. DX 580. Whole Foods' market research confirms this point. In October 2004,

the Natural Marketing Institute reported that, based on both shopping frequency and private label

brand usage, "Wild Oats seems to have little effect on [Whole Foods]." DX 240 at 8.

       Whole Foods' price-checking also confirms that Wild Oats is higher priced than

Whole Foods. A.C. Gallo, Co-President and Chief Operating Officer of Whole Foods, explained

to Whole Foods regional presidents that:

> "[W]e could use the merger with WO to tell some of our stories one of
> which could be we have great prices. The concern in any merger is that
> prices may go up in acquired stores. In fact, we know that WOs prices are

higher than ours and we will be bringing down quite a few prices. We could use this opportunity to shout out either on a local, regional or national basis our great prices."

DX 58.

David Lannon, Regional President for the North Atlantic Region for Whole Foods, explained that Whole Foods does not "find it necessary to price against Wild Oats, because Wild Oats' prices in███████████ as in areas throughout my region, are higher than all other supermarkets in the area." Lannon Decl. ¶ 24; see also Lannon Decl. ¶ 25. The North Atlantic stores have "never targeted a Wild Oats [store]" and no store has "ever requested to do so.") Lannon Decl. ¶ 14.

Wild Oats is also typically higher priced in the Mid-Atlantic region. Meyer Decl. ¶ 13. Kenneth Meyer, the Mid-Atlantic Regional President for Whole Foods, explained that "our true competition on price and other factors is the multitude of other grocery retailers in those areas -- and not Wild Oats." Meyer Decl. ¶ 13. Whole Foods'███████store has "had little occasion to need to compete -- or pay much attention at all, for that matter -- to the Wild Oats store in███████ That store has not adapted to the marketplace and displays insufficient innovation or energy to cause us concern." Meyer Decl. ¶ 12; JX 10 at 108-09 (Meyer Dep.).

Whole Foods' Midwest region no longer systematically price checks Wild Oats on a monthly basis as it does for Trader Joe's and other supermarkets. Whole Foods determined that it was unnecessary to regularly check Wild Oats' prices in the Midwest region because Wild Oats pricing has been consistently higher than both Whole Foods and its other competitors. Bradley Decl. ¶ 13; JX 6 at 74 (Bradley Dep.).

In the Southern Pacific region, Wild Oats has little effect on Whole Foods' prices because Wild Oats' prices are also higher than those of Whole Foods and other competing

73

supermarkets. Besancon Decl. ¶ 24. Because historical price checking confirms that Wild Oats is priced above all supermarkets, including Whole Foods, Whole Foods benchmarks other supermarkets and Trader Joe's to determine its own prices. Besancon Decl. ¶ 38.

In the Rocky Mountain region, Wild Oats has minimal impact on Whole Foods since its prices are "generally higher" than those of Whole Foods and other supermarkets. Paradise Decl. ¶ 22. Wild Oats rarely make capital improvements and are therefore not as strong a competitor to Whole Foods as other supermarkets and Trader Joe's. Id.

In sum, the existence of Wild Oats does not force Whole Foods' prices down because Wild Oats' prices are consistently higher. Thus, the elimination of Wild Oats will not harm competition with respect to price constraints on Whole Foods.

### D. Other Supermarkets and Other Retailers Constrain Competition

As discussed above, competition from other supermarkets is more intense than ever, as supermarkets have improved operations and have increased offerings of natural and organic products. See, e.g., DX 1 (June 2006 e-mail from Whole Foods Co-President and Chief Operating Officer containing thoughts on competition, stating that "[t]his is a time of unprecedented competition for us. . . .We are currently getting hit from many different directions in each market."); DX 3 (October 2006 e-mail from A.C. Gallo) ("After a total slump by the supermarket industry in the last five years we are seeing a comeback by the survivors. Safeway, Giant Eagle, Giant, Stop & Shop, Harris Teeter, Food Lion, Publix are all opening lots of new stores and remodeling stores on the East Coast. Every time they open a store or remodel an

existing one with better perishables and natural foods, we see a hit.").[16]

