# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:07-cv-01021-PLF |
| | ) | |
| WHOLE FOODS MARKET, INC., | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| WILD OATS MARKETS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S NOTICE OF FILING OF
## THE PUBLIC VERSION OF ITS EXPERT REPORTS

Notice is given that redacted public versions of Plaintiff's expert reports are filed via CM-ECF as attachments to this notice.

Respectfully submitted,

Dated: August 23, 2007

   /s/ Eric M. Sprague
Eric M. Sprague
Bureau of Competition
Federal Trade Commission
601 New Jersey Avenue, N.W.
Washington, DC  20001
(202) 326-2101 (direct dial)
(202) 326-2071 (facsimile)
esprague@ftc.gov

Counsel for Plaintiff

# Exhibit 1–Public Version of the
# Expert Report of Kevin M. Murphy, Ph.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| 600 Pennsylvania Avenue, N.W. | ) | |
| Washington, D.C. 20580 | ) | |
| | ) | Civ. No. 1:07-CV-01021 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WHOLE FOODS MARKET, INC. | ) | |
| 550 Bowie Street | ) | |
| Austin, Texas 78703 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILD OATS MARKETS, INC. | ) | |
| 1821 30th Street | ) | |
| Boulder, Colorado 80301 | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**EXPERT REPORT OF KEVIN M. MURPHY, PH.D.**

Dated: July 9, 2007

- FTC v. Whole Foods

1. I am Kevin Murphy, the George J. Stigler Distinguished Service Professor of Economics at the University of Chicago Graduate School of Business. I have been retained by the Federal Trade Commission to determine whether the proposed acquisition of Wild Oats by Whole Foods will tend to substantially lessen competition in any relevant antitrust markets. [1]

2. I have considered the available qualitative and quantitative evidence, and concluded that the proposed acquisition will substantially lessen competition in 18 local markets in which Wild Oats and Whole Foods presently compete.[2] Consequently, this proposed transaction puts consumers in these markets at the risk of facing higher prices, less variety and decreased services. The competitive injury will persist, as entry or repositioning of other companies into those markets will not restore the pre-acquisition competitive dynamic for several years, at the least.

3. My report is organized as follows. Section I provides an overview of my analysis. Section II provides my qualifications as an expert. Section III describes my assignment. Section IV provides a summary of my opinions. In section V, I discuss certain background facts that will provide a foundation for my analysis. In Section VI, I present a series of statistical analyses that demonstrate the patterns of substitution and competition we see in the marketplace. In Section VII, I show that the view of the marketplace implied by my statistical analysis fits well with other evidence provided in this case. In Section VIII, I use the information gained from the analysis of the statistical and qualitative evidence to determine the likely competitive impacts of the acquisition. In Section IX,

---

[1] Chicago Partners is being compensated at $850 per hour for my work on this assignment. To date, I have spent approximately 100 hours on this project.

[2] This does not include an additional 23 stores in markets where Whole Foods and Wild Oats currently compete and competition may be affected by the acquisition but the Wild Oats store is smaller than 25,000 square feet.

1

I show how my economic analysis fits into the antitrust framework outlined in the 1992 Horizontal Merger Guidelines. Section X concludes my report.

4. My analysis is ongoing. I understand that more evidence and data will become available as discovery in this case progresses. To the extent that new evidence and data are relevant to my opinions, I will, to the extent possible, include them in my analysis. Consequently, I reserve the right to supplement or alter the opinions expressed in this report.

## I. Overview

5. Wild Oats and Whole Foods are both premium brands that specialize in offering consumers natural and organic products. The similarity of the product offerings and target demographic of these two competitors make them particularly goods substitutes in the eyes of many consumers.

6. Statistical analyses of prices, margins and sales confirm that Whole Foods and Wild Oats are each other's most significant individual competitors in many local markets. Entry by Whole Foods into a local market where Wild Oats currently operates has a substantial effect on Wild Oats. Margins, prices and sales at the Wild Oats store fall substantially, with sales falling by roughly ██ percent, margins falling by ██ percent and prices falling ██ percent. No other putative competitors have similar effects on either Whole Foods or Wild Oats.

7. The fact that Whole Foods and Wild Oats are differentiated products – differentiated somewhat from each other but even more so from other competitors - has important implications for the proposed acquisition. As the statistical evidence on entry illustrates and the factual evidence from documents, deposition testimony and industry accounts confirms, changes in the level of competition between Wild Oats and Whole Foods

2

can affect outcomes, prices, margins and non-price competition on quality and service in localized markets.

8. Most importantly, the proposed transaction involves Whole Foods acquiring 19 Wild Oats stores in local markets where Wild Oats and Whole Foods currently compete head-to-head or would have competed once Whole Foods opened a store currently in development.[3]  Given the nature of the differentiated products competition described above, the proposed acquisition will reduce competition and harm consumers in these local markets.

9. Whole Foods plans to close about ■ of the acquired Wild Oats stores across roughly ■ local markets.  This will unambiguously reduce competition and harm consumers in these markets.  The statistical evidence on prices and margins suggests that prices will increase in these markets after the acquisition and that these price effects will be non-transitory.  Importantly, the price effects are just one symptom of the reduction in competition in these markets.  Evidence from the record shows that the loss of Whole Foods' most direct competitor in these markets will reduce competition on non-price dimensions as well.  Both Whole Foods and Wild Oats respond to competition from one another by improving product service and other aspects of product quality when they face nearby competition from each other – this increment of competitive discipline will be lost in these local markets.

10. In addition to the loss of price and non-price benefits, all customers who previously shopped at Wild Oats will now be forced to shop at a less preferred option.  Many will move to the Whole Foods store (anywhere

---

[3] Here I use a distance of five miles between the stores to define head-to-head competition and restrict attention to Wild Oats stores that are larger than 25,000 square feet.

between ▓▓▓▓ of them based on Whole Foods own estimates) even though they chose not to shop at Whole Foods. All of these consumers are unambiguously worse off due to a loss of their top choice in addition to any loss from higher prices and reduced service.

11. Consumers will also suffer anticompetitive harm in markets where Whole Foods plans to operate the existing Wild Oats store under the Whole Foods banner, due to a reduction in competition. Empirical evidence suggests that Whole Foods charges lower prices and competes more on other dimensions when they face competition from Wild Oats. That competitive pressure will be lost in these markets with the proposed acquisition.

12. The analysis presented above illustrates how the proposed acquisition will affect competition in "overlap" markets – local markets where Whole Foods and Wild Oats currently compete. In terms of the analysis of mergers outlined in the *1992 Horizontal Merger Guidelines*, the anticompetitive effects of this acquisition may be viewed as a reduction in competition in the relevant market defined as "Premium Natural and Organic Supermarkets." That market definition is consistent with the breadth of products over which the effects will be concentrated and it satisfies the *Guidelines* definition of a relevant antitrust product market based on a price increase standard of one percent.

13. From an economic standpoint, this market definition correctly highlights the issues in this case. The proposed acquisition will significantly affect competition and consumer welfare in a relatively narrow segment of the broader economic market of retail supermarkets. The economic significance of these effects is reflected in higher prices, reduced choice and other losses associated with reduced competition for consumers who currently shop at the affected premium natural and organic supermarkets.

4

## II. Qualifications

14. I earned a doctorate degree in economics from the University of Chicago in 1986. I received my bachelor's degree, also in economics, from the University of California, Los Angeles, in 1981.

15. At the University of Chicago, I teach economics in both the Graduate School of Business and the Department of Economics. I teach graduate level courses in microeconomics, price theory, empirical labor economics, and the economics of public policy issues. In these courses I cover a wide range of topics, including the incentives for firms and individuals, the operation of markets, and the impacts of regulation and the legal system. Most of my teaching focuses on two things: how to use the tools of economics to understand the behavior of individuals, firms and markets; and how to apply economic analysis to data. My focus in both research and teaching has been on integrating economic principles and empirical analysis.

16. I have authored or co-authored more than sixty articles in a variety of areas in economics. Those articles have been published in leading scholarly and professional journals, including the American Economic Review, the Journal of Law and Economics, and the Journal of Political Economy. Several of my articles consider economic issues related to industrial organization and antitrust.[4]

---

[4] *See* "Vertical Restraints and Contract Enforcement" (with Benjamin Klein), *Journal of Law and Economics*, Vol. 31, October 1988, pp. 265-297; "Vertical Integration as a Self-Enforcing Contractual Arrangement" (with Benjamin Klein), *American Economic Review*, Vol. 87, May 1997, pp. 415-420; "A Competitive Perspective on Internet Explorer" (with Steven J. Davis), *American Economic Review*, Vol. 90, May 2000, pp. 184-187; "Economic Perspectives on Software Design: PC Operating Systems and Platforms" (with Steven J. Davis and Jack MacCrisken), in David S. Evans, editor, *Microsoft, Antitrust and the New Economy: Selected Essays* (Norwell, MA: Kluwer Academic Press of Massachusetts, 2002); "The Economics of Copyright 'Fair Use' In a Networked World" (with Benjamin Klein and Andres Lerner), in *American*

5

17. I am a Fellow of the Econometric Society and a member of the American Academy of Arts and Sciences. In 1997 I was awarded the John Bates Clark Medal, which the American Economic Association awards once every two years to an outstanding American economist under the age of forty. In 2005 I received a five-year unrestricted research award from the MacArthur Foundation in recognition of my past contributions and potential future contributions to economics.

18. In addition to my position at the University of Chicago, I am a Principal at Chicago Partners, a consulting firm that specializes in the application of economics to law and regulatory matters. In my teaching, research and consulting, I use basic principles of economics to analyze the costs and benefits of decisions made by businesses, the courts and governmental agencies

19. I have consulted in the area of antitrust for over 20 years. Over that period I have worked on more than 50 antitrust cases involving mergers and acquisitions, contracting practices, monopoly maintenance, collusion, damages, vertical restrictions, and tying arrangements. I have testified in Federal Court in four of those cases and have submitted expert reports in several additional cases.

20. My qualifications are summarized in greater detail in my *resume*, which is attached to this report as Appendix A. Appendix A also contains information relating to previous employment, testimony, and publications. My compensation does not depend on either the findings of my investigation or the outcome of this case.

---

*Economic Review,* Vol. 92, May 2002, pp. 205-208; and, "Entry, Pricing and Product Design in an Initially Monopolized Market" (with Steven J. Davis and Robert H. Topel), *Journal of Political Economy,* Vol. 112, Feb. 2004, pp S188 – S225; "The Antitrust Economics of Interchange Fees" (with Benjamin Klein, Kevin Green, and Lacey Place), Forthcoming, *Antitrust Law Journal.*

### III. Assignment

21. The Federal Trade Commission has asked me to determine whether the proposed acquisition of Wild Oats by Whole Foods will tend to substantially lessen competition in any relevant antitrust markets. Specifically, I have been asked to consider the following economic questions:

    a.  Do Whole Foods and Wild Oats compete directly with one another?

    b.  Do Whole Foods and Wild Oats compete directly with third parties?

    c.  How does the competition between Whole Foods and Wild Oats compare to that which might exist between either of those firms and third parties?

    d.  Do "premium natural and organic supermarkets" constitute a relevant antitrust market as defined in the 1992 *Horizontal Merger Guidelines*?

    e.  Are third parties likely to enter/reposition in a timely manner that is sufficient to fully replicate the competitive constraints that Whole Foods and Wild Oats currently place on one another?

    f.  Will the proposed acquisition substantially reduce competition in any relevant antitrust markets?

### IV. Summary of Opinions

22. Based on my analysis to date, I have formed the following general opinions:

    1.  Whole Foods and Wild Oats compete directly with one another.

    2.  The services provided by Whole Foods and Wild Oats are much better substitutes for one another than are the services provided by either of them with the services provided by conventional supermarkets, other types of retailers such as Trader Joe's.

7

3.   Entry by Whole Foods into a geographic market has a significant impact on profit margins as well as the prices and quantity of products sold at Wild Oats stores.

4.   The proposed closure of ███████ Wild Oats stores following the acquisition will have an anti-competitive effect by denying consumers the benefits of price and non-price competition and reducing consumer choice.  Competition may also be affected in other markets where Whole Foods plans to close ███████ ███████ Wild Oats stores and ████████████████ that was scheduled to open.

5.   Competition is also likely to be reduced in markets where Wild Oats and Whole Foods now compete head to head, and where both stores will continue to operate under common ownership after the acquisition.

6.   To the extent that Wild Oats represents a unique competitive constraint on Whole Foods, competition may also be reduced in local markets where Whole Foods currently does not compete head-to-head with Wild Oats and Wild Oats might have entered in the future, but for the acquisition.

23. In reaching my opinions, I have considered transcripts and exhibits from the depositions and investigational hearings of employees of Whole Foods, Wild Oats, and third parties; internal emails, strategic plans, and other business documents from Whole Foods, Wild Oats, and other firms; published reports and articles; data produced in the course of discovery pursuant to this matter and pursuant to the "second request" and subpoena issued to Whole Foods and Wild Oats by the FTC; and other related documents and information, including the results of my own

8

research. A list of the documents and other materials that I considered in reaching my conclusions is attached to this report as Appendix B.

## V. Background

### A. Basic Description of Parties

24. Whole Foods Markets, Inc. ("Whole Foods") proposes to acquire Wild Oats Markets ("Wild Oats") for $671 million in cash and assumed debt. Whole Foods currently operates 191 stores, while Wild Oats currently operates 110 stores.

25. Acquisition has been a substantial part of the growth of both Whole Foods and Wild Oats. Whole Foods began business in Austin, TX in 1980 as a merger of Safer Way Natural Foods and Clarksville Natural Grocery. Over the next two decades it engaged in a series of acquisitions, totaling over 60 stores across the country. In 1984, it purchased Blue Bonnet Natural Foods Grocery of Dallas, TX. In 1988, it purchased Whole Food Company of New Orleans, LA and in 1990 it acquired Mr. Walter Robb's store in Mill Valley, CA (Mr. Robb is now co-President of Whole Foods). In 1991, Whole Foods acquired Wellspring Grocery (of North Carolina) and in 1992 it acquired Bread and Circus (of Massachusetts and Rhode Island). In 1993, it acquired Mrs. Gooch's in Los Angeles, CA and in 1995 it acquired Bread of Life in the San Francisco, CA area, Unicorn Village in Florida and Oak Street Market in Evanston, IL. In 1996 it acquired Fresh Fields, doing business along the East coast and the Midwest. In 1997 it acquired Granary Market in Pacific Grove, CA, Bread of Life in Florida and Merchant of Vino in Detroit, MI. In 1999 it acquired Nature's Heartland, of Boston, MA and in 2000 it acquired Food 4 Thought Natural Food Market and Deli in Sonoma County, CA. In 2001 it acquired Harry's Farmers Market stores in Atlanta, GA. In 2006, it purchased Whole Grocer of Portland, ME. Now, in 2007, it proposes to acquire Wild Oats.

9

26. Wild Oats is a "rollup" (i.e., the result of a series of acquisitions) that was executed over the course of some years through the acquisition of widely disparate stores. As a result, Wild Oats' fleet of stores exhibits considerable heterogeneity with regard to the size and the quality of its sites. Newer Wild Oats stores are relatively large (in excess of 25,000 square feet. Older Wild Oats stores are considerably smaller (a recently closed store in New York City was only 2700 square feet), thus carry a relatively small number of items (particularly perishables) and have few amenities (such as coffee, juice and sushi bars, community meeting rooms, etc.), and tend to be in relatively poor locations in terms of visibility, access, and proximity to the residences of the upscale consumers comprising these stores' target demographic. The documentary and econometric evidence suggest that the smaller, older Wild Oats stores are not competitively significant. As such, my analysis is limited to markets with Wild Oats stores whose square footage exceeds 25,000 square feet, and that do business under "Wild Oats" banners (as opposed to the relatively down-market stores that Wild Oats operates in Southern California as "Henry's Farmers Market"). There are 38 Wild Oats stores that satisfy this criterion.

**B. An Introduction to Other Producers Relevant to the Analysis**

27. Several other types of retailers are potentially relevant for my analysis since they may compete to varying degrees with Whole Foods and Wild Oats. These retailers include other premium natural and organic supermarkets, premium supermarkets, specialty stores, conventional supermarkets, farmer's market stores, independent health foods stores, and mass merchandisers.

10

28. Other purveyors of premium and organic foods such as Earth Fare and New Seasons provide the most direct competition to Whole Foods and Wild Oats.

29. Earth Fare currently has 13 stores and operates in four states: Georgia, North Carolina, South Carolina and Tennessee.[5]  Earth Fare started with a single natural grocery store in North Carolina in 1975.  It added its second store in 1997 and started its significant expansion in 1998 and has since expanded to its current 13 stores.[6]

30.  New Seasons operates nine stores in the Portland Oregon area with a tenth scheduled to open in 2008.

31.  Specialty stores such as Trader Joe's, premium supermarkets such as Wegman's, farmer's market style stores and small health food stores compete with Wild Oats and Whole Foods to a certain extent on some dimensions but typically carry a different mix of products and/or target a different client base.

32. Conventional supermarkets such as Kroger and mass merchandisers such as Wal-Mart also have some overlap with the product mix and customer base targeted by Whole Foods and Wild Oats.  Some stores of both types offer a more limited selection of natural and organic items than do Whole Foods and Wild Oats and differ in terms of product focus and the attributes that they emphasize.

---

[5] http://www.earthfare.com/storeinfo/1200/

[6] http://www.earthfare.com/cgi-bin/customize?history.html

11

C. **Product differentiation plays a key role in the economic analysis of the competitive impact of this proposed transaction**

33. My economic analysis of market definition and competitive effects regarding this proposed transaction began with recognition that Whole Foods and Wild Oats are highly differentiated, premium positioned, brands. Both firms have focused historically on the sale of natural and organic foods and holistic health and beauty aids, and they premise their respective strategies on providing exceptional service and quality in ways that fit an upscale, gourmet/epicurean and "socially responsible" lifestyle.

34. Other participants in the broad marketplace have their own distinct combination of features. Conventional supermarkets offer a wide range of products and compete aggressively on price. More upscale markets like Wegman's offer premium meats and produce items that compete for some of the same high-end customers targeted by Whole Foods and Wild Oats, but put less emphasis on natural and organic products. Specialty stores like Trader Joe's also sell some products that overlap with those sold by Whole Foods and Wild Oats, but do not focus to the same extent on the sale of perishable items (which account for roughly 70% of Whole Foods' business versus roughly ███ for Trader Joe's). Mass merchandisers such as Wal-Mart also overlap on some items but differ even more in their overall business model. From an economic perspective all of these types of stores compete with Whole Foods and Wild Oats, but they are clearly significantly differentiated relative to the parties.

**D. For several years, Whole Foods has been following a strategy of competing directly with Wild Oats by building new stores in direct competition with Wild Oats existing stores.**

35. Evidence from company documents, deposition testimony, accounts in company filings and accounts in the business press provide consistent evidence that Whole Foods has followed a strategy of competing head-to-head with Wild Oats by entering many of Wild Oats existing markets. This strategy can be seen clearly in the data. Exhibit 1 lists the stores, date of entry and distance to the nearest Wild Oats store as well as the size of the Whole Foods and Wild Oats stores. The stores listed in Exhibit 1 account for 17 of the 95 Whole Foods openings since 1998 and about half of the Whole Foods stores currently located within 5 miles of a Wild Oats.

36. Whole Food's CEO John Mackey summarizes the Whole Foods strategy in his February 2005 posting:

> "OATS was a flourishing, profitable, and rapidly growing company before Whole Foods launched its attack on OATS with its Boulder store about 6 years ago which has badly hurt OATS in its home town. Since then they have opened up at least 15 stores that have obliterated successful OATS stores in Denver, Santa Fe, Los Angeles, the San Francisco Bay Area, Albuquerque, Portland, Sacramento, and several others. Why do you think OATS is no longer successful? Why do you think they are losing money now? Although their management continues to deny it and blames "distributor problems", "road construction", and "cannibalization" the facts are there to see if you follow this industry closely (and I do)--Whole Foods is systematically and relentless taking OATS business away from them one market after another.[7]"

37. A more detailed version of the strategy is laid out in an email to a stock analyst:

---

[7] 2/23/05 812 am Rahodeb Posting, Yahoo! Finance message board.

"Go see for yourself where our stores compete head to head right now. We are killing them in Boulder, Dallas, Sunnyvale, San Anselmo...In the next 12 months Whole Foods will open very large stores in direct competition with OATS in the following markets: Santa Fe--40,000 sq. ft.--within 1/2 mile of 2 OATS stores (22,000 and 18,000 sq. ft) and within 4 miles of a third one (10,000 sq. ft.). This store is scheduled to open on October 6. The 2 stores within 1/2 mile are 2 of OATS highest volume stores. I predict a repeat of Boulder. Despite what OATS has told you and other analysts, we've hurt them very, very badly in Boulder. West Hollywood--24,300 sq. ft--within 1.5 miles of 14,000 sq. ft. OATS store and we have a better location. Scheduled to open January 2000. Ft. Lauderdale--32,350--within 1.5 miles of 15,000 sq. ft. OATS store and we have a much better location. April 2000. Cherry Creek (Denver)--42,000 sq. ft. within .5 miles of high performing 25,000 sq. ft. OATS and within 3 miles of a second OATS store.  Scheduled to open in July of 2000.  Willowbrook (Chicago)--36,000 sq. ft. within 2.5 miles of new 25,000 sq. ft. OATS store in Hinsdale. Scheduled to open in July 2000. Boca Raton--28,000 sq. ft.--within 1 mile of 12,000 sq. ft. store. Scheduled to open in January 2001....You can also expect us to likely announce new locations by our first quarter in St. Louis, Albuquerque, Phoenix, Indianapolis, Portland (so much for over paying for Nature's), and Cincinnati. All these stores will be directly competitive with substantially smaller OATS stores."[8]

---

[8] WFM-008-00000637

14

**E. Overlaps in the Proposed Transaction.**

38. The following diagram provides a taxonomy for Whole Foods and Wild Oats stores that is relevant to the competitive impact of this proposed acquisition:



39. Evidence from company documents, deposition testimony, accounts in company filings and accounts in the business press provide consistent evidence that Whole Foods would close (either immediately or in the near future) a ███████████ of the Wild Oats stores it hopes to acquire ██ ███████████, see Exhibit 2).[9]  Importantly, the large majority of stores to be closed are in markets where Whole Foods and Wild Oats now compete directly.  The anti-competitive effect evident from such closures of stores that directly compete with one another is counted by Whole Foods as a major component of the acquisition's value.  This was position was explicitly expressed in the testimony of Mackey from Whole Foods:

---

[9] WFM-PI-50016983c Project Goldmine v.76. This does not include the Wild Oats' 29th Street store in Boulder, Colorado that has not been opened yet, but had been slated for opening by now but for this proposed acquisition.

"[I]t self evidently will lessen competition in those markets that we are competing with Wild Oats in when we are going to intend to close stores.  Again, isn't that true in every one of the acquisitions any one of these guys do?  One of the motivations is to eliminate a competitor.  I will not deny that.  That is one of the reasons why we are doing this deal.  That is one of the reasons we are willing to pay $18.50 for a company that has lost $60 million in the last six years. If we can't eliminate those stores, then Wild Oats, frankly, isn't worth buying."[10]

40. My analysis will focus on effects in the overlap markets shown in the middle of the diagram above and listed in Exhibit 2.  This includes both markets where Whole Foods plans to close the competing store and where Whole Foods plans to keep that store open.

41. Below I elaborate on the types of anticompetitive effects that are likely to materialize in these markets.   My econometric analyses and review of the qualitative evidence indicates that the acquisition of Wild Oats by a firm that it acknowledges as its closest competitor[11]is likely to result in anti-competitive effects in price and non-price dimensions (including quality, service and importantly, the breadth of product offerings available to consumers).

**F.  Summary of Background Facts**

42. As I noted above, the competition between Whole Foods and Wild Oats is best characterized as differentiated products competition between sellers offering products with similar characteristics.  From an economic standpoint, other producers compete with both Whole Foods and Wild Oats and constrain the prices that either firm can charge for its services.  Other sellers with a similar mix of characteristics (such as Earth Fare and

---

[10] Investigational Hearing of Mackey, p. 75

[11] "Whole Foods Markets. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ when we are head to head."
WO-VS-9-000119 @ 164.

16

New Seasons) are likely to provide the most direct competition in the geographic markets where they compete with Whole Foods and/or Wild Oats. Competition from other firms, such as traditional supermarkets or mass merchants, is less direct because their product offerings are poorer substitutes for those of Whole Foods and Wild Oats.

43. In order to address the effects that the proposed acquisition will have on consumers I have conducted a series of econometric analyses designed to estimate the effects that competition from different parties has on prices and quantities of goods sold by Whole Foods and Wild Oats. The results of these investigations provide direct evidence on the degree of substitutability between the services provided by different suppliers and provide a clear picture of the differentiated products competition outlined above.

44. The results of these exercises also aid in the definition of the relevant antitrust market as defined in the 1992 *Horizontal Merger Guidelines*. I return to this issue and show how to apply the *Guidelines* approach to this case in Section VIII below.

## VI. Econometric Evidence on Substitution and Price Effects

45. To examine the degree of substitution between different types of stores, I first performed an econometric analysis of the effect that entry of each store type has on sales and operating margins at Wild Oats and Whole Foods. The magnitude of these effects will help identify the relative degree of substitution between the product arrays offered by entering sellers and the products offered by Whole Foods and Wild Oats. The key idea is that entry by sellers of products that are the best substitutes for those offered by Whole Foods and Wild Oats will tend to have the largest effects on Whole Foods' and Wild Oats' prices and/or sales.