### E. Repositioning and Entry by Other Retailers

The Merger Guidelines recognize that a merger is not likely to enhance market power or facilitate its exercise if it is easy for other market participants to enter the market or reposition themselves better to compete. Merger Guidelines § 3.0. The question is whether the entry by others (or their repositioning) would be timely -- is it easy to enter or reposition -- likely and sufficient in its magnitude to "achieve significant market impact within a timely period." Id.; see also FTC v. Cardinal Health, 12 F. Supp. 2d at 55-58 (adopting "timely, likely, and sufficient" test). To rebut the presumption of anticompetitive effects, the evidence must show that a firm would enter, and that "entry into the market would likely avert the anticompetitive effects from the acquisition." FTC v. Staples, Inc., 970 F. Supp. at 1086 (quoting United States v. Baker Hughes Inc., 908 F.2d at 989); accord FTC v. Swedish Match, 131 F. Supp. 2d at 170; FTC v. Cardinal Health, 12 F. Supp. 2d at 55. For entry to be sufficient to restore competition, it must replace the competition that existed prior to the acquisition. FTC v. Cardinal Health, 12 F. Supp. 2d at 58.

The FTC concedes that there is always the possibility of de novo entry. In principle, the FTC also agrees that existing retailers could reposition to provide increased competition for existing premium natural and organic supermarkets and that such repositioning could increase competition enough to compensate for the loss of pricing restraint within the market. See Murphy Report ¶ 130.

---

[16]     The Court discusses the vigorous competition between the defendants and other supermarkets in much greater detail, supra, in Part V of this Opinion.

The key question is whether such entry or repositioning would occur in a timely fashion and would be of sufficient magnitude to make a small but significant price increase unprofitable -- that is, it would prevent any harm to competition that might otherwise result from the merger. Murphy Report ¶ 137. While it is possible that a new retailer, a conventional supermarket, or even a PNOS, could enter one of the relevant geographic markets with a new store or reposition themselves, the FTC argues that it is unlikely that retailers would do so in each relevant geographic market at issue in this case to the extent necessary to make price increases unprofitable. Id. ¶¶ 119, 121, 126, 129, 138.

The FTC argues that de novo entry would be neither easy nor timely. It argues that entry and growth in the PNOS market takes significantly longer than two years, the relevant time frame under the Guidelines. See Merger Guidelines § 3.2. Whole Foods agrees that it takes time and is costly and sometimes difficult to enter the market de novo. See Murphy Report ¶ 138. Finding and developing suitable real estate on which to locate a supermarket is often a multi-year task in many metropolitan areas, and it can easily take three or more years from conception to site selection. See, e.g., JX 10 at 20:15-21, 107:3-25 (Meyer Dep.) ("[I]t's about a three-year process at a minimum of taking a store from the point of idea to opening, at a minimum.").

As for repositioning, the FTC argues that other retailers are unlikely to reposition because, in order to compete effectively with Whole Foods, they would have to dramatically change the nature of their operations. They would have to expand the amount of space dedicated to natural and organic products, increase their focus on perishables, devote substantially more selling space to perishables, improve quality, and provide extra services. The FTC does not suggest that other retailers do not or cannot sell fresh and organic produce. Rather, it argues that

they would not reposition in a way that replaces the close, constraining competition that the FTC

alleges that Wild Oats provides to Whole Foods. The question, according to the FTC, is how far

can a traditional retailer or conventional supermarket go to court the Whole Foods/Wild Oats-

type customer without losing focus on its own core constituency.

   The problem with the FTC's analysis is that the evidence shows that retailers have

already been repositioning their formats, services and product selection in order to respond to the

growing consumer demand for natural and organic foods and to better compete against Whole

Foods. Stanton Report ¶¶ 21, 29-34; Scheffman Report, Appendix E ¶¶ 3-8. And other

supermarkets are expanding their product offering and repositioning themselves at Whole Foods'

and Wild Oats' pre-merger prices and pre-merger quality. See Simon (Hain) Decl. ¶ 3; Sliva

(White Wave) Decl. ¶¶ 7-8; DX 617 and 618-19 (Vail Dep.); Scheffman Report ¶ 256. Indeed,

today, over 60% of all natural and organic products are sold by conventional stores. Mays Decl.