17

46. Since this is a merger case, a major question in my analysis will be the effect of reducing the number of sellers in the relevant markets. This question is directly applicable to the proposed transaction since Whole Foods plans to close a ███████████████ of Wild Oats stores in the "overlap" markets after the acquisition. In addition, in cases where Whole Foods will take over Wild Oats stores that currently compete with Whole Foods stores, we will move from two independently operated to stores to two stores operated by a single firm.

47. While there is some experience with a reduction in the number of competitors, the natural and organic supermarket business is a growing industry and entry is the more common event.

48. Since my primary interest is in changing the number of competitors I focus on "banner" entry.[12] A banner entry event is the entry of the first store of a given brand into a given geographic market. Since geographic markets for groceries tend to be local, I examine banner entry into market areas defined using a five mile radius. Since the fleet of Wild Oats stores is very heterogeneous, and the testimony of senior executives from both parties indicates that smaller, older stores owned by Wild Oats are not probative of the competition offered by larger, newer Wild Oats store.[13] I

---

[12] Banner entry refers to the store opening representing the first entry by a particular player into a market (as opposed to subsequent "infill" store openings by that player within that same market). Since conventional supermarkets and mass merchants are found in almost all reasonably large geographic markets I will not be able to focus on banner entry of those retailers as a group even though I am able to focus on "banner" entry by individual brands within those groups. As such, the estimated effect for this category is not strictly comparable to the estimated effects for other categories in which there is a single brand.

[13] "One reason that Wild Oats has had a hard time competition (sic) with us is that their smaller stores don't allow them to have a full selection especially in perishables and prepared foods", A.C. Gallo, co-President of Whole Foods, WFM-001-00006226. Deposition of Freya Brier, General Counsel and Senior VP of Wild Oats (business responsibilities include real estate), pp. 125-127. "Q: Do you recall why stores that were

18

limit my analysis to those Wild Oats stores exceeding 25,000 square feet in size. I also limit my analysis to stores operated under the Wild Oats banner. Wild Oats operates other stores under the Henry's Farmers Market banner but these are quite different from the Whole Foods Markets and newer Wild Oats stores. As such, they are excluded from my analysis.

49. Exhibit 3 shows the impact of banner entry by various food and grocery retailers on Wild Oats' existing-store sales and gross margins. The column headed "Effect on Net Sales" shows the estimated impact of banner entry on Wild Oats' existing-store sales.[14] The unit for these estimates is the change in the natural logarithm of net sales.[15] So, for example, the point estimate of ██ for the impact of new banner entry by Whole Foods implies a percentage reduction in net sales at an existing Wild Oats store of ████████████ which is shown in the "% change" column in the Exhibit. This means that entry by Whole Foods reduces sales at nearby Wild Oats stores by ████████ Notice that entry by Whole Foods has by far the largest impact on Wild Oats sales of all the candidate market participants shown in the Exhibit. The next largest impacts are for New Seasons and Sun Flower Market, whose entries reduces Wild Oats sales by ██████ percent respectively,

---

excluded from [a list of stores evaluated with Wild Oats' sales forecasting model] were excluded? A: .... ████████████████████████████ ████████████████

[14] Throughout my analysis I will use dollar sales to measure the change in Wild Oats business. Since dollar sales of a particular item represents the product of price times quantity, this measure captures changes in both prices and the physical volume of products sold.

[15] The use of logarithms allows me to interpret the estimated regression coefficients as the percentage reductions in sales following entry. A simple inversion of the logarithm – i.e. applying an exponential – yields that percentage reduction in sales.

19

followed by Trader Joe's, with an impact of ██ percent.   This pattern of effects indicates that the introduction of competition from Whole Foods has a larger effect on Wild Oats than does the introduction of competition from other sources.

50   The next column of Exhibit 3 shows the effects that banner entry has on Wild Oats gross margins.   The gross margin is defined as store-wide revenues less costs of goods sold, expressed as a fraction of revenues (e.g. a firm with sales revenue of $10,000,000 and costs of goods sold of $6,000,000 would have a margin of 0.40 = (10,000,000-6,000,000)/10,000,000).   For reference, Wild Oats store gross margins have averaged about ██ percent over the years included in Wild Oats' data production.    The estimate in the first row of Column (1) indicates that Wild Oats margins net of shrinkage[16] *fall* by about ██ percentage points (-██) after entry by a Whole Foods store within 5 miles. The estimate for New Seasons is positive suggesting that entry by New Seasons actually cause Wild Oats margins to rise.

51. The estimates in the "Effect on Margins" column demonstrate that entry by Whole Foods has a much larger impact on Wild Oats' gross margins than does entry by any other food/grocery retailer.  This agrees with the effects I found for the effects of entry on Wild Oats' sales.  The next largest impact after Whole Foods is for Sun Flower Market, whose entry reduces Whole Foods gross margins by about ██████████ Other sellers

---

[16] "Shrinkage" refers to the loss of saleable product as perishables rot.  It is a phenomenon that can be expected to occur after significant competitive entry, as customers are diverted to the entrant store.   As such, while I deduct the impact of shrinkage on margins prior to running my regressions, I note that the very existence of significant (and more specifically, increased) shrinkage implies the existence of significant competitive interaction.

20

have negligible effects on Wild Oats margins. The results in Exhibit 3 imply that Whole Foods is Wild Oats closest competitor.

52. Exhibit 4, which is organized in the same way as Exhibit 3, repeats the foregoing exercise but looks at entry impacts on Whole Foods stores rather than Wild Oats stores. The results show the impact of entry by other food/grocery retailers on Whole Foods' sales and margins. Notice from the exhibit that there are no recorded events in which Wild Oats entered a market within 5 miles of an existing Whole Foods store during the study period. The exhibit demonstrates that the effects of entry by the indicated sellers are typically small. The largest impact is for Earth Fare, another Premium Natural and Organic Supermarket, whose entry reduces Whole Foods' sales by about ▮ percent and Whole Foods' margins by about ▮▮ percentage points. Magnitudes for the effects of entry by other sellers on Whole Foods are roughly the same—though slightly smaller—than the effects I found for the same sellers on Wild Oats. For example, Exhibit 3 showed that entry by Trader Joe's reduced Wild Oats sales by about ▮ percent; the effect of Trader Joe's on Whole Foods' sales shown in Exhibit 4 is roughly ▮▮▮▮▮▮.

53. Taken together, the estimates in Exhibits 3 and 4 indicate that Whole Foods and Wild Oats are closer competitors to each other than to the other candidate sellers studied.

54. The central concern of the *Merger Guidelines* is with the impact of competition on *prices*. If unit costs are constant—i.e. they do not vary with the amount sold—then changes in gross margins can be used to infer the magnitude of price effects, via

$$\frac{\Delta P}{P} = \frac{\Delta m}{1-m}$$

The left hand side of this formula is the percentage change in prices, which with constant costs is equal to the change in the margin, $\Delta m$, divided by 1.0 minus the margin.

55. If unit costs in a representative store are not constant then changes in margins can be a misleading indicator of price effects. For example, if the average unit cost of goods sold declines with sales, then this method of inferring price changes from changes in margins will overstate the impact of entry on prices. Conversely, it will understate the impact of entry on prices if unit costs rise with per-period sales. I therefore requested and received data on Whole Foods and Wild Oats prices and units sold, broken out by store, item (identified by Universal Product Code, or UPC) and time period. The data I received cover all items sold, in all stores, from January of 2004 to May of 2007. This time interval includes five of the Whole Foods banner entry events used in constructing Exhibits 3 and 4.[17] In light of the evidence in Exhibits 3 and 4, I focus my price analysis on the impact of entry by Whole Foods on Wild Oats prices.

56. To estimate the impact of banner entry on Wild Oats' prices, I used a sales-weighted[18] regression of individual items' price changes, where "items" are unique UPCs. Again referring to Wild Oats "treatment" stores as those that experienced banner entry by an indicated retailer, I

---

[17] There were six Wild Oats stores that experienced a Whole Foods entry within five miles but for one of those stores, Shelbyville, KY, I only have data on six weeks before the transaction so I dropped it from our analysis.

[18] Since different items are purchased more or less, and thus constitute more or less of the revenues of a store, it would be misleading and inappropriate to weigh equally the price impact of all items. Thus, applying sales, or revenue, weights to the estimated price changes of each item permits me to calculate a weighted average price change that is representative of the commerce actually being transacted at the relevant store(s).

22

restricted the sample to those UPCs that were available for at least 13 weeks of the year before the entry event and in at least 7 weeks of each 6-month intervals after entry (the corresponding requirement was 13 weeks in any 12 month interval), in both the treatment store in question and in at least one "control" store.[19][20]   Rapid turnover of UPCs implies that these items account for a small fraction of the total number of UPCs in the data, but they account for a much larger fraction of total sales in the representative Wild Oats store.  For the average treatment store, these items account for two-thirds of sales.

57. Exhibit 5 shows the estimated impact on Wild Oats prices and sales for each of the five Whole Foods entry events in the data.   For each entry event, the Exhibit shows the percentage change in store-specific Wild Oats prices between the 12 months prior to Whole Foods entry and three post-entry periods—0-6 months post-entry, 7-12 months post-entry, and 13-24 months post-entry.  The Exhibit also reports changes in each store's total weekly sales between the 12 months prior to Whole Foods entry and each of these post-entry periods, again using the same treatment-control methodology used for the price analysis.

58. Of the five entry events summarized in Exhibit 5, two—West Hartford, Connecticut in October of 2005 and Fort Collins, Colorado in June of 2004—offer sufficient post-entry price and volume data to discern a time-pattern of effects.  For example, the first row of the Exhibit shows the impact of entry by Whole Foods into West Hartford.  Compared to Wild

---

[19] In order to form accurate, but estimates of the impact of entry, and noting that there is reason to believe that competitive responses to entry may be anticipatory in nature (i.e. commence prior to the date of actual entry) I exclude from the pre-entry period the 8 weeks immediately prior to the opening of the Whole Foods store.

[20] For this exercise, control stores are non-treatment Wild Oats stores located in the same region that are at least 25,000 square feet in size.

Oats "control" stores that did not face entry, prices in Wild Oats' West Hartford store were ███ percent lower in the ██████ immediately following entry by Whole Foods, ███████████████████ following entry, and ████████████████████ or more. The corresponding percentage reductions in sales in West Hartford were ████ ████ and ███ for these time intervals. So, although the effect of entry on prices in West Hartford dissipates over time, the impact on sales appears to grow.

59. The initial ███████████ price effect in Fort Collins is ███ percent and remains about ██████████ below their pre-entry level even after ██████ And, as in West Hartford, the effects on sales grow substantially over time. In the second year post-entry, sales in Wild Oats' Fort Collins store had fallen by over ██████████ compared to control stores. It is noteworthy that the Fort Collins Wild Oats store was closed in December of 2006.

60. Exhibits 6a-b provides a graphical representation of the effects of Whole Foods entry on Wild Oats sales and margins that confirms the price and sales effects shown in Exhibit 5. Exhibit 6a presents the results for sales while Exhibits 6b presents the results for margins. The horizontal axis in each figure shows quarters from the date of Whole Foods' entry. So -1 refers to one quarter before the quarter of entry and +1 refers to one quarter after the quarter of entry, and so on.

61. Exhibit 6a shows that sales of the affected Wild Oats stores fall abruptly at the time the Whole Foods store enters, and do not recover. The effects of Whole Foods entry on sales are remarkably large and persistent — the typical Wild Oats "treatment" store suffers nearly a ███ percent reduction in sales due to new competition from Whole Foods, and never recovers. As Exhibit 6b shows, margins fall somewhat pre-entry and then fall very sharply at the time the competing Whole Foods store enters. Margins then

recover somewhat over the subsequent several quarters. After a year, margins in Wild Oats "treatment" stores remain roughly ▮percentage points below the margins of stores that did not experience entry. At fixed unit costs these margin reductions would imply price declines of ▮ percent at the ▮ percent gross margin typical of a Wild Oats store.

62. In summary, the econometric estimates contained in this section of my report suggest that the products offered by Whole Foods and Wild Oats are uniquely good substitutes for one another and that Whole Foods stores have the largest competitive effects on Wild Oats.

### Cross-Sectional Evidence: Ownership Structure in Multi-Store Locales

63. Since the data produced by the parties contain no events in which Wild Oats entered Whole Foods markets (and only one, fairly recent, example in which Wild Oats exited a Whole Foods market) these data do not offer a direct test of the extent to which the Wild Oats presents unique constraints to Whole Foods that will disappear as a result of the proposed transaction.

64. In addition, my Whole Foods entry analysis does not directly address the issue contemplated by the *Guidelines* market definition test in those cases where Whole Foods would choose to operate both stores under a single banner—if a particular set of suppliers (here Whole Foods and Wild Oats) were under single ownership, would prices be materially and sustainably higher?

65. As a result, I undertook a third econometric study that compares Whole Foods' margins across two groups of markets. The first group is composed of those Whole Foods stores that do not have a competing Wild Oats store within 5 miles (the "control" group) and the second group is composed of those Whole Foods stores that do have a competing Wild Oats store within 5 miles ("the treatment group"). I divide the universe

25

of Whole Foods stores as follows: (i) Whole Foods stores in locales with neither another Whole Foods nor a Wild Oats within 5 miles; (ii) Whole Foods stores with exactly one other Whole Foods but no Wild Oats within 5 miles (WF-WF locales); and (iii) Whole Foods stores with exactly one Wild Oats but no other Whole Foods within 5 miles (WF-WO locales). My empirical analysis (i.e. regression) compares Whole Foods margins in the WF-WO locales (where the other local store is owned by Wild Oats) to margins in the WF-WF locales (where W F owns both stores). This difference estimates the change in margin that might occur if independent ownership of the two stores were changed to joint ownership by Whole Foods.

66. Results are shown in Exhibit 7, which shows estimated margin differences between WF-WO locales and WF-WF locales, at both the store and departmental levels. At the store level, Whole Foods margins are about ███ tenths of a percentage point (█████) lower in WF-WO locales than in WF-WF locales though this difference is not statistically significant from zero at the five percent level (p-value = 0.1625). The 95 percent confidence interval runs from ████████ implying that these data are consistent with a competitive effect on margins ranging from ████████████ ████████████████████ at this confidence level. Assuming constant unit costs, the point estimate of ████ implies that store-wide prices are about ██████████ when Whole Foods faces local competition from Wild Oats. To the extent that this experiment replicates the change in ownership structure contemplated by the proposed acquisition, it implies that Whole Foods' prices would ██████ ████████████ in markets where coexisting Whole Foods and Wild Oats stores would come under common ownership.

26

67. The results at the department level show that Whole Foods' margins are ▮▮▮▮▮▮▮▮▮▮▮ in the WF-WF stores than in the WF-WO stores for both produce and seafood. The estimated effects are ▮▮ percent for produce items and ▮▮ for seafood, and both estimates are statistically significant at the .05 level. The effect for meat is ▮▮ percent with a p-value of .051. The fact that margins are ▮▮▮▮▮ in produce, seafood and meat when the two stores in an area are jointly owned by Whole Foods is consistent with the more unique nature of Whole Foods and Wild Oats in these departments. In contrast, the effect for groceries--where the two sellers are less differentiated from others—is ▮▮▮▮▮▮▮▮▮▮

68. Exhibit 8 presents a final comparison that is a hybrid of the entry analysis in Exhibits 3 and 4 and the ownership analysis in Exhibit 7. In Exhibit 8, I compare the effect of Whole Foods entry on the margins of Whole Foods stores to the effect of Whole Foods entry on margins of Wild Oats stores. Again, I focus on entry within a five mile radius of the existing store and focus on Whole Foods stores that have no other Wild Oats or Whole Foods store within 5 miles.[21] The results for the own store entry suggest essentially ▮▮▮▮▮▮▮ in margins – the estimate implies a decline of roughly ▮▮▮▮▮▮▮▮▮▮ The effects of competitive entry on margins are much larger, ▮▮ percentage points, and are similar to those shown in Exhibit 3. Since both events show the effect of entry of a new Whole Foods store within 5 miles, the difference between the effects reflects the owner of the existing store – whether the current store is owned by the entrant, Whole Foods, or a different firm, in this case Wild Oats. These results suggest an ownership effect of roughly ▮ percentage points on margins (corresponding to a ▮ percent effect on prices at fixed

---

[21] Since I do not have events where Wild Oats enters into markets with an existing Whole Foods I cannot perform the corresponding analysis for the effects of Wild Oats entry.

unit costs).[22] This is similar, but somewhat smaller than the competitive entry effect shown in Exhibit 3.

69. The econometric evidence presented above is consistent with the proposition that Whole Foods and Wild Oats are indeed the closest substitutes for one another, and that the entry of other supermarkets that target the same customers with a similar format (e.g. Earth Fare) also have economically significant effects. The econometric evidence also suggests that the entry of Trader Joe's has some effect on Whole Foods and Wild Oats but significantly less than the effect of entry by Whole Foods on Wild Oats. Finally, the econometric estimates show no substantial effect of the entry of conventional supermarkets, premium markets or mass merchants.[23].

## VII.  Other Evidence on Substitution and Price Effects

70. The factual record in this case is consistent with the preceding econometric evidence. As discussed earlier, the Project Goldmine document created by Whole Foods indicates its intent to close roughly ███ Wild Oats stores, most of which currently overlap with Whole Foods stores. The document also provides estimates of the Wild Oats store revenues that Whole Foods anticipates being transferred, or diverted, to the Whole Foods store in that market following the closure of the Wild Oats store. The magnitude of these diversions is ███████████████ ███ and sometimes reaching ██████████–indicating that Whole Foods must be viewed as a good substitute by Wild Oats customers. In

---

[22] Even though my ultimate interest is in prices, I present the results for margins since measuring prices is somewhat problematic due to the changing composition of SKUs.

[23] The lack of effect for these retailers may also reflect the "saturation" of their part of product space. There are often many conventional markets and mass merchants so that the entry of any one would not have a substantial effect on sales or margins.

Appendix C I have mapped the local area around these Wild Oats stores, noting the locations of the parties' stores and various other food retail outlets.  Despite the presence of all these third party competitors, some located closer to Wild Oats than is the Whole Foods store, Whole Foods anticipates that Wild Oats customers will divert to its own stores in ███████████████ Since more closely located third party stores would be better substitutes for Wild Oats if all else were equal, these maps illustrate that the ███ diversions from Wild Oats to Whole Foods indicated in Project Goldmine reveal Whole Foods' perception that there exists a uniqueness of substitutability between Wild Oats and Whole Foods among Wild Oats customers.

71. A wide variety of documents from both parties attest confirm the significant price competition that follows the entry of Whole Foods into a Wild Oats market.  For example, Whole Foods FY 2005 Second Quarter Board Report, states "[M]argins are a little low [in Whole Foods-Louisville] because we are having to match some ridiculously low special pricing at Wild Oats. Sales at Oats are way down, and they are responding with some desperation pricing"[24];  Similarly, documents from Wild Oats show that Wild Oats created separate pricing zones for ███████████ and ███████████████ to defend against Whole Foods entry into those markets.[25] Many other documents show that Whole Foods recognized this competition and responded:

   1. WFM-002-00000802 ("Wild Oats ran their second 20% off the entire store 72 hour sale. ██████████████████ "

---

[24] Whole Foods FY 2005 Second Quarter Board Report page C-2.

[25] EOAT-0326498

29

2. WFM-006-00001131 (" ██████████████████████ ██████████ "

3. WFM006-00000963 ("We had a competitive pricing strategy in place for the two new stores…to claim market share from competitors..██████opened…on████████..We have put in place a competitive pricing strategy to beat ████████ to the punch…██████████████ is now trying desperate measures such as buy one get one free promotions and 20% to 50% off with very limited success. The ████████ store [in ████████ is still…heavily discounting product to try and drive sales."

4. WFM-006-00004600 Whole Foods matches Wild Oats prices in the Rocky Mountain Region.

1. Earth Fare and New Seasons

72. Evidence from the record indicates that Earth Fare, New Seasons and similar stores compete directly with Whole Foods and Wild Oats. The format and positioning of these stores is quite similar to that offered by Wild Oats and Whole Foods. In addition, the econometric evidence presented in Exhibit 4 showed a relatively large effect of ████████entry on Whole Foods pricing and sales.

73. A large set of Whole Foods documents indicates Whole Foods' intent (and then action) to aggressively undercut ████████on the pricing of key items.[26]

---

[26] WFM-123-00016521; WFM-128-00041877; WFM-128-00041879; WFM-123-00016697; WFM-128-00034534; WFM-123-00016954; WFM-128-00042158; WFM-123-00017250; WFM-109-00032941; WFM-128-00005472; WFM-130-00002286; WFM-128-00005691; WFM-025-00011349; WFM-109-00022114; WFM-123-00019231; WFM-127-00000958; WFM-051-00000248; WFM-127-00001529; WFM-128-00001536; WFM-128-00008649; WFM-109-00041987; WFM-109-00009099; WFM-127-00002500; WFM-128-00016935;

30

74. Substantial evidence from Wild Oats indicates its perception that New Seasons is a particularly good substitute. Furthermore, Mr. Perry Odak, ex-CEO of Wild Oats, indicated in his Investigational Hearing (pp. 91-92) that New Seasons was one of his closest competitors on service (other than Whole Foods). Similarly, Mr. Walter Robb, co-President of Whole Foods, indicated in his Investigational Hearing that consumers view New Seasons as a particularly good substitute in the minds of consumers.[27]

2. Trader Joe's

75. Evidence from the record indicates that Trader Joe's competes with Whole Foods and Wild Oats but to a significantly smaller degree. In particular,

1. Trader Joe's overlaps with Wild Oats and Whole Foods on only a handful of items. While Trader Joe's is an important competitive constraint on these items, Trader Joe's does not offer a competitive constraint on the vast majority of Wild Oats and Whole Foods products.[28] This is reflected in John Mackey's report to the Board on 9/13/2006.

> "Trader Joe's continues to rapidly expand, but our new large store format has created a large comparative gap with them. TJ's is now a "fill-in" store for Whole Foods, but lacks a wide enough product selection to be considered to be a complete alternative to our stores."[29]

---

WFM-013-00011261; WFM-109-00026157; WFM-109-00049582; WFM-109-00049583; WFM-051-00003642; WFM-128-00042101.

[27] Investigational Hearing of Walter Robb, p. 227, 285

[28] WFM-GEN-00020217 indicates that Whole Foods only price checks TJs on about ▊ in each region, and only matches prices on about ▊ in each region.

[29] WFM-008-00014799

31

2. Trader Joe's uses a small-store format. This is highlighted in the deposition of Bane from Trader Joe's.[30]

> "Q:     What's the average size of a Trader Joe's store in terms of floor space?
> A:     [T]here's some older stores that would be smaller probably, but right now we're looking for about 12,000 square feet, with maybe 10,000 on the sales floor is a good size for us…..



3. Trader Joe's is not upscale, lifestyle, high service, etc. This too is reflected clearly in the testimony of Trader Joe's' Bane.

> "[O]ur format is going after value, and I just don't see that, you know, adding a service department provides the value for our customers, so we don't do it. We're real dogmatic about it, because our stores are the size that we can't …support service departments"[32]…



─────────────────────

[30] Investigational Hearing of Bane, pp. 44-45

[31] Investigational Hearing of Bane, pp. 44-45.

[32] Investigational Hearing of Bane, p. 62.

[33] Investigational Hearing of Bane, p. 114.

A: 

"34

4. Trader Joe's does not offer the same level of [REDACTED] Once again the testimony of Bane makes this clear

"Q: 

"35

In fact, only about [REDACTED] of Trader Joe's revenues come from perishables[36] compared to roughly 70% for Whole Foods.

76. Based on the differences highlighted in the factual record and the results of econometric analysis presented above I conclude that Trader Joe's does compete with Whole Foods and Wild Oats but to a significantly smaller degree than Wild Oats and Whole Foods compete with each other and other stores with a more similar format such as Earth Fare and New Seasons.

---

[34] Investigational Hearing of Bane, pp. 100-101.

[35] Investigational Hearing of Bane, p. 82.

[36] Trader Joe's response to CID.

3. Conventional Supermarkets

77. Consistent with the econometric evidence presented above, the evidence from the factual record indicates that conventional supermarkets are not as close substitutes for Whole Foods or Wild Oats as they are for each other. There are many reasons:

1. Conventional Supermarkets lack Whole Foods' or Wild Oats' variety of organic offerings. It is difficult for conventional markets to compete on organic offerings. If conventional supermarkets offer a lot of organic items, they do not sell enough with their current customer base, and many of the products spoil, reducing margins. But if conventional supermarkets only offer a few organic items, they cannot add customers with a high demand for organic offerings to their customer base. This is reflected in the statements of Mr. Perry Odak, ex-CEO of Wild Oats[37]:

> "[T]he issue is that until you have a predictable demand or takeaway at the store, you don't know how much to buy. If you buy too much and you don't sell it because you're trying to get in the market, you shrink it out and you lose money. If you buy too little, the consumer comes in your store and says you're not in the business… of organic and I'll go buy it someplace else.
>
> So…the conventionals have a very difficult time getting into this business. One…it's primarily a or predominantly a perishable business. And two, they have never been able to establish a predictable takeaway from the product.
>
> So you can walk any Safeway today, and I've walked hundreds of Safeways and counted the number of organic items even in their new stores, in produce, and it's 48 to 50 SKUs. You know, Whole Foods/Wild Oats probably has ███ ███ in the department.