¶ 19; see also JX 28 at 33 (Whole Foods CEO Mackey explaining that "Our success has created

more competition, it has bred more imitation, has caused all these supermarkets to try to want to

steal Whole Foods' mojo."); 103 (". . .Whole Foods no longer has this product differentiation to

itself. . .") (Mackey I.H.).

   This repositioning trend likely will continue as large, better capitalized

supermarkets leverage their scale to obtain high-quality natural and organic foods at lower costs

than Whole Foods. JX 28 at 103 (Mackey I.H.). Should prices rise or quality fall post-merger,

repositioning is likely to accelerate.

   The evidence before the Court shows that the firms that have already proven

themselves adept at repositioning and proving competitive in the premium natural and organic

food field -- through the addition and expansion of organic produce, perishable meats and other

products, including private labels natural and organic products, and new "lifestyle" formats -- are

Delhaize America and in particular its high-end banners, Hannaford and Bloom; Safeway;

Publix; Kroger; Supervalu; and Wegmans. The Court is less persuaded, despite some evidence

to the contrary, that Trader Joe's is likely to reposition itself to better compete with Whole

Foods, and it is not persuaded that Wal-Mart, Target, Costco or other mass-market retailers have

repositioned or will reposition sufficiently quickly to provide serious competition with respect to

a significant number of Whole Foods' marginal customers.[17] The same is true as to Tesco but for

different reasons.[18]

---

[17]     Whole Foods acknowledges that Trader Joe's offers only a limited range of natural products, not nearly the range that a Whole Foods customer expects to find. JX 32 at 84-85 (LaMacchia I.H.). Trader Joe's does not offer customers in-store service departments like bakeries, prepared food, or service meat counters. JX 39 at 62:1-18 (Bane I.H.); JX 10 at 79:2-10 (Meyer Dep.); accord JX 24 at 109:5-110:4 (Bane Dep.). Trader Joe's has no plans to add these services. See JX 39 at 105:2-10 (Bane I.H.). The evidence shows that Whole Foods openings cause only minimal impact on sales at nearby Trader Joe's. The current format for Trader Joe's uses a smaller format and a narrower range of SKUs than either Whole Foods or Wild Oats. A typical new Trader Joe's store is roughly 11,000 square feet, while recently built Whole Foods stores are typically larger than 40,000 square feet. Murphy Report ¶ 133; JX 39 at 44:20-25 (Bane I.H.); JX 24 at 8:16-17, 120:1-3 (Bane Dep.) (Trader Joe's has no plans to enlarge the footprint of future stores.)

[18]     Tesco will not begin opening stores in the United States until the end of 2007, and then with stores "intentionally smaller than the usual supermarket" at only 10,000 square feet. Tesco's plans to offer only a "limited item selection" of natural and organic items. Tesco's U.S. stores, operating under the "Fresh & Easy Neighborhood Market" small store banner, "will not have service departments such as cafeterias or full service food counters." Neville-Rolfe Decl. ¶ 4. Defendants' industry consultant, Dr. Stanton, expressed his belief that Tesco will not compete against supermarkets. JX 19 at 154:5-6 (Stanton Dep.). The Court does not believe that it can effectively compete against Whole Foods.

### 1. Delhaize America

Delhaize operates over 1,500 supermarkets under the Hannaford Bros., Bloom, Food Lion, Kash n' Karry, Harvey's, Bottom Dollar and Sweetbay banners. Stanton Report ¶ 35. Delhaize has been actively growing the number of natural and organic products sold at its banners -- especially Hannaford, Bloom and Sweetbay -- in response to consumer demand. JX 21 at 37-40 (Vail Dep.); Stanton Report ¶¶ 35-36.

Peter Vail, the Leader of Organic and Natural Foods for Hannaford Bros., a part of Delhaize, testified that Delhaize has taken the approach that natural, organic and fresh foods are "critical" to the growth plan for all of its banner stores. Over the last four years or so, the company has viewed natural and organic products as an "emerging" part of the industry. JX 21 at 37 (Vail Dep.). These products have been identified as one of the "Engines of Growth" for the company. JX 21 at 56-57 (Vail Dep.); see Scheffman Report, Appendix E ¶ 18.