---

[37] Investigational Hearing of Mr. Perry Odak, pp. 77-78.

And you know, I have specifically sat and talked to the department managers there, and what happens is they tell me they get a big push, you got to get more organic, carry more organic. Then when they miss their numbers because… they bought too much and they shrunk out, they get heat from corporate headquarters to the store director, who then puts heat on the department manager, and the first thing he or she does is cut back on the amount of organic they have in the store. Because why? They get pressure to make their numbers.

And we've seen this for the five or six years I ran the company. This has been a consistent pattern. They have a big push on. It doesn't sell through. Their margins aren't where they ought to be, and it shrinks back and shrinks back and shrinks back. There's less and less organic in those stores."

2. While documents from Whole Foods indicate that they price check ▮▮conventional supermarkets on ▮▮▮▮▮▮▮, they also show that ▮▮▮of those SKUs are in dry grocery and only ▮▮are in perishables. In contrast, nearly 70% of Whole Foods' revenues come from perishables.[38]

3. Documented attempts by conventional supermarkets to move closer to the Whole Foods/Wild Oats model have not impacted Whole Foods. This is reflected in Mackey's Q1, 2007 report to the Board[39]:

"Safeway is continuing to roll out their "Lifestyle Stores". I don't believe these stores have had much real impact on us, although they've increased Safeway's comps a couple of hundred basis points (not that much when you consider the immense amount of capital invested)"

---

[38] WFM-019-00006972

[39] WFM-008-00021117

35

78. The evidence also confirms that mass merchants are not close substitutes. Mass merchants have the same problems as conventional supermarkets, often to a larger degree. In Q1, 2007 Mackey reported to his board that[40]:

> "███████ despite the hoopla in the media, hasn't had much impact in the organic market. I doubt they will because their core customers don't want to pay the higher prices and their non-core customers don't want to shop there for various reasons"

> "Some people want the cheapest food and some people want the highest quality food with high levels of customer service. Wal-Mart meets the first group of people and Whole Foods meets the needs of the second group.[41]"

Similarly, a Wild Oats' spokeswoman noted:

Mr. Mackey also has explained that

> "Right now I don't see too much of a customer overlap between Whole Foods and ███████....Whole Foods doesn't operate in the same markets as ███████ and it caters to a higher-income shopper....I don't see ███████ as a great threat to Whole Foods right now....The disparity of their customer base is too great..... There's very little overlap between our shoppers and ███████ We're a specialty retailer and our customers don't focus on price first." [42]

79. From the point of view of market definition, the issue of how to treat premium supermarkets is somewhat moot since the major gourmet market chains, Wegman's, Central Market and Plum Market, are not present in any of the overlap markets.

## VIII.  Competitive Effects of the Acquisition

80.   The evidence on substitution and the degree of competition between Whole Foods, Wild Oats and other retailers presented above provides

---

[40] WFM-008-00021117

[41] John Mackey, http://www.wholefoods.com/blogs/jm/archives/2005/10/

[42] WFM-001-00005640

36

direct evidence for understanding the competitive effects of the proposed acquisition. In this section, I use that evidence to predict the competitive consequences of the acquisition in the local markets where Whole Foods and Wild Oats currently compete. Based on this analysis I find that <u>the proposed acquisition will have anticompetitive effects in the local markets where Wild Oats and Whole Foods currently compete head-to-head</u>.

***Overlap markets where both firms currently compete and Whole Foods plans to close the competing Wild Oats store.***

81.    The competitive effect of the proposed acquisition of Wild Oats by Whole Foods will be most acute in markets where Whole Foods plans to close the Wild Oats stores with which it now competes. The econometric evidence shows that banner entry by Whole Foods into markets where Wild Oats was already present caused Wild Oats to reduce prices. On average, during the first year prices were ▮▮▮▮▮▮▮▮▮ and remained roughly ▮▮▮▮▮ in the second year after entry (see Exhibit 5).

82.    Conceptually, the closure of the Wild Oats stores is essentially the reverse of the entry experiment with a move from having both firms present to having one firm present rather than a movement from one present to both present. However, the effects may not be exactly symmetric due to the fact the Whole Foods and Wild Oats are not identical competitors and we are adding Whole Foods in the entry analysis and eliminating Wild Oats in the candidate closures we wish to address. We might expect the effects of Wild Oats exit to be somewhat smaller owing to the greater size of Whole Foods in most of the overlap markets.[43]

---

[43] Typically larger firms have larger competitive effects on smaller firms than vice-versa. Since Whole Foods is larger than Wild Oats (in terms of sales) in most of the markets in which they compete we might expect the effects of Wild Oats exit on Whole Foods

83. The entry of Earth Fare into direct competition with Whole Foods provides an alternative estimate of the effect of Wild Oats exit. The evidence from Exhibit 4 suggests that margins fell roughly ███ percentage points (corresponding to a price ███████████████████████ with the entry of Earth Fare. The Earth Fare experience may be a useful benchmark for the case at hand since both deal with the effect of firms competing against Whole Foods and the available evidence suggests that both Earth Fare and Wild Oats have struggled in competition against Whole Foods.

84. The medium-run (12-24) effects on price we observe from the Whole Foods entry (adjusted for the difference in sales) which averaged ████████ and the ██████████ effect we see from the Earth fare entry experiment suggest that prices will rise roughly ██████████ with the closure of the Wild Oats stores.

85. The closure of the Wild Oats stores will transfer ██████████ revenues to Whole Foods. On the whole, based on Whole Foods' own predictions, Whole Foods expects to capture ██████████ of current Wild Oats sales in these markets. Using a ██████████ incremental margin, the annual profit on these transferred sales will be roughly ██████████. Indeed, this transferred revenue is a major motivation for the deal. The testimony of Whole Foods' Mackey makes this clear:

> "[I]t self evidently will lessen competition in those markets that we are competing with Wild Oats in when we are going to intend to close stores. Again, isn't that true in every one of the acquisitions any one of these guys do? One of the motivations is to eliminate a competitor. I will not deny that. That is one of the reasons why we are doing this deal. That is one of the reasons we are willing to pay

to be smaller than the effect of Whole Foods entry on Wild Oats. On average, Whole Foods is roughly 3 times larger than Wild Oats in terms of sales in the markets where they compete head-to-head.

$18.50 for a company that has lost $60 million in the last six years. If we can't eliminate those stores, then Wild Oats, frankly, isn't worth buying."[44]

86.  The closure of the Wild Oats stores would be harmful to consumers even if prices were not changed by the acquisition.  Consumers that currently shop at Wild Oats have revealed that they prefer the combination of price, selection, quality, location etc. to that offered by the competing Whole Foods store—that is why they shop at Wild Oats rather than Whole Foods or another supermarket.  For each of these customers, the appropriate loss from the closure could be measured by the price increase required to make them shift from Wild Oats to Whole Foods or another store.  For example, if half of the current Wild Oats current business would shift to other stores in response to a 5 percent rise in price at Wild Oats (an implied demand elasticity of roughly 14) then we know that the loss from closure would be at least 5 percent of expenditures at Wild Oats for the half of the Wild Oats customers that would not switch.  That would make the aggregate consumer loss at least 2.5 percent of current Wild Oats revenue (that is, a 5 percent loss for half of the business).  Since the Lerner Index[45] for the Wild Oats stores implies an elasticity of █rather than 14 these calculations imply that the non-price loss from store closure may be quite high—many times the 2.5 percent of revenues calculated in this simple example.  Indeed, the direct loss from closure may exceed the loss from higher prices.[46]

---

[44] Investigational Hearing of Mackey, p. 75.

[45] The Lerner index uses markups to infer elasticity.  In order to estimate the true price elasticity (which will determine consumer's willingness to pay),  firms must set price holding other prices fixed.  If firms set prices assuming other will match their price changes then the Lerner index will underestimate the true elasticity.

[46] Timely and effective entry and repositioning, if they were to occur, would mitigate this loss.

87.  How long will these effects last? To the extent that Wild Oats is not profitable (in a long-run sense) in these overlap markets a small rise in price would not be eroded by entry or repositioning of other parties unless they are more effective competitors than Wild Oats. Consumers will lose in these markets for as long as the Wild Oats store would have remained in the market or until is replaced by an equivalent competitor.

### Overlap markets where both firms currently compete and Whole Foods plans to continue to operate the competing Wild Oats store.

88.  Competition will be reduced in the markets where Whole Foods and Wild Oats currently compete even if Whole Foods plans to keep the Wild Oats store open.  The empirical evidence comparing markets where the same firm owns two stores to markets where two stores are owned by independent firms indicates that prices are roughly ▮▮▮▮▮▮▮▮▮ in the joint ownership markets.  Thus the evidence would suggest that prices in these markets will be roughly ▮▮▮▮▮▮▮▮ as a result of the acquisition, with a larger impact in perishable items (see Exhibit 7).

89.  The fact that pricing at Whole Foods and Wild Oats is constrained by competition from the other party is also evident from the deposition of Whole Foods and Wild Oats executives.  Thus, Mr. Odak, the ex-CEO of Wild Oats testified:

> "[W]e knew from a competitive standpoint that we could not ▮▮▮▮▮ ▮▮▮▮ Whole Foods and expect that we were going to build the business, so we as a pricing policy strove, where Whole Foods was a competitor, to ▮▮▮▮▮▮▮ with Whole Foods on a market basket."[47]

90.  Evidence from Whole Foods suggests that competition from Wild Oats had similar effects on Whole Foods' pricing and increased their efforts to compete on non-price dimensions as well:

---

[47] Investigational Hearing of Perry Odak, pp. 40-41.

40

"Without competition we potentially become slow and lazy. Our prices go up and our customer service goes down… the opening of Wild Oats makes us take things to the next level. We can't afford to let Wild Oats actually provide the same level of customer service as us….we need to go above and beyond what we are presently doing. We need to be impressing our customers now before Wild Oats opens so that when they go and check it out (which much of Boulder will do) they'll say to themselves and their friends, "well that new store really wasn't all that, let's continue to shop at Whole Foods."[48]

91.    Similarly, the entry of ███████ into a market where Whole Foods operated spurred Whole Foods to increase its competitive efforts on both price and non price margins.  This is reflected  in the following excerpt from one of the quarterly reports that A.C. Gallo, co-President, made to the Whole Foods Board of Directors in 2005:

"In June we will have an ███████ market opening up about a half-mile from our ███████ store and expect some fierce competition.  We have been remodeling the ███████ store, getting it ready to show ███████ that it is a bad idea to open up too close to us."[49]

92.    The elimination of the Wild Oats format will generate some loss to consumers from decreased variety, though there may also be a gain given that the median customer of the two stores seems to prefer the Whole Foods model.  However, given that the Whole Foods option is already available in these markets, the real question is whether customers that do not currently shop at Whole Foods would prefer the change in format. Since those customers choose to shop at Wild Oats or another store this is significantly less likely than for the population as a whole.  In particular,

---

[48] WFM-009-00011413

[49] Q2-FY05 @ p. C-4

to the extent that the stores are close geographically we would expect these customers to prefer the option of the Wild Oats format.

93.    The bottom line is that the acquisition will reduce competition and thereby raise prices by something on the order of one percent (with a larger impact in perishables) in the "overlap" markets where Whole Foods will continue to operate the Wild Oats store. It will also reduce non-price aspects of competition and reduce the variety of offering available to consumers in these markets.

94. If other firms are equally efficient entrants as Wild Oats, welfare will not be affected in the long run in these markets and entry would replace any long run competition that would be lost through the closing of the Wild Oats stores. To the extent that Wild Oats is a more viable competitive threat than the remaining alternatives, price and non-price competition would remain lower and consumer welfare would be reduced even in the long run in these markets.

## IX. Application of the *1992 Horizontal Merger Guidelines*

95. In this section, I show how the economic analysis of the marketplace and the competitive impact of the acquisition described above fit into the *1992 Horizontal Merger Guidelines* approach. In particular, I find that

1.    Premium Natural and Organic Supermarkets represent a relevant antitrust market using a SSNIP test of approximately 1 percent.

2.    The market definition of Premium Natural and Organic Supermarkets effectively captures the competitive impact of the proposed acquisition.

3.    That same market definition provides a useful economic framework for understanding the effects of the acquisition and the broader economic landscape in which it takes place.

42

### A. The Relevant Product Market: Applying the Hypothetical Monopolist Test

96.    The 1992 *Horizontal Merger Guidelines* provide a clear procedure for identifying the "relevant antitrust market" for purposes of analyzing a merger.  In order to determine which products should be included in the relevant antitrust market we begin with each of the products sold by the two firms in question and perform the hypothetical monopolist test.  In that test, we ask whether a hypothetical firm that was the sole seller of a given set of products would find it profitable to impose a small but significant (usually, but not always,[50] taken to be 5%[51]) non-transitory increase in the price of any of those products.  If the answer is "yes" then the given set satisfies the relevant market test.  If not then we add the product which is the next best substitute (defined in the *Guidelines* as the product that gains the largest share of the revenue diverted by a price increase).[52]  The test is then repeated.  Products are added sequentially in

---

[50] "In attempting to determine objectively the effect of a "small but significant and nontransitory" increase in price, the Agency, in most contexts, will use a price increase of five percent lasting for the foreseeable future. However, what constitutes a "small but significant and nontransitory" increase in price will depend on the nature of the industry, and the Agency at times may use a price increase that is larger or smaller than five percent."  Horizontal Merger Guidelines, Section 1.11.

[51] The Guidelines recognize the difference between the relevant market definition exercise and the evaluation of anticompetitive effects, and note that "[t]he "small but significant and non-transitory" increase in price is employed solely as a methodological tool for the analysis of mergers: it is not a tolerance level for price increases." (Guidelines, Section 1.0).

[52] Since the magnitude of diversions are determined by the magnitudes of both market share and cross elasticity, the Guidelines could add a firm/product with a lower cross-elasticity of demand with respect to products already in the relevant market than another firm, simply because that firm had a larger market share (i.e. revenue base).  Yet, this would not take away from the fact that a set of smaller firms/products with greater cross elasticities of demand to those products already in the market might collectively present  stronger competitive constraints to the products within the market.

43

this way until a sole seller would find it profitable to increase price by the amount deemed to be "small but significant".

97.    Given the thousands of products sold by supermarkets, a product-by-product analysis is not feasible.  Such an analysis would also be misleading because consumers do not typically choose retailers of the goods in question on a product-by-product basis; rather, they typically purchase an array of products from a single source.  I therefore approach market definition by considering the collection of products provided by each of the individual retailers at issue and consider substitution by consumers across these collections.  The hypothetical monopolist is then the sole seller of the goods and services offered by a given collection of firms.  If a sole seller in control of that collection of firms was able to raise price a small but significant amount for a non-transitory period of time, that collection of firms would constitute a relevant antitrust market.

98.    I begin with the market definition proposed by the FTC — Premium Natural and Organic Supermarkets — and I ask whether that definition satisfies the hypothetical monopolist test.[53]  To the extent this definition passes that test we can conclude that the relevant market, as defined by the *Guidelines*, is no larger than Premium Natural and Organic Supermarkets.

---

[53] The relevant product market definition exercise of the Guidelines solely focuses on demand side factors ("Market definition focuses solely on demand substitution factors--i.e., possible consumer responses. Supply substitution factors--i.e., possible production responses--are considered elsewhere in the Guidelines in the identification of firms that participate in the relevant market and the analysis of entry", Section 1.0 of the Guidelines).  I have followed this dichotomized approach in the course of fulfilling the assignment I received from the FTC.  Since the Guidelines approach to relevant market definition does not take into account price reductions due to supply-side substitution, whereas results based on the econometric analysis of real world margin/pricing outcomes may include the impact of such effects, such econometric analyses provide a conservative answer to the Guidelines exercise.

99.   To implement the test we must ask which sources of supply fit the definition of premium natural and organic supermarkets and decide what magnitude of price increase represents a small but significant increase in price. I begin with Whole Foods and Wild Oats—as proposed by the FTC—and ask whether other sellers or sources of supply fit that definition. Based on the factual record in this case two particular competitors, Earth Fare and New Seasons are likely candidates.[54] I use the econometric and factual evidence cited above to investigate whether the services provided by these firms are in fact better substitutes for those provided by Wild Oats and Whole Foods than are the services provided by other candidate retailers such as premium supermarkets, conventional supermarkets, specialty retailers (such as Trader Joe's), or mass merchandisers (such as Wal-Mart).

**A. Premium Natural And Organic Supermarkets Constitute a Well-Defined Relevant Antitrust Market for Purposes of Evaluating the Competitive Impact of this Proposed Transaction**

100.  Based on my econometric analysis and the evidence from the record, I apply the hypothetical monopolist test to the Premium Natural and Organic Supermarket market proposed by the FTC. I ask whether the empirical evidence developed above, and further evidence reported here, supports the hypothesis that a monopolist in this proposed market could implement a small but significant non-transitory increase in price. In terms of the percentage change in price deemed to constitute a small but significant non-transitory increase, I will follow what I understand to be

---

[54] See below for discussions of Earth Fare. For New Seasons, see Investigational Hearing of Mackey, p. 132, Investigational Hearing of Odak , pp. 91-92, Investigational Hearing of Walter Robb, p. 227, 285.

previous applications of the Guidelines to grocery store mergers and use a price change of one to two percent that persists for two years.[55]

101. The entry events used to address the degree of substitution above are also informative about the hypothetical monopolist question. The data in Exhibits 3, 4 and 5 above summarizes the evidence on the effect of entry into the candidate relevant product market defined as Premium Natural and Organic Supermarkets. The results indicate that entry reduces storewide margins by an average of ▇ percentage points and prices by an average of ▇ percent in the ▇▇▇▇▇▇. On average sales of the existing store ▇▇▇▇▇▇ Based on the estimates in Exhibit 3 we would predict that eliminating Whole Foods as a competitor would allow Wild Oats to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

102. For purposes of my analysis, it is important to know whether these price effects are non-transitory. As predicted by economic theory, Exhibits 5 and 6 indicated that price and margin reductions ▇▇▇▇▇▇▇ over time, but they ▇▇▇▇▇▇. The evidence from Whole Foods entry events — there are 5 such events, of which 2 provide evidence beyond one year post-entry — support a price effect of ▇▇▇▇▇▇▇ after entry. Results from the cross-sectional analysis (Exhibit 7), which

---

[55] Product markets are determined by the reasonable interchangeability between a product and substitutes for it, and two products are in the same market if consumers would switch from one product to the other in response to a "small but significant" and non transitory price change. Commentators have noted that, for retail markets characterized by high volume of sales but low profit margin per dollar of sales, a hypothetical price increase lower than 5% is appropriate. Harris & Jorde, Market Definition in the Merger Guidelines: Implications for Antitrust Enforcement, 71 Calif. L. Rev. 464, 482 (1983) ("In the high-volume grocery business . . . net income typically represents 0.5% of sales, so a 5% increase in price would represent a 1000% increase in profit . . . . Surely, a sizable number of competitors not now in the market would enter if profits were running at that exorbitant level. Just as surely, the managers of any recently merged grocery firm would know better than to try to raise prices by 5% across the board.").

46

will tend to reflect long-run impacts, are less precisely estimated but imply that changes in ownership structure affect prices by a similar amount. The evidence from the comparison of entry events across ownership types (Exhibit 8) provides further confirmation of effects in ▇▇▇▇▇▇▇▇▇▇▇▇.

103. What does this entry evidence tell us about the hypothetical monopolist test? Since we know that Whole Foods plans to close the Wild Oats stores in ▇▇ overlapping markets where they now compete, we can assume that closing the Wild Oats stores in these markets must be profit maximizing. If prices depend only on the number of competitors and not their identities, then we could infer that prices would return to their pre-entry level and the effect of sole ownership would simply be the reverse of the effect of entry.

104. Taken together, the econometric evidence from Exhibits 3-8 and the evidence from the factual record cited above support the hypothesis that Premium Natural and Organic Supermarkets represent a relevant product market as defined in the *1992 Horizontal Merger Guidelines* if one applies a price increase standard of one to two percent. This does not imply that other retailers do not compete with these stores. It simply means that a sole seller that controlled all of the stores in a particular market could raise price by one percent above the currently prevailing level without losing sufficient sales to retailers outside of this market to make the price increase unprofitable.

**B. Geographic Market Definition**

105. According to the *Horizontal Merger Guidelines*, the geographic market is defined by the same hypothetical monopolist test used to define the relevant product market except what is varied in this case is the

47

geographic scope of products sold rather than the type of products included. Fundamentally, the limits of the geographic market are determined by the willingness of individuals to purchase from sellers outside the geographic boundary.

106. Since people shop for groceries frequently and as a part of their regular routine they tend to purchase groceries from retailers in a relatively small geographic region. Evidence from an analysis prepared for Whole Foods suggests a distance representing 16 minutes drive time as the boundary of where individuals shop.[56]

107. As a practical matter, the exact distance chosen does not matter much for my analysis. In the vast majority of cases where Whole Foods and Wild Oats compete in the same broad area they are in fact located quite near each other (see Exhibit 1). The distribution of stores reflects the process by which Whole Foods has entered these markets—choosing in most cases to locate very close to the existing Wild Oats stores. For purposes of my analysis I define 18 geographic markets. The list of markets and Premium Natural and Organic Supermarkets in those markets are shown in Exhibit 9.

108. For purposes of my analysis I have distinguished markets based on the presence or absence of Whole Foods and Wild Oats. For markets where both firms currently operate I further distinguish between markets based on whether Whole Foods plans to continue operating the existing Wild Oats store. [57] In principle, it might be necessary to divide markets still further based on the presence or absence of other competitors. However,

---

[56] WFM-002-00002450 @ 7.

[57] I make this later distinction based on the categorization of stores provided in the Project Goldmine spreadsheet  Project Goldmine Store Level Merger Model v76 – Non-Divest.xls.

48

there is only one overlap locale with another competitor within the relevant product market (New Seasons in Portland, OR).

### C. Summary on Market Definition

109.  The tools of economic analysis can be applied to a wide range of market definitions, and if done correctly will yield the same answers across those definitions.  In economic analysis, the goal is to define markets in a way that brings transparency and simplicity to the analysis.  In the case at hand, the data support the definition of a rather narrow antitrust market, Premium Natural and Organic Supermarkets, based on the procedures outlined in the *1992 Horizontal Merger Guidelines* using a one to two percent price increase standard.[58]  It is important to keep in mind that in cases of competition among differentiated products, as we have here, market boundaries are not bright lines.  Competition occurs on a continuum, wherein those "in the market" compete most directly.  Other firms who lie outside the indicated market boundary nevertheless often provide substantial competitive constraints.

---

[58] Federal Trade Commission Bureau of Economics Staff Study, "The Petroleum Industry: Mergers, Structural Change, and Antitrust Enforcement," (August 2004) available at http://www.ftc.gov/os/2004/08/040813mergersinpetrolberpt.pdf at 22, n. 13 ("The FTC has staff frequently used a one-cent-per-gallon price increase in defining relevant markets for petroleum mergers." at 22; "[A] one-cent-per-gallon price increase is significant in this industry, much of which is characterized by large volumes and thin margins." at n. 13.); Federal Trade Commission v. The Kroger Co., et al., Plaintiff's Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction, Civil Action No: 3-00CV1196-R (N. Dist. Tx, June 2000 available at http://www.ftc.gov/os/2000/06/krogerbrief.pdf ("Given that the supermarkets in the affected markets have combined annual sales of over $2 billion, even a one percent price increase at these stores would cost consumers an extra $20 million per year in their grocery bills." at 1; "Moreover, there is a large incentive to coordinate behavior, because even a small increase in prices would be highly profitable. For example, a 1% price increase may double a supermarket's net profits. In addition to coordinating on price, firms also could coordinate on a number of other dimensions of competition, such as level of promotional activity, services, and hours of operation." at 20).

49

110. My conclusions are based primarily on the statistical analysis of the available data and evidence taken from the factual record. Since my analysis placed no prior restrictions on the extent to which various firms could compete with one another, my results and conclusions regarding the price and non-price effects of the acquisition would stand even if a broader or narrower market definition were used. The effects predicted are based directly on the estimated degrees of substitution, estimated price and sales impacts, and the conditions of supply. These do not vary with the product market definition adopted – they simply get relabeled.

111. Given that the results of my economic analysis do not depend on the market definition, a natural question might be why market definition matters at all? From my perspective there are three important ways in which it matters and why premium natural and organic supermarkets is the relevant market for analyzing the effects of this acquisition from an antitrust perspective.

112. First, going though the hypothetical monopolist test is important for establishing that there is a potential for antitrust harm from the proposed acquisition. To an economist, antitrust injury is harm that occurs at the level of a market, where price and non-price factors are affected for a broad enough group of consumers to constitute market level rather than individual level effects. Application of the SSNIP test in this case establishes the potential for price harm to consumers who currently shop at premium natural and organic supermarkets through a reduction in competition among firms that sell those products. The SSNIP test implies price harm in this case could be at █████████████████

113. Second, the market definition of Premium Natural and Organic Supermarkets accurately delineates the group of consumers affected by this transaction. While there is competition between many firms in the

50

broader economic market, the anticompetitive effects will be concentrated in this narrower segment of that broader set of differentiated products. It is consumers of premium natural and organic supermarkets that will suffer the loss from higher prices, reduced competition in other dimensions, and reduced choice.