Delhaize has recently launched its own line of private label natural and organic products called "Nature's Place," and these products are being rolled-out at all its banners. The company introduced approximately 150-200 SKUs in this line in April 2007. The evidence shows that the company is planning to grow these offerings by introducing another 100 SKUs in the fall of 2007 and another 100 SKUs within a year. JX 21 at 38-39, 60-68, 104-105 (Vail Dep.). The company anticipates rolling out new products in 2008 and 2009 as well. JX 21 at 83-84 (Vail Dep.). Delhaize's sales of its private label natural and organic line have been so strong that the company doubled its original sales projections shortly after the product line was launched, and the sales have gone up another 25 percent since then. JX 21 at 114-115 (Vail Dep.). The private label organic line has become a "key strategic initiative for us and how we

compete in our marketplace." JX 21 at 73-74 (Vail Dep.).

Delhaize's pricing strategy for its Nature's Place organic SKUs is targeted after other supermarkets, including Whole Foods and Wild Oats, and other food retailers. See DX 645 at DZA 000098 (Delhaize, "EOG Strategic Overview) (document specifically lists Whole Foods and Wild Oats). Peter Vail testified that Delhaize specifically prices its Nature's Place SKUs against Whole Foods and Wild Oats under its Engines of Growth (EOG) strategy because "... we look at Whole Foods and Wild Oats as two competitors ..." and "[w]e wanted to ensure that we were priced competitively against those two banners specifically ...." JX 21 at 71 (Vail Dep.).

About 90 percent of Hannaford stores -- one of Delhaize's banners -- now have a dedicated "Nature's Place" section, which is a "store-within-a-store" concept specializing in natural and organic products, and which carries about 4,000 different natural and organic products. JX 21 at 16-17 (Vail Dep.). Hannaford stores currently carry approximately 5,000 different natural and organic products, or about 10 percent of its total SKUs. JX 21 at 18, 108-109 (Vail Dep.).

A Hannaford customer survey also refers to Whole Foods and Wild Oats as both "Key" and "Primary" competitors. DX 652 at DZA 000111 (Delhaize, "2006 Customer Source Survey") ("primary" competitors for the Hannaford store in Norwell, Massachusetts for Sept. 16, 2006 are limited to Stop & Shop, Whole Foods, and Foodmaster); DX 653 at DZA 000115 (Delhaize, "2006 Customer Source Survey") ("primary" competitors for the Hannaford store on Forest Ave. in Portland, Maine as of Sept. 23, 2006 -- prior to the opening of Whole Foods in Feb. 2007 -- are limited to Shaw's, Wild Oats and Save-A-Lot).

Delhaize has developed two new banners -- Bloom and Sweetbay -- and is repositioning, re-formatting and re-branding a number of former Food Lion and Kash n' Karry

stores so as to provide a new shopping experience, with a particularly strong emphasis on freshness, natural and organic products, and convenience.  Stanton Report ¶ 37; JX 21 at 20-21 (Vail Dep.).

### 2. Safeway

Safeway is one of the largest supermarket chains in the United States.  DX 592 at 4; Stanton Report ¶ 39; Scheffman Report, Appendix E ¶ 60.  Safeway operates over 1,500 supermarkets in 21 states and the District of Columbia.  DX 592 at 5-6; Scheffman Report, Appendix E ¶ 60.  Safeway operates under the Safeway (Western and Mid-Atlantic states), Vons (Southern California), Pavilion, (Southern California), Dominick's (Chicago area), Genuardi's (Philadelphia area), Randall's (Texas), Tom Thumb (Texas), and Carr (Alaska) store banners.  DX 592 at 5; Stanton Report ¶ 41; Scheffman Report, Appendix E ¶ 60.

As of December 31, 2006, Safeway had remodeled 751 of its stores into a newly developed "Lifestyle" format.  DX 592 at 20.  Safeway plans to spend $1.7 billion in 2007 to remodel 275 additional Safeway stores into the Lifestyle format and to open 25 newly constructed Lifestyle format stores.  DX 592 at 20.  In total, Safeway has spent several billion dollars repositioning its stores into the Lifestyle format.  Stanton Report ¶ 40.