114. Finally, the market definition of <u>Premium Natural and Organic Supermarket</u>s provides a useful lens for viewing the proposed transaction. It focuses attention on the key issues. First, would the reduction in competition resulting from the acquisition cause prices to increase? Second, would entry or repositioning into that segment of the broader differentiated products space be sufficient to prevent the merged firms from raising prices to that segment of customers. These questions can usefully be addressed using this market definition, and the process outlined in the *1992 Horizontal Merger Guidelines*.

**D. Entry**

115. The *Guidelines* definition of the relevant product market only asks whether substitution by buyers is sufficient to prevent a sole seller from having the ability to profitably raise price by a small but significant amount. But the power to raise price is constrained by more than buyer substitution. The ability of other firms to enter the market or reposition their products also limits the ability of sellers to increase price. To the extent that such repositioning can occur quickly and at a sufficient scale, firms can be prevented from increasing price even when buyer substitution alone is insufficient to do so. In order to address the ability of firms to raise price we must examine the conditions of entry.

116. In the case at hand there are four important types of entry that could occur. First, a firm that currently competes in the Premium Natural and

51

Organic Supermarket business in one geographic market could enter a geographic market where they currently do not compete. There are many examples of this type of entry in the record. In fact, I used the effects of this type of entry to help define the product and geographic boundaries of the market. Second, retailers that currently are outside the relevant market but who compete in the broader grocery business could enter the market with new stores (perhaps under a related or new brand name) and provide customers with a mix of products, services and other attributes that place those stores within the relevant market. Third, these retailers could reposition their existing stores so as to compete more directly with the stores currently in the market, but without actually entering the market as defined. While this latter form would not technically qualify as entry, I analyze it here because it could, in principle, have the effect of making a price increase unprofitable. Fourth, there is the possibility of entirely new entry by firms that are not currently competing in any related market.

### *Expansion by Existing Firms into Other Markets*

117. The evidentiary record demonstrates the ability of at least one existing premium natural and organic supermarket to move into new geographic markets: Whole Foods. Whole Foods alone was able to open 41 new stores in just the past 5 years. As shown in Exhibit 1, many of these stores came into markets where Wild Oats was already present. Planning documents from Wild Oats and Whole Foods also show that both firms planned significant entry in the near future. Clearly, potential entry by either of the two parties to this transaction is something that could help constrain pricing. The key question for the current analysis is whether other existing participants, essentially Earth Fare or New Seasons would have the ability to do the same.

Earth Fare

118.  Earth Fare has in fact entered against Whole Foods in ████████████ albeit unsuccessfully.  Evidence from the record suggests that this entry has been successful in generating pro-competitive price and quality responses from Whole Foods but has been relatively unsuccessful from the point of view of Earth Fare.  The following excerpts from the quarterly reports that A.C. Gallo made to the Whole Foods Board of Directors is an informative chronology of these events:



> "In June we will have an ██████ market opening up about a half-mile from our ██████ store and expect some fierce competition.  We have been remodeling the ██████ store, getting it ready to show ██████ that it is a bad idea to open up too close to us."  (Q2-FY05 @ p. C-4)

> "██████ opened a store in ██████ less than a mile from our store at the beginning of ██  We responded by aggressively matching all of their prices and specials and by doing a strong special program of our own."  (Q3- FY05 @ p. C-5)

> "We have heard from management at ██████ that they were surprised by our aggressive pricing and that their coming to the ██████ was probably a mistake." (Q4, FY2005 @ p. 4)

> "We are crushing ██████.  We hear that sales at their ██████ ██ store are down to around ████ per week and have been steadily dropping.  Our opening in ██████ dropped their store from about ██████████  We cannot see how this company is viable going forward, and I expect the investors are going to take some drastic action soon.  Three of their board members live in Greenville, and so I am sure they are questioning management at this point as to their strategy." (Q2, FY06 @ p. C-5)

> "We are competing very well against ██████ and are not sure how they are keeping their stores ██████ and ██████ open." (Q3, FY06 @ p. C-4)[59]

---

[59] See:  WFM-123-00016521, WFM-128-00041877, WFM-128-00041879, WFM-123-00016630, WFM-123-00016697, WFM-128-00042101, WFM-128-00034534, WFM-123-00016954, WFM-128-00042158, WFM-128-00005355, WFM-123-00017250, WFM-123-00017251, WFM-128-00005380, WFM-109-00032941, WFM-128-00005472, WFM-130-

53

119.    Ultimately Earth Fare closed it's ████████ store in January 2007. Given its experience with its ███████ store, whether Earth Fare would be willing to enter against Whole Foods in the future is an open question.

**New Seasons**

120.  Based on the statement made by New Seasons founder Brian Rohter, New Seasons does not plan to expand beyond the Portland Oregon area.[60]

*Entry of Firms Currently in Related Markets*

121.  There are several types of firms that in principle might be able to enter and compete in the relevant market. These include conventional supermarkets, premium supermarkets and other specialty stores such as Trader Joe's.

**Conventional Supermarkets**

122.  The potential for conventional supermarkets to enter the market for Premium Natural and Organic Supermarkets has some support from both historical experience and first hand accounts of the industry. Safeway Stores Inc., a major national supermarket chain, has attempted to reposition closer to the relevant product market by opening 76 new Lifestyle format stores between 2003 and 2007 and converting over 700 of its stores in the U.S. and Canada to the Lifestyle format.

123.  The lack of a significant competitive impact of the Lifestyle stores is reflected in Mackey's Q1-FY07 report to the Board:

> "Safeway is continuing to roll out their "Lifestyle Stores". I don't believe these stores have had much real impact on us, although they've

---

00002286, WFM-128-00005995, WFM-127-00000958, WFM-127-00001457, WFM-127-00001529, WFM-127-00002507, WFM-051-00003641, WFM-051-00003642

[60] http://www.nytimes.com/2006/01/04/dining/04well.html?ex=1294030800&en=c5 f24b32d7d43337&ei=5088&partner=rssnyt&emc=rss )

increased Safeway's comps a couple of hundred basis points (not that much when you consider the immense amount of capital invested)."

124.  In his Q2-FY06 report to the Board (written three months after the opening of the ), Robb (co-President of Whole Foods) said:

> "The ███████████████ opening initially hit Pearl by about ███████████████ and pushed us into ███████████, but as of this writing, the store has reduced that to a less than███ impact."[61]

125.  The experience with Kroger's "Signature" and "Fresh Fare" stores appears similar.[62]

126.  Thus the record indicates that, at least to date, conventional supermarkets have not been successful at competing effectively in the relevant market.  Based on the available evidence we cannot say with confidence that conventional supermarkets would be able to prevent any anti-competitive effects generated by the acquisition of Whole Foods and Wild Oats.

**Trader Joe's**

127.  The results in Exhibits 3 and 4 showed the impact that the entry of Trader Joe's has had on sales, and margins of both Wild Oats and Whole Foods.  As can be seen in the Exhibit, the entry of Trader Joe's existing store format has a ███████████ on sales and ███████████ on margins at either Whole Foods or Wild Oats.  This is not surprising given the important differences in the formats of Trader Joe's on the one hand and Wild Oats and Whole Foods on the other.  For example, perishables account for about███ of Trader Joe's sales but roughly 70 percent of the sales at Whole Foods and Wild Oats.  Similarly, Trader Joe's does not

---

[61] Whole Foods Q2-FY06 report @ p. C-23

[62] 4/21/05 5:59 pm Rahodeb Posting, Yahoo! Finance Message Board

carry many of the items sold by the other stores. In order to enter and effectively constrain prices Trader Joe's would need to change the format of its stores. Since this falls under the general concept of repositioning I address this under repositioning below.

**Gourmet Supermarkets**

128. Premium supermarkets represent another potential platform for entry into the relevant market. One potential entrant form this space is Wegman's. However, the format used by Wegman's makes rapid expansion difficult. In particular, Wegman's has built its business model on providing exceptional services to its customers and high quality products. In order for entry to effectively leverage this reputation it would seem essential to carry that expertise over to any new venture. Providing such a high level of service means that adding capacity requires significant effort in training new management and employees. Evidence from Whole Foods documents confirms this:

> The reason Wegman's has continued to earn that reputation, said company president Colleen Wegman, is it remains focused on what has made it successful and not simply opening new stores. ""We're not afraid of growth,"" she said. ""The reason we have grown slowly is that we want to make sure our people are fully prepared and trained to deliver on our model of incredible service."" Ms. Wegman expects the company to continue opening two or three new stores a year as it has done in the past.

> Neil Stern, a partner at McMillan/Doolittle, said Wegman's has a ""fantastic strategy"" for growth that it is able to follow because it is a privately-held company. It might not be able to do so if it had to meet the expectations of shareholders and analysts….""Their format is not only capital-intensive, it's people-intensive,"" said Mr. Stern. ""Literally, they can't train people fast enough. Even if they have access to capital, from a human resources standpoint, they can't grow any faster."" considerable commentary on difficulty that conventional supermarkets have in competing directly in the relevant market.[63]

---

[63] WFM-001-00004054

129.  While super-competitive pricing might cause Wegman's to change its business model somewhat or accelerate its timing, there is no indication that they would be willing or able to provide a meaningful restraint on the ability of the combined firm to raise prices in overlap markets.

### Repositioning of Existing Firms

130.  A third possibility for price restraint is that existing retailers could reposition themselves so as to provide increased competition for existing premium natural and organic supermarkets.  In principle, such repositioning could increase the competition form outside the relevant market enough to compensate for the loss of pricing restraint provided from within the market.  A classic result of demand theory is that the demand for a product within a segment can be expressed as $S \sigma_m + (1-S) \sigma_p$ where is the firm's market share, $\sigma_m$ is the degree of substitution between products in the market and products outside the market and $\sigma_p$ is the degree of substitution of products within the market.  A reduction in competition from within the market due to a rise in $S$ or a fall in $\sigma_p$ can in principle be compensated by a rise in $\sigma_m$.  In the context here, the rise in $\sigma_m$ could come about by other firm's repositioning their products so as to compete more closely with premium natural and organic supermarkets even if that repositioning did not move them close enough to be in the currently defined market.[64]

131.  In principle many retailers could reposition their products in response to an increase in prices in the relevant market.  One common issue to all of these potential entrants is that repositioning is not costless.  Moving one's attribute mix in one direction will typically result in a less suitable fit with one's current customer base.  To the extent that a company's current

---

[64] In principle, the repositioning could be sufficient to change the market definition though this may not be necessary to offset the loss in competition.

position came about through costly investments in reputation and other assets, such repositioning will like cause the firm to forgo economic rents on those investments. While these firms may have some advantages that make their entry easier than the entry of other firms de-novo they also have these additional costs.

**Conventional Supermarkets**

132.  Many conventional supermarkets have started to carry natural and organic products within their traditional store formats. However, the documentary evidence points out that this repositioning is costly. Conventional stores are caught in a sort of "Catch 22" situation: if conventional supermarkets offer a lot of organic items, they do not sell enough with their current customer base, and many of the products spoil, reducing margins. But if conventional supermarkets only offer a few organic items, they cannot add to their customer base. This is reflected in the testimony of Wild Oats' Odak:

> "[T]he issue is that until you have a predictable demand or takeaway at the store, you don't know how much to buy. If you buy too much and you don't sell it because you're trying to get in the market, you shrink it out and you lose money. If you buy too little, the consumer comes in your store and says you're not in the business... of organic and I'll go buy it someplace else.[65]

**Trader Joe's**

133.  Trader Joe's has a strong business model. They currently have over 280 stores. The current format for Trader Joe's uses a smaller format and a narrower range of food items than either Whole Foods or Wild Oats. In particular, a typical new Trader Joe's store is roughly 11,000 square feet

---

[65] Investigational Hearing of Odak, pp. 77-78.

while recently built Whole Foods stores are typically larger than 40,000 square feet. In addition, while Whole Foods and Wild Oats focus on perishables (accounting for roughly 70 percent of their sales), Trader Joe's places much less emphasis on perishables (roughly ▮ percent of sales).

134. This difference can also be seen in the business decisions of Whole Foods. Documents from Whole Foods records indicates that Whole Foods only price checks Trader Joe's on about ▮▮▮▮ in each region, and only ▮▮▮▮▮ on about ▮▮▮▮ in each region.[66]

135. Trader Joe's also differs significantly from Whole Foods and Wild Oats in terms of other attributes. In particular, Trader Joe's focuses much more on discount private label products and does not cultivate an upscale image

136. Given that Trader Joe's differs significantly from both Whole Foods and Wild Oats in terms of product variety, product mix, store size, and image it would seem that Trader Joe's would need to reposition significantly in order to provide broad based price competition for Whole Foods and other premium natural and organic supermarkets. Even if such repositioning is possible it would require that Trader Joe's sacrifice its current successful format. There is no evidence that they would choose to do so in response to a small but significant increase in the prices charged by Whole Foods. This is particularly true given the fact that the largest price increases would likely come in areas where the stores overlap the least.

### De-Novo Entry

137. As with any industry, there is always the possibility of *de-novo* entry. The key question is whether such entry would occur in a timely fashion

---

[66] WFM-GEN-00020217

and would be of a sufficient magnitude to make a small but significant price increase unprofitable.

138. The evidence in this case suggests that entry and growth have taken significant time. Even Whole Foods and Wild Oats achieved much of their growth through acquisitions, though Whole Foods has accomplished much of its recent growth by opening new stores. Even smaller successful participants such as New Seasons in Portland Oregon took many years to achieve their success. Certainly, *de-novo* entry has significant potential in the long run but since it involves creating a new brand that resonates with the customers of Whole Foods and Wild Oats, and opening a fleet of stores to enter the overlap markets, it would not occur in a timely manner. Whole Foods recognizes this fact, "Starting up a brand from scratch is very risky and expensive as Super Value (sic) is now discovering with Sunflower." (WFM-030-00017157).

### Overall effect of Entry

139. Taken together  there is a broad range of avenues through which entry might occur – movement of existing sellers into new markets, brand extension by existing supermarkets, repositioning by existing firms not currently in the market, and de-novo entry. No one of these avenues needs to do all of the work in disciplining a price increase. The question is whether, taken together, they can disciple any potential rise in price generated by the acquisition.

140. One important question is whether we can learn about the disciplining effect of entry from the price impact evidence discussed above. The evidence suggests that prices are higher in markets where Wild Oats does not compete with Whole Foods than in markets where the two firms compete head to head. The evidence also suggests that the entire difference is not transitory.

## X. CONCLUSION

141. Statistical analyses of margin and pricing indicate that the entry of Whole Foods into a local market is associated with approximately a ▮ percent fall in sales, ▮ percent decrease in prices and a ▮ percentage point decrease in margins at Wild Oats stores locate in the same geographic market. The volume effects are permanent while the price and margin effects decrease somewhat over time.

142. The ▮▮▮▮▮▮▮▮ indicate that a large number of consumers view Whole Foods and Wild Oats as close substitutes. The effects of Whole Foods entry and Wild Oats entry on third parties are not nearly as dramatic. The ▮▮▮▮ "diversions" found in my empirical analysis are confirmed in the documents that Whole Foods prepared to quantify the value of this proposed acquisition.

143. My statistical analyses of Whole Foods' margin data comparing cases where Whole Foods is located near one of its own stores versus being located near a Wild Oats store suggest that the presence of Wild Oats is associated with about a ▮▮▮▮▮▮▮ in margins of Whole Foods. My empirical analysis indicates that Whole Foods and Wild Oats are each other's closest competitors.

144. A wide variety of documents and deposition testimony confirm the econometric evidence that the Whole Foods and Wild Oats are each other's closest competitors.

145. Anticompetitive effects, without any countervailing pro-competitive effects, will be realized on price and non-price dimensions (breath of choice, quality and service) in each of the markets where Whole Foods plans to simply close a competing Wild Oats store.

61

146.  Anticompetitive effects will also be felt in the markets where Whole Foods plans to leave open a competing Wild Oats store but "reflag" it as a Whole Foods store.  Current Wild Oats shoppers in these markets will lose their current preferred choice, and all consumers will lose the benefit of head–to-head price and non-price competition.

147.  As a result, I conclude that this proposed acquisition poses the risk of substantial, non-transitory price increases and non price anti-competitive effects that will persist for at least 2 years, in the markets that I have studied.

148.  The analysis I present dovetails nicely with the *1992 Horizontal Merger Guidelines*.  The proposed acquisition will affect competition and harm consumers that currently purchase products from premium natural and organic supermarkets in the local markets where Whole Foods and Wild Oats currently compete head-to-head.  Competition from other sources through entry and or repositioning is not likely to prevent such harm from persisting for a number of years.

149.  My conclusion on the extent of consumer harm is not affected by the market definition chosen – the market definition chosen simply highlights the nature and extent of that harm.

July 9, 2007

Kevin M. Murphy

62

# Exhibit 2–Public Version of the Rebuttal Expert Report of Kevin M. Murphy, Ph.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION          )
600 Pennsylvania Avenue, N.W.     )
Washington, D.C.  20580           )
                                  )     Civ. No. 1:07-CV-01021
                    Plaintiff,    )
                                  )
                                  )
          v.                      )
                                  )
WHOLE FOODS MARKET, INC.          )
550 Bowie Street                  )
Austin, Texas  78703              )
                                  )
and                               )
                                  )
WILD OATS MARKETS, INC.           )
1821 30th Street                  )
Boulder, Colorado  80301          )
                                  )
                                  )
                   Defendants.    )


## REBUTTAL EXPERT REPORT OF KEVIN M. MURPHY, Ph.D.


Dated: July 13, 2007

████████████ - FTC v. Whole Foods

1. I am Kevin Murphy, the George J. Stigler Distinguished Service Professor of Economics at the University of Chicago Graduate School of Business. I have been retained by the Federal Trade Commission to evaluate the report of Dr. David Scheffman submitted on behalf of Whole Foods in this matter. I also submitted an expert report in this matter.

2. My qualifications as an expert and my current resume were provided as part of my expert report in this matter.

3. My Report is organized as follows. Section I of my report provides a summary of my opinions regarding the report submitted by Dr. Scheffman. In Section II I describe some critical errors Dr. Scheffman made in applying the "Critical Loss" methodology to the issues in this case. I show that his methodology is internally inconsistent as a matter of logic and also inconsistent with the facts in this case. In Section III, I show that a corrected version of his methodology reverses his conclusion. In Section IV, I show how a corrected version of his methodology illustrates the anticompetitive effects of the proposed closing of the acquired Wild Oats stores. In Section V, I show that Dr. Scheffman's conclusions regarding Whole Foods and Wild Oats pricing are factually incorrect and that in any case he draws the wrong conclusions from his alleged facts. Section V concludes my report.

## I.    Summary of Opinions

4. Based on my reading of Dr. Scheffman's Expert Report, the work I did in preparation for my own Expert Report, and my review of the backup material provided by Dr. Scheffman, I have reached the following conclusions:

    1. Dr. Scheffman's methodology of comparing the Critical Loss for a hypothetical monopolist with qualitative evidence on the price sensitivity of customers is not reliable.

1

2. The critical flaw in Dr. Scheffman's analysis is widely known in the literature on the limits of Critical Loss analysis.

3. Dr. Scheffman's analysis fails to recognize that the fundamental issue in this acquisition is how the competitive constraints on the combined entity will change as a result of the acquisition, not whether Whole Foods currently competes, at some level, with other firms in addition to Wild Oats.

4. Correctly done, a Critical Loss analysis that uses precisely the evidence cited by Dr. Scheffman indicates that the proposed acquisition would have significant anticompetitive effects.

5. Dr. Scheffman uses a 5% standard for what constitutes a "small but significant non-transitory increase in price" (SSNIP), even though he accepts and recently publicly opined that such a standard is inappropriate for mergers in low net margin industries like supermarkets.

6. Dr. Scheffman's analysis focuses largely on pricing from Whole Foods' perspective, and thereby misses the anticompetitive motive for the closure of many Wild Oats stores that currently compete against Whole Foods.

7. Dr. Scheffman's pricing analysis is inconsistent with the evidentiary record indicating that Whole Foods competes by both lowering prices and increasing the quality of service when it competes directly with Wild Oats and other premium/natural organic supermarkets ("PNOS").

5. My analysis of the materials provided by Dr. Scheffman is on-going. As such I reserve the right to update my analysis as further information becomes available through deposition or at trial.

## II.    Basic Flaws in Dr. Scheffman's Critical Loss Analysis

6. Much of Dr. Scheffman's report is devoted to what he refers to as his "Critical Loss" (CL) analysis. This method has been applied in many merger cases. CL analysis can be useful, but as with most tools, care must be taken to use it properly. When, as in Dr. Scheffman's report, CL is applied poorly it can yield very misleading results and incorrect conclusions. Indeed, the misuse of CL analysis has been the focus of a significant literature in economics over the past decade.[1]

---

[1] See Barry C. Harris and Joseph J. Simons, "Focusing Market Definition: How Much Substitution is Necessary?" Research in Law and Economics, v. 12, 1989, p.207-226; Langenfeld James and Wenquing Li, "Critical Loss Analysis in Evaluating Mergers,"

7. The classic misuse of CL analysis is summarized nicely by Katz and Shapiro:[2]

> "We described in our article a simple but potentially misleading "Defendants' Story" that makes arguments based on Critical Loss to support a broad market definition. The story goes as follows: With high margins, the Critical Loss is small, and thus a price increase is likely to lead to an Actual Loss greater than the Critical Loss. Because the Actual Loss is greater than the Critical Loss, a hypothetical monopolist would not find it profitable to raise price, and thus the market definition should be broadened. We emphasized in our article that this story is very incomplete because a high margin tends to imply a small Actual Loss as well as a small Critical Loss."

8. The methodology criticized in this passage is <u>precisely</u> that employed by Dr. Scheffman in this case. I will now explain why Dr. Scheffman's analysis in this case is of the "misleading" variety referred to by Katz and Shapiro. I begin with a review of Dr. Scheffman's methodology.

9. Dr. Scheffman begins with the calculation of the CL. As both Katz and Shapiro and Dr. Scheffman point out, this part of the analysis is indeed "just arithmetic."[3] If a hypothetical monopolist of a given set of products were to raise price by a small amount, there would be two effects on its profits. First, the higher price would cause the monopolist to sell fewer units, reducing profits. Second, however, the units that buyers still purchase fetch a higher price, raising profits. The CL is the reduction in sales that balances these two effects, leaving the hypothetical monopolist's profits unchanged. Any "Actual Loss" that is larger than the CL would make the price increase unprofitable. One may calculate the CL from the

---

<u>The Antitrust Bulletin</u>, Summer 2001, pp. 299-337; Danger, Kenneth L. and H.E. Frech III, "Critical Thinking about `Critical Loss' in Antitrust," <u>The Antitrust Bulletin</u>, Summer 2001, pp. 339-355; Daniel P. O'Brien & Abraham L. Wickelgren, A Critical Analysis of Critical Loss Analysis, 71 <u>Antitrust</u> L.J. 161 (2003).

[2] Katz and Shapiro, "Further Thoughts on Critical Loss," <u>Antitrust Source</u>, March 2004, p. 2

[3] Expert Report of David Scheffman, at ¶100.

hypothetical monopolist's margin, $m$, and the magnitude of the hypothetical SSNIP, $X$. The formula for CL is simple:

(1) $$CL = \frac{X}{X+m}.$$

10. Dr. Scheffman uses this formula to compute a CL threshold of ███ based on the Whole Foods' margins of $m=$███ and a SSNIP of $X=5\%$. He also calculates a CL of ███ based on Wild Oats' margins of $m=$███ and the same SSNIP of $X=5\%$. The correct conclusion based on this formula is that a 5 percent price increase would not be profitable for our hypothetical monopolist if that price increase reduced sales by more than ██ percent, starting from the ██ percent margin Dr. Scheffman claims is appropriate for Whole Foods.

11. The next step in Dr. Scheffman's analysis is to provide a long review of qualitative evidence that, he asserts, proves that the Actual Loss for a hypothetical PNOS monopolist would greatly exceed the CL thresholds of ████ percent calculated above. Yet, somewhat mysteriously, Dr. Scheffman provides literally no quantitative evidence for the magnitude of the Actual Loss that could be compared to these thresholds, and no methodology for calculating the Actual Loss. He simply asserts that the Actual Loss would "far exceed" the thresholds[4].

12. Putting aside this lack of evidence, Dr. Scheffman's application of CL contains an even more basic flaw. To see that there is something missing from Dr. Scheffman's logic—"the whole story," in the words of Katz and Shapiro—it is useful to consider a symmetric analysis where we ask whether it would pay for Whole Foods or Wild Oats to <u>reduce</u> price by 5%. In this case, rather than a "Critical Loss" there is a "Critical Gain"

---

[4] Expert Report of David Scheffman, at ¶ 117

4

(CG) in sales that the seller must achieve in order to make such a price decrease profitable. Using the same notation as above, the threshold CG is simply

$$(2) \qquad CG = \frac{X}{m - X}$$

13. Applying equation (2) for $X=.05$ and the margins used by Dr. Scheffman, we obtain CG=██ percent using the Whole Foods margin of $m=$██ and CG=██ percent using the Wild Oats margin of $m=$██[5] If the evidence presented by Dr. Scheffman is sufficient to prove that the Actual Loss for a hypothetical monopolist  "arising from such a price increase is likely to far exceed the Critical Loss"[6], then that same evidence would also show that the "Actual Gain" to Whole Foods or Wild Oats from a price decrease would also far exceed the "Critical Gain" given by equation (2).[7] Every piece of evidence he advances to argue that consumers would be very sensitive to a price increase by the hypothetical monopolist applies with equal (in fact greater) force to show why consumers would be very sensitive to price decreases by Whole Foods or Wild Oats. This is exactly the issue raised by Katz and Shapiro and by O'Brien and Wickelgren in their critiques of the misuse of CL analysis.