Ms. Hasker testified that the Lifestyle format was developed in response to customers that "clearly articulated the desire for quality products, for knowledgeable and friendly service and a higher expectation of a shopping experience." JX 25 at 106-07 (Hasker Dep.). <u>See also</u> Scheffman Report, Appendix E ¶ 63 (citing a Bear Stearns December 2006 report noting that Safeway is "not only responding to shifting consumer demand, but helping to drive demand"); Stanton Report ¶ 39 (Lifestyle format also offers consumers an "experiential factor").



<u>See also</u> Scheffman Report, Appendix E ¶ 60.



In addition to launching the "O" organic brand products, Safeway recently introduced its "Eating Right" brand of products for health conscious consumers. DX 592 at 11. "Eating Right products combine great taste with nutritional efficacy and feature a unique nutritional icon system to help consumers identify product attributes that they seek." DX 592 at 11. Safeway's increased emphasis on natural and organic products is in response to consumer demand. Rojan Hasker testified that "our customer base has an interest and a growing interest in organic and natural products. All trend [in]formation obviously supports that." JX 25 at 16 (Hasker Dep.).

Whole Foods considers Safeway a competitor and has observed the success Safeway has reported at its remodeled stores. DX 22 (E-mail December 2006 K. Meyer to Whole Foods executives) Paradise Decl. ¶ 21

(Safeway Lifestyle stores designed to compete with Whole Foods and imitates strategies Whole Food has used to compete against other supermarkets).

Dr. Stanton observed that Safeway's Lifestyle "strategy is aimed at helping the company [Safeway] compete with the likes of Whole Foods, and is winning over customers with organic foods, high-quality meats and produce, and extensive bakery and deli offerings." Stanton Report ¶ 40.

Whole Foods perceives that Safeway has increased the competitive pressure on Whole Foods. Robb Decl. ¶ 23 ("Safeway's aggressive launch of its "O" line of organic products is an important and challenging development for Whole Foods."); see also DX 609 at 18, 54 (Meyer Dep.) ("Safeway has put together a format, their Lifestyle format, that I think is very concerning to me that when they open their stores, . . . [o]ur sales growth diminishes"). Safeway is also actively recruiting suppliers of natural and organic products, making it more difficult for Whole Foods to be "first to market with new organic foods." DX 7 at 1 (February 2006 e-mail, R. Megahan).

### 3. Publix

Publix operates a supermarket chain in the southeastern United States. The company's primary focus has been on providing an upscale "experience," high quality and excellent customer service. Stanton Report ¶ 56.

Publix Publix has added a large selection of

organic and natural foods, including an entire line of private label organic foods called GreenWise. Scheffman Report, Appendix E ¶¶ 56-57. The first GreenWise store is set to open in September 2007 and will provide an array of natural and organic foods, earth-friendly products, freshly prepared cuisine, and high-quality produce, dairy, frozen food, vitamins, grocery items and nutrition products. Stanton Report ¶ 57. The GreenWise products include shelf-stable food products, dairy, poultry, snacks, juices and an environmentally-friendly line of paper products. Stanton Report ¶ 56.



DX 677.

### 4. Kroger

Kroger operates over 2,400 supermarkets and multi-department stores across the United States, and its banners include Kroger, Smith's, Fred Meyer, Dillon's, Ralphs, and King Soopers. Stanton Report ¶ 53; Scheffman Report, Appendix E ¶ 44.

Kroger sells a wide variety of natural and organic products, including shelf-stable

groceries, produce, poultry, dairy, and beverages. It introduced its own line of private label natural and organic products under the "Naturally Preferred" label, which includes over 275 items in a variety of categories. Stanton Report ¶¶ 53-54. Kroger also offers a premium private label food line known as "Private Selection," which is designed to meet or beat national or regional gourmet and upscale brands. Id. Many of the Kroger stores (approximately 1,600) feature dedicated natural and organic departments, such as the "Nature's Marketplace" section within Kroger-bannered stores. Stanton Report ¶ 54.