---

[5] One can obtain a tighter restriction on the data by using a smaller price decrease. After all, even a small price decrease should reduce profits for Wild Oats and Whole Foods if they are currently maximizing profits.  Doing this cuts the effective "gap" between the CL and CG.

[6] Expert Report of David Scheffman, at ¶ 117

[7] Of course it is possible that what Dr. Scheffman means to "far exceed" ██ percent actually falls between ██ percent and ██ percent but that would require a level of precision inconsistent with his entirely qualitative analysis and most likely well beyond the precision of most quantitative economic analysis. In addition, as I point out below, his use of a 5% SSNIP is inappropriate. If he were to use a 2% SSNIP, the corresponding CL and CG would be ██ and ██ respectively. Proving that the level of price sensitivity would fall within such a narrow range would be even more difficult.

14. In a paper with Joseph Simons[8], Dr. Scheffman responded to the Katz-Shapiro critique. Scheffman and Simons argued that it is <u>possible</u> that the hypothetical monopolist would not want to increase price even if the existing firms don't want to decrease price – they postulate that consumers <u>might</u> respond more to price increases than they do to price decreases– a phenomenon referred to as the "kinked demand curve".[9] If true, this specific demand formulation would reconcile things, but one cannot simply accept the assertion that consumers behave in this manner without evidence that they actually do so. Economic theory makes no prediction that consumers would respond more to price increases than to decreases, and Dr. Scheffman provides zero evidence that such asymmetric responses would be expected in this case, or in any other one. All of the qualitative evidence he relies on is equally supportive of large responses to price increases and decreases, for both existing firms and for a hypothetical PNOS monopolist.

15. Why is the prediction that existing firms should cut price problematic? The answer is simple. <u>The exact same theory he uses to predict the behavior of the hypothetical monopolist implies that existing firms would earn greater profits if they charged lower prices.</u>[10] Dr. Scheffman has no

---

[8] David T. Scheffman & Joseph J. Simons, The State of Critical Loss Analysis: Let's Make Sure We Understand the Whole Story, ANTITRUST SOURCE, Nov. 2003.

[9] In his article with Simons, Dr, Scheffman provides alternative defenses but they are either incorrect or inapplicable to this case.

[10] There are several reasons why his predictions could be off. First, he could be overstating the margins – this would cause a bias in both the prediction for the hypothetical monopolist and the existing firms. Second, he could have over estimated the degree of consumer price sensitivity. Again, this would bias predictions for both consumers and existing firms to understate the level of prices charged. Third, firms could not be profit maximizing or have more complex objectives. In this case he would have to explain why this would not be true for both the hypothetical monopolist and the existing firms. Fourth, it could be that marginal costs are much higher for increases in output than they are for reductions in output.

6

sensible explanation or evidence for why Whole Foods and Wild Oats are foregoing these profits. Since his "model" under-predicts prices for existing firms it will almost certainly under-predict the price that a hypothetical monopolist would charge. Both predictions are based on precisely the same framework and exactly the same evidence.

16. In fact, there is an important reason to believe that sales would be more sensitive to price decreases by existing firms than to price increases by the hypothetical monopolist. Existing firms have the ability to draw sales from other firms in the PNOS market whereas, by definition, the hypothetical monopolist does not. The ability to draw sales from other firms within the market makes individual firms' sales even more sensitive to price than would be the sales of the hypothetical monopolist (to price decreases or price increases). This observation, that a firm which controls all of the capacity in the market would face less elastic demand than would the individual firms in the market constitutes the centerpiece of horizontal merger policy.

17. A final point about Dr. Scheffman's calculation of the CL is noteworthy and important. Remarkably, in performing his calculations Dr. Scheffman utilizes a 5% SSNIP even though he cites a prior opinion of this court and economic literature (at ¶114) that smaller SSNIPS are appropriate for retailing markets. In fact, Dr. Scheffman shares this court's opinion on

---

This may be plausible is some cases such as where firms face capacity constraints but it would be hard to argue that here, and Dr. Scheffman does not even attempt to do so. Finally, as stated above, he could argue that responses are different for price increases and price decreases - again such a claim, while possible, would require evidence that he fails to provide. It also bears note that the standard "kinked demand curve" theory is inapposite to market definition as it applies to the demand curves faced by individual firms and does not make economic sense at the market level. It does not explain why the sensitivity to firm price decreases would be less than the sensitivity to market wide increases as Dr. Scheffman's analysis would require.

this point, as revealed in the transcript of his remarks on May 24, 2007 at an FTC conference on "Grocery Store Antitrust: Historical Retrospective and Current Developments"

> "Margins [in the supermarket industry] at the local level were quite small... a few percentage points, across all areas....Now, you have to be careful interpreting margins and trying to make some inferences.  But what that showed is that in this industry, you could just see -- well, clearly across areas, the structure, industry structure, varied a lot, and lots of other things varied a lot.  But what you see overwhelmingly is the margins are really small.
>
> So one of the things I think the Commission realized -- I remember making some intemperate remarks during that time:  Why are we looking at this industry, given these margins?  But I don't agree with that; there's certainly a reason to look at supermarket mergers generally if we look at them in the right way.
>
> *A hypothetical 5 percent price increase for a supermarket would lead it to being the most profitable supermarket in history. ...Their margins are tiny.  You would have a multiple of any existing margins if you had that big a price increase.  .... none of us ever thought the price increase would ever be that large.*
>
> That's not to say we shouldn't worry about supermarket mergers.  The usual argument is 1 percent of people's savings of their expenditures on grocery products is a lot of money, so we should care about it."[11]

18. So, in spite of his opinion that a 5 percent SSNIP standard is vastly too high for the industry and market at issue here, he uses it anyway.  The effect is to make it more likely that the FTC's proposed PNOS market definition will fail his hypothetical monopolist test.

19. In the next section I show how, if correctly applied, the CL concept could be used to address market definition in this case.

---

[11] Transcript of remarks of Dr. Scheffman at the FTC conference on "Grocery Store Antitrust: Historical Retrospective and Current Developments", May 24, 2007.

### III.  Integrating the Analysis of How A Proposed Acquisition Changes Pricing Incentives into the Critical Loss Framework

20.  One approach to "fixing" the CL analysis presented by Dr. Scheffman is to find out what causes his model to understate the incentive for firms to raise price.  For example, Dr. Scheffman might overstate the initial level of Whole Foods' and Wild Oats' margins.  In that case, his estimate of the CL is too small as is the implied threshold for the Critical Gain. This could reconcile the actual pricing decisions of Whole Foods and Wild Oats with his qualitative claims about consumers' high degree of price sensitivity. But he now faces a new problem: establishing that the price sensitivity falls right in the range where the actual loss for the hypothetical monopolist is more than the CL while the actual gain for the individual competitors is smaller than the CG would remain. That is to say, he is caught in the middle, having to fight against both ends.

21. One can perform a useful analysis of the relevant market that is consistent with the current behavior of Whole Foods and Wild Oats without precise evidence on the level of price sensitivity faced by the hypothetical monopolist.  The key insight is that the amount by which a hypothetical monopolist would be able to increase price depends on how the ability to raise price <u>changes</u> when the hypothetical monopolist replaces individual sellers, who would price unilaterally.[12]  If the incentive to raise price does not change when we switch from an individual seller to the hypothetical monopolist, then the hypothetical monopolist would not find it profitable to increase price. Then the candidate market would not qualify as a relevant antitrust market under the SSNIP test.

---

[12] Note that this does not mean that firms do not take account of reactions by their rivals. The assumption required is that firms maximize their individual profits and do not price based on what will make their competitors more profitable (i.e. collusion).

22.  However, pricing incentives do change when we postulate the hypothetical monopolist.  When a single firm raises price it will increase the profits of its competitors by shifting sales in their direction or by allowing them to increase price.  Since the hypothetical monopolist (i.e. a sole price setter) sets prices to maximize the joint profits of all of the firms in the market, this sole seller will "internalize" the gains of other firms in its pricing decision, and so it will have a greater incentive to raise price than did the individual firms, who were unable to "internalize" their diversions to one another.

23. To assess whether it would be profitable for the hypothetical monopolist to increase price by some critical amount, $X$, above the current level, we simply need to determine whether the profit increase to other firms in the proposed market more than compensates for the profit loss suffered by the candidate firm that raises its price.[13,14]   The amount of profits gained by the other firms in the market can be directly assessed if we know two things.  First, we need to know what fraction of the sales lost by the firm that raised its price will be captured by other firms in the candidate market – these are sales are lost to the individual firm that raises its price but are retained by a hypothetical monopolist of all the firms in the candidate market.  This is commonly referred to as the <u>aggregate diversion ratio</u>.  Second, we need to know the incremental profit on these transferred sales.  Together the aggregate diversion ratio and the profit margin will determine how much the other firms gain when an individual firm raises price.

---

[13] Since the individual firm is profit maximizing, we know that its profits will not increase as it raises prices – otherwise it would have done so individually.

[14] To consider a simultaneous increase in all prices we simply need to sum all of these effects across the various producers.

24. A larger fraction of sales diverted to other firms in the market and/or a larger profit margin on these sales will increase the hypothetical monoplists incentive to raise price. Note that the information used in a correctly formulated CL analysis is <u>about how the incentives to increase price change when we allow all firms in the industry to "merge",</u> as they do in the hypothetical monopolist test. But this is what should matter in a merger case—how do pricing incentives change as we combine firms?

25. The same machinery used in the standard CL analysis can be used to calculate whether it would be profitable for a hypothetical monopolist to increase price by the desired amount. We also need to know how rapidly profits of the existing firm fall as we raise price above its individual profit maximizing level. This loss is determined by the "shape" of the firm's demand function. O'Brien and Wickelgren, in their critique of CL analysis, use this very methodology to calculate whether it would be profitable for a hypothetical monopolist to increase price by a given amount, based on the diversion ratio and the profit margin in the industry. Their results are reproduced in Exhibit 1.

26. The values in Exhibit 1 give the critical diversion ratio; that is, the diversion ratio above which a price increase of the given amount is profitable for different levels of the industry margin. For example, with a price increase standard of $X=5\%$ and a margin of $m=$ ▆▆ (the figures used by Dr. Scheffman in his analysis) the critical diversion ratios, for two widely disparate assumptions regarding the "shape" of the demand curve, are ▆▆ percent for linear demand (i.e. demand curves are straight lines, an assumption that demand becomes substantially more elastic as the price increases) and ▆ percent for constant elasticity demand (an assumption that the elasticity of demand is the same regardless of the

market price).[15]  Hence, under the assumption of linear demand a diversion ratio of more than ▮▮ percent would make it profitable for a hypothetical monopolist to increase price 5 percent.  With constant elasticity demand, this threshold for the diversion ratio falls to only ▮ percent.

27. While we do not know the precise shape of the demand curve and therefore the exact level of the critical diversion ratio, the results shown in Exhibit 1 should give one pause about the antitrust relevance of claims hat the majority, or even an overwhelming majority, of the hypothetical monopolist's marginal customers (i.e. the customers lost following the imposition of a SSNIP) would shift their purchases outside the candidate relevant market (rather than shifting to other firms within the relevant market) in response to a price increase by one of the firms.  Under linear demand the fraction of these lost sales that would find their way to sellers outside the candidate market would need to be at least ▮▮ percent.  Under constant elasticity demand it would need to be ▮ percent.  Clearly, a very large fraction of the sales lost to a SSNIP could substitute outside of the market rather than within the market and still make a five percent increase in price profitable.  For a SSNIP price increase standard of 1 percent the corresponding thresholds for the diversion ratio would be ▮▮ percent and ▮▮ percent—nearly all the sales that are lost following a SSNIP could move outside the candidate market and the price increase would still be profitable.

28. In terms of market definition, Dr. Scheffman's analysis simply does not prove his conclusion.  Instead, a small but significant price increase by a hypothetical monopolist PNOS (or the merged firm) would be profitable

---

[15] As O'Brien-Wickelgren note, alternative demand structures such as AIDS, logit and semi-log yield outcomes that are intermediate to the linear and constant elasticity demand structures.

even if the vast majority of consumers shopping at Whole Foods and Wild Oats, say 80% or even 90% of the marginal customers, had a conventional supermarket or another firm outside the hypothesized PNOS market as their next best alternative.

29. Dr. Scheffman has claimed that models such as those that underlie Exhibit 1 do not fit with real world pricing behavior. However, the claim cannot be that they are unrealistic because they do not explain current prices or margins—these models are constructed based on the current levels of prices and margins so they explain price levels precisely. That is why his discussion on the degree of consumer price sensitivity is so misguided: in the end it implies that incremental margins of Whole Foods and Wild Oats cannot be as high as he claims they actually are. One or the other has to give—either Dr. Scheffman has overstated margins, in which case he has understated the CL, or he has overstated price sensitivity, in which case his conclusions regarding the size of the Actual Loss are incorrect. Either way, he is wrong.

30. Dr. Scheffman's analysis of the importance of consumers shifting outside of the PNOS candidate market in response to a SSNIP is also wrong. Though he speculates at length about what this means for the existence of a PNOS market[16], he simply ignores quantitative evidence that directly contradicts his assertions.

31. Evidence of what Whole Foods regards as the next–best option for current Wild Oats shoppers is contained in the "Project Goldmine" spreadsheet, which was prepared by Whole Foods' management to assess the value of the proposed merger with Wild Oats. The spreadsheet provides Whole Foods' estimate of what fraction of business from each closed Wild Oats

---

[16] For example, five of the seven bullet points in ¶ 131 address precisely this point. Expert Report of David Scheffman at ¶131.

store will come to nearby Whole Foods stores.  Since closing a store is like a very large price increase—that is, a price increase that is large enough to drive all customers away—it tells us about where the <u>average</u> Wild Oats shopper would go if they left Wild Oats.  The type of diversion ratio considered in the critical diversion formulation refers to the marginal customers, and asks what fraction of shoppers who leave Wild Oats in response to a small price increase would shift their purchases to Whole Foods or another PNOS?[17]  The average diversion ratio measures the same thing as the marginal diversion ratio: the portion of consumers who used to purchase at A who shift their purchases to B, but does so in the scenario when all of A's customers leave (e.g. when Whole Foods closes a Wild Oats store).  The marginal and average diversion ratios may in fact be different, but one would expect them to be related.

32.  Based on the Project Goldmine spreadsheet, Whole Foods estimates an average diversion ratio for the closed stores of ███ percent.[18]  This

---

[17] Yet, it bears note that even in the critical diversion formulation, if Whole Foods (or more generally for purposes of market definition, a profit maximizing monopolist) would close the Wild Oats store it would be appropriate to use the average (rather than the marginal) diversion ratio to determine the profitability of such an action.  I return to this below in my discussion of the anti-competitive effect of the proposed closing of some of the acquired Wild Oats stores.

[18] Since Whole Foods stores are on average significantly larger (in terms of sales) than the Wild Oats stores with which they compete, head-to-head diversion ratios in the other direction (from Whole Foods to Wild Oats) would tend to be smaller.  For example, in ¶78 and ¶89 of his report, Dr. Scheffman claims that Wild Oats volume losses translate into no more than ███████ of Whole Foods' volume gains.  However, as I pointed out above marginal and average diversions are not the same.  It is important to remember that the antitrust question is where customers would divert <u>out</u> of Whole Foods at the price margin, and the answer to that question is not necessarily the same as the answer to the question of where consumers diverted <u>into</u> Whole Foods upon the introduction of an entirely new choice in their marketplace.  Dr. Scheffman has assumed that diversions into Whole Foods are symmetric to diversions out of Whole Foods and that marginal diversions are identical to average diversions.  The two concepts should be related but they won't in general be the same.

14

estimate is at least ▇▇▇▇ the diversion ratios needed to make a price increase of 5 percent profitable for a joint owner of the two stores. It is more than ▇▇▇▇ the threshold diversion ratio that would make a 1 percent price increase profitable. While the marginal and average diversion ratios could be different, there is no evidence that they would differ by enough to reverse these conclusions—or even that the difference would go in the necessary direction. Notwithstanding Dr. Scheffman's qualitative arguments and assertions, the substantial diversions between Whole Foods and Wild Oats (in those markets where they compete head-to-head) reflected in the Project Goldmine spreadsheet shows that Whole Foods believes that Wild Oats customers simply will not move their purchases to stores outside the proposed PNOS market in competitively relevant numbers. And the magnitudes of the diversion ratios <u>estimated by Whole Foods itself</u> indicate that a SSNIP of the indicated magnitude would be profitable in these situations.

## IV.    Critical Loss and the Anticompetitive Gains from Closing Wild Oats Stores

33. The key insight for correctly applying CL analysis to a merger or market definition is how much profit the other party (in the case of a merger) or other parties (in the case of the SSNIP analysis) gains from an increase in price by one of the firms. The loss in sales from increasing price when each seller acts unilaterally is already factored in to setting the existing (pre-SSNIP) price. In particular, the degree of customer price sensitivity at the store level and the ability of consumers to substitute to other firms outside of the market as well as inside the relevant market are reflected in each seller's chosen margin. The incentive for the merged firm or the hypothetical monopolist to increase price above the current level comes

from the profits that would be gained by the other firm(s) when one firm increases its price.[19]

34.  The gain to any one firm from an increase in price by another firm is its increased profits from greater sales and/or a higher price.  Let $C$ represent the subject firm's unit costs and let its current price be $P$.  Let $Q$ represent the quantity it sells at price $P$, and let the changes in these variables when another seller raises its price be $\Delta P$ and $\Delta Q$.  Then the gain in profits accruing to the firm will be approximately:[20]

$$(3) \qquad \text{Change in Profit} = (P-C)\Delta Q + Q\Delta P$$

.

35. The first term represents the profit from the transferred sales while the second term reflects the gain in profits due to the reduction in competition and the resulting higher price.  The percentage change in profits is then

$$(4) \qquad \text{Percent Change in Profit} = m\frac{\Delta Q}{Q} + \frac{\Delta P}{P}$$

where, as above, m is the firm's margin on incremental sales.  Here $\Delta Q/Q$ is the percentage increase in sales and $\Delta P/P$ is the percentage increase in price.  In words, when seller A increases its price, other firms that compete with A gain.  The gain to these other firms from A's price increase is larger when (i) they capture more of the transferred sales; (ii) their margin is higher, and (iii) they are able to increase price by a greater percentage.  Equation (4) explains why the merged firm or the hypothetical monopolist

---

[19] Of course, this is also the motivation for collusive behavior.

[20] To keep things simple I have ignored the "interaction" effect of the change in price and the change in quantity $\Delta P\Delta Q$ which will lead me to somewhat understate the gain in profits if both P and Q rise for the firm.

would typically have an incentive to raise price above the current level, unless entry or other forces would prevent it from doing so. The merged firm gets to capture this profit increase that would otherwise go to an independent seller, so the gains from raising price are greater.

36. We can apply this type of analysis to the planned closure of Wild Oats stores by Whole Foods. Whole Foods would be willing to close some stores even if they were profitable before the merger and would have continued to be so after the merger, which means they would have been kept open had they had continued to be owned by an independent profit-maximizing firm. Whole Foods would close such a store as long as the profits transferred to Whole Foods as a result of the closure, given by equation (4), exceed the profits that would be earned by keeping the store open. The extra gain to the post-acquisition Whole Foods from closing a Wild Oats store is the same source of gain that Whole Foods would get from increasing prices at Wild Oats. Both transfer profits to Whole Foods and that transfer of profits would not be considered by an independent decision maker at Wild Oats, but would be considered by the combined Whole Foods – Wild Oats.

37. The key difference in analyzing a closure is that the average (rather than the marginal) diversion ratio is directly relevant. The Project Goldmine spreadsheet provides Whole Foods' estimate of exactly this quantity. The ██percent diversion ratio shown in the Project Goldmine spreadsheet is then quite informative. Together with any increase in price, the ██percent diversion ratio represents the transfer to Whole Foods generated by closing one of its competitors—just as it would represent the gain from increased sales and prices at Whole Foods caused by an increase in Wild Oats prices. The existence of the gain expressed in equation (4) gives

_Whole Foods an added incentive to raise price and gives it an added incentive to close the Wild Oats store._

38. In the case of a price increase, it is clear where the transfer to Whole Foods comes from—it comes from consumers who now pay higher prices to Whole Foods. In the case of a firm buying and closing down a competitor that would otherwise continue to operate, it comes from the loss of an alternative place to shop, which is economically equivalent to raising the former competitor's price by so much that no one shops there.[21] Just as ████ diversion ratios generate an incentive for merging firms to raise prices post-merger, they also generate an incentive to reduce consumer options—even if the closed stores may be profitable and would remain open if owned independently.

39. Of course, the duration of any loss would be limited by the time it would take for entry or other forces to replace it, just as the duration of any price increase would be limited by the time it takes for entry/repositioning to erode the price increase. In this regard, it is noteworthy that Project Goldmine estimates that volume gains for Whole Foods from closing Wild Oats stores will last for ████████ years. This is highly informative of Whole Foods' view of the inability of other sellers to quickly erode the effects of the proposed merger, through either new entry or repositioning. In contrast to the testimony of Dr. Scheffman, Whole Foods' own projections assume that other sellers will not quickly erode these effects.

40. Given the ████ diversion ratios identified in Project Goldmine, the anti-competitive incentive to close the Wild Oats stores is clear—closing Wild

---

[21] In his analysis, Dr. Scheffman points out that Whole Foods and Wild Oats are different. That is precisely the point here – that difference is what generates the loss to consumers from decreased variety.

Oats' stores would transfer ███████ revenues to Whole Foods.   This harms consumers in the form of higher prices and reduced choice.[22]

## V.    Dr. Scheffman's Analysis of Whole Foods Prices

41. Dr. Scheffman's calculations of price differences across stores do not meet even minimum standards of analysis, and the conclusions he draws from these calculations are unsupported by both economics and the evidentiary record.

42. Dr. Scheffman's price calculations are based on item-specific register prices at Whole Foods stores on a *single day* in June of 2007—while this dispute was ongoing.  He finds that register prices on this particular day do not vary much across stores within a given region—the vast majority of UPC's (universal product codes) have identical prices at all stores.  He takes this finding as evidence that "WFM prices by regions ... the prices are determined at the ███████████████████████ and prices across stores are the same."[23]

43.  These conclusions are inconsistent with the evidentiary record and testimony in this case.  For example, Will Paradise, President of the Rocky Mountain Region for Whole Foods, testified that Whole Foods ███████



███████████ In this description he specifically referred to these price reductions as resulting from "grocery competition or produce competition" and he named specific competitors.

---

[22] See my Expert Report in this matter (p. 38-40) for a description of how to quantify this value.

[23] Expert Report of David Scheffman at ¶289

44. An example of this pricing strategy is provided by the June 2005 entry of ███████ a competing PNOS, into the ████████████ market. Documents from Whole Foods report the following:

> "We have made the following decisions:  1) We would like to match ██████ on key items on your respective departments 2) Would like to get aggressive in our sales flyer with items that we can make a statement with 3) Would like to match ██████ sales flyer….We want to really punish ██ and make a statement about any competition that thinks about competing with us." [24]

> "We are going to match all their sale items this month; this will be our regular price so that it will not appear that we are just matching their sale items."[25]

> "Here are the additional changes to ██████ pricing that need to be made…[lists 22 items/families of items on which price will be reduced up to ████ "[26]

45. The preceding testimony, empirical evidence and first hand accounts make it clear that, contrary to the claims made by Dr. Scheffman (which were based on a single day in 2007, Whole Foods prices do vary across stores and do respond to competition.  Evidence from the record shows how Whole Foods changed prices in response to competition from Wild Oats as well.  For example, the FY 2005 Second Quarter report to the Whole Foods Board by A.C. Gallo (co-President of WFMI) states:

> "Margins are a little low [in Louisville, KY] because we having to match some ridiculously low special pricing at Wild Oats.  Sales at Oats are way down, and they are responding with some desperation pricing."

---

[24] WFM-128-00034534

[25] WFM-128-00041877

[26] WFM-123-00016697

46. Other documents support the hypothesis that Whole Foods did price by store and did base that pricing on competition:

> "I have put together a list of primary competitors and secondary, By store.  The reason for this list is so that your team can focus on the key competitors and not waste time with every micro competitor out their (sic)…My expectation is that we focus on select items and price match.  Also, if these competitors go up on price we should do the same."[27]

47. Dr. Scheffman's conclusions about pricing are also inconsistent with econometric evidence on Whole Foods' margins, which vary across stores according to the presence or absence of local competition from Wild Oats.  In my Expert Report I showed that Whole Foods' price-cost margins in such perishable departments as seafood, produce and meat are about█ percent lower when a Wild Oats store is located nearby.   Assuming constant unit costs, this implies that Whole Foods' prices on perishables are about█percent lower in locales where Whole Foods and Wild Oats compete head-to-head.  These findings are consistent with what an economist would expect - price effects from competition are largest in the departments where Whole Foods and Wild Oats are most similar to each other, and most distinctive from other sellers.  These findings are also consistent with the testimony of Whole Foods executives, cited above, who stated that Whole Foods charged lower prices when faced with local competition.