Kroger is aware of the growth in demand for natural and organic products, and the repositioning going on all around them in the industry. DX 66 (e-mail from Scott Allshouse). Kroger has stated in its recent internal planning documents: "Kroger is the #1 grocery retailer; we should also be the #1 natural and organic food retailer. The question is: 'How big do we want to get and how soon do we want to get there?' If we are to gain dominance in this industry, we must do more and we must do it now." DX 663 (memorandum from Nancy Moon-Eilers). Chain-wide, Kroger's organic produce sales increased by over 82 percent by January of 2006, and the company felt "we still have a huge upside sales potential." DX 669 (Kroger, Email re: "2006 Organic Produce Sales Goals").

Kroger has a store-within-a-store concept in order to "improve on our ability to meet the Natural Foods needs of our Customers" and to "allow us to enhance our selection with new items and categories and to create an ease-to-shop destination for our Customers." DX 664 (Kroger, "Natural Foods Growth Strategy"). One of Kroger's "Strategy Objectives" is to "Improve distribution for Natural Foods" which "will lower costs of goods and improve instocks." DX 664.

Kroger is remodeling and upgrading its stores, including 158 store remodels in 2006. Kroger's other banners are also upgrading their formats. Stanton Report ¶ 54. For instance, the Ralph's "Fresh Fare" concept emphasizes fresh products, selection and service. Scheffman Report, Appendix E ¶ 54. King Soopers is planning to build a 99,000 square foot store (the largest in the chain) near Boulder, Colorado next year which will emphasize an improved shopping experience, expanded produce, and organic foods. Stanton Report ¶ 54.

### 5. Supervalu

Supervalu is one of the largest grocery distributors and supermarket operators in the nation. It operates supermarkets under the Albertson's, Shaw's, Star, Jewel-Osco, Cub, Acme and other banners, and distributes grocery products to over 2,000 independent supermarkets across the country. Stanton Report ¶¶ 47-48; Scheffman Report, Appendix E ¶ 76. Supervalu has recognized the importance of meeting the growing consumer demand for freshness, nutrition and organic products. Stanton Report ¶ 47.

Supervalu has recently established an aggressive remodeling campaign in order to expand its presence in natural, organic and premium foods. The company is spending approximately $1 billion to remodel and construct new stores in order to customize and enhance the customer shopping experience. Stanton Report ¶ 49; Scheffman report, Appendix E ¶ 78. The remodeling and new store campaign, called "Premium Fresh & Healthy," places a strong emphasis on: the "Wild Harvest" concept, which is a store-within-a-store focused on natural and organic products; expanded perishables, including produce, meat, seafood, bakery and deli; "Shop the World," which is an international food destination department; and expanded health

and beauty care products to support a healthy lifestyle.  Stanton Report ¶ 49.

Supervalu has established two different lines of private label organic products --
"Nature's Best" and "Wild Harvest."  The Nature's Best brand is available to all of Supervalu's
corporately-owned supermarkets and to the approximately 2,200 independent supermarkets to
which Supervalu is the primary grocery distributor.  There are currently over 500 different
products under the Nature's Best label.  Stanton Report ¶ 48.

In addition to the "Premium Fresh & Healthy" remodeling and new store
campaign, Supervalu has created a new format called "Sunflower Market," which is a value-
priced natural and organic retail outlet offering between 8,000 and 12,000 SKUs of natural and
organic products.  Supervalu has announced plans to open 50 Sunflower markets over the next
five years.  Stanton Report ¶ 51; Scheffman Report, Appendix E ¶ 96.

### 6. Wegmans

Wegmans operates supermarkets in New York, New Jersey, Pennsylvania,
Maryland and Virginia.  Scheffman Report, Appendix E ¶ 119.  It has become recognized within
the industry as one of the best supermarkets in the country in terms of produce, fresh product
offerings and prepared foods.  Stanton Report ¶¶ 43-45.

Wegmans has introduced its own line of private label organic products and offers
a store-within-a-store format called "Nature's Marketplace," selling a large assortment of natural
and organic foods, supplements, herbal remedies, non-food items, and foods for special dietary
needs.  Stanton Report ¶ 45; Scheffman Report, Appendix E ¶ 112.