48. Even taken at face value, however, Dr. Scheffman's "finding" that Whole Foods' prices are uniform across locales—they are ostensibly set to meet margin targets—does not support his conclusions about market definition.  According to Dr. Scheffman, the relevant market is "at least" as large as all supermarkets.  This means that Whole Foods' prices are constrained by

---

[27] WFM-108-00007185

competition with conventional supermarkets, to which Whole Foods' customers would substitute were Whole Foods' to raise price or not reduce price when the competition reduced their price. Yet Dr. Scheffman argues that Whole Foods' prices are insensitive to the state of local competition among supermarkets, whether or not Wild Oats is in the mix. The only logical conclusion is that Whole Foods' prices are not much constrained by competition from conventional supermarkets or any other competitive force that varies by location.

49. Even if the claim that Whole Foods prices uniformly across stores within a region were factually accurate, the existence of uniform pricing does not negate or dilute the anticompetitive effects of eliminating Wild Oats as a competitor. First, it does not alter the reduction in consumer welfare from closing Wild Oats stores, which I discussed above. This loss to consumers occurs whether or not Whole Foods raises prices after the merger. This loss to consumers is however <u>equivalent</u> to their loss from raising Wild Oats' prices, as I noted earlier.

50. Second, it ignores the fact that even a seller that prices uniformly across areas will set prices that reflect the degree of competition in each of the local markets in which it sells. When a seller prices purely "to market" in each locale, the prices it sets will reflect the degree of competition and the ability of consumers to substitute in each locale. Then areas with more competition will have lower prices, and so on. But if a seller sets uniform prices, those prices will reflect the average amount of competition (formally, the sales-weighted average of demand elasticities) across locales. Then a reduction in competition in <u>some</u> local markets will cause the uniform pricing seller to raise prices "uniformly"—that is, in all the local markets where it sells. Contrary to Dr. Scheffman's view, the anticompetitive effects of reducing local competition do not disappear,

they are merely spread over consumers in all locations. Spreading these effects widely does not make them any less real.[28]

51. In summary, Whole Foods prices do vary with competition. Evidence from margin data provided by Whole Foods confirms that Whole Foods does cut price in response to local competition. Competitive pressures from Earth Fare and Wild Oats provide two informative historical examples.

July 13, 2007

Kevin M. Murphy

---

[28] The larger effect of competition on margins than on prices is consistent with some tendency to price uniformly. If Whole Foods keeps individual item prices constant across areas but competition varies then Whole Foods will lose sales to competitors on the higher margin products where their prices are "too high." That will lower margins in the areas where they face competition even if by assumption prices are the same item by item.

# Materials Considered

**LEGAL**

Expert Report of David T. Scheffman, Ph. D, July 9, 2007

Expert Report of Kevin M. Murphy, Ph. D, July 9, 2007

**PRESS, WEBSITES, AND OTHER**

Harris, Barry C. and Joseph J. Simons, "Focusing Market Definition: How Much Substitution is Necessary?" Research in Law and Economics, v. 12, 1989

Langenfeld, James and Wenquing Li, "Critical Loss Analysis in Evaluating Mergers," The Antitrust Bulletin, Summer 2001

Danger, Kenneth L. and H.E. Frech III, "Critical Thinking about 'Critical Loss' in Antitrust," The Antitrust Bulletin, Summer 2001

O'Brien, Daniel P. and Abraham L. Wickelgren, "A Critical Analysis of Critical Loss Analysis", 71 Antitrust L.J. (2003)

Katz and Shapiro, "Further Thoughts on Critical Loss," Antitrust Source, March 2004

Scheffman, David T. and Joseph J. Simons, "The State of Critical Loss Analysis: Let's Make Sure We Understand the Whole Story", Antitrust Source, Nov. 2003.

Transcript of remarks of Dr. Scheffman at the FTC conference on "Grocery Store Antitrust: Historical Retrospective and Current Developments", May 24, 2007

**BATES**

WFM-128-00034534

WFM-128-00041877

WFM-123-00016697

WFM-108-00007185

# Exhibit 1

## Critical Diversion Ratios for the Profitability of a Price Increase

| | Linear Demand | | | Constant Elasticity Demand | | |
| | Price Increase (%) | | | Price Increase (%) | | |
| Margin | 1% | 5% | 10% | 1% | 5% | 10% |
|---|---|---|---|---|---|---|
| 10% | 9.1% | 33.3% | 50.0% | 3.80% | 10.50% | 11.40% |
| 15% | 6.3% | 25.0% | 40.0% | 2.50% | 8.40% | 10.70% |
| 20% | 4.8% | 20.0% | 33.3% | 1.80% | 6.70% | 9.40% |
| 25% | 3.8% | 16.7% | 28.6% | 1.40% | 5.40% | 8.10% |
| 30% | 3.2% | 14.3% | 25.0% | 1.10% | 4.40% | 6.90% |
| 35% | 2.8% | 12.5% | 22.2% | 0.90% | 3.70% | 5.90% |
| 40% | 2.4% | 11.1% | 20.0% | 0.70% | 3.00% | 5.00% |
| 45% | 2.2% | 10.0% | 18.2% | 0.60% | 2.50% | 4.30% |
| 50% | 2.0% | 9.1% | 16.7% | 0.50% | 2.10% | 3.60% |
| 55% | 1.8% | 8.3% | 15.4% | 0.40% | 1.80% | 3.00% |
| 60% | 1.6% | 7.7% | 14.3% | 0.30% | 1.40% | 2.50% |
| 65% | 1.5% | 7.1% | 13.3% | 0.30% | 1.20% | 2.10% |
| 70% | 1.4% | 6.7% | 12.5% | 0.20% | 0.90% | 1.70% |
| 75% | 1.3% | 6.3% | 11.8% | 0.20% | 0.70% | 1.30% |
| 80% | 1.2% | 5.9% | 11.1% | 0.10% | 0.60% | 1.00% |
| 85% | 1.2% | 5.6% | 10.5% | 0.10% | 0.40% | 0.70% |
| 90% | 1.1% | 5.3% | 10.0% | 0.10% | 0.30% | 0.50% |

Source: Daniel P. O'Brien & Abraham L. Wickelgren, A Critical Analysis of Critical LossAnalysis, 71 Antitrust L.J. 161 (2003).
Note: Critical diversion rations are from Tables 1 and 2 in O'Brien and Wickelgren

# Exhibit 3–Public Version of the Supplemental Rebuttal Expert Report of Kevin M. Murphy, Ph.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| 600 Pennsylvania Avenue, N.W. | ) | |
| Washington, D.C.  20580 | ) | |
| | ) | Civ. No. 1:07-CV-01021 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WHOLE FOODS MARKET, INC. | ) | |
| 550 Bowie Street | ) | |
| Austin, Texas  78703 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILD OATS MARKETS, INC. | ) | |
| 1821 30th Street | ) | |
| Boulder, Colorado  80301 | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**SUPPLEMENTAL REBUTTAL EXPERT REPORT OF KEVIN M. MURPHY, Ph.D.**

Dated: July 16, 2007

 - FTC v. Whole Foods
Subject to Protective Order

1. In his Expert Report, Dr. Scheffman presented price calculations based on item-specific register prices at Whole Foods stores on a *single day* in June of 2007. He finds that register prices on this particular day do not vary much across stores within a given region—the vast majority of UPC's (universal product codes) have identical prices at all stores. He takes this finding as evidence that "WFM prices by regions ... the prices are determined at the region level (not at the store level) and prices across stores are the same." He further concludes that prices do not vary with the existence of PNOS competition.[1]  I had begun, but because of data problems that I had to resolve, not completed testing of Dr. Scheffman's conclusion at the time my rebuttal report came due. I now have finished, and am amending my rebuttal report to reflect, that testing. Dr. Scheffman's conclusions are simply wrong. The dispersion of prices on a single day does not provide a reliable basis for characterizing the general pricing behavior of Whole Foods and does not meet even minimum standards of analysis.

2. Contrary to claims made by Dr. Scheffman, the evidentiary record in this matter—both qualitative evidence from documents and rigorous analysis of quantitative data—demonstrate that Whole Foods changes the prices it charges at particular stores in response to competitive pressures felt uniquely at that store, and that prices do vary systematically across stores within a region. In my Rebuttal Report I quoted Whole Foods documents surrounding the 2005 entry by ███████, a competing PNOS, into ███████ ███████ ███████, where Whole Foods operated stores.  Those documents showed that Whole Foods executives planned to match ███████s sales prices and to make strategic price cuts that would "really punish █" and make a statement about any competition █

---

[1] Expert Report of David Scheffman at ¶288.

that thinks about competing with us."[2] The documents recommended specific price cuts of up to ██ on particular items.[3]

3. This was not idle talk or bluster—the price cuts associated with this PNOS competition are reflected in data provided to the FTC by Whole Foods. In 2005 Whole Foods operated five stores in ███████████, located in ████████████████████████████████████ Exhibit 1 shows how Whole Foods responded to ████████'s entry by selectively cutting local prices.   The lines in the Exhibit show the average percentage difference in weekly prices between the three Whole Foods stores located near the new████████ stores (in ████████████████████████) and the Whole Foods  stores that did not face local PNOS competition from ████████ (in ████████████████), from January of 2004 through March of 2007.[4]  In other words, <u>I show the percentage amount by which Whole Foods cut prices in geographic markets where it faced PNOS competition.</u>

4. There are three lines in Exhibit 1, each representing the behavior of prices at one of the three Whole Foods stores that faced competitive entry by ████████—████████████ (the blue line), ████████ (the orange line) and ████████ (the black line).  Vertical lines are drawn at the dates when ████████ ████ opened new stores that competed against Whole Foods —June 15, 2005 in ████████████ and August 31, 2005 in ████████.  Notice that there are virtually no price differences among stores in ████████████ prior to ████████'s entry in June.  But in mid-June, precisely when ████████ opened in ████████, prices in Whole Foods' ████████████ store fall

---

[2] WFM-123-00016697

[3] WFM-123-00016472 (and attachment WFM-123-00016474).

[4] These price data cover a period of over 3 years, in contrast to Dr. Scheffman's analysis that used data from a single day in June of 2007.

sharply. By the beginning of July prices in ███████████were more than ██ percent below the prices in the benchmark stores. Importantly, prices in ██████████████████—where ████████ had not yet opened—did not fall at that time.

5. But prices in ████████████████ did fall 11 weeks later, precisely when ███████████opened in ██████████████. Whole Foods cut prices in the ██████████████████ stores by about ██percent, on average, and for some months thereafter the price reductions in the three "competing" Whole Foods stores moved in near lock-step. Notice that the size of price cuts dissipated over time, perhaps reflecting the weakening of ██████████ as a competitive threat[5]—it exited the ███████ market in January of 2007.[6] Even so, PNOS consumers in ████████enjoyed the benefits of substantial price reductions for roughly a year after the advent of PNOS competition in that market.

6. These episodes, including the eventual closure of ███████████████████ store, are illustrative of the types of PNOS local-market price wars that Whole Foods hopes to avoid by acquiring Wild Oats.[7] As John Mackey

---

[5] Indeed, contemporaneous pricing discussions reflect that Whole Foods began to raise prices in ███████████as it became convinced that it had managed to drive the ███████ store out of the market (WFM-123-00021188, WFM-013-00011261, WFM-109-00032941, WFM-130-00002286, WFM-128-00042539, WFM-128-00005995, WFM-051-00000248 ("We are taking them down brick by brick.")

[6] In the Investigational Hearing of John Mackey, Mr. Mackey was asked: "What about an ████████?" He answered: "██████████ doesn't want to compete with Whole Foods. We are kicking their butt." (p. 195) And ██████████'s response to the FTC's CID specifically cites "Competition with Whole Foods" as the reason why it closed its ████████████ store within 16 months of opening that store.

[7] Mr. Mackey considered applying the same strategy with ████████as with Wild Oats. In comments to his senior executives in May of 2006, Mr. Mackey said of ██████████ "Maybe we should approach them about acquiring them? This would permit us to close down all of their competing stores plus gain us the ██████████ store?" (WFM-109-00009099).

noted in his Investigational Hearing, closing a rival's store through acquisition "self evidently" reduces competition:

> "That to me is a relevant question here, not whether or not in the short run us acquiring Wild Oats is going to lessen competition. Because it self evidently will lessen competition in those markets that we are competing with Wild Oats in when we are going to intend to close stores. That is one of the reasons we are willing to pay $18.50 for a company that has lost $60 million in the last six years. If we can't eliminate those stores, then Wild Oats, frankly, isn't worth buying." (p. 75)

**Clarification of Relevant Geographic Markets**

7. I understand that the Court has asked the Federal Trade Commission to expand its explanation of the relevant geographic markets affected by this proposed acquisition. At the request of the Federal Trade Commission, I have considered the question of relevant geographic markets within which to evaluate the competitive effects of this proposed acquisition. My work and conclusions are summarized in the maps that follow.

8. The Federal Trade Commission had prepared a series of maps that show the location of each PNOS market participant (including each Wild Oats and Whole Foods store) in the metropolitan areas at issue. Based primarily on Whole Foods' planning documents (WFM-002-00002450), I then drew circles of radius six miles (approximating a 16-minute drive time) around each store to get an understanding of the draw / trade area of each store. As a matter of logic, there would be competitive interaction in those areas where there is meaningful overlap between the circles around the stores of different participants in the relevant market. The union of these circles approximates the geographic area that will be competitively impacted by this proposed acquisition, and thus represents

4

the relevant geographic market within which the competitive impact of this proposed acquisition can be evaluated.

9. Note that in some areas stores toward the periphery of the metropolitan area may or may not participate in the same relevant geographic market as stores located in the interior of the area. Thus, these maps only represent an approximation of the area of competitive impact of this proposed transaction. Any questions regarding which of these stores on the periphery ultimately get included do not affect my conclusions regarding the existence of anticompetitive effects in each of these markets since the merger will affect competition in these markets for any reasonable choice of the relevant market boundary. The only difference is that if the market is widened, more stores (and thus commerce) would be put at risk of anticompetitive effects.

July 16, 2007

Kevin M. Murphy

# Exhibit 4–Public Version of the
# Expert Report of Kent Van Liere, Ph.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION            )
600 Pennsylvania Avenue, N.W.        )
Washington, D.C. 20580              )
                                    )        Civil Action No. 1:07-CV-01021
                    Plaintiff,      )
                                    )
        v.                          )
                                    )
                                    )
WHOLE FOODS MARKET, INC.            )
550 Bowie Street                    )
Austin, Texas 78703                 )
                                    )
and                                 )
                                    )
WILD OATS MARKETS, INC.             )
1821 30th Street                    )
Boulder, Colorado 80301             )
                                    )
                    Defendants.     )


# EXPERT REPORT OF KENT VAN LIERE, Ph.D.

1.  I am Kent D. Van Liere.  I am a Vice President at the Denver office of NERA Economic

    Consulting ("NERA").  I have expertise in statistics, sampling and survey methodology and I

    have provided expert testimony in these areas in a wide range of cases.  My business address

    is 370 Interlocken Boulevard, 4th Floor, Broomfield, Colorado 80021.  NERA is a firm

    providing expert economic, financial and statistical analysis.

**Assignment**

2.  I and NERA have been retained by the Federal Trade Commission principally to review and

    evaluate the survey conducted by the polling company$^{TM}$ , inc. and the expert opinions

    offered by Ms. Conway in support of Defendants Whole Foods Market, Inc. (Whole Foods)

    and Wild Oats Markets, Inc. (Wild Oats) in the proposed acquisition of Wild Oats by Whole

    Foods. I have also been asked to review the report submitted by Dr. Scheffman, to the extent

    that his report incorporates the results from the polling company$^{TM}$ , inc. survey.

**Summary of Opinions**

3.  My overall opinion in this matter is that Ms. Conway's survey methodology and procedures

    are fundamentally flawed and render her data and results unreliable.  In addition, it is my

    opinion that her survey does not provide a reliable basis to assess the issues associated with

    consumer perceptions of the substitutability of products and services across food retailers.[1]  I

    explain the bases of these opinions in the sections below.

---

[1] My use of various terms to describe food retailers is not meant to suggest that I am rendering expert opinion on
   which retailers do or do not belong inside the relevant antitrust market at issue in this case.

**Qualifications**

4.  I have an M.A. and a Ph.D. in Sociology from Washington State University.  I specialized in social psychology and research methods and statistics, including survey research.  From 1978 to 1985, I served as an Assistant, then Associate Professor with tenure, at the University of Tennessee where I taught classes in attitudes and opinions, survey research, research methods and statistics.  I also regularly published academic research in leading journals based on data collected using surveys.  From 1985 to 1995, I was a Principal and/or President of HBRS, Inc.  HBRS was a survey research company that conducted surveys of consumers and businesses throughout the United States for a wide range of government, academic and business clients.  HBRS was sold to Hagler Bailly, Inc. (a management consulting firm) in 1995, and I served as a Director and Senior Vice President of Hagler Bailly, Inc. from 1995 to 2000.  During this period, I continued to direct the market analysis, market research, and survey research practice of Hagler Bailly, Inc.  From 2000 to 2002, I served as President and CEO of Primen, a joint venture of the Electric Power Research Institute (EPRI) and the Gas Research Institute (GRI).  This firm provided contract- and subscription-based information services including services based on ongoing surveys of consumers and businesses.  From 2003 to 2005, I was a Principal of Freeman Sullivan/Liability Management Systems where I provided litigation support research and consulting on the application of surveys, sampling and statistics in a variety of legal cases.  In Spring 2006, I joined NERA where I continue to provide strategic consulting and litigation-related research and consulting.

5.  I have substantial experience using qualitative research and surveys to measure consumer opinions regarding products and services including purchase processes, branding and

positioning, market segmentations and communications strategies.  I personally facilitated several hundred focus groups with consumers and businesses and I have directed several hundred engagements involving the design and implementation of surveys for clients.  My survey experience includes all modes of survey research including mail, telephone, in-person, internet and mixed modes.

6.    I have conducted qualitative and survey research on a wide range of consumer products that are sold through grocery stores and I have reviewed various forms of sales data by product for items sold through grocery stores.

7.    I have reviewed the application of sampling and survey research methods in litigation for a variety of matters including trademark infringement, misrepresentative/deceptive advertising, labor disputes, construction defects, and telecom class actions.  I have provided deposition testimony and testimony at trial on issues of sampling, survey research and statistical analysis.

8.    I have lectured on survey research issues and on the use of surveys and statistics in litigation. I have published papers in peer-reviewed journals and monographs on a range of topics involving surveys.  I am a member of the American Statistical Association and the American Association for Public Opinion Research ("AAPOR").  A copy of my current resume is attached as Appendix A to this report.

9.    NERA is being compensated for my services in this matter at my usual rate of $500 per hour.

10. I continue to review materials and documents related to this case and reserve the right to supplement this expert report based on any additional work that I may be asked to do.

**Documents Reviewed**

11. As part of my assignment, I have reviewed the complaint filed by the FTC in this case and the expert reports of Ms. Kellyanne Conway and Dr. David Scheffman, as well as the relevant associated appendices. I have also reviewed the associated survey questionnaire and survey data provided with Ms. Conway's report.  Additionally, I have reviewed a number of background documents provided by counsel including a number of market research studies by or relevant to Whole Foods and Wild Oats.  A complete list of the documents reviewed by me or by members of my staff at my direction for this report is shown in Appendix B.

**Background**

12. I understand that Whole Foods proposes to acquire Wild Oats and that this acquisition is being challenged by the FTC on grounds that it will harm consumers.

13. It is my understanding that Dr. Scheffman and Ms. Conway designed and conducted a survey to support Dr. Scheffman's analysis and report on the effects of this proposed merger.[2]  I have been asked to review the survey instrument, sampling procedures, survey implementation, and analysis of the survey data along with the conclusions drawn from the analysis by Ms. Conway.

14. My understanding is that Ms. Conway's firm, the polling company™, oversaw the implementation of a telephone survey that was conducted by a separate call center.  The

---

[2] Expert Report of David T. Scheffman, Ph.D., July 9, 2007, p. 19.

survey was implemented using Random Digit Dialing (RDD) to zip codes that were near Whole Foods and/or Wild Oats stores (presumably within 6 miles).[3]  The survey consisted of approximately 55 questions.[4]  Calls were made to 427,397 randomly generated telephone numbers and surveys were completed with 1,607 respondents.  The surveys were done in eight cities selected by Dr. Scheffman and LECG.[5]  In each city, calling was done until a quota of 100 "Frequent" shoppers and 100 "Cusp" shoppers was completed in each city.  Ms. Conway defined the number of visits to a store for the Frequent and Cusp categories prior to setting the quotas.

**Ms. Conway's Survey Data are Methodologically Flawed and Consequently Are Not Reliable**

15. Ms. Conway's study suffers from numerous methodological flaws any one of which raises serious questions about the reliability of her data and certainly, when taken in combination, indicate her data are unreliable.  Both the *Reference Guide on Survey Research*[6] and the other industry guidelines (such as those set by AAPOR) establish basic standards surveys should meet to be considered reliable.  These guidelines cover a range of issues.  In reviewing Ms. Conway's survey, I find that she fails to meet these basic standards in the following areas:

---

[3] Scheffman Report, p. 66.

[4] This assumes that the gender question was recorded by observation. Not all questions were asked of all respondents; respondents in cities with only one of the store brands (either Whole Foods or Wild Oats) were asked between 36 and 39 questions.

[5] Scheffman Report, p. 65.

[6] Diamond, S. (2000) "Reference Guide on Survey Research" in the *Reference Manual on Scientific Evidence Second Edition,* Federal Judicial Center at: http://www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/$file/sciman00.pdf.

5

a) The response rate to her survey is so low that her results cannot be considered reliable;

b) Her use of quota sampling renders her data unreliable for extrapolating the results of her survey to the population of Whole Foods/Wild Oats shoppers;

c) Careful review of her data and questionnaire indicate that the survey included unqualified respondents given the protocol established by Dr. Scheffman; and

d) A large portion of her questionnaire requires respondents to make mathematical calculations. There is substantial evidence in the survey research literature that appropriate methods be employed to ensure that respondents understand the questions. From her report there is nothing to suggest such methods were used. Moreover, her data suggest that many respondents did not understand or could not complete the questions accurately.

Each of these areas is discussed below.

16. <u>The Survey has an Unacceptably Low Response Rate and No Analysis of Nonresponse is Provided That Would Demonstrate That the Respondents are Representative of the Total Population of Whole Foods/Wild Oats Shoppers.</u> A key issue in evaluating the reliability of survey results is the response rate to the survey. If you draw a random sample of people to call and you talk to 100 percent of your sample, then the response rate is 100 percent and you can be confident that no sampling bias will affect your results because there is no group of people whose attitudes or opinions are unrepresented in your survey. It is almost unheard of to get a 100 percent response rate to a survey as there are always some sample members who

6

decline to respond or who are unable to respond for one reason or another.  So an issue that arises is whether those who do not respond are different from those who respond—this is called nonresponse or selection bias.  To the extent that responders are different from nonresponders, the results from the sample may be biased if they are extrapolated to the population.

17. For example, it is possible that the respondents to the Conway survey were those individuals who were easily contacted at home during the brief study period of June 22-28, 2007.[7]  If the nonrespondents to the study were those with higher education levels (e.g., more likely to work longer hours, less likely to answer the phone or more likely to screen calls, etc.) then the final results would over-represent the opinions of those with lower education levels.

18. The *Reference Guide on Survey Research* establishes guidelines with regard to response rates for surveys used in litigation.  Specifically, "if the response rate drops below 50 %, the survey should be regarded with significant caution as a basis for precise quantitative statements about the population. . ."[8]  Additionally, this guide clearly states that determining the impact of nonresponse requires a calculation of the response rate and some analysis of the determinants of nonresponse.  Ms. Conway does not perform either of these analyses.  In her report she presents a calculation of the incidence rate[9] which is the number of completed surveys divided by those she contacted who were willing to take the survey and who were qualified to do so.  This is not, however, the same as a response rate. The incidence rate is not an acceptable substitute for a response rate here because it cannot be taken as a measure

---

[7] Given the very rapid data collection period for this study, this is not an unreasonable assertion.

[8] *Reference Guide,* p. 239.

[9] Results and Analysis of Whole Foods and Wild Oats Shopper Survey, Expert Report of Kellyanne E. Conway, Esq., p. 3.

of the rate of success in obtaining data from the desired sampled population.  A response rate

can be understood as the number of completed surveys divided by the number of dialed

phone numbers that would be eligible to complete the study.  The response rate takes into

account the number of people who are eligible for the study but who could not be contacted

during the study period, as well as those that refused to participate.  The response rate – not

the incidence rate – is the appropriate measure for judging whether some form of selection

bias may have affected the data.

19. There are several ways to calculate response rates and AAPOR provides various formulas.[10]

Depending on which AAPOR formula is used,[11] Ms. Conway's response rate varies from 6

percent to 0.5 percent (meaning one-half of one percent).  Ms. Conway has made no effort to

demonstrate how or why the very low response rate to her study results in data that can be

used to say anything meaningful about the population of shoppers in these markets. On the

basis of the drastically low response rate and lack of analysis of nonresponse, the survey

results must be viewed as unreliable for purposes of making extrapolations to the population

of Whole Foods and Wild Oats shoppers.

20. The Way in Which Ms. Conway Uses Quota Sampling Makes any Extrapolation of her
Results to the Population of Whole Foods/Wild Oats Shoppers Invalid.  Ms. Conway's study

used a sampling procedure in which she randomly called phone numbers until she had at

least 100 completed Frequent shopper interviews and 100 completed Cusp shopper

---

[10] AAPOR Response Rate Calculator, http://www.aapor.org/rrc.asp.