Whole Foods sees ▮▮▮▮▮▮▮▮▮▮ every time Wegmans opens a store in the

vicinity of a Whole foods store. DX 59 at 3 (FY 2007 First Quarter Board Report by A.C. Gallo); DX 209 at 3 (Co-President A.C. Gallo explained to the Board of Directors that "Wegmans has temporarily taken from us the image of being the best Foodie store in█████ For example, when Wegmans opened two new stores within 15 minutes of Whole Foods'████████ ████tore, Whole Foods ascribed a███decrease in comps to Wegmans. DX 86 at 5. Wegmans also directly engages in price competition with Whole Foods by comparing its prices to Whole Foods' prices on shelf tags and advertisements. DX 72; DX 74. Whole Foods says it has been forced to reduce prices to retain sales. See DX 209 (stating Whole Foods will drop prices to go "toe to toe" with Wegmans).

In sum, the snapshot of the marketplace today is very different than it may have been a few years ago. Delhaize, Safeway, Publix, Kroger, Supervalu, and Wegmans have already repositioned themselves to compete vigorously with Whole Foods and Wild Oats for the consumers' premium natural and organic food business. To put it colloquially, this train has already left the station.

## VIII. POTENTIAL DEFENSES

The defendants suggest two possible affirmative defenses to the potential conclusion that this merger's effect would be anticompetitive: (1) that the merged company would result in the more efficient use of existing resources, thus improving the performance of the merging firms and benefitting consumers, and (2) that Wild Oats is a "flailing" or weakened company.

The Request for Additional Information ("Request") issued to Whole Foods in the

investigation of the proposed acquisition asked Whole Foods to provide a "detailed description of all efficiencies that [Whole Foods] claims will or may arise from the proposed acquisition." The Request also asked Whole Foods to describe the means by which each efficiency was to be accomplished, the investments required, the expected savings, and the time required for Whole Foods to achieve each efficiency. Whole Foods in its response to the Request did not include a single efficiency and did not specify the time in which it expected to achieve any efficiency. See PX01349 at 001-004.

Defendants' expert, Dr. Scheffman, testified in his deposition that he was "not putting forward a [Merger G]uidelines analysis of merger efficiencies" and that his analysis of the purported benefits of the acquisition were based on "guesstimates." JX 18 at 227:12, 233:24-25 (redacted) (Scheffman Dep.). Whole Foods' Senior Vice-President of Growth and Business Development, James Sud, testified that the savings he expected the company to achieve was based on unverified assumptions of general and administrative expenses as a percentage of sales. And Whole Foods' Co-President and COO, Walter Robb, testified that it would be speculative to identify the redundant jobs that would be eliminated to allow for cost savings until Whole Foods can "get in there" and see how Wild Oats is organized. JX 2 at 183:18-185:7 (Robb Dep.).

Based upon the testimony of Dr. Scheffman, Mr. Sud and Mr. Robb, as well as on defendants' response to the FTC's Request for Additional Information, the Court concludes that defendants have failed to meet their burden on the issue of efficiencies under Section 4 of the Horizontal Merger Guidelines. See Merger Guidelines § 4; see also FTC v. H.J. Heinz Co., 246 F.3d at 720; FTC v. Cardinal Health, 12 F. Supp. at 62.

The defendants do not claim that Wild Oats is a failing firm or that it could meet the high standard for showing a failing firm defense. In Camera Session August 1, 2007 PM Tr. Mot. Hr'g at 47:23-24 (Under Seal) (Aronson). They do argue, however, that Wild Oats is a "weakened" or "flailing" firm and that its elimination by Whole Foods will lead to a more efficient competitor. As the FTC points out, however, the "flailing firm" doctrine is "probably the weakest ground of all for justifying a merger." FTC v. Univ. Health, Inc., 938 F.2d 1206, 1221 (11th Cir. 1991).

While the Court has some concern whether Wild Oats can remain as a stand-alone viable competitor if the merger does not go forward, there is simply insufficient record evidence in the record before the Court to reach any conclusion on this matter. And clearly the defendants have failed to carry their burden of establishing this defense.