[11] The actual rate also depends on how the categories in Ms. Conway's Appendix B are interpreted.  Ms. Conway's reported disposition categories do not precisely correspond with the AAPOR standard calculator. We have allocated the categories in a variety of ways, from the most conservative to the most liberal and therefore present a range of possible rates.

interviews in each of her eight cities.  At the outset of her report, she acknowledges that this methodological approach means that the survey results cannot "represent the actual ratio of Frequent to Cusp shoppers in any particular geographical area."[12]  Yet in her report and in Dr. Scheffman's report, these survey results are regularly used to make statements about what the **total** population of Whole Foods/Wild Oats shoppers think or believe, in direct contradiction of her acknowledgment that such extrapolations are not correct in this case. For example, in her report she states:

> "Overall, just 17 % of shoppers said they visit the Whole Foods at least once a week" (p.8)

> "A significant majority (71%) of Whole Foods patrons allocate less than one of every five total dollars spent on groceries to Whole Foods,"  (p. 9)

> "Three-fourths (75%) of Wild Oats shoppers typically spend less than $50 during a single visit to the retailer," (p.12).

These types of statements cannot be accurately made given the nature of her sampling methods and it is inappropriate to represent that the data can be generalized in this way.

21. To be specific, the sampling approach Ms. Conway uses does not result in an accurate estimate of the proportion of Frequent and Cusp buyers in the population.  Instead, her method forces the results to be 50 percent Frequent buyers and 50 percent Cusp buyers in each city.  In the actual population of shoppers, the true proportions of these two groups are not likely to be 50/50, and in fact, it is quite possible that the true population of Frequent and

---

[12] Conway Report, p. 2.

Cusp shoppers varies across the different cities and varies significantly from a 50/50 split. To illustrate why this causes problems for her analysis, I provide the following example: Assume that in the real population of Whole Foods shoppers there are 10 percent Frequent shoppers and 90 percent Cusp shoppers, but also assume we used quota sampling and our respondents are 50 percent Frequent and 50 percent Cusp shoppers as Ms. Conway did.  Say that we want to calculate the overall average number of visits to the store per year in the population of shoppers. In my example, say that we find Frequent shoppers visit a Whole Foods store on average 24 times a year and Cusp shoppers visit a Whole Foods store an average of six times a year. If we follow Ms. Conway's method, we would calculate the overall average number of visits to a Whole Foods store as 15 (i.e., (24+6)/2=15). However, this is not correct. To find the correct average, we need to weight each group appropriately to reflect the group's true proportion in the population.[13]  The correct calculation would be:

Average = ( (Frequent Shopper Ave*Weight)  + (Cusp Shopper Ave*Weight) )/2

Or

Average = ( (24*.1)  + (6*.9) )/2

or 3.9 visits per year—a dramatically different estimation. Ms. Conway did not collect her data in a manner that would allow her to know what the correct ratio of Frequent to Cusp shoppers is.  As a result, her findings that are based on the combined responses of Frequent and Cusp shoppers cannot be correctly extrapolated to the population of all Whole Foods or

---

[13] This example is for illustrative purposes only. To weight appropriately, weights would be applied to each respondent in the survey.

all Wild Oats shoppers.  They are basically meaningless since there is no method to weight

her data appropriately.[14]

22. <u>Failure to Correct for Systematic Bias Associated with Unqualified Respondents Means the</u>
<u>Results Cannot be Correctly Extrapolated to the Population of Whole Foods and Wild Oats</u>
<u>Shoppers</u>.  In his report, Dr. Scheffman indicates that he purposefully selected sample cities

"in order to emphasize a variety of competitive situations within a variety of geographic

areas"[15] rather than choosing them randomly[16] from among the cities at issue in this

litigation.  In addition, he indicates that the specific areas used to sample shoppers for the

survey were to be within six miles of a Wild Oats or Whole Foods store. Ms. Conway and

Dr. Scheffman attempt to accomplish this by sampling from the listed zip codes within the

six mile store radius and presumably matched these zip codes to appropriate telephone

numbers.[17]  The list of zip codes used for the study is found in Appendix A to Ms. Conway's

report.

---

[14] This problem is exacerbated by the fact that Ms. Conway chose to use frequency of shopping as the basis for her quotas. Frequent shoppers are defined as those who shop at Whole Foods/Wild Oats once a month, a few times a month, once a week, and more than once a week.  This arbitrarily combines shoppers who shop at Whole Foods/Wild Oats as few as 12 times a year with those that shop more than 100 times a year.  No analysis was reported that indicates that shoppers with this range of shopping frequencies are appropriately combined into a single group and it is reasonable to expect that their opinions and behaviors may vary substantially.  By grouping them in a single group for purposes of establishing quotas, Ms. Conway cannot break them back out in the correct proportions in the population.  This means the data related to frequency of shopping cannot be used to make estimates for the population of things like the average number of trips per year, the average expenditures per year, or related calculations.

[15]  Scheffman Report, p. 65

[16] Random sampling of cities would have been one method to avoid systematic biases associated with Dr. Scheffman's selection rules as discussed below.

[17] Once the numbers were attained the two final digits of the number were replaced with random digits to allow for listed and unlisted numbers.

23. In analyzing Ms. Conway's data, we find that almost 20 percent[18] of respondents are not in the designated zip codes. This is an excessively high proportion of respondents that are not qualified for the study, using Dr. Scheffman's original criteria, but whose responses are included in Ms. Conway's data. [19] This finding demonstrates that the sample plan was not accurately implemented and that her results are unreliable due to the actual geographic location of the respondents. Ms. Conway's own questionnaire design allowed her to validate the actual zip code of the respondent and she could have screened the unqualified respondents out of the survey, yet she does not use this information to remove respondents who should not have been part of the study.

24. We further investigated this issue. In at least one of the cities, Los Angeles, the problem appears to be extensive. Los Angeles is one of the eight cities in the study, and it is one of only 4 cities in the study that include both Whole Foods and Wild Oats stores. The results from Los Angeles therefore represent a quarter of all of the results from cities where the two companies currently compete. In Los Angeles, there were 51 zip codes targeted by Ms. Conway for inclusion in her study. Of the 200 completed interviews from the Los Angeles area, only 31 respondents or 16 percent had zip codes from the sample list. In other words, 84 percent of the Los Angeles area respondents came from locations that were not meant to be included in Ms. Conway's study.

25. We also plotted the zip code locations for the Los Angeles respondents and the location of every Whole Foods or Wild Oats store in Southern California to determine what share of

---

[18] This is based only on the 1,504 respondents who provided zip code information.

[19] By chance, we might expect a small number of randomly dialed phone numbers to be in zip codes outside those targeted for calling, as U.S. postal zip codes do not have an exact correspondence with telephone area codes and prefixes.

these respondents were within a roughly six mile radius of either a Whole Foods or a Wild Oats.[20] In total, only 40 percent of the Los Angeles respondents were approximately within six miles of a Whole Foods or Wild Oats store. A total of 22 percent of respondents in this city were more than 20 miles from the nearest Whole Foods or Wild Oats store. A few respondents were up to 100 miles away from a Whole Foods/Wild Oats store. See Figure 1. The *Reference Guide on Survey Research* states that each respondent must be carefully screened to determine whether or not they are indeed eligible to participate.[21]

26. Dr. Scheffman defines the population of interest in this merger as those within a six mile radius of the store. The fact that almost one quarter of all Los Angeles respondents come from areas far beyond this parameter calls into question the reliability of these findings for this city and also suggests that the Los Angeles findings may not be comparable to findings in other cities in this study.  Thus, any results that combine Los Angeles and other cities in Ms. Conway's study include inappropriate respondents and therefore cannot be used to make conclusions about shoppers who live in close proximity to the Whole Foods and Wild Oats stores in the markets selected by Dr. Scheffman.

27. We have also reviewed the opening dates for the Whole Foods stores located in the cities chosen for her study.[22] We found that there is only one Whole Foods store in Portland, ME and, surprisingly, it had only opened on February 14, 2007. Portland is another city from the four that were selected to represent the areas with a Whole Foods and Wild Oats store. The

---

[20] We used the center point of each zip code for distance calculations.

[21] "In a carefully executed survey, each potential respondent is questioned or measured on the attributes that determine his or her eligibility to participate in the survey. Thus, the initial questions screen potential respondents to determine if they are within the target population of the survey (e.g., Is she at least 14 years old? Does she own a dog? Does she live within 10 miles?)". *Reference Guide*, p. 241.

[22] PX02052.

recent opening of the Whole Foods store in Portland means that respondents in this city had

less than five months to shop and establish purchasing patterns at this location. Not

surprisingly, as shown in Table 1, Portland respondents are far more likely to report they

have never shopped at Whole Foods. Specifically, 27 percent of Portland respondents have

never shopped at Whole Foods compared to 6 percent of respondents in other surveyed cities

which have Whole Foods stores.  Again, this indicates that it would be inappropriate to

combine the data from Ms. Conway's study across the cities and draw conclusions about the

population of all shoppers at Whole Foods or Wild Oats.

28. Finally, Ms. Conway's screening protocol for the study is designed to include as eligible

respondents people who have only shopped at Whole Foods and/or Wild Oats once or twice.

This is a questionable group to include since many of these individuals may be consumers

who have no intention of ever going back to one of these stores.  A consumer who has visited

Whole Foods or Wild Oats only once and never plans on visiting again should not be

considered a part of the population relevant to Ms. Conway's study since they are not

planning to shop these stores in the future.  This, of course, can be determined by screening

respondents to determine whether they intend to shop in these stores in the future, a step she

did not take, compounding further the unreliability of her survey results.

29. <u>Ms. Conway Fails to Establish that Respondents Comprehend and can Accurately Respond
to Her Questions Rendering Her Results Unreliable.</u>  There is no evidence that Ms. Conway

pretested her questionnaire. Standard survey practice dictates that some form of pretest

should be undertaken if the researcher is going to claim that respondents understood and

were able to answer the questions posed in a meaningful way.[23]  This is particularly true when the survey uses terms or questions that may be new to the respondent, or may have many different meanings to different respondents.  Ms. Conway's study uses a series of terms and concepts that are important to the analysis such as; "typically," "total grocery budget," and "supermarket," that may have many different meanings that affect how respondents understand the questions.  Without a pretest, there is no way to determine how these particular ideas are being understood and interpreted by survey respondents. Additionally, a pretest could provide insight as to the impact of the length of the survey on respondent concentration and the ability of respondents to handle the cognitive demands of the questions.

30. The lack of a pretest is particularly at issue in this study because Ms. Conway's survey requires that respondents make mathematical estimations that are quite complex.  For example, respondents are asked to estimate how much they spend on fresh produce in a month, then what percent of that produce they purchase at Whole Foods or Wild Oats, then what percentage of the produce they buy is organic, then how much they spend on organic food in a typical month, and finally what percent of that organic produce is bought at Whole Foods/Wild Oats.  To answer these questions, a respondent must first determine what a "typical month" is. Given that most consumers shop for groceries multiple times each month, the respondent must add up how many times a month she shops, how often within each of these shopping trips she buys produce, and, for each of the trips when she bought produce, how much she spent. Only then can the respondent calculate the "typical" total monthly expenditure for fresh produce.  After this, the respondent is asked to take the total amount of

---

[23] *Reference Guide,* p. 243.

money spent and calculate what share is spent on items in Whole Foods or Wild Oats. This is even more complicated as it asks respondents to estimate the relative items and prices for the produce purchased over a month. Questions such as these place an extremely large burden on respondents and are likely to generate answers that are simply guessed as opposed to actual estimations.[24]

31. In analyzing Ms. Conway's results, it is clear that the complexity of her questions has resulted in data that are inconsistent or nonsensical.  For example, as shown in Table 2A and Table 2B, anywhere from 15 percent to one quarter of all respondents are unable to accurately estimate the percent of a product category purchased at Whole Foods/Wild Oats when estimation is compared with an earlier response. For example, early in the survey, Ms. Conway asks respondents to determine how often a particular product type is purchased at Whole Foods/Wild Oats. The answer categories range from "Only at Whole Foods/Wild Oats" to "Do not purchase." Later in the survey, respondents are asked to calculate the percent of their typical monthly budget spent in the product category at Whole Foods/Wild Oats. Many of the answers to these two questions are inconsistent. Frequently, respondents underestimate the percent of their budget they spend on a particular product. For example, there are 35 respondents who say they only buy produce at Whole Foods but estimate the share of their produce budget as anything between zero and 80 percent. This table demonstrates that across a variety of questions, respondents were unable to consistently report their shopping habits.

---

[24] Converse, J. and Presser, S. (1990). *Survey Questions: Handcrafting the Standardized Questionnaire.* Sage University Publications: London, p. 14-17.

**Ms. Conway's Survey Results do not Provide Information on Issues Related to Product and Service Substitutability**

32. Both Dr. Scheffman's report and the complaint filed by the FTC indicate that the issue of whether consumers view various products and/or store venues as substitutes versus complements is an important issue in this case.  For example, Dr. Scheffman explains in his report that "*the* issue is the extent to which consumers consider WFM and WO to be sufficiently close substitutes" (italics in the original).[25] I have been asked by Counsel to review the extent to which Ms. Conway's survey results address consumers' views on the substitutability of products and services between Whole Foods, Wild Oats, and other grocers. In my opinion, Ms. Conway's survey does not provide information useful for assessing the substitutability of products and services across types of grocery channels either because her questions do not address the issues precisely (e.g., product categories versus specific products) or because she has chosen to ignore them (e.g., service-related attributes of Whole Foods and Wild Oats).

33. First, in describing shoppers at Whole Foods and Wild Oats, Ms. Conway concludes in her report that "Not only do they visit many different retail grocery outlets, but they also buy the **same** or similar products at each of them."[26]  Note that she specifically mentions purchasing the "same" products.  However, there is no basis for her to conclude whether shoppers are buying the same or even similar products within her eight selected product categories.

---

[25] Scheffman Report, p. 100.

[26] Conway Report, p. 36. Emphasis added.

34. Her results must be interpreted as referring <u>only</u> to food **categories** and <u>not</u> **specific products** within those categories.  The questions Ms. Conway uses to assess cross shopping do not address whether **specific products** found at Whole Foods and Wild Oats are also purchased at other stores.  What Ms. Conway's survey does include is a battery of questions that ask respondents to indicate the extent to which they buy various categories of foods (e.g., fresh fruits and vegetables, dairy products, etc.) primarily from Whole Foods/Wild Oats or primarily at other grocers.  These questions, however, are too generic to disentangle whether respondents are shopping for the same products at both types of stores or whether they go to Whole Foods/Wild Oats for one type of product in this category and to a traditional grocer for another type of product in this category.  For example, a shopper may do his weekend shopping at a Whole Foods because of the broad array of organic cheeses (not to mention other organic products) that they carry which he may not find at a traditional grocer like Safeway.  But during the week he might buy organic milk at a traditional store like Safeway because that store is more conveniently located.  Such respondents are buying from the same product category (dairy products) from Whole Foods and Safeway but would not consider these stores to be substitutes for all dairy products other than perhaps organic milk.  Ms. Conway's questions cannot sort out this type of situation, yet these types of examples are important to understanding issues of substitution.

35. I also note that Ms. Conway's own report concludes that, "For most, Whole Foods and Wild Oats are Regarded as Secondary and Supplemental."[27]  This conclusion suggests that many shoppers at Whole Foods/Wild Oats, in fact, go to these stores because *they cannot find certain products in other types of grocery stores*.  However, this conclusion is at odds with

---

[27] Conway Report, p. 5.

her earlier conclusion that the items purchased by shoppers at Whole Foods and Wild Oats are the "same" as those purchased in other stores. This contradiction highlights yet another problem with the survey, which is the ambiguity of her data, however unreliable.  Put differently, because the questions were poorly and imprecisely worded, it is unlikely that the responses that were generated from the questions regarding cross shopping reveal any useful information about shoppers' views on product or service substitutability.  As noted above, the resulting data could just as plausibly be interpreted to show that shoppers view other grocers as complements to Whole Foods and Wild Oats as opposed to substitutes.

36. Second, the way in which Ms. Conway constructed her cross shopping questions does not clarify whether Whole Foods shoppers are cross shopping at Wild Oats (and vice versa) in cities where both exist or whether they are cross shopping at other grocers.  For example, Question 9 of Ms. Conway's survey asks respondents who shop at Whole Foods to indicate for "Fresh produce like fruits and vegetables" whether they purchase these types of products:

     1. ONLY AT WHOLE FOODS

     2. MOSTLY AT WHOLE FOODS/RARELY AT **ANOTHER GROCER**

     3. HALF THE TIME AT WHOLE FOODS/HALF THE TIME AT **ANOTHER GROCER**

     4. MOSTLY AT **ANOTHER GROCER**/RARELY AT WHOLE FOODS

     5. ONLY AT **ANOTHER GROCER**[28]

     6. DO NOT PURCHASE

The use of the phrase "ANOTHER GROCER" in these response categories does not distinguish between Wild Oats and other grocers.[29]  Thus, respondents who are shopping at

---

[28] Emphasis added.

"another grocer" may be saying they are buying products from Wild Oats or from other grocers or from both. This distinction is important if the purpose of the question is to measure whether cross shopping for product categories is occurring between Whole Foods and Wild Oats stores or across other grocers. The question, as asked, cannot be used to separate these different forms of cross shopping.

37. Third, Ms. Conway's questions focus on product categories. I found no questions in Ms. Conway's study that attempted to measure other **service-related** or **experiential attributes** of shopping at Whole Foods/Wild Oats. None of her questions address consumers' view of the buying experience or the level of services offered (such as: how knowledgeable staff is, tasting opportunities, community information, the trustworthiness of the brand, the commitment to social and ecological causes[30]). Thus, her survey provides no information on these services-related factors. This is surprising because both Whole Foods and Wild Oats differentiate their positioning with consumers on service dimensions, not just product offerings.[31] Beyond information on specific products and the impact of price change, the omission of questions on an important aspect of the stores being studied significantly undermines the usefulness of Ms. Conway's study as a source of information about consumer substitutability between Whole Foods, Wild Oats, and other grocers.

38. I also find that Ms. Conway ignores several types of products or product categories that are important to Whole Foods and Wild Oats. For example, her survey does not include any questions on vitamins, beauty products and other holistic offerings yet, these are known to be

---

[29] This form of question is also asked for Wild Oats shoppers and the same issue applies there. The "Another Grocer" does not distinguish between buying at a Whole Foods or some other grocer.

[30] Complaint, p. 8-9.

[31] Complaint, p. 9.

important categories for Whole Foods and Wild Oats. For example, a Wild Oats market research report demonstrates that holistic health products constitute 19 percent of the product mix found in Wild Oats stores.[32]

39. Finally, I understand from Counsel and from Dr. Scheffman's report that it may be valuable to understand how consumers respond to changes in price and other attributes of their shopping choices. For example, Dr. Scheffman suggests that: "The case law and Guidelines framework for assessing product market definition is dynamic rather than static. Most importantly, it is founded on the real world behavior of consumers. In other words, rather than looking at a snapshot of consumers at any point in time, the framework for market definition focuses on how these consumers would behave and what choices they would make if there was a change in the relative prices among the choices available to them."[33]

40. In reviewing Ms. Conway's survey instrument and her report, I find no questions that specifically attempt to measure how shoppers would respond to price changes. Thus, her data do not directly address this issue. I note, however, this type of information is often gathered using surveys in situations where hypothetical future conditions need to be assessed. This type of question, while possibly complex, is no more difficult for respondents to answer than the very complex questions Ms. Conway attempts to use in her current survey.[34] There is no methodological reason why shoppers' responses to hypothetical price changes could not have been measured.

---

[32] Project Green Space, PX01332-001.

[33] Scheffman Report, p. 16.

[34] As discussed above many of her questions are so complex that it is unlikely respondents were able to provide reliable answers.

**Conclusions**

41.  Based on my review as discussed in this report, it is my opinion that Ms. Conway's survey methodology and procedures are fundamentally flawed and render her data and results unreliable for purposes of extrapolating to the population of shoppers at Whole Foods and Wild Oats.

42. In addition, it is my opinion that her survey does not provide information useful for assessing the substitutability of products and services across types of grocery channels either because her questions do not address the issues precisely (e.g., product categories versus specific products) or because she has chosen to ignore them (e.g., service-related attributes of Whole Foods and Wild Oats).

Finally, to the extent that Dr. Scheffman's conclusions rely upon Ms. Conway's unreliable data, then in my opinion his conclusions would necessarily also be unreliable.

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently thereto.

Dated: July 13, 2007

KENT D. VAN LIERE

# Figure 1: Zip Codes of Respondents NOT Included in Select Zip Codes as Listed in Ms. Conway's Appendix A for the Los Angeles Area



Confidential

**Table 1.  Comparision of the Frequency of Shopping at Whole Foods for Respondents from Portland, Maine to All Respondents in All Other Cities with a Whole Foods**

| Frequency of Shopping at Whole Foods | Portland, Maine | | All Other Markets | |
|---|---|---|---|---|
| More than Once a Week | 3.0% | 6 | 6.6% | 66 |
| Once a Week | 7.0% | 14 | 11.7% | 117 |
| A Few Times a Month | 12.0% | 24 | 14.2% | 143 |
| Once a Month | 15.0% | 30 | 14.4% | 145 |
| A Few Times a Year | 19.0% | 38 | 29.3% | 294 |
| Once a Year or Less | 6.0% | 12 | 7.9% | 79 |
| Have Shopped There Once or Twice | 11.0% | 22 | 10.2% | 102 |
| Never | **27.0%** | 54 | **5.8%** | 58 |
| **Total** | 100.0% | 200 | 100.0% | 1,004 |

Confidential

**Table 2A.  Comparison of the Frequency of Shopping for Product at Whole Foods
with the Estimated Percent of Shopping for Product at Whole Foods**

| Product Category | Percent Purchased in Typical Month is Underestimated | Percent Purchased in Typical Month is Overestimated | Total Number of Respondents Incorrectly Estimating | Total Number of Respondents[1] | Percent of Respondents Incorrectly Estimating |
|---|---|---|---|---|---|
| Produce | 23.2% | 2.5% | 267 | 1037 | 25.7% |
| Dairy | 16.4% | 4.7% | 220 | 1043 | 21.1% |
| Meat and Fish | 17.0% | 3.0% | 207 | 1037 | 20.0% |
| Prepared Foods | 17.0% | 6.7% | 244 | 1028 | 23.7% |

[1] This excludes respondents who answer for one or both questions "Don't Know or Refused"

Confidential

**Table 2B.  Comparision of the Frequency of Shopping for Product at Wild Oats
with the Estimated Percent of Shopping for Product at Wild Oats**

| Product Category | Percent Purchased in Typical Month is Underestimated | Percent Purchased in Typical Month is Overestimated | Total Number of Respondents Incorrectly Estimating | Total Number of Respondents[1] | Percent of Respondents Incorrectly Estimating |
|---|---|---|---|---|---|
| Produce | 21.5% | 2.4% | 177 | 739 | 24.0% |
| Dairy | 12.9% | 4.2% | 127 | 742 | 17.1% |
| Meat and Fish | 13.0% | 2.4% | 114 | 739 | 15.4% |
| Prepared Foods | 16.7% | 3.6% | 147 | 724 | 20.3% |

[1] This excludes respondents who answer for one or both questions "Don't Know or Refused"

Appendix A

**NERA**
Economic Consulting

**Kent D. Van Liere**
Vice President

National Economic Research Associates, Inc.
1 Front St., Suite 2600
San Francisco, California 94111
+1 415 291 1000 Fax +1 415 291 1020
Direct dial: +1 415 291 1010
kent.van.liere@nera.com
www.nera.com

# KENT D. VAN LIERE, Ph.D.
## VICE PRESIDENT

Dr. Van Liere is a Vice President at NERA with expertise in survey research, sampling, statistics, risk analysis and market research.  He has directed a wide range of projects involving the application of statistical methods and survey research to product liability, construction defect, intellectual property, mass tort, and securities litigation.  He has testified at trial and in deposition on the application of statistical methods, sampling, questionnaire design, and the use of surveys.

Dr. Van Liere's litigation and project experience includes sampling, survey research, design of field protocols, and statistical analysis of large data files (i.e., claims, customers, transactions) in a number of areas including:

Intellectual Property
- Trademark Infringement:  Design, analysis, and critique of surveys used to measure consumer confusion, secondary meaning, and dilution in trademark infringement cases.
- Copyright infringement:  Analysis of the rates of infringing material in populations of shared information (such as through websites or other sharing medium).
- Patent Infringement:  Sample designs and surveys to establish rates at which infringing material exist in populations of products or unique use of features in product user populations.

Mass Torts and Class Actions
- Product Liability and Construction Defects:  Analysis of statistical samples of products and product use to determine product performance issues, statistical evaluation of causes of product failures, and damages in product liability and construction defect class action litigation.  Analysis of sales records to forecast total sales.  Products have included a wide range of consumer and building products.
- Representations and Omissions:  Many class actions focus on misleading and deceptive information or omissions of information.  Design and analysis of sampling plans and surveys to measure consumers' awareness of key documents or facts, reliance on representations, materiality of information for decisions, satisfaction with products, purchase processes, and analysis of choice behaviors in range of consumer and business products areas.
- Asbestos and Toxic Torts:  Estimation of future claims and claim costs arising from asbestos exposures including modeling future liability for purposes of setting financial reserves, analysis of large claim files, insurance allocations, and insurance buybacks.

**MMC**  Marsh & McLennan Companies

- Labor: Analysis of employment records, methods for sampling records or employees, and use of surveys for purposes of estimating key facts in labor class actions including time to complete activities, exempt/nonexempt activities, and meal and rest break issues.