## CONCLUSION

As noted at the very outset of this Opinion, under Section 13(b) of the Federal Trade Commission Act, the FTC must demonstrate a likelihood of success on the merits -- that is, that the effect of the Whole Foods/Wild Oats merger under Section 7 of the Clayton Act "may be substantially to lessen competition or tend to create a monopoly" in properly defined relevant product and geographic markets. 15 U.S.C. §§ 18, 53(b); see United States v. Philadelphia National Bank, 374 U.S. at 355-56; FTC v. H.J. Heinz Co., 246 F.3d at 714; United States v. Baker Hughes Inc., 908 F.2d at 982-83; FTC v. Libbey, Inc., 211 F. Supp. 2d at 44; FTC v. Staples, Inc., 970 F. Supp. at 1071. The FTC also has the burden of showing that the balance of the equities warrants entry of an injunction in the public interest. 15 U.S.C. § 53(b). See FTC v.

H.J. Heinz Co., 246 F.3d at 726;  FTC v. Exxon Corp., 636 F.2d 1336, 1343 (D.C. Cir. 1980);
FTC v. Staples, Inc., 970 F. Supp. at 1091-92.

    For all of these reasons discussed herein, the Court concludes that the FTC has not
proven that it is likely to prevail on the merits at an administrative proceeding and subsequent
appeal to the court of appeals.  Considering the voluminous factual record taken as a whole, the
FTC has not "raise[d] questions going to the merits so serious, substantial, difficult, and doubtful
as to make them fair ground for thorough investigation, study, deliberation, and determination by
the FTC in the first instance and ultimately by the Court of Appeals."  FTC v. H.J. Heinz Co.,
246 F.3d at 714-15.  There is no substantial likelihood that the FTC can prove its asserted
product market and thus no likelihood that it can prove that the proposed merger may
substantially lessen competition or tend to create a monopoly.

    Because the FTC has not demonstrated a likelihood of success on the merits, the
Court need not consider the equities and the public interest -- whether, as defendants argue, there
is a real risk that the transaction will not occur at all if an injunction issues or whether, as the
FTC suggests, this is hyperbole based on a single unsubstantiated footnote in defendants'
opening brief.  The answer may lie in the language and terms of Article VII of the Agreement and
Plan of Merger itself (DX 811), but, in view of the Court's findings and conclusions, the Court
need not reach this issue.

For all the forgoing reasons, the Court will deny plaintiff Federal Trade Commission's motion for a preliminary injunction.  An appropriate Order will be issued this same day.

_____
PAUL L. FRIEDMAN
United States District Judge

DATE:

93

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

AUG 1 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

FEDERAL TRADE COMMISSION,       )
                                )
        Plaintiff,              )
                                )
    v.                          )     Civil Action No. 07-1021 (PLF)
                                )
WHOLE FOODS MARKET, INC.,       )
                                )
        and                     )
                                )
WILD OATS MARKETS, INC.,        )
                                )
        Defendants.             )
_____)

ORDER

This matter is before the Court on plaintiff's motion for a preliminary injunction.
Plaintiff, the Federal Trade Commission, filed this lawsuit on June 6, 2007 pursuant to Sections 7
and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Sections 5(b) and 13(b) of the Federal Trade
Commission Act, 15 U.S.C. §§ 45(b), 53(b), seeking to enjoin defendant Whole Foods Market,
Inc. from acquiring defendant Wild Oats Markets, Inc. during the pendency of an administrative
proceeding to be commenced by the FTC. See Complaint at 2, 6.[1]

For the reasons set forth in the Court's 93-page Opinion issued this same day
under seal, it is hereby

_____

[1]    On June 7, 2007, the Court signed and entered a stipulated temporary restraining
order "pending the Court's ruling on the motion of the Commission for a preliminary
injunction[.]"

ORDERED that plaintiff Federal Trade Commission's motion for a preliminary injunction [4] is DENIED.  This is a final appealable order.  See 28 U.S.C. § 1292(a)(1); Fed. R. App. P. 4(a).  Any other pending motions are denied as moot.[2]

SO ORDERED.


_____
PAUL L. FRIEDMAN
United States District Judge

DATE:

_____
[2]        Counsel for plaintiff and counsel for defendants should meet and confer and contact Chambers with their agreed-upon proposed redactions within two business days, after which time the Court will issue a redacted version of the Opinion on the public docket.  As in the past, counsel should propose only those redactions necessary to protect confidential information.

2