Energy/Environment/Water/Infrastructure
- Customer Demand—Design and analysis of customer surveys to measure preferences for a wide range of product and rate offerings including pricing or rate options, incentive programs, information programs, new service offerings.
- Value of Service/Outage Costs—Design and analysis of value of service and outage cost studies based on surveys using lost profits and willingness to pay methodologies
- Evaluation of programs and services including customer satisfaction and program impacts

Market Definition/Market Segmentation/New Products
- Analysis of consumer choice and business decision making for purposes of measuring and evaluating market potential, market segmentation, strategy formulation, new product offerings, positioning/branding, and customer retention/switching behavior in the areas of consumer household products, automobiles, lighting and building products, energy efficiency and solar products, telecommunications services, industrial products, and information and subscription services.

Prior to joining NERA, Dr Van Liere served as a Principal of Freeman Sullivan where he directed survey research and sampling projects for litigation, President of Primen (a firm that conducted market research for the energy industry), Senior Vice President of Hagler Bailly where he directed the survey research and market analysis practice; the President and Principal of HBRS (a highly regarded survey research firm), and Associate Professor at the University of Tennessee where he taught statistics, survey research, and research methods at both the graduate and undergraduate levels.

## Education

**Washington State University**
Ph.D.   Sociology, specialization in research methods and statistics (1979).

**Washington State University**
M.A.   Sociology, (1976).

**Hamline University**
B.A.   Sociology, with Honors (1974).

## Professional Experience

           **NERA Economic Consulting**
2006         Vice President

           **Freeman, Sullivan & Co., San Francisco**
2002-2005   Principal

|  | **Primen (a joint venture of the Electric Power Research Institute and the Gas Research Institute)** |
|---|---|
| 2000-2002 | President and Chief Executive Officer |
|  | **Hagler Bailly, Inc. (HBIX)** |
| 1995-2000 | Senior Vice President (1997-2000), Director (1995-1997) |
|  | **HBRS, Inc., Madison, WI** |
| 1985-1995 | President (1992-1995), Principal (1985-1992) |
|  | **University of Wisconsin-Madison** |
| 1985 | Visiting Associate Professor, Department of Rural Sociology (summer) |
|  | **University of Tennessee** |
| 1978-1985 | Associate Professor (with tenure), Department of Sociology (1984-1985), Assistant Professor, Department of Sociology (1978-1984) |
|  | **Tennessee Valley Authority** |
| 1983-1984 | Visiting Analyst, Strategic Planning Staff, Office of Planning and Budget |

## Expert Analysis and Testimony

Javier Olguin vs Fed Ex Ground Package Systems, Superior Court of California, County of Orange--Expert rebuttal declaration on sampling and survey design issues in a pre-certification labor class action (Expert Declaration: March 2007; Deposition: April, 2007)

Zill et. al vs Sprint Spectrum L.P. and Wireless Co. LP, Superior Court of California, County of Alameda--Expert declaration on sampling, survey design, survey implementation, and the use of contingent valuation survey to estimate damages in a wireless communications class action (Expert Declaration: December, 2006 and February, 2007; Deposition: April 2007; Expert Report: June 2007).

Adelphia Communications Corp vs Deloitte and Touche, LLP, Court of Common Pleas, Philadelphia, Pennsylvania--Expert rebuttal report on use of surveys to estimate business process inputs to calculation of capitalizable costs for accounting restatement.    (Expert Report: December, 2006; Deposition:  February 2007)

Wallace et. al. vs Monier Lifetile et al., Superior Court of California, County of Placer--Deposition testimony and expert report on statistical and survey research, sample design, data analysis regarding issues related to representations and consumer expectations for product longevity in a pre-certification class action (Expert Report and Declarations: October/November 2005; Deposition: November 2005).

Melvin Weiner, et al., vs Shake Company of California, Inc., et. al., Superior Court of California, County of Contra Costa--Testifying expert on statistical analysis, sample design, causation issues, and damages regarding the prevalence of roofing failure in homes made with Cal Shake Roofing products.  (For Liability Phase Trial:  Multiple declarations and depositions in 2005,

trial testimony June 2005. For Damage Phase Trial:  Expert declaration, September, 2006; Deposition: September 2006.)

<u>Align Technology, Inc. vs. Orthoclear, Inc. and Orthoclear Holdings, Inc., United States District Court, Northern District of California, San Francisco/Oakland Division</u>--Consulting rebuttal expert on survey design, sampling, survey implementation, and study design in trademark infringement and confusion analysis in a dental products area

<u>Simpson Strong-Tie Company, Inc. vs.  Pierce Gore, and The Gore Law Firm, Superior Court of California, County of Santa Clara</u>--Consulting expert on design and analysis of a survey to measure damage to brand image from advertising by other parties.

<u>Click Defense Inc. vs. Google, Inc., United States District Court, Northern District of California, San Jose Division</u>--Consulting expert on sampling strategies and survey designs to estimate confusion on contract terms regarding protection from internet fraud in point per click advertising in a pre-certification class action.

<u>Sheri Lotzer, et al. vs International Window Corporation, et al., Superior Court of California, County of Solano</u>--Consulting expert on statistical analysis for purpose of estimating sales from invoice data and design of sampling strategies for product field tests in post-certification class action

<u>Kishan Chand & Eric Farley vs. Target Corporation, Superior Court of California, County of Los Angeles</u>--Consulting expert on use of survey research procedures a pre-certification labor class action involving issues of exempt versus nonexempt activities of managers.

<u>Confidential client</u>--Analysis of asbestos claims, exposures by occupation, settlement costs, and future claims costs associated with a major boiler manufacturer.

<u>Confidential Client, United States Bankruptcy Court, District of Delaware</u>--Statistical surveying, analysis and consultation regarding the prevalence of failure in homes constructed with a specific building product.

<u>Sherry McIlhargie, et al. vs Moulded Fiberglass Companies et al., Superior Court of California, County of San Joaquin</u>--Consulting expert on statistical analysis, sampling design, and consultation on prevalence of construction building product defect in pre-certification class action.

<u>Barbara Bowen-Fromm vs Terra Shake Products, et al., Superior Court of California, County of Alameda</u>--Statistical analysis, sampling design, and consultation on prevalence of product defects in a class action lawsuit.

<u>Bayview Hunters Point, All Hallows, Shorview and LaSalle Apartments L.P. vs Colorworks Collegiate Painters; Simonton Building Products,  United States District Court, Northern District of California</u>--Statistical analysis and sampling design for estimation of the prevalence of construction defects in windows, doors, and siding.

<u>Kaiser Aluminum Chemical Corporation vs Certain Underwriters at Lloyd's London et. al., Superior Court of California, County of San Francisco</u>--Statistical analysis related to allocation of liability among excess insurers for asbestos claims.

<u>Laser Vision Eye Institute of California vs Nidek, Inc., Superior Court of California, County of Alameda</u>--Expert declaration on estimation of economic damages from business interruption due to equipment availability issues (Expert Declaration, March 2003).

<u>Nature Guard Cement Roofing Shingles Cases in Davis vs Louisiana-Pacific Corporation, Superior Court of California, County of Stanislaus</u>--Consulting expert on statistical analysis of evidence regarding prevalence of construction defects.

<u>People of the State of California, v. Apartment Investment and Management Company, et. al., Superior Court of California, County of San Francisco</u>--Consulting expert on statistical analysis and sampling designs related to the prevalence of hazards and other construction and maintenance issues leading to notice of violations in buildings. (Expert report, October, 2003)

<u>Naef, et. al. v. Masonite, Superior Court, County of Mobile, Alabama</u>--Consulting expert on statistical surveying and analysis of the prevalence of siding failure in homes made with Masonite siding. Identification of factors contributing to failure, projection of failure rates observed during the survey to the population of homes manufactured with subject siding, calculation of expected future costs of legal settlement under the various terms and conditions.

<u>Cinergy</u>--Review of labor force exposure and estimation of future claims and claims cost for asbestos-related premise liability in power plants. Estimates used in negotiating insurance settlements and buyback.

<u>Iberdrola</u>--Analysis of the biofuels markets and market opportunities for a large European company

<u>California Energy Commission</u>--Research methods and statistical analysis related to measurement of utility customer outage costs.

<u>California Public Utilities Commission</u>--Research methods and statistical analysis related to measurement of utility customer outage costs.

## Summary of Market Analysis, Survey Research and Policy Evaluation Experience

**Over the past 20 years have served as a Practice Leader, Principal Investigator, and President/CEO for companies in market analysis and customer research. Principal investigator for over 300 market assessment, customer segmentation, customer choice, consumer opinion and public policy evaluation engagements in energy, telecom, environment, infrastructure, transportation, and consumer products and services industries. Key areas have included:**

<u>Measurement of Consumer and Customer Attitudes, Opinions, and Choice Studies –</u>Directed more than 125 major projects measuring customer attitudes, customer intentions, and customer choices using broad range of survey techniques. Research projects used to assess new markets, track satisfaction and company image, segment customers, and in support of litigation related to brand awareness, confusion, trademark issues, and use of products. Surveys included data collection from industrial companies, commercial companies, agricultural firms, and consumers.

Areas included telecom, financial services, energy, environment, consumer products, industrial products, water, and business services.

Value of Service and Outage Cost Research – Led teams that designed and implemented new methods of measuring valuing service reliability by measuring outage costs for electricity and gas service using customer surveys. These surveys measured residential, commercial, industrial, and agricultural customers' outage costs and their preferences for different scenarios of service reliability. These projects included clients throughout the United States. The studies involved several thousand surveys with all customer segments including residential, commercial, industrial, and agricultural customers.

Energy, Environment, and Transportation – Led teams conducting evaluations of major energy efficiency, demand management, environmental and transportation programs including rate programs, rebate programs, information programs and load control programs for major utilities, government agencies, and research institutes. Projects included sampling designs, survey designs, survey implementation using all modes of surveys (in-person, telephone, mail, internet), and statistical analysis of surveys of customers, and cost benefit evaluations. Over 150 program evaluations over past 20 years.

Environmental Attitudes and Behaviors—Early research focused on environmental attitudes and environmental behaviors in a wide range of settings. Co-developer of one of the most widely used environmental attitude scales (New Environmental Paradigm (NEP) scale).

## Publications

Van Liere, Kent. D. "Use of Sample Surveys in Product Liability Litigation", *The International Legal Guide to: Product Liability 2007*, forthcoming.

Lawton, Leora, Michael Sullivan, Kent D. Van Liere, Aaron Katz, and Joseph Eto "*A Framework and Review of Customer Outage Costs: Integration and Analysis of Electric Utility Outage Cost Surveys*," Energy Storage Program, Office of Electric Transmission and Distribution, U.S. Department of Energy, LBNL-54365, 2004.

Dunlap, Riley E., Kent D. Van Liere, Angela G. Mertig, and Robert E. Jones. 2000. "Measuring Endorsement of the New Ecological Paradigm: A Revised NEP Scale." *Journal of Social Issues,* 56: 425-442.

Malloy, Ken, Jamie Wimberly, and Kent D. Van Liere. 1999. "The Customer Stewardship Program: Successfully Linking Consumer Education and Corporate Strategy," *The Electricity Journal*, August/September 1999.

The High Efficiency Laundry Metering and Marketing Analysis (THELMA) Project. EPRI, Palo Alto, CA: 1997. TR-109147-Volumes 1 to 9.

Market Tracking:  Assessing Sources and Access to Appliance Sales Data, EPRI, Palo Alto, CA: 1997.  TR-108928

Performance Measurement in Utilities: A Framework for Creating Effective Management Systems.  EPRI, Palo Alto, CA:  1996. TR-106860  3269-34.

Van Liere, Kent D., Rick Winch, Kathleen Standen, Shel Feldman, and Dale Brugger.  1994. "The Design and Structure of a Statewide Sales Tracking System for Residential Appliances. In *Energizing the Energy Policy Process,* edited by Roberta W. Walsh and John G. Heilman, Westport, Connecticut, Quorum Books, pp. 199-216.

Van Liere, Kent D. and William Lyons. 1986. "Measuring Perceived Program Quality." In *Performance Funding in Higher Education*, edited by Trudy W. Banta, Boulder, Colorado, National Center for Higher Education Management System, pp. 85-94.

Dunlap, Riley E. and Kent D. Van Liere. 1984. "The Dominant Social Paradigm and Concern for Environmental Quality: An Empirical Analysis." *Social Science Quarterly*, 65: 1013-1028.

Hand, Carl M. and Kent D. Van Liere. 1984. "Religion, Mastery Over Nature and Environmental Concerns." *Social Forces*, 63: 555-570.

Ladd, Anthony E., Thomas C. Hood, and Kent D. Van Liere. 1983. "Ideological Themes in the Antinuclear Movement: Consensus and Diversity." *Sociological Inquiry*, 53: 252-272.

Lounsbury, John W., Kent D. Van Liere, and Gregory J. Meissen. 1983. "PsychoSocial Assessment." In *Social Impact Assessment Methods*, edited by K. Kinsterbush, L. Llewellyn, and C.P. Wolff, Beverly Hills, California, Sage, pp. 215-240.

Van Liere, Kent D. and Riley E. Dunlap. 1983. "Cognitive Integration of Social and Environmental Beliefs." *Sociological Inquiry*, 53: 333-341.

Van Liere, Kent D. and Benson H. Bronfman. 1981. "Beliefs About Social Control and Participation in a Load Management Project." *Housing and Society*, 8: 124-135.

Van Liere, Kent D. and Riley E. Dunlap. 1981. "Environmental Concern: Does it Make a Difference How It's Measured?" *Environment and Behavior*, 13: 651-676.

Van Liere, Kent D. and Frank P. Noe. 1981. "Outdoor Recreation and Environmental Attitudes: Further Examination of the Dunlap-Hefferen Thesis." *Rural Sociology*, 46: 505-513.

Van Liere, Kent D. and Riley E. Dunlap. 1980. "The Social Bases of Environmental Concern: A Review of Hypotheses, Explanations, and Empirical Evidence." *Public Opinion Quarterly*, 44: 181-197.

Tremblay, Kenneth R., Jr., Don A. Dillman, and Kent D. Van Liere. 1980. "An Examination of the Relationship Between Housing Preferences and Community Size Preferences." *Rural Sociology*, 45: 509-519.

Dunlap, Riley E. and Kent D. Van Liere. 1978. "The New Environmental Paradigm: A Proposed Measuring Instrument and Preliminary Results." *Journal of Environmental Education*, 9: 10-19.

Van Liere, Kent D. and Riley E. Dunlap. 1978. "Moral Norms and Environmental Behavior: An Application of Schwartz's Norm-Activation Model to Yard Burning." *Journal of Applied Social Psychology*, 8: 174-188.

Dunlap, Riley E. and Kent D. Van Liere. 1977. "Further Evidence of Declining Public Concern with Environmental Problems: A Research Note." *Western Sociological Review*, 8: 110-112.

Dunlap, Riley E. and Kent D. Van Liere. 1977. "Land Ethic or Golden Rule." *Journal of Social Issues*, 33: 200-207.

Dunlap, Riley E. and Kent D. Van Liere. 1977. "Response to Heberlein." *Journal of Social Issues*, 33: 211-212.

Dunlap, Riley E. and Kent D. Van Liere. 1979. "Decline in Public Concern for Environmental Quality: A Reply." *Rural Sociology*, 44: 204-212.

## Professional Associations

Member, American Association of Public Opinion Research

Member, American Statistical Association

June 2007

Appendix B

**Documents Reviewed in connection with**
***Federal Trade Commission v. Whole Foods Market, Inc. and Wild Oats Markets, Inc.***

- Complaint for Temporary Restraining Order and Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act, dated 06/06/07
- Temporary Restraining Order, dated 06/07/07
- Plaintiff's Memorandum in Opposition to Defendant Whole Food Market, Inc.'s Motion for Entry of a Final Protective Order, dated 06/20/07
- Document Number: WFM-006-00005912 Nielsen document: Email from Chris Taylor to Walter Robb re: Price/Value FINAL questionnaire, dated 10/02/06
- Document Number: WFM-006-00005913 Nielsen document: Attachment: Whole Foods market Price/Value Study, dated 10/02/06
- Document Number: WFM-008-00006733 Nielsen document: Email from Tommy Navarre to wflt@wholefoods.com re: Update FT134: National Purchasing & Dist. dated 10/08/04
- Document Number: WFM-001-00000783 Hartman document: Email from Will Paradise to swln re: Customer research - Words that Sell, Tell, Fail
- Document Number: WFM-001-00000784 Hartman document: Attachment:  "Sell, Tell & Fail" A Hartman Group Study of Whole Foods Market Consumer vocabulary, dated  03/01/04
- Document Number: EOAT-0030638 Answer Line 1 document: Email from Kristin Lidstrom to store directors re: Answerline Complaint Report for October 24-29, dated 11/04/05
- Document Number: EOAT-0040912 Answer Line 1 document: Email from Michelle Albert to store directors re: Answerline Report March 5-10, 2007, dated  03/20/07, EOAT 0040912-0040913
- Document Number: EOAT-0041498 Answer Line 1 document: Email from Michelle Albert to store directors re: Answerline Report Feb. 26-Mar.3, 2007, dated  03/12/07, EOAT 0041498-0041499
- Document Number: EOAT-0046200 Answer Line 1 document:  Email from Michelle Albert to store directors re:Answerline Report March 5-10/2007 dated  03/20/07 EOAT 0046200-0046201
- Document Number: EOAT-0059564 Answer Line 1 document:  Email from Michelle Albert to store directors re: Answerline Report Dec. 18-23, 2006 dated  01/05/07 EOAT 0059564-0059565
- Document Number: EOAT-0068112 Answer Line 1 document:  Email from Michelle Albert to store directors re: Answerline Report October 16-21, 2006 dated 11/07/06 EOAT 0068112-0068113
- Document Number: EOAT-0071292 Answer Line 1 document:  Email from Michelle Albert to store directors re: Answerline Report Nov. 27-Dec. 2, 2006 dated 12/20/06 EOAT 0071292-0071293
- Document Number: EOAT-0071772 Answer Line 1 document:  Email from Michelle Albert to store directors re: Answerline Report November 20-25, 2006 dated  12/07/06 EOAT 0071772-0071773
- Document Number: EOAT-0242854 Answer Line 1 document: Email from Michelle Albert to store directors re: Answerline Report March 5-10/2007 dated 03/20/07 EOAT 0242854-0242855
- Document Number: EOAT-0243373 Answer Line 1 document: Email from Michelle Albert to store directors re: Answerline Report Feb. 26-Mar.3, 2007 dated  03/12/07 EOAT 0243373-0243374
- Document Number: EOAT-0258706 Answer Line 1 document: Email from Steve Kaczynski to sales & leadership team re: Answerline anticipated questions for 4/8 briefing dated  04/01/05 EOAT 0258706
- Document Number: EOAT-0258707 Answer Line 1 document:  Answerline Anticipated Consumer Questions for Merchandising   EOAT 0258707-0258708
- Document Number: EOAT-12841391 Answer Line 1 document:  Email from Sonja Tuitele to Laura Coblentz re: Standards Answerline Complaints to date, 08/11/05 EOAT 12841391
- Document Number: EOAT-0046920 Answer Line 2 document:  Email from Michelle Albert to store directors re: Answerline Report Feb. 26-Mar.3, 2007 dated  03/12/07 EOAT 004620-0046921
- Document Number: EOAT-0048936 Answer Line 2 document: Email from Jim Nielsen to San  Martin re: Answerline Report Feb. 19-24, 2007 dated  03/05/07 EOAT 0048936-0048938

- Document Number: EOAT-0048946 Answer Line 2 document: Email from Michelle Albert to store directors re: Answerline Report Feb.19-24, 2007 dated  03/02/07 EOAT 0048946-0048947
- Document Number: EOAT-0059308 Answer Line 2 document:  Email from Michelle Albert to store directors re: Answerline Report Dec. 26-30, 2006 dated  01/09/07 EOAT 0059308-0059309
- Document Number: EOAT-0072226 Answer Line 2 document:  Email from Michelle Albert to store directors re: Answerline Report Nov. 13-18, 2006 dated 11/30/06 EOAT 0072226-0072227
- Document Number: EOAT-0072537 Answer Line 2 document:  Email from Michelle Albert to store directors re: Answerline Report Oct. 30-Nov. 4, 2006 dated 11/21/06 EOAT 0072537-0072538
- Document Number: EOAT-0073819 Answer Line 2 document:  Email from Sam Martin to Jim Nielsen re: Answerline Report March 5-10, 2007 dated 03/20/07 EOAT 0073819-0073820
- Document Number: EOAT-0091411 Answer Line 2 document: Email from Scott Reed to Sam Martin re: Answerline Report Dec. 11-16, 2006 dated 01/03/07 EOAT 0091411-0091412
- Document Number: EOAT-0660254 Answer Line 2 document:  Email from Sam Martin to Jim Nielsen re: Answerline Report June 12-17, 2006 dated 07/03/06 EOAT 0660254-0660256
- Document Number: EOAT-12841387 Answer Line 2 document:  Email from Laura Coblentz to Sonja Tuitele re: Standards Answerline complaints to date, 08/11/05 EOAT 12841387-12841388
- Document Number: EOAT-12841389 Answer Line 2 document:  Email from Sonja Tuitele to Steve Kaczynski re: Standards Answerline complaints to date, 08/11/05 EOAT 12841389
- Document Number: EOAT-12841390 Answer Line 2 document:  Email from Steve Kaczynski to Sonja Tuitele re: Standards Answerline complaints to date, 08/11/05 EOAT 12841390
- Document Number: WFM-001-00001113 Hartman document: Email from Doug Wallace to Lauren Romero re: WB supplement research dated 01/21/05
- Document Number: WFM-004-00005982 Hartman document: Email from Chris Taylor to Walter Robb re: Hartman Study dated 10/30/06
- Document Number: WFM-004-00005983 Hartman document: Attachment: Hartman Group report: The Evolution of the Whole Foods Market Consumer Base
- Document Number: WFM-006-00002259 Hartman document: Email from Margaret Wittenberg to Chris Taylor re: Hartman letter-Please review by Wednesday dated 10/24/05
- Document Number: WFM-006-00002260 Hartman document: Attachment: letter to Laurie Demeritt - Hartman Group dated 10/28/05
- Document Number: WFM-008-00004225 Hartman document: Email from Margaret Wittenberg to eteam re: Hartman Update dated 10/12/03
- Document Number: WFM-008-00004226 Hartman document: Attachment: Current Proposed Research Activity Remaining FY03-FY04 involving the Hartman Group
- Document Number: WFM-008-00004227 Hartman document: Attachment: Whole Foods Consumer Insights-Knowledge Management and Proprietary Information
- Document Number: EOAT-0244557 Spins document: Consumer Drivers Study  EOAT 0244557-0244584
- Document Number: EOAT-0247931 Spins document: SPINS reports through 10/7/06 dated 11/17/06 EOAT 0247931-0247935
- Document Number: EOAT-0260412 Spins document: SPINS report Top 50 Items by Department through 2/21/04    EOAT 0260412-0260490
- Document Number: EOAT-0268913 Spins document: Email from Steve Kaczynski to Babette Brown SPINS reports 061204 dated 07/29/04 EOAT 0268913-0268914
- Document Number: EOAT-0275050 Spins document: Email from Steve Kaczynski to Sales and Leadership team re: SPINS Summary through 12/3/05 dated 01/19/06 EOAT 0275050-0275052
- Document Number: EOAT-0275062 Spins document: Email from Steve Kaczynski to Kandee DeGraw re: SPINS Summary through 12/3/05 dated 01/17/06 EOAT 0275062-0275064

- Document Number: EOAT-01632259 Spins document: Email from Tom Rice re: SPINS 2007 price list dated 12/14/06 EOAT 01632259
- Document Number: EOAT-01632260 Spins document: SPINS report - Category Listing, Tiers and Pricing 2007    EOAT 01632260-01632268
- Document Number: EOAT-01632512 Spins document: Email from Laura Coblentz to Charlie Kingery re: Wild Oats follow up      dated  09/06/06 EOAT 01632512
- Document Number: EOAT-01637192 Spins document: Email from David Brossmer re: SPINS Reports - Period 13 ending 12/30/06 dated  02/12/06 EOAT 01637192-01637196
- Document Number: EOAT-01682113 Spins document: Spreadsheet: Category and Brand Development Index 2004  EOAT 01682113-01682124
- Protective Order dated 7/9/07
- Declaration of Kellyanne E. Conway (with Appendix A-D and Exhibits) dated 7/9/07
- Expert Report of David T. Scheffman, Ph.D. (with Appendix A-G, Figures and Tables) dated 7/9/07
- Conway/"What Women Really Want" Methodology Chapter - Appendix A - Polling Methodology and Results
- Expert Report of John L. Stanton, Ph.D. (with Appendix A and B) dated 7/9/07
- Expert Report of Kevin M. Murphy, Ph.D. (with Appendix A-C and Exhibits) dated 7/9/07
- Memorandum in Support of Plaintiff's Motions for Temporary Restraining Order and Preliminary Injunction dated 6/6/07
- WF Opening Dates.xls
- Document Number: PX01332  Wild Oats Markets presentation - Project Green Space     PX01332-001-025
- Diamond, Shari Seidman, "Reference Guide on Survey Research," http://www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/$file/sciman00.pdf
- Converse, Jean M. and Stanley Presser, "Survey Questions – Handcrafting the Standardized Questionnaire," a Sage University Paper from the Series: Quantitative Applications in the Social Sciences.